# EXHIBIT 1

**HCRE PARTNERS, LLC**
(A Delaware Limited Liability Company)

THIRD AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

Dated as of January 1, 2017

THE MEMBERSHIP INTERESTS ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND MAY NOT BE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

IN ADDITION, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE TRANSFER OF MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH TRANSFER IS MADE IN COMPLIANCE WITH THE SECURITIES ACT AND ALL SUCH APPLICABLE LAWS.

187496

## HCRE PARTNERS, LLC

### THIRD AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT

THIS THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of HCRE PARTNERS, LLC, a Delaware limited liability company (the "Company"), is entered into as of January 1, 2017 (the "Effective Date"), by The Dugaboy Investment Trust ("Dugaboy"), Highland Capital Management Real Estate Holdings I, LLC ("HCMREH I"), Highland Capital Management Real Estate Holdings II, LLC ("HCMREH II"), and each of the other persons listed from time to time on Schedule A as members of the Company (together with Dugaboy, the HCMREH I, and HCMREH II, the "Members").

### RECITALS

WHEREAS, the Members entered into the Second Amended and Restated Limited Liability Company Agreement of HCRE Partners, LLC, dated as of March 1, 2016, as amended (the "Prior Agreement"); and

WHEREAS, the Members deem it desirable to amend and restate the Prior Agreement in its entirety and enter into this Agreement in order to set forth certain agreements among themselves relating to the capitalization and governance of the Company and granting certain rights and imposing certain restrictions on themselves as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

### ARTICLE I
### Organization

1.1    Formation; Continuance. The Company was formed by filing a Certificate of Formation (the "Certificate") pursuant to and in accordance with the applicable provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "Act"). The Company's existence began upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware on November 22, 2013 and shall continue for the period of duration set forth in the Certificate or until the earlier dissolution, liquidation and termination of the Company in accordance with Article IX.

1.2    Name. The name of the Company is HCRE PARTNERS, LLC. The Manager may change the name of the Company from time to time. In such event, the Manager shall (i) give prompt written notice thereof to the Members and (ii) promptly file or cause to be filed with the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting such change of name.

1.3     Purpose. The purpose of the Company is to (i) acquire, invest, hold, maintain, finance, improve, manage, develop, operate, lease, sell, exchange or otherwise deal in financial and real estate- related investment property; and (ii) engage or participate in such other activities related or incidental thereto as the Manager may from time to time deem necessary, appropriate or desirable.

1.4     Registered Office and Agent; Principal Place of Business. The address of the Company's registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The Company's registered agent at such address is The Corporation Trust Company. The address of the Company's initial principal place of business is 300 Crescent Court, Suite 700, Dallas, TX 75201. The Manager may change such registered agent, registered office or principal place of business from time to time. In such event, the Manager shall (i) give prompt written notice of any such change to each Member and (ii) in the case of any change to the registered agent or registered office, promptly file or cause to be filed in the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting any such change. The Company may from time to time have such other place or places of business within or outside the State of Delaware as may be determined by the Manager.

1.5     No State-Law Partnership. The Company shall not be a partnership or a joint venture, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any reason other than for U.S. federal income and state tax purposes, and no provision of this Agreement shall be construed otherwise.

ARTICLE II
Capital Contributions

2.1     Initial Capital Contributions. The prior Capital Contributions of the Members are set forth on Schedule A hereto, which shall be amended from time to time by the Manager so that it sets forth the then current list of Members, the total amount of Capital Contributions made or deemed to be made by each member, the date(s) as of which each such Capital Contribution were made (or deemed made), and the Percentage Interests held by each Member.

2.2     Additional Capital Contributions.

(a)     The Members may contribute additional capital to the Company if, as and when called by the Manager from time to time in order to carry out the business of the Company as set forth in Section 1.3; provided, however, that no Member shall be required to make any such additional capital contribution without the prior written consent of such Member. On each occasion the Manager desires that the Members to make additional capital contributions to the Company, the Manager shall give each Member a written notice (a "Funding Notice") that shall include (i) the aggregate amount of additional capital contributions required and the respective Member's pro rata share thereof (based upon the ratio that such Member's Capital Percentage Interest bears to the Percentage Interests of all Members), (ii) the date by which such additional capital contributions are required to be funded, (iii) a statement to the effect that such additional capital contributions are optional and may or may not be made in the discretion of such Member, and (iv) the address where additional capital contributions shall be sent. Each Member shall have ten (10)

2

business days after the date of the Funding Notice to provide the Manager with written notice of its election ("Election Notice") as to whether or not he desires to make such additional capital contribution. Notwithstanding the foregoing, the Manager shall not call for the Members to make additional capital contributions for payment of indebtedness owed by the Company to Highland Capital Management, LP in the amounts set forth on Schedule C (the "HCMLP Debt").

(b) If any Member fails to timely provide the Manager with its Election Notice, then such Member shall be deemed to have declined to make such additional capital contribution. If less than all Members elect to make their respective additional capital contributions, then the contributing Member(s) may, in addition to their respective share of such additional capital contributions, make additional capital contributions on a pro rata basis based upon the respective Percentage Interests then applicable to such contributing Members in an aggregate amount equal to the sum of all additional capital contributions not made by the non-contributing Members. In the case of any non-pro rata contributions by the Members, the amounts so contributed shall be treated as loans to the Company to be evidenced by one or more nonnegotiable demand promissory notes bearing interest at a rate per annum determined by the Manager (not to exceed 5% per annum, compounded annually), and requiring prepayment of principal and interest prior to any distributions being made to the Members.

(c) The capital contributions commitments of the Members (if any, whether now or hereafter made) are solely for the benefit of the Members, as among themselves, and may not be enforced by any creditor, receiver or trustee of the Company or by any other person.

(d) For purposes of this Agreement and with respect to each Member, the aggregate of the initial and additional contributions made by such Member as described in, or pursuant to, Sections 2.1 and 2.2 is referred herein to as such Member's "Invested Capital".

2.3  No Return of Capital Contributions. No Member shall be entitled to a withdrawal or return of its capital contributions. Instead, each Member shall look solely to distributions from the Company for such purpose.

2.4  No Interest. No Member shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Company's funds shall be included in the Company's property.

2.5  Member Loans. If the Company shall have insufficient cash to pay its obligations, then the Members may, in their joint discretion, advance such funds to the Company on such terms and conditions as are approved by all the Members. Each such advance shall constitute a loan from the Members to the Company and shall not constitute a capital contribution.

2.6  Capital Accounts.

(a) The Company shall maintain a separate capital account (a "Capital Account") for each Member in accordance with the following provisions:

(i) to each Member's Capital Account there shall be credited the amount of money and the initial Book Value of any other property contributed to the Company by such Member, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated hereunder and the amount of any liabilities of the Company assumed by such Member or that are secured by any property distributed to such Member;

(ii) to each Member's Capital Account there shall be debited the amount of money and the Book Value of any other property distributed to such Member by the Company, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated hereunder and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii) if all or a portion of an interest in the Company is transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company; and

(iv) in determining the amount of any liability for purposes of Sections 2.6(a)(i) and 2.6(a)(ii), Section 752(c) of the Code and any other applicable provision of the Code and Regulations shall be taken into account.

(b) This Section 2.6 as it relates to the maintenance of Capital Accounts is intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations; provided, however, that nothing contained herein shall be construed as creating a capital account deficit restoration obligation or otherwise personally obligating any Member to make capital contributions in excess of the capital contributions provided for in this Article II. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, then the Manager may make such modification; provided, however, that such modification is not likely to have a material effect on the amounts distributed to any person pursuant to Article IX upon the dissolution, liquidation and termination of the Company. In addition, the Manager shall (i) make any adjustment that is necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modification if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

## ARTICLE III
### Rights and Obligations of the Manager

3.1 <u>Initial Manager; Term; Vacancies; Resignation; Removal</u>. The manager of the Company (the "<u>Manager</u>") shall be James Dondero. The Manager shall hold office for so long as Dugaboy is a member of the Company. Any Manager may be removed, suspended or replaced at any time with or without cause solely with the written consent of Dugaboy.

3.2 <u>Management</u>. The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who, subject to <u>Section 3.4</u>, shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable.

3.3 <u>Powers</u>. Subject to <u>Section 3.4</u>, the Manager shall have the power generally conferred by law and/or as necessary to do all things and perform all acts necessary and appropriate for successful accomplishment of the purpose of the Company, including, without limitation, the following:

     (a) to negotiate, execute and deliver all documents determined appropriate or necessary to close acquisitions of real estate;

     (b) to acquire, own, hold, manage, maintain, operate, preserve or enhance the value of, seek and obtain zoning and other entitlements for, improve, develop, use, encumber, finance, market and ultimately lease, sell, contribute or otherwise dispose of real estate, or portions thereof, and engage in any and all activities as are related or incidental to the foregoing;

     (c) to obtain any and all financing for real estate, whether interim, permanent or otherwise, and to pledge the real estate, or a portion thereof, to a lender as collateral for such financing;

     (d) to establish reserves for contingencies and for any other proper purpose;

     (e) to employ such accountants, lawyers, managers, agents, and other management or service personnel as may, from time to time, be required or appropriate to carry on the business or purposes of the Company, including persons to manage real estate;

     (f) to negotiate and enter into agreements and contracts (including with any affiliate of the manager) in furtherance of the Company's business including, without limitation, all documents and agreements as may be required or appropriate in connection with the acquisition, ownership, management, leasing, maintenance, operation, improvement, development, construction, marketing, lease, sale or other disposition of real estate or interest therein, and any amendments, extensions or assignments thereof;

     (g) to purchase at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets and business, in such amounts and with such coverage as determined by the Manager;

     (h) to commence, defend and settle litigation or administrative proceedings on behalf of the Company;

     (i)     to open, maintain, and close accounts with banks and other financial institutions, and to pay customary fees in conjunction with the use and termination of their services;

     (j)     to negotiate and effect a merger or consolidation of the Company with any other entity;

     (k)     approve any transaction entered into by the Company and any Member, or affiliate of any Member;

     (l)     to develop an annual budget and to approve any deviations from such budget; and

     (m)     to do any and all acts and things necessary, incidental, appropriate or convenient, as determined by the Manager in sole and absolute discretion, to carry on the business of the Company.

3.4    <u>Limitations on Manager's Authority</u>. Notwithstanding the provisions of <u>Section 3.2</u> above or any other provision of this Agreement, the Manager shall not undertake, cause or allow the Company (or any entity in which the Company owns a direct or indirect interest) to do or agree to do any of the actions described in this <u>Section 3.4</u> without the express written approval of all the Members:

     (a)     enter into any business or engage in any activity other than pursuant to the purpose of the Company as described in <u>Section 1.3</u>;

     (b)     issue additional membership interests in the Company;

     (c)     sell the Company or sell all or substantially all assets of the Company;

     (d)     admit new Members to the Company;

     (e)     permit a transferee of an interest in the Company to become a substitute Member of the Company under <u>Section 7.3</u>;

     (f)     borrow funds or otherwise commit the credit of the Company;

     (g)     make a capital call for which the proceeds shall be used for the payment of the HCMLP Debt;

     (h)     amend, change or modify the HCMLP Debt; or

     (i)     take any action in contravention of the provisions of this Agreement or take any other action that requires the approval of all the Members under the terms of this Agreement or the Act.

3.5    <u>Liability of Manager</u>. No Manager (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

3.6    Other Activities.  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Manager to engage in or derive profit or compensation from any activities or investments, nor give any other Manager, any Member or any other person any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.7    Officers.  Matt McGraner shall be Vice President of the Company and Scott Ellington shall be Secretary of the Company, and each shall have such rights, powers and authority under this Agreement to effect the transactions and powers set forth in Sections 3.3(a)-3.3(l).

3.8    Reimbursement.  The Manager and any Officer shall be entitled to reimbursement for all reasonable expenses paid or incurred by it on behalf of the Company.  Notwithstanding the foregoing, no Manager or Officer shall be entitled to reimbursement in excess of $100,000 per year.

3.9    Replacement of Manager.  In the event that the Manager resigns for any reason, a replacement Manager may be appointed by the written consent of a majority in interest of the Members.

## ARTICLE IV
### Rights and Obligations of Members

4.1    No Authority.  No Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the Manager (subject to the Manager's right to delegate such powers to Matt McGraner pursuant to Section 3.7); provided, however, that nothing contained in this Section 4.1 shall prohibit any Member from acting as a Manager or officer of the Company or its affiliates.

4.2    Liability of Members.  No Member (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

4.3    Consents and Limited Voting Rights.  The Members (whether individually or in combination) shall not be entitled to consent to, vote on or approve any matter for which the action of such Members is not expressly required by the Act or this Agreement or requested by the Manager. In the case of any matter for which the action of the Members is expressly required by the Act or this Agreement or requested by the Manager, such action shall (unless a different percentage is required by the Act or stated in this Agreement) be effective and binding against the Company, each Member and the Manager if taken with the consent, vote or approval of all the Members.

## ARTICLE V
### Exculpation and Indemnification

5.1    Exculpation.  None of the Manager, the Members, their affiliates nor any of their respective officers, directors, stockholders, managers, members, partners, employees or agents (collectively, "Covered Persons") shall be liable, responsible or accountable in damages or

otherwise to the Company or any Member by reason of, arising from or relating to the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or its affiliates, except to the extent that any of the foregoing is determined by a final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct or bad faith of such Covered Person.

5.2     Limitation of Liability.  Notwithstanding any other provision of this Agreement to the contrary, to the extent that any Covered Person has, whether at law or in equity, any duties (fiduciary or otherwise) or any liabilities relating thereto to the Company or any Member (i) such Covered Person shall not be held liable to the Company or any Member for any action taken or failure to act by such Covered Person in reliance upon the provisions of this Agreement, and (ii) such Covered Person's duties (fiduciary or otherwise) and liabilities are intended and shall be construed to be modified and limited to those duties (fiduciary or otherwise) and liabilities expressly specified in this Agreement, and no implied covenants, duties, liabilities or obligations shall be construed to be a part of this Agreement or to otherwise exist against any such Covered Person.

5.3     Indemnification.

(a)     Indemnifiable Claims.  The Company shall indemnify, defend and hold harmless each Covered Person against any claim, loss, damage, liability or expense (including reasonable attorneys' fees, court costs and costs of investigation and appeal) suffered or incurred by such Covered Person by reason of, arising from or relating to, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or their respective affiliates, including, without limitation, as a result of such Covered Person's having executed a Guaranty, except to the extent any of the foregoing (i) is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct, gross negligence, or criminal activity of such Covered Person or (ii) arises out of claim brought by one Member against another Member.

(b)     Satisfaction; Capital Contributions.  The satisfaction of any indemnification obligation shall be from and limited to the assets of the Company. No Member shall have any obligation to make capital contributions to the Company to fund any indemnification obligations hereunder.

(c)     Advancement of Expenses.  Unless a determination has been made by final, nonappealable order of a court of competent jurisdiction that indemnification is not required, the Company shall, upon the request of any Covered Person, advance or promptly reimburse such Covered Person's reasonable costs of investigation, litigation or appeal, including reasonable attorneys' fees; provided, however, that the affected Covered Person shall, as a condition of such Covered Person's right to receive such advances or reimbursements, undertake in writing to repay promptly the Company for all such advancements and reimbursements if a court of competent jurisdiction determines that such Covered Person is not then entitled to indemnification under this Section 5.3.

(d)  Successors; Remedies. The indemnification provided by this Section 5.3 shall be in addition to any other rights to which any Covered Person may be entitled, in any capacity, under any agreement, vote of the Manager or Members, as a matter of law or otherwise and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person. This Section 5.3 shall survive any termination of this Agreement and is for the benefit of the Covered Persons and their respective heirs, successors, assigns and administrators, and shall not be deemed to create any rights for the benefit of any other person.

(e)  Amendment. Any repeal or amendment of this Section 5.3 shall be prospective only and shall not limit the rights of any Covered Person or the obligations of the Company in respect of any claim arising from or related to the services of such Covered Person prior to any such repeal or amendment of this Section 5.3.

5.4  Other Agreements. Notwithstanding anything contained herein to the contrary, the indemnification rights and exculpation contained in this Article V shall not affect, nor provide indemnification for, liabilities of any Member, or their respective affiliates, arising out of any other agreement to provide services to the Company entered into by such Member, or its affiliate, and the Company.

5.5  Guaranties. As used in this Agreement, a "Guaranty" means a partial or full guaranty of principal and/or interest in respect of any loan, a guaranty of completion or cost overruns or debt service, guaranty of "non-recourse carveouts", any other guaranty, indemnity or assurance of payment, or any reimbursement agreement in respect of a letter of credit or similar credit enhancement, in each case provided by a Member or its Affiliate on behalf of the Company or any of its subsidiaries. No Member or Affiliate shall be required to execute any Guaranty; provided, however, the HCMREH I and HCMREH II shall be required to indemnify Dugaboy with respect to the Meritage Asset. If a Member or Affiliate elects in its sole discretion to execute a Guaranty, such Member or Affiliate shall be a "Covered Person" and entitled to indemnification by the Company pursuant to Section 5.3 above with respect to any payments or liability incurred under such Guaranty.

ARTICLE VI
Distributions and Allocations

6.1  Distributions.

(a)  Timing. All Distributable Cash shall be distributed to the Members at such time and in such amounts as determined by the Manager; *provided, however*, that within thirty (30) days following June 30 and December 31 of each fiscal year, subject to applicable law, the Company shall distribute a portion of the Net Asset Value of the assets of the Company as determined as of the end of such semi-annual period to the Members in proportion to their respective Percentage Interests; *provided, further*, that in no event shall less than 5% of the Net Asset Value of the assets of the Company as determined as of December 31 of any fiscal year be distributed in such fiscal year. Notwithstanding the foregoing, each Member and Manager approves the distribution of proceeds from the sale or refinancing of the assets held by the Company's subsidiaries, Park Central Residential, LLC and Sevilla Residential Partners,

LLC. Such proceeds shall be reinvested in projects or funds sponsored by Highland Capital Management, LP, or any of its Affiliates. As used in this Agreement, the term "Distributable Cash" means all cash, revenues and funds received by the Company from Company operations (including, without limitation, from sales, refinancings and other capital events), less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest due and owing to senior lenders holding first mortgages against the Company's underlying real estate properties; (ii) all cash expenditures incurred in the operation of the Company's business; and (iii) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business and in accordance with Section 6.2, in each case determined with respect to the Specified Company Assets (as defined below) and the Meritage Asset (as defined below), as applicable. As used in this Agreement, the term "Net Asset Value" means the fair market value of the assets of the Company as mutually agreed in good faith by the Members, provided, that if the Members cannot agree, the fair market value of the Company's assets shall be determined in accordance with Section 7.5(a).

  (b)  <u>Distributable Cash</u>.

    (i)  With respect to the Specified Company Assets, Distributable Cash will be distributed to the Members in proportion to their respective Percentage Interests. As used in this Agreement, the term "Specified Company Assets" means all assets owned, directly or indirectly, by the Company, except for the Meritage Asset. As used in this Agreement, the term "Meritage Asset" means the multi-family residential real estate property known as "The Meritage Apartments" located at 4550 North Braeswood, Houston, Texas 77096, owned, directly or indirectly, by the Company.

    (ii)  With respect to the Meritage Asset, Distributable Cash will be distributed, on a *pari passu* basis: (A) 83.333% to HCMREH I and (B) 16.667% to HCMREH II.

  (c)  <u>Distributions in Kind</u>. If at any time the Manager determines, with the written consent of all the Members, to make a distribution of Company Assets in-kind, such Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(b) or Section 9.3, as the case may be, on a Company Asset-by-Company Asset basis.

 6.2  <u>Restrictions on Distributions</u>. Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to make any distribution if such distribution would violate the Act or any law then applicable to the Company.

 6.3  <u>Withholding Taxes</u>. Notwithstanding any other provision of this Agreement to the contrary, the Manager is authorized to take any action that they determine to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding or deduction requirement in respect of any allocation, payment or distribution by the Company to any Member or other person. Without limiting the provisions of this Section 6.3, if any such withholding requirement in respect of any Member exceeds the amount distributable to

such Member under the applicable provision of this Agreement, then such Member and any successor or assignee in respect of such Member's membership interest in the Company shall, upon the request of the Manager, contribute such excess amount or amount required to be withheld to the Company and shall indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be. No such contribution pursuant to the immediately preceding sentence shall be considered a contribution for purposes of determining a Member's Capital Percentage Interest. The Company may (but shall not be required to), where permitted by the rules of any taxing authority, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing authority, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid. Each Member shall provide such identifying numbers and other certificates as are requested by the Company to enable it to comply with any tax reporting or withholding requirement under the Code or any applicable state, local or foreign tax law. Notwithstanding the foregoing provisions of this Section 6.3, the Manager shall have no liability to the Company or any Member for failure to request or obtain such information from any Member, or to withhold in respect of any Member who has not furnished such information to the Manager.

6.4    Allocations of Profits and Losses.  Company profits and losses (and items of income, gain, loss, deduction and credit relating thereto) shall be allocated among the Members as described in Schedule C, attached hereto.

ARTICLE VII
Admissions, Transfers and Withdrawals

7.1    Admissions.  New Members may be admitted to the Company only with the unanimous written consent of, and upon such terms and conditions as are approved by, the Members in accordance with Section 3.3. Substituted Members shall not be deemed new Members for purposes of this Section 7.1.

7.2    Transfer of Membership Interests.

(a)    No Transfers Without Consent. No Member may transfer or encumber all or any portion of such Member's membership interest in the Company without the prior written consent of the Manager in accordance with Section 3.3; provided, however, that no consent shall be required in connection with any transfer to a Permitted Transferee.  For purposes hereof, "Permitted Transferee" shall mean any affiliate of a Member, or immediately family member of ultimate beneficial owner of a Member.

(b)    Death, Bankruptcy, etc. of Member.  In the event of the death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination of any Member:

(i)    the Company shall not be dissolved, liquidated or terminated, and the remaining Members shall continue the Company and its operations, business and affairs until the dissolution thereof as provided in Section 9.1;

(ii)     such affected Member shall thereupon cease to be a Member for all purposes of this Agreement and, except as provided in Section 7.3, no officer, partner, beneficiary, creditor, trustee, receiver, fiduciary or other legal representative and no estate or other successor in interest of such Member (whether by operation of law or otherwise) shall become or be deemed to become a Member for any purpose under this Agreement;

(iii)     the interest in the Company of such affected Member shall not be subject to withdrawal or redemption in whole or in part prior to the dissolution, liquidation and termination of the Company;

(iv)     the estate or other successor in interest of such affected Member shall be deemed a transferee of, and shall be subject to all of the obligations in respect of, the interest in the Company of such affected Member as of the date of death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination, except to the extent the Manager releases such estate or successor from such obligations; and

(v)     any legal representative or successor in interest having lawful ownership of the assigned interest in the Company of such affected Member shall have the right to receive notices, reports and distributions, if any, to the same extent as would have been available to such affected Member.

7.3     Substitution. A transferee of any interest in the Company may become a substituted Member, as to the interest in the Company transferred, in place of the transferor only with the written consent of the Manager and the Members in accordance with Section 3.4, provided, that no such consent shall be required in connection with any transfer to a Permitted Transferee, which such Permitted Transferee shall automatically become a substituted member. Unless a transferee of any interest in the Company of a Member becomes a substituted Member in accordance with this Agreement, such transferee shall not be entitled to any of the rights granted to a Member hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions or returns of capital to which its transferor would otherwise be entitled in respect of the interest in the Company so transferred.

7.4     Withdrawal. Except as permitted by this Section 7.4, no Member shall have any right to withdraw or resign from the Company, except that a Member may withdraw (a) after transfer of such Member's entire interest in the Company to one or more transferees, all of whom have been admitted as substituted Members in accordance with Section 7.3 or 7.5 or (b) with respect to HCMREH I and the HCMREH II, by delivery of written notice to the Company, in which chase the Interest of such withdrawing Member shall be redeemed in accordance with Section 7.5.

7.5     Member Separation.

(a)     At any time following the separation of Matt McGraner or Scott Ellington from Highland Capital Management, LP, or any of its affiliates, the Company and/or Dugaboy (the "Offeror"), shall purchase all of, in the case of separation of Matt McGraner,

HCMREH I's, or, in the case of the separation of Scott Ellington, the HCMREH II's, interest in the Company (the "Separated Member Interest," and such Member, the "Separated Member") at 90% of the fair market value of the Separated Member Interest (the "Fair Market Value") and pay such amount pursuant to Section 7.5(c) below. The Fair Market Value shall be determined by an Appraiser by valuing all the Company's underlying real estate investments (including investments for which the Company has a "promote" or "carried interest" in a partnership or investment) (the "Holdings") and applying Separated Member's ownership percentage to the aggregate value of the Holdings, less the applicable mortgages per asset. For purposes of this Section 7.5, the term "Appraiser" means any of CBRE Group, Inc., HFF LP, Jones Lang LaSalle Incorporated, or ARA Newmark as mutually agreed to in good faith and hired by the Company and the Separated Member within ten (10) days following the separation of the Separated Member. If the Company and the Separated Member are unable to mutually agree in good faith and hire an Appraiser within ten (10) days following the separation of the Separated Member, the appointed Appraiser shall be determined by a coin flip between an Appraiser nominated by each of the Company and the Separated Member. Any fees or expenses charged to the Company or the Separated Member by the Appraiser shall be borne solely by the Company.

(b)     The amount to be paid to the Separated Member for the Separated Member Interest (the "Purchase Price") will be equal to the amount that would be distributed to the Separated Member for the Separated Member Interest if all the Holdings were sold at that time for the Fair Market Value.

(c)     The Offeror shall pay cash and close on the purchase of the Separated Member's Interest based on the Purchase Price within forty-five (45) days after the Purchase Price is determined by the Appraiser. The Members agree to execute such documents, instruments and agreements as may be reasonably required to consummate such sale, provided no such documents, instruments or agreements shall create any personal liability for a Member.

(d)     The respective obligations of the Offeror and the Separated Member to purchase or sell, as the case may be, pursuant to this Section 7.5 shall be specifically enforceable.

## ARTICLE VIII
## Accounting and Tax Matters

8.1     Fiscal Year. The fiscal year of the Company ("fiscal year") shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required. The Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

8.2     Books of Account; Tax Returns. The Manager shall cause to be prepared and filed, all U.S. federal, state and local income and other tax returns required to be filed by the Company and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Company's operations,

business and affairs as are usually entered into records and books of account that are maintained by persons engaged in business of like character or are required by the Act. Except as otherwise expressly provided in this Agreement, such books and records shall be maintained in accordance with the basis utilized in preparing the Company's U.S. federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the Manager be prepared on either a cash basis or accrual basis.

     8.3    <u>Place Kept; Inspection</u>. The books and records of the Company shall be maintained at the principal place of business of the Company, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member or Separated Member during the ordinary business hours of the Company.

ARTICLE IX
Dissolution, Liquidation and Termination

     9.1    <u>Dissolution</u>. The Company shall be dissolved upon the first to occur of the following events ("<u>Dissolution Events</u>"): (i) the election of the Manager to dissolve the Company at any time in accordance with <u>Section 3.3</u>; or (ii) the occurrence of any "event requiring winding up" (as defined by the Act) of the Company.

     9.2    <u>Accounting</u>. After the dissolution of the Company pursuant to <u>Section 9.1</u>, the books of the Company shall be closed, and a proper accounting of the Company's assets, liabilities and operations shall be made by the liquidator of the Company, all as of the most recent practicable date. The Manager shall serve as liquidator of the Company. If the Manager fails or refuses to serve as the liquidator, then one or more other persons may be elected to serve as liquidator with the consent of a majority in interest of all Members. The liquidator shall have all rights and powers that the Act confers on any person serving in such capacity. The expenses incurred by the liquidator in connection with the dissolution, liquidation and termination of the Company shall be borne by the Company.

     9.3    <u>Liquidation</u>. As expeditiously as practicable, but in no event later than one year (except as may be necessary to avoid unreasonable loss of the Company's property or business), after the dissolution of the Company pursuant to <u>Section 9.1</u>, the liquidator shall wind up the operations, business and affairs of the Company and liquidate the assets and properties of the Company. The proceeds of such liquidation shall be applied in the following order of priority:

        (a)    first, in payment of the expenses of the liquidation;

        (b)    second, in payment of the liabilities and obligations of the Company to creditors of the Company (other than to Members who are also creditors);

        (c)    third, in payment of liabilities and obligations of the Members who are also creditors (other than payments in respect of Member loans); and

        (d)    thereafter, to the Members in accordance with <u>Section 6.1(b)</u>.

     9.4    <u>Termination</u>. At the time final distributions are made to the Members, a Certificate of Termination in respect of the Company, together with a certificate from the Comptroller of the

14

State of Delaware to the effect that all franchise taxes in respect of the Company have been paid (the "Tax Certificate"), shall be filed in the office of the Secretary of State of the State of Delaware in accordance with the Act. Except as may be otherwise provided by the Act, the legal existence of the Company shall terminate upon the filing of the Certificate of Termination and the Tax Certificate with the Secretary of State of the State of Delaware.

9.5     No Deficit Capital Account Restoration Obligation. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Member who has a deficit balance in its Capital Account (after giving effect to all capital contributions, distributions and allocations for all periods, including the fiscal year during which the liquidation of the Company occurs), have any obligation to make any contribution to the capital of the Company, and such deficit shall not be considered a debt owed to the Company or any other person for any purpose whatsoever, except in respect of any deficit balance resulting from a failure to contribute capital or a withdrawal of capital in contravention of this Agreement.

9.6     Deemed Contribution and Distribution. If the Company is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, but no Dissolution Event has occurred, then the Company's property shall not be liquidated, the Company's debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for U.S. federal income tax purposes, the Company shall be deemed to have contributed all property and liabilities to a new limited liability company in exchange for an interest in such new limited liability company and, immediately thereafter, the Company will be deemed to liquidate by distributing interests in the new limited liability company to the Members.

9.7     No Other Cause of Dissolution. The Company shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this Article IX.

ARTICLE X<br>Miscellaneous Provisions

10.1    Amendments and Waivers. This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and all the Members (a copy of which shall be promptly sent by the Manager to all the Members). For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in Section 1.3, (d) change any provision of this Agreement requiring the approval of all the Members or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the Company or sell all or substantially all assets of the Company, or (g) otherwise materially and disproportionally impair the rights of such Member under this Agreement.

10.2    Binding Effect. Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors and permitted assigns.

10.3 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.

10.4 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Members in respect of the subject matter hereof and supersedes all prior agreements and understandings, if any, between them in respect of such subject matter.

10.5 <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

10.6 <u>Venue</u>. To the maximum extent permitted by applicable law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby, including tort claims, may be brought only in the courts of the State of Delaware and hereby expressly submits to the personal jurisdiction and the venue of those courts for the purposes thereof and expressly waives any claim of improper venue and any claim that those courts are an inconvenient forum.

10.7 <u>Notices</u>. All notices, requests, demands, consents, votes, approvals, waivers and other communications required or permitted hereunder shall be effective only if in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by U.S. certified or registered mail, postage prepaid and return receipt requested, or (iv) by facsimile or e-mail, if to the Members, at the addresses, facsimile numbers or e-mail addresses set forth on <u>Schedule A</u>, and if to the Company, at the address of its principal place of business referred to in <u>Section 1.4</u>, or to such other address, facsimile number or e-mail address as the Company or any Member shall have last designated by notice to the Company and all other parties hereto in accordance with this <u>Section 10.7</u>. Notices sent by hand delivery shall be deemed to have been given when received or delivery is refused; notices mailed in accordance with this <u>Section 10.7</u> shall be deemed to have been given three (3) days after the date so mailed; notices sent by facsimile shall be deemed to have been given when electronically confirmed; notices sent by e-mail shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day after the date so sent. Notwithstanding the foregoing provisions of this <u>Section 10.7</u>, (i) routine communications including tax information, financial statements and reports in respect of the Company may be sent by electronic mail and (ii) distributions will be made by check or wire transfer pursuant to the instructions provided by a Member.

10.8 <u>Remedies Cumulative; No Waiver</u>. The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law. No delay or omission on the part of any party hereto, whether in one or more instances, in exercising any right, power or remedy under any applicable law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof. The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.

10.9 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid under the applicable law of any

16

jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby. In addition, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such law. Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

10.11  Waiver of Partition.  Each Member hereby irrevocably waives all rights that it may have to maintain an action for partition of any of the Company's property.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

THE DUGABOY INVESTMENT TRUST

By: _Nancy M. Dondero_
Name: _Nancy Dondero_
Title: _Trustee_

Highland Capital Management Real Estate Holdings I, LLC

By: _____
Name: _____
Title: _____

Highland Capital Management Real Estate Holdings II, LLC By:

Name: _____
Title: _____

Third
[Second Amended and Restated LLC Agreement – HCRE Partners, LLC]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

THE DUGABOY INVESTMENT TRUST

By: _____
Name: _____
Title: _____

Highland Capital Management Real Estate Holdings I, LLC

By: _____
Name: Matt McGraner
Title: _____

Highland Capital Management Real Estate Holdings II, LLC By: _____
Name: Scott Ellington
Title: _____

[Second Amended and Restated LLC Agreement – HCRE Partners, LLC]

## Schedule A

### Capital Contributions and Percentage Interests[1]

| Member | Capital Contributions | Date | Percentage Interests |
|---|---|---|---|
| The Dugaboy Investment Trust | | | 70% |
| Highland Capital Management Real Estate Holdings I, LLC | | | 25% |
| Highland Capital Management Real Estate Holdings II, LLC | | | 5% |

---

[1] NTD: Can we add the prior capital contributions (if any) and dates?

**Schedule B**

**HCMLP Debt**[2]

| Loan | Date | Principal Amount |
|------|------|-----------------|
| HCRE #1 Lexington earnest funds | 1/9/2014 | $100,000 |
| HCRE #2 Lexington investment | 1/29/2014 | $600,000 |
| HCRE #3 Sevilla equity | 3/10/2014 | $2,000,000 |
| HCRE #4 Lexington | 3/28/2014 | $50,000 |
| HCRE #5 Park Central equity | 5/7/2014 | $2,300,000 |
| HCRE #6 Honey Creek equity | 5/27/2014 | $5,000,000 |
| HCRE #7 Willow Pond Equity | 1/26/2015 | $1,500,000 |
| HCRE #8 Rentlytics equity | 4/2/2015 | $1,500,000 |
| | Sub-total | $ 13,050,000 |
| | | |
| Total outstanding indebtedness owed by the Company to Highland Capital Management, LP | | **$13,050,000** |

---

[2] NTD: Can we confirm the debt outstanding from HCRE Partners LLC to Highland Capital Management?

## Schedule C

### Allocations

A.I.    *Definitions.*  Capitalized terms used and not defined in this Schedule C have the meanings ascribed to them in the Agreement, of which this Schedule C forms a part. As used in this Schedule C, the following additional terms have the following meanings:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(b)    Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5) and 1.704-1 (b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Book Depreciation" for any asset means for any fiscal year or other relevant period an amount that bears the same ratio to the Gross Asset Value of that asset at the beginning of such fiscal year or other relevant period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other relevant period bears to the adjusted tax basis of that asset at the beginning of such year or other relevant period; *provided, however*, if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other relevant period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager; and *provided, further*, if the Company is utilizing the remedial allocation method under Regulations Section 1.704-3(d), Book Depreciation shall be determined under the rules described in Regulations Section 1.704-3(d)(2)

"Capital Account" means the capital account established and maintained for each Member pursuant to Section A.II of this Schedule C.

"Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Gross Asset Value" means, with respect to any property of the Company (other than money), such property's adjusted basis for United States federal income tax purposes, except that:

(a)    the initial Gross Asset Value of each non-cash asset contributed by a Member to the Company shall be the fair market value of such asset on the date of

contribution, as determined by the agreement of the contributor(s) and the Manager;

(b)    the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Manager considers appropriate, whenever such adjustment is permitted under Treasury Regulations Section 1.704-1(b)(2)(ii);

(c)    the Gross Asset Value of any Company non-cash asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)    the Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of Company assets shall not be adjusted pursuant to this clause (d) to the extent the Manager determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)    if the Gross Asset Value of any asset of the Company has been determined pursuant to either of clauses (a), (b) or (d) above, the Gross Asset Value of such asset shall thereafter be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Net Profit" and "Net Loss" mean, for each fiscal year or other period, the positive or negative difference, as applicable, between all items of Profit and all items of Loss for such period; except that items of Profit and Loss specially allocated to a Member pursuant to Section A.III.2 of this Schedule C shall be excluded from the computation of Net Profit and Net Loss.

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or losses for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c) In the event the Gross Asset Value of any Company property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or losses from the disposition of such property for purposes of computing Profits or Losses;

(d) In lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation;

(e) Gains or losses resulting from the disposition of Company property shall be computed by reference to the Gross Asset Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(f) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1 (b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's membership interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

A.II.    *Members' Capital Accounts.*

1.    There shall be established for each Member on the books and records of the Company a Capital Account. Each Member's initial Capital Account shall be zero and, without limiting the generality of the foregoing, shall be adjusted as follows:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions (net of any liabilities assumed by the Company or which are secured by any property contributed by such Member), such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections A.III.2 and A.III.3.

(b)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement (net of any liabilities assumed by the Member or which are secured by any property distributed to such Member by the Company), such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections A.III.2 and A.III.3.

2.    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts and allocations to Members (collectively, the "Allocation Provisions") are intended to comply with Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with such statutory and regulatory provisions.

3.    In the event all or a portion of an Interest in the Company is transferred in accordance with the terms of **Error! Reference source not found.**, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest, adjusted as required by the aforementioned Treasury Regulations.

A.III.    *Allocations.*

1.    *Allocations of Net Profit and Net Loss.* After giving effect to the special allocations set forth in Sections A.III.2 and A.III.3, below, Profits and Losses for any fiscal year or other period shall be allocated among the Members such that each Member's Capital Account balance (computed after taking into account all distributions with respect to such taxable period and increased by such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain) would, as nearly as possible, be equal to the amount that each Member would receive if all of the remaining assets of the Company were sold for cash equal to their Gross Asset Values, all liabilities of the Company were satisfied (limited, with respect to Nonrecourse Liabilities, to the Gross Asset Values of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 9.3(d) to the Members immediately after making such allocation, in each case on a Company Asset-by-Company Asset basis; *provided, however*, that the Losses allocated to a Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year or other period.

2.    *Special Allocations.* The following special allocations shall be made in the following order, in each case on a Company Asset-by-Company Asset basis:

(a)    *Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2, if there is a net decrease in Company Minimum Gain during any fiscal year or other period, each Member shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(f) of the Treasury Regulations. This Section A.III.2(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    *Member Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2(b), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year or other period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section A.III.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, Profits shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section A.III.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Schedule C have been tentatively made as if this Section A.III.2(c) were not in the Agreement. This Section A.III.2(c) is intended to comply with the qualified income offset requirement of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)    *Nonrecourse Deductions.* Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

(e)    *Member Nonrecourse Deductions.* Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of losses with respect to the Member Nonrecourse Debt

to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

3.      *Curative Allocations.*  The allocations set forth in clauses 2(a), 2(b), 2(c), 2(d) and 2(e) of Section A.III hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, losses or deduction pursuant to this Section A.III.3. Therefore, notwithstanding any other provision of this Schedule C (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, losses or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.III.1. In exercising its discretion under this Section A.III.3, the Manager shall take into account future Regulatory Allocations under clauses 2(a) and 2(b) of Section A.III that, although not yet made, are likely to offset other Regulatory Allocations previously made.

A.IV.   *Other Allocation Rules.*

1.      For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

2.      The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

3.      Tax Allocations: Code Section 704(c).

(a)     For U.S. federal income tax purposes, items of Company income, gain, loss, and deduction shall be allocated among the Members in conformity with the book allocations described in the preceding sections of this Schedule C except as otherwise provided in this Section A.IV.3.

(b)     Solely for federal income tax purposes, items of taxable income, gain, loss and deduction shall be allocated among the Members in accordance with Section 704(c) of the Code to the extent necessary to reduce or eliminate any disparity between the Gross Asset Value and adjusted tax basis, at the time of contribution or pursuant to subparagraph (b) of the definition of Gross Asset Value, of any asset of the Company contributed to the Company or that has been revalued on the books of the Company. Any elections or other decisions relating to such allocation shall be made by the Manager in any manner that reasonably reflects the purpose and intention of the Agreement.

(c)     In the event that the Company has taxable income that is characterized as ordinary income under the depreciation and amortization recapture provisions of Sections 1245 and 1250 of the Code, such income shall, to the maximum

extent permissible under the Code and Regulations, be allocated to the Members that were allocated the depreciation and amortization giving rise to such recapture amounts.

(d)     Allocations pursuant to this Section A.IV.3 are solely for purposes of United States federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

B.     _Tax Matters Member._

1.     By joining this Agreement, each Member appoints and designates the Manager as "tax matters" member of the Company, as provided in Treasury Regulations pursuant to Code Section 6231 and any similar provisions under any other state or local or non-U.S. laws, and agrees that upon the request of the Manager it will execute, certify, acknowledge, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. Each Member further agrees that any action taken by the Manager in connection with audits of the Company under the Code will, to the extent permitted by law, be binding upon the Members. Except as required by applicable law, each Member further agrees that such Member will not treat any Company item inconsistently on such Member's income tax return with the treatment of the item on the Company's tax return and that such Member will not independently act with respect to tax audits or tax litigation affecting the Company, unless previously authorized to do so in writing by the Manager, which authorization may be withheld in the discretion of the Manager. Should there be any controversy with the Internal Revenue Service or any other taxing authority involving the Company, the Manager may expend such reasonable funds as necessary and advisable in the interest of the Company to resolve such controversy satisfactorily, including, without limitations, attorneys' and accounting fees, and the Company will reimburse the Manager for any such fees and expenses reasonably incurred. Each Member agrees to consult with and keep each other Member and the Company advised on a timely basis with respect to any income tax audit of a Company income tax return (including providing any notice of any controversy with the Internal Revenue Service or any other taxing authority including the Company). For the avoidance of doubt, the foregoing shall also apply to any Subsidiary or Affiliate of the Company or any Member serving as "tax matters member" for any Subsidiary or Affiliate of the Company.

2.     For all tax years beginning after December 31, 2017, the partnership representative of the Company pursuant to Code Section 6223 shall be a Person designated from time to time by the Manager subject to replacement by the Manager. (Any Person who is designated as the partnership representative is referred to herein as the "Company Representative"). The Company Representative shall inform each Member of all significant matters that may come to its attention in its capacity as Company Representative by giving notice thereof on or before the 20th day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity. The Company Representative shall take no action without the authorization of the Manager, other than such action as may be required by law. Any reasonable, documented cost or expense incurred by the Company Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company. The Company Representative shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Manager. The Company Representative shall not bind any Member to a settlement agreement

without obtaining the consent of such Member. If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

C.    *Tax Elections*

1.    The Manager may cause the Company to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754 or Section 743(e) of the Code); provided, that, the Manager shall make an election under Section 754 of the Code if requested in writing by a Member, whether such Member is a transferor or transferee.