# EXHIBIT 14

1              Dondero - 5-28-2021

2       IN THE UNITED STATES BANKRUPTCY COURT

3         FOR THE NORTHERN DISTRICT OF TEXAS

4                  DALLAS DIVISION

5   In re:                        )
                                  )
6   HIGHLAND CAPITAL              )   Case No.
    MANAGEMENT, LP,               )  19-34054 L.P.
7                                 )   Chapter 11
            Debtor,               )
8   -----------------------------)
    HIGHLAND CAPITAL MANAGEMENT,  )
9   LP,                           )
                                  )
10          Plaintiff,            ) Adversary No.
                                  ) 21-03003-sgi
11      vs.                       )
                                  )
12  JAMES D. DONDERO,             )
                                  )
13          Defendant.            )

14

15            REMOTE DEPOSITION OF

16                JAMES DONDERO

17

18              Pages 103 - 282

19                Dallas, Texas

20        Friday, 28th day of May, 2021

21

22

23  Job No. 194690

24  Reported by:

25  Daniel J. Skur, Notary Public and CSR

1          Dondero - 5-28-2021

2

3

4

5

6

7

8          28th day of May, 2021

9          9:33 a.m. - 1:59 p.m.

10

11

12        Remote Deposition of JAMES DONDERO,

13   located in Dallas, Texas, before Daniel J.

14   Skur, Notary Public and Certified Shorthand

15   Reporter in and for the State of Texas

16   located in Waxahachie, Texas.

17

18

19

20

21

22

23

24

25

```
 1                    Dondero - 5-28-2021

 2    A P P E A R A N C E S:

 3         Pachulski Stang Ziehl & Jones
           Attorney(s) for Debtor
 4         780 Third Avenue

 5    New York, New York 10017

 6         BY:   John Morris, Esq.

 7               Gregory Demo, Esq.

 8
           Stinson
 9         Attorney(s) for The Witness
           3102 Oak Lawn Avenue
10
      Dallas, Texas 75219
11
           BY:   Deborah Deitsch-Perez
12
                 Michael Aigen, Esq.
13
                 Paul Lackey, Esq.
14

15
           Sidley Austin
16         Attorney(s) for The Committee
           2021 McKinney Avenue
17
      Dallas, Texas 75201
18
           BY:   Paige Montgomery, Esq.
19

20

21    ALSO PRESENT:

22               Davor Rukavina, NexPoint

23               La Asia Canty

24

25
```

1          Dondero - 5-28-2021

2

3          IT IS HEREBY STIPULATED AND AGREED

4     by and between the attorneys for the respective

5     parties herein, that filing and sealing be and

6     the same are hereby waived.

7          IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to the form  of

9     the question, shall be reserved to the

10    time of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be sworn to and

13    signed before any officer authorized to

14    administer an oath, with the same force and

15    effect as if signed and sworn to before the

16    Court.

17               - oOo -

18

19

20

21

22

23

24

25

1          Dondero - 5-28-2021

2              P R O C E E D I N G S

3          REMOTE ORAL DEPOSITION OF

4              JAMES DONDERO

5          (REPORTER NOTE:  This deposition is

6      being conducted remotely in accordance with

7      the Current Emergency Order regarding the

8      COVID-19 State of Disaster.

9          Today's date is the 28th day of

10     May, 2021.  The time is 9:33 a.m. Daylight

11     Savings Time.  The witness is located in

12     Dallas, Texas.)

13              JAMES DONDERO,

14  having been duly cautioned and sworn to tell

15  the truth, the whole truth and nothing but the

16          truth, testified as follows:

17              (9:33 A.M.)

18              EXAMINATION

19  BY MR. MORRIS:

20      Q.    Good morning, Mr. Dondero.

21      A.    Morning.

22      Q.    It's John Morris, again, from

23  Pachulski on behalf of the debtor.  We're here

24  for your deposition today.

25              Do you understand that?

1                Dondero - 5-28-2021

2          A.    Yes.

3          Q.    Okay.  We've done this a few times,

4     so I'm going to kind of cut to the chase; but I

5     do want to remind you that we're going to be

6     looking at a number of documents today.

7                And because of the difficulty

8     sometimes of doing this on a Zoom or by video,

9     if, at any time, you believe you need to see

10    other portions of the document, please let me

11    know that.  Okay?

12         A.    Sure.

13         Q.    Okay.

14               MR. MORRIS:  Can we put up the first

15         exhibit, please?

16               (Exhibit 1 introduced.)

17    BY MR. MORRIS:

18         Q.    Okay.  This is a document that's got

19    a title, "Promissory Note."  It's dated

20    February 2, 2018, and the amount of the note is

21    $3,825,000.

22               Do you see that?

23         A.    Yes.

24               MR. MORRIS:  Can we just go to the

25         signature line, please?

1          Dondero - 5-28-2021

2    BY MR. MORRIS:

3          Q.    Is that your signature, sir?

4          A.    I believe that's my assistant on my

5    behalf.

6          Q.    Did you authorize --

7                (Audio distortion.)

8          A.    I'm sorry?

9    BY MR. MORRIS:

10         Q.    I don't want to step on your words.

11               Were you finished with your answer?

12               MS. DEITSCH-PEREZ:  Yeah.  Can

13    you -- yeah, can you ask it again?

14               MR. MORRIS:  Sure.

15   BY MR. MORRIS:

16         Q.    Is that your signature, sir?

17         A.    Yes, for -- yes.

18               MR. MORRIS:  Can we go back to the

19    top of the document?

20   BY MR. MORRIS:

21         Q.    And was this document signed on or

22    around February 2, 2018?

23         A.    Yes.

24         Q.    Did you receive $3,825,000 from the

25    debtor on or around February 2nd, 2018?

```
 1                   Dondero - 5-28-2021
 2        A.    I -- I believe so.  I don't have
 3   direct awareness, but I believe so.
 4        Q.    Okay.  And did you sign this
 5   promissory note in exchange for that cash that
 6   you believe you received?
 7        A.    Yes.
 8        Q.    Okay.  Are you familiar with the
 9   term "demand note"?
10        A.    Yes.
11        Q.    Can you describe for me your
12   understanding of what a demand note is?
13        A.    It's a note that's -- maturity is
14   defined by the term "demand" versus a -- a
15   stipulated date.
16        Q.    And if we look down to paragraph 2,
17   at the time that you signed this document on
18   February 2, 2018, did you understand, based on
19   paragraph 2, that you were signing a demand
20   note, as you've characterized it?
21        A.    Yes.
22        Q.    Okay.
23             MR. MORRIS:  Can we go back to the
24        top of the document?
25   BY MR. MORRIS:
```

1                    Dondero - 5-28-2021

2         Q.    Is it fair to say that under this

3    demand note, you promised to pay Highland

4    Capital Management, L.P., the sum of

5    $3,825,000?

6         A.    Yes.

7         Q.    Okay.  And at the time that you

8    signed this document on February 2nd, 2018, did

9    you intend to repay to Highland Capital

10   Management, L.P., $3,825,000 plus interest?

11        A.    Yes.

12        Q.    And at the time you signed this

13   document, did you intend to repay the principal

14   amount plus interest upon demand by HCMLP?

15        A.    Whatever was appropriate to pay,

16   what hadn't been paid if it -- if it had --

17   yeah, if it had -- whatever the terms are, the

18   terms are.

19        Q.    Okay.  Did you read the promissory

20   note before you signed it?

21        A.    No.

22        Q.    Is there anything about the

23   promissory note today that you don't

24   understand?

25        A.    I haven't looked at it closely.  I'm

1                    Dondero - 5-28-2021

2    aware of it but -- you know, but I'm not aware.

3    I haven't looked at it closely.

4         Q.    Well, but you do know that the

5    debtor has sued you to collect on this note,

6    right?

7         A.    Yes.

8         Q.    Okay.  And can you identify anything

9    in this note today that you don't understand?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12         A.    Again, I don't want to make any

13    legal interpretation or analysis of the

14    contract.

15    BY MR. MORRIS:

16         Q.    And I appreciate that.

17              And to be clear, I'm not asking you

18    for any legal opinion or any legal analysis.

19    I'm asking for facts.

20              As a factual matter, as a layperson,

21    is there anything about this note today that

22    you do not understand?

23              MS. DEITSCH-PEREZ:  Object, no

24         foundation.

25         A.    And I can't say.

1                 Dondero - 5-28-2021

2    BY MR. MORRIS:

3         Q.    Okay.  You're not aware of anything;

4    is that fair?

5              MS. DEITSCH-PEREZ:  Object, no

6         foundation.

7         A.    No.  I'm saying I can't give an

8    opinion.

9    BY MR. MORRIS:

10        Q.    All right.  I'll try one more time a

11   slightly different way.

12              Can you identify any language in

13   this promissory note that you, as the maker of

14   the note and as a layperson, as a matter of

15   fact, do not understand?

16              MS. DEITSCH-PEREZ:  Objection, no

17        foundation.

18        A.    I -- I don't have -- I haven't

19   reviewed it.  I don't have a comment.

20   BY MR. MORRIS:

21        Q.    At the time that you signed this,

22   did you believe that this note reflected all of

23   the terms and conditions with respect to the

24   subject matter of the note?

25              MS. DEITSCH-PEREZ:  Object, no

1                    Dondero - 5-28-2021

2       foundation.

3       A.    Yeah, I believe largely at the time,

4    yes.

5    BY MR. MORRIS:

6       Q.    In fact, if we go to paragraph 8,

7    there's -- the last sentence is what's commonly

8    referred to as an integration clause.

9            Do you see that last sentence of

10   paragraph 8?

11      A.    Yes.

12      Q.    And did you agree with the debtor

13   that the terms and provisions of the paragraph

14   control and supersede every other provision of

15   all other agreements between the payee and the

16   maker in conflict herewith?

17      A.    I see it.  I mean, I read it.  But

18   what's -- what's the question?

19      Q.    Withdrawn.  It's okay.  It speaks

20   for itself.

21           You were the CEO of Highland at the

22   time that you signed the note, correct?

23      A.    Yes.

24      Q.    And you controlled Highland at that

25   time; is that fair?

1              Dondero - 5-28-2021

2       A.    Yes.

3       Q.    And at the time that you signed the

4   note, the Redeemer Committee had not yet

5   obtained a judgment against Highland Capital

6   Management or anybody else; is that -- any

7   other Highland entity; is that right?

8       A.    I -- and I don't recall the -- the

9   timing --

10      Q.    Okay.

11      A.    -- of their arbitration award or...

12      Q.    Let me ask you to just go back in

13  time, February of 2018.  Do you recall having

14  any concern in February 2018 that you might

15  lose control of Highland?

16      A.    No, I don't recall.

17      Q.    While you were the CEO, did

18  Highland -- withdrawn.

19          I'm going to refer to Highland

20  Capital Management, L.P., variously today as

21  either the debtor, Highland, or HCMLP; is that

22  fair?

23          MS. DEITSCH-PEREZ:  John, I think

24      it's a little confusing if you do that.  I

25      mean, if you could refer to the

1                Dondero - 5-28-2021

2           post-bankruptcy entity as "the debtor" and,

3           when you're talking about prebankruptcy,

4           call it "Highland" or "HCM"?

5                MR. MORRIS:  Okay.

6                MS. DEITSCH-PEREZ:  I -- I think

7           that would probably be clearer.

8                MR. MORRIS:  That's fair.  I'll try

9           and do just that.  Thank you very much.

10     BY MR. MORRIS:

11          Q.    While you were the CEO of HCMLP, did

12     HCMLP, prepare, in the ordinary course of

13     business, a document called a "Monthly

14     Reporting Package"?

15          A.    I don't know -- I don't know the

16     name -- I don't know that name in particular,

17     but we did do monthly financials, I believe.

18          Q.    Okay.  And did you personally review

19     the monthly financials each month that they

20     were prepared?

21          A.    No.

22          Q.    Do you know who was responsible for

23     preparing the monthly financials?

24          A.    It would have been in accounting.  I

25     don't know who in accounting.

1                 Dondero - 5-28-2021

2         Q.     Was Frank Waterhouse responsible for

3   preparing the Monthly Operating Reports?

4         A.     He was our CFO.  So everything,

5   ultimately, in accounting reported up through

6   him, but I don't know his involvement in that

7   report.

8         Q.     Can you identify any person who was

9   responsible for preparing the Monthly Operating

10  Reports for HCMLP, while you were the CEO?

11        A.     No.

12        Q.     Do you know what the Monthly

13  Operating Reports were used for?

14               Withdrawn.

15               What was the purpose of preparing

16  Monthly Operating Reports, if you know?

17        A.     I don't know.

18        Q.     Were they delivered to you each

19  month, even if you didn't read them?

20        A.     I don't believe so.  Not physically,

21  that I can remember.  If there was an email, I

22  don't remember.

23        Q.     Did you ever discuss any of the

24  Monthly Operating Reports with Mr. Waterhouse?

25        A.     I can't -- I can't recall.

1              Dondero - 5-28-2021

2              MS. DEITSCH-PEREZ:  I mean, do you

3         mean the report specifically or Highland's

4         financials generally?

5              MR. MORRIS:  The Monthly Operating

6         Reports that we're talking about.

7              And I would appreciate it, Deborah,

8         if you have an objection, just say "Object

9         to the form of the question"; and I'll do

10        the best I can to -- to try to understand

11        what you're saying, but I'd prefer no

12        speaking objections.

13   BY MR. MORRIS:

14        Q.    Do you recall ever speaking with

15   anybody in accounting with respect to any

16   Monthly Operating Report that they prepared?

17        A.    I don't recall.

18        Q.    Okay.

19              MR. MORRIS:  Can we put up Exhibit

20        Number 2, please?

21              (Exhibit 2 introduced.)

22   BY MR. MORRIS:

23        Q.    Looking at the first page, sir, does

24   this appear to be what we've been describing as

25   a Monthly Operating Report for Highland Capital

1          Dondero - 5-28-2021

2    Management?

3          A.    It says "Operating Results."  I -- I

4    have no recollection of seeing this cover sheet

5    before.

6          Q.    Okay.

7                MR. MORRIS:  Can we go to the second

8          page, please?

9                Stop right there.

10   BY MR. MORRIS:

11         Q.    This is the second page of the

12   Operating Results for February 2018, and it's

13   headed "Significant Items Impacting HCMLP's

14   Balance Sheet."

15               Do you see that?

16         A.    Yes.

17         Q.    Do you know whether the accounting

18   department was charged with the responsibility

19   of identifying on a monthly basis significant

20   items that would impact Highland's balance

21   sheet?

22         A.    I have no particular awareness.

23         Q.    Okay.  Do you see at the bottom

24   under the title "Other," it's $3.8 million and

25   it's referred to as "Partner Loan"?

1              Dondero - 5-28-2021

2       A.   Yes.

3       Q.   Do you have an understanding that

4  that 3.8 million-dollar partner loan refers to

5  what we just looked at as Exhibit 1, the

6  promissory note?

7            MS. DEITSCH-PEREZ:  Object, no

8       foundation.

9       A.   I have -- I have no particular

10 awareness other than the amounts are similar.

11 BY MR. MORRIS:

12      Q.   And -- and do you know whether

13 Highland recorded the promissory note as an

14 asset on its balance sheet as of February 2018?

15      A.   I -- I don't know.

16      Q.   So, you signed a promissory note for

17 $3.8 million in February 2018; and as the CEO,

18 you don't know if Highland carried that

19 promissory note on its balance sheet.  Do I

20 have that right?

21      A.   I'm saying I don't have particular

22 knowledge.  I -- I am a CPA and GAAP accounting

23 would suggest that it was, but I don't have --

24 I don't have particular knowledge on how it was

25 accounted for.

1                  Dondero - 5-28-2021

2        Q.    Okay.  Later in the year, you signed

3    two more promissory notes in favor of Highland;

4    is that right?

5        A.    I -- I believe so.  Yeah.

6              MR. MORRIS:  Can you put up

7        Exhibit 3, please?

8              (Exhibit 3 introduced.)

9    BY MR. MORRIS:

10       Q.    And can we go to the signature line?

11             (Scrolling.)

12   BY MR. MORRIS:

13       Q.    Is that your signature, sir?

14       A.    Yes.

15             MR. MORRIS:  Go to the top of the

16       page.

17   BY MR. MORRIS:

18       Q.    Did you sign a promissory note on or

19   about August 1st, 2018, in the amount of

20   $2.5 million in favor of Highland?

21       A.    Yes.

22       Q.    Did you receive from Highland

23   Capital Management, L.P., $2.5 million on or

24   about August 1st, 2018?

25       A.    I believe so.

1              Dondero - 5-28-2021

2      Q.    And did you, in fact, sign this

3  promissory note in exchange for that

4  $2.5 million?

5      A.    Yes.

6            MR. MORRIS:  Can we go down to

7       paragraph 2, please?

8            (Scrolling.)

9  BY MR. MORRIS:

10     Q.    Looking at paragraph 2, would you

11  characterize this as a demand note, using the

12  understanding that you described earlier today?

13     A.    Yes.

14     Q.    And -- and this note, like the

15  other, because they're demand notes, there's no

16  conditions for -- for the demand, is that

17  right, at least as drafted.

18            Withdrawn.  That wasn't a great

19       question.

20            Were these unconditional demand

21       notes, these two documents that we've

22       looked at?

23     A.    I -- I don't want to make a legal

24  interpretation.

25     Q.    I'm just asking for your

1                    Dondero - 5-28-2021

2    understanding as the person who signed the

3    note.  At the time you signed it, at that time,

4    did you understand that there were any

5    conditions placed on Highland's ability to make

6    a demand?

7         A.    I don't know.

8         Q.    Okay.  Did you understand that under

9    these demand notes, that if you defaulted, all

10   amounts that were due and payable would

11   accelerate?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    I don't know.

15   BY MR. MORRIS:

16        Q.    Did you read this -- did you read

17   this promissory note before you signed it?

18        A.    No.

19        Q.    Do you know whose idea it was to

20   give you the principal amount of these notes

21   and for you to execute the promissory notes in

22   exchange?

23        A.    I -- again, I think it's proper

24   accounting consistent with what we've done

25   with -- we've done historically -- or Highland

1           Dondero - 5-28-2021

2     did historically and what Highland did

3     historically for other employees.

4          Q.    Okay.  I'm not asking about that.

5     I'm asking just about you and the two notes

6     that we've looked at so far:  Who made the

7     decision at the respective moments in time to

8     transfer to you the principal amount of the

9     notes and for you to execute the notes?

10          A.    I believe it would have come from

11    accounting.

12          Q.    Who decided -- who decided the

13    principal amount of the note?

14          A.    I don't know.  It would -- I don't

15    know.

16          Q.    Did you ask to borrow money?

17               Did you ask the folks in accounting

18    for a loan from Highland in the principal

19    amount of the notes and request that they

20    document it accordingly?

21          A.    No.

22          Q.    Who was your assistant at this time?

23          A.    My accounting assistant at this time

24    was Melissa Schroth.

25          Q.    And was she authorized to sign these

1                    Dondero - 5-28-2021

2    notes on your behalf?

3         A.    I -- that -- sometimes she signs

4    stuff.  I don't know on this.  I'm -- I'm not

5    denying that it's a bona fide -- signed by me.

6    Or if it wasn't signed by me, it was --

7    somebody who was authorized signed it on my

8    behalf.

9         Q.    Okay.  I appreciate that.  Thank

10   you.

11              Is there anything about --

12   withdrawn.

13              Was there anything about this

14   promissory note that you didn't understand at

15   the time that either you signed it or it was

16   signed on your behalf?

17              MS. DEITSCH-PEREZ:  Object, no

18        foundation.

19        A.    Again, I didn't evaluate it

20   carefully, and I didn't actually even read it.

21   BY MR. MORRIS:

22        Q.    Okay.  As you sit here today, can

23   you identify anything in this document that you

24   do not understand?

25              MS. DEITSCH-PEREZ:  Object, no

1                    Dondero - 5-28-2021

2          foundation.

3          A.    I -- I don't want to make a legal

4     interpretation on a legal document.

5     BY MR. MORRIS:

6          Q.    I appreciate that, but I have no

7     ability to ask any follow-up questions.  So let

8     me ask it just a different way:  Is there

9     anything about this document that you don't

10    understand today?

11              MS. DEITSCH-PEREZ:  Object, no

12         foundation.

13    BY MR. MORRIS:

14         Q.    You can answer.

15         A.    I don't know.

16         Q.    Okay.  Do you understand that if

17    there was something that -- that you did not

18    understand, you have an obligation to tell me

19    that right now?

20              MS. DEITSCH-PEREZ:  Object, no

21         foundation.

22         A.    I -- I -- the answer is the same.  I

23    don't know.

24              MR. MORRIS:  Can we go to Exhibit

25         Number 4, please?

```
 1                    Dondero - 5-28-2021

 2              (Exhibit 4 introduced.)

 3              MR. MORRIS:  Can we go to the

 4         signature line when you get there?

 5    BY MR. MORRIS:

 6         Q.    Is that your signature, sir?

 7         A.    Yes.

 8         Q.    And did you sign this document or --

 9    or -- let me ask two questions first.  Did you

10    personally sign this document?

11         A.    And again, it was either me or

12    someone with my approval, but that doesn't look

13    like my typical signature, but it's close.

14         Q.    Okay.  And whoever signed it had the

15    authority from you to sign on your behalf; is

16    that fair?

17         A.    Yes.

18         Q.    Okay.

19              MR. MORRIS:  Can we go to the top of

20         the page, please?

21    BY MR. MORRIS:

22         Q.    And did you or somebody acting on

23    your behalf sign this promissory note on

24    August 13, 2018, in the amount of $2.5 million?

25         A.    Yes.
```

1              Dondero - 5-28-2021

2              MR. MORRIS:  Can we go to

3       paragraph 2, please?

4    BY MR. MORRIS:

5       Q.    Looking at paragraph 2 and the term

6    contained therein, would you agree that this is

7    a demand note, using the definition that you

8    supplied earlier today?

9       A.    Yes.

10      Q.    At the time that this note was

11   signed on your behalf, did you intend to comply

12   with the terms of this note?

13      A.    Yes.

14      Q.    At the time that this note was

15   signed on your behalf, did you intend to pay

16   all unpaid principal and accrued, but unpaid,

17   interest upon demand of the payee?

18      A.    Let me say I -- I expected to honor

19   the agreement.  I don't know if I can answer

20   that with regard to that one term.

21      Q.    Well, I do just want to make sure

22   that -- withdrawn.

23             You understood at the time you

24   signed this document, or it was signed on your

25   behalf, that it was a demand note, correct?

1              Dondero - 5-28-2021

2        A.     That it was structured -- no.  I

3   think what I've testified or tried to testify

4   to is that they are demand notes or they're

5   written as demand notes.  I didn't read them or

6   pay attention at the time to the structure of

7   the note.

8        Q.     Okay.  And as demand notes, you

9   understood that any unpaid principal and

10  interest would be due upon demand, correct?

11       A.     Again, I don't want to make -- I

12  don't want to make -- I don't want to affirm

13  that statement.  I would say I don't know

14  because I don't want to -- I don't know the

15  rest of the context of the rest of the note and

16  how it all interplays.

17       Q.     All right.  Well, I'm happy to --

18  to -- it's a very short document, so we can

19  look at it for as long as you want, but I

20  really need to know what -- what you, as the

21  maker, understood when you signed the note.  So

22  I'm going to ask a very simple question, and I

23  encourage you to -- to ask to see whatever

24  portions of the document you want, okay?

25              When these three notes were signed

1              Dondero - 5-28-2021

2    by you or signed by someone you authorized to

3    sign, what did you understand the payment terms

4    to be?

5         A.    I -- I didn't.  I didn't have an

6    understanding at the time.

7         Q.    So -- but -- but you would agree

8    that your intention was to comply with the

9    terms of the note; is that fair?

10        A.    In aggregate, yes.

11        Q.    Okay.

12              MR. MORRIS:  Go to Exhibit 5,

13        please.

14              (Exhibit 5 introduced.)

15   BY MR. MORRIS:

16        Q.    Is it your practice to sign

17   documents or to have people sign documents on

18   your behalf that you haven't read?

19        A.    Yes.

20        Q.    This is a document that's entitled

21   "Operating Results" for August 2018.  Do you

22   see that?

23        A.    Yes.

24              MR. MORRIS:  And if we could just go

25        to the second page.

1                    Dondero - 5-28-2021

2    BY MR. MORRIS:

3         Q.    Do you see under Significant Items

4    Impacting Highland's bank -- balance sheet for

5    August 2018 at the bottom, there's a reference

6    to $5 million in "partner loan."  Do you see

7    that?

8         A.    Yes.

9         Q.    Do you have an understanding as to

10   whether or not that refers to the two

11   2.5 million-dollar notes that we just looked at

12   that were signed in August 2018?

13        A.    I don't know.

14        Q.    Do you have any recollection at

15   all or -- withdrawn.

16              Were you personally referred to as a

17   partner of Highland in August 2018?

18        A.    I believe so.

19        Q.    Are you aware of any partner loans

20   that were made by Highland in August 2018 other

21   than the two loans that we just looked at?

22        A.    I don't know.

23        Q.    You're not aware of any; is that

24   fair?

25              MS. DEITSCH-PEREZ:  Object, no

1                    Dondero - 5-28-2021

2        foundation.

3        A.    I don't know.

4   BY MR. MORRIS:

5        Q.    There came a time when the debtor

6   made demand on these three notes, right?

7        A.    I don't know.  I believe -- I don't

8   know specifically, but I believe so.

9             MR. MORRIS:  Can we put up

10       Exhibit 6, please?

11            (Exhibit 6 introduced.)

12  BY MR. MORRIS:

13       Q.    Do you see this is a -- it's a

14  letter dated December 3rd, and it's addressed

15  to you.

16            And if we scroll down a little bit,

17  it's signed by Mr. Seery as the CEO and CRO of

18  Highland Capital Management.

19            Do you see that?

20       A.    Yes.

21       Q.    Do you recall on or around

22  December 3rd, 2020, the debtor made a demand

23  for all outstanding principal and interest due

24  under the three notes that we just looked at?

25       A.    I -- I see the letter.  I don't have

1          Dondero - 5-28-2021

2   a recollection.

3        Q.    All right.  Do you understand that

4   in December 2020, the debtor made a demand for

5   payment of all unpaid principal and interest

6   under the three notes that we just looked at,

7   even if you don't remember this particular

8   letter?

9        A.    I'm sorry.  What was -- yeah, I

10  accept the letter, and I'll accept that it was

11  delivered.

12          What -- what's your question,

13  please?

14       Q.    I'm trying to just get -- get your

15  understanding.

16          And I think you testified that you

17  don't recall seeing this letter.  Do I have

18  that right?

19       A.    That's correct.

20       Q.    Okay.  So, putting the letter to the

21  side, did you become aware in December 2020

22  that the debtor had demanded that you pay all

23  unpaid principal and interest due under the

24  three promissory notes that we just looked at?

25       A.    Again, just generally.

1                    Dondero - 5-28-2021

2         Q.    Did you make any payment to the

3    debtor in response to that demand?

4         A.    No.

5         Q.    Did you or anybody acting on your

6    behalf respond to the debtor's demand in any

7    way?

8              MS. DEITSCH-PEREZ:  Object to the

9         form.

10   BY MR. MORRIS:

11        Q.    Withdrawn.  That's fair.

12             Let me ask a different question.

13             Did you or anybody acting on your

14   behalf respond to the debtor's demand at any

15   time prior to the commencement of this

16   adversary proceeding?

17             MS. DEITSCH-PEREZ:  Object to the

18        form.

19        A.    Can you repeat it one more time?

20   BY MR. MORRIS:

21        Q.    Sure.  Did you or anybody acting on

22   your behalf respond to the debtor's demand for

23   payment of all unpaid principal and interest at

24   any time prior to the commencement of this

25   lawsuit?

1           Dondero - 5-28-2021

2           MS. DEITSCH-PEREZ:  Object to the

3       form.

4       A.    I want -- I want to answer that

5   question as -- as follows:  I'm not saying on

6   my behalf, but I know there was a lot of

7   conversations with lawyers and business people

8   around the notes and their shared services and

9   the split and the overpayments to Highland and

10  -- trying to reach some amicable resolution of

11  shared services -- in fact, the entire

12  estate -- but I don't -- I don't -- I don't

13  recall specifically or -- what lawyers or what

14  business people were saying what to the debtor,

15  but I -- I know there were a lot of

16  conversations that were going on.

17  BY MR. MORRIS:

18      Q.    Can you identify any aspect of any

19  of the conversations you just described that

20  pertained to the debtor's demand for payment of

21  all unpaid principal and interest on the three

22  notes?

23      A.    Not -- not specifically.

24      Q.    Okay.  There came a time when an

25  answer to the debtor's complaint was filed on

1              Dondero - 5-28-2021

2    your behalf.

3              Do you remember that?

4         A.    No, but I'm willing to be refreshed.

5         Q.    Okay.

6              MR. MORRIS:  Can we please put up

7         Exhibit 7?

8              (Exhibit 7 introduced.)

9              MR. MORRIS:  And if we could just

10        scroll down to the title.

11   BY MR. MORRIS:

12        Q.    Do you see that this document is

13   called "Defendant James Dondero's Original

14   Answer"?

15        A.    Yes.

16        Q.    And if we scroll back to the top of

17   the document, do you see that it was filed on

18   the docket on March 16, 2021?

19        A.    Yes.

20        Q.    Did you personally read this

21   document before it was filed?

22        A.    No.

23        Q.    Did you have an understanding as to

24   the contents of the document before it was

25   filed?

1                    Dondero - 5-28-2021

2         A.    No.

3         Q.    Did you authorize Bonds Ellis to

4    file this document on your behalf?

5         A.    Not specifically that I remember.

6         Q.    Did you know on or around March 16,

7    2021, that Bonds Ellis had filed "Defendant

8    James Dondero's Original Answer" in this

9    adversary proceeding?

10        A.    Not specifically.  There's a lot

11   going on.

12        Q.    As you sit here right now--and,

13   again, happy to page through the document--can

14   you tell me whether you have ever read

15   Defendant James Dondero's Original Answer?

16        A.    Not that I recall.

17        Q.    So, as of -- and that's true as of

18   today; is that fair?

19        A.    Can we scroll through this, please?

20        Q.    Yes.  Just let us know if you want

21   us to slow down or speed up.

22             MS. DEITSCH-PEREZ:  Yeah, just go

23        slow enough so he could sort of eyeball

24        each page.

25             MR. MORRIS:  You bet.

1              Dondero - 5-28-2021

2              THE WITNESS:  Yep, keep going.

3              (Scrolling.)

4              THE WITNESS:  Hold on.  Could you go

5         back a little bit, please?  It just goes --

6         stop right there.

7         A.    I do remember paragraph 5.  I think

8    that was recently tried last week or so, but I

9    think that was always the -- always the way it

10   was described to me by lawyers, was that these

11   notes shouldn't be in her Court.

12             MS. DEITSCH-PEREZ:  Okay.  And I'll

13        just -- I'll just caution the witness to

14        not disclose communications with counsel,

15        but it's okay if something catches your eye

16        and you, at least, remember that part, say,

17        "Oh, yeah, I remember that one," but

18        without going into details as to any

19        communications with your lawyers.

20             MR. MORRIS:  And -- and that's fine.

21        That's fine.  I'm certainly not looking for

22        that.

23   BY MR. MORRIS:

24        Q.    The question is really simple:  Have

25   you ever seen this document before and --

1               Dondero - 5-28-2021

2          MS. DEITSCH-PEREZ:  John, I think he

3     said he needs to scroll through it to see

4     if anything --

5          MR. MORRIS:  I understand.

6          MS. DEITSCH-PEREZ:  -- triggers a

7     recollection.  He just said he's looking at

8     5, yeah, that looks familiar.  If you want

9     to keep going, we could find out if there

10    are any others that -- that look familiar

11    to him.

12         THE WITNESS:  Let's keep going.

13         (Scrolling.)

14         MS. DEITSCH-PEREZ:  You'll agree

15    that most answers are not particularly

16    memorable when they say things like --

17         (Simultaneous conversation.)

18         MR. MORRIS:  Please stop.  Please

19    stop.  Please stop talking.  Please stop

20    talking.  It's inappropriate.

21         MS. DEITSCH-PEREZ:  I -- I know.

22    It's your deposition, and you could do all

23    this stuff, but --

24         (Simultaneous conversation.)

25         MR. MORRIS:  Please stop talking.

1            Dondero - 5-28-2021

2       Please stop talking.

3              MS. DEITSCH-PEREZ:  I hear you.

4              THE WITNESS:  Keep -- keep going.

5              (Scrolling.)

6              THE WITNESS:  Okay.  Keep going.

7              (Scrolling.)

8              THE WITNESS:  It looks to me like --

9              MS. DEITSCH-PEREZ:  Keep -- let --

10       let him go through the whole thing.

11             THE WITNESS:  Sure.  Keep going.

12             (Scrolling.)

13             THE WITNESS:  Okay.  Is that it?

14             MR. MORRIS:  Yes.

15             THE WITNESS:  Okay.

16  BY MR. MORRIS:

17       Q.   Do you recall ever seeing this

18  document before, sir?

19       A.   The -- the substance of it, again,

20  some of it I -- I remember, and the -- there --

21  it strikes me as a legal argument and defenses

22  regarding the payment of the notes, and I do

23  remember a lot of conversation regarding it

24  being -- it should be outside -- it should be

25  in a different court, and it should be a jury

1                    Dondero - 5-28-2021

2    trial.  And those are two main points in here,

3    but it seems like there are a bunch of other

4    defenses listed.

5         Q.    Okay.

6         A.    And I have -- and I have an

7    awareness of it, but I'm not a lawyer.

8         Q.    I appreciate that you're not a

9    lawyer; but looking at the document, does that

10   refresh your recollection that you read and

11   reviewed this document before it was filed on

12   your behalf?

13        A.    I have -- I have an awareness of it,

14   but I wouldn't -- I wouldn't have been deeply

15   involved in its drafting or detailed approval.

16             MR. MORRIS:  Can we go to page 6 of

17        8, please?

18   BY MR. MORRIS:

19        Q.    And directing your attention to

20   paragraph 40, do you see it says, as the first

21   affirmative defense, quote, "Defendant asserts

22   that plaintiff's claims should be barred

23   because it was previously agreed by plaintiff

24   that plaintiff would not collect on the notes."

25             Do you see that?

1                Dondero - 5-28-2021

2        A.    Yes.

3        Q.    Okay.  Have I read that accurately?

4        A.    Yes.

5        Q.    Did the plaintiff ever agree that

6    plaintiff would not collect on the notes?

7        A.    Yes.

8        Q.    You subsequently amended this

9    defense; isn't that right?

10       A.    I believe so.

11       Q.    And do you understand that you

12   amended it to add a few words relating to

13   conditions subsequent?

14       A.    I -- I -- other than for

15   clarification and completeness, the -- it was

16   amended.  I don't have specific knowledge of

17   what was amended.

18       Q.    Okay.  When did the plaintiff agree

19   that the plaintiff would not collect on the

20   notes?

21       A.    Boy, that was early on in the case.

22   Every proposal, every POT plan, every

23   settlement discussion never included value for

24   notes.

25       Q.    All right.  I'm going to ask the

1              Dondero - 5-28-2021

2   question again:  When did the plaintiff agree

3   that it would not collect on the notes?

4              MS. DEITSCH-PEREZ:  Are you talking

5          about the subsequent agreements in the next

6          pleading?

7              MR. MORRIS:  I'm asking for an

8          answer as to when the agreement referred to

9          in paragraph 40 was entered into.

10          A.    First quarter of -- first quarter of

11   2020.

12   BY MR. MORRIS:

13          Q.    So it was after the petition date?

14              MS. DEITSCH-PEREZ:  Are you asking

15          about the 2018 notes?

16              MR. MORRIS:  Yes, those are defined

17          to be "the notes."

18   BY MR. MORRIS:

19          Q.    So -- so did -- this is your

20   defense.

21              Is it your position, Mr. Dondero,

22   that in the first quarter of 2020, the

23   plaintiff agreed that it would not collect on

24   the notes?

25          A.    I -- I -- I don't -- I want to leave

1               Dondero - 5-28-2021

2    my testimony as what I just said a minute ago.

3    The notes were never part of any POT plan or

4    suggested POT plan or suggested grand bargain

5    or suggested as having any value starting in

6    the first quarter of '20 -- or most of the

7    year, I believe, until the -- towards the end

8    of the year.

9         Q.    All right.  Was there ever an

10   agreement between you and the plaintiff that

11   the plaintiff would not collect on the notes if

12   there was no grand bargain or no POT plan?

13        A.    Yeah, the -- I'm sorry.  Repeat

14   again.

15        Q.    Who entered the agreement on behalf

16   of the debtor that the plaintiff would not

17   collect on the notes?

18        A.    (Indiscernible speech.)

19              Agreement on -- you know, the --

20   the -- you know the -- I think I'm looking at

21   this question from a perspective of the

22   negotiation, you know, at that time and not

23   including the subsequent conditions that were

24   overlaid on the notes, I guess.  So I guess

25   it's a combination of both.

1                    Dondero - 5-28-2021

2         Q.    I'm asking you to identify the

3    person who acted on behalf of the debtor in

4    reaching the agreement with you that the

5    plaintiff would not collect on the notes.  Who

6    did that?

7              MS. DEITSCH-PEREZ:  John, I think

8         the problem is you're referring to the

9         debtor, so he's looking at post-bankruptcy.

10        You might ask it two questions, one --

11             MR. MORRIS:  No.  Please stop.

12        Please stop.  Please stop.

13             (Simultaneous conversation.)

14             MS. DEITSCH-PEREZ:  You agreed to

15        that condition.  You agreed to distinguish

16        between the debtor --

17             (Simultaneous conversation.)

18             MR. MORRIS:  Deborah --

19             MS. DEITSCH-PEREZ.  -- bankruptcy --

20             MR. MORRIS:  Deborah --

21             (Simultaneous conversation.)

22             THE REPORTER:  I can't -- I can't

23        write two people at the same time.

24             MR. MORRIS:  This is so improper.

25        He has --

1              Dondero - 5-28-2021

2              MS. DEITSCH-PEREZ:  It is not.  You

3         agreed --

4              MR. MORRIS:  Please let me finish.

5         Please let me finish.

6              He has described the conversations

7         as taking place in 2020.  I should be

8         referring to the debtor.  He is

9         describing --

10             MS. DEITSCH-PEREZ:  Right.

11             MR. MORRIS:  -- the context --

12             MS. DEITSCH-PEREZ:  But if you want

13        to know about something that happened

14        before bankruptcy, ask about Highland.

15             MR. MORRIS:  But I'm not.  I

16        don't -- please stop interrupting.

17             MS. DEITSCH-PEREZ:  It's your

18        deposition.  If you want a muddy record, be

19        my guest.

20             MR. MORRIS:  I would really

21        appreciate it.  I think I know what I'm

22        doing.

23   BY MR. MORRIS:

24        Q.   Mr. Dondero, who, on behalf of the

25   debtor, during these conversations about a

1              Dondero - 5-28-2021

2    grand bargain and a POT plan told you or

3    entered into the agreement that the plaintiff

4    would not collect on the notes?

5         A.   I -- I -- during the bankruptcy,

6    we're talking about, right?

7         Q.   I'm just following up on your

8    statement that the conversation -- that the

9    agreement was entered into in the first quarter

10   of 2020.

11             Do I have that right, or is that

12   wrong?

13        A.   Well --

14        Q.   Let's start again.  Let's start

15   again.

16             This affirmative defense refers to

17   an agreement.  Do you see that?

18        A.   Yes.

19        Q.   This is your affirmative defense;

20   isn't that correct?

21        A.   Yes.

22        Q.   And according to this affirmative

23   defense, the agreement was that the plaintiff

24   would not collect on the notes.  Do I have that

25   right?

1              Dondero - 5-28-2021

2      A.    Yes.

3      Q.    Let's start with:  When was that

4  agreement entered into?

5      A.    Okay.  I'm going to have to parse,

6  and I'm going to have to answer your question

7  as accurately as I can.

8              The subsequent conditions for

9  forgiveness of the notes were established

10  during a comp period in early 2019 for these

11  notes that were drafted in '18.

12             And the agreement was reached

13  with -- I believe it's a majority of, whatever,

14  the Class A holders in the fourth amended

15  Highland Capital partnership -- partnership

16  agreement.  And that's what set up the

17  subsequent conditions and the ability for the

18  loans to be forgiven.

19             When you get into bankruptcy,

20  whether it was Seery, the independent board, or

21  whoever, no one ever put any value nor was it

22  ever included in any -- were the notes included

23  in any settlement discussions, period.

24      Q.    All right.  So, it's your testimony

25  that the debtor in settlement negotiations

1              Dondero - 5-28-2021

2    never, ever, ever asked for or demanded the

3    repayment of any unpaid principal or interest

4    under these three notes?

5              That's your sworn testimony?

6         A.   No.

7         Q.   So how did I get that wrong, then?

8         A.   Well, a few minutes ago we went over

9    a letter from the debtor making a demand, but

10   that was, I believe, this year or -- yeah, I

11   believe that was this year or the end of '20.

12             What I'm saying is through '20, the

13   full year of '20 when we were trying to work on

14   a POT plan or global settlement before Seery

15   betrayed the estate, we were -- we never --

16   there was never value assigned to the notes.

17        Q.   And you never offered to make any

18   payment of any kind, principal or interest, on

19   any of the notes in connection with any

20   proposal you ever made as part of the grand

21   bargain or POT plan; is that right?

22        A.   I think -- I believe on the -- not

23   through 2020.  I'll say that.

24             By the time 2021 came along, on the

25   eve of trial when I sent over a capitulation

1          Dondero - 5-28-2021

2    offer -- I think it was even titled that -- I

3    think I threw more money than everybody

4    deserved or was entitled to, to try and resolve

5    it.  And implicitly, there was -- because it

6    was more than everybody was entitled to, I

7    think implicitly it included value for the

8    notes.

9          Q.     And is it your testimony that at no

10   time prior to the delivery of the demand letter

11   did the debtor ever make an offer to you or --

12   of any kind that included any repayment of any

13   principal or interest due under the three

14   notes?

15         A.     I'm willing to be refreshed, but not

16   that I recall.

17         Q.     Okay.  And is it your testimony that

18   anybody acting on behalf of the debtor ever

19   agreed not to collect on the notes?

20         A.     I'm sorry.  Repeat that one more

21   time, just --

22         Q.     Is it your testimony -- withdrawn.

23               Did anybody acting on behalf of the

24   debtor ever agree with you that it would not

25   collect on the notes, irrespective of whether

1                    Dondero - 5-28-2021

2    there was a settlement?

3              MS. DEITSCH-PEREZ:  Object to form.

4         A.    Yeah.   Again, that was my

5    understanding through 2020.

6    BY MR. MORRIS:

7         Q.    Do you have --

8              THE WITNESS:  Let's -- let's --

9         before the next question, let's take a

10        ten-minute break, ten-minute bathroom

11        break, please.

12             MR. MORRIS:  No problem.

13             MS. DEITSCH-PEREZ:  Okay.  We've

14        been going an hour, so we'll come back

15        at -- 10:30, come back at 10:40?

16             MR. MORRIS:  That's fine.  Thank

17        you.

18             (Recess held.)

19   BY MR. MORRIS:

20        Q.    Is the agreement that you're

21   referring to and that's referred to in

22   paragraph 40, is that reflected in any document

23   that you're aware of?

24        A.    Not that I'm aware of.

25        Q.    And I believe you mentioned -- and

1                    Dondero - 5-28-2021

2    we'll talk about this more later, but the part

3    about the subsequent conditions or the

4    conditions subsequent, that was the agreement

5    that was entered into, did you say the -- in

6    part -- as part of a compensation committee

7    meeting?

8         A.    As part of our compensation process

9    in -- early in 2019.

10        Q.    Okay.  And when you say "early

11   2019," can you -- do you recall what month?

12        A.    In January/February.

13        Q.    So, it's your testimony that in

14   January or February 2019, you and the debtor

15   reached the agreement that's referred to in

16   paragraph 40 as subsequently amended by your

17   amended answer; is that right?

18             MS. DEITSCH-PEREZ:  Object to the

19        form.

20             John, I thought you were going to

21        agree to call Highland Highland --

22             MR. MORRIS:  That's fine.  That's

23        fine.

24             (Simultaneous conversation.)

25             MS. DEITSCH-PEREZ:  -- thereafter.

1            Dondero - 5-28-2021

2            MR. MORRIS:  That's fine.  So, let

3       me rephrase the question.

4    BY MR. MORRIS:

5       Q.    I just want to make sure that I have

6    this right, Mr. Dondero.  It's your

7    recollection that in January or February of

8    2019, you reached an agreement with Highland

9    that's reflected in paragraph 40 as

10   subsequently amended to include the phrase

11   "conditions subsequent."  Do I have that right?

12      A.    I gave my testimony.  I don't know

13   if -- I don't want to opine on the legal

14   document and whether the legal document

15   captures it there or somewhere else, but my --

16   my recollection regarding pre-bankruptcy and

17   post-bankruptcy is as I -- as I stated already.

18      Q.    Let me -- let me try this a

19   different way.

20            We looked at the three promissory

21   notes.  Were those promissory notes ever

22   amended, to the best of your knowledge?

23      A.    No, not that -- I mean, not -- not

24   in writing.

25      Q.    Okay.

1                  Dondero - 5-28-2021

2        A.    They were amended -- they were

3    amended -- they were amended verbally.

4        Q.    Okay.  And did that verbal agreement

5    take place in January or February 2019?

6        A.    Yes.

7        Q.    Was there any verbal agreement

8    related to the notes that occurred other than

9    the one you're referring to in January or

10   February 2019?

11       A.    Well, I gave my testimony during

12   bankruptcy in 2020, the substance of all

13   negotiations never assigned value to the -- the

14   notes.

15       Q.    But you never reached an agreement

16   with the debtor on -- on any settlement that

17   would include either payment for or forgiveness

18   of the notes; is that fair?

19             You never reached an agreement?

20       A.    Not in writing, but I believe we

21   were operating with an understanding that

22   the -- weren't likely to have value to the

23   estate.

24             MR. MORRIS:  Okay.  I move to

25       strike, and I'll ask the question again.

1                      Dondero - 5-28-2021

2    BY MR. MORRIS:

3         Q.    Do you have any agreement with the

4    debtor -- agreement with the debtor with

5    respect to any of the three notes?

6              MS. DEITSCH-PEREZ:   Object to the

7         form.

8         A.    I believe the debtor in bankruptcy

9    inherits that subsequent condition agreements

10   from the first quarter of 2019; and I believe

11   in 2020, the debtor operated and participated

12   and acted in a way all negotiations that

13   suggested the notes had -- were unlikely to

14   have any value to the estate.

15             MR. MORRIS:   Okay.   I move to

16        strike.

17   BY MR. MORRIS:

18        Q.    And I'd ask you to please listen

19   carefully to my question and only answer the

20   question that's asked.

21             Is there any agreement that pertains

22   to the notes other than --

23             MS. DEITSCH-PEREZ:   Objection,

24        asked --

25   BY MR. MORRIS:

1                    Dondero - 5-28-2021

2        Q.     -- with --

3        A.     Yeah, I'm going to stick with my

4   same answer that I've given twice.

5        Q.     I'm actually -- I'm actually asking

6   a different question; and if you would let me

7   finish, this would go a lot more smoothly.

8              Is there any agreement, written or

9   verbal, between you and the debtor concerning

10  the notes other than the verbal agreement that

11  you contend was entered into in January and

12  February 2019?

13             I don't want to know about

14  operations or offers or settlement discussions.

15  I want to know about agreements:  Is there any

16  agreement pertaining to the notes other than

17  the verbal agreement entered into in January or

18  February 2019?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.     Yes.

22  BY MR. MORRIS:

23        Q.     What other agreement exists?

24        A.     The agreement between, I guess, me

25  and to the extent other related parties that

1                    Dondero - 5-28-2021

2    had notes with the debtor, beginning in the

3    first quarter after the bankruptcy, that the

4    notes were unlikely to have any value to the

5    estate or have any value in settlement.

6         Q.    Okay.  I don't want to know about

7    value.  I want to know if there is an agreement

8    not to collect.

9              So let me try and answer -- ask the

10   question differently.

11             Other than the agreement that you

12   assert was entered into in January or

13   February 2019, did anybody acting on behalf of

14   Highland or the debtor enter into any other

15   agreement pursuant to which the debtor agreed

16   not to collect on the notes?

17        A.    I'm -- I'm going -- same answer:

18   Implicitly, yes.

19        Q.    Okay.  Is that -- is that implicit

20   agreement written down anywhere?

21             You know what?  I'm going to move

22   on, Mr. Dondero, and I look forward to the jury

23   trial.

24             MR. MORRIS:  Can we put up the next

25        exhibit, Number 8?

1                    Dondero - 5-28-2021

2              (Exhibit 8 introduced.)

3    BY MR. MORRIS:

4        Q.    Did you --

5              MR. MORRIS:  If we could scroll down

6        a little bit.

7    BY MR. MORRIS:

8        Q.    Are you aware that the debtor served

9    discovery in connection with this action?

10       A.    Not specifically.

11       Q.    Do you see that these are your

12   objections and responses to the debtor's

13   requests for admission?

14       A.    Yes.

15       Q.    Have you ever seen this document

16   before?

17              And we can scroll down, if you'd

18   like.

19              MS. DEITSCH-PEREZ:  Scroll through

20       it, please.

21              THE WITNESS:  Yeah, let's scroll

22       through it.

23              (Scrolling.)

24              THE WITNESS:  Can you keep going,

25       please?

1                    Dondero - 5-28-2021

2              MR. MORRIS:  That's the end.

3              THE WITNESS:  Okay.

4    BY MR. MORRIS:

5         Q.    Have you ever seen this document

6    before, sir?

7         A.    I'm aware of it -- I mean, yes, but

8    I don't remember -- ask whatever questions you

9    want about it, and we'll go from there.

10        Q.    Did you see this document before --

11   before it was sent to my firm on April 28th,

12   2021?

13        A.    I mean, I'm sure I did and -- or I'm

14   sure I did if I was supposed to approve it, but

15   I don't specifically remember.

16        Q.    And did you, in fact, authorize your

17   attorneys to serve this particular document?

18        A.    I -- I believe so.

19             MR. MORRIS:  Can we just go to the

20        very last request for admission, number 14?

21             (Scrolling.)

22   BY MR. MORRIS:

23        Q.    You'll see that Request For

24   Admission Number 14 asks you to admit that as

25   of January 22nd, 2021, you hadn't paid the

1                Dondero - 5-28-2021

2    debtor the outstanding amount.

3               Do you see that?

4        A.    Yes.

5        Q.    And the definition of an

6    "outstanding amount" is the number that's just

7    above that.

8               And in response, you admitted only

9    that you hadn't paid the debtor the amount the

10   debtor asserts is due on the notes in the

11   amount of approximately $9 million.  Do you see

12   that?

13       A.    Yes.

14       Q.    Okay.  I just want to ask a slightly

15   different question:  Have you paid any amounts

16   to the debtor on account of the notes since

17   December 1st, 2020?

18       A.    I -- I don't -- I don't know for

19   sure, but I don't believe so.

20       Q.    Okay.

21            MR. MORRIS:  Can we go to the next

22       exhibit, please, Number 9?

23            (Exhibit 9 introduced.)

24            MR. MORRIS:  Okay.  And if we can

25       scroll down just a little bit.

1                Dondero - 5-28-2021

2    BY MR. MORRIS:

3         Q.    You'll see that these are the

4    "Objections and Answers" that were tendered on

5    your behalf in response to the debtor's first

6    set of interrogatories.

7                Do you see that?

8         A.    Yes.

9                MR. MORRIS:  And if we can go to the

10        last page.

11                MS. DEITSCH-PEREZ:  Could you also

12        scroll through it so he could --

13                MR. MORRIS:  Well, I'm happy to do

14        it.  I'd like to do it my way, please.

15        Thank you.

16                Can we go to the last page, please?

17                (Scrolling.)

18    BY MR. MORRIS:

19        Q.    Is that your signature there, sir?

20        A.    Yes.

21        Q.    And did you sign this document in

22    front of a notary public?

23        A.    Yes.

24        Q.    And did you certify that you had

25    read the document and the objections to the

1                    Dondero - 5-28-2021

2    interrogatories?

3         A.    Yes.

4         Q.    And did you swear that the answers

5    were true and correct?

6         A.    Yes.

7         Q.    Okay.

8              MR. MORRIS:  Now let's go back to

9         the top of the document.

10   BY MR. MORRIS:

11        Q.    Did you, in fact, read this document

12   before you signed the Verification in front of

13   a notary?

14        A.    Yes.

15        Q.    Okay.

16              MR. MORRIS:  Go to page 4 of 6,

17        please.

18   BY MR. MORRIS:

19        Q.    Just to help you out, do you see

20   there's a reference to "Purported Agreement" in

21   the first interrogatory, 1(a)?

22        A.    Uh-huh.

23        Q.    That's a "yes," sir; is that right?

24        A.    Yes.

25        Q.    Okay.  The Purported Agreement

1           Dondero - 5-28-2021

2    refers back to the agreement that we were

3    looking at in paragraph 40 of the answer -- and

4    I can just read it again -- that says -- the

5    agreement says, quote, "Plaintiff would not

6    collect on the Notes."

7           And I asked you three questions in

8    the interrogatory.  Did this interrogatory

9    accurately state, to the best of your

10   knowledge, that you, personally, entered into

11   the Purported Agreement on behalf of the

12   debtor?

13       A.    Which -- which one are you -- which

14   agreement are you talking about?

15       Q.    Just the one that we were talking

16   about earlier -- and I'll just read it again

17   for you.  We can call it back on the screen, if

18   it's helpful -- but the agreement that you

19   referred to in your answer that, quote,

20   "plaintiff would not collect on the notes."

21   That's the Purported Agreement.

22           And so, I just want you to confirm

23   that in your answer to Interrogatory No. 1, you

24   stated that it was true and accurate that you

25   entered into that agreement on behalf of the

Dondero - 5-28-2021

1

2   debtor.

3           Do I have that right?

4       A.    I'm -- I'm going to say no because I

5   think you're using the wrong description of the

6   debtor versus Highland prebankruptcy.

7       Q.    I appreciate that.  I apologize.

8   Let me rephrase the question.  That's a fair

9   point.

10          Did you enter into the agreement

11  referred to in your answer on behalf of

12  Highland?

13      A.    The -- the agreement on behalf of

14  Highland prebankruptcy was agreed to by

15  majority of the Class A members, which I

16  believe at the time was Dugaboy.

17      Q.    All right.  That doesn't say that in

18  your answer here, does it?

19      A.    Again, there was an original, I

20  think, answers; and then there were amended

21  answers.  I think the lawyers did the best they

22  could to capture -- but, evidently, the parsing

23  between pre-bankruptcy agreements and

24  post-bankruptcy agreements was done the best it

25  could be by the lawyers but I -- I -- I don't

1                   Dondero - 5-28-2021

2   want to comment on the legal.

3      Q.   I don't want to comment on legal

4   stuff, either; but you signed this document,

5   you verified this document, and you verified

6   that it was true and accurate.  Correct?

7      A.   Yes.

8      Q.   Okay.  And in the first sentence to

9   your answer in Interrogatory 1, you wrote, or

10  somebody wrote on your behalf, quote:  "The

11  agreements were entered into on behalf of the

12  debtor by James Dondero, subsequent to the time

13  each note was executed."

14           Is that an accurate statement, or is

15  it an inaccurate statement?

16      A.   Again, it was between me and the

17  Class A, the majority of the Class A members.

18  It was a Class A -- the Class A members were

19  representing Highland, never the debtor,

20  because the debtor didn't exist yet.

21           But then, again, I don't know if

22  this paragraph refers to, again, how we

23  operated in bankruptcy, which was the

24  assumption that the notes had -- were likely --

25  were not likely to have any value for the

1              Dondero - 5-28-2021

2    estate.  I don't -- I don't know which this is

3    referring to.

4         Q.    You understand that the definition

5    of the "debtor" includes Highland Capital

6    Management, L.P.?

7         A.    I think we started off the depo by

8    saying that there was a Highland prior to

9    bankruptcy and then there was a Highland in

10   bankruptcy and the debtor is Highland in

11   bankruptcy.

12        Q.    Let me just ask you this question,

13   sir:  Is that first sentence accurate, or is it

14   wrong?

15             I didn't write it, so -- and you

16   swore to it.  You're the one who said it was

17   true and accurate.  So now I'm asking you:  Is

18   it actually true and accurate?

19        A.    I'm going to stick with my testimony

20   so far.  I don't want to opine on that.  I

21   think it depends -- it's not -- maybe it's not

22   perfectly written, but...

23        Q.    Sir, with all due respect, please

24   answer my question:  Is the first sentence true

25   and correct, as you verified?

1              Dondero - 5-28-2021

2              MS. DEITSCH-PEREZ:  He already

3         answered your question, John.

4              MR. MORRIS:  That's fine.  You can

5         have the objection, asked and answered.

6              I'm asking him to answer again.

7    BY MR. MORRIS:

8         Q.    Is that first sentence true and

9    correct as you verified it?

10        A.    "Behalf" probably isn't, like I

11   said, the right word.  It should be "between"

12   the debtor and James Dondero.  So that's how I

13   would wordsmith that.

14        Q.    Okay.  So this -- this first

15   sentence is not true and correct, to the best

16   of your knowledge; is that fair?

17        A.    I -- I don't want to say that other

18   than I think it could be stated better.

19        Q.    Okay.  But as stated right now, it

20   says that the agreement was entered into on

21   behalf of the debtor by James Dondero.  Have I

22   read that correctly?

23        A.    Yeah.  I mean, that is what it says.

24   Again, I feel like I'm interpreting legal

25   phraseology here, like "on behalf of the

1              Dondero - 5-28-2021

2    debtor."  If it was an agreement between the

3    debtor and the Class A entered into --

4              MS. DEITSCH-PEREZ:  Mr. Morris knows

5         very well there's another -- that there's

6         an amendment to this.  I don't know why

7         he's doing this.

8              Mr. Morris --

9              (Simultaneous conversation.)

10             MR. MORRIS:  Please stop.  Please

11        stop.

12             I'm allowed to go through his sworn

13        statements.  Give me a break.  Please stop.

14        Don't coach --

15             MS. DEITSCH-PEREZ:  You've been

16        asking the same question over and over and

17        over.

18             MR. MORRIS:  You know, I'm going to

19        shut this down if you do it one more time.

20        I will, and I'm happy to make the motion to

21        the Judge.  I'm begging you, please stop

22        interfering.

23             My apologies, Mr. Dondero.  Never

24        directed at you personally.

25   BY MR. MORRIS:

1              Dondero - 5-28-2021

2       Q.    The second sentence of the answer,

3   have you been able to identify any documents

4   that reflect or memorialize the agreements?

5       A.    I mean, I -- I -- I don't -- I don't

6   know, but I don't think so.

7       Q.    Thank you very much.

8             MR. MORRIS:  Go to the next

9        document, please.

10            (Exhibit 10 introduced.)

11  BY MR. MORRIS:

12      Q.    Do you see that this is the "Amended

13  Answer" that was filed on your behalf?

14            MS. DEITSCH-PEREZ:  Let's please --

15            THE WITNESS:  Yes.

16            MS. DEITSCH-PEREZ:  -- scroll

17       through.

18            THE WITNESS:  Yeah, please scroll

19       through.

20            (Scrolling.)

21  BY MR. MORRIS:

22      Q.    All right.  Have you seen this

23  document before, sir?

24      A.    Yes, generally.

25      Q.    Did you -- do you recall if you saw

1          Dondero - 5-28-2021

2     it prior to the time it was served and filed on

3     your behalf?

4          A.    Probably.

5          Q.    Did you authorize it to be filed on

6     your behalf?

7          A.    Yes.

8               MR. MORRIS:  Can we please go to

9          page 6 of 8?

10              (Scrolling.)

11              MR. MORRIS:  And if we can scroll

12         just down to the "Affirmative Defenses."

13    BY MR. MORRIS:

14         Q.    All right.  Do you see

15    paragraph 40 --

16         A.    Yeah.

17         Q.    -- as compared to the prior version

18    of your answer, has added the words, quote,

19    "upon fulfillment of conditions subsequent."

20    Do you see that?

21         A.    Yes.

22         Q.    Why were those words added?

23              MS. DEITSCH-PEREZ:  Object to the

24         form.

25         A.    I think to make this document more

1                  Dondero - 5-28-2021

2    complete and more clarified as things were

3    learned and investigated.

4    BY MR. MORRIS:

5         Q.    And were things "learned and

6    investigated" after the time that you submitted

7    the -- withdrawn.

8              Were things "learned and

9    investigated" after the time the original

10   answer was served and filed on your behalf?

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13             And I would also just caution the

14        witness before he speaks to think -- to

15        make sure he doesn't disclose

16        attorney-client communications.

17        A.    I'm sorry, could you please repeat

18   the question?

19   BY MR. MORRIS:

20        Q.    Sure.  Did you, personally, learn or

21   discover anything related to this amended

22   paragraph 40 after the time that the original

23   answer was filed on your behalf?

24             MS. DEITSCH-PEREZ:  Same objection.

25        A.    We went through the -- the --

1                Dondero - 5-28-2021

2                MS. DEITSCH-PEREZ:  When you say

3           "we," are you talking about you and

4           lawyers?

5                THE WITNESS:  Yes.

6                MS. DEITSCH-PEREZ:  Don't disclose

7           your communications with lawyers.

8      BY MR. MORRIS:

9           Q.   All right.  I don't want to know

10     anything about your communications with

11     lawyers, but I'm going to ask you for facts.

12               What facts, if any, did you learn

13     after the original answer was filed that relate

14     to the words, quote, "upon fulfillment of

15     conditions subsequent."

16          A.   The "conditions subsequent" involved

17     in the first quarter of 2019 were always an

18     event, but it wasn't captured properly or

19     needed to be clarified in the amendment.

20          Q.   Well, you mentioned that "things

21     were learned and investigated" after the answer

22     was filed, and I'm just trying to pin down what

23     that was?

24          A.   I -- I took it more seriously with

25     the lawyers as it -- as the notes became more

1                  Dondero - 5-28-2021

2    of an issue, and it's -- I'm very busy over

3    here and then spent more time going through the

4    details, and this needed to be clarified or

5    stated differently.

6         Q.    Okay.  With respect to the agreement

7    referred to in paragraph 40, whose idea was it

8    to enter into that agreement?

9         A.    It was -- it was mine.

10        Q.    Okay.  And who were -- who were the

11   majority of Class A holders that you referred

12   to earlier?

13        A.    That was the counterparty

14   decision-maker for Highland prior to

15   bankruptcy, and like I said, I believe it was

16   Dugaboy.

17        Q.    Can you think of any other member of

18   Class A who entered into this agreement on

19   behalf of the debtor in the early part of 2019

20   other than Dugaboy?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        A.    I do believe it was necessary.

24   Dugaboy alone was the requisite majority.  I

25   didn't -- I don't remember or remember even

1              Dondero - 5-28-2021

2    thinking about including anybody else.

3    BY MR. MORRIS:

4         Q.    Okay.  And to be clear, Mr. Dondero,

5    I'm not -- I don't have a view one way or the

6    other as to whether you should or shouldn't --

7    who you should have contacted.

8              I just want to know who -- if you

9    can identify for me the Class A members who

10   acted to approve the agreement that's referred

11   to in paragraph 40.

12             Is there anybody other than Dugaboy?

13        A.    Not -- not -- not -- not

14   specifically regarding that comp cycle.

15        Q.    Okay.  And who acted on behalf of

16   Dugaboy to enter into the agreement that's

17   referred to in paragraph 40?

18        A.    The trustee.

19        Q.    The trustee of Dugaboy?

20        A.    Yes.

21        Q.    And who was the trustee of Dugaboy

22   in the January/February 2019 time period that

23   entered into this agreement on behalf of the

24   debtor?

25        A.    My sister Nancy.

1                    Dondero - 5-28-2021

2        Q.    Did you and Nancy discuss this

3    agreement at all?

4        A.    This agreement?  No.

5        Q.    Can you describe --

6              MS. DEITSCH-PEREZ:  What do you mean

7        by "this agreement"?

8              (Simultaneous conversation.)

9        A.    Not the one that's on the screen.

10   BY MR. MORRIS:

11       Q.    Yes.  That's the only one that I'm

12   talking about, so --

13             MS. DEITSCH-PEREZ:  So you mean --

14             MR. MORRIS:  Please, please, Deb --

15             MS. DEITSCH-PEREZ:  John, can you

16       please clarify:  Are you asking if he

17       discussed the answer with Nancy or the --

18             MR. MORRIS:  I didn't use the word

19       "answer."  I used the word "agreement," so

20       let me --

21             MS. DEITSCH-PEREZ:  I know, but he

22       pointed to the screen.

23             (Simultaneous conversation.)

24             MR. MORRIS:  Are you done?

25             MS. DEITSCH-PEREZ:  Yes.

1              Dondero - 5-28-2021

2    BY MR. MORRIS:

3        Q.    Mr. Dondero, can you describe for

4    me -- withdrawn.

5              Did you discuss with your sister

6    Nancy, the agreement that's referred to in

7    paragraph 40?

8        A.    The agreement to subsequent

9    conditions, yes, absolutely.  But this

10   agreement that's on the screen, I've never --

11   I've never -- I've never shown her this

12   document or talked to her about it.

13       Q.    I'm not asking about the document.

14   I'm not asking about the document.  I'm asking

15   about the agreement that's referred to in

16   paragraph 40.

17             Do you understand that?

18       A.    Yes.  And, yes, we had several

19   conversations about it.

20       Q.    Okay.  Can you describe for me

21   everything you remember about your discussions

22   with Nancy concerning the agreement that's

23   referred to in paragraph 40?

24       A.    That the loans that were in place

25   would be forgiven upon a monetization -- the

1                   Dondero - 5-28-2021

2    favorable monetization of certain large or

3    liquid assets on the Highland balance sheet;

4    and the three that were focused on was MGM,

5    Trussway, and Cornerstone.

6         Q.    Did she say anything in response?

7         A.    Just, "How much are we talking

8    about?"  And I told her it was about 9 million

9    in aggregate, and -- and I told her that it

10   was -- that the forgiveness or the compensation

11   was compliant regarding any credit covenants or

12   Hunter Mountain covenants --

13        Q.    Do you recall any --

14        A.    -- that -- that if it were to be

15   forgiven, that additional compensation would be

16   compliant or permitted and really not material

17   relative to any outstanding credit agreements

18   that Highland had or agreements with Hunter

19   Mountain.

20        Q.    Is this something that you discussed

21   with her, or is this just information that

22   you're giving me?

23        A.    This is what I discussed -- that's

24   almost the entirety of the conversation.  It

25   happened over a couple different conversations,

1                    Dondero - 5-28-2021

2    but...

3        Q.    Did anybody participate in any of

4    the conversations you're describing other than

5    you and your sister?

6        A.    I don't believe it was necessary, it

7    didn't include anybody else.

8        Q.    Okay.  Again, I'm not here to

9    question.  I'm just looking for facts,

10   Mr. Dondero.

11           So nobody participated in any of

12   these conversations that you can recall other

13   than you and Nancy; is that correct?

14       A.    Correct, that I -- yes, there was

15   never a third party involved in our

16   conversations.  I don't know -- I don't think

17   she discussed it with anybody else, but I don't

18   know.

19       Q.    Did -- was the agreement subject to

20   any negotiation?  Did she make any

21   counterproposal of any kind?

22       A.    No.  No, I -- again, I believe both

23   of our views at the time was that it was

24   immaterial to Highland overall or any other

25   agreements.

1              Dondero - 5-28-2021

2      Q.     Do you know if she sought any

3  independent advice before entering into the

4  agreement that you've described?

5      A.     I don't know.

6      Q.     Do you recall whether you provided

7  her with any documents of any kind in

8  connection with the discussions that led to the

9  agreement that's referred to in paragraph 40?

10     A.     I -- I have no -- I don't -- I don't

11 believe -- no, I don't believe I gave her

12 copies of the relevant Hunter Mountain

13 limitations, or whatever.  I just spoke to her

14 about it.

15     Q.     Okay.  I'm just asking -- I'm asking

16 a broader question:  Do you recall giving her

17 any documents of any kind in connection with

18 the discussions that led to the agreement in

19 paragraph 40?

20     A.     Not -- not that I recall.  She --

21 she may -- she may have some, but I don't

22 remember.

23     Q.     Do you know if there were any

24 resolutions that were adopted by Highland to

25 reflect the agreement that's referred to in

1                    Dondero - 5-28-2021

2    paragraph 40?

3        A.    Resolutions that -- no, not that I'm

4    aware of.

5        Q.    Did you give -- did you give Nancy a

6    copy of the three promissory notes that were

7    the subject of the agreement referred to in

8    paragraph 40?

9        A.    No.

10       Q.    Did she ask to see any documents

11   before entering into the agreement that's

12   referred to in paragraph 40?

13       A.    I -- I don't remember.

14       Q.    Did you suggest that she speak with

15   anybody prior to the time that she entered into

16   the agreement that's referred to in

17   paragraph 40?

18            MS. DEITSCH-PEREZ:  Asked and

19       answered.

20       A.    Yeah.  No.

21   BY MR. MORRIS:

22       Q.    Do you know whether she actually

23   spoke with anybody concerning the subject

24   matter of the agreement that's referred to in

25   paragraph 40 prior to the time it was entered

1          Dondero - 5-28-2021

2     into?

3          A.     I don't know.

4          Q.     Is there any time period by which

5     the subsequent -- the conditions subsequent

6     have to be fulfilled, or are they open-ended?

7          A.     I believe it was open-ended.

8          Q.     Under the agreement that's referred

9     to in paragraph 40, did the debtor surrender

10    its right to make a demand under the promissory

11    notes?

12          MS. DEITSCH-PEREZ:  And, again, are

13      you talking about the debtor as in

14      post-bankruptcy or --

15          MR. MORRIS:  I apologize.  Thank

16      you.  Thank you.  Thank you.  Thank you.

17          Withdrawn.

18    BY MR. MORRIS:

19          Q.     Under the agreement that you reached

20    with Nancy that's referred to in paragraph 40,

21    was it your understanding that Highland

22    surrendered its right to make a demand for

23    payment of unpaid principal and interest under

24    the notes?

25          A.     I think essentially, yes.

1          Dondero - 5-28-2021

2     Q.    Okay.  What did Highland receive in

3  return for its agreement to surrender its right

4  to make a demand for unpaid principal and

5  interest, if anything?

6     A.    I think with all forgiveness of

7  notes, what it gets is it gets focus in terms

8  of the monetization and it reduces additional

9  compensation that I could have/would have taken

10  otherwise, or could have/would have been

11  entitled to otherwise.

12          So, it's -- yeah, I mean, I think

13  it's, again, heightened focused for something

14  that would be great for the debtor or great for

15  Highland at the time and reduces -- that form

16  of forgiveness becomes compensation when and if

17  it occurs, and then it -- it theoretically

18  reduces other compensation.

19     Q.    So why not just forgive it at that

20  moment?

21          Why tie it to "conditions

22  subsequent"?

23     A.    I thought it was more appropriate.

24     Q.    Did you and Nancy discuss at all

25  what the benefit would be to Highland from this

1                    Dondero - 5-28-2021

2    arrangement?

3         A.    The focus -- the focus parts for

4    sure.

5         Q.    And without -- without the agreement

6    that's referred to in paragraph 40, you

7    wouldn't have been focused on maximizing the

8    enterprises; is that right?

9         A.    No.

10        Q.    So -- I'm sorry, maybe I missed it.

11              When you used the word "focus" --

12   let me -- when you use the word "focus," what

13   do you mean?

14              What is the benefit to the debtor?

15              MS. DEITSCH-PEREZ:  Object to the

16        form.

17              He said "heightened focus."

18        A.    Yeah, heightened focused was my

19   words, which --

20   BY MR. MORRIS:

21        Q.    Okay.

22        A.    -- you know, means beyond normal

23   focus.  It means additional effort just like in

24   any company or what we do here with other

25   employees, for things you really want to get

1                 Dondero - 5-28-2021

2   done or focus on, you provide that extra

3   incentive.

4       Q.    Okay.   So -- so that's the benefit

5   to Highland, was that you were going to have a

6   heightened focus on maximizing value; is that

7   fair?

8           MS. DEITSCH-PEREZ:   Object to the

9       form.

10      A.    And then also the part 2 of my

11   answer, right, which, you know, that

12   forgiveness would be compensation which

13   would -- in any given year, additional

14   compensation coming from forgiveness reduces

15   other compensation.

16   BY MR. MORRIS:

17      Q.    Was that part of the agreement that

18   you reached with Nancy?   Was that -- was that

19   when these notes were forgiven, you would forgo

20   an amount equivalent to the outstanding

21   principal and unpaid interest?

22          MS. DEITSCH-PEREZ:   Object to the

23       form, misstates his prior testimony.

24      A.    Yeah.   I remember discussing the

25   focus part with her.   The -- I was giving that

1          Dondero - 5-28-2021

2    answer when you were asking me what would be

3    the benefit or consideration to Highland and

4    then ultimately to debtor.  I was giving you

5    compensation answer.

6    BY MR. MORRIS:

7        Q.    Okay.  So I just -- but I do want to

8    try to understand from your perspective the

9    benefit to the debtor.

10            And, one, you told me about the

11   heightened focus, and the second --

12       A.    Right.

13       Q.    -- I think you said, and correct me

14   if I'm wrong, that it would relieve the debtor

15   of paying some compensation in the future.

16            Am I mistaken about that?

17       A.    Yeah, I mean -- I'm sorry.  Repeat

18   that one more time, please.

19       Q.    I believe you said that the second

20   benefit to Highland from entering into the

21   agreement referred to in paragraph 40 is that

22   it would relieve them of a future obligation to

23   pay compensation in the same amount.

24            Do I have that right?

25            MS. DEITSCH-PEREZ:  Object to the

1                    Dondero - 5-28-2021

2        form.

3        A.    Maybe not exactly "the same amount,"

4  but it would -- it would -- it would reduce

5  comp -- yes, it would -- it would, like, in the

6  next cycle, reduce -- or when it was realized,

7  would likely reduce comp then.

8  BY MR. MORRIS:

9        Q.    Okay.  And by what amount would it

10 likely reduce comp, then?

11       A.    I don't know.  By significant --

12 by -- by a significant amount, by something

13 similar to the 9 million bucks.

14       Q.    Okay.  So, is there any -- I'm just

15 trying to understand your perspective.

16             One of the benefits from entering

17 into the agreement referred to in paragraph 40

18 is that upon the realization of the forgiveness

19 of the debt, Highland or the debtor, whatever

20 the case may be, in the future would be

21 relieved from paying you an amount similar to

22 the principal amount of the notes?

23             Do I have that right?

24       A.    Yeah, or -- or -- yeah.  I guess the

25 reason why I keep going back and forth on the

1                      Dondero - 5-28-2021

2    exactness of the answer is that if --

3    there's -- depending on what the compensation

4    target is and whether or not you wanted to grow

5    something up or you're looking for a net

6    amount, but forgiveness of debt becomes a

7    taxable event with no -- no additional ability

8    to pay taxes.  So it's usually not an exact

9    offset to future compensation, the way we've

10   done it here historically.

11        Q.    In the agreement that you reached

12   with Nancy that's referred to in paragraph 40,

13   were there any other -- withdrawn.

14             In the agreement that you reached

15   with Nancy that's referred to in paragraph 40,

16   were there any circumstances under which you

17   would have been obligated to pay all unpaid

18   principal and interest under the notes?

19        A.    If the illiquid assets weren't -- or

20   if -- if none of the illiquid assets were

21   monetized.

22        Q.    But you were -- you were, at the

23   time you entered into this oral agreement, in

24   control of whether or not to monetize those

25   illiquid assets, right?

1            Dondero - 5-28-2021

2       A.    And I expected they would be over

3  time, yes.

4       Q.    Okay.  So, based on your control of

5  the enterprise at the time that you entered

6  into the agreement, is there any -- did you

7  have any -- any scenario under which you

8  believed you might actually have to pay back

9  the unpaid principal and interest due under the

10  notes?

11      A.    If they weren't monetized.

12      Q.    Okay.  Anything else?

13      A.    Assets weren't monetized, yeah.

14      Q.    Anything else?

15      A.    That's -- that's my recollection.

16      Q.    If -- if you -- have the "conditions

17  subsequent" been met yet?

18      A.    I believe the announcement of the

19  MGM sale will meet the conditions precedent

20  when it closes four or five months from now.

21      Q.    Okay.  But none of them have been

22  met -- have the conditions subsequent been met

23  as of today?

24      A.    Have the conditions subsequent been

25  met today.  I don't have awareness of --

```
 1                    Dondero - 5-28-2021
 2   despite objecting vehemently, we don't have
 3   awareness of what the debtor is doing with
 4   Trussway or Cornerstone.  So there's a
 5   potential that those could have triggered, but
 6   I don't -- I don't have -- I don't have
 7   awareness.
 8        Q.    Okay.  Do you know -- and forgive
 9   the question, sir, honestly.  But do you
10   know --
11        A.    Sure.
12        Q.    -- whether your estate would be
13   liable to pay all of the undue principal --
14   unpaid principal and interest if you passed
15   before the conditions subsequent were
16   satisfied?
17             MS. DEITSCH-PEREZ:  Object to the
18        form.
19        A.    I -- I don't know that answer.
20   BY MR. MORRIS:
21        Q.    That wasn't something that you and
22   your sister discussed in January or February of
23   2019; is that fair?
24        A.    I wasn't contemplating that event at
25   that point in time.
```

1                    Dondero - 5-28-2021

2          Q.    That's why I say "forgive the

3    question," sir.

4                Did you ever ask anybody to write

5    the agreement in paragraph 40 down on paper so

6    that it was memorialized somewhere?

7          A.    No.

8          Q.    Did you and Nancy --

9                (Simultaneous conversation.)

10         A.    I'm sorry, go ahead.

11   BY MR. MORRIS:

12         Q.    Do you and Nancy communicate by

13   email from time to time?

14         A.    Almost entirely phone.  I -- from

15   time to time, but it's almost entirely phone.

16         Q.    All right.  Let's -- let's move on.

17         A.    Can I clarify something from before?

18         Q.    Of course.

19         A.    If the assets were never monetized

20   or the -- the notes would stay in place and not

21   be forgiven.

22                If the assets were all monetized

23   below cost or what was considered a less

24   favorable scenario, then it would be -- to

25   forgive it, something would have to be

1                    Dondero - 5-28-2021

2    monetized above cost, you know; but if they

3    were all monetized below cost, that would make

4    the note payable.

5         Q.    I appreciate that.

6              MR. MORRIS:  Let's go to the next

7         document, document Number 11.

8              (Exhibit 11 introduced.)

9              MR. MORRIS:  If we could just scroll

10        down, please.

11             (Scrolling.)

12   BY MR. MORRIS:

13        Q.    All right.  Now, these are your

14   objections and responses to the debtor's second

15   request for admissions.  Do you see that?

16        A.    Yes.

17             MR. MORRIS:  And let's scroll down

18        to page 4, please.

19             (Scrolling.)

20   BY MR. MORRIS:

21        Q.    Okay.  Do you recall whether you saw

22   this document before it was served and filed on

23   your behalf?

24        A.    Yes.  Can we go all the way through,

25   just go all the way down?

1          Dondero - 5-28-2021

2          Was this notarized, also?

3     Q.     No, because these are responses to

4  requests to admit.  You only --

5     A.     Okay.

6     Q.     You only notarize responses to

7  interrogatories, for whatever reason.  So these

8  were not.  Yeah.

9          But I'm just asking you if you have

10  a memory of reviewing the requests for

11  admission before they were served and filed on

12  your behalf?

13     A.     Yes.

14     Q.     Okay.  And did you authorize your

15  lawyers to serve and file this document on your

16  behalf?

17     A.     Yes.

18     Q.     Okay.  Looking at Request For

19  Admission Number 1, it asks you to admit that

20  in December 2019, you made a payment to the

21  debtor, a portion of which was applied to

22  reduce principal and/or interest due under one

23  or more of the notes.

24          Have I read that correctly?

25     A.     Yes.

```
1                   Dondero - 5-28-2021

2        Q.    And you've admitted that that

3   statement is true and accurate as written,

4   right?

5        A.    Yeah, I believe so.  The -- yeah, I

6   believe so.  Let me let you ask the questions.

7        Q.    Okay.  Do you have any reason to

8   believe, as you sit here right now -- let me

9   ask you a different question.

10             Do you want to amend your response

11  in any way right now?

12       A.    I -- I'm not aware of small amounts

13  in terms of, like, interest or principal; and

14  then sometimes the tax guys will say periodic

15  interest payments are important to -- for the

16  character of the notes, so sometimes periodic

17  interest payments are made.  Sometimes I think

18  they peck on some of the notes.

19             I don't -- I don't know or remember,

20  but I hope that something like this is correct.

21  Sometimes, if there was a need for cash into

22  Highland, the easiest way to -- for me or a

23  different entity to put cash into Highland was

24  to reduce a principal amount of a note with the

25  thought that we could create new notes or
```

1                    Dondero - 5-28-2021

2    increase another note later.

3              So how many times or how often

4    interest payments were made or if there was

5    some small principal payment made at some

6    point, I don't know the details; but I'm hoping

7    that's accurate.

8         Q.    Okay.  We looked at three notes that

9    were signed by you in 2018, correct?

10        A.    Yes.

11        Q.    You signed other notes in favor of

12   Highland prior to that time, correct?

13        A.    I believe -- yeah.  I mean, I

14   believe there were numerous notes beyond these.

15        Q.    Were -- were -- did you ever sign a

16   note in favor of Highland that was forgiven?

17        A.    I don't -- I don't know.

18        Q.    Do you have any recollection of ever

19   paying taxes in connection with a note that was

20   subsequently forgiven by Highland?

21        A.    If there was -- if there was a

22   forgiveness and it was taxable, I would have

23   paid the taxes.  We were compliant in that

24   regard.  I'm a hundred percent comfortable

25   we're compliant, but I don't know.

1                    Dondero - 5-28-2021

2        Q.    Okay.  And I appreciate -- I didn't

3    mean to suggest that you weren't compliant,

4    sir.  I'm just asking you if you can identify

5    any note that you made in favor of Highland

6    that was ever forgiven.

7              MS. DEITSCH-PEREZ:  And I'm just

8         going to object because, while he's not

9         30(b)(6) witness, this is a deposition

10        taken in a particular case and he may have

11        not looked at the records going back to

12        2000, or whatever, that's -- since when

13        Highland was started.

14             MR. MORRIS:  I just can't tell you

15        how inappropriate that is.

16   BY MR. MORRIS:

17        Q.    Go ahead, Mr. Dondero.

18        A.    The same answer, I don't know.

19        Q.    Okay.  You did, in fact, pay in full

20   all principal and interest due on notes that

21   you made in favor of Highland other than the

22   three notes at issue in this case, correct?

23             MS. DEITSCH-PEREZ:  Object to the

24        form.

25        A.    I -- I don't know.  I would repeat

1                 Dondero - 5-28-2021

2    the answer I gave a few minutes ago when I kind

3    of rambled about cash management.

4    BY MR. MORRIS:

5        Q.   Do you know how many notes you made

6    in favor of Highland beyond the three that are

7    the subject of this litigation?

8               MS. DEITSCH-PEREZ:  Object to the

9         form.

10       A.   I -- I do not, regarding myself

11   personally.

12              I am aware that the aggregate amount

13   of affiliated notes is approximately 70 or

14   $80 million, including my notes; but that's it.

15   I mean, that's all I know.

16   BY MR. MORRIS:

17       Q.   All right.  I'm just asking you

18   about you, in your individual capacity.

19       A.   I don't know.

20       Q.   You don't know --

21              (Audio distortion.)

22              THE REPORTER:  You broke up, sir.

23   BY MR. MORRIS:

24       Q.   You don't know the number of

25   notes -- (audio distortion) -- Highland beyond

1                    Dondero - 5-28-2021

2    these three, correct?

3         A.    Correct.

4         Q.    And you can't recall whether any --

5    any notes that you made in favor of Highland

6    were ever forgiven, correct?

7         A.    I -- I don't know.

8         Q.    Okay.  So, did you ever object to

9    the application of the payment referred to in

10   Request For Admission Number 1 to principal

11   and/or interest due under one or more of the

12   notes?

13             Did you ever object to the

14   application of the payment in that way?

15             MS. DEITSCH-PEREZ:  Object to the

16        form.

17        A.    I think the decision on how to

18   handle cash needed at Highland was entirely

19   made and the application to note principal or

20   interest was -- was entirely decided by the

21   accounting group.

22   BY MR. MORRIS:

23        Q.    But did you know that decision was

24   made in or around December 2019?

25        A.    Not really, no.  Not specifically.

1              Dondero - 5-28-2021

2         Q.    Well, you've admitted to the fact.

3    So, when did you learn that in December 2019 a

4    payment made on your behalf, at least a portion

5    of which was applied to reduce principal and/or

6    interest due under one or more of the notes?

7    When did you learn that?

8         A.    I don't know.  It would have been as

9    part of the process in preparing this document.

10         Q.    So it's your testimony that somebody

11    used your money in December 2019 to reduce

12    principal and/or interest due under one or more

13    of the notes without your knowledge?

14         A.    Yeah, without my specific knowledge.

15    There was a reason to put money in at that

16    point in time, and then how they applied it was

17    not my decision --

18         Q.    Making --

19         A.    -- not --

20         Q.    Making a payment -- you would agree

21    that making a payment of principle or interest

22    under one or more of the notes conflicts with

23    the agreement that you reached with Nancy,

24    right?

25              MS. DEITSCH-PEREZ:  Object to the

1          Dondero - 5-28-2021

2     form.

3     A.    No, that's not true.

4  BY MR. MORRIS:

5     Q.    Well, the conditions subsequent

6  hadn't arisen yet; is that fair?

7     A.    The notes were in '18, correct?

8     Q.    Yes, sir.

9     A.    And then, yeah, the subsequent

10 condition was in the first quarter of '19.

11    Q.    Right.  And then, in December of

12 '19, a payment of principal and/or interest was

13 made against one or more of the notes, right?

14    A.    Yes.

15    Q.    And I'm just asking you, sir, if

16 that's inconsistent with the agreement that you

17 reached with Nancy.

18         MS. DEITSCH-PEREZ:  Object to the

19    form.

20    A.    And I'm saying -- I'm saying no.  I

21 mean, it's --

22 BY MR. MORRIS:

23    Q.    Okay.  Since learning of the

24 payment, have you tried to identify the person

25 who was responsible for applying your money in

1                    Dondero - 5-28-2021

2    the way that's described in Request For

3    Admission Number 1?

4         A.    No.

5              MR. MORRIS:  Can we go down to

6         number 4, please?

7    BY MR. MORRIS:

8         Q.    In your amended answer, I think you

9    asserted that the -- "each note is ambiguous."

10   Do I have that right?

11             We can go back, if you would like to

12   look?

13        A.    Is this admission number 4?  Is that

14   where you're pointing to?

15        Q.    It is, and I'll just read it.  It

16   refers to paragraph 45 of the amended answer,

17   and I'll read it.  But I'm happy to go back and

18   put it on the screen, if you'd would like.

19             But it says simply:  "Defendant

20   further asserts that each note is ambiguous."

21             So request for number 4 asks you to

22   admit that before you served that amended

23   answer, you had never informed the debtor of

24   your belief that any provision of the notes was

25   ambiguous.

```
 1              Dondero - 5-28-2021
 2              Do you see that?
 3       A.     Yes.
 4       Q.     And you've denied that request for
 5  admission.
 6              Do you see that?
 7       A.     Yes.
 8       Q.     So, who did you inform at the debtor
 9  of your belief that a provision of the notes
10  was ambiguous?
11              Who did you --
12              MS. DEITSCH-PEREZ:  Object.
13  BY MR. MORRIS:
14       Q.     Who did you communicate that to?
15              MS. DEITSCH-PEREZ:  Object to the
16       form, no foundation.
17       A.     I -- I -- I don't -- "I don't know"
18  is my answer to pretty much any question you
19  could ask there.
20  BY MR. MORRIS:
21       Q.     This is -- you're denying the
22  request for admission, and that's your right.
23              Did you ever inform the debtor of
24  your belief that a provision of the notes was
25  ambiguous?
```

1          Dondero - 5-28-2021

2          MS. DEITSCH-PEREZ:  Object, no

3     foundation.

4     A.    As -- ask the question again,

5     please.

6     BY MR. MORRIS:

7     Q.    Did you ever inform the debtor of

8     your belief that any provision of the notes was

9     ambiguous?

10          MS. DEITSCH-PEREZ:  Object, no

11     foundation.

12     A.    You know, I don't know what

13     conversations were had between lawyers.  I -- I

14     don't know.

15     BY MR. MORRIS:

16     Q.    Okay.  So I'm going to ask a

17     slightly different question because of your

18     answer:  Can you tell me whether you or anybody

19     acting on your behalf ever informed the debtor

20     of your belief that any provision of any of the

21     notes was ambiguous?

22          MS. DEITSCH-PEREZ:  Object, no

23     foundation.

24     A.    I'm going to have to say, yes, I

25     believe that statement is true; but I don't

1                    Dondero - 5-28-2021

2    have specific knowledge.

3    BY MR. MORRIS:

4         Q.    Do you have any knowledge, can you

5    identify any person who informed the debtor of

6    your belief?

7         A.    I don't have specific knowledge.  I

8    don't -- I don't -- I don't know.

9         Q.    Can you tell me when the debtor was

10   informed of your belief that any provision of

11   the notes was ambiguous?

12             MS. DEITSCH-PEREZ:  Object, no

13        foundation.

14        A.    I don't know.

15   BY MR. MORRIS:

16        Q.    Can you identify the person who was

17   acting on behalf of the debtor who was informed

18   by you or anyone acting on your behalf of your

19   belief that any provision of the notes was

20   ambiguous?

21             MS. DEITSCH-PEREZ:  Object, no

22        foundation.

23        A.    I don't know.

24   BY MR. MORRIS:

25        Q.    Okay.

1                Dondero - 5-28-2021

2          MR. MORRIS:  Let's go to the next

3    exhibit, please.

4          THE WITNESS:  Is this a good time

5    for a lunch break?

6          MR. MORRIS:  Yeah.  I'm happy to do

7    it.  I'm trying to move as quickly as I

8    can, Mr. Dondero.  This is a little bit

9    longer than you and I usually sit for, and

10   I apologize for that, but I'm happy to take

11   as long a break as you -- as you need.

12         MS. DEITSCH-PEREZ:  How long do you

13   think you have for the rest of the

14   deposition?  What's your guess?

15         MR. MORRIS:  I would say more than

16   an hour, less than two.

17         MS. DEITSCH-PEREZ:  Do you want to

18   take a really short --

19         THE WITNESS:  Can we take a half

20   hour, like 12:30 our time, 1:30 East Coast

21   time?

22         MR. MORRIS:  Of course.

23         THE WITNESS:  Yeah.  So, we'll take

24   35 minutes, and then we'll get back to it.

25   You know --

1          Dondero - 5-28-2021

2          THE REPORTER:  Are we still on the

3    record, please?

4          MR. MORRIS:  Yes.

5          COURT REPORTER:  Okay.

6          MS. DEITSCH-PEREZ:  We'll --

7          MR. MORRIS:  If you have time

8    constraints -- if you have time

9    constraints, Mr. Dondero, I'm prepared to

10   keep going.  I'll take a shorter break.  I

11   don't want -- you know, I apologize for the

12   burden, but these are relevant questions.

13         THE WITNESS:  Yeah, let's -- let's

14   do 35 minutes, and we will try and wrap it

15   up in -- like you're saying, like an hour

16   or less than two.

17         MR. MORRIS:  Yeah.

18         THE WITNESS:  Yeah.  I do need to be

19   someplace in the early afternoon.

20         MR. MORRIS:  I assure you, I'll do

21   my best to keep to that time frame.

22         THE WITNESS:  Okay.  Thank you.

23         THE REPORTER:  And we're off the

24   record.

25         (Lunch recess held.)

```
 1               Dondero - 5-28-2021

 2          MR. MORRIS:  Can we put up the next

 3     exhibit, which I believe is Number 12?

 4          (Exhibit 12 introduced.)

 5  BY MR. MORRIS:

 6      Q.    Okay.  So, Mr. Dondero, these are

 7  interrogatories, and so I direct you first to

 8  the last page of the document, the Verification

 9  page.

10               And is that your signature, sir?

11      A.    Yes.

12      Q.    Now, this wasn't notarized.  Is

13  there a reason why you didn't get this

14  notarized?

15      A.    No.

16      Q.    Okay.

17          MR. MORRIS:  If we could just scroll

18     back up.

19  BY MR. MORRIS:

20      Q.    But is the Verification true --

21          MR. MORRIS:  If we just go back to

22     it.

23  BY MR. MORRIS:

24      Q.    At the time you signed this

25  document, had you read the Defendant's
```

1                    Dondero - 5-28-2021

2    Objections and Answers to Highland Capital

3    Management, L.P.'s Second Set of

4    Interrogatories?

5         A.    Yes.

6         Q.    And did you believe that the facts

7    stated therein were both within your personal

8    knowledge and were true and correct?

9         A.    Yes.

10        Q.    Okay.

11             MR. MORRIS:  Can we go to the

12        substance of the document on page 4 of 6?

13   BY MR. MORRIS:

14        Q.    Okay.  So, in the answer to

15   Interrogatory No. 1, you identify the

16   conditions subsequent that were the subject of

17   the agreement that we've been talking about

18   that you and Nancy entered into.

19             Do I have that right?

20        A.    Yes.

21        Q.    And to the best of your knowledge,

22   does the answer that's set forth in response to

23   Interrogatory No. 1 fully and accurately set

24   forth the conditions subsequent that were the

25   subject of the agreement?

1                Dondero - 5-28-2021

2           MS. DEITSCH-PEREZ:  Object to the

3       form.

4       A.    Repeat the question, please.

5    BY MR. MORRIS:

6       Q.    Does this answer to Interrogatory

7    No. 1 set forth, to the best of your knowledge

8    and understanding, the conditions subsequent

9    that were part of the agreement that you and

10   Nancy entered into in January or February 2019?

11          MS. DEITSCH-PEREZ:  Object to the

12      form.

13      A.    Yes, large -- yes, largely --

14   BY MR. MORRIS:

15      Q.    Okay.

16      A.    -- or yes.

17      Q.    Is there any aspect of this that you

18   believe right now is incorrect?

19      A.    No.

20      Q.    Is there any aspect of your

21   agreement with Nancy on the conditions

22   subsequent that's not described in this answer?

23          MS. DEITSCH-PEREZ:  Object to the

24      form.

25      A.    My recollection is that that largely

1          Dondero - 5-28-2021

2    captures it.

3    BY MR. MORRIS:

4         Q.    Okay.  There's a reference there to,

5    quote, "the disposition of the portfolio

6    company interests managed and/or owned directly

7    or indirectly by Highland and/or its affiliates

8    or managed funds."

9              Do you see that?

10        A.    Yes.

11        Q.    What does that refer to?

12        A.    Just, you know, MGM is owned in a

13   variety of places, Cornerstone is owned in a

14   variety of places, and then Trussway is owned

15   in a subsidiary of Highland.

16             So there -- I believe it's to

17   capture the fact of the different ownerships or

18   controls of those three different investments.

19        Q.    Are those the only portfolio company

20   interests managed and/or directly or indirectly

21   by Highland or its affiliates -- withdrawn.

22   That was bad.

23             This answer doesn't refer

24   specifically to any particular assets, correct?

25        A.    It does not.

1                      Dondero - 5-28-2021

2          Q.      Okay.

3          A.      Well, yeah.  I think what the intent

4     was -- those three companies I just mentioned

5     were always considered portfolio companies.

6     There have been a few others over the years,

7     but those are -- those -- I think they're

8     trying to capture them that way, but I only

9     remember talking to her about those three.

10         Q.      Are there any other portfolio

11    company interests that are managed and/or owned

12    directly or indirectly by Highland and/or its

13    affiliates or managed funds?  Are there any

14    other assets?

15              MS. DEITSCH-PEREZ:  Object to the

16         form.

17         A.      There were some lesser private

18    equity investments or companies, yes.

19    BY MR. MORRIS:

20         Q.      Can you identify them?

21         A.      CCS Medical.  I think OmniMax was

22    one.  Kerri International.  Yeah, those --

23    those are ones that come to mind.

24         Q.      Okay.  But notwithstanding the

25    answer here, to the best of your recollection,

1                    Dondero - 5-28-2021

2    the agreement that you had with Nancy pertained

3    only to MGM, Cornerstone, and Trussway.  Do I

4    have that right?

5                 MS. DEITSCH-PEREZ:  Object to the

6         form.

7         A.    The monetization of those three were

8    the -- were the conditions subsequent, yes.

9    BY MR. MORRIS:

10        Q.    Okay.  And there's a reference there

11   to being disposed of, quote, on a favorable

12   basis.

13                Do you see that?

14        A.    Yes.

15        Q.    What does that mean?

16        A.    Above cost or book value.

17        Q.    How much above cost or book value

18   would you have to dispose of MGM, Cornerstone,

19   and Trussway in order to trigger the conditions

20   subsequent?

21        A.    There wasn't -- there was just

22   monetization on a favorable basis.  There

23   wasn't a specific amount on each individual

24   one.  It only took one to trigger it.

25        Q.    Oh.  So the sale of any of those

```
1                Dondero - 5-28-2021

2   three assets would trigger the conditions

3   subsequent?

4        A.    Correct.

5        Q.    Okay.  And who decided whether the

6   asset was sold on a favorable basis?

7              Who made that decision, under your

8   agreement with Nancy?

9        A.    It was just defined relative to

10  cost, so it was just -- it was just a

11  factual -- there's nothing to decide.  It would

12  just be a factual answer.

13       Q.    So, I just want to make sure I

14  understand.

15             Your agreement with Nancy was that

16  --

17       A.    Yes.

18       Q.    -- that -- all right.  Withdrawn.

19             Your agreement with Nancy in January

20  or February 2019, was that if any of MGM,

21  Cornerstone, or Trussway was sold at cost, the

22  debtor would forgive your obligations under the

23  three notes.

24             Do I have that right?

25             MS. DEITSCH-PEREZ:  Object to the
```

1               Dondero - 5-28-2021

2     form.

3     A.   If any of them were sold above cost,

4  it would -- monetization would trigger the --

5  the three notes -- forgiveness of the three

6  notes, yes.

7  BY MR. MORRIS:

8     Q.   Okay.  And I just want to see if I

9  can understand:  Did you and Nancy discuss in

10  January or February 2019 how much above cost

11  the sale would have to be in order for the

12  debtor to forgive your obligations under the

13  three notes?

14          MS. DEITSCH-PEREZ:  Object to the

15     form.

16     A.   No.  It just had to be above cost,

17  not a amount above cost.

18  BY MR. MORRIS:

19     Q.   Okay.

20     A.   Because just monetizing it -- just

21  monetizing it and getting liquidity for an

22  illiquid investment, even if it was at cost, is

23  good.  So something above cost is great.  And

24  those are all big assets, and the notes were

25  small.

1          Dondero - 5-28-2021

2     Q.    Okay.  So, again, I just want to

3  really understand your agreement with Nancy.

4          Did you and her specifically agree

5  in January or February 2019 that if you sold

6  either MGM or Cornerstone or Trussway for at

7  least $1 more than cost, then your obligations

8  under the three notes would be forgiven?

9          MS. DEITSCH-PEREZ:  Object to the

10     form.

11     A.    Before I answer that, I just -- can

12  you repeat so I can get all the subjects and

13  participants straight in my head from the

14  beginning of that question?

15  BY MR. MORRIS:

16     Q.    Sure.  Did you and Nancy agree in

17  January or February 2019 that if Highland sold

18  either MGM or Cornerstone or Trussway for an

19  amount that was equal to at least $1 more than

20  cost, that -- that Highland would forgive your

21  obligations under the three notes?

22          MS. DEITSCH-PEREZ:  Object to the

23     form.

24     A.    I believe that is correct.

25  BY MR. MORRIS:

1                Dondero - 5-28-2021

2       Q.      Thank you very much.

3               Was Grant Scott the trustee of the

4    Dugaboy trust in January or February 2019?

5       A.      He was at one point.  I don't know

6    if he was -- I don't know when he was the

7    trustee, but he got replaced at a -- some point

8    in time.

9       Q.      Do you know if it was before or

10   after the petition date?

11      A.      Before or after the petition date.

12              It was before the petition date.

13              MR. MORRIS:  Okay.  I'd ask for the

14       production of any documents that show that

15       Nancy Dondero was the trustee of the

16       Dugaboy trust in January or February 2019.

17              MS. DEITSCH-PEREZ:  I'll take your

18       request under advisement.

19   BY MR. MORRIS:

20      Q.      Now, the last portion of

21   Interrogatory No. 1, the answer to it, refers

22   to a, quote, "basis wholly outside Dondero's

23   control."

24              Do you see that?

25      A.      Uh-huh.

1                    Dondero - 5-28-2021

2          Q.    Was that part of the agreement that

3    you entered into with Nancy in January or

4    February 2019?

5          A.    Yeah.  It was probably unnecessary

6    complexity, but yes.

7          Q.    Was there anything that you

8    envisioned in January or February 2019 that

9    would have caused you to lose control of

10   Highland?

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13        A.     No, and I wasn't -- that wasn't the

14   thought process.

15   BY MR. MORRIS:

16        Q.     So what was the thought process?

17   Why was that phrase part of -- why --

18   withdrawn.

19             Did you include that -- that aspect

20   of the conditions subsequent -- withdrawn.

21             Who decided that one of the

22   conditions subsequent would be the disposition

23   of the assets that you've described, quote,

24   "wholly outside of Dondero's control."

25             Whose idea was it to put that into

1          Dondero - 5-28-2021

2    the agreement?

3         A.    It was -- it was mine.  And, again,

4    it was probably unnecessary complexity, but...

5         Q.    And why did you want that piece of

6    it into the agreement?

7         A.    MGM ended up being a success story,

8    but the value of MGM and the prospects of MGM

9    have bounced around considerably over the last

10   decade.  And we never owned more than 17 or

11   18 percent and there was a 32 percent holder,

12   and Carl Icahn was involved at different points

13   in time.  There was definitely a chance that,

14   over our objections, it could have been sold at

15   a lower price without our support.

16             And as far as Cornerstone was

17   concerned, there was a half or a majority that

18   was in the Restoration Fund that had a whole

19   bunch of outside investors in it; and,

20   theoretically, that could have been sold

21   without our -- or against our recommendations.

22             So it was really meant to capture

23   those two possibilities.

24        Q.    Did you tell Frank Waterhouse at any

25   time about your agreement with Nancy that's

1          Dondero - 5-28-2021

2    subject to the conditions subsequent referred

3    to here in Interrogatory No. 1?

4          A.    I don't know if Frank knew the

5    specifics.  I think Frank really was aware that

6    the loans could and would likely be forgiven

7    and -- yes.  That's all to that answer.

8          Q.    Did you tell him that?

9          A.    Yes, and -- I mean, partly he knew

10   it from the history of Highland, and the

11   structure of the notes are structured in a way

12   that facilitates forgiveness.

13              MR. MORRIS:  I move to strike.

14   BY MR. MORRIS:

15        Q.    Did you ever tell Frank Waterhouse

16   about the agreement that you reached with

17   Nancy?

18              MS. DEITSCH-PEREZ:  Object to the

19        form.

20        A.    Not -- not the specifics.

21   BY MR. MORRIS:

22        Q.    Did you ever mention anything about

23   any aspect of your agreement to Nancy -- with

24   Nancy to Frank Waterhouse?

25              MS. DEITSCH-PEREZ:  Object to the

1           Dondero - 5-28-2021

2      form.

3      A.    I -- listen, I don't -- I don't

4   remember talking to him about the specifics,

5   but, in general, I -- he -- he -- he was deeply

6   involved in the thought process and the

7   conclusion that the notes were forgiven or

8   going to be for- --

9           MR. MORRIS:  I'm going to move to

10      strike.

11   BY MR. MORRIS:

12      Q.    And I'm not asking you to get into

13   his head to tell me what you think he knew.

14   I'm asking you about what you told him.

15           Did you ever tell Mr. Waterhouse

16   that you reached an agreement with Nancy

17   pursuant to which the debtor had agreed not to

18   collect on the notes subject to the conditions

19   subsequent set forth in your answer to

20   Interrogatory No. 1?

21           MS. DEITSCH-PEREZ:  Object to the

22      form.

23      A.    I don't remember.  I -- I don't

24   remember enough to say conclusively one way or

25   the other.

1              Dondero - 5-28-2021

2   BY MR. MORRIS:

3       Q.    Do you have any recollection of

4   telling any employee at Highland at any time of

5   your agreement with Nancy?

6              MS. DEITSCH-PEREZ:  Object to the

7        form.

8       A.    I -- I don't know.

9   BY MR. MORRIS:

10      Q.    Okay.  Did you tell anybody employed

11  or representing the debtor at any time of your

12  agreement with Nancy?

13             MS. DEITSCH-PEREZ:  Object to the

14       form.

15      A.    Not that I -- not that I recall.

16  Again, I didn't think there was a reason to,

17  initially.

18             MR. MORRIS:  Can we go to

19       Exhibit 13, please?

20             (Exhibit 13 introduced.)

21  BY MR. MORRIS:

22      Q.    All right.  When you were the CEO,

23  did PricewaterhouseCoopers serve as Highland's

24  auditors?

25             MS. DEITSCH-PEREZ:  Object to the

1            Dondero - 5-28-2021

2      form.

3      A.    At different times they were, and

4  then KPMG was.  I don't remember who it was in

5  '17.

6  BY MR. MORRIS:

7      Q.    Okay.  And it's a fact, is it not,

8  that until at least year-end 2018, Highland had

9  audited the financial statements prepared for

10 itself, right?

11     A.    I don't know.  I wasn't aware they

12 stopped.

13     Q.    Okay.  Okay.

14            So, I'm putting up on the screen the

15 "Consolidated Financial Statements and

16 Supplemental Information" for the period

17 December 31st, 2017.

18            Do you see that?

19     A.    Uh-huh.

20            MR. MORRIS:  And if we can go first

21        to the page marked 33470, which is, I

22        think, the --

23            And is this -- does this refresh

24        your recollection that PWC served as

25        Highland's independent auditors for the

1                Dondero - 5-28-2021

2        financial statements prepared for the year

3        ending December 31st, 2017?

4                MR. MORRIS:  If you could scroll

5        down to the bottom of the page so

6        Mr. Dondero can see the date.

7        A.    Okay.

8    BY MR. MORRIS:

9        Q.    Do you see that?

10       A.    If you're asking me to agree that it

11   was Pricewaterhouse, yes, I agree.

12       Q.    And do you see that they signed

13   their letter on May 18th, 2018?  Do you see

14   that?

15       A.    Yeah.

16       Q.    And do you see, towards the top of

17   the page, there's a statement about

18   "Management's Responsibility for the

19   Consolidated Financial Statements"?

20       A.    Yes.

21       Q.    And that's a pretty standard clause

22   that auditors include in audited financial

23   statements, in your experience; isn't that

24   right?

25       A.    Yes.

1                Dondero - 5-28-2021

2                MR. MORRIS:  Can we go to the

3        page -- the next page, 3471?

4    BY MR. MORRIS:

5        Q.    This is the Consolidated Balance

6    Sheet for the period December 31, 2017, and

7    it's been redacted except to show "Notes and

8    other amounts due from affiliates."  Do you see

9    that?

10       A.    Uh-huh.

11       Q.    When you were the CEO, did Highland

12   carry the Notes and Other Amounts Due from

13   Affiliates as assets on its balance sheet?

14       A.    Yes.

15       Q.    Okay.  And that's what's reflected

16   on this page; is that correct?

17       A.    I mean, that's what the heading

18   says, yes.

19       Q.    Okay.

20                MR. MORRIS:  Can we go to Bates

21        number 33499.

22                (Scrolling.)

23   BY MR. MORRIS:

24       Q.    And you're aware, are you not, that

25   in the Notes to the financial statements, PWC

1            Dondero - 5-28-2021

2    described all of the notes and other amounts

3    that were due to affiliates -- due from

4    affiliates?

5              MS. DEITSCH-PEREZ:  Object to the

6         form.

7         A.    Yes.

8    BY MR. MORRIS:

9         Q.    And were you aware that in the

10   financial statements prepared for Highland for

11   the period ending December 31st, 2017, that PWC

12   included in its notes amounts due from Highland

13   Capital Management Fund Advisors, L.P.?

14        A.    The 0.2 million in the first

15   sentence, is that your question?

16        Q.    Yes.  You know, the whole -- who at

17   Highland was responsible for providing

18   information to PWC relating to Notes and Other

19   Amounts Due from Affiliates?

20        A.    The accounting department.

21        Q.    And who was the head of the

22   accounting department as of the end of 2017?

23        A.    Frank Waterhouse.

24        Q.    And did Frank Waterhouse remain the

25   head of the accounting department until at

1                Dondero - 5-28-2021

2    least the end of 2020, to the best of your

3    knowledge?

4        A.    Yes.

5        Q.    And when did Frank Waterhouse become

6    the head of the accounting department?

7        A.    A few years earlier.

8        Q.    So, to the best of your

9    recollection, Frank Waterhouse has been the

10   head of the accounting department on a

11   continuous basis from the period approximately

12   2015 until the end of 2020; is that right?

13       A.    If not earlier, but yes.  But I

14   don't know the dates.

15       Q.    Okay.

16             MR. MORRIS:  Can we scroll down to

17         the next to the last paragraph there, the

18         one that refers to Mr. Dondero?  There you

19         go.

20   BY MR. MORRIS:

21       Q.    Do you see that, according to this

22   financial report, you "did not issue any new

23   promissory notes to the Partnership" during the

24   year 2017?

25       A.    Yeah.

```
1                Dondero - 5-28-2021

2        Q.     And to the best of your

3   recollection, was that accurate?

4        A.     Yes.

5        Q.     Okay.  And to the best of your

6   recollection, was it also accurate that as of

7   the end of 2017, the total interest and

8   principal due on an -- on outstanding

9   promissory notes was approximately 14 and a

10  half million dollars and was payable in annual

11  installments throughout the term of the note?

12       A.     Yes.

13       Q.     And prior to your execution of the

14  demand notes, do you recall that you had made,

15  in favor of Highland, certain term notes?

16       A.     I don't -- I don't recall.

17       Q.     Do you remember having to make

18  payments to Highland to satisfy the terms of

19  any notes prior to 2018?

20       A.     I can't recall.  I didn't refresh --

21  I didn't refresh myself on anything else, on

22  any other notes for this deposition.

23       Q.     Okay.  But looking at this

24  paragraph, is there anything about it that you

25  currently believe is inaccurate or incorrect?
```

1           Dondero - 5-28-2021

2           MS. DEITSCH-PEREZ:  Object to the

3      form.

4      A.    I -- I don't know.  I don't know.

5  BY MR. MORRIS:

6      Q.    Okay.  We can scroll through the

7  entire page, if you would like, but I just --

8  I'll ask the question first, and then you tell

9  me what you need to read.

10           Do you recall whether

11  PricewaterhouseCoopers' audited financial

12  statements ever disclosed the forgiveness of

13  any loan ever made by Highland to you or any of

14  its employees?

15           MS. DEITSCH-PEREZ:  Object to the

16      form.

17      A.    I don't -- I don't know.

18  BY MR. MORRIS:

19      Q.    Do you have a recollection of any?

20      A.    I don't have a recollection --

21  recollection of any.  As a CPA, I'm not sure

22  it's required until it's forgiven, but I'm not

23  the expert.  I can't remember seeing it or not

24  seeing it.

25      Q.    Did the debtor make --

1          Dondero - 5-28-2021

2              MR. MORRIS:  You know what?  Let's

3      look -- let's look at each of these.  We

4      can start with the bottom of the page.

5  BY MR. MORRIS:

6      Q.    Can you identify any of the makers

7  of the notes that are referred to in this

8  section that are not directly or indirectly

9  owned or controlled by you, other than

10  Mr. Okada?

11          So, if we start at the top, is

12  Highland Capital Management Fund Advisors,

13  L.P., an entity that is either directly or

14  indirectly owned or controlled by you?

15      A.    Yes.

16      Q.    NexPoint Advisors, L.P., the next

17  paragraph, is that an entity that is directly

18  or indirectly owned or controlled by you?

19      A.    Yes.

20      Q.    HCRE Partners, LLC, is that an

21  entity that is directly or indirectly owned or

22  controlled by you?

23      A.    Yes.

24      Q.    Highland Capital Management

25  Services, Inc., is that an entity that is

1              Dondero - 5-28-2021

2   directly or indirectly owned or controlled by

3   you?

4        A.    Yes.

5        Q.    All right.  And you're the subject

6   of the next paragraph, right?

7              The next paragraph relates to Mark

8   Okada.  Are you aware of any loan that was ever

9   made by Highland to Mr. Okada that was

10  forgiven?

11       A.    I don't know.

12       Q.    Okay.

13             MR. MORRIS:  Can we go to the next

14       paragraph, please?

15  BY MR. MORRIS:

16       Q.    There's a reference to The Dugaboy

17  Investment Trust.  Do you see that?

18       A.    Yes.

19       Q.    Either your sister or Mr. Scott have

20  served as the sole trustee of Dugaboy since the

21  time it was created; is that correct?

22             MS. DEITSCH-PEREZ:  Object to the

23       form.

24       A.    I -- I don't know.

25  BY MR. MORRIS:

1                    Dondero - 5-28-2021

2       Q.    Do you recall anybody at any time

3    serving as the trustee of The Dugaboy

4    Investment Trust other than Nancy or Mr. Scott?

5             MS. DEITSCH-PEREZ:  Object to the

6         form.

7       A.    I -- I don't remember.

8    BY MR. MORRIS:

9       Q.    Are you the lifetime beneficiary of

10   The Dugaboy Investment Trust?

11      A.    Yes.

12      Q.    And have you been -- withdrawn.

13            Are you the sole lifetime

14   beneficiary of The Dugaboy Investment Trust?

15            MS. DEITSCH-PEREZ:  Object to the

16        form.

17      A.    I believe so.

18   BY MR. MORRIS:

19      Q.    Okay.  And has that been true since

20   the time The Dugaboy Investment Trust was

21   created?

22            MS. DEITSCH-PEREZ:  Object to the

23        form.

24      A.    I don't know for sure.

25   BY MR. MORRIS:

1                    Dondero - 5-28-2021

2         Q.    Okay.   The next paragraph refers to

3    a Contribution Agreement.   Do you see that?

4         A.    Yes.

5         Q.    Are you familiar who the affiliated

6    trust is that entered into the Contribution

7    Agreement?

8         A.    No.   I'm willing to be refreshed,

9    but I don't remember.

10        Q.    Is it the Hunter Mountain Investment

11   Trust?

12        A.    It could be.

13        Q.    Can you think of any other

14   affiliated trust other than Hunter Mountain who

15   carried a note receivable in the amount of

16   $63 million due to the partnership?

17        A.    No.

18        Q.    Do you directly or indirectly own or

19   control the Hunter Mountain Trust?

20        A.    No.

21        Q.    Let's go -- do you have any interest

22   in the Hunter Mountain Trust?

23        A.    No.

24        Q.    Directly or indirectly?

25        A.    No.

1              Dondero - 5-28-2021

2         MR. MORRIS:  Can we go to 33510,

3     please?

4         (Scrolling.)

5  BY MR. MORRIS:

6     Q.    Just to refresh your recollection,

7  PricewaterhouseCoopers's letter is dated

8  May 18th, 2018.

9         And you see there, note 16 refers to

10  "Subsequent Events."  Do you see that?

11     A.    Yep.

12     Q.    So, sometime between January 1st and

13  May 18, 2018, which is the report date,

14  PricewaterhouseCoopers is disclosing that you

15  issued promissory notes in the amount of

16  $11.7 million.  Do you see that?

17     A.    Yes.

18     Q.    Do you believe that was true and

19  accurate at the time?  Is that your

20  recollection?

21     A.    Yes.

22     Q.    Now, of the three notes that we

23  looked at, only one of them was issued before

24  May 18, 2018.  That was the 2 and a half

25  million-dollar note.

```
 1              Dondero - 5-28-2021
 2              Do you remember that?
 3              I apologize.  Withdrawn.
 4              That was the 3.825 million-dollar
 5      note.
 6              Do you remember that?
 7      A.     Okay.  Yes.
 8      Q.     Okay.  So, if that note was 3. --
 9      let's just call it roughly $3.9 million, does
10      that mean that there were $7.8 million of other
11      notes that you made in favor of Highland during
12      the first five months of 2018?
13              MS. DEITSCH-PEREZ:  Object to the
14      form.
15      A.     Yeah, I think you got the wrong --
16      well, you're -- I'm not the accounting
17      department.  I'm not the auditor.  My comment
18      would be our financial statements have always
19      been -- our audited financial statements have
20      always been extremely accurate and
21      Pricewaterhouse and KPMG literally do a hundred
22      percent sampling of all transactions.
23      Everything is reflected accurately in the
24      financials, and there's no missing note or
25      misstated note or unequal amount, or whatever.
```

1              Dondero - 5-28-2021

2  And I refuse to go in that direction just

3  because I don't know the details.

4  BY MR. MORRIS:

5       Q.    I appreciate that, sir, and I didn't

6  mean to take you into that direction.  I'm just

7  asking you if you know what accounts for the

8  difference between the $11.7 million stated and

9  the 3.825 million-dollar note that we looked at

10  as Exhibit Number 1 that was tendered by you on

11  February 2nd, 2018.  That's all.

12       A.    I -- I don't know.  I have no -- I

13  have no idea.

14       Q.    Okay.  In the course of the audit,

15  you personally sign management representation

16  letters, right?

17       A.    Usually at the end.

18       Q.    Yeah.

19            MR. MORRIS:  So can we call the next

20        exhibit up, please?

21            (Exhibit 14 introduced.)

22  BY MR. MORRIS:

23       Q.    And happy to take a look at it.  I'm

24  going to point you to a couple of things.

25            MR. MORRIS:  But if we could go to

1          Dondero - 5-28-2021

2          the document, it's page 9 of the document,

3          Bates number 33408.  All right.

4               And scroll up to the prior page,

5          please.  Just looking for the signatures.

6     BY MR. MORRIS:

7          Q.    All right.  Is that your signature

8     there, sir?

9          A.    Yeah.

10         Q.    And did you sign this management

11    representation letter on behalf of Highland in

12    your capacity as the Strand Advisors, Inc.,

13    general partner on or about May 18th, 2018?

14         A.    Yeah.

15         Q.    And Frank Waterhouse, is that -- do

16    you know that to be his signature below?

17         A.    It resembles it, yes.

18         Q.    Okay.  Do you have an understanding

19    of why you signed this document?

20         A.    Despite all their auditing and

21    double-checking of all source information,

22    they -- they want a validation from management,

23    also.

24         Q.    And is that standard and customary,

25    to the best of your experience?

1                    Dondero - 5-28-2021

2       A.    Yes.

3       Q.    Okay.

4             MR. MORRIS:  Can we go back to the

5       first page, please?

6             (Scrolling.)

7   BY MR. MORRIS:

8       Q.    Do you see in the second paragraph,

9   the last sentence, there's a reference to

10  "materiality"?

11            MR. MORRIS:  If you can just scroll

12      down a bit.

13  BY MR. MORRIS:

14      Q.    And it says, quote, "Materiality

15  used for purposes of these representations is

16  $2,000,000."

17            Am I reading that correctly?

18      A.    Yes.

19      Q.    And did you understand that Highland

20  was to provide to PWC, so that it could prepare

21  the audited financial statements with

22  information relating to issues and transactions

23  that were material, using that definition?

24      A.    Yes.

25            MR. MORRIS:  Let's go to the next

1          Dondero - 5-28-2021

2     document.

3          (Exhibit 15 introduced.)

4   BY MR. MORRIS:

5     Q.    These are the audited financials for

6   the period ending December 31st, 2018.

7          MR. MORRIS:  And if you could go to

8          the third page, the one ending in 33424.

9          No, above.  Yeah, right there.

10         Do you see PricewaterhouseCoopers

11    signed the audit letter on June 3rd, 2019?

12    A.    Yep.

13         MR. MORRIS:  And if we can scroll up

14         to the top of the page, it has the same

15         statement concerning "Management's

16         Responsibility for the Consolidated

17         Financial Statements" that we looked at

18         earlier in the 2017 audit, correct?

19    A.    Yes.

20  BY MR. MORRIS:

21    Q.    Okay.  And that's -- looking at it,

22  that's customary language that auditors include

23  in audited financial statements, correct?

24    A.    Yep.

25         MR. MORRIS:  Can we go to the next

```
1                 Dondero - 5-28-2021

2        page, please?

3   BY MR. MORRIS:

4        Q.    Again, you'll see that this is the

5   Consolidated Balance Sheet for the period

6   ending December 31st, 2018.  Do you see that?

7        A.    Yes.

8        Q.    And is it accurate that Highland

9   continued to carry on its balance sheet as an

10  asset all "Notes and Other Amounts Due from

11  Affiliates"?

12       A.    Yes.

13            MS. DEITSCH-PEREZ:  Object to the

14       form.

15  BY MR. MORRIS:

16       Q.    And you knew -- you knew at the time

17  that the audited financials were finalized that

18  Highland was carrying on its balance sheet

19  "Notes and Other Amounts Due from Affiliates,"

20  correct?

21       A.    Yup.

22       Q.    Did you personally tell anybody at

23  PWC in connection with the preparation of the

24  audited financial statements for 2018 that you

25  had entered into the agreement with your sister
```

1          Dondero - 5-28-2021

2    Nancy in January or February of 2019?

3              MS. DEITSCH-PEREZ:  Object to the

4         form.

5         A.    Not that I recall.

6    BY MR. MORRIS:

7         Q.    Do you know if anybody told PWC,

8    prior to the completion of the audited

9    financial statements for the period ending

10   December 31st, 2018, of your agreement with

11   Nancy?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    Not that I know of.

15   BY MR. MORRIS:

16        Q.    Did you ever instruct anybody to

17   inform PWC about the agreement you reached with

18   Nancy in --

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21   BY MR. MORRIS:

22        Q.    -- January --

23             MR. MORRIS:  Please let me finish

24        the question.

25             MS. DEITSCH-PEREZ:  You took a

```
1                   Dondero - 5-28-2021
2        breath.  Sorry.
3              MR. MORRIS:  Are you finished?
4              MS. DEITSCH-PEREZ:  Yes.  As I
5        explained, you took a breath, and I thought
6        you were done.  Sorry.
7   BY MR. MORRIS:
8        Q.    Did you ever instruct anybody to
9   inform PWC of your agreement that you reached
10  with Nancy in January or February 2019?
11             MS. DEITSCH-PEREZ:  Object to the
12        form.
13       A.    No.
14             MR. MORRIS:  Can you please go to
15        page 33451?
16             (Scrolling.)
17  BY MR. MORRIS:
18       Q.    And we've got the "Notes and Other
19  Amounts Due from Affiliates."  We had gone
20  through all of this before and I'm not going to
21  do it again, but I do want to ask you, sir:
22  Did you personally approve and authorize each
23  of the notes that are reflected in the PWC
24  disclosure concerning Notes and Other Amounts
25  Due from Affiliates?
```

```
 1                 Dondero - 5-28-2021

 2            MS. DEITSCH-PEREZ:  Object to the

 3       form.

 4       A.    Repeat the question.

 5            Did I personally approve?  Was that

 6  the question or --

 7  BY MR. MORRIS:

 8       Q.    Yes.  Withdrawn.

 9            I'll ask a different question.

10            And I'm happy to give you the time

11  needed to look at the full disclosure, but are

12  you aware of any note or other amount due from

13  affiliate that you didn't approve and

14  authorize?

15       A.    I'm not aware.

16            MR. MORRIS:  Okay.  If we could just

17       focus in on that bottom paragraph relating

18       to Mr. Dondero.

19  BY MR. MORRIS:

20       Q.    So there's a reference there to your

21  having "issued promissory notes to the

22  Partnership in the aggregate amount of

23  $14.9 million" during 2018.

24            Do you see that?

25       A.    Yes.
```

1                Dondero - 5-28-2021

2        Q.    That would include the three notes

3    at issue in this lawsuit; is that right?

4              MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    (No response.)

7    BY MR. MORRIS:

8        Q.    Let me ask a different question.

9              The three -- the three notes at

10   issue in this lawsuit were all issued in 2018,

11   correct?

12       A.    Yes.

13       Q.    Okay.  Do you have a recollection as

14   to what notes account for the difference

15   between the $8.8 million or so that's at issue

16   in this lawsuit and the $14.9 million

17   referenced in this disclosure?

18       A.    I don't, other than that -- I

19   believe the audit is accurate and, you know,

20   there could have been principle or interest

21   paydowns.  I don't know the reason for the

22   difference.

23       Q.    This disclosure, as it pertains to

24   you, doesn't mention any oral agreement, does

25   it?

1                   Dondero - 5-28-2021

2         A.    No.

3         Q.    And it doesn't mention any amendment

4    to any of the notes, correct?

5         A.    No.

6         Q.    It doesn't describe any conditions

7    that have been placed on the collectability of

8    the notes from you, correct?

9         A.    No.

10        Q.    It doesn't state that the notes

11   might be forgiven upon some conditions

12   subsequent, correct?

13        A.    No, it does not.

14             MR. MORRIS:  Can we turn to

15        page 33461, please?

16             (Scrolling.)

17   BY MR. MORRIS:

18        Q.    And these are "Subsequent Events,"

19   and I just want to look through them --

20   withdrawn.

21             You understand that these financial

22   statements are for the period ending

23   December 31st, 2018, correct?

24        A.    Yes.

25        Q.    And the agreement that you reached

1              Dondero - 5-28-2021

2   with Nancy, to the best of your recollection,

3   occurred in January or February 2019, correct?

4           (Simultaneous conversation.)

5       A.   Yes --

6           MS. DEITSCH-PEREZ:  Object to the

7       form.

8           THE REPORTER:  I didn't hear an

9       answer.

10      A.   Repeat the question again, just in

11  case.

12  BY MR. MORRIS:

13      Q.   Sure.  The agreement that you -- the

14  agreement that you reached with Nancy on behalf

15  of Highland was an agreement that was reached

16  in January or February 2019, correct?

17      A.   Was in -- the last was in January or

18  February of '19, yes.  Yes.

19      Q.   Okay.  So I just want to show you

20  the entirety of the "Subsequent Events" because

21  they cover the period from December 31st, 2018,

22  until the report date of June 3, 2019.

23          MR. MORRIS:  If we could just look

24      at that.

25  BY MR. MORRIS:

1              Dondero - 5-28-2021

2       Q.    Is there any reference made to the

3    agreement that you reached with Nancy in

4    January or February 2019?

5       A.    No.

6              MS. DEITSCH-PEREZ:  And I just want

7         to object for the record that we asked the

8         debtor for all of the Highland financial --

9         audited financial statements.  We got

10        highly redacted ones where the debtor has

11        clearly left unredacted only those things

12        it wanted to use while denying Mr. Dondero

13        the unredacted copies.  So we do not have

14        here, for him to look at, the unredacted

15        Highland audited financial statements.

16             MR. MORRIS:  But this is the only

17        portion of the document -- well, I'm not

18        going to argue.

19             MS. DEITSCH-PEREZ:  Yes.  You showed

20        us what you wanted to show him in an

21        unredacted (audio distortion) gave him

22        fully redacted copies.  I understand that.

23             MR. MORRIS:  Yeah, and I'll be happy

24        to submit a unredacted copy to the Judge

25        under seal so that she can see whether or

```
 1                Dondero - 5-28-2021

 2   not there's any other aspect of the

 3   financial statements that --

 4          MS. DEITSCH-PEREZ:  That's fine.

 5          MR. MORRIS:  -- pertain to the

 6   notes.

 7          Give me a break.  Stop.

 8          MS. DEITSCH-PEREZ:  I know.

 9   Litigation isn't a one-way -- one-way

10   disco.

11          MR. MORRIS:  Okay.  All right.

12          The next document, please.

13          THE WITNESS:  How are we doing on

14   time?

15          MR. MORRIS:  We're doing pretty

16   well.  I think we're going to fit within --

17   we're not quite an hour back on, but I'm

18   confident that we'll fit within the one- to

19   two-hour -- we'll be done within an hour.

20   That's my point.

21          THE WITNESS:  Okay.  I'm going to

22   give a hard stop at 2:00.  Okay?

23          MR. MORRIS:  You can do whatever you

24   want.  If we're not finished, we'll just

25   have to figure out a time to come back.  So
```

1          Dondero - 5-28-2021

2          let's get through as much as we can, and

3          we'll see where we are.

4     BY MR. MORRIS:

5          Q.    The next document is the management

6     representation letter.

7               (Exhibit 16 introduced.)

8     BY MR. MORRIS:

9          Q.    And I would just ask you to look at,

10    I guess, page 33419 and just confirm for me

11    that that's your signature.

12         A.    Yes.

13         Q.    Okay.  And this contains the same

14    representations that you made to PWC that we

15    looked at in the earlier management rep letter,

16    right?

17         A.    Yes.

18         Q.    Okay.  Let's look at the next

19    document, please.

20               (Exhibit 17 introduced.)

21    BY MR. MORRIS:

22         Q.    So PWC issues the audited financials

23    in June of 2019, and then Highland files for

24    bankruptcy in October.

25               Do I have that right?

1              Dondero - 5-28-2021

2        A.    Yes.

3        Q.    And at the time Highland filed for

4   bankruptcy, you were the president and CEO of

5   Highland, correct?

6        A.    Yes.

7        Q.    And you personally authorized

8   Highland's bankruptcy filing, correct?

9        A.    On Pachulski's recommendation.

10       Q.    But you're the only person who

11   authorized the filing; is that correct?

12       A.    Yes.

13       Q.    And did you understand -- you have

14   familiarity with bankruptcy proceedings, right?

15            MS. DEITSCH-PEREZ:  Object to the

16       form.

17       A.    Not this kind of bankruptcy, but,

18   yes, we have experience in bankruptcies.

19   BY MR. MORRIS:

20       Q.    And you had experience in the Acis

21   bankruptcy, for example, correct?

22       A.    Yes.

23            MS. DEITSCH-PEREZ:  Object to the

24       form.

25   BY MR. MORRIS:

1                    Dondero - 5-28-2021

2         Q.    And you understand that debtors in

3    bankruptcy have to make certain disclosures; is

4    that right?

5              MS. DEITSCH-PEREZ:   Object to the

6         form.

7    BY MR. MORRIS:

8         Q.    You can answer.

9         A.    Yes.

10        Q.    And you understand that the purpose

11   of the disclosures is to give interested

12   parties an opportunity to review the financial

13   information relating to the debtors, right?

14             MS. DEITSCH-PEREZ:   Object to the

15        form.

16        A.    Generally.

17   BY MR. MORRIS:

18        Q.    The debtor is supposed to be

19   transparent.  Is that a statement you would

20   agree with?

21        A.    I'd agree the debtor is supposed to

22   be.

23        Q.    So, are you aware that the debtor

24   filed certain schedules in connection with the

25   bankruptcy case?

1              Dondero - 5-28-2021

2       A.    I'm sure they filed many schedules.

3       Q.    And did you -- did you review the

4    debtor's schedules before they were filed?

5       A.    No.

6       Q.    All right.  So, here is a summary of

7    the debtor's assets and liabilities that was

8    filed in December -- on December 12th, 2019.

9              Do you see the timeline at the top?

10      A.    Yes.

11      Q.    And you were still in control of the

12   debtor at that time, correct?

13      A.    Yep.

14      Q.    And was Mr. Waterhouse responsible

15   for preparing the debtor's Summary of Assets

16   and Liabilities on behalf of Highland at that

17   time?

18      A.    I -- I don't know whether DSI was in

19   control at that point.  I don't know.

20      Q.    Did DSI rely on Mr. Waterhouse and

21   the accounting team for the information that

22   was used to create the debtor's disclosures?

23              MS. DEITSCH-PEREZ:  Object to the

24       form.

25   BY MR. MORRIS:

1        Dondero - 5-28-2021

2        Q.      Withdrawn.

3                To the best of your knowledge, did

4    DSI rely on Mr. Waterhouse and the accounting

5    team at Highland in order to prepare the

6    debtor's schedules and financial disclosures?

7                MS. DEITSCH-PEREZ:  Object to the

8        form.

9        A.      I don't know.

10   BY MR. MORRIS:

11       Q.      Did you ever discuss with

12   Mr. Waterhouse the debtor's financial

13   disclosures during the bankruptcy case?

14       A.      Nope.

15       Q.      Did you ever look at the Summary of

16   Assets and Liabilities that was filed with the

17   Court in December 2019?

18       A.      Nope.

19               MR. MORRIS:  Turn to the second

20       page, please.  Let's just go down right --

21       right there.

22   BY MR. MORRIS:

23       Q.      Do you see in part 11 -- part 11

24   pertains to all other assets and in Item

25   Number 71, there's a reference to "Notes

1          Dondero - 5-28-2021

2    Receivable."

3          A.    Yep.

4          Q.    And do you see that the Notes

5    Receivable are for an aggregate amount of

6    approximately $150 million?

7          A.    Yep.

8          Q.    And it refers to Exhibit D.  Do you

9    see that?

10         A.    Yes.

11         Q.    All right.

12               MR. MORRIS:  Can we turn -- go to

13         the next page?

14   BY MR. MORRIS:

15         Q.    And exhibit -- this page is Exhibit

16   D.

17               Do you see that?

18         A.    Yes.

19         Q.    And this shows an aggregate amount

20   of -- the face amount of notes to be the same

21   $150.3 million that we just saw, correct?

22               MS. DEITSCH-PEREZ:  Object to the

23         form.

24   BY MR. MORRIS:

25         Q.    We can go back and look, if you

```
1              Dondero - 5-28-2021
2   want.
3        A.    It seems to tie.
4        Q.    Okay.  And it was disclosed on the
5   docket in the bankruptcy case that you
6   personally had made Notes Receivable
7   outstanding in the approximate amount of
8   $9.3 million.  Do you see that?
9        A.    Yes.
10       Q.    Okay.
11             MR. MORRIS:  Can we just go to the
12       top?  I want to just show the date.
13  BY MR. MORRIS:
14       Q.    It's December 13.  That's the date
15  that this disclosure is made.  Do you see that?
16       A.    Yes.
17       Q.    And there's a footnote there, number
18  [1], that says "Doubtful or Uncollectible
19  accounts are evaluated at year end."  Do you
20  see that?
21       A.    Yes.
22       Q.    Now, nothing on this document shows
23  any of the notes as being doubtful or
24  uncollectible, correct?
25       A.    Correct.
```

1                  Dondero - 5-28-2021

2        Q.    Do you know if the debtor's

3    schedules were ever amended after

4    December 13th, 2019, to reflect "Doubtful or

5    Uncollectible" Notes Receivable?

6              MS. DEITSCH-PEREZ:  Object to the

7         form.

8        A.    Yeah.  I believe the Hunter Mountain

9    56 was written off.

10   BY MR. MORRIS:

11       Q.    Okay.  Anything else?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.

14       A.    I -- I don't know.

15   BY MR. MORRIS:

16       Q.    Okay.  Did you ever ask anyone to

17   amend the debtor's schedules to reflect any

18   Doubtful or Uncollectible receivable that's set

19   forth on this page?

20       A.    I did not.

21       Q.    Okay.

22             MR. MORRIS:  La Asia, I'm actually

23        going to just skip the next exhibit.  And

24        if we could go to the one that you and I

25        had marked as 19.  We'll just mark it as 18

1          Dondero - 5-28-2021

2          for purposes of the deposition.

3                MS. DEITSCH-PEREZ:  I think that's

4          confusing.  I don't mind if you just mark

5          18 as "omitted."  I would want a sheet with

6          "18 omitted."  That way, your numbering can

7          stay the same.

8                MR. MORRIS:  Okay.  That's fine.

9          Thank you.  So we'll mark 18 as "omitted",

10         and this will be 19.

11               (Exhibit 19 introduced.)

12    BY MR. MORRIS:

13         Q.    Are you aware of -- that the debtor

14    filed disclosures called Statements of

15    Financial Affairs, often referred to as SoFAs?

16         A.    I've heard of the form before, yes.

17         Q.    Did you ever review the debtor's

18    SoFAs?

19         A.    No.

20         Q.    So, do you know who was responsible

21    at Highland for preparing the debtor's SoFAs?

22         A.    No.

23         Q.    Would it have been -- would --

24    whoever it was, would that person have either

25    been or reported to Frank Waterhouse, as the

1    Dondero - 5-28-2021

2    CFO?

3         A.    I'm sorry.  Can you repeat that one

4    more time?

5         Q.    I appreciate the fact that you

6    don't -- you can't identify the person who

7    prepared the SoFAs; but within the

8    organizational structure of Highland during the

9    time that you were the CEO, would the person

10   have been either Frank Waterhouse or somebody

11   who reported to Frank Waterhouse?

12        A.    Or DSI.

13        Q.    Okay.

14              MR. MORRIS:  Can we go to page 2,

15        please.

16              (Scrolling.)

17   BY MR. MORRIS:

18        Q.    Do you see at number 4 here, there's

19   a reference to payments made to insiders within

20   a year of the bankruptcy case?

21        A.    Yup.

22        Q.    Are you aware -- withdrawn.

23              Were you aware in December 2019 that

24   Highland was going to disclose all payments

25   made to insiders within a year of the

1          Dondero - 5-28-2021

2    bankruptcy case?

3         A.    No.

4              MR. MORRIS:  Let's go to page 19 of

5         34, please.

6              (Scrolling.)

7              MR. MORRIS:  If we could, scroll

8         down near the bottom.

9    BY MR. MORRIS:

10        Q.    You'll see that there's two entries

11   for Highland Capital Management Fund Advisors.

12             Do you see that?

13        A.    Yup.

14        Q.    And in May 2019, the debtor paid

15   Highland Capital Management Fund Advisors the

16   aggregate amount of $7.4 million.  Am I reading

17   that correctly?

18        A.    Yes.

19        Q.    Okay.  And those payments were -- in

20   exchange for those payments, Highland received

21   two promissory notes, correct?

22             MS. DEITSCH-PEREZ:  John, I'm going

23        to object.  You're straying from the

24        subject of this adversary and going into

25        another, and I'm really not comfortable

1          Dondero - 5-28-2021

2    with that since he's only prepared for

3    his -- his -- for this proceeding and has

4    not refreshed himself on anything else.

5    So, this is outside of what the scope of

6    this deposition ought to be.

7          MR. MORRIS:  Okay.  So you have two

8    choices, Deborah:  You can either state

9    your objection, "beyond the scope," or you

10   can direct the witness not to answer.

11   Which would you like to do?

12         MS. DEITSCH-PEREZ:  I am going to

13   state my objection that it's beyond the

14   scope, but I'm asking you because -- as a

15   matter of fairness, that you restrain

16   yourself and limit your deposition to this

17   adversary proceeding --

18         MR. MORRIS:  Okay.  I appreciate --

19         MS. DEITSCH-PEREZ:  -- and not --

20         (Simultaneous conversation.)

21         MS. DEITSCH-PEREZ:  And if the

22   witness isn't prepared to answer these

23   questions, it's not fair that you proceed

24   on them.

25         MR. MORRIS:  Okay.  So I'll just say

1                    Dondero - 5-28-2021

2         that for a couple of questions to ask the

3         former CEO about a 7.4 million-dollar

4         payment made to an affiliate that he owns

5         or controls, I'm going to ask you to give

6         me a little latitude.

7    BY MR. MORRIS:

8         Q.    Mr. Dondero, were those two payments

9    backed up by promissory notes in favor of the

10   debtor, to the best of your knowledge?

11        A.    I don't know.

12        Q.    Okay.

13              MR. MORRIS:  Let's go to the next

14        page, please.

15              Can we go towards the middle of the

16        page.  Right there.  That's fine.

17   BY MR. MORRIS:

18        Q.    Do you see your name, James Dondero,

19   there?

20        A.    Yes.

21        Q.    And you were paid $3.75 million

22   within a year of the bankruptcy, correct?

23        A.    Yes.

24        Q.    Who determined that you should --

25   who made the decision for Highland to pay you

1          Dondero - 5-28-2021

2   that amount?

3        A.    Me?  I don't know.

4        Q.    Is there anybody else who had the

5   authority to determine your compensation prior

6   to the petition date, other than yourself?

7        A.    Especially -- besides myself --

8   okay.  Let me answer that question first.

9             The Class A -- majority Class A

10  holders can, and then I can.

11       Q.    Anybody else?

12       A.    Not that -- not that I know.

13       Q.    In practice, did anybody other than

14  you set your compensation?

15       A.    In practice, yes, sometimes majority

16  Class A did.

17       Q.    And at any time prior to the

18  petition date, can you think of an instance

19  where the majority of the Class A refused to

20  compensate you in the manner in which you

21  wanted?

22       A.    There was -- no, because there was

23  no reason to because there was plenty of head

24  room in all the agreements and compared to

25  market levels.

1          Dondero - 5-28-2021

2          MR. MORRIS:  Let's go to the next

3     document, please.

4          (Exhibit 20 introduced.)

5  BY MR. MORRIS:

6     Q.    Are you aware that, during the

7  course of the bankruptcy proceeding, the

8  debtor, in addition to the schedules and SoFAs,

9  also filed every month a document called the

10 "Monthly Operating Report"?

11    A.    I'm not aware, specifically.

12    Q.    Did you ever review any of the

13 debtor's Monthly Operating Reports?

14    A.    Not that I can recall.

15    Q.    Okay.

16         MR. MORRIS:  We can scroll down a

17    bit.

18 BY MR. MORRIS:

19    Q.    You see there's -- there's two

20 signatures here:  One electronic, one

21 handwritten, both dated December 2nd.  Do you

22 see that Brad Sharp has signed as an authorized

23 individual as the Chief Restructuring Officer?

24    A.    Yup.

25    Q.    Okay.  And then below that, there's

1          Dondero - 5-28-2021

2    the electronic signature of Mr. Waterhouse.  Do

3    you see?

4          A.    Yes.

5          Q.    Okay.  Were -- to the best of your

6    knowledge as the CEO at the time, were

7    Mr. Sharp and Mr. Waterhouse authorized to sign

8    and file Monthly Operating Reports with the

9    Court?

10         A.    Again, it's not my sphere of

11   knowledge.  It looks like -- individually or

12   jointly, I -- I don't have a comment.

13         Q.    I'm just asking you, as the CEO, did

14   you expect Mr. Waterhouse and Mr. Sharp to take

15   care of all financial disclosures required

16   under the bankruptcy code?

17         A.    Yes.

18         Q.    And did you expect them to do that

19   completely, transparently and accurately?

20         A.    Yes.

21         Q.    Do you have any reason to believe

22   that they failed to do so?

23         A.    Not that I'm aware.

24               MR. MORRIS:  Can we go to page 6 of

25         11?

1             Dondero - 5-28-2021

2             (Scrolling.)

3    BY MR. MORRIS:

4        Q.    You haven't seen this document

5    before; is that right?

6        A.    I do not believe so.

7        Q.    Okay.  But you see that it was filed

8    in late January 2020, but it was signed in

9    December, right?

10       A.    Yeah.

11       Q.    Okay.  And do you see that among the

12   assets listed are amounts "Due from

13   affiliates"?

14       A.    Yep.

15       Q.    And do you have any reason to

16   believe that the amounts due from affiliates

17   are anything other than the same notes and

18   amounts due that we saw in the audited

19   financial statements?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.

22       A.    I don't know.

23   BY MR. MORRIS:

24       Q.    Okay.

25             THE WITNESS:  I do look at this and

1              Dondero - 5-28-2021

2         get wistful.  You guys should be ashamed of

3         yourselves, what you've done to this

4         company.

5              MR. MORRIS:  I move to strike.

6              Can we take a look at footnote (1),

7         please?

8    BY MR. MORRIS:

9         Q.   Do you see that it "Includes various

10   notes receivable at carrying value"?

11             Do you have any understanding of

12   what that --

13             MS. DEITSCH-PEREZ:  You didn't state

14        the whole sentence, John.  Please, if

15        you're going to point him to things, read

16        him the whole sentence.

17   BY MR. MORRIS:

18        Q.   Sir, do you have any understanding

19   as to what footnote (1) refers to or means?

20        A.   It says what it says.

21        Q.   Okay.

22             MR. MORRIS:  Let's look at the next

23        document, please.

24             (Exhibit 21 introduced.)

25             MR. MORRIS:  All right.  So if you

1                Dondero - 5-28-2021

2         could just stop right there.

3   BY MR. MORRIS:

4         Q.    This is the Monthly Operating Report

5   for the period ending November 2019.  Do you

6   see that?

7         A.    Yes.

8               MR. MORRIS:  Can we scroll down a

9         bit?

10  BY MR. MORRIS:

11        Q.    And that's Mr. Sharp's and

12  Mr. Waterhouse's signatures, correct?

13        A.    Yes.

14        Q.    Do you see on this version,

15  Mr. Sharp is identified as the "Responsible

16  Party," but Mr. Waterhouse is identified as the

17  "Preparer"?

18        A.    Yes.

19        Q.    Do you recall ever telling Mr.

20  Waterhouse, in his capacity as the preparer of

21  Monthly Operating Reports, that there was

22  anything inaccurate in any Monthly Operating

23  Report filed by the debtor?

24        A.    No.

25        Q.    Do you recall ever telling

1                    Dondero - 5-28-2021

2    Mr. Sharp, as the responsible party, that there

3    was anything inaccurate in any monthly --

4    Monthly Operating Report filed by the debtor?

5         A.    No.

6              MR. MORRIS:  Can we go to the next

7         page, please?

8              (Scrolling.)

9              THE WITNESS:  I'm going to give the

10         12-minute warning here.  I can be back at

11         4:00, but I'm going to need a couple hours.

12              MR. MORRIS:  I'm trying to finish

13         up, okay?

14              THE WITNESS:  Okay.

15              MR. MORRIS:  I'd rather not come

16         back, to be honest with you.

17              Can we go to the next page, please?

18    BY MR. MORRIS:

19         Q.    Again, the debtor reported that the

20    amounts due from affiliates were assets of the

21    debtor's estate, correct?

22         A.    Yep.

23         Q.    Do you -- do you have any issue with

24    the fact that the debtor reported the notes,

25    including your own notes, as assets of the

1          Dondero - 5-28-2021

2   estate?

3          MS. DEITSCH-PEREZ:  Object to the

4      form.

5      A.    Until they're forgiven, they're bona

6   fide notes.

7   BY MR. MORRIS:

8      Q.    And you don't think the "conditions

9   subsequent" agreement that you entered into

10  with Nancy calls into question whether the

11  debtor would ever recover on their notes that

12  you issued to them?

13         MS. DEITSCH-PEREZ:  Object to the

14     form.

15     A.    Again, I don't believe it's material

16  or GAAP, is my understanding.

17  BY MR. MORRIS:

18     Q.    Well, almost a third of the debtor's

19  assets are notes "Due from affiliates," right?

20     A.    You have to back out Hunter

21  Mountain, and you have to back out -- you have

22  to back out about 80 million to get to the 70

23  million of affiliated notes; and then, from

24  there, you have to back out 60 of them to get

25  to the 9 million.

1          Dondero - 5-28-2021

2          MS. DEITSCH-PEREZ:  Mr. Morris,

3      please don't make faces at Mr. Dondero.

4  BY MR. MORRIS:

5      Q.    Why -- why are we backing out Hunter

6  Mountain?

7      A.    I think the Hunter Mountain -- there

8  were notes going both ways, but I think the

9  Hunter Mountain is out of the estate, I

10  believe.

11      Q.    But Hunter Mountain -- the debtor

12  held notes that were made by Hunter Mountain in

13  the approximate amount of $60 million, right?

14      A.    But subsequent to these dates, I

15  think -- I think they realized it was just a

16  cross-transaction.  There were dues and

17  payables that were essentially equal from

18  Hunter Mountain, so I think Hunter Mountain

19  came out of that.

20      Q.    Isn't it -- isn't it a fact that

21  they wrote them off because they didn't believe

22  they were collectible?

23      A.    Yeah, because the payment on those

24  notes depended upon Highland honoring its

25  agreements to Hunter Mountain, which Highland

1                Dondero - 5-28-2021

2 had no intention of doing.  So, there's no

3 ability for Hunter Mountain to pay Highland.

4       Q.  Does Highland -- does Hunter

5 Mountain today have the ability to pay back any

6 of the $60 million that it -- that was

7 reflected in the notes?

8            MS. DEITSCH-PEREZ:  Object.

9       A.  No, not that I know of but --

10 BY MR. MORRIS:

11       Q.  Okay.

12            MS. DEITSCH-PEREZ:  And, Mr. Morris,

13       once again, I think we're straying from

14       this adversary.

15            MR. MORRIS:  Can we go to page 5 of

16       9, please?

17       (Scrolling.)

18            MR. MORRIS:  Above that, I think.

19       Next page, 5 of 9.  We must be looking at

20       the wrong exhibit.

21            Is the one that was marked 22?  No,

22       it's the next -- I believe it's the next

23       document.

24            Let's pull up the next document,

25       please.

1              Dondero - 5-28-2021

2              (Exhibit 22 introduced.)

3              MR. MORRIS:  Yeah, that's it.

4              Go to page 5, please.  Thank you.

5    BY MR. MORRIS:

6         Q.    Do you see that box there?  It says

7    "Non-Operating Receipts - Other."

8         A.    Yes.

9         Q.    Okay.  And do you understand that

10   that shows that, in December 2019, while you

11   were still personally in control of the debtor,

12   that certain payments of "principle or

13   interest" were made with respect to notes made

14   in favor of the debtor?

15        A.    Yes.

16        Q.    Okay.  And do you understand that

17   the one dated December 23rd in the approximate

18   amount of $783,000, that was a payment that was

19   made by you?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.

22        A.    If you say so.  I don't have a basis

23   for denying it or confirming it.

24   BY MR. MORRIS:

25        Q.    Okay.  But it's true, you do recall

1                    Dondero - 5-28-2021

2    that in December 2019, after the petition date,

3    while you were still in control of the debtor,

4    that certain payments of principal and interest

5    were made on notes that were made in favor of

6    the debtor, correct?

7              MS. DEITSCH-PEREZ:  Asked -- asked

8         and answered about an hour ago.

9    BY MR. MORRIS:

10        Q.    You can answer, sir.

11        A.    I believe -- I believe so.

12        Q.    Thank you.  Do you recall that in

13   connection with its Plan and Disclosure

14   Statement, that the debtor prepared a

15   Liquidation Analysis?

16        A.    Yes.

17             MR. MORRIS:  Can we call the next

18        document up on the screen, please?

19             (Exhibit 23 introduced.)

20             MR. MORRIS:  And if we can go to the

21        next page.

22   BY MR. MORRIS:

23        Q.    Your lawyers and lawyers acting on

24   behalf of entities you own and control or

25   otherwise have an interest spent considerable

1               Dondero - 5-28-2021

2    time on the debtor's Liquidation Analysis and

3    confirmation.

4               Do you remember that?

5         A.   I can't -- I can't agree or disagree

6    with that.

7    BY MR. MORRIS:

8         Q.   Okay.  Did you personally review the

9    debtor's Liquidation Analysis?

10        A.   Briefly.

11        Q.   Okay.

12             MR. MORRIS:  Can we go to the next

13        page, please?

14   BY MR. MORRIS:

15        Q.   Do you see that this page contains a

16   list of "Assumptions"?

17        A.   Yes.

18             MR. MORRIS:  And can we scroll up a

19        little further so we can see the date?

20   BY MR. MORRIS:

21        Q.   You'll see that on November 24th,

22   2020, the debtor filed a Liquidation Analysis

23   that contained, as among the Assumptions,

24   quote, "All demand notes are collected in the

25   year 2021."  Do you see that?

1              Dondero - 5-28-2021

2        A.    Yes.

3        Q.    Did you or anybody acting on your

4   behalf ever inform the Court that you believed

5   that assumption was unreasonable?

6        A.    I -- I don't know, but I know we've

7   been fighting the notes consistently through

8   various mechanisms.

9        Q.    Okay.  Did you or anybody acting on

10  your behalf ever inform the Court of your

11  agreement with Nancy?

12            MS. DEITSCH-PEREZ:  Object to the

13       form.

14       A.    Not -- not that I know of.

15  BY MR. MORRIS:

16       Q.    Did you ever instruct anybody to

17  inform the Court that you had an agreement with

18  Nancy that rendered Assumption C unreasonable?

19            MS. DEITSCH-PEREZ:  Object to the

20       form.

21       A.    I did not.

22            MR. MORRIS:  Let's look at the last

23       document, please.

24            (Exhibit 24 introduced.)

25  BY MR. MORRIS:

1                   Dondero - 5-28-2021

2        Q.    Do you recall that there came a time

3    just prior to the confirmation hearing that the

4    debtor amended its Liquidation Analysis?

5        A.    No.  Okay.  Yes.

6              MR. MORRIS:  Okay.  And if we could

7        go to the next page.

8    BY MR. MORRIS:

9        Q.    You'll see at the bottom right-hand

10   corner it's dated January 28th, 2021.

11             MR. MORRIS:  We wanted page up but

12       just -- yeah, page up, the assumptions.

13       Yeah, right there.

14   BY MR. MORRIS:

15       Q.    You see it's dated January 28, 2021?

16       A.    Yes.

17       Q.    Okay.  And let's look at Assumption

18   C.  It's been amended somewhat.

19             And it now says, quote:  "All demand

20   notes are collected in the year 2021; 3 term

21   notes defaulted and have been demanded based on

22   default provisions; payment estimated in 2021."

23             Do you see that?

24       A.    Yes.

25       Q.    Did you or anybody on your behalf

1                  Dondero - 5-28-2021

2   ever inform the Court that this assumption was

3   unreasonable?

4           MS. DEITSCH-PEREZ:  Object to the

5     form.

6     A.   Yes.  Well, Lynn wrote a letter to

7   all the counsels, which I think ended up being

8   put in the Court record, that the notes were

9   all subject to defenses and could not be

10  considered unencumbered, I think, if they're

11  sold, or whatever.  He was -- he was -- he --

12  he realized the attitude towards the notes had

13  shifted, and he penned something to everybody

14  and to make the notes so that they couldn't be

15  sold without notifying people that there were

16  good defenses to them.

17  BY MR. MORRIS:

18     Q.   Did you or anybody acting on your

19  behalf ever challenge this assumption in

20  connection with the debtor's confirmation

21  hearing?

22          MS. DEITSCH-PEREZ:  Object to the

23    form, asked and answered.

24     A.   Yeah.  I think Lynn's letter

25  objected to that vehemently.  It was just

```
 1                Dondero - 5-28-2021

 2   ignored.

 3   BY MR. MORRIS:

 4        Q.    Do you know anything else --

 5   anything else you're aware of?

 6        A.    I think that's powerful enough.

 7        Q.    That's not my question, sir.  My

 8   question is:  Are you aware of any other facts

 9   that you're relying upon to answer my question

10   as to whether or not you or anybody acting on

11   your behalf informed the Court that Assumption

12   C is unreasonable?

13             MS. DEITSCH-PEREZ:  Object to the

14        form.

15        A.    Just the Lynn letter.  I have no

16   other specific awareness.

17             MR. MORRIS:  Thank you very much.  I

18        have no further questions.  Thank you so

19        much, folks.  Been a pleasure.

20             MS. DEITSCH-PEREZ:  Reserve until

21        trial.

22             (Time Noted:  1:59 p.m.)

23

24

25
```

Page 277

1     Dondero - 5-28-2021

2     C E R T I F I C A T E
  STATE OF TEXAS  )
3         )
  COUNTY OF ELLIS  )
4

5     I, Daniel J. Skur, a Notary Public
  within and for the State of Texas, do
6  hereby certify:
     That JAMES DONDERO, the witness whose
7  deposition is hereinbefore set forth, was
  duly sworn by me and that such deposition
8  is a true record of the testimony given by
  such witness.
9    That pursuant to Rule 30 of the Federal
  Rules of Civil Procedure, signature of the
10  witness was not reserved by the witness or
  other party before the conclusion of the
11  deposition;
     I further certify that I am not
12  related to any of the parties to this
  action by blood or marriage; and that I am
13  in no way interested in the outcome of this
  matter.
14     IN WITNESS WHEREOF, I have hereunto
  set my hand this 28th day of May, 2021.

15

16

17

18  _____
  Daniel J. Skur
19  Notary Public, State of Texas.
  My Commission Expires 7/7/2022
20  TSG Reporting, Inc.
  228 East 45th Street, Suite 810
21  New York, New York
  (877) 702-9580

22

23

24

25

Page 278

1                    Dondero - 5-28-2021

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:
              IN THE UNITED STATES BANKRUPTCY COURT
4           FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION
5    In re:                        )
     HIGHLAND CAPITAL              )    Case No.
6    MANAGEMENT, LP,               ) 19-34054 L.P.
     Debtor,                       ) Chapter 11
7    ----------------------------)
     HIGHLAND CAPITAL MANAGEMENT,  )
8    LP,                           )
                                   )
9            Plaintiff,            ) Adversary No.
     vs.                           ) 21-03003-sgi
10   JAMES D. DONDERO,             )
     Defendant.                    )
11   Dep. Date: 05/28/2021
     Deponent:  JAMES DONDERO
12
     Reason codes:
13   1. To clarify the record.
     2. To conform to the facts.
14   3. To correct transcription errors.

15                    CORRECTIONS:

16   Pg. LN.  Now Reads        Should Read      Reason

17   ____ ____ _____ _____ _____

18   ____ ____ _____ _____ _____

19   ____ ____ _____ _____ _____

20   ____ ____ _____ _____ _____

21   ____ ____ _____ _____ _____

22   ____ ____ _____ _____ _____

23   ____ ____ _____ _____ _____

24   ____ ____ _____ _____ _____

25   ____ ____ _____ _____ _____

1          Dondero - 5-28-2021

2    ____ ____ _____ _____ _____

3    ____ ____ _____ _____ _____

4    ____ ____ _____ _____ _____

5    ____ ____ _____ _____ _____

6    ____ ____ _____ _____ _____

7

8

9              _____
               JAMES DONDERO
10

11   SUBSCRIBED AND SWORN BEFORE ME
     THIS _____ DAY OF _____, 2021.
12

13
     _____
14   (Notary Public)  MY COMMISSION EXPIRES:_____

15

16

17

18

19

20

21

22

23

24

25

1                    Dondero - 5-28-2021

2                    -------I N D E X-------

3    WITNESS:              EXAMINATION BY              PAGE:

4    JAMES DONDERO

5                    Mr. Morris                 107

6

7    --------------------EXHIBITS-------------------

8    Defendant's                          PAGE/LINE

9    Exhibit 1    2/2/2020 Promissory Note    108/16
                  2 pages
10
     Exhibit 2    February 2020 Highland      118/21
11                Capital Management, L.P.
                  Operating Results
12                12 pages

13   Exhibit 3    8/1/2020 Promissory Note    121/8
                  2 pages
14
     Exhibit 4    8/13/2018 Promissory Note   127/2
15                2 pages

16   Exhibit 5    August 2018 Highland        130/14
                  Capital Management, L.P.
17                Operating Results
                  9 pages
18
     Exhibit 6    12/3/2020 Demand Letter     132/11
19                3 pages

20   Exhibit 7    Defendant James Dondero's   136/8
                  Original Answer
21                8 pages

22   Exhibit 8    Defendant James Dondero's   158/2
                  Objections and Responses
23                to Highland Capital
                  Management, L.P.'s First
24                Request For Admissions
                  6 pages
25

```
 1                    Dondero - 5-28-2021

 2      --------------------EXHIBITS--------------------

 3   Defendant's                              PAGE/LINE

 4   Exhibit 9    Defendant James Dondero's   160/23
                  Objections and Answers to
 5                Highland Capital
                  Management, L.P.'s First
 6                Set of Interrogatories
                  6 pages
 7
     Exhibit 10   Defendant James Dondero's   169/10
 8                Amended Answer
                  8 pages
 9
     Exhibit 11   Defendant James Dondero's   191/8
10                Objections and Responses
                  to Highland Capital
11                Management, L.P.'s Second
                  Request For Admissions
12                5 pages

13   Exhibit 12   Exhibit 20, Defendant       206/4
                  James Dondero's Objections
14                and Answers to Highland
                  Capital Management, L.P.'s
15                Second Set of Interrogatories
                  7 pages
16
     Exhibit 13   Highland Capital            220/20
17                Management, L.P.'s
                  Consolidated Financial
18                Statements and
                  Supplemental Information
19                12/31/2020
                  48 pages
20
     Exhibit 14   5/18/2020 Management        234/21
21                Representation Letter
                  11 pages
22
     Exhibit 15   Highland Capital            237/3
23                Management, L.P.'s Consolidated
                  Financial Statements and
24                Supplemental Information
                  12/31/2018
25                46 pages
```

Page 282

```
 1                  Dondero - 5-28-2021

 2      --------------------EXHIBITS--------------------

 3    Defendant's                           PAGE/LINE

 4    Exhibit 16   6/3/2019 Management          247/7
                   Representation Letter
 5                 11 pages

 6    Exhibit 17   12/13/2019 Summary of       247/20
                   Assets and Liabilities For
 7                 Nonindividuals
                   3 pages
 8
      Exhibit 18   (Skipped by Agreement)
 9
      Exhibit 19   12/13/2019 Statement of     255/11
10                 Financial Affairs For
                   Nonindividuals Filing
11                 Bankruptcy
                   42 pages
12
      Exhibit 20   10/31/2019 Monthly          261/4
13                 Operating Report
                   11 pages
14
      Exhibit 21   10/31/2019 Monthly          264/24
15                 Operating Report
                   11 pages
16
      Exhibit 22   December 2019 Monthly        270/2
17                 Operating Report
                   9 pages
18
      Exhibit 23   Exhibit C, Liquidation      271/19
19                 Analysis/Financial
                   Projections
20                 8 pages

21    Exhibit 24   1/28/2021 Highland Capital  273/24
                   Management LP Disclaimer
22                 For Financial Projections
                   7 pages
23

24

25
```