Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO
AND NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR THE DUGABOY INVESTMENT
TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS'
MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

Defendants James Dondero, Nancy Dondero and The Dugaboy Investment Trust file this

Appendix in Support of their Motion to Compel Arbitration and Stay Litigation and request the

Court take judicial notice of the documents contained herein.

| Exhibit | Document | Appendix Page(s) |
|---------|----------|------------------|
| A | Declaration of Michael P. Aigen in Support of Motion to Compel Arbitration and Stay Litigation, dated September 1, 2021 | App. 1-3 |
| 1 | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. | App. 4-40 |
| 2 | Excerpts from the Transcript of the Remote Deposition of James Dondero on May 28, 2021, Adversary Proceeding No. 21-3003 | App. 41-54 |
| 3 | Acceptance of Appointment of Family Trustee, executed by Nancy Marie Dondero on October 13, 2015 | App. 55-60 |
| 4 | Trust Agreement Between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees, The Dugaboy Investment, dated November 15, 2010 | App. 61-97 |

Dated: September 1, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND NANCY DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system to the parties that are registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# Exhibit A

Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF
## MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

I, Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1.      I am a member of the law firm of Stinson LLP, counsel to Defendants James Dondero and Nancy Dondero, and I submit this Declaration in support of the *Motion to Compel*

**App. 2**

*Arbitration and Stay Litigation* being filed concurrently with this Declaration. I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit 1** is a true and correct copy of The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

3.      Attached as **Exhibit 2** is a true and correct copy of excerpts of the May 28, 2021 Remote Deposition of James Dondero Transcript at 176-178; 212:18-25; 213:1-17.

4.      Attached as **Exhibit 3** is a true and correct copy of the *Acceptance of Appointment of Family Trustee*, executed by Nancy Marie Dondero on October 13, 2015.

5.      Attached as **Exhibit 4** is a true and correct copy of *Trust Agreement Between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees The Dugaboy Investment*, entered November 15, 2010 at Article 5.2.

Dated: September 1, 2021.                  */s/ Michael P. Aigen*
                                    Michael P. Aigen

**App. 3**

# Exhibit 1

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

ARTICLE 1    GENERAL .................................................................................................... 1
   1.1.    Continuation ........................................................................................ 1
   1.2.    Name .................................................................................................... 1
   1.3.    Purpose ................................................................................................ 1
   1.4.    Term. ................................................................................................... 1
   1.5.    Partnership Offices; Addresses of Partners. ........................................ 1

ARTICLE 2    DEFINITIONS ............................................................................................ 2
   2.1.    Definitions ........................................................................................... 2
   2.2.    Other Definitions ................................................................................ 6

ARTICLE 3    FINANCIAL MATTERS ............................................................................. 6
   3.1.    Capital Contributions ......................................................................... 6
   3.2.    Allocations of Profits and Losses ....................................................... 8
   3.3.    Allocations on Transfers .................................................................... 9
   3.4.    Special Allocations ............................................................................. 9
   3.5.    Curative Allocations ......................................................................... 10
   3.6.    Code Section 704(c) Allocations ...................................................... 10
   3.7.    Capital Accounts .............................................................................. 11
   3.8.    Distributive Share for Tax Purpose .................................................. 12
   3.9.    Distributions. .................................................................................... 12
   3.10.    Compensation and Reimbursement of General Partner ..................... 14
   3.11.    Books, Records, Accounting, and Reports ........................................ 14
   3.12.    Tax Matters ...................................................................................... 14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS ....................................... 15
   4.1.    Rights and Obligations of the General Partner .................................. 15
   4.2.    Rights and Obligations of Limited Partners ...................................... 19
   4.3.    Transfer of Partnership Interests ...................................................... 19
   4.4.    Issuances of Partnership Interests to New and Existing Partners ....... 21
   4.5.    Withdrawal of General Partner ......................................................... 21
   4.6.    Admission of Substitute Limited Partners and Successor General Partner ................... 21

ARTICLE 5    DISSOLUTION AND WINDING UP ......................................................... 22
   5.1.    Dissolution ....................................................................................... 22
   5.2.    Continuation of the Partnership ........................................................ 23
   5.3.    Liquidation ....................................................................................... 23
   5.4.    Distribution in Kind ......................................................................... 24
   5.5.    Cancellation of Certificate of Limited Partnership ............................ 24
   5.6.    Return of Capital .............................................................................. 24
   5.7.    Waiver of Partition. .......................................................................... 24

ARTICLE 6    GENERAL PROVISIONS ......................................................................... 24
   6.1.    Amendments to Agreement ............................................................... 24

i

| 6.2. | Addresses and Notices | 25 |
|------|-----------------------|----|
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

**App. 7**

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation *("Strand"),* as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.** **Continuation**. Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act. Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.** **Name.** The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P. The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.** **Purpose.** The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act. Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.** **Term.** The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.** **Partnership Offices; Addresses of Partners**.

(a)     Partnership Offices. The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate. The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)     Addresses of Partners. The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201. The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership. Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

2.1.    **Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in <u>Section 3.1(b)</u> of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to <u>Section 3.7</u> and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to <u>Section 3.7(a)</u>.

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

"***Class B Limited Partner***" means those Partners holding a Class B Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"***Class B Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"***Class B NAV Ratio Trigger Period***" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"***Class C Limited Partner***" means those Partners holding a Class C Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"***Class C Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"***Class C NAV Ratio Trigger Period***" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"***Code***" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"***Contribution Note***" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"***Default Loan***" has the meaning set forth in <u>Section 3.1(c)(i)</u>.

"***Defaulting Partner***" has the meaning set forth in <u>Section 3.1(c)</u>.

"***Delaware Act***" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"***Effective Date***" means the date first recited above.

"***Fiscal Year***" has the meaning set forth in <u>Section 3.11(b)</u>.

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in <u>Section 5.3</u>.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; <u>provided</u>, <u>however</u>, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* **Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

"***Partner***" means a General Partner or a Limited Partner.

"***Partner Nonrecourse Debt***" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"***Partner Nonrecourse Deductions***" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"***Partner Nonrecourse Debt Minimum Gain***" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"***Partnership***" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"***Partnership Capital***" means, as of any relevant date, the net book value of the Partnership's assets.

"***Partnership Interest***" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"***Partnership Minimum Gain***" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"***Percentage Interest***" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"***Person***" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"***Priority Distributions***" has the meaning set forth in Section 3.9(b).

"***Profits***" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"***Profits Interest Partner***" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"***Purchase Notes***" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

**App. 12**

"**_Record Date_**" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"**_Second Amended Buy-Sell and Redemption Agreement_**" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"**_Securities_**" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"**_Securities Act_**" means the Securities Act of 1933, as amended, and any successor to such statute.

"**_Substitute Limited Partner_**" has the meaning set forth in Section 4.6(a).

"**_Transfer_**" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"**_Treasury Regulations_**" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.** **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

**3.1.** **Capital Contributions**.

(a)     Initial Capital Contributions.   The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)     Additional Capital Contributions.

6

**App. 13**

(i) The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii) Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c) Consequences to Defaulting Partners. In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i) Default Loans. If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***"). A Default Loan shall be deemed advanced on the date actually advanced. Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full. The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion. If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid. Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner. Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner. The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan. In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges). If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement. The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest. Such appointment and authorization are coupled with an interest and shall be irrevocable. The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

(ii)     Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.     Allocations of Profits and Losses**.

(a)     Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

(b)     Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)     First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

8

(c)     Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.    Allocations on Transfers.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.    Special Allocations.  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; provided, however, an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)     Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; provided, however, an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

    (e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

    (f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

    (g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

    (h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7. Capital Accounts.**

(a) <u>Maintenance of Capital Accounts</u>. The Partnership shall establish and maintain a separate capital account (***"Capital Account"***) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) <u>Negative Capital Accounts</u>. If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) <u>Interest</u>. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) <u>No Withdrawal</u>. No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e) <u>Loans From Partners</u>. Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) <u>Revaluations</u>. The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

**3.8.** **Distributive Share for Tax Purpose.** All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion. Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.** **Distributions**.

(a) General. The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f). The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners. Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b) Priority Distributions. Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i) No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii) No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "*Tax Distribution*").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions.    Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

**3.10. Compensation and Reimbursement of General Partner.**

(a)     <u>Compensation</u>.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)     <u>Reimbursement for Expenses</u>.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

**3.11. Books, Records, Accounting, and Reports.**

(a)     <u>Records and Accounting</u>.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)     <u>Fiscal Year</u>.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)     <u>Other Information</u>.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)     <u>Distribution Reporting to Class B Limited Partner and Class C Limited Partner</u>. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under <u>Section 3.9</u> to Partners other than the Partner requesting the information.

**3.12. Tax Matters.**

(a)     <u>Tax Returns</u>.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)  Tax Elections. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)  Tax Controversies. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)  Taxation as a Partnership. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

4.1.  **Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)  Management. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this <u>Section 4.1(d)</u> shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to <u>Section 4.1(e)(i)</u>. All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

  (e)  <u>Loans to or from General Partner: Contracts with Affiliates; Joint Ventures</u>.

    (i)  The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

    (ii)  The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

    (iii)  The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

  (f)  <u>Outside Activities' Conflicts of Interest</u>. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

  (g)  <u>Resolution of Conflicts of Interest</u>. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

  (h)  <u>Indemnification</u>. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

the "*GP Party*"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

      (i)    Liability of General Partner.

      (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

      (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

      (j)    Reliance by General Partner.

      (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

      (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

      (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

**App. 25**

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2. Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a) <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b) <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c) <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d) <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e) <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

**4.3. Transfer of Partnership Interests**.

(a) <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

(b)       Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)       Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)       Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; **provided, however,** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)       Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)       Transfers of Partnership Interests Pursuant to the Purchase Notes. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.    Issuances of Partnership Interests to New and Existing Partners**.

(a)    Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.    Withdrawal of General Partner**

(a)    Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.    Admission of Substitute Limited Partners and Successor General Partner**.

(a)    Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner. A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner. In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.    Dissolution.** The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding: (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**. Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event. If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs. If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**. Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator. The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest. The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest. Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein. Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein. The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**   Notwithstanding the provisions of Section 5.3 that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of Section 5.3, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**   Upon the completion of the distribution of Partnership property as provided in Sections 5.3 and 5.4, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**   Each Partner hereby waives any rights to partition of the Partnership property.

**ARTICLE 6**

**GENERAL PROVISIONS**

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2. Addresses and Notices.** Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3. Titles and Captions.** All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement. All Exhibits hereto are incorporated herein by reference.

**6.4. Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5. Further Action.** The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7. Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8. Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9. Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10. Counterparts.** This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11. Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12. Invalidity of Provisions.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

     **6.13.**    **General Partner Discretion.** Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

     **6.14.**    **Mandatory Arbitration.** In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

**App. 34**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
    James D. Dondero,
    President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership*

**App. 35**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____

James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____

Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:    President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**App. 37**

## EXHIBIT A

|  | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| <u>GENERAL PARTNER:</u> | | |
| Strand Advisors | 0.5573% | 0.2508% |
| <u>LIMITED PARTNERS:</u> | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

# Exhibit 2

1         Dondero - 5-28-2021

2      IN THE UNITED STATES BANKRUPTCY COURT

3        FOR THE NORTHERN DISTRICT OF TEXAS

4               DALLAS DIVISION

5  In re:                    )
                             )
6  HIGHLAND CAPITAL          )   Case No.
   MANAGEMENT, LP,           ) 19-34054 L.P.
7                            )   Chapter 11
           Debtor,          )
8  -----------------------------)
   HIGHLAND CAPITAL MANAGEMENT,  )
9  LP,                       )
                             )
10         Plaintiff,        ) Adversary No.
                             ) 21-03003-sgi
11      vs.                  )
                             )
12  JAMES D. DONDERO,        )
                             )
13         Defendant.        )

14

15            REMOTE DEPOSITION OF

16               JAMES DONDERO

17

18             Pages 103 - 282

19              Dallas, Texas

20      Friday, 28th day of May, 2021

21

22

23  Job No. 194690

24  Reported by:

25  Daniel J. Skur, Notary Public and CSR

1        Dondero - 5-28-2021

2

3

4

5

6

7

8        28th day of May, 2021

9        9:33 a.m. - 1:59 p.m.

10

11

12        Remote Deposition of JAMES DONDERO,

13    located in Dallas, Texas, before Daniel J.

14    Skur, Notary Public and Certified Shorthand

15    Reporter in and for the State of Texas

16    located in Waxahachie, Texas.

17

18

19

20

21

22

23

24

25

```
 1              Dondero - 5-28-2021

 2    A P P E A R A N C E S:

 3        Pachulski Stang Ziehl & Jones
          Attorney(s) for Debtor
 4        780 Third Avenue

 5    New York, New York 10017

 6        BY:   John Morris, Esq.

 7              Gregory Demo, Esq.

 8

          Stinson
 9        Attorney(s) for The Witness
          3102 Oak Lawn Avenue
10
          Dallas, Texas 75219
11
          BY:   Deborah Deitsch-Perez
12
                Michael Aigen, Esq.
13
                Paul Lackey, Esq.
14

15
          Sidley Austin
16        Attorney(s) for The Committee
          2021 McKinney Avenue
17
          Dallas, Texas 75201
18
          BY:   Paige Montgomery, Esq.
19

20

21    ALSO PRESENT:

22              Davor Rukavina, NexPoint

23              La Asia Canty

24

25
```

**App. 44**

```
1                Dondero - 5-28-2021

2

3           IT IS HEREBY STIPULATED AND AGREED

4    by and between the attorneys for the respective

5    parties herein, that filing and sealing be and

6    the same are hereby waived.

7           IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form  of

9    the question, shall be reserved to the

10   time of the trial.

11          IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn to and

13   signed before any officer authorized to

14   administer an oath, with the same force and

15   effect as if signed and sworn to before the

16   Court.

17              - oOo -

18

19

20

21

22

23

24

25
```

```
 1                    Dondero - 5-28-2021

 2              P R O C E E D I N G S

 3           REMOTE ORAL DEPOSITION OF

 4                  JAMES DONDERO

 5           (REPORTER NOTE:  This deposition is

 6        being conducted remotely in accordance with

 7        the Current Emergency Order regarding the

 8        COVID-19 State of Disaster.

 9              Today's date is the 28th day of

10        May, 2021.  The time is 9:33 a.m. Daylight

11        Savings Time.  The witness is located in

12        Dallas, Texas.)

13                    JAMES DONDERO,

14      having been duly cautioned and sworn to tell

15     the truth, the whole truth and nothing but the

16              truth, testified as follows:

17                    (9:33 A.M.)

18                    EXAMINATION

19     BY MR. MORRIS:

20        Q.    Good morning, Mr. Dondero.

21        A.    Morning.

22        Q.    It's John Morris, again, from

23     Pachulski on behalf of the debtor.  We're here

24     for your deposition today.

25                    Do you understand that?
```

1          Dondero - 5-28-2021

2  BY MR. MORRIS:

3       Q.    Mr. Dondero, can you describe for

4  me -- withdrawn.

5            Did you discuss with your sister

6  Nancy, the agreement that's referred to in

7  paragraph 40?

8       A.    The agreement to subsequent

9  conditions, yes, absolutely.  But this

10 agreement that's on the screen, I've never --

11 I've never -- I've never shown her this

12 document or talked to her about it.

13      Q.    I'm not asking about the document.

14 I'm not asking about the document.  I'm asking

15 about the agreement that's referred to in

16 paragraph 40.

17            Do you understand that?

18      A.    Yes.  And, yes, we had several

19 conversations about it.

20      Q.    Okay.  Can you describe for me

21 everything you remember about your discussions

22 with Nancy concerning the agreement that's

23 referred to in paragraph 40?

24      A.    That the loans that were in place

25 would be forgiven upon a monetization -- the

1                 Dondero - 5-28-2021

2    favorable monetization of certain large or

3    liquid assets on the Highland balance sheet;

4    and the three that were focused on was MGM,

5    Trussway, and Cornerstone.

6         Q.    Did she say anything in response?

7         A.    Just, "How much are we talking

8    about?"  And I told her it was about 9 million

9    in aggregate, and -- and I told her that it

10   was -- that the forgiveness or the compensation

11   was compliant regarding any credit covenants or

12   Hunter Mountain covenants --

13        Q.    Do you recall any --

14        A.    -- that -- that if it were to be

15   forgiven, that additional compensation would be

16   compliant or permitted and really not material

17   relative to any outstanding credit agreements

18   that Highland had or agreements with Hunter

19   Mountain.

20        Q.    Is this something that you discussed

21   with her, or is this just information that

22   you're giving me?

23        A.    This is what I discussed -- that's

24   almost the entirety of the conversation.  It

25   happened over a couple different conversations,

1             Dondero - 5-28-2021

2   but...

3       Q.    Did anybody participate in any of

4   the conversations you're describing other than

5   you and your sister?

6       A.    I don't believe it was necessary, it

7   didn't include anybody else.

8       Q.    Okay.  Again, I'm not here to

9   question.  I'm just looking for facts,

10  Mr. Dondero.

11          So nobody participated in any of

12  these conversations that you can recall other

13  than you and Nancy; is that correct?

14      A.    Correct, that I -- yes, there was

15  never a third party involved in our

16  conversations.  I don't know -- I don't think

17  she discussed it with anybody else, but I don't

18  know.

19      Q.    Did -- was the agreement subject to

20  any negotiation?  Did she make any

21  counterproposal of any kind?

22      A.    No.  No, I -- again, I believe both

23  of our views at the time was that it was

24  immaterial to Highland overall or any other

25  agreements.

1          Dondero - 5-28-2021

2    three assets would trigger the conditions

3    subsequent?

4          A.    Correct.

5          Q.    Okay.  And who decided whether the

6    asset was sold on a favorable basis?

7                Who made that decision, under your

8    agreement with Nancy?

9          A.    It was just defined relative to

10   cost, so it was just -- it was just a

11   factual -- there's nothing to decide.  It would

12   just be a factual answer.

13         Q.    So, I just want to make sure I

14   understand.

15               Your agreement with Nancy was that

16   --

17         A.    Yes.

18         Q.    -- that -- all right.  Withdrawn.

19               Your agreement with Nancy in January

20   or February 2019, was that if any of MGM,

21   Cornerstone, or Trussway was sold at cost, the

22   debtor would forgive your obligations under the

23   three notes.

24               Do I have that right?

25               MS. DEITSCH-PEREZ:  Object to the

1               Dondero - 5-28-2021

2     form.

3     A.   If any of them were sold above cost,

4  it would -- monetization would trigger the --

5  the three notes -- forgiveness of the three

6  notes, yes.

7  BY MR. MORRIS:

8     Q.   Okay.  And I just want to see if I

9  can understand:  Did you and Nancy discuss in

10  January or February 2019 how much above cost

11  the sale would have to be in order for the

12  debtor to forgive your obligations under the

13  three notes?

14       MS. DEITSCH-PEREZ:  Object to the

15     form.

16     A.   No.  It just had to be above cost,

17  not a amount above cost.

18  BY MR. MORRIS:

19     Q.   Okay.

20     A.   Because just monetizing it -- just

21  monetizing it and getting liquidity for an

22  illiquid investment, even if it was at cost, is

23  good.  So something above cost is great.  And

24  those are all big assets, and the notes were

25  small.

```
 1              Dondero - 5-28-2021

 2                C E R T I F I C A T E
   STATE OF TEXAS      )
 3                     )
   COUNTY OF ELLIS     )
 4
             I, Daniel J. Skur, a Notary Public
 5      within and for the State of Texas, do
        hereby certify:
 6           That JAMES DONDERO, the witness whose
        deposition is hereinbefore set forth, was
 7      duly sworn by me and that such deposition
        is a true record of the testimony given by
 8      such witness.
          That pursuant to Rule 30 of the Federal
 9      Rules of Civil Procedure, signature of the
        witness was not reserved by the witness or
10      other party before the conclusion of the
        deposition;
11           I further certify that I am not
        related to any of the parties to this
12      action by blood or marriage; and that I am
        in no way interested in the outcome of this
13      matter.
             IN WITNESS WHEREOF, I have hereunto
14      set my hand this 28th day of May, 2021.

15

16

17
        _____
18      Daniel J. Skur
        Notary Public, State of Texas.
19      My Commission Expires 7/7/2022
        TSG Reporting, Inc.
20      228 East 45th Street, Suite 810
        New York, New York
21      (877) 702-9580

22

23

24

25
```

Dondero - 5-28-2021

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| HIGHLAND CAPITAL | ) | Case No. |
| MANAGEMENT, LP, | ) | 19-34054 L.P. |
| Debtor, | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, LP, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. |
| vs. | ) | 21-03003-sgi |
| JAMES D. DONDERO, | ) | |
| Defendant. | ) | |

Dep. Date: 05/28/2021
Deponent: JAMES DONDERO

Reason codes:

1.      To clarify the record.

2.      To conform to the facts.

3.      To correct transcription errors.

CORRECTIONS:

| Pg. | LN. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 140 | 4 | THE WITNESS | MR. MORRIS | 3 |
| 140 | 6 | THE WITNESS | MR. MORRIS | 3 |
| 140 | 8 | THE WITNESS | MR. MORRIS | 3 |
| 140 | 11 | THE WITNESS | MR. MORRIS | 3 |
| 140 | 13 | THE WITNESS | MR. MORRIS | 3 |
| 140 | 14 | MR. MORRIS | THE WITNESS | 3 |
| 140 | 15 | THE WITNESS | MR. MORRIS | 3 |
| 177 | 3 | liquid | illiquid | 3 |

1

**App. 53**

| 181 | 25 | | Add to end (after yes): as long as the conditions subsequent could still be met. | 1 |
| --- | --- | --- | --- | --- |
| 182 | 13 | focused | focus | 3 |
| 188 | 11 | | Add to end (after monetized): or were monetized for less than cost. | 1 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

JAMES DONDERO

SUBSCRIBED AND SWORN BEFORE ME

THIS _29th_ DAY OF _June_ , 2021.

_Linda Lauchner_  6/19/25

(Notary Public)    MY COMMISSION EXPIRES:

LINDA LAUCHNER
Notary Public, State of Texas
Comm. Expires 06-19-2025
Notary ID 1049001

CORE/3522697.0002/167597109.1

**App. 54**

# Exhibit 3

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Primary Beneficiary

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:     The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

## THE DUGABOY INVESTMENT TRUST
### Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

    I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

    This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

## RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          10/12/2015
Family Trustee                    Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14ᵗʰ day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

_____
Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

**App. 58**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this  13th  day of October, 2015.

**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS          §
COUNTY OF DALLAS     §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this  14th  day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Notary Public's Signature

Expiration: January 15, 2019

**App. 59**

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

_____
James D. Dondero

# Exhibit 4

TRUST AGREEMENT


Between


DANA SCOTT BREAULT,
Settlor


and


JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees


THE DUGABOY INVESTMENT TRUST


WINSTEAD PC
DALLAS, TEXAS

# THE DUGABOY INVESTMENT TRUST

## TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS ...........................................................................................1
| | | |
|---|---|---|
| 1.1 | Settlor | 1 |
| 1.2 | Jim | 1 |
| 1.3 | Trustees | 1 |
| 1.4 | Children | 1 |
| 1.5 | Descendants | 1 |
| 1.6 | Code | 1 |
| 1.7 | Per Stirpes | 1 |

ARTICLE II FUNDING ................................................................................................2

ARTICLE III DISTRIBUTION OF PRINCIPAL AND INCOME ...............................2
| | | |
|---|---|---|
| 3.1 | Trust for Jim | 2 |
| 3.2 | Trust for Child | 5 |
| 3.3 | Trusts for Descendants | 6 |
| 3.4 | Contingent Distribution | 9 |
| 3.5 | General Power of Appointment for Certain Beneficiaries | 9 |
| 3.6 | Postponement of Distribution | 10 |

ARTICLE IV PROVISIONS AFFECTING DISTRIBUTION ......................................10
| | | |
|---|---|---|
| 4.1 | Withdrawal Right | 10 |
| 4.2 | Restriction Upon Alienation | 12 |
| 4.3 | Distributions Constitute Separate Property | 12 |
| 4.4 | Method of Payment | 12 |
| 4.5 | Evidence of Need | 12 |
| 4.6 | Termination of Small Trust | 12 |
| 4.7 | Generation-Skipping Transfer Taxes and Payment | 13 |

ARTICLE V THE TRUSTEE .......................................................................................13
| | | |
|---|---|---|
| 5.1 | Resignation of Trustee | 13 |
| 5.2 | Appointment and Succession of Trustees. | 14 |
| 5.3 | Removal of Trustee | 16 |
| 5.4 | Succession of Corporate Trustee | 16 |
| 5.5 | Trustee's Fees | 16 |
| 5.6 | Bond | 16 |
| 5.7 | Liability of Trustee. | 16 |
| 5.8 | Predecessor Fiduciary | 18 |
| 5.9 | Periodic Accounting | 18 |
| 5.10 | Beneficiary under Disability | 19 |
| 5.11 | Incapacity of Individual Trustee | 19 |

ARTICLE VI TRUST ADMINISTRATION ................................................................19

TABLE OF CONTENTS
(Continued)

PAGE

| | | |
|---|---|---|
| 6.1 | General Powers | 19 |
| 6.2 | Division of Powers | 24 |
| 6.3 | Merger of Trusts | 25 |
| 6.4 | Certain Powers and Rights Limited | 25 |
| 6.5 | GST Inclusion Ratio | 25 |
| 6.6 | Out-of-State Properties | 25 |
| 6.7 | Management of Real Property | 26 |
| 6.8 | No Court Supervision | 26 |
| 6.9 | Division of Trusts | 26 |
| 6.10 | Limitation of Powers | 26 |
| 6.11 | Dealing with Fiduciaries | 27 |

ARTICLE VII  IRREVOCABILITY ... 27

ARTICLE VIII  MISCELLANEOUS PROVISIONS ... 28

| | | |
|---|---|---|
| 8.1 | Applicable Law | 28 |
| 8.2 | Perpetuities Provision | 28 |
| 8.3 | Gestation | 28 |
| 8.4 | Survivorship | 29 |
| 8.5 | Release of Powers and Interests | 29 |
| 8.6 | Powers of Appointment | 29 |
| 8.7 | Liability of Third Party | 30 |
| 8.8 | Use of Words | 30 |
| 8.9 | Unenforceable Provision | 30 |
| 8.10 | Titles, Headings, and Captions | 30 |
| 8.11 | Counterpart Signatures | 30 |
| 8.12 | Trust Name | 30 |

**App. 64**

THE DUGABOY INVESTMENT TRUST

AGREEMENT OF TRUST made and entered into at Dallas, Texas, this _____ day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

ARTICLE I

DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1     Settlor. "Settlor" means DANA SCOTT BREAULT.

1.2     Jim. "Jim" means JAMES D. DONDERO.

1.3     Trustees. The initial Trustee of each trust created hereunder is JAMES D. DONDERO. "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number. "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c). "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b). "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a). The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4     Children. "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement. "Child" means one of the Children.

1.5     Descendants. "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6     Code. "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7     Per Stirpes. "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant. The per

stirpital allocation shall commence with the most senior generation that has a living representative.

ARTICLE II

FUNDING

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

ARTICLE III

DISTRIBUTION OF PRINCIPAL AND INCOME

3.1     Trust for Jim.  The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a)     Distributions to Jim.  The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health.  Undistributed income shall be accumulated and added to principal.  In exercising its discretion, the Family Trustee shall take into account the following factors:

(i)     Jim is the primary beneficiary of the trust.

(ii)     The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii)     Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv)     Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v)     Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b)     Distributions by Independent Trustee.  The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable.  It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

-2-

**App. 66**

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c)     Inter Vivos Special Power of Appointment. During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate. Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d)     Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i)     If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

-3-

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii)     The scope and terms of the power shall be defined in the instrument.  Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted.  This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes.  Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e)     <u>Termination</u>.  If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death.  Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i)     <u>Pursuant to General Testamentary Power of Appointment</u>.  This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death.  In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii)     <u>Special Testamentary Power of Appointment</u>.  This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above.  The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it.  However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii)     <u>Alternative Disposition</u>.  The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1)     If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living.  The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof.  The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

-4-

(2)     If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

3.2     <u>Trust for Child</u>.  All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

(a)     <u>Distributions to Child</u>.  The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education.  In exercising its discretion, the Trustee shall take into account the following factors:

(i)     The Child's standard of living at the creation of the trust.

(ii)     The Child is the primary beneficiary of the trust.

(iii)     The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

(iv)     Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

(v)     Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

(b)     <u>Distributions to Child's Descendants</u>.  The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education.  In exercising its discretion, the Trustee shall take into account the following factors:

(i)     The primary purpose of the trust.

(ii)     The respective needs of each Descendant.

(iii)     The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv)     Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

-5-

(v) Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c) <u>Inter Vivos Special Power of Appointment</u>. The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d) <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child. Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate. The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof. If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, <u>Per Stirpes</u>. If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms. If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3 <u>Trusts for Descendants</u>. The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

**App. 70**

Descendants, Per Stirpes. The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

     (a)    <u>Distributions</u>. The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

          (i)    The Beneficiary's standard of living at the creation of the trust.

          (ii)    The Beneficiary is the primary beneficiary of the trust.

          (iii)    The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

          (iv)    Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

          (v)    Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

     (b)    <u>Distributions to Beneficiary's Descendants</u>. The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

          (i)    The primary purpose of the trust.

          (ii)    The respective needs of each Descendant.

          (iii)    The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

          (iv)    Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

          (v)    Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d)     Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

-8-

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4 <u>Contingent Distribution</u>. If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5 <u>General Power of Appointment for Certain Beneficiaries</u>.

(a) Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees shall make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable. As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b) If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

(c)     The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6     <u>Postponement of Distribution</u>.     Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property. At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate. During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education. If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

## ARTICLE IV

## PROVISIONS AFFECTING DISTRIBUTION

4.1     <u>Withdrawal Right</u>. Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer. A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust. If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes. Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

(a)     <u>Amount That May Be Withdrawn</u>. When a contribution is made, Jim may withdraw the lesser of the following amounts:

(i)     the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

(ii)     the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

(iii)     the value of the contribution that is subject to the withdrawal right.

(b)     Withdrawal Period and Notice.  Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right.  Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right.  During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf.  If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse.  For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate.  The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

(c)     Payment of Withdrawal Amount.  If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor.  Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust.  Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose.  Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

(d)     Distributions During Withdrawal Period.  If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

(e)     Lapse of Withdrawal Right.  In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

4.2     Restriction Upon Alienation.  No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it.  Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts.  The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process.  The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3     Distributions Constitute Separate Property.  Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary.  Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary.  Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4     Method of Payment.  The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways:  directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability.  In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto.  The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5     Evidence of Need.  In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs.  The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6     Termination of Small Trust.  Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration.  In the event of termination, the Trustee shall distribute the trust to the income

-12-

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7     Generation-Skipping Transfer Taxes and Payment. It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1     Resignation of Trustee. The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

-13-

5.2     Appointment and Succession of Trustees.

    (a)     Generally.

        (i)     Family Trustee.     Jim is the initial Family Trustee of all trusts created hereunder.  If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising.  If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee.  If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee.  If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee.  If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (ii)     Independent Trustee.  GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee.  If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code.  If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee.  If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee.  If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (iii)     Administrative     Trustee.     COMMONWEALTH     TRUST COMPANY is the initial Administrative Trustee.  If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising.  If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising.  If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above.  The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b)    Successor Trustee. If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act. If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c)    Manner of Appointment; Permissible Trustees. Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee. An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control. The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

-15-

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3     Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4     Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5     Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6     Bond. The Trustee shall not be required to furnish bond or other security.

5.7     Liability of Trustee.

(a)     Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b)     Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

-16-

**App. 80**

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8    Predecessor Fiduciary.  No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9    Periodic Accounting.  The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10    Beneficiary under Disability. A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11    Incapacity of Individual Trustee. In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

ARTICLE VI

TRUST ADMINISTRATION

6.1    General Powers.    Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a)    Retain Property.    To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b)    Invest.    To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c)    Sell. By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper. To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d)     Lease.  To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e)     Real Estate.  To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f)     Borrow.  To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g)     Loans.  To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h)     Conserve Estate.  To take any action to conserve the trust estate.

(i)     Litigation.  To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j)     Claims.  To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k)     Abandon Property.  To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l)     Documents.  To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m)     Agents.  To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

**App. 84**

(n)   Securities.   To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o)   Nominee.   To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p)   Additional Property.   To receive additional property from any source and add it to the trust estate.

(q)   Insurance.   To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r)   Business Powers.

(i)   In General.   To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii)   Closely Held Businesses.   This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1)   Exoneration from Liability.   It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds. Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2)   Management Powers.   The Family Trustee shall have the exclusive duty to deal with and manage the business. In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A)   To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

(B)     To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C)     To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D)     To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E)     To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F)     To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G)     To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or  a fiduciary of this Trust; and

(3)     <u>Exclusion from Powers</u>.    Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s)     <u>Income and Principal</u>. To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t)     <u>Tax Elections</u>. To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others. The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

-22-

(u) <u>Reliance</u>. To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution. The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v) <u>Commingling</u>. To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w) <u>Division and Distribution</u>. To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x) <u>Withholding of Distribution</u>. To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y) <u>Mineral Powers</u>. To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z) <u>Environmental Hazards</u>. To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

**App. 87**

(aa) <u>Miscellaneous Powers</u>. Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2 <u>Division of Powers</u>. The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a) <u>Administrative Trustee</u>. The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i) To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii) To maintain storage of tangible personalty and evidence of intangible trust property.

(iii) To maintain trust records.

(iv) To maintain an office for Trustee meetings and other trust business.

(v) To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi) To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii) To execute documents with respect to trust account transactions.

(viii) To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b) <u>Independent Trustee</u>. The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement. These powers may only be exercised by the Independent Trustee.

(c) <u>Family Trustee</u>. The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee. Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate. If there is no Family Trustee serving,

-24-

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3 <u>Merger of Trusts</u>. If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement. The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement. If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen. If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire. Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4 <u>Certain Powers and Rights Limited</u>. Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d). All issues applicable to the trust shall be resolved accordingly.

6.5 <u>GST Inclusion Ratio</u>. If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero. If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6 <u>Out-of-State Properties</u>. If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper. The ancillary trustee shall be responsible to the Trustee for all property it administers. The Trustee

-25-

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.7     Management of Real Property. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.8     No Court Supervision. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

6.9     Division of Trusts. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

(a)     Division and Funding of Separate Trusts. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

(b)     Administration of Separate Trusts. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

(c)     Powers of Appointment. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

6.10    Limitation of Powers. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

(a)    Support Duty. Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries. When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b)    Adequacy of Consideration. No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c)    Insurance. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d)    Borrow. The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e)    Substitute Property. The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f)    Vote. A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11   Dealing with Fiduciaries. The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement. Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is: a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

## ARTICLE VII

## IRREVOCABILITY

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

ARTICLE VIII

MISCELLANEOUS PROVISIONS

8.1     Applicable Law.  The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware.  However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state.  No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes.  Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust.  Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2     Perpetuities Provision.  The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law.  If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property.  If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement.  Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution.  If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3     Gestation.  A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

-28-

**App. 92**

8.4 <u>Survivorship</u>. Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5 <u>Release of Powers and Interests</u>. Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law. Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6 <u>Powers of Appointment</u>.

(a) <u>Capacity in Which Exercisable</u>. Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b) <u>Manner of Appointment</u>. Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others. Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c) <u>Exercise of Inter Vivos Power</u>. An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it. If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d) <u>Determination of the Exercise of a Testamentary Power</u>. The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised. If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

**App. 93**

(e)     Tax Consequences.  The exercise of a power of appointment may have important tax consequences.  The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7     Liability of Third Party.  No person paying money or delivering property to the Trustee need see to the application of such money or property.  No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8     Use of Words.  As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9     Unenforceable Provision.   If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10     Titles, Headings, and Captions.  All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11     Counterpart Signatures.  This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12     Trust Name.  The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals.  The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement.  The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

-30-

_Dana Scott Breault_ 23 Oct 10

DANA SCOTT BREAULT, Settlor

STATE OF TEXAS      §
                           §

COUNTY OF DALLAS    §

      BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE this _23rd_ day of October, 2010.

Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013

-31-

**App. 95**

_____
JAMES D. DONDERO, Family Trustee

STATE OF TEXAS     §
                           §
COUNTY OF DALLAS   §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.



_____
Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

-32-

COMMONWEALTH TRUST COMPANY,
Administrative Trustee

By: _Cynthia D M Brown_

    Name:   Cynthia D. M. Brown

    Title:    President

STATE OF DELAWARE     §

                              §

COUNTY OF NEW CASTLE   §

    BEFORE ME, the undersigned authority on this day personally appeared Cynthia D. M. Brown, President, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed as the act of COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this 15th day of November, 2010.

_Laura M Owens_
Notary Public

LAURA M. OWENS
MY COMMISSION
EXPIRES
MAY 30, 2014
NOTARY PUBLIC
STATE OF DELAWARE

5480300v.6 47609/1

-33-

**App. 97**