# Exhibit A

Davor Rukavina
Julian P. Vasek
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

Attorneys for NexPoint Advisors, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES | § |
| DONDERO, NANCY DONDERO, AND THE | § |
| DUGABOY INVESTMENT TRUST, | § |
| | § |
| Defendants. | § |

## MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
## EXPERT DISCLOSURE AND DISCOVERY DEADLINES

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery*

*Deadlines* (the "Motion"), respectfully stating as follows:

## I.    <u>RELIEF REQUESTED</u>

1.      By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "<u>Scheduling Order</u>"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.    <u>PROCEDURAL BACKGROUND</u>

2.      The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.      By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "<u>Note</u>").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.      NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready.  As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

## III.    **FACTS**

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018.  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021.  Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services.  NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Declaration at Exhibit C, 337:22-338:8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* Docket No. 6. NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10.     On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement. Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11.     This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.     NexPoint did not know that Waterhouse would provide this testimony.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims."  Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained.  Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.    <u>ARGUMENT AND AUTHORITIES</u>

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20. When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003). Again, this test applies to a deadline which has already expired. Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21. Applying these or any factors:

(i) this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii) if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii) the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv) NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v) the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi) there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii) a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22. NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning. The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero. As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony. It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23. Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V. **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina
     State Bar No. 24030781
     Julian P. Vasek.
     State Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     Email: drukavina@munsch.com
     Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

/s/ Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

1.      My name is Davor Rukavina. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas. I am a shareholder at Munsch Hardt Kopf & Harr, P.C. I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

3.      At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

4.      Highland Capital Management, L.P. (the "<u>Debtor</u>") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5.      The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline. The following is the reason why.

6.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "<u>Agreement</u>") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A." The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7.      The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("<u>Waterhouse</u>"), as did I, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9.     Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10.     This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11.     Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.     In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.     Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero. In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.     I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement. Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true). I do not have a copy of Mr. Seer's deposition yet.

15.     With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.     On October 22, 2021, I began searching for a potential expert. On October 26, 2021, I contacted Steven J. Pully about the potential engagement. After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021. The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time. I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.     Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021. Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents. Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.     NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms.    As used in this Agreement, the following terms shall have the following meanings:

Exhibit A

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office:* Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS), development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)     *Legal/Compliance/Risk Analysis.* Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)     *Tax.* Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)     *Management of Clients and Accounts.* Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)     *Valuation.* Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)     *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)     *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)     *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

        (i)     *Administrative Services.*   The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

        (j)     *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

        (k)     *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

        (l)     *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

    Section 2.03   Shared Employees.

        (a)     The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable. To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

### CONSIDERATION AND EXPENSES

Section 3.01 Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02 Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03 Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

### REPRESENTATIONS AND COVENANTS

Section 4.01 Representations. Each of the Parties hereto represents and warrants that:

(a) It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b) this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c) no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d) neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   Compliance: Advisory Restrictions.

(a)   The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)   This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05 <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06 <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01 <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01 <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02 <u>Assignment and Delegation</u>.

(a) Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b) Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c) The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03 <u>Non-Recourse; Non-Petition</u>.

(a) The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b) Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c) Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d) The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e) The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

15

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10 <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11 <u>Independent Contractor</u>. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12 <u>Written Disclosure Statement</u>. The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13 <u>Headings</u>. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15 <u>Notices</u>. Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

      (a)    If to the Management Company:

          NexPoint Advisors, L.P.
          200 Crescent Court
          Suite 700
          Dallas, TX 75201

(b)   If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer


**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S**
**ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8. Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint. Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court. Defendant NexPoint demands a trial by jury of all issues so triable.

9. Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10. Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11. Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12. Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13. Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14. Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15. Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16. Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## **STATEMENT OF FACTS**

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "<u>Demand Letter</u>") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "<u>Second Demand Letter</u>") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied. To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

**<u>SECOND CLAIM FOR RELIEF</u>**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50. Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

51. Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

52. Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

53. Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54. Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

55. Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56. Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57. Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58. Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.    Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.    Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.    To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.    Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.    Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

```
 1                    WATERHOUSE - 10-19-21

 2            IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 3                        DALLAS DIVISION
          -----------------------------
 4    IN RE:

 5                                   Chapter 11
      HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,              CASE NO.
                                     19-34054-SGI11
 7
              Debtor.
 8    -----------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10    vs.                            Adversary
                                     Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15            Defendants.
      -----------------------------
16

17            REMOTE VIDEOTAPED DEPOSITION OF

18                   FRANK WATERHOUSE

19                   October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

Exhibit C

1                    WATERHOUSE - 10-19-21

2

3

4                    October 19, 2021

5                    9:30 a.m.

6

7

8

9        Remote Deposition of FRANK WATERHOUSE,

10    held before Susan S. Klinger, a Registered

11    Merit Reporter and Certified Realtime Reporter

12    of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              WATERHOUSE - 10-19-21
2    A P P E A R A N C E S:
3    (All appearances via Zoom.)
4    Attorneys for the Reorganized Highland Capital
5    Management:
6         John Morris, Esq.
7         Hayley Winograd, Esq.
8         PACHULSKI STANG ZIEHL & JONES
9         780 Third Avenue
10        New York, New York  10017
11   Attorneys for the Witness:
12        Debra Dandeneau, Esq.
13        Michelle Hartmann, Esq.
14        BAKER McKENZIE
15        1900 North Pearl Street
16        Dallas, Texas  75201
17   Attorneys for NexPoint Advisors, LP and
18   Highland Capital Management Fund Advisors,
19   L.P.:
20        Davor Rukavina, Esq.
21        An Nguyen, Esq.
22        MUNSCH HARDT KOPF & HARDD
23        500 North Akard Street
24        Dallas, Texas  75201-6659
25
```

```
 1              WATERHOUSE - 10-19-21

 2  Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3  and HCMS:

 4       Deborah Deitsch-Perez, Esq.

 5       Michael Aigen, Esq.

 6       STINSON

 7       3102 Oak Lawn Avenue

 8       Dallas, Texas  75219

 9

10  Attorneys for Dugaboy Investment Trust:

11       Warren Horn, Esq.

12       HELLER, DRAPER & HORN

13       650 Poydras Street

14       New Orleans, Louisiana 70130

15

16  Attorneys for Marc Kirschner as the trustee for

17  the litigation SunTrust:

18       Deborah Newman, Esq.

19       QUINN EMANUEL URQUHART & SULLIVAN

20       51 Madison Avenue

21       New York, New York  10010

22

23  Also Present:

24       Ms. La Asia Canty

25
```

1          WATERHOUSE - 10-19-21

2                I N D E X

3

4    WITNESS                              PAGE

5    FRANK WATERHOUSE

6    EXAMINATION BY MR. MORRIS                10

7    EXAMINATION BY MR. RUKAVINA              256

8    EXAMINATION BY MS. DEITSCH-PEREZ         352

9    EXAMINATION BY MR. MORRIS                377

10   EXAMINATION BY MR. RUKAVINA              387

11   EXAMINATION BY MS. DEITSCH-PEREZ         393

12

13              E X H I B I T S

14   No.                                 Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management             91

17            Representation

18   Exhibit 34 HCMLP Consolidated Financial  94

19            Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)         170

22   Exhibit 39 HCMLP Operating Results 2/18  226

23   Exhibit 40 Summary of Assets and         236

24            Liabilities

25   Exhibit 41 12/19 Monthly Operating Report 258

```
 1               WATERHOUSE - 10-19-21

 2   Exhibit 45 HCMFA Consolidated Financial    135

 3              Statements

 4   Exhibit 46 NexPoint 2019 Audited           218

 5              Financials

 6

 7   Exhibit A1 Emails 11/25                     328

 8   Exhibit A2 Emails 12/31                     338

 9   Exhibit A6 Emails 1/12                      341

10   Exhibit A7 Promissory Notes                 297

11   Exhibit A9 Email, 8/31                      307

12   Exhibit A10 Acknowledgment from HCMLP       302

13   Exhibit A11 HCMLP Schedule 71A              309

14

15

16

17

18

19

20

21

22

23

24

25
```

1      WATERHOUSE - 10-19-21

2           P R O C E E D I N G S

3           VIDEOGRAPHER:  Good morning,

4      Counselors.  My name is Scott Hatch.  I'm a

5      certified legal videographer in association

6      with TSG Reporting, Inc.

7           Due to the severity of COVID-19 and

8      following the practice of social

9      distancing, I will not be in the same room

10     with the witness.  Instead, I will record

11     this videotaped deposition remotely.  The

12     reporter, Susan Klinger, also will not be

13     in the same room and will swear the witness

14     remotely.

15          Do all parties stipulate to the

16     validity of this video recording and remote

17     swearing, and that it will be admissible in

18     the courtroom as if it had been taken

19     following Rule 30 of the Federal Rules of

20     Civil Procedures and the state's rules

21     where this case is pending?

22          MR. HORN:  Yes.

23          MS. DANDENEAU:  Yes.

24          MR. MORRIS:  Yes.  John Morris.  I

25     would just try to do a negative notice

1          WATERHOUSE - 10-19-21

2    here, as we did yesterday.  If anybody has

3    a problem with what was just stated, can

4    you state your objection now?

5          Okay.  No response, so everybody

6    accepts the stipulation and the instruction

7    that was just given.

8          VIDEOGRAPHER:  Thank you.  This is

9    the start of media labeled Number 1 of the

10   video recorded deposition of Frank

11   Waterhouse In Re: Highland Capital

12   Management, L.P., in the United States

13   Bankruptcy Court for the Northern District

14   of Texas, Dallas Division, Case Number

15   21-03000-SGI.

16         This deposition is being held via

17   video conference with participants

18   appearing remotely due to COVID-19

19   restrictions on Tuesday, October 19th, 2021

20   at approximately 9:32 a.m.  My name is

21   Scott Hatch, legal video specialist with

22   TSG Reporting, Inc. headquartered at 228

23   East 45th Street, New York, New York.  The

24   court reporter is Susan Klinger in

25   association with TSG Reporting.

1    WATERHOUSE - 10-19-21

2        Counsel, please introduce

3    yourselves.

4        MR. MORRIS:  John Morris, Pachulski

5    Stang Ziehl & Jones for the reorganized

6    Highland Capital Management, L.P., the

7    plaintiff in these actions.

8        MS. DANDENEAU:  Deborah Dandeneau

9    from Baker McKenzie.  My partner, Michelle

10   Hartmann, is also in the room with me,

11   representing Frank Waterhouse individually.

12       MS. DEITSCH-PEREZ:  Deborah

13   Deitsch-Perez from Stinson, LLP,

14   representing Jim Dondero, Nancy Dondero,

15   HCRA, and HCMS.

16       MR. HORN:  Warren Horn with Heller,

17   Draper & Horn in New Orleans representing

18   Dugaboy Investment Trust.

19       MR. RUKAVINA:  Davor Rukavina with

20   Munsch Hardt Kopf & Harr in Dallas

21   representing NexPoint Advisors, LP and

22   Highland Capital Management Fund Advisors,

23   L.P.

24       MR. AIGEN:  Michael Aigen from

25   Stinson, and I represent the same parties

```
 1                WATERHOUSE - 10-19-21
 2        as Deborah Deitsch-Perez.
 3               MS. NEWMAN:  This is Deborah Newman
 4        from Quinn Emanuel.  We represent the
 5        litigation -- Marc Kirschner as the trustee
 6        for the litigation SunTrust.
 7               MR. MORRIS:  I think that is
 8        everybody.
 9               VIDEOGRAPHER:  Thank you.  Will the
10        court reporter please swear in the witness.
11                    FRANK WATERHOUSE,
12   having been first duly sworn, testified as
13   follows:
14                    EXAMINATION
15   BY MR. MORRIS:
16        Q.    Please state your name for the
17   record.
18        A.    My name is Frank Waterhouse.
19        Q.    Good morning, Mr. Waterhouse.  I'm
20   John Morris, as you know, from Pachulski Stang
21   Ziehl & Jones.  You understand that my firm and
22   I represent Highland Capital Management, L.P.;
23   is that right?
24        A.    Yes.
25        Q.    Okay.  And do you understand that
```

```
1                    WATERHOUSE - 10-19-21

2    we're here today for your deposition in your

3    individual capacity?

4         A.    Yes.

5         Q.    Did you review and -- did you

6    receive and review a subpoena that Highland

7    Capital Management, L.P., served upon you?

8         A.    Yes.

9         Q.    You have been deposed before; right?

10        A.    Yes.

11        Q.    How many times have you been

12   deposed?

13        A.    About three or four times.

14        Q.    Okay.  And I defended you in one

15   deposition; isn't that right?

16        A.    That is correct.

17        Q.    So the general ground rules for this

18   deposition are largely the same as the

19   depositions you have given before.  And that is

20   I will ask you a series of questions, and it is

21   important that you allow me to finish my

22   question before you begin your answer; is that

23   fair?

24        A.    Yes.

25        Q.    And it is important that I allow you
```

1          WATERHOUSE - 10-19-21

2    to finish your answers before I begin a

3    question, but if I fail to do that, will you

4    let me know?

5          A.    I can certainly do that.

6          Q.    Okay.  Do you understand that this

7    deposition is being videotaped?

8          A.    Yes.

9          Q.    You understand that I may seek to

10   use portions of the videotape in a court of

11   law?

12         A.    I did not know that, until you just

13   said that.

14         Q.    Okay.  And you are aware of that now

15   before the deposition begins substantively; is

16   that right?

17         A.    Yes.

18         Q.    So unlike I think the other

19   depositions that you have given, this one is

20   being given remotely.  So that presents some

21   unique challenges, at least as compared to a

22   deposition that is taken in-person.

23               From time to time we're going to put

24   documents up on the screen, Mr. Waterhouse.

25   And it is important that I give you the

1                    WATERHOUSE - 10-19-21

2    opportunity to review any portion of the

3    document that you think you need in order to

4    fully and completely answer the question.

5              So I would ask you to let me know if

6    there is a portion of a document that you need

7    to see in order to fully and completely answer

8    the question.  Can you do that for me?

9         A.    Yes.

10             MS. DANDENEAU:  Mr. Morris, I would

11        just note that we do have hard copies of

12        the documents that you sent, so if you can

13        just refer to the exhibit number as

14        reflected in the documents that you sent,

15        Mr. Waterhouse will be able to look at the

16        hard copies of those documents.

17             MR. MORRIS:  I appreciate that,

18        and -- and I will encourage him to do so.

19        There will be other documents that we did

20        not send to you that we'll be using today

21        though.

22        Q.    Okay.  With that as background, if

23   there is anything that I ask you, sir, that you

24   don't understand, will you let me know?

25        A.    Yes.

```
1               WATERHOUSE - 10-19-21

2       Q.    Okay.  Are you currently employed?

3       A.    Yes.

4       Q.    By whom?

5       A.    The Skyview Group.

6       Q.    When did you become employed by the

7  Skyview Group?

8       A.    I believe March 1st of 2021.

9       Q.    Do you have a title at Skyview?

10      A.    Yes.

11      Q.    What is your title?

12      A.    My title is chief financial officer.

13      Q.    Do you report to anybody in your

14 role as CFO?

15      A.    I don't, no.

16      Q.    No.  Is there a president or a CEO

17 of Skyview?

18      A.    Yes.

19      Q.    Who is that?

20      A.    That is Scott Ellington.

21      Q.    But you don't report to

22 Mr. Ellington; is that right?

23      A.    I don't think so.

24      Q.    Does Skyview Group --

25            MS. DANDENEAU:  Excuse me, we --
```

1          WATERHOUSE - 10-19-21

2      A.    I -- I -- I might.  I just -- I

3   don't recall.

4      Q.    Okay.  Does Skyview Group provide

5   any services to any entity directly or

6   indirectly owned or controlled by Jim Dondero?

7      A.    Yes.

8      Q.    Can you name -- is that pursuant to

9   written contracts?

10     A.    Yes.

11     Q.    And do you know how many contracts

12   exist?

13     A.    Approximately six or so.

14     Q.    And is the Skyview Group made up of

15   individuals who were formerly employees of

16   Highland Capital Management, L.P.?

17     A.    No.

18     Q.    Do you know how many -- how many --

19   how many employees does Skyview have?

20     A.    Approximately 35.

21     Q.    And can you tell me how many of

22   those 35 are former officers, directors, or

23   employees of Highland Capital Management, L.P.?

24     A.    I don't know the exact number.

25     Q.    Is it more than 20?

1                    WATERHOUSE - 10-19-21

2         A.    Yes.

3         Q.    Is it more than 30?

4         A.    I don't know.

5         Q.    Can you tell me what portion of

6    Skyview -- Skyview's revenue is derived from

7    entities that are directly or indirectly owned

8    or controlled by Jim Dondero?

9                    MS. DANDENEAU:  Mr. Morris, I mean,

10            you called Mr. Waterhouse here individually

11            for purposes of his testimony in connection

12            with the noticed litigation.  I have given

13            you some leeway to ask him some background

14            information about Skyview Group, but this

15            is not a substitute for a deposition in

16            connection with any other pending disputes

17            that exist.  And -- and we agreed to accept

18            the subpoena on the basis of he -- this is

19            testimony that he is giving in connection

20            with the noticed litigation.

21                    I really think that you are now

22            going a little bit far afield from the

23            purpose of this deposition.

24                    MR. MORRIS:  Okay.  It is -- I'm not

25            intending to use these -- the answers to

```
 1              WATERHOUSE - 10-19-21

 2         these questions for any purpose other than

 3         this litigation.  I think you understand

 4         fully why I'm asking the questions, and I

 5         just have a couple more, if you will bear

 6         with me.

 7              MS. DANDENEAU:  Okay.

 8              MS. DEITSCH-PEREZ:  Can we have an

 9         agreement that an objection by one is an

10         objection for any other party here?

11              MR. MORRIS:  Sure.  I would -- I

12         would encourage that, sure.

13              MS. DEITSCH-PEREZ:  Thank you.

14              MR. MORRIS:  It can't be sustained

15         or overruled more than one time, so...

16         Q.    Mr. Waterhouse, can you answer my

17    question, please.

18              MS. DANDENEAU:  Do you want to

19         repeat it, Mr. Morris, for his benefit?

20              MR. MORRIS:  Sure.

21         Q.    Can you -- can you tell me the

22    approximate portion of Skyview's revenue that

23    is derived from entities that are directly or

24    indirectly owned or controlled by Mr. Dondero?

25         A.    I don't know the exact number.
```

```
 1                WATERHOUSE - 10-19-21

 2      Q.    Is it more than 75 percent?

 3      A.    Yes.

 4      Q.    Is it more than 90 percent?

 5      A.    I don't know.

 6      Q.    Okay.  Can I refer to Highland

 7  Capital Management, L.P., as Highland?

 8      A.    Yes.

 9      Q.    All right.  And you previously

10  served as Highland's CFO; correct?

11      A.    Yes.

12      Q.    When did you join Highland?

13      A.    I don't recall the exact date.

14      Q.    Can you tell me what year?

15      A.    2006.

16      Q.    When did you -- in what year did you

17  become Highland's CFO?

18      A.    I don't recall the exact date.

19      Q.    I'm not asking you for the exact

20  date.  I'm asking you if you recall the year in

21  which you were appointed CFO.

22      A.    I don't recall the exact year.

23      Q.    Can you tell me which years it is

24  possible that you were appointed to CFO of

25  Highland?
```

```
1              WATERHOUSE - 10-19-21
2      A.    2011 or 2012.
3      Q.    Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6      A.    Yes.
7      Q.    During that entire time you reported
8  directly to Jim Dondero; correct?
9      A.    I -- I don't know.
10     Q.    Is there anybody else you reported
11 to -- withdrawn.
12           Did you report to Mr. Dondero for
13 some portion of the time that you served as
14 CFO?
15     A.    Yes.
16     Q.    Is there a portion of time that you
17 don't recall who you reported to?
18     A.    Yes.
19     Q.    What portion of time do you have in
20 your mind when you can't recall who you
21 reported to?
22     A.    From the 2011 to -- for
23 approximately a year or two.
24     Q.    Okay.  So is it fair to say that you
25 reported to Mr. Dondero in your capacity as CFO
```

```
 1              WATERHOUSE - 10-19-21

 2   from at least 2014 until the time you left

 3   Highland?

 4              MS. DANDENEAU:  Objection to form.

 5        A.   I don't want to speculate the exact

 6   or what year that changed or -- so I would like

 7   to stick with my testimony.

 8        Q.   Can you recall when you began

 9   reporting to Mr. Dondero?

10        A.   I don't recall.

11        Q.   Can you -- can you give me an

12   estimate of what year you think you might have

13   began reporting to Mr. Dondero?

14        A.   I will go back to my prior

15   testimony.

16        Q.   Okay.  There is no -- you have no

17   ability to tell me when you began reporting to

18   Mr. Dondero.

19              Do I have that right?

20              MS. DANDENEAU:  Objection to form.

21        A.   I don't recall.

22        Q.   Okay.  Do you recall who you might

23   have reported to before you began reporting to

24   Mr. Dondero?

25        A.   Yes.
```

1                  WATERHOUSE - 10-19-21

2        Q.    Who might you have reported to in

3    your capacity as CFO before you started

4    reporting to Mr. Dondero?

5        A.    That would have been Patrick Boyce.

6        Q.    Are you aware that Highland filed

7    for bankruptcy on October 19th, 2019?

8        A.    Yes.

9        Q.    And we refer to that as the petition

10   date?

11       A.    Yes.

12       Q.    Okay.  Do you hold any professional

13   licenses, sir?

14       A.    Yes.

15       Q.    Can you tell me what professional

16   licenses you hold?

17       A.    I'm a certified public accountant.

18       Q.    Okay.  Anything else?

19       A.    No.

20       Q.    Do you have any other professional

21   licenses or certificates?

22       A.    When you say "professional license,"

23   that is not education?

24       Q.    Tell me -- sure.  Anything other

25   than a driver's license.

```
 1              WATERHOUSE - 10-19-21

 2              Do you have any other license or

 3    certificate or certification?

 4        A.    Are you asking, like, where I went

 5    to school and the --

 6        Q.    I am not.  I am not.  I didn't say

 7    education.  I didn't ask about degrees.

 8              Do you know what a license is?

 9        A.    Well, yeah, I mean, a license is

10    something you get after you receive a certain

11    level of proficiency.

12        Q.    Do you have any licenses or

13    certifications other than your CPA?

14              MS. DANDENEAU:  Objection, form.

15              I assume you mean professional

16        licenses, Mr. Morris; correct?

17        Q.    Can you answer my question, sir?

18        A.    Mr. Morris, I'm thinking.  I

19    don't -- I don't think I have any others.

20        Q.    Are you familiar with an entity

21    called Highland Capital Management Fund

22    Advisors?

23        A.    Yes.

24        Q.    Were you ever -- can we refer to

25    that entity as HCMFA?
```

```
 1                  WATERHOUSE - 10-19-21

 2          A.    Yes.

 3          Q.    Were you ever employed by HCMFA?

 4          A.    Not that I recall.

 5          Q.    Were you ever -- did you ever hold

 6    the title of an officer or director of HCMFA?

 7          A.    Yes.

 8          Q.    What title did you hold?

 9          A.    Treasurer.

10          Q.    When did you become the treasurer of

11    HCMFA?

12          A.    I don't recall.

13          Q.    Can you tell me the year?

14          A.    I don't -- I don't know the year.

15          Q.    Can you approximate the year in

16    which you became the treasurer of HCMFA?

17          A.    I don't know.

18          Q.    Can you tell me if it was before or

19    after 2016?

20          A.    I don't recall.

21          Q.    Are you still the -- do you know if

22    you're still the treasurer of HCMFA today?

23          A.    Today, I am the acting treasurer for

24    HCMFA.

25          Q.    Is there a distinction between
```

```
1              WATERHOUSE - 10-19-21
2    treasurer and acting treasurer?
3        A.   I said "acting treasurer" as I am an
4    employee of Skyview, as you previously
5    stated -- or asked.
6        Q.   But you are the treasurer of HCMFA
7    today; correct?
8        A.   I am -- I am the acting treasurer
9    for HCMFA.
10       Q.   How did you become the treasurer of
11   HCMFA?
12       A.   Are you asking how I became the
13   treasurer of HCMFA today?
14       Q.   How did you become appointed to
15   serve as the treasurer of HCMFA?
16       A.   Well, in -- in -- in what time
17   capacity?
18       Q.   The first time that you were
19   appointed.
20       A.   First time.  I believe I was asked
21   to serve as treasurer for HCMFA the first time.
22       Q.   By who?  Who asked you to do that?
23       A.   I don't recall.
24       Q.   Is there anything that would refresh
25   your recollection as to who appointed you as
```

```
 1              WATERHOUSE - 10-19-21

 2     the treasurer of CF- -- HCMFA for the first

 3     time?

 4          A.    I don't -- I mean, there would be

 5     some documents, some legal documents.  I don't

 6     know where those are.

 7          Q.    How many times have you been

 8     appointed the treasurer of HCMFA?

 9          A.    I don't know.

10          Q.    Was it more than once?

11          A.    I don't know.

12          Q.    Can you tell me any period of time

13     since 2016 that you did not hold the title of

14     treasurer of HCMFA?

15                MS. DANDENEAU:  Objection to form.

16          A.    I don't recall.

17          Q.    What are your duties and

18     responsibilities as the treasurer of HCMFA?

19          A.    My duties are to do the best job

20     that I can as the -- as an accountant and

21     finance guy.

22          Q.    What specific duties and

23     responsibilities do you have as the treasurer

24     of HCMFA?

25          A.    My duties are to do the best job
```

```
1              WATERHOUSE - 10-19-21
2    that I can as the accounting and finance person
3    for HCMFA.
4         Q.    As the accounting and finance person
5    for HCMFA, do you have any particular areas of
6    responsibility?
7         A.    Yeah, it is to manage the accounting
8    and finance function for HCMFA.
9         Q.    Would that include -- do you have
10   responsibility for overseeing HCMFA's annual
11   audit?
12        A.    Can I please elaborate on my prior
13   question?
14        Q.    Of course.  You -- you are giving
15   answers.  I'm asking questions.
16        A.    Okay.  Yes, so the -- it -- like I
17   said, it is to manage the accounting finance
18   aspect, but I am, as we discussed, the
19   treasurer.  That is -- being treasurer is what
20   gives me that -- that management function.
21        Q.    Does anybody report to you in your
22   capacity as treasurer of HCMFA?
23        A.    I don't believe so.
24        Q.    Does HCMFA have a chief financial
25   officer?
```

```
 1              WATERHOUSE - 10-19-21

 2     A.    I don't -- I don't know.

 3     Q.    You don't know?

 4           You're the treasurer of HCMFA but

 5  you don't know if HCMFA has a chief financial

 6  officer.

 7           Do I have that right?

 8     A.    That's right.

 9     Q.    Okay.  Have you heard of a company

10  called NexPoint Advisors?

11     A.    Yes.

12     Q.    We will refer to that as NexPoint.

13  Okay?

14     A.    Okay.

15     Q.    Were you ever employed by NexPoint?

16     A.    I don't recall.

17     Q.    Did you ever hold any title with

18  respect to the entity known as NexPoint?

19     A.    Yes.

20     Q.    What titles have you held in

21  relation to NexPoint?

22     A.    Treasurer.  I think it was only

23  treasurer.

24     Q.    Can you tell me the approximate year

25  you became the treasurer of NexPoint?
```

```
 1                WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    Are you still the treasurer of

 4   NexPoint today?

 5        A.    I am the acting treasurer for

 6   NexPoint.

 7        Q.    When did your title change from

 8   treasurer to acting treasurer?

 9        A.    I don't know.

10        Q.    Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13        A.    I don't -- I don't believe so.

14        Q.    Why did --

15        A.    I still manage the finance and

16   accounting function for NexPoint.

17        Q.    Why did your title change from

18   treasurer to acting treasurer?

19        A.    I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23        Q.    Okay.

24        A.    And we -- we provide officer

25   services.
```

1                    WATERHOUSE - 10-19-21

2          Q.    And you serve as an officer of

3     HCMFA; correct?

4          A.    I think we went over that with my

5     testimony.  Yes, I'm the acting treasurer for

6     HCMFA.

7          Q.    And you are an officer of NexPoint;

8     correct?

9          A.    I think -- I am the acting treasurer

10    for NexPoint Advisors.

11         Q.    And -- and who appointed you acting

12    treasurer of NexPoint Advisors?

13         A.    I don't recall specifically.

14         Q.    Do you have any recollection of who

15    might have appointed you the treasurer of

16    NexPoint?

17         A.    I mean, it -- it -- I don't recall

18    exactly who it was.

19         Q.    Who were the possibilities?

20               MS. DEITSCH-PEREZ:  Object to the

21         form.

22         Q.    You can answer.

23         A.    Someone in the legal group for

24    NexPoint.  The other officers as well.

25         Q.    Have you heard of a company called

1                    WATERHOUSE - 10-19-21

2    Highland Capital Management Services, Inc.?

3         A.    Yes.

4         Q.    We will refer to that as HCMS.

5    Okay?

6         A.    HCMS.  Okay.

7         Q.    Were you ever employed by HCMS?

8         A.    No.

9         Q.    Have you ever held any titles in

10   relation to HCMF -- I apologize -- HCMS?

11        A.    Yes.

12        Q.    What titles have you held in

13   relation to HCMS?

14        A.    Treasurer and acting treasurer.

15        Q.    When did you first become treasurer

16   or acting treasurer of HCMS?

17        A.    I don't recall the exact dates.

18        Q.    Can you recall -- can you

19   approximate the year that you became the

20   treasurer of HCMS?

21        A.    I don't -- I don't know.

22        Q.    Are you still the treasurer of HCMS

23   today?

24        A.    I am the acting treasurer for HCMS.

25        Q.    And are your duties and

1                   WATERHOUSE - 10-19-21

2    responsibilities as the acting treasurer for

3    HCMS and the acting treasurer for NexPoint the

4    same as your duties and responsibilities in

5    your role as the acting treasurer of HCMFA?

6         A.    More or less.

7         Q.    Have you ever heard of a company

8    called HCRE Partners, LLC?

9         A.    Yes.

10        Q.    And do you understand that that

11   entity is now known today as NexPoint Real

12   Estate Partners?

13        A.    I did not know that.

14        Q.    All right.  Can we refer to HCRE

15   Partners as HCRE?

16             MS. DANDENEAU:  Objection to form.

17             Did you mean NexPoint Real Estate

18        Partners, Mr. Morris?

19             MR. MORRIS:  No.

20             MS. DANDENEAU:  Oh.

21             MR. MORRIS:  He said he wasn't

22        familiar that it was succeeded by that

23        entity.  So --

24             MS. DANDENEAU:  Okay.

25             MR. MORRIS:  -- let's go with what

```
 1                  WATERHOUSE - 10-19-21

 2        the witness knows.

 3        Q.    You're familiar with an entity

 4   called HCRE Partners, LLC; correct?

 5        A.    Yes.

 6        Q.    Okay.  So that is the entity that we

 7   will refer to as HCRE.  If you're aware of any

 8   successor, that is great.  If not, let's just

 9   define it as such.

10              Have you ever been employed by HCRE

11   or any entity that you know to have succeeded

12   HCRE?

13        A.    No.

14        Q.    Did you ever serve as an officer or

15   director of HCRE or any successor?

16        A.    Not that I recall.

17        Q.    Okay.  Can we refer to NexPoint and

18   HCMFA as the advisors?

19        A.    Yes.

20        Q.    In general, the advisors provided

21   investment advisory services to certain retail

22   funds; correct?

23        A.    Yes.

24        Q.    And we will refer to the retail

25   funds that are served by the advisors
```

Page 33

1          WATERHOUSE - 10-19-21

2   collectively as the retail funds; is that okay?

3        A.    Okay.

4        Q.    Each of the retail funds is governed

5   by a board; correct?

6        A.    Yes.

7        Q.    And do you know the people who serve

8   on the boards of the retail funds?

9             MS. DANDENEAU:  Objection to form.

10       A.    I don't know all of them.

11       Q.    Do you know whether the same people

12  serve on the board of each of the retail funds

13  as we've defined that term?

14       A.    Which -- so when you say "retail

15  funds" -- again, I want to be -- what retail

16  funds are you referring to, because there are

17  -- there are several distinctions?

18            What retail funds are you using when

19  you refer to them?

20       Q.    That is why -- that is why I tried

21  to define the terms.  So let me do it again.

22            Retail funds for the purposes of

23  this deposition means any retail fund to which

24  either of the advisors provides advisory

25  services.  Okay?

```
 1                    WATERHOUSE - 10-19-21

 2          A.    Okay.

 3          Q.    Okay.  So do you know whether the

 4     same people serve on the board of each of the

 5     retail funds?

 6          A.    I don't know.

 7          Q.    Were you ever employed by any of the

 8     retail funds?

 9          A.    No.

10          Q.    No?

11          A.    No.

12          Q.    Okay.  Do you have any title with

13     respect to any of the retail funds?

14          A.    Yes.

15          Q.    What titles do you hold --

16     withdrawn.

17                Do you have the same titles with

18     respect to all of the retail funds or do

19     they -- or just something else?

20                MS. DANDENEAU:  Objection to form.

21          Q.    Withdrawn.

22                Do you have the same title with

23     respect to each of the retail funds?

24          A.    No.

25          Q.    Tell me which title you have with
```

1                    WATERHOUSE - 10-19-21

2     respect to each retail fund.

3                    Actually, let's do it a different

4     way.  I withdraw the question.

5                    Can you give me one title you have

6     in relation to any retail fund?

7          A.    Yes.

8          Q.    What title -- what title can you

9     give me?

10         A.    Principal executive officer.

11         Q.    Do you serve as principal executive

12    officer for each of the retail funds?

13         A.    No.

14         Q.    Can you identify for me the retail

15    funds in which you serve as the principal

16    executive officer?

17         A.    Yes.  Highland Funds 1, Highland

18    Funds 2, Highland Income Fund, Highland Global

19    Allocation Fund.

20         Q.    I'm sorry, you said "Global

21    Allocation Fund"?

22         A.    Yes.

23                    VIDEOGRAPHER:  Excuse me,

24         Mr. Morris.  This is the videographer.  I'm

25         concerned about the lighting in the

Page 36

```
 1                    WATERHOUSE - 10-19-21

 2        witness' camera.

 3               Do you want to go off the record and

 4        make some adjustments?

 5               MR. MORRIS:  Sure, but just for this

 6        purpose.  I don't want to take a break.  We

 7        just started.

 8               MS. DANDENEAU:  Yeah, that is fine.

 9        That is fine.  We're going to put you on

10        mute.

11               MR. MORRIS:  All right.

12               MS. DANDENEAU:  I'm going to try to

13        open up some of the shades.

14               VIDEOGRAPHER:  We're going off the

15        record at 10:08 a.m.

16        (Recess taken 10:08 a.m. to 10:11 a.m.)

17               VIDEOGRAPHER:  We are back on the

18        record at 10:11 a.m.

19        Q.    Mr. Waterhouse, when did you become

20   the principal executive officer of the four

21   retail funds that you just identified?

22        A.    I don't recall.

23        Q.    Do you recall the approximate year

24   that you became the principal executive officer

25   of the four funds?
```

```
 1                WATERHOUSE - 10-19-21

 2        A.    2021.

 3        Q.    Did you ever hold any title with

 4   respect to any of the four funds you have just

 5   identified other than principal executive

 6   officer?

 7        A.    I don't recall.

 8        Q.    Is it possible that you held a

 9   position or a title with the four funds you

10   just identified prior to 2021?

11        A.    Yes.

12        Q.    But you don't recall if you did or

13   not; do I have that right?

14        A.    No.  You -- I thought you asked, did

15   I hold other titles.

16        Q.    Did you hold any title at the four

17   retail funds for which you now serve as

18   principal executive officer at any time prior

19   to 2021?

20        A.    Yes.

21        Q.    What titles did you hold?

22        A.    I don't recall all the titles.

23        Q.    Do you recall any of the titles?

24        A.    Yes.

25        Q.    What titles do you recall holding at
```

Page 38

1              WATERHOUSE - 10-19-21

2    those four retail funds before 2021?

3         A.    Principal executive officer.

4         Q.    Were you the principal executive

5    officer of the four retail funds that you have

6    identified?

7         A.    Sorry, could you repeat the

8    question?

9         Q.    Were you the principal executive

10   officer for each of the four retail funds that

11   you have identified?

12        A.    Yes.

13        Q.    When did you become the principal

14   executive -- withdrawn.

15             Can you give me the approximate year

16   that you became the principal executive officer

17   for each of the four retail funds you've

18   identified?

19        A.    I don't recall.

20        Q.    What are your duties and

21   responsibilities as the principal executive

22   officer of these four retail funds?

23        A.    It is to manage the finance and

24   accounting positions.

25        Q.    So at the same time you serve as the

```
1                 WATERHOUSE - 10-19-21

2    treasurer of the advisors, you also serve as

3    the principal executive officer of these four

4    retail funds; correct?

5         A.    Yes.

6         Q.    Did you ever hold any title with

7    respect to any other retail fund?

8         A.    Not that I recall.

9         Q.    During the period that you served as

10   Highland's CFO, from time to time Highland

11   loaned money to certain of its officers and

12   employees; correct?

13        A.    Yes.

14        Q.    During the period that you served as

15   Highland's CFO, from time to time Highland

16   loaned money to certain --

17        A.    Let me -- let me retract that,

18   sorry, that -- you asked during the time I was

19   CFO, Highland loaned moneys to employees.  I

20   don't -- I don't recall that during my tenure

21   of CFO.

22        Q.    You have no recollection during the

23   time that you were the CFO of Highland of

24   Highland ever loaning any money to any officer

25   or director of Highland?
```

1                WATERHOUSE - 10-19-21

2      A.    I don't recall during my tenure of

3 Highland or my -- as CFO of Highland -- yeah,

4 if there are any loans as CFO of Highland.

5      Q.    I'm just talking about officers and

6 employees right now.  You have no recollection

7 of Highland ever making a loan to any of its

8 officers or employees during the time that you

9 served as CFO.  Do I have that right?

10         MS. DANDENEAU:  Objection to form.

11      A.    So I thought you were saying

12 officers and employees as CFO, right, so there

13 were -- I mean, okay, yes.

14      Q.    I would ask you to listen carefully

15 to my question.  If I -- if I'm not clear, let

16 me know, but I'm really trying to be as clear

17 as I can.

18      A.    I'm listening as carefully as I can,

19 and you are asking very specific questions in a

20 timeline.  And I'm trying to answer your

21 questions as specifically as I can, and I

22 apologize if -- if I'm going back.  I am -- you

23 are asking very specific questions.  Thank you.

24      Q.    During the period that you served as

25 Highland's CFO, from time to time Highland

```
1                WATERHOUSE - 10-19-21

2    loaned money to certain corporate affiliates;

3    correct?

4              MS. DANDENEAU:  Objection to form.

5         A.    What are corporate affiliates?

6         Q.    How about the ones that are in

7    Highland's audited financial statements under

8    the section entitled Loans to Affiliates.  Why

9    don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12             MS. DANDENEAU:  Objection to form.

13        A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16        Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20        A.    Is that a -- it depends on the

21   context.

22        Q.    How about the context of making

23   loans?

24             MS. DANDENEAU:  Objection to form.

25        A.    I didn't make the determination of
```

```
                    WATERHOUSE - 10-19-21
 1
 2   who an affiliate was or is at the time those --
 3   I didn't -- that wasn't my job to make a
 4   determination of who an affiliate is.
 5        Q.    All right.  So as the CFO of
 6   Highland, do you have any ability right now to
 7   tell me which companies that were directly or
 8   indirectly owned and/or controlled by
 9   Mr. Dondero in whole or in part received loans
10   from Highland Capital Management, L.P.?
11              MS. DANDENEAU:  Objection to form.
12              MS. DEITSCH-PEREZ:  Objection, form.
13        A.    Yes.
14        Q.    Okay.  Identify every entity that
15   you can think of that was directly or
16   indirectly owned and/or controlled by
17   Mr. Dondero in whole or in part that received a
18   loan from Highland Capital Management, L.P.
19              MR. RUKAVINA:  Objection, legal
20        conclusion.
21        A.    NexPoint Advisors, Highland Capital
22   Management Fund Advisors, HCM Services,
23   Dugaboy.  Sorry, I don't think -- Dugaboy
24   doesn't fit that definition.  You said owned
25   and controlled.  I don't think that that
```

```
 1               WATERHOUSE - 10-19-21

 2   definition --

 3        Q.    I said owned and/or controlled.

 4        A.    I don't -- again, I'm not -- I'm not

 5   the legal expert.  I don't think it controls --

 6   he controls Dugaboy, so again, I'm not the

 7   legal person.

 8        Q.    I'm not asking you for a legal

 9   conclusion, sir.  I'm asking you for your

10   knowledge, okay, as the CFO -- the former CFO

11   of Highland Capital Management, other than

12   NexPoint, HCMFA, and HCMF -- HCMS, can you

13   think of any other entities that were owned

14   and/or controlled directly or indirectly in

15   whole or in part by Jim Dondero who received a

16   loan from Highland Capital Management, L.P.?

17               MS. DANDENEAU:  Objection to form.

18        A.    HCRE.

19        Q.    Any others?

20        A.    That is -- that is all I can think

21   of.

22        Q.    And you're aware that from time to

23   time while you were the CFO, Highland loaned

24   money to Jim Dondero; correct?

25        A.    Yes.
```

```
1              WATERHOUSE - 10-19-21
2      Q.    Okay.  Can we refer to the four
3  entities that you just named and Mr. Dondero as
4  the affiliates?
5      A.    So that would be Jim Dondero,
6  NexPoint Advisors, Highland Capital Management
7  Fund Advisors, and HCRE.
8      Q.    And HCMS?
9      A.    And HCMS, okay.
10     Q.    And can we refer to the loans that
11  were given to each of those affiliates as the
12  affiliate loans?
13     A.    Yes.
14     Q.    And is it fair to say that each of
15  the affiliates were the borrowers under the
16  affiliate loans as we're defining the term?
17            MR. RUKAVINA:  Objection, legal
18        conclusion.
19     A.    The borrowers are whoever were on
20  the notes.  I don't -- I don't know.  I'm not
21  the legal person.
22     Q.    But you --
23     A.    I don't know.
24     Q.    You do know, as Highland's former
25  CFO, that each of the affiliates that you have
```

1          WATERHOUSE - 10-19-21

2    identified tendered notes to Highland; correct?

3              MR. RUKAVINA:  Hey, John, will you

4         just give me a running objection to legal

5         conclusion to HCM --

6              MR. MORRIS:  No.  No, if you want to

7         object --

8              MR. RUKAVINA:  I will object every

9         time.  Object to legal conclusion.

10             MR. MORRIS:  That is fine.

11   A.    Sorry, can you repeat the question?

12   Q.    Are you aware that each of the --

13   that each of the affiliates, as we have defined

14   the term, gave to Highland a promissory note in

15   exchange for the loans?

16             MR. RUKAVINA:  Objection to the

17        extent that calls for a legal conclusion.

18   A.    I don't.

19   Q.    No, you don't know that?

20   A.    No, they didn't -- you said they

21   exchanged a promissory note for a loan.  I

22   don't -- I don't understand that question, so I

23   said no.

24   Q.    At the time of the bankruptcy

25   filing, did Highland have in its possession

1              WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4        A.    Yes.

5        Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10            MR. RUKAVINA:  Objection, that calls

11        for a legal conclusion.

12            MS. DEITSCH-PEREZ:  I also couldn't

13        hear you, John, because there was some

14        garbling on -- on the -- on the call.

15            MR. MORRIS:  Folks, I've got to tell

16        you this is not going well, and I'm

17        reserving my right --

18            MS. DANDENEAU:  John, it was just

19        the end of that question.  It was just the

20        end of that question.  I couldn't hear it

21        either.  Sorry, if you could repeat it,

22        please.

23            MR. MORRIS:  That is less than an

24        hour into this, but folks are trying to run

25        out the clock, and so I'm just going to

1          WATERHOUSE - 10-19-21

2     state that now.

3          MS. DANDENEAU:  You know, and,

4     Mr. Morris, I really object to that.  I

5     mean --

6          MR. MORRIS:  Okay.

7          MS. DANDENEAU:  -- Mr. Waterhouse

8     just told you he's trying to listen to your

9     questions and answer them carefully, and

10    you have no basis for saying that.

11         MR. MORRIS:  Okay.

12         MS. DANDENEAU:  This does not --

13    this is not an experienced witness, so he's

14    trying to do the best he can.

15    Q.    Mr. Waterhouse, during the time that

16  you served as Highland's CFO, did Highland

17  disclose to its outside auditors all of the

18  loans that it made to each of the affiliates

19  that you have identified?

20         MR. RUKAVINA:  Objection, legal

21    conclusion.

22    A.    Yes.

23    Q.    To the best of your knowledge, while

24  you were Highland's CFO, were all of the

25  affiliate loans described in Highland's audited

```
 1              WATERHOUSE - 10-19-21

 2  financial statements?

 3              MR. RUKAVINA:  Objection, legal

 4         conclusion.

 5         A.    When an audit was performed, any

 6  loans that were made by Highland to the

 7  affiliates were disclosed to auditors.

 8         Q.    Are you aware of any loan that was

 9  made to any affiliate that was not disclosed to

10  the auditors?

11         A.    I'm not aware.

12         Q.    To the best of your knowledge, did

13  each of the affiliates who were --

14  (inaudible) -- loaned from Highland execute a

15  promissory note in connection with that loan?

16              MR. RUKAVINA:  Objection, legal

17         conclusion.

18         A.    Sorry, you -- halfway through the

19  question it got muffled.

20              Can you repeat that again?

21         Q.    To the best of your knowledge, did

22  every affiliate execute a promissory note in

23  connection with each loan that it obtained from

24  Highland?

25              MR. RUKAVINA:  Objection, legal
```

1                WATERHOUSE - 10-19-21

2          conclusion.

3          A.     Yes.

4          Q.     You are not aware of any loan that

5     any affiliate ever obtained from Highland where

6     the affiliate did not give a promissory note in

7     return; is that fair?

8          A.     Yes, I'm not aware.

9          Q.     And to the best of your knowledge,

10    did Highland loan to each affiliate an amount

11    of money equal to the principal amount of each

12    promissory note?

13             MR. RUKAVINA:   Objection, legal

14          conclusion.

15          A.     Yes.

16          Q.     During the time that you served as

17    CFO, did Highland ever loan money to

18    Mark Okada?

19          A.     I -- I don't recall.

20          Q.     Did you ever see any promissory

21    notes executed by Mark Okada?

22          A.     I don't recall.

23          Q.     Do you know if Highland ever forgave

24    any loan that it ever made to Mr. Okada?

25          A.     I don't recall.

```
1              WATERHOUSE - 10-19-21

2       Q.    Do you recall if Mr. Okada paid back

3   all principal and interest due and owing under

4   any loan he obtained from Highland?

5              MS. DEITSCH-PEREZ:  Objection to

6         form.

7              MS. DANDENEAU:  Objection to form.

8       A.    I don't recall.

9       Q.    Do you recall whether -- during your

10  time as CFO, whether Highland ever loaned money

11  to Jim Dondero?

12      A.    Yes.

13      Q.    To the best of your knowledge, did

14  Mr. Dondero sign and deliver to Highland a

15  promissory note in connection with each loan

16  that he obtained from Highland?

17      A.    If you are referring to the

18  promissory notes that, you know, part of

19  Highland's records, yes.

20      Q.    Okay.  You're not aware of any loan

21  that Mr. Dondero took from Highland that wasn't

22  backed up by -- by a promissory note with a

23  face -- with a principal amount equal to the

24  amount of the loan; correct?

25      A.    Am I aware that Jim Dondero took a
```

1        WATERHOUSE - 10-19-21

2   loan?

3        Q.    Without giving a -- let me ask a

4   better question.  I'm sorry, Mr. Waterhouse.

5             Are you aware of any loan that

6   Mr. Dondero obtained from Highland where he

7   didn't give a promissory note in return?

8        A.    I'm not aware.

9        Q.    During the time that you served as

10  Highland's CFO, did Highland ever forgive any

11  loans, in whole or in part, that it made to

12  Mr. Dondero?

13       A.    Not that I'm aware.

14       Q.    At the time that you served as

15  Highland's CFO, did Highland ever forgive any

16  loan, in whole or in part, that it made to any

17  affiliate as we've defined the term today?

18       A.    Not that I'm aware.

19       Q.    During the time that you served as

20  Highland's CFO, did Highland ever forgive, in

21  whole or in part, any loan that it ever made to

22  any officer or employee?

23       A.    Highland forgave loans to officers

24  and employees.  It may not have been at the

25  time when my title was CFO.

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  And so I appreciate the

3  distinction.

4          Is it fair to say that, to the best

5  of your knowledge, Highland did not forgive a

6  loan that it made to an officer or employee

7  after 2013?

8          MS. DANDENEAU:  Objection to form.

9     A.    I don't recall.

10     Q.    To the best of your knowledge, did

11  Highland disclose to its auditors every

12  instance where it forgave, in whole or in part,

13  a loan that it had made to one of its officers

14  or employees?

15     A.    No.

16     Q.    Can you think of -- can you -- can

17  you identify any loan to an officer or employee

18  that was forgiven by Highland, in whole or in

19  part, that was not disclosed to Highland's

20  outside auditors?

21     A.    Look, I don't recall all of the

22  loans and the loan forgiveness.  I just know as

23  part of the audit process there is a

24  materiality concept.

25          So if there were loans to employees

```
 1                   WATERHOUSE - 10-19-21

 2      that were of -- you know, that were deemed

 3      immaterial, those items may not have been

 4      disclosed by the team to the auditors.

 5           Q.    I appreciate that.

 6                 Do you have an understanding as to

 7      what the level of materiality was?

 8           A.    I don't recall.

 9           Q.    As the CFO of Highland, to the best

10      of your knowledge, did Highland disclose to its

11      outside auditors every loan that was forgiven,

12      in whole or in part, that was material as that

13      term was defined by the outside auditors?

14           A.    Yes.

15           Q.    And do you recall where -- do you

16      recall where the definition of materiality can

17      be found for -- for this particular purpose?

18                 MS. DANDENEAU:  Objection to form.

19           A.    No.  You -- I don't determine

20      materiality.

21           Q.    Okay.  I'm just asking you if you

22      can help me understand where it is, but I think

23      we will find it in a few minutes.

24                 You are aware that Highland has

25      commenced lawsuits against each of the
```

1        WATERHOUSE - 10-19-21

2   affiliates, as we've defined the term, to

3   collect under certain promissory notes; is that

4   right?

5        A.     Yes.

6        Q.     And are you familiar with the notes

7   that are issue -- at issue in the lawsuits?

8               MS. DANDENEAU:  Objection to form.

9        A.     Generally familiar.

10       Q.     Can we refer to the lawsuits that

11  Highland has commenced against the affiliates

12  collectively as the lawsuits?

13       A.     Yes.  And, again, the affiliates are

14  NexPoint, HCMFA, HCMS, and HCRE.

15       Q.     And Mr. Dondero?

16       A.     Okay.  See, that is a new -- and now

17  Mr. Dondero is included in your affiliate

18  definition.

19       Q.     I just --

20       A.     I thought affiliates -- I thought

21  affiliates were just the four prior entities,

22  so I just want to be clear.

23       Q.     I appreciate that.  So let's --

24  let's keep them separate and let's refer to the

25  four corporate entities as the affiliates, and

1               WATERHOUSE - 10-19-21

2    Mr. Dondero we will call Mr. Dondero.  Okay?

3       A.   Okay.  Thank you.  As you can see,

4    Mr. Morris, there is a lot of entities -- a lot

5    here.  I just want to be clear.

6       Q.   Okay.  Now, the affiliates of

7    Mr. Dondero signed promissory notes that are

8    not subject to the lawsuit.

9            Do you understand that?

10          MS. DANDENEAU:  Objection to form.

11       A.   The affiliates and Mr. Dondero

12    signed --

13       Q.   You know what?  I will skip it.

14    That is okay.  Okay.

15            From time to time while you were

16    Highland's CFO, payments were applied against

17    principal and interests that were due under the

18    notes that were tendered by the affiliates and

19    Mr. Dondero; correct?

20          MR. RUKAVINA:  Objection to the

21          extent that calls for a legal conclusion.

22       A.   Yes.

23       Q.   Did Highland have a process where --

24    whereby payments would be applied against

25    principal and interest against the notes that

1                    WATERHOUSE - 10-19-21

2    were given by the affiliates and Mr. Dondero?

3         A.    Yes.

4         Q.    Can you describe the process for me?

5         A.    The process, payment should be

6    applied as laid out in the -- in the promissory

7    note.

8         Q.    From time to time were payments made

9    that were not required under the promissory

10   notes?

11              MS. DANDENEAU:  Objection to form.

12        A.    Yes.

13        Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17        A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19        Q.    Yes.

20        A.    I don't know.

21        Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25              MS. DANDENEAU:  Objection to form.

1               WATERHOUSE - 10-19-21

2      A.    Did I approve the payments?  I

3 approve -- I approve -- if there was cash -- if

4 there was cash being repaid on a note payment,

5 yes, I approved in the general sense of being

6 made aware of the payment and the amount.

7      Q.    And are you the person who

8 authorized Highland's employees to effectuate

9 those payments?

10     A.    Yes.

11     Q.    When you gave the instruction to

12 effectuate the payment, did you obtain

13 Mr. Dondero's prior approval?

14     A.    I mean, it -- I mean, it -- it

15 depends.

16     Q.    Can you think of any instance where

17 you directed Highland's employees to make a

18 payment of principal or interest against any

19 note that was tendered by an affiliate or

20 Mr. Dondero that Mr. Dondero did not approve of

21 in advance?

22     A.    I can't recall specifically.

23     Q.    Can you identify -- withdrawn.

24     Did Mr. Dondero ever tell you that a

25 payment that was made against principal and

```
 1                WATERHOUSE - 10-19-21

 2    interest due under one of the notes that was

 3    tendered by an affiliate or himself should not

 4    have been made?

 5         A.    Yes.

 6         Q.    Can you identify the payment for me?

 7         A.    It would be for -- for NexPoint

 8    Advisors.

 9         Q.    Okay.  And when did Mr. Dondero tell

10    you that a payment that you had initiated on

11    behalf of NexPoint should not have been made?

12         A.    I wasn't initiating payment.  It was

13    in the context of the -- I think you used this

14    term, "the advisors," so NexPoint Advisors and

15    Highland Capital Management Fund Advisors had

16    overpaid on certain agreements with Highland

17    Capital Management, L.P.  And as a part of that

18    process, the advisors -- what I was told at the

19    time were in talks and negotiations and

20    discussions with Highland Capital Management,

21    L.P., on offsets in relation to those

22    overpayments.

23         Q.    When did this conversation take

24    place?

25                MS. DANDENEAU:  Objection to form.
```

```
 1                WATERHOUSE - 10-19-21
 2      A.    I don't recall specifically.
 3      Q.    Do you recall what year it was?
 4      A.    Yes.
 5      Q.    What year did the conversation with
 6  Mr. Dondero take place that you just described?
 7      A.    2020.
 8      Q.    Okay.  Do you remember if it was
 9  December 2020?
10      A.    It -- it -- I don't -- I don't
11  recall what month specifically, but it would
12  have been November or December.
13      Q.    And we're talking here about a
14  payment of principal and/or interest that was
15  due -- withdrawn.
16            We're talking here about a payment
17  of principal and interest that was applied
18  against NexPoint's note; correct?
19            MS. DANDENEAU:  Objection to form.
20      A.    I don't recall what that payment
21  consisted of.
22      Q.    Is it possible that the payment you
23  have in mind related to the shared services
24  agreement?
25            MS. DANDENEAU:  Objection to form.
```

```
 1              WATERHOUSE - 10-19-21

 2      A.     No.

 3      Q.     Are you certain that the payment --

 4  that the payment that you have in mind related

 5  to the promissory note that NexPoint issued in

 6  favor of Highland?

 7              MS. DANDENEAU:  Objection to form.

 8      A.     Yes.

 9      Q.     Okay.  Other than that one payment,

10  can you identify any other instance where

11  Mr. Dondero told you that a payment should not

12  have been applied against principal and

13  interest under any promissory note tendered by

14  any affiliate or Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Objection to

17      form.

18      A.     Not that I recall.

19      Q.     Thank you very much.

20              Do you know if Mr. Dondero approved

21  in advance of each loan made to each affiliate

22  and himself during the time that you were the

23  CFO?

24              MS. DEITSCH-PEREZ:  Object to the

25      form.
```

1                WATERHOUSE - 10-19-21

2          A.    Yes, generally.

3          Q.    Can you identify any loan that was

4    ever made to an affiliate or to Mr. Dondero

5    that Mr. Dondero did not approve of in advance?

6          A.    Other than the ones that are in

7    dispute, I'm not aware.

8          Q.    Do you believe that Mr. Dondero did

9    not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12              MS. DANDENEAU:  Objection to form.

13         A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16         Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19              Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23         A.    Was I aware of every loan, yes.

24         Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans

```
 1              WATERHOUSE - 10-19-21
 2    that were made to one of the affiliates or
 3    Mr. Dondero during the time that you were the
 4    CFO was made without Mr. Dondero's prior
 5    knowledge and approval?
 6         A.    Not that I recall.
 7         Q.    Thank you.  In fact, do you -- as
 8    the CFO, would you have allowed Highland to
 9    loan money to an affiliate or to Mr. Dondero
10    without obtaining Mr. Dondero's prior approval?
11              MS. DANDENEAU:  Objection to form.
12         A.    I can't -- there was so many times
13    over the years, I can't speak for every single
14    one, but generally, yes, I -- I spoke to him.
15         Q.    You -- you never -- you never --
16    withdrawn.  I will just take that.
17              Can you recall any payment that was
18    ever made against principal and interest on a
19    note that was issued in favor of Highland by an
20    affiliate or Mr. Dondero that you personally
21    did not know about in advance?
22         A.    There are so many through the years,
23    I don't -- I don't -- I don't recall every
24    single one.
25         Q.    Okay.  Can you identify any payment
```

```
 1                WATERHOUSE - 10-19-21

 2   that was made against principal and interest on

 3   any note tendered by any affiliate or

 4   Mr. Dondero that you didn't know about in

 5   advance?

 6        A.    I don't recall.

 7        Q.    Other than Mr. Dondero -- withdrawn.

 8              Did anybody at Highland have the

 9   authority to make a payment against principal

10   and interest due under a loan given to the

11   affiliates and Mr. Dondero without your

12   knowledge and approval?

13              MS. DANDENEAU:  Objection to form.

14        A.    Sorry, there was -- to make a

15   payment on an affiliate loan, what you are

16   saying would it require my knowledge and

17   approval, yes.

18        Q.    Okay.  I appreciate that.  Thank

19   you.

20              Did anybody at Highland have the

21   authority, to the best of your knowledge, to

22   effectuate a loan to an affiliate without

23   Mr. Dondero's prior knowledge and approval?

24              MS. DANDENEAU:  Objection to form.

25        A.    I can't speak for all, but
```

1                    WATERHOUSE - 10-19-21

2    generally, yes.

3        Q.    Did you personally communicate with

4    Mr. Dondero to let him know each time a payment

5    of principal or interest was being made against

6    any note that was tendered by an affiliate or

7    Mr. Dondero to Highland?

8        A.    I don't -- are you saying, did I let

9    Mr. Dondero know if a payment was made on any

10   affiliate or loan to Mr. Dondero?  I mean,

11   not -- not every -- no.

12       Q.    Let me ask it this way:  Did you

13   have a practice of informing Mr. Dondero when

14   payments were made against principal and

15   interest on any note that was tendered by an

16   affiliate or Mr. Dondero?

17            MS. DEITSCH-PEREZ:  Objection to

18       form.

19            MS. DANDENEAU:  Objection to form.

20       A.    No, I did not.

21       Q.    Did Mr. Dondero ever tell you that a

22   payment of principal or interest had been made

23   against a note that was tendered by an

24   affiliate or himself that he had been unaware

25   of?

```
 1                WATERHOUSE - 10-19-21
 2       A.    Not that I recall.
 3       Q.    Are you aware that Mr. Dondero and
 4   the affiliates -- withdrawn.
 5             Are you aware that Mr. Dondero
 6   NexPoint, HCRE, and HCMS all contend that they
 7   do not have to pay on any of the notes they
 8   issued because they are subject to an oral
 9   agreement between Mr. Dondero and Nancy
10   Dondero, in her capacity as the trustee of the
11   Dugaboy Investment Trust?
12             MS. DANDENEAU:  Objection to form.
13       A.    I didn't -- I didn't -- I didn't
14   know that it was all notes.
15       Q.    Okay.  Are you -- did you ever learn
16   that there was an oral agreement between Jim
17   Dondero and Nancy Dondero pertaining to any
18   notes issued by any affiliate or Mr. Dondero?
19             MS. DEITSCH-PEREZ:  Object to the
20        form.
21       A.    Yes.
22       Q.    Do you have any understanding as to
23   the terms of that agreement?
24       A.    Yes.
25       Q.    What is your understanding of the
```

1                    WATERHOUSE - 10-19-21

2    terms of the agreement?

3        A.    That there were certain milestones

4    that had to be reached.

5        Q.    Do you have any understanding of the

6    terms of the agreement between Mr. Dondero and

7    Nancy Dondero concerning any of the notes

8    issued by the affiliates or Mr. Dondero other

9    than that there have to be milestones reached?

10              MS. DEITSCH-PEREZ:  Object to the

11        form.

12        A.    There are milestones, I found out

13    yesterday, or there was some --

14              MS. DANDENEAU:  Okay.  I'm just

15        going to object to the extent that you

16        learned anything in conversations with

17        counsel, please don't reveal -- that is

18        privileged, and don't reveal any privileged

19        communications.

20              THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23    were?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't.

1                     WATERHOUSE - 10-19-21

2          Q.    Do you know anything about -- do you

3     know what promissory notes the agreement

4     covered?

5          A.    I don't.

6          Q.    Do you know if -- if Jim and Nancy

7     Dondero entered into one agreement or more than

8     one agreement?

9                MS. DEITSCH-PEREZ:  Object to the

10          form.

11         A.    I don't know.

12         Q.    Do you know if the agreement is in

13    writing?

14         A.    I don't know.

15         Q.    How did you learn of the existence

16    of the agreement?

17               MS. DANDENEAU:  Objection to form.

18          Again --

19         A.    I don't -- I don't recall who told

20    me.

21         Q.    You have no recollection of who told

22    you about this agreement between Jim and Nancy

23    Dondero?

24               MS. DEITSCH-PEREZ:  Object to the

25          form.

```
 1                    WATERHOUSE - 10-19-21

 2        A.     I don't recall.

 3        Q.     Do you recall how you learned of the

 4   agreement?

 5               Was it in a meeting?  Was it in a

 6   phone call?  Was it in an email?

 7        A.     I don't recall.

 8        Q.     Do you recall when you learned of

 9   the agreement?

10        A.     Not specifically.

11        Q.     Do you recall what year you learned

12   of the agreement?

13        A.     In -- look, I mean, there are so

14   many notes.  I may be getting -- I believe it

15   was 2020.

16        Q.     All right.  I'm not asking about

17   notes, sir.  I'm asking about the agreement

18   that you testified you knew about between Jim

19   and Don- -- Nancy Dondero.  Okay.

20               Do you understand my question now?

21   Should I ask my question again?

22        A.     Yeah, sure.  Go ahead.

23        Q.     I'm going to use the word

24   "agreement" to refer to the agreement that

25   Mr. Dondero and Nancy Dondero entered into
```

1                   WATERHOUSE - 10-19-21

2    where you understood that certain milestones

3    had to be reached.  Okay?

4          A.    Uh-huh.

5                MS. DANDENEAU:  Objection.

6                MS. DEITSCH-PEREZ:  Object to the

7          form.

8                MR. MORRIS:  Just defining a term,

9          what is the objection.

10               MS. DEITSCH-PEREZ:  The objection --

11               MR. MORRIS:  I will move on.  I will

12         move on.

13               MS. DEITSCH-PEREZ:  John --

14         Q.    Sir, are you okay with that

15   definition of agreement?

16         A.    Okay.

17         Q.    Okay.  So you don't recall who --

18   who informed you of the existence of the

19   agreement; is that right?

20         A.    I don't recall.

21         Q.    You don't recall who told you the

22   terms of the agreement.

23               Do I have that right?

24         A.    Correct.

25         Q.    And you don't recall if you learned

```
 1                  WATERHOUSE - 10-19-21

 2    about the agreement in a meeting, through an

 3    email, or through a phone call.

 4              Do I have that right?

 5       A.    I don't recall.

 6       Q.    Can you tell me when you learned of

 7    the agreement?

 8       A.    I don't -- I don't -- I don't

 9    remember specifically.

10       Q.    Can you tell me if you learned of

11    the agreement before or after the petition

12    date?

13       A.    It would have been -- it would have

14    been after.

15       Q.    Can you tell me if you learned of

16    the agreement before or after January 9th,

17    2020?

18       A.    It would have been after.

19       Q.    Can you tell me if you learned of

20    the agreement before or after you left Highland

21    Capital Management in February of 2021?

22       A.    I don't -- I don't -- I don't know.

23       Q.    It is possible that you learned of

24    it while you were a Highland employee.

25              Do I have that right?
```

```
1              WATERHOUSE - 10-19-21
2        A.    I don't remember the -- I mean, it
3   was sometime in 2021.  I don't remember when.
4        Q.    All right.  So to the best of your
5   recollection, it was in 2021 but you don't
6   recall if it was before or after you ceased to
7   be a Highland employee.
8              Do I have that right?
9        A.    Yeah, I mean, it was -- it was
10  likely after I was -- after I left Highland
11  because, if I put myself back into the last
12  days of -- of 2021, it was -- you know, the
13  communications with Mr. Dondero were -- were --
14  were -- there weren't as many communications
15  because of the circumstances.
16       Q.    And so based on that you believe
17  that it is most likely that you learned of this
18  agreement sometime after you left Highland
19  employment?
20       A.    I wouldn't use the term "most
21  likely."  I don't recall specifically.  I don't
22  recall.
23       Q.    Do you recall ever telling Jim Seery
24  about this agreement?
25       A.    No, I don't -- I didn't tell
```

1    WATERHOUSE - 10-19-21

2  Jim Seery.

3      Q.    Did you tell anybody at DSI about

4  this agreement?

5      A.    No.

6      Q.    Did you tell any of Highland's

7  independent directors about this agreement?

8      A.    No.

9      Q.    Did you tell anybody at Pachulski

10  Stang Ziehl & Jones about this agreement?

11      A.    No.

12      Q.    Did you tell any employee of

13  Highland about this agreement?

14      A.    No.

15            MS. DANDENEAU:  Mr. Morris, it has

16        been an hour and a half.  Is this a good

17        time for a break?

18            MR. MORRIS:  Sure.

19      Q.    Mr. Waterhouse, I will just remind

20  you that during the break please don't speak

21  with anybody about the deposition, the

22  substance of your testimony or anything else

23  concerning the deposition.  Okay?

24      A.    Yes.

25            MR. MORRIS:  So it is 11:02.  We're

```
 1              WATERHOUSE - 10-19-21

 2       at 11:02 your time.  Let's come back, I

 3       guess, at 15 -- at 11:15 your time.

 4              VIDEOGRAPHER:  We're going off the

 5       record at 11:02 a.m.

 6       (Recess taken 11:02 a.m. to 11:20 a.m.)

 7              VIDEOGRAPHER:  We are back on the

 8       record at 11:20 a.m.

 9       Q.    Mr. Waterhouse, did you speak with

10  anybody during the break about this deposition?

11       A.    No.

12              MS. DANDENEAU:  Other than -- other

13       than his counsel.

14       Q.    Did you speak to your counsel about

15  the substance of your deposition today?

16       A.    No, I didn't bring it up.

17       Q.    I didn't ask you if you brought it

18  up.  I asked you if you had any conversation

19  with your lawyer about the substance of your

20  deposition.

21              MS. DANDENEAU:  Yes, he did.

22       Q.    Can you tell me what the -- you

23  discussed?

24              MS. DANDENEAU:  No, I object to

25       that.  He's not going to answer.  That is a
```

1          WATERHOUSE - 10-19-21

2    privileged conversation.

3          MR. MORRIS:  So I just want to make

4    sure that I understand.  During the break

5    you spoke with your client about the

6    substance of this deposition; is that

7    right?

8          MS. DANDENEAU:  Yes, John.

9          MR. MORRIS:  And you refuse -- you

10   refuse to let your client tell me what was

11   discussed; is that right?

12         MS. DANDENEAU:  That's correct.

13         MR. MORRIS:  You know, I had given

14   the instruction prior to the break not to

15   speak with counsel.  I would have

16   appreciated --

17         MS. DANDENEAU:  No, you didn't --

18   actually, that is not true, Mr. Morris.

19   You said not to speak with anyone.  We

20   never have interpreted that to mean

21   conversations with counsel.  That's never

22   been -- I have never, ever heard that

23   instruction.

24         MR. MORRIS:  Okay.  We will -- we

25   will -- we will deal with it when and if we

1               WATERHOUSE - 10-19-21

2      have to.

3      Q.   Mr. Waterhouse, after learning about

4   the agreement, did you ask anybody if the

5   agreement was reflected in a writing?

6         MS. DANDENEAU:  Objection to form.

7      A.   No.

8      Q.   Did you ask anybody if the terms of

9   the agreement were memorialized anywhere?

10        MS. DANDENEAU:  Objection to form.

11        MR. MORRIS:  What is the --

12     A.   No.

13        MS. DANDENEAU:  Well, because you

14        keep talking about this agreement and I --

15        I -- I think, Mr. Morris, that is really

16        not clear what you mean by "the agreement."

17        And maybe you can just go back and restate

18        what that is.

19        MR. MORRIS:  Okay.  Your client has

20        agreed with me twice on the definition, but

21        I will try one more time.

22      Q.   Mr. Waterhouse, do you understand

23   that when I use the term "agreement," I'm

24   referring to the agreement between Jim and

25   Nancy Dondero concerning certain promissory

```
 1              WATERHOUSE - 10-19-21
 2   notes where you learned that one of the terms
 3   of the agreement was milestones reached?
 4        A.    Okay.
 5        Q.    And did you understand that that was
 6   the -- the agreement that we were referring to
 7   every time we used the word "agreement" in this
 8   deposition?
 9        A.    I don't know anything about this
10   agreement.  So, look, I do -- it -- I don't
11   know whether --
12        Q.    Let's -- let's try this again.
13        A.    Yeah.  Look, I don't know what this
14   agreement relates.
15              MS. DEITSCH-PEREZ:  John, John --
16        Q.    Let me try --
17              MS. DEITSCH-PEREZ:  John, please let
18        the witness finish.
19              MR. MORRIS:  Please stop.  Please
20        stop.  Please stop talking.
21              MS. DEITSCH-PEREZ:  No, you stop.
22        Let the witness --
23              MR. MORRIS:  Stop talking.
24              MS. DEITSCH-PEREZ:  -- finish -- you
25        interrupted him.
```

```
1                    WATERHOUSE - 10-19-21

2              MR. MORRIS:  You know what, you

3         guys, this is really wrong.  It is really,

4         really wrong.  Okay?

5              I had the witness agree not once,

6         but twice to the definition of agreement.

7         Okay?  I'm going to try and do it a third

8         time.

9              MS. DANDENEAU:  No, but, please,

10        John, really --

11             MR. MORRIS:  No, please stop

12        talking.  Please.  It is my deposition.

13        Object to questions.

14             MS. DANDENEAU:  No, but also you

15        instructed him that -- that if you were

16        going -- if you were interrupting him, that

17        he should remind you that you're

18        interrupting him and -- and --

19             MR. MORRIS:  Let him do that.  Let

20        him do that.

21             MS. DANDENEAU:  Okay.  Well, you --

22             MR. MORRIS:  Please stop talking.

23        A.   Okay.  I don't know any of the

24    details of these agreements.  I don't know

25    anything about them.  I heard -- someone -- I
```

```
 1              WATERHOUSE - 10-19-21

 2   don't know who, I don't know when, as you

 3   asked, sometime in '21, someone told me about

 4   this -- or I don't honestly know -- I don't

 5   even recall exactly how I was made aware of

 6   this, but I was.  I don't know -- I don't know

 7   any of these details, and I'm getting -- again,

 8   there is, you know, I -- I -- I had a passing

 9   conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15              Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20         form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on
```

1              WATERHOUSE - 10-19-21

2    milestones that had to be reached; is that

3    right?

4              MS. DANDENEAU:  Objection to form.

5         A.   That was one of the words that was

6    used when I heard about it, yes.

7         Q.   And when you heard about this

8    agreement that had a term in it concerning

9    milestones reached, did you ask the person who

10   was telling you about the agreement whether or

11   not it was in writing?

12        A.   I did not.

13        Q.   Did you ask any questions at all?

14             MS. DANDENEAU:  Objection to form.

15        A.   Not that I recall.

16        Q.   But do you understand that going

17   forward, we're going to refer to the agreement

18   as the agreement that you just described that

19   you were --

20             MS. DANDENEAU:  Object to the form.

21        A.   Yes.

22        Q.   Okay.  You don't have any personal

23   knowledge concerning the terms of the

24   agreement; correct?

25             MS. DEITSCH-PEREZ:  Object to the

1                WATERHOUSE - 10-19-21

2        form.

3        Q.    You can answer.

4        A.    I don't -- I heard about the

5    agreement.  I don't know anything -- I heard

6    there was an agreement.  That is -- again, as I

7    testified before -- I said before, heard about

8    it, don't know the details.  I believe it was

9    sometime this year.

10       Q.    Do you have any personal knowledge

11   about the terms of the agreement, sir?

12             MS. DANDENEAU:  Objection to form.

13       A.    Other than what I have previously

14   discussed, I don't -- I don't know.

15       Q.    Did -- did Mr. Dondero tell you

16   about the existence of the agreement?

17       A.    I don't recall.

18       Q.    Do you recall the source of your

19   information when you learned about the

20   agreement?

21       A.    No, I don't -- I don't recall.  I

22   don't remember.  I just -- I heard about it

23   generally.  I don't remember -- I don't

24   remember who, how, if, how.  I don't remember.

25       Q.    You know, Mr. Waterhouse, I just

```
 1              WATERHOUSE - 10-19-21

 2    want to be clear that I never would have asked

 3    you to appear at this deposition if your name

 4    hadn't been included in responses to discovery

 5    as to somebody with knowledge about the -- who

 6    was told about the existence of the agreement.

 7              That is what prompted me do this,

 8    and I really do feel compelled to tell you that

 9    I otherwise would never have called you as a

10    witness.  So I regret that you're being put

11    through this today.  I had no intention of

12    burdening you or taking your time, but that is

13    the reason that we issued the subpoena is

14    because certain of the defendants identified

15    you as somebody --

16              MS. DEITSCH-PEREZ:  Mr. Morris, you

17         are here to ask questions, not to have --

18              MR. MORRIS:  I feel badly for the

19         guy.  I really do.

20              MS. DEITSCH-PEREZ:  I'm sure you do.

21              MR. MORRIS:  I do.  Stop.

22              MS. DEITSCH-PEREZ:  You stop.

23              MR. MORRIS:  I'm allowed.

24              MS. DEITSCH-PEREZ:  No, you're not

25         allowed to have a chat with the witness.
```

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Well, I hope that you

 3   appreciate what I'm saying here,

 4   Mr. Waterhouse.

 5             MS. DANDENEAU:  All right.  Let's go

 6        ahead and ask questions, and again, you're

 7        entitled to probe his -- his knowledge

 8        of -- whatever knowledge he has about

 9        this -- this agreement and --

10             MR. MORRIS:  That is what I'm doing.

11             MS. DANDENEAU:  -- he will answer

12        the questions to the best that he can.

13             MR. MORRIS:  That is what I'm doing.

14        Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18        A.    Yes, I don't -- I don't know.

19        Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24             MS. DANDENEAU:  Objection to form.

25        A.    I don't know.
```

1                WATERHOUSE - 10-19-21

2        Q.    Did you ever make --

3        A.    I don't know anything about these

4    agreements.

5        Q.    Did you ever make any effort to

6    determine which promissory notes are subject to

7    this agreement?

8        A.    No.

9        Q.    Did you ever ask anybody which

10   promissory notes are subject to this agreement?

11       A.    No.

12       Q.    Do you know if there is a list

13   anywhere of the promissory notes that are

14   subject to this agreement?

15       A.    I'm not aware.

16       Q.    Have you ever seen the terms of the

17   agreement written down anywhere?

18       A.    No.

19       Q.    Have you ever asked anybody whether

20   the terms of the agreement were written down

21   anywhere?

22       A.    I have not.

23       Q.    Did learning about the agreement

24   cause you to do anything in response?

25            MS. DANDENEAU:  Objection to form.

```
 1                  WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did anybody ever describe to you the

 4   nature of the milestones that you referred to

 5   earlier?

 6        A.    No, I don't -- I don't have any

 7   details of this.

 8        Q.    That is fine.

 9              PricewaterhouseCoopers served as

10   Highland's outside auditors prior to the

11   petition date; correct?

12        A.    Yes.

13        Q.    You refer to PricewaterhouseCoopers

14   as PwC?

15        A.    Yes.

16        Q.    PricewaterhouseCoopers audited

17   Highland's financial statements on an annual

18   basis; correct?

19        A.    During my -- during my time as -- as

20   CFO, yes, PricewaterhouseCoopers was the

21   auditor.

22        Q.    Do you know why Highland had its

23   annual financial statements audited each year?

24        A.    Generally.

25        Q.    Tell me your general understanding
```

1                  WATERHOUSE - 10-19-21

2    as to the reason why Highland had its annual

3    financial statements audited each year.

4          A.    From -- from time to time, they were

5    used -- or asked for, as part of diligence or

6    transactions or -- or things of that nature.

7          Q.    And were they given to third parties

8    for purposes of diligence or transactions from

9    time to time?

10         A.    As far as I'm aware, yes.

11         Q.    And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21         Q.    And --

22         A.    You would have to ask them.

23         Q.    Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to form.

3     A.    During my tenure as CFO, I played a

4    very minimal role.

5     Q.    What was the minimal role that you

6    played?

7     A.    You know, again, it was -- it was to

8    check in with the team, to make sure that, you

9    know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18          Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21     Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25     A.    Yeah.  I mean, there was -- there

1              WATERHOUSE - 10-19-21

2  was a -- there was a point -- it varies.  It

3  varies by year, in function, in time and, you

4  know, depending on the request, but yes, I

5  mean, there is -- there is -- there is

6  generally a point person of communication.

7      Q.   And who was the point person from

8  2016 until the time you left Highland?

9      A.   I don't -- I don't know

10  specifically, but it would have been, you

11  know -- you know, someone on the corporate

12  accounting team.

13      Q.   And was there a head of the

14  corporate accounting team?

15      A.   Yes, so -- yes.

16      Q.   Who was the head of corporate

17  accounting for the five years prior to the time

18  you left Highland?

19      A.   I don't -- if you're asking from

20  2016 on, I don't -- it was Dave Klos, but,

21  again, there was -- there was changes to the

22  team and the reporting structure.  I don't

23  remember exactly when that happened during --

24  you know, over the last -- since 2016.

25      Q.   Did the folks who participated and

```
 1                WATERHOUSE - 10-19-21
 2    ran the audit all report to you, directly or
 3    indirectly?
 4         A.    Yes.
 5         Q.    And did you have any responsibility
 6    for making sure that the audit report was
 7    accurate before it was finalized?
 8         A.    Yeah.  I mean, you know, that --
 9    that is -- my responsibility to the auditors
10    was -- again, is -- and the CFO is to -- we are
11    providing accurate financial statements; right?
12              And -- and -- and as part of any
13    audit, we disclose all relevant information as
14    part of any audit.
15         Q.    Okay.  And as the CFO, did you take
16    steps to make sure that the audit report was
17    accurate?
18         A.    I mean, I would say in a general
19    sense, yes.  But, again, I mean, I had a
20    very -- I had a very capable and competent
21    team.  I wasn't managing them.
22              You know, part of what I do is I let
23    the team -- I want managers to grow.  I want
24    managers to have rope.  And that is -- you
25    know, I'm not a stand-behind-you type of guy.
```

1        WATERHOUSE - 10-19-21

2   If you -- if you talk to my team members, I'm

3   not micromanaging people.  I want people to

4   learn and grow in their function so they can go

5   on and do bigger and better things with their

6   careers.

7              And so, yes, generally I was

8   responsible for it, but I wanted the team to

9   learn and grow and be responsible for the bulk

10  of the audit.

11       Q.    Did you personally review each audit

12  report before it was finalized to satisfy

13  yourself that it was accurate?

14       A.    I don't -- I don't recall, you know,

15  for every single -- we're talking 2016, there

16  would have been three years, 2016 to '17, '18.

17  I don't -- we're -- we're going back

18  five years-plus.  I don't -- you know, I don't

19  recall.

20       Q.    Did you have a practice that you

21  employed to make sure that you were satisfied

22  that Highland's audit reports were true and

23  accurate to the best of your knowledge?

24       A.    I mean, our -- the practice was set

25  up with our -- the -- the practice to put

1              WATERHOUSE - 10-19-21

2    together accurate audited or accurate financial

3    statements is to your control environment.

4              So, you know, the -- so the practice

5    was to maintain a stable control environment

6    which then the output is -- is accurate

7    financial statements.

8              So -- so, you know, if I was

9    comfortable that the control environment was

10   operating, then, you know, that would dictate

11   how I would -- you know, what I might or might

12   not do in a given year.

13        Q.   Okay.  Do you recall ever being

14   uncomfortable with the control environment

15   during the period that you served as CFO?

16        A.   Yeah.  I mean, look, yes, there are

17   times -- you know, nothing is perfect.  So

18   there were -- there were times when, yes, you

19   know -- there are times I learned I was

20   uncomfortable with the control environment, and

21   that is part of the management of the process

22   and having, you know -- and -- and working

23   through whatever obstacles present themselves.

24        Q.   Okay.  Were you ever uncomfortable

25   with the control process as it related to

```
 1                  WATERHOUSE - 10-19-21

 2   reporting and disclosures of loans to

 3   affiliates and Mr. Dondero?

 4          MS. DANDENEAU:  Objection to form.

 5      A.   I don't -- I don't recall --

 6      Q.   So you don't recall --

 7      A.   -- the --

 8          MS. DANDENEAU:  Mr. Morris --

 9      A.   I don't recall being uncomfortable.

10   But, again, we're going back several years.  I

11   don't -- you know, the practice in an audit is

12   to disclose all information to the auditors.

13   And I don't -- I don't recall.

14      Q.   As part of the process of the audit,

15   did you sign what is sometimes referred to as a

16   management representation letter?

17      A.   Yes.

18          MR. MORRIS:  Can we put up on the

19       screen a document that we have premarked as

20       Exhibit 33.

21          (Exhibit 33 marked.)

22          MS. DANDENEAU:  Mr. Morris, that is

23       not in the binder; correct?

24          MR. MORRIS:  Correct.

25      Q.   So you will see, Mr. Waterhouse,
```

this is a letter dated June 3rd. And if we could go to the signature page.

And do you see that you and Mr. Dondero signed this document?

A. Yes.

Q. That is your signature; right?

A. Yes.

MR. MORRIS: Okay. Can you go back to the top.

MS. DANDENEAU: Mr. Morris, can you have somebody post this in the chat so that we have can have a copy of this, please.

MR. MORRIS: Yeah, sure. Asia, can you do that, please.

Q. Okay. Do you see at the bottom of the second paragraph there is a reference to materiality?

A. Yes.

Q. Okay. It says, Materiality used for purposes of these representations is $1.7 million.

Do you see that?

A. I do.

Q. And did PwC set that level of

```
 1              WATERHOUSE - 10-19-21

 2   materiality?

 3        A.    Yes.

 4        Q.    And for purposes of the audit, did

 5   PwC set the level of materiality each year?

 6        A.    Yes.

 7        Q.    Did that number change over time?

 8        A.    I'm not aware of what materiality is

 9   every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20              If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of
```

```
 1              WATERHOUSE - 10-19-21
 2    materiality that PwC established?
 3              MS. DANDENEAU:  Objection to form.
 4         A.    So, again, during my tenure as CFO,
 5    and -- Highland -- it was -- it is required to
 6    disclose any affiliate loans that are in excess
 7    of materiality.
 8              Now, the forgiveness of those loans
 9    may or may not -- I mean, since materiality
10    fluctuates every year, a -- you know, if a loan
11    was forgiven, it may or may not, you know --
12    and, look, I would want to consult the guidance
13    around this.
14              It is not something we do -- you
15    know, it is not -- you know, GAAP can be and
16    disclosures can be very specialized so, again,
17    we want to consult the guidance.  But we would
18    see if and what would need to be disclosed if
19    it were deemed immaterial.
20         Q.    Did you and Mr. Dondero sign
21    management representation letters of this type
22    in each year in which you served as Highland's
23    CFO?
24         A.    I -- I -- I will speak for myself.
25    I signed them.  There may have been others that
```

```
 1            WATERHOUSE - 10-19-21
 2   signed as well.  I don't -- I don't recall.
 3        Q.    But to the best of your knowledge,
 4   you, personally, signed a management
 5   representation letter in connection with
 6   Highland's audit each year that you served as
 7   the CFO; correct?
 8        A.    I would say generally speaking,
 9   Mr. Morris.  I don't recall for every single
10   year, you know, generally, but I would want to
11   refer to all the rep letters and see who signed
12   them.
13        Q.    Do you recall Highland having its
14   financial statements audited in any year during
15   the period that you were a CFO where you didn't
16   sign the management representation letter?
17        A.    I don't recall.  But, John, we're
18   going back five, six, seven, eight, nine,
19   decade.  I don't -- I don't remember.
20        Q.    I don't want to go back that many
21   decades, but I'm just asking you if you recall
22   that there was you didn't sign it?
23        A.    I -- I -- I don't, but my memory
24   is -- again, I -- I -- I can't tell you what I
25   did in 2012.  I mean, I think generally, yes,
```

1          WATERHOUSE - 10-19-21

2   but I don't -- I don't know for sure, and I

3   would want to rely on the document.

4          Q.    Let me ask the question a little bit

5   differently then.

6                Do you have any reason to believe

7   that Highland had its annual financial audit

8   and you did not sign a management

9   representation letter in connection with that

10  audit?

11               MS. DANDENEAU:  Objection to form.

12         A.    I don't believe it would, but,

13  again, I would want to -- I don't recall and I

14  would want to confirm it to -- to make, you

15  know, an affirmative -- to give an affirmative

16  answer.

17         Q.    Do you know whether PwC required

18  management to sign management representation

19  letters?

20               MS. DANDENEAU:  Objection to form.

21         A.    Yes.  I mean, it -- management

22  representation letters are signed by

23  management.

24         Q.    Okay.  And do you know -- do you

25  have any understanding as to why PwC requires

```
 1                  WATERHOUSE - 10-19-21

 2   management to sign management representation

 3   letters?

 4            MS. DEITSCH-PEREZ:  Object to the

 5       form.

 6       A.    I don't know why PwC's -- what PwC's

 7   specific practice is.  I know generally what

 8   management representation letters are.

 9       Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14       A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17       Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20       A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23       Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?
```

1                WATERHOUSE - 10-19-21

2      A.    That is -- that is -- other than

3  what I said, it is -- it is -- it is required

4  so -- to ensure that the -- you know, there

5  is -- there is completeness in what is being

6  audited.

7      Q.    Did you -- did you have a practice

8  whereby you and Mr. Dondero conferred about the

9  management representation letters before you

10  signed them?

11     A.    No.

12     Q.    Did you have a practice --

13  withdrawn.

14          Do you see just the next sentence

15  after the materiality, there is a sentence that

16  states:  We confirm, to the best of our

17  knowledge and belief, as of June 3rd, 2019, the

18  date of your report, the following

19  representations made to you during your audit.

20          Do you see that sentence?

21     A.    Yes.

22     Q.    Okay.  Did you understand when you

23  signed this letter that you were confirming the

24  representations that followed?

25     A.    When I signed this management

Page 99

1              WATERHOUSE - 10-19-21
2    letter -- representation letter, yes.
3         Q.    Okay.  Did you discuss this letter
4    with Mr. Dondero before you signed it?
5         A.    I don't recall.
6         Q.    Do you recall if Mr. Dondero asked
7    you any questions before he signed the letter?
8         A.    I don't recall.
9         Q.    Do you recall if you asked
10   Mr. Dondero any questions before you signed
11   this letter?
12        A.    I don't recall.
13        Q.    Is it fair to say that Mr. Dondero
14   did not disclose to you the existence of the
15   agreement that we have -- as we've defined that
16   term prior to the time you signed this letter?
17             MS. DANDENEAU:  Objection to form.
18        A.    I don't think I understand the
19   question.  So, again, you are saying, did
20   Mr. Dondero not disclose to me the existence of
21   this letter?
22        Q.    No, I apologize.
23             Did Mr. Dondero disclose to you the
24   existence of the agreement prior to the time
25   you signed this letter on June 3rd, 2019?

1          WATERHOUSE - 10-19-21

2      A.    The agreement -- the agreement that

3   we talked about earlier?

4      Q.    Correct.

5      A.    Look, as I said earlier, the first

6   time I heard of this agreement was sometime

7   this year.

8      Q.    Okay.  Can we turn -- let's just

9   look at a couple of items on the list.  If we

10  can go to page 33416.  Do you see in Number 35

11  it talks about the proper recording or

12  disclosure in the financial statements of ND

13  relationships and transactions with related

14  parties.

15          Do you see that?

16     A.    I do.

17     Q.    As the CFO, do you have any

18  understanding as to whether Dugaboy is a

19  related party?

20     A.    I don't recall.

21     Q.    Do you know whether any of the

22  affiliates are related parties?

23     A.    If -- if it was NexPoint, HCMFA,

24  HCMS, HCRE, yeah, if -- if that is the

25  affiliate definition, and there.  In ASC 850 --

1          WATERHOUSE - 10-19-21

2    again, I mean, I haven't looked at ASC 850 in

3    quite some time, but, you know, if -- if there

4    is a control language, you know, ASC 850, would

5    that -- that section in GAAP would -- would

6    pick up and define what are related parties.

7              So, you know, like I said, if -- one

8    of the four entities I just described, if -- if

9    they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11        Q.   Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15        A.   I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17        Q.   Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20        A.   Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.

1                    WATERHOUSE - 10-19-21

2          Q.     To the best of your knowledge, was

3    the existence of the agreement ever disclosed

4    to PwC?

5          A.     I'm not -- I'm not aware.

6          Q.     Do you recall if the agreement was

7    ever disclosed in Highland's audited financial

8    statements?

9          A.     I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15         Q.     That is all I'm asking for.

16         A.     I'm not aware.

17         Q.     Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23                Do you see that?

24         A.     Yes.

25         Q.     To the best of your knowledge, as of

1         WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6         A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11        Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15        A.    Yes.

16        Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19        A.    Yes.

20        Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24        A.    It is -- it is -- it is just -- it

25   is a typical audit request.

1              WATERHOUSE - 10-19-21

2        Q.    And do you understand -- do you have

3   an understanding that PwC wanted to know that

4   as of the date of the audit whether any

5   material changes had occurred since the end of

6   the fiscal year, using the definition of

7   materiality that is in this particular

8   management representation letter?

9        A.    It -- it is -- it is -- it is a --

10  it is as described.  It is just a poorly worded

11  question, so it is hard for me to say yes.

12       Q.    If I asked you this, I apologize,

13  but did you ever learn when the agreement was

14  entered into?

15       A.    I don't -- I don't -- like I said

16  before, I don't know or have any details of the

17  agreement.

18       Q.    Okay.  Did you ever ask anybody when

19  the agreement was entered into?

20       A.    I did not.

21       Q.    Let's look at the audited financial

22  statements.  We will put up on the screen a

23  document that has been premarked as Exhibit 34.

24            (Exhibit 34 marked.)

25            MS. DANDENEAU:  And again, if Ms. La

```
 1              WATERHOUSE - 10-19-21

 2         Canty could please put that in the chat

 3         room, that would be great.

 4              MR. MORRIS:  I will assure you we

 5         will put every document in the chat room.

 6         Q.    Now, I'm just going to ask you

 7    questions that are related to the provisions of

 8    this report that concern the affiliate loans,

 9    but again, Mr. Waterhouse, if there is any part

10    of the document that you need to see or that

11    you think you might need to see in order to

12    refresh your recollection to answer any of my

13    questions, will you let me know that?

14         A.    Yes.

15         Q.    Because this is a pretty lengthy

16    document, but do you see that the cover page

17    here is the Highland consolidated financial

18    statements for the period ending December 31st,

19    2018?

20         A.    Yes.

21         Q.    If we can go to -- I think it is the

22    next one, looking for PwC's signature line.

23              MS. CANTY:  I'm sorry, John, did you

24    say something?

25              MR. MORRIS:  Yes, can we turn the
```

1        WATERHOUSE - 10-19-21

2        page.  I think it is 215.  Yes, stop right

3        there, just above -- I'm sorry, I want to

4        see just the date of the report.

5        Q.    Okay.  Do you see at the bottom of

6    that page there, Mr. Waterhouse,

7    PricewaterhouseCoopers has signed this audit

8    report?

9        A.    Yes, I see their signature.

10        Q.    Okay.  And it is the dated same day

11    as your management representation letter; is

12    that right?

13        A.    It is -- yes, it is the same day.

14        Q.    Was that the practice to sign the

15    management representation letter on the same

16    day that the audit report was signed?

17        A.    Yes, that is typical in every audit.

18        Q.    Can we just scroll down to the

19    balance sheet on the next page.

20              Do you see that there is a line

21    there that says, Notes and Other Amounts Due

22    from Affiliates?

23        A.    Yes.

24        Q.    Does that line, to the best of your

25    knowledge, include the amounts that were due

1                    WATERHOUSE - 10-19-21

2  under the affiliate under the notes signed by

3  the affiliates and Mr. Dondero?

4          MR. RUKAVINA:  Objection to the

5        extent that calls for a legal conclusion.

6      A.   I mean, I would want to see the

7  detail and the build to this $173,398,000, but,

8  yes, I mean, if -- if -- given what we

9  discussed before, you know, it -- it should

10  capture that.

11      Q.   And -- and while you were the CFO of

12  Highland, were all notes held by Highland that

13  were issued by an affiliate or Mr. Dondero

14  carried as assets on Highland's balance sheets?

15          MS. DANDENEAU:  Objection to form.

16          MS. DEITSCH-PEREZ:  Object to form.

17      A.   I don't -- I don't know how else

18  they would be carried.

19      Q.   Okay.  Can you think of any -- are

20  you aware of any promissory note issued by an

21  affiliate or Mr. Dondero that was not carried

22  on Highland's audited financial balance sheets?

23      A.   I'm -- I'm -- I'm not aware.

24      Q.   Okay.  Are you aware of any category

25  of asset on Highland's balance sheet in which

1                    WATERHOUSE - 10-19-21

2    any of the promissory notes issued by an

3    affiliate or Mr. Dondero would have been

4    included?

5              MS. DANDENEAU:  Objection to form.

6         A.    Sorry, am I aware of any asset of an

7    affiliate being included --

8         Q.    That -- let me -- let me try again.

9              Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12        A.    Yes.

13        Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16        A.    Yes.

17        Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21        A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.

1                    WATERHOUSE - 10-19-21

2              Now, does that mean absolute?  I

3    don't know.

4         Q.    Do you have any reason to believe

5    that the promissory notes would have been

6    carried on the balance sheet in a category

7    other than Notes and Other Amounts Due from

8    Affiliates?

9         A.    If they were deemed -- no.  If they

10   were deemed an affiliate, you know, under GAAP,

11   they should be carried in that line.

12   Otherwise, it would go into another line.

13        Q.    Okay.  And do you see the total

14   asset base as of December 31st, 2018, was

15   approximately $1.04 billion?

16        A.    Yes.

17        Q.    Is my math correct that the Notes

18   and Other Amounts Due from Affiliates

19   constituted approximately 17 percent of

20   Highland's assets as of the end of 2018?

21        A.    Well, so how are you defining

22   Highland?

23        Q.    Highland Capital Management, L.P.,

24   the entity that this audit is subject to -- or

25   the subject of.

1                    WATERHOUSE - 10-19-21

2        A.    On a consolidated or unconsolidated

3   basis?

4        Q.    I'm looking at the balance sheet.

5   It is a consolidated balance sheet.  Okay?

6              Does the Notes and Other Amounts Due

7   from Affiliates constitute approximately

8   17 percent of the total assets of Highland

9   Capital Management, L.P., on a consolidated

10  basis?

11             MS. DANDENEAU:  Objection to form.

12       A.    I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15       Q.    Okay.

16       A.    If that is accurate, yes.  But,

17  again, on a consolidated basis.

18       Q.    And on an unconsolidated basis the

19  percentage would be higher; correct?

20       A.    I -- no.  I don't know.

21       Q.    Well, okay.  That is fair.

22             MR. MORRIS:  Can we turn to

23        page 241, please.

24       Q.    Do you see that this is a section of

25  the audit report that is entitled Notes and

1                    WATERHOUSE - 10-19-21

2  Other Amounts Due from Affiliates?

3         A.     Sorry, I can't see the -- the --

4         Q.     It is at the top.

5         A.     Notes and Other Amounts Due from

6  Affiliates, yes, I see that.  I don't -- I

7  don't have a page number, but I'm on a page

8  that says at the top:  Notes and Other Amounts

9  Due from Affiliates.

10        Q.     Okay.  And that is the same title of

11 the line item on the balance sheet that we just

12 looked at; right?  Notes and Other Amounts Due

13 from Affiliates?

14        A.     Yes.

15        Q.     And is it your understanding, based

16 on your experience and knowledge as the CFO,

17 that this is the section of the narrative that

18 ties into the line item that we just looked at?

19        A.     Yes.

20        Q.     And is this section of the audit

21 report intended to describe and disclose all of

22 the material facts concerning the Notes and

23 Other Amounts Due from Affiliates?

24               MS. DANDENEAU:  Objection, form.

25        A.     This -- these notes -- these notes

1              WATERHOUSE - 10-19-21

2   of the financial statements are -- the purpose

3   is to disclose any material items in relation

4   to that balance sheet line item.

5        Q.    Okay.  And all of the information,

6   to the best of your knowledge, that is set

7   forth in this section of the audit report was

8   provided by Highland; correct?

9        A.    Yes, it would have been provided by

10  the corporate accounting team.

11       Q.    Okay.  And the corporate accounting

12  team, did that team report to you in the

13  organizational structure?

14       A.    Yes.

15       Q.    And did you have any concerns about

16  the controls that were in place to make sure

17  that the information provided with respect to

18  Notes and Other Amounts Due from Affiliates was

19  accurate and complete?

20            MS. DANDENEAU:  Objection to form.

21       A.    Not that I recall.

22       Q.    Okay.  Do you recall ever being

23  concerned that any portion of the Notes and

24  Other Amounts Due from Affiliates in any audit

25  report was inaccurate, incomplete, or not

1          WATERHOUSE - 10-19-21

2   reliable?

3        A.    I didn't -- I had concerns about,

4   you know, like I talked about before, of there

5   were -- there were potentially issues in the

6   control environment.  But as far as it relates

7   to the audited financial statements, any -- the

8   team would work with the auditors to disclose

9   all -- all notes in Highland's possession.

10            And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15        Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20            MS. DANDENEAU:  Objection to form.

21        A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25            Again, I wasn't anywhere chose to

1          WATERHOUSE - 10-19-21

2    being the point person of this audit.  And I

3    can't recall, you know, when -- you know, I

4    don't even know if I was ever the point person

5    during my tenure as CFO.

6            I don't know if PwC had any concerns

7    when they were performing those audit

8    procedures.  They may have and they may have --

9    and it may not have been communicated to me.  I

10   don't know.

11           MR. MORRIS:  All right.  I move to

12      strike.

13      Q.   And I'm going to ask you to listen

14   carefully to my question.

15           Did you -- do you recall ever having

16   a conversation with anybody at any time

17   concerning the accuracy of the reporting

18   provided in the audited financial statement on

19   the topic of Notes and Other Amounts Due?

20           MS. DANDENEAU:  Objection to form.

21      A.   I don't recall for this, but that

22   doesn't mean that it didn't exist.

23      Q.   Okay.  But you have no reason to

24   believe, as you sit here right now, that you

25   ever discussed with anybody concerns over the

1          WATERHOUSE - 10-19-21

2    accuracy of the section of the audit reports

3    called Notes and Other Amounts Due from

4    Affiliates; correct?

5              MS. DANDENEAU:  Object to the form.

6              MS. DEITSCH-PEREZ:  Objection to

7         form.

8         A.    I don't recall having any

9    conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.

1            WATERHOUSE - 10-19-21

2       A.     -- Highland's responsibility.

3  Highland's responsibility.

4       Q.     Who, at Highland, was responsible

5  for drafting this section of the audit report?

6       A.     I -- I don't know the answer to

7  that.  Again, there was a team who worked on

8  this.  And I don't know, you know, whether it

9  was the staff or the manager.

10            Again, this is where I let the teams

11  manage.  And, you know, there may be a

12  corporate accountant who worked on this.  I

13  just -- you know, I wasn't part of that process

14  to give that person experience.  I don't know.

15      Q.     Do you recall having any

16  communications with anybody at any time

17  concerning this section of the report?

18      A.     Yeah, I don't recall.

19      Q.     Do you recall whether you ever told

20  anybody at any time that any aspect of this

21  section of the report was inaccurate or

22  incomplete?

23      A.     I don't recall.

24      Q.     As you sit here today, do you have

25  any reason to believe that this section of the

1          WATERHOUSE - 10-19-21

2   audit report is incomplete or inaccurate in any

3   way?

4              And I'm happy to give you a moment

5   to -- to look at it, if you would like.

6              MS. DANDENEAU:  Objection to form.

7              MS. DEITSCH-PEREZ:  Same.

8      A.    I mean, I would have to look at -- I

9   would have to look at the bill to the note

10  schedule to make sure I know you presented me

11  with materiality, but again, there might be a

12  note as of 12/31/18 that somehow was -- was

13  under materiality not disclosed.  I don't -- I

14  don't know.  I would need more information.

15     Q.    Okay.  But without more information,

16  you have no reason to believe anything this

17  section is inaccurate; correct?

18             MS. DANDENEAU:  Objection to form.

19     A.    I don't.  I mean, you know, this was

20  part of the audit.

21     Q.    Thank you.  Now, you will see if we

22  could scroll just a little bit more that each

23  of the first five paragraphs concerns

24  specifically the four affiliates that we've

25  been discussing and Mr. Dondero.

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  If we could go the

 3       other way, La Asia.  We don't need Okada.

 4       We're going to have to thread the needle.

 5       Okay.  Good, perfect.

 6       Q.    Do you see those five paragraphs

 7  certain the four affiliates and Mr. Dondero as

 8  we've been referring to today?

 9       A.    Yes.

10       Q.    Okay.  And do you see at the end of

11  every paragraph it states, quote:  A fair value

12  of a partnership's outstanding notes receivable

13  approximates the carrying value of the notes

14  receivable?

15       A.    Yes, I see that.

16       Q.    Do you have an understanding of what

17  that means?

18       A.    Yes.

19       Q.    What is your understanding of that

20  sentence?

21       A.    It is the -- again, the -- the fair

22  value, right, which is -- which is what the --

23  what Highland could sell that asset for.  This

24  statement is comparing the fair value of the

25  notes to the carrying value, so the carrying
```

```
 1              WATERHOUSE - 10-19-21

 2    value is the line item that you showed me

 3    earlier that is in Notes and Other Amounts Due

 4    from Affiliates.

 5         Q.    Okay.  Is another way to say this is

 6    that the fair market value of the notes equals

 7    the principal amount and -- withdrawn.

 8              Is the fair way to interpret this

 9    that the fair market value of the notes equals

10    all remaining unpaid principal and interest due

11    under the notes?

12              MS. DANDENEAU:  Object to the form.

13              MS. DEITSCH-PEREZ:  Objection, form.

14         A.    I don't know the answer to that,

15    because I don't recall where -- where any --

16    where -- in what line item was the interest

17    component reported.

18         Q.    All right.  Well, if we look in this

19    audit report, you will see in the middle of the

20    first paragraph, for example, it states that as

21    of December 31st, 2018, total interest and

22    principal due on outstanding promissory notes

23    was approximately $5.3 million.

24              Do you see that?

25         A.    I do.
```

1              WATERHOUSE - 10-19-21

2        Q.    Is that the carrying value or the

3    fair value?

4        A.    That would be the carrying value --

5        Q.    And is the last --

6        A.    -- in my opinion.

7        Q.    Okay.  And it is in your opinion as

8    the chief financial officer of Highland during

9    the period of time that you described; right?

10   It is an educated opinion?

11       A.    I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13       Q.    Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16             MS. DANDENEAU:  Objection to form.

17             MS. DEITSCH-PEREZ:  Objection, form.

18       A.    Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21       Q.    Correct.

22       A.    If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,

1                    WATERHOUSE - 10-19-21

2    look, I mean, if you -- I mean, if you are

3    saying the 5.3 million is in the notes and

4    other amounts due from affiliates, then the

5    last statement is saying the fair value

6    approximates 5.3 million.  That is what that

7    last sentence is saying.

8         Q.    Do you see in the middle of the

9    first paragraph -- not in the middle, the next

10   to last sentence there is a statement that the

11   partnership will not demand payment on amounts

12   that exceed HCMFA's excess cash availability

13   prior to May 31st, 2021.

14              Do you see that?

15        A.    I do.

16        Q.    Do you know when Highland agreed not

17   to demand payment as described in that

18   sentence?

19        A.    I don't know specifically.

20        Q.    Do you know why Highland agreed not

21   to demand payment on HCMFA's notes until May

22   2021?

23        A.    Yes.

24        Q.    Why was that decision made?

25        A.    You know, well, it -- it -- that

1    WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5         Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10            MS. DANDENEAU:  Objection to form.

11        A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13        Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16            MS. DANDENEAU:  Objection to form.

17        A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21        Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25        A.    I'm trying to remember.  I don't

```
 1              WATERHOUSE - 10-19-21

 2    remember exactly -- I don't remember if it was

 3    myself or -- or Jim Dondero who -- who -- there

 4    was -- there was something signed, from what I

 5    recall, that -- that -- that backed up this

 6    line item in the -- in the notes I'm -- look,

 7    I'm, I'm --

 8         Q.    We will get to that.

 9         A.    You --

10         Q.    I'm just --

11         A.    You have -- I mean --

12         Q.    We're going to give that to you.

13    I'm going to give that to you.

14         A.    You -- you -- you have all the

15    documents.  I don't have the documents, and

16    that is what makes it so hard.  I don't have

17    any documents to prepare for this deposition;

18    right?  You have all -- I don't -- I don't -- I

19    don't remember, but, you know, again, it would

20    probably be myself or Jim.

21         Q.    Do you know if Highland received

22    anything in return for its agreement not to

23    make a demand for two years?

24         A.    I don't -- I don't think it referred

25    anything.
```

1        WATERHOUSE - 10-19-21

2        Q.    And did you and Mr. Dondero discuss

3   HCMFA's ability to satisfy the notes if a

4   demand was made at the time this agreement was

5   entered into?

6             MS. DANDENEAU:  Objection to form.

7        A.    I don't -- I don't -- I don't recall

8   having a specific conversation, if I did, or --

9   or David Klos.

10       Q.    Okay.  I'm just asking if you recall

11  any conversations that you had.

12       A.    I don't recall.

13       Q.    Okay.  Do you know why Highland

14  loaned the money to HCMFA that is the subject

15  of the notes described in this paragraph?

16       A.    I don't remember specifically why

17  5.3 million was loaned.  I mean, I -- it would

18  have to be put in the context.

19       Q.    Do you have any recollection at all

20  as to why Highland ever loaned any money to

21  HCMFA?

22       A.    Yes.

23             MS. DANDENEAU:  Objection to form.

24       Q.    What do you remember about that?

25       A.    There was a Highland Global

1              WATERHOUSE - 10-19-21

2    Allocation Fund, which was a -- a fund managed

3    by Highland Capital Management Fund Advisors.

4    There was a -- we -- I'm just telling you,

5    there was -- there was -- there was a -- a

6    ultimately a NAV error found in this fund while

7    it was an open-ended fund and, you know, there

8    were amounts owed by the advisor in -- in

9    relation to that NAV error.

10            There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16       Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19       A.    These started back -- I think, I

20   mean --

21       Q.    I apologize.

22       A.    -- that -- I mean, the answer to

23   that is no.

24       Q.    I apologize, the loans that were

25   made in connection with the events that you're

1                    WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3            MR. RUKAVINA:  Objection to the

4        extent that calls for a legal conclusion.

5        A.    I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8        Q.    Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13       A.    This is for NexPoint Advisors?

14       Q.    Yes.

15       A.    I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18       Q.    Do you know why?

19       A.    But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21       Q.    Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24       A.    Yes.

25       Q.    Why did High -- why do you recall --

```
 1              WATERHOUSE - 10-19-21
 2   what is the reason you recall Highland lending
 3   money to NexPoint?
 4        A.   I mean, I was just -- I just -- I
 5   just recall.  I mean, I just -- I don't
 6   remember why.
 7        Q.   I understand.  And I'm asking you if
 8   you recall --
 9        A.   Oh, why -- I thought you say --
10   NexPoint Advisors was launching a fund which
11   is -- I believe that the legal name is NexPoint
12   Capital, Inc.  And it -- it provided a
13   co-invest into that fund.
14              And, from what I remember, the --
15   the -- that NexPoint borrowed money from
16   Highland at the time to make that co-invest.
17        Q.   So this was an investment that
18   NexPoint was required to make; is that right?
19              MS. DANDENEAU:  Objection to form.
20        A.   I don't know if it was required to
21   make, I don't recall that, or if it just made
22   it.
23        Q.   Okay.  But your recollection is that
24   NexPoint made an investment and they borrowed
25   money from Highland to finance the investment.
```

```
 1              WATERHOUSE - 10-19-21

 2              Do I have that right?

 3     A.    Yes.

 4     Q.    How about HCRE?  Do you know why

 5  HCRE borrowed money from Highland?

 6     A.    I don't remember specifically.

 7     Q.    Do you remember generally?

 8     A.    Generally, yeah -- I mean, yes.

 9     Q.    Can you tell me your general

10  recollection as to why Highland loaned money to

11  HCRE?

12     A.    For -- for -- for investment

13  purposes.

14     Q.    So HCRE made the investment and it

15  obtained a loan, or loans, from Highland in

16  order to finance that investment or those

17  investments.

18              Do I have that right?

19     A.    I mean, I -- you know, generally.

20     Q.    Okay.  How about Highland Management

21  Services, Inc.?

22              Do you have any recollection as to

23  why HCMS borrowed money from Highland?

24     A.    Generally.

25     Q.    What is your general recollection as
```

```
1              WATERHOUSE - 10-19-21

2    to why HCMS borrowed money from Highland?

3         A.    For -- for investment purposes.

4         Q.    So it is the same thing, HCMS wanted

5    to make investments and it borrowed money from

6    Highland in order to finance those investments;

7    is that right?

8         A.    I mean, yes, generally.  I mean, I

9    can't -- I don't -- on the services, there --

10   there are several loans in these schedules.

11   You know, I can't remember why every single one

12   of these were made, but I would say, yeah, I

13   mean, generally.

14        Q.    Okay.  I appreciate that.

15             MR. MORRIS:  Let's go to the page

16        with Bates No. 251.  La Asia, are you

17        there?

18             MS. CANTY:  Sorry, John.  It went

19        out for a minute.  Can you say that again.

20        I don't know what is going on.

21             MR. MORRIS:  The page with Bates

22        No. 251, can we go to that.

23             MS. CANTY:  Yes, sorry.

24             MR. MORRIS:  Keep going to the

25        bottom.  Yeah, there you go.
```

1              WATERHOUSE - 10-19-21

2         Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5         A.    I do.

6         Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11        A.    I mean, it relates to it, but not in

12   its entirety.

13        Q.    Okay.

14             MR. MORRIS:  If we can scroll up to

15        capture the entirety of this section right

16        here.

17        Q.    And what do you mean by that, sir?

18             MR. MORRIS:  Yeah, right there.

19        Perfect.

20        A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25        Q.    Okay.  And -- and would the type of

```
 1                WATERHOUSE - 10-19-21

 2   subsequent event relating to affiliate loans be

 3   captured in this section if they were -- if

 4   they were made after the end of the fiscal year

 5   and prior to the issuance of the audit report?

 6        A.    Yes, if they were deemed material or

 7   disclosable.

 8        Q.    Okay.  I appreciate that.

 9              Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically
```

```
 1              WATERHOUSE - 10-19-21
 2   if -- you know, what -- if that 7.4 million was
 3   solely attributable to the NAV error.
 4        Q.    Okay.  But there is no question that
 5   Highland told PricewaterhouseCoopers that over
 6   the course of 2019 HCMFA issued promissory
 7   notes to the partnership in the aggregate
 8   amount of $7.4 million; correct?
 9        A.    In the course of the audit, we would
10   have produced all promissory notes in our
11   possession, including the ones that are
12   detailed here.
13        Q.    Do you recall that you signed the
14   two promissory notes that are referenced in
15   that provision?
16              MS. DANDENEAU:  Objection to form.
17        A.    I didn't recall initially but I've
18   been reminded.
19        Q.    Okay.  And -- and do you recall that
20   those notes are dated May 2nd and May 3rd,
21   2019?
22        A.    Yes.
23        Q.    So that was just a month before the
24   audit was completed; correct?
25        A.    Yes.  I think we had a June 3rd
```

1              WATERHOUSE - 10-19-21

2    date, right, if -- if my memory serves me

3    right.

4         Q.   Yes, I will represent to you that

5    your memory is accurate in that regard.

6              Did anybody ever instruct you as the

7    CFO to correct this statement that we're

8    looking at in subsequent events?

9         A.   So let me understand.  You're saying

10   when I was CFO at Highland Capital did anyone

11   ever ask me to correct the -- over the course

12   of 2019 through the report date HCMFA issued

13   promissory notes, this statement?

14        Q.   Right.

15        A.   Not that I'm aware.

16        Q.   While you were the CFO of Highland,

17   did anybody ever tell you that that sentence

18   was wrong?

19        A.   Not that I'm aware.

20        Q.   Highland -- withdrawn.

21             HCMFA disclosed these notes in its

22   own audited financial statements; right?

23             MR. RUKAVINA:  Objection, form.

24        A.   I assume that these would be

25   material -- if these are material financial

1              WATERHOUSE - 10-19-21

2  statements, yes, they -- they -- they should be

3  and they were likely disclosed.

4      Q.    Now, there is no statement

5  concerning the 2019 notes about the forbearance

6  that we looked at in the affiliated note

7  section of the report; right?

8              MS. DANDENEAU:  Objection to form.

9      Q.    I'll withdraw.  That was bad.

10              Do you recall when we were looking

11  at the paragraph concerning HCMFA earlier it

12  had that disclosure about the agreement whereby

13  Highland wouldn't ask for demand on the -- on

14  the HCMFA notes?

15      A.    Yes.

16      Q.    That forbearance disclosure is not

17  made with respect to the 2019 notes; right?

18      A.    Not -- look, not that I can recall,

19  unless -- unless it was done at a subsequent

20  day.

21      Q.    Right.  And it is not in the

22  subsequent event section that we're looking at

23  right now where the 2019 notes are described;

24  right?

25      A.    Right.  But this is through

```
 1              WATERHOUSE - 10-19-21

 2    June 3rd.  It could have been done on June 4th.

 3    I don't -- I don't -- I don't recall.

 4         Q.    Okay.

 5              MR. MORRIS:  Can we put up on the

 6         screen the HCMFA audit report.  And while

 7         we're --

 8              MS. DANDENEAU:  What exhibit is

 9         this?

10              MR. MORRIS:  La Asia, what number is

11         that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17         in the chat.

18              MS. DANDENEAU:  Thank you.

19         Q.    Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.    Yes.

23         Q.    As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that
```

1                  WATERHOUSE - 10-19-21

2 we looked at earlier for Highland?

3     A.    I would imagine I would have been

4 asked to. I don't recall if I did.

5     Q.    Do you recall ever being asked by an

6 auditor to sign a management representation

7 letter and then not doing it?

8     A.    No.

9          MR. MORRIS: Can we just scroll down

10      again. I just want to see the date of the

11      document.

12     A.    I mean, let me -- you know, there

13 are different versions to management

14 representation letters I will qualify.

15          Yes, there are certain -- from time

16 to time auditors can make representations

17 that -- in the rep letter that is being

18 proposed that are inaccurate or out of scope or

19 things like that and they've asked for

20 signature.

21          In that context, yes. I mean, you

22 know -- I mean, if I have been asked to sign

23 and make those representations and those

24 representations are invalid, yes, I would not,

25 I mean, I -- I wouldn't sign that.

1              WATERHOUSE - 10-19-21

2         Q.    Okay.  PricewaterhouseCoopers served

3    as HCMFA's outside auditors as well; correct?

4         A.    Yes.

5         Q.    Do you see that this audit report is

6    signed on June 3rd, 2019, just like the

7    Highland audit report?

8         A.    That is correct.

9         Q.    And did the process of -- of

10   preparing HCMFA's audit report, was that the

11   same process that Highland followed when it did

12   its audit report at this time?

13        A.    I mean, it is a different entity.

14   There are different assets.  You know, it --

15   it -- it is -- as you saw, Highland's

16   financials are on a consolidated basis.  This

17   is different, so it is under the same control

18   environment and team.

19        Q.    Okay.  I appreciate that.  So the

20   same control environment and team participated

21   in the preparation of the audit for Highland

22   and for HCMFA at around the same time; correct?

23        A.    Yes.

24              MR. MORRIS:  Can we go to page 17 of

25        the report.  I don't have the Bates number.

1                    WATERHOUSE - 10-19-21

2       Q.    Okay.  Do you see that just like

3  Highland's audited financial report, HCMFA's

4  audited financial report also has a section

5  related to subsequent events?

6       A.    Yes.

7       Q.    And am I reading this correctly that

8  just as Highland had done, HCMFA disclosed in

9  its audited financial report a subsequent event

10 that related to the issuance of promissory

11 notes to Highland in the aggregate amount of

12 $7.4 million in 2019?

13      A.    That is what I see in the report.

14      Q.    And you were the treasurer of HCMFA

15 at the time; right?

16      A.    Yes, to the best of my knowledge.

17      Q.    And did anybody ever tell you prior

18 to the time of the issuance of this audit

19 report that that sentence relating to HCMFA's

20 2019 notes was inaccurate or wrong in any way?

21      A.    Not that I recall.

22      Q.    As you sit here right now, has

23 anybody ever told you that that sentence is

24 inaccurate or wrong in any way?

25      A.    Not that I recall.

1          WATERHOUSE - 10-19-21

2     Q.    I apologize if I asked you this

3  already, but has anybody ever told you at any

4  time that you are not authorized to sign the

5  promissory notes that are the subject of the

6  sentence we're looking at?

7     A.    Not that I recall.

8     Q.    Did anybody ever tell you at any

9  time that you had made a mistake when you

10  signed the promissory notes that are the

11  subject of this sentence?

12     A.    Say that again.  Did anyone ever say

13  that I made a mistake?

14     Q.    Let me ask the question again.

15          Did anybody ever tell you at any

16  time that you made a mistake when you signed

17  the two promissory notes in Highland's favor on

18  behalf of HCMFA in 2019?

19     A.    Not that I recall.

20          MR. MORRIS:  Let's just look at the

21          promissory notes quickly.  Can we please

22          put up Document Number 1, and so this is in

23          the pile that y'all have.  We'll just go

24          for a few more minutes and we can take our

25          lunch break.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    All right.  So I don't know if you

 3   have seen this before, sir.  Do you see that

 4   this is a complaint against HCMFA?

 5        A.    Yes, I am looking at it on the

 6   screen.

 7        Q.    Okay.  And have you ever seen this

 8   document before?

 9        A.    I went through some of these

10   documents with my counsel here yesterday.

11             MR. MORRIS:  All right.  Can we go

12        to Exhibit 1 of this document.

13        Q.    Do you see Exhibit 1 is a

14   $2.4 million promissory note back in 2019?

15        A.    Yeah, I found it in the book.  Yes,

16   I have it here in front of me.

17        Q.    And this is a demand note, right, if

18   you look at Paragraph 2?

19        A.    Yes.

20        Q.    And this is a note where the maker

21   is HCMFA, and Highland is the payee; right?

22        A.    Yes.

23             MR. MORRIS:  And if we can scroll

24        down, can we just see Mr. Waterhouse's

25        signature.
```

```
 1              WATERHOUSE - 10-19-21

 2      Q.     Is that your signature, sir?

 3      A.     Yes, it is.

 4      Q.     And did you sign this document on or

 5 around May 2nd, 2019?

 6      A.     I don't recall specifically signing

 7 this, but this is my signature.

 8      Q.     Okay.  And do you recall that

 9 Highland transferred $2.4 million to HCMFA at

10 or around the time you signed this document?

11      A.     I don't recall specifically.  I

12 would want to, as I sit here today, go back and

13 confirm that, but again, presumably that --

14 that -- that did happen.

15      Q.     You wouldn't have signed this

16 document if you didn't believe that HCMFA

17 either received or was going to receive

18 $2.4 million from Highland; is that fair?

19      A.     I mean, it -- if -- if -- if there

20 wasn't a transfer of value, yeah, I mean, you

21 know, I would have no reason to -- to sign a

22 note.

23      Q.     And -- and Highland wouldn't have

24 given this note to PricewaterhouseCoopers if --

25 withdrawn.
```

```
1              WATERHOUSE - 10-19-21
2              HCMFA wouldn't have given this note
3    to PricewaterhouseCoopers if it hadn't received
4    the principal value of -- of the note in the
5    form of a loan; correct?
6              MR. RUKAVINA:  Objection, legal
7         conclusion, speculation and form.
8         A.    Again, we -- what we provided to PwC
9    were, as part of the audit, any promissory
10   notes executed and outstanding.  You know, as a
11   part of the audit, they, you know, they -- they
12   have copies of all the bank statements,
13   things -- things of that sort.
14             MR. MORRIS:  Okay.  Can we go to
15        Exhibit 2.
16             (Exhibit 2 marked.)
17        Q.    Do you see that this is a promissory
18   note dated May 3rd, 2019 in the amount of
19   $5 million?
20        A.    Yes.
21        Q.    Do you believe this is also a demand
22   note if you look at Paragraph 2?
23        A.    Yes.
24        Q.    And do you see that HCMFA is the
25   maker, and Highland is the payee?
```

1          WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    And if we go to the bottom, can we

4  just confirm that that is your signature?

5      A.    Yes.

6      Q.    And together these notes are the

7  notes that are referred to both in Highland and

8  HCMFA's audited financial reports in the

9  subsequent event sections; correct?

10          MS. DANDENEAU:  Objection to form.

11     A.    They -- they -- they totaled

12 $7.4 million, so presumably, yes.

13     Q.    Okay.  And you were authorized to

14 sign these two notes; correct?

15          MR. RUKAVINA:  Objection, legal

16     conclusion.

17     A.    Yeah.  I mean, I'm -- I was the

18 officer of -- of HCMFA.  You know, I -- I'm not

19 the legal expert on -- on what that -- what

20 that confers to me or what it doesn't.  I mean,

21 that is my signature on the notes.

22     Q.    And you believed you were authorized

23 to sign the notes; is that fair?

24     A.    I signed a lot of documents in my

25 capacity, just because it is operational in

1              WATERHOUSE - 10-19-21

2      nature.  So, you know, to me this was just

3      another document, to be perfectly honest.

4           Q.    Sir, would you have signed

5      promissory notes with the principal amount of

6      $7.4 million if you didn't believe you were

7      authorized to do so?

8                 MS. DANDENEAU:  Objection to form.

9           Q.    Are you frozen?

10          A.    No.  I'm just -- you know, it is --

11     you know, again, I typically don't sign

12     promissory notes, and I don't recall why I

13     signed these, but -- you know, but I did.

14          Q.    All right.  So listen carefully to

15     my question.  Would you have ever signed

16     promissory notes with a face amount of

17     $7.4 million without believing that you were

18     authorized to do so?

19          A.    No.  I mean, I'm -- I'm putting my

20     signature on there, so no.

21          Q.    Okay.  And would you have signed two

22     promissory notes obligating HCMFA to pay

23     Highland $7.4 million without Mr. Dondero's

24     prior knowledge and approval?

25                MS. DEITSCH-PEREZ:  Object to the

1          WATERHOUSE - 10-19-21

2      form.

3      A.    You know, from -- from what I recall

4  around these notes, you know, I don't recall

5  specifically Mr. -- Mr. Dondero saying to -- to

6  make this a loan.

7          So my conversation with Mr. Dondero

8  around the culmination of the NAV error as

9  related to TerreStar which was a -- a -- I

10 think it was a year and a half process.  I

11 don't know, it was a multi-month process, very

12 laborious, very difficult.

13         When we got to the end, I had a

14 conversation with Mr. Dondero on where to, you

15 know, basically get the funds to reimburse the

16 fund, and I recall him saying, get the money

17 from Highland.

18     Q.    And so he told you to get the money

19 from Highland; is that right?

20     A.    That is what I recall -- in my

21 conversation with him, that is -- that is what

22 I can recall.

23     Q.    Do you know who drafted these notes?

24     A.    I don't.

25     Q.    Did you ask somebody to draft the

```
 1                    WATERHOUSE - 10-19-21

 2    notes?

 3         A.    I didn't ask -- I don't specifically

 4    ask people to draft notes really.  I mean,

 5    again, you know, the legal group at Highland is

 6    responsible and has always been responsible for

 7    drafting promissory notes.

 8         Q.    So based on your -- based on the

 9    practice, you believe that somebody from the

10    Highland's legal department would have drafted

11    these notes.  Do I have that right?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  John, I also asked you for the Word

14         versions of these notes so we could look at

15         the properties, and you have not provided

16         them.  Are you intending to?

17              MR. MORRIS:  No.

18         Q.    Can you answer my question, sir?

19         A.    Again, I --

20              MS. DANDENEAU:  Do you want him to

21         repeat it?

22         A.    Yeah, why don't you repeat it?

23         Q.    Sure.  Mr. Waterhouse, based on the

24    practice that you have described in your

25    understanding, do you believe that these notes
```

```
 1                WATERHOUSE - 10-19-21

 2   would have been drafted by somebody in the

 3   legal department?

 4            MS. DEITSCH-PEREZ:  Object to the

 5        form.

 6        A.    Yes.

 7        Q.    Okay.  And do you know who would

 8   have instructed -- do you have any knowledge as

 9   to who would have instructed the legal

10   department to draft these notes?

11            MS. DEITSCH-PEREZ:  Object to the

12        form.

13        A.    It was whoever was working -- I

14   mean, it was likely someone on the team.  I

15   mean, I don't remember exactly on every note or

16   every document, but, again, a lot of these

17   things of this nature -- they're operational in

18   nature -- were handled by the team.

19            The team knows to -- I mean, we

20   don't draft documents.  We're not lawyers.

21   We're not attorneys.  It is not what I do or

22   accountants do.

23            So they are always instructed to go

24   and -- and go to the legal team to get

25   documents like this drafted.  Also, when you go
```

```
 1              WATERHOUSE - 10-19-21

 2   to the legal team, the -- you know, we always

 3   loop in compliance.  And compliance -- when you

 4   go to the legal team, compliance is part of

 5   legal team.  They're made aware of -- of -- of

 6   these types of transactions.

 7       Q.    And do you believe that you had

 8   the -- withdrawn.

 9            Did you ever tell Mr. Dondero --

10   (inaudible) -- did you see those?

11       A.    Sorry.

12            MS. DEITSCH-PEREZ:  I did not hear

13       the end of that question.

14       Q.    Did you ever tell Mr. Dondero that

15   you signed these two notes?

16       A.    I don't recall ever -- no, I don't

17   recall having a conversation with him.

18       Q.    Did you ever discuss these two notes

19   with him at any time?

20       A.    The conversation, I recall, was what

21   I described earlier.  And that is the only time

22   I recall ever discussing this.

23       Q.    Okay.  But the corporate accounting

24   group had a copy of this -- of these two notes.

25   And pursuant to the audit process, the
```

```
 1                WATERHOUSE - 10-19-21
 2    corporate accounting group gave the two notes
 3    to PricewaterhouseCoopers in connection with
 4    the audit; correct?
 5              MS. DANDENEAU:  Objection to form.
 6         A.   Yes.  I mean, that is -- yeah, I
 7    mean, they -- unless the legal team can also
 8    retain copies of items like this.  I mean, I
 9    don't know everything that they would retain as
10    well.
11              The legal team would also, if they
12    had documents as part of audits, turn that over
13    to the auditors as well.  So it could have been
14    the corporate accounting team.  It could be
15    someone on the legal team.
16         Q.   All right.  So you didn't -- you
17    didn't draft this note; right?
18         A.   I -- I -- I did not.
19         Q.   But somebody at Highland did; is
20    that fair?
21              MS. DEITSCH-PEREZ:  Object to the
22         form.
23         A.   I don't know.  I mean, we can go to
24    the legal team.  I don't -- I'm not sitting
25    behind someone in legal.  Maybe they went to
```

1                    WATERHOUSE - 10-19-21

2    outside counsel.  I have no idea.

3         Q.    Did you have any reason to believe

4    you weren't authorized to sign this note,

5    either of these two notes?

6         A.    I think I have already answered that

7    question.

8         Q.    Okay.  You didn't give these notes

9    to PricewaterhouseCoopers; correct?

10              MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17              MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21              MR. MORRIS:  Okay.  Why don't we

22         take our lunch break here.

23              VIDEOGRAPHER:  We're going off the

24         record at 1:04 p.m.

25         (Recess taken 1:04 p.m. to 1:49 p.m.)

1          WATERHOUSE - 10-19-21

2          VIDEOGRAPHER:  We are back on the

3     record at 1:49 p.m.

4     Q.    Mr. Waterhouse, did you speak with

5     anybody during the break about the substance of

6     this deposition?

7     A.    I spoke to -- to Deb and Michelle.

8     Q.    About the substance of the

9     deposition?

10    A.    Yes.

11    Q.    Can you tell me what you talked

12    about?

13         MS. DANDENEAU:  No.  We object on

14    the basis of privilege.

15    Q.    Okay.  You are going to follow your

16    counsel's objection here?

17    A.    Yes.

18    Q.    Okay.

19         MR. MORRIS:  Can we put up on the

20    screen Exhibit 35.

21         (Exhibit 35 marked.)

22    Q.    Are you able to see that document,

23    sir?

24    A.    Yes.

25    Q.    Have you ever seen an incumbency

```
 1                    WATERHOUSE - 10-19-21
 2    certificate before?
 3          A.     I have.
 4          Q.     Do you have a general understanding
 5    of what an incumbency certificate is?
 6          A.     I have a general understanding.
 7          Q.     What is your general understanding?
 8          A.     You know, those -- my general
 9    understanding is that the incumbency
10    certificate basically lists folks that can --
11    are like authorized signers.
12          Q.     Okay.  And do you see that this is
13    an incumbency certificate for Highland Capital
14    Management Fund Advisors, L.P.?
15          A.     Yes.
16          Q.     Okay.  And if we could scroll down
17    just a little bit, do you see that it's dated
18    effective as of April 11th, 2019?
19          A.     Yes, I see that.
20          Q.     Okay.  And is that your signature in
21    the middle of the signature block?
22          A.     Yes, it is.
23          Q.     And by signing it, did you accept
24    appointment as the treasurer of HCMFA effective
25    as of April 11th, 2019?
```

1                    WATERHOUSE - 10-19-21

2          A.     Again, I'm not the legal -- I don't

3    know if this makes me the treasurer or the

4    appointment.  I don't know -- I don't know

5    that, so I don't -- I don't know if that

6    document -- again, I think -- again, I'm not

7    the legal expert.  I think isn't there --

8    aren't there other legal documents that detail

9    who the officers are that could be incorporated

10   or things like that?  Again, I don't want to

11   play armchair attorney here.

12         Q.     I'm not asking you for a legal

13   conclusion.  I'm asking you for your knowledge

14   and understanding.  When you signed this

15   document, did you understand that you were

16   accepting an appointment as the treasurer of

17   HCMFA?

18              MS. DANDENEAU:  Objection to form.

19              MS. DEITSCH-PEREZ:  Objection, form.

20         A.     Again, I don't think this -- that

21   wasn't my understanding.  I don't think this

22   makes -- this document makes me the treasurer.

23         Q.     What do you think this document --

24   why did you sign this document?

25              MS. DEITSCH-PEREZ:  Objection to

1                    WATERHOUSE - 10-19-21

2        form.

3                    MR. MORRIS:  You're objecting to the

4        form of the question when I asked him why

5        did you sign the document?  What is the

6        basis for the objection?

7                    MS. DEITSCH-PEREZ:  Because, John, I

8        think that it does call for a legal

9        conclusion other than -- with him saying

10       because somebody told me to sign this

11       document.  But if you want to go there,

12       that is fine.

13                   MR. MORRIS:  Okay.

14                   MS. DANDENEAU:  I don't think --

15       he's already said he's not a lawyer.

16                   MR. MORRIS:  I'll allow the witness

17       to answer this question.

18       Q.    Why did you sign this document, sir?

19       A.    I mean, our -- our legal group would

20   bring by these incumbency certificates from

21   time to time.  I have no idea why they're being

22   updated, and I was asked to sign.

23       Q.    Did you ask anybody, what is this

24   document?

25       A.    No.

1               WATERHOUSE - 10-19-21

2        Q.    Did anybody tell you why they needed

3    you to sign the document?

4        A.    Not that I can recall.

5        Q.    You testified earlier that you

6    understood that you served as the acting

7    treasurer for HCMFA; correct?

8        A.    Yes.

9        Q.    How did you become the acting

10   treasurer of HCMFA?

11            MS. DANDENEAU:  Objection to form.

12       A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15       Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18            MS. DANDENEAU:  John, you said --

19            MR. MORRIS:  Stop.

20            MS. DANDENEAU:  -- how did you

21        become the treasurer.  That is --

22            MR. MORRIS:  Please stop.

23            MS. DANDENEAU:  That is a legal

24        question.

25            MR. MORRIS:  I am not asking any

```
1              WATERHOUSE - 10-19-21

2       legal questions, to be clear.  I'm asking

3       for this witness' understanding as to how

4       he became the acting treasurer of HCMFA.

5       If he doesn't know, he can say he doesn't

6       know, but this legal stuff is nonsense, and

7       I really object to it.

8       Q.    Sir, I'm asking you a very simple

9  question.

10            MS. DANDENEAU:  Argumentative.

11      Q.    You testified -- you testified that

12 you became the acting treasurer of HCM --

13 HCMFA; correct?

14      A.    Yes.

15      Q.    How did that happen?

16            MS. DANDENEAU:  Again, object to

17      form.

18            MR. MORRIS:  I can't wait to do this

19      in a courtroom.  Good God.

20      Q.    Go ahead, sir.

21      A.    I don't know the exact process of

22 how that happened.

23      Q.    Do you have any idea whether signing

24 this document was part of the process?

25            MR. MORRIS:  You know what --
```

```
1           WATERHOUSE - 10-19-21

2           MS. DANDENEAU:  Objection.

3           MR. MORRIS:  -- withdrawn.  You guys

4    want to do this, I can't wait.  I can't

5    wait.  This is the craziest stuff ever.

6           MS. DANDENEAU:  John, he said he's

7    not a lawyer, and you are asking him for a

8    legal conclusion, and he says he doesn't

9    know, and you persist.

10          MR. MORRIS:  Okay.

11          MS. DANDENEAU:  So you can ask these

12   questions --

13          MR. MORRIS:  Did anyone -- please

14   stop talking.

15          MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21          MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24          MS. DANDENEAU:  That's right, I'm

25   sure you can't.
```

1                    WATERHOUSE - 10-19-21

2         Q.    Did anyone ever tell you, sir, that

3    even though you were the acting treasurer of

4    HCMFA, that you were not authorized to sign the

5    two promissory notes that we looked at before

6    lunch?

7         A.    I'm not sure I understand the

8    question.  I wasn't -- I mean, I'm -- I'm the

9    current acting treasurer.

10        Q.    Did anybody ever tell you at any

11   time that even though you were the acting

12   treasurer of HCMFA, that you were not

13   authorized to sign the two promissory notes

14   that we looked at before lunch?

15             MS. DANDENEAU:  Objection to form.

16        A.    Not that I recall.

17        Q.    Did anybody ever tell you at any

18   time that you were not authorized to sign the

19   two promissory notes that we looked at before

20   lunch?

21        A.    Not that I recall.

22        Q.    Did anybody ever tell you at any

23   time that you should not have signed the two

24   promissory notes that we looked at before

25   lunch?

1           WATERHOUSE - 10-19-21

2      A.    Not that I recall.

3      Q.    Did you ever tell anybody at any

4 time that you weren't authorized to sign the

5 two promissory notes that we looked at before

6 lunch?

7      A.    Not that I recall.

8      Q.    Did you ever tell anybody at any

9 time that you made a mistake when you signed

10 the two promissory notes that we looked at

11 before lunch?

12     A.    Not that I recall.

13     Q.    As you sit here right now, do you

14 have any reason to believe that you were not

15 authorized to sign the two documents that we

16 looked at before lunch?

17          MS. DANDENEAU:  Objection to form.

18     A.    If -- if this is the -- the valid

19 incumbency certificate, I mean, this does --

20 this does detail who the signers are.

21     Q.    Okay.  And looking at that document,

22 does that give you comfort that you were

23 authorized to sign the two promissory notes

24 that we looked at before lunch?

25          MS. DEITSCH-PEREZ:  Object to the

Page 160

1                    WATERHOUSE - 10-19-21

2          form.

3                    MS. DANDENEAU:  Objection, form.

4          A.    Yes.

5          Q.    As of October 20th -- withdrawn.

6                    I'm trying to take your mind back to

7     a year ago, October 2020.  Do you recall at

8     that time that the boards of the retail funds

9     were making inquiries about obligations that

10    were owed by the advisors to Highland in

11    connection with their 15(c) review?

12                   MS. DANDENEAU:  Objection to form.

13         A.    I don't -- I don't recall.

14         Q.    As of October 2020, you had no

15    reason to believe you weren't authorized to

16    sign the two promissory notes that we just

17    looked at; correct?

18                   MS. DANDENEAU:  Objection, form.

19                   MS. DEITSCH-PEREZ:  Objection to

20         form.

21         A.    I didn't think about it in October

22    of 2020, but I mean --

23         Q.    Did you have any reason to believe

24    at that time that you weren't authorized to

25    sign the two notes that we just looked at?

```
1                 WATERHOUSE - 10-19-21

2        A.      Not that I'm aware, no.

3        Q.      Did you have any reason to believe a

4   year ago that you made a mistake when you

5   signed those two notes?

6        A.      Not that I'm aware.

7        Q.      A year ago you believed that HCMFA

8   owed Highland the unpaid principal amounts that

9   were due under those two notes; correct?

10       A.      They're -- they're promissory notes

11  that were -- as you presented, that were --

12  that were executed.  Whether they're valid or

13  if there's other reasons, I didn't -- I don't

14  know.

15       Q.      I'm not asking you whether they're

16  valid or not.  I'm asking you for your state of

17  mind.  A year ago you believed that HCMFA

18  was -- was obligated to pay the unpaid

19  principal amount under the two notes that you

20  signed; correct?

21       A.      Yeah, I'm -- I'm -- yes.

22       Q.      Thank you.  Are you aware -- you're

23  aware that -- that in 2017, NexPoint issued a

24  note in favor of Highland in the approximate

25  amount of $30 million; correct?
```

```
 1              WATERHOUSE - 10-19-21

 2      A.    I'm -- I'm -- I'm generally aware.

 3      Q.    Okay.  And are you generally aware

 4  that from time to time, after the note was

 5  issued by NexPoint, that moneys were applied to

 6  principal and interest that were due under the

 7  NexPoint note?

 8      A.    Yes, I'm generally aware.

 9      Q.    Okay.  And did anybody ever tell you

10  that the payments that were made against the

11  NexPoint notes were made by mistake?

12      A.    Yes.

13      Q.    And is it the one payment that we

14  talked about earlier today?

15      A.    We talked about a lot of things

16  today.  What payment are we talking about?

17      Q.    Okay.  Who told you that any payment

18  made against the NexPoint note was made by

19  mistake?

20      A.    D.C. Sauter.

21      Q.    When did Mr. Sauter tell you that?

22      A.    I don't -- I don't remember

23  specifically.

24      Q.    Do you remember what payments --

25      A.    Sometime -- sometime this year.
```

```
 1              WATERHOUSE - 10-19-21

 2       Q.     Sometime in 2021?

 3       A.     Yes.

 4       Q.     Do you remember what payment he was

 5   referring to?

 6       A.     It was the -- the payment made in

 7   January of 2021 or -- yeah, January of -- of

 8   this -- January of 2021.

 9       Q.     Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12       A.     And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17       Q.     Can you -- can you give me any

18   specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.
```

1          WATERHOUSE - 10-19-21

2          I'm going to object here, and I'm going to

3          instruct the witness not to answer

4          depending on the discussion that you had --

5          Mr. Waterhouse, I'm the lawyer for

6          NexPoint, and as everyone here knows, D.C.

7          Sauter is in-house counsel.

8               So if you and Mr. Sauter were having

9          a factual discussion and him preparing his

10         affidavit, et cetera, then go ahead and

11         answer that.  But if you were having a

12         discussion as to our legal strategy in this

13         lawsuit, or anything having to do with

14         that, then do not answer that.

15              And if you need to talk to either

16         your counsel or me about that, then we need

17         to have that discussion now.

18         A.    Okay.  Yeah, I don't -- I don't

19    really know how to make that distinction, so

20    maybe I need to talk to counsel before I

21    answer, or if I can answer.

22         Q.    Let me just ask you this question:

23    Did -- did you have any conversation with

24    Mr. Sauter about any payment of principal and

25    interest prior to the time that you left

1          WATERHOUSE - 10-19-21

2    Highland's employment, or did it happen after

3    you left Highland's employment?

4          A.    I don't -- I don't recall if -- I

5    don't recall.  I mean, it was sometime in 2021.

6    I don't remember if it was before or after I

7    was let go from Highland.

8          Q.    Okay.  So -- so nobody told you

9    prior to 2021 that any error or mistake was

10   made in the application of payments against

11   principal and interest due on the NexPoint

12   note.  Do I have that right?

13         A.    Yeah, I don't -- I don't recall this

14   being in 2020.

15         Q.    Okay.  And it didn't happen in 2019;

16   correct?

17         A.    I don't recall that happened.

18         Q.    And it didn't happen in 2018;

19   correct?

20         A.    I don't -- I don't recall that

21   happening.

22         Q.    And it didn't happen in 2017;

23   correct?

24         A.    I don't recall.

25         Q.    But -- but you believe the

1        WATERHOUSE - 10-19-21

2    conversation took place in 2021.  You just

3    don't remember if it was before or after you

4    left Highland's employment.  Do I have that

5    right?

6        A.    It was sometime this year.  I

7    don't -- I don't remember.

8        Q.    Okay.  Did you report this

9    conversation to Mr. Seery at any point?

10       A.    I don't believe so.

11       Q.    Did you report this conversation to

12   anybody at DSI at any time?

13       A.    I don't recall.

14       Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16       A.    Yeah, that's right.  I don't recall

17   doing that.

18       Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21       A.    No, I don't -- I don't recall.

22       Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25       A.    I don't recall.

1                    WATERHOUSE - 10-19-21

2        Q.    Did you tell any of the employees at

3   Highland before you left Highland's employment

4   about this call that you had with Mr. Sauter?

5              MS. DANDENEAU:  Objection to form.

6        A.    No, I don't -- no, I don't recall.

7        Q.    NexPoint -- to the best of your

8   knowledge, did NexPoint ever file a proof of

9   claim against Highland to try to recover moneys

10  that were mistakenly paid against the principal

11  and interest due under the note?

12       A.    Okay.  Hold on.  You are saying did

13  NexPoint Advisors file a proof of claim to

14  Highland for errors related to payments under

15  the NexPoint note to Highland?

16       Q.    Correct.

17       A.    I'm -- I'm -- I'm not -- I'm not

18  aware.

19       Q.    Are you aware --

20       A.    I'm not the legal person here, I

21  don't know.

22       Q.    I'm just asking for your knowledge,

23  sir.

24       A.    Yeah, I don't know.  I'm not aware.

25       Q.    Are you aware of any claim of any

```
 1              WATERHOUSE - 10-19-21

 2   kind that NexPoint has ever made to try to

 3   recover the amounts that it contends were -- or

 4   that Mr. Sauter contend were mistakenly applied

 5   against principal and interest due under the

 6   NexPoint note?

 7        A.    I'm not aware.

 8              MS. DANDENEAU:   Objection to form.

 9        Q.    Okay.   The advisors' agreements with

10   the retail funds are subject to annual renewal;

11   correct?

12        A.    Yes.

13        Q.    And do you participate in the

14   renewal process each year?

15        A.    Yes.

16        Q.    What role do you play in the renewal

17   process?

18        A.    I'm -- I'm asked by the retail board

19   to walk-through the advisors financials.

20        Q.    And do you do that in the context of

21   a board meeting?

22        A.    Yes, it is -- yes, it is typically

23   done in a board meeting.

24        Q.    And do you recall the time --

25   does -- does the renewal process happen around
```

```
 1                 WATERHOUSE - 10-19-21

 2   the same time each year?

 3        A.    Yes, it is -- it is around the same

 4   time every year.

 5        Q.    And what -- what time period of the

 6   year does the renewal process occur?

 7        A.    Approximately the September

 8   timeframe.

 9        Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --
```

1                    WATERHOUSE - 10-19-21

2        Q.    No, I apologize.

3              Do you have an understanding of

4    what -- of what 15(c) refers to in the context

5    of the annual renewal process?

6        A.    Yes, generally.

7        Q.    All right.  What is your general

8    understanding of the term "15(c)" in the

9    context of the annual renewal process?

10       A.    I -- I think 15(c) is the section

11   that -- that -- you know, that -- that the

12   board has to evaluate every year, the retail

13   board.  They have to, you know, go through,

14   evaluate, and go through that approval process

15   on a yearly basis.

16       Q.    Okay.

17             MR. MORRIS:  Can we put up on the

18        screen Exhibit 36, please.

19             (Exhibit 36 marked.)

20             MR. MORRIS:  I guess let's just

21        start at the bottom so Mr. Waterhouse can

22        see what is here.

23       Q.    You see this begins with an email

24   from Blank Rome to a number of people.

25             MR. MORRIS:  And if we can scroll

```
1              WATERHOUSE - 10-19-21
2       up -- keep going just a little bit.
3       Q.    You will see that there is an email
4   from Lauren Thedford to Thomas Surgent and
5   others where she reports that she was attaching
6   and reproducing below additional 15(c)
7   follow-up questions from the board.
8             Do you see that?
9       A.    Yes.
10      Q.    And do you see Question No. 2 asks
11  whether there are any material outstanding
12  amounts currently payable or due in the future
13  (e.g., notes) to HCMLP by HCMFA or NexPoint
14  Advisors or any other affiliate that provides
15  services to the funds?
16            Do you see that?
17      A.    Yes.
18      Q.    And -- and did you -- do you recall
19  that in -- in October of 2020 the retail boards
20  were asking for that information?
21      A.    I don't recall it, but there --
22  they're obviously asking in this email.
23      Q.    Okay.
24            MR. MORRIS:  Can we scroll up a
25       little bit, please.
```

```
 1                WATERHOUSE - 10-19-21

 2        Q.    And then do you see that

 3   Ms. Thedford includes you on the email string

 4   on Tuesday, October 6th, at 5:52?

 5        A.    Yes.

 6        Q.    And she asks you and Dave Klos and

 7   Kristin Hendrix for advice on that particular

 8   Request No. 2 that I have just read; right?

 9        A.    Yes.

10        Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12        A.    She was an attorney that was in the

13   legal group.

14        Q.    At Highland Capital Management,

15   L.P.?

16        A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19        Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22        A.    Yes.

23        Q.    And -- okay.

24              Do you know whether Ms. Thedford

25   held any positions in relation to the retail
```

1                    WATERHOUSE - 10-19-21

2    funds as we defined that term?

3        A.    Yes.

4        Q.    What is your understanding of the

5    positions that Ms. Thedford held at the retail

6    funds?

7        A.    I -- I recall her being an officer.

8    I don't recall her title.

9        Q.    Okay.  Is she still an officer at

10   any of the retail funds today?

11       A.    No.

12       Q.    Do you know when she ceased to be an

13   officer of the retail funds?

14       A.    Approximately.

15       Q.    And when did she approximately cease

16   to be an officer of the retail funds?

17       A.    It was in -- it was in early of

18   2021.

19       Q.    Okay.  Do you know when she became

20   an officer of the retail funds?

21       A.    I don't recall.

22       Q.    To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25       A.    I believe so.

```
1                   WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know what title she

3   held in her capacity as an officer, if any?

4        A.    I told you I don't remember.

5        Q.    Okay.  So she sends this email to

6   you at 5:52 p.m. on October 6th.

7              And if we can scroll up to the

8   response, you responded a minute later with a

9   one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13  response to the retail board's Question No. 2,

14  right, whether there are any material

15  outstanding amounts currently payable or due in

16  the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19       see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21  few minutes later and she asks whether you

22  could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you
```

1              WATERHOUSE - 10-19-21

2    refer her to the balance sheet that was

3    provided to the board as part of the 15(c)

4    materials.

5              Do you see that?

6         A.    Yes.

7         Q.    And -- and did the advisors provide

8    to the board certain balance sheets in 2020 in

9    connection with the 15(c) review?

10        A.    Yes, they did.

11        Q.    Okay.  And were the amounts that

12   were outstanding or that were to be due in the

13   future by the advisors to Highland included in

14   the liability section of the balance sheet that

15   was given to the retail board?

16        A.    Yes.  Notes would be reflected as

17   liabilities.

18        Q.    Okay.  And --

19        A.    If I'm understanding your question

20   correctly.

21        Q.    You are.  And -- and -- and those

22   liabilities you -- you were -- you believed

23   were responsive to the retail board's question;

24   correct?

25        A.    Yes.

1              WATERHOUSE - 10-19-21

2       Q.    Okay.  And then if we can scroll up,

3    you see Ms. Thedford responds to you

4    nine minutes later with a draft response.

5              Do you see that?

6       A.    Yes.

7       Q.    And she says that she is taking from

8    the 6/30 financials certain information about

9    amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11             Do you see that?

12      A.    I do.

13      Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19      A.    I just want to make sure I

20   understand the question.

21             Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their

1          WATERHOUSE - 10-19-21

2    questions?

3          Q.    Yes.

4          A.    Yes.

5          Q.    Thank you.

6                MS. DEITSCH-PEREZ:  John, it is not

7          in the chat yet.  Can you just make sure it

8          gets put in there.

9                MR. MORRIS:  Sure.

10               MS. CANTY:  I put it in there.  I

11         think maybe I just sent it directly, so let

12         me make sure it says to everyone.  But I

13         did put it in there.  I will try again.

14               MR. MORRIS:  Thank you, La Asia.

15               MS. DANDENEAU:  What number is it.

16               MR. MORRIS:  What, the Bates number?

17               MS. DEITSCH-PEREZ:  No, the --

18         this -- yeah, 36 is not in the chat.

19               MR. MORRIS:  Okay.  We'll get it.

20               MS. DANDENEAU:  I think that

21         Ms. Canty just sent it to me originally.

22         Sorry.

23               MR. MORRIS:  Okay.  We will get it

24         there.

25               MS. CANTY:  Okay.  It is there now

1              WATERHOUSE - 10-19-21

2        for everyone.

3              MS. DEITSCH-PEREZ:  Got it.  Thank

4        you.

5        Q.    Do you recall if the proposed

6   response that Ms. Thedford crafted was

7   delivered to the retail board with the -- with

8   the yellow dates having been completed?

9        A.    I don't know.

10             MR. MORRIS:  Davor, I'm going to ask

11        that the advisors and -- the advisors of

12        both HCMFA and NexPoint produce to me any

13        report that was given to the retail board

14        concerning the promissory notes at issue,

15        including the obligations under the notes.

16        Q.    Do you know -- do you know if

17   ultimately NexPoint informed the retail board

18   in response to its question that NexPoint owed

19   Highland approximately 23 or $24 million?

20             MS. DANDENEAU:  Objection to the

21        form.

22        A.    Sorry, are you asking, did NexPoint

23   tell the retail board that it owed Highland?

24        Q.    Let me ask a better question,

25   Mr. Waterhouse.

1          WATERHOUSE - 10-19-21

2          Did -- do you know if anybody ever

3    answered the retail board's question that was

4    Number 2?

5          A.    I don't -- I can't say for sure.

6          Q.    Okay.  Do you recall -- I think you

7    testified earlier that you walked through the

8    advisors' financials with the retail board;

9    correct?

10         A.    Yes.

11         Q.    And as part of that process, did you

12   disclose to the retail board the obligations

13   that NexPoint and HCMFA had to Highland under

14   promissory notes?

15         A.    The retail board, as I stated

16   earlier, receives financial information,

17   balance sheet, income statement information

18   from the advisors.  That information is

19   provided to the retail board in connection with

20   the 15(c) process.

21              So any notes between the advisors

22   and the Highland would be -- anything would be

23   detailed in those financial statements.

24         Q.    Do you recall in 2020 ever speaking

25   with the retail board about the advisors'

1          WATERHOUSE - 10-19-21

2   obligations under the notes to Highland?

3               MS. DANDENEAU:  Objection to form.

4               MS. DEITSCH-PEREZ:  Object to the

5       form.

6       A.   I don't recall specifically.

7       Q.   Do you have any general recollection

8   of discussing with the retail board the

9   advisors' obligations to Highland under the

10  notes that they issued?

11              MS. DANDENEAU:  Object to the form.

12              MS. DEITSCH-PEREZ:  Object to the

13      form.

14      A.   I just recall generally just -- it

15  is just -- I present the financial statements,

16  and if they have questions, I answer their

17  questions and walk them through.

18              I don't recall what they asked.  I

19  don't recall where the discussion went.  I

20  don't recall anything of that nature.

21      Q.   Okay.  Do you know if anybody on

22  behalf of HCMF -- HCMFA ever told the retail

23  board that HCMFA had no obligations under the

24  two 2019 notes that you signed?  Withdrawn.

25              Do you know whether anybody on

1                WATERHOUSE - 10-19-21

2  behalf of HCMFA ever told the retail boards

3  that you weren't authorized to sign either of

4  the two 2019 notes?

5          MS. DANDENEAU:  Objection to form.

6     A.   I'm not aware.

7     Q.   Are you aware of anybody on behalf

8  of HCMFA ever telling the retail boards that

9  your execution of the two 2019 notes was a

10  mistake?

11         MS. DANDENEAU:  Objection to form.

12    A.   I'm not aware.

13    Q.   Are you aware of anybody on behalf

14  of HCMFA ever telling the retail boards that

15  HCMFA did not have to pay the amounts reflected

16  in the two notes that you signed in 2019?

17    A.   I'm not aware.

18    Q.   Do you know whether anybody ever

19  told the retail boards -- withdrawn.

20         Do you know whether anybody ever

21  told the retail boards that Highland has

22  commenced a lawsuit to recover on the two notes

23  that you signed in 2019?

24    A.   I'm not aware.

25    Q.   Are you aware of anybody informing

1                    WATERHOUSE - 10-19-21

2    the retail boards that Highland has sued to

3    recover on the NexPoint note?

4         A.    I'm not aware.

5         Q.    Do you know whether anybody ever

6    told the retail board that Highland had

7    declared a default with respect to the two

8    HCMFA notes that you signed in 2019?

9         A.    I'm not aware.

10        Q.    Are you aware of anybody ever

11   informing the retail boards that Highland had

12   declared a default under the NexPoint note?

13        A.    I'm not aware.

14        Q.    Are you aware of anybody telling the

15   retail board that Highland made a demand for

16   payment under the 2019 notes that you signed on

17   behalf of HCMFA?

18        A.    I'm not aware.

19        Q.    Let's -- let's see if there is a

20   response to Ms. Thedford's email, if we can

21   scroll up.

22              Do you see you responded to

23   Ms. Thedford five minutes after she provided

24   the draft response to you?

25        A.    Yes.

1                    WATERHOUSE - 10-19-21

2      Q.    Okay.  And do you see that Dustin

3   Norris is copied on this email?

4      A.    Yes, he is.

5      Q.    Great.  Do you know whether

6   Mr. Norris held any positions at either of the

7   advisors as of October 6, 2020?

8      A.    I will go back to -- I'm not the

9   legal expert of what appoints you or how or

10  why, but you did see Dustin's name on the

11  incumbency certificate that you produced

12  earlier.

13     Q.    Do you know what his title was in

14  October of 2020?

15           MS. DANDENEAU:  Objection to form.

16     A.    I don't -- I don't recall.

17     Q.    Was he -- did he have a title with

18  each of the advisors, to the best of your

19  recollection?

20     A.    I don't recall.

21     Q.    Do you know why he is included on

22  this email string?

23     A.    I didn't add Dustin.  It looks like

24  Lauren did.  I don't know why she added him or

25  not.  You would have to ask her.

1            WATERHOUSE - 10-19-21

2      Q.    Does Mr. Norris play a role in

3  formulating the advisors' responses to the

4  questions asked by the retail board in

5  connection with the 15(c) annual review?

6            MS. DANDENEAU:  Objection to form.

7      A.    He -- Dustin Norris is there in the

8  board meetings.  But -- so he has a role, yes.

9      Q.    Okay.  And does Mr. Norris hold any

10 positions, to the best of your knowledge, in

11 relation to any of the retail funds?

12     A.    I don't -- I don't believe he does.

13     Q.    How about Mr. Post, do you know

14 whether Mr. Post holds any position in either

15 of the advisors?

16     A.    I mean, he -- he -- yes.

17     Q.    What is your understanding of the

18 positions that Mr. Post holds in relation to

19 the advisors?

20            MS. DANDENEAU:  Objection to form.

21     A.    He is an employee of NexPoint

22 Advisors.  He is also the chief compliance

23 officer for -- for NexPoint.

24     Q.    Who is the chief compliance officer

25 for HCMFA, if you know?

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to form.

3     A.    That would be Jason as well.

4     Q.    Okay.  Now, looking at your

5     response, you noted initially that nothing was

6     owed under shared services.  Do I have that

7     right in substance?

8     A.    Yeah.  I think I'm being responsive

9     to Lauren's question here, whether any of the

10    shared service invoices are outstanding.

11    Q.    Right.

12    A.    Yes.

13    Q.    And that is because -- and that is

14    because the retail the retail board has asked

15    for the disclosure of all material obligations

16    that were owed to HCMLP either then or in the

17    future; isn't that right?

18          MS. DANDENEAU:  Objection to form.

19    Q.    We can go back down and look.

20    A.    Look, I don't know if that's a

21    material item, I mean, again, but sure.

22    Q.    Okay.  But there were no shared

23    services outstanding; correct?

24          MS. DANDENEAU:  Objection to form.

25    A.    That is what this email seems to

1                    WATERHOUSE - 10-19-21

2     indicate.

3          Q.    And you wouldn't have written it if

4     you didn't believe it to be true at the time;

5     correct?

6          A.    Correct.

7          Q.    And when you referred to shared

8     services outstanding, what you meant there was

9     that neither NexPoint nor HCMFA owed Highland

10    any money under the shared services agreements

11    that they had with Highland as of October 6th,

12    2020; right?

13         A.    I don't know if it is as of October

14    6, 2020 or if it was from -- like through the

15    financials -- through the date of the

16    financials as of June 30.

17         Q.    Okay.  And then you noted that

18    HCMA -- the HCMFA note is a demand note; right?

19         A.    Yes.

20         Q.    And then you referred Ms. Thedford

21    to Kristin Hendrix for the term of the NexPoint

22    note.  Do I have that right?

23         A.    Yes.

24         Q.    And then you refer to that agreement

25    that is referenced in the 2018 audited

Here:

---

```
 1              WATERHOUSE - 10-19-21
 2   financials about Highland's agreement not to
 3   make demand upon HCMFA until May 2021; correct?
 4        A.    Correct.
 5        Q.    And then -- and then the next thing
 6   you write is that the attorneys think that BK
 7   doesn't change that, but don't know for sure at
 8   the end of the day.
 9              Do you see that sentence?
10        A.    Yes.
11        Q.    Which attorneys were you referring
12   to?
13        A.    I don't remember.
14        Q.    Did you have a conversation with
15   attorneys concerning whether the bankruptcy
16   would change or alter in any way the agreement
17   not to make a demand under the HCMFA note?
18        A.    Look, yeah, I mean, I don't
19   specifically remember, but generally, I mean,
20   it is in this email.  I don't -- I don't -- I
21   don't -- I don't remember who I talked to or,
22   you know, was it inside counsel, outside
23   counsel, but obviously I talked to somebody.
24        Q.    Do you have any recollection --
25        A.    Well, I don't even know if it's --
```

1          WATERHOUSE - 10-19-21

2     actually, it may not even have been me.  I say

3     the attorneys in, you know, a lot of -- like I

4     talked about the team.

5          It could have been someone on the

6     team, like, hey, we need to run this down, and

7     maybe they talked to attorneys again and

8     relayed that information to me.

9          So I really don't know if I spoke or

10    someone else did or -- or, I mean, and maybe it

11    wasn't even from corporate accounting.  Maybe

12    it was, you know, other -- I'm kind of

13    summarizing, you know, again, so I don't really

14    know -- I can't really say for sure.  I don't

15    remember how I came about of this knowledge.

16         Q.    I appreciate your efforts,

17    Mr. Waterhouse, but I will just tell you that

18    if I ask a question and you don't know the

19    answer or you don't recall, I'm happy to accept

20    that.  I don't -- I don't want you to

21    speculate, so I want to be clear about that.

22    So I appreciate it.

23         Let me just ask you simply:  Do you

24    know what attorneys -- can you identify any of

25    the attorneys who thought that the bankruptcy

1           WATERHOUSE - 10-19-21

2    process didn't change the agreement?

3        A.    I don't recall.

4        Q.    Okay.  Perfect.

5              And then let's look at the last

6    sentence.  It says, quote:  The response should

7    include, as I covered in the board meeting,

8    that both entities have the full faith and

9    backing from Jim Dondero, and to my knowledge

10   that hasn't changed.

11             Do you see that?

12       A.    Yes.

13       Q.    Okay.  Prior to October 6th, 2020,

14   had you told the retail board that HCMFA and

15   NexPoint have the full faith and backing from

16   Jim Dondero?

17       A.    Yes.

18       Q.    Do you remember in the context in

19   which you told the retail board that?

20       A.    I mean, generally, yes.

21       Q.    Tell me what you recall.

22       A.    So we were walking through the

23   financials from the advisors; right?  So as I

24   described to you, you have got HCMFA and NPA.

25   And these -- the financials, you know, show

1          WATERHOUSE - 10-19-21

2     they have liabilities on them that exceed

3     assets.

4               So the retail board has asked, okay,

5     you know, how -- you know, if -- if these

6     liabilities come due or they're payable, you

7     know, how does that come about?

8               And, you know, the response is,

9     well, the advisors have the -- the full faith

10    and backing from -- from Jim Dondero.

11         Q.    And how did you know that the

12    advisors had the full faith and backing from

13    Jim Dondero?  What was the basis for that

14    statement that you made to the retail board?

15         A.    I talked to Jim about it at some

16    point in the past.

17         Q.    And did you tell Mr. Dondero that

18    you were going to inform the retail board that

19    the advisors had his full faith and backing

20    before you actually told that to the retail

21    board?

22         A.    I don't recall having that

23    conversation.

24         Q.    Do you recall if you ever informed

25    Mr. Dondero that you had disclosed or told the

1                WATERHOUSE - 10-19-21

2      retail board that the advisors had the full

3      faith and backing of Mr. -- Mr. Dondero?

4                MS. DEITSCH-PEREZ:  Object to the

5           form.

6      A.     I don't recall discussing that with

7      him at the time.

8      Q.     When you told this to the board, was

9      Mr. Dondero participating in the discussion?

10     A.     Not that I recall.

11     Q.     Withdrawn.  Was it not -- withdrawn.

12               Do you recall whether -- when you

13     covered this issue with the board, was that in

14     a -- a Zoom call or a Webex call?  Was it a

15     telephone call?  Was it in-person?  Like where

16     were you physically in relation to the board?

17     A.     I believe I was at home.

18     Q.     Okay.  Can you identify every person

19     that you recall who was present for this

20     disclosure other than -- other than the board

21     members themselves?

22               MS. DEITSCH-PEREZ:  Object to the

23          form.

24     A.     I don't recall everyone on the call.

25     Q.     Can you identify anybody who was on

1                    WATERHOUSE - 10-19-21

2   the call?

3        A.    Other than the board members?

4        Q.    Yes.

5        A.    Lauren Thedford.  I mean, there

6   are -- there are many -- my section is just one

7   of many sections that are just -- you know, as

8   you can appreciate, this is a long board

9   meeting.

10            I can't recall specifically, really

11  even generally, or who was on when this was

12  discussed.  But Lauren was typically on for the

13  entire time.

14       Q.    I apologize if I asked you this, but

15  do either of Mr. Norris or Mr. Post hold any

16  positions relative to the retail funds?

17       A.    I think you asked me this already,

18  John.

19       Q.    Okay.  I just don't recall.  Can you

20  just refresh my recollection if I did, in fact,

21  ask you the question?

22       A.    I don't believe -- if we can go

23  back.  I don't believe Mr. Norris has a title

24  at the retail funds.  Mr. -- and Mr. Post is

25  the CCO of the advisor, the advisors.

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  Do you know if either of them

3  have a position with the retail board -- with

4  the retail funds?

5     A.    I don't believe Mr. Norris has a

6  position with the retail funds.

7     Q.    All right.  What about Mr. Post?

8     A.    Mr. Post is the CCO of the advisors.

9     Q.    Okay.  Does he hold any position --

10    A.    I don't believe so.

11    Q.    -- with the retail funds?

12    A.    I don't believe.

13    Q.    Okay.

14    A.    I don't know if being the CCO for

15  the advisor conveys something for the retail

16  funds.  Again, I am not -- that is the legal

17  compliance part of it.  I don't know.

18    Q.    Why did you tell the retail board

19  that the advisors have the full faith and

20  backing from Mr. Dondero?

21          MS. DANDENEAU:  Objection to form.

22    A.    It is -- it is -- it is what has

23  been discussed with them prior.

24    Q.    And were you -- were you trying to

25  give them comfort that even though the

1    WATERHOUSE - 10-19-21

2    liabilities exceeded the assets that the

3    advisors would still be able to meet their

4    obligations as they become due?

5           MS. DANDENEAU:  Objection to form.

6           MS. DEITSCH-PEREZ:  Object form.

7    A.    I -- I can't -- I don't remember

8    specifically the conversation, but generally --

9    you know, generally, yes.  And that is why --

10   but, you know, again, in this email saying, you

11   know, I am sure I qualified it with the retail

12   board, you know, as I said I like -- you know,

13   to my knowledge, that hasn't changed.  But,

14   again, generally -- generally that is what I

15   remember.

16   Q.    Okay.  Do you recall if in the

17   advisors' response to the retail board's

18   question if the response included any statement

19   concerning Mr. Dondero and -- and the full

20   faith and backing that he was giving to the

21   advisors?

22          MS. DEITSCH-PEREZ:  Object to the

23     form.

24   A.    I don't -- I don't remember

25   specifically what was provided.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.

 3        A.    And I don't really -- I don't really

 4   remember generally either.

 5        Q.    Okay.

 6              MR. MORRIS:  So -- so, again, I'm

 7        just going to ask Mr. Rukavina if your

 8        clients can produce as soon as possible the

 9        15(c) response, the written response that

10        the advisors made, if any, to the board's

11        Question No. 2.

12              I'm not looking for the whole

13        response, but I certainly want the response

14        to Question No. 2.

15        Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17              Did -- did the assets of --

18   withdrawn.

19              Did the liabilities of HCMFA exceed

20   its assets in 2020?

21              MS. DANDENEAU:  Objection to form.

22              MS. DEITSCH-PEREZ:  Objection, form.

23        A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.
```

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And did the liabilities of

3    NexPoint exceed its assets in 2020?

4              MS. DEITSCH-PEREZ:  Objection to

5         form.

6        A.    I don't believe so.

7        Q.    Okay.  So -- so it was only one of

8    the two advisors who had liabilities that

9    exceeded the value of the assets.

10             Do I have that right?

11             MS. DEITSCH-PEREZ:  Objection to

12        form.

13             MS. DANDENEAU:  Form.

14       A.    Yes.

15       Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18             MS. DANDENEAU:  Objection to form.

19       A.    I don't -- I don't recall.

20             MR. MORRIS:  I had specifically

21        requested in discovery the audited

22        financial reports for both advisors and

23        NexPoint.  I think I may have gotten one

24        for NexPoint but I'm still waiting for the

25        balance.  And I'm going to renew my request

1                    WATERHOUSE - 10-19-21

2          for those documents too.

3          Q.    Let's go to the next exhibit, which

4    is Number 10.  So I think it is in your stack,

5    Mr. Waterhouse.

6                    MR. MORRIS:  And we can take the one

7          down from the screen and put up Number 10

8          for everybody.

9                    (Exhibit 10 marked.)

10         Q.    And I don't know if you have ever

11   seen this before, but I'm really putting it up

12   on the screen for purposes of turning to the

13   very last page of the document.

14                   So this is a document that we have

15   been -- that we premarked as Exhibit 10.  And

16   we're turning to the last page of the document,

17   which is a document that was filed in the

18   adversary proceeding 21-3004.  And -- no, I

19   apologize, I think we -- right there.  Perfect.

20                   And it is page 31 of 31.

21                   MR. MORRIS:  I think there may have

22         been some something erroneously stapled to

23         the hard copy that I gave you folks, but

24         I'm looking for page 31 of 31 in the

25         document that begins with the first page of

```
 1              WATERHOUSE - 10-19-21

 2       Exhibit 10.

 3       Q.    Do you have that, Mr. Waterhouse?

 4       A.    I don't have it yet.  I'm looking.

 5       Q.    All right.  If you look at the top

 6  right-hand corner, you will see it says page

 7  hopefully something of 31?

 8       A.    Yes, I've got it now.

 9       Q.    Okay.  You have got 31 of 31.  You

10  can take a moment to read that, if you would

11  like.

12       A.    (Reviewing document.)  Okay.

13       Q.    Have you ever seen this before?

14       A.    I don't know if I have seen this

15  specific document, but, you know, I've --

16  I'm -- I'm aware of it.

17       Q.    And is this the document that you

18  had in mind when you sent that email to

19  Ms. Thedford that we just looked at where you

20  said that Highland had agreed not to make a

21  demand upon HCMFA until May 2021?

22       A.    Honestly, I don't -- it wasn't this

23  document.  I mean, it's something like this,

24  yes.  I mean, yes.

25       Q.    Well --
```

1              WATERHOUSE - 10-19-21

2         A.    It is something like this, but I

3    don't think it was this specific document.

4         Q.    Well, but this document does say in

5    the last sentence that Highland agreed not to

6    seek -- not to demand payment from HCMFA prior

7    to May 31, 2021; right?

8         A.    Yes.

9         Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17             Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?

```
 1                WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5        A.    I do.

 6        Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8        A.    Yes.

 9        Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.
```

1          WATERHOUSE - 10-19-21

2     A.    May 31 of 2021, excuse me.

3     Q.    And this document states the

4  deferral that you just described; correct?

5     A.    It does.

6     Q.    And this document states the

7  deferral that was described in the audited

8  financial statements that we looked at before;

9  correct?

10    A.    It does.

11          MR. MORRIS:  Okay.  Can we scroll

12     down just a little bit to see who signed on

13     behalf of the acknowledgment there.

14    Q.    Okay.  So Mr. Dondero signed this

15  document on behalf of both HCMFA and Highland;

16  do you see that?

17    A.    I do.

18    Q.    Okay.  Did you discuss this document

19  or the -- withdrawn.

20          Did you discuss the concept of the

21  deferral with Mr. Dondero in the spring of

22  2019?

23    A.    I think I testified I don't recall.

24    Q.    Okay.  Do you know whose idea it was

25  to issue the acknowledgment in this form?

1           WATERHOUSE - 10-19-21

2     A.    I don't recall.

3           MR. MORRIS:  Can we scroll back up

4     to the document, please.

5     Q.    Do you see in the beginning it says,

6  reference is made to certain outstanding

7  amounts loaned from Highland to HCMFA for

8  funding ongoing operations.

9           Do you see that?

10    A.    Yes.

11    Q.    And were you aware as the CFO of

12 Highland and as the treasurer of HCMFA that as

13 of April 15, 2019, Highland had made certain

14 loans to HCMFA to fund HCMFA's ongoing

15 operations?

16    A.    Yes.

17    Q.    And were you aware that those loans

18 were payable on demand and remained outstanding

19 as of December 31st, 2018?

20    A.    Yes.

21    Q.    And were you aware that those

22 amounts were payable on demand, and they

23 remained outstanding as of April 15, 2019?

24           MS. DEITSCH-PEREZ:  Object to the

25     form.

1          WATERHOUSE - 10-19-21

2      A.    Well, this -- this document dated

3  April 15, 2019 says they have been deferred to

4  May 31, 2021.

5      Q.    Right.  But I'm just sticking to the

6  first paragraph where they refer to the

7  outstanding amounts.  And in the end it says

8  the -- it remained outstanding on December

9  31st, 2018, and I think you told me that you

10  understood that, and then I'm just trying to

11  capture the last piece of it.

12          Did you understand that there were

13  amounts outstanding from the loan that Highland

14  made to HCMFA to fund ongoing operations as of

15  April 15th, 2019?

16      A.    Yes.

17      Q.    Thank you.  Let's look at the next

18  sentence.  HCMFA expects that it may be unable

19  to repay such amounts should they become due

20  for the period commencing today and continuing

21  through May 31st, 2021.

22          Do you see that?

23          MS. DANDENEAU:  Objection to form.

24      A.    I do.

25      Q.    As the CFO -- withdrawn.

1          WATERHOUSE - 10-19-21

2              As the treasurer of HCMFA, did you

3    believe that -- do you believe that statement

4    was true and accurate at the time it was

5    rendered?

6        A.    I mean, it -- it -- the answer to

7    that is I really didn't have any -- I didn't

8    have an opinion really.

9        Q.    Did you do anything to educate

10   yourself in April of 2019 on the issue of

11   whether HCMFA could repay the amounts that it

12   owed to Highland should they become due?

13       A.    I don't believe so.

14       Q.    Did you at any time form any

15   opinions as to HCMFA's ability to repay all

16   amounts due to Highland should they become due?

17       A.    Not really.  I guess I don't...

18       Q.    Well, you told the retail board that

19   HCMFA's liabilities exceeded their assets in

20   2020; correct?

21       A.    Yes.

22       Q.    Based on the work that you did to

23   prepare for the retail board, did you form any

24   view as to whether HCMFA would be unable to

25   repay the amounts that it owed to Highland

1              WATERHOUSE - 10-19-21

2   should they become due?

3              MS. DANDENEAU:  Objection to form.

4        A.    I mean, I -- when you look at that,

5   to answer you, completely, you know, again,

6   if -- the response I gave the retail board was,

7   you know, the -- the advice -- HCMFA advisors

8   have the -- have the full faith and backing of

9   Jim Dondero.  So I didn't form an opinion of

10  whether the advisor could pay it or not.

11       Q.    Did you form any view as to whether

12  the advisors could repay the amounts that it

13  owed to Highland should they become due without

14  the full faith and backing of Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Form.

17       A.    I mean, if you -- if you -- if you

18  take that last statement out, I mean, it would

19  be difficult for HCMFA to pay back demand notes

20  at that time.

21       Q.    And it was precisely for that reason

22  that you told the retail board that -- that the

23  retail -- that the advisors had the full faith

24  and backing of Mr. Dondero; correct?

25             MS. DANDENEAU:  Objection to form.

1                    WATERHOUSE - 10-19-21

2          A.     I mean, yes, as the mouthpiece, I

3    was relaying information.

4          Q.     Okay.  And you relayed that

5    information with the knowledge and approval of

6    Mr. Dondero; correct?

7                 MS. DEITSCH-PEREZ:  Object to the

8          form.

9          A.     As I stated in the email, I don't

10   believe, and I think I testified I don't

11   believe I had conversations with Mr. Dondero at

12   the time of that board meeting.

13         Q.     Did you tell the retail board that

14   the advisors had the full faith and backing of

15   Mr. Dondero without Mr. Dondero's prior

16   approval?

17         A.     Yeah, I -- I -- yes, I'm -- like I

18   said, I think I testified earlier, I'm sure I

19   qualified it as well.

20         Q.     What do you mean by that?

21                MS. DANDENEAU:  Objection to form.

22         A.     Again -- again, like I said in the

23   email, it has the full faith and backing of Jim

24   Dondero unless that has changed.

25         Q.     Actually that is not what you said,

1          WATERHOUSE - 10-19-21

2    so let's put the email back up.

3         A.    It is -- it is -- it is in the

4    email.

5         Q.    Let's put the email back up.  You

6    didn't say unless it has changed.  You said you

7    believe it hasn't changed; right?

8         A.    Okay.  And to my knowledge that

9    hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19             We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24             So I am relaying, as I'm telling you

25   now, what is in the email.  And unless

```
 1              WATERHOUSE - 10-19-21

 2   something has changed -- to my knowledge, it

 3   hasn't changed, but it could have changed.

 4        Q.    When you say that the advisors have

 5   the full faith and backing from Mr. Dondero,

 6   did you intend to convey that, to the extent

 7   the advisors were unable to satisfy their

 8   obligations as they become due, Mr. Dondero

 9   would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12        form.

13              And, John, we have given you a lot

14        of leeway here but this does not seem

15        relevant to this case.  You seem sort of

16        taking a complete sort of diversion into

17        the allegations and the complaint just

18        filed on Friday, and so I would ask you to

19        move on because --

20              MR. MORRIS:  And I will tell you --

21        I will tell you that I have never read that

22        complaint cover-to-cover.  I have nothing

23        to do with the prosecution of those claims.

24        And this issue that we're talking about

25        right now is related solely to the
```

1        WATERHOUSE - 10-19-21

2        promissory notes that your clients refuse

3        to pay.

4               So I'm going to continue to ask my

5        questions, and I would ask the court

6        reporter to read back my last question.

7                       (Record read.)

8               MS. DEITSCH-PEREZ:  And then I

9        believe there were objections to form.

10       Q.    You can answer the question.

11       A.    Yes.

12       Q.    Thank you very much, sir.

13              MR. MORRIS:  Can we go back to the

14       other document, please?

15       Q.    Mr. Waterhouse, do you know if this

16  document was ever shared with the retail board?

17       A.    I don't recall.

18       Q.    Did you ever share it with the

19  retail board?

20       A.    I don't recall.

21       Q.    Did you ever tell the retail board

22  about the substance of this document?

23       A.    I don't recall.

24       Q.    Did you ever tell the retail board

25  that Highland had agreed not to make a demand

1                 WATERHOUSE - 10-19-21

2   against HCMFA until May 2021?

3       A.     I don't recall.

4       Q.     Do you know whether anybody on

5   behalf of the advisors ever informed the retail

6   board that Highland had agreed on April 15,

7   2019, not to make a demand against HCMFA under

8   the promissory notes?

9       A.     I don't recall.

10      Q.     Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13      A.     Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document? Is that what you -- I

16   just want to make sure.

17      Q.     Uh-huh.

18      A.     Yeah, I don't -- I don't recall.

19      Q.     Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24           MS. DANDENEAU: Objection to form.

25      A.     I don't recall.

```
1                    WATERHOUSE - 10-19-21

2         Q.    Did you ever inform PwC that HCMFA's

3    liabilities exceeded its assets?

4              MS. DANDENEAU:  Object to the form.

5         A.    I don't -- I don't think I told

6    them.  I mean, they -- they audited the

7    financial statements.

8         Q.    Did -- do you know if anybody on

9    behalf of Highland ever informed

10   PricewaterhouseCoopers that HCMFA may be unable

11   to repay amounts owing to Highland, should they

12   become due?

13             MS. DANDENEAU:  Objection to form.

14        A.    Yes.  Again, I think I testified

15   earlier that -- that this was communicated to

16   the auditors.

17        Q.    Ideally --

18        A.    I don't know who exactly did that.

19   I don't recall doing it, but, yeah, it was --

20   it was communicated.  And that is why -- I

21   mean, there is a disclosure in the financial

22   statements; right?

23        Q.    There is, and that disclosure

24   relates to the last sentence of this document;

25   correct?
```

1                    WATERHOUSE - 10-19-21

2          A.   Yes.

3          Q.   Do you recall looking in the

4    document and seeing anything that was disclosed

5    with respect to the sentence above that?

6          A.   No.

7          Q.   Do you know whether anybody on

8    behalf of Highland ever informed

9    PricewaterhouseCoopers that HCMFA expects that

10   it may be unable to repay amounts due and owing

11   to Highland should they become due?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  I think that is the third time.

14         A.    I don't recall.  Again, as I said,

15   we -- all of this was given to the auditors.

16         Q.   Do you know if Highland received

17   anything of value in exchange for its agreement

18   not to demand payment on amounts owed by HCMFA

19   prior to May 31st, 2021?

20              MS. DEITSCH-PEREZ:  Object to the

21         form.  That is the second time.

22              MS. DANDENEAU:  Object to the form.

23         A.    I have answered this question.

24              MR. RUKAVINA:  Hold on.  Object to

25         legal conclusion.  Go ahead.

1           WATERHOUSE - 10-19-21

2      A.     I have answered this question

3  before.

4      Q.     And the answer was no?

5      A.     I'm not aware.

6      Q.     Now, this acknowledgment can't

7  possibly apply to the two notes that you signed

8  on behalf of HCMFA because those notes were

9  signed on May 2nd and May 3rd, 2019; is that

10  right?

11           MS. DANDENEAU:  Objection to form.

12     A.     Unless there is a drafting error.

13     Q.     Okay.  Are you aware of a drafting

14  error?

15     A.     I'm not aware.  I didn't -- I wasn't

16  part of -- I didn't sign this note or this

17  acknowledgment.  I didn't draft it.

18     Q.     But you do see it is dated April 15,

19  2019; right?

20     A.     Yes.

21     Q.     And this was a document that was

22  actually included by the advisors in a pleading

23  they filed with the Court; right?

24           MR. RUKAVINA:  Well, I don't know

25       that so I object to form.

1              WATERHOUSE - 10-19-21

2       Q.    Okay.  Let's go to the first page of

3  the document and just confirm that.

4              MR. AIGEN:  Mr. Morris, I just note

5       that you already said there was some error

6       with the document that is listed as

7       exhibit --

8              MR. MORRIS:  No.  No, no, no.

9              MS. DEITSCH-PEREZ:  Oh, okay.

10             MR. MORRIS:  What I said is that

11      there is a few pages that were mistakenly

12      stapled to the end of the document.

13             MS. DEITSCH-PEREZ:  Okay.

14             MR. MORRIS:  There is no problem

15      with this document.

16             MS. DEITSCH-PEREZ:  And just so

17      we're clear that the document -- the pages

18      that start with defendant's amended answer

19      are not intended to be part of this

20      document?

21             MR. MORRIS:  That's correct.

22             MS. DEITSCH-PEREZ:  And that the --

23      but it is your representation that the rest

24      of the document is -- is -- is correct

25      because we don't -- we don't have any way

1                WATERHOUSE - 10-19-21

2          of verifying that, we're just --

3                MR. MORRIS:  You do, actually.  You

4          could just go to Docket No. 21-3004.

5                MS. DEITSCH-PEREZ:  If you want to

6          stop this deposition so we can go and pull

7          that document up, we're happy to do it.  So

8          I am just asking you for your

9          representation.

10               MR. MORRIS:  Sure.  I gave that.

11               MS. DEITSCH-PEREZ:  Okay.

12          Q.    So do you see that this is a

13     document that was actually filed with the Court

14     by Highland Capital Management Fund Advisors?

15          A.    No.  I get with the first page in

16     the section.  Maybe I'm looking at the wrong

17     thing.  It says, Highland Capital Management.

18          Q.    Don't worry about it.  Don't worry

19     about it.

20          A.    Maybe I went back -- okay.

21               MR. MORRIS:  All right.  Can we put

22          up on the screen Exhibit 2.

23               (Exhibit 2 marked.)

24               MR. MORRIS:  I think it is

25          Exhibit 1.

```
 1                    WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  I'm sorry, John, did

 3         you say Exhibit 2 or Exhibit 1?

 4              MR. MORRIS:  It is Exhibit 2 in the

 5         binders so it is premarked Exhibit 2.  And

 6         now I'm asking -- right there -- going to

 7         Exhibit 1 to the document that was marked

 8         as Exhibit 2.

 9              MS. DANDENEAU:  Got it.  In the

10         binder there is no --

11              MS. DEITSCH-PEREZ:  There is no

12         Exhibit 1.

13              MR. MORRIS:  All right.  So look at

14         the one on the screen.

15         Q.   Do you see, Mr. Waterhouse, that

16    this is a promissory note dated May 31st, 2017,

17    in the approximate amount of $30.7 million?

18         A.   Yes.

19         Q.   And do you see that the maker of the

20    note is NexPoint?

21         A.   Yes.

22         Q.   And that Highland is the payee; is

23    that right?

24         A.   Yes.

25         Q.   Okay.  And do you see in Paragraph 2
```

```
 1              WATERHOUSE - 10-19-21
 2    this is an annual installment note?
 3         A.    Can you scroll down.
 4         Q.    Sure.
 5               MR. MORRIS:  Can we scroll down --
 6         yeah, there you go.
 7         A.    Right there, yeah.  Yes.
 8               MR. MORRIS:  And can we scroll down
 9         to the signature line.
10         Q.    And do you recognize that as
11    Mr. Dondero's signature?
12         A.    Yes.
13         Q.    And is this the promissory note that
14    we talked about earlier where NexPoint had made
15    certain payments in the aggregate amount of
16    about 6 to $7 million against principal and
17    interest?
18         A.    I don't recall discussing the
19    aggregate principal amounts of 6 to $7 million,
20    but -- so I don't -- I don't recall that prior
21    discussion with those amounts.
22         Q.    All right.  Let's take a look.
23    NexPoint always included this promissory note
24    as a liability on its audited financial
25    statements; right?
```

```
1                WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And NexPoint had its financial

4   statements audited; isn't that correct?

5        A.    Yes.

6        Q.    And was the process of NexPoint's

7   audit similar to the process you described

8   earlier for Highland and HCMFA?

9        A.    Yes, it is similar.

10       Q.    Okay.

11             MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15             MS. CANTY:  It is going to be

16        Exhibit 46.

17             (Exhibit 46 marked.)

18       Q.    And do you see, sir, that we've put

19   up NexPoint Advisors' consolidated financial

20   statements and supplemental information for the

21   period ending December 31st, 2019?

22       A.    Yes.

23       Q.    Did you participate in the process

24   whereby these audited financial statements were

25   issued?
```

1                    WATERHOUSE - 10-19-21

2          A.    I didn't participate directly, as

3     I've described before, about the -- the team

4     performing the audit.

5          Q.    Do you recall when the audit of

6     NexPoint's financial statements for the period

7     ending December 31st, 2019 was completed?

8          A.    Yes.

9          Q.    And when do you recall it being

10    completed?

11         A.    In January of 2021.

12         Q.    Do you know why the 2019 audit

13    report wasn't completed until January of 2021?

14         A.    Yes.

15         Q.    Why was the NexPoint audit report

16    for the period ending 12/31/19 not completed

17    until January 2021?

18         A.    Because we had to deal with working

19    from home from -- with COVID, and on top of all

20    of our daily responsibilities and job duties

21    at -- at providing -- at Highland providing

22    services to NexPoint, we had to do all of this

23    extra work for a bankruptcy that was filed in

24    October of 2019.

25              MR. MORRIS:  Can we go to the

```
 1              WATERHOUSE - 10-19-21

 2       balance sheet on page 3?  Okay.  Stop right

 3       there.

 4       Q.    Do you see under the liabilities

 5   section, the last item is note payable to

 6   affiliate?

 7       A.    Yes.

 8       Q.    And is that the note that we just

 9   looked at?

10              MS. DANDENEAU:  Objection to form.

11       Q.    Withdrawn.

12              Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15              MS. DANDENEAU:  Objection to form.

16       A.    I believe no.

17       Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21       A.    I don't recall.

22       Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25              MS. DEITSCH-PEREZ:  Object to the
```

1                    WATERHOUSE - 10-19-21

2        form.

3        A.    Approximately.

4        Q.    And does that refresh your

5   recollection that between the time the note was

6   executed and the end of 2019, that NexPoint had

7   paid down approximately $7 million?

8        A.    Yes.  If we are just doing the math,

9   yes.

10       Q.    Okay.  Did NexPoint complete its

11  audit from 2020?

12       A.    Sorry, you kind of broke up.  Do

13  NexPoint complete?

14       Q.    The audit of its financial

15  statements for the period ending December 31st,

16  2020?

17       A.    No.

18       Q.    No, it's not complete?

19       A.    No, it is not complete.

20       Q.    Did HCMFA complete its audit for the

21  year ending December 31st, 2020?

22       A.    No.

23            MR. MORRIS:  Can we go to page 15,

24       please, the paragraph at the bottom.

25       Q.    Do you see that NexPoint has

1          WATERHOUSE - 10-19-21

2    included under notes payable to Highland a

3    reference to the amounts that were outstanding

4    as of the year-end 2019 under the note that we

5    looked at just a moment ago?

6         A.    Yes.  Are you talking about the

7    second paragraph?

8         Q.    I'm actually talking about first

9    paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13            MS. DANDENEAU:  Objection to form.

14         John, do you mean the first paragraph of

15         that page?

16            MR. MORRIS:  No, the first paragraph

17         under notes payable to Highland.

18         A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in

1              WATERHOUSE - 10-19-21

2    perfectly together.

3         Q.   Okay.  But you're not aware of any

4    note that was outstanding at the end of 2019

5    from NexPoint to Highland other than whatever

6    principal was still due and owing under the

7    $30 million note issued in 2017; correct?

8         A.   Well, it -- I don't -- there is

9    reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12        Q.   Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20             Do you see that?

21        A.   Oh, I do, yes.

22        Q.   So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original

1          WATERHOUSE - 10-19-21

2     $30 million 2017 note that we looked at a

3     moment ago?

4          A.    Well, we're at the bottom of the

5     page.  Is there anything on page 16?

6          Q.    That is a fair question, sure.  That

7     is it.

8          A.    Okay.  So it appears that that is

9     the only note that is detailed in the notes in

10    the financial statement.

11         Q.    And you don't have any memory of any

12    other note other than the 2017 note, right,

13    being outstanding as of the end of the year?

14         A.    I deal with thousands of

15    transactions every year.  I don't really have a

16    very specific memory for what exactly was

17    outstanding.

18              MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22              VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25              VIDEOGRAPHER:  We are going back on

```
1                 WATERHOUSE - 10-19-21

2          the record at 3:39 p.m.

3          Q.    All right.  Mr. Waterhouse, we -- I

4     don't think we have a lot more here.

5                 To the best of your knowledge and

6     recollection, were all affiliate loans and all

7     loans made to Mr. Dondero recorded on

8     Highland's books and records as assets of

9     Highland?

10                MS. DANDENEAU:  Object to the form,

11          asked and answered.

12         A.    To my knowledge, yes.

13         Q.    Okay.  Can you recall any loan to

14    any affiliate or Mr. Dondero that was not

15    recorded on Highland's books and records as an

16    asset?

17         A.    Like during my time as CFO?  I don't

18    recall.

19         Q.    How about after the time that you

20    were CFO?  Did you recall that there was a loan

21    by Highland to an affiliate or to Mr. Dondero

22    that hadn't been previously recorded on

23    Highland's books as an asset?

24                MS. DANDENEAU:  Objection to form.

25         A.    I guess I don't understand the
```

1         WATERHOUSE - 10-19-21

2    question.  I left Highland as of -- I'm not

3    aware of -- I left Highland in February --

4    probably the last day of February of 2021.

5         Q.    Okay.

6         A.    I'm not -- I'm not aware of any --

7    I'm not aware of anything past that date.

8         Q.    Okay.  While you were the CFO at

9    Highland, did Highland prepare in the ordinary

10   course of business a document that reported

11   operating results on a monthly basis?

12        A.    Yes.

13        Q.    And are you generally familiar with

14   the monthly operating reports?

15        A.    Yeah.  You are referring to the

16   reports that we filed to the Court every month?

17        Q.    I apologize, I'm not.  I'm taking

18   you back to the pre-petition period.  There was

19   a report that I have seen that I'm going to

20   show you, but I'm just asking for your

21   knowledge.

22              MR. MORRIS:  Let's put it up on the

23         screen, Exhibit 39.

24              (Exhibit 39 marked.)

25        Q.    Do you see this is a document that

1                  WATERHOUSE - 10-19-21

2    is called operating results?

3         A.    Yeah, that's the title of it.

4         Q.    Okay.  And was a report of operating

5    results prepared by Highland on a monthly basis

6    during the time that you served as CFO?

7         A.    No.

8         Q.    Are you familiar with a document of

9    this type?  And we can certainly look at the

10   next page or two to refresh your recollection.

11        A.    I'm just looking at the title.  I

12   don't really -- again, as I discussed before, I

13   don't have any records or documents or emails

14   or appointments or anything that I was able to

15   use prior to -- prior to this deposition, so

16   I'm doing the best I can.

17        Q.    Okay.  You don't need to apologize.

18   I'm just asking you if you are familiar with

19   the document called Operating Results that was

20   prepared on a monthly basis at Highland?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        Q.    If you're not, you're not.

24        A.    I don't believe this was prepared on

25   a monthly basis.

```
1              WATERHOUSE - 10-19-21
2      Q.    Okay.  Do you see that this one
3  is -- is dated February 2018?
4      A.    Yes.
5      Q.    Do you have -- do you believe --
6  have you ever seen a document that was
7  purporting to report operating results for
8  Highland?
9            MS. DANDENEAU:  Objection to form.
10     A.    Yes.
11     Q.    Okay.  And when you say that you
12 don't believe it was produced on a monthly
13 basis, was it produced on any periodic bases to
14 the best of your recollection?
15     A.    I believe it was -- it was prepared
16 on an annual basis.
17     Q.    Okay.
18            MR. MORRIS:  Can we look at the next
19     page.
20     Q.    Do you see that there is a statement
21 here called:  Significant items impacting
22 HCMLP's balance sheet?
23            And it is dated February 2018.
24     A.    Yes.
25     Q.    Do you recall that there was a
```

1          WATERHOUSE - 10-19-21

2    report that Highland prepared that identified

3    significant items impacting the balance sheet?

4          A.     A report that was prepared.

5          Q.     Let me ask a better question:  Did

6    Highland prepare reports to the best of your

7    recollection that identified significant items

8    that impacted its balance sheet?

9          A.     Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17         Q.     Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21              Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24              MS. DANDENEAU:  Objection to form.

25         A.     Yes.

1              WATERHOUSE - 10-19-21

2        Q.    And did the monthly close package

3    that Highland prepared include information

4    concerning significant items that impacted

5    Highland's balance sheet?

6        A.    Yes, it had a page like that is --

7    that is on the screen that detailed items

8    like -- of that nature.

9        Q.    And do you know who -- was there

10   anybody at Highland who was responsible for

11   overseeing the preparation of the monthly

12   reporting package?

13       A.    That would have been -- again, it

14   varies over time during my tenure as CFO.

15   It -- it varied over -- over time, but -- but

16   typically a -- a corporate accounting manager.

17       Q.    And who were the corporate

18   accounting managers during your tenure as CFO?

19       A.    It would have been Dave Klos and

20   Kristin Hendrix.

21       Q.    And did the corporate accounting

22   manager deliver to you drafts of the monthly

23   close package before it was finalized?

24       A.    Sometimes.

25       Q.    Was that the practice even if there

```
1                    WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.    The practice meaning that they

4    sometimes lured them to me?

5         Q.    That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8              MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17             Do I have that right?

18             MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.
```

1                WATERHOUSE - 10-19-21

2      A.    And, quite frankly, I don't even

3  know if these were -- these were sent to me

4  even in any capacity.

5      Q.    What was the purpose of preparing

6  the monthly reporting package -- withdrawn.

7            What was the purpose of preparing

8  the monthly close package?

9            MS. DEITSCH-PEREZ:  Object to the

10      form.

11     A.    The -- the original purpose was so

12  that it would just -- it would be a report that

13  was reviewed monthly with senior management.

14     Q.    Who was included in the idea of

15  senior management?

16     A.    You know, I think originally when

17  this was conceived that would have been like

18  Jim Dondero and Mark Okada.

19     Q.    Were monthly reporting -- withdrawn.

20           Were monthly close packages prepared

21  to the best of your knowledge until the time

22  you left Highland?

23     A.    To my knowledge -- I don't know,

24  actually.  I mean, to my knowledge, I believe

25  it was being -- that was still being done.  I

1          WATERHOUSE - 10-19-21

2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6          Q.    Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10         A.    I can't -- I can't -- I can't recall

11   specifically.

12         Q.    Did you speak with the independent

13   board from time to time?

14         A.    Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19         Q.    Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25         A.    I don't recall any conversations

```
 1                WATERHOUSE - 10-19-21

 2   specifically.

 3        Q.    Do you know if the topic was ever

 4   discussed, even if you don't remember it

 5   specifically?

 6             MS. DANDENEAU:  Objection to form.

 7        A.    It -- it -- it may have.  I don't

 8   know.  I don't recall.

 9        Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12        A.    I don't -- I don't recall

13   specifically.

14        Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18        A.    Nothing -- nothing is really jumping

19   out at me.

20        Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24        A.    I don't recall having that

25   conversation.
```

```
1              WATERHOUSE - 10-19-21
2      Q.    Did you ever tell Mr. Seery that you
3  had any reason to believe that the amounts
4  reflected in the notes issued by the affiliates
5  and Mr. Dondero were invalid for any reason?
6      A.    I don't -- I don't recall.
7      Q.    Did you tell Mr. Dondero -- did you
8  tell Mr. Seery that you thought the promissory
9  notes issued by the advisors and Mr. Dondero
10 that were outstanding as of the petition date
11 were assets of the estate?
12     A.    I don't recall having a specific
13 conversation about those -- you know, those
14 notes outstanding as -- as of the petition date
15 being assets on the estate.  I mean, we put
16 together -- you know, they're in the books and
17 records of the financial statements.  I don't
18 recall having a specific conversation.
19     Q.    Did you ever prepare any documents
20 that were delivered to Mr. Seery that concerned
21 the promissory notes issued by any of the
22 affiliates or Mr. Dondero?
23           MS. DANDENEAU:  Objection to form.
24     A.    Did I produce any that concerned --
25 you mean did I just -- did I give Mr. Seery
```

```
 1              WATERHOUSE - 10-19-21

 2   anything that -- that said I have concerns over

 3   these notes?

 4       Q.   No.  Let me try again.  Maybe it was

 5   my question.

 6            Did you ever give Mr. Seery any

 7   information concerning any of the notes that

 8   were issued by any of the affiliates or

 9   Mr. Dondero?

10            MS. DANDENEAU:  Objection to form.

11       A.   I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15            MR. MORRIS:  Can we put up the

16       document that has been premarked as Exhibit

17       39?

18            MS. DANDENEAU:  John, that is this

19       document, isn't it?

20            MR. MORRIS:  Oh, yeah, it might be,

21       as a matter of fact.  Let's go to Number

22       40.

23            (Exhibit 40 marked.)

24       Q.   During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that
```

1          WATERHOUSE - 10-19-21

2    were filed with the bankruptcy court?

3         A.    I didn't -- I didn't prepare them

4    personally.

5         Q.    Did people prepare them under your

6    direction?

7         A.    Yes.  There were members of the team

8    that prepared them, and they worked in -- you

9    know, there were members of DSI that were

10   involved in the process as well.

11        Q.    To the best of your knowledge, did

12   DSI rely on the employees of Highland for the

13   information that they used to prepare the

14   bankruptcy filings?

15        A.    Yes.  The books and records were

16   with the Highland personnel.

17        Q.    Okay.  And do you see on the screen

18   here, there is a document that we have marked

19   as Exhibit 40 that is -- that is titled Summary

20   of Assets and Liabilities?

21        A.    Uh-huh.

22        Q.    Okay.  And do you recall reviewing

23   any summary of assets and liabilities before it

24   was filed with the bankruptcy court?

25        A.    Yes, I recall reviewing this at a

```
 1                 WATERHOUSE - 10-19-21

 2    high level.

 3         Q.    And did you believe that it was

 4    accurate at the time it was filed?

 5         A.    I didn't have any other reason to

 6    believe otherwise.

 7         Q.    Okay.  Do you see that the total

 8    value of all properties listed in Part 1 is

 9    approximately $410 million?

10              MS. DEITSCH-PEREZ:  Objection to

11         form.

12         A.    Yes, it is in 1c.

13         Q.    Yes.

14         A.    Yes, I see that.

15         Q.    Okay.  If we go to the second page,

16    now I think I may just have excerpts here, just

17    so everybody is clear, but if we scroll down to

18    the second page, you will see that there is

19    a -- a little further.  There you go.  You will

20    see there is a reference to Item 71, notes

21    receivable.

22              Do you see that?

23         A.    I do.

24         Q.    And that was a reference to the

25    notes receivable from the affiliates and
```

```
1                   WATERHOUSE - 10-19-21
2     Mr. Dondero, among others; is that right?
3                 MS. DANDENEAU:  Objection to form.
4          A.    Yes.  The affiliate notes and the
5     Dondero notes were in this amount, but they
6     weren't -- again, like you said, and among
7     others.
8          Q.    Okay.  We will look at the
9     specificity because I'm not playing gaming
10    here, but do you know if the $150 million of
11    notes receivable was included within the
12    $410 million of total value of the debtor's
13    assets?
14                MS. DANDENEAU:  Objection to form.
15         A.    I -- I -- I believe so.
16         Q.    Right.  And so is it fair to say
17    that as of the date this document was prepared,
18    the notes receivable were more than one-third
19    of the value of the debtor's assets?
20                MS. DEITSCH-PEREZ:  Object to the
21         form.
22                MS. DANDENEAU:  Object to the form.
23         A.    Again, if you are just taking the
24    math, 150 divided by whatever the $400 million
25    number is above, then yes, you get there.
```

1                    WATERHOUSE - 10-19-21

2        Q.     Okay.

3        A.     You know, but as of the time of this

4   filing, that is what was put in this filing,

5   right, but, you know, I mean, numbers --

6   numbers change, facts and circumstances change.

7        Q.     But as the CFO of Highland, the

8   debtor in bankruptcy, did you believe that this

9   number accurately reflected the total amount

10  due under the notes receivable?

11       A.     That is what we had in our books and

12  records.

13       Q.     Okay.  And did you believe as the

14  CFO that the books and records accurately

15  reported the then value of the debtor's assets?

16              MS. DANDENEAU:  Objection to form.

17       A.     We didn't -- as part of this filing,

18  there was no fair value measurement or

19  anything.  These were just accounting entries

20  for the promissory notes.  There is no analysis

21  for impairment or fair market value adjustments

22  or anything of that nature.  This is purely

23  taking numbers and putting them in our form.

24       Q.     Did you do any impairment analysis

25  at any time while you were employed by

```
1                    WATERHOUSE - 10-19-21

2    Highland?

3         A.    Yes, we did do impairment analysis

4    on -- on assets.

5         Q.    Okay.  Did you ever do an impairment

6    analysis on any of the promissory notes that

7    were given to Highland by any of the affiliates

8    or Mr. Dondero?

9         A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19             As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?
```

1                    WATERHOUSE - 10-19-21

2          A.     The audited financials -- yes,

3     audited financial statements are prepared in

4     accordance with GAAP.

5          Q.     Do you recall whether any of

6     Highland or HCMFA or NexPoint ever made a fair

7     market value adjustment to any of the notes

8     issued by any of the affiliates or Mr. Dondero

9     to Highland?

10         A.     I do not recall that happening, but

11    the -- it is because under -- under GAAP,

12    the -- the treatment of liabilities is

13    different than assets.

14         Q.     Okay.  So then let's just focus on

15    Highland's audited financial statements.

16                The last audited financial

17    statements were for the period ending December

18    31st, 2018; correct?

19         A.     That is my understanding.

20         Q.     And you had -- you had an obligation

21    to disclose anything to PricewaterhouseCoopers

22    concerning any subsequent events between the

23    end of 2018 and June 3rd, 2019; correct?

24                MS. DANDENEAU:  Objection to form.

25                MS. DEITSCH-PEREZ:  Form.

1                    WATERHOUSE - 10-19-21

2         A.    Correct.

3         Q.    Okay.  To the best of your

4    knowledge, as Highland's CFO, did Highland ever

5    make any fair market value adjustments to any

6    of the promissory notes that were carried on

7    its balance sheet and that were issued by any

8    of the affiliates or Mr. Dondero?

9         A.    I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14        Q.    Okay.

15              MR. MORRIS:  Can we go to the next

16        page.

17        Q.    Do you see this is a note a list of

18   notes receivable?  Do you see that?

19        A.    Yes, I do.

20        Q.    And do you see that this ties into

21   the page that we were just looking?

22        A.    I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.

1                    WATERHOUSE - 10-19-21

2       Q.    Okay.  So now let's look at that

3   schedule.  So this was the face amount of all

4   of the promissory notes that Highland held at

5   the time this document was filed with the

6   bankruptcy court; right?

7       A.    Yes.

8       Q.    There is a footnote there that says,

9   doubtful or uncollectible accounts are

10  evaluated at year-end.

11            Do you see that?

12      A.    I do.

13      Q.    Okay.  And is it fair to say that as

14  of the year-end 2018, the year before this,

15  that to the extent any of these notes were

16  outstanding at that time, they weren't deemed

17  to be doubtful or uncollectible?

18      A.    Yeah.  For the 2018 audit, there

19  weren't any -- there weren't any adjustments to

20  fair value.

21      Q.    Okay.  And during the bankruptcy, do

22  you recall that Highland subsequently reserved

23  for the Hunter Mountain Investment Trust note?

24      A.    Yes.

25      Q.    Why did Highland -- were you

1          WATERHOUSE - 10-19-21

2    involved in the decision to reserve the Hunter

3    Mountain Investment Trust note?

4          A.    I was not.

5          Q.    Do you know why Highland decided to

6    reserve for the Hunter Mountain Investment

7    Trust note?

8          A.    I don't know yet decision was made.

9    I believe it was made by someone at DSI.

10         Q.    Okay.  I'm just asking if you know

11   why.

12               Did you ever ask anyone why they

13   reserved for that particular note?

14         A.    I don't recall.

15         Q.    Do you know whether the debtor

16   reserved for any other note on this list during

17   the bankruptcy?

18         A.    Again, I don't recall.  I wasn't

19   part of any process of -- again, like any fair

20   value adjustments or anything to that degree.

21   Like I said, a lot of that was done by DSI and

22   it was kind of out of our court.

23         Q.    Okay.  Do you know if any note

24   receivable on this list was ever deemed by the

25   debtor to be doubtful or uncollectible?

1                    WATERHOUSE - 10-19-21

2        A.    I don't -- I don't have a

3   recollection of every filing, so I don't know.

4        Q.    Did you ever have a discussion with

5   anybody at any time about whether any of the

6   notes receivable on this list should be deemed

7   to be doubtful or uncollectible?

8        A.    No.  As I previously stated, we were

9   told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13              MR. MORRIS:  I move to strike.

14       Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19              MS. DANDENEAU:  Objection to form.

20       A.    I don't recall.

21       Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25              MS. DANDENEAU:  Objection to form.

1            WATERHOUSE - 10-19-21

2      A.    I don't recall.  I mean, it may have

3  happened, you know, again, when we initially

4  getting DSI up to speed and going through

5  financials, it may have happened, but I don't

6  recall specifically.

7      Q.    While you were the CFO of Highland

8  during the time that the company was in

9  bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14            MS. DANDENEAU:  Objection to form.

15            MS. DEITSCH-PEREZ:  Form.

16      A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21            MR. MORRIS:  I move to strike.

22      Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

1           WATERHOUSE - 10-19-21

2           MS. DEITSCH-PEREZ:  This is like the

3      fifth time you've asked it.  Object to the

4      form.

5           MR. MORRIS:  I'm moving to strike,

6      if you haven't noticed, because he's not

7      answering the question.

8           MS. DEITSCH-PEREZ:  He was answering

9      the question, you just didn't like it, like

10     the answer.

11          MR. MORRIS:  Good Lord.

12     Q.     Go ahead, Mr. Waterhouse.

13     A.     Again, I don't -- we brought up a

14  myriad of issues at the start of the bankruptcy

15  case.  I don't recall if this was one of them,

16  but, again, there are a lot of things we

17  couldn't change.  Even, you know, I was told

18  status quo, blah, blah, blah, right, there is a

19  stay, you can't -- you know, I don't recall

20  specifically, but that doesn't mean it didn't

21  happen.

22          MR. MORRIS:  I move to strike.

23     Q.     During the time that Highland was in

24  bankruptcy and you served as CFO, did you have

25  any reason to believe that any of the notes

```
 1              WATERHOUSE - 10-19-21
 2   receivable on this list were doubtful or
 3   uncollectible?
 4              MS. DEITSCH-PEREZ:  Object to the
 5         form.
 6         A.    Potentially.
 7         Q.    Did you ever tell anybody that?
 8         A.    As I just stated like five times,
 9   yes, we -- at the beginning after filing and we
10   were getting DSI and others up to speed, you
11   know, we had a myriad of discussions of a lot
12   of things and this was likely one of them.  I
13   don't -- but I don't recall specifically we
14   talked --
15         Q.    I don't want to know -- I don't want
16   to know what was --
17              MS. DEITSCH-PEREZ:  Wait, wait.
18         Excuse me.  Mr. Morris, you did not let him
19         finish his answer.
20         A.    I spoke -- we had -- we were
21   bringing Fred Karesa and Brad Sharp (phonetic)
22   up to speed on all of these items, contracts,
23   and investments and going through -- we had
24   hours and hours and hours of discussion.  And
25   then not only do I have to repeat this not
```

```
1                    WATERHOUSE - 10-19-21

2     once, twice, three, four times with -- you

3     know, I mean, we -- I don't -- I don't remember

4     the sum culmination of all these discussions.

5     They all kind of blend together.

6                    MR. MORRIS:  Okay.  I move to strike

7         and I will try one more time.

8         Q.    Did you ever tell anybody at DSI

9     that you believed any of the notes receivable

10    on this list were doubtful or uncollectible?

11                   MS. DANDENEAU:  Object to form.

12        A.    Potentially.

13        Q.    Potentially you told them or

14    potentially they were doubtful or

15    uncollectible?

16        A.    Potentially I told them that we

17    needed to look at the value of these -- of

18    these assets.

19        Q.    Okay.  Did you -- okay.  It is

20    potential that you told them and it is

21    potentially that you didn't; right?

22                   MS. DANDENEAU:  Objection to form.

23        A.    I've gone through that.  I don't

24    recall specifically.

25        Q.    So you should just -- I don't want
```

1           WATERHOUSE - 10-19-21

2    to tell what you to do.  Do you have --

3              MS. DANDENEAU:  Good.

4         Q.    Other than -- other than telling

5    them that they should look at the values, do

6    you have any recollection whatsoever of ever

7    having told anybody at DSI that any of the

8    notes receivable on this page were doubtful or

9    uncollectible?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12             MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14   about everything on our balance sheet which

15   would have included these -- these notes

16   receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19   those discussions delved into.

20        Q.    Do you recall any discussion at all

21   on the topic of whether any of these notes on

22   this list were doubtful or uncollectible?

23             MR. AIGEN:  Mr. Morris, how on earth

24        is that question different from the

25        question that you just asked for the last

1          WATERHOUSE - 10-19-21

2    five times?  I mean, really I thought you

3    were -- (overspeak.)

4          MR. MORRIS:  Because he never

5    answered it.

6          MS. DEITSCH-PEREZ:  Are you

7    listening to him?

8          MR. MORRIS:  You know --

9          MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14         What more do you want him -- to ask

15   of him?

16         MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20         MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24         MR. MORRIS:  Okay.

25         MS. DEITSCH-PEREZ:  -- because it

```
1              WATERHOUSE - 10-19-21

2         suggests that he has not testified

3         truthfully.

4              MR. MORRIS:  I will ask my question

5         again.  And if at any time you want to

6         direct him not to answer, that is your

7         prerogative.

8         Q.    Mr. Waterhouse, do you have any

9    recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12             MS. DANDENEAU:  Object to form.

13        A.    I don't remember specifically.

14        Q.    Do you remember generally that

15   specific topic?

16        A.    We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23             So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.
```

1           WATERHOUSE - 10-19-21

2      Q.    Do you believe that an affiliate

3  loan on this list was doubtful or

4  uncollectible?  Would you have told that to

5  DSI?

6           MS. DANDENEAU:  Objection to form.

7           MS. DEITSCH-PEREZ:  Object to form.

8      A.    If we had, like -- again, if we --

9  if -- if we weren't preparing financial

10  statements in accordance with GAAP, and -- you

11  know, if DSI at that point -- they were --

12  again, I was new to bankruptcy.

13           The CRO is -- we are delegating

14  everything to the CRO.  All the decisionmaking.

15  Remember -- remember when you and I went into

16  Delaware Court and we were saying DSI basically

17  does everything, remember this, Mr. Morris?

18           You were my counsel at the time, and

19  basically we're running everything through DSI.

20  That was what this was like in the early part.

21           Everything was communicated through

22  DSI.  So DSI says this.  DSI says that.  That

23  is what we're doing, and we're pointing out

24  things to them.

25           Now, they decide what direction this

1                WATERHOUSE - 10-19-21

2    goes.

3        Q.    Did you point out that any of

4    these --

5        A.    I don't recall specifically.

6        Q.    Okay.  At any time that you served

7    as Highland's CFO, did you ever point out to

8    DSI that any of these loans were doubtful or

9    uncollectible?

10            MS. DEITSCH-PEREZ:  Object to the

11       form.

12            MS. DANDENEAU:  Objection.

13       A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17       Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19       A.    Yes.

20       Q.    You prepared those personally,

21   didn't you?

22            MS. DEITSCH-PEREZ:  Objection to

23       form.

24       A.    I didn't personally prepare them,

25   the team did with DSI.

1          WATERHOUSE - 10-19-21

2     Q.     But you signed them; correct?

3     A.     My signature is on the MORs.

4     Q.     And you signed them as the preparer

5  of the document; correct?

6     A.     Yes, I did this pursuant to DSI's

7  instructions.

8     Q.     Okay.  You wouldn't have signed the

9  document if you didn't believe it to be

10 accurate; correct?

11    A.     If I had reason to believe it

12 wasn't, presumably I wouldn't have signed it.

13    Q.     Okay.  And do you have any reason to

14 believe right now that any monthly operating

15 report that has your signature on it was

16 inaccurate in any way?

17         MS. DEITSCH-PEREZ:  Object to the

18    form.

19    A.     My understanding of the monthly

20 operating reports is we were filing them in

21 accordance with the standards set by the Court.

22 It wasn't -- you know, again, I don't -- you

23 know, it wasn't GAAP.  It wasn't these other

24 standards, so I testified I didn't have

25 experience in this.  The CRO was running the

1        WATERHOUSE - 10-19-21

2   show.  I followed their advice.

3        Q.    But you assured yourself that

4   everything in the report was accurate before

5   you signed them; correct?

6             MS. DANDENEAU:  Objection to form.

7        A.    I trusted the guidance from the CRO

8   and their team and their experience and their

9   guidance for doing this for many, many, many

10  years to -- to -- to categorize and put things

11  in ways on the form.

12            You know, my team had -- had not

13  filled out these forms before and needed all of

14  this guidance.  I'm not an expert in this.  I

15  have oversight of it.  I signed the form.  DSI

16  told me to.

17       Q.    And you and your team are the source

18  of the information that DSI used to create the

19  reports; correct?

20            MS. DANDENEAU:  Objection to form.

21       A.    The books and records reside with

22  the -- with -- with the corporate accounting

23  team.

24       Q.    Okay.  And the corporate accounting

25  team was the corporate accounting team that was

1                    WATERHOUSE - 10-19-21

2    under your direction; correct?

3         A.    Yes.

4         Q.    So -- so your team was responsible

5    for maintaining Highland's books and records;

6    correct?

7         A.    I'm sorry, my team was responsible?

8         Q.    Correct.

9         A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13        Q.    The corporate accounting group

14   reported to you; correct?

15        A.    Yes.

16              MR. MORRIS:  Can we put up 41,

17        please.

18              (Exhibit 41 marked.)

19        Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22              Do you see that?

23        A.    I do.

24        Q.    And you signed this report in your

25   capacity as the chief financial officer of

```
 1              WATERHOUSE - 10-19-21

 2    Highland; correct?

 3         A.    Yes.

 4         Q.    And you're the preparer -- you're

 5    identified as the preparer of the report;

 6    correct?

 7         A.    That is correct.

 8         Q.    Do you recall participating in the

 9    preparation of monthly operating reports?

10         A.    As I testified earlier, it was put

11    together, you know, with the team.  The team

12    worked with DSI to put these monthly operating

13    reports together.  We had no experience at this

14    time of the monthly operating reports or things

15    of this nature.

16              MR. MORRIS:  Can you turn to the

17         next page, please.

18         Q.    Do you see a line item under assets

19    due from affiliates?

20         A.    Yes, I do.

21         Q.    Okay.  And to the best of your

22    knowledge and understanding, as the person who

23    is identified as the preparer of this report,

24    does that line item include the affiliate loans

25    that we've been talking about?
```

1              WATERHOUSE - 10-19-21

2        A.     Again, I would have to see, just

3   like we did with the financial statements of

4   Highland and NexPoint, I would have to see a

5   detailed build, but, you know, if you look at

6   the other line items, you know, the only other

7   place it could be would be in -- in other

8   assets.

9        Q.     Okay.  And as a matter of

10  arithmetic, is it fair to say that is the value

11  of the assets due from affiliates was more than

12  25 percent of the value of Highland's total

13  assets as of 12/31/2019?

14             MS. DANDENEAU:  Objection to form.

15       A.     I'm really not doing the mental math

16  right now, so I've been going at this depo for

17  hours, so I'm really not -- you know --

18       Q.     All right.  No problem.

19       A.     -- these are millions of dollars.

20       Q.     Let's look at the Footnote 1,

21  please.  Do you see there is a reference to the

22  Hunter Mountain note?

23       A.     Yes, I see that in Footnote 1.

24       Q.     Okay.  And that's the reserve that

25  was taken against that note?

1          WATERHOUSE - 10-19-21

2     A.     Yes, that is what this indicates.

3     Q.     Okay.  And were you aware that the

4 reserve was being taken on that it was?

5     A.     I was -- I was aware, yeah, at some

6 point, yes.

7     Q.     Okay.  And are you aware of any

8 reserve being taken with respect to any other

9 note that was issued in favor of Highland?

10     A.     Again, as I testified, we didn't go

11 through an analysis on -- on -- on the other

12 notes.

13     Q.     Can we turn --

14     A.     I believe -- I believe it says that

15 in Footnote 1, fair value has not been

16 determined with respect to any of the notes.

17          So this footnote -- footnotes, look,

18 there has been no determination.

19     Q.     Okay.  The determination was made in

20 the audited financial statements just six

21 months earlier; right?  We saw that earlier?

22     A.     That was as of 12/31/18.  I mean,

23 things -- circumstances -- there's a bank --

24 circumstances change, things change -- things

25 change over time, you know, facts and

1                 WATERHOUSE - 10-19-21

2    circumstances change.  Again, you have to do an

3    analysis.

4         Q.    Okay.  And you do recall that in

5    Highland's 2018 financial statement, all of the

6    notes issued by affiliates and Mr. Dondero that

7    were due at year-end had a fair value equal to

8    the carrying value; correct?  We looked at

9    that?

10        A.    Yes.  That was in the -- in the

11   disclosure for the -- for the affiliate notes,

12   yes.

13        Q.    And -- and you were obligated to

14   share with PwC any subsequent events between

15   the end of 2018 and the date that you signed

16   your management representation letter on June

17   3rd, 2019; correct?

18             MS. DEITSCH-PEREZ:  Object to the

19        form.

20        A.    Yes.  I -- I -- I signed the

21   management, you know, my signature is in the

22   management representation letter -- I hope I'm

23   answering your question -- that is dated in

24   June with the representations made in that

25   management representation letter.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And there was nothing that

3    caused PricewaterhouseCoopers to include in

4    subsequent events any adjustment to the

5    conclusion that the fair value of the affiliate

6    notes and the notes issued by Mr. Dondero

7    equaled the carrying value; correct?

8              MS. DANDENEAU:  Objection to the

9         form.

10       A.    That is correct.  That is what was

11   in the -- in the -- in the footnotes.

12       Q.    Okay.  So are you aware of anything

13   that occurred between June 3rd, 2019 and

14   December 31st, 2019 that would have caused the

15   fair value of the notes to differ from the

16   carrying value?

17       A.    Yeah.  Highland filed for

18   bankruptcy, things changed -- I mean, there was

19   a bankruptcy filed in October of -- of -- of

20   2019, right, the petition date that we've

21   described earlier.

22             I mean, I had a -- I guess looking

23   back naively, I thought we were going to get an

24   audit from PwC for year-ended 2019, and when we

25   had discussions with PwC, they were like, are

1              WATERHOUSE - 10-19-21

2    you crazy, we're not auditing this.  Values

3    change, all these things change, bankruptcy

4    changes the entire scenario.  I mean -- and

5    they're like, we're not -- we're not touching

6    this.

7              And so, you know, I was like, okay,

8    sorry, I get it, okay, no an audit.

9              I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12             Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18       Q.    Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21       A.    No.

22       Q.    So --

23       A.    That's right.

24       Q.    So can you identify any fact that

25   would cause the fair value to deviate from the

```
 1              WATERHOUSE - 10-19-21

 2  carrying value during the seven-month period

 3  between June 3rd and the end of the year, 2019?

 4              MS. DANDENEAU:  Objection to form.

 5       A.    No.  I mean, I'm putting myself back

 6  at that time, right.  Hindsight is 2020, but we

 7  didn't do an analysis, but we would have done a

 8  fulsome analysis and looked at all of the facts

 9  and circumstances at the time, but asset values

10  change.  You know, there could have been a

11  market crash in hindsight in 2020, which --

12  which affected entities' abilities.

13              There could have been all of these

14  things, right, that -- that happen.  It is --

15  it is easy to look back in hindsight, but when

16  you are looking at this in -- in realtime, the

17  analysis is different, and again, we didn't do

18  an analysis.

19       Q.    Okay.  You didn't do an analysis.

20              Do I have that right?

21       A.    I don't -- I don't recall doing one

22  or maybe -- you know, I don't recall doing one.

23              MR. MORRIS:  Okay.  I'm going to

24         take a break.  I may be done, so the time

25         now is -- is 4:30 your time.  Let's just
```

1                    WATERHOUSE - 10-19-21

2          take a short break until 4:40 your time.

3                    MS. DANDENEAU:  Okay.

4                    VIDEOGRAPHER:  We're going off the

5          record, 4:31 p.m.

6          (Recess taken 4:31 p.m. to 4:43 p.m.)

7                    VIDEOGRAPHER:  We are back on the

8          record at 4:43 p.m.

9                    MR. MORRIS:  I have no further

10         questions.

11                   MR. RUKAVINA:  Okay.

12         Mr. Waterhouse, I will go next.

13                         EXAMINATION

14     BY MR. RUKAVINA:

15         Q.    Sir, my name is Davor Rukavina.  I'm

16     the lawyer for --

17                   MR. MORRIS:  Hey, Davor, just before

18         you begin, I just want to put on the record

19         Highland's objection to documents that were

20         produced to me 10 minutes before the

21         deposition began.

22                   MR. RUKAVINA:  What the basis of

23         your objection?

24                   MR. MORRIS:  That they were due

25         quite some time ago, and the fact that you

```
1                  WATERHOUSE - 10-19-21

2        had -- I just think it's appropriate to --

3        to dump documents on somebody 10 minutes

4        before the deposition.  I just think

5        that's --

6               MR. RUKAVINA:  Well, these are

7        documents Highland produced.  I'm not aware

8        of any rule I have to give you advance

9        documents when I know for the record that

10       other than the exhibits that you sent to us

11       last week, most of the exhibits you used

12       today you did not provide to me prior to

13       this deposition.

14              MR. MORRIS:  No, but the documents

15       were produced by me in -- in litigation,

16       right?

17              MR. RUKAVINA:  I'm going to use

18       primarily, John, the documents that you

19       produced to me today, but you may.

20              MR. MORRIS:  Primarily.  I've got --

21       I've got my objection.  You have got your

22       response.  Proceed.

23       Q.    Mr. Waterhouse, again, I represent

24   the advisors, HCMFA and NexPoint Advisors.

25              Do you understand that?
```

```
1                WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    You and I have never met or talked

4  before today, have we?

5      A.    No, I have -- I have heard your

6  voice on calls before.

7      Q.    Okay.

8            MR. RUKAVINA:  Madam Court Reporter,

9      I will use a few exhibits today.  My

10     associate, Mr. Nguyen, will find some way

11     to get them to you.  I don't know how to do

12     that, but it looks like you guys do.

13           I am going to use numbers as well.

14     But to differentiate them from Mr. Morris

15     we're going to mark mine with the prefix A

16     for advisors.

17           Do you understand?

18           COURT REPORTER:  Yes.

19           MR. RUKAVINA:  Okay.  Perfect.

20     Q.    Okay.  So, Mr. Waterhouse, let's

21  start with those two HCMFA notes that you were

22  asked about, one for 5 million and one for

23  2.4 million.

24           Do you recall those notes?

25     A.    Yes.
```

```
 1               WATERHOUSE - 10-19-21

 2        Q.    Were you ever the CFO of HCMFA?

 3        A.    I don't recall.

 4        Q.    So to the best of your recollection,

 5   you were still an officer of HCMFA in 2019,

 6   just that your title was treasurer?

 7               MR. MORRIS:  Object to the form of

 8          the question.  There is no leading here.

 9          He works for your client.

10               MS. DANDENEAU:  That is not -- that

11          is not true.

12               MR. MORRIS:  He's the treasurer --

13          he is the treasurer of your client.  I

14          don't -- I'm going to object every time you

15          try to lead, so...

16               MR. RUKAVINA:  Totally fine to

17          object.

18               MR. MORRIS:  Okay.

19        Q.    Please answer my question,

20   Mr. Waterhouse.

21        A.    I'm sorry, could you repeat?  There

22   was...

23        Q.    Yes.  You were -- you testified

24   earlier that in 2019 you were an officer of

25   HCMFA; correct?
```

1          WATERHOUSE - 10-19-21

2      A.    Yes, I testified that I was the

3  treasurer and I didn't know if that incumbency

4  certificate, you know, was one that appointed

5  me as a treasurer, but yes.

6      Q.    I'm just trying to confirm that

7  sitting here today, to the best of your

8  recollection, at that time you were -- your

9  title was treasurer.  It was not chief

10 financial officer.

11     A.    I don't recall that being my title.

12     Q.    Okay.  And in May of 2019, however,

13 I think you testified you were the chief

14 financial officer of the debtor; correct?

15          MR. MORRIS:  Objection to the form

16     of the question.

17     A.    Yes, I was -- yes.

18     Q.    Okay.  As such, in May of 2019, did

19 you have the authority, to your understanding,

20 to unilaterally loan $5 million or $2.4 million

21 to anyone on behalf of the debtor?

22          MR. MORRIS:  Objection to the form

23     of the question.

24     A.    Sorry, can you repeat that?

25     Q.    Yes.  So in your capacity as the

```
 1              WATERHOUSE - 10-19-21

 2    chief financial officer of the debtor, Highland

 3    Capital Management, L.P., in May of 2019, did

 4    you believe that you unilaterally, just Frank

 5    Waterhouse, had the authority to loan on behalf

 6    of the debtor to anyone $5 million and

 7    $2.4 million?

 8              MR. MORRIS:  Objection to the form

 9         of the question.

10    A.    No.

11    Q.    Is it because loans of that amount

12    would have had to be approved by someone else?

13    A.    Yes.

14    Q.    Who in '20 -- in May of 2019, if

15    Highland wanted to loan 5 million or

16    $2.4 million to someone, what would have been

17    the internal approval procedure?

18              MR. MORRIS:  Objection to the form

19         of the question.

20    A.    If -- if we had loans of that nature

21    that needed to be made due to their size, we

22    would have gotten approval from the -- the

23    president of Highland.

24    Q.    And who that was individual?

25    A.    It was James Dondero.
```

1              WATERHOUSE - 10-19-21

2       Q.    Okay.  Now, I'm going to ask you a

3  similar question but for a different entity.

4              In May of 2019, as the treasurer of

5  HCMFA, did you believe that you unilaterally

6  had the ability to cause HCMFA to become the

7  borrower of a $5 million loan and a

8  $2.4 million loan?

9              MR. MORRIS:  Objection to the form

10      of the question.

11      A.    No.

12      Q.    What would -- what would the

13  approval have taken place -- strike that.

14             What would the approval process have

15  been like in May of 2019 at HCMFA for HCMFA to

16  take out a $7.4 million loan?

17             MR. MORRIS:  Objection to the form

18      of the question.

19      A.    The process would have been similar

20  to what we just discussed on -- for Highland to

21  make a loan to others.  So, again, you know,

22  we -- we would have -- either myself or someone

23  on the team would have discussed this with

24  the -- the president and owner of -- of HCMFA.

25      Q.    And who was that individual?

1              WATERHOUSE - 10-19-21

2       A.     That was James -- Jim Dondero.

3       Q.     So do I understand that in May of

4    2019, on behalf of both the lender, Highland,

5    and the borrower, HCMFA, Mr. Dondero would have

6    had to approve $7.4 million in loans?

7              MR. MORRIS:  Objection to the form

8         of the question.

9       A.     Yes.

10      Q.     You mentioned when Mr. Morris was

11   asking you the NAV error, N-A-V error, with

12   respect to TerreStar, without writing us a

13   novel, unless you feel like you have to, can

14   you summarize what that NAV error was?  What

15   happened?

16      A.     There was a -- in the Highland

17   Global Allocation Fund, it owned at the time an

18   equity interest in a company called TerreStar.

19   And TerreStar is -- at the time was a private

20   company, and it may still be today.  Again, I'm

21   putting myself back then as a private company.

22             We had -- sorry, I don't mean we --

23   the fund and the advisor used Houlihan Lokey

24   to -- to value that investment.  And during

25   that time there was some trades that were

1                    WATERHOUSE - 10-19-21

2    executed at market levels that were much lower

3    than the Houlihan Lokey model.

4                    And based on information and

5    discussions with the portfolio managers and,

6    you know, principals that were very familiar

7    with TerreStar, it was determined that those

8    trades were non-orderly and they were not

9    considered in the valuation as consulted with

10   Houlihan Lokey and PricewaterhouseCoopers at

11   the time.

12                   Subsequent to a -- I can't remember

13   the exact circumstances of why the SEC got

14   involved.  I think it was due to this -- this

15   investment became a material position in the

16   fund.  It triggered an SEC, kind of, inquiry.

17   And as part of that inquiry, they questioned

18   the valuation methodology.  "They" meaning the

19   SEC.

20                   And at the culmination of that

21   process -- this is all summarized -- the value

22   that was -- that ultimately had to be used in

23   the fund's NAV was different than -- materially

24   different than what the original valuation at

25   Houlihan Lokey provided.

1          WATERHOUSE - 10-19-21

2          And given that there was this fund

3    was, as we discussed -- I don't know if we

4    discussed it, but it was an open-ended fund

5    that was going -- that was converting to a

6    close-end fund.

7          Due to the fact that it was an

8    open-ended fund, you had to recalculate NAV and

9    see what the impact was on people -- on

10   investors coming in and out of the fund and if

11   there is a detrimental impact and to calculate

12   what that -- what that impact was and if there

13   was any amounts owed to the fund pursuant to

14   the error.

15        Q.    Were you personally involved

16   internally at either Highland or HCMFA with

17   these investigations and discussions with the

18   SEC?

19        A.    I was.

20        Q.    Which other key people or senior

21   people at Highland were involved, to your

22   recollection?

23        A.    Myself, Thomas Surgent, David Klos,

24   Lauren Thedford, Jason Post.

25        Q.    Mr. Dondero, was he --

1                    WATERHOUSE - 10-19-21

2        A.    I believe Cliff Stoops.  I'm trying

3    to think.  And maybe that is -- that is -- that

4    is -- that is all kind I can recall at the

5    moment.

6        Q.    Do you recall whether it was

7    determined that the fund suffered losses as a

8    result of this error?

9        A.    The -- the fund -- the -- the --

10   because the open-ended nature of the fund,

11   there were losses that were attributable to

12   investors.  Meaning they -- they would have

13   redeemed and got a less money or -- or they

14   subscribed in and maybe because they didn't get

15   enough shares and then they later sold and then

16   they were harmed in that fashion.

17              And there is -- there is -- there

18   were very -- there were very detailed

19   calculations and, you know, all these different

20   scenarios that we had to -- I'm sorry, I keep

21   saying "we" -- that the individuals involved

22   had to calculate and quantify.

23       Q.    Well, do you recall whether HCMFA

24   admitted certain fault and liability for this

25   error?

1          WATERHOUSE - 10-19-21

2     A.     I don't recall specifically.

3     Q.     Do you recall whether HCMFA caused

4  any funds to be paid to the investors and the

5  fund the subject of the NAV error?

6     A.     Yes.

7     Q.     Do you recall the approximate amount

8  of funds, moneys paid to the investors and the

9  fund?

10     A.     It was -- it was approximately

11  $7 million.

12     Q.     If I was to suggest 7.8 million,

13  would that ring more true or are you sticking

14  with your original answer?

15     A.     It was -- it was approximately 7 --

16  7 to $8 million.  Again, I don't remember the

17  exact number, but it was in that ballpark.

18     Q.     So regardless of whether HCMFA

19  accepted fault or liability, it caused some

20  $7 million or more to be paid out to affected

21  investors in the fund?

22          MR. MORRIS:  Objection to the form

23     of the question.

24     A.     And I want to make sure I'm

25  understanding your question because there is a

1                  WATERHOUSE - 10-19-21

2    lot of different entities that are going on to

3    my head.

4                  I think what you are saying is based

5    on this error, shareholders were harmed by this

6    approximately $7.8 million -- by approximately

7    $7.8 million.  Is that what you are asking?

8        Q.    Yes, sir.

9        A.    Yes, that was -- again, I don't have

10   the exact numbers.  If I take -- it was -- it

11   was in that ballpark, and there is a detail

12   calculation and write-up that could, that --

13   that exists someplace.

14       Q.    Now, at that time, at the time that

15   the NAV error occurred, was there a contract in

16   place between HCMFA and the debtor pursuant to

17   which the debtor was providing services to

18   HCMFA?

19                  MR. MORRIS:  Objection to the form

20        of the question.

21       A.    Yes.

22       Q.    Was that contract generally called a

23   shared services agreement?

24       A.    It was generally called that, but

25   there were -- there were -- I mean, it -- it --

```
1              WATERHOUSE - 10-19-21

2    it depends on who you talk to, but yes,

3    generally, there were -- there are multiple

4    agreements.

5         Q.   Pursuant to one or more of those

6    agreements, was the debtor providing certain

7    services to HCMFA?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.   Yes.

11        Q.   And can you at a very high level

12   summarize in 2018 and 2019 what those services

13   were?

14        A.   Yes, there was a -- yes.

15        Q.   Okay.  Please -- please go -- go

16   through a short summary.

17        A.   There was a -- a cost reimbursement

18   agreement between Highland Capital Management

19   Fund Advisors and Highland Capital Management,

20   L.P.  That agreement was for what we referred

21   to as front office services, so investment

22   management, things of that nature.

23             There was I think what most people

24   refer to as the shared services agreement that

25   was -- that agreement was between Highland
```

1        WATERHOUSE - 10-19-21

2    Capital Management Fund Advisors and Highland

3    Capital Management for back office services.

4        Q.    And can you summarize what you mean

5    by back office services?

6        A.    Those services were for accounting,

7    finance, tax, valuation, HR, IT, you know,

8    legal compliance, things of -- things of those

9    nature -- or things of that nature, excuse me.

10       Q.    So in the spring of 2019, do you

11   recall whether HCMFA took the position that it

12   was actually Highland that caused the NAV error

13   to occur pursuant to the valuation services

14   that Highland was providing?

15       MR. MORRIS:  Objection to the form

16   of the question.

17       A.    I do not recall.

18       Q.    Did you ever have any discussions

19   with anyone, Jim Dondero or anyone in the first

20   half of 2019 as to whether Highland, the

21   debtor, that is, had any liability to HCMFA

22   related to the NAV error?

23       MR. MORRIS:  Objection to the form

24   of the question.

25       A.    I do not recall.

1          WATERHOUSE - 10-19-21

2     Q.     And then you mentioned that the fund

3  was being closed and some compensation related

4  to that.  Can you -- can you elaborate?  What

5  were you referring to?

6     A.     Right.  So the advisor, pursuant to

7  board approval, put a proposal in front of the

8  shareholders of the Highland Global Allocation

9  Fund to convert it from an open-ended fund to a

10  closed-end fund.

11          So an open-ended fund, when

12  shareholders subscribe to the fund or redeem

13  into the fund, they do it at NAV.

14          When it is -- when you have a

15  closed-end fund, closed-end funds are -- are

16  publicly-traded, like on the New York Stock

17  Exchange, exchanges like that, and -- and

18  shareholders or investors, they're not --

19  they're -- they're not subscribing and

20  redeeming with the fund.  They are like shares

21  of Apple.

22          Those shares of the Highland Global

23  Allocation Fund trade on an exchange, and that

24  is how you, you know, that is how, you know,

25  you become an equity owner in the fund or you

1                  WATERHOUSE - 10-19-21

2    sell your shares and you are no longer an

3    equity owner.

4              As part of that proposal, the

5    advisor told shareholders if you -- if you vote

6    for this proposal to -- to convert it from an

7    open-ended fund to a closed-end fund, we will

8    pay you some amounts of money.  I forgot -- a

9    certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12        Q.    Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19        A.    I do.

20        Q.    So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24        A.    I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero

```
1              WATERHOUSE - 10-19-21

2    for -- for these amounts attributable to -- it

3    was either the error -- you know, the error,

4    and in that conversation he said, go get the

5    money from Highland.  I believe that is what I

6    testified earlier, and that -- that is my

7    recollection.

8         Q.    Do you recall if that was an

9    in-person meeting or some other mode for the

10   meeting?

11        A.    I -- I -- I recall that being

12   in-person.

13        Q.    Do you recall if anyone else was

14   present, or was it just you and Mr. Dondero?

15        A.    I recall just he and I.

16        Q.    And the moneys that he told you to

17   find from -- or get from Highland, was that in

18   the amount of $5 million and $2.4 million?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I believe so, but I would have to go

22   back and look and see when those moneys were

23   actually paid into the -- into the fund and,

24   you know, when those transfers were done.  If

25   they were all done around that same time, then
```

```
1              WATERHOUSE - 10-19-21
2    yes, I would say it was -- it was all related
3    to that.
4         Q.   Did Mr. Dondero tell you that those
5    funds would be a loan from Highland to HCMFA?
6         A.   I don't recall.
7              MR. MORRIS:  Objection to the form
8         of the question.
9         Q.   Now, and forgive me, I'm probably
10   the only non-American born here, but I speak
11   reasonably well in English.  I don't recall,
12   does that mean you don't remember or does that
13   mean it didn't happen?
14             MR. MORRIS:  Objection to the form
15        of the question.
16        A.   It -- it means I don't -- I don't
17   remember.
18        Q.   Did Mr. Dondero tell you to have
19   those two promissory notes prepared?
20        A.   I don't recall.
21        Q.   When you -- again, when you say, I
22   don't recall today, that means that sitting
23   here today, you just don't remember one way or
24   the other.  Is that accurate?
25        A.   Yes.
```

1               WATERHOUSE - 10-19-21

2        Q.    Is it possible that you, having

3   heard what Mr. Dondero said and seeing funds

4   being transferred, assumed that that would be a

5   loan without him actually telling you that

6   would be a loan?

7               MR. MORRIS:   Objection to the form

8        of the question.

9        A.    Sorry, I want to make sure -- did I

10  ask the amounts that were transferred that I --

11  that -- that I assumed that that was a loan?

12       Q.    Well, let me -- let me take -- let

13  me try again.

14              So you have established already that

15  there were quite a number of promissory notes

16  back and forth -- I'm sorry, quite a number of

17  promissory notes with affiliated companies and

18  individuals owing Highland money; right?

19       A.    Yes.

20       Q.    And you have established that there

21  were many transactions and transfers going back

22  and forth over the years; right?

23              MS. DANDENEAU:   Objection to form.

24       A.    In -- yes, in my capacity as CFO and

25  my employment, yes, that is -- yes.

1           WATERHOUSE - 10-19-21

2      Q.    And that's part of the reason why

3   you just can't remember some of the details

4   today because this -- this happened years ago,

5   and there were a number of transactions.  Is

6   that accurate?

7           MS. DANDENEAU:  Objection to the

8      form.

9           MR. MORRIS:  Objection to the form

10      of the question.

11      A.    I mean, I deal with thousands of --

12   of -- of -- of transactions, you know, whether

13   it has -- the processing of transactions, you

14   know, if it has got, you know, more -- more

15   zeros, you know, behind it than others.

16           When you look at thousands of

17   transactions over the years for funds and

18   advisors and -- and, you know, financial

19   statements, I mean, it is -- it is very hard

20   going back in -- in -- in my -- you know,

21   14-ish year career at -- at Highland to

22   remember a lot of those details, especially

23   when I don't have any records or books or

24   anything like that, and -- and going back many

25   years.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    And that is fine.  That -- that --

 3   that is why I asked the question.

 4              Is it possible in May of 2019 when

 5   Mr. Dondero told you to transfer the funds from

 6   Highland, you just assumed on your own that

 7   those would be loans without him actually

 8   telling you that those would be loans?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I don't know.

12        Q.    I'm sorry, you --

13        A.    I said I don't know.

14        Q.    Okay.  Well, as the -- as the CFO

15   for Highland, if you saw $7.4 million going

16   out, you would feel some responsibility to

17   account for that, wouldn't you?

18              MR. MORRIS:  Objection to the form

19        of the question.

20        A.    Yes.

21        Q.    Is it fair to say that those would

22   be in the range large enough to rise up to your

23   level?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

```
1              WATERHOUSE - 10-19-21

2        A.    If -- I don't know if I understand

3   your question.  Those amounts would arise to my

4   level where I would be involved or...

5        Q.    You would want to know what a

6   transfer for that amount, $7.4 million, was all

7   about, as the CFO of Highland, wouldn't you?

8              MR. MORRIS:  Objection to the form

9        of the question.

10       A.    Yes, I make it -- I mean, I -- I

11  review all sorts of payments, I mean, even

12  smaller dollar payments on a periodic basis,

13  you know, to -- to -- to understand and to make

14  sure that we are paying things in a -- you

15  know, in -- in -- in an informed way.  And, you

16  know -- and we're -- and we're paying things

17  pursuant to vendor contracts and things like

18  that.

19       Q.    So as part of that, is it possible

20  that seeing $7.4 million go out you would have

21  promissory notes made in order to keep a paper

22  trail, assuming that those were loans, when

23  perhaps they were never intended to be loans by

24  Mr. Dondero?

25             MR. MORRIS:  Objection to the form
```

1          WATERHOUSE - 10-19-21

2          of the question.

3          A.    I don't know.  As I testified

4     earlier, I had conversations with Mr. Dondero

5     about -- about the -- the -- the moneys that

6     were needed for the NAV error.  And I recall

7     him saying go get it from Highland -- or get it

8     from Highland.

9          Q.    Well, why did you sign those

10    promissory notes and why didn't you have him

11    sign them?

12              MR. MORRIS:  Objection to the form

13         of the question.

14         A.    I don't know.  I don't know.

15         Q.    You mentioned earlier that you

16    typically don't sign promissory notes.  Am I

17    remembering your testimony correctly?

18              I mean, promissory notes on behalf

19    of the entities.  Not yourself, obviously.

20         A.    Yes, that is what I said earlier.

21         Q.    Do you recall any other promissory

22    notes in the million-plus range that you had

23    ever signed before on behalf of any entity?

24         A.    There is -- there has been a lot of

25    transactions over the years.  I don't -- I

```
1              WATERHOUSE - 10-19-21

2    don't -- I don't recall generally.  I don't --

3    I don't recall.

4         Q.   So -- but to the best of your

5    recollection, it was on your initiative,

6    following your discussion with Mr. Dondero,

7    that you had someone draft those two promissory

8    notes; is that correct?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.   Yes, we would have -- the team, as I

12   stated earlier, we don't draft promissory

13   notes.  "The team" meaning the accounting and

14   finance team.

15             So the team would have worked with

16   the legal group at Highland to draft any notes.

17        Q.   Do you believe or do you have any

18   recollection as to whether you would have done

19   that pursuant to an email or telephone call or

20   in-person meeting?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.   Are you asking if I would have -- if

24   those notes would have been drafted pursuant to

25   an email or phone call?
```

1                    WATERHOUSE - 10-19-21

2        Q.     Strike that.

3               Do you recall whether you sent an

4    email to anyone asking them to draft those two

5    promissory notes?

6        A.     I don't recall because, again,

7    once -- I would have instructed -- likely

8    instructed the team to -- to work with the

9    legal group to draft these documents.

10              I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17       Q.     And who on your team do you think

18   you would have asked to do that?

19              MR. MORRIS:  Objection --

20       Q.     Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23              MR. MORRIS:  Objection to the form

24       of the question.

25       A.     It -- it -- there is only two

1              WATERHOUSE - 10-19-21

2    managers of the group.  That would have been

3    Dave Klos or Kristin Hendrix.

4              Dave was the -- one of his duties

5    was managing the valuation team, and so he was

6    intimately involved with this process.  So, you

7    know...

8         Q.    Okay.

9         A.    I don't recall specifically but, I

10   mean, my general -- you know, I -- I -- I

11   likely would have talked to Dave first about it

12   versus someone like Kristin who hadn't been

13   intimately involved.

14        Q.    And -- and do you have a view as to

15   whether it is most likely that you would have

16   done that by email or in-person or how would

17   you believe you would have communicated that to

18   Mr. Klos?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I likely would have done that in

22   person.  Again, if things of this nature

23   that -- again, you have to put ourselves back

24   to, we have been working on this very stressful

25   project for many, many months.  And once the

1          WATERHOUSE - 10-19-21

2    go-ahead was to -- you know, we see the light

3    at the end of the tunnel with wrapping this up

4    and making shareholders whole -- sorry to say

5    "we" -- you know, the -- so the folks that are

6    involved in it.

7               I like to talk to people

8    face-to-face and -- and -- and go to -- and go

9    to their desk, because that shows if I'm going

10   to their desk that -- that is something that I

11   want done, you know.

12       Q.    And do you remember, Mr. Waterhouse,

13   getting those two promissory notes in paper

14   format or by email before they were executed?

15             MR. MORRIS:  Objection to the form

16        of the question.

17       A.    I don't recall.

18       Q.    For whatever was the ordinary course

19   back then in May 2019, would you expect to have

20   received them only on paper or would you have

21   expected to have received them in Word document

22   or PDF document by email?

23             MR. MORRIS:  Objection to the form

24        of the question.

25       A.    I -- I didn't sign -- I signed very

1          WATERHOUSE - 10-19-21

2    few documents via email.  I can't say that it

3    never happened, but people either stopped by my

4    office and physically walked in documents for

5    signature that we discussed face-to-face.

6              Or documents were -- if -- if --

7    if -- if -- let's say I wasn't there or I

8    wasn't available, documents were dropped off.

9    I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11             Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16             And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23             Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.

```
1              WATERHOUSE - 10-19-21

2              And my assistant, you know, if she

3    was there, she would review that -- you know,

4    whatever was being dropped off.  And if that

5    has legal, you know, reviewed or -- reviewed or

6    approved it, if that wasn't -- if that stuff

7    hadn't been done, it was like she would just

8    tell them like, go -- go -- go to the legal

9    group, because --

10        Q.    Let me -- let me pause --

11              MS. DANDENEAU:  Let him finish.

12              MR. MORRIS:  Thank you.  Go ahead.

13        A.    I take -- go to the legal group

14   because that -- that was my -- you know, I

15   didn't -- I didn't review anything that -- that

16   they weren't -- you know, or there wasn't some

17   representation made to me that they had

18   reviewed, approved in some capacity.

19              Again, my -- my -- my goal, as CFO,

20   is to provide transparency and make sure that

21   groups like compliance and other things -- and

22   the other group in legal are -- are in -- you

23   know, their -- they're made aware of

24   transactions of -- you know, that are crossing

25   my desk.
```

```
 1                  WATERHOUSE - 10-19-21

 2              Because I'm not in every

 3    conversation.  They're not in every

 4    conversation -- meaning legal compliance -- and

 5    I just want to make sure that -- that everyone

 6    is in sync to, you know, to -- to the extent

 7    possible.

 8        Q.    So if we summarize, you don't

 9    specifically remember signing these two notes,

10    but most likely it would have been that they

11    would have presented -- been presented to you

12    physically on paper?

13              MR. MORRIS:  Objection to the form

14        of the question.

15        A.    They would -- they would have been

16    presented physically on paper most likely or

17    someone would have left it.  But, I mean,

18    again, I don't -- I don't recall.

19        Q.    I understand.  Understand.

20              When you signed -- when you signed

21    documents, when you personally signed

22    documents, did you typically use a ink pen or

23    did you use a stamp?

24        A.    No, I -- I -- I use a -- an -- an

25    ink pen.
```

1          WATERHOUSE - 10-19-21

2     Q.    Do you know -- was there a file at

3   Highland kept anywhere with ink-signed

4   originals of a promissory notes in general or

5   these two promissory notes specifically?

6          MR. MORRIS:  Objection to the form

7       of the question.

8     A.    Sorry, I just want to make sure I

9   understand your question.  Are you saying is

10   there a file somewhere that has ink-signed

11   originals of these two promissory notes?

12     Q.    Yes.

13     A.    I would -- I would assume they're

14   some place.  I mean --

15     Q.    Well, was there a -- was there a

16   place where Highland generally kept originals

17   of promissory notes owed to it?

18     A.    I wouldn't -- no.

19          MR. RUKAVINA:  Mr. Nguyen, would you

20   please pull up my A7, alpha 7.

21     Q.    These are the two promissory notes,

22   Mr. Waterhouse.

23          (Exhibit A7 marked.)

24     Q.    And please -- Mr. Waterhouse, please

25   command my associate to scroll down as you need

1           WATERHOUSE - 10-19-21

2    to, but I want you to take a very close look at

3    your two signatures here and tell me whether

4    you believe, in fact, that you ink signed them

5    or whether you --

6              MS. DANDENEAU:  Mr. Rukavina,

7         Mr. Waterhouse has the copies.

8              MR. RUKAVINA:  Perfect.  Then you

9         can take this down, Mr. Nguyen.

10        A.    These -- these -- these signatures

11   are identical, now that I stare at them, and I

12   mean, they are so close -- I mean, they're

13   identical that, I mean, even with my chicken

14   scratch signature, I don't know if I can -- you

15   know, I do this 100 times, could I do that

16   as -- as precisely as I see between the two

17   notes.

18        Q.    Well, that is why I ask.

19   Mr. Waterhouse, now that you have examined

20   them, does it seem like it is more likely that

21   you actually electronically signed these?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Is -- I don't -- I don't recall

25   specifically.  As I said before, my assistant

1          WATERHOUSE - 10-19-21

2    did have a -- an electronic signature, and that

3    was used from time to time.  It wasn't as

4    common practice back in 2019.  It definitely

5    was more common practice when we had to work

6    from home and remotely for COVID because it

7    that made it almost impossible to, right,

8    provide wet signatures since we're all working

9    from home remotely.

10         Q.    Well, going just for these two

11   promissory notes, Mr. Waterhouse, in light of

12   your inability to remember any details, are you

13   sure you actually signed either or both of

14   those notes?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't recall specifically

17   signing -- actually physically signing these

18   notes.  As I said before, I don't recall doing

19   that.  This -- this looks like my signature,

20   but yet these two signatures are identical.

21         Q.    So you don't recall physically

22   signing them, and I take it you don't recall

23   electronically signing them either?

24         A.    I don't recall.  You know, Highland

25   has all my emails.  If that occurred, you know,

1              WATERHOUSE - 10-19-21

2   you know, I don't have any of these records is

3   what I'm saying.  I don't have any of those

4   records.

5      Q.   That is why I'm asking you these

6   questions in great detail because I don't have

7   those emails.  I'm trying to -- I'm hoping that

8   you will give me some names or some details so

9   I can go look for more emails, but again, you

10  don't remember any -- any individual, other

11  than Mr. Dondero that we've discussed, you

12  don't remember any individual with whom you

13  discussed these promissory notes prior to their

14  execution?

15         MR. MORRIS:  Objection to the form

16     of the question.

17    A.   I don't recall discussing it with

18  anybody else.

19     Q.   Okay.

20     A.   I mean, prior --

21     Q.   I understand.

22     A.   You know, there was no one else --

23  there was no one else in that meeting that I

24  recall with Mr. Dondero.

25     Q.   Now, when you established that by

1           WATERHOUSE - 10-19-21

2    May of 2019 --

3         A.    And -- and from what I recall, and

4    the reason why I was by myself is -- is, you

5    know, I don't -- I don't want to speculate, I'm

6    sorry.

7         Q.    Okay.  We have established that by

8    May of 2019, in your view, the liabilities of

9    HCMFA exceeded its assets; correct?

10        A.    Yeah.  I mean, again, I don't have

11   financial statements in front of me, but I

12   think, if I recall, we'd have to go through the

13   testimony with Mr. Morris, I believe that was

14   the case.

15        Q.    In fact, you will recall that in

16   April of 2019, Mr. Dondero signed a document

17   that extended the demand feature of two prior

18   notes to May 31, 2019.  Do you recall that?

19             MS. DEITSCH-PEREZ:  I think you

20        might -- maybe have the court reporter read

21        that back.  You might have misspoke.

22             (Record read.)

23             MR. RUKAVINA:  And I did misspeak.

24        Q.    I meant to say to May 31, 2021.  Do

25   you recall that, sir?

1              WATERHOUSE - 10-19-21

2          MR. MORRIS:  Objection to the form

3   of the question.

4     A.   Yes.

5          MR. RUKAVINA:  And, Mr. Nguyen, just

6  so that the record is clear, will you please

7  pull up my Exhibit Alpha 10, A10.

8          (Exhibit A10 marked.)

9     Q.   You don't have this one in front of

10  you, Mr. Waterhouse?  This is the one that

11  Mr. Morris used earlier.  Do you see that

12  document, sir?

13     A.   Yes, I do.

14     Q.   And this is what you were testifying

15  about before when Mr. Morris was asking you.

16  Do you remember that?

17     A.   Yes.

18     Q.   So here is my question for you,

19  Mr. Waterhouse:  As the chief financial officer

20  of Highland, was it prudent for Highland less

21  than three weeks later to be lending

22  $7.2 million to an insolvent entity that

23  couldn't even then pay its debts back to

24  Highland?

25          MS. DANDENEAU:  Objection to form.

1      WATERHOUSE - 10-19-21

2      MR. MORRIS:  Objection to the form

3   of the question.

4      A.    Sorry, I just want to make sure --

5   are you asking me, did you say, was it prudent

6   for Highland to loan $7.4 million to HCMFA a

7   few weeks after this document was executed?

8      Q.    Yes, and at a time when HCMFA's

9   liabilities exceeded its assets.

10      MR. MORRIS:  Objection to the form

11   of the question.

12      A.    I don't -- it is odd.  I don't know.

13      MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15      Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20      MR. MORRIS:  Objection to the form

21   of the question.

22      A.    I don't recall.

23      Q.    Did you receive personally any of

24   that $7.4 million?

25      A.    No.

1          WATERHOUSE - 10-19-21

2     Q.    Did you even --

3          MR. MORRIS:  I didn't hear that

4     question, sir.

5          MR. RUKAVINA:  The one that he

6     answered, John, or my new one?

7          MR. MORRIS:  No, no, your question,

8     Davor.

9          MR. RUKAVINA:  I had asked him

10    whether he received any of the

11    $7.4 million.  He said no.

12         MR. MORRIS:  Yeah.  I thought there

13    was a question after that.  Maybe I was

14    mistaken.  I apologize.

15         MR. RUKAVINA:  I had started a new

16    question, so here, let me start the new

17    question again.

18    Q.    Did you personally receive any

19 direct benefit from those two notes for

20 $7.4 million?

21    A.    No.

22    Q.    Did you ever personally consider

23 yourself obligated to repay either or both of

24 those notes?

25    A.    No.

1              WATERHOUSE - 10-19-21

2              MR. RUKAVINA:  Pull up those notes

3    again, Mr. Nguyen.

4         Q.   You can have them in front of you,

5    Exhibit 7, Mr. Waterhouse, whatever is easier

6    for you.  If you go to your signature page, my

7    question to you is, why did you not include

8    your title as treasurer by your name, Frank

9    Waterhouse?

10              MS. DANDENEAU:  Objection to form.

11        A.   I didn't -- I didn't draft this

12   document.

13        Q.   So you relied on whoever drafted it

14   to draft it correctly?

15        A.   Yes.

16        Q.   Okay.  But back then when you signed

17   this, did it ever cross your mind that you were

18   the maker on these notes?

19        A.   No.

20        Q.   Back then when you signed this

21   document, did it ever cross your mind that you

22   could be a co-obligor on these notes?

23        A.   No.  I didn't receive $7.4 million,

24   I mean...

25        Q.   But can you say that HCMFA received

```
 1              WATERHOUSE - 10-19-21

 2   $7.4 million?

 3        A.    I would have to go back and look and

 4   check in, you know, the -- the financial

 5   records and the bank statements.

 6              MR. RUKAVINA:  You can take this

 7   exhibit down, Mr. Nguyen.

 8        Q.    Mr. Waterhouse, I'm not trying to be

 9   a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19        Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

 1              WATERHOUSE - 10-19-21

 2         MS. DANDENEAU:  Objection to the

 3     form.

 4     A.    Yes.

 5     Q.    So do you agree with me that it's

 6  odd -- I think that is the word you used --

 7  that Highland would be loaning $7.4 million a

 8  few weeks after that extension to an entity

 9  whose liabilities exceeded its assets, and you

10  would agree with me that it was never your

11  intention to be in any way liable for these two

12  promissory notes; correct?

13         MR. MORRIS:  Objection to the form

14     of the question.

15     A.    Sorry, you -- you asked a lot there.

16         MR. RUKAVINA:  I will strike it and

17  I will move on.

18         Let's go to -- pull up Exhibit 9,

19  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20  9, A9.

21         (Exhibit A9 marked.)

22     Q.    Sir, take a moment to look at this,

23  but this is an email, and you will see attached

24  July 31, 2020 affiliate notes.

25         Do you see that attachment?

```
 1              WATERHOUSE - 10-19-21

 2      A.    Yes.

 3      Q.    Okay.  And do you see an entry for

 4  Highland Capital Management Fund Advisors?

 5            MR. MORRIS:  I'm sorry, hold on.

 6      Where are you looking?

 7            MR. RUKAVINA:  Last page, John.

 8            MR. MORRIS:  Is it the page on the

 9      screen?

10            MR. RUKAVINA:  Oh, I'm sorry.

11      Mr. Nguyen just did it.  Yes, the last page

12      there.

13            MR. MORRIS:  Thank you.

14      Q.    Do you see an entry there for HCMFA?

15      A.    Yes.

16      Q.    About $10.5 million.

17            Do you see that?

18      A.    I do.

19      Q.    And, now, do you have any

20  explanation for why if HCMFA owed $7.4 million,

21  plus the 5.3 million that had been extended,

22  why that amount was only 10.5 million?

23      A.    I don't know.  Okay.

24            MR. RUKAVINA:  Close this one and

25      pull up, Mr. Nguyen, the schedules,
```

```
1              WATERHOUSE - 10-19-21
2         schedule of assets.  What exhibit is this
3         of ours, Mr. Nguyen?
4              MR. NGUYEN:  This is A11.
5              MR. RUKAVINA:  Oh, this will be A11.
6              (Exhibit A11 marked.)
7         Q.   You don't have this in front of you,
8    Mr. Waterhouse?
9         A.   Okay.
10        Q.   This is what Mr. Morris used
11   earlier.  Do you remember looking at this with
12   Mr. Morris?
13        A.   Yes.
14             MR. RUKAVINA:  You might have to
15        zoom in a little.  Okay.
16        Q.   Now, I see Affiliate Note A, B, and
17   C.
18             Do you have any recollection as to
19   why the names of the affiliates are omitted?
20        A.   I don't.  I testified earlier that,
21   you know, the team worked with DSI in providing
22   these.  I -- I don't -- I don't know.
23        Q.   Can we deduce -- is it logical to
24   deduce that Affiliate Note A would be NexPoint
25   given its size of $24.5 million?
```

1                    WATERHOUSE - 10-19-21

2                    MR. MORRIS:  Objection to the form

3         of the question.

4         A.    I mean, it -- it is a -- it is -- it

5    is approximate.

6         Q.    Well, can we -- can we deduce -- or,

7    I'm sorry, strike that.

8                    Can you, sitting here today,

9    logically conclude that Affiliate Note B or C

10   represents HCMFA?

11                   MR. MORRIS:  Objection to the form

12        of the question.

13        A.    I don't know.  I don't know.  I

14   can't.

15        Q.    Okay.  As of the petition date, we

16   have established that HCMFA, under promissory

17   notes, owed $7.4 million and $5.3 million to

18   the debtor; correct?

19                   MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Okay.  And by my reckoning, that

23   would be somewhere approaching $13 million.

24                   MR. MORRIS:  Objection to the form

25        of the question.

1              WATERHOUSE - 10-19-21

2        Q.    It would be $12.7 million.  Is that

3    generally correct?

4        A.    Sorry, the amounts were 7.4, 5.3.

5        Q.    Yes.

6        A.    Okay.  Yeah, that -- that -- I can

7    do that math, yes.

8        Q.    Do you have any explanation or any

9    understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12            MR. MORRIS:  Objection to the form

13        of the question.

14       A.    I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19       Q.    Well, that was going to be my next

20   question.  You anticipated it.

21            MR. RUKAVINA:  You can -- you can

22        take this down, Mr. Nguyen.

23       Q.    Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the

```
 1                   WATERHOUSE - 10-19-21

 2    affiliates for Affiliate Note A, B, and C would

 3    have been listed there?

 4         A.    Are you asking we provided the names

 5    to the financial advisor?  I don't -- I don't

 6    understand who the financial advisor is.

 7         Q.    I'm sorry, DSI.

 8               Let me ask the question this way,

 9    Mr. Waterhouse.

10               Whenever you provided information

11    about the affiliate notes to DSI, do you

12    believe that you would have included the actual

13    names of the affiliates, you or your team, or

14    that you would have done the Affiliate Note A,

15    Note B, Note C?

16               MR. MORRIS:  Objection to the form

17          of the question.

18               MS. DANDENEAU:  Objection to the

19          form.

20         A.    We -- like I testified earlier, when

21    we were -- we gave everything to -- to DSI.  We

22    were giving all of our records, all of our

23    files, everything to DSI.  We weren't redacting

24    information or saying, hey, here is a note,

25    here is Affiliate Note A or B.
```

```
 1                  WATERHOUSE - 10-19-21
 2            I mean, it was -- our job and our
 3    focus -- and I testified in court back in 2019;
 4    right -- was -- was to be transparent and, you
 5    know, get DSI up to speed on -- on the matters
 6    at Highland.  So I can't see us redacting at
 7    that point.
 8            MR. RUKAVINA:  Mr. Nguyen, will you
 9        please pull up Mr. Morris' Exhibit 36.
10        Just the very first page, the very top
11        email.  You might zoom in a little bit.
12        Q.   Now, you recall being asked about
13    this by Mr. Morris?
14        A.   Yes, I do.
15        Q.   And you wrote:  The HCMFA note is a
16    demand note.
17            You wrote that; right?
18        A.   Yes.
19        Q.   And, in fact, weren't there by that
20    point in time several notes?
21        A.   Yes, there were.  Again, I don't --
22    I don't remember everything specifically.  I
23    mean --
24        Q.   I understand.  I understand.
25            So this is an example where -- where
```

1          WATERHOUSE - 10-19-21

2    you might have made a mistake by referring to a

3    singular instead of a plural; right?

4          A.    Yes.

5          Q.    Okay.  And you -- you wrote -- a

6    couple of sentences later, you wrote:  There

7    was an agreement between HCMLP and HCMFA the

8    earliest they could demand is May 2021.

9              You wrote that; right?

10         A.    Yes.

11         Q.    But I think you -- you agreed with

12   Mr. Morris that that can't possibly apply to

13   the May 2019 notes, can it?

14             MR. MORRIS:  Objection to the form

15         of the question.  That is not what he

16         testified to.

17         Q.    Let me ask -- let me ask a different

18   question.

19             Sitting here today -- or if you can

20   answer me from your memory on October 6,

21   2020 -- did the April acknowledgment that

22   extended the maturity date apply to the

23   May 2019 notes also?

24         A.    I don't recall specifically.

25         Q.    Well, you recall that the notes that

1              WATERHOUSE - 10-19-21

2    you signed were demand notes; right?

3        A.    Yes.

4        Q.    Do you find it logical, based on

5    your experience, that had they intended to have

6    a different or a set maturity date, you would

7    have instructed that that set maturity date be

8    included instead of a demand feature?

9              MR. MORRIS:  Objection to the form

10         of the question.

11       A.    Sorry, just want to make sure I

12   understand.  You are saying that -- that the

13   $5 million note, the $2.4 million note, if

14   those were supposed to be a term note, that I

15   would have made sure that those were a term

16   note?

17       Q.    I'm saying -- I'm saying,

18   Mr. Waterhouse, that on May the 2nd and May the

19   3rd, 2019, if you intended that those two

20   promissory notes could not be called until May

21   2021, would you have included such language in

22   those two promissory notes?

23             MR. MORRIS:  Objection to the form

24         of the question.

25       A.    I guess -- I'm sorry, I don't recall

```
 1              WATERHOUSE - 10-19-21

 2   putting language in those May notes.  I don't

 3   remember what language you are referring to.

 4        Q.    Well, let's read this again.

 5              There was an agreement between HCMLP

 6   and HCMFA the earliest they could demand is May

 7   2021.

 8              Do you recall that agreement?

 9        A.    Yes, that was the agreement we

10   looked at earlier; correct?

11        Q.    Okay.  Yes.

12              Do you -- do you understand now that

13   that agreement that we looked at earlier also

14   applied to the May 2019 notes that you signed?

15        A.    I don't -- I don't know.

16        Q.    But as of October 6, 2020, you're

17   writing that there is one demand note and

18   you're categorizing that demand note as not

19   being demandable on May 2021; correct?

20        A.    Yes.

21        Q.    And you know now that you made at

22   least one mistake in this email; correct?

23              MR. MORRIS:  Objection to the form

24         of the question.

25        A.    Yes.
```

1              WATERHOUSE - 10-19-21

2         MR. RUKAVINA:  You can pull this

3    down, Mr. Nguyen.

4         Q.    So, Mr. Waterhouse, you don't

5    remember Mr. Dondero telling you to make these

6    loans or not.  HCMLP was loaning $7.4 million

7    to someone that their assets were less than

8    their liabilities.

9              We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14             Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    I -- I don't know.

20        Q.    And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23             MS. DANDENEAU:  Objection to the

24        form.

25             MR. MORRIS:  Join.

1                WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    If Mr. Dondero testifies that he

4  never told you to make these loans, would you

5  disagree with his testimony?

6           MR. MORRIS:  Objection to the form

7      of the question.

8      A.    Like I testified earlier with my

9  conversation with Mr. Dondero, all I recall is

10  he said, get the money from Highland.

11      Q.    And if Mr. Dondero testifies that

12  he, in consultation with other senior personnel

13  at Highland, decided that Highland needed to

14  pay HCMFA $7.4 million as compensation for the

15  NAV error and not a loan, would you have any

16  reason to disagree with Mr. Dondero?

17           MR. MORRIS:  Objection to the form

18      of the question.

19      A.    If that was -- if that was his

20  intent, yes, it would -- I would --

21      Q.    Do you have any reason to disagree

22  with him?

23           MR. MORRIS:  Objection to the form

24      of the question.

25      A.    If that was his intent, I don't

1            WATERHOUSE - 10-19-21

2    know.  I don't know how I disagree with that.

3        Q.    And just to confirm, you don't

4    remember ever asking Mr. Dondero whether you

5    should have two promissory notes prepared?

6        A.    No.

7        Q.    And you don't remember discussing

8    with Mr. Dondero what the terms of those two

9    promissory notes should be?

10       A.    I don't recall -- I testified all I

11   recall is he said, get the money from Highland.

12   I don't -- the -- the terms of the note, I

13   don't recall ever having a discussion around

14   the terms of the note, but since I don't draft

15   the notes, that -- there could have been a

16   conversation with other people later.

17       Q.    Do you have any memory of whether

18   after the notes were drafted, but before you

19   signed them, that you communicated with

20   Mr. Dondero in any way to just confirm or -- or

21   get his blessing or ratification to signing

22   those notes?

23            MR. MORRIS:  Objection to the form

24        of the question.

25       A.    I don't recall.

```
1                    WATERHOUSE - 10-19-21

2        Q.    Again, the only thing you remember,

3    sitting here today, was Mr. Dondero said, get

4    the money from Highland, and that is it, that

5    is all you remember?

6              MR. MORRIS:  Objection to the form

7         of the question.

8        A.    I testified to that several times.

9    This was over two years ago.  A lot has

10   happened.  That is all I recall.

11       Q.    And help me here.  I'm not very

12   technologically astute.  When you -- and I -- I

13   recognize that you do it rarely, but when you

14   sign a document electronically, do you believe

15   that there is an electronic record of you

16   having authorized or signed a document

17   electronically?

18             MR. MORRIS:  Objection to the form

19        of the question.

20       A.    I -- I don't know the tech answer to

21   that, but, you know, since I don't have -- I

22   don't ever attach my signature block

23   electronically, my assistant would have done

24   that, and if that is done over email like we

25   did several times -- you know, multiple,
```

1          WATERHOUSE - 10-19-21

2    multiple times over COVID, she would attach my

3    signature block and then email it out to

4    whatever party.

5          Q.    What was your assistant's name in

6    May 2019?

7          A.    It was Naomi Chisum.

8          Q.    Is she the only one?  I'm sorry, was

9    she your only assistant that would have maybe

10   facilitated logistically something like you

11   just described?

12         A.    You know, she was out on maternity

13   leave at some point.  I don't -- I don't recall

14   those dates where she was out for maternity

15   leave.  There was -- there were folks backing

16   her up.  I don't recall specifically who

17   those -- who those, you know, administrative

18   assistants were, and I don't recall

19   specifically if she was out during this time on

20   maternity leave.

21              I do know that that she was out for

22   a period of time, or who knows, or she could

23   have been on vacation that day or, you know, I

24   don't know.

25         Q.    Switching gears now, the two

1            WATERHOUSE - 10-19-21

2    complaints that have been filed that is against

3    HCMFA and NexPoint, did you see any drafts of

4    those complaints before they were filed?

5            MR. MORRIS:  Objection to the form

6        of the question, and to the extent that you

7        had any communications with counsel or you

8        were shown drafts of the complaints by

9        counsel while you were employed by

10       Highland, I direct you not to answer.

11   A.    I -- I reviewed documents yesterday

12   with counsel here.  I believe that is the first

13   time I have ever seen those.

14   Q.    Okay.  Did you ever discuss with

15   Mr. Seery these two lawsuits before or after

16   they were filed?

17   A.    I don't recall.

18   Q.    Were you ever interviewed by legal

19   counsel, to your knowledge, about these

20   promissory notes before the complaints were

21   filed?  Without going into what was said, were

22   you ever interviewed by legal counsel?

23           MR. MORRIS:  Objection to the form

24       of the question.

25   A.    I don't recall.

1          WATERHOUSE - 10-19-21

2     Q.    Obviously with COVID, it changed,

3  but -- but before COVID, did you used to meet

4  with Mr. Seery from time to time in-person?

5     A.    Yeah, I mean, so before COVID -- so

6  we're talking kind of late March, early April,

7  right, there was about -- I don't remember the

8  specific date when the board for Highland was

9  appointed.  I believe it was around February of

10 2020, so maybe there was a month-and-a-half,

11 two-month window where we were meeting

12 in-person or, you know, like we were actually

13 in the office, excuse me, we were in the

14 office.

15          And, you know, when they were first

16 appointed, the board members and Mr. Seery

17 were -- were definitely down here more

18 in-person.

19     Q.    Did you ever see Mr. Seery taking

20 written notes of -- of his meetings with you or

21 others?

22     A.    I don't recall.

23     Q.    Do you recall on any Zoom or video

24 conference with Mr. Seery, seeing him take

25 notes, written notes?

1          WATERHOUSE - 10-19-21

2     A.    The Zoom calls we had, I don't

3   recall having seen video or, you know, or if it

4   was on Zoom, I just remember it being -- well,

5   no, you know what, there were some -- you know,

6   I take that back.

7          So there were -- there were some

8   times that I did remember seeing Mr. Seery

9   on -- on some of the Zoom calls.

10    Q.    Well, let me --

11    A.    I don't -- sorry, I'm thinking.  I'm

12  thinking -- I'm going back.  I'm trying to

13  process this.

14    Q.    I can make it much quicker,

15  Mr. Waterhouse.  I have heard -- I have heard

16  that Mr. Seery is a copious note taker.

17          Do you have any knowledge about

18  that?

19    A.    No.

20    Q.    Okay.  Switching gears yet again,

21  and this will be last theme.  Do you need a

22  restroom break, or are you good to go for

23  another half an hour?

24          MS. DEITSCH-PEREZ:  I need a

25      restroom break.

```
 1              WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Can we make it five

 3         minutes?

 4              THE WITNESS:  Five minutes would be

 5         great.

 6              VIDEOGRAPHER:  We're going off the

 7         record at 5:53 p.m.

 8         (Recess taken 5:53 p.m. to 5:59 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10         record at 5:59 p.m.

11         Q.    Mr. Waterhouse, I had asked you

12    earlier about contracts between HCMFA and the

13    debtor, and now I'm going to talk about

14    contracts between the debtor and NexPoint

15    Advisors.  Okay?

16         A.    Okay.

17         Q.    Now, were there contracts similar to

18    the ones with HCMFA that NexPoint had in the

19    nature of employee reimbursement and shared

20    services?

21         A.    Yes, they -- NexPoint Advisors and

22    Highland Capital Management Fund Advisors had

23    cost reimbursement and shared services

24    agreements with Highland Capital Management,

25    L.P.
```

1          WATERHOUSE - 10-19-21

2     Q.    And was that shared services

3 agreement, to the best of your understanding,

4 in place as of December 31, 2020?

5     A.    It was -- it was terminated at some

6 point, and I remember the contracts had

7 different termination dates, but I think the --

8 the date of termination was January 31st of

9 2021, after the termination was put in.

10          So yeah, it would be in place at the

11 end of the year of December -- it would be in

12 place at December 31st, 2020.

13     Q.    And pursuant to that agreement as of

14 December 31st, 2020, was the debtor providing

15 what you would describe as back office services

16 to NexPoint?

17     A.    Yes.

18     Q.    Would those have included accounting

19 services?

20     A.    Yes.

21     Q.    And as part of those accounting

22 services, would the debtor have assisted

23 NexPoint with paying its bills?

24          MR. MORRIS:  Objection to the form

25     of the question.

```
 1              WATERHOUSE - 10-19-21

 2      A.   Yes.

 3      Q.   So let's break that up.  You were a

 4  treasurer of NexPoint as well in December of

 5  2020?

 6           MR. MORRIS:  Objection to the form

 7      of the question.

 8      A.   Yes.

 9      Q.   Okay.  And in December of 2020, did

10  NexPoint have its own bank accounts?

11      A.   Yes.

12      Q.   And did it use those bank accounts

13  to pay various of its obligations?

14      A.   Yes.

15      Q.   Did employees of the debtor have the

16  ability to cause transfers to be made from

17  those bank accounts on behalf of NexPoint?

18      A.   Yes.

19      Q.   And is that one of services that the

20  debtor provided NexPoint, basically ensuring

21  that accounts payable and other obligations

22  would be paid?

23      A.   Yes.

24           MR. MORRIS:  Objection to the form

25      of the question.
```

1                    WATERHOUSE - 10-19-21

2        Q.     You answered yes?

3        A.     Yes.

4        Q.     And the payments, though, whose

5    funds would they be made from?

6        A.     From the bank account of NexPoint

7    Advisors.  If they were NexPoint advisor

8    obligations, it would be made from NexPoint

9    Advisors' bank account.

10       Q.     So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13              (Exhibit A1 marked.)

14       Q.     So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18              Do you see that, sir?

19       A.     I do.

20       Q.     And do you see where Ms. Hendrix

21   writes:  NPA.

22              Do you know what NPA stood for?

23       A.     Yes.

24       Q.     And what does it stand for?

25       A.     NexPoint Advisors.

```
1              WATERHOUSE - 10-19-21

2      Q.    And was that how you-all internally

3   at Highland refer to NexPoint Advisors, L.P.?

4      A.    I mean, yes, amongst other things.

5      Q.    And she writes at the bottom of her

6   email:  Okay to release?

7            Do you see that?

8      A.    Yes, I do.

9      Q.    So what --

10           MR. MORRIS:  Hold on one second.

11           Okay.  Go ahead.

12           MR. RUKAVINA:  Yeah.

13     Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15     A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21           So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.
```

```
 1              WATERHOUSE - 10-19-21
 2              So she is -- she is putting in all
 3   the payments for the week because we batch
 4   payments weekly.  And these are the payments
 5   that go out that week, and she is informing me
 6   of the payments and -- you know, again, at the
 7   bottom of the email, she is asking for my okay
 8   to -- to release these payments in the wire
 9   system.
10        Q.   So these would be accounts payable
11   of NexPoint?
12        A.   I mean, it would be accounts payable
13   for all of these entities listed on this email.
14        Q.   And who was Ms. Hendrix employed by
15   in November and December of 2020?
16        A.   Highland Capital Management.
17        Q.   Okay.  So -- so part of the services
18   that NexPoint had contracted with was for
19   Highland to ensure that NexPoint timely paid
20   its accounts payable; is that accurate?
21              MR. MORRIS:  Objection to the form
22        of the question.  You have got to be
23        kidding me.
24        Q.   Is that accurate?
25        A.   Yes.
```

1          WATERHOUSE - 10-19-21

2     Q.    And did NexPoint rely on employees

3  of the debtor to ensure that NexPoint's

4  accounts payable were timely paid?

5          MR. MORRIS:  Objection to the form

6     of the question.

7     A.    Yes.

8          MR. RUKAVINA:  Let's flip to the

9     next page, Mr. Nguyen, if you will please

10    scroll to the next page.

11    Q.    So this is an email similar to the

12 prior one, November 30th.

13         Do you see where it says, NPA HCMFA,

14 USD $325,000 one-day loan?

15         Do you see that, sir?

16    A.    I do.

17    Q.    Do you have any memory of what that

18 was?

19    A.    I don't recall what that -- what

20 that payment was for.

21    Q.    Did it sometimes occur that one

22 advisor would, on very short-terms, make loans

23 to another advisor?

24    A.    Yes.  This -- this -- this occurred

25 from -- from -- from time to time.  It actually

1                WATERHOUSE - 10-19-21

2    looking at -- I'm -- I'm looking at the date of

3    this email.  It is November 30th.  It is the

4    last day of the month.

5              HCMFA has obligations it needs to

6    pay to its broker-dealer, which is HCFD.  And

7    it likely was short funds to make those

8    obligations under that -- under its agreement,

9    and so it provided a one-day loan because on

10   the next business day on 12/1 -- or the next

11   business day in December, it would receive

12   management fees from the underlying funds that

13   it managed and it would be able to pay back

14   that loan to NexPoint Advisors.

15        Q.    So -- so here Ms. Hendrix was

16   seeking your approval to transfer $325,000 from

17   NexPoint to HCMFA for a one-day loan; is that

18   correct?

19        A.    That is correct.

20        Q.    Let's flip to the next page, sir.

21              MR. RUKAVINA:  And, Mr. Nguyen, if

22        you will please scroll down.

23        Q.    Now we have as an entry for

24   $325,000, 11/30 loan payment.

25              Do you see that, sir?

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And that is probably the loan that

4   was approved on the prior page?

5        A.    Yes, most likely.

6        Q.    So is it also true, sir, that in

7   addition to accounts payable debtor employees

8   would be assisting NexPoint with respect to

9   paying back its debt?

10            MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I mean, yes, for loans of this

13   nature, yes.

14       Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18            MR. MORRIS:  Objection to the form

19       of the question.

20            MS. DANDENEAU:  Objection to form.

21       A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember

1                   WATERHOUSE - 10-19-21

2    specifically but, yes, generally we -- you

3    know, we did do that.

4         Q.    So do you recall -- and we can pull

5    it up, if need be -- that under the NexPoint

6    note that Mr. Morris asked you about earlier,

7    the one for more than $30 million, that

8    NexPoint was obligated to make an annual

9    payment of principal and interest?

10              MR. MORRIS:   Objection to the form

11        of the question.

12        A.    Yes, it was -- yes, it -- it was an

13   amortizing note.  It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.  So -- but are --

16   are you asking me --

17        Q.    I'm just asking you, sir, if you

18   recall the note.

19        A.    Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21        Q.    And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24        A.    I do.

25        Q.    And do you believe that employees of

1          WATERHOUSE - 10-19-21

2     the debtor would have played any role in

3     NexPoint having made those prior payments?

4               MR. MORRIS:  Objection to the form

5          of the question.

6     A.    Yes.

7     Q.    And what role in years prior to 2020

8     would employees of the debtor have had with

9     respect to NexPoint making that annual payment?

10    A.    We -- we -- we would have -- I keep

11    saying "we."  The team would have calculated

12    any amounts due under that loan and other

13    loans, as -- as standard course.

14              We would -- since we provided

15    treasury services to the advisors, we would

16    inform the -- the -- the -- we informed

17    Mr. Dondero of any cash obligations that are

18    forthcoming, whether we do cash projections.

19              If, you know, any of these payments

20    would have -- or, you know, the sum total of

21    all of these payments, including any note

22    payments, if there were any cash shortfalls, we

23    would have informed Mr. Dondero of any cash

24    shortfalls.  We could adequately plan, you

25    know, in instances like that.

1                    WATERHOUSE - 10-19-21

2              Or, sorry, we -- I say "we" -- I

3    keep saying "we" -- I keep wearing my -- again,

4    my -- my treasurer hat.

5              But, yes, it is to -- it is to

6    inform Mr. Dondero of the obligations of the

7    advisors in terms of cash and obligations that

8    are -- are upcoming and that -- and that are --

9    are scheduled to be paid.

10        Q.    And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Davor, I think

16        you misspoke.  You might want to just

17        repeat the question.

18        Q.    Okay.  Let me repeat the question,

19   sir.

20              Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24        A.    Yes.

25        Q.    So someone at the debtor in treasury

1          WATERHOUSE - 10-19-21

2    or accounting would have sent some schedule or

3    a reminder that a payment would be coming due

4    in the future.  Is that generally the practice?

5         A.    Yes, we would -- you know, again, I

6    didn't -- I didn't micromanage the teams, but

7    we had a -- a corporate accounting calendar

8    that we use as kind of a tickler file to keep

9    track of payments.

10              I actually, you know, don't know how

11   actively they're using that in -- in prior to

12   2020, but it was actively used at some point.

13              We did look at NexPoint cash

14   periodically and cash for the other advisors as

15   well and payments.  You know, we -- payments

16   like this would have appeared in our cash

17   projections, in the advisor's cash projections.

18              And, again, as like I said earlier,

19   they would have appeared there, so there would

20   be time to plan for making any of these

21   payments.

22        Q.    And based on your experience, would

23   it have been reasonable for NexPoint to rely on

24   the debtors' employees to inform NexPoint of an

25   upcoming payment due on the $30 million

```
1                    WATERHOUSE - 10-19-21

2    promissory note?

3              MR. MORRIS:  Objection to form of

4         the question.

5              MS. DANDENEAU:  Objection to form.

6         A.    Yes.  Yes, they did.  I mean, but I

7    mean, but I don't think these -- these notes

8    were any secret to anybody.

9         Q.    I understand, and I'm not suggesting

10   otherwise.

11             MR. RUKAVINA:  Please pull up Alpha

12   2, Mr. Nguyen.

13             (Exhibit A2 marked.)

14        Q.    Now, this document is similar to the

15   ones we've seen before as of December 31, 2020,

16   and I don't see under NTA anything there for

17   paying the promissory note to Highland.

18             Do you see anything like that?

19        A.    I do not.

20             MR. RUKAVINA:  You can pull that --

21   that exhibit down, Mr. Nguyen.

22        Q.    You are aware, of course, by now

23   that, in fact, NexPoint failed to make the

24   payment due December 31, 2020, are you not?

25        A.    I am aware, and yes, I do understand
```

```
 1              WATERHOUSE - 10-19-21

 2   it.

 3        Q.     Were you aware that Highland

 4   accelerated that $30 million promissory note?

 5        A.     I am aware.

 6        Q.     Were you aware of that acceleration

 7   at the time that it occurred?

 8        A.     I don't remember specifically.

 9        Q.     Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.     Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.     Yes, before acceleration.

16              MR. MORRIS:  Objection to the form

17        of the question.

18        A.     I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20              MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.     Let me try again, Mr. Waterhouse,

23   let me try again.

24              I am saying you're the CFO of

25   someone, in this case, Highland, and the
```

1          WATERHOUSE - 10-19-21

2     borrower failed to make the required payment.

3     Are you with me so far?

4          A.    I am.

5          Q.    Did anyone then ask you, what should

6     we do with respect to our rights against the

7     borrower that missed the payment?

8          A.    Not that I recall.

9          Q.    Did you play a role in the decision

10    to accelerate that $30 million promissory note?

11         A.    I did not.

12         Q.    Do you recall whether Mr. Seery ever

13    asked you before the acceleration as to whether

14    he should accelerate the note?

15         A.    I don't recall.

16         Q.    And you don't recall when you

17    learned of the acceleration itself?

18              MR. MORRIS:   Objection to the form

19         of that question.

20         A.    It was -- it was sometime in

21    early -- in early 2021.  I don't remember

22    specifically.

23         Q.    But do you recall whether it was

24    after the acceleration had already been

25    transmitted?

```
 1               WATERHOUSE - 10-19-21

 2               MS. DANDENEAU:  Objection to the

 3       form of the question.

 4       A.    I don't recall.

 5       Q.    Do you recall in early to mid

 6  January of 2021, after the default, discussing

 7  the default with Mr. Dondero?

 8       A.    I do recall discussing with

 9  Mr. Dondero after December 31, 2020?

10       Q.    Yes, the fact of the default.

11       A.    I don't recall.

12               MR. RUKAVINA:  Let's pull up my

13       Exhibit 6, Alpha 6.

14               (Exhibit A6 marked.)

15               MR. RUKAVINA:  And, Mr. Nguyen, if

16       you will please scroll down.

17       Q.    This email chain begins with you

18  writing to Ms. Hendrix on January the 12th:

19  NexPoint note to HCMLP.

20               Do you see that, sir?

21       A.    I do.

22       Q.    Were you discussing this same

23  $30 million note we're talking about right now

24  with Ms. Hendrix?

25       A.    Yes.
```

```
1                    WATERHOUSE - 10-19-21
2        Q.    Okay.  Do you recall what prompted
3   you to send that email to her?
4        A.    Yes, I had -- I had a conversation
5   with Jim.
6        Q.    Okay.  And what -- what did you
7   discuss with Jim that led to this email chain?
8        A.    He -- he called me and he said he
9   wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13       Q.    And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18       A.    No, it was -- it was that morning.
19       Q.    And do you recall how you had that
20  conversation with him?
21            MR. MORRIS:  Objection to the form
22       of the question.
23       Q.    By telephone, by email, in-person?
24       A.    Yeah, he -- he called me.  I was at
25  home.  We were working from home here in
```

```
 1              WATERHOUSE - 10-19-21

 2   December of 2020.  He called me from home.  He

 3   said he was in court.  He wanted to -- he asked

 4   about, you know, making payment on the note and

 5   the amount, and so I didn't have those numbers

 6   in front of me, so I said I would get back to

 7   him.  I wanted all the details, so here is

 8   this -- so I reached out to Kristin.

 9        Q.   And then she gave you that

10   $1,406,000 figure?

11             MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.   Yes.  Yeah, she -- the $1,406,112.

14        Q.   And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.   Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.   Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.   Yes, they did.

22        Q.   Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25             When you conveyed the number to
```

1          WATERHOUSE - 10-19-21

2   Mr. Dondero, was -- was it also on January

3   12th?

4        A.    Sorry, when I conveyed the

5   $1.4 million number?

6        Q.    Yes.

7        A.    Yes, yes, it was that -- it was --

8        Q.    So you had --

9        A.    It was that point.

10        Q.    Well, to the best of your

11   recollection, you had a conference with

12   Mr. Dondero by the telephone in the morning,

13   and then another conference with him by

14   telephone after 11:40 a.m. that morning?

15        A.    Yeah, I can't remember -- yeah, it

16   was either that morning or it could have been,

17   you know, early afternoon, but again, I

18   remember calling him back, relaying this

19   information to him, and he said, okay, pay --

20   you know, make -- make this payment.

21        Q.    And during either of those two

22   calls, did you tell Mr. Dondero anything to the

23   effect that making those -- I'm sorry, making

24   that payment would not de-accelerate the

25   promissory note?

1              WATERHOUSE - 10-19-21

2       A.    No.

3       Q.    Did you tell him anything to the

4  effect that making that payment would not cure

5  the default?

6       A.    No.

7       Q.    Did you discuss that in any way with

8  him?

9       A.    No, I did not.

10      Q.    Did he say why he wanted to have

11 that $1.4 million payment made?

12            MR. MORRIS:  Objection to the form

13      of the question.

14      A.    He -- he -- he didn't go into

15 specifics.

16      Q.    Did he say anything to you to the

17 effect that if NexPoint makes that payment,

18 then the note will be de-accelerated?

19            MR. MORRIS:  Objection to the form

20      of the question.

21      A.    I don't recall.

22            MR. RUKAVINA:  You can put this one

23      down, Mr. Nguyen.

24      Q.    And, again, when you say you don't

25 recall, you mean you don't remember right now

1              WATERHOUSE - 10-19-21

2    either way; correct?

3         A.    Yeah, I don't remember.  I don't

4    remember us discussing that.

5         Q.    Now -- and we're almost done, I

6    promise.  I'm just going to -- I don't know how

7    to ask this question, so I'm just going to try

8    to do my best.

9              Prior to the default on December 31,

10   2020, did Mr. Seery ever tell you any words to

11   the effect that you or someone at Highland

12   should ensure that NexPoint doesn't make its

13   payment?

14        A.    No.

15        Q.    Did you have any hint or any belief

16   that anyone at NexPoint -- I'm sorry, strike

17   that.

18             Did you have any reason to believe

19   that anyone with Highland was actively trying

20   to get NexPoint to make that default by not

21   paying on December 31?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Are you asking, did any Highland

25   employees actively work to make -- to

```
 1              WATERHOUSE - 10-19-21

 2   somehow --

 3        Q.    Yes.  Let me take a step back.  Let

 4   me take a step back.

 5              So you are aware now that as a

 6   result of that default, what was still some

 7   25-year note was accelerated and became

 8   immediately due.  You are aware of that now;

 9   right?

10        A.    Yes.

11        Q.    And can you see how someone at

12   Highland might actually have been pleased with

13   that development?

14              MR. MORRIS:  Objection to the form.

15        Q.    Not that they were --- not that they

16   were pleased, but you can see how someone at

17   Highland might have been pleased with that

18   development?

19              MR. MORRIS:  Objection to the form

20        of the question.

21              MS. DANDENEAU:  Object to form.

22        A.    I don't know how they would have

23   reacted to that.

24        Q.    Okay.  But you're not -- you're not

25   aware of any instructions or any actions being
```

1           WATERHOUSE - 10-19-21

2    given or taken at Highland by Mr. Seery, the

3    independent board, DSI, that -- that would have

4    basically led Highland to ensure that NexPoint

5    would fail to make that payment?

6         A.    I'm not aware.

7         Q.    In other words, there wasn't a trick

8    or a settlement; right?

9              MS. DEITSCH-PEREZ:  Objection to

10        form.

11             MS. DANDENEAU:  Object to form.

12             MR. MORRIS:  Object to form.

13        A.    I'm not aware.

14             Look, I'm not aware.  I'm not in

15    every conversation.  I mean, and I'm just --

16    again, I'm sitting at home.  It is the end of

17    the year.  Again, I'm not aware.

18        Q.    That is a perfectly legitimate

19    answer.  I don't know why -- why you think

20    otherwise.

21             Okay.  Just give me one second to

22    compose my thoughts.

23             MS. DEITSCH-PEREZ:  While you're

24        taking your one second, why don't we take

25        three minutes.  I will be right back.

```
1                    WATERHOUSE - 10-19-21

2                    VIDEOGRAPHER:  Do we want to go off

3         the record?

4                    MR. RUKAVINA:  Yes.

5                    VIDEOGRAPHER:  All right.  We're

6         going off the record at 6:27 p.m.

7         (Recess taken 6:27 p.m. to 6:30 p.m.)

8                    VIDEOGRAPHER:  We are back on the

9         record at 6:30 p.m.

10                   MR. HORN:  Is Deb back?

11                   MS. DANDENEAU:  Are you asking about

12        me?  I'm here.

13                   MR. HORN:  Oh, okay.  I don't see

14        you, sorry.

15        Q.   Actually, yeah, Mr. Waterhouse, so

16     when you had --

17                   MS. DANDENEAU:  Are you asking about

18        Deb Dandeneau or Deborah?  I mean, there

19        are a lot -- as we talked about, a lot of

20        Debs.  I'm here.

21                   MS. DEITSCH-PEREZ:  I'm here.

22                   MR. HORN:  Yes, I was asking about

23        DDP.

24                   MS. DEITSCH-PEREZ:  Oh, DDP is here.

25                   MR. HORN:  Okay.  Here we go.  I'm
```

```
1              WATERHOUSE - 10-19-21
2       going back on mute.
3              MS. DANDENEAU:  Get the right
4       nomenclature.
5       Q.    Mr. Waterhouse, on January 12th,
6  2021, when you had those talks with Mr. Dondero
7  about the $1.4 million payment, did you have a
8  communication or a conversation with Mr. Seery
9  about that payment after January 12th, 2021?
10      A.    I don't recall.
11      Q.    Well, in response to Mr. Dondero
12 reaching out to you, do you recall on that day,
13 January 12th, talking to Mr. Seery or anyone at
14 Highland other than the email chain we just saw
15 about Mr. Dondero's call with you?
16      A.    Did I talk to -- I spoke with
17 Kristin -- I don't know if I spoke to her.  I
18 likely spoke to Kristin Hendrix because we had
19 to get the wire on NexPoint's behalf to make
20 the payment to Highland.
21      Q.    So it is true, then, that -- that
22 employees of the debtor did actually cause that
23 payment to be made when it was made after
24 January 12th?
25      A.    Yes, I mean, we -- we -- as I
```

1          WATERHOUSE - 10-19-21

2    testified earlier, we provided that accounting

3    finance treasury function as -- under the

4    shared services agreement.  And so once I

5    got the -- I talked to Jim, got the approval to

6    make this payment, we have to then make the

7    payment, or the team does, and so the payment

8    was made.

9       Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15           MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I don't -- I don't recall.

18       Q.    And does that include legal counsel?

19           Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24       A.    I don't recall.

25       Q.    Okay.  Thank you, sir, for your

```
 1                    WATERHOUSE - 10-19-21

 2   time.

 3              MR. RUKAVINA:  Pass the witness.

 4              MR. MORRIS:  I just have a few

 5        questions, if I may.

 6              MS. DEITSCH-PEREZ:  Don't you go at

 7        the end?

 8              MR. MORRIS:  Oh, I apologize.  He is

 9        your witness.  I'm surprised you want to

10        ask him questions, but go right ahead.

11              MS. DEITSCH-PEREZ:  Just have a

12        couple of things.

13              MR. RUKAVINA:  And I will just

14        object to that, that he's our witness.

15        That's not --

16              MR. MORRIS:  I'm not talking to you.

17        I'm not talking to you.

18              MS. DANDENEAU:  Also, Mr. Morris, it

19        is -- it is --

20              MS. DEITSCH-PEREZ:  He is not my

21        witness.  He's been subpoenaed by you.

22        Okay?

23              That is no offense, Mr. Waterhouse,

24        I'm -- I'm not -- okay.  Anyway.

25                    EXAMINATION
```

1                    WATERHOUSE - 10-19-21

2    BY MS. DEITSCH-PEREZ:

3         Q.    Good evening.  I'm very sorry to be

4    going last and I know you have had a long and

5    taxing day, so I thank you for indulging me.

6               The kinds of services that you

7    describe that the -- that Highland provided for

8    NexPoint, did Highland also provide similar

9    services to that to HCRE and HCMS?

10        A.    Yes.

11              MR. MORRIS:  Objection to the form

12        of the question.

13        Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15              MR. MORRIS:  Objection to the form

16        of the question.

17              MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19              MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23              MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.    Let's take them one at a time.

1          WATERHOUSE - 10-19-21

2          What kinds of services did Highland

3    provide to HCRE?

4          MR. MORRIS:  Objection to the form

5      of the question.

6      A.    HCMS, Highland employees provided

7    accounting services, treasury management

8    services, potentially legal services.  I

9    don't -- but I wouldn't have been directly

10   involved in that.  But as far as the teams that

11   I manage, it was accounting, treasury, things

12   of that nature.

13     Q.    Okay.  And that was for HCM, LLP --

14     A.    And -- and, sorry, it would also be

15   any asset valuation if needed as well.

16     Q.    Okay.  We went back and forth on

17   each other and I apologize, so just to clarify.

18          You were talking about the services

19   that Highland Capital Management provided to

20   HCMS; is that right?

21     A.    HCMS.  So, again, yes.  And

22   accounting, treasury, valuation, and also tax

23   services too.

24     Q.    Okay.

25     A.    Tax services.  Look, I'm expanding

```
 1                  WATERHOUSE - 10-19-21

 2   this, their HR services as well.

 3        Q.    Okay.  And did that include bill

 4   paying?

 5              MR. MORRIS:  Objection to the form

 6        of the question.

 7        Q.    Did the services that HCM provided

 8   to HCMS include bill paying?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21              MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did
```

1          WATERHOUSE - 10-19-21

2   HCMLP cause HCMS to pay its bills?

3          MR. MORRIS:  Objection to the form

4      of the question.

5      A.   I mean, it -- it -- it depend -- it

6   depended on the nature of the payment and the

7   vendor, but, you know, if there were -- if

8   there were larger scheduled payments, you know,

9   I would like to give at least 30 days notice.

10         And that is -- that is kind of my

11  rule of thumb so no one is surprised.

12     Q.   Okay.  And was it generally HCMLP's

13  practice to timely pay HCMS' bills?

14         MR. MORRIS:  Objection to the form

15     of the question.

16     A.   It -- it -- it -- that depended on

17  the nature of the payment.

18     Q.   Okay.  And can you explain what you

19  mean by that?

20     A.   Yeah, I mean if -- if it was -- I

21  mean -- if there was some professional fees

22  that weren't -- you know, they were due but

23  they weren't urgent, those fees may not be paid

24  as timely as others that have a due date or --

25  or things like that.

1          WATERHOUSE - 10-19-21

2      Q.    Okay.  Are loan payments the kinds

3  of thing that HCMLP would pay on time because

4  of potential consequences of not paying on

5  time?

6          MR. MORRIS:  Objection to the form

7      of the question.

8      A.    Yes.  As I testified earlier, we

9  would want to give, you know, notice on -- on

10  -- on larger payments and -- and things of that

11  nature so we didn't miss due dates.

12      Q.    Okay.  And over the course of time,

13  did HCMLP generally pay HCMS' loan payments in

14  a timely fashion?

15          MR. MORRIS:  Objection to the form

16      of the question.

17      A.    I can't remember specifically, but

18  generally, yes.

19      Q.    Okay.  Now, did HCMLP provide

20  similar services to HCRE that you have

21  described it provided to HCMS?

22          MR. MORRIS:  Objection to the form

23      of the question.

24      A.    Yes, but I don't think it -- it

25  provided -- I don't think it provided HR

```
 1                WATERHOUSE - 10-19-21

 2   services.

 3        Q.    Can you describe the accounting and

 4   treasury services that HCMLP provided for HCRE?

 5        A.    Yeah, it -- it would provide

 6   bookkeeping services on a -- on a periodic

 7   basis.  It would make payments, you know, as

 8   needed.

 9        Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the
```

```
 1                  WATERHOUSE - 10-19-21

 2     loan payment that was due from HCMS to HCMLP in

 3     December of 2020?

 4               MR. MORRIS:  Objection to the form

 5          of the question.

 6          A.    I don't believe that payment --

 7     payment was made.

 8          Q.    Okay.  And when HCMLP caused HCMS in

 9     the past to make loan payments, whose money did

10     it use to make those payments?

11               MR. MORRIS:  Objection to the form

12          of the question.

13          A.    It was the -- the money in HCMS's

14     operating account would be made to that --

15     those moneys would be used to make payment to

16     Highland Capital Management.

17          Q.    Okay.  And Highland -- is it correct

18     that Highland Capital Management personnel had

19     the access to HCMS's accounts to be able to

20     cause such payments to be made?

21          A.    Yes, Highland personnel had access

22     to those accounts.

23          Q.    Okay.  And so now for HCRE, whose

24     money was used when HCMLP caused HCRE

25     payments -- loan payments to Highland to be
```

1          WATERHOUSE - 10-19-21

2    made?

3              MR. MORRIS:  Objection to the form

4         of the question.

5         A.    It was -- it was cash in HCRE's bank

6    account that would be used to make payments to

7    Highland Capital Management.

8         Q.    Okay.  And so did Highland Capital

9    Management have access to HCRE's funds in order

10   to be able to make such payments?

11             MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25             MR. MORRIS:  Objection to the form

1                WATERHOUSE - 10-19-21

2        of the question.

3        A.    I -- I don't recall.

4        Q.    Do you have any reason to believe

5    that either HCRE or HCMS simply didn't have the

6    funds on hand to make the December 2020

7    payments?

8        A.    I don't know.

9        Q.    I guess I'm asking, do you have any

10   reason to believe that they didn't have the

11   funds?

12       A.    We managed cash for so many

13   different entities and funds, and I don't

14   recall, you know, where the cash position was

15   for HCRE and HCMS at 12/31/2020.

16       Q.    Okay.

17       A.    I just don't recall, and I don't --

18   and I don't remember what the loan payment

19   obligations were from HCRE to Highland, and

20   from HCMS to Highland.  I don't recall.  I

21   don't recall, I mean...

22       Q.    Let me come at it a different way.

23   Were the -- were the payments that would

24   otherwise have been due in December of 2020

25   made in January of 2021 for HCMS and HCRE?

1                    WATERHOUSE - 10-19-21

2         A.    I believe the HCRE payment was made

3    in January of 2021.  I don't recall any

4    payments being made from HCMS to Highland.

5         Q.    If it -- how is it the HCRE payment

6    came to be made?  Why did you make it -- why

7    did HCM make the payment in January of 2021?

8         A.    Jim -- Jim called me and instructed

9    me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11        Q.    Did he seem upset that -- that the

12   payment had not been made?

13        A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17        Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19        A.    Yes.

20        Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23        A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't

1                  WATERHOUSE - 10-19-21

2   believe I'm an authorized signer.  So I

3   can't -- other personnel have to make payment

4   from HCRE to -- to -- to -- to Highland.

5        Q.    Okay.  And in the conversation

6   that -- that you had with Mr. Dondero when he

7   requested the payment to be made, did you say

8   to him words to the effect, Jim, this loan is

9   going to stay in default, what are you making

10  the payment for, anything like that?

11       A.    No.

12       Q.    In fact, did you have the impression

13  from him that he thought that the loan would

14  be -- the default would be cured by making the

15  payment?

16            MR. MORRIS:  Objection to the form

17       of the question.

18       A.    Did I get the impression from Jim

19  Dondero that the loan would be cured if the

20  payment from HCRE --

21       Q.    Yeah, if that is what he thought.

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    I didn't get any impression from him

25  on that at the time.

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Do you know whether there was an

 3   HCMS term loan that had a payment due in

 4   December of 2020?

 5        A.    I don't recall.

 6        Q.    Okay.  And so the reason you don't

 7   recall whether or not there was a payment in

 8   January of 2021 is because you just don't

 9   remember whether there was such a loan at all?

10              MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22              MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in
```

1          WATERHOUSE - 10-19-21

2     January of 2021, do you think it was part of

3     the same conversation where Jim Dondero said,

4     hey, why didn't that get paid, please make

5     that -- get that payment done?

6          MR. MORRIS:  I object to the form of

7          the question.

8     A.    Yes.  Likely it would have been -- I

9     mean, again, I don't recall a payment being

10    made, but, you know, again, I don't remember

11    everything.

12    Q.    Okay.  Did -- at the time you were

13    communicating with Kristin Hendrix about the

14    payment being made, whichever payments were

15    made in January, did she say anything to you

16    about the payments not curing the loan

17    defaults?

18    A.    No.

19    Q.    Okay.  All right.  So I'm going to

20    take you back to very early in the deposition

21    when Mr. Morris was asking you about the --

22    the -- the agreement with respect to

23    the -- the forgiveness element of the loans, so

24    that is just to orient you.

25          Do you remember that there was a

```
1                WATERHOUSE - 10-19-21

2    time that you and Mr. Dondero were

3    communicating about potential means of

4    resolving the Highland bankruptcy by what was

5    colloquially referred to as a pot plan?

6        A.    Yes.

7        Q.    Okay.  And can you tell me generally

8    when that was?

9        A.    Like mid -- mid 2020, sometime in

10   2020, mid 2020.

11       Q.    Okay.  And did the process of trying

12   to figure out what the numbers should be

13   involve looking at what one should pay for the

14   Highland assets?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    Yes.

18       Q.    Okay.  And did there come a time

19   when you were proposing some potential numbers

20   and Mr. Dondero said something to you like,

21   well, why are you including payment for the

22   related party notes, those, you know, were

23   likely to be forgiven as part of my deferred

24   executive compensation?

25            MR. MORRIS:  Objection to the form
```

1                    WATERHOUSE - 10-19-21

2          of the question.

3          A.    Yes, we did have that conversation.

4          Q.    Okay.  Was that conversation in

5     connection with trying to figure out the right

6     numbers for a pot plan?

7          A.    Yeah.  I mean, it was -- it was -- I

8     mean, Jim -- Jim would ask for, you know,

9     most -- most recent asset values, you know, for

10    Highland, and -- and myself and the team

11    provided those to him, so it was in that

12    context.

13         Q.    Okay.  And does that refresh your

14    recollection that these communications were in

15    2020 rather than 2021?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    The -- the -- the executive

19    compensation discussions were definitely in

20    2020.

21         Q.    Okay.  Now, did you ever make

22    proposals that took into account Jim's comment

23    that the notes were likely to end up forgiven

24    as part of his compensation?

25              MR. MORRIS:  Objection to the form

1      WATERHOUSE - 10-19-21

2      of the question.

3      A.    Yes, we -- the team and myself put

4  together, you know, asset summaries of Highland

5  at various times for all the assets of

6  Highland, and not including the notes.

7      Q.    Okay.  And were those presentations

8  communicated to -- to Mr. Seery?

9      A.    No.  Well, look, I didn't tell -- I

10  didn't tell Mr. Seery.  I don't know what

11  Mr. Dondero did with the information.

12      Q.    Okay.

13      A.    I did not have conversations with

14  Mr. Seery.

15      Q.    Okay.  Do you know who saw the

16  presentations that you put together that didn't

17  include the value of the related party notes?

18      A.    We're talking presentations -- these

19  are -- these are Excel spreadsheets?

20      Q.    Uh-huh.

21      A.    I don't know who -- these were given

22  to -- to Jim Dondero.  I don't know what was

23  done with them after that.

24      Q.    Okay.  You also mentioned earlier

25  that sometime during your tenure at Highland

1              WATERHOUSE - 10-19-21

2      you knew of the practice of giving forgivable

3      loans to executives.

4              MR. MORRIS:  Objection to the form

5         of the question.

6         Q.    Can you -- can you tell me what you

7      recall about that practice?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.    Yes, so there were -- there were --

11     during my tenure at Highland, there were loans

12     or -- given to employees that were later

13     forgiven at a future date and time.

14        Q.    Okay.  And when the loans were

15     given, did the notes, to your recollection, say

16     anything about the potential forgiveness term?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    When you say "did the notes," did

20     the promissory notes detail the forgiveness?

21        Q.    Yes.

22        A.    Not that I recall.

23        Q.    And until such time as whatever was

24     to trigger the forgiveness occurred, were the

25     notes bona fide notes as far as you were

1            WATERHOUSE - 10-19-21

2  concerned?

3            MR. MORRIS:  Objection to the form

4       of the question.

5       A.    Yes, similar to -- yes.

6       Q.    Okay.  You were going to say similar

7  to what?

8       A.    Mr. Morris earlier today showed

9  notes of the financial statements about various

10  affiliate loans.  I -- I -- I do recall these

11  notes because I -- at that time personally

12  worked on the -- the financial statements of

13  Highland.  That was, you know, in my role as a

14  corporate accountant.

15            And there were -- those loans

16  were -- to the partners were detailed in the

17  notes to the financial statements, similar to

18  what we went through earlier today in the prior

19  testimony about what we saw with Highland

20  and -- and -- and the -- and HCMFA.

21       Q.    Is it fair to say that on Highland's

22  balance sheet there were any number of assets

23  that the value of which could be affected by

24  subsequent events?

25            MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21

2     of the question.

3          A.    Yes.  I mean, yes, that -- there

4     are.  And that is -- yes.

5          Q.    Okay.  And is it typical accounting

6     practice that until there is some certainty

7     about those potential future events, that asset

8     value listed on -- on the books doesn't take

9     into account those potential future events?

10              MR. MORRIS:  Objection to the form

11     of the question.

12         A.    Yeah, if those -- yes.  If -- if

13    those future events, you know, at the time of

14    issuance are not known or knowable, like I

15    discussed earlier with, like, market practice,

16    asset dislocation, or, you know, I mean, things

17    like that, you -- I mean, it -- it could affect

18    its fair value --

19         Q.    Okay.

20         A.    -- in the future.

21         Q.    And am I correct you wouldn't feel

22    compelled to footnote in every possible change

23    in -- in an asset when those possibilities are

24    still remote?

25              MR. MORRIS:  Objection to the form

1    WATERHOUSE - 10-19-21

2    of the question.

3    A.    The accounting standard is you have

4    to estimate to the best -- you know, to -- to

5    the best of your ability, the fair value of an

6    asset as of the balance sheet date under --

7    under GAAP.

8    Q.    Did -- strike that.

9    Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13   VIDEOGRAPHER:  We're going off the

14   record at 7:02 p.m.

15   (Recess taken 7:02 p.m. to 7:03 p.m.)

16   VIDEOGRAPHER:  We are back on the

17   record at 7:03 p.m.

18   Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfettered access to their own former files?

22   MR. MORRIS:  Objection to the form

23   of the question.

24   A.    Yes, I am -- I am generally aware.

25   Q.    Okay.  And do you think you could

1          WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4          MR. MORRIS:  Objection to the form

5      of the question.

6      A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10          You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15     Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17     A.    Yes.

18     Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20          MR. MORRIS:  Objection to the form

21      of the question.

22     A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

```
 1                    WATERHOUSE - 10-19-21

 2              Is that -- I don't know the

 3    relationship.  So, again, I'm not the lawyers.

 4    I've said many times.  But my understanding is

 5    the litigation trust is suing me.  I could be

 6    wrong there.  I don't know.

 7         Q.   Okay.  I understand.

 8              Someone with some connection to the

 9    Highland debtor has brought a claim against

10    you; is that fair?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.   Yes.

14         Q.   Okay.  And is there also some motion

15    practice in the bankruptcy where the debtor or

16    someone associated with the debtor is

17    attempting to undo something that was

18    previously resolved with you?

19         A.   Yes.

20         Q.   And so in one action somebody is

21    associated with the debtors trying to --

22    threatening you with trying to take money from

23    you, and then in the other -- and trying to --

24    and in the other they are threatening not to

25    pay you things that had previously been agreed;
```

1                    WATERHOUSE - 10-19-21

2    is that correct?

3                    MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I want to be -- yes, I -- there

6    is -- I'm being sued, again, on -- on something

7    that was agreed to with Mr. Seery and myself.

8    I don't -- I don't -- I don't own that claim.

9         Q.    Okay.

10        A.    To be transparent, I don't own that

11   claim.  So it is not my personal property.

12        Q.    Okay.

13        A.    And -- and being the nonlawyer, I

14   don't know how I can get sued for something

15   that I don't owe or, like, I don't own

16   anything.  I'm not the lawyer.  But, I mean, if

17   that is -- if I'm understanding the facts

18   correctly.

19        Q.    Okay.  And the lawsuit that was

20   filed that names you, that was just filed

21   this -- this past week; is that right?

22                    MS. DANDENEAU:  Ms. Deitsch-Perez, I

23        do want to interrupt at this point because

24        just as I told Mr. Morris, that this is a

25        deposition about the noticed litigation.

                        WATERHOUSE - 10-19-21

1

2            I really don't want to go -- go

3      afield --

4            MS. DEITSCH-PEREZ:  Yeah.

5            MS. DANDENEAU:  -- and open up a

6      whole new line of inquiry about the lawsuit

7      or the -- the motion and the bankruptcy

8      court.  We will be here all night.

9            MS. DEITSCH-PEREZ:  And I

10     understand.

11     Q.   My -- my point is:  Do you feel

12     like -- like there is some effort by these

13     parties related to the debtor to intimidate

14     you -- not that you -- I'm not saying you are

15     or you aren't.

16           But do you feel like there is some

17     effort to intimidate you and maybe an effort to

18     deter you from being as prepared as you might

19     be in this deposition?

20           MR. MORRIS:  Objection to the form

21     of the question.

22     A.   I was -- I was surprised by the

23     lawsuit, by me being named, because, again, I

24     don't own the asset and things like that.

25     Yeah, I just -- I want to move forward with my

1          WATERHOUSE - 10-19-21

2    life at Skyview.

3               MS. DEITSCH-PEREZ:  Thank you.

4               THE WITNESS:  Thank you.

5                    FURTHER EXAMINATION

6    BY MR. MORRIS:

7         Q.    If I may, I just have a few

8    questions.

9               Mr. Waterhouse, we saw a number of

10   documents that Mr. Rukavina put up on the

11   screen where Ms. Hendrix would send you a

12   schedule of payments that were due on behalf of

13   certain Highland affiliates.

14              Do you remember that?

15        A.    Yes.

16        Q.    And in each instance she asked for

17   your approval to make the payments; is that

18   right?

19        A.    Yes, she did.

20        Q.    And was that the -- was that the

21   practice in the second half of 2020 whereby

22   Ms. Hendrix would prepare a list of payments

23   that were due on behalf of Highland associates

24   and ask for approval?

25        A.    Yes.

1          WATERHOUSE - 10-19-21

2      Q.    And I think you said that there was

3  a -- a --

4      A.    It was -- I think I testified to

5  this earlier when we talked about procedures

6  and policy, you know, again, I want to be

7  informed of -- of -- of -- of -- of any

8  payments that are going out.  I want to be made

9  aware of these payments, and that was just a

10  general policy, not just for 2020.

11      Q.    Okay.  So it went beyond 2020?

12      A.    Yes.

13      Q.    Is that right?

14      A.    Yes.

15      Q.    Okay.  And the corporate accounting

16  group would prepare a calendar that would set

17  forth all of the payments that were anticipated

18  in the -- in the three weeks ahead; is that

19  right?

20      A.    I -- like I testified earlier, we

21  had a corporate calendar that was set up, you

22  know, to -- to provide reminders or, you know,

23  of anything of any nature, whether it is

24  payments or -- or financial statements or, you

25  know, whatever it is, you know, to meet

1           WATERHOUSE - 10-19-21

2    deadlines.

3           I don't know how, as I testified

4    earlier, how much they were using that

5    calendar.

6      Q.    Okay.  But -- but you did get notice

7    and a request to approve the payments that were

8    coming due on behalf of Highland's affiliates.

9    Do I have that right?

10          MS. DANDENEAU:  Objection to form.

11     A.    I mean, generally, yes.  I mean, you

12   know, as we saw with these emails, generally, I

13   mean, did that encompass everything, no.

14     Q.    Okay.  Do you know why the

15   payment -- do you know why there was no payment

16   made by NexPoint at the end of 2020?

17     A.    Yes.  There was -- there was -- we

18   talked about these agreements between the

19   advisors and Highland, the shared services and

20   the cost reimbursement agreement.

21          And in late 2020, there were

22   overpayments, large overpayments that had been

23   made over the years on these agreements, and it

24   was my understanding that the advisors were --

25   were talking with -- like Jim Seery and others

```
1                WATERHOUSE - 10-19-21
2   to offset any obligations that the advisors
3   owed to Highland as offset to the overpayments
4   on these agreements.
5        Q.   Okay.  Did you participate in any of
6   those conversations?
7        A.   I did not.
8        Q.   Okay.  Do you know -- do you recall
9   that the -- at the end of November, the debtor
10  did notice to the advisors of their intent to
11  terminate the shared services agreements?
12       A.   Like I testified earlier, there
13  was -- the agreements weren't identical, from
14  what I recall, and there is one that had a
15  longer notice period, which I think had a
16  60-day notice period.  I don't recall which one
17  that was, so not all of them were -- notice
18  hadn't been given as of November 30th, for all
19  of the agreements.
20       Q.   Upon the receipt of the -- the
21  termination notices that you recall, do you
22  know if the advisors decided at that point not
23  to make any further payments of any kind to
24  Highland?
25            MR. RUKAVINA:  Objection, form.
```

1                WATERHOUSE - 10-19-21

2     A.    No.  The advisors -- the advisors

3  had stopped making payments prior to that

4  notice.

5     Q.    Okay.  And how do you know that the

6  advisors stopped making -- making payments

7  prior to the notice?

8     A.    I had -- I had a conversation

9  with -- with Jim Dondero.

10     Q.    And did Mr. Dondero tell you that

11  the advisors would no longer make payments to

12  Highland?

13          MS. DEITSCH-PEREZ:  Object to the

14    form.

15     A.    Yes, he -- he -- again, he said

16  they -- they -- the advisors have overpaid on

17  these agreements, to not make any future

18  payments, and that there needs to be offsets,

19  and they're working on getting offsets to these

20  overpayment.

21     Q.    Do you know if anybody ever

22  instructed Highland's employees to make the

23  payment that was due by NexPoint at the end of

24  the year?

25     A.    Did anyone instruct Highland's

```
1              WATERHOUSE - 10-19-21

2  employees to make that payment?

3       Q.    Correct.

4       A.    Anyone -- not that I'm aware.

5       Q.    Were any of Highland's employees

6  authorized to make the payments on behalf of

7  its affiliates -- withdrawn.

8              Was any of Highland's employees

9  authorized to effectuate the payment on behalf

10 of NexPoint that was due at the end of the year

11 without getting approval from either you or

12 Mr. Dondero?

13      A.    They had the -- they had the ability

14 to make the payment, but they didn't -- you

15 know, that -- that payment needed to be

16 approved.

17      Q.    Okay.  And it needed to be approved

18 by you or Mr. Dondero; is that right?

19      A.    I mean, I'm not going to make the

20 unilateral decision.

21      Q.    Is that a decision that you

22 understood had to be made by Mr. Dondero?

23      A.    Yes.  Sitting back in December of

24 2020, the -- that -- there was this off --

25 offset negotiation that -- that was happening,
```

```
 1              WATERHOUSE - 10-19-21
 2    so I mean, until those negotiations were
 3    resolved, you know, there wasn't any
 4    payments -- there weren't any payments.
 5         Q.    And -- and there were no payments
 6    until the negotiations were resolved because
 7    that was the directive that you received from
 8    Mr. Dondero; correct?
 9         A.    I don't think he said -- I mean, I
10    think -- yeah, I mean -- I'm trying to recall
11    the conversation.  It was -- you know, there
12    is -- there is these negotiations.  There's --
13    there needs to be these offsets.  They're
14    talking with the debtor.  So, you know, until
15    this is resolved, right, I mean, depending on
16    how, whatever that resolution was, were we to
17    take any action.
18         Q.    Okay.  How about with respect to
19    HCMS, did HCMS have a term payment due at the
20    end of the year?
21         A.    Again, I don't -- I don't recall.
22         Q.    Okay.  You discussed briefly two
23    payments that were made in January of 2021, one
24    on behalf of NexPoint, and one on behalf of
25    HCMS.  Do I have that right?
```

1          WATERHOUSE - 10-19-21

2      A.    No.  The two payments I recall were

3  NexPoint and HCRE.

4      Q.    Okay.  And those two payments --

5  thank you for the correction.  And those two

6  payments were made because Mr. Dondero

7  authorized those payments to be made; correct?

8      A.    Yes.

9      Q.    And they hadn't been made before

10  that because Mr. Dondero had not authorized

11  them to be made?

12          MS. DEITSCH-PEREZ:  Object to the

13      form.

14      A.    Yes, because of these negotiations.

15      Q.    Okay.  Just a couple of more

16  questions.

17          Did anybody, to the best of your

18  knowledge, on behalf of HCMFA, ever tell the

19  SEC that HCMLP was responsible for the mistakes

20  that were made on the TerreStar valuation?

21      A.    Did anyone from Highland on HCMFA's

22  behalf tell the SEC that Highland -- that

23  Highland was responsible for there -- I just

24  want to make sure --

25      Q.    It was a little bit different, so

1               WATERHOUSE - 10-19-21

2  let me try again.

3       A.   These are very long questions, John.

4  I'm not trying to be --

5       Q.   That is good.  Do you know whether

6  anybody -- do you know whether anybody on

7  behalf of HCMS -- HCMFA ever told the SEC that

8  Highland was the responsible party for the

9  TerreStar valuation error?

10      A.   Not that I'm aware.

11      Q.   Okay.  Did anybody on behalf of

12  the -- on behalf of HCMFA ever tell the retail

13  board that Highland was responsible for the

14  TerreStar valuation error?

15      A.   Not that I'm aware.

16      Q.   Do you know if HCMFA made an

17  insurance claim with respect to the damages

18  that were incurred in relation to the TerreStar

19  valuation error?

20      A.   Yes.

21      Q.   And do you know why they made that

22  insurance claim?

23      A.   Because there was an error.  I

24  mean --

25      Q.   Was the insured's claim made -- was

```
 1              WATERHOUSE - 10-19-21
 2   the insurance claim made under HCMFA's policy?
 3       A.    Yes.
 4       Q.    Did HCMFA at any time prior to the
 5   petition date -- withdrawn.
 6             You were asked a couple of questions
 7   where -- where you said that Mr. Dondero told
 8   you that he was ascribing zero value to the
 9   notes as part of a pot plan because he believed
10   that the notes were part of executive
11   compensation.
12             Do I have that right?
13             MS. DEITSCH-PEREZ:  Object to the
14        form.
15       A.    Yes.
16       Q.    Okay.  Have you ever heard that
17   before the time that Mr. Dondero told you that
18   in the conversation about the pot plan?
19       A.    Had I heard that prior to my
20   conversation with Mr. Dondero?
21       Q.    Yes.
22       A.    No, I had not heard that prior.
23       Q.    Okay.  And that was in the context
24   of his formulation of the settlement proposal;
25   is that right?
```

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I mean, generally, yes.  You know,

 3  we were asked to provide asset values, right,

 4  and he was having settlement discussions.

 5  Again, I don't know who those went to

 6  ultimately.  I don't recall.

 7             MR. MORRIS:  I have no further

 8        questions.  Thank you very much for your

 9        patience.  I apologize for the late hour.

10             MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12             MR. RUKAVINA:  Hold on, I'm not

13        done.

14             MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19                  FURTHER EXAMINATION

20  BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22  testifying about a discussion you had with

23  Mr. Dondero where he said something like no

24  more payments.

25             Do you remember that testimony?
```

 1             WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Okay.  And was that late November or

 4   early December of 2020?

 5       A.    It was, I would say, first or second

 6   week of November.

 7       Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11       A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13       Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19             MR. MORRIS:  Objection to the form

20       of the question.

21       A.    That is correct.

22       Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25             But had -- by that time that you

```
 1              WATERHOUSE - 10-19-21

 2    talked to Mr. Dondero, had your office or you

 3    done any estimate of what the alleged

 4    overpayments were?

 5              MR. MORRIS:  Objection to the form

 6         of the question.

 7         A.   Yes, we had -- there was a -- there

 8    was a detailed analysis that was put together

 9    by David Klos at the time.

10         Q.   And do you recall just generally

11    what the total amount for both advisors of the

12    overpayments was?

13         A.   It was in excess of $10 million.

14         Q.   Was it in excess of $14 million?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.   I -- I remember it was an

18    eight-figure number.  I don't remember

19    specifically.

20         Q.   Okay.  And did you convey that

21    number to Mr. Dondero when you had that

22    conversation?

23         A.   Yes.

24         Q.   What was his reaction?

25         A.   I mean, he wasn't happy.
```

```
 1              WATERHOUSE - 10-19-21

 2     Q.     Is it fair to say he was upset?

 3     A.     Yes.

 4     Q.     Did Mr. Dondero ever expressly tell

 5  you to not have NexPoint make the required

 6  December 31, 2020, payment?

 7     A.     Yes, I recall him saying don't make

 8  the payment because it was being negotiated, as

 9  I discussed with Mr. Morris, this offset

10  concept.  So there were obligations due by the

11  advisors to Highland, they should be offset

12  that -- you know, those obligations should be

13  offset by this -- by this overpayment.

14     Q.     And when did he tell you that?

15     A.     I would say -- I would say around --

16  probably December -- December-ish.

17     Q.     Early December, late December?

18     A.     I don't recall with as much

19  specificity as -- as -- as -- as stopping the

20  shared services payments, because we had

21  actually made one shared services payment in

22  November.  So that is why I need to remember

23  that one more clearly.  I don't remember where

24  exactly in December that conversation occurred.

25     Q.     Did Mr. Dondero expressly use the
```

1              WATERHOUSE - 10-19-21

2   word "NexPoint" when he was saying don't make

3   these payments?

4              MR. MORRIS:  Objection to the form

5         of the question, asked and answered.

6         A.    Yeah, we were -- we were discussing

7   advisor obligations.  So it was -- you know, it

8   was just obligations from the advisors.

9              And -- and he specifically talked

10  about the NexPoint payment as well.

11        Q.    Okay.  And it is your testimony that

12  he expressly told you not to make that NexPoint

13  December 31 payment?

14             MR. MORRIS:  Objection, asked and

15        answered twice.

16        A.    Yes, he -- he did, during that

17  conversation.

18        Q.    And did you ever follow up with him

19  after that about whether NexPoint should or

20  shouldn't make that payment?

21        A.    I did not.

22        Q.    Did you ever, on or about

23  December 31, 2020, remind him and say, hey,

24  this payment is due, what shall I -- what

25  should I do?

```
 1                WATERHOUSE - 10-19-21

 2      A.    I did not.

 3      Q.    So sitting here today, you -- you

 4 remember distinctly that Dondero in December of

 5 2020 expressly told you not to have NexPoint

 6 make that payment?

 7            MR. MORRIS:  Objection, asked and

 8       answered three times.

 9      A.    Yes.

10      Q.    Can you say categorically it wasn't

11 just some general discussion where he told you

12 not to make payments?

13            MR. MORRIS:  Objection, asked and

14       answer four times.

15            MR. HORN:  Four times now.  Go for

16       five.

17      A.    Yes.

18      Q.    Did you tell Mr. Seery that?

19      A.    I don't believe I did.  I don't

20 recall.

21      Q.    And was this an in-person discussion

22 or telephone or email?  Do you remember?

23      A.    This was a phone -- a phone

24 conversation.

25      Q.    Okay.  Would you have a record of --
```

1          WATERHOUSE - 10-19-21

2    on your cell phone of when that conversation

3    might have taken place?

4              I'm sorry, strike that.

5              Was that by cell phone?

6         A.    I believe -- yes, because we -- I

7    was at home.  I mean, I don't have a landline.

8    All I have is my cell phone.

9         Q.    Do you know whether your cell phone

10   still has records of conversations from

11   December 2020 on it?

12        A.    My call log doesn't go back that

13   far.

14        Q.    Okay.  Thank you.

15             MR. RUKAVINA:  I will pass the

16   witness.

17             MS. DEITSCH-PEREZ:  Just a couple

18        quick questions.

19                  FURTHER EXAMINATION

20   BY MS. DEITSCH-PEREZ:

21        Q.    With respect to HCRE and HCMS, am I

22   correct there was -- there was no direction not

23   to pay those loan payments?

24             MR. MORRIS:  Objection to the form

25        of the question.

1                    WATERHOUSE - 10-19-21

2        A.    Yes, I don't recall having

3   conversations about, you know, those -- those

4   entities.

5        Q.    And, in fact, what was the tone that

6   Mr. Dondero had when he talked to you about the

7   fact that HCRE and HCMS payments hadn't been

8   made when he found out that they hadn't been

9   paid?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  Objection to form.

12        Q.    What was the tone he took with you?

13        A.    Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16        Q.    Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Okay.  Thank you.

23             MR. MORRIS:  I have nothing further.

24        Thank you so much, Mr. Waterhouse.

25             MR. HORN:  I have no questions.

1                    WATERHOUSE - 10-19-21

2          Thank you, Mr. Waterhouse.  We appreciate

3          your time.  I am logging off the discussion

4          and I will talk to y'all tomorrow.

5               MR. MORRIS:  Super.

6               VIDEOGRAPHER:  If there are no

7          further questions, this ends the

8          deposition -- excuse me.  This ends the

9          deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                    FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this     day of             2021.

18

19    ---------------------------------

20

21

22

23

24

25

1                 WATERHOUSE - 10-19-21

2              C E R T I F I C A T E

3

4        I, SUSAN S. KLINGER, a certified shorthand

5    reporter within and for the State of Texas, do

6    hereby certify:

7        That FRANK WATERHOUSE, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11       I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19       Susan S. Klinger, RMR-CRR, CSR

20       Texas CSR# 6531

21

22

23

24

25

```
1              WATERHOUSE - 10-19-21

2    NAME OF CASE:  In re:  Highland Capital

3    DATE OF DEPOSITION:  October 19, 2021

4    NAME OF WITNESS:  Frank Waterhouse

5    Reason Codes:

6         1.  To clarify the record.

7         2.  To conform to the facts.

8         3.  To correct transcription errors.

9    Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25
```