# EXHIBIT 174

Appx. 02765

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX 75201

May 31, 2021
Invoice    127958
Client     36027
Matter     00002
         **JNP**

RE:  Postpetition

---

**STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH  05/31/2021**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    12
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/01/2021 | GVD | BL | Further revise motion to enforce the reference | 4.30 | 950.00 | $4,085.00 |
| 05/02/2021 | IDK | BL | Review of J Pomerantz comments to draft opposition to Advisors, others motions for withdrawal of reference. | 0.30 | 1325.00 | $397.50 |
| 05/02/2021 | JJK | BL | Analysis withdrawal issues; revise NexPoint/HCMFA oppositions. | 4.30 | 995.00 | $4,278.50 |

D-CNL001107

**Appx. 02767**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    13
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/02/2021 | GVD | BL | Further revise and circulate motion to enforce the reference | 4.80 | 950.00 | $4,560.00 |
| 05/02/2021 | GVD | BL | Correspondence re extension of answer date | 0.20 | 950.00 | $190.00 |
| 05/03/2021 | IDK | BL | E-mails with J Kim re his latest revised opposition to | 1.40 | 1325.00 | $1,855.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   14
Invoice 127958
May 31, 2021

| Date | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | NextPoint motion to withdraw the reference, as well as feedback of others re same and consider (.5) Attend conference call with J Pomerantz, J Kim, G Demo re open issues on draft opposition to motions to withdraw reference (.3); Review of further revised draft of opposition to same (.2); Attend next conference call re same on next draft of opposition (.4). | | | |
| 05/03/2021 | JJK | BL | Emails Pomerantz, Demo re: opp to NextPoint/HCMFA withdrawal reference motions; research/analysis/revisions to same. | 2.40 | 995.00 | $2,388.00 |
| 05/03/2021 | JJK | BL | Prepare opp to HCMFA withdrawal reference motion and analysis for same. | 2.70 | 995.00 | $2,686.50 |
| 05/03/2021 | JJK | BL | Analysis/revise oppositions to NexPoint and HCMFA reference motions. | 3.70 | 995.00 | $3,681.50 |
| 05/03/2021 | JJK | BL | Research/analysis re: reference withdrawal matters. | 1.00 | 995.00 | $995.00 |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | | | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | | | |
| 05/03/2021 | JNP | BL | Brief review of motion to enforce reference. | 1.00 | 1295.00 | $1,295.00 |
| 05/03/2021 | JNP | BL | Conference with Robert J. Feinstein regarding motion to enforce reference and related litigation matters. | 0.30 | 1295.00 | $388.50 |
| 05/03/2021 | JNP | BL | Conference with Robert J. Feinstein and Gregory V. Demo regarding  motion to enforce reference. | 0.20 | 1295.00 | $259.00 |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| 05/03/2021 | JNP | BL | Review revised motion to withdraw reference response. | 0.30 | 1295.00 | $388.50 |
| 05/03/2021 | JNP | BL | Conference with Jonathan J. Kim, Ira D. Kharasch and Gregory V. Demo regarding motion to withdraw | 0.60 | 1295.00 | $777.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    15
Invoice 127958
May 31, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

reference responses  (2x).

D-CNL001110
Appx. 02770

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   16
Invoice 127958
May 31, 2021

| Date | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | █ | ███████████ | █ | █ | ██ |
| ███ | ██ | █ | ██████████ | █ | █ | ██ |
| 05/03/2021 | GVD | BL | Revise and serve demand letter re Dugaboy note | 0.30 | 950.00 | $285.00 |
| 05/03/2021 | GVD | BL | Revise and serve demand letter re Hunter Mountain note | 0.30 | 950.00 | $285.00 |
| 05/03/2021 | GVD | BL | Conference with PSZJ team re response to withdrawal of reference in NPA notes litigation | 0.40 | 950.00 | $380.00 |
| 05/03/2021 | GVD | BL | Review and revise response to motion to enforce the reference in NPA notes litigation | 1.20 | 950.00 | $1,140.00 |
| 05/03/2021 | GVD | BL | Follow up conference with PSZJ re opposition to motion to withdraw the reference in NPA litigation | 0.30 | 950.00 | $285.00 |
| 05/03/2021 | GVD | BL | Conference with J. Morris re status of notes litigation | 0.20 | 950.00 | $190.00 |
| ███ | ██ | █ | ████████ | █ | █ | ██ |
| ███ | ██ | █ | ████████ | █ | █ | ██ |
| ███ | █ | █ | █████████ | █ | █ | ██ |
| ███ | ██ | █ | ████████ | █ | █ | ██ |
| ███ | ██ | █ | █████████ | █ | █ | ██ |
| ███ | ██ | █ | █████████ | █ | █ | ██ |
| ███ | ██ | █ | ███████ | █ | █ | ██ |
| ███ | ██ | █ | █████████ | █ | █ | ██ |
| 05/04/2021 | IDK | BL | Review of J Kim's next version of opposition to NextPoint motion to withdraw reference (.3); E-mails with J Kim re my proposed changes to same, as well as comments/questions from J Pomerantz re same and J Kim response (.5); Review of final revised opposition to same and green light to file (.2). | 1.00 | 1325.00 | $1,325.00 |
| 05/04/2021 | JJK | BL | Emails Demo, Morris, Pomerantz on withdrawal reference pleadings issues; research/revise oppositions to reference withdrawal motions. | 2.20 | 995.00 | $2,189.00 |

D-CNL001111

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    17
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/04/2021 | JJK | BL | Emails Demo on withdrawal reference pleadings issues; research/revise oppositions to reference withdrawal motions. | 3.90 | 995.00 | $3,880.50 |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| 05/04/2021 | JNP | BL | Review and comment on latest version on motion to withdraw reference. | 0.20 | 1295.00 | $259.00 |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| 05/04/2021 | RJF | BL | Review and revise motion to enforce the reference. | 1.30 | 1395.00 | $1,813.50 |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| 05/04/2021 | JAM | BL | Review draft opposition to withdraw the reference (NexPoint) (0.4). | 0.40 | 1245.00 | $498.00 |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    18
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

(entries redacted)

| Date | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/04/2021 | HRW | BL | Call with DSI regarding NPA document production for demand note proceeding. | 0.50 | 695.00 | $347.50 |
| 05/04/2021 | HRW | BL | Call with R. Half and J. Morris regarding NPA document production in demand note litigation. | 0.20 | 695.00 | $139.00 |
| 05/04/2021 | HRW | BL | Prepare for call with R. Half and J. Morris regarding NPA document production in demand note litigation. | 1.20 | 695.00 | $834.00 |
| 05/04/2021 | HRW | BL | Review J. Seery comments to NPA R&O's in | 0.30 | 695.00 | $208.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    19
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

demand in demand note litigation.



| 05/05/2021 | JJK | BL | Research/finalize objection to Dondero motion to withdraw reference. | 3.70 | 995.00 | $3,681.50 |

D-CNL001114

Appx. 02774

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:     20
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/05/2021 | JAM | BL | E-mails with B. Assink re: Dondero document production (notes litigation (0.2); review Dondero document production (0.1). | 0.30 | 1245.00 | $373.50 |

D-CNL001115

Appx. 02775

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    21
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/05/2021 | HRW | BL | Prepare interrogatory verification for R&Os to NPA interrogatories in notes litigation (0.2); Review Seery's comments to R&Os to NPA discovery demands in notes litigation (0.1); Review DSI documents for production for NPA discovery demands in notes litigation (0.2). | 0.50 | 695.00 | $347.50 |
| 05/06/2021 | IDK | BL | Review of updated opposition to Dondero motion to withdraw reference (.3); E-mails with J Kim re same and further issues on mandatory withdrawal of reference and related memo on same (.3); Telephone conference with J Pomerantz re same (.1); E-mails with J Kim re status and ok to file (.1). | 0.80 | 1325.00 | $1,060.00 |
| 05/06/2021 | IDK | BL | E-mails with J Kim re mistake made in filed opposition today to Dondero motion to withdraw ref, and how to fix, including feedback of J Pomerantz re same. | 0.40 | 1325.00 | $530.00 |
| 05/06/2021 | JJK | BL | Emails Kharasch on withdrawal reference objections, and revise same and prepare supplement for filing. | 4.20 | 995.00 | $4,179.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    23
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/06/2021 | HRW | BL | Communicate with R. Half re: NPA production in demand note proceeding (0.9); Call with L. Canty re: NPA production in notes litigation (0.1); Review critical dates re: Dondero stay motion and motion to withdraw reference in notes litigation (0.2); Prepare search terms for NPA production in notes litigation (0.3). | 1.50 | 695.00 | $1,042.50 |
| 05/07/2021 | IDK | BL | Review of draft addendum to prior filed opposition to Dondero motion to withdraw ref and consider changes (.2); E-mails with J Kim and J Pomerantz re same, as well as feedback of local counsel (.3). | 0.50 | 1325.00 | $662.50 |
| 05/07/2021 | JJK | BL | Two conf. calls (2x 0.3) with Pomerantz, Kharasch, Demo on reference withdrawal oppositions. | 0.60 | 995.00 | $597.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    24
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/07/2021 | JNP | BL | Review further filing regarding opposition to motion to withdraw reference. | 0.10 | 1295.00 | $129.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    26
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 05/07/2021 | HRW | BL | Review discovery requests in notes litigation (2.0); Edit R&O's for NPA discovery requests (0.3). | 2.30 | 695.00 | $1,598.50 |
| 05/08/2021 | RJF | BL | Review and revise motion to enforce. | 0.80 | 1395.00 | $1,116.00 |
| | | | | | | |
| | | | | | | |
| 05/08/2021 | JAM | BL | Review/revise document requests, interrogatories, and requests for admission relating to HCMS notes litigation (1.1); e-mails with J. Pomerantz, H. Winograd re: revisions to discovery requests for HCMS notes litigation (0.2). | 1.30 | 1245.00 | $1,618.50 |

D-CNL001119

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/08/2021 | HRW | BL | Draft discovery demands for notes litigation (3.5); Review discovery requests to Debtor in notes litigation (1.2). | 4.70 | 695.00 | $3,266.50 |
| 05/09/2021 | HRW | BL | Review discovery requests to Debtor in notes litigation (2.5); Prepare search terms for document production in notes litigation (1.0). | 3.50 | 695.00 | $2,432.50 |
| 05/10/2021 | RJF | BL | Begin work on motion to dismiss. | 1.00 | 1395.00 | $1,395.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    28
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/10/2021 | JAM | BL | E-mail to J. Rudd, L. Drawhorn re: discovery in HCMS notes litigation (0.1); review motions to amend Answers (0.3). | 0.40 | 1245.00 | $498.00 |

D-CNL001121

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    29
Invoice 127958
May 31, 2021



|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/10/2021 | HRW | BL | Draft and review discovery search criteria for NPA production in demand note proceeding (3.6); Draft responses and objections to Dondero discovery demands in notes litigation (0.8); Draft and prepare discovery demands in HCMS notes litigation (0.6). | 5.00 | 695.00 | $3,475.00 |

D-CNL001122

Appx. 02782

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 30
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| | | | ████ | | | |
| 05/11/2021 | JAM | BL | E-mails with B. Assink re: discovery on Dondero notes litigation (0.3); telephone conference with J. Seery, D. Klos re: Dondero notes litigation (0.4); e-mail to B. Assink, J. Bonds, J. Pomerantz, G. Demo, H. Winograd re: depositions (0.4). | 1.10 | 1245.00 | $1,369.50 |
| 05/11/2021 | LSC | BL | Assist with preparation of responses and objections to discovery requests in NexPoint notes litigation. | 0.60 | 460.00 | $276.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    31
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ████ | ███ | ██ | ████████████ | ██ | ██ | ███ |
| ████ | ███ | ██ | ██████████████ | ██ | ██ | ███ |
| ████ | ███ | ██ | ██████ | ██ | ██ | ███ |
| ████ | ███ | ██ | ████████████ | ██ | ██ | ███ |
| 05/11/2021 | GVD | BL | Conference with counsel to Hunter Mountain re note demand and follow up re same | 0.30 | 950.00 | $285.00 |
| ████ | ███ | ██ | ██████ | | | |
| ████ | ███ | ██ | █████ | | | |
| ████ | █ | ██ | ████████████ | ██ | ██ | ███ |
| ████ | ███ | ██ | ████████ | ██ | ██ | ███ |
| ████ | ███ | ██ | ██████████ | | | |
| 05/11/2021 | HRW | BL | Draft search terms for document production for NPA notes litigation (1.3); Communicate with R. Half re: document production for NPA notes litigation (0.6). | 1.90 | 695.00 | $1,320.50 |
| ████ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ████ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ██████████ | | | |
| ████ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ███████████ | ██ | ██ | ██ |
| ████ | ██ | ██ | ██████████ | ██ | ██ | ███ |

D-CNL001124

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 33
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/12/2021 | HRW | BL | Gather documents responsive to NPA discovery request in notes litigation (0.4). | 0.40 | 695.00 | $278.00 |

D-CNL001125

Appx. 02785

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    34
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/13/2021 | HRW | BL | Draft responses and objections to Dondero discovery in demand note litigation (2.0). | 2.00 | 695.00 | $1,390.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    35
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 05/14/2021 | JAM | BL | Meet and confer call with M Aigen re: Rule 30(b)(6) topics and depositions (0.3); e-mails with M. Aigen, Bonds Ellis, J. Pomerantz re: discovery (0.2); review/revise draft responses and objections to Dondero's discovery requests (notes litigation) (1.1). | 1.60 | 1245.00 | $1,992.00 |

D-CNL001127

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    36
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ████ | ██ | ████████████████████████ | ██ | | ████ |
| 05/14/2021 | HRW | BL | Draft responses and objections to Dondero discovery in demand note litigation (2.5). | 2.50 | 695.00 | $1,737.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002



|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/16/2021 | JAM | BL | Draft objection to Dondero's motion to compel (4.2); e-mails with H. Winograd re: draft objection to Dondero's motion to compel (0.1). | 4.30 | 1245.00 | $5,353.50 |

D-CNL001129

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    40
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███████████████████ | | | | | | |
| 05/17/2021 | JAM | BL | Review/revise objection to Dondero motion to compel (2.0); e-mails with J. Pomerantz, G. Demo, H. Winograd, Z. Annable re: draft objection to Dondero motion to compel (0.2); draft JAM declaration in support of Debtor's objection to Dondero motion to compel (0.7); e-mails with G. Demo, H. Winograd, L. Canty, Z. Annable re: exhibits to JAM declaration (0.2). | 3.10 | 1245.00 | $3,859.50 |
| ████ | ████ | ████ | ████████████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ██████████████ | ████ | ████ | ████ |
| 05/17/2021 | LSC | BL | Conduct research in connection with motion to withdraw the reference for G. Demo. | 0.60 | 460.00 | $276.00 |
| 05/17/2021 | LSC | BL | Assist with preparation of exhibits in connection with Debtor's Objection to Motion to Compel Deposition Testimony of James P. Seery, Jr. | 0.40 | 460.00 | $184.00 |
| ████ | ████ | ████ | ████████████████████ | ████ | ████ | ████ |
| 05/17/2021 | GVD | BL | Review response to motion to compel | 0.30 | 950.00 | $285.00 |
| ████ | ████ | ████ | ████████████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ████████████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ████████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ████████████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ███████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ████████████ | ████ | ████ | ████ |
| 05/17/2021 | GVD | BL | Prepare for argument on motions to withdraw the reference | 0.80 | 950.00 | $760.00 |
| ████ | ████ | ████ | ████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ████████████████ | ████ | ████ | ████ |
| ████ | ████ | ████ | ████████████████ | ████ | ████ | ████ |

D-CNL001130

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 41
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/17/2021 | HRW | BL | Oversee discovery searches and production for NPA notes litigation (0.3); Review opposition to Dondero motion to compel in notes litigation (0.2). | 0.50 | 695.00 | $347.50 |
| 05/18/2021 | JNP | BL | Review motion to withdraw the reference in | 0.40 | 1295.00 | $518.00 |

D-CNL001131

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    42
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | preparation for hearing. | | | |
| 05/18/2021 | JNP | BL | Review reply regarding motion to withdraw reference. | 0.10 | 1295.00 | $129.50 |
| 05/18/2021 | JMF | BL | Review response re discovery motion to compel testimony re demand notes. | 0.30 | 1050.00 | $315.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    43
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 05/18/2021 | GVD | BL | Prepare for argument re motion to withdraw the reference | 4.90 | 950.00 | $4,655.00 |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 05/18/2021 | HRW | BL | Gather general discovery in notes litigations (0.5); Review discovery demands in notes litigation (0.3); Call with J. Morris re: general discovery for notes litigation (0.1); Call with J. Donahue re: general discovery for notes litigation (0.3). | 1.20 | 695.00 | $834.00 |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 05/19/2021 | IDK | BL | Attend conference call with J Pomerantz, others on | 1.20 | 1325.00 | $1,590.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | presentation of opposition argument to motions to withdraw the reference (1.2) | | | |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| 05/19/2021 | JNP | BL | Participate on zoom hearing prep for motions to withdraw the reference with Gregory V. Demo, John A. Morris and Ira D. Kharasch. | 1.20 | 1295.00 | $1,554.00 |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:   45
Invoice 127958
May 31, 2021



| | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/19/2021 | JAM | BL | Review documents and e-mails to H. Winograd, L. Canty re: document production for Dondero notes litigation (0.7); e-mails with J. Seery, H. Winograd re: discovery responses, notary (0.2); e-mails with Dondero's counsel, J. Pomerantz, H. Winograd re: expert witnesses and discovery (0.4). | 1.30 | 1245.00 | $1,618.50 |
| 05/19/2021 | LSC | BL | Review documents and prepare supplemental production in connection with Dondero notes litigation, including redaction of documents, addressing various issues in connection with the same, and correspondence regarding the same. | 12.90 | 460.00 | $5,934.00 |

D-CNL001135

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

Page: 46

Invoice 127958

May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | ██ | ██████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████████ | ██ | ██ | ███ |
| 05/19/2021 | GVD | BL | Attend conference with PSZJ working team re preparation for argument on motion to withdraw reference | 1.20 | 950.00 | $1,140.00 |
| 05/19/2021 | GVD | BL | Prepare for argument on motion to withdraw the reference | 3.10 | 950.00 | $2,945.00 |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ██ | ███ |
| ███ | █ | ██ | ███████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| 05/19/2021 | HRW | BL | Send amended discovery R&Os to opposing counsel for NPA requests in notes litigation (0.1); Call with J. Morris and C. Mackle re: document production to Dondero's first Set of requests in notes litigation (0.3); Send production to Dondero's counsel in response to first set of requests in notes litigation (0.1). | 0.50 | 695.00 | $347.50 |
| 05/19/2021 | HRW | BL | Prepare and review document production to Dondero's first Set of requests in notes litigation (2.2). | 2.20 | 695.00 | $1,529.00 |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ██ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    47
Invoice 127958
May 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/20/2021 | JNP | BL | Participate in hearing on motion to compel J. Seery testimony. | 1.10 | 1295.00 | $1,424.50 |
| 05/20/2021 | JNP | BL | Emails to and from J. Seery and Gregory V. Demo regarding Latham communications with DSI. | 0.10 | 1295.00 | $129.50 |
| 05/20/2021 | JNP | BL | Emails to and from John A. Morris regarding U. S. Trustee inquiry. | 0.10 | 1295.00 | $129.50 |
| 05/20/2021 | JAM | BL | Preparing for hearing on Dondero's motion to compel (0.3); court conference on Dondero's motion to compel (1.1). | 1.40 | 1245.00 | $1,743.00 |
| 05/20/2021 | GVD | BL | Attend hearing re motion to compel | 1.10 | 950.00 | $1,045.00 |

D-CNL001137

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:   48

Invoice 127958

May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/20/2021 | JE | BL | Work on reply brief (11.0); review motion to amend complaint (.4); call with Mr. Morris regarding briefing (.3); research judgment issues (1.4). | 13.10 | 1195.00 | $15,654.50 |
| 05/21/2021 | JMF | BL | Review replies re contempt and reference withdrawal motions. | 0.40 | 1050.00 | $420.00 |
| 05/21/2021 | JAM | BL | Finalize responses and objections to Dondero's second set of document requests (0.1); e-mail to Dondero's counsel re: R&Os to second set of document requests (0.1). | 0.20 | 1245.00 | $249.00 |
| 05/21/2021 | GVD | BL | Prepare witness and exhibit list re notes litigation | 0.60 | 950.00 | $570.00 |

D-CNL001138

**Appx. 02798**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 49
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/22/2021 | JNP | BL | Review motion to compel testimony of former employees. | 0.20 | 1295.00 | $259.00 |
| 05/22/2021 | GVD | BL | Conference with J. Morris, J. Seery, and HCMLP team re HCMFA affirmative defense | 1.10 | 950.00 | $1,045.00 |
| 05/22/2021 | GVD | BL | Review motions for leave to amend | 0.20 | 950.00 | $190.00 |
| 05/22/2021 | HRW | BL | Review HCMFA motion to amend answer (0.5). | 0.50 | 695.00 | $347.50 |
| 05/23/2021 | JNP | BL | Emails to and from D. Rukavina regarding Sauter subpoena in connection with reference motion. | 0.20 | 1295.00 | $259.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    50
Invoice 127958
May 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | ██ | ████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ███ | ███ |
| 05/23/2021 | JAM | BL | Prepare Subpoena for DC Sauter (notes litigation) for hearing on motion to withdraw reference (0.3); e-mail to J. Seery, T. Surgent, D. Klos, J. Pomerantz, G. Demo, H. Winograd re: strategy, hearing on motion to withdraw reference (0.3); telephone conference with J. Seery, G. Demo re: prepare for deposition (Dondero notes litigation) (1.1); e-mail to H. Winograd, J. Pomerantz, I. Kharasch, G. Demo re: motion for summary judgment, opposition to motions to amend (0.7); communications with G. Demo re: potential exhibits for amended W&E list (0.2); e-mails with B. Levine re: Dondero summary judgment motion (0.1); telephone conference with H. Winograd re: Dondero summary judgment motion (0.1); telephone conference with G. Demo re: documents/exhibit list/facts re: motion to withdraw the reference (1.1); revise Sauter subpoena (0.1); e-mails with Z. Annable re: Sauter subpoena (0.3); amend Sauter subpoena (0.1); e-mails with D. Rukavina, J. Pomerantz re: Sauter subpoena (0.3). | 4.70 | 1245.00 | $5,851.50 |
| 05/23/2021 | LSC | BL | Preparation of amended exhibit lists (3) and exhibits for 5/25/21 hearing, including redactions to certain exhibits. | 5.60 | 460.00 | $2,576.00 |
| 05/23/2021 | GVD | BL | Conference with J. Morris re motion to withdraw reference | 0.10 | 950.00 | $95.00 |
| 05/23/2021 | GVD | BL | Conference with J. Seery and J. Morris re depo prep for notes litigation | 1.20 | 950.00 | $1,140.00 |
| 05/23/2021 | GVD | BL | Conference with J. Morris re evidentiary issues for motion to withdraw the reference | 1.10 | 950.00 | $1,045.00 |
| 05/23/2021 | GVD | BL | Prepare for hearing on motion to withdraw the reference | 2.90 | 950.00 | $2,755.00 |
| ███ | ██ | ██ | ████████ | ██ | ███ | ███ |

D-CNL001140

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page:    51
Invoice 127958
May 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/24/2021 | IDK | BL | Attend conference call re notes collection issues (.3). | 0.30 | 1325.00 | $397.50 |
| 05/24/2021 | JNP | BL | Review and comment on Gregory V. Demo outline on motion to withdraw reference argument. | 0.50 | 1295.00 | $647.50 |
| 05/24/2021 | JNP | BL | Conference with Gregory V. Demo, Ira D. Kharasch and John A. Morris regarding hearing on motion to withdraw reference. | 0.60 | 1295.00 | $777.00 |
| 05/24/2021 | JNP | BL | Conference with PSZJ team regarding update on notes litigation. | 0.30 | 1295.00 | $388.50 |
| 05/24/2021 | JNP | BL | Conference with John A. Morris regarding proposal regarding depositions in notes litigation. | 0.10 | 1295.00 | $129.50 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    52

Invoice 127958

May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ████ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| ████ | ██ | ██ | ██████ | ██ | ██ | ████ |
| ████ | ██ | ██ | █████████████ | ██ | ██ | ████ |
| ████ | ██ | ██ | ██████ | ██ | ██ | ████ |
| 05/24/2021 | RJF | BL | Internal call regarding notes litigation. | 0.30 | 1395.00 | $418.50 |
| 05/24/2021 | JMF | BL | Review litigation summary (.3); status call re same (.3). | 0.60 | 1050.00 | $630.00 |
| ████ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| 05/24/2021 | JMF | BL | Status call re  issues in notes payable litigation. | 0.30 | 1050.00 | $315.00 |
| 05/24/2021 | JMF | BL | Review motion to amend answer re notes litigation. | 0.30 | 1050.00 | $315.00 |
| ████ | ██ | ██ | ███████████████ | ██ | ██ | ████ |
| ████ | ██ | ██ | ███████████████ | ██ | ██ | ████ |
| 05/24/2021 | JAM | BL | Tel c. w/ J. Dubel re: motions to amend and withdraw the reference (0.4); prepare for Seery deposition (0.3); tel c. w/ G. Demo re: hearing on motion to withdraw the reference (0.2); tel c. w/ J. Seery re: deposition (0.1); review/revise exhibit list for hearing on motion to withdraw the reference (0.2); prepare for hearing on withdrawal of the reference (0.7); communications w/ J. Pomerantz, G. Demo re: debtor's schedules and Advisor's notes (0.2); Seery deposition (Dondero notes litigation) (2.7); tel c. w/ J. Seery, G. Demo re: deposition and hearing (0.4); tel c. w/ J. Pomerantz, I. Kharasch, G. Demo re: hearing on motion to withdraw the | 7.00 | 1245.00 | $8,715.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    53

Invoice 127958

May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | reference (0.6); tel c. w/ J. Pomerantz re: hearing (0.2); tel c. w/ J. Pomerantz re: e-mails with D. Rukavina concerning motion to amend/motion to withdraw reference (0.1); e-mails w/ D. Rukavina, J. Pomerantz re: motion to amend/Sauter subpoena/motion to withdraw the reference (0.4); e-mail to J. Seery re: deposition transcript (0.1); e-mail to J. Seery, J. Pomerantz, G. Demo, H. Winograd re: Klos deposition (0.1); e-mails w/ M. Aigen, J. Seery, T. Surgent, D. Klos re: discovery in Dondero notes litigation (0.3) | | | |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████ | | | |
| 05/24/2021 | GVD | BL | Prepare for hearing on motion to withdraw the reference | 5.80 | 950.00 | $5,510.00 |
| 05/24/2021 | GVD | BL | Attend deposition of J. Seery re Dondero note litigation | 2.60 | 950.00 | $2,470.00 |
| 05/24/2021 | GVD | BL | Conference with J. Seery and J. Morris re follow up to Seery deposition | 0.30 | 950.00 | $285.00 |
| 05/24/2021 | GVD | BL | Conference with PSZJ re status of note litigation and motion to withdraw the reference | 0.60 | 950.00 | $570.00 |
| 05/24/2021 | GVD | BL | Attend PSZJ status conference on notes litigation | 0.30 | 950.00 | $285.00 |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | █ | ████████████ | ███ | ███ | ███ |
| | | | ████ | | | |
| ███ | ███ | ███ | ████ | ███ | ███ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    54
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | BL | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| 05/25/2021 | JNP | BL | Participate on hearing regarding motions to withdraw reference. | 2.80 | 1295.00 | $3,626.00 |
| 05/25/2021 | JNP | BL | Conference with J. Seery and John A. Morris after hearing on motion to withdraw reference. | 0.40 | 1295.00 | $518.00 |
| 05/25/2021 | JNP | BL | Emails regarding answer date and response. | 0.10 | 1295.00 | $129.50 |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    55
Invoice 127958
May 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ███ | ██ | | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ███████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ██████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | | ██ | ████ | ████ |
| 05/25/2021 | JAM | BL | Prepare Notice of Service of Subpoena (NexBank) (0.2); e-mail to Z. Annable, G. Demo, H. Winograd re: Notice of Service of Subpoena (NexBank) (0.1); prepare Notice of Service of Subpoena (Advisors) (0.1); e-mail to Z. Annable, G. Demo, H. Winograd re: Notice of Service of Subpoena (Advisors) (0.1); meet and confer call w/ L. Phillips, M. Sbaiti re: document requests (0.5) | 1.00 | 1245.00 | $1,245.00 |
| 05/25/2021 | JAM | BL | Tel c. w/ G. Demo re: withdrawal of the reference hearing (0.1); prepare for withdrawal of the reference hearing (0.4); work on summary judgment against Dondero (notes litigation) (0.7); hearing on withdrawal of the reference (2.2); tel c. w/ J. Pomerantz re: hearing (0.1); tel c. w/ J. Seery, J. Dubel, J. Pomerantz, G. Demo re: hearing (0.4); telc . w/ G. Demo re: hearing, document production and related matters (0.3); e-mails w/ D. Klos, G. Demo re: document production (0.2); e-mails to L Canty re: document production (Dondero notes litigation) (0.3); e-mails to Dondero's counsel re: document production (0.1) | 4.80 | 1245.00 | $5,976.00 |
| ██████ | ███ | ██ | | ██ | ████ | ████ |
| 05/25/2021 | LSC | BL | Prepare for and assist at hearing on motions to stay and status conference re motion to withdraw the reference. | 2.30 | 460.00 | $1,058.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    56
Invoice 127958
May 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/25/2021 | LSC | BL | Preparation of supplemental production to Dondero. | 2.00 | 460.00 | $920.00 |
| ██████ | ██ | ██ | ██████████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | ██████████████████ | ██ | ██ | ██████ |
| 05/25/2021 | GVD | BL | Prepare for evidentiary hearing on motion to withdraw reference | 3.80 | 950.00 | $3,610.00 |
| 05/25/2021 | GVD | BL | Attend hearing on motions to withdraw the reference | 2.10 | 950.00 | $1,995.00 |
| 05/25/2021 | GVD | BL | Conference with team re follow up to hearing on motion to withdraw the reference | 0.50 | 950.00 | $475.00 |
| 05/25/2021 | GVD | BL | Conference with J. Morris on evidentiary hearing on motion to withdraw | 0.30 | 950.00 | $285.00 |
| 05/25/2021 | GVD | BL | Conference with J. Romey re status of note litigation | 0.20 | 950.00 | $190.00 |
| ██████ | ██ | ██ | ██████████ | ██ | ██ | ██████ |
| ██████ | █ | ██ | █████████████ | ██ | ██ | ██████ |
| ██████ | █ | ██ | ███████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | █████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | ██████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | ██████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | ██████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | ███████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | █████████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | ██████████████ | ██ | ██ | ██████ |
| ██████ | ██ | ██ | █████████████ | ██ | ██ | ██████ |
| ██████ | █ | ██ | █████████ | ██ | ██ | ██████ |
| ██████ | █ | ██ | █████████████ | ██ | ██ | ██████ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    57
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  | | | | | | |
| 05/26/2021 | JAM | BL | Tel c. w/ D. Rukavina re: discovery concerning Advisors (notes litigation) (0.1); e-mails w/ D. Rukavina re: discovery concerning Advisors (notes litigation) (0.1); prepare for Dondero deposition (notes litigation) (3.0); e-mail to L. Canty re: exhibits for use in Dondero deposition (0.7); prepare written responses to Advisor's discovery requests (notes litigation) (2.4); review/revise written responses to Dondero's Third Set of Discovery Demands (0.7); e-mail to T. Surgent, D. Klos, G. Demo, H. Winograd re: written responses to Advisor's discovery requests (notes litigation) (0.2) | 7.20 | 1245.00 | $8,964.00 |
| 05/26/2021 | LSC | BL | Preparation of exhibits and materials in connection with J. Dondero's 5/28/21 deposition (Notes Litigation). | 3.20 | 460.00 | $1,472.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027  - 00002

Page:    58
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ████ | ███ | ██ | ████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ███████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | █████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ███████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ██████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████ | ██ | ██ | ██ |
| ████ | █ | ██ | █████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ███████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | █████████████████ | | | |
| 05/26/2021 | HRW | BL | Review production for NPA discovery requests in notes litigation (0.3) | 0.30 | 695.00 | $208.50 |
| ████ | ███ | ██ | █████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | █████████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ███████████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ████████████████ | ██ | ██ | ██ |
| 05/27/2021 | JNP | BL | Conference with John A. Morris regarding Dondero amended answer and discovery issues. | 0.20 | 1295.00 | $259.00 |
| ████ | ███ | ██ | ████████████████████ | | | |
| ████ | ███ | ██ | ███████████████ | ██ | ██ | ██ |
| ████ | ███ | ██ | ███████████████████ | ██ | ██ | ██ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    59
Invoice 127958
May 31, 2021



|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/27/2021 | JAM | BL | Review/revise written responses to Advisor's discovery requests (0.2); e-mail to J. Seery, T. Surgent, D. Klos, G. Demo, H. Winograd re: revised written responses to Advisor's discovery requests (0.1); tel c. w/ J. Seery re: Dondero and notes litigation (0.1); work on written responses to discovery served by HCRE (notes litigation) (1.5); e-mails w/ D. Deitz-Perez, B. Assink re: Dondero's amended interrogatory responses (0.3); tel c. w/ D. Deitz-Perez re: Dondero's amended interrogatory responses (0.1); prepare for Dondero deposition (0.4) | 2.70 | 1245.00 | $3,361.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    60
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮▮▮▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮ | ▮ | |
| 05/28/2021 | JNP | BL | Conference with John A. Morris regarding Dondero deposition on note litigation. | 0.10 | 1295.00 | $129.50 |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮ | | |
| 05/28/2021 | JAM | BL | Prepare for Dondero deposition (3.5); Dondero deposition (4.6); tel c. w/ J. Pomerantz re: Dondero deposition (0.1); tel c. w/ J. Seery re: Dondero deposition (0.3); e-mails w/ J. Seery, H. Winograd re: written responses to Advisor's discovery requests (0.2); e-mail to Bonds Ellis, J. Pomerantz, G. Demo, H. Winograd re: proposed order on stay (0.1) | 8.80 | 1245.00 | $10,956.00 |
| 05/28/2021 | LSC | BL | Preparation for and assist at deposition of Jim Dondero (notes litigation) | 5.50 | 460.00 | $2,530.00 |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮ | ▮ | ▮ |
| 05/28/2021 | GVD | BL | Conference with J. Morris and J. Seery re Dondero deposition and next steps | 0.20 | 950.00 | $190.00 |
| 05/28/2021 | GVD | BL | Attend Dondero Deposition (partial) | 1.60 | 950.00 | $1,520.00 |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮ | ▮ | ▮ |

D-CNL001150

Appx. 02810

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

Page:   61
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/28/2021 | HRW | BL | Prepare responses and objections to HCMFA discovery in notes litigation (0.4) | 0.40 | 695.00 | $278.00 |
| 05/28/2021 | HRW | BL | Deposition of Dondero in connection with notes litigation (3.5) | 3.50 | 695.00 | $2,432.50 |
| 05/28/2021 | HRW | BL | Review production for NPA discovery requests in notes litigation (0.3) | 0.30 | 695.00 | $208.50 |
| 05/29/2021 | JAM | BL | E-mails to Counsel re: Zoom instructions for Tuesday's depositions (0.2); review Dondero written responses to discovery (0.2); e-mail to B. Assink, C. Taylor, J. Pomerantz, G. Demo, H. Winograd re: Dondero's written responses to discovery (0.2) | 0.60 | 1245.00 | $747.00 |
| 05/29/2021 | JAM | BL | Review HCMFA's second request for discovery (0.2); e-mails w/ T. Surgent, D. Klos, G. Demo, H. Winograd re: HCMFA's second request for discovery (0.1); review Dondero expert report (0.3); e-mails w/ J. Pomerantz, G. Demo, H. Winograd re: Dondero's expert report (0.2); draft written responses to HCRE's document requests, interrogatories, and requests for admission (3.1); e-mail to G. Demo, H. Winograd re: draft written responses to HCRE's document requests, interrogatories, and requests for admission (0.1); tel c. w/ H. Winograd re: opposition to HCRE/Services motion for leave to serve amended complaint and cross-motion for summary judgment (0.4) | 4.40 | 1245.00 | $5,478.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    62
Invoice 127958
May 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | ████████████████ | | | |
| 05/29/2021 | HRW | BL | Draft opposition to HCRE and HCMS motions for leave to amend answer in notes litigation (2.0) | 2.00 | 695.00 | $1,390.00 |
| 05/29/2021 | HRW | BL | Call with J. Morris re: opposition to HCRE and HCMS motions for leave to amend answer in notes litigation (0.3) | 0.30 | 695.00 | $208.50 |
| ████ | ██ | ██ | ███████████ | ██ | ███ | ████ |
| 05/30/2021 | JAM | BL | Review documents (1.9); tel c. w/ G. Demo re: document review/facts (1.1); e-mails w/ G. Demo re: facts (0.3); tel c. w/ G. Demo re: document review/facts (0.6); prepare for depositions (0.8) | 4.70 | 1245.00 | $5,851.50 |
| ████ | ██ | ██ | ████████ | ██ | ███ | ████ |
| ████ | ██ | ██ | █████████████ | ██ | ███ | ████ |
| ████ | ██ | ██ | ████████████ | ██ | ███ | ███ |
| ████ | ██ | ██ | ██████████ | ██ | ███ | ███ |
| 05/30/2021 | GVD | BL | Conference with J. Morris re deposition preparation | 0.60 | 950.00 | $570.00 |
| ████ | ██ | ██ | ████████████ | | | |
| 05/30/2021 | HRW | BL | Draft opposition to HCRE and HCMS motions for leave to amend answer in notes litigation (3.5) | 3.50 | 695.00 | $2,432.50 |
| ████ | ██ | ██ | █████████ | ██ | | |
| 05/31/2021 | JAM | BL | Analyze G. Scott prior deposition transcript (2.4); analysis of use of Scott transcript, and e-mail to J. Pomerantz, G. Demo, H. Winograd concerning the same (0.6); prepare for Dondero and Scott depositions (6.4); e-mails w/ L. Canty re: deposition exhibits (0.2); tel c. w/ G. Demo, C. Wilkins re: potential conflicts (0.2); | 10.40 | 1245.00 | $12,948.00 |
| | | | █████████ | | | |
| 05/31/2021 | JAM | BL | Review/revise discovery requests for HCRE (notes litigation (0.4); e-mail to L. Drawhorn, G. Demo, H. Winograd, J. Rudd re: discovery requests for HCRE (notes litigation) (0.1); tel c. w/ H. Winograd re: status of brief for opposition to motion to amend (0.2) | 0.70 | 1245.00 | $871.50 |

D-CNL001152

Pachulski Stang Ziehl & Jones LLP                                Page:    63
Highland Capital Management LP                                   Invoice 127958
36027   - 00002                                                 May 31, 2021



|  | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 05/31/2021 | HRW | BL | Draft opposition to HCRE and HCMS motions for leave to amend answer in notes litigation (9.5) | 9.50 | 695.00 | $6,602.50 |
| | | | | **1119.20** | | **$1,118,798.00** |

D-CNL001153

**Appx. 02813**

# EXHIBIT 175

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

June 30, 2021
Invoice    128195
Client     36027
Matter     00002
         **JNP**

RE:   Postpetition

---

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   06/30/2021



Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 15
Invoice 128195
June 30, 2021



**Bankruptcy Litigation [L430]**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    16
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/19/2021 | CHM | BL | Review Dondero notes litigation document production and cross check for privilege filter; email production links to H. Winograd and J. Morris. | 4.50 | 750.00 | $3,375.00 |
| 06/01/2021 | JAM | BL | Review/revise objection to HCMS motion for leave to amend answer (2.2); e-mail to J. Pomerantz, G. | 3.00 | 1245.00 | $3,735.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    17
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Demo, H. Winograd re: comments to draft objection to HCMS motion for leave to amend answer (0.1); tel c. w/ J. Dubel re: expert report (0.1); tel c. w/ H. Winograd re: objections to HCRE and HCMS motions for leave to amend answer (0.1); review/revise objections to HCRE and HCMS motions for leave to amend answer (0.2); e-mails w/ G. Demo, H. Winograd, D. Klos, K. Hendrix, J. Donohue re: partial payment/performance by HCRE and HCMS (0.1); communications w/ H. Winograd, Z. Annable re: finalizing and filing objections to HCRE and HCMS motions for leave to amend answer (0.2) | | | |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |
| 06/01/2021 | LSC | BL | Draft declarations in support of oppositions to HCMS and HCRE motions to amend (1.1); assist with revising and finalizing of oppositions to HCMS and HCRE motions to amend (1.3); revise and finalize exhibits (.5). | 2.90 | 460.00 | $1,334.00 |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| 06/01/2021 | GVD | BL | Review and revise motion for leave to amend HCRE and HCMS answers | 2.00 | 950.00 | $1,900.00 |
| ███ | ███ | ███ | █████████████ | ███ | ███ | ███ |
| 06/01/2021 | HRW | BL | Draft opposition to HCRE and HCMS motions for leave to amend answer in notes litigation (12.5) | 12.50 | 695.00 | $8,687.50 |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |
| 06/02/2021 | JMF | BL | Review responses to motions for leave to amend answer. | 0.40 | 1050.00 | $420.00 |
| ███ | ███ | ███ | ████████████████ | ███ | ███ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    18
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/02/2021 | GVD | BL | Correspondence with J. Morris re HCRE/HCMS motion for leave to withdraw the reference | 0.40 | 950.00 | $380.00 |
| 06/02/2021 | GVD | BL | Draft demand letter re HCMFA notes and serve same | 0.60 | 950.00 | $570.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    19
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ███ | ██ | ███████ | ██ | ██ | ██ |
| ███ | ███ | ██ | ████████ | ██ | ██ | ██ |
| ███ | ███ | ██ | ████████ | ██ | ██ | ██ |
| 06/02/2021 | HRW | BL | Review documents produced in Dondero notes litigation (0.1) | 0.10 | 695.00 | $69.50 |
| ███ | ███ | ██ | █████████ | ██ | ██ | ██ |
| ███ | ███ | ██ | ████████ | ██ | ██ | ██ |
| ███ | ███ | ██ | ██████████ | ██ | ██ | ██ |
| | | | ██████████ | | | |
| ███ | ███ | ██ | ██████████ | ██ | ██ | ██ |
| | | | ███████████ | | | |
| 06/03/2021 | JAM | BL | E-mail to L. Drawhorn, J. Rudd, J. Pomerantz, G. Demo re: motion to withdraw the reference and related matters (0.3); e-mails w/ M. Aigen, Dondero's other counsel, J. Pomerantz, G. Demo, H. Winograd re: scheduling of expert depositions (0.1); prepare notices of deposition for Nancy Dondero and Dondero's expert witnesses and send to Z. Annable, H. Winograd (0.2); review HCRE/HCMS motions (0.3) | 0.90 | 1245.00 | $1,120.50 |
| 06/03/2021 | LSC | BL | Review documents, redact, and prepare NexPoint document production (and address numerous issues with). | 8.20 | 460.00 | $3,772.00 |
| ███ | ███ | ██ | █████████ | ██ | ██ | ██ |
| ███ | ███ | ██ | ████████ | ██ | ██ | ██ |
| 06/03/2021 | GVD | BL | Correspondence with J. Donohue re demand letters on notes | 0.20 | 950.00 | $190.00 |
| 06/03/2021 | GVD | BL | Correspondence with J. Morris re HCRE/HCMS motions for leave to amend | 0.20 | 950.00 | $190.00 |

D-CNL001047

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:     20
Invoice 128195
June 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/03/2021 | GVD | BL | Correspondence with J. Morris and H. Winograd re status of notes litigation | 0.20 | 950.00 | $190.00 |
| 06/03/2021 | HRW | BL | Prepare document production for NexPoint discovery in connection with notes litigation (1.0) | 1.00 | 695.00 | $695.00 |
| 06/03/2021 | HRW | BL | Call with L. Canty re: document production for NexPoint discovery in connection with notes litigation (0.2) | 0.20 | 695.00 | $139.00 |
| 06/03/2021 | HRW | BL | Draft responses and objections to document requests in HCMS notes litigation (1.0) | 1.00 | 695.00 | $695.00 |
| 06/03/2021 | HRW | BL | Prepare search terms for document production in HCMS notes litigation (0.5) | 0.50 | 695.00 | $347.50 |

D-CNL001048

Appx. 02821

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    21

Invoice 128195

June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| 06/04/2021 | LSC | BL | Transmit HCRE document production to additional party. | 0.20 | 460.00 | $92.00 |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| 06/04/2021 | HRW | BL | Draft 30(b)(6) deposition notice directed to HCMS and HCRE (0.6) | 0.60 | 695.00 | $417.00 |
| 06/04/2021 | HRW | BL | Send production for NexPoint discovery demands re: notes litigation to opposing counsel (0.1) | 0.10 | 695.00 | $69.50 |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |
| | ████ | ██ | █ | ██ | ██ | ████ |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:    22
Invoice 128195
June 30, 2021



|  | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | ████████████████ |  |  |  |
| 06/06/2021 | HRW | BL | Review HCMFA motion to amend (1.0) | 1.00 | 695.00 | $695.00 |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████████████ |  |  |  |
| 06/07/2021 | JAM | BL | Review/revise Rule 30(b)(6) deposition notice for HCRE (0.1); e-mail to H. Winograd re: Rule 30(b)(6) deposition notice for HCRE (0.1); review/revise Rule 30(b)(6) deposition notice for HCMS (0.1); e-mail to H. Winograd re: Rule 30(b)(6) deposition notice for HCMS (0.1). | 0.40 | 1245.00 | $498.00 |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ██ | ███0 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ████ | ██ | █████████████ | ██ | ██ | ███ |
| ██████ | ████ | ██ | ███████████████ | ██ | ██ | ███ |
| ██████ | ██ | ██ | ████████████████████ | ██ | ██ | ███ |
| | | | ███████████████████ | | | |
| ██████ | ████ | ██ | ███████████ | ██ | ██ | ███ |
| | | | ██ | | | |
| 06/07/2021 | HRW | BL | Communications with DSI re: HCMS discovery (0.2) | 0.20 | 695.00 | $139.00 |
| 06/07/2021 | HRW | BL | Draft R&Os to HCMS discovery (2.6) | 2.60 | 695.00 | $1,807.00 |
| 06/07/2021 | HRW | BL | Draft search terms for HCMS document production (1.0) | 1.00 | 695.00 | $695.00 |
| 06/07/2021 | HRW | BL | Edit and review 30(b)(6) deposition notice directed to HCMS and HCRE (0.2) | 0.20 | 695.00 | $139.00 |
| ██████ | ███ | ██ | ███████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | █████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | █████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | █████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | █████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████ | ██ | ██ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | | |
| 06/08/2021 | HRW | BL | Communications with DSI re: HCMS discovery (0.3) | 0.30 | 695.00 | $208.50 |
| 06/08/2021 | HRW | BL | Draft R&Os to HCMS discovery (1.5) | 1.50 | 695.00 | $1,042.50 |
| 06/08/2021 | HRW | BL | Draft search terms for HCMS document production (1.0) | 1.00 | 695.00 | $695.00 |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| 06/09/2021 | JNP | BL | Review of motion to amend answer. | 0.10 | 1295.00 | $129.50 |
| 06/09/2021 | JNP | BL | Review motion to modify answer and emails regarding same. | 0.20 | 1295.00 | $259.00 |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| 06/09/2021 | JMF | BL | Review motion for leave to amend answer. | 0.30 | 1050.00 | $315.00 |
| | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   26
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮ | ▮ | ▮▮ |
| 06/09/2021 | JAM | BL | Review/revise R&Os to HCMS's discovery requests (0.7); e-mails with H. Winograd re: R&Os to HCMS's discovery requests (0.1). | 0.80 | 1245.00 | $996.00 |
| | | | ▮▮▮ | ▮ | ▮ | ▮▮ |
| 06/09/2021 | LSC | BL | Preparation of document production to HCMS, including redaction of certain documents, and correspondence with H. Winograd regarding the same. | 5.70 | 460.00 | $2,622.00 |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮ | ▮ | ▮ | ▮▮▮ | ▮▮ | | ▮▮ |
| | | | ▮▮▮▮▮ | ▮▮ | | |
| ▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| 06/09/2021 | HRW | BL | Draft R&Os for HCMS discovery demands (4.3) | 4.30 | 695.00 | $2,988.50 |
| 06/09/2021 | HRW | BL | Communicate with L. Canty re: HCMS document production (0.7) | 0.70 | 695.00 | $486.50 |
| 06/09/2021 | HRW | BL | Organize and review document production for HCMS (1.3) | 1.30 | 695.00 | $903.50 |
| 06/09/2021 | HRW | BL | Send HCMS productions in response to document requests (0.2) | 0.20 | 695.00 | $139.00 |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| 06/09/2021 | HRW | BL | Communicate with client re: R&OS to HCMS discovery and verification (0.2) | 0.20 | 695.00 | $139.00 |
| 06/10/2021 | IDK | BL | Office conference with J Morris re upcoming hearing this morning on notes litigation and presentation. | 0.30 | 1325.00 | $397.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/10/2021 | JNP | BL | Participation in hearing on motion to amend answer. | 1.50 | 1295.00 | $1,942.50 |
| 06/10/2021 | JAM | BL | Prepare for hearing on HCRE and HCMS motion for leave to amend (2.3); court hearing on HCRE and HCMS motion for leave to amend (0.8); telephone | 3.30 | 1245.00 | $4,108.50 |

D-CNL001055

Appx. 02828

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 28
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | conference with H. Winograd re: subpoena for PwC (0.1); telephone conference with D. Klos re: subpoena for PwC (0.1). | | | |
| 06/10/2021 | LSC | BL | Research in connection with subpoena and correspondence with H. Winograd regarding the same. | 0.90 | 460.00 | $414.00 |
| 06/10/2021 | LSC | BL | Prepare for and assist at hearing on motion to amend. | 3.00 | 460.00 | $1,380.00 |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| 06/10/2021 | GVD | BL | Attend hearing on motion to amend notes | 2.50 | 950.00 | $2,375.00 |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ██ | ███ | ████████████ | ██ | ██ | ███ |
| 06/10/2021 | HRW | BL | Call with J. Morris re: PwC subpoenas (0.1) | 0.10 | 695.00 | $69.50 |
| 06/10/2021 | HRW | BL | Call with G. Demo re: HCMFA motion to amend (0.1) | 0.10 | 695.00 | $69.50 |
| 06/10/2021 | HRW | BL | Review HCMFA motion to amend (1.2) | 1.20 | 695.00 | $834.00 |
| 06/10/2021 | HRW | BL | Draft opposition to HMCFA motion to amend (0.6) | 0.60 | 695.00 | $417.00 |
| 06/10/2021 | HRW | BL | Draft document and deposition subpoenas for PwC (2.6) | 2.60 | 695.00 | $1,807.00 |
| 06/10/2021 | HRW | BL | Call with L. Canty re: PwC subpoenas (0.1) | 0.10 | 695.00 | $69.50 |
| 06/10/2021 | HRW | BL | Hearing on HCRE/HCMS motion to amend answer (1.0) | 1.00 | 695.00 | $695.00 |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |
| ███ | ███ | ███ | ████████████ | ██ | ██ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    29
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| 06/11/2021 | JNP | BL | Review emails regarding consolidation of notes litigation. | 0.10 | 1295.00 | $129.50 |
| 06/11/2021 | JNP | BL | Review of response to motion to quash. | 0.10 | 1295.00 | $129.50 |
| 06/11/2021 | JNP | BL | Conference with J. Seery, Robert J. Feinstein and Gregory V. Demo regarding status of Sentinel matters and next steps. | 0.50 | 1295.00 | $647.50 |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| ███ | ██ | ██ | ███████████ | | | |
| 06/11/2021 | GVD | BL | Conference with J. Morris and H. Winograd re status of HCMFA amended answer | 0.50 | 950.00 | $475.00 |
| 06/11/2021 | GVD | BL | Correspondence with D. Rukavina re amendments to notes litigation | 0.20 | 950.00 | $190.00 |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | |
| ███ | ██ | ██ | ████████████ | | | ██ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ██ |
| 06/11/2021 | HRW | BL | Draft subpoenas and ancillary documents for PwC in connection with HCMS notes litigation (1.6) | 1.60 | 695.00 | $1,112.00 |
| 06/11/2021 | HRW | BL | Send PwC subpoena to representative of PwC for HCMS notes litigation (0.2) | 0.20 | 695.00 | $139.00 |
| 06/11/2021 | HRW | BL | Communicate with local counsel and J. Morris re: subpoenas for PwC for HCMS notes litigation (0.6) | 0.60 | 695.00 | $417.00 |
| 06/11/2021 | HRW | BL | Meeting with client for notarization of ROG verification in connection with HCMS R&Os in notes litigation (0.1) | 0.10 | 695.00 | $69.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/11/2021 | HRW | BL | Communications with client and notary for ROG verification in connection with HCMS R&Os in notes litigation (0.1) | 0.10 | 695.00 | $69.50 |
| 06/11/2021 | HRW | BL | Send opposing counsel ROG verification for HCMS R&Os in notes litigation (0.1) | 0.10 | 695.00 | $69.50 |
| 06/11/2021 | HRW | BL | Call with J. Morris and G. Demo re: HCMFA motion to amend answer in notes litigation (0.5) | 0.50 | 695.00 | $347.50 |
| 06/11/2021 | HRW | BL | Draft 30(b)(6) deposition notices for HCMFA and NPA for notes litigations (0.4) | 0.40 | 695.00 | $278.00 |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| 06/14/2021 | JAM | BL | E-mails w/ D. Rukavina re: discovery in the notes litigation against the Advisors (0.3). | 0.30 | 1245.00 | $373.50 |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    31
Invoice 128195
June 30, 2021

| | Hours | Rate | Amount |
|---|---|---|---|

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    32
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    33
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ███ | ██ | ██████████████████ █ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ███████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ███████████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████████████ ████████████ | ██ | ████ | ████ |
| 06/16/2021 | JAM | BL | Draft e-mail to counsel for defendants in notes litigation re: discovery, proposed amendments (0.8). | 0.80 | 1245.00 | $996.00 |
| 06/16/2021 | JAM | BL | Review/revise e-mail to counsel for defendants in notes litigation re: discovery, proposed amendments (0.4). | 0.40 | 1245.00 | $498.00 |
| ██████ | ███ | ██ | ████████████████████ ████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ███████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | █████████████████████ █ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ███████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | █████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ██████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████████████ ██████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ███████████████████████ | ██ | ████ | ████ |
| ██████ | ███ | ██ | ████████████████████ | ██ | ████ | ████ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |  |  |  |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ |  | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ |  | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ |  | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ |  | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ |  | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

Appx. 02835

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    35
Invoice 128195
June 30, 2021



|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/17/2021 | HRW | BL | Draft search terms for HCMFA production in notes litigation (0.7); Review HCMFA discovery requests | 1.50 | 695.00 | $1,042.50 |

D-CNL001063

Appx. 02836

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:   36

Invoice 128195

June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (0.7); Review HCRE discovery schedule in notes litigation (0.1). | | | |

| 06/18/2021 | JAM | BL | Review PwC Subpoena from Dondero (0.1); tel c. w/ J. Seery re: PwC subpoena from Dondero (0.1); e-mails w/ M. Aigen, J. Pomerantz re: PwC subpoena and financial statements (0.1). | 0.30 | 1245.00 | $373.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    37
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|



Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    38
Invoice 128195
June 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ███ | ██ | ████████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ██████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ███████████████ | ██ | ███ | ███ |
| 06/21/2021 | JNP | BL | Email to and from Gregory V. Demo regarding concerns with note defendant disposing of assets. | 0.10 | 1295.00 | $129.50 |
| ██████ | ███ | ██ | ██████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | █████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | █████████████ | ██ | ███ |  |
| ██████ | ███ | ██ | █████████████ | ██ | ███ | ███ |
| 06/21/2021 | JAM | BL | Communications w/ M. Aigen, counsel for all defendants, J. Pomerantz, G. Demo, H. Winograd re: discovery and schedule for notes litigations (0.3). | 0.30 | 1245.00 | $373.50 |
| ██████ | ███ | ██ | ████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ███████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | ████████████ | ██ | ███ | ███ |
| ██████ | ███ | ██ | █████████████ | ██ | ███ | ███ |

D-CNL001066

Appx. 02839

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    39

Invoice 128195

June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| 06/21/2021 | HRW | BL | Communicate with DSI re: HCMFA discovery in notes litigation (0.2); Review HCMFA motion to amend answer (0.2); Draft search terms for HCMFA discovery in notes litigation (0.3). | 0.70 | 695.00 | $486.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    40
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | 116.50 |
| 06/22/2021 | JAM | BL | Analyze status of notes litigations and prepare outline of scheduling and discovery issues (0.7). | 0.70 | 1245.00 | $871.50 |

D-CNL001068

Appx. 02841

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 41
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/23/2021 | JAM | BL | Tel c. w/ H. Winograd re: amending the complaint to add new causes of action (0.2). | 0.20 | 1245.00 | $249.00 |
| 06/23/2021 | HRW | BL | Communicate with R. Half re: privilege review in notes litigation (0.2); Call with J. Morris re: amending complaints in notes litigation (0.1). | 0.30 | 695.00 | $208.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

Page:    42
Invoice 128195
June 30, 2021



|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/24/2021 | JAM | BL | Tel c. w/ counsel to PwC re: subpoena (0.1); tel c. w/ H. Winograd re: amended complaint (0.1). | 0.20 | 1245.00 | $249.00 |
| 06/24/2021 | HRW | BL | Hearing on HCMFA motion to amend (0.3); Review | 8.40 | 695.00 | $5,838.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    43
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | HCMFA proposed order (0.1); Call with J. Morris re: amending complaints in notes litigations (0.1); Research re: fraudulent transfer and other newly asserted claims for notes litigations (3.7); Draft amended complaint for notes litigation (3.2); Communicate with R. Half re: privilege review for notes litigations (0.1); Draft R&Os for HCMFA second RFPs (0.9). | | | |
| 06/25/2021 | IDK | BL | E-mails with G Demo re issues on Dondero conversion of HCMFA to holding company and impact on note litigation, and related background to same, including memo from Wilmer Hale on same. | 0.40 | 1325.00 | $530.00 |
| 06/25/2021 | JAM | BL | Tel c. w/ H. Winograd re: amended complaints for notes litigation (0.3). | 0.30 | 1245.00 | $373.50 |
| 06/25/2021 | GVD | BL | Correspondence with J. Morris and H. Winograd re preparation for amendment to the notes litigation | 0.30 | 950.00 | $285.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    44
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| 06/25/2021 | HRW | BL | Draft amended complaint for notes litigation (3.8); Call with J. Morris re: amended complaints for notes litigation (0.2); Research re: additional claims in notes litigation (2.0); Review HCMFA discovery and production (0.2); Send counsel for HCMFA first production (0.1); Review outstanding litigation critical dates (0.4). | 6.70 | 695.00 | $4,656.50 |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| 06/27/2021 | JAM | BL | Review/revise draft Amended Complaint against Dondero (1.2); e-mails w/ H. Winograd, G. Demo re: revised Amended Complaint against Dondero (0.3). | 1.50 | 1245.00 | $1,867.50 |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| ██████ | ███ | ███ | ████████████████ | ██ | ██ | ██ |
| 06/27/2021 | HRW | BL | Draft amended complaint for notes litigation (6.5); Research re: additional claims for amended claim in notes litigation (1.0). | 7.50 | 695.00 | $5,212.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    45
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/28/2021 | JNP | BL | Review amended complaint. | 0.20 | 1295.00 | $259.00 |
| 06/28/2021 | JNP | BL | Conference with John A. Morris regarding amended complaint. | 0.20 | 1295.00 | $259.00 |
| 06/28/2021 | JNP | BL | Email to and from Ira D. Kharasch and J.  Elkin regarding research regarding withdrawal of the reference and amended complaints. | 0.20 | 1295.00 | $259.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    46
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/28/2021 | JAM | BL | Review/revise draft amended complaint against Dondero (1.1); e-mail to J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: revised draft amended complaint against Dondero (0.3); tel c. w/ J. Pomerantz re: revised draft amended complaint against Dondero (0.2). | 1.60 | 1245.00 | $1,992.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    47
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

06/28/2021   HRW   BL   Draft amended complaint for notes litigation (1.6); Research re: additional claims for amended claim in notes litigation (1.0); Review HCMFA R&Os and production to discovery requests (0.4); Send HCMFA R&Os and production to opposing counsel (0.1); Call with L. Canty re: HCMFA production (0.1); Draft R&Os to HCRE discovery requests in notes litigation (0.6).   3.80   695.00   $2,641.00

06/29/2021   JNP   BL   Review opposition to motion to withdraw reference.   0.30   1295.00   $388.50

D-CNL001075

Appx. 02848

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:    48

Invoice 128195

June 30, 2021

|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ████ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ████████████ | ██ | ███ | ████ |
| ████ | ██ | ██ | ████████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ██████████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ████████ | ██ | ██ | ██ |
| ████ | ██ | ██ | ███████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ████████ | ██ | ██ | ███ |
| 06/29/2021 | GVD | BL | Correspondence with PSZJ working group re notes litigation | 0.20 | 950.00 | $190.00 |
| 06/29/2021 | GVD | BL | Review amended notes complaint | 0.90 | 950.00 | $855.00 |
| ████ | ██ | ██ | ███████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ███████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ███████ | ██ | ██ | ███ |
| ████ | ██ | ██ | ███████ | ██ | ██ | ████ |
| ████ | █ | ██ | ██████ | ██ | ██ | ███ |
| ████ | █ | ██ | ████████ | | | |

D-CNL001076

Appx. 02849

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    49
Invoice 128195
June 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ██ | ██ | ████████████████ | ██ | ██ | ████ |
| | | | ████████████ | | | |
| 06/29/2021 | HRW | BL | Research re: amended complaint for notes litigations (1.2); Review amended complaint re: notes litigations (0.5); Draft R&Os for HCRE discovery requests in notes litigation (1.4). | 3.10 | 695.00 | $2,154.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

Page:    50
Invoice 128195
June 30, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/30/2021 | JAM | BL | E-mails w/ G. Demo, H. Winograd re: potential claims in amended complaint (0.2); e-mails w/ G. Demo re: issues concerning proposed amended complaint (0.1); review draft responses and objections to discovery requests tendered by HCM (0.4); review HCMFA motion for protective order (0.3); e-mails w/ J. Vasek, D. Rukavina, J. Pomerantz, G. Demo, H. Winograd re: HCMFA motion for protective order (0.2); tel c. w/ J. Seery re: issues concerning potential amended complaint (0.4). | 1.60 | 1245.00 | $1,992.00 |
| 06/30/2021 | GVD | BL | Correspondence with PSZJ team re revisions to amended note complaint | 0.20 | 950.00 | $190.00 |

D-CNL001078

Appx. 02851

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    51
Invoice 128195
June 30, 2021

|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|



| Date | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/30/2021 | HRW | BL | Draft and review R&Os to HCRE discovery in notes litigation (0.7); Draft search terms for HCRE production in notes litigation (1.2); Call with L. Canty re: HCRE production in notes litigation (0.1); Review and gather HCRE production in notes litigation (0.8); Send HCRE production and R&Os to opposing counsel (0.1); Edit amended complaint re: notes litigation (0.6); Research re: fraudulent transfer and fiduciary claims for amended complaint in notes litigation (1.6). | 5.10 | 695.00 | $3,544.50 |

# EXHIBIT 176

**Pachulski Stang Ziehl & Jones LLP**

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

July 31, 2021
Invoice    128292
Client      36027
Matter     00002
**JNP**

RE:   Postpetition

---

**STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   07/31/2021**



Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    18
Invoice 128292
July 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ |  |  |
| ███ | ██ | ██ | ██████ |  |  |  |
| 07/01/2021 | JAM | BL | Further revisions to draft Amended Complaint (0.4); e-mails w/ G. Demo, H. Winograd, J. Pomerantz re: revisions to draft Amended Complaint (0.2). | 0.60 | 1245.00 | $747.00 |
| 07/01/2021 | GVD | BL | Review revisions to letter re conflicts of interest | 0.40 | 950.00 | $380.00 |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| 07/01/2021 | GVD | BL | Review amended complaint re notes litigation and correspondence re same | 0.30 | 950.00 | $285.00 |
| ███ | █ | ██ | ██████ |  |  |  |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████ | ██ | ██ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/01/2021 | HRW | BL | Edit and review amended complaint for notes litigation (0.6); Assist client re: verification for HCRE interrogatories in notes litigation (0.1); Review supplemental production for HCMFA and NPA notes litigations (0.1); Send verification for HCRE interrogatories to opposing counsel in notes litigation (0.1). | 0.90 | 695.00 | $625.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 20
Invoice 128292
July 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/02/2021 | HRW | BL | Review supplemental production for HCMFA and NPA notes litigations (0.2); Send supplemental production for HCMFA and NPA notes litigations to opposing counsel (0.1). | 0.30 | 695.00 | $208.50 |
| 07/03/2021 | GVD | BL | Correspondence with J. Elkin re fraudulent conveyance actions in notes litigation | 0.20 | 950.00 | $190.00 |
| 07/03/2021 | JE | BL | Review additional transcripts and pleadings on fraudulent transfers; correspondence with Mr. Morris and Mr. Demo. | 5.30 | 1195.00 | $6,333.50 |

D-CNL001020

Appx. 02857

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    21
Invoice 128292
July 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/04/2021 | JE | BL | Prepare memo on implications of amending Note Suit Complaints to add fraudulent transfer cause of action. | 10.00 | 1195.00 | $11,950.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 22
Invoice 128292
July 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/06/2021 | JAM | BL | E-mail to M. Aigen, other defense counsel on notes litigation, concerning proposed Amended Complaint and scheduling matters (0.3); review written responses and document production from HCRE in notes litigation (0.3). | 0.60 | 1245.00 | $747.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    23
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▇▇▇ | ▇▇ | ▇ | ▇▇▇▇▇▇▇ | ▇▇ | ▇▇ | ▇▇ |
| 07/07/2021 | JNP | BL | Review Bankruptcy Court report and recommendation to District Court regarding withdrawal of reference. | 0.10 | 1295.00 | $129.50 |
| ▇▇ | ▇ | ▇ | ▇▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇▇▇ | ▇ | ▇ | |
| ▇▇ | ▇ | ▇ | ▇▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇ | ▇ | | ▇ |
| 07/07/2021 | JMF | BL | Review report and recommendations re notes adversary proceedings. | 0.60 | 1050.00 | $630.00 |
| ▇▇ | ▇ | | ▇▇▇▇▇ | | | ▇ |
| 07/07/2021 | JAM | BL | E-mails w/ D. Rukavina re: proposed amended complaint (0.2). | 0.20 | 1245.00 | $249.00 |
| ▇▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | ▇ | ▇ |
| ▇▇ | ▇ | ▇ | ▇▇▇ | ▇ | ▇ | ▇ |

D-CNL001023

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

Page:    24
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ████ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████ | ██ | ████ | ████ |
| 07/08/2021 | JNP | BL | Participate in hearing on motion to amend and motion to stay notes actions. | 0.20 | 1295.00 | $259.00 |
| 07/08/2021 | JNP | BL | Conference with J. Dubel regarding hearing on notes litigation. | 0.20 | 1295.00 | $259.00 |
| ██████ | ████ | ██ | █████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ██████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ██████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ████████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ████████████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████████████ | ██ | ████ | ████ |
| 07/08/2021 | JAM | BL | Court hearing on HCRE/HCMS motions to withdraw the reference and related matters (0.8); tel c. w/ J. Pomerantz re: court hearing (0.1). | 0.90 | 1245.00 | $1,120.50 |
| ██████ | ████ | ██ | █████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ███████████████ | ██ | ████ | ████ |
| ██████ | ████ | ██ | ██████████████ | ██ | ████ | ████ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    25
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ |
| | | | | | | |
| 07/08/2021 | JE | BL | Review certain documents relating to note suits (.5); call with Mr. Pomerantz, Mr. Morris and Mr. Demo regarding reference issues, preference issues and jury trials (.4). | 0.90 | 1195.00 | $1,075.50 |
| 07/08/2021 | HRW | BL | Send production to counsel for HCRE (0.1). | 0.10 | 695.00 | $69.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

Page:    26
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

07/09/2021   JAM   BL   Review M. Aigen e-mail re: notes litigation and discovery (0.1).   0.10   1245.00   $124.50

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:     27
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 07/11/2021 | JAM | BL | Work on Amended Complaints in notes litigation (2.2); e-mails w/ D. Rukavina re: NexPoint amended | 2.30 | 1245.00 | $2,863.50 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

answer (0.1).

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    29
Invoice 128292
July 31, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/12/2021 | JAM | BL | Analysis of status of each of the Notes Litigations. | 1.20 | 1245.00 | $1,494.00 |

D-CNL001029

Appx. 02866

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    30
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | █ | ███████████ | ██ | ██ | ██ |
| ███ | ██ | █ | ██████ | ██ | ██ | ██ |
| ███ | ██ | █ | ████████████ | | | |
| ███ | ██ | █ | ██████ | ██ | ██ | ███ |
| ███ | ██ | █ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | █ | ██████████ | ██ | ██ | ███ |
| ███ | ██ | █ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | █ | █████████ | ██ | ██ | ███ |
| ███ | ██ | █ | ████████ | ██ | ██ | ███ |
| ███ | ██ | █ | ██████████ | ██ | ██ | ███ |
| 07/13/2021 | JNP | BL | Conference with John A. Morris regarding notes litigation and defenses. | 0.20 | 1295.00 | $259.00 |
| ███ | ██ | █ | ████████████ | ██ | | ███ |
| ███ | ██ | █ | ██████████ | ██ | ██ | ███ |
| ███ | ██ | █ | ██████ | ██ | ██ | ███ |
| ███ | ██ | █ | █████████████ | | | |
| ███ | ██ | █ | █████████████ | ██ | ██ | ███ |

D-CNL001030

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    31
Invoice 128292
July 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 07/13/2021 | JAM | BL | E-mail to D. Rukavina re: NexPoint amended answer (0.2); e-mails w/ D. Klos, J. Seery re: HCMFA amended answer (0.2); review revise draft Amended Complaint for Dondero (0.4); review/revise draft Amended Complaint for HCMFA (0.9); review/revise draft Amended Complaint for NexPoint (0.9); review/revise draft Amended Complaint for HCRE (0.9); review/revise draft Amended Complaint for HCM Services, Inc. (0.9); draft e-mail to M. Aigen and other defense counsel re: schedule and related matters (0.6); e-mail to J. Seery re: amended complaints and HCMFA (0.2); tel c. w/ J. Seery re: HCMFA proposed amended complaint (0.2); e-mail to M. Aigen and other defense counsel, J. Pomerantz, G Demo re: Amended Complaints (0.1). | 5.50 | 1245.00 | $6,847.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    33
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|



| 07/15/2021 | JNP | BL | Review and execute pro hac vice applications for District Court note litigation. | 0.10 | 1295.00 | $129.50 |

D-CNL001032

Appx. 02869

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 37
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  | | | | | | |
| 07/19/2021 | JMF | BL | Review report and recommendations re notes litigation adversaries. | 1.10 | 1050.00 | $1,155.00 |
| 07/19/2021 | JAM | BL | E-mails w/ D. Rukavina re: NexPoint's amended answer (0.1); tel c. w/ M. Aigen re: scheduling issues and related matters (0.2). | 0.30 | 1245.00 | $373.50 |

D-CNL001033

Appx. 02870

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    38
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

07/20/2021    JAM    BL    E-mails w/ J. Wander, L. Drawhorn re: PwC subpoena (0.2); e-mails w/ J. Vasek, D. Rukavina, J. Pomerantz re: HCMFA motion for protective order    0.40    1245.00    $498.00

D-CNL001034

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 39
Invoice 128292
July 31, 2021



|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (0.2). | | | |
| 07/21/2021 | JNP | BL | Review brief regarding report and recommendation on withdrawal of reference and emails regarding same. | 0.10 | 1295.00 | $129.50 |
| 07/21/2021 | JAM | BL | E-mail to J. Vasek, D. Rukavina, J. Pomerantz, H. Wingrad re: motion for protective order (0.3); e-mails w/ M. Aigen re: scheduling stipulation (0.1); e-mails w/ L. Drawhorn, J. Wander re: PwC subpoena (0.2); e-mail to D. Rukavina re: PwC subpoena (0.2). | 0.80 | 1245.00 | $996.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   41
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/23/2021 | IDK | BL | E-mails with local counsel, J. Pomerantz re issues on Dondero entities objections in District Court to Report & Recommendations and procedural issues on same and opposition to motion to strike, including review of rules (.5); E-mails with J. Pomerantz and J. Morris re same and need for draft motion to strike (.3). | 0.80 | 1325.00 | $1,060.00 |
| 07/23/2021 | JNP | BL | Review and respond to email regarding stipulation to consolidate notes matters and open issues. | 0.10 | 1295.00 | $129.50 |
| 07/23/2021 | JAM | BL | E-mails w/ J. Wander, L. Drawhorn, D. Rukavina re: PwC subpoena, document production, and deposition (0.4); prepare Notices of Deposition (PwC) for each of the five adversary proceedings (including revisions based on comments received) (0.8); e-mail to Z. Annable re: PwC subpoena and Notices of Deposition (0.2). | 1.40 | 1245.00 | $1,743.00 |
| 07/24/2021 | IDK | BL | E-mails and telephone conference with J. Pomerantz re Dondero objection to R&R and need for motion to strike (.4); E-mails with J.Kim re same and relevant background (.3); E-mails with G Demo re same and related docs (.2). | 0.90 | 1325.00 | $1,192.50 |

D-CNL001036

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

Page:     42
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | ██ | █████████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | █████████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ███████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | █████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████ | ██ | ███ | ███ |
| ███ | ██ | ██ | ██████████████ | ██ | ███ | ███ |
| 07/26/2021 | IDK | BL | Review and consider J Kim draft motion to strike Dondero objection to report and rec, as well as his summary of caselaw (.5); E-mail J Pomerantz re timing on same (.1); E-mails with attorneys re problems on filing motion to strike same and issues on procedure re District Court for same (.3). | 0.90 | 1325.00 | $1,192.50 |
| 07/26/2021 | IDK | BL | E-mail local counsel re District Court order adopting R&R of Judge Jurnigan re HCM Services and review of same. | 0.20 | 1325.00 | $265.00 |
| ███ | ██ | ██ | ████████████ | ██ | ███ | ███ |

D-CNL001037

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 43
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| 07/26/2021 | JNP | BL | Review and respond to email regarding motion to strike objection to report and recommendation regarding withdrawal of reference. | 0.10 | 1295.00 | $129.50 |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| 07/26/2021 | RJF | BL | Review draft motion to strike objection to reference report and related emails. | 0.40 | 1395.00 | $558.00 |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮ | ▮▮ | | ▮▮▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| 07/26/2021 | JAM | BL | Review/analyze HCMLP's audited financials from 2008 to 2016 (1.8); e-mail to J. Seery, D. Klos, J. Pomerantz, G. Demo, H. Winograd re: production of audited financials (0.2). | 2.00 | 1245.00 | $2,490.00 |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮▮ | ▮▮ | ▮▮ |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

Page: 44

Invoice 128292

July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ███ | ██ | ████████ | ██ | ██ | ███ |
| ███ | ███ | ██ | ██████████ | ██ | ██ | ███ |
| ███ | ███ | ██ | ██████████ | ██ | ██ | ███ |
| ███ | ███ | ██ | ██████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | █████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | █████████ | ██ | ██ | ███ |
| ███ | ███ | ██ | █████████ | ██ | ██ | ███ |
| ███ | ███ | ██ | ██████ | ██ | ██ | ███ |
| ███ | ███ | ██ | █████████ | ██ | ██ | ███0 |
| 07/27/2021 | IDK | BL | E-mails with J Kim re decision to file response to Dondero objection to R&R vs motion to strike. | 0.20 | 1325.00 | $265.00 |
| ███ | ███ | ██ | █████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | ███████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | ████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | █████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | ████████ | ██ | ██ | ████ |
| 07/27/2021 | JAM | BL | E-mails w/ J. Seery, L. Canty, M. Aigen re: audited financial statements (0.3). | 0.30 | 1245.00 | $373.50 |
| ███ | ███ | ██ | █████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | █████████ | ██ | ██ | ████ |
| ███ | ███ | ██ | ██████ | ██ | ██ | ████ |

D-CNL001039

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    46
Invoice 128292
July 31, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ■■■■ | ■ | ■ | ■■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■■ | ■ | ■ | ■■ |
|  |  |  | ■■■■■ | ■ |  | ■■ |
| 07/29/2021 | JMF | BL | Review notes adversary proceedings district and bankruptcy dockets and draft memorandum re pending issues and status re same. | 2.10 | 1050.00 | $2,205.00 |
| 07/29/2021 | JAM | BL | Review audited financial statements and prepare for PwC deposition (1.1); e-mails w/ M. Aigen, L. Canty re: PwC financial statements (0.2); e-mails w/ L. Drawhorn, J. Seery re: Wick Phillips proposed withdrawal from notes litigation (0.1). | 1.40 | 1245.00 | $1,743.00 |
| ■■■■ | ■ | ■ | ■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■■ | ■ | ■ |  |
| ■■■■ | ■ | ■ | ■■■ | ■ | ■ | ■■ |
| 07/29/2021 | HRW | BL | Send production to opposing counsel for notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| 07/29/2021 | HRW | BL | Review objections to R&Rs issued in notes litigations (0.5). | 0.50 | 695.00 | $347.50 |
| 07/29/2021 | HRW | BL | Review and edit chart of District Court proceedings for notes litigations (0.6). | 0.60 | 695.00 | $417.00 |
| ■■■■ | ■ | ■ | ■■■■ | ■ | ■ | ■■ |
| ■■■■ | ■ | ■ | ■■■■ | ■ | ■ | ■■ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    47
Invoice 128292
July 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮ | ▮ | ▮▮ | ▮▮ |
| 07/30/2021 | JNP | BL | Email to and from Jonathan J. Kim regarding status of reports and recommendations in connection with motion to withdraw reference. | 0.20 | 1295.00 | $259.00 |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | ▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮ | ▮▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮▮▮ | | | |
| 07/30/2021 | JAM | BL | E-mail to L. Lambert, M. Clemente, J. Pomerantz re: Advisors' motion for protective order (0.2); prepare for PwC deposition (4.3); PwC deposition (2.0). | 6.50 | 1245.00 | $8,092.50 |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮ | ▮ | ▮▮ |
| ▮▮▮ | ▮ | ▮ | ▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮ | ▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮▮ | ▮ ▮ | ▮ | ▮▮▮▮ | ▮ | ▮ | ▮▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮▮ | ▮ | ▮ | ▮ |
| ▮▮▮ | ▮▮ | ▮ | ▮▮▮ | ▮ | ▮ | ▮▮ |
| 07/30/2021 | HRW | BL | Review pleadings in District Court notes litigations (1.0). | 1.00 | 695.00 | $695.00 |
| 07/30/2021 | HRW | BL | Review deadlines for District Court notes litigations (0.5). | 0.50 | 695.00 | $347.50 |
| 07/30/2021 | HRW | BL | Deposition of Peet Burger for notes litigations (2.0). | 2.00 | 695.00 | $1,390.00 |

# EXHIBIT 177

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX 75201

August 31, 2021
Invoice    128567
Client     36027
Matter     00003
**JNP**

RE: Post-Effective Date

---

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH  08/31/2021



Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

Page: 37
Invoice 128567
August 31, 2021

**Notes Litigation**

| | | | | | | |
|---|---|---|---|---|---|---|
| 08/11/2021 | JJK | NL | Prepare HCM objection to motion to reconsider. | 4.20 | 995.00 | $4,179.00 |
| 08/11/2021 | JAM | NL | Review stipulations for each adversary proceeding (0.4); e-mails w/ M. Aigen re: scheduling stipulations (0.1). | 0.50 | 1245.00 | $622.50 |
| 08/11/2021 | HRW | NL | Draft motion to file amended complaints for notes litigations (2.8) | 2.80 | 695.00 | $1,946.00 |
| 08/12/2021 | JJK | NL | Research and prepare replies re: Reports, motions to reconsider; emails Kharasch on same. | 5.20 | 995.00 | $5,174.00 |
| 08/12/2021 | LSC | NL | Retrieve and transmit Reports and Recommendations regarding notes litigations for J. Morris. | 0.30 | 460.00 | $138.00 |
| 08/12/2021 | HRW | NL | Draft motion to file amended complaints for notes litigations (3.0) | 3.00 | 695.00 | $2,085.00 |
| 08/13/2021 | IDK | NL | E-mail H Winograd re updated litigation WIP list with focus on deadlines re matters on Dondero entities motions for withdrawal of reference. | 0.20 | 1325.00 | $265.00 |
| 08/13/2021 | IDK | NL | E-mail J Kim re draft of response to HCMS motion to reconsider to D Court, including review of same and new argument. | 0.40 | 1325.00 | $530.00 |
| 08/13/2021 | JAM | NL | Review motion to amend complaint and proposed orders (0.9); e-mails w/ G. Demo, H. Winograd re: motion to amend complaint and proposed orders (0.2); e-mails w/ M. Aigen, others, re: scheduling order and motion to amend complaints (0.4). | 1.50 | 1245.00 | $1,867.50 |
| 08/13/2021 | GVD | NL | Review open issues re notes litigation and correspondence with H. Winograd re same | 0.40 | 950.00 | $380.00 |
| 08/13/2021 | HRW | NL | Edit and finalize motions to file amended complaints in notes litigations (1.2). | 1.20 | 695.00 | $834.00 |
| 08/16/2021 | IDK | NL | Review and consider revised response to HCMS motion to reconsider R&R (.3); E-mails with J Pomerantz re same and Texas litigation counsel (.2); E-mails with J Kim re my feedback on draft of same and timing for filing today (.2). | 0.70 | 1325.00 | $927.50 |
| 08/16/2021 | JJK | NL | Emails Kharasch, Pomerantz on motions to reconsider; related research and final revisions to last reply re: Reports. | 1.50 | 995.00 | $1,492.50 |
| 08/16/2021 | JNP | NL | Review response to motion for reconsideration of | 0.10 | 1295.00 | $129.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00003

Page:    38
Invoice 128567
August 31, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | order adopting report and recommendations. | | | |
| 08/17/2021 | JAM | NL | Review/revise motions for leave to amend complaints in Notes Litigation (1.1); e-mail to L. Canty, Z. Annable, H. Winograd re: motions for leave to amend complaints in Notes Litigation and related matters (0.2); e-mails w/ Z. Annable, H. Winograd re: motions to amend complaints in Notes Litigation (0.1). | 1.40 | 1245.00 | $1,743.00 |
| 08/17/2021 | LSC | NL | Prepare and transmit exhibits to motions to amend. | 0.50 | 460.00 | $230.00 |
| 08/18/2021 | JAM | NL | Communications w/ M. Aigen, Z. Annable re: form of Order for motions for leave to amend complaints (0.2); tel c. w/ D. Rukavina re: Advisors' motion for protective order (0.2). | 0.40 | 1245.00 | $498.00 |
| 08/18/2021 | LSC | NL | Transmit proposed orders on motions to amend. | 0.20 | 460.00 | $92.00 |
| 08/19/2021 | JAM | NL | Revise Advisors' draft Stipulation resolving their motion for a protective order (0.5); draft e-mail to D. Rukavina re: revised Stipulation resolving Advisors' motion for a protective order (0.2). | 0.70 | 1245.00 | $871.50 |
| 08/20/2021 | JNP | NL | Conference with John A. Morris regarding protective order regarding notes litigation. | 0.20 | 1295.00 | $259.00 |
| 08/20/2021 | JAM | NL | E-mails w/ D. Rukavina re: proposed settlement of motion for protective order (0.1); e-mails w/ J. Seery, J. Pomerantz, G. Demo re: Advisors' motion for a protective order (0.1). | 0.20 | 1245.00 | $249.00 |
| 08/24/2021 | HRW | NL | Draft notice of filing stipulations re: notes litigation (2.2). | 2.20 | 695.00 | $1,529.00 |
| 08/25/2021 | JAM | NL | E-mails w/ H. Winograd re: HCMFA scheduling stipulation (0.1). | 0.10 | 1245.00 | $124.50 |
| 08/25/2021 | HRW | NL | Draft proposed orders re: notes litigation (2.5); Communicate with opposing counsel for HCMFA re: notes stipulation (0.1). | 2.60 | 695.00 | $1,807.00 |
| 08/26/2021 | JAM | NL | E-mails w/ H. Winograd, Z. Annable re: filing of Amended Complaints (0.2); e-mails w/ H. Winograd, D. Rukavina re: scheduling order for HCMFA notes litigation (not subject to amended complaint) (0.2). | 0.40 | 1245.00 | $498.00 |
| 08/26/2021 | LSC | NL | Prepare exhibits to amended complaints (.7); prepare exhibits to orders approving discovery stipulations (.3). | 1.00 | 460.00 | $460.00 |
| 08/26/2021 | HRW | NL | Prepare and review amended complaints and | 1.70 | 695.00 | $1,181.50 |

D-CNL001156

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | exhibits for notes litigations filings (1.5); Communicate with opposing counsel for Advisors re: discovery stipulations (0.1); Review discovery stipulations for notes litigations (0.1). | | | |
| 08/27/2021 | JAM | NL | E-mails w/ D. Rukavina, M. Aigen re: timing of answers and discovery demands (0.1); e-mails w/ Z. Annable re: filing of amended answers and orders approving scheduling stipulations (0.2). | 0.30 | 1245.00 | $373.50 |
| 08/27/2021 | HRW | NL | Review adversary cover sheets for notes litigations (0.2); Review and prepare discovery stipulations and proposed orders for notes litigations (1.0). | 1.20 | 695.00 | $834.00 |
| 08/29/2021 | JMF | NL | Review amended complaints re notes litigation. | 0.30 | 1050.00 | $315.00 |
| | | | | **35.40** | | **$31,635.50** |

# EXHIBIT 178

Appx. 02884

## Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX 75201

August 10, 2021
Invoice    128474
Client     36027
Matter     00002
**JNP**

RE:  Postpetition

---

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH  08/10/2021



Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:      9

Invoice 128474

August 10, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

## Bankruptcy Litigation [L430]

| 04/15/2021 | JAM | BL | Review/revise Rule 26 disclosures for Dondero notes litigation (0.8); e-mails with H. Winograd, Z. Annable re: Rule 26 disclosures for Dondero notes litigation (0.2); | 4.80 | 1245.00 | $5,976.00 |



telephone conference with B. Assink re: Dondero's withdrawal of the reference in notes litigation and related matters (0.1); telephone conference with J. Pomerantz re: Dondero's withdrawal of the reference in notes litigation and related matters (0.1);

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    10
Invoice 128474
August 10, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | ; review Dondero motion to withdraw the reference and stay the notes litigation (0.3). | | | |
| 04/23/2021 | JAM | BL | telephone conference with B. Sharp re: e-discovery (0.1); | | | |
| 05/25/2021 | CHM | BL | Email K. Kim re document production. | 0.10 | 750.00 | $75.00 |
| 05/25/2021 | CHM | BL | Exchange multiple emails with IDS re document | 0.40 | 750.00 | $300.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

Page: 11

Invoice 128474

August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | production and search issues. | | | |
| 05/25/2021 | CHM | BL | Emails with J. Morris and B. Sharp re document production. | 0.30 | 750.00 | $225.00 |
| 05/26/2021 | CHM | BL | Prepare Nexpoint document production and check document being produced; email H. Winograd re same. | 3.20 | 750.00 | $2,400.00 |
| 05/26/2021 | CHM | BL | Review email from H. Winograd re RFPs and reply. | 0.10 | 750.00 | $75.00 |
| 05/27/2021 | CHM | BL | Review requests for production and documents being produced and search terms run for completeness. | 4.00 | 750.00 | $3,000.00 |
| 05/27/2021 | CHM | BL | Review search terms and exchange emails with H. Winograd and IDS team re new production searches. | 1.10 | 750.00 | $825.00 |
| 05/28/2021 | CHM | BL | Review email from J. Vaughn and reply. | 0.10 | 750.00 | $75.00 |
| 05/28/2021 | CHM | BL | Run document production and review of documents being produced. | 1.80 | 750.00 | $1,350.00 |
| 06/02/2021 | CHM | BL | Review document production issues and coordinate with IDS team re same. | 0.30 | 750.00 | $225.00 |
| 06/02/2021 | CHM | BL | Email H. Winograd re document production issues. | 0.10 | 750.00 | $75.00 |
| 06/03/2021 | CHM | BL | Review RFPs and coordinate searches with IDS team; review document hits re same. | 3.20 | 750.00 | $2,400.00 |
| 06/04/2021 | CHM | BL | Review UDF documents for responsiveness and run production re same. | 4.30 | 750.00 | $3,225.00 |
| 06/07/2021 | CHM | BL | Review email from B. Sharp and reply. | 0.10 | 750.00 | $75.00 |
| 06/07/2021 | CHM | BL | Review RFPs and proposed search terms; email IDS team re same and review results. | 2.50 | 750.00 | $1,875.00 |
| 06/09/2021 | CHM | BL | Correspond with G. Crane and H. Winograd re privilege review and begin preparation of privilege assignments. | 3.00 | 750.00 | $2,250.00 |
| 06/09/2021 | CHM | BL | Review documents for responsiveness and run production. | 3.70 | 750.00 | $2,775.00 |
| 06/09/2021 | CHM | BL | Email IDS team re additional searches. | 0.20 | 750.00 | $150.00 |
| 06/10/2021 | CHM | BL | Review parties list and update privilege breaker list and email same to G. Demo. | 1.80 | 750.00 | $1,350.00 |
| 06/10/2021 | CHM | BL | Review email from J. Sommer re UDF privilege holdback and reply. | 0.10 | 750.00 | $75.00 |
| 06/11/2021 | CHM | BL | Review documents flagged by G. Crane and reply re same. | 0.30 | 750.00 | $225.00 |
| 06/11/2021 | JAM | BL | Telephone conference with G. Demo, H. Winograd re: HCMFA and NexPoint motions to amend (0.5); | 1.80 | 1245.00 | $2,241.00 |

D-CNL000962

Appx. 02888

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    12
Invoice 128474
August 10, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | telephone conference with J. Seery re: HCMFA and NexPoint motion to amend (0.1); e-mail to D. Rukavina, J. Vasek, J. Pomerantz, G. Demo, H. Winograd re: proposed amended complaints for HCMFA and NexPoint in notes litigation (0.4); e-mail to D. Rukavina, J. Vasek, J. Pomerantz, G. Demo, H. Winograd re: Rule 30(b)(6) notices in notes litigation (0.2); review/revise subpoena for PwC for HCMFA and NexPoint notes litigation (0.3); communications w/ H. Winograd, Z. Annable re: substance of PwC subpoena and issues concerning service (0.3). |  |  |  |
| 06/12/2021 | CHM | BL | Review email from J. Morris re G. Crane privilege review and reply. | 0.10 | 750.00 | $75.00 |
| 06/15/2021 | CHM | BL | Review email from G. Crane re privilege review and reply. | 0.10 | 750.00 | $75.00 |
| 06/15/2021 | CHM | BL | Create and update privilege review assignments and email G. Crane re same. | 1.00 | 750.00 | $750.00 |
| 06/15/2021 | CHM | BL | Review discovery and deadline tracker and update; coordinate with H. Winograd re next priority. | 0.50 | 750.00 | $375.00 |
| 06/15/2021 | CHM | BL | Emails with G. Crane re parameters of privilege review and RFPs for responsiveness review. | 0.20 | 750.00 | $150.00 |
| 06/15/2021 | CHM | BL | Review G. Crane privilege tagging re HCMS production; email H. Winograd re same. | 0.80 | 750.00 | $600.00 |
| 06/16/2021 | CHM | BL | Emails with J. Morris, G. Demo and IDS team re additional custodian collection. | 0.20 | 750.00 | $150.00 |
| ██████ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |
| 06/21/2021 | CHM | BL | Review RFP and proposed search terms and coordinate searches with IDS team. | 0.50 | 750.00 | $375.00 |
| ██████ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |
| 06/22/2021 | CHM | BL | Exchange emails with IDS team re requested searches. | 0.10 | 750.00 | $75.00 |
| ██████ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:     13
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/23/2021 | CHM | BL | Review email from H. Winograd re HCMFA document searches and reply. | 0.10 | 750.00 | $75.00 |
| 06/23/2021 | CHM | BL | Review RFP and coordinate additional searches with IDS team. | 0.50 | 750.00 | $375.00 |
| ███ | ███ | ██ | ████████████████████ | ███ | ███ | ███ |
| 06/24/2021 | CHM | BL | Review email from G. Crane re coding issues; review database and impacted documents. | 0.60 | 750.00 | $450.00 |
| 06/24/2021 | CHM | BL | Draft email to IDS team re pending documents. | 0.40 | 750.00 | $300.00 |
| 06/24/2021 | CHM | BL | Review documents for responsiveness and run production re first portion of HCMFA documents. | 3.90 | 750.00 | $2,925.00 |
| 06/28/2021 | CHM | BL | Review email from G. Crane re review status and reply. | 0.10 | 750.00 | $75.00 |
| 06/28/2021 | CHM | BL | Review documents for responsiveness and run production re 2nd set of HCMFA requests. | 3.50 | 750.00 | $2,625.00 |
| ███ | ███ | ██ | █████████████████ | ███ | ███ | ███ |
| ███ | ███ | ██ | ██████████████████████ | ███ | ███ | ███ |
| ███ | ███ | ██ | ████████████████████ | ███ | ███ | ███ |
| ███ | ███ | ██ | ████████████ | ███ | ███ | ███ |
| ███ | ███ | ██ | ██████████████████ | ███ | ███ | ███ |
| 07/01/2021 | CHM | BL | Email G. Crane re privilege review; review UDF privileged documents. | 1.10 | 750.00 | $825.00 |
| 07/01/2021 | CHM | BL | Review RFPs, run preliminary searches in existing database and email IDS re HCRE search terms. | 0.60 | 750.00 | $450.00 |
| ███ | ███ | ██ | ████████████████ | ███ | ███ | ███ |
| ███ | ███ | ██ | ██████████████████ | ███ | ███ | ███ |
| 07/01/2021 | LSC | BL | Prepare supplemental HCMFA production. | 0.30 | 460.00 | $138.00 |
| 07/01/2021 | LSC | BL | Preparation of NPA supplemental production. | 0.30 | 460.00 | $138.00 |
| 07/02/2021 | CHM | BL | Draft email to IDS team re privilege filter issue. | 0.30 | 750.00 | $225.00 |
| 07/02/2021 | CHM | BL | Review prior productions re privilege filter issues. | 3.30 | 750.00 | $2,475.00 |
| 07/█ | ███ | ██ | ██████████████████ | ███ | ███ | ███ |
| 07/06/2021 | CHM | BL | Review email from IDS re UBS results and reply. | 0.10 | 750.00 | $75.00 |

D-CNL000964

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    14

Invoice 128474

August 10, 2021

| Date | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| 07/06/2021 | LSC | BL | Research and correspondence regarding privileged documents and supplemental document production. | 0.90 | 460.00 | $414.00 |
| 07/07/2021 | LAF | BL | Legal research re: Withdrawal of reference; update chart of rules/general orders in various districts. | 3.30 | 475.00 | $1,567.50 |
| 07/08/2021 | CHM | BL | Review HCRE search results and email IDS re same. | 1.80 | 750.00 | $1,350.00 |
| 07/08/2021 | CHM | BL | Run production re HCRE search results and review same; email link to H. Winograd. | 2.00 | 750.00 | $1,500.00 |
| 07/08/2021 | CHM | BL | Review email from K. Kim re privilege filter and reply. | 0.10 | 750.00 | $75.00 |
| 07/08/2021 | LSC | BL | Retrieve and review HCRE document production. | 1.70 | 460.00 | $782.00 |
| 07/09/2021 | CHM | BL | Review search results and begin production of certain UBS documents. | 5.00 | 750.00 | $3,750.00 |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ██████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | █████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | █████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| 07/12/2021 | LSC | BL | Circulate responses to Court's order requiring disclosures and correspondence regarding the same. | 0.30 | 460.00 | $138.00 |
| 07/12/2021 | LSC | BL | Review Dondero designation, related documents and correspondence with J. Morris regarding same. | 0.50 | 460.00 | $230.00 |
| ███ | ██ | | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | | ██████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ███ |
| 07/15/2021 | JEO | BL | Review court ordered disclosures | 1.00 | 1050.00 | $1,050.00 |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |
| ███ | ██ | ██ | ███████████████ | ██ | ██ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 15
Invoice 128474
August 10, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/21/2021 | LSC | BL | Retrieve PwC document production. | 0.60 | 460.00 | $276.00 |

D-CNL000966

Appx. 02892

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    16

Invoice 128474

August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | █████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████████████████ | ██ | ██ | ██ |
| 07/24/2021 | JJK | BL | Emails Kharasch on Debtor's motion to strike Dondero objection to R&R. | 0.30 | 995.00 | $298.50 |
| 07/25/2021 | JJK | BL | Research and review pleadings and prepare motion to strike Dondero objection to R&R. | 3.40 | 995.00 | $3,383.00 |
| 07/25/2021 | JJK | BL | Research, review documents, and prepare motion to strike Dondero objection. | 5.90 | 995.00 | $5,870.50 |
| ██ | ██ | ██ | ██████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | █████████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | █████████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██████████████ | ██ | ██ | ██ |
| 07/27/2021 | LSC | BL | Redact supplemental document production. | 3.20 | 460.00 | $1,472.00 |
| ██ | ██ | ██ | ████████████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████████████ | ██ | ██ | ██ |
| 07/28/2021 | IDK | BL | E-mails with local counsel and J Pomerantz re new motion for reconsideration filed in District Court to R&R by HCMSI, and next steps re same, and review of same (.5); E-mails with J Kim re same and need to respond to HCMSI pleadings (.2). | 0.70 | 1325.00 | $927.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    17
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/28/2021 | IDK | BL | Review of District Court order adopting R&R of Judge Jurnigan re NexPoint Advisors and its objection to the R&R (.2); E-mails with J Kim re same (.2). | 0.40 | 1325.00 | $530.00 |
| 07/28/2021 | JJK | BL | Emails Kharasch on multiple replies/objections re: reference withdrawal and consider same. | 0.20 | 995.00 | $199.00 |
| 07/28/2021 | JJK | BL | Research, analysis, pleading review to prepare multiple replies re: reference withdrawal. | 5.00 | 995.00 | $4,975.00 |
| ███ | ███ | ███ | ██████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | █████████████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ████████████ | ███ | ███ | ███ |
| 07/29/2021 | IDK | BL | E-mails with J Kim, others on the status of the 5 objections/motions for reconsideration to bankruptcy court R&R to District Court and issues on our various responses to same (.4); E-mails with H Winograd and J Fried re same and re deadlines to same and updated chart (.2). | 0.60 | 1325.00 | $795.00 |
| 07/29/2021 | JJK | BL | Research and prepare replies to Dondero, et al. re: bankruptcy court reports. | 3.90 | 995.00 | $3,880.50 |
| 07/29/2021 | JJK | BL | Review pleadings, research, and prepare replies to Dondero, et al., re: bankruptcy court reports. | 4.50 | 995.00 | $4,477.50 |
| 07/29/2021 | JEO | BL | Email follow up on critical dates issue regarding deposition scheduling | 0.20 | 1050.00 | $210.00 |
| 07/29/2021 | RJF | BL | Prepare for Ellington deposition, including review of exhibits. | 0.50 | 1395.00 | $697.50 |
| 07/29/2021 | RJF | BL | Attend Ellington deposition. | 10.00 | 1395.00 | $13,950.00 |
| 07/29/2021 | LSC | BL | Prepare for Burger deposition. | 0.70 | 460.00 | $322.00 |
| 07/29/2021 | LSC | BL | Preparation of Consolidated Notes Litigation Production. | 2.40 | 460.00 | $1,104.00 |
| 07/30/2021 | CHM | BL | Email correspondence re non-email document collection. | 0.50 | 750.00 | $375.00 |
| 07/30/2021 | CHM | BL | Email IDS team re Surgent screenshot. | 0.10 | 750.00 | $75.00 |
| ███ | ███ | ███ | ███████████████████████ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███████████████████████ | ███ | ███ | ███ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    18
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 07/30/2021 | IDK | BL | E-mails with J Kim, others on status/issues on the 5 Dondero related motions to withdraw the reference and response status/drafts (.4); E-mails with local counsel, H Winograd on updates to timing on filing responses to same (.1). | 0.50 | 1325.00 | $662.50 |
| ███ | ██ | ██ | ████████████████████ | ██ | ██ | ████ |
| 07/30/2021 | JJK | BL | Research and prepare replies/objections to Dondero, et al. re: bankruptcy court reports. | 5.70 | 995.00 | $5,671.50 |
| 07/30/2021 | RJF | BL | Emails regarding reference reports. | 0.20 | 1395.00 | $279.00 |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████████████ | ██ | ██ | ████ |
| 07/30/2021 | LSC | BL | Prepare for and assist at deposition of Peet Burger. | 3.00 | 460.00 | $1,380.00 |
| 07/31/2021 | IDK | BL | Review of correspondence to Texas litigation specialists on various questions on motions to withdraw reference and related objections to R&R. | 0.20 | 1325.00 | $265.00 |
| 07/31/2021 | JJK | BL | Research, prepare replies/objections re: bankruptcy court's reports & recommendations. | 5.50 | 995.00 | $5,472.50 |
| ███ | ██ | ██ | ██ | ██ | ██ | ████ |
| 08/01/2021 | JJK | BL | Research, review documents, and prepare replies to objections to reports/recommendations and opposition to motion to reconsider. | 5.20 | 995.00 | $5,174.00 |
| 08/01/2021 | JJK | BL | Prepare replies to objections to reports/recommendations and motion to reconsider. | 3.60 | 995.00 | $3,582.00 |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ████ |
| ███ | ██ | ██ | ████████████ | ██ | ██ | ████ |

D-CNL000969

Appx. 02895

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:     19
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██████ | ██ | ██ | ██ |
| ██ | █ | ██ | ███████ | ██ | ██ | ██ |
| ██ | ██ | ██ | █████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ████████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ███████ | ██ | ██ | ██ |
| 08/02/2021 | IDK | BL | Review and consider correspondence between H Winograd and local counsel re deadlines to object to pleadings on 5 matters re report and rec to D Court as well as H Winograd of chart on all related actions (.5). | 0.50 | 1325.00 | $662.50 |
| 08/02/2021 | IDK | BL | E-mails with J Kim re 5 outstanding motions to withdraw reference and objections to report and rec by defendants, and various issues on opponents bias of judge argument (.4); Telephone conference with J Kim re same (.3). | 0.70 | 1325.00 | $927.50 |
| 08/02/2021 | IDK | BL | E-mails with special Texas litigation counsel on notes litigation and withdrawal of ref and coordination of call re same (.2). | 0.20 | 1325.00 | $265.00 |
| 08/02/2021 | JJK | BL | Review objections to bankruptcy court reports and prepare additonal responses thereto. | 1.20 | 995.00 | $1,194.00 |
| 08/02/2021 | JJK | BL | Calls Kharasch re: replies to objections to reports/recommendations. | 0.10 | 995.00 | $99.50 |
| 08/02/2021 | JJK | BL | Call Kharasch on several replies re: withdrawal of reference. | 0.20 | 995.00 | $199.00 |
| 08/02/2021 | JJK | BL | Revise replies re: objections to withdrawal of reference, etc. | 0.20 | 995.00 | $199.00 |
| 08/02/2021 | JJK | BL | Prepare replies to objections to Reports, etc. | 1.20 | 995.00 | $1,194.00 |
| ██ | ██ | ██ | ████ | ██ | ██ | ██ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    21
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ■■■ | ■■ | ■ | ■■■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■■ | ■■ | ■■ | ■■ |
| 08/02/2021 | JE | BL | Work on vexatious litigant memo. | 6.20 | 1195.00 | $7,409.00 |
| ■■■ | ■■ | ■ | ■■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■■ | ■■ | ■■ | ■■ |
| 08/03/2021 | IDK | BL | Review and consider J Kim's draft of response to Dondero objection in District Court to bankruptcy report and recommendation and need for changes (.3); Numerous E-mails with J Kim re need for extensive revisions to same and his responses and new draft re same (.5); E-mail H Winograd re materials to supplement same response (.1). | 0.90 | 1325.00 | $1,192.50 |
| 08/03/2021 | JJK | BL | Review objections to reports/recommendations and prepare additional replies thereto for filing. | 4.80 | 995.00 | $4,776.00 |
| 08/03/2021 | JJK | BL | Emails local counsel, Winograd on Debtor replies re: reports and consider issues (0.6); emails Kharasch, Pomerantz on Dondero and HCMFA replies (0.1); prepare replies re: Reports and related research/analysis (2.2). | 2.90 | 995.00 | $2,885.50 |
| 08/03/2021 | JNP | BL | Conference with John A. Morris and D. Ashby regarding continued investigation. | 0.50 | 1295.00 | $647.50 |
| 08/03/2021 | JNP | BL | Conference with Farralon, Holland & Knight, John A. Morris and Gregory V. Demo regarding Dondero discovery action. | 0.50 | 1295.00 | $647.50 |
| 08■ | ■■ | ■ | ■■■■■ | ■■ | ■■ | ■■ |
| ■■■ | ■■ | ■ | ■■■■■ | ■■ | ■■ | ■■ |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    22
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | | | ▮ | | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 08/03/2021 | HRW | BL | Research and draft response to HCMFA objection to R&R in notes litigation (1.5) | 1.50 | 695.00 | $1,042.50 |
| 08/03/2021 | HRW | BL | Review notes litigations deadlines (0.6) | 0.60 | 695.00 | $417.00 |
| ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ |
| 08/04/2021 | IDK | BL | Telephone conferences with J Morris and J Pomerantz re result of hearing today as well as need for his comments to draft response to Dondero objection to Report and Recommendation to District Court (.4); Telephone conference with J Pomerantz re timing on filing given feedback of litigation | 0.60 | 1325.00 | $795.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    23
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | specialists (.1); Telephone conference with J Morris re timing on his feedback (.1). | | | |
| 08/04/2021 | IDK | BL | E-mails with J Kim and local counsel re status on our response to Dondero objection to R&R (.3); E-mails with J Morris re his revisions to such response, including quick review of same (.2); E-mails with J Kim re same and status on responding to HCMFA objection to R&R and similar changes for same (.2). | 0.70 | 1325.00 | $927.50 |
| 08/04/2021 | IDK | BL | Numerous E-mails with Gruber, Texas litigation counsel, on their feedback on communications with D Court and timing for responses to Dondero entities objections to R&R (.4). | 0.40 | 1325.00 | $530.00 |
| 08/04/2021 | JJK | BL | Continue work on replies for filing to objections to reports/recommendations. | 4.70 | 995.00 | $4,676.50 |
| 08/04/2021 | JJK | BL | Emails Kharasch on Reports replies, related research and review; emails local counsel re: same and certificates of interestedness for various suits. | 4.20 | 995.00 | $4,179.00 |
| ■■ | ■ | ■ | ■■■■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■■■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■■■■ | ■ | | |
| 08/04/2021 | JNP | BL | Conference with Ira D. Kharasch regarding response regarding objections to reports and recommendation on withdrawal motions. | 0.10 | 1295.00 | $129.50 |
| ■■ | ■ | ■ | ■■■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■■■■ | ■ | ■ | |
| ■■ | ■ | ■ | ■■■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■■■■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■■ | ■ | ■ | ■ |
| ■■ | ■ | ■ | ■■ | ■ | ■ | ■0 |

D-CNL000973

Appx. 02899

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    24
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ▬▬▬ | ▬▬ | ▬ | ▬▬▬▬▬ | ▬ | ▬ | ▬ |
| ▬▬▬ | ▬▬ | ▬ | ▬▬▬▬▬▬▬ | ▬ | ▬ | ▬0 |
| | | | | | | |
| 08/04/2021 | JAM | BL | Review/revise draft response to Dondero objection to Report and Recommendations (1.1); e-mail to I. Kharasch, J. Kim, G. Demo re: revised draft response to Dondero objection to Report and Recommendations (0.1). | 1.20 | 1245.00 | $1,494.00 |
| 08▬ | ▬▬ | ▬ | ▬▬▬▬▬ | ▬ | ▬ | ▬ |
| ▬▬▬ | ▬▬ | ▬ | ▬▬▬▬▬▬ | | | |
| ▬▬ | ▬▬ | ▬ | ▬▬▬▬▬▬▬ | | | |
| ▬▬ | ▬▬ | ▬ | ▬▬▬▬▬ | | | |
| ▬▬ | ▬▬ | ▬ | ▬▬▬▬ | ▬ | ▬ | ▬ |
| ▬▬ | ▬▬ | ▬ | ▬▬▬▬ | | | |
| ▬▬ | ▬▬ | ▬ | ▬▬▬▬▬▬ | ▬ | ▬ | ▬ |
| ▬▬ | ▬▬ | ▬ | ▬▬▬▬▬▬▬▬ | ▬ | ▬ | ▬ |
| 08/05/2021 | IDK | BL | E-mail J Kim re his draft response to HCMFA objection to R&R, including review of same (.3); E-mails with J Morris re same and his changes, along with final response (.3). | 0.60 | 1325.00 | $795.00 |
| 08/05/2021 | JJK | BL | Emails Morris on HCMFA reply matters. | 0.10 | 995.00 | $99.50 |
| 08/05/2021 | JJK | BL | Continue work on replies and filing thereof to objections to reports/recommendations. | 4.20 | 995.00 | $4,179.00 |
| 08/05/2021 | JJK | BL | Emails Morris on HCMFA reply and review comments. | 0.10 | 995.00 | $99.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 25
Invoice 128474
August 10, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 08/05/2021 | JJK | BL | Coordinate finalizing HCMFA reply and filing/service; prepare other replies re: Reports. | 3.00 | 995.00 | $2,985.00 |

D-CNL000975
Appx. 02901

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    26
Invoice 128474
August 10, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ██████ | ███ | ██ | ██████████████████ | ██ | ██ | ████ |
| ██████ | ██ | ██ | ████████████ | ██ | ███ | ████ |
| 08/05/2021 | JMF | BL | Review response to opposition to bankruptcy court recommendations to district court. | 0.30 | 1050.00 | $315.00 |
| 08/05/2021 | JAM | BL | Review/revise objection to HCMFA motion for reconsideration of report and recommendations on notes litigation (0.9); e-mails w/ J. Kim, I. Kharasch re: revisions to objection to HCMFA motion for reconsideration of report and recommendations on notes litigation (0.1). | 1.00 | 1245.00 | $1,245.00 |
| 08/05/2021 | GVD | BL | Correspondence with working group re status of notes litigation | 0.20 | 950.00 | $190.00 |
| ██████ | ███ | ██ | ██████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ████████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | █████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ████████████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ██████████ | ██ | ██ | ███ |
| 08/06/2021 | IDK | BL | Review of draft response to HCRE objection in D Court to R&R, along with J Kim commentary on same. | 0.40 | 1325.00 | $530.00 |
| ██████ | ███ | ██ | ██████████████ | ██ | ██ | ███ |
| ██████ | ███ | ██ | ███████████████ | ██ | ██ | ███ |

D-CNL000976

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    27
Invoice 128474
August 10, 2021



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 08/06/2021 | JAM | BL | Review/revise scheduling stipulation for notes litigation (0.6); e-mail to H. Winograd re: revised scheduling stipulation (0.1); e-mail to M. Aigen re: revised scheduling stipulation (0.1). | 0.80 | 1245.00 | $996.00 |
| 08/06/2021 | LSC | BL | Assist with preparation of discovery requests, including preparation of exhibits. | 1.40 | 460.00 | $644.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 31
Invoice 128474
August 10, 2021

| Date | | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 08/10/2021 | IDK | BL | Review of J Kim's response to motion for reconsideration of R&R by HCRE Partners (.3); E-mails with J Morris re need for his feedback (.1); Review of revised response to HCRE objection (.2); E-mails with J Kim and Local counsel re same (.1). | 0.70 | 1325.00 | $927.50 |
| 08/10/2021 | IDK | BL | Review of HCMS motion for reconsideration to D Court of R&R of bankruptcy court (.3); E-mails with J Kim re same and need for response to same and issues re same (.2). | 0.50 | 1325.00 | $662.50 |
| 08/10/2021 | JJK | BL | Emails local counsel on HCM Real Estate reply. | 0.10 | 995.00 | $99.50 |

# EXHIBIT 179

Appx. 02905

## Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

September 30, 2021
Invoice    128688
Client     36027
Matter     00003
           **JNP**

RE:   Post-Effective Date

---

**STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   09/30/2021**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00003

Page:    42
Invoice 128688
September 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

**Notes Litigation**

| | | | | | | |
|---|---|---|---|---|---|---|
| 09/01/2021 | JMF | NL | Review motion to compel arbitration. | 0.40 | 1050.00 | $420.00 |
| 09/01/2021 | JAM | NL | Review docket for filings (amended answers, motion to compel arbitration, and motions to dismissed) (0.4). | 0.40 | 1245.00 | $498.00 |
| 09/01/2021 | GVD | NL | Review motions to dismiss and motions to compel arbitration in notes proceedings | 0.30 | 950.00 | $285.00 |
| 09/01/2021 | HRW | NL | Review NexPoint amended answer in notes litigation (0.3). | 0.30 | 695.00 | $208.50 |
| 09/02/2021 | JNP | NL | Conference with John A. Morris regarding arbitration motion, motion to stay and strategy. | 0.20 | 1295.00 | $259.00 |
| 09/02/2021 | JMF | NL | Review motions to dismiss and compel arbitration. | 0.50 | 1050.00 | $525.00 |
| 09/02/2021 | GVD | NL | Conference with J. Morris re notes litigation and next steps | 0.50 | 950.00 | $475.00 |
| 09/02/2021 | HRW | NL | Communicate with local counsel re: stipulations in notes litigations (0.1). | 0.10 | 695.00 | $69.50 |
| 09/04/2021 | GVD | NL | Review limited partnership provisions re motions to dismiss | 1.60 | 950.00 | $1,520.00 |
| 09/05/2021 | GVD | NL | Review correspondence from J. Morris re notes litigation | 0.20 | 950.00 | $190.00 |
| 09/05/2021 | HRW | NL | Draft discovery requests for consolidated notes | 3.50 | 695.00 | $2,432.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:    43
Invoice 128688
September 30, 2021

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | litigations (3.5). | | | |
| 09/05/2021 | HRW | NL | Review motions for stay and arbitration in notes litigations (1.5). | 1.50 | 695.00 | $1,042.50 |
| 09/06/2021 | GVD | NL | Conference with J. Morris re notes litigation | 0.20 | 950.00 | $190.00 |
| 09/06/2021 | HRW | NL | Draft discovery requests for consolidated notes litigations (9.5). | 9.50 | 695.00 | $6,602.50 |
| 09/07/2021 | JMF | NL | Review scheduling orders re notes litigation adversaries. | 0.30 | 1050.00 | $315.00 |
| 09/07/2021 | JAM | NL | Review draft discovery demands for notes litigation (0.6); tel c. w/ H. Winograd re: discovery issues (0.3); communications w/ D. Klos, J. Seery re: cost/value of MGM, RCP, Trussway (0.2); draft discovery requests for NexPoint (0.5); tel c. w/ H. Winograd re: discovery demands (0.1); review revised discovery demands (0.5); e-mails w/ H. Winograd re: final versions of discovery demands (0.1). | 2.30 | 1245.00 | $2,863.50 |
| 09/07/2021 | HRW | NL | Call with J. Morris re: notes litigation discovery (0.3). | 0.30 | 695.00 | $208.50 |
| 09/07/2021 | HRW | NL | Call with J. Morris re: notes litigation arbitration motions (0.4). | 0.40 | 695.00 | $278.00 |
| 09/07/2021 | HRW | NL | Draft discovery requests for consolidated notes litigations. | 6.80 | 695.00 | $4,726.00 |
| 09/07/2021 | HRW | NL | Serve discovery requests on opposing counsel for consolidated notes litigations. | 0.20 | 695.00 | $139.00 |
| 09/08/2021 | JJK | NL | Emails Kharasch on reference matters and consider/research same. | 1.30 | 995.00 | $1,293.50 |
| 09/08/2021 | GVD | NL | Correspondence re email discovery issues | 0.20 | 950.00 | $190.00 |
| 09/08/2021 | GVD | NL | Conference with J. Morris re additional notes litigation | 0.20 | 950.00 | $190.00 |
| 09/09/2021 | JNP | NL | Conference with John A. Morris regarding response to arbitration and motion to dismiss motion. | 0.10 | 1295.00 | $129.50 |
| 09/09/2021 | JAM | NL | Meet with G. Demo, H. Winograd re: motions for arbitration and to dismiss (0.5); tel c. w/ J. Seery, D. Klos re: Dondero compensation (0.5). | 1.00 | 1245.00 | $1,245.00 |
| 09/09/2021 | GVD | NL | Conference with J. Morris and H. Winograd re response to notes litigation actions | 1.00 | 950.00 | $950.00 |
| 09/09/2021 | HRW | NL | Review deadlines re: consolidated notes litigations motions to dismiss and motion for stay (0.2). | 0.20 | 695.00 | $139.00 |
| 09/13/2021 | JNP | NL | Conference with John A. Morris regarding motion to dismiss and motion to compel arbitration. | 0.20 | 1295.00 | $259.00 |

D-CNL003814

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:    44
Invoice 128688
September 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 09/13/2021 | JNP | NL | Conference with Jordan A. Kroop regarding motion to dismiss and motion to compel arbitration. | 0.20 | 1295.00 | $259.00 |
| 09/13/2021 | JNP | NL | Review motion to compel arbitration. | 0.20 | 1295.00 | $259.00 |
| 09/13/2021 | JNP | NL | Conference with Hayley R. Winograd, John A. Morris and Jordan A. Kroop regarding motion to compel arbitration. | 0.80 | 1295.00 | $1,036.00 |
| 09/13/2021 | JAM | NL | Tel c. w/ J. Pomerantz, J. Kroop, H. Winograd re: defendants' arbitration motion (0.8); e-mail to J. Seery re: motions to dismiss and to arbitrate (0.2); e-mail to J. Pomerantz, J. Kroop re: motions to dismiss and arbitrate (0.1). | 1.10 | 1245.00 | $1,369.50 |
| 09/13/2021 | HRW | NL | Call with J. Morris, J. Pomerantz, and J. Kroop (0.8). | 0.80 | 695.00 | $556.00 |
| 09/13/2021 | HRW | NL | Review motion to dismiss in notes litigations (2.0). | 2.00 | 695.00 | $1,390.00 |
| 09/13/2021 | JAK | NL | Begin review of motion to compel arbitration (0.8); strategy and planning discussion with John Morris, Jeff Pomerantz, and Hayley Winograd (0.8); follow-up discussion with Jeff Pomerantz regarding arbitration motion (0.2); additional review and analysis of arbitration motion (1.1); | 2.90 | 1100.00 | $3,190.00 |
| 09/14/2021 | IDK | NL | E-mails with attorneys re D Court upholding report and recommendation re HCMFA proceeding, including review of same | 0.30 | 1325.00 | $397.50 |
| 09/14/2021 | HRW | NL | Review motion to dismiss complaint in notes litigation (2.0). | 2.00 | 695.00 | $1,390.00 |
| 09/15/2021 | HRW | NL | Research re: motion to dismiss complaint in notes litigation (3.5). | 3.50 | 695.00 | $2,432.50 |
| 09/15/2021 | HRW | NL | Send opposing counsel supplemental productions in notes litigation (0.2). | 0.20 | 695.00 | $139.00 |
| 09/17/2021 | GVD | NL | Conference with J. Morris re status of notes litigation | 0.10 | 950.00 | $95.00 |
| 09/17/2021 | GVD | NL | Conference with H. Winograd re response to motions to dismiss and next steps | 0.60 | 950.00 | $570.00 |
| 09/17/2021 | HRW | NL | Call with G. Demo re: motion to dismiss in notes litigations (0.6). | 0.60 | 695.00 | $417.00 |
| 09/17/2021 | HRW | NL | Call with J. Morris re: litigation deadlines (0.1). | 0.10 | 695.00 | $69.50 |
| 09/17/2021 | HRW | NL | Review and research re: motion to dismiss in notes litigations (3.5). | 3.50 | 695.00 | $2,432.50 |
| 09/17/2021 | JAK | NL | Review previous pleadings and begin outlining opposition to demand for arbitration; | 1.40 | 1100.00 | $1,540.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:    45
Invoice 128688
September 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 09/18/2021 | HRW | NL | Draft and research re: motion to dismiss in notes litigations (5.5). | 5.50 | 695.00 | $3,822.50 |
| 09/19/2021 | JAM | NL | Review of documents and docket and e-mails to J. Kropp, J. Pomerantz, G. Demo, H. Winograd re: facts and arguments concerning opposition to motion to compel arbitration (3.0); further communications w/ J. Kroop re: arbitration motion (0.1). | 3.10 | 1245.00 | $3,859.50 |
| 09/19/2021 | HRW | NL | Draft and research re: motion to dismiss in notes litigations (8.5). | 8.50 | 695.00 | $5,907.50 |
| 09/19/2021 | JAK | NL | Email correspondence with John Morris regarding various arguments pertaining to waiver and estoppel for arbitration motion objection; review and analyze transcripts from previous hearing; begin research regarding various arguments for arbitration objection; | 3.30 | 1100.00 | $3,630.00 |
| 09/20/2021 | IDK | NL | Review of order from District Court on order of reference re DAF action, including E-mail from J Morris re same. | 0.20 | 1325.00 | $265.00 |
| 09/20/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (13.0). | 13.00 | 695.00 | $9,035.00 |
| 09/20/2021 | JAK | NL | Drafting of portions of objection to arbitration motion; research legal issues for use in same; emails with John Morris regarding additional arguments and support for same; review and analyze provisions of limited partnership agreement for use in arguments in opposition of arbitration agreement; memo outlining legal issues to be researched and supporting direction; | 4.40 | 1100.00 | $4,840.00 |
| 09/21/2021 | GVD | NL | Correspondence with team re ability to enforce arbitration in rejected agreement | 0.50 | 950.00 | $475.00 |
| 09/21/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (9.0). | 9.00 | 695.00 | $6,255.00 |
| 09/21/2021 | HRW | NL | Review prior discovery R&OS sent to all parties in notes litigations (1.0). | 1.00 | 695.00 | $695.00 |
| 09/21/2021 | HRW | NL | Draft R&Os for discovery requests in consolidated notes litigation (1.5). | 1.50 | 695.00 | $1,042.50 |
| 09/22/2021 | JJK | NL | Emails Kroop, Keane on research for opp. to Dondero motion re arbitration; research for inserts. | 3.60 | 995.00 | $3,582.00 |
| 09/22/2021 | JJK | NL | Research for opp. to motion re: arbitration. | 4.80 | 995.00 | $4,776.00 |
| 09/22/2021 | JJK | NL | Research for opp. to arbitration motion and emails Kroop on same. | 1.40 | 995.00 | $1,393.00 |

D-CNL003816

Pachulski Stang Ziehl & Jones LLP                                    Page:    46
Highland Capital Management LP                                       Invoice 128688
36027   - 00003                                                      September 30, 2021

| Date | | | Description | Hours | Rate | Amount |
|------|---|---|-------------|-------|------|--------|
| 09/22/2021 | JAM | NL | Review defendants' discovery demands (0.4); tel c. w. G. Demo re: responses to RFAs (corporate issues) (0.3); tel c. w/ H. Winograd re: document requests and responses (0.7); tel c. w/ G. Demo re: responses to discovery (0.2); e-mails w/ T. Surgent, D. Klos, G. Demo, H. Winograd re: e-mail searches for Nancy Dondero (0.3). | 1.90 | 1245.00 | $2,365.50 |
| 09/22/2021 | GVD | NL | Conference with J. Morris re discovery issues | 0.30 | 950.00 | $285.00 |
| 09/22/2021 | GVD | NL | Conference with H. Winograd re response to motion to dismiss | 0.20 | 950.00 | $190.00 |
| 09/22/2021 | GVD | NL | Draft responses to discovery questions and correspondence with J. Morris re same | 0.70 | 950.00 | $665.00 |
| 09/22/2021 | GVD | NL | Conference with J. Morris re notes litigation status | 0.20 | 950.00 | $190.00 |
| 09/22/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (11.0). | 11.00 | 695.00 | $7,645.00 |
| 09/22/2021 | HRW | NL | Draft R&Os for discovery requests in consolidated notes litigation (2.0). | 2.00 | 695.00 | $1,390.00 |
| 09/22/2021 | HRW | NL | Call with J. Morris re: discovery requests in consolidated notes litigation (0.7). | 0.70 | 695.00 | $486.50 |
| 09/22/2021 | JAK | NL | Extensive drafting of opposition to arbitration motion; legal research regarding issues and arguments for same; emails with internal research group regarding issues for researching and related matters; | 6.90 | 1100.00 | $7,590.00 |
| 09/23/2021 | JJK | NL | Research for opp. to arbitration motion; conf. call Kroop and Keane on same (0.6). | 5.80 | 995.00 | $5,771.00 |
| 09/23/2021 | JJK | NL | Research for opp. to arbitration motion. | 3.10 | 995.00 | $3,084.50 |
| 09/23/2021 | JNP | NL | Review of emails from N. Dondero; Conference with John A. Morris regarding same. | 0.30 | 1295.00 | $388.50 |
| 09/23/2021 | JAM | NL | Tel c. w/ L. Canty re: document review (0.1); tel c. w/ J. Seery re: strategy for responding to motions (0.2); tel c. w/ J. Pomerantz re: strategy for responding to motions (0.1); review documents (3.1). | 3.50 | 1245.00 | $4,357.50 |
| 09/23/2021 | LSC | NL | Begin preparation of document productions. | 2.60 | 460.00 | $1,196.00 |
| 09/23/2021 | GVD | NL | Correspondence re research items re arbitration demand | 0.10 | 950.00 | $95.00 |
| 09/23/2021 | GVD | NL | Conference with J. Morris re notes discovery | 0.10 | 950.00 | $95.00 |
| 09/23/2021 | GVD | NL | Conference with J. Morris re status of notes litigation and next steps | 0.20 | 950.00 | $190.00 |

Pachulski Stang Ziehl & Jones LLP        Page: 47

Highland Capital Management LP        Invoice 128688

36027    - 00003        September 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 09/23/2021 | HRW | NL | Gather documents for discovery requests in consolidated notes litigation (1.0). | 1.00 | 695.00 | $695.00 |
| 09/23/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (12.0). | 12.00 | 695.00 | $8,340.00 |
| 09/23/2021 | JAK | NL | Review and analyze initial research results on issues pertaining to arbitration opposition from Jonathan Kim and Peter Keane; extensive drafting of arbitration opposition; additional case research and analysis regarding arguments for same; confer with Jonathan Kim and Peter Keane regarding same; | 4.90 | 1100.00 | $5,390.00 |
| 09/24/2021 | JNP | NL | Conference with Jordan A. Kroop regarding opposition to motion to compel arbitration. | 0.30 | 1295.00 | $388.50 |
| 09/24/2021 | JAM | NL | Tel c. w/ J. Seery re: opposition to motions (0.3); review documents and begin preparing for depositions (4.1). | 4.40 | 1245.00 | $5,478.00 |
| 09/24/2021 | GVD | NL | Review discovery responses to notes litigation | 0.30 | 950.00 | $285.00 |
| 09/24/2021 | HRW | NL | Call with J. Morris and DSI re: discovery requests in consolidated notes litigation (1.0). | 1.00 | 695.00 | $695.00 |
| 09/24/2021 | HRW | NL | Draft R&Os for discovery requests in consolidated notes litigation (1.5). | 1.50 | 695.00 | $1,042.50 |
| 09/24/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (9.0). | 9.00 | 695.00 | $6,255.00 |
| 09/24/2021 | JAK | NL | Continued research and analysis of cases in connection with arbitration opposition; strategy discussion with Jeff Pomerantz regarding same; extensive additional drafting and revision of arbitration opposition; | 5.70 | 1100.00 | $6,270.00 |
| 09/25/2021 | JAM | NL | Review/revise opposition to motion to dismiss (2.7); tel c. w/ J. Seery re: status and strategy for notes litigation (0.3). | 3.00 | 1245.00 | $3,735.00 |
| 09/26/2021 | JAM | NL | Communications w/ J. Seery, D. Klos, D. Newman re: responses to discovery (0.2). | 0.20 | 1245.00 | $249.00 |
| 09/26/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (7.0). | 7.00 | 695.00 | $4,865.00 |
| 09/26/2021 | JAK | NL | Additional research on issues pertaining to arbitration opposition; additional drafting of opposition; email to Jeff Pomerantz and John Morris regarding same with explanation of approach and related suggestions; | 2.30 | 1100.00 | $2,530.00 |
| 09/27/2021 | JNP | NL | Review opposition to motion to arbitrate. | 0.30 | 1295.00 | $388.50 |
| 09/27/2021 | JNP | NL | Conference with John A. Morris regarding opposition to motion to arbitrate. | 0.20 | 1295.00 | $259.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00003

Page: 48

Invoice 128688

September 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 09/27/2021 | JNP | NL | Conference with John A. Morris and Jordan A. Kroop regarding response to motion to arbitrate. | 0.40 | 1295.00 | $518.00 |
| 09/27/2021 | JAM | NL | Review/revise opposition to motion to dismiss (2.5); review/revise written responses to discovery (2.4); e-mails w/ J. Seery, J. Pomerantz, G. Demo, H. Winograd re: written responses to discovery (0.2); tel c. w. J. Seery re: written responses to discovery (0.2); tel c. w/ J. Pomerantz re: oppositions to MTD and arbitration (0.2); tel c. w/ J. Pomerantz, J. Koop re: opposition to motion to compel arbitration (0.4); further revisions to written responses to discovery (0.2); communications w/ J. Seery re: responses to written discovery (0.1). | 6.20 | 1245.00 | $7,719.00 |
| 09/27/2021 | LSC | NL | Continued preparation of document productions. | 9.10 | 460.00 | $4,186.00 |
| 09/27/2021 | GVD | NL | Review response to motion to dismiss litigation | 0.60 | 950.00 | $570.00 |
| 09/27/2021 | HRW | NL | Draft opposition to motion to dismiss in notes litigations (7.5). | 7.50 | 695.00 | $5,212.50 |
| 09/27/2021 | HRW | NL | Gather production for consolidated notes discovery (1.8). | 1.80 | 695.00 | $1,251.00 |
| 09/27/2021 | HRW | NL | Draft and review R&Os for discovery requests in consolidated notes litigation (1.5). | 1.50 | 695.00 | $1,042.50 |
| 09/27/2021 | HRW | NL | Send opposing counsel R&Os in consolidated notes litigation (0.2). | 0.20 | 695.00 | $139.00 |
| 09/27/2021 | HRW | NL | Send opposing counsel production in consolidated notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| 09/27/2021 | JAK | NL | Strategy discussion with John Morris and Jeff Pomerantz regarding opposition to arbitration motion and related matters; extensive additional drafting, research, and review of issues and portions of arbitration motion opposition; work with Greg Demo regarding confirmation-related citations and background for use in opposition; additional drafting and revisions to arbitration opposition; | 3.10 | 1100.00 | $3,410.00 |
| 09/28/2021 | JNP | NL | Review latest version of opposition to motion to arbitrate and emails regarding same. | 0.20 | 1295.00 | $259.00 |
| 09/28/2021 | JNP | NL | Review opposition to motion to dismiss. | 0.30 | 1295.00 | $388.50 |
| 09/28/2021 | JMF | NL | Review responses to motion to dismiss and arbitration. | 0.50 | 1050.00 | $525.00 |
| 09/28/2021 | JAM | NL | Review/revise draft opposition to motion to compel arbitration (4.8); e-mails w/ J. Seery, J. Pomerantz, J. Koop, G. Demo, H. Winograd re: opposition to motion to compel arbitration (0.4); tel c. w/ J. Seery re: opposition to motion to compel arbitration (0.1); | 9.10 | 1245.00 | $11,329.50 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00003

Page:    49
Invoice 128688
September 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | tel c. w/ J. Koop re: motion to compel arbitration (0.1); further review and revisions to opposition to motions to dismiss and to compel arbitration (3.2); communications w/ H. Winograd, J. Koop re: oppositions to motion to dismiss and to compel arbitration (0.5). | | | |
| 09/28/2021 | LSC | NL | Prepare draft declaration in support of opposition to Motion to compel Arbitration and Stay Litigation, revise same, and prepare exhibits to same. | 0.70 | 460.00 | $322.00 |
| 09/28/2021 | GVD | NL | Review motion to dismiss response | 1.00 | 950.00 | $950.00 |
| 09/28/2021 | HRW | NL | Draft and file opposition to motion to dismiss in notes litigations (8.0). | 8.00 | 695.00 | $5,560.00 |
| 09/28/2021 | JAK | NL | Extensive revisions, review, and editing of opposition to arbitration motion; edits and review of declaration in support of same; confer over telephone and emails with John Morris and Jeff Pomerantz regarding same; final edits and preparation of opposition for filing and service; supervise filing and service of same, with drafting of cover response per local rules; | 6.80 | 1100.00 | $7,480.00 |
| 09/29/2021 | JAM | NL | Review documents and written responses to discovery served by all defendants (2.0); e-mail to defense counsel re: deficiencies in written responses to discovery (0.4); e-mail to J. Seery, T. Surgent, D. Klos, J. Pomerantz, G. Demo, H. Winograd re: defendants' deficiencies in discovery (0.4); tel c. J. Seery re: discovery in the notes litigation (0.3). | 3.10 | 1245.00 | $3,859.50 |
| 09/29/2021 | GVD | NL | Conference with J. Morris re notes litigation discovery | 0.20 | 950.00 | $190.00 |
| 09/30/2021 | JAM | NL | Tel c. w/ G. Demo, Wilmer re: Waterhouse as a witness and regulatory issues (0.8); e-mail to defense counsel re: discovery issues and depositions (0.6); e-mail to D. Dandeneau, J. Pomerantz, G. Demo re: Waterhouse deposition (0.1) | 1.50 | 1245.00 | $1,867.50 |
| 09/30/2021 | GVD | NL | Conference with WilmerHale and J. Morris re discovery issues in notes litigation | 0.80 | 950.00 | $760.00 |
| 09/30/2021 | HRW | NL | Communicate with Robert Half for production re: consolidated notes production (0.2). | 0.20 | 695.00 | $139.00 |
| | | | | **269.40** | | **$235,361.50** |

# EXHIBIT 180

## Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

November 05, 2021
Invoice    128811
Client     36027
Matter     00003
**JNP**

RE:  Post-Effective Date

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   11/05/2021

D-CNL003837
**Appx. 02916**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 -00003

Page: 92
Prebill#287690
November 05, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|

**Notes Litigation**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHM Bill | 09/15/2021 | | NL | 2.00 | 2.00 | 750.00 | 1,500.00 |
| 09/15/2021 | CHM | NL | Review results of privilege review and check documents marked for production or withholding. Run production of NexPoint results and email J. Morris and H. Winograd re same. | | 2.00 | 750.00 | $1,500.00 |
| CHM Bill | 09/15/2021 | | NL | 0.10 | 0.10 | 750.00 | 75.00 |
| 09/15/2021 | CHM | NL | Review email from H. Winograd and reply. | | 0.10 | 750.00 | $75.00 |
| CHM Bill | 09/23/2021 | | NL | 0.10 | 0.10 | 750.00 | 75.00 |
| 09/23/2021 | CHM | NL | Review email from H. Winograd and reply. | | 0.10 | 750.00 | $75.00 |
| CHM | 09/30/2021 | | NL | 2.30 | 2.30 | 750.00 | 1,725.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:     93
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 09/30/2021 | CHM | NL | Review documents and run production of consolidated notes litigation search results; email H. Winograd re same. | 2.30 | 750.00 | $1,725.00 |
| JAM Bill | 10/01/2021 | | NL | 3.10 | 3.10 | 1,245.00 | 3,859.50 |
| 10/01/2021 | JAM | NL | Review discovery responses and pleadings and prepare Rule 30(b)(6) deposition notices for HCRE, HCMS, and Nexpoint (2.8); communications w/ J. Seery, T. Surgent, D. Klos, J. Pomerantz, G. Demo, H. Winograd re: deposition notices (0.3). | 3.10 | 1245.00 | $3,859.50 |
| HRW Bill | 10/01/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/01/2021 | HRW | NL | Communicate with Robert Half for production re: consolidated notes production (0.5). | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/01/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/01/2021 | HRW | NL | Oversee and review production re: re: consolidated notes production (0.5). | 0.50 | 695.00 | $347.50 |
| JAM Bill | 10/02/2021 | | NL | 2.60 | 2.60 | 1,245.00 | 3,237.00 |
| 10/02/2021 | JAM | NL | Tel c. w/ G. Demo re: discovery, strategy (0.4); draft deposition notices for J. Dondero, N. Dondero, F. Waterhouse, Dugaboy, and HCMFA (2.1); e-mails w/ J. Pomerantz, G. Demo, H. Winograd, Z. Annable re: deposition notices (0.1). | 2.60 | 1245.00 | $3,237.00 |
| GVD Bill | 10/02/2021 | | NL | 0.40 | 0.40 | 950.00 | 380.00 |
| 10/02/2021 | GVD | NL | Conference with J. Morris about notes litigation discovery issues | 0.40 | 950.00 | $380.00 |
| GVD Bill | 10/02/2021 | | NL | 0.50 | 0.50 | 950.00 | 475.00 |
| 10/02/2021 | GVD | NL | Review deposition notices | 0.50 | 950.00 | $475.00 |
| JAM Bill | 10/03/2021 | | NL | 3.90 | 3.90 | 1,245.00 | 4,855.50 |
| 10/03/2021 | JAM | NL | Prepare deposition notices for HCRE, HCMS, | 3.90 | 1245.00 | $4,855.50 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP                       Page:    94
Highland Capital Management LP                         Prebill#287690
36027   -00003                                   November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | NexPoint and subpoena for DC Sauter, and revise deposition notices for F. Waterhouse and HCMFA (3.6); e-mails w/ J. Seery, T. Surgent, D. Klos, J. Pomerantz, G. Demo, H. Winograd re: deposition notices (0.2); tel c. w/ J. Seery, G. Demo re: deposition notices (0.1). | | | |
| GVD Bill | 10/03/2021 | NL | | 0.30 | 0.30 | 950.00 | 285.00 |
| 10/03/2021 | GVD | NL | Review discovery requests and correspondence re same | 0.30 | 950.00 | $285.00 |
| HRW Bill | 10/03/2021 | NL | | 1.00 | 1.00 | 695.00 | 695.00 |
| 10/03/2021 | HRW | NL | Review and edit deposition notices for notes litigation (1.0). | 1.00 | 695.00 | $695.00 |
| JAM Bill | 10/04/2021 | NL | | 1.80 | 1.80 | 1,245.00 | 2,241.00 |
| 10/04/2021 | JAM | NL | Review/revise/finalize deposition notices, subpoenas, and notices of subpoenas (1.1); e-mail to defense counsel, J. Pomerantz, G. Demo, H. Winograd, Z. Annable re: deposition notices, subpoenas, notices of subpoena and related matters (0.3); e-mail to Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: service of the deposition notices and subpoenas (0.1); tel c. w/ J. Seery re: status, discovery (0.3). | 1.80 | 1245.00 | $2,241.00 |
| HRW Bill | 10/04/2021 | NL | | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/04/2021 | HRW | NL | Review production re: consolidated notes production (0.5). | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/04/2021 | NL | | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/04/2021 | HRW | NL | Communicate with Robert Half re: production for Employee Claims (0.2). | 0.20 | 695.00 | $139.00 |
| JAM Bill | 10/05/2021 | NL | | 1.70 | 1.70 | 1,245.00 | 2,116.50 |
| 10/05/2021 | JAM | NL | Tel c. w/ H. Winograd re: discovery, Aigen e-mail (0.5); tel c. w/ D. Rukavina re: discovery (0.3); tel c. w/ J. Seery re: discovery, status (0.5); e-mails w/ D. Rukavina, D. Deitsch-Perez re: discovery, | 1.70 | 1245.00 | $2,116.50 |

D-CNL003840

Appx. 02919

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00003

Page:    95
Prebill#287690
November 05, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| | | depositions (0.4). | | | | | |
| GVD Bill | 10/05/2021 | NL | 0.30 | 0.30 | 950.00 | | 285.00 |
| 10/05/2021 | GVD | NL | Correspondence with Quinn re notes litigation | | 0.30 | 950.00 | $285.00 |
| HRW Bill | 10/05/2021 | NL | 0.50 | 0.50 | 695.00 | | 347.50 |
| 10/05/2021 | HRW | NL | Call with J. Morris re: discovery issues in notes litigation (0.5). | | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/05/2021 | NL | 0.30 | 0.30 | 695.00 | | 208.50 |
| 10/05/2021 | HRW | NL | Review discovery issues in notes litigation (0.3). | | 0.30 | 695.00 | $208.50 |
| JAM Bill | 10/06/2021 | NL | 1.60 | 1.60 | 1,245.00 | | 1,992.00 |
| 10/06/2021 | JAM | NL | E-mail to D. Deitz-Perez, D. Rukavina re: discovery (0.3); e-mail to D. Dandeneau re: Waterhouse deposition (0.1); e-mail to M. Aigen re: discovery issues (0.3); e-mail to defense counsel re: response to various discovery issues (0.9). | | 1.60 | 1245.00 | $1,992.00 |
| LSC Bill | 10/06/2021 | NL | 2.10 | 2.10 | 460.00 | | 966.00 |
| 10/06/2021 | LSC | NL | Research, correspondence, and review of discovery. | | 2.10 | 460.00 | $966.00 |
| GVD Bill | 10/06/2021 | NL | 0.20 | 0.20 | 950.00 | | 190.00 |
| 10/06/2021 | GVD | NL | Correspondence with litigation trustee re outstanding notes | | 0.20 | 950.00 | $190.00 |
| HRW Bill | 10/06/2021 | NL | 0.80 | 0.80 | 695.00 | | 556.00 |
| 10/06/2021 | HRW | NL | Review responses and production re: discovery requests in notes litigation (0.8). | | 0.80 | 695.00 | $556.00 |
| HRW Bill | 10/06/2021 | NL | 0.50 | 0.50 | 695.00 | | 347.50 |
| 10/06/2021 | HRW | NL | Respond to J. Morris email re: discovery issues in notes litigation (0.5). | | 0.50 | 695.00 | $347.50 |
| HRW | 10/06/2021 | NL | 0.20 | 0.20 | 695.00 | | 139.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

Page: 96
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/06/2021 | HRW | NL | Review emails regarding 30(b)(6) deposition issues and scheduling (0.2). | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/06/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/06/2021 | HRW | NL | Send opposing counsel supplemental notes litigation production (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/06/2021 | | NL | 0.80 | 0.80 | 695.00 | 556.00 |
| 10/06/2021 | HRW | NL | Prepare supplemental production for notes litigation (0.8). | 0.80 | 695.00 | $556.00 |
| JAM Bill | 10/07/2021 | | NL | 0.40 | 0.40 | 1,245.00 | 498.00 |
| 10/07/2021 | JAM | NL | Review/revise e-mail to defense counsel re: discovery (0.4). | 0.40 | 1245.00 | $498.00 |
| LSC Bill | 10/07/2021 | | NL | 2.30 | 2.30 | 460.00 | 1,058.00 |
| 10/07/2021 | LSC | NL | Research, correspondence, and review of discovery. | 2.30 | 460.00 | $1,058.00 |
| GVD Bill | 10/07/2021 | | NL | 0.20 | 0.20 | 950.00 | 190.00 |
| 10/07/2021 | GVD | NL | Correspondence with Quinn re notes collection issues | 0.20 | 950.00 | $190.00 |
| HRW Bill | 10/07/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/07/2021 | HRW | NL | Email J. Morris re: discovery issues in notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/07/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/07/2021 | HRW | NL | Email DSI re: re: discovery issues in notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| JAM Bill | 10/08/2021 | | NL | 2.70 | 2.70 | 1,245.00 | 3,361.50 |
| 10/08/2021 | JAM | NL | Analyze NexPoint's Rule 30(b)(6) deposition notice and e-mail to J. Seery, T. Surgent, J. Pomerantz, G. | 2.70 | 1245.00 | $3,361.50 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 -00003

Page: 97
Prebill#287690
November 05, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| | | | Demo, H. Winograd re: same (1.4); e-mails to J. Seery, T. Surgent, D. Rukavina, H. Winograd re: objections to NexPoint's Rule 30(b)(6) deposition notice (0.4); revise deposition notices for J. Dondero, HCRE, HCMS, and NexPoint (0.2); e-mails w/ Z. Annable, H. Winograd re: revised deposition notices for J. Dondero, HCRE, HCMS, and NexPoint (0.1); e-mails w/ D. Klos, T. Surgent, H. Winograd re: documents and information concerning J. Dondero compensation, loan history (0.4); review defendants' document production (0.2). | | | | |
| HRW Bill | 10/08/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/08/2021 | HRW | NL | Review 30(b)(6) notices for consolidated notes litigation (0.1). | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/08/2021 | | NL | 0.30 | 0.30 | 695.00 | 208.50 |
| 10/08/2021 | HRW | NL | Review DSI email and production re: Dondero compensation (0.3). | | 0.30 | 695.00 | $208.50 |
| HRW Bill | 10/08/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/08/2021 | HRW | NL | Review production from defendants in consolidated notes litigation (0.2). | | 0.20 | 695.00 | $139.00 |
| JAM Bill | 10/09/2021 | | NL | 5.90 | 5.90 | 1,245.00 | 7,345.50 |
| 10/09/2021 | JAM | NL | E-mails to TSG re: depositions (0.3); e-mail to H. Winograd re: additional document production (0.1); e-mails w/ D. Klos, T. Surgent, H, Winograd re: Dondero loans and payment history (0.2); e-mails w/ J. Seery, D, Klos re: cost/value of portfolio companies (0.1); begin Nancy Dondero deposition outline (2.3); tel c. w/ J. Seery re: notes litigation (0.2); review documents/transcripts (2.7). | | 5.90 | 1245.00 | $7,345.50 |
| JAM Bill | 10/10/2021 | | NL | 2.10 | 2.10 | 1,245.00 | 2,614.50 |
| 10/10/2021 | JAM | NL | Analyze Rule 30(b)(6) Notice of Dondero, HCRE and HCMS and prepare draft objections (1.8); tel c. w/ J. Seery re: litigation matters (0.3). | | 2.10 | 1245.00 | $2,614.50 |
| JAM | 10/11/2021 | | NL | 0.40 | 0.40 | 1,245.00 | 498.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

Page: 98
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/11/2021 | JAM | NL | E-mails w/ D. Rukavina, D. Deitz-Perez re: depositions (0.2); e-mails w/ D. Klos, T. Conouyer re: Waterhouse roles (0.1); e-mails w/ H. Winograd, L. Canty re: supplemental document production (0.1). | 0.40 | 1245.00 | $498.00 |
| LSC Bill | 10/11/2021 | NL | | 0.50 | 0.50 | 460.00 | 230.00 |
| 10/11/2021 | LSC | NL | Retrieve and review Dondero's supplemental production. | 0.50 | 460.00 | $230.00 |
| HRW Bill | 10/11/2021 | NL | | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/11/2021 | HRW | NL | Review email from counsel re: deposition schedule in consolidated notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/11/2021 | NL | | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/11/2021 | HRW | NL | Review supplemental production in consolidated notes litigation (0.5). | 0.50 | 695.00 | $347.50 |
| JAM Bill | 10/12/2021 | NL | | 4.60 | 4.60 | 1,245.00 | 5,727.00 |
| 10/12/2021 | JAM | NL | E-mails w/ defense counsel re: discovery (0.3); e-mails w/ D. Klos, L. Canty, H. Winograd re: supplemental document production (0.5); prepare for depositions (3.4); e-mails w/ defense counsel re: depositions (0.2); tel c. w/ J. Seery, D. Klos re: obligors' payments on Notes (0.2). | 4.60 | 1245.00 | $5,727.00 |
| LSC Bill | 10/12/2021 | NL | | 4.20 | 4.20 | 460.00 | 1,932.00 |
| 10/12/2021 | LSC | NL | Preparation of supplemental productions (2), including redactions to same and correspondence regarding the same. | 4.20 | 460.00 | $1,932.00 |
| LSC Bill | 10/12/2021 | NL | | 0.50 | 0.50 | 460.00 | 230.00 |
| 10/12/2021 | LSC | NL | Coordinate and assist with retrieval and preparation of documents with respect to notes litigation for J. Morris. | 0.50 | 460.00 | $230.00 |
| HRW | 10/12/2021 | NL | | 1.80 | 1.80 | 695.00 | 1,251.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00003

Page:    99
Prebill#287690
November 05, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| Bill | | | | | | | |
| 10/12/2021 | HRW | NL | Review supplemental production for consolidated notes litigation (1.8). | | 1.80 | 695.00 | $1,251.00 |
| HRW Bill | 10/12/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/12/2021 | HRW | NL | Send counsel supplemental production for consolidated notes litigation (0.2). | | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/12/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/12/2021 | HRW | NL | Call with DSI re: backup documentation for demonstrative chart showing Trussway, MGM, Cornerstone valuations in consolidated notes litigation (0.5). | | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/12/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/12/2021 | HRW | NL | Email J. Morris, G. Demo, J. Pomerantz, and client re: backup documentation for demonstrative chart showing Trussway, MGM, Cornerstone valuations in consolidated notes litigation (0.2). | | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/12/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/12/2021 | HRW | NL | Email J. Morris re: supplemental productions for consolidated notes litigations (0.2). | | 0.20 | 695.00 | $139.00 |
| JAM Bill | 10/13/2021 | | NL | 6.80 | 6.80 | 1,245.00 | 8,466.00 |
| 10/13/2021 | JAM | NL | Prepare for meeting with J. Seery concerning depositions, including analysis of issues concerning NexPoint (1.2); e-mails to J. Seery, T. Surgent, D. Klos re: deposition preparation (0.3); tel c. w/ J. Seery, D. Klos, T. Surgent, G. Demo, H, Winograd re: preparation for depositions (1.5); letters to defense counsel re: documents (0.2); prepare for depositions (3.6). | | 6.80 | 1245.00 | $8,466.00 |
| GVD Bill | 10/13/2021 | | NL | 1.60 | 1.60 | 950.00 | 1,520.00 |
| 10/13/2021 | GVD | NL | Conference with J. Seery, D. Klos and PSZJ re preparation for depositions | | 1.60 | 950.00 | $1,520.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

Page: 100
Prebill#287690
November 05, 2021

| | | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| GVD Bill | 10/13/2021 | | NL | 0.30 | 0.30 | 950.00 | | 285.00 |
| 10/13/2021 | GVD | NL | Conference with J. Morris re status of notes litigation and next steps | | | 0.30 | 950.00 | $285.00 |
| GVD Bill | 10/13/2021 | | NL | 0.10 | 0.10 | 950.00 | | 95.00 |
| 10/13/2021 | GVD | NL | Review transcripts re notes litigation issues | | | 0.10 | 950.00 | $95.00 |
| HRW Bill | 10/13/2021 | | NL | 1.50 | 1.50 | 695.00 | | 1,042.50 |
| 10/13/2021 | HRW | NL | Review defendants' R&Os to Highland's discovery requests in notes litigations (1.5). | | | 1.50 | 695.00 | $1,042.50 |
| HRW Bill | 10/13/2021 | | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/13/2021 | HRW | NL | Email J. Morris re: defendants' R&Os to Highland's discovery requests in notes litigations (0.2). | | | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/13/2021 | | NL | 1.20 | 1.20 | 695.00 | | 834.00 |
| 10/13/2021 | HRW | NL | Call with J. Seery and D. Klos re: deposition prep for notes litigation (1.2). | | | 1.20 | 695.00 | $834.00 |
| HRW Bill | 10/13/2021 | | NL | 1.00 | 1.00 | 695.00 | | 695.00 |
| 10/13/2021 | HRW | NL | Prepare for call with J. Seery and D. Klos re: deposition prep for notes litigation (1.0). | | | 1.00 | 695.00 | $695.00 |
| HRW Bill | 10/13/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/13/2021 | HRW | NL | Email J. Morris re: supplemental production in notes litigation (0.1). | | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/13/2021 | | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/13/2021 | HRW | NL | Send opposing counsel supplemental production in notes litigation (0.2). | | | 0.20 | 695.00 | $139.00 |

D-CNL003846

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:   101
Prebill#287690
November 05, 2021

| | | | | Hours | | Rate | Amount |
|---|---|---|---|---|---|---|---|
| LSC Bill | 10/14/2021 | | NL | 5.90 | 5.90 | 460.00 | 2,714.00 |
| 10/14/2021 | LSC | NL | Assist with research, retrieval, and review of discovery documents in connection with upcoming depositions. | 5.90 | | 460.00 | $2,714.00 |
| LSC Bill | 10/14/2021 | | NL | 0.50 | 0.50 | 460.00 | 230.00 |
| 10/14/2021 | LSC | NL | Research and correspondence regarding certain management documents for J. Morris. | 0.50 | | 460.00 | $230.00 |
| JNP Bill | 10/15/2021 | | NL | 0.20 | 0.20 | 1,295.00 | 259.00 |
| 10/15/2021 | JNP | NL | Conference with John A. Morris regarding upcoming depositions and issues relating to notes litigation including hearing coverage. | 0.20 | | 1295.00 | $259.00 |
| JNP Bill | 10/15/2021 | | NL | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 10/15/2021 | JNP | NL | Review emails regarding notes depositions and discovery. | 0.10 | | 1295.00 | $129.50 |
| JAM Bill | 10/15/2021 | | NL | 6.80 | 6.80 | 1,245.00 | 8,466.00 |
| 10/15/2021 | JAM | NL | Tel c. w/ J. Seery, D. Klos, G. Demo, H. Winograd re: preparation for depositions (1.7); tel c. w/ H. Winograd, L. Canty re: depositions, exhibits, and related matters (0.2); prepare for depositions (3.1); e-mails to L. Canty, H. Winograd re: deposition exhibits (0.4); tel c. w/ G. Demo re: depositions (0.2); tel c. w/ J. Pomerantz re: notes litigation (0.3); e-mail to J. Seery, D. Klos re: prior court filings (0.5); e-mail to J. Seery, D. Klos, H. Winograd re: LP Agreement (0.3); e-mail to J. Seery, D. Klos, H. Winograd re: management representation letters (0.1). | 6.80 | | 1245.00 | $8,466.00 |
| LSC Bill | 10/15/2021 | | NL | 3.10 | 3.10 | 460.00 | 1,426.00 |
| 10/15/2021 | LSC | NL | Research, retrieve, and review documents in connection with Notes Litigation and correspondence regarding the same (2.6); research and correspondence regarding prior productions (.5). | 3.10 | | 460.00 | $1,426.00 |
| GVD | 10/15/2021 | | NL | 1.60 | 1.60 | 950.00 | 1,520.00 |

HIGHLY CONFIDENTIAL

D-CNL003847

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:   102
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| **Bill** | | | | | | |
| 10/15/2021 | GVD | NL | Attend conference re preparation for notes litigation | 1.60 | 950.00 | $1,520.00 |
| **HRW** **Bill** | 10/15/2021 | | NL | 1.50 | 1.50 | 695.00 | | 1,042.50 |
| 10/15/2021 | HRW | NL | Review productions from Highland to defendants in notes litigations (1.5). | 1.50 | 695.00 | $1,042.50 |
| **HRW** **Bill** | 10/15/2021 | | NL | 0.40 | 0.40 | 695.00 | | 278.00 |
| 10/15/2021 | HRW | NL | Communicate with L. Canty re: productions from Highland to defendants in notes litigations (0.4). | 0.40 | 695.00 | $278.00 |
| **HRW** **Bill** | 10/15/2021 | | NL | 1.60 | 1.60 | 695.00 | | 1,112.00 |
| 10/15/2021 | HRW | NL | Call with J. Morris, G. Demo, J. Seery, D. Klos re: deposition prep for notes litigation (1.6). | 1.60 | 695.00 | $1,112.00 |
| **HRW** **Bill** | 10/15/2021 | | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/15/2021 | HRW | NL | Call with J. Morris and L. Canty re: deposition prep for notes litigation (0.2). | 0.20 | 695.00 | $139.00 |
| **JAM** **Bill** | 10/16/2021 | | NL | 7.80 | 7.80 | 1,245.00 | | 9,711.00 |
| 10/16/2021 | JAM | NL | Prepare for depositions (7.5); e-mail to HCMLP, PSZJ re: Deposition Outline for Nancy Dondero (0.1); e-mail to L. Canty, H. Winograd re: deposition exhibits (0.1); tel c. w/ H. Winograd re: document production (0.1). | 7.80 | 1245.00 | $9,711.00 |
| **LSC** **Bill** | 10/16/2021 | | NL | 8.50 | 8.50 | 460.00 | | 3,910.00 |
| 10/16/2021 | LSC | NL | Preparation of exhibits in connection with upcoming depositions and research discovery documents regarding the same (4.9); preparation of materials in connection with hearing on motions to dismiss, including legal research regarding the same (3.6) | 8.50 | 460.00 | $3,910.00 |
| **HRW** **Bill** | 10/16/2021 | | NL | 3.80 | 3.80 | 695.00 | | 2,641.00 |
| 10/16/2021 | HRW | NL | Review supplemental HCMFA production for notes litigation (3.8). | 3.80 | 695.00 | $2,641.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00003

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| HRW Bill | 10/16/2021 | | NL | 0.40 | 0.40 | 695.00 | 278.00 |
| 10/16/2021 | HRW | NL | Communicate with L. Canty re: supplemental HCMFA production for notes litigation (0.4). | 0.40 | 695.00 | $278.00 |
| HRW Bill | 10/16/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/16/2021 | HRW | NL | Email with C. Mackle re: supplemental HCMFA production for notes litigation (0.2). | 0.20 | 695.00 | $139.00 |
| JNP Bill | 10/17/2021 | | NL | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 10/17/2021 | JNP | NL | Review emails regarding depositions. | 0.10 | 1295.00 | $129.50 |
| JAM Bill | 10/17/2021 | | NL | 11.00 | 11.00 | 1,245.00 | 13,695.00 |
| 10/17/2021 | JAM | NL | Prepare for depositions (9.2); multiple calls with J. Seery re: depositions, facts and strategy for Notes Litigation (1.2); e-mails w H. Winograd, L. Canty re: exhibits (0.3); e-mails w/ defense counsel, court reporter re: depositions (0.3). | 11.00 | 1245.00 | $13,695.00 |
| LSC Bill | 10/17/2021 | | NL | 2.00 | 2.00 | 460.00 | 920.00 |
| 10/17/2021 | LSC | NL | Preparation of exhibits in connection with upcoming depositions and research discovery documents regarding the same. | 2.00 | 460.00 | $920.00 |
| HRW Bill | 10/17/2021 | | NL | 8.00 | 8.00 | 695.00 | 5,560.00 |
| 10/17/2021 | HRW | NL | Review supplemental HCMFA production for notes litigation (8.0). | 8.00 | 695.00 | $5,560.00 |
| HRW Bill | 10/17/2021 | | NL | 0.80 | 0.80 | 695.00 | 556.00 |
| 10/17/2021 | HRW | NL | Review emails from J. Morris and DSI re: hot documents for depositions in notes litigation (0.8). | 0.80 | 695.00 | $556.00 |
| HRW Bill | 10/17/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/17/2021 | HRW | NL | Send email to J. Morris re: document productions from Highland to defendants in notes litigations | 0.20 | 695.00 | $139.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00003

Page:    104
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | (0.2). | | | | |
| JNP Bill | 10/18/2021 | NL | 1.00 | 1.00 | 1,295.00 | 1,295.00 |
| 10/18/2021 | JNP | NL | Review motion to dismiss and opposition regarding notes litigation. | 1.00 | 1295.00 | $1,295.00 |
| JNP Bill | 10/18/2021 | NL | 0.90 | 0.90 | 1,295.00 | 1,165.50 |
| 10/18/2021 | JNP | NL | Conference with John A. Morris and then J. Seery regarding Nancy Dondero deposition. | 0.90 | 1295.00 | $1,165.50 |
| JAM Bill | 10/18/2021 | NL | 13.90 | 13.90 | 1,245.00 | 17,305.50 |
| 10/18/2021 | JAM | NL | Prepare for depositions (5.8); tel c. w/ G. Demo re: depositions (0.2); Nancy Dondero deposition (7.0); tel c. w/ J. Seery (partial), J. Pomerantz re: Nancy Dondero deposition (0.8); tel c. w/ D. Newman re: Nancy Dondero deposition (0.1). | 13.90 | 1245.00 | $17,305.50 |
| LSC Bill | 10/18/2021 | NL | 7.90 | 7.90 | 460.00 | 3,634.00 |
| 10/18/2021 | LSC | NL | Prepare for and assist at deposition of Susan Dondero. | 7.90 | 460.00 | $3,634.00 |
| GVD Bill | 10/18/2021 | NL | 0.10 | 0.10 | 950.00 | 95.00 |
| 10/18/2021 | GVD | NL | Correspondence with L. Canty re deposition issues | 0.10 | 950.00 | $95.00 |
| GVD Bill | 10/18/2021 | NL | 0.20 | 0.20 | 950.00 | 190.00 |
| 10/18/2021 | GVD | NL | Conference with J. Morris re notes litigation strategy | 0.20 | 950.00 | $190.00 |
| GVD Bill | 10/18/2021 | NL | 4.50 | 4.50 | 950.00 | 4,275.00 |
| 10/18/2021 | GVD | NL | Attend deposition of N. Dondero (partial) | 4.50 | 950.00 | $4,275.00 |
| GVD Bill | 10/18/2021 | NL | 0.20 | 0.20 | 950.00 | 190.00 |
| 10/18/2021 | GVD | NL | Review WilmerHale analysis of Investment Company Act issues | 0.20 | 950.00 | $190.00 |
| HRW | 10/18/2021 | NL | 3.50 | 3.50 | 695.00 | 2,432.50 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00003

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| Bill | | | | | | | |
| 10/18/2021 | HRW | NL | Review supplemental HCMFA production for notes litigation (3.5). | | 3.50 | 695.00 | $2,432.50 |
| HRW Bill | 10/18/2021 | | NL | 6.00 | 6.00 | 695.00 | 4,170.00 |
| 10/18/2021 | HRW | NL | Deposition of Nancy Dondero for notes litigation (6.0). | | 6.00 | 695.00 | $4,170.00 |
| HRW Bill | 10/18/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/18/2021 | HRW | NL | Review Waterhouse deposition outline (0.5). | | 0.50 | 695.00 | $347.50 |
| JNP Bill | 10/19/2021 | | NL | 1.40 | 1.40 | 1,295.00 | 1,813.00 |
| 10/19/2021 | JNP | NL | Continue to prepare for hearing on motion to dismiss. | | 1.40 | 1295.00 | $1,813.00 |
| JNP Bill | 10/19/2021 | | NL | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 10/19/2021 | JNP | NL | Review and respond to email regarding use of Dondero plan proposal in course of litigation. | | 0.10 | 1295.00 | $129.50 |
| JAM Bill | 10/19/2021 | | NL | 14.60 | 14.60 | 1,245.00 | 18,177.00 |
| 10/19/2021 | JAM | NL | Prepare for Waterhouse deposition (3.6); Waterhouse deposition (including multiple calls with G. Demo and/or H. Winograd) (10.2); tel c. w/ J. Seery re: Waterhouse deposition (0.1); tel c. w/ G. Demo, H. Winograd re: Waterhouse deposition (0.3); tel c. w/ J. Seery re: status, strategy (0.4). | | 14.60 | 1245.00 | $18,177.00 |
| LSC Bill | 10/19/2021 | | NL | 11.30 | 11.30 | 460.00 | 5,198.00 |
| 10/19/2021 | LSC | NL | Prepare for and assist at deposition of Frank Waterhouse. | | 11.30 | 460.00 | $5,198.00 |
| GVD Bill | 10/19/2021 | | NL | 0.20 | 0.20 | 950.00 | 190.00 |
| 10/19/2021 | GVD | NL | Conference with J. Seery re issues re Dondero deposition | | 0.20 | 950.00 | $190.00 |
| GVD | 10/19/2021 | | NL | 1.10 | 1.10 | 950.00 | 1,045.00 |

D-CNL003851
Appx. 02930

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00003

Page:   106
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/19/2021 | GVD | NL | Review issues re application of mediation privilege | 1.10 | 950.00 | $1,045.00 |
| GVD Bill | 10/19/2021 | | NL | 0.60 | 0.60 | 950.00 | 570.00 |
| 10/19/2021 | GVD | NL | Multiple conferences with H. Winograd and J. Morris re status of Waterhouse deposition | 0.60 | 950.00 | $570.00 |
| GVD Bill | 10/19/2021 | | NL | 4.60 | 4.60 | 950.00 | 4,370.00 |
| 10/19/2021 | GVD | NL | Attend Waterhouse deposition (partial) | 4.60 | 950.00 | $4,370.00 |
| HRW Bill | 10/19/2021 | | NL | 9.50 | 9.50 | 695.00 | 6,602.50 |
| 10/19/2021 | HRW | NL | Deposition of Frank Waterhouse for notes litigation (9.5). | 9.50 | 695.00 | $6,602.50 |
| HRW Bill | 10/19/2021 | | NL | 1.50 | 1.50 | 695.00 | 1,042.50 |
| 10/19/2021 | HRW | NL | Review Waterhouse deposition outline (1.5). | 1.50 | 695.00 | $1,042.50 |
| HRW Bill | 10/19/2021 | | NL | 1.80 | 1.80 | 695.00 | 1,251.00 |
| 10/19/2021 | HRW | NL | Review supplemental HCMFA production for notes litigation (1.8). | 1.80 | 695.00 | $1,251.00 |
| HRW Bill | 10/19/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/19/2021 | HRW | NL | Calls with G. Demo and J. Morris re: Waterhouse deposition (0.5). | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/19/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/19/2021 | HRW | NL | Call with J. Morris re: Waterhouse deposition (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/19/2021 | | NL | 0.30 | 0.30 | 695.00 | 208.50 |
| 10/19/2021 | HRW | NL | Email with G. Demo and J. Elkin re: mediation privilege (0.3). | 0.30 | 695.00 | $208.50 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

|  |  |  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| HRW Bill | 10/19/2021 |  | NL | 0.30 | 0.30 | 695.00 |  | 208.50 |
| 10/19/2021 | HRW | NL | Research issue of FRE 408 and use of documents from mediation (0.3). |  |  | 0.30 | 695.00 | $208.50 |
| JAM Bill | 10/20/2021 |  | NL | 6.80 | 6.80 | 1,245.00 |  | 8,466.00 |
| 10/20/2021 | JAM | NL | Prepare for Dondero deposition (4.2); e-mails w/ L. Canty re: exhibits for Dondero deposition (0.2); Dondero deposition (cancelled) (0.2); tel c. w/ J. Seery re: notes litigation (0.3); e-mails w/ court reporter re: Seery deposition (0.1); e-mails w/ D. Rukavina, H. Winograd re: discovery (0.6); tel c. w/ J. Seery re: notes litigation (0.5); tel c. w/ G. Demo re: notes litigation (0.1); tel c. w/ D. Klos, K. Hendrix re: depositions in notes litigation (0.2); tel c. w/ J. Seery re: notes litigation (0.3); tel c. w/ B. Sharp re: forensic analysis of notes (0.1). |  |  | 6.80 | 1245.00 | $8,466.00 |
| LSC Bill | 10/20/2021 |  | NL | 1.90 | 1.90 | 460.00 |  | 874.00 |
| 10/20/2021 | LSC | NL | Prepare for anticipated Dondero and related entities deposition (ultimately canceled). |  |  | 1.90 | 460.00 | $874.00 |
| GVD Bill | 10/20/2021 |  | NL | 0.10 | 0.10 | 950.00 |  | 95.00 |
| 10/20/2021 | GVD | NL | Correspondence with J. Pomerantz re mediation issues |  |  | 0.10 | 950.00 | $95.00 |
| GVD Bill | 10/20/2021 |  | NL | 0.10 | 0.10 | 950.00 |  | 95.00 |
| 10/20/2021 | GVD | NL | Correspondence with H. Winograd re HCMFA notes litigation |  |  | 0.10 | 950.00 | $95.00 |
| HRW Bill | 10/20/2021 |  | NL | 0.30 | 0.30 | 695.00 |  | 208.50 |
| 10/20/2021 | HRW | NL | Review HCMFA discovery in notes litigation (0.3). |  |  | 0.30 | 695.00 | $208.50 |
| HRW Bill | 10/20/2021 |  | NL | 0.10 | 0.10 | 695.00 |  | 69.50 |
| 10/20/2021 | HRW | NL | Email G. Demo re: HCMFA adversary proceeding (0.1). |  |  | 0.10 | 695.00 | $69.50 |
| HRW | 10/20/2021 |  | NL | 0.10 | 0.10 | 695.00 |  | 69.50 |

D-CNL003853
Appx. 02932

Pachulski Stang Ziehl & Jones LLP                                  Page:    108
Highland Capital Management LP                                     Prebill#287690
36027    -00003                                                   November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/20/2021 | HRW | NL | Email J. Morris re: HCMFA supplemental discovery in notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/20/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/20/2021 | HRW | NL | Review email from J. Morris re: document requests to HCMFA in notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/20/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/20/2021 | HRW | NL | Review email from HCMFA counsel re: Highland's document requests to HCMFA in notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| JNP Bill | 10/21/2021 | | NL | 0.70 | 0.70 | 1,295.00 | 906.50 |
| 10/21/2021 | JNP | NL | Continue to prepare for motion to dismiss  hearing. | 0.70 | 1295.00 | $906.50 |
| JAM Bill | 10/21/2021 | | NL | 8.30 | 8.30 | 1,245.00 | 10,333.50 |
| 10/21/2021 | JAM | NL | E-mail to J. Vaughn, J. Seery, B. Sharp re: metadata for promissory notes (0.2); meet w/ J. Seery to prepare for deposition (0.8); review audited financials concerning "practice of forgivable loans" (0.6); tel c. w/ J. Seery, D. Klos re: "practice of forgivable loans" (0.1); prepare for J. Seery deposition (1.6); Seery deposition (4.8); tel c. w/ J. Pomerantz re: Seery deposition (0.2). | 8.30 | 1245.00 | $10,333.50 |
| GVD Bill | 10/21/2021 | | NL | 2.10 | 2.10 | 950.00 | 1,995.00 |
| 10/21/2021 | GVD | NL | Attend J. Seery deposition (partial) | 2.10 | 950.00 | $1,995.00 |
| HRW Bill | 10/21/2021 | | NL | 3.00 | 3.00 | 695.00 | 2,085.00 |
| 10/21/2021 | HRW | NL | Deposition of Jim Seery for notes litigation (3.0). | 3.00 | 695.00 | $2,085.00 |
| HRW Bill | 10/21/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/21/2021 | HRW | NL | Email J. Pomerantz re: notes litigation MTD (0.1). | 0.10 | 695.00 | $69.50 |
| HRW | 10/21/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |

D-CNL003854

Appx. 02933

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00003

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/21/2021 | HRW | NL | Review notes litigation MTD (0.2). | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/21/2021 | | NL | 0.10 0.10 | 695.00 | 69.50 |
| 10/21/2021 | HRW | NL | Review J. Morris email re: legal research for MSJ and notes litigation (0.1). | 0.10 | 695.00 | $69.50 |
| JAM Bill | 10/22/2021 | | NL | 3.70 3.70 | 1,245.00 | 4,606.50 |
| 10/22/2021 | JAM | NL | E-mail to D. Dandeneau re: Waterhouse transcript (0.2); e-mails w/ D. Klos re: proof of payment on loans (0.3); tel c. w/ J. Seery re: Seery deposition (0.2); e-mails w/ J. Vaughn, T. Surgent, G. Demo, H. Winograd re: metadata for the notes (0.4); tel c. w/ J. Vaughn, T. Surgent re: metadata for the notes (0.3); prepare for depositions (1.7); e-mail to L. Canty re: proof of payment document production (0.2); tel c. w/ J. Seery re: notes litigation (0.2); tel c. w/ J. Seery re: notes litigation (0.2). | 3.70 | 1245.00 | $4,606.50 |
| GVD Bill | 10/22/2021 | | NL | 0.50 0.50 | 950.00 | 475.00 |
| 10/22/2021 | GVD | NL | Conference with J. Morris and J. Pomerantz re open issues in notes litigation | 0.50 | 950.00 | $475.00 |
| JAM Bill | 10/23/2021 | | NL | 3.50 3.50 | 1,245.00 | 4,357.50 |
| 10/23/2021 | JAM | NL | E-mail to defense counsel re: discovery (0.4); e-mail to D. Deitz-Perez re: costs for cancelling Dondero deposition (0.1); e-mails w/ T. Surgent, P. Giep re: document production (0.2); prepare for depositions (2.7); tel c. w/ J. Seery re: facts, status, strategy of notes litigation (0.1). | 3.50 | 1245.00 | $4,357.50 |
| JAM Bill | 10/24/2021 | | NL | 4.30 4.30 | 1,245.00 | 5,353.50 |
| 10/24/2021 | JAM | NL | Review documents and prepare for depositions (including sending documents to L. Canty, H. Winograd for production) (4.0); tel c. w/ J. Seery re: Notes Litigation facts and status (0.3). | 4.30 | 1245.00 | $5,353.50 |

D-CNL003855

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00003

Page:    110
Prebill#287690
November 05, 2021

| | | | | Hours | | | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| HRW Bill | 10/24/2021 | | NL | 3.00 | 3.00 | 695.00 | | 2,085.00 |
| 10/24/2021 | HRW | NL | Draft second HCMFA notes complaint (3.0). | | 3.00 | | 695.00 | $2,085.00 |
| HRW Bill | 10/24/2021 | | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/24/2021 | HRW | NL | Review documents for notes production (0.2). | | 0.20 | | 695.00 | $139.00 |
| JNP Bill | 10/25/2021 | | NL | 1.00 | 1.00 | 1,295.00 | | 1,295.00 |
| 10/25/2021 | JNP | NL | Continue to prepare for oral argument on motion to dismiss. | | 1.00 | | 1295.00 | $1,295.00 |
| JNP Bill | 10/25/2021 | | NL | 0.10 | 0.10 | 1,295.00 | | 129.50 |
| 10/25/2021 | JNP | NL | Review emails regarding notes litigation discovery. | | 0.10 | | 1295.00 | $129.50 |
| JAM Bill | 10/25/2021 | | NL | 8.00 | 8.00 | 1,245.00 | | 9,960.00 |
| 10/25/2021 | JAM | NL | Work on Dondero deposition outline (5.3); tel c. w/ J. Seery re: notes litigation (0.1); communications w/ H. Winograd, P. Jeffries re: document production (0.3); prep session w/ D. Klos, K. Hendrix, H. Winograd (1.5); e-mail to defense counsel re: document production (0.3); e-mails w/ defense counsel re: deposition schedule (0.1); tel c. w/ H. Winograd re: notes litigation (0.2); review HCMFA document production (0.2). | | 8.00 | | 1245.00 | $9,960.00 |
| GVD Bill | 10/25/2021 | | NL | 0.40 | 0.40 | 950.00 | | 380.00 |
| 10/25/2021 | GVD | NL | Review limited partnership agreement re fiduciary duty issues and correspondence with J. Pomerantz re same | | 0.40 | | 950.00 | $380.00 |
| GVD Bill | 10/25/2021 | | NL | 0.30 | 0.30 | 950.00 | | 285.00 |
| 10/25/2021 | GVD | NL | Review and comment on new note adversary for HCMFA | | 0.30 | | 950.00 | $285.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00003

Page:   111
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| HRW Bill | 10/25/2021 | NL | 2.50 | 2.50 | 695.00 | | 1,737.50 |
| 10/25/2021 | HRW | NL | Review HCMFA supplemental documents (2.5). | 2.50 | 695.00 | $1,737.50 |
| HRW Bill | 10/25/2021 | NL | 1.50 | 1.50 | 695.00 | | 1,042.50 |
| 10/25/2021 | HRW | NL | Review HCRE supplemental documents (1.5). | 1.50 | 695.00 | $1,042.50 |
| HRW Bill | 10/25/2021 | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/25/2021 | HRW | NL | Call with J. Morris re: Hendrix and Klos depo prep (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/25/2021 | NL | 1.50 | 1.50 | 695.00 | | 1,042.50 |
| 10/25/2021 | HRW | NL | Call with J. Morris, D. Klos, K. Hendrix re: depo prep (1.5). | 1.50 | 695.00 | $1,042.50 |
| HRW Bill | 10/25/2021 | NL | 0.30 | 0.30 | 695.00 | | 208.50 |
| 10/25/2021 | HRW | NL | Review HCMFA supplemental production (0.3). | 0.30 | 695.00 | $208.50 |
| HRW Bill | 10/25/2021 | NL | 0.30 | 0.30 | 695.00 | | 208.50 |
| 10/25/2021 | HRW | NL | Review notes litigation supplemental production (0.3). | 0.30 | 695.00 | $208.50 |
| HRW Bill | 10/25/2021 | NL | 0.50 | 0.50 | 695.00 | | 347.50 |
| 10/25/2021 | HRW | NL | Edit and review HCMFA second notes complaint (0.5). | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/25/2021 | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/25/2021 | HRW | NL | Email J. Morris re: HCMFA notes discovery (0.2). | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/25/2021 | NL | 1.50 | 1.50 | 695.00 | | 1,042.50 |
| 10/25/2021 | HRW | NL | Research issues for summary judgment in notes litigation (1.5). | 1.50 | 695.00 | $1,042.50 |
| JNP | 10/26/2021 | NL | 0.40 | 0.40 | 1,295.00 | | 518.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:   112
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/26/2021 | JNP | NL | Conference with John A. Morris regarding depositions and strategy in notes litigation. | 0.40 | 1295.00 | $518.00 |
| JNP Bill | 10/26/2021 | | NL | 1.10 | 1.10 | 1,295.00 | | 1,424.50 |
| 10/26/2021 | JNP | NL | Continue to review cases regarding preparation for hearing on motion to dismiss. | 1.10 | 1295.00 | $1,424.50 |
| JAM Bill | 10/26/2021 | | NL | 9.20 | 9.20 | 1,245.00 | | 11,454.00 |
| 10/26/2021 | JAM | NL | Review of transcripts and begin outlining issues/facts (3.2); meet w/ D. Klos, K. Hendrix to prepare for depositions (2.7); tel c. w/ J. Pomerantz re: notes litigation (0.4); prepare for depositions, including review of expert report (1.8); e-mails w/ defense counsel re: discovery (0.4); meet w/ D. Klos re: Dondero compensation (0.4); tel c. w/ J. Pomerantz re: Dondero compensation and expert issues (0.3). | 9.20 | 1245.00 | $11,454.00 |
| GVD Bill | 10/26/2021 | | NL | 0.40 | 0.40 | 950.00 | | 380.00 |
| 10/26/2021 | GVD | NL | Conference with J. Morris and D. Klos re preparation for Klos deposition | 0.40 | 950.00 | $380.00 |
| HRW Bill | 10/26/2021 | | NL | 2.00 | 2.00 | 695.00 | | 1,390.00 |
| 10/26/2021 | HRW | NL | Research issues for consolidation of cases (2.0). | 2.00 | 695.00 | $1,390.00 |
| HRW Bill | 10/26/2021 | | NL | 1.20 | 1.20 | 695.00 | | 834.00 |
| 10/26/2021 | HRW | NL | Draft errata for opposition to MTD (1.2). | 1.20 | 695.00 | $834.00 |
| HRW Bill | 10/26/2021 | | NL | 0.80 | 0.80 | 695.00 | | 556.00 |
| 10/26/2021 | HRW | NL | Review notes litigation supplemental HCRE production (0.8). | 0.80 | 695.00 | $556.00 |
| HRW Bill | 10/26/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/26/2021 | HRW | NL | Review J. Morris email to counsel re: Dondero production in notes litigation (0.1). | 0.10 | 695.00 | $69.50 |

HIGHLY CONFIDENTIAL

D-CNL003858

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 -00003

Page: 113
Prebill#287690
November 05, 2021

| | | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| HRW Bill | 10/26/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/26/2021 | HRW | NL | Review email from counsel re: Dondero notes production in notes litigation (0.1). | | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/26/2021 | | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/26/2021 | HRW | NL | Review Dondero responses to discovery requests in notes litigation (0.2). | | | 0.20 | 695.00 | $139.00 |
| HRW Bill | 10/26/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/26/2021 | HRW | NL | Email J. Morris re: HCRE supplemental production in notes litigation (0.1). | | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/26/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/26/2021 | HRW | NL | Email J. Morris and J. Pomerantz re: errata for opposition to MTD in notes litigation (0.1). | | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/26/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/26/2021 | HRW | NL | Email local counsel re: errata for opposition to MTD in notes litigation (0.1). | | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/26/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/26/2021 | HRW | NL | Review email from local counsel re: errata for opposition to MTD in notes litigation (0.1). | | | 0.10 | 695.00 | $69.50 |
| JNP Bill | 10/27/2021 | | NL | 1.30 | 1.30 | 1,295.00 | | 1,683.50 |
| 10/27/2021 | JNP | NL | Continue to prepare for hearing on motion to dismiss. | | | 1.30 | 1295.00 | $1,683.50 |
| JNP Bill | 10/27/2021 | | NL | 0.30 | 0.30 | 1,295.00 | | 388.50 |
| 10/27/2021 | JNP | NL | Conference with Gregory V. Demo, John A. Morris and J. Seery regarding Klos and Hendrix depositions. | | | 0.30 | 1295.00 | $388.50 |
| JAM | 10/27/2021 | | NL | 9.00 | 9.00 | 1,245.00 | | 11,205.00 |

HIGHLY CONFIDENTIAL

D-CNL003859

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

Page: 114
Prebill#287690
November 05, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 10/27/2021 | JAM | NL | Prepare for depositions (0.6); e-mails w/ defense counsel re: document production (0.2); Hendrix and Klos depositions (7.7); tel c. w/ J. Seery, J. Pomerantz, G. Demo re: depositions (and certain unrelated matters) (0.5). | 9.00 | 1245.00 | $11,205.00 |
| GVD Bill | 10/27/2021 | | NL | 0.50 | 0.50 | 950.00 | 475.00 |
| 10/27/2021 | GVD | NL | Attend K. Hendrix deposition (partial) | 0.50 | 950.00 | $475.00 |
| HRW Bill | 10/27/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/27/2021 | HRW | NL | Review HCMFA supplemental documents for notes litigations (0.5). | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/27/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/27/2021 | HRW | NL | Email J. Morris re: HCMFA and HCRE supplemental documents for notes litigations (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/27/2021 | | NL | 2.00 | 2.00 | 695.00 | 1,390.00 |
| 10/27/2021 | HRW | NL | Research re: summary judgment standard for notes litigations (2.0). | 2.00 | 695.00 | $1,390.00 |
| HRW Bill | 10/27/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/27/2021 | HRW | NL | Email local counsel re: errata for opposition briefs to MTD (0.1). | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/27/2021 | | NL | 1.00 | 1.00 | 695.00 | 695.00 |
| 10/27/2021 | HRW | NL | Draft errata for opposition briefs to MTD (1.0). | 1.00 | 695.00 | $695.00 |
| HRW Bill | 10/27/2021 | | NL | 3.00 | 3.00 | 695.00 | 2,085.00 |
| 10/27/2021 | HRW | NL | Hendrix deposition for notes litigations (3.0). | 3.00 | 695.00 | $2,085.00 |
| HRW Bill | 10/27/2021 | | NL | 2.50 | 2.50 | 695.00 | 1,737.50 |
| 10/27/2021 | HRW | NL | Klos deposition for notes litigations (2.5). | 2.50 | 695.00 | $1,737.50 |

HIGHLY CONFIDENTIAL

D-CNL003860

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00003

Page:   115
Prebill#287690
November 05, 2021

| | | | | Hours | | | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| JNP Bill | 10/28/2021 | | NL | 2.00 | 2.00 | 1,295.00 | | 2,590.00 |
| | 10/28/2021 | JNP | NL | Continue to prepare for hearing on motion to dismiss. | | 2.00 | 1295.00 | $2,590.00 |
| JAM Bill | 10/28/2021 | | NL | 6.70 | 6.70 | 1,245.00 | | 8,341.50 |
| | 10/28/2021 | JAM | NL | Amend six deposition notices (0.3); e-mail to counsel re: Dondero deposition (0.1); tel c. w/ J. Seery re: notes litigation (0.5); communications w/ L. Canty, P. Jeffries re: Dondero deposition and exhibits (0.6); tel c. w/ H. Winograd re: notes litigation (0.8); prepare for Dondero deposition (4.1); tel c. w/ G. Demo re: notes litigation (0.2); tel c. w/ D. Rukavina, H. Winograd re: witnesses (0.1). | | 6.70 | 1245.00 | $8,341.50 |
| GVD Bill | 10/28/2021 | | NL | 0.20 | 0.20 | 950.00 | | 190.00 |
| | 10/28/2021 | GVD | NL | Conference with J. Morris re potential expert discovery issues | | 0.20 | 950.00 | $190.00 |
| GVD Bill | 10/28/2021 | | NL | 0.20 | 0.20 | 950.00 | | 190.00 |
| | 10/28/2021 | GVD | NL | Conference with J. Morris re deposition issues re notes litigation | | 0.20 | 950.00 | $190.00 |
| HRW Bill | 10/28/2021 | | NL | 0.80 | 0.80 | 695.00 | | 556.00 |
| | 10/28/2021 | HRW | NL | Call with J. Morris re: notes litigations (0.8). | | 0.80 | 695.00 | $556.00 |
| HRW Bill | 10/28/2021 | | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| | 10/28/2021 | HRW | NL | Review email from counsel re: extension for expert reports in notes litigation (0.1). | | 0.10 | 695.00 | $69.50 |
| HRW Bill | 10/28/2021 | | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| | 10/28/2021 | HRW | NL | Send counsel supplemental production for notes litigations and related tasks (0.2). | | 0.20 | 695.00 | $139.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00003

Page:   116
Prebill#287690
November 05, 2021

| | | | | Hours | | Rate | Amount |
|---|---|---|---|---|---|---|---|
| HRW Bill | 10/28/2021 | | NL | 7.00 | 7.00 | 695.00 | 4,865.00 |
| 10/28/2021 | HRW | NL | Research re: summary judgment in notes litigation (7.0). | 7.00 | | 695.00 | $4,865.00 |
| HRW Bill | 10/28/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/28/2021 | HRW | NL | Review and finalize errata for opposition briefs to MTD in notes litigation (0.2). | 0.20 | | 695.00 | $139.00 |
| HRW Bill | 10/28/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/28/2021 | HRW | NL | Review and edit amended deposition notices in notes litigation (0.2). | 0.20 | | 695.00 | $139.00 |
| HRW Bill | 10/28/2021 | | NL | 0.10 | 0.10 | 695.00 | 69.50 |
| 10/28/2021 | HRW | NL | Email local counsel re: amended deposition notices in notes litigation (0.1). | 0.10 | | 695.00 | $69.50 |
| JNP Bill | 10/29/2021 | | NL | 2.50 | 2.50 | 1,295.00 | 3,237.50 |
| 10/29/2021 | JNP | NL | Continue preparing for hearing on motion to dismiss. | 2.50 | | 1295.00 | $3,237.50 |
| JNP Bill | 10/29/2021 | | NL | 0.20 | 0.20 | 1,295.00 | 259.00 |
| 10/29/2021 | JNP | NL | Conference with Jordan A. Kroop regarding overlap between motion to dismiss and motion to enforce in notes litigation. | 0.20 | | 1295.00 | $259.00 |
| JNP Bill | 10/29/2021 | | NL | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 10/29/2021 | JNP | NL | Review of NexPoint motion to extend time to designate experts. | 0.10 | | 1295.00 | $129.50 |
| JMF Bill | 10/29/2021 | | NL | 0.30 | 0.30 | 1,050.00 | 315.00 |
| 10/29/2021 | JMF | NL | Review motions to extend expert discovery deadlines. | 0.30 | | 1050.00 | $315.00 |
| JAM | 10/29/2021 | | NL | 11.90 | 11.90 | 1,245.00 | 14,815.50 |

HIGHLY CONFIDENTIAL

D-CNL003862

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00003

Page:   117
Prebill#287690
November 05, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| Bill | | | | | | | |
| 10/29/2021 | JAM | NL | Prepare for Dondero deposition (4.2); Dondero deposition (including multiple calls with G. Demo, H. Winograd during breaks) (7.0); tel c. w/ G. Demo, H. Winograd re: post-deposition follow-up (0.5); tel c. w/ J. Seery re: Dondero deposition (0.2). | | 11.90 | 1245.00 | $14,815.50 |
| GVD Bill | 10/29/2021 | | NL | 2.80 | 2.80 | 950.00 | 2,660.00 |
| 10/29/2021 | GVD | NL | Attend deposition of J. Dondero (partial) | | 2.80 | 950.00 | $2,660.00 |
| GVD Bill | 10/29/2021 | | NL | 0.40 | 0.40 | 950.00 | 380.00 |
| 10/29/2021 | GVD | NL | Review emails re correspondence re prepayment allocation | | 0.40 | 950.00 | $380.00 |
| GVD Bill | 10/29/2021 | | NL | 1.00 | 1.00 | 950.00 | 950.00 |
| 10/29/2021 | GVD | NL | Multiple conferences with J. Morris and H. Winograd re status of Dondero deposition | | 1.00 | 950.00 | $950.00 |
| HRW Bill | 10/29/2021 | | NL | 5.00 | 5.00 | 695.00 | 3,475.00 |
| 10/29/2021 | HRW | NL | Dondero deposition for consolidated notes litigation (5.0). | | 5.00 | 695.00 | $3,475.00 |
| HRW Bill | 10/29/2021 | | NL | 1.00 | 1.00 | 695.00 | 695.00 |
| 10/29/2021 | HRW | NL | Research for summary judgment in consolidated notes litigation (1.0). | | 1.00 | 695.00 | $695.00 |
| HRW Bill | 10/29/2021 | | NL | 0.50 | 0.50 | 695.00 | 347.50 |
| 10/29/2021 | HRW | NL | Draft and review DC Sauter deposition subpoena and related documents (0.5). | | 0.50 | 695.00 | $347.50 |
| HRW Bill | 10/29/2021 | | NL | 0.20 | 0.20 | 695.00 | 139.00 |
| 10/29/2021 | HRW | NL | Email with local counsel re: DC Sauter deposition subpoena (0.2). | | 0.20 | 695.00 | $139.00 |

HIGHLY CONFIDENTIAL

D-CNL003863

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00003

Page: 118
Prebill#287690
November 05, 2021

| | | | | Hours | | Rate | Amount |
|---|---|---|---|---|---|---|---|
| HRW Bill | 10/29/2021 | NL | 0.60 | 0.60 | 695.00 | | 417.00 |
| 10/29/2021 | HRW | NL | Calls with J. Morris and G. Demo re: Dondero deposition (0.6). | 0.60 | 695.00 | | $417.00 |
| HRW Bill | 10/29/2021 | NL | 0.20 | 0.20 | 695.00 | | 139.00 |
| 10/29/2021 | HRW | NL | Review Waterhouse deposition transcript (0.2). | 0.20 | 695.00 | | $139.00 |
| HRW Bill | 10/29/2021 | NL | 0.30 | 0.30 | 695.00 | | 208.50 |
| 10/29/2021 | HRW | NL | Review NexPoint motion to extend discovery deadlines (0.3). | 0.30 | 695.00 | | $208.50 |
| HRW Bill | 10/29/2021 | NL | 0.10 | 0.10 | 695.00 | | 69.50 |
| 10/29/2021 | HRW | NL | Email HCMFA counsel re: deposition subpoena (0.1). | 0.10 | 695.00 | | $69.50 |
| JAM Bill | 10/30/2021 | NL | 4.30 | 4.30 | 1,245.00 | | 5,353.50 |
| 10/30/2021 | JAM | NL | Review documents and prepared for Alan Johnson (expert) deposition (4.3). | 4.30 | 1245.00 | | $5,353.50 |
| JAM Bill | 10/31/2021 | NL | 5.00 | 5.00 | 1,245.00 | | 6,225.00 |
| 10/31/2021 | JAM | NL | Prepare for Johnson deposition and for summary judgment (4.8); tel c. w/ J. Seery re: notes litigation (0.2). | 5.00 | 1245.00 | | $6,225.00 |
| HRW Bill | 10/31/2021 | NL | 2.20 | 2.20 | 695.00 | | 1,529.00 |
| 10/31/2021 | HRW | NL | Research and related tasks for response to NexPoint's motion to extend discovery deadlines (2.2). | 2.20 | 695.00 | | $1,529.00 |
| HRW Bill | 10/31/2021 | NL | 0.80 | 0.80 | 695.00 | | 556.00 |
| 10/31/2021 | HRW | NL | Review productions in notes litigations (0.8). | 0.80 | 695.00 | | $556.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00003

Page:   119
Prebill#287690
November 05, 2021

| | | | | Hours | | | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| GVD Bill | 11/01/2021 | | NL | 0.10 | 0.10 | 950.00 | | 95.00 |
| 11/01/2021 | GVD | NL | Correspondence with J. Morris re filing of HCMFA adversary | | 0.10 | | 950.00 | $95.00 |
| GVD Bill | 11/01/2021 | | NL | 0.60 | 0.60 | 950.00 | | 570.00 |
| 11/01/2021 | GVD | NL | Conference with Quinn re status of notes litigation | | 0.60 | | 950.00 | $570.00 |
| JAK Bill | 11/01/2021 | | NL | 1.00 | 1.00 | 1,100.00 | | 1,100.00 |
| 11/01/2021 | JAK | NL | Strategy emails regarding reply to objection to motion to dismiss among Jeff Pomerantz, John Morris, and local co-counsel (0.5); review outline of argument for objection to motion to dismiss from Jeff Pomerantz (0.5); | | 1.00 | | 1100.00 | $1,100.00 |
| JAK Bill | 11/01/2021 | | NL | 0.90 | 0.90 | 1,100.00 | | 990.00 |
| 11/01/2021 | JAK | NL | Begin outlining argument for hearing on objection to motion for arbitration. | | 0.90 | | 1100.00 | $990.00 |
| GVD Bill | 11/02/2021 | | NL | 0.30 | 0.30 | 950.00 | | 285.00 |
| 11/02/2021 | GVD | NL | Conference with J. Morris re strategy for notes litigation | | 0.30 | | 950.00 | $285.00 |
| GVD Bill | 11/03/2021 | | NL | 1.20 | 1.20 | 950.00 | | 1,140.00 |
| 11/03/2021 | GVD | NL | Review draft arguments on motion to dismiss and motion to compel arbitration | | 1.20 | | 950.00 | $1,140.00 |
| GVD Bill | 11/03/2021 | | NL | 0.50 | 0.50 | 950.00 | | 475.00 |
| 11/03/2021 | GVD | NL | Initial conference with PSZJ team re preparation for oral argument (0.3); Attend follow up conference re preparation for oral argument (partial) (0.2) | | 0.50 | | 950.00 | $475.00 |
| GVD Bill | 11/04/2021 | | NL | 0.40 | 0.40 | 950.00 | | 380.00 |
| 11/04/2021 | GVD | NL | Conference with J. Morris re preparation for Dondero deposition | | 0.40 | | 950.00 | $380.00 |

HIGHLY CONFIDENTIAL

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00003

Page:   120
Prebill#287690
November 05, 2021

| | | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| GVD Bill | 11/04/2021 | | NL | | 0.20 | 0.20 | 950.00 | 190.00 |
| 11/04/2021 | GVD | NL | Conference with J. Pomerantz and J. Morris re status of Dondero deposition | | | 0.20 | 950.00 | $190.00 |
| | | | | | | 377.30 | | $361,824.00 |

# EXHIBIT 181

Appx. 02946

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF DENNIS C. SAUTER, JR.

I, Dennis C. Sauter, Jr., hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.     My name is Dennis C. Sauter, Jr.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration, or such facts are known to me from my review of the books and records of Highland Capital Management Fund Advisors, L.P. ("HCMFA").

2.     I am an attorney licensed to practice law in the State of Texas and have been such since 2001.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 1

EXHIBIT "A"

3.      While I provided limited legal services to Highland Capital Management, L.P. (the "Debtor") and its affiliated entities as outside counsel before I became in-house counsel, those services were limited to real estate transactions having nothing to do with the facts discussed in this Declaration.

4.      HCMFA is a registered advisor under the Investment Advisors Act of 1940.  CITE. As such, HCMFA advises various independent funds, which, in turn, are investment vehicles for a large number of investors.

5.      HCMFA has always had very few employees.  During 2019, for example, HCMFA had only 7 to 9 employees.

6.      Instead, most of the services needed by HCMFA to transact its business were provided by the Debtor pursuant to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "Shared Services Agreement"), a true and correct copy of which is attached hereto as Exhibit 1.

7.      This was standard business practices for the Debtor and various other affiliated companies, including other advisers within the Debtor's and its affiliates "complex" of businesses: the Debtor would employ most of the employees and then share those employees with HCMFA and other "complex" entities in exchange for payments by HCMFA and such other entities.

8.      Thus, under the Shared Services Agreement, employees of the Debtor (many of whom were highly trained and specialized) provided many of the key services to HCMFA on an as-needed basis.  These services included legal, accounting, regulatory, compliance, IT, and tax services, among others.  Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored on the Debtor's server.

9.      These facts are very important to the issues I will discuss below.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 2

10.     On January 22, 2021, the Debtor filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint") against HCMFA, thereby initiating this Adversary Proceeding.

11.     The Complaint concerns two promissory notes each dated May 2, 2019 (the "Notes") that the Debtor seeks a judgment against HCMFA for: (i) a note for $5 million; and (ii) a note for $2.4 million.

12.     On March 1, 2021, HCMFA filed its *Defendant's Original Answer* (the "Answer").

13.     At the time that the Debtor filed the Complaint, I promptly undertook an internal review of the background facts concerning the Notes.  I had no knowledge of them since I had not been employed by HCMFA, and the few employees of HCMFA had no knowledge of the Notes.  I also discussed the Notes with James Dondero, formerly the CEO of the Debtor, and Mr. Dondero could not recall the genesis of the Notes.  My review of the limited books and records of HCMFA that were not in the possession of the Debtor did not reveal any background facts regarding the Notes or the existence of the Notes.

14.     Normally, I would have discussed the Notes with employees of the Debtor who also provided services to HCMFA pursuant to the Shared Services Agreement in order to assess what defenses or affirmative defenses to the Complaint existed.  However, in this instance I was precluded from doing so.

15.     First, attached hereto as Exhibit 2 is a true and correct copy of an e-mail exchange between me and Mr. James Seery dated September 17, 2020.  Mr. Seery was and remains the Chief Executive Officer of the Debtor.  As stated in Exhibit 2, Mr. Seery was informing me that Debtor employees had been instructed not to discuss with me anything that is "inimical" to the interests of the Debtor, and that they would be terminated if they did so.  This e-mail communication comports with other communications between myself and Mr. Seery and/or Debtor's counsel,

where I was cautioned not to discuss with Debtor employees matters that may be adverse to the Debtor.

16.    Second, by the time of the filing of the Complaint, the Court had entered a preliminary injunction against Mr. Dondero, a true and correct copy of which is attached hereto as Exhibit 3. That injunction prohibited Mr. Dondero from "directly or indirectly . . . communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided." As the information concerning the Notes was background information and not related to "services currently provided," I was concerned that, if I discussed the Notes with the Debtor's employees, the Debtor would argue that either Mr. Dondero or I violated the Court's injunction.

17.    In sum, after the Complaint was filed, no one at HCMFA knew anything about the Notes, and I was precluded from contacting the people that would have known something about the notes, *i.e.* the Debtor's employees, to discuss what they may have known. I also had very limited access to HCMFA books and records and, even if I had had full access, I would not have known what relevant books and records to search for in the many millions of files without first obtaining a generalized background of the facts regarding the Notes from Debtor employees.

18.    I then worked with outside counsel at Munsch Hardt Kopf & Harr, P.C. to review the Complaint and prepare and file the Answer. That original Answer did not contain any affirmative defenses because, as explained above, no one at HCMFA knew of any facts that might give rise to an affirmative defense.

19.    The situation changed by mid-April, 2021. As of late February, 2021, the Debtor terminated the Shared Services Agreement and terminated most of its former employees. Many of those employees then formed their own company, Skyview Group, which then contracted with HCMFA (and others) to continue providing essentially the same services that they had previously provided under the Shared Services Agreement. Additionally, the Debtor provided access to

DECLARATION OF DENNIS C. SAUTER, JR.—Page 4

HCMFA of much of its books and records (although not all). Thus, as of March, 2021, I was able to communicate with most former Debtor employees and to access the books and records of HCMFA without fear of violating any court order.

20.    March, 2021, was exceedingly busy, to say the least. With the termination of the Shared Services Agreement, HCMFA, other entities that I am general counsel to, and I were preoccupied with transitioning the services that the Debtor had been providing for more than a decade to a new entity, using new infrastructure, new offices, new networks, etc., all for the primary goal of ensuring a smooth and uninterrupted continuity of business and services provided by HCMFA and others to third parties.

21.    By mid-April, 2021, the situation had calmed down to the point that I was able to discuss the Notes with former employees, most importantly Frank Waterhouse ("Waterhouse") and Will Mabry ("Mabry"). Mabry in particular was able to provide me internal documents and memorandums that I had not previously known about or had access to that helped with the factual background of the Notes.

22.    From these discussions and documents, I have been able to understand the factual background concerning the Notes, ultimately concluding that the Notes were signed by mistake by Waterhouse without authority from HCMFA and have no consideration and were never intended to be debt instruments of HCMFA.

23.    My investigation has revealed the following.

24.    One of the funds that HCMFA advises is Highland Global Allocation Fund ("GAF"). In March, 2018, GAF sold equity interests it held in TerreStar. As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of GAF assets. HCMFA was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement and in accordance with applicable compliance and operating procedures, the Debtor

was responsible to HCMFA to calculate the NAV, and the Debtor had several employees charged with these and similar calculations as part of the Debtor's routine business services and as part of what the Debtor regularly provided to HCMFA and affiliated companies.

25.     The Debtor made a mistake in calculating the NAV (the "NAV Error"). The NAV Error was discovered in early 2019 as GAF was being converted from an open-ended fund to a closed-ended fund. The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Debtor, HCMFA, and GAF worked with the SEC to correct the error and to compensate GAF and the various investors in GAF harmed by the NAV Error.

26.     Ultimately, and working with the SEC, the Debtor determined that the losses from the NAV Error to GAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of GAF.

27.     HCMFA accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. I am not sure of the flow of funds, whether the funds flowed through HCMFA or were paid by the Debtor on behalf of HCMFA, and discovery will likely clear that up. Either way, however, the payments were of HCMFA funds and on behalf of HCMFA.

28.     In turn, the Debtor accepted responsibility to HCMFA for having caused the NAV Error, and the Debtor ultimately, whether through insurance or its own funds, compensated HCMFA for the above payments.

29.     Returning to the Notes, Waterhouse was the Chief Financial Officer of both the Debtor and HCMFA during the above events and at the time he signed the Notes.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 6

30.    It appears clear that Waterhouse made a mistake in preparing and signing the Notes. First, , the Notes correspond very closely to the ultimate $5,186,496 and $2,398,842 payments. Second, it appears that Waterhouse assumed, incorrectly, that the funds being paid by the Debtor were a loan to HCMFA, instead of payments as compensation and restitution to HCMFA for the Debtor having caused the NAV Error.  Third, it therefore appears that Waterhouse prepared the Notes for some internal accounting or other purpose, but without there being actual consideration for the Notes and without any intention on the part of the Debtor and HCMFA that there be Notes or that there be a loan transaction.

31.    I also note that, as of May, 2019, HCMFA had executed other demand notes payable to the Debtor. On April 15, 2019, the Debtor executed that certain *Acknowledgement from HCMLP*, a true and correct copy of which is attached hereto as Exhibit 4.  By the same, the Debtor agreed not to demand payment of these notes prior to May 31, 2021, because HCMFA believed that it would not be able to repay those notes prior to that time.  It is illogical that, in light of the same, the Debtor would shortly thereafter lend an additional $7.4 million to HCMFA.  Rather, as my investigation has shown, the Debtor did not lend the funds to HCMFA but instead paid the funds, directly or indirectly, to compensate HCMFA for the NAV Error, which was the Debtor's error and therefore its obligation to correct and compensate for.

32.    Therefore, in light of having learned of these facts in mid to late-April, 2019, HCMFA now believes that it has affirmative defenses to the Notes in the nature of mutual mistake, void for lack of consideration, and no proper authority of Waterhouse to sign the Notes.

33.    Neither I, nor HCMFA, nor any of HCMFA's agents, have been less than diligent in investigating the Notes and the Complaint.

34.    HCMFA respectfully requests that it be granted leave to assert these affirmative defenses in the Adversary Proceeding.

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 7

Signed: May ___21___, 2021

DENNIS C. SAUTER, JR.

**SECOND AMENDED AND RESTATED**
**SHARED SERVICES AGREEMENT**

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "***Agreement***") is entered into to be effective as of 8th day of February, 2013 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("***HCMFA***"), and any affiliate of HCMFA that becomes a party hereto. Each of the signatories hereto is individually a "***Party***" and collectively the "***Parties***".

RECITALS

A.    During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

ARTICLE I
DEFINITIONS

"***Actual Cost***" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocation Percentage***" has the meaning set forth in Section 4.01.

"***Applicable Margin***" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Quarterly Report*" has the meaning set forth in Section 5.01.

"*Recipient*" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.02.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 7.01.

Appx. 02956

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "*Shared Services*"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "*Change*").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "*Change Request*") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "*New Shared Service*").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "*Shared Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

Appx. 02957

ARTICLE III
SHARED ASSETS

Section 3.01   <u>Shared IP Rights</u>.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "***Shared IP Rights***") pursuant to third party intellectual property Agreements ("***Third Party IP Agreements***"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02   <u>Other Shared Assets</u>.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "***Future Shared Assets***" and collectively with the Shared IP Rights, the "***Shared Assets***").

ARTICLE IV
COST ALLOCATION

Section 4.01   <u>Actual Cost Allocation Formula</u>.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "***Allocation Percentage***" means:

(a)   To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)   To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)   All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02   <u>Non-Cash Cost Allocation</u>.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01   <u>Quarterly Statements</u>.  Within thirty (30) days following the end of each calendar quarter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "***Quarterly Report***").

Section 5.02    Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

5

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c) The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

ARTICLE VI
SERVICE PROVIDER RESPONSIBILITIES

Section 6.01 <u>Service Provider General Obligations</u>. Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "***Service Standards***"). Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 6.02 <u>Books and Records; Access to Information</u>. Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures. Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder. This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider). Service Provider will promptly respond to any reasonable requests for information or access. For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times. Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 6.03 <u>Return of Property and Equipment</u>. Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

ARTICLE VII
TERM AND TERMINATION

Section 7.01 <u>Term</u>. The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 9.02. The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

Section 7.02     <u>Termination</u>.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII<br>LIMITED WARRANTY

Section 8.01     <u>Limited Warranty</u>.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX<br>MISCELLANEOUS

Section 9.01     <u>No Partnership or Joint Venture; Independent Contractor</u>.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02     <u>Amendments; Waivers</u>.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03     <u>Schedules and Exhibits; Integration</u>.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04     <u>Further Assurances</u>.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

7

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147
>
> If to HCMFA, addressed to:
>
> Highland Capital Management Fund Advisors, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147

Section 9.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Appx. 02962

Section 9.12   Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13   Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14   Arbitration; Jurisdiction.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15   General Rules of Construction.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein,""hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:    President


HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.

By:    Strand Advisors XVI, Inc., its general partner

By: _____
Name:  Brian Mitts
Title:    Assistant Secretary

11

**Annex A**

**Shared Services**

Compliance
> General compliance
> Compliance systems

Facilities
> Equipment
> General Overhead
> Office Supplies
> Rent & Parking

Finance & Accounting
> Book keeping
> Cash management
> Cash forecasting
> Credit facility reporting
> Financial reporting
> Accounts payable
> Accounts receivable
> Expense reimbursement
> Vendor management

HR
> Drinks/snacks
> Lunches
> Recruiting

IT
> General support & maintenance (OMS, development, support)
> Telecom (cell, phones, broadband)
> WSO

Legal
> Corporate secretarial services
> Document review and preparation
> Litigation support
> Management of outside counsel

Marketing and PR
> Public relations

Tax
> Tax audit support
> Tax planning
> Tax prep and filing

Investments
> Investment research on an ad hoc basis as requested by HCMFA

|          | Valuation Committee |
|----------|---------------------|
| Trading  |                     |
|          | Trading desk services |
| Operations |                   |
|          | Trade settlement    |

Appx. 02967

**Rukavina, Davor**

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Thursday, September 17, 2020 4:17 PM |
| **To:** | DC Sauter |
| **Cc:** | Gregory V. Demo |
| **Subject:** | Re: Acis Settlement |

DC

I believe your concerns regarding the release are misplaced as it does not bind entities that HCMLP does not control.  Greg can walk you through the language, but I do not believe it requires adjustment nor does it create any liability.  To the contrary, it reduces liability.

With regard to the HCMLP employee prohibitions, no employee whether legal or non-legal can work on any matter that is inimical to the interests of HCMLP.  I ,as CEO, and the Independent Board will make the determination as to whether an action violates the prohibition, and a breach of the prohibition will lead to termination for cause.  I believe that most of the employees have been informed of this requirement and are following the directive.

With regard to transactional matters, HCMLP employees will continue to work with you on those issues that do not run afoul of the prohibition above.  If there is a particular matter where you are taking a potentially adversarial action vis a vis HCMLP, please let me know what it is.  We can then consider whether a customized operating protocol for that issue is needed or whether you will simply be on your own.  I will make the determination with the advice of counsel.  We do not believe the Texas rules of professional responsibility apply in this situation.

Please let me know what matter you are considering with respect to the immediately preceding paragraph, and we will consider how to best address your concerns.

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Date:** Thursday, September 17, 2020 at 4:56 PM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** Greg Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

Jim/Greg, follow up on my email below.  I have a few items that have been placed on my plate, and I really need to understand who I can speak with and the extent to which they are permitted to share information with me.




EXHIBIT 2

**Appx. 02968**

O: 972.628.4117  |  C: 469.877.6440

---

**From:** DC Sauter
**Sent:** Tuesday, September 15, 2020 8:55 AM
**To:** 'James Seery' <jpseeryjr@gmail.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

My apologies for copying Isaac.  I was under the mistaken impression that he would have assisted in the settlement.

In my view, the requested clarification is beneficial to Strand, HCMLP, and the other "HCMLP Entities."  The documents purport to release ACIS from claims on behalf of, among others, any entity that is "managed" by HCMLP and "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns" of any "HCMLP Entity."  Those "HCMLP Entities" lack the authority to bind a whole host of parties in that laundry list, which could result in claims against HCMLP, Strand, and the other "HCMLP Entities" by both the "ACIS Released Parties," who will claim they didn't receive the benefit of the bargain, and the parties on whose behalf the "HCMLP Parties" purported to release claims who didn't consent to the release.

Additionally, I'd like to visit with you all regarding the board's position that prohibits certain HCMLP personnel from working on certain matters.

First, I am unclear whether the prohibition applies to only HCMLP legal personnel or whether it applies to all HCMLP employees.  Please clarify.

Second, as you may know, virtually all of these matters are falling into my lap, and in most cases I lack any knowledge about them.  It would help me tremendously if current HCMLP employees, and particularly the legal personnel, could provide me with transactional background to assist in the transition of the matter.  While I understand the board's concern with Judge Jernigan's order, I don't believe that the Texas Disciplinary Rules of Professional Conduct mandate or even permit an attorney licensed in the State of Texas to refuse to cooperate with a former client in the transfer of a matter to a new attorney.  Rule 1.15(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned."  The comments to that rule provide additional clarity:  "In every instance of withdrawal and even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client."  T.D.R.P.C. Rule 1.15, comment 9.  Proper steps may include providing information to new counsel or even continuing to represent the client for a limited time to meet impending deadlines. *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550 *23-24 fn. 11 (E.D. Tex. Dec. 13, 2007).  Even if the board insists that the HCMLP legal personnel cannot continue to represent others in non-HCMLP matters or matters adverse to HCMLP (irrespective of any conflict of interest analysis of whether those attorneys may continue to represent HCMLP in those matters), the ethical rules require that the attorneys provide assistance in transferring those matters to me or others.

Finally, I routinely handle, and am routinely asked to handle, legal matters that relate to real estate for entities owned or controlled by HCMLP (Park West, the Arizona assets, the Maple Ave. property, to name a few).  I am not an HCMLP employee, and it's my understanding that NexPoint Advisors, L.P. is not compensated for the time I spend on HCMLP matters.  I'm not suggesting that this arrangement should change, but it feels from my perspective that the board's position is only working in one direction.  In other words, if I understand the board's position correctly, I can work on both NexPoint and HCMLP matters, but the HCMLP legal employees may only work on HCMLP-related matters.  It has also put a significant amount of additional work on my plate.  I would like to understand two things.  First, what is the scope of my authority in these matters, and what is the proper protocol vis-à-vis you, DSI, and the board?  I have tried to take the conservative approach in keeping you all informed and asking for consent or approval where I thoughts it

2

appropriate.  I assume this is how you'd like to continue to handle things, but I would like confirmation of that.  Second, I have heard that you all were working to transfer a couple of the legal personnel (perhaps Thedford and Post) to HCMFA so they could assist with the work load (particularly in the areas where I don't have a significant amount of experience).  I'd like to know where that stands and when relief can be expected.

I'm available most of today and tomorrow to discuss.


**D.C. Sauter**

# NEXPOINT

O: 972.628.4117  |  C: 469.877.6440

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:01 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Acis Settlement

DC.  We will discuss and revert to you.  Neither Isaac nor anyone else at HCMLP is permitted to work on any issues related to the settlement and release other than as directed by me.

Thanks

Sent from my iPad


> On Sep 14, 2020, at 7:08 PM, DC Sauter <DSauter@nexpointadvisors.com> wrote:


Greg,

I've been asked to review the attached release on behalf of HCMFA and the closed-end funds.  I'm concerned that the language below creates an ambiguity as to whether the closed-end funds and HCMFA have released claims against the ACIS parties:

1.    The release by Strand, which also serves as the general partner of HCMFA; and
2.    The release by each "HCMLP Entity" of its "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns."

We would like the final sentence in paragraph 1.a. of the Release to be revised to specifically identify HCMFA and the closed-end funds as parties not covered by the release.  Please let me know if you'd like to discuss in more detail.


**D.C. Sauter | General Counsel, Real Estate**

<image001.jpg>

300 Crescent Court  |  Suite 700  |  Dallas, Texas 75201
O: 972.628.4117  |  C: 469.877.6440  |  F: 972.628.4147
dsauter@nexpointadvisors.com    |    www.NexPointGroup.com

**Appx. 02970**

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

<Acis - Release (EXECUTION VERSION).pdf>

Appx. 02971



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed January 11, 2021

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | No. 20-03190-sgj |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
### AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210111

EXHIBIT 3

Appx. 02972

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

2

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

3

Appx. 02974

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.     James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.     James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.     James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.     James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.     This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

8.      All objections to the Motion are overruled in their entirety.

9.      The Court shall retain exclusive jurisdiction with respect to all matters arising

from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

DOCS_NY:41944.3 36027/002

Appx. 02976

**Acknowledgement from HCMLP**

April 15, 2019

    Reference is hereby made to certain outstanding amounts loaned from HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCMLP") to HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("HCMF") for funding of HCMF's ongoing operations, which are payable on demand and remained outstanding on December 31, 2018 and as of the date hereof.

    HCMF expects that it may be unable to repay such amounts should they become due, for the period commencing today and continuing through May 31, 2021.

    HCMLP hereby agrees to not demand payment on amounts owed by HCMF prior to May 31, 2021.

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

By: _____

**Acknowledged By:**

Highland Capital Management Fund Advisors, L.P.
By: Strand XVI, Inc., its general partner

By: _____

EXHIBIT 4

# EXHIBIT 182

Appx. 02978



DATE:      May 28, 2019

TO:        The Board of Trustees (the "Board") of Highland Global Allocation Fund (the "Fund")

FROM:      Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the "Adviser")

RE:        Resolution of the Fund's Net Asset Value ("NAV") Error

This memorandum summarizes the final resolution of the Fund's NAV error related to its TerreStar Corporation ("TerreStar") equity holding. In connection with the Fund's conversion from an open-end fund to a closed-end fund (the "Conversion") on February 13, 2019, the Office of the Chief Accountant ("OCA") of the SEC reviewed the Adviser's fair valuation of TerreStar equity, in particular the application of Financial Accounting Standards Board Accounting Standards Update 2011-4, Topic 820, Fair Value Measurement ("ASC 820") to two transactions in TerreStar equity that occurred in March 2018 (the "March Transactions"). The OCA provided its feedback during an exit call on February 8, 2019 and subsequently confirmed no comments to the Adviser's confirmation of understanding letter on February 14, 2019.

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value. As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly." The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value. The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

After incorporation of the updated valuation into the Fund's NAV, the gross NAV Error, excluding interest, the advisory fee rebate, and processing costs, amounted to approximately $6.1 million of loss to the Fund and approximately $1.4 million of losses to Shareholders (a total loss of approximately $7.5 million) over the period between March 18, 2018 and January 19, 2019 (the "NAV Restatement Period").

The Fund was made whole through a $5,186,496 payment on February 15, 2019, and a $2,398,842 payment on May 2, 2019. A detailed breakdown of the NAV Error and the make whole payments is set forth below. Shareholder reprocessing and reimbursement are in progress with the Fund's prior transfer agent, DST Systems, Inc. (as transfer agent to the open-end fund), and given detailed omnibus account information has not yet been obtained the estimated make whole payments are subject to change. A representative of the Adviser will provide the Board with an update on the process during the May 28, 2019 Board meeting.

<u>NAV Error Breakdown and Make Whole Payments</u>

| | Transaction Date(s) | Loss to Fund | Estimated Loss to Shareholders[3] | Totals |
|---|---|---|---|---|
| Estimated Net Loss | 3/14/18 thru 1/7/19 | (6,068,851) | (1,373,272) | (7,442,123) |
| Processing, Fees, Interest | 3/14/18 thru 1/7/19 | (375,000) | - | (375,000) |
| Insurance Proceeds | 2/15/2019 | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance deductible paid by Adviser | 2/15/2019 | 246,976 | - | 246,976 |
| Management fee offset | 4/1/2019 | 47,000 | - | 47,000 |
| Additional payment from Adviser | 5/2/2019 | 2,339,627[2] | - | 2,339,627 |
| Reimbursement of Processing costs from Adviser | - [1] | 244,000 | - | 244,000 |
| Total | | - | - | - |

**<u>Supplemental Numerical Update</u>**

| | | | | |
|---|---|---|---|---|
| Additional estimated loss to fund and shareholders | 1/8/19 thru 1/28/19 [5] | (19,789) | | |
| Additional processing, management fees, and interest | Note 4 | (39,426) | | |
| Additional payment from Adviser | 5/2/2019 | 59,215 | | |

| | | | | |
|---|---|---|---|---|
| **Total additional payment from Adviser [6]** | **5/2/2019** | **2,398,842** | | |

**Notes**

1 - Expected to be incurred thru 12/31/19, and will be reimbursed by Adviser as incurred. To date no invoices have been billed or paid, but upon receipt of a future invoice, the Adviser will promptly pay.

2 - Includes $2,255,628 of previously outstanding balance, and $84,000 of interest calculated through 1/7/19, which was the "as of date" used for the calculations in the OCA submission.

3 - Represents the estimated losses to fund and shareholder subscribing into the fund during the NAV Restatement Period and estimated losses to be determined after reprocessing individual capital activity that was held in Omnibus accounts.

4 - Proposal from service provider was higher than original estimate, and includes interest thru date of final payment made by Adviser.

5 - This includes the calculations subsequent to 1/7/19 (which was the "as of date" used for the calculations in the OCA submission) "through date" 1/28/19, which the final date in which the revised mark was fully reflected in the NAV.

6 - Includes $2,339,627 and $59,215 of Additional payments from Adviser

**Appx. 02980**

EXHIBIT 183

# INTENTIONALLY

# OMITTED

# EXHIBIT 184

Appx. 02982

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003 |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT JAMES DONDERO'S RULE 26 INITIAL DISCLOSURES

TO:   Plaintiff Highland Capital Management, L.P., by and through its attorneys of record, John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067.


Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, made applicable to this

proceeding through Rule 7026 of the Federal Rules of Bankruptcy Procedure, Defendant James

**Appx. 02983**

Dondero ("Dondero" or "Defendant") makes the following initial disclosures to Plaintiff Highland

Capital Management, L.P. ("Plaintiff" or "Debtor").[1]

1. **The names, and, if known, the addresses, and telephone numbers of individuals likely to have discoverable information, along with the subjects of that information are listed below. Defendant reserves the right to amend and/or supplement these disclosures.**

**ANSWER:**

**James D. Dondero**
c/o D. Michael Lynn
Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
*Attorneys for Defendant*

Dondero may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the terms of the promissory notes, the drafting and execution of the notes, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the purpose and intent of the notes, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

**Highland Capital Management, L.P. and certain of its current employees**
c/o John Morris
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
*Attorneys for Plaintiff*

Debtor and certain of its current employees, including potentially Thomas Surgent, David Klos, and Kristen Hendrix, may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and Dondero's defenses to the allegations in the complaint, including the circumstances surrounding the execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions

---

[1] Defendant makes these disclosures subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and the Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. Defendant does not waive, but instead hereby preserves, his right to a jury trial and all rights and requests for relief asserted in the motions. Defendant does not consent to the Bankruptcy Court determining this proceeding or entering final orders or judgments in this proceeding. Instead, Defendant requests that the reference be withdrawn and that the District Court adjudicate this proceeding.

subsequent, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

**Brian Collins, former employee of the Debtor**
Tel: 213-550-4538

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Amy Theriot, former employee of the Debtor**
Tel: 214-893-5352

As a former employee, she may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Mark Okada, former employee of the Debtor**
Tel: 975-989-1000

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Scott Ellington, former employee of the Debtor**
c/o Frances Smith
Ross & Smith PC
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution

of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Frank Waterhouse, former employee of the Debtor**
c/o Frances Smith
Ross & Smith PC
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

As a former employee, he may have knowledge regarding the promissory notes, the circumstances surrounding the execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**John Honis, employee of Rand Advisors**
Tel: 214-335-7969

As an employee of Rand Advisors, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Jack Yang, former employee of the Debtor**
Tel: 646-387-2351

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Paul Adkins, former employee of the Debtor**
Tel: +65 9728 0599

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Pat Daugherty, former employee of the Debtor**
c/o Jason Kathman
Spencer Fane LLP
2200 Ross Avenue, Suite 4800
Dallas, TX 75201

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Tim Lawler, former employee of the Debtor**
Tel: 847-305-3013

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Appu Mundassery, former employee of the Debtor**

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Mike Hurley, former employee of the Debtor**
Tel: 775-750-8921

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Gibran Mahmud, former employee of the Debtor**
Tel: 972-740-0018

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

2.      A copy or a description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses.

**ANSWER: Defendant may have documents and communications related to the following matters in his possession, custody, or control that he may use to support his claims or defenses. The inclusion of a general category of documents below does not mean that specific documents necessarily exist or that Defendant has such documents in his possession, custody, or control.**

1.      Documents and communications related to the allegations in the complaint and Dondero's defenses to the allegations in the complaint, including, without limitation, documents related to the terms of the promissory notes, the drafting and execution of the notes, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the purpose and intent of the notes, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

2.      Documents related to Dondero's personal tax returns.

3.      Documents related to tax loan(s) made by the Debtor to Dondero and such tax amounts incurred related to federal partnership tax.

4.      Documents and/or communications related to Dondero's compensation during his employment at Highland.

5.      Any and all pleadings filed in this matter and the main bankruptcy case.


3.      A computation of each category of damages claimed by the disclosing party, who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

**ANSWER:**

Defendant is not seeking actual damages at this time.

4.      For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

---

**ANSWER:**

No such insurance agreements known.

**<u>Reservation of Rights</u>**

Defendant makes these disclosures subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. Defendant does not waive, but hereby preserves, his right to a jury trial and all additional rights and relief available as asserted in the motions.

The Defendant's investigation is ongoing, and he reserves the right to further amend, modify and/or supplement these initial disclosures as provided in Federal Rule of Civil Procedure 26(e) if warranted and to the extent additional disclosures are not mooted or made redundant by information made known during the discovery process or in writing. In addition, the Defendant makes these initial disclosures without waiving but expressly preserving: (a) his right to a jury trial; (b) his right to have this proceeding determined by the District Court; (c) his right to object to the entry of any final orders or final judgments by the Bankruptcy Court in this proceeding; (d) the right to object to any discovery requests or to the admissibility of evidence on the grounds of privilege, work product, relevance, materiality, or any other proper ground; and (e) the right to object to the use of any information provided in or derived from these initial disclosures for any purpose in this action.

Dated: April 15, 2021

Respectfully submitted,

*/s/ Bryan C. Assink*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

ATTORNEYS FOR DEFENDANT JAMES
DONDERO

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on April 15, 2021, a true and correct copy of the foregoing Rule 26 initial disclosure was served via email on counsel for the Plaintiff as listed below.

Jeff Pomerantz
Ira Kharasch
John Morris
Greg Demo
Hayley Winograd
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

*/s/ Bryan C. Assink*
Bryan C. Assink

# EXHIBIT 185

Docket #0084 Date Filed: 11/30/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03004-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Cresce...

1934054211130000000000013

### PLAINTIFF'S THIRD AMENDED NOTICE OF RULE 30(B)(6) DEPOSITION TO HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P., the plaintiff in the above-referenced adversary proceeding in the above-captioned chapter 11 case, shall take the deposition of Highland Capital Management Fund Advisors, L.P. ("HCMFA") by the person(s) most qualified to testify on HCMFA's behalf with respect to the topics described in **Exhibit A** attached hereto on **December 1, 2021, commencing at 10:00 a.m. Central Time** or at such other day and time as the Plaintiff may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

The deposition will be taken remotely via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated:  November 30, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ John A. Morris*

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## EXHIBIT A

## DEFINITIONS

1.      "<u>Amended Answer</u>" means *Defendant's Amended Answer* lodged in the above-referenced adversary proceeding at Docket No. 48.

2.      "<u>Bankruptcy Case</u>" refers to the above-referenced bankruptcy case styled as *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11.

3.      "<u>Communications</u>" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

4.      "<u>Concerning</u>" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

5.      "<u>Discovery Requests</u>" means (i) the *Debtor's First Requests for Admission Directed to Highland Capital Management Fund Advisors, L.P.*, (ii) the *Debtor's First Request for Production of Documents Directed to Highland Capital Management Fund Advisors, L.P.*, and (iii) the *Debtor's First Interrogatories Directed to Highland Capital Management Fund Advisors, L.P.*

6.      "<u>Document</u>" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or

intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

7.    "Exhibits" refers to each of the documents identified as Exhibits 28-66 on *Debtor's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 25, 2021* lodged in the above-referenced adversary proceeding at Docket No. 35.

8.    "HGAF" shall have the meaning ascribed to that term in paragraph 38 of the Amended Answer.

9.    "Highland" means Highland Capital Management, L.P.

10.    "Insurance Claim" means any claim that You filed for insurance coverage Concerning the NAV Error.

11.    "Motion to Amend" means *Defendant's Motion for Leave to Amend Answer* lodged in the above-referenced adversary proceeding at Docket No. 32.

12.    "NAV Error" means the error made in calculating the net asset value of the equity interests HGAF held in TerreStar that were sold in March 2018.

13.    "Notes" shall have the meaning ascribed to that term in paragraph 15 of the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* lodged in the above-referenced adversary proceeding at Docket No. 1.

14.    "Original Answer" means *Defendant's Original Answer* lodged in the above-referenced adversary proceeding at Docket No. 6.

15.    "Retail Board" means any board of trustees or directors of any fund to which You provide advisory services.

16.    "Sauter Declaration" means the *Declaration of Dennis C. Sauter, Jr.* lodged in the above-referenced adversary proceeding at Docket No. 32-1.

17. "<u>You</u>" or "<u>Your</u>" means Highland Capital Management Fund Advisors, L.P., and anyone authorized to act on its behalf.

## **Rule 30(b)6) Topics**

**Topic No. 1:**

Your Original Answer.

**Topic No. 2:**

Your Amended Answer

**Topic No. 3:**

Each Affirmative Defense asserted in Your Amended Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense. *See* Answer ¶¶ 38-47.

**Topic No. 4:**

The Notes, including but not limited to (a) the negotiation of the Notes, (b) the terms of the Notes, (c) Communications Concerning the Notes, (d) any payments of principal or interest made by You or on Your behalf with respect to the Notes, (e) the use of the proceeds of the Notes, (f) Your communications with Your outside auditors Concerning the Notes and the obligations thereunder, and (g) any agreements Concerning the Notes.

**Topic No. 5:**

The Exhibits.

**Topic No. 6:**

The Motion to Amend.

**Topic No. 7:**

The Sauter Declaration.

**Topic No. 8:**

3

Appx. 02997

Any Insurance Claim that You filed, including but not limited to: (a) any proceeds You received on account of any Insurance Claim; (b) any deductible paid by You in connection with any Insurance Claim; (c) the date You received any insurance proceeds on account of any Insurance Claim; (d) the use of the proceeds from any Insurance Claim; and (e) any Communications with any insurance carrier that processed any Insurance Claim.

**Topic No. 9**:

Any "consent fee" paid by You in April or May 2019, including the amount, date of payment, and source of funding for any such "consent fee."

**Topic No. 10**:

Your accounting for (a) the $2.4 million transferred from Highland to You on May 2, 2019, and (b) the $5 million transferred from Highland to You on May 3, 2019.

**Topic No. 11**:

Communications in 2020 with any Retail Board concerning any amounts due and owing by You to Highland, including but not limited to the disclosures You made to any Retail Board in October 2020.

**Topic No. 12**:

All Communications that You made in the Bankruptcy Case Concerning the Notes, including in any pleading, court filing, or argument.

**Topic No. 13**:

The identity (including the title or position) of each of Your officer(s), director(s), direct and indirect owner(s), and employee(s) for the period January 1, 2018 through the present.

**Topic No. 14**:

Your responses to the Discovery Requests.

4

# EXHIBIT 186

# INTENTIONALLY

# OMITTED

# EXHIBIT 187

# INTENTIONALLY

# OMITTED

# EXHIBIT 188

| | |
|---|---|
| **From:** | David Klos <DKlos@HighlandCapital.com> |
| **Sent:** | Friday, February 02, 2018 2:16 PM |
| **To:** | Corporate Accounting |
| **Cc:** | Melissa Schroth |
| **Subject:** | $3.825mm to Jim |

Blair,
Please set up $3.825mm to go to Jim this afternoon. Frank has approved.

Drew, this is a new loan.

**DAVID KLOS** | CONTROLLER



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147
dklos@highlandcapital.com | www.highlandcapital.com

Appx. 03002

# EXHIBIT 189

Appx. 03003

From: wiremail@bbvacompass.com <wiremail@bbvacompass.com>
Sent: Friday, February 2, 2018 1:35 PM
To: Corporate Accounting <CorporateAccounting@hcmlp.com>
Subject: Compass Bank [Texas Bank Outgoing] Message ID:180202133456H400 Advice Code:TxBkOut

Compass Bank Wire Transfer Dept.
701 S 32nd Street
Birmingham, AL  35233

Outgoing Wire - Advice of Debit

Date: 2018-02-02 00:00:00          Wire Create Time 13:34:57

    Account #       :
    Account Name    : HIGHLAND CAPITAL MANAGEMENT LP
    Amount          : $3,825,000.00
    GFX Reference    : 180202133456H400
    Receiving Bank  : 311973208
    Recv BK Name     : NEXBANK SSB

    Originator      : HIGHLAND CAPITAL MANAGEMENT LP

    Beneficiary     : James Dondero
    Bene Acct #     : ███884

Beneficiary Info (OBI):
2/2/2018 Loan

Reference for Beneficiary (RFB):

FED Reference Number (IMAD):
20180202F2QCZ60C002532

Appx. 03004

# EXHIBIT 190

| | |
|---|---|
| **From:** | Blair Hillis <BHillis@HighlandCapital.com> |
| **Sent:** | Wednesday, August 01, 2018 1:12 PM |
| **To:** | David Klos; Corporate Accounting |
| **Cc:** | Melissa Schroth |
| **Subject:** | RE: $2.5mm loan to Dondero |

Funds have been transferred to Jim's account. Thanks!

Kind Regards,
Blair Roeber

---

**From:** David Klos
**Sent:** Wednesday, August 1, 2018 10:47 AM
**To:** Corporate Accounting
**Cc:** Melissa Schroth
**Subject:** $2.5mm loan to Dondero

Jim has authorized a $2.5mm loan from HCMLP to Dondero.

Blair, can you please set up this wire today?
Drew, can you please draw up loan docs for execution?

**DAVID KLOS | CONTROLLER**



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147
dklos@highlandcapital.com | www.highlandcapital.com

Appx. 03006

# EXHIBIT 191

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Friday, October 15, 2021 1:23 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Douglas Draper <ddraper@hellerdraper.com>; elmsd@gtlaw.com
**Subject:** RE: HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

John:

Defendants have the following objections to your corporate representative topics:

NexPoint, HCMS and HCRE

Topic 1: Your answer.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 2: Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 3: The Note, including but not limited to (a) the negotiation of the Note, (b) the terms of the Note, (c) Communications Concerning the Note, (d) any payments of principal or interest made by You or on Your behalf with respect to the Note; (e) the use of the proceeds of the Note, (f) Your communications with Your outside auditors Concerning the Note and the obligations thereunder, and (g) all agreements Concerning the Note.

Defendants object to the portion of this topic seeking information related to the use of the proceeds of the Note because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendants will provide a witness on this topic.

Topic 4: Your responses to the Discovery Requests.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Defendants incorporate all objections made in their discovery responses. Subject to these objections, Defendants will provide a witness on this topic.

Dugaboy

**Appx. 03008**

Topic 2: Your authority to enter into the Alleged Agreement.

Defendant objects to this topic to the extent that it seeks privileged information and seeks legal conclusions. Subject to these objections, Defendant will provide a witness on this topic.

Topic 3: Ownership, beneficial ownership, and control of The Dugaboy Investment Trust.

Defendant objects to this topic because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on this topic.

Topics 4-8:  Other agreements other than the agreements at issue in these proceedings.

Defendant object to these topics because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on these topics.

Topic 9: Your responses to the Discovery Requests.

Defendant objects to this topic because it is vague and not specific enough to allow Defendant to adequately prepare a witness. Defendant incorporates all objections made in its discovery responses.  Subject to these objections, Defendant will provide a witness on this topic.


**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201  \  Bio

**STINSON.COM**

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, October 12, 2021 5:50 PM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>
**Subject:** HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

Michael:

HCMLP has the following objections to the attached Rule 30(b)(6) notice:

**HCMLP objects to Topic No. 2**  (a) to the extent it calls for HCMLP to tender a witness to testify with precision to all principal, interest, and fees due under each Note that is the subject of the Complaints, and on the grounds that (b) HCMLP provided calculations of damages in its demand and default letters as well as its Complaints, (c) the categories of damages are all (i) unpaid principal, (ii) accrued but unpaid interest, and (iii) costs of collection, including reasonable attorneys' fees (the "Damages"), (d) based on the Notes and the documents produced proving HCMLP's costs of collection (which will be

Appx. 03009

supplemented from time to time to account for additional costs), the Defendants are just as easily capable of calculating the Damages at any moment in time as HCMLP, (e) it is unreasonable to expect any witness to specifically recall the precise Damages due under each Note, particularly when such Damages continue to increase every day.

Subject to those objections, HCMLP will tender a witness prepared to testify on Topic No. 2.

**HCMLP objects to Topic No. 4** on the grounds that (a) the phrase "involved in" is vague and ambiguous, and (b) it assumes that any of the Notes were subject to "negotiations."

Subject to those objections, HCMLP will tender a witness prepared to testify as to the identify of individuals it knows were involved in communications related to the execution and/or terms of the notes.

**HCMLP objects to Topic No. 7** on the grounds that (a) it seeks "facts" that are solely within the Defendants' knowledge, and that (b) Defendants' defenses and affirmative defenses have materially changed over time, and are otherwise ambiguous or not specifically set forth in the Answers.

Subject to that objection, HCMLP will tender a witness prepared to testify as to facts that it knows of that relate to or concern the defenses and affirmative defenses specifically proffered by any of the Defendants.

**HCMLP objects to Topics No. 9** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 10** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 11** on the grounds that (a) there is no time limitation, (b) documents concerning Mr. Dondero's compensation for the period 2016 through 2020 (the "Compensation Documents") have been or will be produced and HCMLP specifically refers Defendants to the Compensation Documents, and (c) it is unreasonable to expect any witness to specifically recall the specific amounts and components of Mr. Dondero's compensation from 2016 and 2020.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topic No. 12** on the grounds that it is (a) overly broad, unduly burdensome, and not relevant to the claims or defenses in this adversary proceeding, and (b) none of the Defendants who served the attached Rule 30(b)(6) notice is or was a party to a Shared Services Agreement with HCMLP.

Based on the forgoing, HCMLP will not proffer a witness to testify as to Topic No. 12.

Appx. 03010

**HCMLP objects to Topic Nos. 13, 14, 15, 16, and 17** to the extent those topics assume that HCMLP had any contractual or legal duty or obligation to take or refrain from taking the actions described therein.

Subject to those objections, and any additional objections referred to below, HCMLP will tender a witness prepared to testify on Topics 13, 14, 15, 16, and 17.

**HCMLP objects to Topic No. 14** on the ground that the phrase "may have previously had any role" is speculative, vague, and ambiguous.

Subject to that objection, HCMLP will tender a witness prepared to testify as to those referenced employees who actually processed, made, facilitated or coordinated such payments, if any.

**HCMLP objects to Topic No. 15** on the grounds that the phrase (a) "[a]ny communications or instructions that may have been given" is speculative, vague, and ambiguous, and (b) there is no time limitation.

Subject to those objections, HCMLP will tender a witness prepared to testify as to communications or instructions that were actually given from 2018 to the present, if any.

---

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Thursday, October 07, 2021 2:49 PM
**To:** Rukavina, Davor <drukavina@munsch.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: NexPoint Notice of 30(b)(6) to Debtor

Please see attached notice for the Seery/30B6 deposition.

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201 \ Bio

**STINSON.COM**
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** Rukavina, Davor <drukavina@munsch.com>
**Sent:** Thursday, October 7, 2021 11:42 AM
**To:** 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R.

Winograd <hwinograd@pszjlaw.com>
**Subject:** NexPoint Notice of 30(b)(6) to Debtor

**External Email – Use Caution**

Counsel, please see attached notice.

Thank you

**Davor Rukavina, Esq.**

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800 / Dallas, Texas 75201-6659

Direct: +1.214.855.7587 / drukavina@munsch.com / munsch.com

Notice: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

# EXHIBIT 192

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2             DALLAS DIVISION

3  In re:               )Chapter 11
                     )
4  HIGHLAND CAPITAL MANAGEMENT, LP, )
                     )Case No.
5      Debtor.         )19-34054-SGJ-11
                     )
6  HIGHLAND CAPITAL MANAGEMENT, LP, )
                     )
7      Plaintiff,      )
                     )
8  vs.            )Advisory Proceeding No.
                     )21-03004
9  NEXPOINT ADVISORS, LP; JAMES    )
  DONDERO; NANCY DONDERO; and THE )
10  DUGABOY INVESTMENT TRUST,     )
                     )
11      Defendants.      )

12
        ************************************
13         REMOTE DEPOSITION OF
               DUSTIN NORRIS
14          December 1, 2021
        ************************************
15

16      DUSTIN NORRIS, produced as a witness at the

17  instance of the Highland Capital Management, was

18  duly sworn and deposed in the above-styled and

19  numbered cause on December 1, 2021, from

20  10:01 a.m. CST to 3:25 p.m. CST, stenographically

21  reported, pursuant to the Federal Rules of Civil

22  Procedure and the provisions stated on the record.

23   Job Number:   203362
    Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24            Texas CSR 9306
            California CSR 14407
25            Illinois CSR 084.004659

Page 2

1            A P P E A R A N C E S
2   (all attendees appearing via remote videoconference)
3
4   REPRESENTING HIGHLAND CAPITAL MANAGEMENT, LP:
5    John Morris, Esq.
     Hayley Winograd, Esq.
6   PACHULSKI STANG ZIEHL & JONES LLP
     780 Third Avenue
7   New York City, New York  10017
8
9
10  REPRESENTING NEXPOINT ADVISORS, LP:
11   Davor Rukavina, Esq.
     MUNSCH HARDT KOPF & HARR, PC
12   500 North Akard Street
     Dallas, Texas  75201
13
14
15  REPRESENTING JAMES DONDERO, NANCY DONDERO, HCRE,
    and HCMS:
16
     Michael Aigen, Esq.
17   STINSON LLP
     3102 Oak Lawn Avenue
18   Dallas, Texas  75219
19
20
21  ALSO PRESENT:
22   La Asia Canty, Paralegal,
     Pachulski Stang Ziehl & Jones
23
24
25

Page 3

1                INDEX
                              PAGE
2
3   EXAMINATION BY MR. MORRIS...................... 5
4
5
6              EXHIBITS
7   NUMBER       DESCRIPTION              PAGE
8   Exhibit 185   Plaintiff's Third Amended Notice of
9               Rule 30(b)(6) Deposition to
10              Highland Capital Management Fund
11              Advisors............................ 7
12
13
14           PREVIOUSLY MARKED EXHIBITS
15  NUMBER       DESCRIPTION              PAGE
16  Exhibit 1     Complaint for (I) Breach of
17              Contract and (II) Turnover of
18              Property of the Debtor's Estate...... 38
19  Exhibit 5     Defendant's Original Answer.......... 29
20  Exhibit 13    Defendant's Amended Answer........... 158
21  Exhibit 36    Email Chain; Bates D-HCMFA290880
22              through 290883....................... 87
23
24
25

Page 4

1            PREVIOUSLY MARKED EXHIBITS
2   NUMBER       DESCRIPTION              PAGE
3   Exhibit 45    Highland Capital Management Fund
4               Advisors, LP, Consolidated
5               Financial Statements and
6               Supplemental Information, 12/31/18;
7               Bates D-CNL-002273 through 002296..... 46
8   Exhibit 59    Supplemental 15(c) Info Request;
9               Bates HCMFAS 000025 through 000031.... 71
10  Exhibit 147   BBVA Compass Bank Statement, Date
11              Ending 5/31/19  (no Bates range)..... 51
12  Exhibit 182   Memo Dated 5/28/19 (no Bates range).. 119
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                PROCEEDINGS
2        (On the record at 10:01 a.m. CST)
3        (Witness duly sworn.)
4             DUSTIN NORRIS,
5   being first duly sworn, testified as follows:
6             EXAMINATION
7   BY MR. MORRIS:
8   Q     Good morning, Mr. Norris.  As you may
9   recall, my name is John Morris.  I'm an attorney
10  at Pachulski Stang Ziehl & Jones, and we're
11  counsel to the reorganized debtor known as
12  Highland Capital Management, LP, and we're here
13  for your deposition today.
14        Do you understand that?
15  A     Yes, sir.
16  Q     And do you understand that you're being
17  deposed today in your capacity as what's called a
18  Rule 30(b)(6) witness on behalf of Highland
19  Capital Management Fund Advisors, LP?
20  A     I do.
21  Q     Can we refer to Highland Capital
22  Management Fund Advisors, LP, as "HCMFA"?
23  A     Yes, that works.
24  Q     And can we refer to Highland Capital
25  Management, LP, as either "Highland" or "HCMLP"?

Page 6

```
Dustin Norris
1
2  A    Yes.
3  Q    Okay.  Are you aware that your answers
4  today will bind HCMFA?
5  A    Generally, yes.
6  Q    Okay.  Have you seen the notice that was
7  served by Highland on HCMFA in connection with
8  this deposition?
9  A    I have.
10  Q    Okay.  I've -- I've examined you before;
11  right?
12  A    Yes.
13  Q    Okay.  So the rules are the exact same,
14  and they are very simple.  If I ask a question, I
15  would ask you to refrain from answering until I've
16  completed my question; is that fair?
17  A    Yes, it is.  Thank you.
18  Q    And if I begin a question or respond
19  before you've completed your answer, will you let
20  me know that?
21  A    Yes.
22  Q    We're going to be putting documents up on
23  the screen from time to time today.  If at any
24  time you believe you need to see other portions of
25  the document in order to give complete and
```

Page 7

```
Dustin Norris
1
2  accurate answers, will you let me know that?
3  A    Yes.
4  Q    If you need a break at any time, will you
5  let me know that as well?
6  A    I will.
7  Q    Okay.
8       MR. MORRIS:  I would ask my
9  colleague, Ms. Canty, to put up on the
10  screen the Rule 30(b)(6) deposition
11  notice.
12       (Norris Exhibit 185 marked.)
13       (Reporter discussion off the record.)
14       MR. MORRIS:  Okay.  Asia, what
15  exhibit number should we put on this
16  document?
17       MS. CANTY:  185.
18       MR. MORRIS:  Okay.  Davor and
19  Michael, this will be Exhibit 185.
20       And if we can scroll down and show
21  it to Mr. Norris.
22  BY MR. MORRIS:
23  Q    Do you see that this is the plaintiff's
24  third amended notice of deposition for today?
25       MR. RUKAVINA:  And just so you
```

Page 8

```
Dustin Norris
1
2  know, John and Dustin, I did not send this
3  to you, Dustin.  All that it does is
4  changes the time of today's deposition.
5  It's identical to the last one that you
6  did get.
7       THE WITNESS:  Okay.  And I have the
8  last one here with me as well.
9  BY MR. MORRIS:
10  Q    Okay.  So there's no -- I'll represent to
11  you that there's no difference between the one
12  that's on the screen and the one you have except
13  that the one on the screen says "Third Amended
14  Notice," and it was scheduled for 9:00 today.
15  It's scheduled for 10:00 today, the -- the time
16  that we're beginning.
17       Do you have any other documents in
18  front of you other than the deposition notice?
19  A    I do.
20  Q    What -- what other documents do you have
21  before you?
22  A    Yeah.  I have the original complaint I
23  believe it's called -- forgive me if I call them
24  the wrong items --
25  Q    Uh-huh.
```

Page 9

```
Dustin Norris
1
2  A    -- but the original complaint from HCMLP.
3  I have the original answer response from HCMFA.  I
4  have the amended response.  I have the declaration
5  from Mr. Sauter.  I have copies of the promissory
6  notes.  I have the shared services agreement.  I
7  have a -- incumbency certificates, which will help
8  me respond to one of your questions in the
9  30(b)(6) notice.  And I have a board to the
10  memo [sic] regarding NAV error, and I have the
11  "Defendant's Second Motion for Leave to Amend
12  Answer and Brief in Support Thereof" that was
13  filed yesterday.
14       So a number of documents that -- and I
15  also have up on my screen your exhibits that I
16  believe we'll be going through in one of the --
17  let me check here -- Topic Number 5.  So I have
18  open, you know, a 650-page document that was filed
19  in Docket 35 on May 24th, I believe, is the
20  correct document.  So those are the materials that
21  I have.
22  Q    Excellent.  I appreciate that.
23       So you've seen -- you've seen at least
24  the plaintiff's second amended notice of
25  Rule 30(b)(6) deposition before today.  Do I have
```

Page 10

Dustin Norris

1
2 that right?
3    A    That's correct.
4    Q    And you have that with you; right?
5    A    I do.
6    Q    Okay.  Are you prepared to testify on
7 behalf of HCMFA today on -- in connection with
8 each of the topics in the deposition notice?
9    A    Yes, I am.
10   Q    All right.
11       MR. MORRIS:  Let's just, for the
12   record, scroll down to make sure that the
13   topics are the same as the -- the one that
14   Mr. Norris has in front of him.
15 BY MR. MORRIS:
16   Q    Do you see the first five topics on the
17 screen?
18   A    I do.
19   Q    All right.  Can you confirm that they're
20 the same topics that you have in the second
21 amended notice of deposition?
22   A    Yes.  I'm looking now.
23       Yes, they all are the same.
24   Q    Okay.  And if we can continue to scroll
25 down, you see Topics 6, 7, and 8 up on the screen,

Page 11

Dustin Norris

1
2 and 9.  Are they the same as what you have?
3    A    Can you scroll down for 9?
4    Q    Uh-huh.
5    A    They look to be the same, yes.
6    Q    Okay.  And let's just look at the last
7 few.  How about 10 through 14?  Are they the same
8 as the topics that are in your second amended
9 notice?
10   A    They look to be the same, yes.
11   Q    Okay.  And did you do anything to prepare
12 for today's deposition?
13   A    I did.
14   Q    What did you do?
15   A    I reviewed all of the pleadings.  I
16 reviewed all of the -- the documents that were, I
17 believe, responsive to -- to help me to respond to
18 this, look through your exhibits.  I had met with
19 Mr. Rukavina as counsel.  I met and spoke with
20 Mr. Dondero.  I spoke with Jason Post.
21       I spoke with -- I reviewed my
22 documents internally and emails, things that I
23 might have had, confirmed with our IT group that
24 they have provided all documents responsive to
25 your discovery requests.

Page 12

Dustin Norris

1
2       I reviewed the depositions of
3 Mr. Seery, of Frank Waterhouse, Dave Klos, and
4 Kristin Hendrix.  I met in person and by Zoom with
5 Mr. Rukavina over the last few weeks, and -- so
6 that -- that's the general -- you know, there may
7 have been other things, but that's the general
8 overview of the things that I did --
9    Q    I appreciate --
10   A    -- to understand the company's position.
11   Q    I appreciate that.
12       So just focusing in on the people that
13 you spoke with in connection with your
14 preparation, one was Davor; right?
15   A    Correct.
16       And I -- I may have -- I don't know if
17 I said it or not, but DC Sauter as well I also
18 spoke with.
19   Q    Okay.  So the other people are DC Sauter,
20 Jason Post, and Mr. Dondero.  Do I have that
21 right?
22   A    Correct.
23   Q    Did you speak with Frank Waterhouse at
24 all?
25   A    No, I did not.

Page 13

Dustin Norris

1
2    Q    Is there any particular reason you didn't
3 speak with Mr. Waterhouse?
4    A    Yes.
5    Q    And what -- why didn't you speak with
6 Mr. Waterhouse?
7    A    My -- my -- yeah, sorry.
8       My understanding is his counsel did
9 not allow us to speak with him regarding this,
10 because HCMLP had sued him for various things, and
11 so we weren't allowed to talk with him.
12       You'll -- you'll note that DC, earlier
13 on, had spoken to him.  I believe that was back in
14 April, if you look back and I'd refer you to
15 Mr. Sauter's declaration.  But in preparation for
16 this, we did not speak with him.  We needed to
17 wait for his deposition based on his attorney's
18 instructions.
19   Q    How many times did you speak with
20 Mr. Dondero about today's deposition?
21   A    Multiple times over the last few weeks.
22   Q    And was Mr. Rukavina present for those
23 discussions?
24   A    He was not.
25   Q    Can you tell me what you discussed with

Page 14

Dustin Norris

1
2  Mr. Dondero about today's deposition?
3  A    Yeah.  Discussed with him general view of
4  the company from his perspective.  We discussed
5  particularly around -- and we'll get into more
6  details on this -- but around the purpose and
7  transfer of cash, the seven-and-a-half million
8  dollars.  And I guess there were two transactions.
9      Discussed with him what he remembered
10 in discussions with Frank Waterhouse when he
11 instructed him to transfer the cash, and any
12 recollection he had regarding the notes or the --
13 the -- promissory notes.
14     And so those were the general topics.
15     And we did talk about --
16 Q    Did Mr. --
17 A    Sorry.  Go ahead.
18 Q    Yeah, I don't mean to step on your words.
19 A    No, no.
20     We talked about the NAV error, we
21 talked about responsibility for the NAV error and
22 those aspects as well.
23 Q    Did -- did Mr. Dondero tell you when he
24 first learned of the existence of the notes?
25 A    No.

Page 15

Dustin Norris

1
2  Q    Did you ask him in connection with your
3  preparation for today's deposition?
4  A    What I did ask, I asked him -- I said,
5  "Did you tell Frank Waterhouse that there should
6  be -- that this should be a loan?"
7      And his response was, "No, that I
8  never told Frank it should be a loan, and Frank
9  never asked if it should be a loan."  And that the
10 intent -- and the reason for the transfer was
11 compensation for the NAV error.
12     And so that was -- he did not know --
13 and if I -- if I remember correctly, looking at
14 his deposition, I believe he did not know about
15 the notes at that time and found out about them
16 much later.
17 Q    I know, and I'm trying to understand from
18 you if you can tell me, as HCMFA's 30(b)(6)
19 representative, whether you can share with me when
20 Mr. Dondero first learned of the existence of the
21 notes.
22 A    It -- it would have been -- I believe, if
23 my understanding is correct, it would have been
24 after they were demanded.
25 Q    After they were?

Page 16

Dustin Norris

1
2  A    Demanded.
3  Q    Okay.  How about your conversations with
4  Mr. Post?  Did the subject of when he learned
5  about the existence of the notes come up?
6  A    No.  That was not -- a discussion with
7  Jason Post -- Post -- talking with Jason was more
8  around the NAV error, the events surrounding the
9  NAV error, facts and circumstances around the NAV
10 error.
11 Q    Okay.  And were your discussions with
12 Mr. Sauter limited to the investigation that he
13 undertook earlier this year that's reflected in
14 his declaration?
15 A    I would say it's not limited to that.
16 Q    What other topics did you discuss with
17 Mr. Sauter beyond the investigation that he
18 undertook that's reflected in his declaration?
19     MR. RUKAVINA:  And I would just
20     caution you, Dustin, that to the extent
21     that you and Mr. Sauter discussed factual
22     matters, that's fair game.
23         But as far as if you discussed
24     litigation strategy, that's not fair game.
25     So be careful with your answer, please,

Page 17

Dustin Norris

1
2  and tell Mr. Morris what you can and can't
3  answer.
4      THE WITNESS:  Yeah.
5      So early on with Mr. Sauter,
6  discussions were around if I had any
7  knowledge of the note, if he had any
8  knowledge of the note, trying to discover
9  what the notes were, what they were
10 related to, and neither of us had
11 knowledge related to notes.
12     And then discussions around more
13 generally -- I'm trying to think back.
14 There were many discussions with
15 Mr. Sauter on the topic.
16     General facts and circumstances of
17 what he was learning from his
18 investigation in which -- all of which I
19 would refer you to his declaration.
20     And then subsequent, talking with
21 him regarding the -- I'm trying to
22 recollect the -- the key components.
23     But it was general overview of --
24 of the notes and NAV error and the
25 process.  He wasn't here during much of

Page 18

Dustin Norris

1
2 that time period or involved, and so we
3 were talking together based on what he was
4 doing.
5 BY MR. MORRIS:
6 Q    Who are you employed by today?
7 A    NexPoint Advisors.
8 Q    Do you hold any position or title with
9 HCMFA?
10 A    I do.
11 Q    And what's your position or title with
12 HCMFA?
13 A    Executive vice president is my officer
14 role.
15 Q    And when did you become an officer of
16 HCMFA?
17 A    So I -- I was originally secretary -- and
18 I can't remember if I was assistant secretary, but
19 I've been involved with HCMFA since 2012. I don't
20 know if I was added as an assistant secretary at
21 that time; but for many -- for several years, I've
22 been an officer of HCMFA.
23 Q    And you were an officer in 2018 and 2019;
24 is that right?
25 A    Correct. I was secretary in 2018, and --

Page 19

Dustin Norris

1
2 I'm looking at the incumbency certificates here --
3 and in 2019 in April became executive vice
4 president. So from January to -- January 2018 to
5 April 2019, I was secretary and then became
6 executive vice president.
7 Q    When did you first learn of the existence
8 of the notes?
9 A    So it was after they were demanded, and it
10 was -- so I believe the demand came in in early
11 2020 -- 2021. So January-ish 2021.
12 Q    Do you have any role or any title with any
13 of the funds that are managed by either NexPoint
14 or HCMFA?
15 A    I do.
16 Q    Can you describe those roles or titles for
17 me, please?
18 A    Yeah. I'm -- I'm the executive vice
19 president of the funds, and my role more broadly
20 is I am the head of distribution and chief product
21 strategist. And so in that role, I lead the sales
22 and business development and marketing for the
23 funds, more broadly.
24 Q    And what is your title with NexPoint
25 Advisors, LP?

Page 20

Dustin Norris

1
2 A    I am executive vice president in the
3 officer capacity, and my role is -- as an employee
4 is head of distribution and chief product
5 strategist.
6 Q    Okay. So just to summarize, you're the
7 executive vice president of NexPoint Advisors, LP;
8 correct?
9 A    Correct.
10 Q    And that's an officer position; correct?
11 A    It is.
12 Q    And when did you attain that title?
13 A    Probably -- I don't have the incumbency
14 certificates, but it was probably the same time as
15 HCMFA.
16 Q    Is it fair to say that it was sometime
17 before January 1st, 2018?
18 A    No.
19 Q    Can you give me an estimate of when that
20 was? Feel free --
21 A    Yeah. The time-- the timeline for HCMFA
22 was April 2019. I was secretary before that, and
23 I don't recall if NexPoint Advisors changed at the
24 same time.
25 Q    Okay. Can I refer to HCMFA and NexPoint

Page 21

Dustin Norris

1
2 Advisors, LP, together as "the advisers"?
3 A    That's fine.
4 Q    Okay. So is it fair to say that you were
5 the executive vice president, which was an officer
6 position, for each of the advisers as of April
7 2019?
8 A    Yes.
9 Q    Okay. And --
10 A    I believe that's correct.
11 Q    And you also serve as the executive vice
12 president of the funds that each of the advisers
13 manages. Do I have that right?
14 A    Yes. Currently.
15 Q    And have you held the --
16 A    Yes, currently.
17 Q    And when did you become the executive vice
18 president of the funds?
19 A    I don't remember the exact date, if that
20 was around the same time, but I was the secretary
21 before that and assistant secretary before that,
22 dating back to 2012.
23 Q    So you've been -- is it fair to say that
24 you've been an officer of the funds managed by the
25 advisers since at least 2013?

Page 22

Dustin Norris

2   A   I believe so. I'd have to go back and
3   look for sure, but I believe. There may have been
4   periods of time where I was not, but yes.
5   Q   Okay. Were any of those periods of time
6   when you were not, at any point since 2018 to the
7   present?
8   A   I don't believe so.
9   Q   Okay. So to the best of your
10  recollection, you've served as an executive vice
11  president of each of the funds managed by the
12  advisers since at least the beginning of 2018; is
13  that fair?
14  A   No. That's -- that's different than my
15  prior testimony that -- I was secretary until
16  April --
17  Q   I apologize. Let me restate the question.
18      You've been an officer of -- of the
19  funds managed by the advisers on a continuous
20  basis since at least the beginning of 2018; fair?
21  A   I believe that's correct, yes.
22  Q   Thank you for the question -- for -- for
23  the correction.
24      So as I think you pointed out earlier,
25  one of the topics on the 30(b)(6) notice is the

Page 23

Dustin Norris

2   identity of officers, directors, and employees of
3   HCMFA?
4   A   Uh-huh.
5   Q   Do you want to take a look at that topic
6   on the document that you have in front of you?
7   A   Yes.
8   Q   Okay.
9   A   That is -- which topic?
10  Q   13.
11  A   13, yes.
12  Q   Okay. So let's focus on 13 for a moment.
13      Can you -- can you identify for me
14  HCMFA's officers from January 1st, 2018, to the
15  present --
16  A   Yes.
17  Q   -- including names and titles?
18  A   Yes.
19  Q   Okay.
20  A   So from January 1st, 2018 -- and I don't
21  have -- I -- I'm assuming that the dates that I
22  have on the incumbency certificates are complete,
23  but I'm not certain, and -- if there was one in
24  between, but I'm assuming this is -- that the
25  dates I have changing is -- is effective when they

Page 24

Dustin Norris

2   changed.
3       But Brad Ross was president of HCMFA
4   from January 1st, 2018, until, I believe,
5   February 2018 -- sorry -- yeah, until
6   February 2018.
7       In that same time period, Brad Ross,
8   president; Trey Parker, executive vice president;
9   Frank Waterhouse, treasurer; Dustin Norris,
10  secretary.
11      And effective 26th of February --
12  Q   I apologize. What is Mr. Parker's title?
13  A   Executive vice president.
14  Q   Thank you.
15  A   And beginning February 26th, 2018, Trey
16  Parker, executive vice president; Frank
17  Waterhouse, treasurer; and Dustin Norris,
18  secretary; and no longer president, Brad Ross.
19  There's no president on the lineup.
20      So continuing on, April 11th, 2019,
21  Dustin Norris, executive vice president; Frank
22  Waterhouse, treasurer; Lauren Thedford, secretary.
23  Q   And Trey Parker was no longer an officer
24  as of that time?
25  A   He was no longer an officer.

Page 25

Dustin Norris

2   Q   Okay.
3   A   And February 18th, 2021, Dustin Norris,
4   executive vice president; Frank Waterhouse,
5   treasurer; Brian Mitts, assistant treasurer; David
6   Willmore, secretary. So Lauren Thedford, no
7   longer secretary.
8   Q   And have there been any changes since
9   February 2021?
10  A   Yes. You have April 8, 2021, Dustin
11  Norris, executive vice president; Frank Waterhouse,
12  treasurer; Will Mabry, assistant treasurer; and
13  Stephanie Vitiello, secretary.
14      Again, I -- I don't have -- this is
15  based on what was provided to me with effective
16  dates. I don't know if there was any that were
17  missing, if that's complete, but I -- I believe
18  those are accurate.
19  Q   Is it fair to say that you're relying on
20  exclusively on the incumbency certificates to
21  identify the officers of HCMFA since January 1st,
22  2018?
23  A   For this purpose, yes.
24  Q   Do you have any other information that you
25  can share with me regarding the identity of any

Page 26

Dustin Norris

1          Dustin Norris
2   officers of HCMFA since January 1st, 2018?
3   A    I don't, no.
4   Q    Okay.  Can you identify for me HCMFA's
5   direct and indirect owners since January 1st,
6   2018?
7   A    I can, yes.  Generally Jim Dondero and
8   Mark Okada are the indirect owners through trusts.
9   They own approximately two-thirds, Jim Dondero, a
10  little less than a third, Mark Okada, with a
11  general partner that is -- that owns 1 percent.
12  Q    And who is the general partner?
13  A    It's a Strand entity that I believe is
14  owned 100 percent by Mr. Dondero.
15  Q    So Mr. Dondero controls the general
16  partner --
17  A    Right.
18  Q    -- of HCMFA?
19  A    Correct, and owns approximately two-thirds
20  of the equity.
21  Q    And is that a controlling interest to the
22  best of your knowledge?
23  A    Yes, I believe so.
24  Q    Okay.  Does HCMFA have any directors?
25  A    It does not.  It has a sole director

Page 27

Dustin Norris

1          Dustin Norris
2   through the general partners.  So HCMFA does
3   not -- Strand -- whatever the Strand entity does,
4   Jim Dondero is the sole director.
5   Q    Okay.  And what about employees?  Does
6   HCMFA have any employees?
7   A    It does have some front-office employees,
8   trading professionals.
9   Q    Are there any employees who perform any
10  services other than trading services?
11  A    Trading in front-office investment
12  analysts, portfolio managers, generally that's
13  been the structure with HCMFA, is they held --
14  they had employees that performed front-office
15  functions, and we, as I believe you're aware,
16  outsourced the back-office accounting, compliance,
17  and legal services to Highland Capital Management,
18  LP, during this time period.
19  Q    Let's go to Topic Number 12.
20  A    Okay.
21  Q    And Topic Number 12 asks for a witness who
22  can testify as to all communications that HCMFA
23  "made in the bankruptcy case concerning the notes,
24  including any pleadings, court filing, or
25  argument."

Page 28

Dustin Norris

1          Dustin Norris
2         Do you see that?
3   A    I do.
4   Q    Are you prepared to answer questions on
5   that topic?
6   A    I am.
7   Q    All right.  You're aware that obviously
8   Highland has commenced an adversary proceeding
9   against HCMFA to collect on two promissory notes;
10  right?
11  A    I am, yes, and I believe this right here
12  is the complaint filed January 22nd.
13  Q    Okay.  And you're aware that the notes
14  that are the subject of the lawsuit were dated
15  May 2nd and May 3rd, 2019, respectively; right?
16  A    Sorry.  Can you repeat that?
17  Q    You're aware that the notes that are the
18  subject of the lawsuit are dated May 2nd and
19  May 3rd, 2019, respectively; correct?
20  A    Yes.  The notes that are attached to the
21  complaint, May 2nd and May 3rd.
22  Q    Okay.  And can we refer to those two
23  notes -- those two promissory notes for the rest
24  of this deposition collectively as "the notes"?
25  A    Yes.

Page 29

Dustin Norris

1          Dustin Norris
2   Q    Okay.  And you're aware that after
3   Highland commenced this action, HCMFA filed its
4   original answer; correct?
5   A    That's correct.
6   Q    Okay.  And Topic Number 1 on your list, in
7   fact, is the answer, correct, the original answer?
8   A    That's correct.  It's Topic Number 1.
9         MR. MORRIS:  Okay.  Can we put
10  Deposition Exhibit 5 up on the screen?
11  We're going to look at the original
12  answer.
13        (Exhibit 5 tendered.)
14  BY MR. MORRIS:
15  Q    And, again, feel free to let me know if
16  there's any portion of this document that you need
17  to see.  But looking at the first page -- and
18  perhaps we can continue to scroll through it -- is
19  this the original answer that was filed on behalf
20  of HCMFA on March 1st, 2021?
21  A    I'll take your representation that it is.
22  It looks to be, yeah.
23  Q    Okay.
24  A    I was not involved in the filing of it,
25  but...

Page 30

Dustin Norris

1
2  Q    Okay.  Is the copy that you have with you
3  dated March 1st, 2021?
4  A    Yes, it is.
5  Q    And if you can turn to Page 6 of 7, does
6  it appear to be the exact same as what appears on
7  the screen, showing the March 1st, 2021, date?
8  A    It does.
9  Q    And do you refer to the March 1st, 2021,
10  date, as "the answer date"?
11  A    Yes.
12  Q    Okay.  HCMFA did not assert any
13  affirmative defenses in this pleading; correct?
14  A    That's my understanding.
15  Q    Okay.  And HCMFA had full access to you as
16  of March 1st, 2021; correct?
17  A    Yes.
18  Q    And HCMFA had full access to Mr. Dondero
19  as of March 1st, 2021; correct?
20  A    In the term "full access," they could have
21  talked to him, yes.
22  Q    Right.  And there was no restriction from
23  the bankruptcy court or otherwise on HCMFA's
24  ability to communicate with Mr. Dondero that you
25  know of; correct?

Page 31

Dustin Norris

1
2  A    None that I know of.
3  Q    And there was no restriction or limitation
4  on HCMFA's ability to speak with you at or prior
5  to March 1st, 2021; correct?
6  A    That's correct.
7  Q    How about Ms. Thedford?  Are you aware of
8  any restriction or limitation on HCMFA's ability
9  to speak with her prior to March 1st, 2021?
10  A    Yes.
11  Q    Okay.  And what restriction was that?
12  A    Yeah.  So she was part of the Highland
13  legal team.  She was an employee of HCMLP.  And
14  during this time period, we had outsourced our
15  legal and compliance functions to them.  And if --
16  I would refer you to Mr. Sauter's declaration and
17  the attachments and schedules.  There's a very
18  strict direction from Mr. Seery that
19  individuals -- particularly on the legal team --
20  could not work on anything that would be inimical
21  to the debtor.
22  Q    Okay.
23  A    And so Ms. Thedford, on multiple
24  occasions, told us she was unable to work on
25  things, and that began back in fall of 2000- --

Page 32

Dustin Norris

1
2  fall of 2020 -- late summer 2020, actually.  And
3  so she was not accessible for things like this.
4  Q    How about Mr. Post?  Do you know who
5  Mr. Post was employed by in 2018 and 2019?
6  A    2018 and '19, he was employed by Highland
7  Capital Management, LP.
8  Q    Do you know whether, in your conversations
9  with him, does he have any personal knowledge
10  regarding the NAV error?
11  A    Yes.
12  Q    Was he involved in any of the issues
13  surrounding the NAV error?
14  A    He was knowledgeable -- as he was
15  chief -- chief compliance officer of the retail
16  advisers at that time, and interacted with the
17  HCMLP employees and the board regarding the NAV
18  error, he also -- in your schedules, you'll notice
19  in one of the memos, he participated in calls with
20  the SEC, and so he was -- he was involved in the
21  process of the NAV error and understood and worked
22  with the other HCMLP employees, which naturally
23  they would.  We had outsourced valuation services
24  to HCMLP.  We had outsourced legal and compliance
25  to HCMLP, and as such, that was all part of what

Page 33

Dustin Norris

1
2  they were working on.
3  Q    Did -- did -- were there any restrictions
4  or limitations on HCMFA's ability to speak with
5  Mr. Post prior to March 1st, 2021?
6  A    So once -- so Jason -- one important
7  component here is Jason Post did leave the debtor,
8  and working with Mr. Seery, I believe, to then
9  leave and become an employee of NexPoint Advisors,
10  and that was at the request of our retail board,
11  as there were restrictions on Mr. Post at that
12  time.
13       And as chief compliance officer of the
14  funds, the board had become very uncomfortable
15  that they had restrictions on Mr. Post.  And so it
16  was in everybody's interest to allow him to become
17  an employee of NexPoint Advisors, and so that was
18  late 2020, I believe.  I don't know the exact
19  date.  And at that time, there were certain things
20  that Jason was able to then help the adviser with,
21  but there were still restrictions.  And he had
22  limited access to his prior data.  He left the
23  debtor, but he didn't have -- I believe he had
24  restrictions on what he could access in the
25  information.

Page 34

Dustin Norris

1
2    Q    Okay. But it is fair to say that between
3    January 21st, 2021, the day that the complaint was
4    filed, and March 1st, 2021, the date that HCMFA
5    filed its original answer, HCMFA had complete and
6    unfettered access to you, to Mr. Dondero, and
7    Mr. Post; correct?
8    A    Again, the complete and unfettered access
9    on the Jason Post aspect, they could have talked
10   to him. I'm not sure if there were any other
11   restrictions related to what he had or information
12   he had or based on his prior role of the debtor,
13   he was restricted on what he could or couldn't
14   talk about, if he had any lease agreement. I'm
15   not certain on that. But, yes, we could talk
16   to -- or HCMFA could talk to Mr. Post.
17   Q    Okay. And the topics that you just raised
18   are speculation on your part; correct?
19   A    It is.
20   Q    You're not aware of any restriction of --
21   you don't have any knowledge of any restriction or
22   limitation placed on HCMFA in respect of its
23   ability to communicate with Mr. Post between
24   January 21st, 2021, and March 1st, 2021; correct?
25   A    Based on my personal knowledge, no. There

Page 35

Dustin Norris

1    could have been something, but --
2    Q    Okay. I'm just asking about your
3    knowledge, not what could have been.
4         All right. So we're going to use
5    March 1st, 2021, as the answer date.
6         Are you aware of any document that
7    HCMFA filed with the bankruptcy court prior to the
8    answer date that concerns or relates in any way to
9    the notes?
10   A    I'm thinking if I'm aware.
11        Not that I'm aware of.
12   Q    Are you aware -- withdrawn.
13        Do you know what a "pleading" is, if I
14   use that phrase?
15   A    I believe so. These are the answers that
16   we gave. The first answer, the amended answer,
17   and the second amended answer, that -- I believe
18   those are the two pleadings. Is that correct?
19   Q    You know what? I think my first question
20   was broad enough, because I just used the word
21   "document," so I'm going to let that sit.
22        Are you aware of any argument that
23   anybody ever made on behalf of HCMFA prior to the
24   answer date that concerned or related to any of

Page 36

Dustin Norris

1    the notes?
2    A    And you mean an argument to the Court?
3    Q    Yes.
4    A    Not that I'm aware of.
5    Q    Okay. Are you aware of any statement of
6    any kind that was made to the bankruptcy court
7    prior to the answer date that concerned or related
8    in any way to the notes?
9    A    Not that I can remember. But there's
10   obviously been a lot of documents with the Court,
11   but not that I'm aware of.
12   Q    Right. But you -- did you do anything to
13   prepare yourself to answer questions on Topic 12?
14   A    Yes.
15   Q    And do you believe that you're able to
16   competently answer my questions relating to
17   Topic 12 as HCMFA's 30(b)(6) witness?
18   A    I am. But I guess in this regard you're
19   asking to my knowledge. And so, I guess, that --
20   are you asking my personal knowledge or as my
21   knowledge as a representative of the company?
22   Q    All right. I appreciate that.
23        I am only examining you today in your
24   capacity as a 30(b)(6) witness.

Page 37

Dustin Norris

1    A    Okay. That makes sense. Okay.
2    Q    And so if I use the phrase "you," just as
3    we did in the deposition notice, I'm really
4    referring to HCMFA; is that fair?
5    A    That's fair.
6    Q    Okay. So let me just ask the questions
7    again with that clarification.
8         Are you aware, in your capacity as the
9    30(b)(6) witness today, of any document that was
10   ever filed on behalf of HCMFA prior to the answer
11   date that concerns or relates to the notes?
12   A    No.
13   Q    Are you aware, in your capacity as the
14   HCMFA 30(b)(6) witness, of any argument that was
15   ever made to the Court prior to the answer date
16   that concerns or relates in any way to the notes?
17   A    No.
18   Q    Are you aware of -- again, when I use the
19   phrase "you," I'm referring to HCMFA, just to
20   shorten these questions a little bit.
21        Are you aware of any statement that
22   was ever made on your behalf to the bankruptcy
23   court prior to the answer date that concerns or
24   relates in any way to the notes?

Page 38

Dustin Norris

1
2  A    Not that I recall.
3  Q    Okay.  When did HCMFA first learn of the
4  existence of the notes?
5  A    So HCMFA's position is that they learned
6  of them when they were demanded, or after they
7  were demanded.  I don't even know that when we
8  received -- or who they were sent to, but it was
9  after they were demanded.
10  Q    Okay.  And do you recall when they were
11  demanded?
12  A    I don't have the exact date.  If you could
13  remind me or show a document, that might be
14  helpful.  I don't know if you have the demand, or
15  if that's one of the documents, but I don't
16  remember the specific date.
17        MR. MORRIS:  Can we put Exhibit 1
18  up on the screen?
19        It's actually the complaint -- the
20  original complaint, sir.
21        (Exhibit 1 tendered.)
22  BY MR. MORRIS:
23  Q    If you go to Exhibit 3, do you see there's
24  a demand letter there?
25  A    Yes.

Page 39

Dustin Norris

1
2  Q    And you've seen that before; right?
3  A    I have.
4  Q    Okay.  And are you -- do you see that it
5  was sent to Mr. Waterhouse?
6  A    Yes.
7  Q    And Mr. Waterhouse was the treasurer of
8  HCMFA on December 3rd, 2020; correct?
9  A    Correct.
10  Q    Okay.  So is it fair to say that HCMFA
11  knew of the existence of the notes on
12  December 3rd, 2020?
13  A    It's safe to say that Frank Waterhouse
14  received this.  I'm not sure the date exactly
15  when -- when the company became aware.  Frank,
16  yes, is an officer.  He's also -- the irony here,
17  he's CFO of the debtor who is demanding this, so
18  he's demanding it from himself.  I know it's
19  coming from -- from who is sending it, but at this
20  time, I don't know when Mr. Dondero or other
21  officers became aware of it.  Sometime after
22  December 3rd.
23  Q    Okay.  Do you know if HCMFA ever responded
24  to this demand letter prior to the time the
25  complaint was filed on January 21st, 2021?

Page 40

Dustin Norris

1
2  A    I don't believe they did.
3  Q    So it's fair to say that nobody on behalf
4  of HCMFA ever told any representative of Highland
5  that it was previously unaware of the existence of
6  the notes?
7  A    Sorry.  Can you repeat that one more time?
8  Q    HCMFA never responded to this letter prior
9  to the commencement of the lawsuit; right?
10  A    Not to my knowledge, didn't respond to
11  HCMLP on this.
12  Q    Is there a reason why they didn't reach
13  out to Highland to let Highland know that it
14  disputed the existence of these notes?
15  A    I don't know if there's a reason, but I do
16  know, during this time period, you'll recall,
17  December and January, leading up to the actual
18  demand -- or the initial complaint, there was a
19  lot going on.  We were almost in daily depositions
20  and court hearings.  There was a hearing
21  injunction handed out against Jim.  There was a
22  restraining order.  There -- TRO.  There were
23  lawsuits against the advisers.  And so there was a
24  lot going on, and I think this was put back in the
25  priority line.

Page 41

Dustin Norris

1
2        Again, all of the compliance and legal
3  functions at this time, December 2020, were being
4  outsourced to HCMLP, and we were told they were
5  unable to help with anything that was inimical to
6  the debtor.  And so there were no employees of
7  HCMFA that were legal compliance professionals,
8  and so this -- this was -- I guess -- this is my
9  speculation -- put in the back of the line, or
10  further back from the actual litigation that they
11  were defending or working against the daily
12  depositions and coordinating.
13  Q    Do you have any reason to believe, as you
14  sit here right now, that Mr. Waterhouse did not
15  receive this demand letter on or about
16  December 3rd, 2020?
17  A    I don't know.  I don't have any reason to
18  believe that, but I don't know.
19  Q    Okay.
20  A    And I don't recall what he testified to in
21  regard to receiving the demand, but we see here it
22  was sent to him.  We can assume it got sent to
23  him.
24  Q    Okay.  Let me ask the question again, and
25  I would appreciate you listening carefully to my

Page 42

Dustin Norris

1
2 question.
3         As HCMFA's 30(b)(6) witness today,
4 does HCMFA contend that this letter was not
5 received by Mr. Waterhouse on or about
6 December 3rd, 2020?
7         MR. RUKAVINA: Well, that's not our
8     contention. We agree that it was received
9     on or about that date.
10        MR. MORRIS: Okay.
11        THE WITNESS: Yeah. That's --
12    yeah.
13 BY MR. MORRIS:
14    Q    Okay. HCMFA actually knew about the notes
15 just weeks after they were signed; correct?
16        MR. RUKAVINA: Objection; form.
17        THE WITNESS: So the debtor
18    employees who created the notes knew about
19    them, but it was not knowledge of HCMFA.
20    Those were all Highland Capital
21    Management, LP, employees.
22 BY MR. MORRIS:
23    Q    So it's your testimony that HCMFA had no
24 knowledge of the existence of the notes in
25 June 2019; is that correct?

Page 43

Dustin Norris

1
2    A    June 2019.
3         Correct.
4    Q    As the executive vice president of HCMFA,
5 have you ever reviewed HCMFA's audited financial
6 statements?
7    A    I have not.
8    Q    Is there anybody on behalf of HCMFA who is
9 charged with the responsibility of reading HCMFA's
10 audited financial statements?
11    A    Yeah. We -- again, the key here is we
12 outsourced finance, accounting, back-office
13 functions. It includes financial statement
14 preparation. The treasurer of HCMFA is an HCMLP
15 employee, Frank Waterhouse, at that time, and at
16 all times that we're talking about. And so with
17 we -- and Frank is a professional, and his team
18 are professionals, right? We outsource to an
19 accounting group to prepare and oversee, work with
20 the auditors in preparation of those financials.
21 And so they were tasked with that. And we relied
22 on them. And there was not a specialist during
23 this time period that did that.
24    Q    Does Frank Waterhouse have any
25 responsibility, as the treasurer of HCMFA, to make

Page 44

Dustin Norris

1
2 sure that HCMFA's audited financial statements are
3 true, accurate, and reliable?
4    A    Him and his team, yeah. We actually --
5 that's what we rely on them for.
6    Q    And did you rely on him not only in his
7 capacity as an employee of Highland, but in his
8 capacity as the treasurer of HCMFA?
9    A    Yeah, he was -- let's take the first --
10 as a -- in his capacity under the shared services
11 agreement, okay, doing accounting, books and
12 records, audited -- audit support, yes, we relied
13 on him in that capacity. And he also, as an HCMLP
14 employee, served as a treasurer of HCMFA. In that
15 role, we would expect him to oversee the
16 financials.
17        MR. MORRIS: Okay. And move to
18    strike.
19 BY MR. MORRIS:
20    Q    And I'm going to ask you very
21 specifically: As HCMFA's representative today,
22 did Frank Waterhouse have a duty as the treasurer
23 of HCMFA to make sure that HCMFA's audited
24 financial statements were true and accurate?
25    A    That -- very specific from the treasurer

Page 45

Dustin Norris

1
2 role, I would say the treasurer role was to
3 oversee the financial aspects of the advisers.
4    Q    And was one of those aspects HCMFA's
5 audited financial statements?
6    A    As -- yeah. And he was -- again, I'll
7 reiterate, he was the CFO of Highland who was
8 tasked with creating the financial statements for
9 the advisers.
10        MR. MORRIS: Okay. I'm again going
11    to move to strike.
12 BY MR. MORRIS:
13    Q    I'm not asking about his role as CFO of
14 Highland. I'm limiting it strictly to his role as
15 the treasurer of HCMFA.
16    A    And I don't have --
17    Q    Did Frank -- let me ask my question.
18        Is any officer of HCMFA responsible
19 for making sure that HCMFA's audited financial
20 statements are true and accurate?
21    A    I don't know, but I would assume -- and I
22 don't want to make assumptions here as the
23 representative -- but I would assume that the
24 treasurer would have that role.
25    Q    Okay. And what is your assumption based

Appx. 03025

Page 46

Dustin Norris

1    on?
2    A    Based on the understanding of what a
3    treasurer role would be. But I -- I don't have
4    any -- I don't have any knowledge, I'm not
5    representing that we have any roles and
6    responsibilities or defined procedures that the
7    treasurer does this, that, or the other.
8    Q    Okay. Have you -- as you sit here right
9    now, have you ever seen HCMFA's audited financial
10   statements for the period ending December 31st,
11   2018?
12   A    I saw them in the materials that were
13   provided in your schedules, I believe.
14   Q    Okay. Let's --
15   A    That was the first time.
16   Q    Let's take a quick look at it.
17       MR. MORRIS: If we could put up on
18   the screen the document that's been marked
19   Exhibit 45.
20       (Exhibit 45 tendered.)
21   BY MR. MORRIS:
22   Q    Okay. And do you see that this is the
23   first page of HCMFA's audited financial statements
24   for the period ending December 31st, 2018?

Page 47

Dustin Norris

1    A    I do.
2        MR. MORRIS: Okay. And if we could
3    just scroll, I think, to the third page.
4    BY MR. MORRIS:
5    Q    Do you see that it's signed by
6    PricewaterhouseCoopers on June 3rd, 2019?
7    A    I see that the audit opinion is signed by
8    them, yes.
9    Q    Correct. And -- and you're aware that
10   PricewaterhouseCoopers was the outside auditor
11   retained by HCMFA to conduct the audit of HCMFA's
12   financial statements; correct?
13   A    Given that they gave an opinion, yes.
14   Q    Okay. And you have no reason to believe
15   that the document that's up on the screen is
16   anything other than HCMFA's audited financial
17   statements for the period ending December 31st,
18   2018, do you?
19       And we're happy -- I'm happy to scroll
20   through whatever you need to see.
21   A    Yeah. And there they're distinguishing --
22   you have an audit opinion and having audited
23   financials, I assume that you have all that is
24   here. You showed me the first page of the

Page 48

Dustin Norris

1    financials, which --
2    Q    Yeah. Yeah. Let's --
3    A    So I'm assuming that's the --
4    Q    Let's scroll down just a little bit.
5        You can see that the next page is
6    HCMFA's balance sheet. Do you see that?
7    A    I do.
8    Q    Okay.
9        MR. MORRIS: Can we go to
10   "Subsequent Events"? I think it's
11   Page 17.
12   BY MR. MORRIS:
13   Q    Have you seen this page of HCMFA's audited
14   financial statements before?
15   A    Just in preparation for this.
16   Q    Do you understand that in the "Subsequent
17   Events" section, the notes are described in the
18   audited financial statements?
19   A    There is a reference to promissory notes
20   in aggregate of $7.4 million, yes.
21   Q    And those are the two notes that Highland
22   is suing on; correct?
23   A    I would assume that's the case, because
24   the dollar amounts line up. But I don't have the

Page 49

Dustin Norris

1    backup, but I would assume that's the case.
2    Q    And not only do the dollar amounts line
3    up, but do you see that the statement in
4    "Subsequent Events" specifically identifies the
5    notes as having been issued in the year 2019?
6    A    Yes.
7    Q    And are you aware of any notes that
8    anybody in the world contends were signed by HCMFA
9    between January 1st, 2019, and June 3rd, 2019,
10   other than the two notes that Highland is suing
11   on?
12   A    No.
13   Q    Okay. So can you conclude, as HCMFA's
14   30(b)(6) witness, that the notes that are
15   described in the subsequent events are the very
16   notes that are the subject of the pending lawsuit?
17   A    That appears to be the case.
18   Q    Okay. And so it's also fair to say, then,
19   that HCMFA does not dispute that its own audited
20   financial statements that were the subject of a
21   June 3rd, 2019, opinion by PricewaterhouseCoopers
22   disclosed the existence of the notes at issue;
23   correct?
24   A    No. We don't dispute that that was

Page 50

Dustin Norris

1          Dustin Norris
2 included in the financial statements. You know,
3 I -- I think we're going to get into it in our
4 affirmative defenses, but we dispute that the
5 notes were actually valid notes, and we would say
6 that this was an error. These should not have
7 been included, but were included in good faith by
8 the accounting team who thought that they were
9 valid notes.
10    Q    Okay.
11    A    So --
12          MR. MORRIS: I move to strike
13    everything other than the first portion of
14    your answer that was responsive to my
15    question.
16 BY MR. MORRIS:
17    Q    HCMFA does not dispute that it received
18 $2.4 million from Highland on May 2nd, does it?
19    A    No.
20    Q    HCMFA does not dispute that it received
21 $5 million on May 3rd, 2019, does it?
22    A    No.
23    Q    Let's just confirm that, if we can.
24          MR. MORRIS: Can we put on the
25    screen a document that's been marked as

Page 51

Dustin Norris

1          Dustin Norris
2    Exhibit 147?
3          (Exhibit 147 tendered.)
4 BY MR. MORRIS:
5    Q    Okay. Do you see that this is -- or at
6 least this appears to be a bank account statement?
7    A    Yes. BBVA Compass is a bank, so I'll take
8 your representation it's a statement.
9          MR. MORRIS: All right. And if we
10    can just scroll down.
11          All right. Stop right there.
12 BY MR. MORRIS:
13    Q    Do you see that there's a reference on
14 May 2nd to a 2.4-million-dollar transfer?
15    A    I do.
16    Q    Okay. And is that consistent with your
17 testimony just now that on May 2nd, Highland
18 transferred $2.4 million to HCMFA?
19    A    That's correct.
20    Q    And lower on the page, the statement shows
21 a transfer of $5 million on May 3rd; correct?
22    A    Yes.
23    Q    And that's the payment that HCMFA
24 acknowledged -- acknowledges receiving from
25 Highland on that day; correct?

Page 52

Dustin Norris

1          Dustin Norris
2    A    Is this HCMFA's bank statement or is this
3 HCMLP's?
4    Q    No. It's HCMLP's.
5    A    Okay. It just says "Highland Capital
6 Management," and I'm assuming it lines up -- I'm
7 assuming this is the transfer, but --
8    Q    Okay.
9    A    -- I can't confirm an entity. But we're
10 not denying that there was cash received those
11 dates from HCMLP.
12    Q    Okay. And are you aware --
13          MR. MORRIS: We can take this down
14    now.
15 BY MR. MORRIS:
16    Q    Do you recall that Topic Number 10 asks
17 for a witness who can testify about the accounting
18 of these transfers?
19    A    Uh-huh. Yup.
20    Q    Are you prepared to testify on Topic
21 Number 10?
22    A    Yes.
23    Q    Can you tell me how HCMFA accounted for
24 these payments on its books and records?
25    A    I can, yeah.

Page 53

Dustin Norris

1          Dustin Norris
2          So my understanding of the company's
3 position is that -- and -- and it may be helpful
4 to provide some additional color leading up to the
5 accounting. I don't know if we want to address
6 that later in our affirmative defenses, if you
7 have a preference there.
8    Q    I'd just like you to -- maybe it's my
9 question, but I just want you to focus on my
10 question.
11    A    Uh-huh.
12    Q    And that is: First, do you know how HCMFA
13 accounted for these two payments in its books and
14 records?
15    A    Yeah. So the HCMLP employees who were
16 tasked with creating books and records of the
17 adviser, the accounting team recorded, we -- we --
18 our position is that is an incorrect recording of
19 a payable to HCMLP. And so there was a payable
20 booked on the balance sheet of HCMFA by the HCMLP
21 accounting team.
22          MR. MORRIS: Okay. I'm going to
23    move to strike.
24 BY MR. MORRIS:
25    Q    I -- I'd appreciate not having the

Page 54

Dustin Norris

1
2 commentary. Your counsel can ask those questions
3 or if it's responsive to a question. I'm just
4 asking a very simple question.
5 A    Yup.
6 Q    How -- how did HCMFA record these payments
7 on its books and records?
8 A    Yeah. My understanding is they recorded a
9 payable to HCMLP, a liability.
10 Q    And do you know when HCMFA first
11 discovered that the payments were booked on its
12 books and records as a liability?
13 A    Our position is that that was revealed
14 through after the -- sorry -- after the demand.
15 And as we began to get additional information --
16 particularly, and I would refer you to
17 Mr. Sauter's declaration, our amended response,
18 and our second amended response that was filed
19 yesterday regarding each of those time periods.
20 But it was after the demand we found out how it
21 was booked.
22 Q    Okay. So just to simplify this: HCMFA's
23 books and records recorded the transfers on
24 May 2nd and May 3rd as liabilities from HCMFA to
25 Highland; correct?

Page 55

Dustin Norris

1
2 A    So my understanding is the audited
3 financials recorded in a subsequent event -- you
4 showed me that -- they recorded a subsequent
5 event. The balance sheet as of 12/31/2018 wasn't
6 amended because it was a subsequent event. But on
7 their books and records at that time, or
8 subsequent to that, they recorded a liability.
9 Q    And -- and do you know if that liability
10 was recorded contemporaneously in May of 2019?
11 A    I don't know.
12 Q    But it's -- it's HCMFA's position that,
13 notwithstanding the recording of the liability on
14 it's books and records, that HCMFA didn't learn of
15 that fact until after the demand letter was sent
16 in December of 2020.
17     Do I have that right?
18 A    Correct.
19 Q    Okay. Have there been any changes in
20 HCMFA's books and records since it learned of the
21 promise -- of the existence of the promise --
22 withdrawn.
23     Has -- has HCMFA changed its books and
24 records after learning that the payments were
25 recorded as liabilities?

Page 56

Dustin Norris

1
2 A    I'm not aware of how it's been treated
3 since then.
4 Q    Okay.
5     MR. RUKAVINA:  And, John, no
6 urgency, but find some time in the near
7 future for the restroom break. The
8 morning coffee is working its magic.
9     MR. MORRIS:  Happy to do it right
10 now, Davor.
11     THE WITNESS:  I can use that, too.
12 I'm almost through my water bottle.
13     MR. MORRIS:  All right. So, look,
14 it's 12:05. Let's just come back at 12:15
15 or 11:15.
16     THE WITNESS:  Thank you.
17     MR. MORRIS:  Thanks so much.
18 (Recess from 11:05 a.m. to 11:16 a.m. CST)
19 BY MR. MORRIS:
20 Q    To the best of your knowledge, has HCMFA
21 ever changed its books and records in order to
22 reverse the booking of the payments that were made
23 by Highland in May from liabilities to something
24 else?
25 A    I'm not aware of how the accounting

Page 57

Dustin Norris

1
2 entries have been done since then, but -- yeah,
3 I'm not aware.
4 Q    Okay. But you'll -- you'll agree that the
5 accounting for these two payments was among the
6 30(b)(6) topics, correct, Number 11 -- Number 10?
7 A    Yes.
8 Q    And as the 30(b)(6) witness for HCMFA, can
9 you confirm that, to the best of your knowledge,
10 those payments were booked as liabilities and the
11 booking of those payments as -- as liabilities has
12 not changed?
13 A    To the best of my knowledge, they were
14 booked as liabilities, and I don't know how they
15 have been treated. There's not been a year-end
16 audit for 2021, and I'm sure the accountants and
17 auditors will determine based on current facts and
18 circumstances how those will be reported.
19 Q    Okay. But as of today, you have no
20 knowledge that the booking of those payments as
21 liabilities has ever been changed; correct?
22 A    Those -- there's no financial statements
23 that are prepared, like a balance, intra-year, during
24 the year, for audited purposes. And so, you know,
25 that -- that would be, I'm sure, determined based

Page 58

Dustin Norris

1
2    on any audit needs.
3    Q    Does HCMFA maintain an accounts payable
4    ledger?
5    A    I'm sure it does.
6    Q    Did you do anything to try to ascertain
7    whether or not these notes appear as liabilities
8    on the accounts payable ledger?
9    A    As current accounts payable ledger?
10   Q    Yeah.
11   A    No.
12   Q    Did you -- other than the audited
13   financial statements, did you take any steps to
14   ascertain how these payments were recorded in
15   HCMFA's books and records, or is -- or is it only
16   on the audited financial statements?
17   A    So at the time that they were recorded, we
18   know they were recorded as liabilities on the
19   books and records.
20   Q    And when you say that it was recorded as a
21   liability in the books and records, where in the
22   books and records was it recorded as a liability?
23   A    Meaning on the balance sheet?
24   Q    Okay. So the balance sheet is one place;
25   is that right?

Page 59

Dustin Norris

1
2    A    Yes. We record liabilities on the balance
3    sheet.
4    Q    Okay. Did HCMFA complete its audit for
5    2019?
6    A    I don't -- not that I'm aware of. I don't
7    believe they had an audit for 2019.
8    Q    Okay. Now, HCMFA contends that the
9    payments were -- should not have been booked as a
10   loan because they were supposed to be compensation
11   for the error that Highland made in connection
12   with the NAV error; correct?
13   A    Correct.
14   Q    Okay. Did HCMFA ever issue an invoice or
15   a bill of any kind to Highland?
16   A    Not that I'm aware of.
17   Q    Okay. Is there anything in HCMFA's books
18   and records that reflects its position that the
19   payments should not have been billed as
20   liabilities, but they should have been billed as
21   income?
22   A    As compensation?
23   Q    Yeah.
24   A    Yes.
25        Anything in their records?

Page 60

Dustin Norris

1
2    Q    Yes.
3    A    I -- I would refer you to the testimony of
4    Mr. Dondero and Mr. Waterhouse, who both testified
5    to this; Mr. Dondero that it was compensation, and
6    that Frank testified in his deposition that he
7    don't -- didn't remember Mr. Dondero saying it was
8    a loan, and that Mr. Dondero told him to get the
9    money from Highland. And so it's -- it's -- that
10   is on the record and in the record.
11        But in HCMFA's other records, we have
12   the president of HCMLP, Jim Dondero, who made that
13   transfer and has said that that is for
14   compensation.
15        So there is -- but there is -- I
16   wouldn't -- I would be surprised to see some kind
17   of a settlement agreement or invoice with -- to
18   affiliates.
19        MR. MORRIS: Okay. I move to
20   strike.
21   BY MR. MORRIS:
22   Q    And my answer -- my question is really
23   simple.
24        Is there anything in HCMFA's books and
25   records that reflects its position that these

Page 61

Dustin Norris

1
2    payments were supposed to be made as compensation
3    rather than in the form of loans?
4    A    I -- I would say that the pleadings are a
5    part of our books and records now. I would say
6    depositions. And within that, it is well
7    documented.
8    Q    Okay. Let me ask a different question
9    then.
10       Remember we were using the answer date
11   as being March 1st, 2021.
12   A    Correct.
13   Q    Is there anything in HCMFA's books and
14   records that was created prior to March 1st, 2021,
15   that corroborates HCMFA's position that the
16   payments were intended to be compensation and not
17   in the form of a loan?
18   A    Yeah, and I would, again, refer you to
19   DC's -- what do you call it -- declaration. That
20   prior to that, we didn't have access to -- to,
21   largely, our books and records as that was
22   outsourced to Highland Capital Management, LP, and
23   to their employees, legal, compliance, and
24   accounting. So our position is we did not have
25   anything at that point related to this agreement.

Page 62

Dustin Norris

1
2      MR. MORRIS: Okay. I move to
3   strike.
4   BY MR. MORRIS:
5   Q      And listen carefully to my question.
6          Is HCMFA aware of anything that was
7   created prior to the answer date that corroborates
8   its position today that the payments were intended
9   to be treated as compensation rather than a loan?
10  A     I -- I think as far as books and records
11  go, we have NAV error memos, we have communication
12  with the SEC. Right?
13         There's -- there is a lot of
14  information related to the services that were
15  performed under the shared services agreement,
16  were for valuation purposes that Highland had
17  created and was responsible for the valuation
18  process, and that is a host of documents that are
19  in the record, yes.
20         MR. MORRIS: Okay. I -- I move to
21  strike.
22  BY MR. MORRIS:
23  Q     I'm asking about accounting. Maybe it's
24  my fault. Okay? I'll -- I'll take responsibility
25  for this. I'm asking as a matter of accounting.

Page 63

Dustin Norris

1   I'm still on 30(b)(6) Topic Number 10.
2
3          Is there anything in HCMFA's books and
4   records that was created before the answer date
5   that shows that the payment should have been
6   accounted for as compensation rather than as a
7   loan?
8   A     As far as an accounting record, I wouldn't
9   expect there to be, because the accountant
10  function was outsourced to HCMLP, and -- and I
11  would refer you to our latest response and our
12  amended response of -- of what was discovered and
13  found throughout the process here.
14         The accountants recorded a liability
15  and they thought it should be liability. And so,
16  no, there wasn't anything, to my knowledge, prior
17  to that that was in the accounting books and
18  records. And I -- you know, I'm not surprised
19  there wasn't, because of the facts that you'll --
20  you'll see in our amended answers.
21  Q     Okay. Do you know whether, if it was
22  intended to be compensation, that HCMFA's income
23  statement should have shown the inflow of the
24  $7.4 million?
25  A     I don't know how it would be reported for

Page 64

Dustin Norris

1
2   accounting purposes. I -- I do have an accounting
3   background, but I haven't done accounting in a
4   long time. And I'm not an expert in adviser
5   financial statements. So I would say I don't
6   have -- and I guess -- I guess that -- stepping
7   back and answering on behalf of the company here,
8   I don't have a knowledge of how that would be
9   recorded for income statement purposes.
10  Q     Okay.
11  A     But it would -- it would be compensation
12  that would be reported --
13  Q     Okay.
14  A     -- somewhere in the financial statements.
15  Q     So it's your testimony today, as HCMFA's
16  30(b)(6) witness, that HCMFA was unaware that its
17  audited financial statements disclosed these notes
18  until after the lawsuit was commenced.
19         Do I have that right?
20  A     That's correct.
21  Q     And it's your position today, as HCMFA's
22  30(b)(6) witness, that HCMFA was unaware that the
23  payments that were made by Highland were booked as
24  liabilities until sometime after the lawsuit was
25  commenced; correct?

Page 65

Dustin Norris

1
2   A     Yes, that's correct. The accounting
3   function was outsourced to HCMLP.
4   Q     Okay. And there's -- was there anybody --
5   was there any officer of HCMFA who had
6   responsibility for reviewing HCMFA's balance
7   sheet?
8   A     I believe I already answered this earlier.
9   Q     I actually asked the question on the
10  audited financial statements.
11  A     Okay.
12  Q     Now I'm going to ask specifically. Is
13  there anybody who served as an officer of HCMFA
14  who had the responsibility of making sure that
15  HCMFA's balance sheets were true and accurate?
16  A     Yes. So Frank Waterhouse and his team,
17  Frank was the named treasurer of HCMFA, and his
18  role at HCMLP, as a service provider, would have
19  had that responsibility along with his team.
20  Q     Okay. Let's go to the next topic,
21  Topic 11. Do you see Topic 11 refers to
22  "communications in 2020 with any retail board --
23  A     Yes.
24  Q     -- concerning the amounts due and owing to
25  Highland"?

Page 66

Dustin Norris

1
2  A    Yes, I do.
3  Q    Okay. HCMFA is a financial advisory firm;
4  correct?
5  A    It is.
6  Q    And it provides advisory services to
7  certain funds; correct?
8  A    It does.
9  Q    And those advisory services are provided
10 pursuant to written agreements; correct?
11 A    They are.
12 Q    And those agreements are subject to annual
13 review; correct?
14 A    They are.
15 Q    And those agreements the principal source
16 of HCMFA's revenue?
17 A    Yes, I believe so.
18 Q    Okay. It's among the most important
19 contracts HCMFA has; correct?
20 A    Yes.
21 Q    In fact, it's the reason for HCMFA's
22 existence, is that fair, is to serve the funds?
23 A    Largely, yes.
24 Q    And the funds are managed by boards;
25 correct?

Page 67

Dustin Norris

1
2  A    Correct.
3  Q    And can we refer to the boards that manage
4  the funds that served by the advisers as "the
5  retail board"?
6  A    Yes.
7  Q    Okay. Did you participate -- are you
8  aware that in the fall of 2020 the retail board
9  conducted a review in connection with the
10 determination as to whether or not to renew
11 HCMFA's contracts?
12 A    I am aware, yes.
13 Q    Did you participate in that process?
14 A    I did, in some -- in some parts, yes.
15 Q    What parts did you participate in?
16 A    Yeah, so I attended the board meetings in
17 relation to -- we call this the 15(c) analysis.
18 And so it's Section 15(c) of the 1940 Act requires
19 the board to determine and renew the contracts on
20 an annual basis. And so they look at a number of
21 factors. And there's, I believe, certain case law
22 that dictates the things that they should look at:
23 Quality of services, performance, fees.
24        And so my aspect -- the biggest part
25 of my contribution is to talk about the

Page 68

Dustin Norris

1
2  performance of the funds, how they performed
3  during the year. We hire an outside third party
4  to come in and talk about performance and fees. I
5  help provide insight, talk about -- as I oversee
6  the sales and business development of the firm, I
7  talk about inflows and outflows, which help --
8  helps impact the economies of scale funds. We
9  have certain funds that are shrinking, some that
10 are growing. So talking about future, talking
11 about mergers, talking about different aspects of
12 that.
13        And so my -- mine is more of the sales
14 business development function and regarding the
15 services. One of the things that we do as the
16 adviser is we, again -- they have to determine
17 that the quality of services we're providing are
18 sufficient, and so they have to get comfortable
19 with the various functions.
20 Q    Okay. Who else on behalf of HCMFA
21 participated in the 15(c) analysis that you've
22 just described?
23 A    Yeah, so as -- again, going back to the
24 shared services agreement, I point you to the
25 services that are provided by HCMLP. In large

Page 69

Dustin Norris

1
2  part, this process is managed and run by the HCMLP
3  employees as part of that shared services. Legal
4  and compliance help draft the memos. They are --
5  Q    And I'm going to interrupt you, and I
6  really apologize for doing that. I'm not asking
7  about HCMLP.
8  A    Yeah.
9  Q    These are -- these are HCMFA's contracts;
10 correct?
11 A    They are.
12 Q    And they're the most important contracts
13 that HCMFA has; correct?
14 A    Correct.
15 Q    Okay. So who -- which officers of HCMFA
16 are involved in the 15(c) analysis?
17 A    Yeah, one -- going back to -- to clarify
18 on your -- you know, this is the most important
19 thing, you know, that we have, it is, and as such
20 we have -- a lot of those functions, and to talk
21 about HCMFA's role, we have front-office
22 investment professionals who join those meetings
23 to talk about the funds and performance. The
24 aspects of the adviser that we provide and source
25 is the management of the funds: The performance,

Page 70

Dustin Norris

1 the investment selection. And then we bring in
2 HCMLP to provide the various other services. And
3 so they are a huge part of that. To say that --
4 yeah, it's not -- they are legal, compliance,
5 accounting, finance, back office, settlement.
6 Those are all functions that they're providing.
7 Q   I know -- I appreciate that they're
8 functions that they play under the shared services
9 agreement.
10 A   Yup.
11 Q   Let me -- let me move on.
12 A   Okay. Go ahead.
13 Q   In October 2020, HCMFA informed the retail
14 board that HCMFA was obligated to pay Highland the
15 outstanding principal amount due under the notes;
16 correct?
17        MR. RUKAVINA: Objection; form.
18        THE WITNESS: Yeah, the
19     obligated -- I would -- sorry. Can you
20     ask the question again?
21 BY MR. MORRIS:
22 Q   Sure.
23        In October 2020, HCMFA informed the
24 retail board of the existence of the notes;

Page 71

Dustin Norris

1 correct?
2 A   Not that I'm aware of. If you have
3 something you could -- you know, a document or
4 something that you're thinking of?
5 Q   So you participated in the 15(c) process,
6 and you have no knowledge of HCMFA informing the
7 retail board of the existence of the notes?
8 A   Of these notes? No. And I would say that
9 there was a question from the retail board posed
10 to the advisers, which we passed along to HCMLP,
11 which included Lauren Thedford as an HCMLP
12 employee and Frank Waterhouse, is: Were there any
13 liabilities to -- owed to Highland?
14 Q   So let's take a look -- I'm sorry. Go
15 ahead.
16 A   No, go ahead.
17 Q   I was going to say, let's take a look at
18 that.
19        MR. MORRIS: So if we could put up
20     on the screen Exhibit 59.
21        (Exhibit 59 tendered.)
22 BY MR. MORRIS:
23 Q   Have you seen this document before, sir?
24 A   I have.

Page 72

Dustin Norris

1 Q   And this is the report that the advisers
2 gave to the retail board in October 2020 as part
3 of the 15(c) analysis; correct?
4 A   Yes, working closely with HCMLP in the
5 accounting, compliance, and legal function did
6 draft this.
7 Q   Okay. And who -- who on behalf of the
8 advisers authorized the sending of this memo?
9 A   I don't know that there's a formal
10 authorization. Lauren Thedford, who was the
11 secretary of the advisers and an HCMLP employee,
12 helped prepare the memo along with the rest of the
13 legal and compliance team. Thomas Surgent was
14 probably involved.
15        MR. MORRIS: Okay. I'm going to
16     move to strike.
17 BY MR. MORRIS:
18 Q   I don't want to know who was probably
19 involved. I actually asked a very specific
20 question, and if you don't know, please just say
21 you don't know.
22        Who on behalf of the advisers
23 authorized the sending of this memo to the retail
24 board?

Page 73

Dustin Norris

1 A   I don't know.
2 Q   Did anybody on behalf of the advisers ever
3 suggest that this memo was wrong or inaccurate in
4 any way to the best of your knowledge?
5 A   At that time? Is that what you mean?
6 Q   Yes.
7 A   No, not -- not to my knowledge.
8 Q   Okay. When did you see this memo for the
9 first time?
10 A   I may have been copied on it at the time.
11 I don't remember if I read it, but I did review
12 it -- and actually, I didn't review the whole
13 memo. I reviewed the one email that was related
14 to the note payable in this. So I don't know that
15 I read the whole memo.
16 Q   So -- so --
17        MR. MORRIS: Can we see how long
18     the memo is?
19 BY MR. MORRIS:
20 Q   So it's two pages, and it's got some
21 charts; is that fair?
22 A   That's fair.
23 Q   And in October 2020, you were the
24 executive vice president of every single entity

Page 74

Dustin Norris

2  that this email is being sent to and from;
3  correct?
4    A    I'm looking at the entities.
5        I'm executive vice president of most
6  of the entities.
7    Q    Okay.  You're the executive vice president
8  of each of the entities that are sending this
9  memo; correct?
10   A    No.  Not NexPoint Securities.
11   Q    I appreciate that.  Thank you for the
12  clarification.
13        Did you review this before it was
14  sent?
15   A    I don't remember.
16   Q    Did you take any steps to make sure that
17  it was accurate?
18   A    Probably not.  And that wouldn't have been
19  my function.  We had a legal and compliance team
20  that was -- through the shared services agreement
21  that prepared memos.  This is going to the board.
22  That would have all obviously gone through legal
23  and compliance.  It wouldn't have been my
24  function.
25   Q    Did anybody who served as an officer or

Page 75

Dustin Norris

2  employee of HCMFA have any responsibility to make
3  sure that this memo was true and accurate before
4  it was sent to the retail board?
5    A    Lauren Thedford was the secretary of the
6  advisers and the funds, and I believe this has to
7  do with -- and depending on the material, I think
8  this has to do with the note, and other things.
9  So the finance team, Frank Waterhouse and his team
10  at HCMLP, would have been supplying those answers.
11   Q    Okay.  And why do you keep saying Frank
12  Waterhouse at HCMLP instead of Frank Waterhouse as
13  the treasurer of the entity that's sending this
14  memo?
15   A    Because Frank was the CFO of Highland who
16  was responsible for the accounting, finance,
17  back-office functions of these funds.  And the
18  answer -- the adviser did not have that
19  information, and intentionally hired HCMLP to
20  provide that function.  And so that is how it was
21  viewed.  Those were HCMLP employees, and that was
22  under the shared services agreement.
23   Q    Is it your testimony as the HCMFA 30(b)(6)
24  witness that Frank Waterhouse did not have any
25  responsibility in his capacity as the treasurer of

Page 76

Dustin Norris

2  HCMFA to make sure that this report was true and
3  accurate before it was sent to the retail board?
4    A    I don't know of any function or
5  requirement of his role as treasurer of HCMFA that
6  he was responsible for reviewing 15(c) memos prior
7  to going to the board.
8    Q    And other than Lauren Thedford, you can't
9  identify any officer or employee of HCMFA who had
10  any responsibility to make sure that this report
11  was true and accurate before it was sent; is that
12  correct?
13   A    No.  And I can't -- and I would, again, go
14  back to legal.  And this is a memo that is going
15  to the board and would have a legal and compliance
16  function that would have been provided services by
17  HCMLP.  And that was always the case.  Those
18  employees, for years, have provided the
19  legal/compliance support of memos of the 15(c)
20  process and the support for everything that went
21  into it.
22        MR. MORRIS:  Okay.  Move to strike.
23  BY MR. MORRIS:
24   Q    Do you know if Jim Dondero reviewed this
25  before it was sent?

Page 77

Dustin Norris

2    A    I don't know for sure, but I highly doubt.
3  He was never, to my knowledge, involved in
4  drafting or reviewing 15(c) memos.
5    Q    Okay.  You'll agree that this memo was
6  sent by the advisers in response to the retail
7  board's questions; correct?
8    A    Correct.
9    Q    And you'll agree --
10   A    And actually, let me -- let me correct
11  that.
12        It was from the advisers.  I believe
13  that HCMLP employees sent it, getting back to --
14  it was sent by -- technicality, but I believe
15  Lauren Thedford would have sent this.
16   Q    And why do you say that she sent it in her
17  capacity as an HCMLP employee rather than as the
18  secretary of the entity that's actually the author
19  of the memo?
20   A    Because that was the function that they
21  were providing as part of the shared services
22  agreement.  And I -- yeah.  That was what -- she's
23  part of the legal team at HCMLP, and that was the
24  service she was providing.  We didn't have a legal
25  and compliance function at HCMFA.

Page 78

1          Dustin Norris
2   Q    Okay.
3          MR. MORRIS:  Can we scroll down to
4   Question 2, please?
5   BY MR. MORRIS:
6   Q    Have you seen Question 2 before?
7   A    Yes.
8   Q    Do you have an understanding of what was
9   being requested by the retail board in Question
10  Number 2?
11  A    Yes.  They are asking for amounts
12  currently payable or due in the future to HCMLP by
13  HCMFA or NexPoint Advisors.
14  Q    And -- and did the advisers report to the
15  retail board in October 2020 that, quote,
16  "$12,286,000 remains outstanding to HCMLP from
17  HCMFA"?
18  A    It says it right there.  That's in the
19  memo.
20  Q    Okay.
21  A    And I would note that came from Frank
22  Waterhouse and his team, that information, the
23  accounting department at HCMLP.
24         MR. MORRIS:  Okay.  I move to
25  strike everything after the portion of

Page 79

1          Dustin Norris
2   your answer that was responsive to my
3   question.
4   BY MR. MORRIS:
5   Q    As HCMFA's 30(b)(6) witness today, have
6   you done anything to determine whether or not the
7   $12.286 million number includes the principal
8   amount of the notes?
9   A    Looking at it, we can't tell.  Because it
10  doesn't line up exactly with those notes.  There
11  were other notes that had been recorded in the
12  books for several years before.  And if you add
13  those two together, it doesn't add up.  So it's
14  not clear.
15  Q    Did you read the testimony of Mr. Klos and
16  Ms. Hendrix?  I think you said you did; right?
17  A    I did.
18  Q    Did you read the portion of their
19  testimony where they said that this number
20  includes the notes as well as certain other
21  amounts that were due and owing to certain
22  Highland affiliates?
23  A    I did -- I didn't read every single line,
24  and there were, between the two of them -- I don't
25  know -- 600 pages.  So if it's in there and you

Page 80

1          Dustin Norris
2   can point to it, then I can take your
3   representation.  But I don't remember that.
4   Q    All right.  So did anybody acting on
5   behalf of HCMFA -- withdrawn.
6          Did any officer of -- or employee of
7   HCMFA do anything to make sure the information in
8   this response was true and accurate before it was
9   sent to the retail board?
10  A    We received it from the individuals
11  responsible.  And there was no -- you know, there
12  was no reason to doubt that it was incorrect.
13  Right?  These were professionals.  We were relying
14  on them.  This is Frank Waterhouse, Dave Klos,
15  Kristen.  We anticipated this would be accurate.
16  Q    Okay.  You anticipated it.  But it's your
17  testimony that no officer or employee of HCMFA did
18  anything independently to make sure that it was
19  accurate; that they completely and 100 percent
20  just deferred and relied on somebody else under a
21  contract?
22  A    Frank Waterhouse was the treasurer.  You
23  said any -- any officer.  He was -- in his role,
24  he provided this information.  And I don't know
25  his extent of how he looked into it, but if you

Page 81

1          Dustin Norris
2   look at the email chain, it didn't look too
3   extensive.  And if you even look at this, he's
4   saying that the earliest the note between HCMLP
5   and HCMFA can come due is May 21st.  He himself
6   seems to be confused here, because as we found out
7   through discovery and in the testimony of what has
8   come out, there was an agreement -- that was a
9   separate agreement.  That wasn't related to the
10  notes at issue in this case.
11         And so I don't know the extent that
12  was gone into this, but it -- it -- there's
13  confusion even in the response.
14         MR. MORRIS:  Okay.  I move to
15  strike.
16  BY MR. MORRIS:
17  Q    Again, I was just asking about the
18  identity of anybody who was charged with the
19  responsibility of making sure that this was true
20  and accurate.
21         Is there any officer or employee of
22  HCMFA who was charged with the responsibility of
23  making sure this response was true and accurate?
24  A    Yeah.  It was sent to -- the request went
25  to Frank Waterhouse because he and his team would

Page 82

Dustin Norris

1
2 have this information. That's -- that's where we
3 would get this information.
4   Q   Okay. Thank you.
5       MR. RUKAVINA: Hey, John, let me
6   just interject for a little. Let's go off
7   the record for just a minute.
8       (Discussion off the record.)
9 BY MR. MORRIS:
10   Q   Do you know, as HCMFA's 30(b)(6)
11 representative, whether the $12.286 million
12 includes the $7.5 million -- withdrawn.
13       Do you know if the 12. -- withdrawn.
14       As HCMFA's 30(b)(6) witness, do you
15 know whether the $12.286 million referenced in
16 Response Number 2 includes the $7.4 million in
17 principal amount on the notes?
18   A   I don't.
19   Q   Okay. Did you do anything to try to
20 answer that question before appearing for today's
21 deposition?
22   A   Yeah. We discussed this with counsel. We
23 don't have underlying backup. We couldn't talk to
24 Frank Waterhouse on this in preparation, but the
25 numbers just don't match up to principal amounts

Page 83

Dustin Norris

1
2 and what is owing. We don't have information on
3 the other notes. So discussed it with counsel,
4 but I -- we don't have any backup to support or --
5   Q   Did you make -- did you make any attempt
6 to speak with Ms. Thedford?
7   A   No, I didn't. And she wouldn't have that
8 information. She's an attorney and was involved
9 in the legal field, and she's no longer employed
10 there or at Skyview.
11       MR. MORRIS: I move to strike.
12 BY MR. MORRIS:
13   Q   Okay. And so you don't know what the
14 component parts of this $12.286 million number
15 are; correct?
16   A   I don't.
17   Q   Okay. Do you see the last sentence of
18 this response that says, quote: "The adviser
19 notes that both entities have the full faith and
20 support of Jim Dondero," close quote?
21   A   I do.
22   Q   Do you know what that means?
23   A   Other than what Frank Waterhouse
24 testified -- and I, again, refer you to his
25 deposition -- that -- I believe that wording came

Page 84

Dustin Norris

1
2 from him, and he emailed that. So I would refer
3 you to his testimony.
4   Q   Well, as the 30(b)(6) witness, you were
5 asked to be prepared about communications to the
6 retail board; correct?
7   A   Yes.
8   Q   Okay. Did you do anything to try to
9 figure out what that sentence meant -- that
10 sentence meant, other than reading Frank
11 Waterhouse's deposition transcript?
12   A   Knowing that it came from Frank, and Frank
13 elaborated, I didn't do any additional research.
14   Q   Did you ask Mr. Dondero if he was aware
15 that that statement was included in the report to
16 the retail board?
17   A   I did not.
18   Q   Do you know why this statement was
19 included in the report to the retail board?
20   A   I could speculate, but I don't know
21 specifically.
22   Q   Do you know if Mr. Dondero authorized the
23 advisers to inform the retail board, in October
24 of 2020, that the advisers had the full faith and
25 support of Mr. Dondero?

Page 85

Dustin Norris

1
2   A   I'm not aware, and if you look at Frank's
3 testimony, I believe he testified that he -- he
4 didn't have that authority either, but I'm not
5 sure. I would refer you to his -- I don't have
6 any other knowledge.
7   Q   Okay. So it's HCMFA's position that the
8 statement in the last sentence of Response
9 Number 2 was unauthorized. Do I have that
10 correctly?
11   A   I don't know that we're taking that
12 position either way. It wasn't something
13 that -- that we're -- even part of the -- our
14 arguments.
15   Q   I'm not asking if it's part of your
16 arguments. I'm just asking you, as a factual
17 matter, does HCMFA contend that sentence was
18 included without authorization?
19   A   I don't have the knowledge of that.
20 That's -- I'm not going to contend that.
21   Q   Okay.
22   A   It may have been. I don't know.
23   Q   Okay. So this letter was sent over a year
24 ago. Do I have that right?
25   A   What's the date on it?

Page 86

Dustin Norris

1           Dustin Norris
2           MR. MORRIS: If we can go back to
3    the top.
4           THE WITNESS: Yup.
5    BY MR. MORRIS:
6    Q    Okay. Has -- have the advisers ever told
7    the retail board that the response to Question
8    Number 2 was inaccurate in any way?
9    A    Specifically saying, "Hey, let me tell you
10   this memo, Question 2, let me go back, it was
11   inaccurate," no, that was never a specific
12   disclosure of the retail board.
13          However, the retail board is aware of
14   all of the facts and circumstances surrounding the
15   notes, and so they're aware of our position.
16   They're aware of -- they've been demanded.
17   There's been a lawsuit involved on both notes.
18          And -- and -- but, no, this specific
19   Number 2 is incorrect, no. But they're aware of
20   our position and what we found out since then.
21   Q    Okay. Earlier in 2020, before this memo
22   was sent to the retail board, HCMFA had provided
23   to the retail board its financial statements for
24   the period ending June 30, 2020; correct?
25   A    I believe that's typical in our August

Page 87

Dustin Norris

1    meeting as part of the 15(c) process, but -- I
2    don't know if you have that in hand, but I believe
3    that was supplied. I'm not certain. Sometimes it
4    was 12/31 balance sheets, sometimes it was a
5    June 30th balance sheet.
6    Q    Okay. Can we -- are you aware -- have you
7    seen an email exchange that preceded the --
8    finalization of this memo to the retail board?
9    A    I believe it was part of your exhibits.
10   Q    All right.
11          MR. MORRIS: So let's put that up
12   on the screen, Exhibit 36.
13          (Exhibit 36 tendered.)
14   BY MR. MORRIS:
15   Q    So is this the document that you've seen
16   before?
17   A    Yes.
18   Q    Okay.
19          MR. MORRIS: And can we start at
20   the bottom of the document?
21   BY MR. MORRIS:
22   Q    Okay. And do you know who Stacy from
23   Blank Rome is?
24   A    I do.

Page 88

Dustin Norris

1           Dustin Norris
2    Q    And who is that?
3    A    She is independent counsel for the retail
4    board, the independent directors.
5    Q    And did she provide to the people on this
6    email string certain questions that the retail
7    board had in connection with its annual 15(c)
8    review?
9    A    Yes. These were follow-up requests. So
10   they have a memo that she provides early on with
11   an extensive list of questions, and these were the
12   follow-up questions from the board.
13   Q    Okay. And so it was sent to you,
14   actually; correct?
15   A    To me and Lauren.
16          MR. MORRIS: Can we scroll up a
17   little bit, please? Keep going.
18   BY MR. MORRIS:
19   Q    And then Lauren forwards it to certain
20   people, including you; correct?
21   A    She forwards it to Thomas and copies me.
22   Q    Uh-huh. And -- she includes the
23   questions that are being asked by the retail
24   board; correct?
25   A    I don't know if -- I don't know if that's

Page 89

Dustin Norris

1    all of them. I don't know if you have the memo.
2    If you represent that is all the questions,
3    then --
4    Q    Yeah.
5    A    -- then I'll take that representation,
6    but --
7    Q    And -- and Question Number 2 is the same
8    Question Number 2 that we just looked at in the
9    report that was given to the retail board;
10   correct?
11   A    I don't know if it's exact, but -- I don't
12   know if you want to pull that up.
13   Q    Don't you have a copy of it with you right
14   there?
15   A    I don't know if I have a copy of that.
16   Oh, I have the exhibits. What exhibit was that?
17   I have it in PDF.
18   Q    Yeah, that's -- that was 59.
19   A    I'm scrolling. There are 650 pages here.
20          Sorry. Which exhibit again?
21   Q    You know, let's just move on.
22   A    Is it fair to say that Ms. Thedford
23   forwarded to Mr. Surgent, you, and others,
24   questions that had been presented by Stacy, the

Page 90

1           Dustin Norris
2  retail board's outside counsel?
3  A    Just one correction there.  She forwarded
4  it to Mr. Surgent and copied me.
5  Q    Fair enough.
6  A    I'm not on the "To" line.  That would
7  be --
8        MR. MORRIS:  Let's scroll down,
9  please.  Let's scroll.
10 BY MR. MORRIS:
11 Q    And then -- and then she forwards it
12 further to Mr. Waterhouse, Mr. Klos, and
13 Ms. Hendrix.
14       Do you see that?
15 A    I do.
16 Q    And you're still copied on it; correct?
17 A    I am.
18 Q    And do you see that she's asking Frank,
19 Mr. Klos, and Kristin to respond to Question
20 Number 2 that concerns material outstanding
21 amounts currently payable or due in the future to
22 Highland or its affiliates by either of the
23 advisers?
24 A    Yes, it -- HCMLP will take that as a typo.
25 But yes.  And that would be standard.  Lauren

Page 91

1           Dustin Norris
2  would go to them as the source for that
3  information.
4  A    Okay.
5        MR. MORRIS:  And let's scroll up
6  and see the response.
7  BY MR. MORRIS:
8  Q    And do you see Mr. Waterhouse responded
9  with one word:  "Yes"?
10 A    Yes, I see that.
11 Q    And then Ms. Thedford asked if
12 Mr. Waterhouse could provide the amounts.
13       Do you see that?
14 A    I do.
15 Q    And you're still copied on this email
16 chain; correct?
17 A    I am.
18 Q    So --
19 A    Which, again, is not unusual to copy me on
20 some things I wish they wouldn't.  But I was
21 copied on board items fairly regularly.
22       MR. MORRIS:  Okay.  I move to
23 strike.
24 BY MR. MORRIS:
25 Q    I appreciate your wishes, but the question

Page 92

1           Dustin Norris
2  was simply whether or not, you know, you would
3  acknowledge that you were copied on this email.
4  A    Yup, that's my email.
5  Q    Okay.  And let's see what the next
6  response is.
7        And do you see Mr. Waterhouse
8  responds -- can you read Mr. Waterhouse's
9  response?
10 A    I can.  He said:  "It's on the balance
11 sheet that was provided the board as part of the
12 15(c) materials."
13 Q    Okay.  So everybody to whom Mr. Waterhouse
14 has sent -- withdrawn.
15       So you don't dispute, as HCMFA's
16 30(b)(6) witness, that Mr. Waterhouse informed all
17 of the recipients of his email on Tuesday,
18 October 6th, 2020, at 6:05 p.m. that the answer to
19 the retail board's Question Number 2 could be
20 found in HCMFA's balance sheet; correct?
21 A    Correct.
22 Q    Okay.  Let's go --
23 A    Actually, can you go back down to the
24 answer -- the exact question?
25 Q    Of course.

Page 93

1           Dustin Norris
2        Okay.
3  A    "Are there material outstanding amounts
4  currently payable or due to the future by HCMLP to
5  HCMFA" -- yeah -- "or any other affiliate?"
6        Okay.
7  Q    Having read that, does that change your
8  answer at all?
9  A    And so -- go back to your original
10 question on whether his --
11 Q    Right.  So Mr. --
12       MR. MORRIS:  Can we scroll back up
13 to Mr. Waterhouse's response?
14 BY MR. MORRIS:
15 Q    Thank you for your patience, Mr. Norris.
16 A    Uh-huh.
17 Q    You'll see that Mr. Waterhouse responds at
18 6:05 p.m. on October 6th, and my question is a
19 simple one:  Does HCMFA dispute that in
20 Mr. Waterhouse's email that he is telling the
21 recipients that the answer to the retail board's
22 Question Number 2 can be found in HCMFA's balance
23 sheet?
24 A    I would say the answer -- his -- his
25 response is the answer to the retail board is not

Page 94

Dustin Norris

1
2  completely accurate, because there was -- there's
3  not enough there to be responsive. I think what
4  he's saying here is to Lauren, "Hey, it's on the
5  balance sheet. Can you look at it and figure it
6  out?"
7         And I -- I think they go back and
8  forth, "Well, can you give us more information?"
9  And so it -- this is not responsive to the
10 question and isn't what was provided to the board,
11 but that's --
12 Q    Well, let -- let's see what Ms. Thedford
13 does. Ms. Thedford's the lawyer; right?
14 A    She is.
15 Q    Yeah. But she's also the secretary of
16 HCMFA; correct?
17 A    At this time, I believe so, yes.
18 Q    And you wouldn't dispute that she is
19 taking the lead on formulating the advisers'
20 response to the retail board; correct?
21 A    I would not dispute that.
22 Q    Okay. And do you see that she reports to
23 you and everybody else in her email that she has
24 taken information from the 6/30 financials?
25 A    Yes, I see the below from the 6/30

Page 95

Dustin Norris

1
2  financials. And, again, to correct to me, I'm
3  CC'd. It's a nuance, but she's representing to
4  Frank and Dave and Kristin with a CC to me.
5  Q    Okay. Does HCMFA acknowledge that the
6  information contained in the October 23rd, 2020,
7  report to the retail board with respect to
8  Question Number 2 was derived from HCMFA's
9  June 30th, 2020, financials?
10 A    Sorry. One more time?
11 Q    Will you agree, as HCMFA's 30(b)(6)
12 witness, that the information provided to the
13 retail board in October 2020 in response to
14 Question Number 2 was taken directly from HCMFA's
15 financial statements for the period ending
16 June 30th, 2020?
17 A    Yeah. The unaudited financials, yes.
18 Q    Okay. And so -- so as HCMFA's 30(b)(6)
19 witness, you will agree that the $12,286,000
20 figure that was included in the former response to
21 the retail board was obtained from HCMFA's
22 unaudited financial statements for the period
23 ending June 30th, 2020; correct?
24 A    It appears that way.
25        And I -- I think -- and, again, we're

Page 96

Dustin Norris

1
2  looking at a draft answer here. I don't have the
3  final answer. But it looks as work product that
4  she's pulling numbers from the unaudited balance
5  sheet and plugging them in here.
6  Q    Okay. And we can look at the final if you
7  want, but that $12,286,000 number that was due to
8  HCMLP as of June 30th 2020, that's the exact
9  figure that was given to the retail board in the
10 final report; correct?
11 A    "Final report," meaning the final memo --
12 final memos?
13 Q    Yes.
14 A    Yes. Yes, I believe so.
15 Q    Okay.
16        MR. MORRIS: Can you scroll back up
17    to the last email?
18 BY MR. MORRIS:
19 Q    So this is Mr. Waterhouse's response to
20 Ms. Thedford. And, again, Mr. Waterhouse is
21 Highland's CFO and the advisers' treasurer;
22 correct?
23 A    Correct.
24 Q    And at this time, Ms. Thedford is an
25 attorney at Highland, but she also serves as the

Page 97

Dustin Norris

1
2  secretary for the advisers; correct?
3  A    That's correct.
4  Q    And you are the executive vice president
5  for the advisers; correct?
6  A    As of this date, yes.
7  Q    And you had no position with Highland;
8  correct?
9  A    At this time?
10 Q    Correct.
11 A    No position with Highland, no.
12 Q    Okay. How about Mr. Post? Had he
13 transitioned from Highland to the advisers as of
14 October 6th?
15 A    I don't believe so.
16 Q    Okay. It happened in October, though;
17 right?
18 A    I -- I don't know.
19 Q    Okay.
20 A    Late October/November. It was late in the
21 year.
22 Q    Okay. And do you know if anybody ever
23 told Mr. Waterhouse in October 2020 that there was
24 any aspect of his email that was incorrect?
25 A    Not at that time, no, that I'm -- not that

Page 98

Dustin Norris

1
2    I'm aware of.
3    Q    Okay.
4    A    And -- and would we have reason to doubt
5    him?  This -- he was the source of the
6    information.
7    Q    Okay.  And do you see that the last
8    sentence of his email actually refers to the last
9    sentence of Response Number 2 that was given to
10   the retail board later in October 2020?
11   A    I do.
12   Q    Did you ever ask Mr. Waterhouse anything
13   about that last sentence?
14   A    I don't believe so.
15   Q    Do you see that he says, quote:  "The
16   response should include, as I covered in the board
17   meeting, that both entities have the full faith
18   and backing from Jim Dondero, and to my knowledge
19   that hasn't changed"?
20        Do you see that?
21   A    I do.
22   Q    Do you know what board meeting he's
23   referring to?
24   A    "The response should include, as I covered
25   in the board meeting, that both entities have a

Page 99

Dustin Norris

1
2    full faith and backing."
3        So I don't know the exact board
4    meeting.  However, we do have an August board
5    meeting related to 15(c).  There's typically an
6    in-person or telephonic meeting in August, and
7    then there's a September board meeting that is
8    devoted almost exclusively to the 15(c) process.
9        And after that, there is follow-up
10   meetings -- multiple sometimes, particularly in
11   2020 during the bankruptcy proceedings that --
12   where the board was getting comfortable.  So it
13   would have been one of those meetings, but I don't
14   know which one.
15   Q    And -- and did you personally participate
16   in a board meeting where Mr. Waterhouse covered
17   the topic of the advisers having the full faith
18   and backing from Mr. Dondero?
19   A    I -- I probably would have been in most or
20   all of those board meetings, but I don't remember
21   that specifically.
22   Q    Okay.  Do you know -- do you know whether
23   anybody who's copied on this email ever questioned
24   any aspect of the last sentence of
25   Mr. Waterhouse's email at any time prior to the

Page 100

Dustin Norris

1
2    sending of the final memo on October 23rd?
3    A    Not that I'm aware of.
4    Q    You didn't; isn't that right?
5    A    I don't know that I read it, but I didn't
6    question it.  If I -- I either didn't read it or I
7    didn't question it.
8    Q    Okay.  So you have no recollection of ever
9    asking Mr. Waterhouse what he meant by the last
10   sentence of this email; correct?
11   A    No, I have no recollection.
12   Q    And you have no recollection of any
13   recipient of this email asking Mr. Waterhouse what
14   he meant by that last sentence; correct?
15   A    I don't remember.
16   Q    And you never told Mr. Waterhouse that you
17   had no knowledge of him having covered this issue
18   before the board?
19   A    You're wondering if I ever told him I had
20   no knowledge?
21   Q    Yeah.
22   A    No, I never talked to him about that.
23   Q    And to the best of your knowledge, no
24   recipient of this email ever challenged
25   Mr. Waterhouse's statement in this last sentence;

Page 101

Dustin Norris

1
2    correct?
3    A    I don't know what the conversations were
4    had between the others, but I have no knowledge of
5    that.
6    Q    Okay.
7    A    And -- and you've got -- sorry.  Go ahead.
8    Q    This email string is -- is an email string
9    devoted for the sole purpose of addressing
10   questions posed by the retail board in connection
11   with the 15(c) review; correct?
12   A    I believe so.
13   Q    Okay.  Have you ever seen HCMFA's
14   unaudited financial statements for June 30th,
15   2020?
16   A    Yes.
17   Q    And do you know if those audited --
18   unaudited financial statements included the
19   amounts due and payable under the notes?
20   A    I -- I think that -- I -- I don't
21   remember, but I think our position is it's
22   unclear, because the amounts don't agree to
23   the -- again, we have prior notes, we have these
24   notes.  The amounts don't line up.
25        So it's -- it's -- the underlying

Page 102

Dustin Norris

1                    Dustin Norris
2  backing is not provided. There's no footnotes.
3  It's just a number that says due to HCMLP.
4    Q    Do you know -- do you know -- do you have
5  any recollection as to the totality of HCMFA's
6  liabilities as of June 30th, 2020?
7    A    Including this note? Or just this note?
8    Q    All -- all liabilities. What's the bottom
9  of the balance sheet?
10    A    I don't know. Do you have it? Do you
11  want to pull it up?
12    Q    I don't.
13    A    Yeah, I don't remember.
14        MR. RUKAVINA: Hey, John, it's
15  approaching 12:15. Just whenever, you
16  know --
17        MR. MORRIS: Yeah. You know what?
18  I was just about to change topics, so this
19  is a good time.
20        MR. RUKAVINA: Okay.
21        MR. MORRIS: Why don't we stop
22  here, and we'll come back at the top of
23  the hour.
24        MR. RUKAVINA: Excellent. Thank
25  you.

Page 103

1                    Dustin Norris
2        (Recess from 12:11 p.m. to 1:06 p.m. CST)
3  BY MR. MORRIS:
4    Q    Mr. Norris, Topic Number 9 relates to
5  consent fees.
6        Do you understand that?
7    A    I do.
8    Q    Do you have an understanding of what a
9  "consent fee" is?
10    A    I do.
11    Q    Did you do anything to prepare for this
12  particular topic?
13    A    I did.
14    Q    What did you do to prepare for this topic?
15    A    I discussed the consent fee with
16  Mr. Dondero, with Mr. Rukavina, and with
17  Mr. Sauter.
18    Q    Okay. Mr. Sauter has no personal
19  knowledge of any consent fee that was paid in the
20  spring of 2019; correct?
21    A    No.
22    Q    Okay. What's your understanding of what a
23  "consent fee" is?
24    A    Generally or the specific consent fee
25  in -- that --

Page 104

1                    Dustin Norris
2    Q    Let's start generally.
3    A    Yeah. So a "consent fee" is a fee paid to
4  a -- paid to someone who's agreeing to amend terms
5  or change the structure of the -- of a document or
6  a loan. In -- in bank loan world, or loan world,
7  if you are going to amend or extend or change the
8  terms, typically there was a consent fee paid to
9  those willing to consent.
10        Those that have voted or consented
11  receive a fee.
12    Q    Okay. And did HCMFA pay any consent fees
13  in or around April or May 2019?
14    A    It began to pay consent fees in May
15  of 2019, I believe.
16    Q    Okay. Are you looking at something as you
17  prepare your answer?
18    A    Yeah. I'm looking at Topic Number 9 that
19  says consent fee in April or May 2019.
20    Q    Okay. Thank you so much.
21        And -- and I think you testified that
22  they began paying consent fees at around that
23  time?
24    A    That's right.
25    Q    What do you mean by that?

Page 105

1                    Dustin Norris
2    A    Yeah. So the consent fee was related to
3  the global allocation fund that converted from an
4  open-end fund to a closed-end fund, and there was
5  a 3 percent fee that would be paid to investors
6  that, one, consented to the conversion from an
7  open-end fund to a closed-end fund, but also held
8  their investment through the conversion.
9        The conversion was finalized in
10  February of 2019, and the consent fee was an
11  operational challenge because you had to determine
12  who the investors were that voted yes and that
13  held on to the conversion.
14        So with that, the -- the amounts that
15  were paid, there was an operational challenge to
16  determine who -- who needed to be paid, and so
17  they were deposited and then paid out over a
18  couple-month period.
19    Q    And who made the decision to pay the
20  consent fee?
21    A    So the consent fee was a collaborative
22  decision of senior management. Jim Dondero and
23  myself were involved in the decision, the
24  discussion to -- and it was a novel idea in terms
25  of converting from an open-end fund to a

Page 106

Dustin Norris

1
2  closed-end fund, and it was submitted to
3  investors. It went through SEC review as a proxy
4  statement, and it went out to shareholders who
5  needed to vote for the proposal.
6  Q    And who paid the consent fee? HCMFA?
7  A    My understanding is HCMFA as the adviser
8  of the global allocation fund paid the consent fee
9  to investors.
10  Q    And whose idea was it to seek consent to
11  change from an open fund to a closed-end fund?
12  A    I -- I would say it was collaborative of
13  senior management. Jim Dondero, myself, legal
14  compliance was involved. It was, you know, Mark
15  Okada, who was a partner at the time. There was a
16  lot of discussion involved.
17  Q    And when the decision was made to seek
18  consent to change from an open-end fund to a
19  closed-end fund, did HCMFA understand that there
20  would be costs, fees, and expenses associated with
21  that decision?
22  A    Being cost fees as in the consent fee?
23  Q    Correct.
24  A    Yes.
25  Q    And did it undertake any analysis to

Page 107

Dustin Norris

1
2  determine what the likely total fee would be?
3  A    Yeah. I'm sure they did.
4  Q    Do you know what the total fee
5  paid -- what the total consent fee paid was?
6  A    I don't have the exact amount, but it was
7  over $5 million.
8  Q    Okay. And over what period of time were
9  the consent fees paid?
10  A    I know they were paid in May and June, and
11  there may be a portion that were paid thereafter,
12  but at least May and June of 2019. There were
13  certain broker-dealers that reported later, and
14  when those were reported and verified, they were
15  paid out. I don't remember the final date of the
16  last distribution.
17  Q    Okay. And forgive me. It's not my
18  business. But were the consent fees paid to the
19  fund's shareholders?
20  A    They were paid to the shareholders.
21  That's correct.
22  Q    Okay.
23  A    That's consented. The shareholders had to
24  vote, and they had to be a shareholder on
25  conversion date.

Page 108

Dustin Norris

1
2  Q    Okay. And the decision to seek and obtain
3  consent, was that a voluntary decision by HCMFA?
4  A    To seek consent to move to a closed-end
5  fund?
6  Q    Yes. That's not something that any
7  regulator required, was it?
8  A    No.
9  Q    It's not something that any rule or
10  anybody mandated; correct?
11  A    Not that I believe.
12  Q    Okay. How did HCMFA fund the payment of
13  the total consent fee of over $5 million?
14  A    Yeah, from cash that it had on the balance
15  sheet.
16  Q    And where did it get the cash that was on
17  the balance sheet?
18  A    The cash came from the transaction that we
19  discussed earlier -- and you showed the capital
20  coming in from Highland -- which was compensation
21  for the NAV error.
22  Q    So it used the money that it received in
23  the transfers that we talked about to pay the
24  consent fee. Do I have that right? Or at least
25  some of it?

Page 109

Dustin Norris

1
2  A    Yes.
3  Q    And, in fact, it used approximately
4  $5 million of the moneys paid in May 2019 to pay
5  the consent fee of approximately $5 million; is
6  that fair?
7  A    At least $5 million.
8  Q    Okay. Do you know the exact number?
9  Q    Of the consent fee?
10  Q    Withdrawn.
11         Do you have a better or more precise
12  estimate of the total consent fee other than
13  $5 million?
14  A    It was over $5 million. I don't remember
15  the exact amount, whether it was 5.6 or 5.2 --
16  Q    All right.
17  A    -- because it was paid over time.
18  Q    Let's talk about the TerreStar valuation
19  issue for a few minutes, if we can.
20  A    Okay.
21  Q    Just generally, in 2018/2019, HCMFA spent
22  a fair amount of time addressing the consequences
23  of a valuation error concerning TerreStar. Do I
24  have that right?
25  A    There was a lot in there, but there was,

Page 110

Dustin Norris

1
2 during that time, a lot of discussions with
3 TerreStar over the concerns of a valuation error
4 in 2018 and '19.
5    Q    And did it ultimately turn out that there
6 was a valuation error involving TerreStar?
7    A    There was.
8    Q    Okay. And had HCMFA retained Houlihan
9 Lokey in connection with doing the TerreStar
10 valuation?
11    A    Houlihan Lokey was involved in the
12 valuation, yes.
13    Q    And who retained Houlihan Lokey?
14    A    I don't know.
15    Q    As you sit here right now, you can't tell
16 me who retained Houlihan Lokey?
17    A    I don't know if it was HCMLP or HCMFA
18 or -- I don't know.
19    Q    Okay. Are you familiar with the firm
20 Houlihan Lokey?
21    A    I am.
22    Q    And do you know what services they
23 provided in connection with the TerreStar
24 valuation?
25    A    I do.

Page 111

Dustin Norris

1
2    Q    Can you describe for me the services that
3 were provided by Houlihan Lokey in connection with
4 the TerreStar --
5    A    And I would say I do generally. I was not
6 involved in the individual details. That was all
7 the HCMLP employees.
8        So all of the Highland employees that
9 were involved in the shared services agreement,
10 the valuation committee, valuation services were
11 the responsibility of HCMLP. Key inputs were
12 provided by HCMLP. Key estimates and
13 interpretations to Houlihan, and they used their
14 models to calculate a valuation that was then
15 approved by the valuation committee at HCMLP.
16        And so that's my general understanding
17 of the valuation process.
18    Q    Do you know how much Houlihan Lokey was
19 paid for its work?
20    A    I don't.
21    Q    Do you know if there's an engagement
22 letter pursuant to which Houlihan Lokey provided
23 these services?
24    A    I'm not aware.
25    Q    Would you dispute that HCMFA is the entity

Page 112

Dustin Norris

1
2 that retained Houlihan Lokey?
3    A    I don't know.
4    Q    Would you agree that Houlihan Lokey is
5 fairly described as an independent third-party
6 valuation consultant?
7    A    Yes, generally.
8    Q    Okay. And do you know when Houlihan Lokey
9 was retained?
10    A    I don't.
11    Q    Houlihan Lokey's retention was approved by
12 the retail board, wasn't it?
13    A    I'm not sure.
14    Q    Have you ever seen any of the work product
15 of Houlihan Lokey in connection with the TerreStar
16 valuation?
17    A    Yeah. I remember seeing the valuation
18 model.
19    Q    So Houlihan Lokey did prepare the
20 valuation model that is the subject of the
21 TerreStar valuation issue; is that fair?
22    A    Working very closely with the HCMLP
23 employees with the inputs, yes.
24    Q    Did HCMFA rely on the Houlihan Lokey
25 valuation model?

Page 113

Dustin Norris

1
2    A    I'm not sure.
3    Q    Does HCMFA contend that Houlihan Lokey
4 made any mistakes in connection with its valuation
5 services?
6    A    I'm not sure.
7    Q    Does HCMFA have a position as to whether
8 or not Houlihan Lokey made any mistakes in any of
9 the services that it performed in connection with
10 the TerreStar valuation?
11    A    I think they don't have details and would
12 retain their rights to understand what their role
13 and -- sorry. What was the original question?
14    Q    Just whether HCMFA has a position as to
15 whether or not Houlihan Lokey made any mistakes in
16 the work that it did in connection with the
17 TerreStar valuation?
18    A    Yeah. I think they're retaining their
19 rights to understand that better.
20    Q    Is there any agreement with Houlihan Lokey
21 that would give HCMFA the time to do that? Is
22 there a tolling agreement or anything like that?
23    A    Not that I'm aware of.
24    Q    Is HCMFA undertaking any analysis to
25 determine whether or not Houlihan Lokey made any

Page 114

Dustin Norris

1
2  mistakes in connection with the work that it did
3  on the TerreStar valuation?
4  A    Sorry.  One more time.
5  Q    Is HCMFA undertaking any analysis or
6  investigation to try to determine whether Houlihan
7  Lokey made any mistakes?
8  A    There are -- I don't know.  I don't know.
9  Q    You have no knowledge, as you sit here
10  today, as to whether HCMFA is undertaking any
11  analysis or investigation to try to determine
12  whether Houlihan Lokey did anything wrong in
13  connection with its valuation services; correct?
14  A    And I wasn't prepared -- I don't think
15  this is one of the topics -- you know, Houlihan
16  Lokey's, you know, involvement, and so I wasn't
17  prepared to answer that one.
18  Q    Okay.  Well, the defense -- HCMFA's
19  defense is that Highland is responsible for the
20  TerreStar valuation issue; correct?
21  A    Yes.
22  Q    And there's no question that Houlihan
23  Lokey provided services in connection with that
24  valuation; correct?
25  A    Correct.

Page 115

Dustin Norris

1
2  Q    But HCMFA has not undertaken any analysis
3  or investigation, to the best of your knowledge,
4  to try to determine if Houlihan Lokey was the
5  responsible party; fair?
6  A    We don't know if there is a contract or
7  not.  At this point, we're talking about the
8  defense of Highland's responsibility.  There's no
9  question they were responsible for the valuations.
10  They were outsource provider of the valuation
11  committee.  Every individual working and
12  coordinating with Houlihan Lokey was an HCMFA
13  employee.  All the data and information that was
14  provided to them came from HCMLP.  There's no
15  question that Highland was responsible for the NAV
16  error.  No one ever questioned that.  That was
17  always known.  It was all the employees that were
18  involved.
19         MR. RUKAVINA:  John, I'll just
20  reiterate that we did not understand your
21  topics to include Houlihan Lokey.  If you
22  need more information about that or if we
23  need to have a supplemental deposition,
24  that's fine.  But this is just not
25  something that we reasonably anticipated

Page 116

Dustin Norris

1
2  you asking about.
3         MR. MORRIS:  I think it's -- I
4  think I have the answer that I need and
5  that the executive vice president and
6  30(b)(6) witness has no knowledge of any
7  investigation or analysis that has been
8  undertaken by HCMFA to try to even
9  determine whether Houlihan Lokey is at
10  fault.
11  BY MR. MORRIS:
12  Q    Do I have that right, Mr. Norris?
13         MR. RUKAVINA:  Well, I will just
14  object that that was not your prior
15  question.
16         MR. MORRIS:  All right.  Well,
17  that's my question now.
18  BY MR. MORRIS:
19  Q    Is that correct, Mr. Norris?
20  A    I know there's been discussion with
21  counsel.
22         MR. RUKAVINA:  Well, I will
23  represent to you that we have looked for a
24  Houlihan Lokey contract and have not been
25  able to find one.  Otherwise, we would

Page 117

Dustin Norris

1
2  have produced it to you.  So if you have
3  anything like that, we'd love to see it.
4  We do not even know whether we had a
5  contract with Houlihan Lokey or not.  So
6  we'll try to find you information, John.
7  We just -- we just don't have it.
8         MR. MORRIS:  We'll get to that in a
9  moment.
10  BY MR. MORRIS:
11  Q    Has HCMFA -- withdrawn.
12         Has HCMFA ever told Houlihan Lokey
13  that it believed it made any mistake or error of
14  any kind in connection with its work on the
15  TerreStar valuation?
16  A    Again, I -- this is not a topic that we
17  reviewed, so I don't know.
18  Q    Okay.  You're not aware of anything today;
19  correct?
20  A    Again, the employees working with Houlihan
21  Lokey were the HCMLP employees.  So I don't know
22  if the debtor employees have that conversation,
23  but --
24         MR. MORRIS:  Yeah, I'm going to
25  move to strike.

Page 118

1              Dustin Norris
2    BY MR. MORRIS:
3    Q    And I'm asking about HCMFA.
4              Did -- has HCMFA ever informed
5    Houlihan Lokey that HCMFA believes that Houlihan
6    Lokey made a mistake or error in the work that it
7    did?
8    A    There were ongoing discussions extensively
9    throughout this with Houlihan Lokey and the debtor
10   employees regarding the error and what the causes
11   were. It was extensive discussions.
12             MR. MORRIS: Okay. Move to strike.
13   BY MR. MORRIS:
14   Q    Has HCMFA ever told Houlihan Lokey that
15   HCMFA believes that Houlihan Lokey made a mistake
16   or an error in connection with its valuation
17   services?
18   A    It may have, but I'm not aware.
19   Q    Thank you.
20             Are you familiar with the report that
21   HCMFA prepared and sent to the Global Allocation
22   Fund concerning the TerreStar valuation issues?
23   A    They sent to the fund?
24   Q    Uh-huh.
25   A    What do you mean "they sent to the fund"?

Page 119

1              Dustin Norris
2    Q    They sent to the board of the fund?
3    A    Oh, the board of the fund.
4              There were a number of memos and
5    presentations. If you have one you want to pull
6    up, you can -- we can refer to it.
7    Q    Sure.
8              MR. MORRIS: Let's put up what
9    we've marked as Exhibit 182.
10             (Exhibit 182 tendered.)
11   BY MR. MORRIS:
12   Q    And while we're doing that, have you ever
13   seen a single document anywhere at any time in
14   which any representative of HCMFA took Highland to
15   task for the work that it did in connection with
16   the TerreStar valuation?
17   A    "Took them to task"? Define "take them to
18   task."
19   Q    Told them that they were the source and
20   cause of the NAV error.
21   A    The irony of all of the reporting to the
22   board, all of the valuation knowledge was from
23   HCMLP's employees. We -- we outsourced that to
24   them. There was -- there was no question that
25   they were at fault, and that's -- every employee

Page 120

1              Dustin Norris
2    involved was an HCMLP employee.
3              MR. MORRIS: I move to strike.
4    BY MR. MORRIS:
5    Q    And I'm going to ask you, sir, to listen
6    carefully to my question.
7              Have you ever seen a document that
8    HCMFA sent to Highland in which HCMFA accused
9    Highland of being the cause of the NAV error?
10   A    I have not.
11   Q    Thank you.
12             Do you see the document that's on the
13   screen?
14   A    I do.
15   Q    Before I get to that, so the NAV error
16   occurred sometime prior to May 2019; correct?
17   A    Beginning -- I don't know the specific
18   dates. I believe it began in May of 2019 --
19   sorry. May 2019 --
20   Q    That's when it ended; right?
21   A    What's that?
22   Q    That's when it ended; right? That's --
23   A    Yeah, it was before May 2019.
24   Q    Okay. So during the entire time that the
25   TerreStar NAV error was being discussed and

Page 121

1              Dustin Norris
2    analyzed and debated and communications with the
3    SEC, during that entire period, Jim Dondero was in
4    control of both HCMFA and Highland; correct?
5    A    Yes, I believe so.
6    Q    Okay. Can you identify any employee of
7    Highland who was fired as a result of any of the
8    mistakes that were made in connection with the
9    TerreStar valuation?
10   A    No.
11   Q    Can you identify --
12   A    Not that I can remember.
13   Q    Can you identify any steps that
14   Mr. Dondero took against any employee who was
15   allegedly involved in the NAV error?
16   A    That would have been an HCMLP matter. I
17   don't have any knowledge of HCMLP's hiring or
18   firing practices.
19   Q    Okay. So at no time did anybody ever tell
20   you that any disciplinary measures were imposed
21   upon any Highland employee as a result of the NAV
22   error that Highland allegedly caused; correct?
23   A    Any firing practice? Is that what you
24   said?
25   Q    Disciplinary. Firing. Anything.

Page 122

Dustin Norris

2  A    There was a remediation process that had
3  to go into effect, which was improvement of
4  controls, and they maybe even hired additional
5  people. But it was -- and I don't -- I'm not
6  aware of any disciplinary, but there could have
7  been.
8  Q    Okay. But that would just be speculation
9  on your part; correct?
10 A    Yeah.
11 Q    So have you seen the document that's up on
12 the screen?
13 A    I have.
14 Q    Did you read it before it was sent?
15 A    I don't think so.
16 Q    Did anybody -- did any officer or employee
17 take responsibility for making sure that --
18 withdrawn.
19       What is this document?
20 A    It is titled "Resolution of the Funds Net
21 Asset Value Error."
22 Q    And was -- is it your understanding that
23 the purpose of this document was to enable HCMFA
24 to explain to the Global Allocation Fund how the
25 resolution of the NAV error was being conducted?

Page 123

Dustin Norris

2  A    Not to the Global Allocation Fund. This
3  is a memo to the board.
4  Q    Thank you for the clarification.
5       Subject to that clarification, is my
6  description otherwise correct?
7  A    I believe so. There had been a number of
8  communications with the board, and this is the
9  resolution of the whole process, or most of the
10 process.
11 Q    This was a pretty big issue for HCMFA,
12 wasn't it?
13 A    There was a lot of people involved. It
14 was -- there was a lot of involvement from --
15 mostly Highland Capital Management, LP, employees,
16 but it was -- there was a lot involved.
17 Q    And who -- what outside counsel was
18 retained?
19 A    Adviser counsel is counsel -- is -- I
20 believe it was K&L Gates for HCMFA.
21 Q    And who was Highland's counsel?
22 A    I don't know.
23 Q    Do you know if Highland had counsel?
24 A    I don't know.
25 Q    Do you --

Page 124

Dustin Norris

2  A    I know they had counsel they referred to
3  for SEC matters, and I don't know if they utilized
4  them here or not. They were all Highland
5  employees that worked on this. So I'm sure you
6  probably have that in your records.
7  Q    Sir, can you identify any outside counsel
8  that was retained by Highland to advise it in
9  connection with the TerreStar valuation issues
10 that were the subject of an SEC investigation?
11 A    I have -- I have no knowledge of that.
12 Q    Okay. Did you see this memo that's up on
13 the screen that's been marked as Exhibit 182 prior
14 to the time that it was sent?
15 A    I don't recall.
16 Q    The NAV error was the subject of an SEC
17 investigation; correct?
18 A    Correct.
19 Q    Do you know if HCMFA ever told the SEC
20 orally, in writing, or otherwise that Highland
21 Capital Management, LP, was the cause of the NAV
22 error?
23 A    Not that I'm aware of, but they were
24 concerned about the ultimate correction of the NAV
25 error. I don't think they were concerned about

Page 125

Dustin Norris

2  the responsible party.
3       But I would say every single person
4  that interacted with the SEC, I believe, were
5  HCMLP employees. We can see that on the other
6  memo that they have to the SEC following up on a
7  call; all HCMLP employees. So whether they told
8  them or not, they were all HCMLP employees.
9       MR. MORRIS: Okay. Move to strike
10 after the very first portion of the answer
11 that was responsive.
12 BY MR. MORRIS:
13 Q    Did anybody -- did any officer or employee
14 of HCMFA ever inform the SEC that Highland Capital
15 Management, LP, was the responsible party for the
16 NAV error?
17 A    Specifically, not that I'm aware of.
18 Q    Okay. Was any HCMFA officer or employee
19 responsible for making sure that the memorandum up
20 on the screen that's been marked as 182 was true
21 and accurate before it was sent to the board of
22 the Highland Global Allocation Fund?
23 A    I don't know that there is a -- there's a
24 specific requirement of an officer to verify the
25 accuracy.

Page 126

                    Dustin Norris

1
2    Q    Okay.  But my question was a little bit
3    broader, and that was whether there was any
4    officer or employee who was given the
5    responsibility of making sure this document was
6    true and accurate before it was sent to the board
7    of the GAF.
8    A    I don't even know who drafted this.  It
9    would have come from Highland's compliance legal
10   and accounting team with all the expertise around
11   the NAV error and all of those that were involved.
12   Q    So did you see this document at or around
13   the time it was sent to the GAF board?
14   A    I probably did.
15   Q    Do you recall telling anybody at that time
16   that you believed there were any errors in the
17   document?
18   A    I think, as I testified before, I
19   don't -- I don't remember reading it.  But I
20   didn't -- I didn't say there were errors in the
21   document, no.
22   Q    Prior to the answer date of March 1st,
23   2021, did anybody acting on behalf of HCMFA ever
24   tell anybody in the world at any time that there
25   was any error in this memorandum?

Page 127

                    Dustin Norris

1
2    A    Not that I'm aware of.
3    Q    Did HCMFA send this memorandum --
4    withdrawn.
5         Did HCMFA intend this -- withdrawn.
6         Did HCMFA expect the GAF board to rely
7    on this memorandum?
8    A    I don't know what the intention was.
9    Q    You don't know what HCMFA's intention was
10   in sending this memorandum?
11   A    If it's addressed to the board, it could
12   be to educate.  But I'm sure that the board
13   would -- would rely on or expect that memo
14   would be accurate.
15   Q    Okay.  And this is dated after all of the
16   payments have been made that we've been talking
17   about, the May 2nd and the May 3rd payments;
18   correct?
19   A    Correct.
20   Q    Take a look at the second paragraph.
21   A    Yup.
22   Q    Do you see the first sentence refers to
23   two initial determinations that were made by the
24   adviser and Houlihan Lokey?
25   A    Sorry.  Which part?  Just the first

Page 128

                    Dustin Norris

1
2    sentence of the second paragraph?
3    Q    Yeah.  First of all, do you see that the
4    second paragraph refers to the adviser and
5    Houlihan Lokey?
6    A    It does.
7    Q    And do you see that the reference to
8    Houlihan Lokey includes a reference to Houlihan
9    Lokey having been approved by the board?
10   A    Yes.
11   Q    And do you understand that that means the
12   board of GAF?
13   A    Yes.
14   Q    Does that refresh your recollection that
15   the GAF board approved of the retention of
16   Houlihan Lokey as an independent third-party
17   expert valuation consultant?
18   A    It doesn't refresh my recollection, but it
19   says it there.  I don't know that I have a
20   document saying they -- I haven't seen the
21   approval, the agreement.
22   Q    But you don't dispute that this memo was
23   sent to the GAF board on or about May 28th, 2019;
24   correct?
25   A    Correct.

Page 129

                    Dustin Norris

1
2    Q    Okay.  And HCMFA told the GAF board at
3    that time that HCMFA and Houlihan Lokey, quote,
4    "initially determined that the March transactions
5    were non-orderly and should be given zero
6    weighting for purposes of fair value."
7         Is that correct?
8    A    The HCMLP, as part of the valuation -- or
9    as the outsource valuation provider, were the
10   employees that made that determination.  The
11   adviser ultimately has the responsibility, but it
12   was outsourced.  And those were HCMLP employees,
13   along with Houlihan Lokey, that determined the
14   March transactions were non-orderly.
15        MR. MORRIS:  I'm going to move to
16   strike.
17   BY MR. MORRIS:
18   Q    And I'm going to ask you to listen
19   carefully to my question.
20        I'm asking you what HCMFA told the GAF
21   board.  Did HCMFA tell the GAF board on May 28th,
22   2019, that HCMFA and Houlihan Lokey, quote,
23   "initially determined that the March transactions
24   were non-orderly and should be given zero
25   weighting for purposes of determining fair value."

Page 130

Dustin Norris

2      Is that correct?

3  A    The -- in the memo, it says that on this

4  date, there were many other conversations probably

5  around this date and on this date discussing the

6  determinations and non-orderly and that it was the

7  HCMLP employees, and the board knew that. They

8  were very aware that it was the -- the valuation

9  control environment of HCMLP that determined these

10  were non-orderly transactions.

11  Q    So this -- so this report is inaccurate,

12  according to you?

13  A    No. There's -- there's just -- your

14  question was did they tell the board. There is a

15  lot that we told the board outside of this memo.

16  This memo does say advised from Houlihan Lokey.

17  The adviser is ultimately responsible. But there

18  was a lot of communication with the board --

19  Q    Okay.

20  A    -- around this, that they knew exactly who

21  was responsible for valuation as the board

22  determining that these were market transactions

23  and orderly or non-orderly.

24  Q    Okay. I want to focus on this memo,

25  because this is the one that I have. And you'll

Page 131

Dustin Norris

2  agree with me that there's no reference to

3  Highland Capital Management, LP, anywhere in this

4  report; correct?

5  A    No, there's not, but the board knew that

6  HCMLP was preparing the valuations.

7      MR. MORRIS: All right. I move to

8  strike after the word "no."

9  BY MR. MORRIS:

10  Q    And it was the determination concerning

11  whether or not it was orderly or non-orderly, and

12  whether or not to use zero weighting that were the

13  two causes of the NAV error; correct?

14  A    Those were key portions.

15  Q    In the last sentence, in fact, that's the

16  only portions; isn't that fair?

17  A    "Initially determined" -- well, it doesn't

18  say that there's not other factors. They're the

19  only ones mentioned.

20  Q    Let me -- let me -- let me read the last

21  sentence.

22      Quote: "The orderly determination and

23  adoption of the weighted fair value methodology

24  resulted in NAV errors in the fund," and that's

25  what it's defining as the NAV error.

Page 132

Dustin Norris

2      Have I read that correctly?

3  A    You did.

4  Q    And so would you agree with me, as HCMFA's

5  30(b)(6) witness, that on May 28th, 2019, HCMFA

6  told the GAF board that the two causes of the NAV

7  error were the orderly determination and the

8  adoption of the weighted fair value methodology --

9  fair value -- fair valuation methodology?

10  A    Those were -- it doesn't say those are

11  exclusively the only factors, but those are

12  mentioned here.

13  Q    It says those two factors resulted in the

14  NAV error; correct?

15  A    Those -- no, it didn't say "the NAV

16  error." It said "in NAV errors."

17  Q    Which it's defining as the NAV error;

18  correct?

19  A    Defines as "the NAV error."

20  Q    Okay. Does HCMFA contend that there's

21  anything in this paragraph that is inaccurate?

22  A    Again, I -- I don't know that Houlihan

23  Lokey was approved by the board, but I don't know

24  of any other contention.

25  Q    Okay. And you don't -- and HCMFA doesn't

Page 133

Dustin Norris

2  dispute that Houlihan Lokey was approved by the

3  board. You're just telling me that, as you sit

4  here today, that's the one fact that you've not

5  been able to confirm; is that fair?

6  A    As far as I know, yeah.

7  Q    Okay. Let's go on to the next paragraph.

8      MR. MORRIS: If we could just

9  scroll up a little bit.

10  BY MR. MORRIS:

11  Q    I'm going to try and summarize here, but

12  if you don't think it's a fair summary, of course

13  I would encourage you to let me know.

14      Is it fair to say that, as a general

15  matter, the next paragraph describes a total loss

16  from the NAV error as being approximately

17  $7.5 million?

18  A    Yeah, including processing costs and

19  rebates and offsets, yes.

20  Q    Right. That's what the parenthetical

21  says, a total loss --

22  A    Yup.

23  Q    -- of approximately $7.5 million?

24  A    Correct.

25  Q    And the next paragraph states that that

Page 134

Dustin Norris

1
2  loss was funded with two payments. Do I have that
3  correct in the first sentence?
4  A    Correct.
5  Q    Okay. Did HCMFA pay approximately
6  $5.186 million on or around February 15, 2019, in
7  connection with the NAV error?
8  A    I believe so.
9        And if we go to the next page, it has
10  dates and payments. I think it's represented
11  there.
12  Q    Okay. Where did HCMFA get the money to
13  make that payment?
14  A    A combination of insurance proceeds and
15  cash that it had. And, again, that's detailed, I
16  believe, on the next page.
17  Q    HCMFA contends that the $7.4 million
18  transferred by Highland to HCMFA was mistakenly
19  recorded as a loan; correct?
20  A    There's -- there's two different amounts
21  that we contend were recorded as a note, a
22  combined 7.4 million, yes.
23  Q    Okay. And HCMFA contends that the
24  $7.4 million in payments was not to be a loan, but
25  was supposed to be compensation for Highland's

Page 135

Dustin Norris

1
2  negligent valuation services in connection with
3  the NAV error; correct?
4  A    Sorry. One more time.
5  Q    HCMFA contends that the $7.4 million in
6  payments was supposed to be compensation resulting
7  from Highland's negligent valuation services;
8  correct?
9  A    Yes, subject to all of our defenses that
10  we've laid out in our pleadings.
11  Q    Okay. When did HCMFA reach the conclusion
12  that Highland was the cause of the NAV error?
13  A    The -- there was never -- I don't think
14  there was ever a question. It was always known
15  that HCMLP employees were the ones creating the
16  valuation, overseeing the valuation, working with
17  the value -- you know, everything that was done
18  was outsourced to HCMLP.
19        And so it was discussed with the
20  board. It was discussed in-depth internally. The
21  employees were all HCMLP employees. So I can't
22  pinpoint a date, but there -- it was a known
23  factor that HCMLP was responsible.
24        MR. MORRIS: Okay. I move to
25  strike.

Page 136

Dustin Norris

1
2  BY MR. MORRIS:
3  Q    The only thing I'm asking you for is a
4  date. And if you don't know, the answer is "I
5  don't know." So let me try one more time.
6        Do you know when HCMFA first
7  determined that Highland was negligent?
8  A    I don't know the first date.
9  Q    Do you know if it was in 2018 or 2019?
10  A    I don't know.
11  Q    Do you know when the NAV error first --
12  was first identified?
13  A    I believe the NAV error was determined in
14  early 2019.
15  Q    Was it before or after -- I mean, the --
16  the NAV error must have been identified before
17  February 15, 2019; correct?
18  A    Correct.
19  Q    Okay.
20  A    Well, I should say whether there -- I
21  don't know. I don't remember -- we'll have to
22  look through the documents -- what the actual --
23  oh, you're saying before February 15th. Yes,
24  that's when the paid insurance proceeds came in.
25  So yes.

Page 137

Dustin Norris

1
2  Q    No question -- no question that HCMFA knew
3  before February 15, 2019, that there was a NAV
4  error; correct?
5  A    Correct.
6  Q    No question that HCMFA knew before
7  February 15, 2019, that the NAV error was caused
8  by Highland; correct?
9  A    Yeah. Like I said, it was always known
10  that these were Highland employees that were
11  outsourced through the valuation, and they were
12  the ones at fault.
13  Q    Okay. Do you know if -- if HCMFA ever
14  demanded compensation from Highland for any errors
15  or mistakes it may have made in connection with
16  the TerreStar valuation?
17  A    Yeah. Mr. Dondero told Frank to make the
18  payments to compensate for the NAV error.
19  Q    And did he do that in his capacity as the
20  person in control of HCMFA, or did he do that in
21  his capacity as the person in control of Highland?
22  A    I would imagine it would have been both.
23  Further supported, he transferred money -- of his
24  own money to HCMLP to then pay HCMFA. And so
25  he -- yes, he was on both sides of it, but he had

Page 138

            Dustin Norris

1  the authority on both sides to make that decision.
2
3  Q    Okay.  And so Mr. Dondero reached an
4  agreement with himself pursuant to which HCMFA
5  demanded and Highland agreed to pay the
6  $7.4 million as a consequence of Highland's
7  negligent conduct in the performance of its
8  valuation services.  Do I have that right?
9  A    Sounds like there's a legal determination
10  there that needs to be made.  I --
11  Q    It's a factual one, I promise.
12  A    Entering -- whether entering into an
13  agreement or not, I -- that seems like a legal
14  determination.  But maybe ask the question again.
15  Q    Did somebody on behalf of Highland agree
16  to pay HCMFA $7.4 million in order to compensate
17  HCMFA for Highland's negligent services in
18  connection with the TerreStar valuation?
19  A    Yes.  Mr. Dondero.
20  Q    Thank you.
21       Is there any document anywhere that
22  you have ever seen that reflects Highland's
23  agreement to pay $7.4 million as compensation to
24  HCMFA?
25  A    I haven't seen a settlement agreement or

Page 139

            Dustin Norris

1  an agreement to that effect, no.
2
3  Q    You haven't seen anything; correct?
4  A    No.
5  Q    Have you looked?
6  A    We have.  I actually wouldn't be
7  surprised -- I would be surprised to see one.  And
8  it's -- my understanding is -- and the company's
9  position is that there doesn't need to be an
10  agreement.  Right?  We --
11  Q    I'm not asking -- I'm going to interrupt
12  you again.  I'm not asking you --
13       MR. RUKAVINA:  Well, John --
14       MR. MORRIS:  -- anything like that.
15  I need him to answer my questions or we're
16  going to be here all night.
17       MR. RUKAVINA:  John, hold on.
18  BY MR. MORRIS:
19  Q    Have you ever -- have you ever seen
20  anything --
21       MR. RUKAVINA:  John, hold on.  Hold
22  on.
23       MR. MORRIS:  No, no.  Davor,
24  please -- please --
25       MR. RUKAVINA:  John, it is not our

Page 140

            Dustin Norris

1  position -- it is not -- it is our
2  position that there is no settlement
3  agreement.
4
5       MR. MORRIS:  Thank you very much.
6  BY MR. MORRIS:
7  Q    Is it your position that there is any
8  document of any kind that reflects Highland's
9  agreement to pay $7.4 million as compensation?
10  A    No.  Subject to our defenses, but there's
11  none.
12  Q    Did Mr. Dondero tell Mr. Waterhouse that
13  the money that he was asking to be transferred
14  from Highland to HCMFA be transferred as
15  compensation for the NAV error?
16  A    Our position is that this was compensation
17  for the NAV error, and that was discussed.
18  Mr. Dondero told Frank.  And I believe Frank even
19  testified to that, and Mr. Dondero testified to
20  that in their depositions.
21  Q    Okay.  Now, you said that the February
22  payment of over $5 million was funded through
23  insurance proceeds and cash.
24       Do I have that right?
25  A    Yes.

Page 141

            Dustin Norris

1
2  Q    And the cash portion was really just the
3  deductible?
4  A    If you want to go to Page 2, we can look
5  at the details.
6  Q    Sure.  Sure.
7  A    I don't have it all by memory.
8  Q    That's fair.
9       MR. MORRIS:  Let's go to the next
10  page.
11  BY MR. MORRIS:
12  Q    Looking at this, do the third and fourth
13  lines refresh your recollection --
14  A    Yes.
15  Q    -- that the February payment was funded
16  through insurance proceeds and an insurance
17  deductible paid by the adviser?
18  A    Yes, I believe that's correct.
19  Q    Okay.  And Topic Number 8 on the 30(b)(6)
20  notice relates to the insurance claim; right?
21  A    Uh-huh.
22  Q    Okay.  Did you do anything to familiarize
23  yourself with the insurance claim?
24  A    I did.
25  Q    And what did you do to familiarize

Page 142

Dustin Norris

1   yourself with the insurance claim?
2   A   I discussed with DC and Davor the
3   company's position on the insurance claim.
4   Q   Okay. I don't want to know what the
5   company's position is. I want to know what the
6   facts are.
7       Did you learn any facts in connection
8   with your diligence and your preparation to answer
9   topic -- questions on Topic Number 8?
10  A   Yeah. The HCMFA policy was -- was -- the
11  HCMFA -- HCMFA had an insurance policy with ICI
12  Mutual; and based on the NAV error, the policy
13  was -- I don't know what the word is -- was used
14  to seek reimbursement for the NAV error.
15  Q   Okay. So --
16      (Reporter discussion off the record.)
17  BY MR. MORRIS:
18  Q   So did HCMFA file a claim for insurance
19  coverage with ICI Mutual in connection with the
20  NAV error?
21  A   The HCMLP employees, I believe, through
22  Frank Waterhouse and his team, did that. They --
23  they managed the insurance as part of the shared
24  services agreement, and they filed with the

Page 143

Dustin Norris

1   insurance company --
2   Q   And -- and the filing --
3   A   -- on behalf of HCMFA.
4   Q   And the filing that was made, was that a
5   claim that was made on behalf of HCMFA?
6   A   I believe so, yes.
7   Q   And did HCMFA authorize the filing of that
8   claim?
9   A   Our position is that that -- that is a
10  valid claim from HCMFA.
11  Q   All right. Did HCMFA authorize the filing
12  of the insurance claim?
13  A   I -- I don't know.
14  Q   Did -- has HCMFA ever told anybody at any
15  time that the insurance claim was not authorized
16  by HCMFA?
17  A   No.
18  Q   And HCMFA received almost $5 million on
19  account of the claim; right?
20  A   Correct.
21  Q   And HCMFA wanted to recover on its
22  insurance claim; correct?
23  A   Yes.
24  Q   Did the claim -- was the claim made in

Page 144

Dustin Norris

1   writing?
2   A   I believe so.
3   Q   Have you seen the claim?
4   A   I don't -- I don't recall seeing the
5   claim.
6   Q   In connection with the defense of this
7   lawsuit and the preparation, have you made any
8   efforts to identify the actual claim that was
9   filed on behalf of HCMFA?
10      MR. RUKAVINA: Let me interject --
11      let -- let me interject. And we can talk
12      about this offline. We searched for that
13      and could not find it. We suspect it
14      might be in HCMLP's legal documents that
15      we don't have access to, but we have and
16      we continue to actively search for the
17      claim itself. We have not been able to
18      find it.
19  BY MR. MORRIS:
20  Q   Does HCMFA use an insurance broker?
21  A   I don't believe so from this. I think it's
22  directly with ICI Mutual. And it -- we -- there's
23  no broker, but it goes through HCMLP's employees.
24  Frank Waterhouse would have been the one probably

Page 145

Dustin Norris

1   interacting with ICI Mutual.
2   Q   HCMFA and HCMLP broke up at the end of
3   February; is that fair?
4   A   That's correct.
5   Q   At any time since the end of February, has
6   HCMFA made any effort to obtain any information
7   concerning this insurance claim from ICI Mutual?
8   A   I don't know where we got the source of --
9   of the documents, but there -- there was -- they
10  were searching for the ICI documents. I don't
11  know if it came from ICI or another source.
12  Q   Anybody --
13  A   I don't --
14  Q   Anybody from HCMFA reach out to ICI Mutual
15  for information relating to this insurance claim
16  at any time?
17  A   I don't -- not that I'm aware of.
18  Q   Okay.
19  A   They may have, but I don't know.
20  Q   Do you know when the claim was filed?
21  A   I don't. I -- I don't. I -- I think it
22  may have been late 2018, but I'm not sure.
23  Q   And at the time HCMFA filed the claim for
24  insurance, it had already formed the opinion that

Page 146

Dustin Norris

2 Highland Capital Management, LP, was the
3 responsible party; correct?
4    A    I believe so, yes.
5    Q    Did HCMFA tell the insurance company that
6 Highland Capital Management was the responsible
7 party?
8    A    I'm not sure.  Again, this was Highland
9 employees that filled out the materials and was
10 working with ICI.  So I don't know if your
11 employees notified them.
12    Q    So the total estimated loss was
13 approximately $7.5 million; right?  That's the top
14 number on the right?
15    A    Yes.
16    Q    Okay.  And roughly two-thirds of that was
17 financed through insurance proceeds that were
18 received in February of 2019; correct?
19    A    Correct.
20    Q    And thereafter, it's HCMFA's contention
21 that Highland paid it another $7.4 million for
22 purposes of providing compensation in connection
23 with its negligent work on the -- on the TerreStar
24 valuation error; correct?
25    A    Yes, that's correct.  And that lines up,

Page 147

Dustin Norris

2 7.4 million, with the net -- net loss that's shown
3 there, estimated loss.
4    Q    Right.  So it's fair to say, then, from --
5 that it's HCMFA's position that it received
6 $7.4 million from Highland as compensation, and
7 approximately $5 million from the insurance
8 carrier as compensation for total receipts of
9 $12.4 million in connection with the NAV star --
10 with the TerreStar valuation error?
11    A    Correct.
12    Q    Okay.  Why would H- -- why does HCMFA
13 contend that its entitled to $12.4 million from
14 Highland and the insurance company when the total
15 loss was only $7.4 million?
16    A    Yeah, it's -- it's our position that the
17 collateral -- and I'm not an attorney.  But
18 understanding our position here, that under Texas
19 law, the collateral source rule would permit us
20 to recover value from the insurance company and to
21 the individual or the -- the company that created
22 the -- or caused you harm.
23    Q    So you're -- would you agree that HCMFA
24 has profited by about $5 million as a result of
25 the NAV error under that theory?

Page 148

Dustin Norris

2    A    I -- I don't know that -- how the theory
3 relates to profits, but we've -- we've paid -- and
4 say, "What's the logic for this?"  We paid in
5 insurance premiums for years, significant
6 insurance premiums.  And so there's been a loss
7 for years and years for the insurance, and then
8 we're now hitting that insurance to say there's a
9 gain of $5 million, whatever number you threw out.
10 I would disagree with that.
11          But, yes, there was proceeds of
12 12-and-a-half million, but we've been paying in
13 insurance proceeds or premiums for a long time.
14 We're going to continue, and likely, I would
15 imagine, those premiums will go up because of the
16 claim.
17          So I -- I'm, again, not a lawyer.  I
18 don't understand all the reasons why it's
19 permitted.  But our position is that the
20 collateral source rule under Texas law permits you
21 to receive from the insurance -- your insurance
22 provider and from the party that did you harm.
23 And as you said, here we believe it's negligence.
24 It may be breach of contract, but we believe it's
25 negligence.

Page 149

Dustin Norris

2    Q    Okay.  I just want to make this really
3 clean.
4          The estimated net loss from the NAV
5 error is $7.442 million; correct?
6    A    The estimated loss from the NAV error,
7 yes.
8    Q    Okay.  And notwithstanding that HCMFA
9 believed that Highland was the responsible party,
10 HCMFA, nevertheless, filed a claim for insurance
11 coverage with ICI Mutual; correct?
12    A    That's correct.
13    Q    And ICI Mutual paid almost $5 million in
14 connection with that claim; correct?
15    A    Correct.
16    Q    And in addition to that almost $5 million,
17 it's HCMFA's position that it received and was
18 entitled to receive an additional $7.4 million
19 from Highland as compensation for its error;
20 correct?
21    A    Correct.
22    Q    So that notwithstanding the fact that the
23 estimated net loss was $7.44 million, HCMFA
24 received and contends that it's entitled to keep
25 $12.4 million; correct?

Page 150

Dustin Norris

2 A    That's correct, subject to our defenses.

3 Q    Okay.  Did -- has -- has HCMFA ever

4 informed ICI Mutual that it received $7.4 million

5 from Highland on account of the NAV error?

6 A    Not that I'm aware of.

7 Q    Has HCMFA ever told ICI Mutual that

8 Highland was at fault?

9 A    Again, I think I already answered that.  I

10 don't know.  Communication with ICI was done by

11 the HCMLP employees as part of the shared services

12 agreement, and I'm not sure if they communicated

13 that.

14         MR. MORRIS:  Okay.  I move to

15    strike.

16 BY MR. MORRIS:

17 Q    I just -- I'm just asking for your

18 knowledge, not speculation.

19         Do you have any knowledge that anyone

20 on behalf of HCMFA ever informed ICI Mutual that

21 Highland was the cause of the NAV error?

22 A    I have no knowledge.

23         MR. MORRIS:  Let's take a short

24    break.  The time now is 3:06 -- or 2:06.

25    Let's just come back at 3:20.

Page 151

Dustin Norris

2    (Recess from 2:07 p.m. to 2:21 p.m. CST)

3 BY MR. MORRIS:

4 Q    So we were talking a bit about the

5 insurance payment that was received in February

6 of 2019.  Do you remember that?

7 A    Yes.

8 Q    And there was a claim that was filed on

9 behalf of HCMFA that resulted in that insurance

10 proceed payment; correct?

11 A    Correct.

12 Q    And do you recall if that insurance claim

13 was filed in 2018 or 2019?

14 A    I don't recall, but I believe it was late

15 2018.  But I don't know.

16 Q    Yeah.

17 A    And as we testified, we don't have that

18 claim.  We've searched for it.  It's probably on

19 your server, as I -- Frank Waterhouse and his team

20 would have submitted that.

21 Q    Yeah.  But you haven't made any effort to

22 get it from the carrier; right?

23 A    No, not that I know of.

24 Q    Okay.  And would you agree with me that

25 it's probably extremely unlikely that an insurance

Page 152

Dustin Norris

2 carrier would have processed a claim of that

3 magnitude in six weeks?

4 A    I know they expedited it and they

5 specialize in -- sorry.  I'll step back.

6         I have no knowledge of how quick

7 carriers make these claims --

8 Q    All right.  Do you know --

9 A    Other than hail on my house -- hail damage

10 on my roof, I don't have personal knowledge of

11 insurance claims.

12         MR. MORRIS:  You know, I apologize,

13    but can I ask Ms. Canty to put back up on

14    the screen that last exhibit that we had?

15    I don't have the exhibit number.

16         All right.  And go to the prior

17    page.  And go to the bottom of that page.

18 BY MR. MORRIS:

19 Q    So we've put back up on the screen, I

20 think --

21         MS. CANTY:  182.

22         MR. MORRIS:  182.

23 BY MR. MORRIS:

24 Q    All right.  And do you see in the next to

25 the last paragraph, Mr. Norris, there's a

Page 153

Dustin Norris

2 reference to a period from March 18, 2018, to

3 January 19, 2019?

4 A    Yes.

5 Q    That's what they've defined as the NAV

6 restatement period.  Do you see that?

7 A    Yes, I do.

8 Q    Okay.  Looking at that period, does that

9 refresh your recollection at all as to when in

10 2018 HCMFA first learned about the NAV error?

11 A    No, because that was -- that was the

12 period of time when the market -- the off-market

13 or on-market transactions happened, March 18th.

14 Q    Okay.

15 A    It was sometime in between that they found

16 out that there was an error.

17 Q    Okay.  And do you know if it was the first

18 half of 2018 or the second half?

19 A    The midyear audits of some of our funds, I

20 believe, is when it first came up.

21 Q    And --

22 A    So 6/30 audits that were due 60 days

23 later.  So second half -- I believe second half of

24 2018.

25 Q    So is it fair to say sometime in August or

Page 154

Dustin Norris

1    Dustin Norris
2    September is when HCMFA first learned about it?
3    A    About -- define "it." Is that the NAV
4    error.
5    Q    I apologize. Let me ask the question
6    again.
7         Is it fair to say, based on the timing
8    of the audit, 60 days after June 30th would take
9    us to approximately August 31st; right?
10   A    It does.
11   Q    And so is it fair to say, then, that HCMFA
12   first learned about the NAV error sometime in
13   August of 2018 while it was preparing the
14   financials for the period ending June 30th?
15   A    No. I don't think there was a
16   determination of whether there was a NAV error or
17   not at that point. I think the reason they have
18   going all the way to January 19 -- 2019 is it
19   wasn't determined -- finalized if there is an
20   error or not.
21        There was a lot of discussion with the
22   SEC and auditors over whether there was or wasn't
23   an error, what the amount was, what the proper
24   valuation should be. There was consultation with
25   the SEC, and that process lasted, I believe,

Page 155

Dustin Norris

1    several weeks, if not months.
2         So that is not when they found out
3    about a NAV error, but the questions over
4    valuation, yes.
5    Q    Okay. So then let me state the question
6    differently then.
7         Is it fair to say that HCMFA first
8    learned in or about August 2018 of the valuation
9    issues?
10   A    The "about" is key here. I don't know the
11   specific date, but around that time or earlier --
12   Q    Okay.
13   A    -- or later. On or around that time.
14   Q    And did HCMFA conclude, at the same time
15   it learned of the valuation issues, that HCMFA was
16   the responsible party? Or was there a gap between
17   learning about the valuation issues and making the
18   determination that Highland was the responsible
19   party?
20   A    Yeah, first you said HCMFA was the
21   responsible party, and then you said Highland.
22   Q    I apologize. Let me try and restate that.
23        Did HCMFA conclude that Highland was
24   the responsible party at or around the same time

Page 156

Dustin Norris

1    that it learned of the valuation issues, or was
2    there a period during which it knew about the
3    valuation issues, but not -- had not yet formed
4    the conclusion that Highland was the responsible
5    party?
6    A    From the beginning, everybody knew who the
7    responsible party was for the valuation. Those
8    reporting the issues, those responding to
9    auditors, those responding to SEC and the board
10   were all HCMLP employees from the beginning. But
11   I don't have a specific date.
12        Again, as you look here, it doesn't
13   say when the NAV error was determined, but from
14   the beginning, it was the knowledge that HCMLP was
15   responsible for the valuations.
16   Q    Okay. Do you know when HCMFA first
17   determined that the estimated loss was
18   approximately $7.4 million?
19   A    I don't, no. I don't have specifics, but
20   it was after there was a determination there was
21   actually a NAV error. And it may be in some of
22   the documents that you have. I believe it may be
23   in, you know, a memo to the board or the SEC, but
24   I don't know offhand.

Page 157

Dustin Norris

1    Q    Do you know when there was a determination
2    that there was a NAV error?
3    A    I don't know the specific time, no.
4    Q    Do you know if it was in 2019 or 2018?
5    A    I don't remember.
6    Q    Is it fair to say that it was before
7    May of 2019?
8    A    That there was a determination there was a
9    NAV error? Yes.
10   Q    And is it fair to say that HCMFA had
11   concluded that the loss of that NAV error was
12   going to be more than a million dollars prior to
13   May 2019?
14   A    More than a million? Probably -- yes.
15   Q    Okay. Is there a reason that HCMFA waited
16   until May to have Highland pay it for the
17   compensation?
18   A    I think that the whole process -- as you
19   see, the resolution memo is in May to the board.
20   That was the conclusion of the overall process.
21   So our stance would be that that was when it was
22   the right time and everything was -- the right
23   time to be sent.
24        MR. MORRIS: Okay. Can we put up

Page 158

Dustin Norris

1
2  on the screen a document that's been
3  marked as, I think, as Exhibit 13? I
4  don't know if you're able to get that,
5  La Asia.
6      MS. CANTY: Yup, I got it.
7      MR. MORRIS: Thank you.
8      (Exhibit 13 tendered.)
9  BY MR. MORRIS:
10 Q  Are you aware, sir, that there came a
11 point in time when HCMFA amended its answer?
12 A  Yes.
13 Q  And I think topic --
14 A  Topic 2 is our amended answer.
15 Q  Okay. So that's the document that's in
16 front of you?
17 A  Yes.
18 Q  And you've seen that before; correct?
19 A  Yes.
20 Q  Okay.
21     MR. MORRIS: Can we turn to Page 5
22 of 9, please?
23     And if we can scroll to the bottom.
24 BY MR. MORRIS:
25 Q  These are HCMFA's affirmative defenses; is

Page 159

Dustin Norris

1  that right?
2  A  On the second amended answer, yes.
3  Q  Yes.
4  A  I'm sorry. The first amended answer, yes.
5  Q  And as of today, is it your understanding
6  that this is HCMFA's operative pleading?
7  A  No.
8  Q  Has it been amended after this time?
9  A  Yeah, we --
10     MR. RUKAVINA: Well, he doesn't
11 know what "operative pleading" means.
12     THE WITNESS: Oh.
13     MR. RUKAVINA: Yes, it is our
14 operative pleading, Dustin.
15     THE WITNESS: It is our operative
16 pleading then.
17 BY MR. MORRIS:
18 Q  And I didn't mean to trick you. I
19 apologize. I just meant to say that this has not
20 been amended as of today; correct?
21 A  We filed a -- wait. Let me see what it's
22 called.
23 Q  You filed a motion for permission to amend
24 it further --

Page 160

Dustin Norris

1
2  A  Yes.
3  Q  -- but that motion hasn't been granted;
4  right?
5  A  To my understanding, no.
6  Q  Okay. And you understand that your -- the
7  answer that's up on the screen can't be amended
8  unless the Court grants the motion; right?
9  A  I -- if you tell me that that's the
10 process, I'll take that for what it's worth. I'm
11 not an attorney. I don't know the process.
12 Q  Okay. So let's just look at this
13 document.
14     Is it fair to say that Paragraph 38
15 through 45 deals with --
16 A  I'm going to grab the --
17 Q  Yeah.
18 A  -- thing here so I can see it on my desk,
19 too.
20 Q  Sure.
21 A  Okay.
22     38?
23 Q  Right.
24 A  Okay.
25 Q  Now -- actually, a little background.

Page 161

Dustin Norris

1
2      This amended complaint was prepared
3  after DC Sauter conducted an investigation
4  concerning the circumstances surrounding the two
5  notes that Highland was suing on; right?
6  A  Yes. My understanding is it is after
7  he -- so background, when he -- we filed our
8  initial response, we didn't have access to the
9  HCMLP employees during that time period. They
10 were not permitted to talk to us about things like
11 this. And so he did the best he could to prepare
12 a response. But once they were mostly all fired
13 by HCMLP and formed their own company called
14 Skyview, he was able to talk to them on
15 particulars. As you note in his -- his statement,
16 he was able to talk to Frank Waterhouse, where he
17 wasn't before, on this topic.
18 Q  Right. So by the time this document has
19 been prepared, HCMFA had copies of the notes that
20 Highland was suing on for six months; right?
21 Because the lawsuit was commenced in January, and
22 the notes were attached as exhibits to the
23 complaint; right?
24 A  Yes. This is July 6th this is filed.
25 Q  Right. Okay. So this is filed almost six

Page 162

```
1            Dustin Norris
2   months after the complaint is filed; right?
3   A     More like a five-month -- five months and
4   a week, but yeah.
5   Q     All right. I won't quarrel with you.
6   A     Or five and a half -- five and a half
7   months, yeah.
8   Q     Okay.
9   A     Whether you consider that --
10  Q     Okay.
11  A     -- six full months or not.
12  Q     So --
13  A     We know the dates January 22nd and
14  July 6th.
15  Q     Okay. So for that entire time period of
16  time, there's no dispute that HCMFA had in its
17  possession copies of the notes that Highland was
18  suing on; correct?
19  A     I'm looking at the original -- you said
20  they were attached, but I --
21  Q     Yeah.
22  A     If you want to show me the original notes
23  on the original filing.
24  Q     Well, I asked you to look at the original
25  complaint. I think -- was the original complaint
```

Page 163

```
1            Dustin Norris
2   Topic Number 1? No. It's just the answer.
3        In looking at the answer, did you look
4   at the original complaint?
5   A     Yes.
6   Q     Do you recall seeing that the notes were
7   attached to the original complaint?
8   A     I looked at thousands of pages in
9   preparation, so I just -- I could take your word
10  for it if you say it's in there, or if you want to
11  show it to me, we can look at it.
12       MR. RUKAVINA: They are, Dustin.
13  They are.
14       MR. MORRIS: Yeah. I think you'll
15  have to take my word for it. Thank you,
16  Davor, for confirming my word.
17  BY MR. MORRIS:
18  Q     So let me just try this again to make it
19  clean.
20       Based on my representation, that
21  Mr. Rukavina has agreed with, that the notes that
22  Highland are suing on were attached to its
23  complaint in January, you would agree with me that
24  HCMFA had the notes in its possession from at
25  least the time the complaint was filed until the
```

Page 164

```
1            Dustin Norris
2   time HCMFA filed this amended answer on July 6th;
3   correct?
4   A     Yes.
5   Q     And this amended answer was filed because
6   HCMFA had a -- had previously made a motion to the
7   Court for leave to amend its answer; correct?
8       MR. RUKAVINA: That's correct,
9   Dustin.
10      He wouldn't know about that, but
11  that's all correct.
12  BY MR. MORRIS:
13  Q     Okay. Well, you're familiar with the
14  Sauter declaration; right?
15  A     I am.
16  Q     And the Sauter declaration purports to
17  describe an investigation that Mr. Sauter
18  undertook to determine the circumstances
19  surrounding the notes; is that fair?
20  A     I don't know if I'd characterize it
21  investigation, but he was tasked with -- and I've
22  got it right here. I would refer you to the
23  agreement on -- or his -- to his declaration on --
24  Q     How would you -- how would you
25  characterize the work that he did? An
```

Page 165

```
1            Dustin Norris
2   investigation? An analysis? What word do
3   you -- would you use? Due diligence? How would
4   you characterize the work that Mr. Sauter did
5   that's set forth in his declaration?
6   A     I -- I'm looking here. I want to see how
7   he characterizes it.
8       I think he does a very good job of
9   explaining.
10      My investigation would be of the
11  following. So he calls it an investigation.
12  Q     Okay. So HCMFA would agree that after
13  Mr. Waterhouse left the employ of Highland, that
14  DC Sauter conducted an investigation into the
15  circumstances surrounding the notes that Highland
16  was suing on; correct?
17  A     Correct.
18  Q     And as part of that investigation, he
19  spoke with Mr. Waterhouse; correct?
20  A     Yes.
21  Q     And as part of that investigation, he
22  spoke with Mr. Dondero; correct?
23  A     I believe so, but let me -- let me confirm
24  in his statement.
25      Because I believe in -- yeah.
```

Page 166

Dustin Norris

2  Q    Is that correct, that he spoke with
3  Mr. Dondero in connection with his investigation?
4  A    I'm -- I'm seeing what he rep'ed to in his
5  statement.
6  Q    And does his statement say that? I don't
7  have it in front of me.
8  A    I don't know. That's what I'm looking at.
9  Q    And you don't know, independently of the
10 document, whether Mr. Sauter spoke with
11 Mr. Dondero as part of his investigation?
12 A    I know he did. I know he talked
13 throughout from when we received the original
14 complaint on. I just -- you're asking about the
15 time frame between filing the original filing.
16 And I think he may have spoken with him before
17 that, too, but I -- I just want to take a...
18      So at the time -- this is on
19 March 1st, filed the defendant's original answer.
20 At that -- at the time the debtor filed a
21 complaint, I promptly undertook an internal review
22 of the background facts concerning the notes. I
23 had no knowledge of them since I had not been
24 employed by HCMFA. And a few employees of HCMLP
25 had no knowledge of notes. I also discussed the

Page 167

Dustin Norris

2  notes of James Dondero, formerly the CEO of the
3  debtor, Mr. Dondero.
4      So this is March 1st when that first
5  filing was made. So he did speak with Mr. Dondero
6  prior, and then I believe the source of the
7  additional information was being able to speak
8  with Frank Waterhouse and Will Mabry.
9  Q    Okay. And is it fair to say that the
10 amended complaint is based on Mr. Sauter's
11 investigation?
12 A    Yes, I believe so.
13 Q    Yeah.
14 A    Yes.
15 Q    That's why HCMFA amended its complaint.
16 It's because Mr. Sauter had undertaken this
17 investigation, and he learned what he believed
18 were relevant facts, and those facts are described
19 in his declaration, and they formed the basis of
20 the affirmative defenses that we're looking at now
21 in the amended answer; fair?
22 A    Let me pull up the amended answer just
23 to --
24 Q    It's up on the screen, but if you have a
25 hard copy, that's fine.

Page 168

Dustin Norris

2  A    Yeah. I have a hard copy here, although I
3  may have mixed my documents.
4      Yeah, it was based on additional facts
5  that weren't available at the time of the original
6  response.
7  Q    Okay. And is it fair to say that
8  Paragraphs 38 through 45 relate to the affirmative
9  defense that Highland was responsible for the NAV
10 error, and the $7.4 million payment was intended
11 to be compensation for Highland's negligent work?
12 A    Sorry. Can you ask that one more time?
13 There was a couple parts there.
14 Q    No problem.
15      Is it fair to say that
16 Paragraphs 35 -- withdrawn.
17      Is it fair to say that Paragraphs 38
18 to 45 relate to HCMFA's affirmative defense that
19 the $7.4 million that was transferred from
20 Highland to HCMFA in May 2019 was intended to be
21 compensation for Highland's negligent work in
22 connection with the NAV error and not in the form
23 of a loan?
24 A    You said 38 to 42?
25 Q    38 to 45.

Page 169

Dustin Norris

2  A    38 to 45.
3      Yeah, it -- the NAV error items are
4  included in there as one of our defenses.
5  Q    Right.
6  A    43 and 44 and 45 discuss additional
7  defenses related to the note and who may or may
8  not have signed the note and who had authority to
9  sign the note.
10 Q    Okay.
11      MR. MORRIS: Can you -- can we turn
12 to Paragraph 42?
13      THE WITNESS: Yes.
14 BY MR. MORRIS:
15 Q    Do you see the first four -- first few
16 words in Paragraph 42 are, quote: "The defendant
17 accepted responsibility for the NAV error"?
18 A    Yes.
19 Q    Okay. "Defendant" there refers to
20 Highland Capital Management, LP; correct?
21 A    No. I believe --
22 Q    Oh, I apologize. I apologize.
23 A    Thank you.
24 Q    It's HCMFA; right?
25 A    HCMFA.

Page 170

Dustin Norris

2  Q    Okay.  And is -- did -- did HCMFA accept
3  responsibility for the NAV error?
4  A    They did.  They -- they are the adviser,
5  and there's already -- in the next sentence, HCMLP
6  then accepted that they had a contract with and
7  accepted responsibility.
8  Q    Okay.  And so when did the plaintiff
9  accept responsibility for having caused the NAV
10  error?
11  A    Again, going back to -- this was always
12  known and communicated that it was HCMLP
13  employees.  It was the valuation services they
14  were performing.  The legal and compliance team
15  was all outsourced in the shared services
16  agreement.
17       And that was -- again, there's not a
18  singular determination; but Jim Dondero, as
19  president, I would say effectuated that with the
20  payment of the NAV -- for the NAV error.
21  Q    So you can't tell me when the plaintiff
22  accepted responsibility for having caused the NAV
23  error; correct?
24  A    Not a specific date.
25  Q    Okay.  And it's HCMFA's position that Jim

Page 171

Dustin Norris

2  Dondero, in his capacity as the president of
3  Highland Capital Management, LP, accepted
4  responsibility on behalf of Highland Capital
5  Management, LP, for having caused the NAV error?
6  A    He, and in addition all of the employees
7  involved.  Right?  The valuation team members,
8  Frank Waterhouse was CFO, Dave Klos overseeing the
9  valuation process, they were all Highland
10  employees, and Jim Dondero as well as president
11  recognized that based on all the communications
12  and conversations they would have had.
13       MR. MORRIS:  Okay.  I'm going to --
14  I'm going to move to strike.
15  BY MR. MORRIS:
16  Q    And I'm going to ask you to listen
17  carefully to my question.
18       Who had the authority to accept, on
19  behalf of plaintiff, the responsibility for having
20  caused the NAV error?
21  A    Ultimately Jim Dondero, as president here,
22  had that authority.
23  Q    Okay.  And then it says, quote:  "The
24  plaintiff ultimately, whether through insurance or
25  its own funds, compensated the defendant."

Page 172

Dustin Norris

2       Do you see that?
3  A    Yes.
4  Q    Is that statement accurate?
5       MR. RUKAVINA:  I'll object to
6  vagueness, given the different points in
7  time.
8  BY MR. MORRIS:
9  Q    Does HCMFA believe that that statement is
10  accurate today?
11  A    We know now.  It's come out in discovery
12  that -- and it was represented that Mr. Dondero
13  transferred money to Highland who transferred it
14  to HCMFA.  And I don't know -- and it says "or,"
15  "or its own funds."  So it's accurate whether
16  through insurance or its own funds.
17       But at the time of this writing, we
18  didn't have all the details and have firmed up
19  those details, and I would refer you to
20  depositions and the pleadings and our additional
21  statement regarding cash and movement.
22  Q    Did Highland file an insurance claim, to
23  the best of your knowledge?
24  A    Not that I know of.
25  Q    Did you ever ask anybody, in preparation

Page 173

Dustin Norris

2  for today's deposition, about that sentence in
3  Paragraph 42 and whether or not Highland had ever
4  filed an insurance claim?
5  A    I didn't ask about that sentence, but we
6  did discuss whether Highland had filed an
7  insurance claim.  And to our knowledge, we don't
8  know that they have.  I'd, again, ask you as their
9  attorney.  That would be a question for you.
10  Q    Well, with all due respect, you have
11  complete and unfettered access to the former
12  president and CFO of Highland; correct?
13  A    I do, but -- I'm sorry.  You said
14  president and CEO?
15  Q    The former president and CFO.
16  A    President and -- I don't have unfettered
17  access to the former CFO.
18       MR. RUKAVINA:  I'll -- I'll object
19  to that.  We have been prohibited by
20  Waterhouse's attorney from discussing the
21  matter with him.
22  BY MR. MORRIS:
23  Q    You're -- you're not allowed -- did -- did
24  you -- did HCMFA ask Mr. Waterhouse at any time
25  whether Highland had filed an insurance claim?

Page 174

Dustin Norris

1
2  A    Not -- not that I know of.  However, we've
3  been not permitted to talk to him related to this,
4  based on his attorney.  So --
5  Q    Well, when did --
6  A    We never really discussed -- go ahead.
7  Q    I'm sorry.
8  A    Go ahead.  You were --
9  Q    I was just going to ask:  When did that
10 prohibition go into effect?
11      MR. RUKAVINA:  John, the witness
12 wouldn't know that.  It's about three
13 months ago that the lady from Baker
14 McKenzie, Deb -- I don't know her last
15 name -- got angry at me because I tried to
16 talk to Frank and she said, "Absolutely
17 not.  You're forbidden, and you're
18 violating your ethical rules if you do."
19      MR. MORRIS:  So sometime in
20 September?
21      MR. RUKAVINA:  I would say August
22 or September.
23      MR. MORRIS:  Okay.
24 BY MR. MORRIS:
25 Q    But sometime -- but you had -- HCMFA had

Page 175

Dustin Norris

1
2  complete, unfettered access to Mr. Waterhouse from
3  the time he left Highland in early March 2021
4  until at least the end of July 2021; right?
5  A    Yeah.  And I would add a point to
6  Mr. Sauter's declaration and our pleadings and the
7  depositions for the various details of what we've
8  discovered since.  However, the unfettered access
9  was also inhibited -- or -- or Mr. Sauter
10 represented this.  There was a lot going on in
11 March, April, May of 2021.
12 Q    Yeah.
13 A    And we were trying to lift out an entire
14 business and keep everything afloat, and -- as
15 you're very aware.  And so there was a lot going
16 on.
17 Q    Right.  Right.
18      Do you see -- can we go to
19 Paragraph 43, please?
20 A    Yes.
21      MR. MORRIS:  If we could just
22 scroll down to Paragraph 43, please.
23 Thank you.
24 BY MR. MORRIS:
25 Q    Now, again, this amended complaint is

Page 176

Dustin Norris

1
2  filed is July 2006; correct?
3  A    July 6th, not July 2006.
4  Q    I apologize.  Let me ask the question
5  again.
6      This amended answer was filed on
7  July 6th, 2021; correct?
8  A    Correct.
9  Q    And it was filed after Mr. Sauter
10 conducted his investigation to determine the
11 circumstances surrounding the note; correct?
12 A    Uh-huh, correct.
13 Q    And it was filed after HCMFA had had in
14 its possession since January copies of the notes
15 that Highland was suing on; correct?
16 A    Correct.
17 Q    And it was filed at a time before any
18 limitation or prohibition was placed on HCMFA's
19 ability to communicate with Mr. Waterhouse since
20 the time he had left Highland; correct?
21 A    Sorry.  You want to repeat the first part
22 of that?
23 Q    Sure.
24      It was filed at a time after
25 Mr. Waterhouse left the employ of Highland but

Page 177

Dustin Norris

1
2  before there was any limitation or restriction
3  imposed on HCMFA's ability to communicate with
4  Mr. Waterhouse?
5  A    Yes.  Once he left in March of 2021 is
6  when that happened.  And, again, in March, we
7  were, on both sides, the creation of Skyview, as
8  well as our employees, trying as much -- doing
9  everything we could do to transition the
10 businesses and services.  And so that was an
11 important time.
12      MR. MORRIS:  Okay.  Move to strike.
13 BY MR. MORRIS:
14 Q    I just want to confirm that HCMFA had
15 unfettered access to Mr. Waterhouse between the
16 time he left Highland and the time this amended
17 answer was filed in July.
18 A    We had access to him to ask him what we
19 needed.  Unfettered in the sense of, "Hey, we can
20 access you whenever we need," no, because there
21 was a lot involved in launching and -- launching
22 of Skyview and creating all the services needed
23 for our funds since we -- HCMLP is sharing
24 services provided --
25 Q    Does Mr. Sauter have a role with HCMFA?

Page 178

Dustin Norris

2  A    I don't believe so.
3  Q    Do you know who authorized him to conduct
4  this investigation?
5  A    Yeah.  It would have been management,
6  Mr. Dondero, and probably our outside counsel.  At
7  the time, we had been utilizing Highland's
8  services as legal services, all the way up until
9  the end of February.
10      There were legal and compliance
11  services that were part of the shared services
12  agreement.  There was an entire legal team, entire
13  team of litigators who were unable to work on
14  this.
15      Mr. Sauter was a real estate attorney
16  for us, and he picked up the slack and was
17  assigned by Mr. Dondero to help in these causes
18  working with outside counsel, because HCMLP was
19  not providing or no longer able to provide those
20  legal services based on their -- their view, even
21  though they were contracted to do those.
22  Q    That contract ended at the end of
23  February; isn't that right?
24  A    That's correct.
25  Q    And with the exception of a couple of

Page 179

Dustin Norris

2  people, Highland's legal team migrated to Skyview
3  in early 2021; is that fair?
4  A    Yes.
5  Q    Okay.  And among the people who migrated
6  were Stephanie Vitiello; correct?
7  A    Yes.
8  Q    And Isaac Leventon; correct?
9  A    Correct.
10  Q    And he's the chief litigation guy at
11  Highland prior to the bankruptcy; correct?
12  A    I -- I don't know if that was Isaac or if
13  it was Scott Ellington.  I don't know.
14  Q    And Scott -- Scott Ellington also
15  migrated; right?
16  A    Correct.
17  Q    So you had access to those folks for the
18  first six months of 2021; right?
19  A    No.  I would -- our position is that those
20  individuals were unable to work on -- even though
21  they had left, they were unable to work on
22  something of this nature.
23      I -- I believe there was also a
24  preliminary injunction still in place where Jim or
25  his employees could not talk to Scott or Isaac.  I

Page 180

Dustin Norris

2  don't remember all the specific details, but the
3  legal team at Highland -- or at Skyview was not
4  working on this.
5  Q    Okay.
6  A    It was probably professional -- I don't
7  know the standards, but they were unable to work
8  on -- on this.
9  Q    All right.  But you would agree that at
10  the time HCMFA asked the court for permission to
11  amend its answer, it did so based on Mr. Sauter's
12  investigation; correct?
13  A    Yes, and I would caveat that subject to
14  our -- our pleadings.
15  Q    Right.  And I think I moved to strike your
16  earlier answer, so let me try and ask the question
17  again.
18      Did Mr. Dondero authorize Mr. Sauter
19  to conduct the investigation?
20  A    I don't have specific knowledge of that.
21  Q    All right.  I think you used the phrase
22  "management."  Did management authorize Mr. Sauter
23  to conduct this investigation on behalf of HCMFA?
24  A    I don't know specifically who -- who would
25  have asked him to do the -- Jim and -- Jim Dondero

Page 181

Dustin Norris

2  asked him to help with the -- the legal items, and
3  stepped in and help in the absence of HCMLP's
4  help.
5  Q    Okay.  And based on that investigation
6  looking at Paragraph 43, HCMFA took the position,
7  quote:  "Waterhouse signed the two promissory
8  notes the subject of the complaint," close quote;
9  correct?
10  A    That's right.  It's our position that
11  at -- and I'd refer you to our amended pleading
12  with additional information, but it's -- it's our
13  position that Mr. Waterhouse saw the notes, was
14  confronted, discussed with DC and said, "Look,
15  that's my signature.  I signed them."
16  Q    Okay.  So that's -- and it was on the
17  basis of Mr. Waterhouse's conversation with
18  Mr. Sauter that HCMFA wrote that sentence; is that
19  fair?
20  A    I believe so.  And I would refer you to
21  Mr. Sauter's declaration as well, which goes into
22  details on that.
23  Q    And Mr. Sauter specifically said that
24  Mr. Waterhouse signed the notes; correct?
25  A    We can look at Mr. Sauter's declaration.

Page 182

Dustin Norris

1      I -- I believe he said he was -- Mr. Waterhouse
2  told him he signed, but --
3    Q    Right. And, in fact, HCMFA's position
4  throughout this entire case was that
5  Mr. Waterhouse signed the notes, but he did so by
6  mistake and without authority; correct?
7    A    That's right. And if you look at the
8  depositions, he testified of that, that he didn't
9  remember signing them, and he didn't have a
10  recollection, and Mr. Dondero never told him to
11  sign it, and he never asked him whether -- or
12  he -- Mr. Dondero told him never -- told him
13  shouldn't be -- didn't -- Mr. Dondero didn't tell
14  him it was a note, and he never asked if it should
15  be a note.
16        With this -- this amended pleading,
17  the thought was he mistakenly thought it was a
18  note, because that was the practice for other
19  notes or other -- other transfers of this
20  nature -- not of this nature, but other transfers
21  between companies, and so he had papered it up as
22  a note.
23        But if you look at the depositions,
24  you'll see that additional details came out that

Page 183

Dustin Norris

1      he told his controller, Mr. Klos, to transfer the
2  funds, and Mr. Klos then turned around and asked
3  Kristin to paper it up as a note, and to transfer
4  the cash. And Ms. Hendrix -- Kristin Hendrix then
5  added Mr. Waterhouse's JPEG signature to the Word
6  document, which then was filed away.
7        So we -- we, through the process of
8  depositions and discovery, were able to find more
9  information that Frank Waterhouse did not
10  remember. He didn't remember signing but said his
11  signature is on there, so he must have signed it.
12        MR. MORRIS: All right. I move to
13    strike. My question is really, really
14    simple.
15  BY MR. MORRIS:
16    Q    Up until the time that you filed the
17  motion last night, HCMFA's publicly stated
18  position has always been that Frank Waterhouse
19  signed the notes, and that he did so by mistake
20  and without authority; correct?
21    A    Correct. It says it here:
22  "Mr. Waterhouse made a mistake in preparing and
23  signing the notes for the defendant."
24    Q    Okay. Good enough.

Page 184

Dustin Norris

1    A    And then it says: "Upon information" --
2    Q    That's --
3    A    -- "and belief, Waterhouse was not aware
4  that the payment from the plaintiff to defendant
5  were to compensate the defendant for the NAV
6  error."
7    Q    I'm sorry. Where are you reading from?
8  Oh, that's 44?
9    A    That's in number 44.
10    Q    Okay.
11    A    Yeah. "Waterhouse made a mistake in
12  preparing and signing the notes for the
13  defendant."
14    Q    Right. Okay.
15    A    But, again, I'll refer you to the
16  depositions and the evidence --
17        MR. MORRIS: Move to strike. It's
18    not responsive to my question.
19  BY MR. MORRIS:
20    Q    Do you see in Paragraph 47 there's a
21  reference to "lack of consideration"?
22    A    Yes.
23    Q    Okay. What does that mean?
24    A    My understanding is that there was no

Page 185

Dustin Norris

1  consideration. We -- there were notes, but there
2  was no payment for those notes. The payment was
3  for compensation related to the NAV error, so
4  there was no payment -- no compensation for
5  notes that had been drafted.
6    Q    Okay. And the next defense there in
7  Paragraph 47 is "mutual mistake."
8        Do you see that?
9    A    Correct.
10    Q    Do you have any facts that support that,
11  that the mistake was mutual?
12    A    Yeah. I -- I would look to the
13  depositions. And if you go to the testimony of
14  Frank and Jim Dondero and David Klos and Kristin,
15  it was a clear path and a clear record of mutual
16  mistake.
17        Jim told Frank to transfer the money
18  for the NAV error. Frank then goes, tells
19  Mr. Klos, the controller, to go and transfer the
20  money, who tells Kristin to transfer the money --
21  or to make the transfer and to paper it up.
22  Kristin then papers it up, following the process
23  that she's always followed or she said she's
24  followed for many other notes.

Page 186

Dustin Norris

1
2      She lacked the authority to do so.
3  Mr. Klos lacked the authority. Mr. Waterhouse was
4  never told to make a note, and so the note itself
5  is drafted by an accountant without authority to
6  do so with a maker and a counterparty that is on
7  both sides of this, representing supposedly both
8  sides.
9      And our position is that the maker of
10 this -- even if you look at the document, Frank
11 Waterhouse signs as maker, not as his position.
12 He's signing the maker.
13     And so there's various aspects of this
14 that had errors on both sides, the -- the position
15 of HCMFA where they thought they had authority and
16 the position of HCMLP.
17 Q     Anything else, sir?
18 A     I -- I would refer you to the -- again,
19 the depositions and our pleadings. But there's --
20 there's a host of support there.
21 Q     Other than the deposition transcripts and
22 the -- and HCMFA's pleadings, are you aware of any
23 document anywhere in the world that corroborates
24 the defense of mutual mistake?
25 A     Other than the documents, the pleadings,

Page 187

Dustin Norris

1
2  and any schedules and other forms that are filed
3  with the court, there's -- there's plenty there.
4  Q     Okay. What schedules are you referring
5  to?
6  A     I would say all of your supporting
7  schedules, all of your documentation, the notes
8  themselves, the -- the Word documents that we
9  received as well in discovery that have the
10 metadata showing that Kristin Hendrix applied
11 Frank Waterhouse's JPEG signature.
12 Q     Okay.
13 A     All of those items as well as, again,
14 depositions all -- of all those individuals.
15 Q     So -- so I just want to make sure that I
16 have this clear.
17     So you've got the JPEG documents.
18 You've got the deposition transcripts. You know
19 what? Let me restate the question.
20     You've identified the JPEG documents.
21 Other than the JPEG documents, are you aware of
22 any document in the world that was created before
23 the answer date that supports or corroborates the
24 defense of mutual mistake?
25 A     I'm -- again, I -- I'd point to the --

Page 188

Dustin Norris

1
2  let -- let me take a look here again.
3  Q     What is it you're looking at?
4  A     This is the amended complaint.
5  Q     Okay.
6  A     Which paragraph was that again?
7  Q     It's 47.
8  A     47.
9  Q     Yeah. There's -- it's a -- there's --
10 A     Mutual mistake.
11 Q     -- one of the defenses there. It's up on
12 the screen.
13 A     Yeah.
14 Q     There's "mutual mistake," and I just want
15 you to identify for me every document that HCMFA
16 is aware of that was created before the answer
17 date of March 1st, 2001 [sic], other than the JPEG
18 documents --
19 A     I would -- I would refer you to --
20 Q     -- that support or corroborate -- that
21 support or corroborate the defense of mutual
22 mistake?
23 A     Yeah. And I'd also point you to DC
24 Sauter's declaration.
25 Q     Okay. That wasn't created before the

Page 189

Dustin Norris

1
2  answer date; correct?
3  A     Well, you're saying -- you -- it was
4  before the answer date.
5  Q     Pardon me?
6  A     The answer date being when we did the
7  amended answer?
8  Q     No. Let me ask the question again.
9  A     Yes, please. Sorry.
10 Q     Can you identify any document in the
11 world, other than the JPEG documents, that support
12 or corroborate the defense of mutual mistake that
13 was created before March 1st, 2021?
14 A     I got you.
15     The JPEG documents is the Word
16 documents with the metadata.
17 Q     Correct.
18 A     There were emails that went between the
19 accounting team on how to paper it up. That is in
20 your -- your documentation as well, and I would
21 say any other document that's in the court
22 filings.
23 Q     Can you identify them? That's kind of --
24 that's not really helpful to me.
25 A     Yeah. I -- there's the -- there's an

Page 190

Dustin Norris

1    email -- and this was used in depositions.
2    There's an email that went -- was David Klos
3    instructing the group -- or instructing Kristin to
4    send the cash and to record a note.
5    Q    And you believe that -- and it's HCMFA's
6    contention that that document supports their
7    position of mutual mistake. Do I have that right?
8    A    Again, I'm not an attorney, so tying the
9    definition as little M, little M, I'm going to
10   have to say I don't know.
11   Q    Okay. Other than the emails, the two
12   emails that you referenced and the JPEG documents,
13   can you identify any other document created before
14   May 1st -- March 1st, 2021, that supports or
15   corroborates the defense of mutual mistake?
16   A    There may be a document. I -- I don't
17   know.
18   Q    Okay.
19   A    And, again, as you've seen, there's a lot
20   of stuff that's come out in discovery, and it's
21   important that testimony of -- of those witnesses
22   is taken into account.
23        MR. MORRIS: Okay. Move to strike
24        the last portion of that answer.
25

Page 191

Dustin Norris

1        Let's take a short break. I may be
2    done. It's 4:09. Can we just come back
3    in six minutes?
4        THE WITNESS: Yes. Thank you.
5        MR. RUKAVINA: Sure.
6        MR. MORRIS: Thank you.
7        (Recess from 3:09 p.m. to 3:19 p.m. CST)
8    BY MR. MORRIS:
9    Q    Just a couple more questions, Mr. Norris.
10        If you can take a look again at
11   Paragraph 47 of the amended answer.
12   A    Yes.
13   Q    Do you see there's also a reference to,
14   quote, "the lack of authority from the defendant
15   to Waterhouse," close quote?
16   A    Yes.
17   Q    HCMFA does not dispute that Mr. Waterhouse
18   was an officer of HCMFA in May of 2019, does it?
19   A    No, we don't dispute that.
20   Q    And HCMFA doesn't dispute that
21   Mr. Waterhouse, in fact, served as the treasurer
22   of HCMFA in May 2019; correct?
23   A    We don't, no.
24   Q    Okay. Is the sole basis for the assertion
25

Page 192

Dustin Norris

1    that Mr. Waterhouse lacked authority was that
2    Mr. Dondero did not specifically approve it?
3    A    By nature, just the size of this note and
4    the nature of it would have required Mr. Dondero's
5    authority. And both Mr. Waterhouse and
6    Mr. Dondero testified to that in their deposition.
7    So I'd refer you to that. They both testified he
8    did not have the authority.
9        MR. MORRIS: I'm not sure that he
10       did, so I'm going to move to strike. The
11       testimony will be what the testimony will
12       be, not your characterization of it.
13   BY MR. MORRIS:
14   Q    But what about the size of the notes
15   causes HCMFA to contend that Mr. Waterhouse didn't
16   have authority?
17   A    A seven and a half million dollar note is
18   large enough to rise that Jim Dondero would have,
19   in any instance, authorized or needed to authorize
20   this, and he did not.
21   Q    And is that because a $7.4 million note is
22   a substantial obligation for HCMFA?
23   A    You know, substantial -- define
24   "substantial." It's sizeable. Right? It's seven
25

Page 193

Dustin Norris

1    and a half million dollars. Overall from the
2    operating business, it was meaningful. But seven
3    and a half million dollars in any entity would
4    have required Jim Dondero's approval.
5    Q    And so can you explain to me why, if it
6    would have required his approval, nobody at HCMFA
7    noticed that it was carried on HCMFA's books and
8    records as a liability since May of 2019?
9    A    Yeah. I think it's a simple mistake.
10   There were other notes of a similar nature in
11   size. And as Mr. Dondero testified, he wasn't
12   reviewing these regularly, the balance sheet.
13   Frank Waterhouse was. The accounting team was.
14   And so the HCMFA side, there was other notes of
15   similar size and nature. It didn't occur to them
16   that there was new notes. The accounting team, as
17   we've -- which is our position, created the notes,
18   added the signature of Mr. Waterhouse, and then
19   they continued to record those as liabilities on
20   the balance sheet. And --
21   Q    Is --
22   A    -- that was -- you had -- and, again, I'd
23   refer you to our pleadings and our amended
24   pleadings and the recent pleading yesterday that
25

Page 194

Dustin Norris

1  Dustin Norris
2  we discovered in the discovery process. But
3  Kristin Hendrix and Dave Klos and Frank Waterhouse
4  made it very clear what the process -- and I would
5  say why -- in answer to your question, it was
6  probably a little sloppy. It may have cut
7  corners. They should have received Mr. Dondero's
8  authorization, and they didn't. And so
9  that's -- that's our position.
10 Q    Does --
11 A    And I would say these are all
12 professionals. These are good people. I don't
13 think they were dishonest. I think they made a
14 mistake. Professionals make mistakes, but this
15 was a costly mistake.
16 Q    Did -- does -- does HCMFA contest that
17 Frank Waterhouse knew, on May 2nd and May 3rd,
18 2019, that the corporate accounting group was
19 going to paper these transactions as loans?
20 A    Again, I would refer you to the actual
21 depositions and pleadings -- and our pleadings.
22 But our position is -- sorry. One more time, do
23 you want to ask the question?
24 Q    Yeah. I think you need to -- I want to
25 try to finish up, and I really appreciate your

Page 195

1  Dustin Norris
2  patience.
3     MR. RUKAVINA: And I'll just say,
4  John, that was a bit of a confusing
5  question.
6     MR. MORRIS: Okay. And that's
7  fair. Let me try again.
8  BY MR. MORRIS:
9  Q    Does HCMFA contest that Frank Waterhouse
10 knew, on May 2nd and May 3rd, 2019, that the
11 corporate accounting group was going to paper the
12 transfers from Highland as loans?
13 A    Did we contest that he knew that?
14 Q    Correct.
15 A    I think his testimony speaks -- I'll refer
16 you to his testimony. I think he testified that
17 he didn't know, right? He didn't know that
18 they -- yes, he was copied on an email, but he
19 didn't have any recollection that they were
20 papered up as a loan.
21 Q    Okay. And on the basis of that testimony,
22 does HCMFA now contend that Mr. Waterhouse didn't
23 know, in May of 2019, that these transfers were
24 papered as loans?
25 A    I would say that's part of it. I would,

Page 196

1  Dustin Norris
2  again, refer you to all the pleadings, our
3  pleadings and depositions that -- of these
4  individuals. There's -- there's a lot of support
5  there.
6  Q    Right.
7     Have you seen the emails from May 2nd
8  and May 3rd?
9  A    I can't remember if they were included in
10 your exhibits, but I know they were discussed in
11 detail in the depositions from Dave Klos and
12 Kristin and Frank.
13 Q    Right. Okay.
14    MR. MORRIS: I have no further
15 questions. This is not particularly
16 helpful. Thanks.
17    MR. RUKAVINA: Okay. I'll reserve
18 questions. Thank you.
19    MR. MORRIS: Okay. Thanks a lot.
20    MR. RUKAVINA: Thank you.
21    (Off the record at 3:25 p.m. CST)
22
23
24
25

Page 197

1     IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
2         DALLAS DIVISION
3  In re:            )Chapter 11
                     )
4  HIGHLAND CAPITAL MANAGEMENT, LP, )
                     )Case No.
5     Debtor.        )19-34054-SGJ-11
   _____)
6  HIGHLAND CAPITAL MANAGEMENT, LP, )
                     )
7     Plaintiff,     )
                     )
8  vs.               )Advisory Proceeding No.
                     )21-03004
9  NEXPOINT ADVISORS, LP; JAMES    )
   DONDERO; NANCY DONDERO; and THE )
10 DUGABOY INVESTMENT TRUST,        )
                     )
11    Defendants.    )
12
      REPORTER'S CERTIFICATION
13    REMOTE DEPOSITION OF
         DUSTIN NORRIS
14      December 1, 2021
15    I, Rebecca A. Graziano, Certified Shorthand
16 Reporter in and for the State of Texas, hereby
17 certify to the following:
18    That the witness, DUSTIN NORRIS, was duly
19 sworn and that the transcript of the oral
20 deposition is a true record of the testimony given
21 by the witness;
22    I further certify that pursuant to FRCP Rule
23 30(f)(1) that the signature of the deponent:
24    ____ was requested by the deponent or a
25 party before the completion of the deposition and

Page 198

1  returned within 30 days from date of receipt of
2  the transcript.  If returned, the attached Changes
3  and Signature Page contains any changes and the
4  reasons therefor.
5  _____ was not requested by the deponent or a
6  party before the completion of the deposition.
7      I further certify that I am neither attorney
8  nor counsel for, related to, nor employed by any
9  of the parties to the action in which this
10  testimony was taken.
11      Further, I am not a relative or employee of
12  any attorney of record in this cause, nor do I
13  have a financial interest in the action.
14      Subscribed and sworn to on this 1st day of
15  December, 2021.
16
17
18
19
20  _____
         Rebecca A. Graziano, CSR, RMR, CRR
21      Texas CSR 9306
         Expiration:  07/31/22
22      California CSR 14407
         Expiration:  09/30/22
23      Illinois CSR 084.004659
         Expiration: 05/31/23
24
25

Page 199

1          ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads    Should Read  Reason
6  ___  ___ _____  _____  _____
7  ___  ___ _____  _____  _____
8  ___  ___ _____  _____  _____
9  ___  ___ _____  _____  _____
10  ___  ___ _____  _____  _____
11  ___  ___ _____  _____  _____
12  ___  ___ _____  _____  _____
13  ___  ___ _____  _____  _____
14  ___  ___ _____  _____  _____
15  ___  ___ _____  _____  _____
16  ___  ___ _____  _____  _____
17  ___  ___ _____  _____  _____
18  ___  ___ _____  _____  _____
19  ___  ___ _____  _____  _____
20
21          _____
22          Signature of Deponent
     SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

## $

**$12,286,000** 78:16 95:19 96:7

**$12.286** 79:7 82:11, 15 83:14

**$12.4** 147:9,13 149:25

**$2.4** 50:18 51:18

**$5** 50:21 51:21 107:7 108:13 109:4,5,7,13, 14 140:22 143:19 147:7,24 148:9 149:13,16

**$5.186** 134:6

**$7.4** 48:21 63:24 82:16 134:17,24 135:5 138:6,16,23 140:9 146:21 147:6, 15 149:18 150:4 156:19 168:10,19 192:22

**$7.44** 149:23

**$7.442** 149:5

**$7.5** 82:12 133:17,23 146:13

## 1

**1** 26:11 29:6,8 38:17, 21 163:2

**10** 11:7 52:16,21 57:6 63:2

**100** 26:14 80:19

**10:00** 8:15

**10:01** 5:2

**11** 57:6 65:21

**11:05** 56:18

**11:15** 56:15

**11:16** 56:18

**11th** 24:20

**12** 27:19,21 36:14,18 82:13

## 12-and-a-half

148:12

**12/31** 87:5

**12/31/2018** 55:5

**12:05** 56:14

**12:11** 103:2

**12:15** 56:14 102:15

**13** 23:10,11,12 158:3, 8

**14** 11:7

**147** 51:2,3

**15** 134:6 136:17 137:3,7

**15(c)** 67:17,18 68:21 69:16 71:6 72:4 76:6, 19 77:4 87:2 88:7 92:12 99:5,8 101:11

**15th** 136:23

**17** 48:12

**18** 153:2

**182** 119:9,10 124:13 125:20 152:21,22

**185** 7:12,17,19

**18th** 25:3 153:13

**19** 32:6 110:4 153:3 154:18

**1940** 67:18

**1:06** 103:2

**1st** 20:17 23:14,20 24:4 25:21 26:2,5 29:20 30:3,7,9,16,19 31:5,9 33:5 34:4,24 35:6 49:10 61:11,14 126:22 166:19 167:4 188:17 189:13 190:15

## 2

**2** 78:4,6,10 82:16 85:9 86:8,10,19 89:8,9 90:20 92:19 93:22 95:8,14 98:9 141:4 158:14

## 2.4-million-dollar

51:14

**2000-** 31:25

**2001** 188:17

**2006** 176:2,3

**2012** 18:19 21:22

**2013** 21:25

**2018** 18:23,25 19:4 20:17 22:6,12,20 23:14,20 24:4,5,6,15 25:22 26:2,6 32:5,6 46:12,25 47:19 110:4 136:9 145:23 151:13, 15 153:2,10,18,24 154:13 155:9 157:5

**2018/2019** 109:21

**2019** 18:23 19:3,5 20:22 21:7 24:20 28:15,19 32:5 42:25 43:2 47:7 49:6,10,22 50:21 55:10 59:5,7 103:20 104:13,15,19 105:10 107:12 109:4 120:16,18,19,23 128:23 129:22 132:5 134:6 136:9,14,17 137:3,7 146:18 151:6,13 153:3 154:18 157:5,8,14 168:20 191:19,23 193:9 194:18 195:10, 23

**2020** 19:11 32:2 33:18 39:8,12 41:3, 16 42:6 55:16 65:22 67:8 70:14,24 72:3 73:24 78:15 84:24 86:21,24 92:18 95:6, 9,13,16,23 96:8 97:23 98:10 99:11 101:15 102:6

**2021** 19:11 25:3,9,10 29:20 30:3,7,9,16,19 31:5,9 33:5 34:3,4,24 35:6 39:25 57:16 61:11,14 126:23 175:3,4,11 176:7 177:5 179:3,18 189:13 190:15

**21st** 34:3,24 39:25

**81:5**

**22nd** 28:12 162:13

**23rd** 95:6 100:2

**24th** 9:19

**26th** 24:11,15

**28th** 128:23 129:21 132:5

**2:06** 150:24

**2:07** 151:2

**2:21** 151:2

**2nd** 28:15,18,21 50:18 51:14,17 54:24 127:17 194:17 195:10 196:7

## 3

**3** 38:23 105:5

**30** 86:24

**30(b)(6)** 5:18 7:10 9:9,25 15:18 22:25 36:18,25 37:10,15 42:3 49:15 57:6,8 63:2 64:16,22 75:23 79:5 82:10,14 84:4 92:16 95:11,18 116:6 132:5 141:19

**30th** 87:6 95:9,16,23 96:8 101:14 102:6 154:8,14

**31st** 46:11,25 47:18 154:9

**35** 9:19 168:16

**36** 87:13,14

**38** 160:14,22 168:8, 17,24,25 169:2

**3:06** 150:24

**3:09** 191:8

**3:19** 191:8

**3:20** 150:25

**3:25** 196:21

**3rd** 28:15,19,21 39:8, 12,22 41:16 42:6 47:7 49:10,22 50:21

**51:21 54:24 127:17 194:17 195:10 196:8**

## 4

**42** 168:24 169:12,16 173:3

**43** 169:6 175:19,22 181:6

**44** 169:6 184:9,10

**45** 46:20,21 160:15 168:8,18,25 169:2,6

**47** 184:21 185:8 188:7,8 191:12

**4:09** 191:3

## 5

**5** 9:17 29:10,13 158:21

**5.2** 109:15

**5.6** 109:15

**59** 71:21,22 89:19

## 6

**6** 10:25 30:5

**6/30** 94:24,25 153:22

**60** 153:22 154:8

**600** 79:25

**650** 89:20

**650-page** 9:18

**6:05** 92:18 93:18

**6th** 92:18 93:18 97:14 161:24 162:14 164:2 176:3,7

## 7

**7** 10:25 30:5

**7.4** 134:22 147:2

**8**

**8** 10:25 25:10 141:19
142:10

**9**

**9** 11:2,3 103:4 104:18
158:22

**9:00** 8:14

**A**

**a.m.** 5:2 56:18

**ability** 30:24 31:4,8
33:4 34:23 176:19
177:3

**absence** 181:3

**Absolutely** 174:16

**accept** 170:2,9
171:18

**accepted** 169:17
170:6,7,22 171:3

**access** 30:15,18,20
33:22,24 34:6,8
61:20 144:16 161:8
173:11,17 175:2,8
177:15,18,20 179:17

**accessible** 32:3

**account** 51:6 143:20
150:5 190:23

**accountant** 63:9
186:5

**accountants** 57:16
63:14

**accounted** 52:23
53:13 63:6

**accounting** 27:16
43:12,19 44:11 50:8
52:17 53:5,17,21
56:25 57:5 61:24
62:23,25 63:8,17
64:2,3 65:2 70:6 72:6
75:16 78:23 126:10
189:19 193:14,17
194:18 195:11

**accounts** 58:3,8,9

**accuracy** 125:25

**accurate** 7:2 25:18
44:3,24 45:20 65:15
74:17 75:3 76:3,11
80:8,15,19 81:20,23
94:2 125:21 126:6
127:14 172:4,10,15

**accused** 120:8

**acknowledge** 92:3
95:5

**acknowledged**
51:24

**acknowledges**
51:24

**Act** 67:18

**acting** 80:4 126:23

**action** 29:3

**actively** 144:17

**actual** 40:17 41:10
136:22 144:9 194:20

**add** 79:12,13 175:5

**added** 18:20 183:6
193:19

**addition** 149:16
171:6

**additional** 53:4
54:15 84:13 122:4
149:18 167:7 168:4
169:6 172:20 181:12
182:25

**address** 53:5

**addressed** 127:11

**addressing** 101:9
109:22

**adoption** 131:23
132:8

**adversary** 28:8

**advise** 124:8

**advised** 130:16

**adviser** 33:20 53:17
64:4 68:16 69:24
75:18 83:18 106:7
123:19 127:24 128:4

**accounts** continued...

**advisers** 21:2,6,12,
25 22:12,19 32:16
40:23 45:3,9 67:4
71:11 72:2,9,12,23
73:3 75:6 77:6,12
78:14 84:23,24 86:6
90:23 97:2,5,13
99:17

**advisers'** 94:19
96:21

**Advisors** 5:19,22
18:7 19:25 20:7,23
21:2 33:9,17 78:13

**advisory** 66:3,6,9

**affiliate** 93:5

**affiliates** 60:18 79:22
90:22

**affirmative** 30:13
50:4 53:6 158:25
167:20 168:8,18

**afloat** 175:14

**aggregate** 48:21

**agree** 42:8 57:4 77:5,
9 95:11,19 101:22
112:4 131:2 132:4
138:15 147:23
151:24 163:23
165:12 180:9

**agreed** 138:5 163:21

**agreeing** 104:4

**agreement** 9:6 34:14
44:11 60:17 61:25
62:15 68:24 70:10
74:20 75:22 77:22
81:8,9 111:9 113:20,
22 128:21 138:4,13,
23,25 139:2,10
140:4,9 142:25
150:12 164:23
170:16 178:12

**agreements** 66:10,
12,15

**ahead** 14:17 70:13
71:16,17 101:7
174:6,8

**accounts** continued...

**allegedly** 121:15,22

**allocation** 105:3
106:8 118:21 122:24
123:2 125:22

**allowed** 13:11
173:23

**amend** 9:11 104:4,7
159:24 164:7 180:11

**amended** 7:24 8:13
9:4,24 10:21 11:8
35:17,18 54:17,18
55:6 63:12,20
158:11,14 159:3,5,9,
21 160:7 161:2
164:2,5 167:10,15,
21,22 175:25 176:6
177:16 181:11
182:17 188:4 189:7
191:12 193:24

**amount** 70:16 79:8
82:17 107:6 109:15,
22 154:23

**amounts** 48:25 49:3
65:24 78:11 79:21
82:25 90:21 91:12
93:3 101:19,22,24
105:14 134:20

**analysis** 67:17 68:21
69:16 72:4 106:25
113:24 114:5,11
115:2 116:7 165:2

**analysts** 27:12

**analyzed** 121:2

**angry** 174:15

**annual** 66:12 67:20
88:7

**answering** 6:15 64:7

**answers** 6:3 7:2
35:16 63:20 75:10

**anticipated** 80:15,16
115:25

**apologize** 22:17
24:12 69:6 152:12
154:5 155:23 159:20
169:22 176:4

**appearing** 82:20

**appears** 30:6 49:18

**accounts** continued...

51:6 95:24

**applied** 187:10

**approaching** 102:15

**approval** 128:21
193:5,7

**approve** 192:3

**approved** 111:15
112:11 128:9,15
132:23 133:2

**approximately** 26:9,
19 109:3,5 133:16,23
134:5 146:13 147:7
154:9 156:19

**April** 13:14 19:3,5
20:22 21:6 22:16
24:20 25:10 104:13,
19 175:11

**argument** 27:25
35:23 36:3 37:15

**arguments** 85:14,16

**ascertain** 58:6,14

**Asia** 7:14 158:5

**asks** 27:21 52:16

**aspect** 34:9 67:24
97:24 99:24

**aspects** 14:22 45:3,4
68:11 69:24 186:13

**assert** 30:12

**assertion** 191:25

**Asset** 122:21

**assigned** 178:17

**assistant** 18:18,20
21:21 25:5,12

**assume** 41:22 45:21,
23 47:24 48:24 49:2

**assuming** 23:21,24
48:4 52:6,7

**assumption** 45:25

**assumptions** 45:22

**attached** 28:20
161:22 162:20 163:7,
22

**attachments** 31:17

**attain** 20:12

**attempt** 83:5

**attended** 67:16

**attorney** 5:9 83:8 96:25 147:17 160:11 173:9,20 174:4 178:15 190:9

**attorney's** 13:17

**audit** 44:12 47:8,12, 23 57:16 58:2 59:4,7 154:8

**audited** 43:5,10 44:2, 12,23 45:5,19 46:10, 24 47:17,23 48:14,19 49:20 55:2 57:24 58:12,16 64:17 65:10 101:17

**auditor** 47:11

**auditors** 43:20 57:17 154:22 156:10

**audits** 153:19,22

**August** 86:25 99:4,6 153:25 154:9,13 155:9 174:21

**author** 77:18

**authority** 85:4 138:2 169:8 171:18,22 182:7 183:21 186:2, 3,5,15 191:15 192:2, 6,9,17

**authorization** 72:11 85:18 194:8

**authorize** 143:8,12 180:18,22 192:20

**authorized** 72:9,24 84:22 143:16 178:3 192:20

**aware** 6:3 27:15 28:7,13,17 29:2 31:7 34:20 35:7,11,12,13, 23 36:5,6,12 37:9,14, 19,22 39:15,21 47:10 49:8 52:12 56:2,25 57:3 59:6,16 62:6 67:8,12 71:3 84:14 85:2 86:13,15,16,19

87:7 98:2 100:3 111:24 113:23 117:18 118:18 122:6 124:23 125:17 127:2 130:8 145:18 150:6 158:10 175:15 184:4 186:22 187:21 188:16

**B**

**back** 13:13,14 17:13 21:22 22:2 31:25 40:24 41:9,10 56:14 64:7 68:23 69:17 70:6 76:14 77:13 86:2,10 92:23 93:9, 12 94:7 96:16 102:22 150:25 152:5,13,19 170:11 191:3

**back-office** 27:16 43:12 75:17

**background** 64:3 160:25 161:7 166:22

**backing** 98:18 99:2, 18 102:2

**backup** 49:2 82:23 83:4

**Baker** 174:13

**balance** 48:7 53:20 55:5 58:23,24 59:2 65:6,15 87:5,6 92:10, 20 93:22 94:5 96:4 102:9 108:14,17 193:13,21

**bank** 51:6,7 52:2 104:6

**bankruptcy** 27:23 30:23 35:8 36:7 37:23 99:11 179:11

**based** 13:17 18:3 25:15 34:12,25 45:25 46:3 57:17,25 142:13 154:7 163:20 167:10 168:4 171:11 174:4 178:20 180:11 181:5

**basis** 22:20 67:20 167:19 181:17 191:25 195:21

**BBVA** 51:7

**began** 31:25 54:15 104:14,22 120:18

**begin** 6:18

**beginning** 8:16 22:12,20 24:15 120:17 156:7,11,15

**behalf** 5:18 10:7 29:19 35:24 37:11,23 40:3 43:8 64:7 68:20 72:8,23 73:3 80:5 126:23 138:15 143:4, 6 144:10 150:20 151:9 171:4,19 180:23

**belief** 184:4

**believed** 117:13 126:16 149:9 167:17

**believes** 118:5,15

**big** 123:11

**biggest** 67:24

**bill** 59:15

**billed** 59:19,20

**bind** 6:4

**bit** 37:21 48:5 88:17 126:2 133:9 151:4 195:4

**Blank** 87:24

**board** 9:9 32:17 33:10,14 65:22 67:5, 8,16,19 70:15,25 71:8,10 72:3,25 74:21 75:4 76:3,7,15 78:9,15 80:9 84:6,16, 19,23 86:7,12,13,22, 23 87:9 88:4,7,12,24 89:10 91:21 92:11 93:25 94:10,20 95:7, 12,21 96:9 98:10,16, 22,25 99:3,4,7,12,16, 20 100:18 101:10 112:12 119:2,3,22 123:3,8 125:21 126:6,13 127:6,11,12 128:9,12,15,23 129:2,21 130:7,14, 15,18,21 131:5 132:6,23 133:3

135:20 156:10,24 157:20

**board's** 77:7 90:2 92:19 93:21

**boards** 66:24 67:3

**booked** 53:20 54:11, 21 57:10,14 59:9 64:23

**booking** 56:22 57:11,20

**books** 44:11 52:24 53:13,16 54:7,12,23 55:7,14,20,23 56:21 58:15,19,21,22 59:17 60:24 61:5,13,21 62:10 63:3,17 79:12 193:8

**bottle** 56:12

**bottom** 87:21 102:8 152:17 158:23

**Brad** 24:3,7,18

**breach** 148:24

**break** 7:4 56:7 150:24 191:2

**Brian** 25:5

**bring** 70:2

**broad** 35:21

**broader** 126:3

**broadly** 19:19,23

**broke** 145:3

**broker** 144:21,24

**broker-dealers** 107:13

**business** 19:22 68:6,14 107:18 175:14 193:3

**businesses** 177:10

**C**

**calculate** 111:14

**call** 8:23 61:19 67:17 125:7

**called** 5:17 8:23 159:23 161:13

**calls** 32:19 165:11

**Canty** 7:9,17 152:13, 21 158:6

**capacity** 5:17 20:3 36:25 37:9,14 44:7,8, 10,13 75:25 77:17 137:19,21 171:2

**capital** 5:12,19,21,24 27:17 32:7 42:20 52:5 61:22 108:19 123:15 124:21 125:14 131:3 146:2,6 169:20 171:3,4

**careful** 16:25

**carefully** 41:25 62:5 120:6 129:19 171:17

**carried** 193:8

**carrier** 147:8 151:22 152:2

**carriers** 152:7

**case** 27:23 48:24 49:2,18 67:21 76:17 81:10 182:5

**cash** 14:7,11 52:10 108:14,16,18 134:15 140:23 141:2 172:21 183:5 190:5

**caused** 121:22 137:7 147:22 170:9,22 171:5,20

**caution** 16:20

**caveat** 180:13

**CC'D** 95:3

**CEO** 167:2 173:14

**certificates** 9:7 19:2 20:14 23:22 25:20

**CFO** 39:17 45:7,13 75:15 96:21 171:8 173:12,15,17

**chain** 81:2 91:16

**challenge** 105:11,15

**challenged** 100:24

**change** 93:7 102:18 104:5,7 106:11,18

**changed** 20:23 24:2 55:23 56:21 57:12,21 98:19

**changing** 23:25

**characterization** 192:13

**characterize** 164:20,25 165:4

**characterizes** 165:7

**charged** 43:9 81:18, 22

**charts** 73:22

**check** 9:17

**chief** 19:20 20:4 32:15 33:13 179:10

**circumstances** 16:9 17:16 57:18 86:14 161:4 164:18 165:15 176:11

**claim** 141:20,23 142:2,4,19 143:6,9, 11,13,16,20,23,25 144:4,6,9,18 145:8, 16,21,24 148:16 149:10,14 151:8,12, 18 152:2 172:22 173:4,7,25

**claims** 152:7,11

**clarification** 37:8 74:12 123:4,5

**clarify** 69:17

**clean** 149:3 163:19

**clear** 79:14 185:16 187:16 194:4

**close** 83:20 181:8 191:16

**closed-end** 105:4,7 106:2,11,19 108:4

**closely** 72:5 112:22

**coffee** 56:8

**collaborative** 105:21 106:12

**collateral** 147:17,19 148:20

**colleague** 7:9

**collect** 28:9

**collectively** 28:24

**color** 53:4

**combination** 134:14

**combined** 134:22

**comfortable** 68:18 99:12

**commenced** 28:8 29:3 64:18,25 161:21

**commencement** 40:9

**commentary** 54:2

**committee** 111:10, 15 115:11

**communicate** 30:24 34:23 176:19 177:3

**communicated** 150:12 170:12

**communication** 62:11 130:18 150:10

**communications** 27:22 65:22 84:5 121:2 123:8 171:11

**companies** 182:22

**company** 14:4 36:22 39:15 64:7 143:2 146:5 147:14,20,21 161:13

**company's** 12:10 53:2 139:8 142:4,6

**Compass** 51:7

**compensate** 137:18 138:16 184:6

**compensated** 171:25

**compensation** 15:11 59:10,22 60:5, 14 61:2,16 62:9 63:6, 22 64:11 108:20 134:25 135:6 137:14 138:23 140:9,15,16

**146:22 147:6,8 149:19 157:18 168:11,21 185:4,5**

**competently** 36:17

**complaint** 8:22 9:2 28:12,21 34:3 38:19, 20 39:25 40:18 161:2,23 162:2,25 163:4,7,23,25 166:14,21 167:10,15 175:25 181:8 188:4

**complete** 6:25 23:22 25:17 34:5,8 59:4 173:11 175:2

**completed** 6:16,19

**completely** 80:19 94:2

**compliance** 27:16 31:15 32:15,24 33:13 41:2,7 61:23 69:4 70:5 72:6,14 74:19, 23 76:15 77:25 106:14 126:9 170:14 178:10

**component** 33:7 83:14

**components** 17:22

**concerned** 35:25 36:8 124:24,25

**concerns** 35:9 37:12,17,24 90:20 110:3

**conclude** 49:14 155:15,24

**concluded** 157:12

**conclusion** 135:11 156:5 157:21

**conduct** 47:12 138:7 178:3 180:19,23

**conducted** 67:9 122:25 161:3 165:14 176:10

**confirm** 10:19 50:23 52:9 57:9 133:5 165:23 177:14

**confirmed** 11:23

**confirming** 163:16

**confronted** 181:14

**confused** 81:6

**confusing** 195:4

**confusion** 81:13

**connection** 6:7 10:7 12:13 15:2 59:11 67:9 88:7 101:10 110:9,23 111:3 112:15 113:4,9,16 114:2,13,23 117:14 118:16 119:15 121:8 124:9 134:7 135:2 137:15 138:18 142:8, 20 144:7 146:22 147:9 149:14 166:3 168:22

**consent** 103:5,9,15, 19,23,24 104:3,8,9, 12,14,19,22 105:2, 10,20,21 106:6,8,10, 18,22 107:5,9,18 108:3,4,13,24 109:5, 9,12

**consented** 104:10 105:6 107:23

**consequence** 138:6

**consequences** 109:22

**consideration** 184:22 185:2

**consistent** 51:16

**consultant** 112:6 128:17

**consultation** 154:24

**contained** 95:6

**contemporaneously** 55:10

**contend** 42:4 85:17, 20 113:3 132:20 134:21 147:13 192:16 195:22

**contends** 49:9 59:8 134:17,23 135:5 149:24

**contention** 42:8 132:24 146:20 190:7

**confirming** 163:16

**contest** 194:16 195:9,13

**continue** 10:24 29:18 144:17 148:14

**continued** 193:20

**continuing** 24:20

**continuous** 22:19

**contract** 80:21 115:6 116:24 117:5 148:24 170:6 178:22

**contracted** 178:21

**contracts** 66:19 67:11,19 69:9,12

**contribution** 67:25

**control** 121:4 130:9 137:20,21

**controller** 183:2 185:20

**controlling** 26:21

**controls** 26:15 122:4

**conversation** 117:22 181:17

**conversations** 16:3 32:8 101:3 130:4 171:12

**conversion** 105:6,8, 9,13 107:25

**converted** 105:3

**converting** 105:25

**coordinating** 41:12 115:12

**copied** 73:11 90:4,16 91:15,21 92:3 99:23 195:18

**copies** 9:5 88:21 161:19 162:17 176:14

**copy** 30:2 89:14,16 91:19 167:25 168:2

**corners** 194:7

**corporate** 194:18 195:11

**correct** 9:20 10:3

12:15,22 15:23 18:25 20:8,9,10 21:10 22:21 26:19 28:19 29:4,5,7,8 30:13,16, 19,25 31:5,6 34:7,18, 24 35:19 39:8,9 42:15,25 43:3 47:10, 13 48:23 49:24 51:19,21,25 54:25 55:18 57:6,21 59:12, 13 61:12 64:20,25 65:2 66:4,7,10,13,19, 25 67:2 69:10,13,14 70:17 71:2 72:4 74:3, 9 76:12 77:7,8,10 83:15 84:6 86:24 88:14,20,24 89:11 90:16 91:16 92:20,21 94:16,20 95:2,23 96:10,22,23 97:2,3,5, 8,10 100:10,14 101:2,11 103:20 106:23 107:21 108:10 114:13,20,24, 25 116:19 117:19 120:16 121:4,22 122:9 123:6 124:17, 18 127:18,19 128:24, 25 129:7 130:2 131:4,13 132:14,18 133:24 134:3,4,19 135:3,8 136:17,18 137:4,5,8 139:3 141:18 143:21,23 145:5 146:3,18,19, 24,25 147:11 149:5, 11,12,14,15,20,21,25 150:2 151:10,11 158:18 159:21 162:18 164:3,7,8,11 165:16,17,19,22 166:2 169:20 170:23 173:12 176:2,7,8,11, 12,15,16,20 178:24 179:6,8,9,16 180:12 181:9,24 182:7 183:21,22 185:10 189:2,17 191:23 195:14

**correction** 22:23 90:3 124:24

**correctly** 15:13 85:10 132:2

**corroborate** 188:20,

21 189:12

**corroborates** 61:15 62:7 186:23 187:23 190:16

**cost** 106:22

**costly** 194:15

**costs** 106:20 133:18

**counsel** 5:11 11:19 13:8 54:2 82:22 83:3 88:3 90:2 116:21 123:17,19,21,23 124:2,7 178:6,18

**counterparty** 186:6

**couple** 168:13 178:25 191:10

**couple-month** 105:18

**court** 27:24 30:23 35:8 36:3,7,11 37:16, 24 40:20 160:8 164:7 180:10 187:3 189:21

**coverage** 142:20 149:11

**covered** 98:16,24 99:16 100:17

**created** 42:18 61:14 62:7,17 63:4 147:21 187:22 188:16,25 189:13 190:14 193:18

**creating** 45:8 53:16 135:15 177:22

**creation** 177:7

**CST** 5:2 56:18 103:2 151:2 191:8 196:21

**current** 57:17 58:9

**cut** 194:6

**D**

**daily** 40:19 41:11

**damage** 152:9

**data** 33:22 115:13

**date** 21:19 30:7,10 33:19 34:4 35:6,9,25

36:8 37:12,16,24 38:12,16 39:14 42:9 61:10 62:7 63:4 85:25 97:6 107:15,25 126:22 130:4,5 135:22 136:4,8 155:12 156:12 170:24 187:23 188:17 189:2,4,6

**dated** 28:14,18 30:3 127:15

**dates** 23:21,25 25:16 52:11 120:18 134:10 162:13

**dating** 21:22

**Dave** 12:3 80:14 95:4 171:8 194:3 196:11

**David** 25:5 185:15 190:3

**Davor** 7:18 12:14 56:10 139:23 142:3 163:16

**day** 34:3 51:25

**days** 153:22 154:8

**DC** 12:17,19 13:12 142:3 161:3 165:14 181:14 188:23

**DC's** 61:19

**deals** 160:15

**Deb** 174:14

**debated** 121:2

**debtor** 5:11 31:21 33:7,23 34:12 39:17 41:6 42:17 117:22 118:9 166:20 167:3

**December** 39:8,12, 22 40:17 41:3,16 42:6 46:11,25 47:18 55:16

**decision** 105:19,22, 23 106:17,21 108:2,3 138:2

**declaration** 9:4 13:15 16:14,18 17:19 31:16 54:17 61:19 164:14,16,23 165:5 167:19 175:6 181:21,

25 188:24

**deductible** 141:3,17

**defendant** 169:16,19 171:25 183:24 184:5, 6,14 191:15

**defendant's** 9:11 166:19

**defending** 41:11

**defense** 114:18,19 115:8 144:7 168:9,18 185:7 186:24 187:24 188:21 189:12 190:16

**defenses** 30:13 50:4 53:6 135:9 140:10 150:2 158:25 167:20 169:4,7 188:11

**deferred** 80:20

**define** 119:17 154:3 192:24

**defined** 46:7 153:5

**Defines** 132:19

**defining** 131:25 132:17

**definition** 190:10

**demand** 19:10 38:14,24 39:24 40:18 41:15,21 54:14,20 55:15

**demanded** 15:24 16:2 19:9 38:6,7,9,11 86:16 137:14 138:5

**demanding** 39:17, 18

**denying** 52:10

**department** 78:23

**depending** 75:7

**deposed** 5:17

**deposited** 105:17

**deposition** 5:13 6:8 7:10,24 8:4,18 9:25 10:8,21 11:12 13:17, 20 14:2 15:3,14 28:24 29:10 37:4 60:6 82:21 83:25

25 188:24

**84:11 115:23 173:2 186:21 187:18 192:7

**depositions** 12:2 40:19 41:12 61:6 140:20 172:20 175:7 182:9,24 183:9 184:17 185:14 186:19 187:14 190:2 194:21 196:3,11

**derived** 95:8

**describe** 19:16 111:2 164:17

**describes** 133:15

**description** 123:6

**desk** 160:18

**detail** 196:11

**detailed** 134:15

**details** 14:6 111:6 113:11 141:5 172:18, 19 175:7 180:2 181:22 182:25

**determination** 67:10 129:10 131:10, 22 132:7 138:9,14 154:16 155:19 156:21 157:2,9 170:18

**determinations** 127:23 130:6

**determine** 57:17 67:19 68:16 79:6 105:11,16 107:2 113:25 114:6,11 115:4 116:9 164:18 176:10

**determined** 57:25 129:4,13,23 130:9 131:17 136:7,13 154:19 156:14,18

**determining** 129:25 130:22

**development** 19:22 68:6,14

**devoted** 99:8 101:9

**dictates** 67:22

**difference** 8:11

**differently** 155:7

**diligence** 142:9 165:3

**direct** 26:5

**direction** 31:18

**directly** 95:14 144:23

**director** 26:25 27:4

**directors** 23:2 26:24 88:4

**disagree** 148:10

**disciplinary** 121:20, 25 122:6

**disclosed** 49:23 64:17

**disclosure** 86:12

**discover** 17:8

**discovered** 54:11 63:12 175:8 194:2

**discovery** 11:25 81:7 172:11 183:9 187:9 190:21 194:2

**discuss** 16:16 169:6 173:6

**discussed** 13:25 14:3,4,9 16:21,23 82:22 83:3 103:15 108:19 120:25 135:19,20 140:17 142:3 166:25 174:6 181:14 196:10

**discussing** 130:5 173:20

**discussion** 7:13 16:6 82:8 105:24 106:16 116:20 142:17 154:21

**discussions** 13:23 14:10 16:11 17:6,12, 14 110:2 118:8,11

**dishonest** 194:13

**dispute** 49:20,25 50:4,17,20 92:15 93:19 94:18,21 111:25 128:22 133:2 162:16 191:18,20,21

**disputed** 40:14

**distinguishing** 47:22

**distribution** 19:20 20:4 107:16

**Docket** 9:19

**document** 6:25 7:16 9:18,20 23:6 29:16 35:7,22 37:10 38:13 46:19 47:16 50:25 71:4,24 87:16,21 104:5 119:13 120:7, 12 122:11,19,23 126:5,12,17,21 128:20 138:21 140:8 158:2,15 160:13 161:18 166:10 183:7 186:10,23 187:22 188:15 189:10,21 190:7,14,17

**documentation** 187:7 189:20

**documented** 61:7

**documents** 6:22 8:17,20 9:14 11:16, 22,24 36:11 38:15 62:18 136:22 144:15 145:10,11 156:23 168:3 186:25 187:8, 17,20,21 188:18 189:11,15,16 190:13

**dollar** 48:25 49:3 192:18

**dollars** 14:8 157:13 193:2,4

**Dondero** 11:20 12:20 13:20 14:2,23 15:20 26:7,9,14,15 27:4 30:18,24 34:6 39:20 60:4,5,7,8,12 76:24 83:20 84:14, 22,25 98:18 99:18 103:16 105:22 106:13 121:3,14 137:17 138:3,19 140:12,18,19 165:22 166:3,11 167:2,3,5 170:18 171:2,10,21 172:12 178:6,17 180:18,25 182:11,13, 14 185:15 192:3,7,19

193:12

**Dondero's** 192:5 193:5 194:7

**doubt** 77:2 80:12 98:4

**draft** 69:4 72:7 96:2

**drafted** 126:8 185:6 186:5

**drafting** 77:4

**due** 65:24 70:16 78:12 79:21 81:5 90:21 93:4 96:7 101:19 102:3 153:22 165:3 173:10

**duly** 5:3,5

**Dustin** 5:4 6:1 7:1 8:1,2,3 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,20 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,10 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1

136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1,15 160:1 161:1 162:1 163:1,12 164:1,9 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1

**duty** 44:22

**E**

**earlier** 13:12 16:13 22:24 65:8 86:21 108:19 155:12 180:16

**earliest** 81:4

**early** 17:5 19:10 88:10 136:14 175:3 179:3

**economies** 68:8

**educate** 127:12

**effect** 122:3 139:2 174:10

**effective** 23:25 24:11 25:15

**effectuated** 170:19

**effort** 145:7 151:21

**efforts** 144:9

**elaborated** 84:13

**Ellington** 179:13,14

**email** 73:14 74:2 81:2 87:8 88:6 91:15 92:3, 4,17 93:20 94:23 96:17 97:24 98:8

**99:23,25 100:10,13, 24 101:8 190:2,3 195:18**

**emailed** 84:2

**emails** 11:22 189:18 190:12,13 196:7

**employ** 165:13 176:25

**employed** 18:6 32:5, 6 83:9 166:24

**employee** 20:3 31:13 33:9,17 43:15 44:7,14 71:13 72:12 75:2 76:9 77:17 80:6, 17 81:21 115:13 119:25 120:2 121:6, 14,21 122:16 125:13, 18 126:4

**employees** 23:2 27:5,6,7,9,14 32:17, 22 41:6 42:18,21 53:15 61:23 69:3 75:21 76:18 77:13 111:7,8 112:23 115:17 117:20,21,22 118:10 119:3 123:15 124:5 125:5, 7,8 129:10,12 130:7 135:15,21 137:10 142:22 144:24 146:9, 11 150:11 156:11 161:9 166:24 170:13 171:6,10 177:8 179:25

**enable** 122:23

**encourage** 133:13

**end** 145:3,6 175:4 178:9,22

**ended** 120:20,22 178:22

**ending** 46:11,25 47:18 86:24 95:15,23 154:14

**engagement** 111:21

**entering** 138:12

**entire** 120:24 121:3 162:15 175:13 178:12 182:5

**entities** 74:4,6,8 83:19 98:17,25

**entitled** 147:13 149:18,24

**entity** 26:13 27:3 52:9 73:25 75:13 77:18 111:25 193:4

**entries** 57:2

**environment** 130:9

**equity** 26:20

**error** 9:10 14:20,21 15:11 16:8,9,10 17:24 32:10,13,18,21 50:6 59:11,12 62:11 108:21 109:23 110:3, 6 115:16 117:13 118:6,10,16 119:20 120:9,15,25 121:15, 22 122:21,25 124:16, 22,25 125:16 126:11, 25 131:13,25 132:7, 14,16,17,19 133:16 134:7 135:3,12 136:11,13,16 137:4, 7,18 140:15,17 142:13,15,21 146:24 147:10,25 149:5,6,19 150:5,21 153:10,16 154:4,12,16,20,23 155:4 156:14,22 157:3,10,12 168:10, 22 169:3,17 170:3, 10,20,23 171:5,20 184:7 185:4,19

**errors** 126:16,20 131:24 132:16 137:14 186:14

**estate** 178:15

**estimate** 20:19 109:12

**estimated** 146:12 147:3 149:4,6,23 156:18

**estimates** 111:12

**ethical** 174:18

**event** 55:3,5,6

**events** 16:8 48:11,18 49:5,16

**everybody's** 33:16

**evidence** 184:17

**exact** 6:13 21:19 30:6 33:18 38:12 89:12 92:24 96:8 99:3 107:6 109:8,15

**EXAMINATION** 5:6

**examined** 6:10

**examining** 36:24

**Excellent** 9:22 102:24

**exception** 178:25

**exchange** 87:8

**exclusively** 25:20 99:8 132:11

**executive** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4, 11 43:4 73:25 74:5,7 97:4 116:5

**exhibit** 7:12,15,19 29:10,13 38:17,21,23 46:20,21 51:2,3 71:21,22 87:13,14 89:17,21 119:9,10 124:13 152:14,15 158:3,8

**exhibits** 9:15 11:18 87:10 89:17 161:22 196:10

**existence** 14:24 15:20 16:5 19:7 38:4 39:11 40:5,14 42:24 49:23 55:21 66:22 70:25 71:8

**expect** 44:15 63:9 127:6,13

**expedited** 152:4

**expenses** 106:20

**expert** 64:4 128:17

**expertise** 126:10

**explain** 122:24 193:6

**explaining** 165:9

**extend** 104:7

**extensive** 81:3 88:11 118:11

**extensively** 118:8

**extent** 16:20 80:25 81:11

**extremely** 151:25

---

**F**

**fact** 29:7 55:15 66:21 109:3 131:15 133:4 149:22 182:4 191:22

**factor** 135:23

**factors** 67:21 131:18 132:11,13

**facts** 16:9 17:16 57:17 63:19 86:14 142:7,8 166:22 167:18 168:4 185:11

**factual** 16:21 85:16 138:11

**fair** 6:16 16:22,24 20:16 21:4,23 22:13, 20 25:19 34:2 37:5,6 39:10 40:3 49:19 66:22 73:22,23 89:23 90:5 109:6,22 112:21 115:5 129:6,25 131:16,23 132:8,9 133:5,12,14 141:8 145:4 147:4 153:25 154:7,11 155:8 157:7,11 160:14 164:19 167:9,21 168:7,15,17 179:3 181:19 195:7

**fairly** 91:21 112:5

**faith** 50:7 83:19 84:24 98:17 99:2,17

**fall** 31:25 32:2 67:8

**familiar** 110:19 118:20 164:13

**familiarize** 141:22, 25

**fault** 62:24 116:10 119:25 137:12 150:8

**February** 24:5,6,11,

15 25:3,9 105:10 134:6 136:17,23 137:3,7 140:21 141:15 145:4,6 146:18 151:5 178:9, 23

**fee** 103:9,15,19,23,24 104:3,8,11,19 105:2, 5,10,20,21 106:6,8, 22 107:2,4,5 108:13, 24 109:5,9,12

**feel** 20:20 29:15

**fees** 67:23 68:4 103:5 104:12,14,22 106:20, 22 107:9,18

**field** 83:9

**figure** 84:9 94:5 95:20 96:9

**file** 142:19 172:22

**filed** 9:13,18 28:12 29:3,19 34:4,5 35:8 37:11 39:25 54:18 142:25 144:10 145:21,24 149:10 151:8,13 159:22,24 161:7,24,25 162:2 163:25 164:2,5 166:19,20 173:4,6,25 176:2,6,9,13,17,24 177:17 183:7,17 187:2

**filing** 27:24 29:24 143:3,5,8,12 162:23 166:15 167:5

**filings** 189:22

**filled** 146:9

**final** 96:3,6,10,11,12 100:2 107:15

**finalization** 87:9

**finalized** 105:9 154:19

**finance** 43:12 70:6 75:9,16

**financed** 146:17

**financial** 43:5,10,13 44:2,24 45:3,5,8,19 46:10,24 47:13,17 48:15,19 49:21 50:2

**financials** 43:20 44:16 47:24 48:2 55:3 94:24 95:2,9,17 154:14

**find** 56:6 116:25 117:6 144:14,19 183:9

**fine** 21:3 115:24 167:25

**finish** 194:25

**fired** 121:7 161:12

**firing** 121:18,23,25

**firm** 66:3 68:6 110:19

**firmed** 172:18

**five-month** 162:3

**focus** 23:12 53:9 130:24

**focusing** 12:12

**folks** 179:17

**follow-up** 88:9,12 99:9

**footnotes** 102:2

**forbidden** 174:17

**forgive** 8:23 107:17

**form** 42:16 61:3,17 70:18 168:22

**formal** 72:10

**formed** 145:25 156:4 161:13 167:19

**forms** 187:2

**formulating** 94:19

**forwarded** 89:24 90:3

**forwards** 88:19,21 90:11

**found** 15:15 54:20 63:13 81:6 86:20 92:20 93:22 153:15 155:3

57:22 58:13,16 64:5, 14,17 65:10 66:3 86:23 95:15,22 101:14,18

Index: fourth..Highland

**fourth** 141:12

**frame** 166:15

**Frank** 12:3,23 14:10
15:5,8 24:9,16,21
25:4,11 39:13,15
43:15,17,24 44:22
45:17 60:6 65:16,17
71:13 75:9,11,12,15,
24 78:21 80:14,22
81:25 82:24 83:23
84:10,12 90:18 95:4
137:17 140:18
142:23 144:25
151:19 161:16 167:8
171:8 174:16 183:10,
19 185:15,18,19
186:10 187:11
193:14 194:3,17
195:9 196:12

**Frank's** 85:2

**free** 20:20 29:15

**front** 8:18 10:14 23:6
158:16 166:7

**front-office** 27:7,11,
14 69:21

**full** 30:15,18,20 83:19
84:24 98:17 99:2,17
162:11

**function** 63:10 65:3
68:14 72:6 74:19,24
75:20 76:4,16 77:20,
25

**functions** 27:15
31:15 41:3 43:13
68:19 69:20 70:7,9
75:17

**fund** 5:19,22 105:3,4,
7,25 106:2,8,11,18,
19 108:5,12 118:22,
23,25 119:2,3 122:24
123:2 125:22 131:24

**fund's** 107:19

**funded** 134:2 140:22
141:15

**funds** 19:13,19,23
21:12,18,24 22:11,19
33:14 66:7,22,24
67:4 68:2,8,9 69:23,
25 75:6,17 122:20

153:19 171:25
172:15,16 177:23
183:3

**future** 56:7 68:10
78:12 90:21 93:4

_____

**G**

**GAF** 126:7,13 127:6
128:12,15,23 129:2,
20,21 132:6

**gain** 148:9

**game** 16:22,24

**gap** 155:17

**Gates** 123:20

**gave** 35:17 47:14
72:3

**general** 12:6,7 14:3,
14 17:16,23 26:11,
12,15 27:2 111:16
133:14

**generally** 6:5 17:13
26:7 27:12 103:24
104:2 109:21 111:5
112:7

**give** 6:25 20:19 94:8
113:21

**global** 105:3 106:8
118:21 122:24 123:2
125:22

**good** 5:8 50:7 102:19
165:8 183:25 194:12

**grab** 160:16

**granted** 160:3

**grants** 160:8

**group** 11:23 43:19
190:4 194:18 195:11

**growing** 68:10

**guess** 14:8 36:19,20
41:8 64:6

**guy** 179:10

_____

**H**

**H-** 147:12

**hail** 152:9

**half** 153:18,23 162:6
192:18 193:2,4

**hand** 87:3

**handed** 40:21

**happened** 97:16
153:13 177:6

**happy** 47:20 56:9

**hard** 167:25 168:2

**harm** 147:22 148:22

**HCMFA** 5:22 6:4,7
9:3 10:7 18:9,12,16,
19,22 19:14 20:15,
21,25 23:3 24:3
25:21 26:2,18,24
27:2,6,13,22 28:9
29:3,20 30:12,15,18
34:4,5,16,22 35:8,24
37:5,11,15,20 38:3
39:8,10,23 40:4,8
41:7 42:4,14,19,23
43:4,8,14,25 44:8,14,
23 45:15,18 47:12
49:9,20 50:17,20
51:18,23 52:23
53:12,20 54:6,10,24
55:14,23 56:20 57:8
58:3 59:4,8,14 62:6
64:16,22 65:5,13,17
66:3,19 68:20 69:13,
15 70:14,15,24 71:7
75:2,23 76:2,5,9
77:25 78:13,17 80:5,
7,17 81:5,22 85:17
86:22 93:5,19 94:16
95:5 104:12 106:6,7,
19 108:3,12 109:21
110:8,17 111:25
112:24 113:3,7,14,
21,24 114:5,10
115:2,12 116:8
117:11,12 118:3,4,5,
14,15,21 119:14
120:8 121:4 122:23
123:11,20 124:19
125:14,18 126:23
127:3,5,6 129:2,3,20,
21,22 132:5,20,25
134:5,12,17,18,23
135:5,11 136:6
137:2,6,13,20,24
138:4,16,17,24

140:14 142:11,12,19
143:4,6,8,11,12,15,
17,19,22 144:10,21
145:3,7,15,24 146:5
147:12,23 149:8,10,
23 150:3,7,20 151:9
153:10 154:2,11
155:8,15,16,21,24
156:17 157:11,16
158:11 161:19
162:16 163:24 164:2,
6 165:12 166:24
167:15 168:20
169:24,25 170:2
172:9,14 173:24
174:25 176:13
177:14,25 180:10,23
181:6,18 186:15
188:15 191:18,19,21,
23 192:16,23 193:7,
15 194:16 195:9,22

**HCMFA's** 15:18
23:14 26:4 30:23
31:4,8 33:4 36:18
38:5 42:3 43:5,9
44:2,21,23 45:4,19
46:10,24 47:12,17
48:7,14 49:14 52:2
54:22 55:12,20 58:15
59:17 60:11,24
61:13,15 63:3,22
64:15,21 65:6,15
66:16,21 67:11 69:9,
21 79:5 82:10,14
85:7 92:15,20 93:22
95:8,11,14,18,21
101:13 102:5 114:18
127:9 132:4 146:20
147:5 149:17 158:25
159:7 168:18 170:25
176:18 177:3 182:4
183:18 186:22 190:6
193:8

**HCMLP** 5:25 9:2
13:10 31:13 32:17,
22,24,25 40:11 41:4
43:14 44:13 52:11
53:15,19,20 54:9
60:12 63:10 65:3,18
68:25 69:2,7 70:3
71:11,12 72:5,12
75:10,12,19,21 76:17
77:13,17,23 78:12,
16,23 81:4 90:24
93:4 96:8 102:3

110:17 111:7,11,12,
15 112:22 115:14
117:21 120:2 121:16
125:5,7,8 129:8,12
130:7,9 131:6
135:15,18,21,23
137:24 142:22 145:3
150:11 156:11,15
161:9,13 166:24
170:5,12 177:23
178:18 186:16

**HCMLP's** 52:3,4
119:23 121:17
144:15,24 181:3

**head** 19:20 20:4

**hearing** 40:20

**hearings** 40:20

**held** 21:15 27:13
105:7,13

**helped** 72:13

**helpful** 38:14 53:3
189:24 196:16

**helps** 68:8

**Hendrix** 12:4 79:16
90:13 183:5 187:10
194:3

**Hey** 82:5 86:9 94:4
102:14 177:19

**Highland** 5:12,18,21,
24,25 6:7 27:17 28:8
29:3 31:12 32:6 40:4,
13 42:20 44:7 45:7,
14 48:22 49:11 50:18
51:17,25 52:5 54:25
56:23 59:11,15 60:9
61:22 62:16 64:23
65:25 70:15 71:14
75:15 79:22 90:22
96:25 97:7,11,13
108:20 111:8 114:19
115:15 119:14 120:8,
9 121:4,7,21,22
123:15,23 124:4,8,20
125:14,22 131:3
134:18 135:12 136:7
137:8,10,14,21
138:5,15 140:14
146:2,6,8,21 147:6,
14 149:9,19 150:5,8,
21 155:19,22,24

156:5 157:17 161:5, 20 162:17 163:22 165:13,15 168:9,20 169:20 171:3,4,9 172:13,22 173:3,6, 12,25 175:3 176:15, 20,25 177:16 179:11 180:3 195:12

**Highland's** 96:21 115:8 123:21 126:9 134:25 135:7 138:6, 17,22 140:8 168:11, 21 178:7 179:2

**highly** 77:2

**hire** 68:3

**hired** 75:19 122:4

**hiring** 121:17

**hitting** 148:8

**hold** 18:8 139:17,21

**host** 62:18 186:20

**Houlihan** 110:8,11, 13,16,20 111:3,13, 18,22 112:2,4,8,11, 15,19,24 113:3,8,15, 20,25 114:6,12,15,22 115:4,12,21 116:9,24 117:5,12,20 118:5,9, 14,15 127:24 128:5, 8,16 129:3,13,22 130:16 132:22 133:2

**hour** 102:23

**house** 152:9

**huge** 70:4

**I**

**ICI** 142:12,20 144:23 145:2,8,11,12,15 146:10 149:11,13 150:4,7,10,20

**idea** 105:24 106:10

**identical** 8:5

**identified** 136:12,16 187:20

**identifies** 49:5

**identify** 23:13 25:21

26:4 76:9 121:6,11, 13 124:7 144:9 188:15 189:10,23 190:14

**identity** 23:2 25:25 81:18

**imagine** 137:22 148:15

**impact** 68:8

**important** 33:6 66:18 69:12,18 177:11 190:22

**imposed** 121:20 177:3

**improvement** 122:3

**in-depth** 135:20

**in-person** 99:6

**inaccurate** 73:4 86:8,11 130:11 132:21

**include** 98:16,24 115:21

**included** 50:2,7 71:12 84:15,19 85:18 95:20 101:18 169:4 196:9

**includes** 43:13 79:7, 20 82:12,16 88:22 128:8

**including** 23:17 27:24 88:20 102:7 133:18

**income** 59:21 63:22 64:9

**incorrect** 53:18 80:12 86:19 97:24

**incumbency** 9:7 19:2 20:13 23:22 25:20

**independent** 88:3,4 112:5 128:16

**independently** 80:18 166:9

**indirect** 26:5,8

**individual** 111:6 115:11 147:21

**individuals** 31:19 80:10 179:20 187:14 196:4

**inflow** 63:23

**inflows** 68:7

**inform** 84:23 125:14

**information** 25:24 33:25 34:11 54:15 62:14 75:19 78:22 80:7,24 82:2,3 83:2,8 91:3 94:8,24 95:6,12 98:6 115:13,22 117:6 145:7,16 167:7 181:12 183:10 184:2

**informed** 70:14,24 92:16 118:4 150:4,20

**informing** 71:7

**inhibited** 175:9

**inimical** 31:20 41:5

**initial** 40:18 127:23 161:8

**initially** 129:4,23 131:17

**injunction** 40:21 179:24

**inputs** 111:11 112:23

**insight** 68:5

**instance** 192:20

**instructed** 14:11

**instructing** 190:4

**instructions** 13:18

**insurance** 134:14 136:24 140:23 141:16,20,23 142:2, 4,12,19,24 143:2,13, 16,23 144:21 145:8, 16,25 146:5,17 147:7,14,20 148:5,6, 7,8,13,21 149:10 151:5,9,12,25 152:11 171:24 172:16,22 173:4,7,25

**intend** 127:5

**intended** 61:16 62:8 63:22 168:10,20

**intent** 15:10

**intention** 127:8,9

**intentionally** 75:19

**interacted** 32:16 125:4

**interacting** 145:2

**interest** 26:21 33:16

**interject** 82:6 144:11,12

**internal** 166:21

**internally** 11:22 135:20

**interpretations** 111:13

**interrupt** 69:5 139:11

**intra-year** 57:23

**investigation** 16:12, 17 17:18 114:6,11 115:3 116:7 124:10, 17 161:3 164:17,21 165:2,10,11,14,18,21 166:3,11 167:11,17 176:10 178:4 180:12, 19,23 181:5

**investment** 27:11 69:22 70:2 105:8

**investors** 105:5,12 106:3,9

**invoice** 59:14 60:17

**involved** 18:2,19 29:24 32:12,20 69:16 72:15,20 77:3 83:8 86:17 105:23 106:14, 16 110:11 111:6,9 115:18 120:2 121:15 123:13,16 126:11 171:7 177:21

**involvement** 114:16 123:14

**involving** 110:6

**irony** 39:16 119:21

**Isaac** 179:8,12,25

**issue** 49:23 59:14 81:10 100:17 109:19

112:21 114:20 123:11

**issued** 49:6

**issues** 32:12 118:22 124:9 155:10,16,18 156:2,4,9

**items** 8:24 91:21 169:3 181:2 187:13

**J**

**James** 167:2

**January** 19:4 20:17 23:14,20 24:4 25:21 26:2,5 28:12 34:3,24 39:25 40:17 49:10 153:3 154:18 161:21 162:13 163:23 176:14

**January-ish** 19:11

**Jason** 11:20 12:20 16:7 33:6,7,20 34:9

**Jim** 26:7,9 27:4 40:21 60:12 76:24 83:20 98:18 105:22 106:13 121:3 170:18,25 171:10,21 179:24 180:25 185:15,18 192:19 193:5

**job** 165:8

**John** 5:9 8:2 56:5 82:5 102:14 115:19 117:6 139:13,17,21, 25 174:11 195:4

**join** 69:22

**Jones** 5:10

**JPEG** 183:6 187:11, 17,20,21 188:17 189:11,15 190:13

**July** 161:24 162:14 164:2 175:4 176:2,3, 7 177:17

**June** 42:25 43:2 47:7 49:10,22 86:24 87:6 95:9,16,23 96:8 101:14 102:6 107:10, 12 154:8,14

## K

**K&l** 123:20

**key** 17:22 43:11 111:11,12 131:14 155:11

**kind** 36:7 59:15 60:16 117:14 140:8 189:23

**Klos** 12:3 79:15 80:14 90:12,19 171:8 183:2,3 185:15,20 186:3 190:3 194:3 196:11

**knew** 39:11 42:14,18 130:7,20 131:5 137:2,6 156:3,7 194:17 195:10,13

**Knowing** 84:12

**knowledge** 17:7,8, 11 26:22 32:9 34:21, 25 35:4 36:20,21,22 40:10 42:19,24 46:5 56:20 57:9,13,20 63:16 64:8 71:7 73:5, 8 77:3 85:6,19 98:18 100:17,20,23 101:4 103:19 114:9 115:3 116:6 119:22 121:17 124:11 150:18,19,22 152:6,10 156:15 166:23,25 172:23 173:7 180:20

**knowledgeable** 32:14

**Kristen** 80:15

**Kristin** 12:4 90:19 95:4 183:4,5 185:15, 21,23 187:10 190:4 194:3 196:12

## L

**La** 158:5

**lack** 184:22 191:15

**lacked** 186:2,3 192:2

**lady** 174:13

**laid** 135:10

**large** 68:25 192:19

**largely** 61:21 66:23

**lasted** 154:25

**late** 32:2 33:18 97:20 145:23 151:14

**latest** 63:11

**launching** 177:21

**Lauren** 24:22 25:6 71:12 72:11 75:5 76:8 77:15 88:15,19 90:25 94:4

**law** 67:21 147:19 148:20

**lawsuit** 28:14,18 40:9 49:17 64:18,24 86:17 144:8 161:21

**lawsuits** 40:23

**lawyer** 94:13 148:17

**lead** 19:21 94:19

**leading** 40:17 53:4

**learn** 19:7 38:3 55:14 142:8

**learned** 14:24 15:20 16:4 38:5 55:20 153:10 154:2,12 155:9,16 156:2 167:17

**learning** 17:17 55:24 155:18

**lease** 34:14

**leave** 9:11 33:7,9 164:7

**ledger** 58:4,8,9

**left** 33:22 165:13 175:3 176:20,25 177:5,16 179:21

**legal** 27:17 31:13,15, 19 32:24 41:2,7 61:23 69:3 70:5 72:6, 14 74:19,22 76:14,15 77:23,24 83:9 106:13 126:9 138:9,13 144:15 170:14 178:8, 10,12,20 179:2 180:3 181:2

**legal/compliance** 76:19

**letter** 38:24 39:24 40:8 41:15 42:4 55:15 85:23 111:22

**Leventon** 179:8

**liabilities** 54:24 55:25 56:23 57:10, 11,14,21 58:7,18 59:2,20 64:24 71:14 102:6,8 193:20

**liability** 54:9,12 55:8, 9,13 58:21,22 63:14, 15 193:9

**lift** 175:13

**limitation** 31:3,8 34:22 176:18 177:2

**limitations** 33:4

**limited** 16:12,15 33:22

**limiting** 45:14

**lines** 52:6 141:13 146:25

**lineup** 24:19

**list** 29:6 88:11

**listen** 62:5 120:5 129:18 171:16

**listening** 41:25

**litigation** 16:24 41:10 179:10

**litigators** 178:13

**loan** 15:6,8,9 59:10 60:8 61:17 62:9 63:7 104:6 134:19,24 168:23 195:20

**loans** 61:3 194:19 195:12,24

**logic** 148:4

**Lokey** 110:9,11,13, 16,20 111:3,18,22 112:2,4,8,15,19,24 113:3,8,15,20,25 114:7,12,23 115:4, 12,21 116:9,24 117:5,12,21 118:5,6, 9,14,15 127:24

**128:**5,8,9,16 129:3, 13,22 130:16 132:23 133:2

**Lokey's** 112:11 114:16

**long** 64:4 73:18 148:13

**longer** 24:18,23,25 25:7 83:9 178:19

**looked** 80:25 89:9 116:23 139:5 163:8

**loss** 133:15,21 134:2 146:12 147:2,3,15 148:6 149:4,6,23 156:18 157:12

**lot** 36:11 40:19,24 62:13 69:20 106:16 109:25 110:2 123:13, 14,16 130:15,18 154:21 175:10,15 177:21 190:20 196:4, 19

**love** 117:3

**lower** 51:20

**LP** 5:12,19,22,25 19:25 20:7 21:2 27:18 32:7 42:21 61:22 123:15 124:21 125:15 131:3 146:2 169:20 171:3,5

## M

**Mabry** 25:12 167:8

**made** 27:23 35:24 36:7 37:16,23 56:22 59:11 60:12 61:2 64:23 105:19 106:17 113:4,8,15,25 114:7 117:13 118:6,15 121:8 127:16,23 129:10 137:15 138:10 143:5,6,25 144:8 145:7 151:21 164:6 167:5 183:23 184:12 194:4,13

**magic** 56:8

**magnitude** 152:3

**maintain** 58:3

**make** 10:12 43:25 44:23 45:22 74:16 75:2 76:2,10 80:7,18 83:5 134:13 137:17 138:2 149:2 152:7 163:18 185:22 186:4 187:15 194:14

**maker** 186:6,9,11,12

**makes** 37:2

**making** 45:19 65:14 81:19,23 122:17 125:19 126:5 155:18

**manage** 67:3

**managed** 19:13 21:24 22:11,19 66:24 69:2 142:24

**management** 5:12, 19,22,25 27:17 32:7 42:21 52:6 61:22 69:25 105:22 106:13 123:15 124:21 125:15 131:3 146:2,6 169:20 171:3,5 178:5 180:22

**managers** 27:12

**manages** 21:13

**mandated** 108:10

**March** 29:20 30:3,7, 9,16,19 31:5,9 33:5 34:4,24 35:6 61:11, 14 126:22 129:4,14, 23 153:2,13 166:19 167:4 175:3,11 177:5,6 188:17 189:13 190:15

**Mark** 26:8,10 106:14

**marked** 7:12 46:19 50:25 119:9 124:13 125:20 158:3

**market** 130:22 153:12

**marketing** 19:22

**match** 82:25

**material** 75:7 90:20 93:3

**materials** 9:20 46:13 92:12 146:9

**matter** 62:25 85:17 121:16 133:15 173:21

**matters** 16:22 124:3

**Mckenzie** 174:14

**meaning** 58:23 96:11

**meaningful** 193:3

**means** 83:22 128:11 159:12

**meant** 84:9,10 100:9, 14 159:20

**measures** 121:20

**meeting** 87:2 98:17, 22,25 99:4,5,6,7,16

**meetings** 67:16 69:22 99:10,13,20

**members** 171:7

**memo** 9:10 72:9,13, 24 73:4,9,14,16,19 74:9 75:3,14 76:14 77:5,19 78:19 86:10, 21 87:9 88:10 89:2 96:11 100:2 123:3 124:12 125:6 127:13 128:22 130:3,15,16, 24 156:24 157:20

**memorandum** 125:19 126:25 127:3, 7,10

**memory** 141:7

**memos** 32:19 62:11 69:4 74:21 76:6,19 77:4 96:12 119:4

**mentioned** 131:19 132:12

**mergers** 68:11

**met** 11:18,19 12:4

**metadata** 187:10 189:16

**methodology** 131:23 132:8,9

**Michael** 7:19

**midyear** 153:19

**migrated** 179:2,5,15

**million** 14:7 48:21 50:18,21 51:18,21 63:24 79:7 82:11,12, 15,16 83:14 107:7 108:13 109:4,5,7,13, 14 133:17,23 134:6, 17,22,24 135:5 138:6,16,23 140:9,22 143:19 146:13,21 147:2,6,7,9,13,15,24 148:9,12 149:5,13, 16,18,23,25 150:4 156:19 157:13,15 168:10,19 192:18,22 193:2,4

**mine** 68:13

**minute** 82:7

**minutes** 109:19 191:4

**missing** 25:17

**mistake** 117:13 118:6,15 182:7 183:20,23 184:12 185:8,12,17 186:24 187:24 188:10,14,22 189:12 190:8,16 193:10 194:14,15

**mistakenly** 134:18 182:18

**mistakes** 113:4,8,15 114:2,7 121:8 137:15 194:14

**Mitts** 25:5

**mixed** 168:3

**model** 112:18,20,25

**models** 111:14

**moment** 23:12 117:9

**money** 60:9 108:22 134:12 137:23,24 140:13 172:13 185:18,21

**moneys** 109:4

**months** 155:2 161:20 162:2,3,7,11 174:13 179:18

**morning** 5:8 56:8

**Morris** 5:7,9 7:8,14, 18,22 8:9 10:11,15 17:2 18:5 29:9,14 38:17,22 42:10,13,22 44:17,19 45:10,12 46:18,22 47:3,5 48:10,13 50:12,16,24 51:4,9,12 52:13,15 53:22,24 56:9,13,17, 19 60:19,21 62:2,4, 20,22 70:22 71:20,23 72:16,18 73:18,20 76:22,23 78:3,5,24 79:4 81:14,16 82:9 83:11,12 86:2,5 87:12,15,20,22 88:16,18 90:8,10 91:5,7,22,24 93:12, 14 96:16,18 102:17, 21 103:3 116:3,11, 16,18 117:8,10,24 118:2,12,13 119:8,11 120:3,4 125:9,12 129:15,17 131:7,9 133:8,10 135:24 136:2 139:14,18,23 140:5,6 141:9,11 142:18 144:20 150:14,16,23 151:3 152:12,18,22,23 157:25 158:7,9,21,24 159:18 163:14,17 164:12 169:11,14 171:13,15 172:8 173:22 174:19,23,24 175:21,24 177:12,13 183:13,16 184:18,20 190:24 191:7,9 192:10,14 195:6,8 196:14,19

**motion** 9:11 159:24 160:3,8 164:6 183:18

**move** 44:17 45:11 50:12 53:23 60:19 62:2,20 70:12 72:17 76:22 78:24 81:14 83:11 89:22 91:22 108:4 117:25 118:12 120:3 125:9 129:15 131:7 135:24 150:14 171:14 177:12 183:13 184:18 190:24 192:11

**moved** 180:15

**movement** 172:21

**multiple** 13:21 31:23 99:10

**mutual** 142:13,20 144:23 145:2,8,15 149:11,13 150:4,7,20 185:8,12,16 186:24 187:24 188:10,14,21 189:12 190:8,16

**N**

**named** 65:17

**names** 23:17

**naturally** 32:22

**nature** 179:22 182:21 192:4,5 193:11,16

**NAV** 9:10 14:20,21 15:11 16:8,9 17:24 32:10,13,17,21 59:12 62:11 108:21 115:15 119:20 120:9,15,25 121:15,21 122:25 124:16,21,24 125:16 126:11 131:13,24,25 132:6,14,15,16,17,19 133:16 134:7 135:3, 12 136:11,13,16 137:3,7,18 140:15,17 142:13,15,21 147:9, 25 149:4,6 150:5,21 153:5,10 154:3,12,16 155:4 156:14,22 157:3,10,12 168:9,22 169:3,17 170:3,9,20, 22 171:5,20 184:6 185:4,19

**needed** 13:16 105:16 106:5 177:19,22 192:20

**negligence** 148:23, 25

**negligent** 135:2,7 136:7 138:7,17 146:23 168:11,21

**net** 122:20 147:2 149:4,23

**Nexpoint** 18:7 19:13, 24 20:7,23,25 33:9, 17 74:10 78:13

**night** 139:16 183:18

**non-orderly** 129:5, 14,24 130:6,10,23 131:11

**norris** 5:4,8 6:1 7:1, 12,21 8:1 9:1 10:1,14 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,11 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,15 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,4 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1, 12,19 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,25 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1

164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1,10 192:1 193:1 194:1 195:1 196:1

**note** 13:12 17:7,8 73:15 75:8 78:21 81:4 102:7 134:21 161:15 169:7,8,9 176:11 182:15,16,19, 23 183:4 186:4 190:5 192:4,18,22

**notes** 9:6 14:12,13, 24 15:15,21 16:5 17:9,11,24 19:8 27:23 28:9,13,17,20, 23,24 35:10 36:2,9 37:12,17,25 38:4 39:11 40:6,14 42:14, 18,24 48:18,20,22 49:6,8,11,15,17,23 50:5,9 58:7 64:17 70:16,25 71:8,9 79:8, 10,11,20 81:10 82:17 83:3,19 86:15,17 101:19,23,24 161:5, 19,22 162:17,22 163:6,21,24 164:19 165:15 166:22,25 167:2 176:14 181:8, 13,24 182:6,20 183:20,24 184:13 185:2,3,6,25 187:7 192:15 193:11,15,17, 18

**notice** 6:6 7:11,24 8:14,18 9:9,24 10:8, 21 11:9 22:25 32:18 37:4 141:20

**noticed** 193:8

**notified** 146:11

**notwithstanding** 55:13 149:8,22

**nuance** 95:3

**number** 7:15 9:14,17 27:19,21 29:6,8

52:16,21 57:6 63:2 67:20 78:10 79:7,19 82:16 83:14 85:9 86:8,19 89:8,9 90:20 92:19 93:22 95:8,14 96:7 98:9 102:3 103:4 104:18 109:8 119:4 123:7 141:19 142:10 146:14 148:9 152:15 163:2 184:10

**numbers** 82:25 96:4

---

### O

**object** 116:14 172:5 173:18

**Objection** 42:16 70:18

**obligated** 70:15,20

**obligation** 192:23

**obtain** 108:2 145:7

**obtained** 95:21

**occasions** 31:24

**occur** 193:16

**occurred** 120:16

**October** 70:14,24 72:3 73:24 78:15 84:23 92:18 93:18 95:6,13 97:14,16,23 98:10 100:2

**October/november** 97:20

**off-market** 153:12

**offhand** 156:25

**office** 70:6

**officer** 18:13,15,22, 23 20:3,10 21:5,24 22:18 24:23,25 32:15 33:13 39:16 45:18 65:5,13 74:25 76:9 80:6,17,23 81:21 122:16 125:13,18,24 126:4 191:19

**officers** 23:2,14 25:21 26:2 39:21 69:15

**offline** 144:13

**offsets** 133:19

**Okada** 26:8,10 106:15

**on-market** 153:13

**ongoing** 118:8

**open** 9:18 106:11

**open-end** 105:4,7,25 106:18

**operating** 193:3

**operational** 105:11, 15

**operative** 159:7,12, 15,16

**opinion** 47:8,14,23 49:22 145:25

**orally** 124:20

**order** 6:25 40:22 56:21 138:16

**orderly** 130:23 131:11,22 132:7

**original** 8:22 9:2,3 29:4,7,11,19 34:5 38:20 93:9 113:13 162:19,22,23,24,25 163:4,7 166:13,15,19 168:5

**originally** 18:17

**outflows** 68:7

**outsource** 43:18 115:10 129:9

**outsourced** 27:16 31:14 32:23,24 41:4 43:12 61:22 63:10 65:3 119:23 129:12 135:18 137:11 170:15

**outstanding** 70:16 78:16 90:20 93:3

**oversee** 43:19 44:15 45:3 68:5

**overseeing** 135:16 171:8

**overview** 12:8 17:23

**owed** 71:14

**owing** 65:24 79:21 83:2

**owned** 26:14

**owners** 26:5,8

**owns** 26:11,19

---

### P

**p.m.** 92:18 93:18 103:2 151:2 191:8 196:21

**Pachulski** 5:10

**pages** 73:21 79:25 89:20 163:8

**paid** 103:19 104:3,4,8 105:5,15,16,17 106:6,8 107:5,9,10, 11,15,18,20 109:4,17 111:19 136:24 141:17 146:21 148:3, 4 149:13

**paper** 183:4 185:22 189:19 194:19 195:11

**papered** 182:22 195:20,24

**papers** 185:23

**paragraph** 127:20 128:2,4 132:21 133:7,15,25 152:25 160:14 169:12,16 173:3 175:19,22 181:6 184:21 185:8 188:6 191:12

**Paragraphs** 168:8, 16,17

**Pardon** 189:5

**parenthetical** 133:20

**Parker** 24:8,16,23

**Parker's** 24:12

**part** 31:12 32:25 34:18 61:5 67:24 69:2,3 70:4 72:3 77:21,23 85:13,15

87:2,10 92:11 122:9 127:25 129:8 142:24 150:11 165:18,21 166:11 176:21 178:11 195:25

**participate** 67:7,13, 15 99:15

**participated** 32:19 68:21 71:6

**particulars** 161:15

**partner** 26:11,12,16 106:15

**partners** 27:2

**parts** 67:14,15 83:14 168:13

**party** 68:3 115:5 125:2,15 146:3,7 148:22 149:9 155:17, 20,22,25 156:6,8

**passed** 71:11

**path** 185:16

**patience** 93:15 195:2

**pay** 70:15 104:12,14 105:19 108:23 109:4 134:5 137:24 138:5, 16,23 140:9 157:17

**payable** 53:19 54:9 58:3,8,9 73:15 78:12 90:21 93:4 101:19

**paying** 104:22 148:12

**payment** 51:23 63:5 108:12 134:13 140:22 141:15 151:5, 10 168:10 170:20 184:5 185:3,5

**payments** 52:24 53:13 54:6,11 55:24 56:22 57:5,10,11,20 58:14 59:9,19 61:2, 16 62:8 64:23 127:16,17 134:2,10, 24 135:6 137:18

**PDF** 89:18

**pending** 49:17

**people** 12:12,19 88:5,20 122:5 123:13

Index: percent..question

179:2,5 194:12

**percent** 26:11,14
80:19 105:5

**perform** 27:9

**performance** 67:23
68:2,4 69:23,25
138:7

**performed** 27:14
62:15 68:2 113:9

**performing** 170:14

**period** 18:2 24:7
27:18 31:14 40:16
43:23 46:11,25 47:18
86:24 95:15,22
105:18 107:8 121:3
153:2,6,8,12 154:14
156:3 161:9 162:15

**periods** 22:4,5 54:19

**permission** 159:24
180:10

**permit** 147:19

**permits** 148:20

**permitted** 148:19
161:10 174:3

**person** 12:4 125:3
137:20,21

**personal** 32:9 34:25
36:21 103:18 152:10

**personally** 99:15

**perspective** 14:4

**phrase** 35:15 37:3,20
180:21

**picked** 178:16

**pinpoint** 135:22

**place** 58:24 179:24

**plaintiff** 170:8,21
171:19,24 184:5

**plaintiff's** 7:23 9:24

**play** 70:9

**pleading** 30:13
35:14 159:7,12,15,17
181:11 182:17
193:25

**pleadings** 11:15
27:24 35:19 61:4
135:10 172:20 175:6
180:14 186:19,22,25
193:24,25 194:21
196:2,3

**precise** 109:11

**preference** 53:7

**preliminary** 179:24

**premiums** 148:5,6,
13,15

**preparation** 12:14
13:15 15:3 43:14,20
48:16 82:24 142:9
144:8 163:9 172:25

**prepare** 11:11 36:14
43:19 72:13 103:11,
14 104:17 112:19
161:11

**prepared** 10:6 28:4
52:20 57:23 74:21
84:5 114:14,17
118:21 161:2,19

**preparing** 131:6
154:13 183:23
184:13

**present** 13:22 22:7
23:15

**presentations** 119:5

**presented** 89:25

**president** 18:13
19:4,6,19 20:2,7
21:5,12,18 22:11
24:3,8,13,16,18,19,
21 25:4,11 43:4
60:12 73:25 74:5,7
97:4 116:5 170:19
171:2,10,21 173:12,
14,15,16

**pretty** 123:11

**previously** 40:5
164:6

**Pricewaterhouseco
opers** 47:7,11 49:22

**principal** 66:15
70:16 79:7 82:17,25

**prior** 22:15 31:4,9
33:5,22 34:12 35:8,
24 36:8 37:11,16,24
39:24 40:8 61:14,20
62:7 63:16 76:6
99:25 101:23 116:14
120:16 124:13
126:22 152:16

157:13 167:6 179:11

**priority** 40:25

**problem** 168:14

**procedures** 46:7

**proceed** 151:10

**proceeding** 28:8

**proceedings** 5:1
99:11

**proceeds** 134:14
136:24 140:23
141:16 146:17
148:11,13

**process** 17:25 32:21
62:18 63:13 67:13
69:2 71:6 76:20 87:2
99:8 111:17 122:2
123:9,10 154:25
157:19,21 160:10,11
171:9 183:8 185:23
194:2,4

**processed** 152:2

**processing** 133:18

**produced** 117:2

**product** 19:20 20:4
96:3 112:14

**professional** 43:17
180:6

**professionals** 27:8
41:7 43:18 69:22
80:13 194:12,14

**profited** 147:24

**profits** 148:3

**prohibited** 173:19

**prohibition** 174:10
176:18

**promise** 55:21
138:11

**promissory** 9:5
14:13 28:9,23 48:20
181:7

**promptly** 166:21

**proper** 154:23

**proposal** 106:5

**provide** 53:4 68:5
69:24 70:3 75:20
88:5 91:12 178:19

**provided** 11:24
25:15 46:14 66:9
68:25 76:16,18 80:24
86:22 92:11 94:10
95:12 102:2 110:23
111:3,12,22 114:23
115:14 177:24

**provider** 65:18
115:10 129:9 148:22

**providing** 68:17 70:7
77:21,24 146:22
178:19

**proxy** 106:3

**publicly** 183:18

**pull** 89:13 102:11
119:5 167:22

**pulling** 96:4

**purports** 164:16

**purpose** 14:6 25:23
101:9 122:23

**purposes** 57:24
62:16 64:2,9 129:6,
25 146:22

**pursuant** 66:10
111:22 138:4

**put** 7:9,15 29:9 38:17
40:24 41:9 46:18
50:24 71:20 87:12
119:8 152:13,19
157:25

**putting** 6:22

**Q**

**quality** 67:23 68:17

**quarrel** 162:5

**question** 6:14,16,18
22:17,22 35:20 41:24
42:2 45:17 50:15
53:9,10 54:3,4 60:22
61:8 62:5 65:9 70:21
71:10 72:21 78:4,6,9
79:3 82:20 86:7,10
89:8,9 90:19 91:25

92:19,24 93:10,18,22 94:10 95:8,14 100:6, 7 113:13 114:22 115:9,15 116:15,17 119:24 120:6 126:2 129:19 130:14 135:14 137:2,6 138:14 154:5 155:6 171:17 173:9 176:4 180:16 183:14 184:19 187:19 189:8 194:5,23 195:5

**questioned** 99:23 115:16

**questions** 9:8 28:4 36:14,17 37:7,21 54:2 77:7 88:6,11,12, 23 89:3,25 101:10 139:15 142:10 155:4 191:10 196:15,18

**quick** 46:17 152:6

**quote** 78:15 83:18,20 98:15 129:3,22 131:22 169:16 171:23 181:7,8 191:15,16

**R**

**raised** 34:17

**reach** 40:12 135:11 145:15

**reached** 138:3

**read** 73:12,16 79:15, 18,23 92:8 93:7 100:5,6 122:14 131:20 132:2

**reading** 43:9 84:10 126:19 184:8

**real** 178:15

**reason** 13:2 15:10 40:12,15 41:13,17 47:15 66:21 80:12 98:4 154:17 157:16

**reasons** 148:18

**rebates** 133:19

**recall** 5:9 20:23 38:2, 10 40:16 41:20 52:16

124:15 126:15 144:5 151:12,14 163:6

**receipts** 147:8

**receive** 41:15 104:11 148:21 149:18

**received** 38:8 39:14 42:5,8 50:17,20 52:10 80:10 108:22 143:19 146:18 147:5 149:17,24 150:4 151:5 166:13 187:9 194:7

**receiving** 41:21 51:24

**recent** 193:25

**recess** 56:18 103:2 151:2 191:8

**recipient** 100:13,24

**recipients** 92:17 93:21

**recognized** 171:11

**recollect** 17:22

**recollection** 14:12 22:10 100:8,11,12 102:5 128:14,18 141:13 153:9 182:11 195:19

**record** 5:2 7:13 10:12 54:6 59:2 60:10 62:19 63:8 82:7,8 142:17 185:16 190:5 193:20 196:21

**recorded** 53:17 54:8, 23 55:3,4,8,10,25 55:7,14,20,24 56:21 58:15,19,21,22 59:18,25 60:11,25 61:5,14,21 62:10 63:4,18 124:6 193:9

**recording** 53:18 55:13

**records** 44:12 52:24 53:14,16 54:7,12,23 55:7,14,20,24 56:21 58:15,19,21,22 59:18,25 60:11,25 61:5,14,21 62:10 63:4,18 124:6 193:9

**recover** 143:22 147:20

**refer** 5:21,24 13:14 17:19 20:25 28:22 30:9 31:16 54:16 60:3 61:18 63:11 67:3 83:24 84:2 85:5 119:6 164:22 172:19 181:11,20 184:16 186:18 188:19 192:8 193:24 194:20 195:15 196:2

**reference** 48:20 51:13 128:7,8 131:2 153:2 184:22 191:14

**referenced** 82:15 190:13

**referred** 124:2

**referring** 37:5,20 98:23 187:4

**refers** 65:21 98:8 127:22 128:4 169:19

**reflected** 16:13,18

**reflects** 59:18 60:25 138:22 140:8

**refrain** 6:15

**refresh** 128:14,18 141:13 153:9

**regard** 36:19 41:21

**regularly** 91:21 193:13

**regulator** 108:7

**reimbursement** 142:15

**reiterate** 45:7 115:20

**relate** 168:8,18

**related** 17:10,11 34:11 35:25 36:8 61:25 62:14 73:14 81:9 99:5 105:2 169:7 174:3 185:4

**relates** 35:9 37:12, 17,25 103:4 141:20 148:3

**relating** 36:17 145:16

**relation** 67:17

**relevant** 167:18

**reliable** 44:3

**relied** 43:21 44:12 80:20

**rely** 44:5,6 112:24 127:6,13

**relying** 25:19 80:13

**remains** 78:16

**remediation** 122:2

**remember** 15:13 18:18 21:19 36:10 38:16 60:7 61:10 73:12 74:15 80:3 99:20 100:15 101:21 102:13 107:15 109:14 112:17 121:12 126:19 136:21 151:6 157:6 180:2 182:10 183:11 196:9

**remembered** 14:9

**remind** 38:13

**renew** 67:10,19

**reorganized** 5:11

**rep'ed** 166:4

**repeat** 28:16 40:7 176:21

**report** 72:2 76:2,10 78:14 84:15,19 89:10 95:7 96:10,11 118:20 130:11 131:4

**reported** 57:18 63:25 64:12 107:13,14

**reporter** 7:13 142:17

**reporting** 119:21 156:9

**reports** 94:22

**represent** 8:10 89:3 116:23

**representation** 29:21 51:8 80:3 89:6 163:20

**representative** 15:19 36:22 40:4 44:21 45:23 82:11

119:14

**represented** 134:10 172:12 175:10

**representing** 46:6 95:3 186:7

**request** 33:10 81:24

**requested** 78:9

**requests** 11:25 88:9

**required** 108:7 192:5 193:5,7

**requirement** 76:5 125:24

**requires** 67:18

**research** 84:13

**reserve** 196:17

**resolution** 122:20, 25 123:9 157:20

**respect** 34:22 95:7 173:10

**respond** 6:18 9:8 11:17 40:10 90:19

**responded** 39:23 40:8 91:8

**responding** 156:9, 10

**responds** 92:8 93:17

**response** 9:3,4 15:7 54:17,18 63:11,12 77:6 80:8 81:13,23 82:16 83:18 85:8 86:7 91:6 92:6,9 93:13,25 94:20 95:13,20 96:19 98:9, 16,24 161:8,12 168:6

**responsibilities** 46:7

**responsibility** 14:21 43:9,25 62:24 65:6, 14,19 75:2,25 76:10 81:19,22 111:11 115:8 122:17 126:5 129:11 169:17 170:3, 7,9,22 171:4,19

**responsible** 45:18 62:17 75:16 76:6 80:11 114:19 115:5,

9,15 125:2,15,19 130:17,21 135:23 146:3,6 149:9 155:17,19,22,25 156:5,8,16 168:9

**responsive** 11:17,24 50:14 54:3 79:2 94:3, 9 125:11 184:19

**rest** 28:23 72:13

**restate** 22:17 155:23 187:19

**restatement** 153:6

**restraining** 40:22

**restricted** 34:13

**restriction** 30:22 31:3,8,11 34:20,21 177:2

**restrictions** 33:3,11, 15,21,24 34:11

**restroom** 56:7

**result** 121:7,21 147:24

**resulted** 131:24 132:13 151:9

**resulting** 135:6

**retail** 32:15 33:10 65:22 67:5,8 70:14, 25 71:8,10 72:3,24 75:4 76:3 77:6 78:9, 15 80:9 84:6,16,19, 23 86:7,12,13,22,23 87:9 88:3,6,23 89:10 90:2 92:19 93:21,25 94:20 95:7,13,21 96:9 98:10 101:10 112:12

**retain** 113:12

**retained** 47:12 110:8,13,16 112:2,9 123:18 124:8

**retaining** 113:18

**retention** 112:11 128:15

**revealed** 54:13

**revenue** 66:16

**reverse** 56:22

**review** 66:13 67:9 73:12,13 74:13 88:8 101:11 106:3 166:21

**reviewed** 11:15,16, 21 12:2 43:5 73:14 76:24 117:17

**reviewing** 65:6 76:6 77:4 193:13

**rights** 113:12,19

**rise** 192:19

**role** 18:14 19:12,19, 21 20:3 34:12 44:15 45:2,13,14,24 46:4 65:18 69:21 76:5 80:23 113:12 177:25

**roles** 19:16 46:6

**Rome** 87:24

**roof** 152:10

**Ross** 24:3,7,18

**roughly** 146:16

**Rukavina** 7:25 11:19 12:5 13:22 16:19 42:7,16 56:5 70:18 82:5 102:14,20,24 103:16 115:19 116:13,22 139:13,17, 21,25 144:11 159:11, 14 163:12,21 164:8 172:5 173:18 174:11, 21 191:6 195:3 196:17,20

**rule** 5:18 7:10 9:25 108:9 147:19 148:20

**rules** 6:13 174:18

**run** 69:2

**S**

**safe** 39:13

**sales** 19:21 68:6,13

**Sauter** 9:5 12:17,19 16:12,17,21 17:5,15 103:17,18 161:3 164:14,16,17 165:4, 14 166:10 167:16

175:9 176:9 177:25 178:15 180:18,22 181:18,23

**Sauter's** 13:15 31:16 54:17 167:10 175:6 180:11 181:21,25 188:24

**scale** 68:8

**scheduled** 8:14,15

**schedules** 31:17 32:18 46:14 187:2,4, 7

**Scott** 179:13,14,25

**screen** 6:23 7:10 8:12,13 9:15 10:17, 25 29:10 30:7 38:18 46:19 47:16 50:25 71:21 87:13 120:13 122:12 124:13 125:20 152:14,19 158:2 160:7 167:24 188:12

**scroll** 7:20 10:12,24 11:3 29:18 47:4,20 48:5 51:10 78:3 88:16 90:8,9 91:5 93:12 96:16 133:9 158:23 175:22

**scrolling** 89:20

**search** 144:17

**searched** 144:13 151:18

**searching** 145:11

**SEC** 32:20 62:12 106:3 121:3 124:3, 10,16,19 125:4,6,14 154:22,25 156:10,24

**secretary** 18:17,18, 20,25 19:5 20:22 21:20,21 22:15 24:10,18,22 25:6,7, 13 72:12 75:5 77:18 94:15 97:2

**section** 48:18 67:18

**Securities** 74:10

**seek** 106:10,17 108:2,4 142:15

**Seery** 12:3 31:18 33:8

**selection** 70:2

**send** 8:2 127:3 190:5

**sending** 39:19 72:9, 24 74:8 75:13 100:2 127:10

**senior** 105:22 106:13

**sense** 37:2 177:19

**sentence** 83:17 84:9,10 85:8,17 98:8, 9,13 99:24 100:10, 14,25 127:22 128:2 131:15,21 134:3 170:5 173:2,5 181:18

**separate** 81:9

**September** 99:7 154:2 174:20,22

**serve** 21:11 66:22

**served** 6:7 22:10 44:14 65:13 67:4 74:25 191:22

**server** 151:19

**serves** 96:25

**service** 65:18 77:24

**services** 9:6 27:10, 17 32:23 44:10 62:14,15 66:6,9 67:23 68:15,17,24,25 69:3 70:3,9 74:20 75:22 76:16 77:21 110:22 111:2,9,10,23 113:5,9 114:13,23 118:17 135:2,7 138:8,17 142:25 150:11 170:13,15 177:10,22,24 178:8, 11,20

**set** 165:5

**settlement** 60:17 70:6 138:25 140:3

**seven-and-a-half** 14:7

**share** 15:19 25:25

**shared** 9:6 44:10 62:15 68:24 69:3

70:9 74:20 75:22 77:21 111:9 142:24 150:11 170:15 178:11

**shareholder** 107:24

**shareholders** 106:4 107:19,20,23

**sharing** 177:23

**sheet** 48:7 53:20 55:5 58:23,24 59:3 65:7 87:6 92:11,20 93:23 94:5 96:5 102:9 108:15,17 193:13,21

**sheets** 65:15 87:5

**short** 150:23 191:2

**shorten** 37:21

**show** 7:20 38:13 162:22 163:11

**showed** 47:25 55:4 108:19

**showing** 30:7 187:10

**shown** 63:23 147:2

**shows** 51:20 63:5

**shrinking** 68:9

**sic** 9:10 188:17

**side** 193:15

**sides** 137:25 138:2 177:7 186:7,8,14

**sign** 169:9 182:12

**signature** 181:15 183:6,12 187:11 193:19

**signed** 42:15 47:6,8 49:9 169:8 181:7,15, 24 182:3,6 183:12,20

**significant** 148:5

**signing** 182:10 183:11,24 184:13 186:12

**signs** 186:11

**similar** 193:11,16

**simple** 6:14 54:4

60:23 93:19 183:15
193:10

**simplify** 54:22

**simply** 92:2

**single** 73:25 79:23
119:13 125:3

**singular** 170:18

**sir** 5:15 38:20 71:24
120:5 124:7 158:10
186:17

**sit** 35:22 41:14 46:9
110:15 114:9 133:3

**size** 192:4,15 193:12,
16

**sizeable** 192:25

**Skyview** 83:10
161:14 177:7,22
179:2 180:3

**slack** 178:16

**sloppy** 194:6

**sole** 26:25 27:4 101:9
191:25

**Sounds** 138:9

**source** 66:15 69:24
91:2 98:5 119:19
145:9,12 147:19
148:20 167:6

**speak** 12:23 13:3,5,
9,16,19 31:4,9 33:4
83:6 167:5,7

**speaks** 195:15

**specialist** 43:22

**specialize** 152:5

**specific** 38:16 44:25
72:20 86:11,18
103:24 120:17
125:24 155:12
156:12 157:4 170:24
180:2,20

**specifically** 44:21
49:5 65:12 84:21
86:9 99:21 125:17
180:24 181:23 192:3

**specifics** 156:20

**speculate** 84:20

**speculation** 34:18
41:9 122:8 150:18

**spent** 109:21

**spoke** 11:19,20,21
12:13,18 165:19,22
166:2,10

**spoken** 13:13 166:16

**spring** 103:20

**Stacy** 87:23 89:25

**stance** 157:22

**standard** 90:25

**standards** 180:7

**Stang** 5:10

**star** 147:9

**start** 87:20 104:2

**state** 155:6

**stated** 183:18

**statement** 36:6
37:22 43:13 49:4
51:6,8,20 52:2 63:23
64:9 84:15,18 85:8
100:25 106:4 161:15
165:24 166:5,6
172:4,9,21

**statements** 43:6,10
44:2,24 45:5,8,20
46:11,24 47:13,18
48:15,19 49:21 50:2
57:22 58:13,16 64:5,
14,17 65:10 86:23
95:15,22 101:14,18

**states** 133:25

**step** 14:18 152:5

**Stephanie** 25:13
179:6

**stepped** 181:3

**stepping** 64:6

**steps** 58:13 74:16
121:13

**stop** 51:11 102:21

**Strand** 26:13 27:3

**strategist** 19:21 20:5

**strategy** 16:24

**strict** 31:18

**strictly** 45:14

**strike** 44:18 45:11
50:12 53:23 60:20
62:3,21 72:17 76:22
78:25 81:15 83:11
91:23 117:25 118:12
120:3 125:9 129:16
131:8 135:25 150:15
171:14 177:12
180:15 183:14
184:18 190:24
192:11

**string** 88:6 101:8

**structure** 27:13
104:5

**stuff** 190:21

**subject** 16:4 28:14,
18 49:17,21 66:12
112:20 123:5 124:10,
16 135:9 140:10
150:2 180:13 181:8

**submitted** 106:2
151:20

**subsequent** 17:20
48:11,17 49:5,16
55:3,4,6,8

**substantial** 192:23,
24,25

**sued** 13:10

**sufficient** 68:18

**suggest** 73:4

**suing** 48:23 49:11
161:5,20 162:18
163:22 165:16
176:15

**summarize** 20:6
133:11

**summary** 133:12

**summer** 32:2

**supplemental**
115:23

**supplied** 87:4

**supplying** 75:10

**support** 9:12 44:12
76:19,20 83:4,20
84:25 185:11 186:20
188:20,21 189:11
196:4

**supported** 137:23

**supporting** 187:6

**supports** 187:23
190:7,15

**supposed** 59:10
61:2 134:25 135:6

**supposedly** 186:7

**Surgent** 72:14 89:24
90:4

**surprised** 60:16
63:18 139:7

**surrounding** 16:8
32:13 86:14 161:4
164:19 165:15
176:11

**suspect** 144:14

**sworn** 5:3,5

---

**T**

**taking** 85:11 94:19

**talk** 13:11 14:15
34:14,15,16 67:25
68:4,5,7 69:20,23
82:23 109:18 144:12
161:10,14,16 174:3,
16 179:25

**talked** 14:20,21
30:21 34:9 100:22
108:23 166:12

**talking** 16:7 17:20
18:3 43:16 68:10,11
115:7 127:16 151:4

**task** 119:15,17,18

**tasked** 43:21 45:8
53:16 164:21

**team** 31:13,19 43:17
44:4 50:8 53:17,21
65:16,19 72:14 74:19
75:9 77:23 78:22

**technicality** 77:14

**telephonic** 99:6

**telling** 93:20 126:15
133:3

**tells** 185:19,21

**tendered** 29:13
38:21 46:21 51:3
71:22 87:14 119:10
158:8

**term** 30:20

**terms** 104:4,8 105:24

**Terrestar** 109:18,23
110:3,6,9,23 111:4
112:15,21 113:10,17
114:3,20 117:15
118:22 119:16
120:25 121:9 124:9
137:16 138:18
146:23 147:10

**testified** 5:5 41:20
60:4,6 83:24 85:3
104:21 126:18
140:19 151:17 182:9
192:7,8 193:12
195:16

**testify** 10:6 27:22
52:17,20

**testimony** 22:15
42:23 51:17 60:3
64:15 75:23 79:15,19
80:17 81:7 84:3 85:3
185:14 190:22
192:12 195:15,16,21

**Texas** 147:18 148:20

**Thedford** 24:22 25:6
31:7,23 71:12 72:11
75:5 76:8 77:15 83:6
89:23 91:11 94:12
96:20,24

**Thedford's** 94:13

**theory** 147:25 148:2

**Thereof** 9:12

**thing** 69:19 136:3 160:18

**things** 11:22 12:7,8 13:10 31:25 32:3 33:19 67:22 68:15 75:8 91:20 161:10

**thinking** 35:11 71:5

**third-party** 112:5 128:16

**Thomas** 72:14 88:21

**thought** 50:8 63:15 182:18 186:15

**thousands** 163:8

**threw** 148:9

**time** 6:23,24 7:4 8:4, 15 15:15 18:2,21 20:14,24 21:20 22:4, 5 24:7,24 27:18 31:14 32:16 33:12,19 39:20,24 40:7,16 41:3 43:15,23 46:16 54:19 55:7 56:6 58:17 64:4 73:6,10, 11 94:17 95:10 96:24 97:9,25 99:25 102:19 104:23 106:15 107:8 109:17,22 110:2 113:21 114:4 119:13 120:24 121:19 124:14 126:13,15,24 129:3 135:4 136:5 143:16 145:6,17,24 148:13 150:24 153:12 155:12,14,15, 25 157:4,23,24 158:11 159:9 161:9, 18 162:15,16 163:25 164:2 166:15,18,20 168:5,12 172:7,17 173:24 175:3 176:17, 20,24 177:11,16 178:7 180:10 183:17 194:22

**time-** 20:21

**timeline** 20:21

**times** 13:19,21 43:16

**timing** 154:7

**title** 18:8,11 19:12,24 20:12 24:12

**titled** 122:20

**titles** 19:16 23:17

**today** 5:13,17 6:4,23 7:24 8:14,15 9:25 10:7 18:6 36:24 37:10 42:3 44:21 57:19 62:8 64:15,21 79:5 114:10 117:18 133:4 159:6,21 172:10

**today's** 8:4 11:12 13:20 14:2 15:3 82:20 173:2

**told** 15:8 31:24 40:4 41:4 60:8 86:6 97:23 100:16,19 117:12 118:14 119:19 124:19 125:7 129:2, 20 130:15 132:6 137:17 140:18 143:15 150:7 182:3, 11,13 183:2 185:18 186:4

**tolling** 113:22

**top** 86:3 102:22 146:13

**topic** 9:17 17:15 23:5,9 27:19,21 28:5 29:6,8 36:14,18 52:16,20 63:2 65:20, 21 99:17 103:4,12,14 104:18 117:16 141:19 142:10 158:13,14 161:17 163:2

**topics** 10:8,13,16,20, 25 11:8 14:14 16:16 22:25 34:17 57:6 102:18 114:15 115:21

**total** 107:2,4,5 108:13 109:12 133:15,21 146:12 147:8,14

**totality** 102:5

**trading** 27:8,10,11

**transaction** 108:18

**transactions** 14:8 129:4,14,23 130:10,

22 153:13 194:19

**transcript** 84:11

**transcripts** 186:21 187:18

**transfer** 14:7,11 15:10 51:14,21 52:7 60:13 183:2,4 185:18,20,21,22

**transferred** 51:18 134:18 137:23 140:13,14 168:19 172:13

**transfers** 52:18 54:23 108:23 182:20, 21 195:12,23

**transition** 177:9

**transitioned** 97:13

**treasurer** 24:9,17,22 25:5,12 39:7 43:14, 25 44:8,14,22,25 45:2,15,24 46:4,8 65:17 75:13,25 76:5 80:22 96:21 191:22

**treated** 56:2 57:15 62:9

**Trey** 24:8,15,23

**trick** 159:19

**TRO** 40:22

**true** 44:3,24 45:20 65:15 75:3 76:2,11 80:8 81:19,23 125:20 126:6

**trusts** 26:8

**Tuesday** 92:17

**turn** 30:5 110:5 158:21 169:11

**turned** 183:3

**two-thirds** 26:9,19 146:16

**tying** 190:9

**typical** 86:25

**typically** 99:5 104:8

**typo** 90:24

**U**

**Uh-huh** 8:25 11:4 23:4 52:19 53:11 88:22 93:16 118:24 141:21 176:12

**ultimate** 124:24

**ultimately** 110:5 129:11 130:17 171:21,24

**unable** 31:24 41:5 178:13 179:20,21 180:7

**unaudited** 95:17,22 96:4 101:14,18

**unauthorized** 85:9

**unaware** 40:5 64:16, 22

**unclear** 101:22

**uncomfortable** 33:14

**underlying** 82:23 101:25

**understand** 5:14,16 12:10 15:17 48:17 103:6 106:19 113:12, 19 115:20 128:11 148:18 160:6

**understanding** 13:8 15:23 30:14 46:3 53:2 54:8 55:2 78:8 103:8,22 106:7 111:16 122:22 139:8 147:18 159:6 160:5 161:6 184:25

**understood** 32:21

**undertake** 106:25

**undertaken** 115:2 116:8 167:16

**undertaking** 113:24 114:5,10

**undertook** 16:13,18 164:18 166:21

**unfettered** 34:6,8 173:11,16 175:2,8 177:15,19

**unusual** 91:19

**urgency** 56:6

**utilized** 124:3

**utilizing** 178:7

**V**

**vagueness** 172:6

**valid** 50:5,9 143:11

**valuation** 32:23 62:16,17 109:18,23 110:3,6,10,12,24 111:10,14,15,17 112:6,16,17,20,21,25 113:4,10,17 114:3, 13,20,24 115:10 117:15 118:16,22 119:16,22 121:9 124:9 128:17 129:8,9 130:8,21 132:9 135:2,7,16 137:11,16 138:8,18 146:24 147:10 154:24 155:5, 9,16,18 156:2,4,8 170:13 171:7,9

**valuations** 115:9 131:6 156:16

**verified** 107:14

**verify** 125:24

**vice** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4 43:4 73:25 74:5, 7 97:4 116:5

**view** 14:3 178:20

**viewed** 75:21

**violating** 174:18

**Vitiello** 25:13 179:6

**voluntary** 108:3

**vote** 106:5 107:24

**voted** 104:10 105:12

**W**

**wait** 13:17 159:22

**waited** 157:16

**wanted** 143:22

**water** 56:12

**Waterhouse** 12:3,23 13:3,6 14:10 15:5 24:9,17,22 25:4,11 39:5,7,13 41:14 42:5 43:15,24 44:22 60:4 65:16 71:13 75:9,12, 24 78:22 80:14,22 81:25 82:24 83:23 90:12 91:8,12 92:7, 13,16 93:17 96:20 97:23 98:12 99:16 100:9,13,16 140:12 142:23 144:25 151:19 161:16 165:13,19 167:8 171:8 173:24 175:2 176:19,25 177:4,15 181:7,13,24 182:2,6 183:10,19,23 184:4, 12 186:3,11 191:16, 18,22 192:2,6,16 193:14,19 194:3,17 195:9,22

**Waterhouse's** 84:11 92:8 93:13,20 96:19 99:25 100:25 173:20 181:17 183:6 187:11

**week** 162:4

**weeks** 12:5 13:21 42:15 152:3 155:2

**weighted** 131:23 132:8

**weighting** 129:6,25 131:12

**Willmore** 25:6

**wishes** 91:25

**withdrawn** 35:13 55:22 80:5 82:12,13 92:14 109:10 117:11 122:18 127:4,5 168:16

**witnesses** 190:22

**wondering** 100:19

**word** 35:21 91:9 131:8 142:14 163:9, 15,16 165:2 183:6

187:8 189:15

**wording** 83:25

**words** 14:18 169:16

**work** 31:20,24 43:19 96:3 111:19 112:14 113:16 114:2 117:14 118:6 119:15 146:23 164:25 165:4 168:11, 21 178:13 179:20,21 180:7

**worked** 32:21 124:5

**working** 33:2,8 41:11 56:8 72:5 112:22 115:11 117:20 135:16 146:10 178:18 180:4

**works** 5:23

**world** 49:9 104:6 126:24 186:23 187:22 189:11

**worth** 160:10

**writing** 124:20 144:2 172:17

**written** 66:10

**wrong** 8:24 73:4 114:12

**wrote** 181:18

Y

**year** 16:13 49:6 57:24 68:3 85:23 97:21

**year-end** 57:15

**years** 18:21 76:18 79:12 148:5,7

**yesterday** 9:13 54:19 193:25

**Yup** 52:19 54:5 70:11 86:4 92:4 127:21 133:22 158:6

Z

**Ziehl** 5:10

**Zoom** 12:4

# EXHIBIT 193

Page 1

1    IN THE UNITED STATES BANKRUPTCY COURT

2      FOR THE NORTHERN DISTRICT OF TEXAS

3         DALLAS DIVISION

4
 IN RE:            ) Chapter 11
5  HIGHLAND CAPITAL      ) Case No.
  MANAGEMENT, LP,        ) 19-34054-
6       Debtor.     ) sgj11
 -------------------------- )
7  HIGHLAND CAPITAL       )
  MANAGEMENT, LP,        ) Adversary
8                ) Proceeding
       Plaintiff,   ) No.
9                ) 21-03004
    vs.           )
10                )
 HIGHLAND CAPITAL       )
11  MANAGEMENT FUND ADVISORS,   )
 LP,             )
12                )
       Defendant.    )
13  -------------------------- )

14

15

16

17    REMOTE ZOOM DEPOSITION OF DENNIS C. SAUTER

18         Wednesday, November 17, 2021

19

20

21

22

23  Reported by:

24  Stacey L. Daywalt

25  JOB NO. 202810

Appx. 03084

Page 2

1
2
3              Wednesday, November 17, 2021
4              1:08 p.m.
5
6
7              Remote Zoom Deposition of DENNIS C.
8  SAUTER, held before Stacey L. Daywalt, a Court
9  Reporter and Notary Public of the District of
10 Columbia.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  A P P E A R A N C E S:
2  (All appearances via remote Zoom)
3
4      PACHULSKI STANG ZIEHL & JONES
5      Attorneys for Plaintiff
6          780 Third Avenue
7          New York, New York 10017
8      BY:   JOHN MORRIS, ESQ.
9
10     MUNSCH HARDT KOPF & HARR
11     Attorneys for Defendant
12         500 North Akard Street
13         Dallas, Texas 75201
14     BY:   DAVOR RUKAVINA, ESQ.
15
16     STINSON LLP
17     Attorneys for James Dondero and Nancy
18 Dondero
19         3102 Oak Lawn Avenue
20         Dallas, Texas 75219
21     BY:   MICHAEL AIGEN, ESQ.
22
23 ALSO PRESENT:
24
25         LA ASIA CANTY

Page 4

1              D. Sauter
2  D E N N I S  C.  S A U T E R,
3          called as a witness, having been
4  duly sworn by a Notary Public, was examined and
5  testified as follows:
6
7  EXAMINATION BY
8  MR. MORRIS:
9      Q.   Can you please state your name for
10 the record.
11     A.   Dennis Sauter.
12     Q.   Good afternoon, Mr. Sauter.  My name
13 is John Morris.  I'm an attorney at Pachulski
14 Stang Ziehl & Jones.  We are counsel to the
15 reorganized Highland Capital Management, LP.
16         Are you aware of that?
17     A.   Yes, sir.
18     Q.   Okay.  And we're here for your
19 deposition today.  Correct?
20     A.   Yes, sir.
21     Q.   And I've examined you previously.
22 Is that right?
23     A.   I don't believe so.
24     Q.   Okay.  Have you ever been deposed
25 before?

Page 5

1              D. Sauter
2      A.   I don't think so.
3      Q.   Okay.  So very simple ground rules.
4          I'm going to ask you a series of
5  questions, and it's important that you allow me
6  to finish my question before you begin the
7  answer.
8          Is that fair?
9      A.   Yes, sir.
10     Q.   And I will certainly attempt to do
11 the same for you and -- insofar as I will
12 attempt to allow you to finish your answer
13 before I begin my question.
14         But if I fail to do that, will you
15 let me know?
16     A.   I will.
17     Q.   If there's anything that I ask you
18 that you don't understand, will you let me know
19 that?
20     A.   I will.
21     Q.   If you want to take a break at any
22 time, just let me know and I'll try to
23 accommodate you.  I'd only ask that you don't
24 ask for a break while a question is pending.
25         Is that fair?

Page 6

D. Sauter

1
2    A.    That's fair.
3    Q.    Okay.  Do you have a license to
4    practice law, sir?
5    A.    I do.
6    Q.    In what states are you admitted to
7    practice?
8    A.    Just Texas.
9    Q.    When did you obtain your license?
10    A.    November of 2001.
11    Q.    And did you graduate from law
12    school?
13    A.    I did.
14    Q.    Where did you graduate from law
15    school?
16    A.    Southern Methodist University.
17    Q.    And can you describe for me your
18    employment history from the time you graduated
19    law school until today.
20    A.    Sure.
21        Out of law school I began at a firm
22    called Winstead Sechrest & Minick.  And I was
23    there just till tax day, so April 15 of 2002,
24    when my group moved to a firm at the time that
25    was called Godwin Gruber.  I was at Godwin

Page 7

D. Sauter

1
2    Gruber until 2006.
3        And I went in-house with a
4    development firm called St. Ives Realty.  I was
5    there until 2009.
6        And in 2009, I went back to work
7    with the group I'd worked with before but now
8    it was called Langley Weinstein.  I was with
9    Langley Weinstein until December 31 of '13.
10        And in 2014, I started at Wick
11    Phillips Gould & Martin, and I was at Wick
12    Phillips until February of 2020 when I began at
13    Nexpoint.
14    Q.    And while you were at Nexpoint -- I
15    mean, withdrawn.
16        While you were at Wick Phillips, did
17    you provide services to Highland or any of its
18    affiliates?
19    A.    I provided services primarily to
20    Nexpoint advisors and its wholly owned
21    subsidiaries.
22        I did have occasion to do a couple
23    of discrete engagements for -- I think they
24    were CLOs but managed by Highland.
25    Q.    Prior to the time that you joined

Page 8

D. Sauter

1
2    Nexpoint, did you have any particular expertise
3    in a specified area of the law?
4    A.    For about the last ten years, real
5    estate.
6        It was, before that, kind of a
7    hybrid of construction related litigation,
8    landlord-tenant disputes, you know,
9    foreclosures.  It was all real estate related
10    litigation and then real estate transactional
11    work.
12    Q.    How did you come to become employed
13    by Nexpoint?
14    A.    I had worked with the folks here at
15    Nexpoint for my entire tenure at Wick Phillips,
16    and they gave me an offer and I accepted.
17    Q.    What offer did they give you?  What
18    position?
19    A.    I was hired to be general counsel of
20    real estate.
21    Q.    Are you still the general counsel of
22    real estate?
23    A.    I'm now the general counsel of
24    Nexpoint.
25    Q.    When did you become the general

Page 9

D. Sauter

1
2    counsel of Nexpoint?
3    A.    I don't recall exactly, but I would
4    say April or May of this year.
5    Q.    All right.  So from approximately
6    February of 2020 until approximately April of
7    2021, you were the general counsel of real
8    estate, and since approximately April of 2021
9    you were -- you have been the general counsel
10    of Nexpoint.
11        Do I have that right?
12    A.    Correct.
13    Q.    Was there a general counsel of
14    Nexpoint during the time you served as general
15    counsel of real estate?
16    A.    There was not.
17        Generally the way things worked is
18    Scott Ellington was general counsel at Highland
19    Capital, and most of the legal department
20    reported to him.  I was the one attorney that
21    was not under him.
22        So no, there was not.
23    Q.    Okay.  To whom do you report today?
24    A.    Matt McGraner.
25    Q.    And what is Mr. McGraner's title?

Page 10

D. Sauter

1
2    A.   I believe it's managing director.
3    Q.   When did you begin reporting to
4  Mr. McGraner?
5    A.   The day I was hired.
6    Q.   What are your duties and
7  responsibilities today as the general counsel
8  of Nexpoint?
9    A.   A lot different than I anticipated
10  when I came on.
11    Q.   Fair.
12    A.   It's a little bit of everything.  I
13  get lots of questions from lots of different
14  people.
15         As you can imagine, there's been
16  quite a shuffle with the Skyview formation,
17  people leaving, people staying, and so, you
18  know, it's been fairly fluid.  So I try to
19  handle whatever somebody brings me.
20    Q.   In your capacity as general counsel,
21  do you have any responsibility for overseeing
22  Nexpoint's litigation matters?
23    A.   I do.
24    Q.   Okay.  And do you have
25  responsibility for overseeing Nexpoint's

Page 11

D. Sauter

1
2  defense of the lawsuit that Highland has
3  commenced against it?
4         MR. RUKAVINA:  Allow me to interject
5  just a little bit here, John.
6         You subpoenaed Mr. Sauter in the
7  HCMFA lawsuit.
8         Why are you asking him all about
9  this Nexpoint?
10         MR. MORRIS:  Just because he told me
11  that's where he works.
12         MR. RUKAVINA:  Yeah, that's fine.
13         I mean, I'm not trying to be rude.
14  Just --
15         MR. MORRIS:  I appreciate that.
16         MR. RUKAVINA:  -- if you're --
17         (Simultaneous crosstalk.)
18         MR. MORRIS:  Duly noted.  Thank you,
19  Davor.
20         THE REPORTER:  Please watch the
21  overlap of talking.  Thank you.
22  BY MR. MORRIS:
23    Q.   Mr. Sauter, Mr. Rukavina brings up a
24  good point.
25         Are you also the general counsel of

Page 12

D. Sauter

1
2  Highland Capital Management Fund Advisors, LLP?
3    A.   I'm not.
4    Q.   You are not?
5    A.   I'm not the general counsel of
6  Highland Capital Management Fund Advisors.
7    Q.   Okay.  Can we refer to that entity
8  as HCMFA today?
9    A.   Yes, sir.
10    Q.   Do you have any title or role with
11  HCMFA today?
12    A.   I don't have any official capacity
13  with HCMFA, although I do perform work from
14  time to time for HCMFA.
15    Q.   Okay.  Does HCMFA have a general
16  counsel, to the best of your knowledge?
17    A.   It does not.
18    Q.   Does HCMFA have any officers today,
19  to the best of your knowledge?
20    A.   It does, but I'm not sure I can name
21  them off to you.
22    Q.   Okay.  What services do you provide
23  to HCMFA?
24    A.   Again, like other affiliated
25  entities, when it has legal needs that meet my

Page 13

D. Sauter

1
2  expertise, people bring it to me and I work on
3  it.
4    Q.   And what's an "affiliated entity" in
5  the way that you've used that term?
6    A.   I generally refer to HCMFA, Nexpoint
7  Advisors and the wholly owned subsidiaries of
8  Nexpoint Advisors as the affiliated entities.
9         HCMFA also owns Nexpoint Securities,
10  which is the broker dealer, and so I do work
11  with those folks from time to time as well.
12    Q.   Is there a source of affiliation
13  between Nexpoint and HCMFA?
14    A.   Yes, Mr. Dondero.
15    Q.   And he controls them both to the
16  best of your knowledge.  Is that right?
17    A.   I -- I guess it depends on how you
18  define "control."
19         But yes, he is a controlling person
20  of Nexpoint Advisors, and yes, for all intents
21  and purposes, he's the controlling person of
22  HCMFA.
23    Q.   Okay.  And can we refer to HCMFA and
24  Nexpoint Advisors, LP together as "the
25  advisors"?

Page 14

D. Sauter
1
2    A.   That's fine.
3    Q.   The advisors are each advisory
4  firms.  Is that right?
5    A.   Correct.
6    Q.   And each of them provide advisory
7  services to certain funds.  Is that correct?
8    A.   Correct.
9    Q.   Okay.  Do you hold any titles with
10 any of the funds that are advised by either of
11 the advisors?
12   A.   Yes, I am general counsel for
13 Nexpoint Residential Trust and I'm general
14 counsel of Nexpoint Real Estate Finance.
15   Q.   Any others?
16   A.   No, sir.
17   Q.   Okay.  Do you have --
18   A.   Wait.  Wait.  Let me clarify.
19        I think I am general counsel of
20 Nexpoint Real Estate Advisors, and I may be
21 general counsel of each of them.  I think there
22 are nine in total.
23   Q.   Okay.  And are each of them separate
24 funds?
25   A.   Each of the advisors are -- manage a

Page 15

D. Sauter
1
2  discrete business line.  They're separate
3  entities, but not necessarily funds.
4    Q.   And are each of them owned
5  indirectly or directly by Nexpoint Advisors,
6  LP?
7    A.   Yes, sir.
8    Q.   Okay.
9        When did you first meet Mr. Dondero?
10   A.   I don't recall.
11        I think I met him once at an event
12 that I was invited to years ago, maybe 2017.
13   Q.   Do you know if he holds a title at
14 HCMFA?
15   A.   I don't believe he does.
16   Q.   How about Nexpoint?  Does he hold a
17 title at Nexpoint?
18   A.   Yes, he's the president.
19   Q.   And even though he doesn't hold a
20 title at HCMFA, it's your understanding that he
21 controls HCMFA.  Is that right?
22   A.   I don't know that I would say that.
23        And again, I would need to look at
24 the organizational documents.
25   Q.   Well, as -- withdrawn.

Page 16

D. Sauter
1
2        Do you know if Mr. Dondero serves as
3  the portfolio manager for any of the funds to
4  which the advisors provide advisory services?
5    A.   He does.
6        I don't know which ones.
7    Q.   We're going to talk in a little
8  while about a TerreStar NAV issue.
9        MR. MORRIS:  And Stacey, that's all
10 caps N-A-V, and it's T-E-R-R-A-S-T-A-R [sic].
11   Q.   We're going to talk a little bit
12 about a TerreStar NAV issue.
13        Are you generally familiar with
14 that?
15   A.   Generally.
16   Q.   Okay.  And is it your understanding
17 that that NAV issue, that TerreStar NAV issue,
18 related to certain equity positions that were
19 held by certain funds managed by HCMFA?
20   A.   Yes, I think it was -- Global
21 Allocation Fund is the one that was
22 particularly the insured.
23   Q.   And can we refer to that as GAF?
24   A.   Yes, sir.
25   Q.   Do you know who the portfolio

Page 17

D. Sauter
1
2  manager of GAF was in 2019?
3    A.   I do not.
4    Q.   Do you know if it was Mr. Dondero?
5    A.   I do not.
6    Q.   In the course of your investigation,
7  did you ever ask who the portfolio manager of
8  GAF was?
9    A.   I did not.
10   Q.   Do you know Frank Waterhouse?
11   A.   I do.
12   Q.   When did you first meet
13 Mr. Waterhouse?
14   A.   I think I met him just before I came
15 on.  It would have been maybe December of 2019.
16   Q.   Okay.  Do you know if Mr. Waterhouse
17 holds any titles with either of the advisors?
18   A.   I believe so, but I'm not exactly
19 sure.
20        MR. RUKAVINA:  I'm going to object
21 to vague or form there.
22        What time are you specifying,
23 Mr. Morris?
24        MR. MORRIS:  I appreciate that.  Let
25 me restate the question.

Page 18

1                    D. Sauter
2    BY MR. MORRIS:
3        Q.   Mr. Sauter, do you know if
4    Mr. Waterhouse held any position with either of
5    the advisors at any time in 2019?
6        A.   I believe he did, but I -- I would
7    say it was probably treasurer and CFO, but I'm
8    speculating.
9        Q.   In the course of your investigation,
10   did you try to determine what title
11   Mr. Waterhouse held with HCMFA?
12       A.   I have not.
13       Q.   Have you ever tried to determine
14   what title Mr. Waterhouse held at HCMFA at any
15   time?
16       A.   At one point I knew what it is.  I
17   just can't recall.
18       Q.   Okay.  Does -- do you know if
19   Mr. Waterhouse holds a position with HCMFA
20   today?
21       A.   I believe he does.
22       Q.   Do you have any understanding as to
23   what that position is?
24       A.   Again, I think it's CFO and/or
25   treasurer.  That's consistent, I think.

Page 19

1                    D. Sauter
2        Q.   Do you have any understanding as to
3    when Mr. Waterhouse became the treasurer and/or
4    the CFO of HCMFA?
5        A.   I do not.
6        Q.   Do you know if Mr. Waterhouse holds
7    any positions with any of the funds that are
8    advised by either of the advisors?
9        A.   I believe he -- I'm speculating.  I
10   don't know for certain.
11       Q.   During the course of your -- you
12   conducted an investigation around the TerreStar
13   NAV issue.  Right?
14       A.   Correct.
15       Q.   Okay.  During the course of your
16   investigation, did you ever try to determine
17   whether Mr. Waterhouse served in any capacity
18   with any of the funds that are managed by
19   HCMFA?
20       A.   Whether he -- yes.
21       Q.   And what did you -- what information
22   did you learn in the course of your
23   investigation on that issue?
24       A.   My understanding is that the
25   valuation team was a subset of the group that

Page 20

1                    D. Sauter
2    Mr. Waterhouse ran.
3        Q.   Right.
4        I'm asking you specifically about
5    whether he held positions at any of the funds.
6        Did you understand that when I asked
7    my question?
8        A.   I don't know whether he held any
9    position with the funds.
10       Q.   Okay.  And during your
11   investigation, did you make any effort to try
12   to determine whether he held any positions with
13   GAF?
14       Let's be very specific.
15       A.   I don't recall.
16       Q.   Do you know a gentleman named Will
17   Mabry?
18       A.   I do.
19       Q.   And do you know if Mr. Mabry was
20   ever employed by either of the advisors?
21       A.   I don't know who employed Mr. Mabry.
22       Q.   Do you know if he was ever employed
23   by Highland Capital Management, LP?
24       A.   I would suspect that he was employed
25   by Highland Capital Management, LP.

Page 21

1                    D. Sauter
2        Q.   Okay.  And what's the basis for that
3    speculation?
4        A.   Because he's at Skyview, and I think
5    all of the employees that were at Nexpoint
6    Advisors or HCMFA remained where they were.
7        Q.   Do you know what position he held at
8    Highland in 2019, if any?
9        A.   I don't know.
10       Q.   Do you know anything about
11   Mr. Mabry's skills or expertise, if any?
12       A.   Other than I believe he was the
13   assistant treasurer at GAF and he was on the
14   valuation team as well.
15       Q.   So your understanding is he was the
16   assistant treasurer of the fund that we have
17   defined as GAF.
18       Do I have that right?
19       A.   That's my understanding.
20       Q.   Okay.  And what's the basis for that
21   understanding?
22       A.   That's just what I recall.
23       Q.   Okay.  To the best of your
24   knowledge, does he have an accounting
25   background?

Page 22

D. Sauter

1
2    A.   I don't know.
3    Q.   And is it your understanding that he
4  was part of a valuation team?
5       I think you used that term.
6    A.   Yes, I believe he was.
7    Q.   Okay.  And what's the basis for that
8  understanding on your part?
9    A.   Discussions that I've had with Frank
10  and his knowledge of the TerreStar NAV error.
11    Q.   Did Mr. Mabry tell you that he was
12  part of the valuation team?
13    A.   I don't recall.
14    Q.   Did you ask him?
15    A.   I don't recall.
16    Q.   Do you know if Mr. Mabry played any
17  role in any aspect of the TerreStar
18  investigation that was conducted by the SEC?
19    A.   I don't recall.
20    Q.   Did you ask Mr. Mabry if he played
21  any role in connection with the SEC
22  investigation?
23    A.   I did not.
24    Q.   Do you know if Mr. Mabry played any
25  role in formulating HCMFA's response to the

Page 23

D. Sauter

1
2  SEC?
3    A.   I do not.
4    Q.   Did you ask him?
5    A.   I don't recall.
6    Q.   Do you know when he left Highland?
7    A.   I think he was terminated with the
8  other employees.
9    Q.   You submitted a declaration in
10  connection with the adversary proceeding that
11  Highland commenced against the HCMFA.
12       Do I have that right?
13    A.   Yes, sir.
14    Q.   All right.  Let's take a look at
15  that, if we can put that up on the screen.
16       So from time to time, my assistant
17  Ms. Canty is going to put some documents up on
18  the screen, Mr. Sauter.  And it's very
19  important that you understand that I will give
20  you every opportunity that you believe you need
21  in order to read the document.
22       So you know, if there's something
23  that I put up there that you want to see more
24  of, just let me know and we'll just scroll
25  around.  Okay?

Page 24

D. Sauter

1
2    A.   Okay.
3       (Exhibit 181, Declaration of Dennis
4  C. Sauter, Jr., previously marked for
5  identification.)
6    Q.   Okay.  Do you see the first page of
7  this document states that it's your
8  declaration?
9    A.   I do.
10    Q.   And if we can go to the signature
11  line, please.
12       And that's your signature there,
13  sir?
14    A.   It is.
15    Q.   And did you sign this on or about
16  May 21st, 2021?
17    A.   Yes, sir.
18    Q.   Do you remember the purpose of this
19  declaration?
20    A.   It was requesting to file an amended
21  answer.
22    Q.   Okay.  Is it fair to say that your
23  declaration sets forth the factual basis for
24  the proposed amendment?
25    A.   Yes.

Page 25

D. Sauter

1
2    Q.   And is it fair to say that your
3  declaration describes the investigation that
4  you did initially after the complaint was filed
5  and then basically a second phase of the
6  investigation after Mr. Waterhouse and
7  Mr. Mabry migrated from Highland?
8    A.   Yes.
9    Q.   Okay.  So the purpose of your
10  investigation was to understand the origin of
11  two promissory notes.  Right?
12    A.   Yes, sir.
13    Q.   Okay.  I just want to go through to
14  the notes to make sure that the record is clear
15  that we're talking about the same thing.
16       There are certain documents that
17  we've used in other depositions so they've been
18  premarked, and I'd ask Ms. Canty to put up the
19  document that's already been marked as
20  Exhibit 54.
21       MS. CANTY:  Okay.  John, do you want
22  to let the court reporter know this current one
23  is 181, premarked 181, this declaration.
24       MR. MORRIS:  Okay.  Fine.
25       (Exhibit 54, E-mail chain with

Page 26

D. Sauter

1          D. Sauter
2   attachment dated 5/2/19, D-CNL003777-779,
3   previously marked for identification.)
4       Q.   So if could just scroll down a
5   little bit.
6            Do you see there's -- do you see
7   it's -- there's an e-mail from David Klos dated
8   May 2nd?
9       A.   Yes.
10      Q.   Do you know who Mr. Klos is?
11      A.   I do.
12      Q.   And who do you understand Mr. Klos
13  to be?  What role did he play in May of 2019?
14      A.   I don't know.
15           I know he worked under Frank.
16      Q.   He worked out of -- do you see
17  there's an e-mail to a corporate accounting
18  group?
19      A.   Yes.
20      Q.   Have you ever sent or received an
21  e-mail from a Highland corporate accounting
22  e-mail chain called the corporate accounting
23  group?
24      A.   I've never sent an e-mail from the
25  corporate accounting group.

Page 27

D. Sauter

1            I can't recall receiving one from
2   them either.
3       Q.   Do you see that in this e-mail
4   Mr. Klos asks to have $2.4 million transferred
5   from HCMLP to HCMFA?
6       A.   I do.
7       Q.   And do you see that he states:
8   "This is a new interco loan"?
9       A.   I do.
10      Q.   And if we can see the response
11  above, do you see how Ms. -- do you know
12  Kristin Hendrix?
13      A.   I do.
14      Q.   And who is Ms. Hendrix, to the best
15  of your knowledge.
16      A.   I believe she worked under Mr. Klos.
17      Q.   And do you see that she wrote to
18  someone named Blair and attached a copy of a
19  note?
20      A.   Yes.
21      Q.   Okay.
22      A.   That's what it says.
23      Q.   And can we go to the next page,
24  please.

Page 28

D. Sauter

1          D. Sauter
2            And do you see that this is a
3   promissory note for $2.4 million dated May 2,
4   2019?
5       A.   I do.
6       Q.   Okay.  And can we go to the
7   signature line.
8            Do you see Mr. Waterhouse's
9   signature?
10           Do you see Mr. Waterhouse's
11  signature, sir?
12      A.   I can't verify whether that's his
13  signature, but I'll take your word for it.
14      Q.   Okay.  Can you go to the top of the
15  note, please.
16           Do you see that the maker is defined
17  to be Highland Capital Management Fund
18  Advisors, LP?
19      A.   I do see that that's what it says on
20  the first page.
21      Q.   Okay.  And this is one of the two
22  notes that was the source of your
23  investigation.  Right?  This was one of the two
24  notes that you were investigating the origins
25  of?

Page 29

D. Sauter

1          D. Sauter
2       A.   Yes.
3       Q.   Okay.  Let's look at the next note,
4   please.
5            (Exhibit 57, Promissory Note dated
6   5/3/19, D-CNL003764-65, previously marked for
7   identification.)
8            Do you see this is a note for
9   $5 million and it's dated the next day,
10  May 3rd, 2019?
11      A.   I see that.
12      Q.   Do you see that it's -- it also
13  defines as the maker Highland Capital
14  Management Fund Advisors, LP?
15      A.   That's what it says on the first
16  page, yes.
17      Q.   Okay.  And if we can go to the
18  signature line.
19           Again, does that appear to be
20  Mr. Waterhouse's signature?
21      A.   Again, I can't verify whether that's
22  Mr. Waterhouse's signature or not.
23           But it does say that the maker is
24  Frank Waterhouse, not Highland Capital
25  Management Fund Advisors.

Page 30

D. Sauter

1
2    Q.   I understand.
3         But the definition of "maker" is
4    above.  Correct?
5    A.   I wouldn't -- that's not how I would
6    draft a promissory note.
7    Q.   I didn't ask you how you would draft
8    it.
9         I'm just asking you whether, having
10   just looked at the document and as a lawyer
11   admitted to practice in law, you agree
12   that the term "maker" is a defined term in this
13   document?
14        MR. RUKAVINA:  I'll just object to
15   form here and also that this witness has not
16   been called as an expert, even though he's a
17   lawyer.
18        So I'll just preserve that for the
19   record.
20        MR. MORRIS:  Fair.  That's fine.
21        THE WITNESS:  I would agree that
22   "maker" is defined on the first page, but that
23   would be an improper signature block, if it was
24   intended to be Highland Capital Management Fund
25   Advisors.

Page 31

D. Sauter

1
2    BY MR. MORRIS:
3    Q.   All right.  We're going to refer to
4    these two notes collectively as "the notes."
5         Is that okay?
6    A.   That's fine.
7    Q.   And these are the two notes that you
8    were investigating.  Right?
9    A.   Yes.
10   Q.   And it's your understanding that
11   these are the two notes that Highland Capital
12   Management is suing to collect on.  Right?
13   A.   Yes.
14   Q.   Okay.  According to your
15   declaration, if we can go to Paragraph 13, if
16   we can put that back up on the screen, as part
17   of the initial investigation -- withdrawn.
18        I'm going to use the phrase "initial
19   investigation" to mean the investigation that
20   you conducted between the time the complaint
21   was filed and the time that HCMFA filed its
22   original answer on March 1st.
23        Is that okay?
24   A.   Sure.
25   Q.   And during that initial

Page 32

D. Sauter

1
2    investigation, you spoke with Jim Dondero.
3    Correct?
4    A.   I did.
5    Q.   Okay.  And according to
6    Paragraph 13, he couldn't recall the genesis of
7    the notes.  Is that right?
8    A.   That's correct.
9    Q.   Did you show him the notes?
10   A.   I don't recall.
11   Q.   Did you tell him that the notes were
12   dated May 2nd and May 3rd, 2019?
13   A.   I don't recall that either.
14   Q.   Did you do anything to try to
15   refresh his recollection about the timing of
16   the notes?
17   A.   I'm sure I did.
18        But I don't recall that conversation
19   in any detail as I'm sitting here today.
20   Q.   Did you tell him the principal
21   amount of the notes?
22   A.   Yes.
23   Q.   And even though you told him the
24   principal amount of the notes, he still had no
25   recollection as to what they related to.  Is

Page 33

D. Sauter

1
2    that right?
3    A.   He couldn't recall the genesis,
4    correct.
5    Q.   Did he have any recollection at all
6    as to what the notes related to?
7    A.   I don't -- I don't believe so,
8    because if he had, then I would have been able
9    to pin it down further.
10   Q.   How many conversations did you have
11   with Mr. Dondero as part of your initial
12   investigation?
13   A.   I don't recall.
14        Two, three.
15   Q.   Was there anybody present other than
16   the two of you?
17   A.   Again, I don't recall.
18   Q.   Do you recall if they took place on
19   the phone or were they in person?
20   A.   It would have been in person.
21   Q.   And why do you say it would have
22   been in person?
23   A.   Well, now that you say that, no, it
24   probably wasn't in person because he would not
25   have been in the office at that time.

Page 34

D. Sauter

1          D. Sauter
2          There was obviously a lot of things
3   going on at this point.  Mr. Dondero had been
4   evicted from the building, and so that made --
5   I shouldn't say evicted.  He'd been kicked out
6   by the debtor, and so that made our
7   communications a little more difficult.
8          So I would have spoken with him on
9   the phone because I did not go over to the
10  NexBank office very often.
11     Q.   Paragraph 13 says that you also
12  spoke with "the few employees of HCMFA."
13         Do you see that in the middle of the
14  paragraph?
15     A.   Yes.
16     Q.   Can you identify the other CMFA
17  employees that you spoke with as part of your
18  initial investigation?
19     A.   I would have spoken with Dustin
20  Norris and --
21     Q.   Do you recall speaking -- I
22  apologize for interrupting.
23         Go ahead.
24     A.   And so he wasn't an HCMFA employee,
25  but Jason Post.

Page 35

D. Sauter

1     Q.   Do you have a recollection of
2  speaking to Mr. Norris, or are you just
3  surmising that you probably did?
4     A.   I'm surmising that I probably would
5  have.
6          There was a lot, again, that was
7  happening.  I didn't have the historical
8  knowledge of these things, and so I talked with
9  Mr. Post and Mr. Norris daily about everything
10 that was going on just to get some background
11 on all of the moving parts.
12     Q.   Okay.  Do you know if Mr. Norris
13 held any position with HCMFA in 2019?
14     A.   I don't -- I don't know for certain.
15 I believe he did.
16         I can't recall what his position
17 would have been.
18     Q.   Does he have a position with HCMFA
19 today, to the best of your knowledge?
20     A.   I believe he does.
21     Q.   And what do you understand his
22 position to be?
23     A.   I would say vice president.
24     Q.   Do you know when he became vice
25

Page 36

D. Sauter

1   president of HCMFA?
2      A.   I do not.
3      Q.   Do you know if he was vice president
4   of HCMFA in October 2020?
5      A.   I do not.
6      Q.   Do you know if Mr. Norris holds any
7   positions with DAF -- I'm sorry.
8          Do you know if Mr. Norris holds any
9   positions with GAF?
10     A.   I don't know.
11     Q.   How about Mr. Post?  Do you know if
12  Mr. Post held any positions with HCMFA in 2019?
13     A.   I don't.
14     Q.   Do you know if he holds any
15  positions with HCMFA today?
16     A.   He does not.
17     Q.   Is Mr. Post a compliance officer, to
18  the best of your knowledge?
19     A.   He was.
20         He left a week ago to take another
21  job.
22     Q.   So he was -- and who did he -- for
23  whom did he serve as the chief compliance
24  officer until a week ago?

Page 37

D. Sauter

1      A.   He was chief compliance officer for
2   Nexpoint Advisors.
3          He may have been the chief
4   compliance officer for HCMFA as well.
5      Q.   Okay.
6      A.   And if I had to guess, he would have
7   had those same positions back in 2019 --
8      Q.   Okay.
9      A.   -- because Thomas Surgent was the
10  chief compliance officer for HCMLP and Jason
11  worked under him.
12          And I think that started sometime in
13  2014, maybe earlier.
14     Q.   And did Mr. Norris and Mr. Post tell
15  you during your initial investigation that they
16  had no knowledge of the notes?
17     A.   Yeah, generally I don't think that
18  they were aware of the notes, or I should say
19  they weren't aware of the genesis of the notes.
20     Q.   Were they aware of the existence of
21  the notes?
22     A.   They were.
23     Q.   Did they tell you when they had
24  learned of the existence of the notes?
25

Page 38

D. Sauter

1
2    A.    I think it's something that I raised
3  to them because I didn't know where the notes
4  had come from.
5    Q.    Right.
6          And they told you that they were
7  aware of the notes but they didn't know the
8  genesis of them?
9    A.    I don't recall whether they were
10  aware of the notes before I asked about them.
11    Q.    Did you ask them if they were aware
12  of the notes prior to the time you showed it to
13  them?
14    A.    I would have asked them what the
15  notes were about.
16    Q.    I don't want to know what you would
17  have done.
18          I know this is hard, Mr. Sauter.
19  I'm really just asking you to search your
20  memory.
21          Do you recall asking them whether
22  they were aware of the existence of the notes
23  prior to your conversation with them?
24    A.    I don't recall if I asked whether
25  they were aware of the existence of the notes

Page 39

D. Sauter

1
2  prior to my conversation with them.
3    Q.    Now, Paragraph 13 says that
4  Mr. Dondero could not recall the genesis of the
5  notes.
6          Do you see that?
7    A.    Yes.
8    Q.    Did Mr. Dondero indicate to you that
9  he was aware of the existence of the notes even
10  though he couldn't recall the genesis of the
11  notes?
12    A.    That's not how I would characterize
13  it, but...
14    Q.    How would you characterize it?
15    A.    He suggested that I talk to
16  Mr. Waterhouse.
17    Q.    Did you ask Mr. Dondero when he
18  first learned of the existence of the notes?
19    A.    No.
20    Q.    Did he say to you anything that
21  caused you to believe that he was unaware of
22  the existence of the notes prior to the
23  commencement of the lawsuit?
24    A.    No.
25          I guess let me clarify.

Page 40

D. Sauter

1
2          He didn't make any comments that
3  made me think one way or the other.
4    Q.    And you didn't ask.
5          Is that fair?
6    A.    Correct, I did not ask.
7    Q.    So you had no information as to
8  whether or not Mr. Dondero actually knew of the
9  existence of the notes prior to the
10  commencement of the lawsuit.
11          Is that fair?
12    A.    Correct.
13    Q.    Okay.  Paragraph 13 also states that
14  you reviewed limited books and records of
15  HCMFA.
16          Do you see that?
17    A.    Yes.
18    Q.    Okay.  What books and records did
19  you review as part of your initial
20  investigation?
21    A.    I don't recall exactly what I looked
22  at or for.
23          I literally had to just go onto the
24  system and try to find anything that related to
25  the notes so I could try to find out what they

Page 41

D. Sauter

1
2  were.
3    Q.    Did you make any effort to try to
4  determine whether HCMFA had accounted for the
5  notes in its books and records?
6    A.    I did not.
7    Q.    Do you know today whether HCMFA ever
8  accounted for the notes in its books and
9  records?
10    A.    I don't know.
11    Q.    Have you ever reviewed HCMFA's
12  balance sheets?
13    A.    I think I have, but I don't -- I
14  can't recall exactly when.
15    Q.    Did you ever make any effort to
16  determine whether HCMFA carried these notes on
17  its balance sheet as liabilities?
18    A.    I did not.
19    Q.    Do you know if HCMFA ever requested
20  an extension of time to respond to the
21  complaint?
22    A.    I don't know, but I would assume so.
23    Q.    Okay.  Do you have any knowledge of
24  HCMFA having done so?
25    A.    No.

Page 42

D. Sauter

1
2    Q.   Okay.  Do you know if -- prior to
3    the time it filed its original answer, whether
4    HCMFA ever asked HCMLP to provide any documents
5    in connection with the adversary proceeding?
6        A.   Say that again.
7        Q.   Sure.
8            So HCMFA filed its answer on
9    March 1st, according to Paragraph 12.
10           Do I have that right?
11       A.   I believe that's right.
12       Q.   Okay.  Do you know if HCMFA ever
13   asked Highland for any documents before it
14   filed its answer?
15       A.   I don't recall.
16       Q.   So at the time HCMFA filed its
17   answer, Mr. Dondero couldn't recall the genesis
18   of the notes.  Correct?
19       A.   That's right.
20       Q.   And neither Mr. Post nor Mr. Norris
21   could recall the genesis of the notes.
22   Correct?
23       A.   Correct.
24       Q.   And HCMFA had limited access to
25   books and records.  Correct?

Page 43

D. Sauter

1
2        A.   Correct.
3        Q.   And HCMFA had no access to the
4    debtor's employees who had provided services to
5    HCMFA under shared services agreements.
6    Correct?
7        A.   I think our view was it was
8    potentially improper to reach out to those
9    employees on a matter that was adverse to
10   HCMLP, and so we refrained from doing so.
11       Q.   Okay.  And so under those
12   circumstances, HCMFA nevertheless filed an
13   answer that asserted no affirmative defenses.
14   Correct?
15       A.   Yes.
16       Q.   But this situation changed in
17   mid-April 2001.  Correct?
18       A.   Yes.
19       Q.   If we can scroll down to
20   Paragraph 19.
21           (Discussion was held off the
22   record.)
23       Q.   So in April 2001, the situation
24   changed because Mr. Waterhouse and other former
25   employees of Highland had migrated over to

Page 44

D. Sauter

1
2    Skyview so that you had access to them.  Is
3    that right?
4        A.   Correct.
5        Q.   And that's when you conducted the
6    second phase of your investigation.  Correct?
7        A.   Yes.
8        Q.   And you'll see at the end of Page 4
9    you reference that the debtor had provided
10   access to HCMFA of much of its books and
11   records.
12           Do I have that right?
13       A.   Yes.
14       Q.   Okay.  And what books and records
15   did Highland provide between March 1st and
16   mid-April when you conducted the second phase
17   of your investigation?
18           Are there any particular books and
19   records that you're referring to in that
20   sentence?
21       A.   I can't recall exactly what it was.
22           There was a process that we were
23   going through that I think -- if you'll recall,
24   that we went back and forth on obtaining access
25   to books and records, submitting written

Page 45

D. Sauter

1
2    requests, and those were either granted or
3    denied.  And so there were a litany of
4    documents that were sent over.
5        Q.   Can you identify any documents that
6    you reviewed as part of either the initial
7    investigation or the follow-up investigation in
8    April 2021?
9        A.   Yes.
10           I would have reviewed documents
11   related to the TerreStar NAV error.
12       Q.   And can you describe what those
13   documents are.
14       A.   Memos.
15       Q.   Okay.  Do you recall how many memos
16   you reviewed that concerned the TerreStar NAV
17   issue?
18       A.   I want to say that there were three,
19   four or five, something along those lines.
20           I think there was a memo that was
21   submitted to the board and then maybe some
22   communications with the SEC.
23       Q.   And is it your testimony that HCMFA
24   did not have those memos until after March 1st,
25   2021?

Page 46

D. Sauter

1          D. Sauter
2       A.   I don't know whether we had access
3    to those memos, but I didn't -- I wasn't able
4    to speak to Frank Waterhouse, and so I didn't
5    know to look for them.
6       Q.   And neither Mr. Dondero nor
7    Mr. Norris nor Mr. Post thought to inform you
8    about the NAV star error [sic] because they had
9    no idea what the notes related to.  Correct?
10      A.   That's my recollection.  That's
11   correct.
12      Q.   Okay.  Other than the three to five
13   memos that you've just described, are there any
14   other documents that you recall reviewing as
15   part of your investigation?
16      A.   No.
17      Q.   Do you know to whom the memos that
18   you've just described were addressed?
19           Who were they sent to?
20      A.   I believe there was one that was
21   sent to the board.
22           And then the others, I think, were
23   just either internal communications or
24   communications with the SEC.
25      Q.   Can we scroll down to Paragraph 22,

Page 47

D. Sauter

1    please.
2       A.   Actually, look at Paragraph 21
3    first.
4            According to Paragraph 21, as part
5    of the second phase of your investigation, you
6    spoke with Mr. Waterhouse and Mr. Mabry.
7    Correct?
8       A.   Yes.
9       Q.   Did you speak with anybody else as
10   part of the second phase of your investigation?
11      A.   Yes, I would have spoken with Jason
12   Post and Dustin Norris.
13      Q.   And is it fair to say based on the
14   second phase of your -- withdrawn.
15           Is it fair to say that your
16   conclusions that resulted from the second phase
17   of your investigation are set forth in
18   Paragraph 22?
19      A.   (Reviewing document.)
20           I wouldn't say all of my
21   conclusions.  But yes, that's some of them.
22      Q.   Okay.  Is it fair to say that, based
23   on the second phase of your investigation, you
24   concluded, among other things, "that the notes

Page 48

D. Sauter

1    were signed by mistake by Waterhouse without
2    authority from HCMFA"?
3       A.   Yes.
4       Q.   Okay.  Let's talk about your
5    discussions with Mr. Waterhouse as part of your
6    investigation.
7            How many times did you speak with
8    him?
9       A.   Probably three.
10      Q.   And was anybody else present for any
11   of the three conversations?
12      A.   I don't recall.  I don't think so.
13      Q.   Did you take any notes of your
14   conversations with Mr. Waterhouse?
15      A.   I don't recall.
16      Q.   Do you recall whether you sent
17   anybody any e-mails summarizing your
18   conversations with Mr. Waterhouse?
19      A.   I don't recall.
20      Q.   Did the three conversations take
21   place in person, on the phone or some mix
22   thereof?
23      A.   I think it would have been a mix
24   thereof.

Page 49

D. Sauter

1       Q.   Do you recall which of the three
2    conversations was the longest, which was the
3    shortest?
4            I just want to get a sense of how
5    much time you spent with Mr. Waterhouse.
6       A.   I don't, because again, there was
7    lots going on.
8            The first one was in the conference
9    room on the 11th floor at NexBank.  The second
10   one was in his office.  And I think the third
11   was on a phone call.
12      Q.   Did any of them last more than ten
13   minutes?
14      A.   I can't say for certain.
15           I would think so, but...
16      Q.   Okay.  Did you show Mr. Waterhouse
17   either of the notes as part of either of these
18   three interviews?
19      A.   I don't recall if I did.
20           But he knew -- he knew the notes.
21      Q.   And what did he say to you that led
22   you to believe that he knew the notes?
23      A.   Because he was aware of the notes.
24           I...

Page 50

D. Sauter

2 Q. Did he tell the circumstances
3 surrounding the execution of the notes?
4 A. Yes.
5 Q. What did he tell you?
6 A. He said those notes were executed in
7 connection with the TerreStar NAV error.
8 Q. During your discussions with
9 Mr. Waterhouse, did he ever deny signing the
10 notes?
11 A. No.
12 Q. He never told you that he was
13 unaware of the existence of the notes, did he?
14 A. No.
15 Q. In fact, before signing your
16 declaration, you believed Mr. Waterhouse in
17 fact had signed the notes. Correct?
18 A. Yes.
19 Q. And that's why in Paragraph 22 you
20 specifically wrote that the notes were signed
21 by mistake by Waterhouse. Right?
22 A. Yes.
23 Q. And you understood at the time you
24 signed your declaration that Mr. Waterhouse had
25 signed the notes at a time when he was HCMFA's

Page 51

D. Sauter

2 chief financial officer. Correct?
3 A. I don't think I said that, but that
4 would have been my assumption.
5 Q. Okay. I think if we can -- give me
6 just one moment. I think I...
7 Can we go to Paragraph 29, please.
8 You'll see, according to your
9 declaration, it says: "Returning to the notes,
10 Waterhouse was the chief financial officer of
11 both the debtor and the HCMFA during the above
12 events and at the time he signed the notes."
13 Have I read that correctly?
14 A. You did.
15 Q. Does that refresh your recollection
16 that at the time you signed this declaration
17 you believed that Mr. Waterhouse was HCMFA's
18 CFO at the time he signed the notes?
19 A. It does.
20 Q. Okay. During your investigation did
21 Mr. Waterhouse ever tell you that he signed the
22 notes by mistake?
23 A. No.
24 Q. Did you ever ask Mr. Waterhouse
25 during your investigation whether he signed the

Page 52

D. Sauter

2 notes by mistake?
3 A. I guess I'd like to clarify that
4 response, if I may.
5 Q. Go right ahead.
6 A. I asked Mr. Waterhouse why he would
7 have signed it -- the notes in his personal
8 capacity.
9 And his response was, I don't know,
10 I didn't prepare them.
11 So I don't know if that gives you
12 the answer you're looking for, but there was
13 some confusion about the execution of those
14 notes.
15 Q. Okay. Did he say anything else
16 that -- on the topic of whether signing the
17 notes was a mistake?
18 A. No.
19 Q. Okay. Your declaration doesn't
20 disclose what you just described for me.
21 Correct?
22 A. Not in those exact words, no.
23 Q. Is there anything in your
24 declaration that suggests that Mr. Waterhouse
25 hadn't signed the notes?

Page 53

D. Sauter

2 A. I don't think there's anything else
3 in my declaration from --
4 Q. Okay. There's nothing --
5 (Simultaneous crosstalk.)
6 Q. I apologize.
7 A. -- from May that would suggest that
8 Mr. Waterhouse didn't sign the notes.
9 Q. There's nothing in here, in your
10 declaration, that states that Mr. Waterhouse
11 admitted that he made a mistake in signing the
12 notes. Correct?
13 A. Correct.
14 Q. There's nothing in your declaration
15 that suggests that Mr. Waterhouse in fact did
16 not sign or did not authorize the signing of
17 his signature to these notes. Correct?
18 A. Correct, because he told me he did.
19 Q. Okay. And Mr. -- he told you that
20 he had signed the notes. Correct?
21 A. Yes.
22 He said that he didn't use his
23 electronic signature then, and if his signature
24 was on them, it would have been his.
25 Q. Okay. Mr. Waterhouse never filed

Page 54

D. Sauter

1        his own declaration in support of HCMFA's
2        motion for leave to amend their answer.
3        Correct?
4
5        A.   Correct.
6        Q.   During your investigation did you
7    ask Mr. Waterhouse if he had authority to sign
8    the notes?
9        A.   Probably not in those exact words.
10       Q.   Okay.  Did you ask him in form or
11   substance whether he was authorized to sign the
12   notes?
13       A.   Yes.
14       Q.   And what did he say?
15       A.   I think he -- well, his response was
16   if he signed them, he was authorized to sign
17   them.
18       Q.   Okay.  And Mr. Waterhouse never told
19   you that he signed the notes without authority.
20   Correct?
21       A.   He told me that -- I asked him if
22   Mr. Dondero had approved the notes.
23            And I don't think he could recall.
24       Q.   Okay.  Did Mr. Waterhouse ever tell
25   you that he signed the notes without authority?

Page 55

D. Sauter

1
2        A.   No.
3        Q.   Okay.  Your declaration certainly
4    doesn't say that Mr. Waterhouse admitted
5    signing the notes without authority.  Correct?
6        A.   Correct.
7        Q.   Mr. Waterhouse never filed a
8    declaration in this case stating that he had
9    filed the notes without authority.  Correct?
10       A.   Correct.
11       Q.   Are you aware that Mr. Waterhouse
12   was deposed in this case?
13       A.   I'm -- yes, I'm aware.
14       Q.   Have you reviewed his deposition
15   transcript?
16       A.   I have not.
17       Q.   Has his testimony been described for
18   you by anybody?
19            MR. RUKAVINA:  And I'll just caution
20   you, Mr. Sauter.  You know, I think that's a
21   yes or no answer, but don't go into the
22   substance of any discussions with me.
23            THE WITNESS:  Yes.  Okay.
24            Yes.
25

Page 56

D. Sauter

1
2    BY MR. MORRIS:
3        Q.   All right.  Are you aware that he
4    testified that nobody has ever told him that he
5    made a mistake in signing the notes?
6            MR. RUKAVINA:  Objection, form.
7            THE WITNESS:  I'm not.
8        Q.   Are you aware of anybody in the
9    world ever telling Mr. Waterhouse that he made
10   a mistake in signing the notes?
11       A.   Yes.
12       Q.   And who told him that?
13       A.   Me.
14       Q.   And when did you tell him that?
15       A.   When we had this discussion.
16       Q.   Okay.  So it's your testimony that
17   you actually told Mr. Waterhouse that he made a
18   mistake in signing the notes.  Right?
19       A.   I asked him who had approved these
20   notes and what was the process.
21            And he said he couldn't give me any
22   process.  He said the money was transferred,
23   and so we signed the notes.
24       Q.   Okay.  But did you tell him that he
25   made a mistake?

Page 57

D. Sauter

1
2        A.   I think I implied it.
3        Q.   Do you have a recollection of
4    actually telling him that he made a mistake?
5        A.   That would be my recollection.
6            Obviously he disagrees with it.
7        Q.   Do you know if any -- and on what
8    basis did you conclude that he made a mistake?
9            Withdrawn.
10            You have no personal knowledge of
11   anything that happened in connection with the
12   TerreStar valuation issue.  Correct?
13       A.   I was not personally involved in the
14   TerreStar valuation issue, correct.
15       Q.   You weren't involved in any of the
16   decisions that were made in connection with the
17   TerreStar valuation.  Correct?
18       A.   Correct.
19       Q.   You weren't made -- you weren't
20   involved and had no responsibility for HCMFA's
21   response to the SEC.  Correct?
22       A.   Correct.
23       Q.   You had no responsibility or
24   involvement in the decision as to how HCMFA was
25   going to fund the losses to the GAF.  Correct?

Page 58

D. Sauter

1
2    A.    Correct.
3    Q.    You had no responsibility or
4 involvement in how HCMFA reported to GAF.
5 Correct?
6    A.    Correct.
7    Q.    But nevertheless, despite having no
8 personal knowledge of those issues, you told
9 Mr. Waterhouse or implied to Mr. Waterhouse
10 that he made a mistake in executing the notes.
11 Correct?
12    A.    Correct.
13    Q.    What did Mr. Waterhouse say in
14 response?
15    A.    Not much. He just disagreed.
16    Q.    Did he just say, I disagree, and
17 that's it or did he actually -- do you recall
18 anything specific that he said?
19    A.    I think I've already testified he
20 said, we transferred the money, so I executed
21 the notes. HCMFA didn't have the money to pay
22 GAF, and so we transferred it from HCMLP and I
23 executed the notes.
24    Q.    Okay. Your declaration doesn't
25 attribute any specific statements to

Page 59

D. Sauter

1 Mr. Waterhouse, does it?
2    A.    It does not.
3    Q.    In fact, your declaration is just --
4 withdrawn.
5        If we can go to Paragraph 30.
6        Take a look at Paragraph 30. We'll
7 kind of parse it through.
8        The first sentence says: "It
9 appears clear that Mr. Waterhouse made a
10 mistake."
11        Do you see that?
12    A.    Yes.
13    Q.    But again, Mr. Waterhouse never
14 admitted to making a mistake. Correct?
15    A.    Correct.
16    Q.    And this is your -- this is a
17 conclusion that you're reaching in May of 2021,
18 more than two years after the fact. Correct?
19    A.    Based upon my review of the
20 documents and my discussions with Mr. Post and
21 Mr. Norris.
22    Q.    Did you ever have any discussions
23 with Mr. Dondero in May of 2021 as you were
24 preparing this document?

Page 60

D. Sauter

1
2    A.    Did I have any discussions with him
3 about this?
4    Q.    I apologize. That was a bad
5 question.
6        Did you discuss in May of 2021 the
7 issues concerning the notes with Mr. Dondero,
8 or was that just part of the initial
9 investigation?
10    A.    I don't recall.
11    Q.    And then a couple of lines down, you
12 say -- you wrote: "It appears that
13 Mr. Waterhouse assumed incorrectly that the
14 funds being paid by the debtor were a loan to
15 HCMFA."
16        Do you see that?
17    A.    Yes.
18    Q.    Did you ask Mr. Waterhouse if he
19 actually made the assumption that you're
20 attributing to him?
21    A.    Yes.
22    Q.    And did he ever admit that the
23 assumption was incorrect?
24    A.    He did not admit that the assumption
25 was incorrect.

Page 61

D. Sauter

1
2    Q.    Okay. Again, that's your own
3 conclusion. Is that fair?
4    A.    That's correct.
5    Q.    And then you continue on and you
6 write: "Third -- withdrawn.
7        You write: "Third, it therefore
8 appears that Mr. Waterhouse prepared the notes
9 for some internal accounting or other purpose
10 but without there being actual consideration
11 for the notes and without any intention on the
12 part of the debtor and HCMFA that there be
13 notes or that there be a loan transaction."
14        Have I read that correctly?
15    A.    Yes.
16    Q.    So did Mr. Waterhouse tell you that
17 he prepared the notes for some internal
18 accounting or other purpose?
19    A.    Yes.
20    Q.    And did he tell you what the purpose
21 of the notes was?
22    A.    Yes.
23        He said if he transferred money he
24 had to have a note to go with it.
25    Q.    You state in your declaration:

Page 62

D. Sauter

1  "There was no" -- withdrawn.
2  You state in your declaration that
3  there was no "intention on the part of the
4  debtor and HCMFA that there be notes or that
5  there be a loan transaction."
6  Do you see that?
7  A. Yes.
8  Q. What's the basis for --
9  MR. RUKAVINA: Object to the form.
10  I apologize. I apologize, John.
11  I apologize, DC.
12  I'll just object to the form.
13  That's not what this says.
14  Go ahead.
15  MR. MORRIS: Well, then let me
16  restate it if I read it incorrectly.
17  BY MR. MORRIS:
18  Q. Mr. Sauter, does the last sentence
19  of your Paragraph 30 state, among other things,
20  that the notes were prepared "without any
21  intention on the part of the debtor and HCMFA
22  that there be notes or that there be a loan
23  transaction"?
24  A. Yes.

Page 63

D. Sauter

1  Q. What's the basis for your sworn
2  statement concerning the debtor's intentions?
3  MR. RUKAVINA: Again, I'll object.
4  Just so that we're clear, Mr. Sauter
5  says "it appears that." He does not say it is
6  a fact. He says "it appears that." There is a
7  distinction there.
8  MR. MORRIS: Okay. You've got your
9  objection.
10  BY MR. MORRIS:
11  Q. What's the basis for your statement
12  that it appeared the debtor had no intention
13  that there would be notes or that there would
14  be a loan transaction?
15  A. If you're talking about a
16  $7.4 million obligation, I would assume that
17  there would be a process internally on who was
18  responsible for the payment of the fees for
19  the -- or the expenses for the NAV error.
20  Based upon my discussions with Frank
21  Waterhouse, there was no process or the legal
22  department was not involved in making a
23  determination as to whether there should be
24  notes. It was merely a ministerial act that

Page 64

D. Sauter

1  accounting performed when they transferred the
2  funds to pay GAF.
3  Q. Is it your testimony as the general
4  counsel of Nexpoint that the law department or
5  the legal department is involved in every note
6  that's executed by one of the Highland
7  affiliates?
8  MR. RUKAVINA: Object to the form.
9  THE WITNESS: I can't answer that.
10  Q. Okay. So other than the fact that
11  it didn't go past the legal department, do you
12  have any other basis for your statement that it
13  appears that the debtor had no intention that
14  there would be notes?
15  A. Yes, there's an internal NAV error
16  correction policy that obligates the
17  responsible party to pay for it.
18  In this case it was HCMLP that made
19  the NAV error.
20  Q. There's a policy that you're
21  referring to?
22  A. Yes.
23  Q. And do you know when that policy was
24  adopted?

Page 65

D. Sauter

1  A. I don't know for certain.
2  But I know there was a policy in
3  place as of 2018.
4  Q. Okay. Other than the policy, have
5  you ever seen any memo written -- withdrawn.
6  Have you ever seen any document in
7  the world that states that HCMLP is responsible
8  for the TerreStar NAV error?
9  A. I would say the memos that
10  acknowledged that there was a mistake.
11  Q. And is it your recollection that the
12  memos specifically say that HCMLP was
13  responsible for the mistake?
14  A. No, because the memos were vis-à-vis
15  HCMFA and GAF.
16  Q. Okay. So let me ask you the
17  question again.
18  During the course of your two
19  investigations, did you ever see a document
20  that stated that HCMLP was responsible for the
21  TerreStar NAV error?
22  A. I don't recall.
23  Q. You don't recall seeing one. Is
24  that correct?

Page 66

D. Sauter

1
2    A.   That's correct.
3    Q.   Okay.
4    A.   Can we take a quick break?
5    Q.   Yeah, now would be perfectly fine.
6         Give me just one second before we go
7    off the record.
8         So it's 2:15 local time.  Can we
9    limit it to ten minutes, Mr. Sauter?
10   A.   Yeah, that would be fine.
11   Q.   Okay.  And I would ask that you're
12   still under oath, and I would ask that you not
13   speak with counsel or communicate with anybody
14   about the substance of your deposition.
15        Is that fair?
16        MR. RUKAVINA:  Don't answer that
17   question, Mr. Sauter.
18        The law is what it is, and we're not
19   going to agree to something (audio issue) than
20   the law requires.
21        MR. MORRIS:  Well, then I'm not
22   going to take a break.  How about that?
23        Let's keep going.
24        MR. RUKAVINA:  No, we're taking a
25   break and I'm going to the restroom.

Page 67

D. Sauter

1
2         MR. MORRIS:  We're not taking a
3    break, bud.  I'm not --
4         (Simultaneous crosstalk.)
5         MR. RUKAVINA:  We'll be back in ten
6    minutes.
7         MR. MORRIS:  Hey, Davor, I'm going
8    to ask your client a question.  Okay?
9         (Simultaneous crosstalk.)
10        MR. RUKAVINA:  -- but we're not --
11   I'm sorry.
12        You can ask him afterwards who he's
13   talked to and about what, but you don't get to
14   tell him that he can't talk to anyone.
15        So let's go take a piss break and be
16   back in nine minutes.
17        MR. MORRIS:  Put that on the record.
18        (Recess was taken from 2:17 p.m. to
19   2:28 p.m.)
20   BY MR. MORRIS:
21   Q.   Are you ready to proceed, Mr.
22   Sauter?
23   A.   I am.
24   Q.   During the break did you speak to
25   anybody about the substance of your testimony?

Page 68

D. Sauter

1
2    A.   I did not.
3    Q.   Okay.  Did you communicate with
4    anybody about the substance of your testimony?
5    A.   I did not.
6    Q.   I want to stick with the focus on
7    the debtor's intent as stated in Paragraph 30.
8         Before you prepared your
9    declaration, did you spend any time reviewing
10   any of the debtor's bankruptcy filings?
11   A.   Yes.
12   Q.   And are you aware that throughout
13   the bankruptcy the debtor disclosed these notes
14   as assets of the estate?
15   A.   Yes.
16   Q.   And what documents did you review
17   that led you to conclude that the debtor was
18   disclosing the notes as assets of the estate?
19   Do you recall?
20   A.   I mean, I would have known it from
21   the schedules.  I would have known it from your
22   complaint.
23   Q.   Okay.  So you reviewed the debtor's
24   schedules of assets and liabilities prior to
25   the time you signed your declaration.  Is that

Page 69

D. Sauter

1
2    right?
3    A.   Well, I didn't review them in
4    connection with my preparation of the
5    declaration, but yes, I had reviewed them.
6    Q.   And in reviewing them, did you learn
7    that the debtor had in fact carried the notes
8    as assets on its balance sheet or on its
9    schedules of assets and liabilities?
10        MR. RUKAVINA:  I'm going to object
11   to the form.
12        THE WITNESS:  I was aware that the
13   debtor sought to collect on the note from
14   HCMFA, the notes.
15   BY MR. MORRIS:
16   Q.   Are you aware that Mr. Dondero was
17   in control of Highland Capital Management, LP
18   from at least the date of the bankruptcy filing
19   in October 2019 through around January 9th,
20   2020?
21   A.   Yes.
22   Q.   Okay.  Are you aware that, while
23   Mr. Dondero was in control of the debtor during
24   that period, that Highland filed statements of
25   financial affairs and schedules of assets?

Page 70

D. Sauter

1
2    A.   Generally, I guess, yes.
3         But I'm not aware of a particular
4    document called statement of financial affairs.
5    Q.   Are you aware that while Mr. Dondero
6    was in control of Highland during the
7    bankruptcy, the debtor filed documents stating
8    that the notes were assets of the estate?
9    A.   I was not.
10   Q.   Okay.  Did you ever, as part of your
11   investigation, try to see how the debtor
12   treated the notes in its court filings?
13   A.   I did not, beyond the filing of the
14   complaint.
15   Q.   So you never had a conversation with
16   anybody -- withdrawn.
17        Did you ever ask Mr. Waterhouse how
18   the debtor treated the notes in its books and
19   records?
20   A.   No.
21   Q.   Did you ever ask Mr. Waterhouse how
22   HCMFA treated the notes in its books and
23   records?
24   A.   No.
25   Q.   Have you been following developments

Page 71

D. Sauter

1
2    in this particular adversary proceeding?
3    A.   Yes.
4    Q.   Are you aware that both HCMFA and
5    Highland disclosed the existence of the notes
6    to their outside auditors within 30 days of
7    their execution?
8        MR. RUKAVINA:  Objection, form.
9        THE WITNESS:  Yes.
10       And it's my understanding that's why
11   the notes were prepared.
12   Q.   And what's that understanding based
13   on?
14       MR. RUKAVINA:  And now, Mr. Sauter,
15   let's be very careful here.
16       Please answer only if it's based on
17   factual information that a nonlawyer told you.
18       THE WITNESS:  Yeah.  I believe
19   Mr. Waterhouse told me that he needed a note to
20   document the transfer of funds.
21   BY MR. MORRIS:
22   Q.   Okay.  But I asked you a different
23   question, and that's simply whether or not
24   you're aware as you sit here today whether
25   HCMFA and Highland disclosed the existence of

Page 72

D. Sauter

1
2    the notes to the outside auditors.
3        MR. RUKAVINA:  I'll object again.
4        THE WITNESS:  Yes, I am aware.
5    Q.   Have you ever seen HCMFA's audited
6    financial statements?
7    A.   I don't recall.
8        I think you asked me that earlier.
9    And I may have seen them, but I don't recall
10   specifically.
11   Q.   Do you recall looking at the audited
12   financial statements as part of your
13   investigation?
14   A.   No.
15   Q.   Let's put up HCMFA's audited
16   financial statements for the period ending
17   December 31st, 2018.  And it's previously been
18   marked as Deposition Exhibit 45.
19       (Exhibit 45, Consolidated Financial
20   Statements and Supplemental Information
21   December 31, 2018, D-CNL002273-296, previously
22   marked for identification.)
23   Q.   Do you see the first page there?
24       This is the HCMFA consolidated
25   financial statements for the period ending

Page 73

D. Sauter

1
2    December 31st, 2018.
3        Do you see that?
4    A.   I do.
5    Q.   And I think you said you may have
6    seen it before.
7        Did I get that wrong?
8    A.   I said I may have.
9        In looking at this, I don't think
10   I've ever seen this document.
11   Q.   Okay.  Can we just go to the third
12   page and see the date.
13       Do you see that this is the report
14   of the independent auditors
15   PricewaterhouseCoopers?
16   A.   Yes.
17   Q.   And you do see it's dated June 3rd,
18   2019?
19   A.   Yes.
20   Q.   And do you understand that this
21   document was prepared by HCMFA's outside
22   auditors prior to Highland's bankruptcy filing?
23   A.   That's what it purports to be.
24   Q.   Okay.  And it also purports to have
25   been prepared prior to the commencement of the

Page 74

1                    D. Sauter
2   adversary proceeding as you understand the
3   timing. Correct?
4       A.   Yep.
5       Q.   Let's go to Page 17, please.
6          Do you see there's a section in the
7   audited financial statements called Subsequent
8   Events?
9       A.   Yep.
10      Q.   Do you have any understanding as to
11  what a Subsequent Events section is in audited
12  financial statements?
13      A.   Yes.
14      Q.   What's your understanding of what
15  that section is supposed to include?
16      A.   It's intended to pick up events that
17  occurred after the date of the financials but
18  prior to the date the financials are
19  executed -- or issued.
20      Q.   And do you see in the second
21  paragraph there's a description of the two
22  notes?
23      A.   Yes.
24      Q.   Okay. You were not aware that the
25  two notes were included in HCMFA's audited

Page 75

1                    D. Sauter
2   financial statements for -- as subsequent
3   events at the time you executed your
4   declaration. Correct?
5       A.   Correct.
6       Q.   Now that you know that, do you think
7   HCMFA made a mistake in including these notes
8   in the audited financial statements, or does it
9   cause you to reconsider your conclusion that
10  the issuance of the notes was a mistake?
11         MR. RUKAVINA: I'll object to that
12  question based on form.
13         THE WITNESS: You're asking me for
14  my legal conclusion?
15      Q.   No, I'm not actually, but it
16  probably wasn't a great question.
17         So your conclusion was that the
18  execution of the notes was a mistake. Correct?
19      A.   Yes.
20      Q.   But HCMFA is reporting the notes as
21  part of its audited financial statements.
22  Correct?
23      A.   Yes.
24      Q.   And do you understand that these
25  financial statements have been audited by

Page 76

1                    D. Sauter
2   independent -- an independent outside firm
3   called PricewaterhouseCoopers?
4       A.   I assume they're audited financials.
5          And yes, what you've shown me, it
6   appears as though they were prepared by
7   PricewaterhouseCoopers.
8       Q.   Okay. Would you agree with me that
9   it's inconsistent that the notes can't be both
10  a mistake and be reported as valid obligations
11  in the audited financial statements?
12         MR. RUKAVINA: I'll object.
13         This witness is not an expert. He
14  has no personal knowledge. This is well
15  outside the scope of his factual investigation
16  in May of 2021.
17  BY MR. MORRIS:
18      Q.   You can answer, sir.
19      A.   I would agree that the two
20  statements are at odds with one another.
21      Q.   Okay. So I'm just asking you
22  whether -- now that you know that HCMFA
23  included these in the audited financial
24  statements, does that cause you to question at
25  all your conclusion that the execution of the

Page 77

1                    D. Sauter
2   notes was a mistake?
3          MR. RUKAVINA: I'll again object.
4          This witness is not an expert. He's
5   not going to be a trial expert. And a motion
6   to amend has already been agreed upon and ruled
7   upon.
8   BY MR. MORRIS:
9       Q.   You can answer, sir.
10      A.   I would say that the audited
11  financials were prepared by
12  PricewaterhouseCoopers with input from the
13  accounting team.
14         And as I stated previously, I think
15  there was an -- a breakdown in the process that
16  should have occurred, and had others looked at
17  this, they wouldn't have come to the same
18  conclusion.
19      Q.   So do you believe, based on the
20  investigation that you did, that a second
21  mistake occurred not only in signing the notes
22  but including them in the audited financial
23  statements?
24         MR. RUKAVINA: Again, I'll object.
25         This witness is not an expert. He

Page 78

D. Sauter

1       D. Sauter
2  has no personal knowledge.
3       THE WITNESS: Yeah, I can't tell you
4  whether that's a mistake.
5       My experience is that generally
6  accounting folks internally said that.
7       So if the accounting folks made a
8  determination that the notes should be included
9  as a subsequent event, then the auditors would
10 include it as a subsequent event.
11 BY MR. MORRIS:
12      Q.   Okay.  Do you know, is there anybody
13 at HCMFA who's responsible for overseeing the
14 preparation of the audited financial
15 statements?
16      A.   I think Mr. Waterhouse.
17      Q.   When did you first learn that the
18 notes had been included in the financial
19 statements?
20      Are you learning that for the first
21 time right now or did you know that before
22 today?
23      A.   I think I heard that a couple weeks
24 ago.
25      MR. RUKAVINA:  Let's be careful here

Page 79

D. Sauter

1  again, Mr. Sauter, to exclude our
2  communications, please.
3       THE WITNESS:  Okay.
4       Q.   Do you know if HCMFA ever reached
5  out to PricewaterhouseCoopers to inform them
6  that their audited financial statements were
7  incorrect?
8       A.   I don't know.
9       Q.   Do you know whether the debtor
10 included reference to the notes in its audited
11 financial statements?
12      A.   I don't.
13      Q.   Let's go back to your declaration,
14 please, Paragraph 28.
15      Okay.  So Paragraph 28 says:  "The
16 debtor accepted responsibility to HCMFA for
17 having caused the NAV error, and the debtor
18 ultimately, whether through insurance or its
19 own funds, compensated HCMFA for the above
20 payments."
21      Have I read that correctly?
22      A.   Correct.
23      Q.   Paragraph 28 doesn't cite any source
24 for that statement.  Right?

Page 80

D. Sauter

1       D. Sauter
2       A.   Correct.
3       Q.   Okay.  You don't attribute that
4  statement to any particular person.  Correct?
5       A.   That's correct.
6       Q.   What is the basis for your statement
7  that the debtor accepted responsibility to
8  HCMFA?
9       A.   It would be that the debtor's
10 employees who performed the valuation function
11 acknowledged that they had made a mistake.
12      Q.   And who are those employees?
13      A.   Well, ultimately I don't know
14 exactly who it was that came to that
15 determination, but I think it was Frank
16 Waterhouse and Thomas Surgent.
17      Q.   Did you ever interview Mr. Surgent
18 as part of your investigation?
19      A.   No, I was prohibited from speaking
20 with him.
21      Q.   So you're not aware of
22 Mr. Waterhouse ever saying that the debtor
23 accepted responsibility -- withdrawn.
24      You're not aware of Mr. Surgent --
25 withdrawn.

Page 81

D. Sauter

1       D. Sauter
2       You have no personal knowledge that
3  Mr. Surgent accepted, on behalf of the debtor,
4  responsibility for the NAV error.  Correct?
5       A.   I have no personal knowledge of
6  that, correct.
7       Q.   Okay.  And did Mr. Waterhouse tell
8  you that the debtor accepted responsibility to
9  HCMFA for having caused the NAV error?
10      A.   I think Mr. Waterhouse said that the
11 HCMLP employees who formed the valuation
12 committee ultimately concluded that they had
13 made a mistake and they needed to accept that.
14      Q.   Okay.  It doesn't say that in your
15 declaration, does it?
16      A.   Doesn't say what?
17      Q.   That Mr. Waterhouse told you that.
18      A.   No.
19      Q.   In fact, is there any particular
20 reason why you didn't share that with the
21 court?
22      A.   No.
23      Q.   Is there anything in writing that
24 you've ever seen which states that the debtor
25 accepts responsibility to HCMFA for having

Page 82

1              D. Sauter
2 caused the NAV error?
3     A.   Other than what I've identified, no.
4     Q.   And what you've identified is that
5 policy.  Is that right?
6     A.   There's a policy and the
7 acknowledgment that the NAV error was made by
8 the HCMLP employees who were on the valuation
9 committee.
10    Q.   Okay.  You're aware that shortly
11 after HCMFA paid the $7.4 million to the fund,
12 HCMFA sent the fund a written report.  Is that
13 right?
14    A.   Yes.
15    Q.   Let's take a look at that, if we can
16 put that on the screen.
17         MS. CANTY:  Sorry, John, you went
18 out for a second.
19         Can you say that again.
20         MR. MORRIS:  Yeah.
21         If you could, I think -- I think I
22 had it listed as Exhibit 37, but it's one of
23 the new ones.  It's the memo, I think, from
24 HCMFA to the funds.
25         MS. CANTY:  Got it.

Page 83

1              D. Sauter
2         (Exhibit 182, Memo dated 5/28/19,
3 previously marked for identification.)
4 BY MR. MORRIS:
5     Q.   Is this one of the memos that -- and
6 again, Mr. Sauter, if you need to see more of
7 it, just let me know.
8         But is this one of the memos that
9 you saw as part of your investigation?
10    A.   I believe so.
11    Q.   Okay.  And do you understand that
12 this is a memo from HCMFA to the board of the
13 Highland Global Allocation Fund?
14    A.   Yes.
15    Q.   And this is where HCMFA describes
16 for the board the resolution of the NAV error.
17 Correct?
18    A.   Correct.
19    Q.   Okay.  And did you discuss this memo
20 with anybody as part of your investigation?
21    A.   I mean, other than reviewing it, no.
22    Q.   So -- and how did you obtain a copy
23 of it?
24    A.   Mr. Post.
25    Q.   So Mr. Post gave it to you.

Page 84

1              D. Sauter
2         But you didn't speak with him about
3 it in substance.  Correct?
4     A.   I mean, I spoke to him about the
5 transaction and the mistake.
6         I did the same thing with Dustin
7 Norris.
8     Q.   Okay.  But you didn't speak with
9 anybody about the substance of this memo.
10 Correct?
11    A.   Correct.
12    Q.   Okay.  And -- but you did see this
13 memo before you signed your declaration.
14 Correct?
15    A.   Yes.
16    Q.   Okay.  And do you have an
17 understanding of what this memo is?
18    A.   Yeah.
19         I'd like to take a -- I'd like to
20 see the memo in full.
21    Q.   Sure.  Take your time.
22         So just tell Ms. Canty when you want
23 to see more and then she'll scroll.
24         Okay.  Stop right there.
25    A.   (Reviewing document.)

Page 85

1              D. Sauter
2     A.   Yes.  Okay.
3     Q.   So then the second page is this NAV
4 error breakdown.
5         Do you see that?
6     A.   Yes.
7     Q.   All right.  We'll come to that, but
8 let's go back to the first page.
9         Have you taken a look at the second
10 paragraph there that begins:  "The advisor and
11 Houlihan Lokey, an independent third party
12 expert valuation consultant approved by the
13 board," have you read that paragraph?
14    A.   Yes.
15    Q.   Okay.  To the best of your
16 knowledge, did HCMFA accurately define "NAV
17 error" for the board in that paragraph?
18         MR. RUKAVINA:  Objection --
19         THE WITNESS:  As far as I know, yes.
20         MR. RUKAVINA:  This witness is not
21 an expert and has no personal knowledge.
22    Q.   Do you have any reason to believe
23 that HCMFA did not accurately describe for the
24 board the definition of "NAV error"?
25    A.   No.

Page 86

D. Sauter

1
2     Q.   Do you have any reason to believe --
3  take a look at the last sentence.
4          "The orderly determination and
5  adoption of the weighted fair valuation
6  methodology resulted in NAV errors in the
7  fund."
8          Do you see that?
9     A.   Yes.
10    Q.   And that's what's being defined as
11 the NAV error.  Correct?
12    A.   Yes.
13    Q.   Do you have any reason to believe
14 that that sentence is false or misleading in
15 any way?
16    A.   I do not.
17    Q.   Nothing you uncovered during your
18 investigation caused you to believe that that
19 sentence was false or misleading in any way.
20 Correct?
21    A.   No.
22    Q.   Okay.  And the advisor was the
23 entity that made the orderly determination.
24 Correct?
25    A.   That's what this memo says.

Page 87

D. Sauter

1
2     Q.   Okay.  Who's Houlihan Lokey?  Do you
3  know who Houlihan Lokey is?
4     A.   It's a third party valuation firm.
5     Q.   Do they have a good reputation?
6     A.   Yes.
7     Q.   And did they do the valuation of
8  TerreStar?
9     A.   That's my understanding.
10    Q.   Okay.  And were they retained by the
11 advisor or by HCMLP?
12    A.   I don't know.
13    Q.   Did you ever ask anybody who hired
14 Houlihan Lokey?
15    A.   I did not.
16    Q.   Do you know whether HCMFA utilizes
17 Houlihan Lokey's valuation services in the
18 ordinary course of its business?
19    A.   I don't know.
20         I know that Houlihan Lokey has been
21 utilized by either HCMLP, HCMFA or Nexpoint
22 Advisors in the past.
23    Q.   And to the best of your knowledge,
24 has -- have those entities continued to use
25 Houlihan Lokey even after May 2019?

Page 88

D. Sauter

1
2     A.   I -- I don't know.
3     Q.   Do you know whether anybody ever
4  suggested that Houlihan Lokey was responsible
5  for the valuation error?
6     A.   I don't.
7     Q.   Did you ever ask anybody if Houlihan
8  Lokey was responsible for the valuation error?
9     A.   No.
10    Q.   Do you know if -- to the best of
11 your knowledge, this memo was given to the
12 board by HCMFA.  Correct?
13    A.   Yes.
14    Q.   Did -- having reviewed the memo, is
15 there anything that you're aware of in this
16 memo where HCMFA tells the board that HCMLP is
17 responsible for the NAV error?
18    A.   No.
19         And I don't think that they would.
20 It would be irrelevant.
21         MR. MORRIS:  I move to strike the
22 latter portion of the answer.
23    Q.   Let's take a look at the bottom
24 paragraph there.
25         Do you see that there's a reference

Page 89

D. Sauter

1
2  to two different payments?
3     A.   Yes.
4     Q.   A payment of approximately
5  $5.2 million was made on February 15th, 2019,
6  and a second payment of approximately
7  $2.4 million was made on May 2nd.
8          Do I have that right?
9     A.   Yes.
10    Q.   Do you know what the source of
11 funding was for the first payment?
12    A.   I do not.
13    Q.   Did you ever ask anybody how
14 HCMFA -- withdrawn.
15         Did you ever ask anybody what the
16 source of HCMFA's funding was to make the
17 payment on February 15th, 2019?
18    A.   Say that again.
19    Q.   Did you ever ask anybody what the
20 source of HCMFA's capital was to make that
21 payment on February 15th?
22    A.   I was told that it was a transfer
23 from HCMLP.
24    Q.   You were told that the transfer from
25 HCMLP was made in February of 2019?

Page 90

D. Sauter

1
2    A.   Yes.
3    Q.   Who told you that?
4    A.   Mr. Waterhouse.
5    Q.   Okay.  Do you know what the source
6  was -- hold on one second.
7         And do you know what the source of
8  the second payment was, that $2.4 million on
9  May 2nd, 2019?
10    A.   HCMLP.
11    Q.   Now, we saw earlier that one of the
12  notes was for $2.4 million on May 2nd.
13         Do you recall that?
14    A.   Yes.  Yes.
15    Q.   Okay.  So is it fair -- did you
16  conclude as part of your investigation that at
17  least the amount and the date of the payment
18  matched the amount and the date of the note?
19    A.   I did on the second note, yes.
20    Q.   Okay.  But the -- neither the amount
21  nor the date of the first payment matched the
22  amount or the date of the second note.
23  Correct?
24    A.   That's correct.
25    Q.   Let's take a look at the second

Page 91

D. Sauter

1
2  page.
3         Have you seen this before?
4    A.   I have.
5    Q.   Did you ever have any discussions
6  with anybody at any time during your
7  investigation about this page?
8    A.   I did at some point, and I don't
9  recall exactly when.
10    Q.   Okay.
11    A.   But probably it may have been after
12  the declaration.
13    Q.   Okay.  Do you understand that the
14  first -- I think it's a row -- shows that the
15  total estimated net loss resulting from the NAV
16  error was approximately $7.44 million?
17    A.   Yes, I see that.
18    Q.   Okay.  And do you understand that
19  this chart depicts the sources that are going
20  to be called upon to fund the $7.44 million
21  payment from HCMFA to the fund?
22    A.   I -- yes, I understand that now.
23    Q.   And do you understand that
24  approximately $5 million was going to be funded
25  through insurance proceeds?

Page 92

D. Sauter

1
2    A.   That's what it appears to show.
3    Q.   And during your investigation, were
4  you aware that HCMFA had obtained almost
5  $5 million in connection with the NAV error
6  that it was using to fund the payment to GAF?
7    A.   I subsequently learned that, yes.
8    Q.   And were you aware prior to the time
9  that you signed your declaration -- I apologize
10  if I asked this before -- withdrawn.
11         Were you aware of the almost
12  $5 million in insurance proceeds that was --
13  that were obtained by HCMFA before you signed
14  your declaration?
15    A.   I was not.
16    Q.   So that's new information for you
17  since the time you signed your declaration?
18    A.   Yes.
19    Q.   Okay.  Were you aware at the time
20  you signed your declaration that HCMFA had paid
21  an insurance deductible of almost $250,000?
22    A.   I was not.
23    Q.   Is it your understanding that after
24  the sources described in the top portion of
25  this page, that the total amount needed by the

Page 93

D. Sauter

1
2  advisor to make GAF whole was approximately
3  $2.4 million?
4         That's the 2,398,842 number there.
5    A.   I've not done the math.
6    Q.   Well, that number there matches the
7  number in the bottom paragraph of the first
8  page, if we can scroll back up.
9    A.   Yeah.  No, I understand.
10    Q.   Okay.  So that's the total payment
11  that was made on May 2nd, 2019, according to
12  this memo?
13    A.   That's total payment made to GAF.
14         What I'm unclear about is that it's
15  the total amount out of pocket from the
16  advisor, which may be different, but...
17    Q.   Do you know what the total out of
18  pocket was from the advisor?
19    A.   I don't.
20         (Simultaneous crosstalk.)
21         THE WITNESS:  -- what's listed here.
22    Q.   And do you understand that a total
23  of $7.44 million was paid by HCMFA to GAF?
24    A.   I do.
25    Q.   Okay.  And do you have any reason to

Page 94

D. Sauter

1  D. Sauter
2  believe that the source of the funding is
3  anything other than what's set forth on this
4  page?
5      A.   I don't.
6      Q.   And the $2.4 million, that's the
7  $2.4 million that HCMFA obtained from Highland
8  on May 2nd. Correct?
9          MR. RUKAVINA: Objection.
10         The witness is not qualified to
11  answer that.
12     Q.   During the course of your
13  investigation, did you learn that Highland
14  transferred $2.4 million to HCMFA on May 2nd,
15  2019 so that it could pay GAF?
16     A.   That's what I was told.
17     Q.   Okay. Is it your conclusion that
18  Highland was responsible for the $7.44 million
19  estimated net loss resulting from the NAV
20  error?
21         MR. RUKAVINA: Objection.
22         This witness is not an expert, and
23  he has no personal knowledge.
24         THE WITNESS: Yes, I believe that
25  that's accurate.

Page 95

D. Sauter

1  D. Sauter
2  BY MR. MORRIS:
3      Q.   And that's because you believe the
4  notes were executed by mistake. Correct?
5      A.   I believe that Highland made the NAV
6  error and was responsible for making GAF whole,
7  albeit vis-à-vis HCMFA, its advisor.
8      Q.   Okay. So because Highland created
9  the NAV error, your understanding based on your
10  discussions with Mr. Post and Mr. Norris is
11  that Highland paid the $7.4 million to HCMFA
12  not as a loan but as compensation for the error
13  that it made.
14         Do I have that right?
15     A.   That would not be based on my
16  discussions with Mr. Post and Mr. Norris.
17         But yes, your conclusion is
18  accurate.
19     Q.   Okay. And let's be really clear
20  what the conclusion is.
21         It's your conclusion that because
22  Highland was negligent in making the NAV error,
23  that when it paid $7.4 million to HCMFA on
24  May 2nd and May 3rd, 2019, it did so as
25  compensation for its negligent conduct and not

Page 96

D. Sauter

1  D. Sauter
2  as a loan. Correct?
3      A.   I didn't say negligent, and I don't
4  know that I can make that conclusion.
5          But it should have been indemnity
6  and reimbursement for the error that Highland
7  created.
8      Q.   Okay. Can you tell me why HCMFA
9  took $5 million from an insurance company at
10  the same time it was being made whole by
11  Highland?
12         MR. RUKAVINA: I'll instruct you not
13  to answer that.
14         That is attorney client privileged
15  and work product.
16     Q.   Sir, as part of your investigation,
17  did you make any assessment as to why HCMFA
18  accepted $5 million in proceed -- in insurance
19  proceeds at the same time it believed that the
20  $7.4 million was being paid by Highland as
21  compensation?
22         MR. RUKAVINA: Just want to make
23  sure, Mr. Sauter, you understand that counsel
24  is asking about your investigation in May of
25  this year as referenced in your declaration and

Page 97

D. Sauter

1  D. Sauter
2  not the investigation generally.
3          THE WITNESS: Yes.
4          And as I said, the May declaration,
5  I was unaware of the $5 million in insurance
6  payments.
7  BY MR. MORRIS:
8      Q.   Now that you're aware of it, does it
9  cause you to question your conclusion that the
10  payment made by Highland in May of 2019 was
11  compensation and not a loan?
12         MR. RUKAVINA: I instruct you not to
13  answer that, Mr. Sauter.
14         MR. MORRIS: On what basis? That
15  you don't like the question?
16         MR. RUKAVINA: No.
17         Let's be professional here, John. I
18  don't know why you've got to get --
19         (Simultaneous crosstalk.)
20         MR. MORRIS: I don't understand.
21  It's a --
22         MR. RUKAVINA: No, you -- the way --
23         MR. MORRIS: It's an investigation.
24  He made a conclusion in the investigation.
25         He's now learned a new fact. I'm

Page 98

D. Sauter

1
2 allowed to ask him if it changes his
3 conclusion.
4        MR. RUKAVINA: Let me just explain
5 what I understand, what's going on here.
6        He undertook an evidentiary and
7 factual conclusion, which is fair game for you
8 to ask about. Pardon me.
9        He's told you that he didn't know
10 about this. His declaration says -- I'm
11 paraphrasing -- it appears that there was a
12 mistake.
13        He has never claimed to have
14 personal knowledge. He has never claimed to be
15 an expert. He is not going to be a trial
16 witness. He has never testified and is not
17 testifying today that there was a mistake.
18        But most importantly, and why I'm
19 instructing him not to answer, is because the
20 issue of how this payment relates to the
21 insurance payable, which again arose after his
22 declaration and is something that he and I have
23 discussed and is my work product. That is not
24 a part of his factual investigation.
25        So I am instructing him not to

Page 99

D. Sauter

1
2 answer. There's no point in you and I arguing
3 about it now.
4        If you feel my objection is
5 inappropriate, then you have your rights
6 intact.
7        MR. MORRIS: All right. I'm going
8 to continue to ask questions.
9 BY MR. MORRIS:
10    Q.   Sir, you had this document before
11 you signed your declaration. Correct?
12    A.   I did.
13    Q.   Okay. And your conclusion was that
14 because Highland made the NAV mistake, the
15 $7.4 million payment was supposed to be
16 compensation and not in the form of a loan.
17 Correct?
18        MR. RUKAVINA: Objection, form.
19        THE WITNESS: Correct.
20    Q.   Okay. And now the document that you
21 had before you signed your declaration
22 discloses that HCMFA received almost $5 million
23 as part of the insurance proceeds in connection
24 with the NAV error. Correct?
25    A.   Yes.

Page 100

D. Sauter

1
2    Q.   Okay. Does that cause you to change
3 the conclusion that you reached as set forth in
4 your declaration?
5    A.   I don't know enough about the
6 insurance proceeds, the insurance policy and
7 what transpired at the time to make that
8 determination.
9    Q.   Do you know if HCMFA has ever
10 informed the insurance carrier that HCMLP was
11 responsible for the NAV error?
12    A.   I do not.
13    Q.   Did you ever ask anybody?
14    A.   I did not.
15    Q.   As part of your investigation, did
16 you try to determine whether HCMFA ever told
17 the insurance company that HCMLP was
18 responsible for the NAV error?
19    A.   I think I already said I wasn't
20 aware of the insurance proceeds at the time of
21 my declaration.
22    Q.   Has HCMFA returned all or any
23 portion of the insurance proceeds to the
24 carrier?
25    A.   I wouldn't know.

Page 101

D. Sauter

1
2    Q.   Have you ever asked anybody?
3    A.   No.
4        MR. RUKAVINA: You've got to wait a
5 second, Mr. Sauter, before answering.
6        Go ahead.
7    Q.   During the course of your
8 investigation, did anybody tell you that on
9 May 3rd, 2019, HCMFA needed another $5 million?
10    A.   Not during the course of my initial
11 investigation.
12    Q.   Are you aware of that today?
13    A.   I am, yes.
14    Q.   Okay. And do you understand that
15 that $5 million was needed in order for HCMFA
16 to pay what's called a consent fee?
17        MR. RUKAVINA: I'm going to object.
18        And I'm going to instruct the
19 witness not to answer.
20        Again, this is attorney-client
21 privilege and work product.
22        He learned about all of this well
23 after his investigation and well after his
24 declaration.
25        MR. MORRIS: These are facts.

Page 102

D. Sauter

1
2      I don't get it. These are facts.
3  And I'm not limited to his declaration. He's
4  here under a subpoena. I can ask him whatever
5  I want factually.
6      I don't understand, Davor.
7      MR. RUKAVINA: Well, there's three
8  things.
9      You're generally right, you can ask
10  him whatever you want factually. I'm not
11  saying that he -- I haven't prevented you from
12  asking factually. That's issue one.
13      Issue two, he's not a trial witness.
14  His role is limited to the motion to amend,
15  which was granted by consent.
16      And issue three, the question you're
17  asking him right now, if he has any knowledge,
18  he can have only through discussions with me
19  and things he's learned during me in this
20  litigation. He's told you he did not know
21  about this during his investigation.
22      So I'm going to stick by my
23  instruction not to answer that, Mr. Sauter.
24      MR. MORRIS: And I'm going to tell
25  you he is a trial witness. I will certainly be

Page 103

D. Sauter

1
2  calling him at trial because he conducted an
3  investigation.
4      And I don't think that I need to
5  stop asking questions as of the date of his
6  declaration. I'm asking purely factual
7  questions.
8      So you know, if you want to continue
9  to direct him not to answer, we'll deal with
10  it, but I'm going to continue to ask him
11  factual questions.
12      MR. RUKAVINA: To me, this is --
13      (Simultaneous crosstalk.)
14  BY MR. MORRIS:
15      Q.  Mr. Sauter, do you understand that
16  the $5 million was needed by HCMFA on May 3rd,
17  2019 to pay a consent fee?
18      MR. RUKAVINA: I'm going to instruct
19  you not to answer that, Mr. Sauter.
20      Q.  Are you going to follow your
21  counsel's instructions?
22      A.  I am.
23      Q.  Do you know what a consent fee is,
24  sir?
25      A.  I don't.

Page 104

D. Sauter

1
2      Q.  Did you ever have -- withdrawn.
3      Did anybody ever tell you that
4  Highland was responsible for any consent fee
5  that HCMFA paid?
6      MR. RUKAVINA: You're instructed not
7  to answer that to the extent that whoever told
8  you that would be an attorney.
9  BY MR. MORRIS:
10      Q.  Okay. Did anybody other than an
11  attorney ever tell you that Highland was
12  responsible for any consent fee ever paid by
13  HCMFA?
14      A.  That Highland was responsible for
15  paying a consent fee?
16      Q.  That Highland was responsible for
17  any consent fee that was paid by HCMFA.
18      A.  I don't believe so.
19      Q.  During your discussions as part of
20  your investigation with Mr. Norris and Mr. Post
21  and Mr. Dondero and Mr. Waterhouse, did anybody
22  tell you why Highland paid HCMFA $5 million on
23  May 3rd, 2019?
24      A.  Yes.
25      Q.  And why did -- what did they tell

Page 105

D. Sauter

1
2  you?
3      A.  It was payment for a consent fee.
4      Q.  All right. Okay.
5      And who told you that?
6      A.  Mr. Norris.
7      Q.  And did Mr. Norris tell you that
8  Highland had any responsibility for the payment
9  of that consent fee by HCMFA?
10      A.  I don't know that we got into that.
11      Q.  Okay. Did anybody else tell you
12  that the May 3rd, 2019 $5 million payment was
13  made so that HCMFA could pay the consent fee?
14      MR. RUKAVINA: Again, I'll instruct
15  you not to answer to the extent you learned
16  anything from an attorney.
17      THE WITNESS: I don't believe so.
18      Q.  Okay. Did you speak with
19  Mr. Waterhouse about the $5 million consent fee
20  that Mr. Norris mentioned to you?
21      A.  I have not spoken with
22  Mr. Waterhouse for quite some time about this,
23  since he's represented by counsel.
24      Q.  No.
25      But as part of your investigation,

Page 106

D. Sauter

2 after you learned from Mr. Norris that the
3 $5 million was paid so that HCMFA could pay the
4 consent fee, did you follow up with
5 Mr. Waterhouse at all?
6 A. I didn't know about the consent fee
7 at the time of my investigation.
8 Q. Okay. When did Mr. Norris tell you
9 about the consent fee?
10 A. Probably within the last six weeks.
11 Q. And does learning about the consent
12 fee from Mr. Norris cause you to question your
13 conclusion that the $7.4 million was paid by
14 Highland to HCMFA on account of the mistake
15 that Highland made on the NAV error?
16 MR. RUKAVINA: I'll again object
17 that this witness is not an expert and he has
18 no personal knowledge.
19 Q. You can answer, sir.
20 A. I wasn't aware of the consent fee.
21 I don't know much about the consent
22 fee. I don't know what it is, who paid it, why
23 they paid it, what the consideration was for
24 it.
25 So I'm not prepared to answer that.

Page 107

D. Sauter

2 Q. Okay. Let's go back to your
3 declaration, please, Paragraph 31.
4 Is it fair to summarize this
5 paragraph as saying that because HCMFA and the
6 debtor had executed that acknowledgment, that
7 it would have been illogical for Highland to
8 lend HCMFA $7.4 million in May 2021?
9 A. Yes.
10 Q. Okay. And what was the source of
11 your information for Paragraph 31?
12 A. I'm not sure I follow.
13 Q. So you've got the acknowledgment
14 that you attached as Exhibit 4. Correct?
15 A. Yes.
16 Q. Did you discuss with anybody during
17 your investigation any of the facts or
18 conclusions that are set forth in Paragraph 31
19 or did you -- or is it based just on your
20 review of Exhibit 4?
21 A. Based on my review.
22 Q. Okay. Are you aware that in
23 May 2019, Mr. Dondero contemporaneously and
24 personally paid Highland exactly $7.4 million
25 that was owed by Mr. Dondero to Highland under

Page 108

D. Sauter

2 a promissory note where he was the maker?
3 A. I was not.
4 Q. Nobody told you that as part of your
5 investigation, that the way Highland was able
6 to transfer the $7.4 million to HCMFA was to
7 get that money from Mr. Dondero on account of a
8 note that he signed?
9 A. No one told me that.
10 Q. You're hearing that for the first
11 time today?
12 A. I am.
13 Q. If Mr. Dondero paid down
14 $7.4 million in obligations that he owed to
15 Highland, would it change your view that it was
16 illogical for Highland to loan that money to
17 HCMFA in May of 2019?
18 A. Again, without seeing the documents
19 and the timing and the details of the
20 transaction, I can't answer that.
21 Q. Okay. Now, the advisors have
22 contracts with the funds they advise. Correct?
23 A. Advisory agreements, yes.
24 Q. And those advisory agreements are
25 subject to annual renewal. Correct?

Page 109

D. Sauter

2 A. Yes.
3 Q. As Nexpoint's general counsel, did
4 you participate in the annual renewal process
5 in the fall of 2020?
6 A. I would have participated in the
7 process, but only with respect to NXRT,
8 Nexpoint Residential Trust and Nexpoint Real
9 Estate Finance.
10 Q. I see.
11 A. I had some limited involvement in
12 the 15(c) process with respect to Nexpoint's
13 strategic opportunities fund, but very limited.
14 Q. Do you know who the representative
15 was for HCMFA who was responsible for the 15(c)
16 annual renewal process in the fall of 2020?
17 A. I don't.
18 I can speculate, and I would assume
19 it's Mr. -- a combination of Mr. Norris and
20 Mr. Sella (phonetic).
21 Q. And why do you speculate that it's a
22 combination of them?
23 A. Because they were actively involved
24 in the process just from conversations I had
25 with them.

Page 110

D. Sauter

1
2    Q.  Okay.  Have you ever seen any of the
3  reports that the advisors sent to the retail
4  board in connection with the 15(c) annual
5  review?
6        MR. RUKAVINA:  Now, this one,
7  Mr. Sauter, I am going to instruct you not to
8  answer.
9        MR. MORRIS:  Have you ever seen the
10  document?  That's what, you're going to
11  instruct him not to --
12        MR. RUKAVINA:  Don't answer that.
13  Don't answer that.  That relates to discovery
14  and work product privilege.
15        The document was produced to you.
16  Mr. Sauter helped me find that document.  Other
17  than that, nothing about that document and his
18  knowledge is fair game.
19        MR. MORRIS:  Well, I'm going to ask
20  my questions, and you can keep directing him
21  not to answer.
22  BY MR. MORRIS:
23    Q.  Mr. Sauter, have you ever seen any
24  of the reports that were issued by the advisors
25  to the funds?

Page 111

D. Sauter

1
2    A.  Could you clarify the question.
3    Q.  Sure.
4        Have you ever seen any of the
5  reports that were issued by the advisors to the
6  retail board in the fall of 2020 in connection
7  with the 15(c) review?
8        MR. RUKAVINA:  Mr. Sauter, I'm
9  instructing you not to answer that if your
10  answer involves working with me in this
11  adversary proceeding.
12        If you saw it otherwise as part of
13  business operation, that's fine.
14        THE WITNESS:  In the fall of 2020, I
15  would have had -- I would not have been
16  involved and I would not have seen anything
17  sent to the board.
18  BY MR. MORRIS:
19    Q.  All right.  Well, let's put it up on
20  the screen.  It's, I think, a document that was
21  previously marked as Deposition Exhibit 59.
22        (Exhibit 59, Memo dated 10/23/20,
23  HCMFAS 000025-031, marked for identification.)
24    Q.  Have you ever seen this document
25  before, sir?

Page 112

D. Sauter

1
2    A.  Could you scroll down.
3    Q.  Sure.
4    A.  (Reviewing document.)
5    Q.  We can keep going.
6    A.  All right.
7        What's the date on this?
8    Q.  October 23rd, 2020.
9    A.  I honestly don't think I would have
10  been involved in that or seen that.
11    Q.  Okay.  Did you ever ask anybody as
12  part of your investigation -- withdrawn.
13        Are you aware that the advisors were
14  asked to provide information to the retail
15  board as to the obligations that it owed to
16  Highland and its affiliates in connection with
17  the 15(c) annual review?
18    A.  I was not.
19    Q.  So is it fair to say that you never
20  saw this document as part of your
21  investigation?
22    A.  I don't think so.
23    Q.  Is it fair to say that nobody ever
24  told you about the advisors' responses to the
25  retail board in connection with the 15(c)

Page 113

D. Sauter

1
2  review in October of 2020?
3    A.  I think that's accurate.
4        MR. MORRIS:  We're going to do the
5  30(b)(6) deposition on December 1st?
6        MR. RUKAVINA:  I think I'm waiting
7  for you to confirm.
8        I think that's what --
9        MR. MORRIS:  Let's confirm that
10  right now.
11        I'll send you an e-mail, but I
12  just...
13        MR. RUKAVINA:  Okay.  10 a.m.,
14  Dallas?
15        MR. MORRIS:  Yeah, that sounds fair.
16  BY MR. MORRIS:
17    Q.  All right.  Let's go back to your
18  declaration, please, Paragraph 32.
19        I'm almost done, sir.
20        So you state, among other things,
21  that -- and I'm paraphrasing.  Let me know if
22  I -- if this is fair -- that as a result of
23  your investigation in April of 2019, HCMFA now
24  believes that it has affirmative defenses to
25  the notes that includes the defense of mutual

Page 114

```
1           D. Sauter
2  mistake.
3       Do I have that right?
4    A.  Yes.
5    Q.  Okay.  What does "mutual" -- excuse
6  me -- what does "mutual mistake" mean?
7       MR. RUKAVINA:  Are you asking for
8  his legal opinion or how he used it in this
9  declaration?
10      MR. MORRIS:  Only how he used it in
11 the declaration.
12      THE WITNESS:  Well, wouldn't that be
13 a legal conclusion because it's an affirmative
14 defense?
15 BY MR. MORRIS:
16   Q.  Well, I don't know.  It's in your
17 declaration.  I'm just asking you what you
18 meant when you used the phrase -- withdrawn.
19      Let me ask a better question.  Maybe
20 it's my fault.
21      Mr. Sauter, what did you mean when
22 you used the phrase "mutual mistake"?
23   A.  What I meant is that there was no
24 analysis or consideration of what had
25 transpired and who is legally responsible for
```

Page 115

```
1           D. Sauter
2  the payments to the fund.
3       A transfer was made.  A note was
4  executed without any analysis.
5    Q.  And do you have anything else to add
6  to that?
7    A.  I don't think so.
8    Q.  Okay.  You also say that the notes
9  are void for lack of consideration.
10      Do I have that right?
11   A.  Yes.
12   Q.  You don't dispute that Highland paid
13 HCMFA $2.4 million on May 2nd, 2019.  Correct?
14   A.  No.
15   Q.  And you don't dispute that Highland
16 paid HCMFA $5 million on May 3rd, 2019.
17 Correct?
18   A.  I mean, I believe that's right.
19 That's what I've been told.
20      So yeah, I don't dispute that.
21   Q.  Your reference to "a lack of
22 consideration" means only that, in your
23 opinion, the money should not have been
24 transferred in the form of a loan.
25      Do I have that right?
```

Page 116

```
1           D. Sauter
2    A.  You do.
3    Q.  It does not mean that HCMFA did not
4  receive an amount of money exactly equal to the
5  principal amount of the notes.  Correct?
6    A.  Based upon what I've been told,
7  correct.
8    Q.  Okay.  You also write here that
9  Mr. Waterhouse did not "have proper authority
10 to sign the notes."
11      Do I have that right?
12   A.  Yes.
13   Q.  What does "proper" -- what did you
14 mean by the phrase "proper authority"?
15   A.  I mean going through the process of
16 what I would expect to see in making a loan of
17 $7.4 million.
18   Q.  So that's just your own subjective
19 view.
20      Is that fair?
21   A.  No.
22      I mean, I think there's a legal
23 basis for that, so yeah.
24   Q.  What's your legal basis for that?
25   A.  There is a process to go through in
```

Page 117

```
1           D. Sauter
2  papering a transaction like a $7.4 million
3  loan.  And my understanding of the process, as
4  described to me by Frank Waterhouse, was not
5  the proper process.
6    Q.  Is there a policy or a law that
7  requires a particular process to be followed
8  that you're aware of?
9    A.  What I would expect is
10 communications among the various parties that
11 are involved and agreement that this should be
12 a loan rather than just transferring money and
13 sign a note.
14   Q.  You knew when you signed this
15 declaration that Mr. Waterhouse in fact was an
16 officer of HCMFA at the time his signature was
17 put on the notes.  Correct?
18   A.  Yes.
19   Q.  And is it your view that an officer
20 is not authorized to execute notes on behalf of
21 the company for which he or she works for?
22   A.  I think every company has
23 limitations on authority.
24   Q.  And what limits are you aware of on
25 Mr. Waterhouse -- withdrawn.
```

Page 118

D. Sauter

1
2      What limits are you aware of that
3  existed on Mr. Waterhouse's authority to sign
4  notes on behalf of HCMFA in May of 2019?
5      A.  I don't know what the HCMFA -- what
6  the partnership agreement says, or I should say
7  the general partnership agreement says.
8      But what I would expect is the full
9  participation of legal, accounting and then
10 perhaps Mr. Dondero.
11     Q.  Do you know if Mr. Waterhouse has
12 ever signed any other notes on behalf of HCMFA
13 or any other affiliated entity?
14     A.  I'm sure he has.
15     Q.  Did you do -- as part of your
16 investigation, before reaching your conclusion
17 that Mr. Waterhouse didn't have proper
18 authority, did you try to determine whether in
19 fact he had previously issued notes on behalf
20 of HCMFA or other affiliates?
21     A.  I can't answer your question without
22 knowing the facts surrounding the execution of
23 any particular note.
24     I mean, I think it matters the
25 amount of the note, the term of the note.

Page 119

D. Sauter

1
2  There's a number of factors that come into it.
3      Q.  But you didn't --
4      A.  So --
5      Q.  But you made no inquiry as to any of
6  those issues.  Correct?
7      A.  I made an inquiry of Mr. Waterhouse
8  as it relates to this transaction.
9      Q.  Okay.  And again, Mr. Waterhouse did
10 not admit that he was not authorized to sign
11 these notes.  Correct?
12     A.  Sorry.  He did not admit that he was
13 not authorized to sign the notes, correct.
14     Q.  Okay.
15     MR. MORRIS:  Let's just take a
16 five-minute break.  I may be done.
17     It's 4:28.  Let's just come back at
18 4:35 so I can take a break.
19     (Recess was taken from 3:29 p.m. to
20 3:37 p.m.)
21     MR. MORRIS:  Mr. Sauter, I greatly
22 appreciate your time and attention today.  I
23 have no further questions.
24     THE WITNESS:  Okay.
25     MR. RUKAVINA:  I'll pass the

Page 120

D. Sauter

1
2  witness, save my questions till trial.  Thank
3  you.
4      MR. MORRIS:  Thank you, sir.  Have a
5  good day.
6      MR. RUKAVINA:  Madam Reporter, just
7  before we're done, just to confirm, the witness
8  does want his 30 days to read and review, so
9  please send the transcript to me with exhibits.
10     THE REPORTER:  And Michael, do you
11 need a copy?
12     MR. AIGEN:  Yeah, we'll order one,
13 just regular time.  Doesn't need to be
14 expedited.
15     (Time Noted:  3:38 p.m.)
16
17
18     --------------------
19         DENNIS C. SAUTER
20
21 Subscribed and sworn to before me
22 this        day of         2021.
23
24 ---------------------------------------
25 Notary Public

Page 121

1  District of Columbia, to wit:
2      I, Stacey L. Daywalt, a Notary
3  Public of the District of Columbia, do hereby
4  certify that the within-named witness remotely
5  appeared before me at the time and place herein
6  set out, and after having been duly sworn by
7  me, according to law, was examined by Counsel.
8      I further certify that the
9  examination was recorded stenographically by me
10 and this transcript is a true record of the
11 proceedings.
12     I further certify that I am not of
13 counsel to any of the parties, nor an employee
14 of counsel, nor related to any of the parties,
15 nor in any way interested in the outcome of
16 this action.
17     As witness my hand and Notarial Seal
18 this 17th day of November, 2021.
19
20
21 _____
22     Stacey L. Daywalt, Notary Public
23     My Commission Expires:  4/14/2026
24
25

Page 122

```
1    --------------------I N D E X-------------------
2
         WITNESS            EXAMINATION BY      PAGE
3
4    DENNIS C. SAUTER   BY MR. MORRIS        4
5
          -------------------EXHIBITS-------------------
6
7    PREVIOUSLY MARKED EXHIBITS        PAGE  LINE
8    Exhibit 181
          Declaration of Dennis C. Sauter,
9    Jr.                    24   3
10   Exhibit 54
          E-mail chain with attachment dated
11   5/2/19
          D-CNL003777-779          25   25
12
          Exhibit 57
13   Promissory Note dated 5/3/19
          D-CNL003764-65           29   5
14
          Exhibit 45
15   Consolidated Financial Statements
          and Supplemental Information
16   December 31, 2018
          D-CNL002273-296          72   19
17
          Exhibit 182
18   Memo dated 5/28/19           83   2
19   Exhibit 59
          Memo dated 10/23/20
20   HCMFAS 000025-031           111  22
21
22
23
24
25
```

Page 123

```
1    NAME OF CASE:
2    DATE OF DEPOSITION:
3    NAME OF WITNESS:
4    Reason Codes:
5       1. To clarify the record.
6       2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25          _____
```

Appx. 03115

**$**

**$2.4** 27:5 28:3 89:7
90:8,12 93:3 94:6,7,
14 115:13

**$250,000** 92:21

**$5** 29:9 91:24 92:5,12
96:9,18 97:5 99:22
101:9,15 103:16
104:22 105:12,19
106:3 115:16

**$5.2** 89:5

**$7.4** 63:17 82:11
95:11,23 96:20 99:15
106:13 107:8,24
108:6,14 116:17
117:2

**$7.44** 91:16,20 93:23
94:18

**0**

**000025-031** 111:23

**1**

**10** 113:13

**10/23/20** 111:22

**11th** 49:10

**12** 42:9

**13** 7:9 31:15 32:6
34:11 39:3 40:13

**15** 6:23

**15(c)** 109:12,15
110:4 111:7 112:17,
25

**15th** 89:5,17,21

**17** 74:5

**181** 24:3 25:23

**182** 83:2

**19** 43:20

**1st** 31:22 42:9 44:15
45:24 113:5

**2**

**2** 28:3

**2,398,842** 93:4

**2001** 6:10 43:17,23

**2002** 6:23

**2006** 7:2

**2009** 7:5,6

**2014** 7:10 37:14

**2017** 15:12

**2018** 65:4 72:17,21
73:2

**2019** 17:2,15 18:5
21:8 26:13 28:4
29:10 32:12 35:14
36:13 37:8 69:19
73:18 87:25 89:5,17,
25 90:9 93:11 94:15
95:24 97:10 101:9
103:17 104:23
105:12 107:23
108:17 113:23
115:13,16 118:4

**2020** 7:12 9:6 36:5
69:20 109:5,16
111:6,14 112:8 113:2

**2021** 9:7,8 24:16
45:8,25 59:18,24
60:6 76:16 107:8
120:22

**21** 47:3,5

**21st** 24:16

**22** 46:25 47:19 50:19

**23rd** 112:8

**28** 79:15,16,24

**29** 51:7

**2:15** 66:8

**2:17** 67:18

**2:28** 67:19

**2nd** 26:8 32:12 89:7
90:9,12 93:11 94:8,
14 95:24 115:13

**3**

**30** 59:6,7 62:20 68:7
71:6 120:8

**30(b)(6)** 113:5

**31** 7:9 72:21 107:3,
11,18

**31st** 72:17 73:2

**32** 113:18

**37** 82:22

**3:29** 119:19

**3:37** 119:20

**3:38** 120:15

**3rd** 29:10 32:12 73:17
95:24 101:9 103:16
104:23 105:12
115:16

**4**

**4** 44:8 107:14,20

**45** 72:18,19

**4:28** 119:17

**4:35** 119:18

**5**

**5/2/19** 26:2

**5/28/19** 83:2

**5/3/19** 29:6

**54** 25:20,25

**57** 29:5

**59** 111:21,22

**9**

**9th** 69:19

**A**

**a.m.** 113:13

**accept** 81:13

**accepted** 8:16 79:17
80:7,23 81:3,8 96:18

**accepts** 81:25

**access** 42:24 43:3
44:2,10,24 46:2

**accommodate** 5:23

**account** 106:14
108:7

**accounted** 41:4,8

**accounting** 21:24
26:17,21,22,25 61:9,
18 64:2 77:13 78:6,7
118:9

**accurate** 94:25
95:18 113:3

**accurately** 85:16,23

**acknowledged**
65:11 80:11

**acknowledgment**
82:7 107:6,13

**act** 63:25

**actively** 109:23

**actual** 61:10

**add** 115:5

**addressed** 46:18

**admit** 60:22,24
119:10,12

**admitted** 6:6 30:11
53:11 55:4 59:15

**adopted** 64:25

**adoption** 86:5

**adversary** 23:10
42:5 71:2 74:2
111:11

**adverse** 43:9

**advise** 108:22

**advised** 14:10 19:8

**advisor** 85:10 86:22
87:11 93:2,16,18
95:7

**advisors** 7:20 12:2,6
13:7,8,20,24,25 14:3,
11,20,25 15:5 16:4

**17:17 18:5 19:8
20:20 21:6 28:18
29:14,25 30:25 37:3
87:22 108:21 110:3,
24 111:5 112:13

**advisors'** 112:24

**advisory** 14:3,6 16:4
108:23,24

**affairs** 69:25 70:4

**affiliated** 12:24 13:4,
8 118:13

**affiliates** 7:18 64:8
112:16 118:20

**affiliation** 13:12

**affirmative** 43:13
113:24 114:13

**afternoon** 4:12

**agree** 30:11,21 66:19
76:8,19

**agreed** 77:6

**agreement** 117:11
118:6,7

**agreements** 43:5
108:23,24

**ahead** 34:23 52:5
62:15 101:6

**AIGEN** 120:12

**albeit** 95:7

**Allocation** 16:21
83:13

**allowed** 98:2

**amend** 54:3 77:6
102:14

**amended** 24:20

**amendment** 24:24

**amount** 32:21,24
90:17,18,20,22 92:25
93:15 116:4,5 118:25

**analysis** 114:24
115:4

**and/or** 18:24 19:3

**annual** 108:25 109:4,
16 110:4 112:17

Index: answering..confusion

**answering** 101:5

**anticipated** 10:9

**apologize** 34:22
53:6 60:4 62:11,12
92:9

**appeared** 63:13

**appears** 59:10 60:12
61:8 63:6,7 64:14
76:6 92:2 98:11

**approved** 54:22
56:19 85:12

**approximately** 9:5,
6,8 89:4,6 91:16,24
93:2

**April** 6:23 9:4,6,8
43:23 45:8 113:23

**area** 8:3

**arguing** 99:2

**arose** 98:21

**asks** 27:5

**aspect** 22:17

**asserted** 43:13

**assessment** 96:17

**assets** 68:14,18,24
69:8,9,25 70:8

**assistant** 21:13,16
23:16

**assume** 41:22 63:17
76:4 109:18

**assumed** 60:13

**assumption** 51:4
60:19,23,24

**attached** 27:19
107:14

**attachment** 26:2

**attempt** 5:10,12

**attention** 119:22

**attorney** 4:13 9:20
96:14 104:8,11
105:16

**attorney-client**
101:20

**attribute** 58:25 80:3

**attributing** 60:20

**audio** 66:19

**audited** 72:5,11,15
74:7,11,25 75:8,21,
25 76:4,11,23 77:10,
22 78:14 79:7,11

**auditors** 71:6 72:2
73:14,22 78:9

**authority** 48:3 54:7,
19,25 55:5,9 116:9,
14 117:23 118:3,18

**authorize** 53:16

**authorized** 54:11,16
117:20 119:10,13

**aware** 4:16 37:19,20,
21 38:7,10,11,22,25
39:9 49:24 55:11,13
56:3,8 68:12 69:12,
16,22 70:3,5 71:4,24
72:4 74:24 80:21,24
82:10 88:15 92:4,8,
11,19 97:8 100:20
101:12 106:20
107:22 112:13 117:8,
24 118:2

---

**B**

**back** 7:6 31:16 37:8
44:24 67:5,16 79:14
85:8 93:8 107:2
113:17 119:17

**background** 21:25
35:11

**bad** 60:4

**balance** 41:12,17
69:8

**bankruptcy** 68:10,
13 69:18 70:7 73:22

**based** 47:14,23
59:20 63:21 71:12,16
75:12 77:19 95:9,15
107:19,21 116:6

**basically** 25:5

**basis** 21:2,20 22:7
24:23 57:8 62:9 63:2,

12 64:13 80:6 97:14
116:23,24

**began** 6:21 7:12

**begin** 5:6,13 10:3

**begins** 85:10

**behalf** 81:3 117:20
118:4,12,19

**believed** 50:16 51:17
96:19

**believes** 113:24

**bit** 10:12 11:5 16:11
26:5

**Blair** 27:19

**block** 30:23

**board** 45:21 46:21
83:12,16 85:13,17,24
88:12,16 110:4
111:6,17 112:15,25

**books** 40:14,18 41:5,
8 42:25 44:10,14,18,
25 70:18,22

**bottom** 88:23 93:7

**break** 5:21,24 66:4,
22,25 67:3,15,24
119:16,18

**breakdown** 77:15
85:4

**bring** 13:2

**brings** 10:19 11:23

**broker** 13:10

**bud** 67:3

**building** 34:4

**business** 15:2 87:18
111:13

---

**C**

**call** 49:12

**called** 4:3 6:22,25
7:4,8 26:22 30:16
70:4 74:7 76:3 91:20
101:16

**calling** 103:2

**Canty** 23:17 25:18,21
82:17,25 84:22

**capacity** 10:20 12:12
19:17 52:8

**capital** 4:15 9:19
12:2,6 20:23,25
28:17 29:13,24 30:24
31:11 69:17 89:20

**caps** 16:10

**careful** 71:15 78:25

**carried** 41:16 69:7

**carrier** 100:10,24

**case** 55:8,12 64:19

**caused** 39:21 79:18
81:9 82:2 86:18

**caution** 55:19

**CFO** 18:7,24 19:4
51:18

**chain** 25:25 26:22

**change** 100:2 108:15

**changed** 43:16,24

**characterize** 39:12,
14

**chart** 91:19

**chief** 36:24 37:2,4,11
51:2,10

**circumstances**
43:12 50:2

**cite** 79:24

**claimed** 98:13,14

**clarify** 14:18 39:25
52:3 111:2

**clear** 25:14 59:10
63:5 95:19

**client** 67:8 96:14

**CLOS** 7:24

**CMFA** 34:16

**collect** 31:12 69:13

**collectively** 31:4

**combination**
109:19,22

**commenced** 11:3
23:11

**commencement**
39:23 40:10 73:25

**comments** 40:2

**committee** 81:12
82:9

**communicate** 66:13
68:3

**communications**
34:7 45:22 46:23,24
79:3 117:10

**company** 96:9
100:17 117:21,22

**compensated** 79:20

**compensation**
95:12,25 96:21 97:11
99:16

**complaint** 25:4
31:20 41:21 68:22
70:14

**compliance** 36:18,
24 37:2,5,11

**concerned** 45:16

**conclude** 57:8 68:17
90:16

**concluded** 47:25
81:12

**conclusion** 59:18
61:3 75:9,14,17
76:25 77:18 94:17
95:17,20,21 96:4
97:9,24 98:3,7 99:13
100:3 106:13 114:13
118:16

**conclusions** 47:17,
22 107:18

**conduct** 95:25

**conducted** 19:12
22:18 31:20 44:5,16
103:2

**conference** 49:9

**confirm** 113:7,9
120:7

**confusion** 52:13

**connection** 22:21 23:10 42:5 50:7 57:11,16 69:4 92:5 99:23 110:4 111:6 112:16,25

**consent** 101:16 102:15 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4, 6,9,11,20,21

**consideration** 61:10 106:23 114:24 115:9, 22

**consistent** 18:25

**consolidated** 72:19, 24

**construction** 8:7

**consultant** 85:12

**contemporaneousl y** 107:23

**continue** 61:5 99:8 103:8,10

**continued** 87:24

**contracts** 108:22

**control** 13:18 69:17, 23 70:6

**controlling** 13:19,21

**controls** 13:15 15:21

**conversation** 32:18 38:23 39:2 70:15

**conversations** 33:10 48:12,15,19,21 49:3 109:24

**copy** 27:19 83:22 120:11

**corporate** 26:17,21, 22,25

**correct** 4:19 9:12 14:5,7,8 19:14 30:4 32:3,8 33:4 40:6,12 42:18,22,23,25 43:2, 6,14,17 44:4,6 46:9, 11 47:8 50:17 51:2 52:21 53:12,13,17, 18,20 54:4,5,20 55:5, 6,9,10 57:12,14,17,

18,21,22,25 58:2,5,6, 11,12 59:15,16,19 61:4 65:25 66:2 74:3 75:4,5,18,22 79:23 80:2,4,5 81:4,6 83:17,18 84:3,10,11, 14 86:11,20,24 88:12 90:23,24 94:8 95:4 96:2 99:11,17,19,24 107:14 108:22,25 115:13,17 116:5,7 117:17 119:6,11,13

**correction** 64:17

**correctly** 51:13 61:14 79:22

**counsel** 4:14 8:19, 21,23 9:2,7,9,13,15, 18 10:7,20 11:25 12:5,16 14:12,14,19, 21 64:5 66:13 96:23 105:23 109:3

**counsel's** 103:21

**couple** 7:22 60:11 78:23

**court** 25:22 70:12 81:21

**created** 95:8 96:7

**crosstalk** 11:17 53:5 67:4,9 93:20 97:19 103:13

**current** 25:22

**D**

**D-CNL002273-296** 72:21

**D-CNL003764-65** 29:6

**D-CNL003777-779** 26:2

**DAF** 36:8

**daily** 35:10

**Dallas** 113:14

**date** 69:18 73:12 74:17,18 90:17,18, 21,22 103:5 112:7

**dated** 26:2,7 28:3 29:5,9 32:12 73:17 83:2 111:22

**David** 26:7

**Davor** 11:19 67:7 102:6

**day** 6:23 10:5 29:9 120:5,22

**days** 71:6 120:8

**DC** 62:12

**deal** 103:9

**dealer** 13:10

**debtor** 34:6 44:9 51:11 60:14 61:12 62:5,22 63:13 64:14 68:13,17 69:7,13,23 70:7,11,18 79:10,17, 18 80:7,22 81:3,8,24 107:6

**debtor's** 43:4 63:3 68:7,10,23 80:9

**December** 7:9 17:15 72:17,21 73:2 113:5

**decision** 57:24

**decisions** 57:16

**declaration** 23:9 24:3,8,19,23 25:3,23 31:15 50:16,24 51:9, 16 52:19,24 53:3,10, 14 54:2 55:3,8 58:24 59:4 61:25 62:3 68:9, 25 69:5 75:4 79:14 81:15 84:13 91:12 92:9,14,17,20 96:25 97:4 98:10,22 99:11, 21 100:4,21 101:24 102:3 103:6 107:3 113:18 114:9,11,17 117:15

**deductible** 92:21

**defense** 11:2 113:25 114:14

**defenses** 43:13 113:24

**define** 13:18 85:16

**defined** 21:17 28:16 30:12,22 86:10

**defines** 29:13

**definition** 30:3 85:24

**denied** 45:3

**Dennis** 4:11 24:3 120:19

**deny** 50:9

**department** 9:19 63:23 64:5,6,12

**depends** 13:17

**depicts** 91:19

**deposed** 4:24 55:12

**deposition** 4:19 55:14 66:14 72:18 111:21 113:5

**depositions** 25:17

**describe** 6:17 45:12 85:23

**describes** 25:3 83:15

**description** 74:21

**detail** 32:19

**details** 108:19

**determination** 63:24 78:8 80:15 86:4,23 100:8

**determine** 18:10,13 19:16 20:12 41:4,16 100:16 118:18

**development** 7:4

**developments** 70:25

**difficult** 34:7

**direct** 103:9

**directing** 110:20

**directly** 15:5

**director** 10:2

**disagree** 58:16

**disagreed** 58:15

**disagrees** 57:6

**disclose** 52:20

**disclosed** 68:13 71:5,25

**discloses** 99:22

**disclosing** 68:18

**discovery** 110:13

**discrete** 7:23 15:2

**discuss** 60:6 83:19 107:16

**discussed** 98:23

**discussion** 43:21 56:15

**discussions** 22:9 48:6 50:8 55:22 59:21,23 60:2 63:21 91:5 95:10,16 102:18 104:19

**dispute** 115:12,15,20

**disputes** 8:8

**distinction** 63:8

**document** 23:21 24:7 25:19 30:10,13 47:20 59:25 65:7,20 70:4 71:20 73:10,21 84:25 99:10,20 110:10,15,16,17 111:20,24 112:4,20

**documents** 15:24 23:17 25:16 42:4,13 45:4,5,10,13 46:14 59:21 68:16 70:7 108:18

**Dondero** 13:14 15:9 16:2 17:4 32:2 33:11 34:3 39:4,8,17 40:8 42:17 46:6 54:22 59:24 60:7 69:16,23 70:5 104:21 107:23, 25 108:7,13 118:10

**draft** 30:6,7

**duly** 4:4 11:18

**Dustin** 34:19 47:13 84:6

**duties** 10:6

## E

**e-mail** 25:25 26:7,17, 21,22,24 27:4 113:11

**e-mails** 48:18

**earlier** 37:14 72:8 90:11

**effort** 20:11 41:3,15

**electronic** 53:23

**Ellington** 9:18

**employed** 8:12 20:20,21,22,24

**employee** 34:24

**employees** 21:5 23:8 34:12,17 43:4,9, 25 80:10,12 81:11 82:8

**employment** 6:18

**end** 44:8

**ending** 72:16,25

**engagements** 7:23

**entire** 8:15

**entities** 12:25 13:8 15:3 87:24

**entity** 12:7 13:4 86:23 118:13

**equal** 116:4

**equity** 16:18

**error** 22:10 45:11 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:4,17,24 86:11 88:5,8,17 91:16 92:5 94:20 95:6,9,12,22 96:6 99:24 100:11,18 106:15

**errors** 86:6

**estate** 8:5,9,10,20,22 9:8,15 14:14,20 68:14,18 70:8 109:9

**estimated** 91:15 94:19

**event** 15:11 78:9,10

**events** 51:12 74:8, 11,16 75:3

**evicted** 34:4,5

**evidentiary** 98:6

**exact** 52:22 54:9

**EXAMINATION** 4:7

**examined** 4:4,21

**exclude** 79:2

**excuse** 114:5

**execute** 117:20

**executed** 50:6 58:20,23 64:7 74:19 75:3 95:4 107:6 115:4

**executing** 58:10

**execution** 50:3 52:13 71:7 75:18 76:25 118:22

**exhibit** 24:3 25:20,25 29:5 72:18,19 82:22 83:2 107:14,20 111:21,22

**exhibits** 120:9

**existed** 118:3

**existence** 37:21,25 38:22,25 39:9,18,22 40:9 50:13 71:5,25

**expect** 116:16 117:9 118:8

**expedited** 120:14

**expenses** 63:20

**experience** 78:5

**expert** 30:16 76:13 77:4,5,25 85:12,21 94:22 98:15 106:17

**expertise** 8:2 13:2 21:11

**explain** 98:4

**extension** 41:20

**extent** 104:7 105:15

## F

**fact** 50:15,17 53:15 59:4,19 63:7 64:11 69:7 81:19 97:25 117:15 118:19

**factors** 119:2

**facts** 101:25 102:2 107:17 118:22

**factual** 24:23 71:17 76:15 98:7,24 103:6, 11

**factually** 102:5,10,12

**fail** 5:14

**fair** 5:8,25 6:2 10:11 24:22 25:2 30:20 40:5,11 47:14,16,23 61:3 66:15 86:5 90:15 98:7 107:4 110:18 112:19,23 113:15,22 116:20

**fairly** 10:18

**fall** 109:5,16 111:6,14

**false** 86:14,19

**familiar** 16:13

**fault** 114:20

**February** 7:12 9:6 89:5,17,21,25

**fee** 101:16 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4, 6,9,12,20,22

**feel** 99:4

**fees** 63:19

**file** 24:20

**filed** 25:4 31:21 42:3, 8,14,16 43:12 53:25 55:7,9 69:24 70:7

**filing** 69:18 70:13 73:22

**filings** 68:10 70:12

**Finance** 14:14 109:9

**financial** 51:2,10 69:25 70:4 72:6,12,

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**financials** 74:17,18 76:4 77:11

**find** 40:24,25 110:16

**fine** 11:12 14:2 25:24 30:20 31:6 66:5,10 111:13

**finish** 5:6,12

**firm** 6:21,24 7:4 76:2 87:4

**firms** 14:4

**five-minute** 119:16

**floor** 49:10

**fluid** 10:18

**focus** 68:6

**folks** 8:14 13:11 78:6,7

**follow** 103:20 106:4 107:12

**follow-up** 45:7

**foreclosures** 8:9

**form** 17:21 30:15 54:10 56:6 62:10,13 64:9 69:11 71:8 75:12 99:16,18 115:24

**formation** 10:16

**formed** 81:11

**formulating** 22:25

**Frank** 17:10 22:9 26:15 29:24 46:4 63:21 80:15 117:4

**full** 84:20 118:8

**function** 80:10

**fund** 12:2,6 16:21 21:16 28:17 29:14,25 30:24 57:25 82:11,12 83:13 86:7 91:20,21 92:6 109:13 115:2

**funded** 91:24

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**funding** 89:11,16 94:2

**funds** 14:7,10,24 15:3 16:3,19 19:7,18 20:5,9 60:14 64:3 71:20 79:20 82:24 108:22 110:25

## G

**GAF** 16:23 17:2,8 20:13 21:13,17 36:10 57:25 58:4,22 64:3 65:16 92:6 93:2,13, 23 94:15 95:6

**game** 98:7 110:18

**gave** 8:16 83:25

**general** 8:19,21,23, 25 9:7,9,13,14,18 10:7,20 11:25 12:5, 15 14:12,13,19,21 64:4 109:3 118:7

**generally** 9:17 13:6 16:13,15 37:18 70:2 78:5 97:2 102:9

**genesis** 32:6 33:3 37:20 38:8 39:4,10 42:17,21

**gentleman** 20:16

**give** 8:17 23:19 51:5 56:21 66:6

**Global** 16:20 83:13

**Godwin** 6:25

**good** 4:12 11:24 87:5 120:5

**Gould** 7:11

**graduate** 6:11,14

**graduated** 6:18

**granted** 45:2 102:15

**great** 75:16

**greatly** 119:21

**ground** 5:3

**group** 6:24 7:7 19:25 26:18,23,25

**Gruber** 6:25 7:2

**guess** 13:17 37:7 39:25 52:3 70:2

**H**

**handle** 10:19

**happened** 57:11

**happening** 35:8

**hard** 38:18

**HCMFA** 11:7 12:8, 11,13,14,15,18,23 13:6,9,13,22,23 15:14,20,21 16:19 18:11,14,19 19:4,19 21:6 23:11 27:6 31:21 34:12,24 35:14,19 36:2,5,13, 16 37:5 40:15 41:4,7, 16,19,24 42:4,8,12, 16,24 43:3,5,12 44:10 45:23 48:3 51:11 57:24 58:4,21 60:15 61:12 62:5,22 65:16 69:14 70:22 71:4,25 72:24 75:7, 20 76:22 78:13 79:5, 17,20 80:8 81:9,25 82:11,12,24 83:12,15 85:16,23 87:16,21 88:12,16 89:14 91:21 92:4,13,20 93:23 94:7,14 95:7,11,23 96:8,17 99:22 100:9, 16,22 101:9,15 103:16 104:5,13,17, 22 105:9,13 106:3,14 107:5,8 108:6,17 109:15 113:23 115:13,16 116:3 117:16 118:4,5,12,20

**HCMFA's** 22:25 41:11 50:25 51:17 54:2 57:20 72:5,15 73:21 74:25 89:16,20

**HCMFAS** 111:23

**HCMLP** 27:6 37:11 42:4 43:10 58:22 64:19 65:8,13,21 81:11 82:8 87:11,21 88:16 89:23,25 90:10

100:10,17

**heard** 78:23

**hearing** 108:10

**held** 16:19 18:4,11,14 20:5,8,12 21:7 35:14 36:13 43:21

**helped** 110:16

**Hendrix** 27:13,15

**Hey** 67:7

**Highland** 4:15 7:17, 24 9:18 11:2 12:2,6 20:23,25 21:8 23:6, 11 25:7 26:21 28:17 29:13,24 30:24 31:11 42:13 43:25 44:15 64:7 69:17,24 70:6 71:5,25 83:13 94:7, 13,18 95:5,8,11,22 96:6,11,20 97:10 99:14 104:4,11,14, 16,22 105:8 106:14, 15 107:7,24,25 108:5,15,16 112:16 115:12,15

**Highland's** 73:22

**hired** 8:19 10:5 87:13

**historical** 35:8

**history** 6:18

**hold** 14:9 15:16,19 90:6

**holds** 15:13 17:17 18:19 19:6 36:7,9,15

**honestly** 112:9

**Houlihan** 85:11 87:2, 3,14,17,20,25 88:4,7

**hybrid** 8:7

**I**

**idea** 46:9

**identification** 24:5 26:3 29:7 72:22 83:3 111:23

**identified** 82:3,4

**identify** 34:16 45:5

**illogical** 107:7 108:16

**imagine** 10:15

**implied** 57:2 58:9

**important** 5:5 23:19

**importantly** 98:18

**improper** 30:23 43:8

**in-house** 7:3

**inappropriate** 99:5

**include** 74:15 78:10

**included** 74:25 76:23 78:8,18 79:11

**includes** 113:25

**including** 75:7 77:22

**inconsistent** 76:9

**incorrect** 60:23,25 79:8

**incorrectly** 60:13 62:17

**indemnity** 96:5

**independent** 73:14 76:2 85:11

**indirectly** 15:5

**inform** 46:7 79:6

**information** 19:21 40:7 71:17 72:20 92:16 107:11 112:14

**informed** 100:10

**initial** 31:17,18,25 33:11 34:18 37:16 40:19 45:6 60:8 101:10

**initially** 25:4

**input** 77:12

**inquiry** 119:5,7

**instruct** 96:12 97:12 101:18 103:18 105:14 110:7,11

**instructed** 104:6

**instructing** 98:19,25 111:9

**instruction** 102:23

**instructions** 103:21

**insurance** 79:19 91:25 92:12,21 96:9, 18 97:5 98:21 99:23 100:6,10,17,20,23

**insured** 16:22

**intact** 99:6

**intended** 30:24 74:16

**intent** 68:7

**intention** 61:11 62:4, 22 63:13 64:14

**intentions** 63:3

**intents** 13:20

**interco** 27:9

**interject** 11:4

**internal** 46:23 61:9, 17 64:16

**internally** 63:18 78:6

**interrupting** 34:22

**interview** 80:17

**interviews** 49:19

**investigating** 28:24 31:8

**investigation** 17:6 18:9 19:12,16,23 20:11 22:18,22 25:3, 6,10 28:23 31:17,19 32:2 33:12 34:18 37:16 40:20 44:6,17 45:7 46:15 47:6,11, 18,24 48:7 51:20,25 54:6 60:9 70:11 72:13 76:15 77:20 80:18 83:9,20 86:18 90:16 91:7 92:3 94:13 96:16,24 97:2, 23,24 98:24 100:15 101:8,11,23 102:21 103:3 104:20 105:25 106:7 107:17 108:5 112:12,21 113:23 118:16

**investigations** 65:20

**invited** 15:12

**involved** 57:13,15,20 63:23 64:6 109:23 111:16 112:10 117:11

**involvement** 57:24 58:4 109:11

**involves** 111:10

**irrelevant** 88:20

**issuance** 75:10

**issue** 16:8,12,17 19:13,23 45:17 57:12,14 66:19 98:20 102:12,13,16

**issued** 74:19 110:24 111:5 118:19

**issues** 58:8 60:7 119:6

**Ives** 7:4

**J**

**January** 69:19

**Jason** 34:25 37:11 47:12

**Jim** 32:2

**job** 36:22

**John** 4:13 11:5 25:21 62:11 82:17 97:17

**joined** 7:25

**Jones** 4:14

**Jr** 24:4

**June** 73:17

**K**

**kicked** 34:5

**kind** 8:6 59:8

**Klos** 26:7,10,12 27:5, 17

**knew** 18:16 40:8 49:21,23 117:14

**knowing** 118:22

**knowledge** 12:16,19 13:16 21:24 22:10 27:16 35:9,20 36:19 37:17 41:23 57:10 58:8 76:14 78:2 81:2, 5 85:16,21 87:23 88:11 94:23 98:14 102:17 106:18 110:18

**Kristin** 27:13

**L**

**lack** 115:9,21

**landlord-tenant** 8:8

**Langley** 7:8,9

**law** 6:4,11,14,19,21 8:3 30:11 64:5 66:18, 20 117:6

**lawsuit** 11:2,7 39:23 40:10

**lawyer** 30:10,17

**learn** 19:22 69:6 78:17 94:13

**learned** 37:25 39:18 92:7 97:25 101:22 102:19 105:15 106:2

**learning** 78:20 106:11

**leave** 54:3

**leaving** 10:17

**led** 49:22 68:17

**left** 23:6 36:21

**legal** 9:19 12:25 63:22 64:6,12 75:14 114:8,13 116:22,24 118:9

**legally** 114:25

**lend** 107:8

**liabilities** 41:17 68:24 69:9

**license** 6:3,9

**limit** 66:9

**limitations** 117:23

**limited** 40:14 42:24 102:3,14 109:11,13

**limits** 117:24 118:2

**lines** 45:19 60:11

**listed** 82:22 93:21

**litany** 45:3

**literally** 40:23

**litigation** 8:7,10 10:22 102:20

**LLP** 12:2

**loan** 27:9 60:14 61:13 62:6,23 63:15 95:12 96:2 97:11 99:16 108:16 115:24 116:16 117:3,12

**local** 66:8

**Lokey** 85:11 87:2,3, 14,20,25 88:4,8

**Lokey's** 87:17

**longest** 49:3

**looked** 30:10 40:21 77:16

**loss** 91:15 94:19

**losses** 57:25

**lot** 10:9 34:2 35:7

**lots** 10:13 49:8

**LP** 4:15 13:24 15:6 20:23,25 28:18 29:14 69:17

**M**

**Mabry** 20:17,19,21 22:11,16,20,24 25:7 47:7

**Mabry's** 21:11

**Madam** 120:6

**made** 34:4,6 40:3 53:11 56:5,9,17,25 57:4,8,16,19 58:10 59:10 60:19 64:19 75:7 78:7 80:11 81:13 82:7 86:23 89:5,7,25 93:11,13

95:5,13 96:10 97:10, 24 99:14 105:13 106:15 115:3 119:5,7

**make** 20:11 25:14 40:2 41:3,15 89:16, 20 93:2 96:4,17,22 100:7

**maker** 28:16 29:13, 23 30:3,12,22 108:2

**making** 59:15 63:23 95:6,22 116:16

**manage** 14:25

**managed** 7:24 16:19 19:18

**Management** 4:15 12:2,6 20:23,25 28:17 29:14,25 30:24 31:12 69:17

**manager** 16:3 17:2,7

**managing** 10:2

**March** 31:22 42:9 44:15 45:24

**marked** 24:4 25:19 26:3 29:6 72:18,22 83:3 111:21,23

**Martin** 7:11

**matched** 90:18,21

**matches** 93:6

**math** 93:5

**Matt** 9:24

**matter** 43:9

**matters** 10:22 118:24

**Mcgraner** 9:24 10:4

**Mcgraner's** 9:25

**means** 115:22

**meant** 114:18,23

**meet** 12:25 15:9 17:12

**memo** 45:20 65:6 82:23 83:2,12,19 84:9,13,17,20 86:25 88:11,14,16 93:12 111:22

**memory** 38:20

**memos** 45:14,15,24 46:3,13,17 65:10,13, 15 83:5,8

**mentioned** 105:20

**met** 15:11 17:14

**Methodist** 6:16

**methodology** 86:6

**Michael** 120:10

**mid-april** 43:17 44:16

**middle** 34:13

**migrated** 25:7 43:25

**million** 27:5 28:3 29:9 63:17 82:11 89:5,7 90:8,12 91:16, 20,24 92:5,12 93:3, 23 94:6,7,14,18 95:11,23 96:9,18,20 97:5 99:15,22 101:9, 15 103:16 104:22 105:12,19 106:3,13 107:8,24 108:6,14 115:13,16 116:17 117:2

**Minick** 6:22

**ministerial** 63:25

**minutes** 49:14 66:9 67:6,16

**misleading** 86:14,19

**mistake** 48:2 50:21 51:22 52:2,17 53:11 56:5,10,18,25 57:4,8 58:10 59:11,15 65:11,14 75:7,10,18 76:10 77:2,21 78:4 80:11 81:13 84:5 95:4 98:12,17 99:14 106:14 114:2,6,22

**mix** 48:22,24

**moment** 51:6

**money** 56:22 58:20, 21 61:23 108:7,16 115:23 116:4 117:12

**Morris** 4:8,13 11:10, 15,18,22 16:9 17:23,

24 18:2 25:24 30:20 31:2 56:2 62:16,18 63:9,11 66:21 67:2,7, 17,20 69:15 71:21 76:17 77:8 78:11 82:20 83:4 88:21 95:2 97:7,14,20,23 99:7,9 101:25 102:24 103:14 104:9 110:9, 19,22 111:18 113:4, 9,15,16 114:10,15 119:15,21 120:4

**motion** 54:3 77:5 102:14

**move** 88:21

**moved** 6:24

**moving** 35:12

**mutual** 113:25 114:5, 6,22

**N**

**N-A-V** 16:10

**named** 20:16 27:19

**NAV** 16:8,12,17 19:13 22:10 45:11,16 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:3,16,24 86:6,11 88:17 91:15 92:5 94:19 95:5,9,22 99:14,24 100:11,18 106:15

**necessarily** 15:3

**needed** 71:19 81:13 92:25 101:9,15 103:16

**negligent** 95:22,25 96:3

**net** 91:15 94:19

**Nexbank** 34:10 49:10

**Nexpoint** 7:13,14,20 8:2,13,15,24 9:2,10, 14 10:8 11:9 13:6,8, 9,13,20,24 14:13,14, 20 15:5,16,17 21:5

37:3 64:5 87:21
109:8

**Nexpoint's** 10:22,25
109:3,12

**nonlawyer** 71:17

**Norris** 34:20 35:3,10,
13 36:7,9 37:15
42:20 46:7 47:13
59:22 84:7 95:10,16
104:20 105:6,7,20
106:2,8,12 109:19

**Notary** 4:4 120:25

**note** 27:20 28:3,15
29:3,5,8 30:6 61:24
64:6 69:13 71:19
90:18,19,22 108:2,8
115:3 117:13 118:23,
25

**noted** 11:18 120:15

**notes** 25:11,14
28:22,24 31:4,7,11
32:7,9,11,16,21,24
33:6 37:17,19,20,22,
25 38:3,7,10,12,15,
22,25 39:5,9,11,18,
22 40:9,25 41:5,8,16
42:18,21 46:9 47:25
50:3,6,10,13,17,20,
25 51:9,12,18,22
52:2,7,14,17,25 53:8,
12,17,20 54:8,12,19,
22,25 55:5,9 56:5,10,
18,20,23 58:10,21,23
60:7 61:8,11,13,17,
21 62:5,21,23 63:14,
25 64:15 68:13,18
69:7,14 70:8,12,18,
22 71:5,11 72:2
74:22,25 75:7,10,18,
20 76:9 77:2,21 78:8,
18 79:11 90:12 95:4
113:25 115:8 116:5,
10 117:17,20 118:4,
12,19 119:11,13

**November** 6:10

**number** 93:4,6,7
119:2

**NXRT** 109:7

## O

**oath** 66:12

**object** 17:20 30:14
62:10,13 63:4 64:9
69:10 72:3 75:11
76:12 77:3,24 101:17
106:16

**objection** 56:6 63:10
71:8 85:18 94:9,21
99:4,18

**obligates** 64:17

**obligation** 63:17

**obligations** 76:10
108:14 112:15

**obtain** 6:9 83:22

**obtained** 92:4,13
94:7

**obtaining** 44:24

**occasion** 7:22

**occurred** 74:17
77:16,21

**October** 36:5 69:19
112:8 113:2

**odds** 76:20

**offer** 8:16,17

**office** 33:25 34:10
49:11

**officer** 36:18,25 37:2,
5,11 51:2,10 117:16,
19

**officers** 12:18

**official** 12:12

**operation** 111:13

**opinion** 114:8
115:23

**opportunities**
109:13

**opportunity** 23:20

**order** 23:21 101:15
120:12

**orderly** 86:4,23

**ordinary** 87:18

**organizational**
15:24

**origin** 25:10

**original** 31:22 42:3

**origins** 28:24

**overlap** 11:21

**overseeing** 10:21,25
78:13

**owed** 107:25 108:14
112:15

**owned** 7:20 13:7
15:4

**owns** 13:9

## P

**p.m.** 67:18,19 119:19,
20 120:15

**Pachulski** 4:13

**paid** 60:14 82:11
92:20 93:23 95:11,23
96:20 104:5,12,17,22
106:3,13,22,23
107:24 108:13
115:12,16

**papering** 117:2

**paragraph** 31:15
32:6 34:11,14 39:3
40:13 42:9 43:20
46:25 47:3,5,19
50:19 51:7 59:6,7
62:20 68:7 74:21
79:15,16,24 85:10,
13,17 88:24 93:7
107:3,5,11,18 113:18

**paraphrasing** 98:11
113:21

**Pardon** 98:8

**parse** 59:8

**part** 22:4,8,12 31:16
33:11 34:17 40:19
45:6 46:15 47:5,11
48:6 49:18 60:8
61:12 62:4,22 70:10
72:12 75:21 80:18

83:9,20 90:16 96:16
98:24 99:23 100:15
104:19 105:25 108:4
111:12 112:12,20
118:15

**participate** 109:4

**participated** 109:6

**participation** 118:9

**parties** 117:10

**partnership** 118:6,7

**parts** 35:12

**party** 64:18 85:11
87:4

**pass** 119:25

**past** 64:12 87:22

**pay** 58:21 64:3,18
94:15 101:16 103:17
105:13 106:3

**payable** 98:21

**paying** 104:15

**payment** 63:19 89:4,
6,11,17,21 90:8,17,
21 91:21 92:6 93:10,
13 97:10 98:20 99:15
105:3,8,12

**payments** 79:21
89:2 97:6 115:2

**pending** 5:24

**people** 10:14,17 13:2

**perfectly** 66:5

**perform** 12:13

**performed** 64:2
80:10

**period** 69:24 72:16,
25

**person** 13:19,21
33:19,20,22,24 48:22
80:4

**personal** 52:7 57:10
58:8 76:14 78:2 81:2,
5 85:21 94:23 98:14
106:18

**personally** 57:13
107:24

**phase** 25:5 44:6,16
47:6,11,15,17,24

**Phillips** 7:11,12,16
8:15

**phone** 33:19 34:9
48:22 49:12

**phonetic** 109:20

**phrase** 31:18 114:18,
22 116:14

**pick** 74:16

**pin** 33:9

**piss** 67:15

**place** 33:18 48:22
65:4

**play** 26:13

**played** 22:16,20,24

**pocket** 93:15,18

**point** 11:24 18:16
34:3 91:8 99:2

**policy** 64:17,21,24
65:3,5 82:5,6 100:6
117:6

**portfolio** 16:3,25
17:7

**portion** 88:22 92:24
100:23

**position** 8:18 18:4,
19,23 20:9 21:7
35:14,17,19,23

**positions** 16:18 19:7
20:5,12 36:8,10,13,
16 37:8

**Post** 34:25 35:10
36:12,13,18 37:15
42:20 46:7 47:13
59:21 83:24,25
95:10,16 104:20

**potentially** 43:8

**practice** 6:4,7 30:11

**premarked** 25:18,23

**preparation** 69:4
78:14

**prepare** 52:10

**prepared** 61:8,17 62:21 68:8 71:11 73:21,25 76:6 77:11 106:25

**preparing** 59:25

**present** 33:15 48:11

**preserve** 30:18

**president** 15:18 35:24 36:2,4

**prevented** 102:11

**previously** 4:21 24:4 26:3 29:6 72:17,21 77:14 83:3 111:21 118:19

**Pricewaterhouseco opers** 73:15 76:3,7 77:12 79:6

**primarily** 7:19

**principal** 32:20,24 116:5

**prior** 7:25 38:12,23 39:2,22 40:9 42:2 68:24 73:22,25 74:18 92:8

**privilege** 101:21 110:14

**privileged** 96:14

**proceed** 67:21 96:18

**proceeding** 23:10 42:5 71:2 74:2 111:11

**proceeds** 91:25 92:12 96:19 99:23 100:6,20,23

**process** 44:22 56:20,22 63:18,22 77:15 109:4,7,12,16, 24 116:15,25 117:3, 5,7

**produced** 110:15

**product** 96:15 98:23 101:21 110:14

**professional** 97:17

**prohibited** 80:19

**promissory** 25:11 28:3 29:5 30:6 108:2

**proper** 116:9,13,14 117:5 118:17

**proposed** 24:24

**provide** 7:17 12:22 14:6 16:4 42:4 44:15 112:14

**provided** 7:19 43:4 44:9

**Public** 4:4 120:25

**purely** 103:6

**purports** 73:23,24

**purpose** 24:18 25:9 61:9,18,20

**purposes** 13:21

**put** 23:15,17,23 25:18 31:16 67:17 72:15 82:16 111:19 117:17

---

**Q**

**qualified** 94:10

**question** 5:6,13,24 17:25 20:7 60:5 65:18 66:17 67:8 71:23 75:12,16 76:24 97:9,15 102:16 106:12 111:2 114:19 118:21

**questions** 5:5 10:13 99:8 103:5,7,11 110:20 119:23 120:2

**quick** 66:4

---

**R**

**raised** 38:2

**ran** 20:2

**reach** 43:8

**reached** 79:5 100:3

**reaching** 59:18 118:16

**read** 23:21 51:13 61:14 62:17 79:22

85:13 120:8

**ready** 67:21

**real** 8:4,9,10,20,22 9:7,15 14:14,20 109:8

**Realty** 7:4

**reason** 81:20 85:22 86:2,13 93:25

**recall** 9:3 15:10 18:17 20:15 21:22 22:13,15 23:5 27:2 32:6,10,13,18 33:3, 13,17,18 34:21 35:17 38:9,21,24 39:4,10 40:21 41:14 42:15, 17,21 44:21,23 45:15 46:14 48:13,16,17,20 49:2,20 54:23 58:17 60:10 65:23,24 68:19 72:7,9,11 90:13 91:9

**receive** 116:4

**received** 26:20 99:22

**receiving** 27:2

**recess** 67:18 119:19

**recollection** 32:15, 25 33:5 35:2 46:10 51:15 57:3,5 65:12

**reconsider** 75:9

**record** 4:10 25:14 30:19 43:22 66:7 67:17

**records** 40:14,18 41:5,9 42:25 44:11, 14,19,25 70:19,23

**refer** 12:7 13:6,23 16:23 31:3

**reference** 44:9 79:11 88:25 115:21

**referenced** 96:25

**referring** 44:19 64:22

**refrained** 43:10

**refresh** 32:15 51:15

**regular** 120:13

**reimbursement**

96:6

**related** 8:7,9 16:18 32:25 33:6 40:24 45:11 46:9

**relates** 98:20 110:13 119:8

**remained** 21:6

**remember** 24:18

**renewal** 108:25 109:4,16

**reorganized** 4:15

**report** 9:23 73:13 82:12

**reported** 9:20 58:4 76:10

**reporter** 11:20 25:22 120:6,10

**reporting** 10:3 75:20

**reports** 110:3,24 111:5

**representative** 109:14

**represented** 105:23

**reputation** 87:5

**requested** 41:19

**requesting** 24:20

**requests** 45:2

**requires** 66:20 117:7

**Residential** 14:13 109:8

**resolution** 83:16

**respect** 109:7,12

**respond** 41:20

**response** 22:25 27:11 52:4,9 54:15 57:21 58:14

**responses** 112:24

**responsibilities** 10:7

**responsibility** 10:21,25 57:20,23 58:3 79:17 80:7,23

81:4,8,25 105:8

**responsible** 63:19 64:18 65:8,14,21 78:13 88:4,8,17 94:18 95:6 100:11,18 104:4,12,14,16 109:15 114:25

**restate** 17:25 62:17

**restroom** 66:25

**result** 113:22

**resulted** 47:17 86:6

**resulting** 91:15 94:19

**retail** 110:3 111:6 112:14,25

**retained** 87:10

**returned** 100:22

**Returning** 51:9

**review** 40:19 59:20 68:16 69:3 107:20,21 110:5 111:7 112:17 113:2 120:8

**reviewed** 40:14 41:11 45:6,10,16 55:14 68:23 69:5 88:14

**reviewing** 46:14 47:20 68:9 69:6 83:21 84:25 112:4

**rights** 99:5

**role** 12:10 22:17,21, 25 26:13 102:14

**room** 49:10

**row** 91:14

**rude** 11:13

**Rukavina** 11:4,12, 16,23 17:20 30:14 55:19 56:6 62:10 63:4 64:9 66:16,24 67:5,10 69:10 71:8, 14 72:3 75:11 76:12 77:3,24 78:25 85:18, 20 94:9,21 96:12,22 97:12,16,22 98:4 99:18 101:4,17 102:7 103:12,18 104:6

105:14 106:16 110:6,
12 111:8 113:6,13
114:7 119:25 120:6

**ruled** 77:6

**rules** 5:3

---

**S**

**Sauter** 4:1,11,12 5:1
6:1 7:1 8:1 9:1 10:1
11:1,6,23 12:1 13:1
14:1 15:1 16:1 17:1
18:1,3 19:1 20:1 21:1
22:1 23:1,18 24:1,4
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1,18 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1,
20 56:1 57:1 58:1
59:1 60:1 61:1 62:1,
19 63:1,5 64:1 65:1
66:1,9,17 67:1,22
68:1 69:1 70:1 71:1,
14 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1,2 80:1 81:1 82:1
83:1,6 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1,23 97:1,13
98:1 99:1 100:1
101:1,5 102:1,23
103:1,15,19 104:1
105:1 106:1 107:1
108:1 109:1 110:1,7,
16,23 111:1,8 112:1
113:1 114:1,21 115:1
116:1 117:1 118:1
119:1,21 120:1,19

**save** 120:2

**schedules** 68:21,24
69:9,25

**school** 6:12,15,19,21

**scope** 76:15

**Scott** 9:18

**screen** 23:15,18
31:16 82:16 111:20

**scroll** 23:24 26:4
43:19 46:25 84:23
93:8 112:2

**search** 38:19

**SEC** 22:18,21 23:2
45:22 46:24 57:21

**Sechrest** 6:22

**section** 74:6,11,15

**Securities** 13:9

**Sella** 109:20

**send** 113:11 120:9

**sense** 49:5

**sentence** 44:20 59:9
62:19 86:3,14,19

**separate** 14:23 15:2

**series** 5:4

**serve** 36:24

**served** 9:14 19:17

**serves** 16:2

**services** 7:17,19
12:22 14:7 16:4 43:4,
5 87:17

**set** 47:18 94:3 100:3
107:18

**sets** 24:23

**share** 81:20

**shared** 43:5

**she'll** 84:23

**sheet** 41:17 69:8

**sheets** 41:12

**shortest** 49:4

**shortly** 82:10

**show** 32:9 49:17 92:2

**showed** 38:12

**shown** 76:5

**shows** 91:14

**shuffle** 10:16

**sic** 16:10 46:8

**sign** 24:15 53:8,16
54:7,11,16 116:10

117:13 118:3 119:10,
13

**signature** 24:10,12
28:7,9,11,13 29:18,
20,22 30:23 53:17,23
117:16

**signed** 48:2 50:17,
20,24,25 51:12,16,
18,21,25 52:7,25
53:20 54:16,19,25
56:23 68:25 84:13
92:9,13,17,20 99:11,
21 108:8 117:14
118:12

**signing** 50:9,15
52:16 53:11,16 55:5
56:5,10,18 77:21

**simple** 5:3

**simply** 71:23

**simultaneous** 11:17
53:5 67:4,9 93:20
97:19 103:13

**sir** 4:17,20 5:9 6:4
12:9 14:16 15:7
16:24 23:13 24:13,17
25:12 28:11 76:18
77:9 96:16 99:10
103:24 106:19
111:25 113:19 120:4

**sit** 71:24

**sitting** 32:19

**situation** 43:16,23

**skills** 21:11

**Skyview** 10:16 21:4
44:2

**sought** 69:13

**sounds** 113:15

**source** 13:12 28:22
79:24 89:10,16,20
90:5,7 94:2 107:10

**sources** 91:19 92:24

**Southern** 6:16

**speak** 46:4 47:10
48:8 66:13 67:24
84:2,8 105:18

**speaking** 34:21 35:3

80:19

**specific** 20:14 58:18,
25

**specifically** 20:4
50:20 65:13 72:10

**speculate** 109:18,21

**speculating** 18:8
19:9

**speculation** 21:3

**spend** 68:9

**spent** 49:6

**spoke** 32:2 34:12,17
47:7 84:4

**spoken** 34:8,19
47:12 105:21

**St** 7:4

**Stacey** 16:9

**Stang** 4:14

**star** 46:8

**started** 7:10 37:13

**state** 4:9 61:25 62:3,
20 113:20

**stated** 65:21 68:7
77:14

**statement** 63:3,12
64:13 70:4 79:25
80:4,6

**statements** 58:25
69:24 72:6,12,16,20,
25 74:7,12 75:2,8,21,
25 76:11,20,24 77:23
78:15,19 79:7,12

**states** 6:6 24:7 27:8
40:13 53:10 65:8
81:24

**stating** 55:8 70:7

**staying** 10:17

**stick** 68:6 102:22

**stop** 84:24 103:5

**strategic** 109:13

**strike** 88:21

**subject** 108:25

**subjective** 116:18

**submitted** 23:9
45:21

**submitting** 44:25

**subpoena** 102:4

**subpoenaed** 11:6

**Subscribed** 120:21

**subsequent** 74:7,11
75:2 78:9,10

**subsequently** 92:7

**subset** 19:25

**subsidiaries** 7:21
13:7

**substance** 54:11
55:22 66:14 67:25
68:4 84:3,9

**suggest** 53:7

**suggested** 39:15
88:4

**suggests** 52:24
53:15

**suing** 31:12

**summarize** 107:4

**summarizing** 48:18

**Supplemental** 72:20

**support** 54:2

**supposed** 74:15
99:15

**Surgent** 37:10 80:16,
17,24 81:3

**surmising** 35:4,5

**surrounding** 50:3
118:22

**suspect** 20:24

**sworn** 4:4 63:2
120:21

**system** 40:24

---

**T**

**T-E-R-R-A-S-T-A-R**
16:10

**taking** 66:24 67:2

**talk** 16:7,11 39:15 48:5 67:14

**talked** 35:9 67:13

**talking** 11:21 25:15 63:16

**tax** 6:23

**team** 19:25 21:14 22:4,12 77:13

**telling** 56:9 57:4

**tells** 88:16

**ten** 8:4 49:13 66:9 67:5

**tenure** 8:15

**term** 13:5 22:5 30:12 118:25

**terminated** 23:7

**Terrestar** 16:8,12,17 19:12 22:10,17 45:11,16 50:7 57:12, 14,17 65:9,22 87:8

**testified** 4:5 56:4 58:19 98:16

**testifying** 98:17

**testimony** 45:23 55:17 56:16 64:4 67:25 68:4

**Texas** 6:8

**thereof** 48:23,25

**thing** 25:15 84:6

**things** 9:17 34:2 35:9 47:25 62:20 102:8,19 113:20

**Thomas** 37:10 80:16

**thought** 46:7

**till** 6:23 120:2

**time** 5:22 6:18,24 7:25 9:14 12:14 13:11 17:22 18:5,15 23:16 31:20,21 33:25 38:12 41:20 42:3,16 49:6 50:23,25 51:12, 16,18 66:8 68:9,25 75:3 78:21 84:21

**91**:6 92:8,17,19 96:10,19 100:7,20 105:22 106:7 108:11 117:16 119:22 120:13,15

**times** 48:8

**timing** 32:15 74:3 108:19

**title** 9:25 12:10 15:13, 17,20 18:10,14

**titles** 14:9 17:17

**today** 4:19 6:19 9:23 10:7 12:8,11,18 18:20 32:19 35:20 36:16 41:7 71:24 78:22 98:17 101:12 108:11 119:22

**told** 11:10 32:23 38:6 50:12 53:18,19 54:18,21 56:4,12,17 58:8 71:17,19 81:17 89:22,24 90:3 94:16 98:9 100:16 102:20 104:7 105:5 108:4,9 112:24 115:19 116:6

**top** 28:14 92:24

**topic** 52:16

**total** 14:22 91:15 92:25 93:10,13,15, 17,22

**transaction** 61:13 62:6,24 63:15 84:5 108:20 117:2 119:8

**transactional** 8:10

**transcript** 55:15 120:9

**transfer** 71:20 89:22, 24 108:6 115:3

**transferred** 27:5 56:22 58:20,22 61:23 64:2 94:14 115:24

**transferring** 117:12

**transpired** 100:7 114:25

**treasurer** 18:7,25 19:3 21:13,16

**treated** 70:12,18,22

**trial** 77:5 98:15 102:13,25 103:2 120:2

**Trust** 14:13 109:8

**U**

**ultimately** 79:19 80:13 81:12

**unaware** 39:21 50:13 97:5

**unclear** 93:14

**uncovered** 86:17

**understand** 5:18 20:6 23:19 25:10 26:12 30:2 35:22 73:20 74:2 75:24 83:11 91:13,18,22,23 93:9,22 96:23 97:20 98:5 101:14 102:6 103:15

**understanding** 15:20 16:16 18:22 19:2,24 21:15,19,21 22:3,8 31:10 71:10, 12 74:10,14 84:17 87:9 92:23 95:9 117:3

**understood** 50:23

**undertook** 98:6

**University** 6:16

**utilized** 87:21

**utilizes** 87:16

**V**

**vague** 17:21

**valid** 76:10

**valuation** 19:25 21:14 22:4,12 57:12, 14,17 80:10 81:11 82:8 85:12 86:5 87:4, 7,17 88:5,8

**verify** 28:12 29:21

**vice** 35:24,25 36:4

**view** 43:7 108:15 116:19 117:19

**vis-à-vis** 65:15 95:7

**void** 115:9

**W**

**wait** 14:18 101:4

**waiting** 113:6

**watch** 11:20

**Waterhouse** 17:10, 13,16 18:4,11,14,19 19:3,6,17 20:2 25:6 29:24 39:16 43:24 46:4 47:7 48:2,6,15, 19 49:6,17 50:9,16, 21,24 51:10,17,21,24 52:6,24 53:8,10,15, 25 54:7,18,24 55:4,7, 11 56:9,17 58:9,13 59:2,10,14 60:13,18 61:8,16 63:22 70:17, 21 71:19 78:16 80:16,22 81:7,10,17 90:4 104:21 105:19, 22 106:5 116:9 117:4,15,25 118:11, 17 119:7,9

**Waterhouse's** 28:8, 10 29:20,22 118:3

**week** 36:21,25

**weeks** 78:23 106:10

**weighted** 86:5

**Weinstein** 7:8,9

**wholly** 7:20 13:7

**Wick** 7:10,11,16 8:15

**Winstead** 6:22

**withdrawn** 7:15 15:25 31:17 47:15 57:9 59:5 61:6 62:2 65:6 70:16 80:23,25 89:14 92:10 104:2 112:12 114:18 117:25

**word** 28:13

**words** 52:22 54:9

**work** 7:6 8:11 12:13 13:2,10 96:15 98:23 101:21 110:14

**worked** 7:7 8:14 9:17 26:15,16 27:17 37:12

**working** 111:10

**works** 11:11 117:21

**world** 56:9 65:8

**write** 61:6,7 116:8

**writing** 81:23

**written** 44:25 65:6 82:12

**wrong** 73:7

**wrote** 27:18 50:20 60:12

**Y**

**year** 9:4 96:25

**years** 8:4 15:12 59:19

**Z**

**Ziehl** 4:14

# EXHIBIT 194

Kristin Hendrix - October 27, 2021

## 1

```
 1           IN THE UNITED STATES BANKRUPTCY COURT
 2            FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4                      --oOo--
 5
 6  HIGHLAND CAPITAL MANAGEMENT,      )
    L.P.,                            )
 7                                   )
               Plaintiff,            )
 8                                   )
            vs.                      ) No. 21-03004-sgj
 9                                   )
    HIGHLAND CAPITAL MANAGEMENT FUND )
10  ADVISORS, L.P.,                  )
                                     )
11             Defendants.           )
12  _____
13                 DEPOSITION OF
14                 KRISTIN HENDRIX
15                 October 27, 2021
16  _____
17
18          DEPOSITION OF KRISTIN HENDRIX, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.
```

## 2

```
 1                   APPEARANCES
 2
 3          MUNSCH, HARDT, KOPF & HARR, PC, 500 North
 4  Akard Street, Suite 3800, Dallas, TX 75201, represented
 5  by DAVOR RUKAVINA, Attorney at Law, appeared as counsel
 6  on behalf of the Defendants.
 7          Email: drukavina@munsch.com
 8
 9
10          PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11  Avenue, 34th Floor, New York, NY 10017-2024, represented
12  by JOHN A. MORRIS, Attorney at Law, appeared as counsel
13  on behalf of the Plaintiff.
14          Email: jmorris@pszjlaw.com
15
16
17          STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19  at Law, appeared via videoconference as counsel on
20  behalf of the Defendants Jim Dondero, HCMS and HCRE
21  Partners.
22          Email: michael.aigen@stinson.com
23
24
25
```

## 3

```
 1                      INDEX
 2                                                   PAGE
 3  Examination by MR. RUKAVINA                        6
 4  Examination by MR. AIGEN                          94
 5  Further Examination by MR. RUKAVINA              110
 6  Examination by MR. MORRIS                        111
 7
 8  EXHIBITS                                         PAGE
 9
10  Exhibit 1    Promissory Note, 5M, May 3           30
11
12  Exhibit 2    Promissory Note, 2.4M, May 2         30
13
14  Exhibit 3    Email from David Klos, May 2, 2019,  31
15               HCMLP to HCMFA loan
16
17  Exhibit 4    Promissory Note, 5M, May 3           42
18
19  Exhibit 5    Promissory Note, 2.4M, May 2         42
20
21  Exhibit 6    Promissory Note, 5M, May 3           43
22
23  Exhibit 7    Promissory Note, 2.4M, May 2         43
24
25  Exhibit 8    Info, HCMF loan 05.03.2019           56
```

## 4

```
 1  Exhibit 9   Info, HCMF loan 05.02.2019         56
 2
 3  Exhibit 10  Email from Scott Ellington, Dec 2,  59
 4              2020, HCM - HCMFA financial
 5              statements
 6
 7  Exhibit 11  Email from John Morris to           62
 8              James Seery, Jan 6, 2021,
 9              HCM information request
10
11  Exhibit 12  Letter, Dec 3, 2020, Demand on      65
12              Promissory Notes
13
14  Exhibit 13  Promissory Note, $30,746,812.33,    72
15              May 31
16
17  Exhibit 14  NPA $30.7M                          76
18
19  Exhibit 15  HCMLP Notes Receivable              83
20
21  Exhibit 16  Email from Frank Waterhouse to      85
22              Lauren Thedford, Oct 6, 2020, 15(c)
23              follow-up
24
25
```

Kristin Hendrix - October 27, 2021

5

1 Exhibit 17  Email from James Seery to          88
2        James Dondero, Jan 7, 2021, demand
3        on promissory note
4
5 Exhibit 18  Email from Kristin Hendrix, Jan 12,   90
6        2021, NexPoint Note to HCMLP
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1          KRISTIN HENDRIX,
2    having been first duly sworn, testified as follows:
3          EXAMINATION
4    Q.  (BY MR. RUKAVINA)  Good morning.  If you'll
5 state your name.
6    A.  Kristin Hendrix.
7    Q.  We're doing this both ways.  You're on the
8 Zoom remotely and they can see you, but I would ask
9 that you and I maintain eye contact.  Of course, if
10 someone is asking you on the Zoom, then maintain
11 contact with them, if that's okay with you.
12    A.  Sure.
13    Q.  Have you been deposed before?
14    A.  No.
15    Q.  So I'm sure your counsel explained to you,
16 but very quickly, you understand that you're testifying
17 under oath and penalty of perjury as though you were in
18 a court of law?
19    A.  Yes.
20    Q.  And you understand my job is to ask clear
21 questions that you understand?
22    A.  Yes.
23    Q.  And if for whatever reason you don't
24 understand my questions, please let me know or ask me
25 to rephrase; otherwise, I'm going to assume that you

7

1 understood my question; okay?
2    A.  Yeah.
3        MR. MORRIS:  Objection.
4    Q.  (BY MR. RUKAVINA)  Sometimes Counsel will
5 make objections.  Unless he instructs you not to
6 answer, you're still required to answer my questions.
7    A.  Okay.
8    Q.  Now, in preparation for this deposition, did
9 you read the deposition transcript or any part of it of
10 Frank Waterhouse?
11    A.  I did not.
12    Q.  Did anyone provide you a synopsis or summary
13 of it?
14    A.  Maybe a few bits and pieces, but...
15        MR. RUKAVINA:  Off the record for a second.
16        (Off the record.)
17    Q.  (BY MR. RUKAVINA)  What do you mean bits and
18 pieces?
19    A.  I don't recall anything specific that was
20 said, other than it was very long.
21    Q.  Did you talk to Frank Waterhouse about it?
22    A.  Did not.
23    Q.  Other than Highland's legal counsel, did you
24 talk to anyone else about -- or -- strike that.
25        Other than Highland's legal counsel, did you

8

1 talk to anyone about Frank Waterhouse's deposition from
2 last week?
3    A.  I did not.
4    Q.  Did you review -- strike that.
5        Did you see any of the video of
6 Mr. Waterhouse's deposition?
7    A.  Nope.
8    Q.  Same questions now for Mr. Seery, S-e-e-r-y.
9        Did you read any portion or the whole of
10 Mr. Seery's deposition from last week?
11    A.  I did not.
12    Q.  See any of the video?
13    A.  No.
14    Q.  Did you see any synopsis or summary of his
15 deposition?
16    A.  No.
17    Q.  Did you talk to him about his deposition?
18    A.  I did not.
19    Q.  Other than talking to Highland's counsel, did
20 you talk to anyone about Mr. Seery's deposition?
21    A.  No.
22    Q.  Other than talking to Highland's counsel, did
23 you talk to anyone about your deposition today?
24    A.  Just John Morris and Dave Klos.
25    Q.  When did you talk to Mr. Klos, K-l-o-s?

Kristin Hendrix - October 27, 2021

---

**9**

1    A.  First time about this was last Friday.  And
2  then again Monday this week.  And yesterday.  And this
3  morning.
4    Q.  Friday was there any lawyer present during
5  your discussion with Mr. Klos?
6    A.  Yes, every time Mr. Morris was present.
7    MR. RUKAVINA:  Is it your position that those
8  four discussions would be privileged, Counsel?
9    MR. MORRIS:  Yes.
10   MR. RUKAVINA:  Then we'll move on.
11   Q.  (BY MR. RUKAVINA)  So we've established the
12  four times you talked to Mr. Klos with counsel present.
13  Did you do anything else related to or in preparation
14  for today's deposition?
15   A.  Yes, probably went through and reviewed some
16  emails, documentation that I may have had that I need
17  to refresh memory on.
18   Q.  These documents and emails that you might
19  have reviewed, did you supplementally provide them to
20  counsel or anyone else?
21   A.  Yes.
22   Q.  This would have been in the last week or
23  10 days?
24   A.  Yes.
25   Q.  Prior to the last week or 10 days, are you

---

**10**

1  aware that my office served requests for production on
2  Highland?
3    A.  Yes.
4    Q.  And did you do anything prior to the last
5  week or 10 days to try to search both your personal
6  records and corporate records for any responsive
7  documents?
8    A.  Not that I recall.
9    Q.  Is that something that you understand legal
10  counsel was charged with?
11   A.  Yes.
12   Q.  Let's go briefly now about your background,
13  please.
14   Where do you live?
15   A.  I live in Denton, Texas.
16   Q.  And what is your date of birth, please?
17   A.  January 26, 1982.
18   Q.  And walk me through your educational
19  background, starting with any postsecondary, if any,
20  schooling or college or anything like that.
21   A.  Sure.  Graduated in 2004 from the University
22  of North Texas with a degree in finance.  Went on to
23  get my MBA from SMU in 2009.  And then went further and
24  got my CPA license I believe in 2015.
25   Q.  In the state of Texas?

---

**11**

1    A.  Yes.
2    Q.  And has your CPA license been current since
3  then?
4    A.  Sure has.
5    Q.  Have you faced any kind of disciplinary
6  action as a CPA?
7    A.  I have not.
8    Q.  Now, please walk me through your work
9  history.  Let's say starting with after you graduated
10  college.
11   A.  Sure.  December of 2005, which was shortly --
12  sorry, 2004, shortly after I graduated from
13  North Texas, I started at Highland.  It was my first
14  real job out of college.  I have been there ever since,
15  almost 17 years now.
16   Have worked in the corporate accounting
17  department the entire time.  Started off as the AP
18  associate, and worked my way up over the years and
19  currently am the controller.
20   Q.  So even when you were getting your MBA and
21  CPA you were employed by Highland?
22   A.  Yes.
23   Q.  Impressive.  You're the controller today you
24  mentioned?
25   A.  Yes.

---

**12**

1    Q.  That's -- when did you become the controller,
2  sometime February or March of this year?
3    A.  Yes.
4    Q.  Before you became the controller, what was
5  your role at Highland?
6    A.  Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10   Q.  So in May of 2019 would you have been the
11  senior -- you said senior account?
12   A.  Senior accounting manager I believe was my
13  title.
14   Q.  And would that have been your title in May of
15  2017?
16   A.  Yes, I believe so.
17   Q.  And let's focus now on May 2019 as the senior
18  accounting manager.  How would you describe your role
19  at Highland in May of 2019?  What were your duties?
20   A.  Sure.  I helped with treasury management
21  function, cash forecasts and things like that.  And
22  oversaw the financial reporting from the last batch of
23  AP all the way to financials and reporting on
24  audits.
25   Q.  Who did you report to in May of 2019?

---

Kristin Hendrix - October 27, 2021

**13**

1   A.  David Klos.
2   Q.  What was Mr. Klos' title to your
3  understanding back then?
4   A.  I believe he was the controller.
5   Q.  And do you have an understanding as to who
6  Mr. Klos reported to back then?
7   A.  Yes, Frank Waterhouse.
8   Q.  Frank Waterhouse.  Who was he in May of 2019?
9   A.  The CFO.
10  Q.  Is Mr. Klos still with Highland today?
11  A.  He is.
12  Q.  What is his role now?
13  A.  He's now CFO.
14  Q.  You mentioned treasury management as of 2019,
15  May.  What do you mean by treasury management?  What is
16  that?
17  A.  Generally speaking, we -- it's not just me as
18  one person.  We have checks and balances.
19      My team would be in charge of sending out
20  payments, reconciling bank statements, making sure
21  money is in the right accounts, creating cash forecasts
22  and reporting on those every week with the CFO and
23  oftentimes the CEO.
24      Generally that's everything that fell under
25  the umbrella.

**14**

1   Q.  And would your description of treasury
2  management be the same for the December 2020 period?
3   A.  Yes.
4   Q.  Who at Highland or which group at Highland in
5  December of 2020 would have been responsible for noting
6  that there are certain bills that need to be paid in
7  the near or subsequent future.
8      By way of, let's say, accounts payable or
9  promissory notes or taxes or anything like that?
10  A.  Can you repeat your question.
11  Q.  Sure.  So obviously, Highland was a pretty
12  sophisticated business; correct?
13  A.  Yeah.
14      MR. MORRIS:  Objection to the form.
15  Q.  (BY MR. RUKAVINA)  And had various accounts
16  payable; right?
17  A.  Yes.
18  Q.  And it had maybe, let's just say, certain
19  note obligations that it had to pay from time to time;
20  correct?
21      MR. MORRIS:  Objection to the form of the
22  question.  Do you mean Highland Capital?
23      MR. RUKAVINA:  I mean Highland Capital
24  Management; correct, I'm sorry.  The debtor.
25  Q.  (BY MR. RUKAVINA)  Can we say the debtor?

**15**

1   A.  Yes, you can say the debtor.
2   Q.  So when I say the debtor and you say the
3  debtor we understand each other to mean Highland
4  Capital Management, comma, LP; correct?
5   A.  Correct.
6   Q.  I apologize.  In the December 2020 period, I
7  would imagine that the debtor had its own -- that
8  was -- strike that.
9      We'll cut to the chase.
10      In December of 2020, the debtor was providing
11  services to various other entities affiliated with
12  Mr. Dondero; correct?
13  A.  Correct.
14  Q.  That would have included NexPoint Advisors,
15  LP?
16  A.  Correct.
17  Q.  And you're aware that NexPoint Advisors was
18  the obligor on at least one promissory note to the
19  debtor; correct?
20  A.  Correct.
21  Q.  And did the debtor in December 2020 provide
22  so-called treasury management services to NexPoint
23  Advisors?
24      MR. MORRIS:  Objection to the form of the
25  question.

**16**

1      THE WITNESS:  Yes.
2   Q.  (BY MR. RUKAVINA)  As part of that, in
3  December 2020, would it have been employees of the
4  debtor that would have scheduled for potential payment,
5  subject to approval by NexPoint, NexPoint's future
6  obligations as they were coming due?
7   A.  Yes, we would have scheduled, only with
8  approval.
9   Q.  And would that have included NexPoint's
10  obligations on the promissory note to Highland?
11  A.  Yes.
12  Q.  Back to your background briefly.
13      Do you have any legal training at all?
14  A.  I do not.
15  Q.  Do you have any courses, have you taken any
16  courses in drafting promissory notes?
17  A.  No.
18  Q.  Do you believe that your expertise as a
19  certified public accountant gives you any greater
20  qualification than anyone else to prepare a promissory
21  note?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  No.
25  Q.  (BY MR. RUKAVINA)  Have you ever prepared or

Kristin Hendrix - October 27, 2021

## 17

1  drafted a promissory note?
2      A.  That term is probably used loosely.  I have
3  not completely drafted a promissory note from scratch,
4  no.
5      Q.  And we'll go into the details.  Fair to say
6  that you have taken a form promissory note and revised
7  it?
8      A.  Absolutely.
9      Q.  Was this part of your job in May of 2019 at
10 Highland?
11     A.  Yes.
12     Q.  Going back to the May 2019 time frame, were
13 you part of a particular group at Highland, like
14 accounting or legal or compliance?
15     A.  Yes, corporate accounting.
16     Q.  Corporate accounting.  That's what you
17 described before about treasury management and
18 projections and forecasts?
19     A.  Yes.
20     Q.  In May of 2019, was it the practice at
21 Highland that corporate accounting would be responsible
22 for drafting intercompany promissory notes?
23     A.  Not necessarily drafting, but updating a
24 draft that had been previously produced and provided by
25 our legal team, yes.

## 18

1      Q.  And Highland in May -- the debtor in May of
2  2019 did have a legal department?
3      A.  Yes.
4      Q.  Kind of like the corporate accounting, there
5  was a separate legal department; correct?
6      A.  Correct.
7      Q.  And who would have been in charge of that
8  department in May of 2019?
9      A.  Scott Ellington, E-l-l-i-n-g-t-o-n.
10     Q.  In May of 2019 or by May of 2019 was there
11 any practice at Highland as to whether its legal
12 department would be involved with the drafting or
13 execution of any intercompany promissory notes?
14        MR. MORRIS:  Objection to the form of the
15 question.
16        THE WITNESS:  It depends on the note.
17     Q.  (BY MR. RUKAVINA)  What did it depend on?
18     A.  Our typical practice is if we have a loan
19 with certain affiliates that it's a demand note.  We
20 have a template that we have used for years that was
21 created by either our internal legal team or an outside
22 law firm, I'm not sure which.
23        The typical practice is always updating a few
24 things on that template, getting it executed, and
25 filing it in our audit folders.

## 19

1      Q.  By updating, what do you mean?
2      A.  There's a few things that would need
3  updating, the date.
4      Q.  Maker?
5      A.  Maker.
6      Q.  Amount?
7      A.  The dollar amount, the interest rate.
8      Q.  And is it your testimony that the corporate
9  accounting group would do these things on its own
10 without necessarily the involvement of the legal group?
11        MR. MORRIS:  Objection to the form of the
12 question.
13        THE WITNESS:  Generally, yes.
14     Q.  (BY MR. RUKAVINA)  Do you have any memory in
15 or before May of 2019 if the corporate -- I'm sorry, if
16 the legal group became involved in drafting or
17 executing any prior intercompany promissory notes?
18     A.  Yes.
19     Q.  Explain to me what you remember about that.
20     A.  I do know that they were involved with
21 drafting restructured notes.  So taking demand notes
22 and turning them into a 30-year amort note.
23        That was in 2017.  I know for sure that they
24 were involved in that because it was something
25 different.  We weren't just updating a demand note.

## 20

1      Q.  Is it your testimony that to the best of your
2  recollection by May of 2019 and in May of 2019 it would
3  have been the corporate accounting group that would
4  have handled routine intercompany demand notes?
5      A.  Yes.
6      Q.  And you can think of more than one instance
7  on which that happened?
8      A.  Yes.
9      Q.  And this is not a memory test, but going back
10 in time can you try to give an estimate of what year
11 that first started happening, that the corporate
12 accounting would handle the drafting or execution of
13 intercompany demand notes?
14     A.  As far as I can remember.
15     Q.  Is it your testimony that as -- maybe even
16 going back as far as 2005 there were intercompany
17 demand notes?
18     A.  Yes.
19     Q.  I don't know how to ask this question, but
20 was this a significant thing in corporate accounting or
21 just another routine deal when you handled demand
22 notes?
23        MR. MORRIS:  Objection to the form of the
24 question.
25        THE WITNESS:  This is a routine job duty that

Kristin Hendrix - October 27, 2021

**21**

1 we routinely did.
2 Q. (BY MR. RUKAVINA) Between 2005 and 2019, do
3 you remember any maker on these intercompany demand
4 notes actually being required to pay a demand note, in
5 other words, Highland making demand?
6 A. Not that I can specifically recall.
7 Q. Do you have any recollection as to what
8 happened to these intercompany demand notes over the
9 years between 2005 and 2019?
10 A. Yeah. Typically anytime specifically Jim
11 Dondero would need to move money between related
12 parties, he would pay down -- when I say him, he would
13 have us in corporate accounting move money around, pay
14 off notes, reissue new notes somewhere else.
15 So a way to move money around between his
16 entities.
17 Q. So let's use just hypotheticals here so that
18 I'm not trying to pin you down to any specific fact.
19 But between 2005 and 2019, is it fair to say
20 that if some Dondero entity that's not the debtor
21 needed money and the debtor had money, then Dondero
22 would have the debtor lend money to that entity on a
23 demand note basis?
24 A. So long as they have the cash available to do
25 so.

**22**

1 Q. "They" being the debtor?
2 A. Debtor, yes.
3 Q. And is it fair to say, then, again
4 hypothetically without any specifics, that if the
5 debtor maybe from time to time needed money and one of
6 these other entities had cash, then Dondero would cause
7 that other entity to pay down the demand note?
8 MR. MORRIS: Objection to the form of the
9 question.
10 THE WITNESS: Can you repeat that.
11 Q. (BY MR. RUKAVINA) Sure. So I think you
12 mentioned that from time to time these entities would
13 pay down these demand notes?
14 A. To the debtor?
15 Q. To the debtor.
16 A. Yes.
17 Q. And is that, hypothetically again, is that
18 because on occasion the debtor might have needed cash
19 and these entities had the cash, so Dondero would have
20 them pay back the note?
21 MR. MORRIS: Objection to the form of the
22 question.
23 THE WITNESS: Yes, that could be a reason.
24 Q. (BY MR. RUKAVINA) Can you think of any other
25 reason in those 14 years?

**23**

1 A. If the debtor needed cash to lend to another
2 entity.
3 Q. I see. So again, it's all one big happy
4 family, and whoever needed cash, the cash moved around;
5 correct?
6 A. Correct.
7 Q. Was it Mr. Dondero that basically was the
8 only deciding person in each instance that you're aware
9 of in those 14 years as to when a note would be made or
10 repaid?
11 A. I can't answer specifically to that. Most of
12 my direction came from our CFO at the time,
13 Frank Waterhouse. So what conversations he would have
14 with Jim Dondero, I can't answer to that. But I would
15 suspect so, yes.
16 Q. And in May of 2019 or by May of 2019, did you
17 communicate personally, by email or telephone, in
18 person, periodically with Jim Dondero?
19 A. I can't say periodically, no.
20 Q. Well, I'm not trying to put words in your
21 mouth. Is it fair to say that you kind of -- your
22 communications stopped with Mr. Waterhouse and
23 Waterhouse communicated with Dondero, as opposed to you
24 regularly communicating with Dondero?
25 A. That's typical, yes.

**24**

1 Q. Can you think of any instances in which
2 Mr. Dondero gave you any instructions or you came to
3 him seeking any instructions, without some intermediary
4 between the two of you?
5 A. No, usually Frank was present.
6 Q. Would you categorize Mr. Waterhouse as kind
7 of guarding with jealousy his access to Mr. Dondero?
8 MR. MORRIS: Objection to the form of the
9 question.
10 THE WITNESS: No.
11 Q. (BY MR. RUKAVINA) What kind of boss was he
12 in May of 2019? Was he laid back, or was he a jerk?
13 Was he demanding? How would you characterize him in
14 May of 2019?
15 MR. MORRIS: Objection to the form of the
16 question.
17 THE WITNESS: I would say he was a good boss.
18 Q. (BY MR. RUKAVINA) You think he was competent
19 as far as his job went?
20 A. Yes, very competent.
21 Q. Do you think he was competent as far as his
22 job went in December of 2020?
23 A. Yes.
24 Q. January 2021?
25 A. Yes.

Kristin Hendrix - October 27, 2021

**25**

1    Q.  Was he patient and understanding as a boss?
2    A.  Yes.
3    Q.  Okay.  Was he ever condescending or rude to
4  anyone in your presence?
5    A.  No.
6    Q.  So you're the controller today at Highland,
7  the debtor, the reorganized debtor; right?
8    A.  Yes.
9    Q.  And who do you report to?  You mentioned
10  Mr. Klos is the CFO?
11    A.  Yes.
12    Q.  And do you also report to Mr. Seery?
13    A.  Yes, I think everybody does.
14    Q.  And I don't need to know details, but I take
15  it you're on a salary from reorganized Highland?
16    A.  Yes.
17    Q.  Is any part of your compensation merit or
18  bonus based?
19    A.  It could potentially be.
20    Q.  Have you had any discussions with Mr. Seery
21  or Mr. Klos about some sort of bonus compensation?
22    A.  Yes.
23    Q.  Has anything been agreed to?
24    A.  Yes.
25    Q.  And again, I don't need to know the exact

**26**

1  numbers.  What would your bonus compensation consist
2  of?  How would it be decided?
3    A.  It's actually -- was decided when I agreed to
4  stay on the Highland team back in February 2021, so
5  it's in my employment agreement.
6    Q.  So what's your bonus compensation?
7    A.  I'm not sure I understand what you're asking.
8    Q.  So is the bonus discretionary on the part of
9  Highland?
10    A.  No, it's a set amount.
11    Q.  And what triggers it or governs the set
12  amount?
13    A.  Just it gets paid out on a certain date of
14  the year.  It's very straightforward, set out in my
15  employment agreement.
16    Q.  Is it irrespective of the performance of the
17  reorganized debtor?
18    A.  Yes.
19    Q.  So why do you call it a bonus instead of base
20  compensation?
21    A.  That's what it's called in my agreement.
22    Q.  So your base compensation and your bonus,
23  it's your testimony, you're going to earn it
24  irrespective of whether reorganized Highland does good
25  or bad with respect to its profitability?

**27**

1    A.  Correct.
2    Q.  And how Highland, reorganized Highland
3  collects these promissory notes is going to play no
4  part in your base and bonus compensation to your
5  understanding; is that correct?
6    A.  To my knowledge, yes.
7    Q.  So you have no direct or indirect stake in
8  the outcome of these litigations?
9    A.  No.
10    Q.  And you understand that I represent HCMFA and
11  NexPoint?
12    A.  Yes.
13    Q.  And these court reporters are not familiar
14  with some of our terminology.  NAP [verbatim], if we
15  say that, that means NexPoint; right?
16    A.  Uh-huh.
17    Q.  You have to say yes or no.
18    A.  Yes, NPA, NexPoint.
19    Q.  NPA.  And when we say NexPoint, you and I are
20  meaning NexPoint Advisors, LP; right?
21    A.  Yes.
22    Q.  And when we say HCMFA, we're meaning Highland
23  Capital Management Fund Advisors, LP, yes?
24    A.  Yes.
25    Q.  What is your understanding of the two

**28**

1  lawsuits, the one against HCMFA and the one against
2  NexPoint, that you're being deposed on today?
3      MR. MORRIS:  Objection to the form of the
4  question.
5    Q.  (BY MR. RUKAVINA)  Who is suing who and for
6  what?
7    A.  I don't know all the details.
8    Q.  So we've established that you've discussed
9  these lawsuits in the last week or a little bit more
10  with legal counsel.  I don't want to talk about that.
11      Prior to these recent discussions, did you
12  have any discussions with anyone at Highland about its
13  lawsuits against HCMFA and NexPoint on promissory
14  notes?
15    A.  Repeat that again.
16    Q.  Sure.  So remember we're excluding the recent
17  discussions in the last week or 10 days with counsel;
18  right?
19    A.  Okay.
20    Q.  Are you aware that in January of 2021 the
21  debtor sued NexPoint to collect on a promissory note?
22    A.  I'm aware that demand notices were sent.
23    Q.  So until recently you weren't aware that a
24  lawsuit had been filed?
25    A.  There's a lot of lawsuits filed.  I can't

Kristin Hendrix - October 27, 2021

**29**

1 keep track of what is what or what we're talking about
2 at certain times.
3        Q.  But you have no distinct memory of that?
4        A.  Correct.
5        Q.  And same question for the lawsuit that the
6 debtor filed against HCMFA in January.
7              Do you have any specific memory of that
8 lawsuit having been filed?
9        A.  Not specifically.
10       Q.  You mentioned that you're aware that on or
11 before January 2021, demand letters had been sent?
12       A.  Yes.
13       Q.  Did you play any role in either drafting
14 those demand letters or the decision to send them?
15       A.  No.
16       Q.  So going back to my question about these
17 lawsuits, do you have any memory of anyone asking
18 you -- again, excluding the last week or two.
19             Do you have any memory of anyone asking you
20 to do anything with respect to either or both of these
21 lawsuits?
22       A.  No.
23       Q.  You have no memory of Mr. Waterhouse,
24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25 background information or your input at all on these

**30**

1 two lawsuits?
2        MR. MORRIS:  Better not have been --
3        THE WITNESS:  No.
4        Q.  (BY MR. RUKAVINA)  Who did I say?  Did I
5 misspeak?  Okay.
6              Now we're going to have some exhibits here.
7 And do you have the labels?
8              Let's take a minute break off the record.
9              (Off the record.)
10       Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
11 provide to you a promissory note in the original
12 principal amount of $5 million from HCMFA.  This is the
13 PDF version of this as filed with the Court for
14 collection.  It's going to be Exhibit 1.
15             (Whereupon, Exhibit 1 was marked for
16             identification.)
17       Q.  (BY MR. RUKAVINA)  Before you look at
18 Exhibit 1, I'm going to do the same thing for
19 Exhibit 2, which is a promissory note from HCMFA for
20 $2.4 million, dated May 2, 2019.
21             (Whereupon, Exhibit 2 was marked for
22             identification.)
23       Q.  (BY MR. RUKAVINA)  Again, Ms. Hendrix, these
24 are the PDF versions of these notes as filed with the
25 Court.  Sitting here today, do you remember anything

**31**

1 about either or both of these two promissory notes?
2        A.  Sure, yes.
3        Q.  What do you remember?
4        A.  I remember seeing them because I've recently
5 looked at them.  I see them all the time in our loan
6 tracking spreadsheets.  My team would have been
7 responsible for the whole process that I explained
8 before when it comes to a promissory note.
9        Q.  And --
10       MR. MORRIS:  Are you finished?
11       THE WITNESS:  Yes.
12       Q.  (BY MR. RUKAVINA)  And we have an email here
13 that might give some more context to that if I can find
14 it here.
15             This will be Exhibit 3.  This is an email
16 from David Klos to corporate accounting dated May 2,
17 2019.
18             (Whereupon, Exhibit 3 was marked for
19             identification.)
20       Q.  (BY MR. RUKAVINA)  Do you see this email,
21 ma'am?
22       A.  Yes.
23       Q.  Okay.  Corporate accounting, would that email
24 group have included you?
25       A.  Yes.

**32**

1        Q.  And this email says, Kristin, can you or
2 Hayley.  Do you think that Kristin was you?
3        A.  I do.
4        Q.  Do you remember receiving this email?
5        A.  Not explicitly.
6        Q.  So it says Blair.  Who would Blair be?
7        A.  Blair was our AP associate.
8        Q.  What is her last name?
9        A.  At this time it would have been Roeber,
10 R-o-e-b-e-r.
11       Q.  Okay.  And did it subsequently change?
12       A.  Yes, it's now Hillis, H-i-l-l-i-s.
13       Q.  Please send $2.4 million from HCMLP to HCMFA.
14 This is a new interco loan.  Kristin, can you or Hayley
15 please prep a note for execution.  I'll have further
16 instructions later today, but please process this
17 payment as soon as possible.
18             Did I read that correctly?
19       A.  Yes.
20       Q.  Do you have any memory of whether this email
21 relates to Exhibit 2, the $2.4 million promissory note?
22       A.  It seems like it does, same date, same
23 amount.
24       Q.  Do you have any memory, or in reviewing your
25 files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

**33**

1 would have related to Exhibit 1, the $5 million
2 promissory note?
3    A.  Yes.  I believe there's another email for
4 that one.
5    Q.  And do you believe that you provided that to
6 counsel?
7    A.  Yes.
8    Q.  Recently or some time ago?
9    A.  Well, I don't think I provided it, so I'm not
10 sure when they got it.  I know it has been provided.
11    Q.  You know that it has?
12    A.  Uh-huh.
13    Q.  How do you know?
14    A.  Because I've seen it.
15    Q.  In the production that was produced to me?
16    A.  Yes.
17    Q.  And also from a David Klos?
18    A.  This one, or on the -- when I say this one,
19 on the $2.4 million or the 5-?
20    Q.  On the $5 million note.
21    A.  I'm not sure.
22    Q.  Okay.  Let me make sure I understand you
23 correctly.
24        Sitting here today you believe that there is
25 another email referencing the $5 million loan that has

**34**

1 been produced to my office?
2    A.  Yes.  I believe so.
3    Q.  Okay.  And going off memory, did it kind of
4 say the same thing as this Exhibit 3 except that it
5 referenced $5 million?
6    MR. MORRIS:  Objection to the form of the
7 question.
8    THE WITNESS:  Generally, should have said the
9 similar situation, yeah.
10    Q.  (BY MR. RUKAVINA)  So Mr. Klos says, this is
11 a new interco loan, for Exhibit 3.  Other than what he
12 told you, that this is an intercompany loan, did anyone
13 else tell you or did you have any other information on
14 May 2, 2019 that this was a loan?
15    A.  I don't specifically recall these
16 conversations, but I can tell you our normal practice
17 would be we would either likely be in a cash meeting --
18 and I say "we."  Would have been myself, Dave Klos,
19 Frank Waterhouse, potentially even Jim Dondero.
20        But I don't recall conversations on this
21 specific date.  But general practice is we would talk
22 about it.
23        Oftentimes, Frank would either call Dave or I
24 or stop by and tell us that, we need to send money to
25 an affiliate, paper up a new loan, let's get a wire out

**35**

1 the door, is typically how this works.
2    Q.  Is the answer generally the same for the
3 $5 million note?
4    A.  Yes.
5    Q.  So is it fair to say that typically,
6 obviously not every time, but typically your corporate
7 accounting group when it would see intercompany
8 transfers in large amounts would believe that they were
9 loans?
10    MR. MORRIS:  Objection to the form of the
11 question.
12    THE WITNESS:  Typically they were loans.
13 There's not really another way to get money from one
14 entity to another.  And if they were papered as a loan,
15 that means we were told to set it up that way.
16    Q.  (BY MR. RUKAVINA)  What do you mean papered
17 as a loan?  Aren't you papering it as a loan when
18 someone makes the promissory note?
19    A.  Yes, because we're told by somebody to do
20 that.
21    Q.  And in this instance, Mr. Klos on Exhibit 3
22 told the group that this was a loan; right?
23    A.  Correct.  But he would have spoken with
24 Frank Waterhouse or Jim Dondero prior to that, before
25 telling anybody to do that.

**36**

1    Q.  Okay.  And do you have any knowledge that he
2 did speak to Mr. Waterhouse or Mr. Dondero before
3 sending this email?
4    A.  Again, I don't have specific knowledge on the
5 exact conversations, but that's always how it has
6 worked.
7    Q.  That's how it was for 14 or 15 years;
8 correct?
9    A.  Yes.
10    Q.  But you're logically assuming that it
11 happened here.  You don't know that it happened here;
12 correct?
13    MR. MORRIS:  Objection to the form of the
14 question.
15    THE WITNESS:  I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18    Q.  (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21    A.  No.  It's quite possible I was involved in
22 the conversation.  I reported to him.  I wouldn't
23 question his authority.
24    Q.  Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

Kristin Hendrix - October 27, 2021

## 37

1    A.  I did not ask that specific question that I
2  can recall.
3    Q.  Did you ask Mr. Waterhouse whether either of
4  these transactions were loans?
5    A.  I'm sure Mr. Waterhouse is the one that told
6  us they were loans.  We wouldn't just paper up a loan,
7  send money out and call it a loan and account for it
8  that way, unless somebody specifically told us.
9    Q.  Do you have any memory of Mr. Waterhouse
10  orally or in writing or email or in any way, shape, or
11  form on or about May 2 or 3, 2019 telling you that the
12  2.4 million or $5 million transfers were intercompany
13  loans?
14    A.  No specific knowledge of exact conversations,
15  but I'm certain that those conversations were had
16  because that's the only way that we would have papered
17  up a loan, sent money out as a loan, had them on our
18  financials for two years.
19    Q.  So you're saying that this email, Exhibit 3,
20  from Mr. Klos was not enough, that there would have
21  been other things that happened to make you and other
22  people in your group confident that these were loans?
23    A.  Yes.
24    Q.  And these other things would have been in
25  person or by email?

## 38

1    A.  Most likely in person via phone call.
2    Q.  Okay.  So again, you have no specific memory
3  of it, but based on the 14-year pattern and conduct you
4  believe that you would have discussed these two
5  transfers with Mr. Waterhouse and he would have told
6  you these are loans?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    THE WITNESS:  Correct.
10    Q.  (BY MR. RUKAVINA)  And then would he have
11  told you to take care of the promissory notes, or was
12  that Mr. Klos here in Exhibit 3?
13    A.  It could have been both.  It's clearly Dave
14  in this email, but Frank could have also said that to
15  me.
16    Q.  Now, do you -- strike that.
17    In May of 2019, did you know or were you told
18  why these $7.4 million were being transferred from the
19  debtor to HCMFA?
20    A.  Yes.  I do have recollection that -- I do
21  know that there were two big events in May 2019.
22  2.4 million was related to a TerreStar NAV error, with
23  one of the funds advised by HCMFA.  That's Global
24  Allocation Fund.
25    Similar with the $5 million loan.  There was

## 39

1  a consent fee that the advisor of the Global Allocation
2  Fund had promised to pay to shareholders of that fund,
3  and it was in the amount of $5 million roughly.
4    So both of these loans were for those
5  purposes respectfully.
6    Q.  And were you in May of 2019 also aware that
7  in addition to the $2.4 million, there was another more
8  than $5 million paid to that fund by HCMFA's insurer as
9  compensation for the NAV error?
10    A.  By the insurance company, yes.
11    Q.  So the $7.4 million, you understood then was
12  a loan as opposed to compensation to HCMFA?
13    A.  Yes.
14    Q.  Okay.  Did you understand in May of 2019 that
15  it had been the debtor and its valuation team that
16  caused that NAV error?
17    MR. MORRIS:  Objection to the form of the
18  question.
19    THE WITNESS:  I can't answer that.  I was not
20  involved with the activities leading up to the NAV
21  error.
22    Q.  (BY MR. RUKAVINA)  How do you know that the
23  $7.4 million were being transferred for the NAV error
24  and consent fee?
25    A.  Because I do know about both of those

## 40

1  instances and I do know that HCMFA needed to pay these
2  dollar amounts for both of those.
3    Q.  And you knew that in May of 2019?
4    A.  Yes.
5    Q.  How did you know that in May of 2019?
6    A.  It was lots of discussions had been going on
7  around both of these issues for months.  These weren't
8  surprises to anybody.
9    Q.  So although you weren't involved directly
10  with the NAV error issues, it was more or less common
11  knowledge in your accounting group?
12    A.  Correct.
13    Q.  Do you have any knowledge at all as to
14  whether Mr. Dondero decided to transfer these
15  $7.4 million not as a loan, but to compensate HCMFA for
16  the debtor's alleged liability?
17    A.  Have not heard of that.
18    Q.  Ever?
19    A.  Never.
20    Q.  But you also never heard Mr. Dondero say that
21  these $7.4 million were a loan; correct?
22    A.  That was not told to me directly.
23    Q.  Again, you're logically assuming that based
24  on many instances of intercompany transfers in the
25  14 years prior to that?

Kristin Hendrix - October 27, 2021

**41**

1     MR. MORRIS:  Objection to the form of the
2  question.  Mischaracterizes the testimony.
3     THE WITNESS:  Correct.
4     Q.  (BY MR. RUKAVINA)  I think you answered
5  correct?
6     A.  Correct.
7     Q.  And you mentioned that after these notes, you
8  saw them on internal financials and that reinforces
9  your view that these were loans?
10    A.  Correct.
11    Q.  But as of May 2 and 3, 2019, no one had told
12  you directly that these are loans?
13    MR. MORRIS:  Objection to the form of the
14  question.  It's in writing.
15    THE WITNESS:  That's not what I'm saying at
16  all.
17    Q.  (BY MR. RUKAVINA)  Other than Mr. Klos' email
18  or emails, no one told you on May 2 or May 3, 2019 that
19  you remember today that these were loans?
20    A.  It quite possibly could have been told to me
21  in addition to this email.
22    Q.  I understand.  You just have no memory of
23  that today; correct?
24    A.  Correct.
25    Q.  Is there anything that you can think of

**42**

1  sitting here today to refresh your memory on that
2  point?
3     A.  I do not think so.  I'm sure there was
4  conversation that unfortunately would not be in an
5  email.
6     Q.  Now, we have the Word documents, the Word
7  version of these two promissory notes, and you're going
8  to have rely on me that I printed these out as
9  Mr. Morris sent to me.  If I'm misleading you on that,
10  then I'm in trouble and your answers don't count.
11    So please assume that I didn't doctor these
12  and that I printed them out as they were prepared to
13  me; okay?
14    A.  Yes.
15    Q.  So Exhibit 4 will be the $5 million note and
16  Exhibit 5 will be the 2.4 million.
17    (Whereupon, Exhibits 4 & 5 were marked for
18    identification.)
19    Q.  (BY MR. RUKAVINA)  Before I ask about 4 and
20  5, to be fair to you and refresh your memory, I'm going
21  to provide you printouts of the metadata, metadata --
22  I'm not sure how to better say that -- for both notes.
23    And again I'm representing to you that I
24  printed out the metadata without doctoring it, so
25  please assume that's true, and if it's not, your

**43**

1  answers don't count and I'm in trouble.
2     6 will be the $5 million note, and 7 will be
3  the $2.4 million note.
4     (Whereupon, Exhibits 6 & 7 were marked for
5    identification.)
6     Q.  (BY MR. RUKAVINA)  Okay.  So Exhibit 4 and 5
7  are the Word documents.  Do you have any memory of you
8  doing anything with respect to these two Word
9  documents?
10    A.  I don't have specific memory, but generally
11  speaking, it was my job to update promissory note
12  templates and create promissory notes.
13    Q.  So do you believe that -- we discussed
14  earlier that your group would have used a template and
15  that it would have made changes reflecting the maker,
16  amount, date, interest rate.
17    Do you believe you were the one with respect
18  to 4 and 5 that updated that template to create 4
19  and 5?
20    A.  I'm sure that I was, yes.
21    Q.  Well, Exhibit 6 -- do you know what metadata
22  is?
23    A.  Sort of.
24    Q.  What's your understanding of what metadata
25  is?

**44**

1     A.  Just in context from speaking on it recently,
2  it's going to tell you who made changes to the
3  documents, is what I would assume.
4     MR. RUKAVINA:  Go off the record for one
5  second.
6     (Off the record.)
7     Q.  (BY MR. RUKAVINA)  So a little bit of error
8  on my part.  We'll have some more metadata, but we can
9  still talk about 6 and 7.
10    It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11  Do you recall or do you know who that person was?
12    A.  I recognize the name, and it makes sense.
13  This says Strasburger is the company.  I think he was
14  one of the lawyers that we had used at some point in
15  time.
16    Q.  Strasburger is a law firm?
17    A.  Yes.
18    Q.  And then it says, so Exhibit 6 created May 3,
19  Exhibit 7 created May 2, modified, accessed.  Does that
20  to the best of your understanding comport with when
21  Exhibits 4 and 5 were actually created?
22    A.  Can you repeat that.
23    Q.  Yeah.  We'll wait for the rest of the
24  metadata.  But let's go back to 4 and 5.
25    In and by May 2019 I think you mentioned that

Kristin Hendrix - October 27, 2021

---

45

1  it was your job to, I think you said update promissory
2  notes?
3          MR. MORRIS:  Objection to the form of the
4  question.
5      Q.  (BY MR. RUKAVINA)  Let me take that question
6  back.
7          You testified earlier that your group would
8  have taken a template and used it to create or prepare
9  a new promissory note; right?
10     A.  Right.
11     Q.  How would you call that process?  What word
12  would you use for that process?
13     A.  Let's call it papering the loan.
14     Q.  In May of 2019, was it your job to paper the
15  loan?
16     A.  Yes.
17     Q.  Would anyone else at the corporate accounting
18  group have been responsible to paper a loan?
19     A.  At that time, I don't think so.  I think I
20  was the one doing it.
21     Q.  I think you mentioned that you think you
22  papered the loan, respecting Exhibits 4 and 5; correct?
23     A.  Correct.
24     Q.  You have no distinct present memory of
25  papering 4 and 5; correct?

---

46

1      A.  Correct.
2      Q.  Can you think of anyone else at the corporate
3  accounting group that would have papered 4 and 5?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  The only other person that
7  could have would either be Dave Klos or Hayley Eliason.
8      Q.  (BY MR. RUKAVINA)  What was Hayley's role in
9  May of 2019?
10     A.  She was the accountant.  I can't recall her
11  specific title.
12     Q.  Now, in May of 2019 when you papered a loan,
13  would you have consulted with either internal or
14  external legal before finishing that loan or presenting
15  it for signature or anything else?
16     A.  Not if it was just our standard demand note
17  that we already had a template on.
18     Q.  So would it have been your general course in
19  May of 2019, if you prepared Exhibits 4 and 5, not to
20  seek advice from internal or legal before proceeding
21  with these notes?
22     A.  With these two specific notes?
23     Q.  Yes.
24     A.  Yes.
25     Q.  If we flip the page, I'll represent to you

---

47

1  that Mr. Waterhouse's signature there appears on the
2  Word document as an image.
3      A.  Uh-huh.
4      Q.  Do you have any memory of whether there was
5  an image that someone would have affixed of
6  Mr. Waterhouse's signature to promissory notes?
7      A.  Yes.  We typically always -- he was
8  completely fine with having documentations -- sorry,
9  having documents signed or executed with his
10  e-signature.
11     Q.  Would these pictures of his signature have
12  been his e-signature in May of 2019?
13     A.  Yes.
14     Q.  So let's just clarify that because I don't
15  want there to be any confusion.
16         I know there's some computer programs out
17  there that are restrictive and have passwords before
18  any signature is printed.  And then there's some people
19  that use a stamp or an image; right?
20         MR. MORRIS:  Objection to the form of the
21  question.
22     Q.  (BY MR. RUKAVINA)  Are you following me?
23     A.  I follow you.
24     Q.  In May of 2019, did Mr. Waterhouse have any
25  specific program that would have to -- you would have

---

48

1  to go through before it would spit out his e-signature,
2  or was he fine with you and his staff using an image
3  like this?
4      A.  He was fine with using his e-signature, and
5  what is on these documents was that exact e-signature.
6  So I don't know if he had -- I don't know how it was
7  created originally.
8      Q.  The e-signature?
9      A.  E-signature.
10     Q.  Do you have any memory with respect to
11  Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12  approval to use his e-signature?
13     A.  I don't have exact specific memory, same as
14  conversations on these loans.  But he would have had to
15  approve this loan in the dollar amount, the day.
16         He would have been the one directing us to
17  create these loans.  In past practice he has always
18  approved using his e-signature to execute documents.
19     Q.  How would he have approved Exhibits 4 and 5?
20  By that, I mean by email or memorandum?  How would he
21  have approved it in May of 2019?
22         MR. MORRIS:  Objection to the form of the
23  question.
24         THE WITNESS:  I would assume that, as I've
25  stated previously, these directions were coming

---

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

Case 21-03007-sgj Doc 127-4 Filed 12/18/21   Entered 12/18/21 02:23:50   Page 375 of 474

13 (Pages 49 to 52)

Kristin Hendrix - October 27, 2021

**49**

1 directly from him to paper a loan. These changes that
2 are made are only to the dollar amount. Interest rate
3 is pulled right off the IRS website.
4     That is his approval to paper a loan and in
5 fact execute or approve the loan.
6     Q.  (BY MR. RUKAVINA)  In May of 2019, would
7 Mr. Waterhouse -- what was his practice as far as using
8 an ink signature on documents as opposed to an
9 e-signature?  Did he have a practice?
10     MR. MORRIS:  Objection to the form of the
11 question.
12     THE WITNESS:  He has never specifically said,
13 on certain documents I would like to ink it with my
14 signature.  Probably at this time, 99 percent of the
15 stuff my team got his signature on was his e-signature.
16 I think it just depended on the group and what it was.
17     Q.  (BY MR. RUKAVINA)  So how would he authorize
18 you or your team to use his e-signature for any given
19 document in May of 2019?
20     MR. MORRIS:  Objection to the form of the
21 question.
22     THE WITNESS:  Through the conversations that
23 would have been had before these emails went out saying
24 paper loan.
25     Q.  (BY MR. RUKAVINA)  And -- okay.  So, and

**50**

1 after his e-signature was used either on these notes or
2 other documents in May of 2019, would you have brought
3 the documents back to him for any kind of verification?
4     MR. MORRIS:  Objection to the form of the
5 question.
6     THE WITNESS:  Probably not.  These are all
7 very standard.  We've papered hundreds of loans.  So I
8 think he trusted that we can handle updating a date and
9 a dollar amount on these loan templates.
10     Q.  (BY MR. RUKAVINA)  Do you know or believe, or
11 your recent review of documents, did it reveal an email
12 from Mr. Waterhouse to you specifically authorizing his
13 e-signature on Exhibits 4 and/or 5?
14     A.  Not that I recall seeing, no.
15     Q.  Sitting here today, do you have any memory of
16 Mr. Waterhouse orally or otherwise specifically
17 authorizing you to affix his e-signature to Exhibits 4
18 and/or 5?
19     A.  Specifically on these loans, no, I don't
20 recall those conversations.  But, again, our practice
21 has always been we have this discussion, he's under the
22 understanding that we're going to paper the loans, he's
23 always comfortable with using his e-signature.
24     This is not something me or my team would
25 have done without that authority and approval from him.

**51**

1     Q.  But you have no memory of that authority or
2 approval, specifically for 4 and 5?
3     MR. MORRIS:  Objection.  Asked and answered
4 about five times.
5     THE WITNESS:  Same as my answer I just gave.
6     Q.  (BY MR. RUKAVINA)  And I think you mentioned
7 that in your years at Highland your team papered
8 hundreds of loans?
9     A.  Yeah.
10     Q.  In your time at Highland, is it your
11 testimony that the accounting -- corporate accounting
12 department never made a mistake with respect to
13 anything that it did?
14     MR. MORRIS:  Objection to the form of the
15 question.
16     THE WITNESS:  No, I did not say that.
17     Q.  (BY MR. RUKAVINA)  Do you recall any mistakes
18 in your time at the corporate accounting group at
19 Highland that had been made, any significant mistakes?
20     MR. MORRIS:  Objection to the form of the
21 question.
22     THE WITNESS:  Significant mistakes, not that
23 I can recall.
24     Q.  (BY MR. RUKAVINA)  No accounts payable
25 mistakenly paid?

**52**

1     MR. MORRIS:  Objection to the form of the
2 question.
3     THE WITNESS:  I cannot specifically answer
4 that question with 17 years of work to recall, sorry.
5     MR. RUKAVINA:  Just take a quick break.  If
6 you need a restroom -- off the record.
7     (Off the record.)
8     Q.  (BY MR. RUKAVINA)  Going back to Exhibits 4
9 and 5.
10     Mr. Waterhouse signed these promissory notes.
11 Is there any particular reason why he signed them as
12 opposed to Dondero or someone else?
13     A.  No particular reason.  He's an officer for
14 both companies.  He's a signatory.
15     Q.  Who decided, if anyone, to your knowledge,
16 that he would be the one signing the notes, these two
17 notes?
18     A.  I don't know who would have decided that, but
19 typically if Frank specifically wanted Jim Dondero to
20 sign it, he would say, take it to Jim to sign.
21     Q.  Do you have a recollection of
22 Mr. Dondero -- strike that.
23     Do you have a recollection of Mr. Waterhouse
24 signing other promissory notes?
25     A.  Yes.  I know for sure he has signed other

Kristin Hendrix - October 27, 2021

---

53

1 promissory notes. I can't tell you explicitly which
2 ones.
3     (Off the record.)
4     Q. (BY MR. RUKAVINA) Are you saying that in May
5 of 2019 -- strike that.
6     By May of 2019, was it not the standard
7 practice at the debtor that Mr. Dondero would sign
8 intercompany promissory notes?
9     MR. MORRIS: Objection to the form of the
10 question.
11     THE WITNESS: No, that's not standard
12 practice. Just needed to be somebody -- somebody who
13 is a signer for the entity on the incumbency
14 certificate.
15     Q. (BY MR. RUKAVINA) Was there a standard
16 practice, or did you just describe the standard
17 practice that it was someone on the incumbency
18 certificate?
19     A. That's correct, somebody on the incumbency
20 certificate. Frank is a great prospect to sign, with
21 giving direction to set loans up, send money out. Why
22 wouldn't he sign it.
23     Q. Do you have any memory sitting here today of
24 Mr. Waterhouse telling you or agreeing that he would be
25 signing these two promissory notes for HCMFA?

---

54

1     A. Not specifically, but he didn't need to tell
2 me. He typically would tell me if he wanted Jim to
3 sign them.
4     Q. Sitting here today, do you have any memory of
5 giving Mr. Waterhouse these two promissory notes after
6 they were prepared?
7     A. I specifically don't remember walking into
8 his office and providing it to him, but he could have
9 found it on our shared drive if he wanted to.
10     Q. Do you have any memory or in your recent
11 review of documents did you see any email to the effect
12 of you sending either or both of these promissory notes
13 to Mr. Waterhouse after they were papered up?
14     A. I don't have any specific recollection,
15 again, but he had access to look at them.
16     Q. On the shared drive?
17     A. Yes.
18     Q. In May -- I'm going to ask this question
19 multiple different ways, so let's start with kind of
20 the general.
21     In May or by May of 2019, was there a
22 repository, electronic or paper, where the debtor kept
23 original promissory notes that were owed -- where money
24 was owed to it?
25     A. Original meaning paper?

---

55

1     Q. Well, let's go back a little bit in time.
2     Would you agree that at some point prior to
3 2019 the standard course was that paper notes were ink
4 signed?
5     MR. MORRIS: Objection to the form of the
6 question.
7     THE WITNESS: I could not tell you
8 specifically when notes were or were not ink signed.
9     Q. (BY MR. RUKAVINA) Was there any repository,
10 to the best of your recollection, as of May 2019 where
11 any ink-signed original promissory notes were kept by
12 the debtor?
13     A. No. We always would scan them in, save them
14 on our shared drive. Never had paper copies.
15     Q. So that's -- fixing to ask that question
16 next.
17     So Exhibits 4 and 5, would they even have
18 been printed after they were papered up?
19     MR. MORRIS: Objection to the form of the
20 question.
21     THE WITNESS: Possibly. Somebody could have
22 printed them.
23     Q. (BY MR. RUKAVINA) Do you remember printing
24 Exhibits 4 or 5 sitting here today?
25     A. I don't recall printing them myself, no.

---

56

1     Q. Would there have been a reason to print them
2 out if, as you said, the notes were stored
3 electronically?
4     MR. MORRIS: Objection to the form of the
5 question.
6     THE WITNESS: There could be a reason. I
7 don't recall that I for any reason printed these
8 particular notes.
9     Q. (BY MR. RUKAVINA) So as of May 2019, is it
10 your testimony that notes that were papered up by the
11 corporate accounting group would have been saved
12 electronically on the system and not kept by way of
13 paper copies in some file?
14     A. Correct. That's right.
15     Q. This is additional metadata. And you
16 understand I have a bit of an accent.
17     What are we on?
18     (Off the record.)
19     Q. (BY MR. RUKAVINA) Ms. Hendrix, Exhibit 8 is
20 going to be additional metadata for the May 3, 2019,
21 note that we've been looking at, and Exhibit 9 will be
22 the same thing for the May 2 note that we've been
23 looking at.
24     That's 8. That's 9.
25     (Whereupon, Exhibits 8 & 9 were marked for

---

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

Kristin Hendrix - October 27, 2021

57

1    identification.)
2    Q. (BY MR. RUKAVINA) Ms. Hendrix, I'm going to
3 represent to you again that my office has faithfully
4 printed this metadata out without doctoring or changing
5 anything, and I ask you to assume that. If I'm wrong
6 on that, then your answers don't count.
7    Ma'am, as I look at these two documents, it
8 says last modified by Kristin Hendrix.
9    Do you see that?
10   A. Yes.
11   Q. And that would have -- that could have only
12 been you; correct, in that department?
13   A. I hope so, yes.
14   Q. Seeing these two documents, can you agree
15 with me now that it was in fact you that papered up
16 Exhibits 4 and 5?
17   MR. MORRIS: Objection. Asked and answered.
18   THE WITNESS: I would assume so since my name
19 is on it, yes.
20   Q. (BY MR. RUKAVINA) Both of these documents
21 say last printed -- I'm sorry. If you see related
22 dates, it says last printed May 2, 2019, 11:27 A.M. Do
23 you have any memory or any understanding as to why that
24 date would be there or what last printed might mean?
25   A. I don't know why it says last printed the day

58

1 before it was created. That doesn't make any sense. I
2 have no idea.
3    Unless, the only thing I could think of is if
4 we changed this template. When I say "this," the
5 $2.4 million loan, which was papered on the 2nd, and
6 then used it for the next day for the template to
7 update the date, possibly. I have no idea.
8    Q. Well, it may be -- and I understand that you
9 don't have any memory; we're speculating a little bit.
10   It may be, looking at Exhibits 8 and 9, that
11 the $2.4 million note was printed on May 2, and then
12 after having been used as the template for the
13 $5 million note, the $5 million note would not have
14 been printed.
15   Does that sound possible?
16   MR. MORRIS: Objection to the form of the
17 question.
18   THE WITNESS: Sure, it could be possible.
19   Q. (BY MR. RUKAVINA) But you don't have any
20 memory either way?
21   A. No. And when these were printed they're
22 printed to PDF, I believe, is probably what that means.
23   Q. Okay.
24   We're going to switch gears a little bit now,
25 if you want to make a pile of those exhibits.

59

1 Obviously, you're welcome to use them anytime you need
2 to, but I think we're done with those notes.
3    Going to hand you what we're going to mark as
4 Exhibit 10, which is an email chain produced by the
5 debtor.
6    And I don't know how anyone on the video will
7 see it. I apologize. I'll have to send it to you
8 later.
9    (Whereupon, Exhibit 10 was marked for
10   identification.)
11   Q. (BY MR. RUKAVINA) Now, if you start with
12 this email chain, it starts on November 19, 2020 from
13 Jack Donohue to you, copying Mr. Seery and various
14 others.
15   Do you see that?
16   A. Yes.
17   Q. And Mr. Donohue is asking you to provide him
18 the financial records of HCMFA due to the funds owed
19 the debtor.
20   Do you see that?
21   A. Yes.
22   Q. Do you recall that email from Mr. Donohue to
23 you?
24   A. Yes.
25   Q. Do you recall any context or subsequent

60

1 discussions or how that email came to be, or do you
2 just recall getting that email?
3    A. I just recall getting the email.
4    Q. You write back, hi Jack, Scott Ellington is
5 going to follow up with the board on this request.
6    Do you see that?
7    A. Yes.
8    Q. Do you recall why you told Jack that
9 Mr. Ellington was going to follow up?
10   A. From what I recall, I had asked Frank
11 Waterhouse if it was okay to send these financials
12 over, and he wanted me to check with Scott Ellington
13 and that was Scott's response.
14   Q. And did he tell you why he wanted you to
15 check with Scott Ellington?
16   A. Just to make sure that there were no issues
17 with sending them over.
18   Q. Mr. Seery writes back, can I get this ASAP.
19 HCMFA is way overdue.
20   Do you see that?
21   A. Yes.
22   Q. And Mr. Seery writes again, it's about a week
23 later, and he says, this is an explicit direction from
24 me as CEO of HCMLP. But it looks like you are the
25 recipient of that December 2 email; correct?

Kristin Hendrix - October 27, 2021

**61**

1    A. Yes.
2    Q. Do you remember him sending you that email
3 and copying those people?
4    A. Yes.
5    Q. Do you remember anything happening in that
6 week between his November 25 and December 2 email along
7 the same discussion lines?
8    A. I don't remember anything. I think I was
9 probably left out of any discussions, and if there were
10 any, it was with Scott Ellington and whomever he had
11 discussions with.
12    Q. Then subsequent, on December 2, Mr. Seery
13 writes, all, Scott and I have spoken and agree that the
14 information should be provided to James immediately.
15    Would that have been James Romey, do you
16 think?
17    A. Yes.
18    Q. And who was James Romey?
19    A. He also worked for DSI.
20    Q. And then he writes, Kristin, please proceed
21 with James. If anyone has any questions or issues,
22 please call me.
23    Do you see that?
24    A. Yes.
25    Q. Did you proceed with James Romey?

**62**

1    A. I further made sure that Scott was okay, to
2 confirm. He said yes, please do, and I did send them
3 to James Romey.
4    Q. So Mr. Seery has some of it in this email
5 chain, but do you have any understanding as to why
6 either DSI or Mr. Seery in November of 2020 was asking
7 for the financial records of HCMFA?
8    A. I do not, other than what's in this email.
9    Q. Did you discuss with either DSI or Mr. Seery
10 or Mr. Waterhouse in November or December 2020 whether
11 the demand notes from HCMFA should be demanded, should
12 be called?
13    A. I did not have discussions.
14    Q. Next exhibit is Exhibit 11. This is another
15 email chain.
16    And I apologize to the folks on the video.
17 I'll have to get it to you during some break.
18    MR. MORRIS: Hold on one second.
19    MR. RUKAVINA: Sure. Off the record.
20    (Off the record.)
21    (Whereupon, Exhibit 11 was marked for
22    identification.)
23    Q. (BY MR. RUKAVINA) Exhibit 11, Ms. Hendrix,
24 if you'll go to the beginning of this email chain, is
25 an email on January 6, 2021, again from Mr. Donohue to

**63**

1 you, copying Waterhouse, Seery, a bunch of others.
2    Where he says, at the direction of Jim Seery,
3 please provide DSI with the requested information for
4 each entity below.
5    And you'll see the entity includes both of my
6 clients, NexPoint Advisors and HCMFA. And the
7 information includes bank statements, income
8 statements, balance sheets, cash flows.
9    Do you see that?
10    A. Yes.
11    Q. Do you recall this email?
12    A. Vaguely, yes.
13    Q. Did you have any concerns when you received
14 this email?
15    A. Concerns about the email, no. I probably
16 checked with -- I would have checked with Frank to make
17 sure it was okay to send this first.
18    Q. Frank Waterhouse?
19    A. Yes.
20    Q. Do you have any understanding as to why
21 Mr. Donohue requested bank statements, income
22 statements, balance sheets for NexPoint and/or HCMFA?
23    A. I do not.
24    Q. Did he or anyone at DSI tell you why they
25 were requesting that?

**64**

1    A. Not that I can recall.
2    Q. If we go forward in time, you'll see that
3 Mr. Waterhouse is writing back to Mr. Donohue. And
4 then Mr. Seery interjects and says, these are HCMLP
5 business records. Please provide them as requested by
6 Jack ASAP.
7    Do you see that?
8    A. Yes.
9    Q. And it looks like you were not privy to
10 subsequent communications where Frank and Jim were
11 talking back and forth about this. You were not privy
12 to those, like you weren't blind copied or anything to
13 your recollection?
14    A. No.
15    Q. Did you in fact on or after January 6, 2021,
16 provide Mr. Donohue or anyone on his team the
17 information that he had requested as it relates to
18 NexPoint and/or HCMFA?
19    A. Without going back to check, I couldn't
20 answer yes or no for certain.
21    Q. So I think you mentioned when you received
22 the email from Mr. Donohue you would have checked with
23 Frank. And what do you remember asking Frank or
24 checking with him about?
25    A. I don't remember asking him specifically. In

Kristin Hendrix - October 27, 2021

65

1 fact, it's possible that Frank just responded on his
2 own here to Jack. Again, would have been a
3 conversation that I can't specifically recall.
4    Q.   Sure. And you don't specifically remember
5 today providing Mr. Donohue any of that information;
6 right?
7    A.   Right.
8    Q.   You don't specifically remember today having
9 a discussion with Mr. Donohue or Seery or anyone else
10 at or about that time as to why they were wanting this
11 information?
12    A.   Correct.
13    Q.   Exhibit 12, Ms. Hendrix, is going to be the
14 December 3, 2020, letter by which Highland called the
15 notes.
16    MR. MORRIS:  Objection to the form of the
17 question if there was one.
18    (Whereupon, Exhibit 12 was marked for
19    identification.)
20    Q.   (BY MR. RUKAVINA)  Are you familiar with
21 Exhibit 12, Ms. Hendrix?
22    A.   No, I haven't seen this.
23    Q.   Prior to today, you don't remember seeing
24 this?
25    A.   No.

66

1    Q.   I think you're answering no?
2    A.   No, sorry, no.
3    Q.   On or before December 3, 2020, did anyone
4 discuss with you whether Highland should call the
5 demand notes that were outstanding by HCMFA?
6    A.   No.
7    Q.   Do you recall in December 2020 any discussion
8 with anyone at the debtor about the NexPoint
9 $30.7 million term note?
10    A.   Repeat your question again, please.
11    Q.   Sure. So you're familiar, and we'll talk
12 about it in some detail, with the NexPoint
13 $30.7 million note?
14    A.   Yes.
15    Q.   And again, we'll talk about it, but at that
16 point in time that was a term note; correct?
17    A.   Correct.
18    Q.   Do you remember in the December 2020 or
19 November 2020 time frame discussing with anyone at the
20 debtor the status of that NexPoint note?
21    A.   Yes, we would have discussed this on a weekly
22 basis in our cash meetings that we would have had, as
23 identifying that there are payments due on these loans
24 in December.
25    Q.   What weekly cash meetings are you referring

67

1 to?
2    A.   We had a standing weekly cash meeting with
3 Frank Waterhouse, myself, Jim Seery. I can't recall
4 everyone on it. Some of the DSI folks. We go through
5 cash forecasts. It's a 13-week cash forecast. We go
6 through it every week.
7    It's going to lay out incoming and outgoing
8 payments that are forecasted, of which these term loans
9 were in those forecasts, so they were discussed.
10    Q.   And Mr. Morris produced some of those to me
11 this morning. I haven't had time to go through them.
12    But it is your recollection in November and
13 December of 2020 the fact of the NexPoint term note
14 being out there was known to Mr. Seery?
15    A.   Yes.
16    Q.   And the fact of an upcoming December 31,
17 2020, payment was known to Mr. Seery?
18    A.   Yes.
19    Q.   So with that background, in November and
20 December of 2020, do you remember discussing with
21 anyone anything to the effect of, oh, it really would
22 be better if NexPoint defaulted on that note so we
23 could call it?
24    A.   No.
25    Q.   Did Mr. Seery ever state to you anything in

68

1 November or December of 2020 about how the debtor might
2 monetize that NexPoint note?
3    A.   No.
4    Q.   Did he discuss with you any potential sale of
5 that promissory note?
6    A.   No.
7    Q.   Did DSI ever discuss with you in November or
8 December 2020 any potential sale of that note?
9    A.   No.
10    Q.   Or how to monetize that note?
11    A.   No.
12    Q.   So -- well, strike that.
13    Did Mr. Seery or anyone at DSI, or anyone at
14 all, in November or December of 2020 state any words to
15 you to the effect that they were hoping that NexPoint
16 would default on that note?
17    A.   Never.
18    Q.   Or that it would be in the debtor's interest
19 for NexPoint to default on that note?
20    A.   No.
21    Q.   In November or December of 2020, do you
22 recall having any discussions with Mr. Seery or anyone
23 at DSI as to the collectibility of that note? And by
24 that I mean whether NexPoint can pay the note?
25    A.   I don't specifically recall. It most likely

Kristin Hendrix - October 27, 2021

69

1 came up in cash conversations.
2     Q. I think you were assistant controller back
3 then?
4     A. Yes.
5     Q. Would a discussion of a borrower's ability to
6 repay have been something within your general sphere of
7 responsibility in that time frame?
8         MR. MORRIS: Objection to the form of the
9 question.
10        THE WITNESS: It depends on who the borrower
11 is, and at that time we did -- we had knowledge over
12 that information, so yes.
13    Q. (BY MR. RUKAVINA) Well, you've seen some
14 instructions or requests from Mr. Seery to you and DSI
15 to you for financial information of NexPoint and HCMFA.
16 We've gone through those documents; right?
17    A. Yes.
18    Q. Does that refresh your memory that there was
19 any internal discussion that you were privy to about
20 the ability of HCMFA and/or NexPoint to pay these
21 notes?
22    A. I don't recall that specifically being asked.
23 It could have.
24    Q. Did you ever at any point in time have any
25 employment or officer or any title or role with

70

1 NexPoint Advisors, LP?
2     A. No.
3     Q. Were you ever the controller or assistant
4 controller for NexPoint Advisors LP?
5     A. No.
6     Q. Did you ever at any point in time have any
7 employment, officer or any title or role at HCMFA?
8     A. No.
9     Q. Were you ever the controller or assistant
10 controller of HCMFA?
11    A. No.
12    Q. So you might have indirectly provided
13 services to those two as part of shared services, but
14 never directly; is that fair?
15        MR. MORRIS: Objection to the form of the
16 question.
17        THE WITNESS: When you say never directly,
18 meaning I was not employed by those entities?
19    Q. (BY MR. RUKAVINA) Correct.
20    A. That's correct.
21    Q. Do you have any understanding -- first of
22 all, NexPoint did not make a payment on December 31,
23 2020; correct?
24    A. Correct.
25    Q. Okay. Do you have any understanding of why

71

1 not?
2     A. Yes.
3     Q. What's your understanding?
4     A. Either November 30 or December 1, 2020, I
5 received a phone call from Frank Waterhouse that said,
6 no payments are going from any of the Advisors to
7 Highland.
8     Q. Can you be more specific with what he said?
9     A. That's what he said.
10    Q. So he said no payments from the Advisors to
11 Highland?
12    A. Yes.
13    Q. Did he reference the promissory note
14 expressly?
15    A. No.
16    Q. But no payments means?
17    A. Nothing.
18    Q. That would logically in your mind include the
19 promissory note?
20    A. Yes.
21    Q. Did you ask him why?
22    A. No.
23    Q. Did he tell you why?
24    A. No.
25    Q. Did you, prior to January 1, 2021, did you

72

1 hear from anyone as to why Mr. Waterhouse gave that
2 instruction?
3     A. Not that I recall.
4     Q. Did you, after that November 30 or December 1
5 phone call, did you follow up with him or anyone else
6 about the upcoming note payment?
7     A. I didn't have any reason to.
8     Q. I'm going to -- let me find you a document
9 for a moment.
10        Just so the record is complete, let's include
11 this promissory note. It's going to be Exhibit 13.
12 This is the NexPoint promissory note.
13        (Whereupon, Exhibit 13 was marked for
14        identification.)
15    Q. (BY MR. RUKAVINA) I take it you've seen this
16 promissory note, Exhibit 13?
17    A. Yes.
18    Q. And I think you testified about this before,
19 but just to summarize to save time.
20        This would have been a note that you would
21 not have papered but would have gone through legal
22 because it was a roll-up. Is that generally accurate?
23    A. Yes.
24    Q. And do you have any memory at all of having
25 anything to do with papering up this loan?

Kristin Hendrix - October 27, 2021

---

**73**

1    A.  Not that I recall.
2    Q.  Would you have had, after 2017 and before
3 2021, any role with respect to any payments or upcoming
4 payments on this note, any role at all?
5    A.  Yes.
6    Q.  What would have been your role or roles?
7    A.  That would have been taking direction from
8 Frank Waterhouse or possibly Jim Dondero saying, go
9 ahead and make these payments that are due on these
10 term notes.
11    Q.  Would you have recorded on any books or
12 records payments that actually were made?
13    A.  Not me personally.
14    Q.  Who would have?
15    A.  Our accountant, which could have been one of
16 two different people, depending on the time frame.
17    Q.  Would you have had any role with respect to
18 recording those payments or is that just something that
19 your group would have done?
20    MR. MORRIS:  Objection to the form of the
21 question.
22    THE WITNESS:  I would not have had a role.
23 My group would have.
24    Q.  (BY MR. RUKAVINA)  What about calculating
25 amortization and/or interest payments that are due or

---

**74**

1 upcoming?  Who would have done that, you or someone
2 else?
3    A.  Our accountant.
4    Q.  Do you have any memory of doing that?
5    MR. MORRIS:  Objection to the form of the
6 question.
7    THE WITNESS:  Not during 2017 through 2019.
8    Q.  (BY MR. RUKAVINA)  What about 2020?
9    A.  No.
10    Q.  Going back to that November 30 or December 1
11 telephone call, do you recall who initiated the call?
12    A.  To me?
13    Q.  The one between you and Mr. Waterhouse.
14    A.  Frank called me.
15    Q.  Frank called you.
16    And was it just to discuss -- or just to give
17 you that instruction, no payments from the Advisors, or
18 was there other things discussed?
19    A.  I could not tell you if something else was
20 discussed on that phone call.
21    Q.  Do you remember if it was a long phone call
22 or short?
23    A.  Couldn't tell you.
24    Q.  Do you remember where you were when he called
25 you?

---

**75**

1    A.  At my house.
2    Q.  Did you answer on a cell phone or landline?
3    A.  My cell phone.
4    Q.  Is there any chance in hell that your cell
5 phone would still have a record of that phone call,
6 like what time it was and how long it lasted?
7    MR. MORRIS:  Objection to the form of the
8 question.
9    Q.  (BY MR. RUKAVINA)  I apologize for using
10 hell.
11    MR. MORRIS:  And to foundation.
12    THE WITNESS:  I have no idea.
13    Q.  (BY MR. RUKAVINA)  Do you have your cell
14 phone with you right now?
15    A.  In the other room.
16    Q.  I might ask you during the break to just --
17 we'll take a short break before I'm done, and I'll ask
18 you if you've had a chance to look for November and
19 December 2020 phone logs between you and
20 Mr. Waterhouse.  I would ask you to do that, please.
21    A.  Sure.
22    Q.  And I apologize, I think you said you thought
23 it was a short telephone call?
24    A.  I have no idea.
25    Q.  Did the telephone call or Mr. Waterhouse's

---

**76**

1 instructions surprise you in any way?
2    A.  Nothing surprises me anymore, so no.
3    Q.  Did it surprise you back in November or
4 December of 2020?
5    A.  No.
6    Q.  Did it pique your curiosity?
7    A.  Nope.
8    Q.  Just another instruction from your boss?
9    A.  Yep.
10    Q.  Exhibit 14 is going to be a document that
11 we're not sure what it is and we're not sure who
12 prepared it.  It appears to be a ledger of charges
13 against and payments on this promissory note.
14    I'm just saying that so the people on the
15 phone know what it is, but you don't have to take what
16 I said as correct.
17    (Whereupon, Exhibit 14 was marked for
18    identification.)
19    Q.  (BY MR. RUKAVINA)  So Ms. Hendrix, Exhibit 14
20 was produced by the debtor.  And I'm going to ask you,
21 do you know what this is or have you seen it before?
22 Can you help us state what it is?
23    A.  This looks like it is an amortization
24 schedule of the NexPoint Advisors term loan.
25    Q.  Would this have been something that it

---

Kristin Hendrix - October 27, 2021

**77**

1  appears to you would have been maintained internally by
2  the debtor, or does it look like it might have been
3  prepared by DSI or someone else for some other reason?
4      A.  It looks like the debtor's amortization
5  schedule that they kept.
6      Q.  Did the debtor keep an amortization schedule
7  for the NexPoint promissory note, to your knowledge?
8      A.  Yes.
9      Q.  Did the debtor keep amortization schedules
10  for other term promissory notes?
11      A.  Yes.
12      Q.  In what format, like Excel spreadsheets or
13  Word documents?  What is your recollection for NexPoint
14  specifically?
15      A.  Excel.
16      Q.  Would that have been on the shared system or
17  something?
18      A.  Yes.
19      Q.  And who would have been responsible on an
20  ongoing basis to update the NexPoint amortization
21  schedule?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  Depends on what time you're
25  asking.

**78**

1      Q.  (BY MR. RUKAVINA)  Let's talk about the year
2  of 2020.
3      A.  That would have been Hayley Eliason, our
4  accountant at that time.
5      Q.  What about the year 2019?
6      A.  Still Hayley.
7      MR. RUKAVINA:  I'm going to just ask, to
8  preserve the record, Mr. Morris, if he hasn't already,
9  to produce any such Excel spreadsheet in the native
10  form.
11      Q.  (BY MR. RUKAVINA)  If we look at this,
12  Ms. Hendrix -- and I'm a little confused as to what
13  these entries mean.  Maybe you could help me.  But
14  columns that say interest paid, principal paid, total
15  paid, do you know what those columns mean?
16      A.  Exactly as they state.  These are interest
17  and principal payments made on the date that's listed,
18  and then you've got a total.
19      Q.  And then they're in brackets because they're
20  negative numbers?
21      A.  Correct.
22      Q.  So here's what I'm not understanding.  Go to
23  the second page.
24      You see there's an entry under interest paid
25  12/30/29 [verbatim] that says negative 530,000 and

**79**

1  change but it doesn't use brackets?
2      A.  It's a negative number.  It's just a
3  formatting issue.
4      Q.  What about also on that same page in the
5  other column, principal paid, 5/31/2020, it's a
6  positive number, 575,550.
7      MR. MORRIS:  Where are you?
8      MR. RUKAVINA:  On page 2 of this exhibit.
9      MR. MORRIS:  What date?
10      MR. RUKAVINA:  May 31, 2020.  And it's the
11  column over, principal paid.  It's a positive number,
12  575,000 and change.
13      MR. MORRIS:  Got it, thank you.
14      Q.  (BY MR. RUKAVINA)  Do you see that,
15  Ms. Hendrix?
16      A.  Yes.
17      Q.  Do you have an understanding of why that
18  number would be positive?
19      A.  Actually, I think this looks like an entry to
20  me where the interest is what we call picking.  So on
21  the anniversary date of this loan, which is May, from
22  what I can tell, the accrued interest total, which is
23  that 575-, is being rolled into principal.
24      That's what I can tell from looking at it.
25      Q.  Okay.  Do you have any understanding as to

**80**

1  why that would have been done or why that would have
2  been done on that day?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  Because that's the anniversary
6  date of the loan.  I would assume that that's how the
7  loan is written.
8      Q.  (BY MR. RUKAVINA)  And I think that that
9  Section 1 of the promissory note does say, the unpaid
10  principal balance of this note from time to time
11  outstanding shall bear interest.
12      At the rate of 6 percent per annum from the
13  date hereof until maturity date, compounded annually on
14  the anniversary of the date of this note.
15      Do you see that?
16      MR. MORRIS:  Objection to the form of the
17  question.
18      THE WITNESS:  Yeah, I see that.
19      Q.  (BY MR. RUKAVINA)  Assuming that this is the
20  correct amortization schedule for the NexPoint note,
21  and that the numbers in here are correct, if you look
22  at the second page under the column total paid there
23  are a number of entries for 2019.
24      Do you see that, the far right column?
25      A.  At the top, yes.

Kristin Hendrix - October 27, 2021

---

**81**

1    Q.  For example, 1.3 million, 2.1 million,
2  1.3 million.
3        Do you see that?
4    A.  Yes.
5    Q.  Assuming that that's correct, do you have any
6  memory or understanding whether in the year 2019, or
7  why NexPoint was making these payments on this
8  promissory note?
9    A.  Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13    Q.  This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16    A.  Yes.
17    Q.  Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20    A.  We generally always had a need for cash, so
21  yes.
22    Q.  And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

---

**82**

1        MR. MORRIS:  Objection to the form of the
2  question.
3        THE WITNESS:  Yes.
4    Q.  (BY MR. RUKAVINA) Sitting here today, do you
5  have any reason to believe based on the formatting or
6  anything on Exhibit 14 that it's not the amortization
7  schedule as it was maintained by the debtor?
8    A.  I don't have any reason to not believe that
9  it was.
10    Q.  Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13        So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16        MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21        MR. RUKAVINA:  You're assuming that I read my
22  emails.
23        MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25    Q.  (BY MR. RUKAVINA) So I'm going to hand you

---

**83**

1  Exhibit 15 and I'm going to represent to you that it's
2  the email that Mr. Morris sent to me today and I've not
3  doctored it in any way.
4        (Whereupon, Exhibit 15 was marked for
5        identification.)
6        MR. MORRIS:  Do you have the email that it
7  was attached to?
8        MR. RUKAVINA:  Somewhere.  I can find it at a
9  break.
10        MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13        MR. RUKAVINA:  Off the record.
14        (Off the record.)
15    Q.  (BY MR. RUKAVINA) So you have Exhibit 15.
16        And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2018, to Mr. Dondero by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21    A.  Correct.
22    Q.  Do you recall what prompted you to send that
23  email and this attachment?
24    A.  Yes.
25    Q.  What?

---

**84**

1    A.  Frank Waterhouse called me on August 29, and
2  requested that I do so.
3    Q.  Did he tell you why?
4    A.  From what I recall, this was a time when Jim
5  was trying to come up with his bargain or pop land,
6  whatever he referenced it as.  This was all information
7  that Frank said he wanted.
8    Q.  Okay.  So going back to Exhibit 15, what I'm
9  interested in is NexPoint Advisors, the 23,846,000 and
10  change number.
11        Do you see that?
12    A.  Yes.
13    Q.  Where did that number -- or where did this
14  Exhibit 15 come from, if you understand my question?
15    A.  Sure.  These numbers should all be balances
16  off of the corresponding notes that each entity owed to
17  the debtor.
18    Q.  Did you or someone prepare Exhibit 15
19  specifically for that email?  Or was Exhibit 15 already
20  existing somewhere on the system?
21    A.  I believe that we prepared it specifically
22  for this request.
23    Q.  Do you recall who?
24    A.  It was either myself or our accountant.  I
25  don't recall who put it together.

---

Kristin Hendrix - October 27, 2021

---

85

1    Q.  Okay.  And where would that 23 million and
2  change number for NexPoint have come from, an
3  amortization schedule?
4    A.  Yes.
5    Q.  And what about Highland Capital Management
6  Fund Advisors?  You see $10.5 million and change demand
7  on Exhibit 15?
8    A.  Yes.
9    Q.  Where would that $10.5 million number have
10  come from, do you remember?
11    A.  The same.  It would have come off of the
12  amortization schedules for all of their notes.
13    Q.  How was there an amortization schedule for a
14  demand note?
15    A.  Because it's accruing interest.
16    Q.  So sitting here today, you expect there would
17  be some amortization schedule like Exhibit 14 but for
18  HCMFA?
19    A.  Yes.
20    Q.  Now we're going to have an exhibit [verbatim]
21  chain that's going to be marked as Exhibit 16.
22        (Whereupon, Exhibit 16 was marked for
23        identification.)
24    MR. RUKAVINA:  For the folks on the video,
25  Exhibit 16 is the email chain that Mr. Morris used last

---

86

1  week regarding the Section 15(c) document.
2    Q.  (BY MR. RUKAVINA)  Are you familiar with this
3  Exhibit 16 email chain, Ms. Hendrix?
4    A.  Yes.
5    Q.  Why are you familiar with it?
6    A.  Well, I'm copied on it, and I saw it
7  yesterday.
8    Q.  Do you have any memory -- well, that's a
9  stupid question.  But prior to yesterday, did you have
10  any memory of this?
11    A.  Yes.
12    Q.  And do you recall the context or the purpose
13  of this exhibit, or this email chain?
14    A.  From what I remember this is the time where
15  information was being prepared for the retail board to
16  re-up the debtor's shared services.
17    Q.  So, here -- you're certainly welcome to read
18  it in its entirety and if you feel like you want to or
19  need to, that's fine.  But I only have one question.
20  Well, one question with two subparts.
21        I'm looking at Ms. Lauren Thedford's,
22  T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]
23  where she says, I see the below from the 6/30
24  financials.  NPA, due to HCMLP and affiliates as of
25  June 30, 2020.

---

87

1        Do you see that, ma'am?
2    A.  Yes.
3    Q.  23 million 683?
4    A.  Yes.
5    Q.  And you see, HCMFA due to HCMLP as of
6  June 30, 2020, 12,286,000?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    Q.  (BY MR. RUKAVINA)  Strike that.
10        It says 12,286.  What do you take that 12,286
11  to mean?
12    A.  I think that's a typo and it should have
13  said -- well, there's several things wrong with this,
14  from looking at it.
15        She left off three zeros on the end of it.
16  Should have said 12,286,000.  Secondly, that amount is
17  our due to affiliates on HCMFA's books, not just due to
18  HCMLP.
19    Q.  That was going to be my question, why that
20  12,286,000 number didn't jive with the 10,530,000
21  number on Exhibit 15?
22    A.  Yes, there's another loan due to a different
23  affiliate.
24    Q.  So that $12,286,000 amount doesn't mean that
25  it's all due to Highland; is that correct?

---

88

1    A.  Correct.
2    Q.  Exhibit 17 is going to be the January 7, 2021
3  notice from the debtor to NexPoint about the default.
4        (Whereupon, Exhibit 17 was marked for
5        identification.)
6    Q.  (BY MR. RUKAVINA)  You've been handed
7  Exhibit 17.  Have you seen this document before?
8    A.  Not that I believe.
9    Q.  And I think we've asked this before, but just
10  to clarify.
11        Did anyone at the debtor, including Mr. Seery
12  or DSI, discuss with you after December 31, 2020 that
13  the payment had not been made and what, if anything,
14  the debtor should do about that?
15    MR. MORRIS:  Objection to the form of the
16  question.
17    THE WITNESS:  I can't recall specific
18  conversations that may or may not have been had around
19  that topic.
20    Q.  (BY MR. RUKAVINA)  Would -- so back then you
21  were the assistant controller, on January 7; right?
22    A.  Yes.
23    Q.  Do you think that back then Mr. Seery or DSI
24  would have sought your advice or input as to what they
25  should do about the missed payment?

---

Kristin Hendrix - October 27, 2021

**89**

1      A.  No.
2      MR. MORRIS:  Objection to the form of the
3  question.
4      THE WITNESS:  No.
5      Q.  (BY MR. RUKAVINA)  That would have been
6  outside of your purview?
7      A.  Yes.
8      Q.  And you see in this notice in the middle, it
9  says an amount due as of January 8 in the $24,471,000
10  range.
11      Do you see that?
12      A.  Yes.
13      Q.  Do you have any idea, I take it you don't,
14  where that number came from?
15      MR. MORRIS:  Objection to the form of the
16  question.
17      THE WITNESS:  I don't know who provided that
18  number or where it came from.
19      Q.  (BY MR. RUKAVINA)  Do you have any
20  understanding as to why that number is higher than the
21  number on Exhibit 15?
22      A.  My guess would be that Exhibit 15 is just
23  principal balances.
24      Q.  Okay.
25      Exhibit 18, please.

**90**

1      (Whereupon, Exhibit 18 was marked for
2      identification.)
3      Q.  (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,
4  is an email chain between you and Mr. Waterhouse on
5  January 12, 2021.  Do you remember this email chain?
6      A.  No.
7      Q.  Do you remember on January 12 Mr. Waterhouse
8  emailing you, asking when the last amort payment due
9  and what the amount was for NexPoint?
10      A.  No.
11      Q.  When was the last time -- well, strike that.
12      Do you remember ever seeing this email
13  between then and today?
14      A.  No.
15      Q.  Do you have any present memory of any
16  communications with Mr. Waterhouse on or about
17  January 12, 2021 regarding the NexPoint default or
18  note?
19      A.  Not specific, no.
20      Q.  Any general memory?
21      A.  Not that I can pinpoint, no.
22      Q.  Were you aware that on or about January 14
23  NexPoint transferred about $1.4 million and change to
24  the debtor?
25      A.  Yes.

**91**

1      Q.  Were you aware of it then?
2      A.  Was I aware of what?
3      Q.  That transfer of $1.4 million and change.
4      A.  On January 14?
5      Q.  Yes.
6      A.  Yes.
7      Q.  Did you facilitate that transfer?
8      A.  Yes.
9      Q.  Who told you to make that transfer?
10      A.  Frank Waterhouse.
11      Q.  Did he tell you why?
12      A.  Nope.
13      Q.  He just said make the transfer?
14      A.  Yes.
15      Q.  Did he tell you that it was on account of the
16  NexPoint note?
17      A.  Yes.
18      Q.  Did he tell you how to, if at all, to credit
19  that note for that amount?
20      A.  No.
21      Q.  Sitting here today, you have no memory other
22  than that Frank Waterhouse told you to transfer some
23  $1.4 million on the NexPoint note?
24      A.  Right.
25      Q.  And do you recall, was that oral or written

**92**

1  or how would that have been?
2      A.  That was a phone call.
3      Q.  Do you recall who initiated the phone call?
4      A.  Frank called me.
5      Q.  Was that the only topic discussed in that
6  phone call to your memory?
7      A.  Yes.
8      Q.  Did you ask him why the payment or
9  anything -- did you ask him anything at all?
10      A.  No.
11      Q.  And after you made the payment -- or I'm
12  sorry, after you caused the payment to be made, did you
13  take any further steps with respect to the NexPoint
14  note?
15      A.  I forwarded the payment confirmation, showing
16  that the money was sent from NexPoint Advisors to
17  Highland, forwarded that payment confirmation from the
18  bank to Jack Donohue at DSI, letting him know.
19      Q.  Did you let Mr. Donohue or anyone at DSI know
20  about the transfer before the transfer was made?
21      A.  No.
22      Q.  And you sent that by email to Mr. Donohue?
23      A.  Yes.
24      Q.  Did Mr. Donohue thereafter have any
25  discussion with you about that in any way?

Kristin Hendrix - October 27, 2021

93

1      A.  I have no idea.
2      Q.  He didn't ask what this was for or anything
3  like that?
4      A.  He may have asked what the amount
5  represented.  I can't specifically recall.  But it's
6  possible.
7      Q.  Okay.  Do you recall any discussion about
8  that time, January 14, with Mr. Donohue or
9  Mr. Waterhouse or anyone as to whether that payment
10  would in any way relieve NexPoint of the default or
11  would not relieve NexPoint of the default?
12      A.  No.
13      Q.  Ms. Hendrix, I believe that I am done.  I
14  would like you, however, because it's important, to
15  check your phone.  Would you like a short, five-minute
16  restroom break and just check --
17      A.  Yeah, and I might need help figuring out how
18  to do that.
19      Q.  I'm not saying that it's possible, but I'm
20  going to ask you on the record to look for that
21  November 30 or December 1, 2020 phone call.
22      MR. MORRIS:  We're happy to do that.
23      Q.  (BY MR. RUKAVINA)  But what I would like if
24  you find it, I would like you to tell me the time, the
25  date and the length of that call.

94

1      A.  Okay.
2      Q.  Thank you.
3      We'll be back in five minutes.
4      (Off the record.)
5      Q.  (BY MR. RUKAVINA)  Ms. Hendrix, during the
6  break did you look at your phone?
7      A.  I did.
8      Q.  Did you find anything?
9      A.  Sadly, it only goes back to October 5 of
10  2021.
11      Q.  Not surprised.  Thank you.
12      Have I been courteous to you today?
13      A.  Yes.
14      MR. RUKAVINA:  I pass the witness.
15      MR. MORRIS:  Thank you.
16      MR. AIGEN:  Are we ready to move forward?
17      MR. MORRIS:  Yes.  You're a little dark
18  there.
19      MR. RUKAVINA:  Can we increase the volume on
20  that thing?
21      (Off the record.)
22      EXAMINATION
23      Q.  (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24  My name is Michael Aigen.  I represent Mr. Dondero,
25  HCMS and HCRE Partners in several of the adversary

95

1  proceedings today.
2      I'm going to try to ask you some questions
3  about these adversary proceedings.  I'll try to make it
4  as quick as possible so we don't keep you here.
5      You understand that you're still under oath;
6  is that correct?
7      A.  Correct.
8      Q.  First topic I want to ask you about is one of
9  the defenses in this case related to an oral agreement.
10  Let me start off with this question.
11      Are you aware that some of the defendants in
12  these adversary proceedings have raised a defense that
13  there was a subsequent oral agreement allowing the
14  notes at issue to be potentially forgiven if certain
15  events occurred?
16      A.  I've recently been made aware that this came
17  up, yes.
18      Q.  When you say recently, approximately when?
19      A.  Within the last week.
20      Q.  And where did you learn that from?
21      A.  In my speakings with John Morris just
22  preparing for today.
23      MR. AIGEN:  And John, I'm going to assume
24  that those conversations are privileged?
25      MR. MORRIS:  That's a very fair assumption.

96

1      Q.  (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5      A.  No.
6      Q.  So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9      A.  That's right.
10      Q.  This is a similar question but slightly
11  different, just to sort of finish this topic.  I'm not
12  asking about this oral agreement as a defense, I'm just
13  asking more generally.
14      Other than this conversation, were you aware
15  generally of any conversations that anyone had where
16  the notes at issue might be forgiven if certain events
17  occurred?
18      MR. MORRIS:  Objection to the form of the
19  question.
20      THE WITNESS:  No.
21      Q.  (BY MR. AIGEN)  Is it fair to say that you
22  haven't had any conversations about this subsequent
23  oral agreement with anyone other than Mr. Morris?
24      A.  That's fair.
25      Q.  You never discussed it with Mr. Seery?

Kristin Hendrix - October 27, 2021

97

1    A.  No.
2    Q.  Never discussed it with Mr. Klos?
3    A.  No.  Well, sorry, Mr. Klos was present when
4  John and I talked about it.  But that's it.
5    Q.  Have you ever made any investigation or
6  effort in order to determine if this oral agreement
7  actually occurred?
8    A.  No.
9    Q.  If there was such an oral agreement to
10  potentially forgive the notes, do you believe that you
11  would have known about such an oral agreement as part
12  of your duties and responsibilities?
13    A.  Yes, I would hope so.
14    Q.  Why do you say that?
15    A.  That's something that should be disclosed in
16  audited financial statements, and me and my team are
17  responsible for preparing those financial statements
18  and presenting them to the auditors as fair and
19  accurate.
20    Q.  And is it fair to say that this oral
21  agreement should have been disclosed to PwC if it was
22  determined that it was material?
23    A.  Yes.
24    Q.  And have you done any sort of analysis to
25  determine whether the oral agreement at issue here

98

1  would have been material for purposes of a PwC audit?
2    A.  I've not done any work, just finding out
3  about it, but from what it sounds like, it would be
4  material.
5    Q.  That's your opinion, that it would have been
6  material; is that fair to say?
7    A.  Fair.
8    Q.  Have you had any discussions with anyone else
9  about whether the oral agreement would have been
10  material?
11    A.  No.
12    Q.  Changing topics a little bit here, are you
13  aware --
14    (Off the record.)
15    Q.  (BY MR. AIGEN)  Are you aware that a few of
16  the loans at issue here, specifically related to HCMS
17  and HCRE, were term loans as opposed to demand loans?
18    A.  Yes.
19    Q.  And are you aware that for those particular
20  loans, there were payments that were supposed to be
21  made but weren't on December 31, 2020?
22    A.  Yes.
23    Q.  Do you have any understanding as to why those
24  payments weren't made with respect to the HCMS and HCRE
25  term loans on December 31, 2020?

99

1    A.  Yes.
2    Q.  Can you tell me why?
3    A.  Sure.  It goes along with the same statement
4  as HCMFA and NPA and the phone call that I got from
5  Frank Waterhouse saying there's no payments coming from
6  any of the affiliates to the debtor.
7    Q.  I may have written that down wrong when you
8  talked about that before, but I believe your earlier
9  testimony when you described that conversation was that
10  there was no more payments coming from the Advisors,
11  not affiliates.
12    Let me ask you then, what was the
13  conversation?  Was it no more payments from affiliates
14  or Advisors?
15    A.  It could have been either.  I probably did
16  say Advisors.  But regardless, those payments would
17  have been directed to me to be made, either by Frank
18  Waterhouse or Jim Dondero.
19    And I would assume that nobody directed me to
20  make those payments because we weren't making any
21  payments from Jim's related parties.  I don't know for
22  a fact, but that's what I would assume.  Those were all
23  under the same umbrella.
24    Q.  And again, let's back up a second.
25    When you refer to Advisors, fair to say that

100

1  that does not include HCMS and HCRE; is that correct?
2    A.  When I say Advisors, I am referring to HCMFA
3  and NPA.
4    Q.  And when you use the term "affiliates,"
5  you're referring to all four; is that correct?
6    A.  Correct.
7    Q.  Just want to make sure we're on the same
8  page.
9    When you answered the previous question you
10  started to get into assumptions and things like that.
11  Let me start off with what your specific recollection
12  of that phone call was.  Tell me as best as you can
13  what you remember Frank telling you?
14    A.  I remember it as being no payments from the
15  Advisors to the debtor.
16    Q.  So you don't remember the instruction being,
17  don't make payments from the affiliates.  It was, don't
18  make payments from the Advisors; is that correct?
19    A.  Correct.
20    Q.  So is it fair to say that you don't remember
21  any instructions telling you not to make any payments
22  from HCMS or HCRE?
23    A.  That's fair.
24    Q.  So if that is the case, why weren't payments
25  made from HCMS or HCRE for December 31, 2020, payment?

Kristin Hendrix - October 27, 2021

101

1    A.  Sure.  Typically what would have happened is
2  Frank would be talking to Jim Dondero about making
3  these payments and getting his approval to do so,
4  because Jim Dondero is, you know, directing payments
5  out of these entities.
6        I have never -- had never been given the
7  direction to effectuate those payments by anybody.
8    Q.  Is it fair to say, then, that you're not
9  aware of any instructions from anyone saying that the
10  HCMS and HCRE payments should not be made on
11  December 31, 2020?
12    A.  That's fair.
13    Q.  So the reason the payments weren't made is
14  because you never got an affirmative instruction to
15  actually make that payment; is that correct?
16    A.  Correct.
17    Q.  And you're not aware of Mr. Dondero
18  instructing anyone that HCMS and HCRE should not have
19  made the December 31, 2020, payments; is that correct?
20    A.  I'm not aware personally, no.  Correct.
21    Q.  You say personally.  In any way are you aware
22  of such a specific instruction?
23    A.  No.
24    Q.  If that payment was to be made, who at the
25  debtor would have been responsible for making those

102

1  payments on behalf of HCMS and HCRE?
2        MR. MORRIS:  Objection to the form of the
3  question.
4        THE WITNESS:  The corporate accounting team.
5    Q.  (BY MR. AIGEN)  And that included you?
6    A.  Yes.
7    Q.  And in December of 2020, were you aware that
8  those payments were due on December 31, 2020?
9    A.  Yes.
10    Q.  Did you make any attempts or efforts to
11  determine whether Mr. Dondero wanted those payments to
12  be made?
13    A.  I did not, no.
14    Q.  Why not?
15    A.  That would have been something that Frank
16  Waterhouse would have done directly with Jim Dondero
17  himself.
18    Q.  Did you have any conversations with anyone
19  about whether the December 31 payments for HCMS and
20  HCRE would be made in December of 2020?
21    A.  Not that I can recall.
22    Q.  And you didn't think it was your
23  responsibility to check on those payments and find out
24  if they should have been made?
25    A.  Right, correct.

103

1    Q.  And is that because it's only your job to
2  make payments that you're told to specifically make; is
3  that correct?
4    A.  Yes, in this case, that is correct.
5    Q.  Is it fair to say then that as part of your
6  job responsibilities you've never made a payment to
7  anyone without being specifically told by Mr. Dondero
8  and Mr. Waterhouse?
9    A.  Sorry, say that again.
10    Q.  As part of your job responsibilities, have
11  you ever made a payment to anyone without the specific
12  instruction of Mr. Waterhouse or Mr. Dondero?
13        MR. MORRIS:  Objection to the form of the
14  question.
15        THE WITNESS:  Yes, we make payments all the
16  time.
17    Q.  (BY MR. AIGEN)  So why is this different in
18  that this payment was not made without the specific
19  instructions from Mr. Waterhouse and Mr. Dondero, even
20  though you believed the payment was due on December 31,
21  2020?
22    A.  The difference between making a loan payment
23  and making normal course -- or sorry, normal, ordinary
24  course, you know, overhead expense payments is that
25  something like that is not necessarily what we would

104

1  take to Jim Dondero to approve.
2        He doesn't have time to approve every single
3  overhead payment that we're making out of every single
4  entity.  That's what that's for.
5        Something that's once a year that's more
6  material in amount, such as a loan payment, that is
7  something that needs to get approved by Jim Dondero.
8    Q.  You say needs to get approved.  What's your
9  basis for that, something in a policy manual, something
10  someone told you?
11    A.  It's a policy that my team followed.  I don't
12  think that it's written in an actual manual anywhere,
13  but anything that's not ordinary course needs to get
14  approved by Jim Dondero.
15    Q.  Is that something that's written in a policy
16  anywhere?
17    A.  Not that I know of.
18    Q.  Were you ever told that payments in the
19  ordinary course can be made without Mr. Dondero's
20  approval but loan payments cannot?
21    A.  Yes, I do recall years ago that Frank and I,
22  possibly Jim, this was years ago, had a conversation
23  that anything ordinary course is up to Frank to
24  approve.  And this is, quite frankly, up to Frank.
25        Whatever he felt Jim needed to sign off on,

Kristin Hendrix - October 27, 2021

---

**105**

1 that's what Jim would sign off on. This was not my
2 responsibility to make that decision.
3    Q. And in December -- prior to the December 31,
4 2020, due date you didn't have any conversations with
5 anyone about whether this -- these payments that were
6 due should be made; is that correct?
7    A. Correct.
8    Q. And you didn't try to check with anyone to
9 see whether anyone wanted these payments to be made; is
10 that correct?
11    A. Correct.
12    Q. Subsequent to the payment being missed, did
13 you ever have any conversations with anyone about why
14 the payment was not made?
15    A. Not that I recall.
16    Q. So is it fair to say that sitting here today
17 you have no idea why the payments were not made for
18 HCMS and HCRE on December 31, 2020?
19       MR. MORRIS: Objection to the form of the
20 question.
21       THE WITNESS: I don't have any specific
22 evidence telling me why they weren't. I can make
23 assumptions but that's not going to help.
24    Q. (BY MR. AIGEN) Well, did you ever have any
25 conversations with anyone about why those payments were

---

**106**

1 not made?
2    A. No.
3    Q. You have no idea why they weren't made other
4 than just speculation; is that fair to say?
5    A. Correct.
6       MR. MORRIS: Objection. Asked and answered.
7       THE WITNESS: Correct.
8    Q. (BY MR. AIGEN) And are you aware that with
9 respect to those two loans, some payments were actually
10 made in the next month, in January of 2021?
11    A. Yes.
12    Q. What role, if any, did you have with respect
13 to those payments?
14    A. Frank Waterhouse would call me and tell me to
15 have my team effectuate a wire.
16    Q. And you say would call you. Do you remember
17 this conversation or are you just assuming it occurred?
18       MR. MORRIS: Objection to the form of the
19 question.
20       THE WITNESS: If we sent a payment out, Frank
21 would have told me to do it. I would not have done it
22 on my own.
23    Q. (BY MR. AIGEN) Sitting here today, do you
24 have a specific recollection of the conversation where
25 someone told you to make the January 2021 payments?

---

**107**

1    A. I can't tell you the exact date, but, yes, I
2 do have a recollection of Frank calling or emailing me
3 to have, I believe it was the HCRE wire sent out for
4 their payment.
5    Q. What about the HCMS payment?
6    A. I don't recall that one as much.
7    Q. Other than the payment being made, do you
8 have any recollection of any other conversations about
9 why the payment was being made?
10    A. No.
11    Q. Are you aware of any conversations that
12 anyone had regarding whether these payments would
13 deaccelerate loans?
14    A. No.
15    Q. Is that something you would normally be part
16 of, conversations like that?
17    A. No.
18    Q. Changing topics here. Not sure if this is an
19 area that you know anything about.
20       Are you familiar with the term, as it's used
21 at Highland, NAV ratio trigger period?
22    A. No.
23    Q. This may go very quick. If I represent to
24 you that it's a term that's used in the -- in the
25 fourth amended limited partnership agreement for

---

**108**

1 Highland Capital Management, would that refresh your
2 recollection at all?
3    A. No.
4    Q. Fair to say, then, that you have no knowledge
5 as to whether NAV ratio trigger period was ever reached
6 at any time prior to bankruptcy buyouts?
7    A. No, I don't know.
8    Q. Have you ever had any conversations with
9 Nancy Dondero?
10    A. I have not.
11    Q. Never met her?
12    A. No. I may have exchanged an email with her
13 on an invoice, but that's the extent of it. No
14 conversations.
15    Q. In the years leading up to the bankruptcy of
16 Highland Capital, was there any time period where
17 Highland was unable to pay its salaries?
18    A. Salaries?
19    Q. Salaries of its employees?
20    A. No.
21    Q. In the time leading up to the Highland
22 bankruptcy, was there any time period where Highland
23 wasn't able to pay bonuses owed to any of its
24 employees?
25    A. Not that I know of. Not that I can recall.

---

Kristin Hendrix - October 27, 2021

**109**

1    Q.  Are you aware of any time period leading up
2 to the Highland bankruptcy where Highland was unable to
3 pay its bills?
4    A.  There's times where we would be in a cash
5 flow crunch and we would stretch our AP, but eventually
6 it would get paid.
7    Q.  And I think this is the last topic and we can
8 probably move through this pretty quickly.
9       Are you aware of any loans made by Highland
10 to any of its employees or officers that were forgiven
11 in part or all?
12    A.  Yes.
13    Q.  Which officers or employees are you aware of?
14    A.  I recall there were two employees.  I can't
15 remember one of them, but I believe another, the second
16 one, was Paul Adkins.  Again, I'm just recalling this
17 was years ago.
18    Q.  And these two are the only ones you're aware
19 of?
20    A.  Or I'm sorry, not Paul Adkins, Tim Lawler.
21 It's possible Paul Adkins was the other one, but I
22 can't tell you for sure.
23    Q.  Tim Lawler and some other employee that you
24 can't remember the name of are the only two that you're
25 aware of?

**110**

1    A.  Yes.
2    Q.  This other employee, I know you don't
3 remember the name.  Is there any other description that
4 you can give me, what their position was, how long they
5 worked, or is it just you remember those loans?
6    A.  I just remember we had two employee loans.
7    Q.  Approximately when was this?
8    A.  I couldn't even tell you.  All the years just
9 commingle together.
10    Q.  More than five years ago?
11    A.  Yes.
12    Q.  More than 10 years ago?
13    A.  I couldn't say.
14       MR. AIGEN:  Why don't we take a five-minute
15 break and then I'll either be done or have just a few
16 wrap-up questions.
17       MR. RUKAVINA:  Okay.
18       (Off the record.)
19       FURTHER EXAMINATION
20    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, in May of
21 2019, would you on behalf of Highland alone,
22 unilaterally, have the authority to lend to HCMFA 2.4-
23 and/or $5.0 million?
24    A.  No.
25    Q.  And would you have had any authority on

**111**

1 behalf of HCMFA in May of 2019 to bind HCMFA to such
2 notes?
3    A.  No.
4    Q.  Thank you, ma'am.
5       EXAMINATION
6    Q.  (BY MR. MORRIS)  Ms. Hendrix, can you get out
7 of your pile, Exhibit Number 3.
8       And this is the email from Dave Klos to
9 corporate accounting on May 2nd concerning the
10 $2.4 million that was going to be transferred from
11 HCMLP to HCMFA?
12    A.  Yes.
13    Q.  And how did Mr. Klos characterize that
14 transfer?
15    A.  He called it a new intercompany loan.
16    Q.  What does a new intercompany loan mean to
17 you?
18    A.  That means we are creating a new loan
19 document, sending money out, tracking it as a
20 brand-new, fresh loan.
21    Q.  And he sent this email to an email group
22 called corporateaccounting@hcmlp.com.  Do I have that
23 right?
24    A.  Yes.
25    Q.  Were you included in that email group?

**112**

1    A.  I was.
2    Q.  Can you identify everybody else who you
3 recall being in that email group?
4    A.  Yes.
5    Q.  Who else was in that email group?
6    A.  Dave Klos, Frank Waterhouse, myself, Hayley
7 Eliason, and Blair Roeber.
8    Q.  Okay.  Did Mr. Waterhouse ever tell anybody,
9 to the best of your knowledge, in May 2019 that the
10 transaction should not be booked as a loan?
11    A.  No, not to my knowledge.
12    Q.  You testified earlier that there was, you
13 recall, a similar email the next day with respect to a
14 $5 million transaction.
15       Do you recall that?
16    A.  Yes.
17    Q.  Do you recall if that email also went to
18 corporate accounting?
19    A.  I believe so, yes.
20    Q.  And to the best of your knowledge, would
21 Mr. Waterhouse have been informed on May 3, 2019, that
22 the transaction was being booked by the corporate
23 accounting department as a loan?
24    A.  Yes.
25    Q.  Did Mr. Waterhouse tell you at that time or

Kristin Hendrix - October 27, 2021

**113**

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3      A.  No.
4      Q.  Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7      A.  No.
8      MR. RUKAVINA:  Objection.  To the last
9  question, objection to form.
10      Go ahead.
11      Q.  (BY MR. MORRIS)  Okay.  The promissory notes,
12  to be clear, are the two promissory notes that you
13  testified to earlier that have been marked as exhibits
14  in this deposition for $5 million and $2.4 million
15  respectively.
16      With that definition as promissory notes, did
17  Mr. Waterhouse ever tell you at any time that it was a
18  mistake to sign those notes?
19      MR. RUKAVINA:  I'll object to the form.
20      Go ahead.
21      THE WITNESS:  No.
22      Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
23  anybody -- withdrawn.  I'll go back to the first
24  question.
25      Did Mr. Waterhouse or anybody in the world

**114**

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A.  No.
5      Q.  Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8      MR. RUKAVINA:  And I'll object.  Assumes
9  facts not in evidence, i.e., the signature.  That's
10  what I've been objecting to.
11      But go ahead and answer.
12      THE WITNESS:  Say it again.
13      Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
14  anybody in the world tell you at any time that he
15  wasn't authorized to have his signature affixed to the
16  promissory notes?
17      MR. RUKAVINA:  Same objection.
18      THE WITNESS:  No.
19      Q.  (BY MR. MORRIS)  Did you have anything to do
20  with Highland's annual audit?
21      A.  Yes.
22      Q.  What role did you play with respect to
23  Highland's annual audit?
24      A.  I personally was in charge of completely
25  writing the entire audit report for the debtor and for

**115**

1  HCMFA.  I oversaw all other aspects of the audit my
2  team carried out.
3      Any requests from the auditors, emails with
4  questions, any issues that arose, all of that went
5  through me.
6      Q.  And did Mr. Waterhouse play a role in
7  relation to the annual audit?
8      A.  Yes.
9      Q.  What is your understanding of
10  Mr. Waterhouse's role?
11      A.  Let's see.  He was in charge of reviewing the
12  financial statements as they were done, so he saw the
13  end product.  He would sign off on the management rep
14  letter.  He signed engagement letters.
15      If there were any big issues, those got --
16  those would be brought to Frank's attention for sure.
17      Q.  Okay.  And are you a CPA?
18      A.  Yes.
19      Q.  And are you familiar with management rep
20  letters?
21      A.  Yes.
22      Q.  What is your understanding of what a
23  management rep letter is?
24      A.  That's basically telling the auditors that
25  everything in the audited financial report is accurate

**116**

1  to the best of their knowledge, they've presented
2  everything that they have fair and accurately, they're
3  not withholding any information.
4      Q.  And do you recall that the -- Highland's 2018
5  audit was completed in early June 2019?
6      A.  Yes.
7      Q.  And did you cause the two promissory notes
8  that we're talking about here to be delivered to
9  PricewaterhouseCoopers in connection with the audit?
10      A.  Yes.
11      Q.  And were those two promissory notes delivered
12  to PricewaterhouseCoopers because they constituted
13  subsequent events?
14      A.  Yes.
15      Q.  Do you recall whether those promissory notes
16  were described in Highland's 2018 audited financial
17  statements?
18      A.  Yes.
19      Q.  And did Mr. Waterhouse or Mr. Dondero ever
20  tell you at any time that there was a mistake in the
21  audited financial statements?
22      A.  No.
23      Q.  Did they ever tell you -- did Mr. Waterhouse
24  or Mr. Dondero or anybody in the world ever tell you at
25  any time that the two notes were mischaracterized in

Kristin Hendrix - October 27, 2021

---

**117**

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.  No.
4      Q.  Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.  Yes.
7      Q.  Did you play any role in connection with that
8  audit?
9      A.  Yes.
10     Q.  What role did you play in connection with
11  HCMFA's audit of the 2018 financial statements?
12     A.  Same exact role as with the debtors --
13     Q.  And --
14     A.  -- writing the audit report, overseeing all
15  other audit functions.
16     Q.  And did you and your group cause HCMFA to
17  deliver to PricewaterhouseCoopers the two promissory
18  notes that we've been discussing from May 2019?
19     A.  Yes.
20     Q.  Did Mr. Waterhouse or Mr. Dondero or anybody
21  in the world ever tell you that it was a mistake to
22  deliver those promissory notes to PwC in connection
23  with HCMFA's 2018 audit?
24     A.  No.
25     Q.  Were those notes delivered -- withdrawn.

---

**118**

1          Were those notes delivered to
2  PricewaterhouseCoopers because they constituted
3  subsequent events in connection with the 2018 audit?
4      A.  Yes.
5      Q.  Do you recall whether PricewaterhouseCoopers
6  included as a liability on HCMFA's balance sheet the
7  obligations reflected in the two promissory notes at
8  issue?
9          MR. RUKAVINA:  Objection.  Best evidence.
10  Answer.
11         THE WITNESS:  On the 2018 financials?
12     Q.  (BY MR. MORRIS)  Correct.
13     A.  Those would not have been included as
14  liabilities in the 2018 financials.
15     Q.  Do you know if HCMFA completed their audit
16  for 2019?
17     A.  No.
18     Q.  Okay.  Did the notes appear in HCMFA's 2018
19  audited financials under the subsequent events section?
20     A.  Yes.
21         MR. RUKAVINA:  Objection.  Best evidence.
22  Go ahead.
23     Q.  (BY MR. MORRIS)  Did Mr. Dondero or -- did
24  Mr. Waterhouse or Mr. Dondero or anybody in the world
25  ever tell you that it was a mistake to include

---

**119**

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3          MR. RUKAVINA:  Same objection.
4          THE WITNESS:  No.
5      Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10     A.  No.
11     Q.  Did anybody in the world tell you that you
12  made a mistake when you created those promissory notes?
13     A.  No.
14     Q.  Can you pull out what was marked as
15  Exhibit 16.
16         Do you understand that the Advisors provide
17  services to certain retail funds?
18     A.  Yes.
19     Q.  And do you recall that the services are
20  subject to an agreement that's subject to annual
21  review?
22     A.  Yes.
23     Q.  So looking at Exhibit 16, did you understand
24  that the retail board had asked Highland to disclose --
25  I'll just read it from the document on page 2,

---

**120**

1  Bates number ending 881.
2          There's an email from Ms. Thedford that says,
3  quote, are there any material amounts -- withdrawn.
4          Are there any material outstanding amounts
5  currently payable or due in the future, open paren,
6  e.g., notes, close paren, to HCMLP by HCMFA or NexPoint
7  Advisors or any other affiliate that provides services
8  to the funds?
9          Do you see that?
10     A.  Yes.
11     Q.  And were you generally aware that that was
12  part of the annual renewal process?
13     A.  Yes.
14     Q.  And you made some comments earlier about
15  Ms. Thedford's response on the first page.
16         Do you recall that?
17     A.  Yes.
18     Q.  And you actually were able to correct certain
19  mistakes that you perceived in her response.
20         Do I have that right?
21     A.  Correct.
22     Q.  Do you know -- do you see where it says,
23  HCMFA due to HCMLP as of June 30, 2020, let's just call
24  it $12.3 million.
25         Do you see that?

---

Kristin Hendrix - October 27, 2021

121

1    A.  Yes.
2    Q.  And above that there is a reference to the
3  6/30 financials.
4        Do you see that?
5    A.  I do.
6    Q.  Do you know what the reference to the 6/30
7  financials is?
8    A.  Yes.
9    Q.  And what is that reference?
10    A.  That is referencing the amounts on the
11  balance sheet at 6/30 that we provided for the 15(c)
12  materials to the board.
13    Q.  Okay.  And does that $12.3 million include,
14  to the best of your knowledge, the principal amount of
15  the two notes that we were talking about?
16    A.  Yes.
17        MR. RUKAVINA:  Objection.  Best evidence.
18        THE WITNESS:  Yes.
19    Q.  (BY MR. MORRIS)  And how do you know that?
20    A.  Because I kept their financials, I know for a
21  fact that it included all of their outstanding notes
22  and it most certainly included these two notes that
23  we've been talking about today.
24    Q.  And to the best of your recollection did
25  HCMFA provide the 6/30 financials to the retail board?

122

1    A.  Yes.
2    Q.  And to the best of your knowledge did
3  Mr. Dondero or Mr. Waterhouse or anybody in the world
4  ever tell you that the financial statements that were
5  provided to the retail board were erroneous in any way?
6    A.  No.
7    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
8  in the world ever tell you that the 6/30 financials
9  that were given to the retail board should not have
10  included the $7.4 million principal amount on the two
11  promissory notes?
12        MR. RUKAVINA:  Objection.  Best evidence.
13        Answer.
14        THE WITNESS:  No.
15    Q.  (BY MR. MORRIS)  Do you know whether -- are
16  you at all familiar with the Advisors' actual response
17  to the retail board in October 2020?
18    A.  Say that again, please.
19    Q.  So this email string is October 2020; right?
20    A.  Right.
21    Q.  And do you understand that this is kind of a
22  discussion between Mr. Waterhouse and Ms. Thedford as
23  to how to respond?
24    A.  Yes.
25    Q.  Have you ever seen the actual response that

123

1  was given to the retail board?
2    A.  I likely did.  I can't tell you for certain
3  that I was on the correspondence.
4    Q.  Do you recall any discussion at any time that
5  the $12.3 million number in Ms. Thedford's email should
6  be changed in the final report to the retail board?
7    A.  I don't believe so.
8    Q.  Did anybody ever tell you at any time that
9  the $12.3 million number was incorrect?
10    A.  No.
11    Q.  Did anybody ever tell you at any time that
12  that number wrongly included the $7.4 million reflected
13  in the two notes?
14    A.  No.
15    Q.  Okay.  Do you recall that earlier that
16  summer -- we looked at Exhibit 15?
17    A.  Yep.
18    Q.  And that was an attachment to an email that
19  you personally sent to Mr. Dondero.  We saw that
20  before?
21    A.  Right.
22    Q.  And this Exhibit 15, which was attached to
23  your email, identifies amounts due and owing from
24  NexPoint Advisors; right?
25    A.  Right.

124

1    Q.  And it identifies amounts due and owing for a
2  number of different entities, including HCMFA; right?
3    A.  Correct.
4    Q.  Do you know whether the amount included for
5  HCMFA on Exhibit 15 included the principal amount due
6  on the two promissory notes?
7    A.  It does.
8    Q.  Did Mr. Dondero or Mr. Waterhouse ever ask
9  you why -- withdrawn.
10        Did Mr. Dondero or Mr. Waterhouse ever ask
11  you how the $10.5 million number was calculated?
12    A.  No.
13    Q.  Did Mr. Dondero or Mr. Waterhouse ever
14  suggest to you that the number was incorrect?
15    A.  No.
16    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
17  in the world ever question the number that you gave to
18  Mr. Dondero in the summer of 2020 concerning the
19  principal amount due by HCMFA to HCMLP?
20    A.  No.
21    Q.  Have you ever made a payment -- withdrawn.
22        Have you ever caused a payment to be made in
23  connection with an intercompany loan without receiving
24  the prior approval from either Frank Waterhouse or
25  Mr. Dondero?

Kristin Hendrix - October 27, 2021

125

1    A.  No.
2    Q.  Has anybody ever said to you that you made a
3  mistake in applying a payment against principal or
4  interest due on an intercompany loan?
5    A.  No.
6    Q.  We saw this morning, and we produced to
7  Mr. Rukavina and he mentioned earlier, 13-week
8  forecasts?  Do you understand that?
9    A.  Yes.
10   Q.  Did you review the 13-week forecasts
11 recently?
12   A.  Yes.
13   Q.  And we're talking specifically about the
14 13-week forecasts for the November/December 2020 time
15 period.  Do you understand that?
16   A.  Yes.
17   Q.  Based on your review of those forecasts, did
18 those forecasts specifically identify the principal and
19 interest that were due on the three term notes as of
20 December 28, 2020?
21   A.  Yes.
22   Q.  And what was the purpose of creating the
23 13-week forecasts?
24   A.  Sure.  That was to keep everybody informed
25 who was on the cash call, Frank Waterhouse, Jim Seery

126

1  and others, keep everybody informed of upcoming
2  payments that were due on term loans well in advance.
3    Everybody knew about it.  It was out there
4  for everybody to see that was on these cash calls.
5    Q.  Now, is it your understanding that
6  Mr. Waterhouse -- withdrawn.
7    Did you email these forecasts -- withdrawn.
8    Did anybody email these forecasts to the best
9  of your recollection in late 2020?
10   A.  Yes.
11   Q.  And was it sent to the corporate accounting
12 group that we saw earlier?
13   A.  It was probably sent to Frank, Seery, the DSI
14 guys that were involved with the cash call.
15   Q.  Okay.  And so did you participate in the
16 creation of the 13-week forecasts?
17   A.  Yes.
18   Q.  What role did you play in the creation of the
19 13-week forecasts?
20   A.  I was responsible for creating the entire
21 thing.
22   Q.  Okay.  And based on the work that you did,
23 was one of the purposes to make sure that
24 Mr. Waterhouse was aware of all payments that were
25 coming due under the intercompany notes?

127

1    A.  Yes.
2    Q.  And was that information that was included on
3  the reports to Mr. Waterhouse?
4    A.  Yes.
5    Q.  And do you recall whether there were any
6  specific discussions in November or December of 2020
7  concerning those payments -- withdrawn.  That wasn't a
8  good question.
9      Did Mr. Waterhouse or -- withdrawn.
10     Did anybody on behalf of HCMS or HCRE ever
11 instruct you to make the payments that were due under
12 their term notes?
13   A.  No.
14   Q.  Did anybody on behalf of NexPoint ever
15 instruct you to make a payment that was due at year end
16 with respect to the NexPoint term note?
17   A.  No.
18   Q.  Were you authorized to make those payments
19 without the prior approval of either Mr. Waterhouse or
20 Mr. Dondero?
21   A.  No.
22   Q.  I think you testified that there were certain
23 payments that were made in January 2001 under each of
24 the three term notes.
25     Do I have that right?

128

1    A.  Correct.
2    MR. RUKAVINA:  2021.
3    MR. MORRIS:  Thank you very much.
4    Q.  (BY MR. MORRIS)  With that amendment, do you
5  understand my question?
6    A.  Yes.
7    Q.  Do you know why the three payments were made
8  in January of 2021 on each of three term notes?
9    A.  Because Frank Waterhouse instructed me to do
10 so.
11   Q.  And he had not instructed you to make those
12 payments prior to that time?
13   A.  Correct.
14   Q.  Did you have to prompt Frank Waterhouse in
15 January of 2021 to make those payments?
16   A.  No.
17   Q.  So based on the 13-week forecast that you
18 prepared and delivered to Mr. Waterhouse, is it your
19 understanding that Mr. Waterhouse knew as early as mid
20 November 2020 that payments would be due under the
21 three term notes at the end of the year?
22   A.  Yes.
23   Q.  And, in fact, did HCMS and HCRE and NexPoint
24 timely make their installment payments that were due at
25 year end 2018?

Kristin Hendrix - October 27, 2021

129

1     A. Yes.
2     Q. And was that done because HCMLP received the
3  instructions of somebody authorized to give the
4  instruction on behalf of those entities?
5     A. Yes.
6     Q. Did HCMS and HCRE and NexPoint timely make
7  the installment payments that were due at year end
8  2019?
9     A. Yes.
10    Q. And why did they make those payments?
11    A. Because we were provided instruction and
12 authorization to do so.
13    Q. Okay. And is the only reason that the
14 payment wasn't made at year end 2020 because nobody on
15 behalf of the Advisors -- withdrawn.
16       Is the only reason that no payment was made
17 at the end of 2020 is because no one on behalf of
18 NexPoint, HCRE, or HCMS directed HCMLP to make those
19 payments?
20    A. Correct.
21       MR. AIGEN:  Objection.  Form.
22    Q. (BY MR. MORRIS)  And you testified earlier to
23 a call that you had with Mr. Waterhouse.  I think you
24 said it was either November 30 or December 1.
25       Do you recall that?

130

1     A. Yes.
2     Q. And did you personally continue to prepare
3  the 13-week forecasts after your conversation with
4  Mr. Waterhouse?
5     A. Yes.
6     Q. And did those 13-week forecasts continue to
7  include the payments that were due under the three term
8  notes at the year end?
9     A. Yes.
10    Q. And that's information that you gave to
11 Mr. Waterhouse; is that right?
12    A. Right.
13    Q. Mr. Rukavina elicited from you the fact that
14 payments of principal hadn't been made on demand notes
15 that were executed in favor of Mr. Dondero's
16 affiliates.
17       Do you recall that?
18    A. Yes.
19    Q. Okay.  Was that a topic of conversation with
20 PricewaterhouseCoopers at any time?
21    A. Yes.
22    Q. Can you tell me about that conversation?
23    A. Sure.  As part of our annual audit, the
24 auditors would, you know, make sure that our
25 receivables are collectible.  And if they thought for

131

1  any reason they weren't, then they were going to raise
2  an issue, a going concern issue.
3       That came up several years in a row with
4  HCMFA.
5     Q. Do you recall that the three term notes at
6  issue here were all signed on May 31, 2017?
7     A. Yes.
8     Q. And all of those term notes involved a
9  roll-up of previously issued demand notes; is that
10 right?
11    A. Correct.
12    Q. Do you know why in -- at the end of May 2017
13 NexPoint, HCRE, and HCMS rolled up their demand notes
14 into individualized term notes?
15    A. Yes.
16    Q. What is your understanding as to why that
17 happened?
18    A. That would get the auditors a little bit more
19 comfort over our outstanding loans, ensuring that we
20 have an amortization schedule, an underlying contract,
21 showing that payments will be coming in every year on
22 these outstanding receivables.
23    Q. Okay.  As the person responsible for
24 preparing Highland's audit, did anybody ever tell you
25 at any time that any of the notes were not valid

132

1  obligations of the maker?
2     A. No.
3     Q. As the person responsible for Highland's
4  audit, did anybody ever tell you at any time that any
5  of the notes at issue should not have been signed?
6     A. No.
7     Q. As the person responsible for Highland's
8  audit, did anybody ever tell you at any time that any
9  of the notes at issue were signed by mistake?
10    A. No.
11    Q. Did anybody ever tell you at any time that --
12 withdrawn.
13       As the person responsible for Highland's
14 audit, did anybody ever tell you at any time that
15 Mr. Dondero didn't approve of any of the notes?
16    A. No.
17    Q. As the person responsible for Highland's
18 audit, did anybody ever tell you at any time that
19 the -- any of the notes at issue were subject to an
20 oral agreement?
21    A. No.
22    Q. As the person responsible for Highland's
23 audit, did anybody ever tell you at any time that any
24 of the notes were amended?
25    A. No.

Kristin Hendrix - October 27, 2021

**133**

1    Q. As the person responsible for Highland's
2 audit, did anybody ever tell you at any time that any
3 of the notes would be forgiven?
4    A. No.
5    Q. During your 15 years at Highland, has an
6 intercompany loan ever been forgiven in whole or in
7 part?
8    A. No.
9    Q. During your -- withdrawn.
10    Can you recall any note that Highland ever
11 held as the payee that was forgiven in whole or in part
12 in the five years prior to bankruptcy, go back to 2014?
13    A. No.
14    Q. Is it your understanding as the person
15 responsible for Highland's audit that the forgiveness
16 of notes, if they were in a material amount, would have
17 had to have been disclosed in the audited financial
18 statements?
19    A. Yes.
20    Q. So is it fair to say that any evidence of the
21 forgiveness of material amounts would have been
22 disclosed in Highland's financial statements?
23    A. Yes.
24    MR. MORRIS: I have no further questions.
25    MR. RUKAVINA: I have none.

**134**

1    MR. AIGEN: None.
2    MR. RUKAVINA: Okay. Thank you very much.
3    (Whereupon, the deposition adjourned at
4    1:19 P.M.)
5    --oOo--
6    I declare under penalty of perjury that the
7 foregoing is true and correct. Subscribed at
8 _____, Texas, this ____ day of
9 _____, 2021.
10
11
12 _____
13 KRISTIN HENDRIX
14
15
16
17
18
19
20
21
22
23
24
25

**135**

1    CERTIFICATE OF REPORTER
2    I, BRANDON D. COMBS, a Certified Shorthand
3 Reporter, hereby certify that the witness in the
4 foregoing deposition was by me duly sworn to tell the
5 truth, the whole truth, and nothing but the truth in the
6 within-entitled cause;
7    That said deposition was taken in shorthand by
8 me, a disinterested person, at the time and place
9 therein stated, and that the testimony of the said
10 witness was thereafter reduced to typewriting, by
11 computer, under my direction and supervision;
12    That before completion of the deposition,
13 review of the transcript was not requested. If
14 requested, any changes made by the deponent (and
15 provided to the reporter) during the period allowed are
16 appended hereto.
17    I further certify that I am not of counsel or
18 attorney for either or any of the parties to the said
19 deposition, nor in any way interested in the event of
20 this cause, and that I am not related to any of the
21 parties thereto.
22    DATED: November 1, 2021
23
24 _____
25    Brandon Combs, Certified Shorthand

**136**

1    State of Texas
    Dickman Davenport, Inc. Cert 312
2    4228 North Central Expressway
    Suite 101, Dallas, TX 75206
3    (214) 855-5100 (800) 445-9548
    Email: info@dickmandavenport.com
4    www.dickmandavenport.com
    My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

A.M 1:22 57:22
ability 69:5,20
able 108:23
  120:18
above-styled
  1:21
Absolutely 17:8
accent 56:16
access 24:7 54:15
accessed 44:19
account 12:11
  37:7 91:15
accountant 16:19
  46:10 73:15
  74:3 78:4 84:24
accounting 11:16
  12:8,12,18
  17:14,15,16,21
  18:4 19:9 20:3
  20:12,20 21:13
  31:16,23 35:7
  40:11 45:17
  46:3 51:11,11
  51:18 56:11
  102:4 111:9
  112:18,23
  126:11
accounts 13:21
  14:8,15 51:24
accrued 79:22
accruing 85:15
accurate 72:22
  97:19 115:25
accurately 116:2
action 11:6
activities 39:20
actual 104:12
  122:16,25
addition 39:7
  41:21
additional 56:15
  56:20
adjourned 134:3
Adkins 109:16

109:20,21
advance 126:2
adversary 94:25
  95:3,12
advice 46:20
  88:24
advised 38:23
advisor 39:1
Advisors 1:10
  15:14,17,23
  27:20,23 63:6
  70:1,4 71:6,10
  74:17 76:24
  84:9 85:6 92:16
  99:10,14,16,25
  100:2,15,18
  119:16 120:7
  123:24 129:15
Advisors' 122:16
affiliate 34:25
  87:23 120:7
affiliated 15:11
affiliates 18:19
  86:24 87:17
  99:6,11,13
  100:4,17
  130:16
affirmative
  101:14
affix 50:17 114:6
affixed 47:5
  114:15
afternoon 94:23
ago 33:8 104:21
  104:22 109:17
  110:10,12
agree 55:2 57:14
  61:13
agreed 25:23
  26:3
agreeing 53:24
agreement 26:5
  26:15,21 95:9
  95:13 96:4,8,12
  96:23 97:6,9,11

97:21,25 98:9
  107:25 119:20
  132:20
ahead 73:9
  113:10,20
  114:11 118:22
Aigen 2:18 3:4
  94:16,23,24
  95:23 96:1,21
  98:15 102:5
  103:17 105:24
  106:8,23
  110:14 129:21
  134:1
Akard 1:24 2:4
alleged 40:16
  96:3,7
Allocation 38:24
  39:1
allowed 135:15
allowing 95:13
amended 107:25
  132:24
amendment
  128:4
amort 19:22 90:8
amortization
  73:25 76:23
  77:4,6,9,20
  80:20 82:6 85:3
  85:12,13,17
  131:20
amount 19:6,7
  26:10,12 30:12
  32:23 39:3
  43:16 48:15
  49:2 50:9 87:16
  87:24 89:9 90:9
  91:19 93:4
  104:6 121:14
  122:10 124:4,5
  124:19 133:16
amounts 35:8
  40:2 120:3,4
  121:10 123:23

124:1 133:21
analysis 97:24
and/or 50:13,18
  63:22 64:18
  69:20 73:25
  110:23
anniversary
  79:21 80:5,14
annual 114:20,23
  115:7 117:4
  119:20 120:12
  130:23
annually 80:13
annum 80:12
answer 7:6,6
  23:11,14 35:2
  39:19 51:5 52:3
  64:20 75:2
  114:11 118:10
  122:13
answered 41:4
  51:3 57:17
  100:9 106:6
answering 66:1
answers 42:10
  43:1 57:6
anybody 35:25
  40:8 101:7
  112:8 113:23
  113:25 114:5
  114:14 116:24
  117:20 118:24
  119:6,11 122:3
  122:7 123:8,11
  124:16 125:2
  126:8 127:10
  127:14 131:24
  132:4,8,11,14
  132:18,23
  133:2
anymore 76:2
anytime 21:10
  59:1
AP 11:17 12:23
  32:7 109:5

apologize 15:6
  59:7 62:16 75:9
  75:22
appear 118:18
APPEARANC...
  2:1
appeared 2:5,12
  2:19
appears 47:1
  76:12 77:1
appended 135:16
applying 125:3
approval 16:5,8
  48:12 49:4
  50:25 51:2
  101:3 104:20
  124:24 127:19
approve 48:15
  49:5 104:1,2,24
  132:15
approved 48:18
  48:19,21 104:7
  104:8,14
approximately
  95:18 110:7
April 12:7
area 107:19
arose 115:4
ASAP 60:18 64:6
asked 51:3 57:17
  60:10 69:22
  88:9 93:4 106:6
  119:24
asking 6:10 26:7
  29:17,19,24
  59:17 62:6
  64:23,25 77:25
  90:8 96:12,13
aspects 115:1
assistant 12:6
  69:2 70:3,9
  88:21
associate 11:18
  32:7
assume 6:25

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

**B**
**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

**C**
**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

Kristin Hendrix - October 27, 2021

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

concerning 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
correctly 32:18
33:23
correspondence
123:3
corresponding
84:16
counsel 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
count 42:10 43:1
57:6
couple 83:19
course 6:9 46:18
55:3 103:23,24
104:13,19,23
courses 16:15,16
court 1:1 6:18
27:13 30:13,25
courteous 94:12
CPA 10:24 11:2
11:6,21 115:17
create 43:12,18
45:8 48:17
created 18:21
44:18,19,21
48:7 58:1
119:12
creating 13:21
111:18 125:22
126:20
creation 126:16
126:18
credit 91:18

crunch 109:5
CSR 1:23
curiosity 76:6
current 11:2
currently 11:19
120:5
cut 15:9

D

D 1:22 135:2
Dallas 1:3,25 2:4
2:18 136:2
dark 94:17
date 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
dated 30:20
31:16 135:22
dates 57:22
Dave 8:24 34:18
34:23 38:13
46:7 111:8
112:6
Davenport 136:1
David 3:14 13:1
31:16 33:17
DAVOR 2:5
day 48:15 57:25
58:6 80:2
112:13 134:8
days 9:23,25 10:5
28:17
deaccelerate
107:13
deal 20:21 36:25
debtor 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
debtor's 40:16
68:18 77:4
86:16
debtors 117:12
Dec 4:3,11
December 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
decided 26:2,3
40:14 52:15,18
deciding 23:8
decision 29:14
105:2
declare 134:6
default 68:16,19

88:3 90:17
93:10,11
defaulted 67:22
defendants 1:11
1:20 2:6,20
95:11 96:4
defense 95:12
96:7,12
defenses 95:9
defined 114:3
definition 113:16
degree 10:22
deliver 117:17,22
delivered 116:8
116:11 117:25
118:1 128:18
demand 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
demanded 62:11
demanding 24:13
Denton 10:15
department
11:17 18:2,5,8
18:12 51:12
57:12 112:23
depend 18:17
depended 49:16
depending 73:16
depends 18:16
69:10 77:24
deponent 135:14
deposed 6:13
28:2
deposition 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
describe 12:18
53:16
described 17:17
99:9 116:16
119:7
description 14:1
110:3
detail 66:12
details 17:5
25:14 28:7
determine 97:6
97:25 102:11
determined
97:22
Dickman 136:1
difference 103:22
different 19:25
54:19 73:16
87:22 96:11
103:17 124:2
direct 27:7
directed 99:17,19
129:18
directing 48:16
101:4
direction 23:12
53:21 60:23
63:2 73:7 101:7
135:11
directions 48:25
directly 40:9,22
41:12 49:1
70:14,17
102:16
disciplinary 11:5
disclose 119:24
disclosed 97:15
97:21 133:17
133:22
discretionary
26:8
discuss 62:9 66:4
68:4,7 74:16

88:12
discussed 28:8
38:4 43:13
66:21 67:9
74:18,20 81:13
92:5 96:25 97:2
discussing 66:19
67:20 117:18
discussion 9:5
50:21 61:7 65:9
66:7 69:5,19
92:25 93:7
122:22 123:4
discussions 9:8
25:20 28:11,12
28:17 40:6 60:1
61:9,11 62:13
68:22 98:8
127:6
disinterested
135:8
distinct 29:3
45:24
DISTRICT 1:2
DIVISION 1:3
doctor 42:11
doctored 83:3
doctoring 42:24
57:4
document 32:25
47:2 49:19 72:8
76:10 82:13
86:1 88:7
111:19 119:8
119:25
documentation
9:16
documentations
47:8
documents 9:18
10:7 42:6 43:7
43:9 44:3 47:9
48:5,18 49:8,13
50:2,3,11 54:11
57:7,14,20

69:16 77:13
82:10,18
doing 6:7 43:8
45:20 74:4
dollar 19:7 40:2
48:15 49:2 50:9
Dondero 2:20 5:2
15:12 21:11,20
21:21 22:6,19
23:7,14,18,23
23:24 24:2,7
34:19 35:24
36:2 40:14,20
52:12,19,22
53:7 73:8 81:14
83:18 94:24
99:18 101:2,4
101:17 102:11
102:16 103:7
103:12,19
104:1,7,14
108:9 116:19
116:24 117:20
118:23,24
122:3,7 123:19
124:8,10,13,16
124:18,25
127:20 132:15
Dondero's
104:19 130:15
Donohue 59:13
59:17,22 62:25
63:21 64:3,16
64:22 65:5,9
92:18,19,22,24
93:8
door 35:1
draft 17:24
drafted 17:1,3
drafting 16:16
17:22,23 18:12
19:16,21 20:12
29:13
drive 54:9,16
55:14

drukavina@m...
2:7
DSI 61:19 62:6,9
63:3,24 67:4
68:7,13,23
69:14 77:3
88:12,23 92:18
92:19 126:13
due 16:6 59:18
66:23 73:9,25
86:24 87:5,17
87:17,22,25
89:9 90:8 102:8
103:20 105:4,6
120:5,23
123:23 124:1,5
124:19 125:4
125:19 126:2
126:25 127:11
127:15 128:20
128:24 129:7
130:7
duly 1:19 6:2
135:4
duties 12:19
97:12
duty 20:25

_____

E

E-l-l-i-n-g-t-o-n
18:9
e-signature 47:10
47:12 48:1,4,5
48:8,9,12,18
49:9,15,18 50:1
50:13,17,23
e.g 120:6
earlier 43:14
45:7 99:8
112:12 113:13
120:14 123:15
125:7 126:12
129:22
early 116:5
128:19

earn 26:23
educational
10:18
effect 54:11
67:21 68:15
effectuate 101:7
106:15
effort 97:6
efforts 102:10
either 18:21
29:13,20 31:1
34:17,23 37:3
46:7,13 50:1
54:12 58:20
62:6,9 71:4
84:24 99:15,17
110:15 124:24
127:19 129:24
135:18
electronic 54:22
electronically
56:3,12
Eliason 46:7 78:3
112:7
elicited 130:13
Ellington 4:3
18:9 60:4,9,12
60:15 61:10
email 2:7,14,22
3:14 4:3,7,21
5:1,5 23:17
31:12,15,20,23
32:1,4,20,25
33:3,25 36:3
37:10,19,25
38:14 41:17,21
42:5 48:20
50:11 54:11
59:4,12,22 60:1
60:2,3,25 61:2
61:6 62:4,8,15
62:24,25 63:11
63:14,15 64:22
82:16,19 83:2,6
83:11,11,12,18

83:23 84:19
85:25 86:3,13
86:22 90:4,5,12
92:22 108:12
111:8,21,21,25
112:3,5,13,17
120:2 122:19
123:5,18,23
126:7,8 136:3
emailing 90:8
107:2
emails 9:16,18
41:18 49:23
81:9 82:22
115:3
employed 11:21
70:18
employee 109:23
110:2,6
employees 16:3
108:19,24
109:10,13,14
employment 26:5
26:15 69:25
70:7
engagement
115:14
ensuring 131:19
entire 11:17
114:25 126:20
entirety 86:18
entities 15:11
21:16 22:6,12
22:19 70:18
81:15 101:5
124:2 129:4
entitled 82:12
entity 21:20,22
22:7 23:2 35:14
53:13 63:4,5
84:16 104:4
entries 78:13
80:23
entry 78:24 79:19
erroneous 122:5

Kristin Hendrix - October 27, 2021

**error** 38:22 39:9
  39:16,21,23
  40:10 44:7
**established** 9:11
  28:8 83:16
**estimate** 20:10
**event** 135:19
**events** 38:21
  95:15 96:16
  116:13 118:3
  118:19
**eventually** 109:5
**everybody** 25:13
  112:2 125:24
  126:1,3,4
**evidence** 105:22
  114:9 118:9,21
  121:17 122:12
  133:20
**exact** 25:25 36:5
  37:14 48:5,13
  107:1 117:12
**Exactly** 78:16
**Examination** 3:3
  3:4,5,6 6:3
  94:22 110:19
  111:5
**example** 81:1
**Excel** 77:12,15
  78:9
**exchanged**
  108:12
**excluding** 28:16
  29:18
**execute** 48:18
  49:5
**executed** 18:24
  47:9 130:15
**executing** 19:17
**execution** 18:13
  20:12 32:15
**exhibit** 3:10,12
  3:14,17,19,21
  3:23,25 4:1,3,7
  4:11,14,17,19

4:21 5:1,5
  30:14,15,18,19
  30:21 31:15,18
  32:21 33:1 34:4
  34:11 35:21
  36:20 37:19
  38:12 42:15,16
  43:6,21 44:18
  44:19 56:19,21
  59:4,9 62:14,14
  62:21,23 65:13
  65:18,21 72:11
  72:13,16 76:10
  76:17,19 79:8
  82:6 83:1,4,15
  83:17 84:8,14
  84:18,19 85:7
  85:17,20,21,22
  85:25 86:3,13
  87:21 88:2,4,7
  89:21,22,25
  90:1,3 111:7
  119:7,15,23
  123:16,22
  124:5
**exhibits** 3:8 30:6
  42:17 43:4
  44:21 45:22
  46:19 48:11,19
  50:13,17 52:8
  55:17,24 56:25
  57:16 58:10,25
  113:13
**existing** 84:20
**expect** 85:16
**expense** 103:24
**expertise** 16:18
**expires** 136:4
**Explain** 19:19
**explained** 6:15
  31:7
**explicit** 60:23
**explicitly** 32:5
  53:1
**expressly** 71:14

**Expressway**
  136:2
**extent** 108:13
**external** 46:14
**eye** 6:9

**F**

**faced** 11:5
**facilitate** 91:7
**fact** 21:18 49:5
  57:15 64:15
  65:1 67:13,16
  99:22 121:21
  128:23 130:13
**facts** 114:9
**fair** 17:5 21:19
  22:3 23:21 35:5
  42:20 70:14
  95:25 96:8,21
  96:24 97:18,20
  98:6,7 99:25
  100:20,23
  101:8,12 103:5
  105:16 106:4
  108:4 116:2
  133:20
**fairly** 36:15
**faithfully** 57:3
**familiar** 27:13
  65:20 66:11
  86:2,5 107:20
  115:19 122:16
**family** 23:4
**far** 20:14,16
  24:19,21 49:7
  80:24
**favor** 130:15
**February** 12:2
  26:4
**fee** 39:1,24
**feel** 86:18
**fell** 13:24
**felt** 104:25
**figuring** 93:17
**file** 56:13

**filed** 28:24,25
  29:6,8 30:13,24
**files** 32:25
**filing** 18:25
**final** 123:6
**finance** 10:22
**financial** 4:4
  12:22 59:18
  62:7 69:15
  97:16,17
  115:12,25
  116:16,21
  117:1,5,11
  119:2 122:4
  133:17,22
**financials** 12:23
  37:18 41:8
  60:11 86:24
  118:11,14,19
  121:3,7,20,25
  122:8
**find** 31:13 72:8
  83:8 93:24 94:8
  102:23
**finding** 98:2
**fine** 47:8 48:2,4
  86:19
**finish** 96:11
**finished** 31:10
**finishing** 46:14
**firm** 18:22 44:16
**first** 6:2 9:1
  11:13 20:11
  63:17 70:21
  81:17 82:13
  95:8 113:23
  120:15
**five** 51:4 94:3
  110:10 133:12
**five-minute**
  93:15 110:14
**fixing** 55:15
**flip** 46:25
**Floor** 1:25 2:11
**flow** 109:5

**flows** 63:8
**focus** 12:17
**folders** 18:25
**folks** 62:16 67:4
  85:24
**follow** 47:23 60:5
  60:9 72:5
**follow-up** 4:23
**followed** 104:11
**following** 47:22
**follows** 6:2
**forecast** 67:5
  128:17
**forecasted** 67:8
**forecasts** 12:21
  13:21 17:18
  67:5,9 125:8,10
  125:14,17,18
  125:23 126:7,8
  126:16,19
  130:3,6
**foregoing** 134:7
  135:4
**forgive** 97:10
**forgiven** 95:14
  96:16 109:10
  133:3,6,11
**forgiveness**
  133:15,21
**form** 14:14,21
  15:24 16:22
  17:6 18:14
  19:11 20:23
  22:8,21 24:8,15
  28:3 34:6 35:10
  36:13 37:11
  38:7 39:17 41:1
  41:13 45:3 46:4
  47:20 48:22
  49:10,20 50:4
  51:14,20 52:1
  53:9 55:5,19
  56:4 58:16
  65:16 69:8
  70:15 73:20

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
format 77:12
formatting 79:3
82:5
forth 64:11
forward 64:2
94:16
forwarded 92:15
92:17
found 54:9
foundation 75:11
four 9:8,12 100:5
fourth 107:25
frame 17:12
66:19 69:7
73:16
Frank 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
Frank's 115:16
frankly 104:24
fresh 111:20

Friday 9:1,4
function 12:21
functions 117:15
fund 1:9 27:23
38:24 39:2,2,8
85:6
funds 38:23
59:18 119:17
120:8
further 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
future 14:7 16:5
120:5

G
gears 58:24
general 34:21
46:18 54:20
69:6 90:20
generally 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
getting 11:20
18:24 48:11
60:2,3 81:12
101:3
give 20:10 31:13
74:16 110:4
129:3
given 49:18
101:6 122:9
123:1
gives 16:19
giving 53:21 54:5
Global 38:23
39:1
go 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
goes 94:9 99:3
going 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
good 6:4 24:17
26:24 94:23
127:8
governs 26:11
graduated 10:21
11:9,12
great 53:20
greater 16:19
group 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

guarding 24:7
guess 89:22
guys 126:14

H
H-i-l-l-i-s 32:12
half 81:17
hand 59:3 82:25
handed 88:6
handle 20:12
50:8
handled 20:4,21
happened 20:7
21:8 36:11,11
37:21 101:1
131:17
happening 20:11
61:5
happy 23:3 93:22
HARDT 2:3
HARR 2:3
Hayley 32:2,14
46:7 78:3,6
112:6
Hayley's 46:8
HCM 4:4,9
HCMF 3:25 4:1
HCMFA 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
HCMFA's 39:8
87:17 117:11
117:23 118:6
118:18 119:1
HCMLP 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
HCMS 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
HCRE 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
hear 72:1
heard 40:17,20
held 12:8 133:11
hell 75:4,10
help 76:22 78:13
93:17 105:23
helped 12:20
Hendrix 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

111:6 134:13
hereof 80:13
hereto 135:16
hi 60:4
higher 89:20
Highland 1:6,9
  10:2 11:13,21
  12:5,19 13:10
  14:4,4,11,22,23
  15:3 16:10
  17:10,13,21
  18:1,11 21:5
  25:6,15 26:4,9
  26:24 27:2,2,22
  28:12 51:7,10
  51:19 65:14
  66:4 71:7,11
  81:10,18,23,23
  85:5 87:25
  92:17 107:21
  108:1,16,17,21
  108:22 109:2,2
  109:9 110:21
  117:1 119:24
  133:5,10
Highland's 7:23
  7:25 8:19,22
  114:20,23
  116:4,16
  131:24 132:3,7
  132:13,17,22
  133:1,15,22
Hillis 32:12
history 11:9
Hold 62:18
hope 57:13 97:13
hopefully 82:11
hoping 68:15
house 75:1
hundreds 50:7
  51:8
hypothetically
  22:4,17
hypotheticals
  21:17

I
i.e 114:9
idea 58:2,7 75:12
  75:24 89:13
  93:1 105:17
  106:3
identification
  30:16,22 31:19
  42:18 43:5 57:1
  59:10 62:22
  65:19 72:14
  76:18 83:5
  85:23 88:5 90:2
identifies 123:23
  124:1
identify 112:2
  125:18
identifying 66:23
image 47:2,5,19
  48:2
imagine 15:7
immediately
  61:14
important 93:14
Impressive 11:23
include 71:18
  72:10 100:1
  118:25 121:13
  130:7
included 15:14
  16:9 31:24
  102:5 111:25
  118:6,13
  121:21,22
  122:10 123:12
  124:4,5 127:2
includes 63:5,7
including 88:11
  124:2
income 63:7,21
incoming 67:7
incorrect 123:9
  124:14
increase 94:19
incumbency

53:13,17,19
INDEX 3:1
indirect 27:7
indirectly 70:12
individualized
  131:14
Info 3:25 4:1
info@dickman...
  136:3
information 4:9
  29:25 34:13
  61:14 63:3,7
  64:17 65:5,11
  69:12,15 84:6
  86:15 116:3
  127:2 130:10
informed 112:21
  125:24 126:1
initiated 74:11
  92:3
ink 49:8,13 55:3
  55:8
ink-signed 55:11
input 29:25
  88:24
installment
  128:24 129:7
instance 1:20
  20:6 23:8 35:21
instances 24:1
  40:1,24
instruct 127:11
  127:15
instructed 128:9
  128:11
instructing
  101:18
instruction 72:2
  74:17 76:8
  100:16 101:14
  101:22 103:12
  129:4,11
instructions 24:2
  24:3 32:16
  69:14 76:1

100:21 101:9
  103:19 129:3
instructs 7:5
insurance 39:10
insurer 39:8
intend 113:5
interco 32:14
  34:11
intercompany
  17:22 18:13
  19:17 20:4,13
  20:16 21:3,8
  34:12 35:7
  36:19,25 37:12
  40:24 53:8
  111:15,16
  124:23 125:4
  126:25 133:6
interest 19:7
  43:16 49:2
  68:18 73:25
  78:14,16,24
  79:20,22 80:11
  85:15 125:4,19
interested 84:9
  135:19
interjects 64:4
intermediary
  24:3
internal 18:21
  41:8 46:13,20
  69:19
internally 77:1
investigation
  97:5
invoice 108:13
involved 18:12
  19:16,20,24
  36:21 39:20
  40:9 126:14
  131:8
involvement
  19:10
irrespective
  26:16,24

IRS 49:3
issue 79:3 95:14
  96:16 97:25
  98:16 114:2
  118:8 131:2,2,6
  132:5,9,19
issued 131:9
issues 40:7,10
  60:16 61:21
  115:4,15

J
J-F-O-R-S-H-...
  44:10
Jack 59:13 60:4,8
  64:6 65:2 92:18
James 4:8 5:1,2
  61:14,15,18,21
  61:25 62:3
Jan 4:8 5:2,5
January 10:17
  24:24 28:20
  29:6,11 62:25
  64:15 71:25
  88:2,21 89:9
  90:5,7,17,22
  91:4 93:8
  106:10,25
  127:23 128:8
  128:15
jealousy 24:7
jerk 24:12
JFORSHEE
  44:10
Jim 2:20 21:10
  23:14,18 34:19
  35:24 52:19,20
  54:2 63:2 64:10
  67:3 73:8 84:4
  99:18 101:2,4
  102:16 104:1,7
  104:14,22,25
  105:1 125:25
Jim's 99:21
jive 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
2:14
job 6:20 11:14
17:9 20:25
24:19,22 43:11
45:1,14 103:1,6
103:10
John 2:12 4:7
8:24 95:21,23
97:4
JONES 2:10
June 86:25 87:6
116:5 120:23

**K**

K-l-o-s 8:25
keep 29:1 77:6,9
95:4 125:24
126:1
kept 54:22 55:11
56:12 77:5
121:20
kind 11:5 18:4
23:21 24:6,11
34:3 50:3 54:19
81:13 122:21
Klos 3:14 8:24,25
9:5,12 13:1,6
13:10 25:10,21
29:24 31:16
33:17 34:10,18
35:21 36:18,24
37:20 38:12
46:7 97:2,3
111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
128:19
know 6:24 19:20
19:23 20:19
25:14,25 28:7
33:10,11,13
36:11 38:17,21
39:22,25 40:1,5
43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
knowledge 27:6
36:1,4 37:14
40:11,13 52:15
69:11 77:7
108:4 112:9,11
112:20 116:1
121:14 122:2
known 67:14,17
97:11
KOPF 2:3
Kristin 1:14,18
5:5 6:1,6 32:1,2
32:14 57:8
61:20 134:13

**L**

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
86:21
law 2:5,12,19
6:18 18:22
44:16

Lawler 109:20
109:23
Lawn 2:17
lawsuit 28:24
29:5,8
lawsuits 28:1,9
28:13,25 29:17
29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
108:15,21
109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
16:13 17:14,25
18:2,5,11,21
19:10,16 28:10
46:14,20 72:21
lend 21:22 23:1
110:22
length 93:25
let's 10:12 11:9
12:17 14:8,18
21:17 30:8
34:25 44:24
45:13 47:14
54:19 55:1
72:10 78:1
99:24 115:11
120:23
letter 4:11 65:14
115:14,23
letters 29:11,14
115:14,20
letting 92:18
liabilities 118:14
liability 40:16
118:6
license 10:24
11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
55:1 58:9,24
78:12 94:17
98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
18:18 31:5
32:14 33:25
34:11,12,14,25
35:14,17,17,22
36:19,25 37:6,7
37:17,17 38:25
39:12 40:15,21
45:13,15,18,22
46:12,14 48:15
49:1,4,5,24
50:9 58:5 72:25
76:24 79:21
80:6,7 87:22
103:22 104:6
104:20 111:15
111:16,18,20
112:10,23
113:2 119:9
124:23 125:4
133:6
loans 35:9,12
37:4,6,13,22
38:6 39:4 41:9
41:12,19 48:14
48:17 50:7,19
50:22 51:8
53:21 66:23
67:8 98:16,17
98:17,20,25
106:9 107:13
109:9 110:5,6
126:2 131:19
logically 36:10
40:23 71:18
logs 75:19

long 7:20 21:24
74:21 75:6
110:4
look 30:17 54:15
57:7 75:18 77:2
78:11 80:21
93:20 94:6
looked 31:5
123:16
looking 56:21,23
58:10 79:24
81:10 86:21
87:14 119:23
looks 60:24 64:9
76:23 77:4
79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
27:23 70:1,4

**M**

ma'am 31:21
57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
82:7
maker 19:4,5
21:3 43:15
132:1
making 13:20
21:5 81:7 99:20
101:2,25
103:22,23
104:3
management 1:6
1:9 12:20 13:14
13:15 14:2,24
15:4,22 17:17
27:23 85:5
108:1 115:13
115:19,23
manager 12:8,12

12:18
**manual** 104:9,12
**March** 12:2
**mark** 59:3
**marked** 30:15,21
31:18 42:17
43:4 56:25 59:9
62:21 65:18
72:13 76:17
83:4 85:21,22
88:4 90:1
113:13 119:14
**material** 97:22
98:1,4,6,10
104:6 120:3,4
133:16,21
**materials** 121:12
**maturity** 80:13
**MBA** 10:23
11:20
**mean** 7:17 13:15
14:22,23 15:3
19:1 35:16
48:20 57:24
68:24 78:13,15
87:11,24
111:16
**meaning** 27:20
27:22 54:25
70:18
**means** 27:15
35:15 58:22
71:16 111:18
**meeting** 34:17
67:2
**meetings** 66:22
66:25
**memorandum**
48:20
**memory** 9:17
19:14 20:9 29:3
29:7,17,19,23
32:20,24 34:3
37:9 38:2 41:22
42:1,20 43:7,10

45:24 47:4
48:10,13 50:15
51:1 53:23 54:4
54:10 57:23
58:9,20 69:18
72:24 74:4 81:6
81:17 86:8,10
90:15,20 91:21
92:6
**mentioned** 11:24
13:14 22:12
25:9 29:10 41:7
44:25 45:21
51:6 64:21
125:7
**merit** 25:17
**met** 108:11
**metadata** 42:21
42:21,24 43:21
43:24 44:8,24
56:15,20 57:4
**Michael** 2:18
94:24
**michael.aigen...**
2:22
**mid** 128:19
**middle** 89:8
**million** 30:12,20
32:13,21 33:1
33:19,20,25
34:5 35:3 36:25
37:12,12 38:18
38:22,25 39:3,7
39:8,11,23
40:15,21 42:15
42:16 43:2,3
58:5,11,13,13
66:9,13 81:1,1
81:2 85:1,6,9
87:3 90:23 91:3
91:23 110:23
111:10 112:14
113:14,14
120:24 121:13
122:10 123:5,9

123:12 124:11
**mind** 71:18
**minute** 30:8
**minutes** 94:3
**mischaracteriz...**
116:25
**Mischaracterizes**
41:2
**misleading** 42:9
**missed** 88:25
105:12
**misspeak** 30:5
**mistake** 51:12
113:1,18 114:2
116:20 117:21
118:25 119:12
125:3 132:9
**mistakenly** 51:25
**mistakes** 51:17
51:19,22
120:19
**modified** 44:19
57:8
**moment** 72:9
**Monday** 9:7
**monetize** 68:2,10
**money** 13:21
21:11,13,15,21
21:21,22 22:5
34:24 35:13
37:7,17 53:21
54:23 81:15,19
81:22,24 92:16
111:19
**month** 106:10
**months** 40:7
**morning** 6:4 9:3
67:11 82:14
125:6
**Morris** 2:12 3:6
4:7 7:3 8:24 9:6
9:9 14:14,21
15:24 16:22
18:14 19:11
20:23 22:8,21

24:8,15 28:3
30:2 31:10 34:6
35:10 36:13
38:7 39:17 41:1
41:13 42:9 45:3
46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:7,16
62:18 65:16
67:10 69:8
70:15 73:20
74:5 75:7,11
77:22 78:8 79:7
79:9,13 80:3,16
82:1,14,16,23
83:2,6,10 85:25
87:7 88:15 89:2
89:15 93:22
94:15,17 95:21
95:25 96:2,6,18
96:23 102:2
103:13 105:19
106:6,18 111:6
113:11,22
114:13,19
118:12,23
119:5 121:19
122:15 128:3,4
129:22 133:24
**mouth** 23:21
**move** 9:10 21:11
21:13,15 94:16
109:8
**moved** 23:4
**multiple** 54:19
**MUNSCH** 2:3

_____
**N**
_____

**name** 6:5 32:8
44:12 57:18
94:24 109:24
110:3

**Nancy** 108:9
**NAP** 27:14
**native** 78:9
**NAV** 38:22 39:9
39:16,20,23
40:10 107:21
108:5
**near** 14:7
**necessarily** 17:23
19:10 103:25
**need** 9:16 14:6
19:2 21:11
25:14,25 34:24
52:6 54:1 59:1
81:19,20 82:12
86:19 93:17
**needed** 21:21
22:5,18 23:1,4
40:1 53:12
81:11,14,23
104:25
**needs** 104:7,8,13
**negative** 78:20,25
79:2
**never** 40:19,20
49:12 51:12
55:14 68:17
70:14,17 96:25
97:2 101:6,6,14
103:6 108:11
119:8
**new** 2:11 21:14
32:14 34:11,25
36:19 45:9
111:15,16,18
**NexPoint** 5:6
15:14,17,22
16:5 27:11,15
27:18,19,20
28:2,13,21 63:6
63:22 64:18
66:8,12,20
67:13,22 68:2
68:15,19,24
69:15,20 70:1,4

Kristin Hendrix - October 27, 2021

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

———————
**O**
o0o-- 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

Kristin Hendrix - October 27, 2021

**prepayments**
81:25
**presence** 25:4
**present** 9:4,6,12
24:5 45:24
90:15 97:3
**presented** 116:1
**presenting** 46:14
97:18
**preserve** 78:8
**pretty** 14:11
109:8
**previous** 100:9
**previously** 17:24
48:25 131:9
**Pricewaterhou...**
116:9,12 117:5
117:17 118:2,5
130:20
**principal** 30:12
78:14,17 79:5
79:11,23 80:10
89:23 121:14
122:10 124:5
124:19 125:3
125:18 130:14
**print** 56:1
**printed** 42:8,12
42:24 47:18
55:18,22 56:7
57:4,21,22,24
57:25 58:11,14
58:21,22
**printing** 55:23,25
**printouts** 42:21
**prior** 9:25 10:4
19:17 28:11
35:24 40:25
55:2 65:23
71:25 86:9 96:6
105:3 108:6
124:24 127:19
128:12 133:12
**privileged** 9:8
95:24

**privy** 64:9,11
69:19
**probably** 9:15
17:2 49:14 50:6
58:22 61:9
63:15 99:15
109:8 126:13
**proceed** 61:20,25
**proceeding** 46:20
**proceedings** 95:1
95:3,12
**process** 31:7
32:16 45:11,12
120:12
**produce** 78:9
**produced** 1:18
17:24 33:15
34:1 59:4 67:10
76:20 82:14,19
125:6
**product** 115:13
**production** 10:1
33:15
**profitability**
26:25
**program** 47:25
**programs** 47:16
**projections** 17:18
**promised** 39:2
**promissory** 3:10
3:12,17,19,21
3:23 4:12,14
5:3 14:9 15:18
16:10,16,20
17:1,3,6,22
18:13 19:17
27:3 28:13,21
30:11,19 31:1,8
32:21 33:2
35:18 38:11
42:7 43:11,12
45:1,9 47:6
52:10,24 53:1,8
53:25 54:5,12
54:23 55:11

68:5 71:13,19
72:11,12,16
76:13 77:7,10
80:9 81:8 113:6
113:11,12,16
114:2,7,16
116:7,11,15
117:17,22
118:7 119:12
122:11 124:6
**prompt** 128:14
**prompted** 83:22
**prospect** 53:20
**provide** 7:12
9:19 15:21
30:11 42:21
59:17 63:3 64:5
64:16 119:16
121:25
**provided** 17:24
33:5,9,10 61:14
70:12 89:17
121:11 122:5
129:11 135:15
**provides** 120:7
**providing** 15:10
54:8 65:5
**public** 16:19
7:6 8:8 61:21
95:2 110:16
115:4 133:24
**pull** 119:14
**pulled** 49:3
**purpose** 86:12
125:22
**purposes** 39:5
98:1 126:23
**purview** 89:6
**put** 23:20 84:25
**PwC** 97:21 98:1
117:22

─────────
**Q**
**qualification**
16:20
**question** 7:1
14:10,22 15:25
16:23 18:15

19:12 20:19,24
22:9,22 24:9,16
28:4 29:5,16
34:7 35:11
36:14,23 37:1
38:8 39:18 41:2
41:14 45:4,5
46:5 47:21
48:23 49:11,21
50:5 51:15,21
52:2,4 53:10
54:18 55:6,15
55:20 56:5
58:17 65:17
66:10 69:9
70:16 73:21
74:6 75:8 77:23
80:4,17 82:2
84:14 86:9,19
86:20 87:8,19
88:16 89:3,16
95:10 96:10,19
100:9 102:3
103:14 105:20
106:19 113:9
113:24 124:17
127:8 128:5
**questions** 6:21,24
7:6 8:8 61:21
95:2 110:16
115:4 133:24
**quick** 52:5 95:4
107:23
**quickly** 6:16
109:8
**quite** 36:21 41:20
104:24
**quote** 120:3

─────────
**R**
**R-o-e-b-e-r** 32:10
**raise** 131:1
**raised** 95:12
**range** 89:10
**rate** 19:7 43:16

49:2 80:12
**ratio** 107:21
108:5
**re-up** 86:16
**reached** 108:5
**read** 7:9 8:9
32:18 82:21
86:17 119:25
**reading** 81:9
**ready** 94:16
**real** 11:14
**really** 35:13
67:21
**reason** 6:23
22:23,25 52:11
52:13 56:1,6,7
72:7 77:3 82:5
82:8 101:13
129:13,16
131:1
**recall** 7:19 10:8
21:6 34:15,20
36:16 37:2
44:11 46:10
50:14,20 51:17
51:23 52:4
55:25 56:7
59:22,25 60:2,3
60:8,10 63:11
64:1 65:3 66:7
67:3 68:22,25
69:22 72:3 73:1
74:11 83:22
84:4,23,25
86:12 88:17
91:25 92:3 93:5
93:7 102:21
104:21 105:15
107:6 108:25
109:14 112:3
112:13,15,17
116:4,15 118:5
119:5,8,19
120:16 123:4
123:15 127:5

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

**services** 15:11,22
70:13,13 86:16
119:17,19
120:7
**set** 26:10,11,14
35:15 53:21
**shape** 37:10
**shared** 54:9,16
55:14 70:13
77:16 86:16
**shareholders**
39:2
**sheet** 118:6
121:11
**sheets** 63:8,22
**short** 74:22 75:17
75:23 93:15
**shorthand** 1:24
135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
131:21
**sick** 82:17
**sign** 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
**signatory** 52:14
**signature** 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
**signed** 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
**signer** 53:13
**significant** 20:20
51:19,22
**signing** 52:16,24
53:25
**similar** 32:25
34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
37:8 53:12,12
53:19 55:21
129:3
**soon** 32:17
**sophisticated**
14:12
**sorry** 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
**sort** 25:21 43:23
96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
43:11 44:1
**speakings** 95:21
**specific** 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

127:6
**specifically** 21:6
  21:10 23:11
  29:9 34:15 37:8
  49:12 50:12,16
  50:19 51:2 52:3
  52:19 54:1,7
  55:8 64:25 65:3
  65:4,8 68:25
  69:22 77:14
  84:19,21 93:5
  98:16 103:2,7
  125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
  106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
  61:13
**spreadsheet** 78:9
**spreadsheets**
  31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
  82:18
**standard** 46:16
  50:7 53:6,11,15
  53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
  95:10 100:11
**started** 11:13,17
  20:11 100:10
**starting** 10:19
  11:9
**starts** 59:12
**state** 1:23 6:5
  10:25 67:25
  68:14 76:22
  78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
  13:20 63:7,8,21
  63:22 97:16,17
  115:12 116:17
  116:21 117:1,5
  117:11 119:2
  122:4 133:18
  133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
  26:14
**Strasburger**
  44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
  15:8 38:16
  52:22 53:5
  68:12 87:9
  90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
  119:20,20
  132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
  59:25 61:12
  64:10 95:13
  96:22 105:12
  116:13 118:3
  118:19
**subsequently**
  32:11

**sued** 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
  136:2
**summarize** 72:19
**summary** 7:12
  8:14
**summer** 123:16
  124:18
**supervision**
  135:11
**supplementally**
  9:19
**supposed** 98:20
**sure** 6:12,15
  10:21 11:4,11
  12:20 13:20
  14:11 18:22
  19:23 22:11
  26:7 28:16 31:2
  33:10,21,22
  37:5 42:3,22
  43:20 52:25
  58:18 60:16
  62:1,19 63:17
  65:4 66:11
  75:21 76:11,11
  84:15 99:3
  100:7 101:1
  107:18 109:22
  115:16 125:24
  126:23 130:23
  130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
  76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
  135:4
**synopsis** 7:12
  8:14

**system** 56:12
  77:16 84:20

——————

**T**

**T-h-e-d-f-o-r-d's**
  86:22
**take** 25:14 30:8
  38:11 45:5 52:5
  52:20 72:15
  75:17 76:15
  82:12 87:10
  89:13 92:13
  104:1 110:14
**taken** 1:20 16:15
  17:6 45:8 135:7
**talk** 7:21,24 8:1
  8:17,20,23,25
  28:10 34:21
  44:9 66:11,15
  78:1
**talked** 9:12 97:4
  99:8
**talking** 8:19,22
  29:1 64:11
  101:2 116:8
  121:15,23
  125:13
**taxes** 14:9
**team** 13:19 17:25
  18:21 26:4 31:6
  39:15 49:15,18
  50:24 51:7
  64:16 97:16
  102:4 104:11
  106:15 115:2
**telephone** 23:17
  74:11 75:23,25
**tell** 34:13,16,24
  44:2 53:1 54:1
  54:2 55:7 60:14
  63:24 71:23
  74:19,23 79:22
  79:24 84:3
  91:11,15,18
  93:24 99:2

100:12 106:14
  107:1 109:22
  110:8 112:8,25
  113:4,17 114:1
  114:6,14
  116:20,23,24
  117:21 118:25
  119:6,11 122:4
  122:8 123:2,8
  123:11 130:22
  131:24 132:4,8
  132:11,14,18
  132:23 133:2
  135:4
**telling** 35:25
  37:11 53:24
  100:13,21
  105:22 115:24
**template** 18:20
  18:24 43:14,18
  45:8 46:17 58:4
  58:6,12
**templates** 43:12
  50:9
**term** 17:2 66:9
  66:16 67:8,13
  73:10 76:24
  77:10 98:17,25
  100:4 107:20
  107:24 125:19
  126:2 127:12
  127:16,24
  128:8,21 130:7
  131:5,8,14
**terminology**
  27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
  72:18 112:12
  113:13 127:22
  129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

treasury 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

___
**U**
**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

**use** 21:17 45:12
  47:19 48:12
  49:18 59:1 79:1
  100:4
**usually** 24:5

**V**
**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15
  15:11 59:13
**verbatim** 27:14
  78:25 85:20
  86:22
**verification** 50:3
**version** 30:13
  42:7
**versions** 30:24
**video** 8:5,12 59:6
  62:16 85:24
**videoconference**
  1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

**W**
**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15
  58:25 86:18
  95:8 100:7
**wanted** 52:19
  54:2,9 60:12,14
  82:17 84:7
  102:11 105:9
**wanting** 65:10
**wasn't** 108:23
  114:6,15 127:7
  129:14
**Waterhouse** 4:21
  7:10,21 13:7,8
  23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
**Waterhouse's**
  8:1,6 47:1,6
  48:11 75:25
  115:10
**way** 11:18 12:23
  14:8 21:15
  35:13,15 37:8
  37:10,16 56:12
  58:20 60:19
  76:1 81:12 83:3
  92:25 93:10
  101:21 122:5
  135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
**we're** 6:7 27:22
  28:16 29:1 30:6
  35:19 50:22
  58:9,24 59:2,3
  76:11,11 85:20
  93:22 100:7
  104:3 116:8
  125:13
**we've** 9:11 28:8
  50:7 56:21,22
  69:16 88:9
  114:2 117:18
  121:23
**website** 49:3
**week** 8:2,10 9:2
  9:22,25 10:5
  13:22 28:9,17
  29:18 60:22
  61:6 67:6 86:1
  95:19
**weekly** 66:21,25
  67:2
**welcome** 59:1
  86:17
**went** 9:15 10:22
  10:23 24:19,22
  49:23 112:17
  115:4
**weren't** 19:25
  28:23 40:7,9
  64:12 96:7
  98:21,24 99:20
  100:24 101:13
  105:22 106:3
  131:1
**wire** 34:25
  106:15 107:3
**withdrawn**
  113:23 117:25
  120:3 124:9,21
  126:6,7 127:7,9
  129:15 132:12

133:9
**withholding**
  116:3
**within-entitled**
  135:6
**witness** 1:19 16:1
  16:24 18:16
  19:13 20:25
  22:10,23 24:10
  24:17 30:3
  31:11 34:8
  35:12 36:15
  38:9 39:19 41:3
  41:15 46:6
  48:24 49:12,22
  50:6 51:5,16,22
  52:3 53:11 55:7
  55:21 56:6
  57:18 58:18
  69:10 70:17
  73:22 74:7
  75:12 77:24
  80:5,18 82:3
  83:10,12 88:17
  89:4,17 94:14
  96:20 102:4
  103:15 105:21
  106:7,20
  113:21 114:12
  114:18 118:11
  119:4 121:18
  122:14 135:3
  135:10
**word** 42:6,6 43:7
  43:8 45:11 47:2
  77:13
**words** 21:5 23:20
  68:14
**work** 11:8 52:4
  98:2 126:22
**worked** 11:16,18
  36:6 61:19
  110:5
**works** 35:1
**world** 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
**wouldn't** 36:22
  37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22
  61:13,20
**writing** 37:10
  41:14 64:3
  114:25 117:14
**written** 80:7
  82:19 91:25
  99:7 104:12,15
**wrong** 57:5 87:13
  99:7
**wrongly** 123:12
**www.dickman...**
  136:4

**X**

**Y**
**yeah** 7:2 14:13
  21:10 34:9
  44:23 51:9
  80:18 93:17
**year** 12:2 20:10
  26:14 78:1,5
  81:6 104:5
  127:15 128:21
  128:25 129:7
  129:14 130:8
  131:21
**years** 11:15,18
  12:9 18:20 21:9
  22:25 23:9 36:7
  37:18 40:25
  51:7 52:4
  104:21,22
  108:15 109:17
  110:8,10,12

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
    86:7,9
**York** 2:11

---

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

---

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

---

**1**

**1** 3:10 30:14,15
    30:18 33:1 71:4
    71:25 72:4
    74:10 80:9
    93:21 129:24
    135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
    10:5 28:17 59:4
    59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
    124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
    62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
    65:18,21 90:5,7
    90:17
**12,286** 87:10,10
**12,286,000** 87:6
    87:16,20,24

**12.3** 120:24
    121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
    72:16
**13-week** 67:5
    125:7,10,14,23
    126:16,19
    128:17 130:3,6
**14** 4:17 22:25
    23:9 36:7 40:25
    76:10,17,19
    82:6 85:17
    90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
    83:4,15,17 84:8
    84:14,18,19
    85:7 87:21
    89:21,22
    123:16,22
    124:5 133:5
**15(c)** 4:22 86:1
    121:11
**16** 4:21 85:21,22
    85:25 86:3
    119:15,23
**17** 5:1 11:15 52:4
    88:2,4,7
**18** 5:5 89:25 90:1
    90:3
**19** 59:12
**1982** 10:17

---

**2**

**2** 3:12,12,14,19
    3:23 4:3 30:19
    30:20,21 31:16
    32:21 34:14
    37:11 41:11,18
    44:19 56:22
    57:22 58:11
    60:25 61:6,12
    79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
    32:21 33:19
    37:12 38:22
    39:7 42:16 43:3
    58:5,11 111:10
    113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
    21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
    73:2 74:7 131:6
    131:12
**2018** 116:4,16
    117:1,11,23
    118:3,11,14,18
    119:1 128:25
**2019** 3:14 12:10
    12:17,19,25
    13:8,14 17:9,12
    17:20 18:2,8,10
    18:10 19:15
    20:2,2 21:2,9
    21:19 23:16,16
    24:12,14 30:20
    31:17 34:14
    37:11 38:17,21
    39:6,14 40:3,5
    41:11,18 44:25
    45:14 46:9,12
    46:19 47:12,24
    48:21 49:6,19
    50:2 53:5,6
    54:21 55:3,10
    56:9,20 57:22
    74:7 78:5 80:23
    81:6,18 110:21
    111:1 112:9,21
    114:1 116:5

117:18 118:16
    129:8
**2020** 4:4,11,22
    12:7 14:2,5
    15:6,10,21 16:3
    24:22 59:12
    62:6,10 65:14
    66:3,7,18,19
    67:13,17,20
    68:1,8,14,21
    70:23 71:4 74:8
    75:19 76:4 78:2
    79:10 83:18
    86:25 87:6
    88:12 93:21
    98:21,25
    100:25 101:11
    101:19 102:7,8
    102:20 103:21
    105:4,18
    120:23 122:17
    122:19 124:18
    125:14,20
    126:9 127:6
    128:20 129:14
    129:17
**2021** 1:15,21 4:8
    5:2,6 24:24
    26:4 28:20
    29:11 62:25
    64:15 71:25
    73:3 88:2 90:5
    90:17 94:10
    106:10,25
    128:2,8,15
    134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

---

**3**

**3** 3:10,14,17,21
    4:11 31:15,18
    34:4,11 35:21
    36:20 37:11,19
    38:12 41:11,18
    44:18 56:20
    65:14 66:3
    111:7 112:21
    119:7
**30** 3:10,12 71:4
    72:4 74:10
    86:25 87:6
    93:21 120:23
    129:24
**30-year** 19:22
**30,746,812.33**
    4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
    67:16 70:22
    79:10 88:12
    98:21,25
    100:25 101:11
    101:19 102:8
    102:19 103:20
    105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

---

**4**

**4** 3:17 42:15,17
    42:19 43:6,18
    43:18 44:21,24
    45:22,25 46:3
    46:19 48:11,19
    50:13,17 51:2
    52:8 55:17,24

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

**5**

**5** 3:19 30:12 33:1
33:20,25 34:5
35:3 36:25
37:12 38:25
39:3,8 42:15,16
42:17,20 43:2,6
43:18,19 44:21
44:24 45:22,25
46:3,19 48:11
48:19 50:13,18
51:2 52:9 55:17
55:24 57:16
58:13,13 94:9
112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

**6**

**6** 3:3,21 4:8,22
43:2,4,21 44:9
44:18 62:25
64:15 80:12
86:22
**6/30** 86:23 121:3
121:6,11,25
122:8
**62** 4:7
**65** 4:11
**683** 87:3

**7**

**7** 3:23 5:2 43:2,4
44:9,19 88:2,21
**7.4** 38:18 39:11
39:23 40:15,21
122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

**8**

**8** 3:25 56:19,24
56:25 58:10
89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

**9**

**9** 4:1 56:21,24,25
58:10
**90** 5:5
**94** 3:4
**99** 49:14

# EXHIBIT 195

David Klos - October 27, 2021

## 1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2          FOR THE NORTHERN DISTRICT OF TEXAS
 3                   DALLAS DIVISION
 4                      --oOo--
 5
 6  HIGHLAND CAPITAL MANAGEMENT,    )
    L.P.,                           )
 7                                  )
                 Plaintiff,         )
 8                                  )
            vs.                     )  No. 21-03004-sgj
 9                                  )
    HIGHLAND CAPITAL MANAGEMENT FUND )
10  ADVISORS, L.P.,                 )
                                    )
11            Defendants.           )
12  _____
13                DEPOSITION OF
14                 DAVID KLOS
15              October 27, 2021
16  _____
17
18         DEPOSITION OF DAVID KLOS, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.
```

## 2

```
 1                    APPEARANCES
 2
 3         MUNSCH, HARDT, KOPF & HARR, PC, 500 North
 4  Akard Street, Suite 3800, Dallas, TX 75201, represented
 5  by DAVOR RUKAVINA, Attorney at Law, appeared via
 6  videoconference as counsel on behalf of the Defendants.
 7         Email: drukavina@munsch.com
 8
 9
10         PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11  Avenue, 34th Floor, New York, NY 10017-2024, represented
12  by JOHN A. MORRIS, Attorney at Law, appeared via
13  videoconference as counsel on behalf of the Plaintiff.
14         Email: jmorris@pszjlaw.com
15
16
17         STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19  at Law, appeared via videoconference as counsel on
20  behalf of the Defendants Jim Dondero, HCMS and HCRE
21  Partners.
22         Email: michael.aigen@stinson.com
23
24
25
```

## 3

```
 1                      INDEX
 2                                              PAGE
 3  Examination by MR. RUKAVINA                    4
 4  Examination by MR. AIGEN                      95
 5  Examination by MR. MORRIS                    109
 6  Further Examination by MR. RUKAVINA          127
 7
 8
 9
10       (No exhibits marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 4

```
 1                    DAVID KLOS,
 2  having been first duly sworn, testified as follows:
 3                    EXAMINATION
 4       Q.  (BY MR. RUKAVINA)  Sir, state your name for
 5  the record, please.
 6       A.  David Klos.
 7       Q.  K-l-o-s?
 8       A.  K-l-o-s.
 9       Q.  What's your date of birth?
10       A.  May 6, 1982.
11       Q.  And where do you live?
12       A.  I live in Dallas.
13       Q.  What's your educational background?
14       A.  Undergraduate and graduate degrees.  I went
15  to undergrad at Boston College, graduate school at SMU,
16  with a degree in, Master's of Science in accounting and
17  MBA from SMU.
18       Q.  Do you hold any professional licenses?
19       A.  CPA in the state of Texas and, I don't know
20  if it's technically a license, but Series 27 from
21  FINRA.
22       Q.  And when did you get your CPA license?
23       A.  I don't recall specifically, but it would
24  have been probably in the '08, '09 time frame.
25       Q.  Is it current?
```

David Klos - October 27, 2021

**5**

1   A. As far as I know.
2   Q. Have you ever been disciplined or threatened
3 with disciplinary proceedings?
4   A. No.
5   Q. And your relevant work experience, please,
6 starting with college and afterwards?
7   A. Sure. Out of grad school I started working
8 at Deloitte in Boston. I worked at Deloitte for
9 approximately three and a half years, between the
10 Boston office and the Dallas office.
11   And then I began working at Highland Capital
12 Management in March of 2009 and I've been at Highland
13 since then.
14   Q. And when you joined Highland in March of
15 2009, what was your title or your role at that time?
16   A. My title, if I remember correctly, was
17 valuation senior analyst. I'm not certain if that was
18 exactly it, but it was something along those lines.
19   Q. Was it in the valuation group?
20   A. Yes.
21   Q. And then give me your -- today you're the CFO
22 of Highland; correct?
23   A. Correct.
24   Q. So give me the progression from valuation
25 analyst to CFO with, to the best of your recollection,

**6**

1 the approximate year that you were promoted, et cetera?
2   A. Sure. I was in the valuation role from
3 basically March of 2009 to end of 2009.
4   I was then brought over to what we call the
5 corporate accounting team, so doing the accounting for
6 Highland Capital Management, LP and of the other
7 advisor-type entities, where I was primarily focused on
8 budgeting and forecasting, credit facility compliance.
9   That took from roughly 2010 until I think
10 middle of 2011, at which point I was moved over to the
11 fund accounting group, so doing hedge fund accounting,
12 which was a short role, really, for probably three or
13 four months.
14   At which point I was brought back to the
15 corporate team and also put in charge of the valuation
16 group. I held that role in some way, shape, or form
17 more or less continuously for the next several years,
18 although certainly my role evolved and changed.
19   But in terms of the groups that I had
20 oversight over, those were the groups. Like I said, my
21 role definitely evolved over time from 2011.
22   Q. So by 2017 what was your title?
23   A. So, yeah, by that time, I was, I believe,
24 controller. I might have still been assistant
25 controller.

**7**

1   There were a few title changes in between
2 there. I think at one point I was manager, at one
3 point I was senior manager, at one point I was
4 assistant controller and at one point I was controller.
5   I can't remember the exact times of all of
6 those break points.
7   Q. Let me pause you. When you were assistant
8 controller, who was the controller?
9   A. There was quite a bit of time where I was
10 assistant controller and we didn't have a controller.
11 I couldn't tell you the exact time frame, but there was
12 definitely an extended time frame.
13   And then in April of 2020, our existing chief
14 accounting officer left and I assumed his
15 responsibilities at that time.
16   Q. Let me pause you. That's a new term for me.
17 Chief accounting officer?
18   A. Uh-huh.
19   Q. Who was that person?
20   A. The person that left?
21   Q. The person that was the chief accounting
22 officer until April 2020.
23   A. Cliff Stoops.
24   Q. And do you have any idea or knowledge whether
25 at Highland that was like an officer-level position?

**8**

1   A. It was not. It was more of a term of art, I
2 would describe it. So it -- so, yeah --
3   Q. To the best of your recollection, when did
4 you become the controller at Highland Capital
5 Management, LP?
6   A. I couldn't pin down a specific date. Like I
7 said, the responsibilities were very similar. I would
8 guess the change from assistant controller to
9 controller was probably in the, most likely in the '16,
10 '17, maybe '18 time frame.
11   Q. Can we agree that as of May 1, 2019, you were
12 the controller at Highland?
13   A. Yes.
14   Q. So let's focus on that time frame, May 2019,
15 and you're the controller. Who do you report to at
16 Highland?
17   A. Frank Waterhouse.
18   Q. The CFO?
19   A. Correct.
20   Q. No one in between you and him?
21   A. Correct.
22   Q. So what -- explain to me the role between the
23 chief accounting officer and the chief financial
24 officer in that time frame, '19, '20?
25   MR. MORRIS: Objection to the form of the

David Klos - October 27, 2021

9

1 question.
2      THE WITNESS: Very little. Like I said,
3 chief accounting officer was more of a term of art.
4 What that role actually had oversight of was our retail
5 fund accounting, institutional fund accounting,
6 operations, so loan settlement and treasury.
7      And probably another department or two that
8 I'm forgetting, but it did not have any oversight over
9 the corporate accounting group.
10      Q. (BY MR. RUKAVINA) And in May of 2019, as the
11 controller, what were -- what was your role or what
12 were your duties?
13      A. In May of 2019 I was at that point still
14 overseeing the valuation group. I was overseeing the
15 corporate accounting group, which my primary direct
16 report there was Kristin Hendrix, who really was the
17 day-to-day person. But I certainly oversaw her.
18      Q. By that you mean the person that answers to
19 you?
20      A. Correct. Sorry. If I flipped that, I
21 apologize. So I was overseeing that group, which had,
22 you know, fairly broad responsibilities.
23      In terms of, you know, accounting for the
24 Advisor, doing forecasts when they were called for,
25 performing the audit every year, managing cash,

10

1 processing payroll, things of that nature.
2      And then at that time I was also put in
3 charge of one of the public REITs that was launching at
4 the time under the NexPoint flag. And getting that
5 team started.
6      Q. Did you mention that in May of 2019 you were
7 still involved with the valuation group?
8      A. I did.
9      Q. Did you have a title at the valuation group?
10      A. Nothing distinct from my overall controller
11 title. These titles were often, like I said, terms of
12 art, whether it was controller or chief accounting
13 officer.
14      Q. What did the valuation group at Highland do?
15      A. Well, valuation group was really a liaison
16 with both third-party pricing providers, pricing
17 services, brokers on the street, front office, members
18 at Highland.
19      To, you know, to work on valuing the
20 securities held across the platform, both for Highland
21 HCMLP managed funds as well as affiliated managed
22 funds.
23      Q. So who did -- did you report to anyone at the
24 valuation group? In other words, did it have its own
25 separate hierarchy kind of?

11

1      A. Frank Waterhouse.
2      Q. And were --
3      A. I should clarify too, that the valuation team
4 isn't ultimately responsible for the valuations
5 themselves, but they do act in this liaison role.
6      Q. Perhaps that's my confusion. Is there a
7 separate group that handles just valuation?
8      A. No.
9      Q. Is there an outside consultancy that handled
10 that in May of 2019?
11      A. I don't know if I would call it consultancy,
12 but there was a third-party valuation service provider
13 that would do certain of the, call it illiquid, harder
14 to value securities.
15      Q. So would you say that you were pretty busy in
16 April, May 2019?
17      MR. MORRIS: Objection to the form of the
18 question.
19      THE WITNESS: I've been busy throughout my
20 career.
21      Q. (BY MR. RUKAVINA) In April, May, June 2019,
22 how many hours a month do you estimate you worked for
23 Highland?
24      MR. MORRIS: Objection to the form of the
25 question.

12

1      THE WITNESS: I don't remember. A
2 significant number.
3      Q. (BY MR. RUKAVINA) Certainly full-time?
4      A. Absolutely.
5      Q. Would you say that you were working more than
6 200 hours a month in that time frame for Highland?
7      A. I don't know how many hours. I should
8 clarify, we're using Highland very liberally. When I
9 say Highland, supporting the entire apparatus,
10 platform. Significant number of hours at that time,
11 and before and after.
12      Q. And let's explore that a little bit. You
13 mentioned one of the funds for NexPoint. I'd like to
14 talk about NexPoint Advisors, LP, just NexPoint
15 Advisors, LP.
16      Did you ever have an official role or title
17 with NexPoint Advisors, LP?
18      A. Not that I can remember.
19      Q. Do you know if you were ever the controller
20 for that entity?
21      A. I'm not certain. I'm not certain.
22      Q. But I take it that pursuant to the shared
23 services agreement you, as an employee of Highland,
24 were providing services on behalf of NexPoint?
25      MR. MORRIS: Objection to the form of the

David Klos - October 27, 2021

**13**

1 question.
2     THE WITNESS: I provided many of the same
3 services for NexPoint Advisors that I provided for
4 Highland, similar types of services.
5     Q. (BY MR. RUKAVINA) And briefly about Highland
6 Capital Management Fund Advisors, LP, HCMFA, did you
7 ever have like an official title or role with that
8 entity, to your knowledge?
9     A. Again, not that I can remember.
10     Q. Not to your knowledge, the controller ever of
11 that entity?
12     A. I'm not certain whether I was or not.
13     Q. But you provided services to that entity as
14 part of your role at Highland pursuant to shared
15 services?
16     A. Similar to NexPoint as I described.
17     Q. When you were controller of Highland, was
18 that an officer-level position at Highland?
19     A. No.
20     Q. When did you become the chief financial
21 officer of Highland?
22     A. Chief financial officer?
23     Q. Uh-huh.
24     A. 2021, March.
25     Q. After Mr. Waterhouse was gone?

**14**

1     A. Yes.
2     Q. And I'm going to ask you a little bit about
3 your compensation today at Highland.
4     You don't have to give me specific numbers
5 unless I ask you, please, but I take it you have a base
6 compensation?
7     A. Yes, I have a base.
8     Q. Do you have any bonus structure compensation?
9     A. Yes, I have a bonus.
10     Q. And what is that bonus number or whether it's
11 paid out based upon or contingent upon?
12     MR. MORRIS: Objection to the form of the
13 question.
14     THE WITNESS: As I understand, it's based on
15 my offer letter.
16     Q. (BY MR. RUKAVINA) On your what?
17     A. My letter for extending an offer.
18     Q. Tell me, what is your -- without having to
19 use express numbers, what is your bonus compensation?
20 When is it paid, et cetera?
21     A. Yeah, it's not too dissimilar from the
22 prior Highland plan that has semiannual installments
23 payable. And then there's a, kind of an end of plan
24 bonus when -- I don't remember the specifics on exactly
25 what triggers that, but it's back-ended in the plan.

**15**

1     Q. Do you have an expectation as to when the
2 winding down and monetization of Highland and its
3 assets will be complete?
4     A. That's very hard to speculate, especially
5 given the amount of litigation that's going on because
6 I don't know when that's going to play out and that's a
7 material asset.
8     Q. Have you discussed with Mr. Seery how long
9 that might be?
10     A. Not that I can specifically remember.
11     Q. Do you believe it will be at least probably
12 two years, from today?
13     A. I don't know.
14     Q. This bonus compensation, does it or any
15 amount of it depend on how well Highland or the
16 claimant trust, how well they do vis-a-vis collecting
17 money from creditors?
18     A. Not that I can think of. I'd have to
19 probably go back and look and understand the back-end
20 piece to say definitively.
21     Q. And back-end piece, does that mean whenever
22 the winding down is completed?
23     A. Yeah, like I said, I'm not exactly -- I'm not
24 completely facile with the exact timing, if it's
25 completed 100 percent or 80 percent, what kind of

**16**

1 qualitative considerations go into that. But
2 substantially completed.
3     Q. Sitting here today, do you think or believe
4 that any portion of your compensation over the next
5 however long it takes to wind down Highland depends on
6 how much Highland recovers from the litigation
7 regarding promissory notes?
8     A. I really take exception to that question
9 because the insinuation is that it's going to somehow
10 change my answers here, and it's absolutely not.
11     How litigation, it may or may not affect my
12 ultimate compensation, but that's not going to affect
13 one iota of the answers I give you today or at any
14 time, whether I'm on or off the record.
15     Q. Fair enough. So you're going to testify
16 today truthfully regardless of your compensation. I
17 got you; right? Correct?
18     A. I didn't follow what you just asked me.
19     Q. You're going to testify today truthfully
20 regardless of how these events may or may not affect
21 your compensation; right?
22     A. It's such a loaded question I can't even
23 begin to answer that.
24     Q. So sitting here today -- I want to ask you
25 the same question I did before, and your answer to me

David Klos - October 27, 2021

---

**17**

1  was that you took exception to the insinuation. Now
2  I'd like you to answer my question.
3       Which is, sitting here today, do you believe
4  that any part of your compensation in the future,
5  however long it takes to wind down Highland, is going
6  to depend on how well Highland does in these
7  litigations concerning the notes?
8       A. I believe my ultimate compensation will
9  depend on how long this process takes, which I don't
10 know, and ultimate recoveries to trust beneficiaries
11 under the plan.
12      And so I do expect that it will vary, but I
13 would reiterate my earlier comment.
14      Q. So sitting here today, you understand that if
15 the trust beneficiaries recover more, then you might be
16 compensated more?
17      A. That's possible.
18      Q. Well, sir, I'm not trying to be a smart ass,
19 but --
20      MR. MORRIS: Actually, you're coming awfully
21 close, just to be clear, so be careful, because I'm
22 offended as well. But continue.
23      MR. RUKAVINA: I'm entitled to ask the man
24 about his compensation.
25      MR. MORRIS: Right. And your clients have

---

**18**

1  $75 million, hard dollars at stake in this litigation,
2  so we should never believe anything that he says? Is
3  that where we are now?
4       Q. (BY MR. RUKAVINA) Sir, again, what is your
5  bonus compensation as it relates to how well the
6  claimant trust does? Do you remember or not?
7       A. I don't know that that's even something that
8  I could know at this point.
9       Q. In preparing for this deposition, I take it
10 you spoke to legal counsel, and I'm not entitled to
11 know that and I'm not asking that.
12      But did you talk to anyone else?
13      A. I've spoken in general terms to Mr. Seery.
14      Q. Okay. Anyone else?
15      A. I've spoken, again in general terms, to
16 Kristin Hendrix.
17      Q. Anyone else?
18      A. Not that I can think of.
19      Q. Now, I understand you spoke to Ms. Hendrix
20 when legal counsel was present; right?
21      A. Yes.
22      Q. So let's exclude that conversation.
23      Did you have any conversations with
24 Ms. Hendrix regarding this deposition or this
25 litigation at which counsel was not present?

---

**19**

1       A. Not in any substance.
2       Q. And when do you recall you might have had
3  those discussions with her?
4       A. I'm not even sure.
5       Q. Would it have been recently or like 9,
6  10 months ago?
7       A. No, it would have been recently.
8       Q. And with Mr. Seery, when did you have a
9  general conversation with Mr. Seery?
10      A. I've had, you know, one or more general
11 conversations with Mr. Seery. It's my understanding
12 that he was the 30(b)(6) witness, and he had questions
13 in preparation for his role in that.
14      Q. So that would have been before last Thursday
15 that you talked to him? I'll represent to you that
16 that's when his deposition was.
17      A. Yeah, if I'm accepting that representation,
18 yes, prior to.
19      Q. Other than that conversation with respect to
20 him preparing for the 30(b)(6), did you have a
21 discussion with him about this litigation as it might
22 relate to your deposition?
23      A. I don't believe so in terms of relating to
24 this deposition. We've talked at length about the
25 notes more generally.

---

**20**

1       Q. And we'll go through that I'm sure.
2       So other than the conversations with
3  Ms. Hendrix and Mr. Seery and, of course, with counsel
4  that I'm not entitled to know about, did you discuss
5  this deposition or what you might be asked today with
6  anyone else?
7       A. No.
8       Q. Okay. Did you read all or any portions of
9  the deposition of Frank Waterhouse?
10      A. Certainly didn't read all of it. I have a
11 general understanding of the topics that were -- that's
12 a bad way to frame it.
13      I have a general understanding of a few
14 points that were covered in his deposition.
15      Q. Were you provided -- were you provided the
16 exact pages of any of his deposition?
17      MR. MORRIS: Objection. Direct him not to
18 answer.
19      MR. RUKAVINA: You're going to direct him not
20 to answer whether he read --
21      MR. MORRIS: If you're asking him whether I
22 directed him to particular --
23      MR. RUKAVINA: I didn't ask that.
24      MR. MORRIS: Rephrase your question.
25      Q. (BY MR. RUKAVINA) Did you read any pages

---

David Klos - October 27, 2021

---

**21**

1 from Mr. Waterhouse's deposition?
2     MR. MORRIS: Objection. Asked and answered.
3 You can answer again.
4     THE WITNESS: I don't recall -- I don't
5 recall reading it.
6     Q. (BY MR. RUKAVINA) So were you provided a
7 summary of his deposition?
8     A. I have had discussions with Mr. Morris in
9 preparation for this deposition.
10     Q. That's fine. And we can stop there.
11     Did you read or -- did you read the whole or
12 any portion of Mr. Seery's deposition?
13     A. No, I don't believe I -- no, I don't believe
14 so.
15     Q. Is it the same answer, that whatever you
16 discussed would have been through counsel?
17     A. Yes.
18     Q. Did you see any of the videotape of either
19 Mr. Waterhouse's or Mr. Seery's deposition?
20     A. No.
21     Q. So let's talk about the NexPoint
22 $30.7 million note.
23     You're familiar with that note; right?
24     MR. MORRIS: Objection to the form of the
25 question.

**22**

1     THE WITNESS: Before I answer that, I'd like
2 to see the note.
3     Q. (BY MR. RUKAVINA) It's in here. I'm looking
4 for the exhibit number. It's in here somewhere.
5     A. Yes, I'm familiar with this note.
6     Q. Are you familiar with anything having to do
7 with the negotiation or execution of this note?
8     MR. MORRIS: Objection to the form of the
9 question.
10     THE WITNESS: Can you repeat.
11     Q. (BY MR. RUKAVINA) Yes. Let me rephrase it.
12     Did you have anything to do, back on or about
13 May 31, 2017, with the negotiation or execution of this
14 promissory note?
15     MR. MORRIS: Objection to the form of the
16 question.
17     THE WITNESS: Nothing with respect to the
18 negotiation --
19     Q. (BY MR. RUKAVINA) I'm sorry.
20     A. In terms of the execution, I believe I
21 coordinated with internal counsel, who drafted the
22 note, and I can't remember -- I can't recall one way or
23 the other if I assisted in actually physically
24 receiving signatures. I just don't remember.
25     Q. Do you remember who that internal counsel

**23**

1 was?
2     A. Yeah, it was Lauren Thedford, who is Highland
3 in-house counsel.
4     Q. She's a lawyer?
5     A. Yes.
6     Q. Do you recall from that -- strike that.
7     Did you know on or about May 31, 2017 what
8 the purpose or reason behind Exhibit 13, this
9 promissory note, was?
10     MR. MORRIS: Objection to the form of the
11 question.
12     THE WITNESS: The purpose was to take
13 existing notes, which I believe were exclusively demand
14 notes, I'm not a hundred percent certain on that, and
15 roll them into a single note that would have a 30-year
16 amortization period.
17     Q. (BY MR. RUKAVINA) Do you know why that was
18 done?
19     A. I believe it was done probably for a number
20 of reasons, one of which was to ensure some level of
21 cash flow back to Highland, when I say Highland,
22 Highland Capital Management, LP, on an annual basis.
23     Q. Was that a concern at Highland Capital
24 Management, that it wasn't getting any level of cash
25 flow back?

**24**

1     A. It wasn't a concern of mine. I don't know if
2 it was a concern of others.
3     Q. Do you recall whether any auditor ever raised
4 that concern?
5     A. The auditors did raise that in conjunction
6 with the audit that was concluding around this time.
7 So yes, they did raise it, you know, probably in the
8 May of 2017 time frame.
9     Q. Do you know who decided that it would be a
10 30-year term note? By that I mean 30 years.
11     A. Jim Dondero.
12     Q. Do you know if he decided that in connection
13 with discussions with anybody or, to your knowledge, he
14 just decided?
15     A. As far as I know he just decided it. I
16 believe there was a draft at one point that was for
17 20 years, and he wanted to do 30.
18     Q. So this note is executed in May 31, 2017.
19 Did you have any further role prior to, let's say,
20 December 1, 2020 with respect to anything to do with
21 this promissory note?
22     A. Sorry, tell me the date again.
23     Q. From execution of the note until December 1,
24 2020?
25     A. And the question was?

---

David Klos - October 27, 2021

**25**

1    Q.  Did you have any role in that time frame with
2  respect to this promissory note on behalf of Highland?
3        MR. MORRIS:  Objection to the form of the
4  question.
5        THE WITNESS:  I don't know how to answer
6  that, it's such an open-ended question.  I just don't
7  know how to respond to that.
8    Q.  (BY MR. RUKAVINA)  If payments were made on
9  this note, would you have any duty to record or credit
10  those payments?
11        MR. MORRIS:  Objection to the form of the
12  question.
13        THE WITNESS:  I wouldn't have personally in
14  my role, but my team would have been involved in the
15  recording of those.
16    Q.  (BY MR. RUKAVINA)  And when payments were due
17  on this note, did you personally have any role with
18  respect to doing anything to facilitate those payments?
19    A.  When payments were due did I have anything --
20  yes.
21    Q.  What was your role?
22    A.  So my role, as part of the corporate team,
23  part of our role is managing cash at the various
24  entities.  So I was involved in weekly cash meetings,
25  where things like upcoming, whether it's an obligation

**26**

1  or a receipt, would be put on people's radars.
2        And we would, in connection with the 30-year
3  notes such as this one from NexPoint, we would either
4  confer with Jim or -- certainly Jim.  Also likely his
5  accountant.
6        In terms of teeing them up to make sure that
7  they were prepared from a cash flow statement to make
8  the payment.
9    Q.  What do you mean by his accountant?
10    A.  Melissa Schroth.
11    Q.  What do you mean by his?  That's a new name
12  to me.  Who is Melissa Schroth?
13    A.  I find it hard to believe that she's a new
14  name to you.  But I think her title was executive
15  accountant, and she was the keeper of Jim's -- many of
16  Jim's trusts and personal entities.
17    Q.  Was she a Highland employee?
18    A.  She was.  And when I say Highland, I should
19  be clear, Highland Capital Management, LP.
20    Q.  So when you say Jim's accountant, she was
21  still a debtor employee, just that she handled
22  primarily Jim's personal matters?
23    A.  She was still a Highland Capital Management,
24  LP employee but she did Jim's personal matters.
25    Q.  Did you have any role at either Highland

**27**

1  Capital Management or NexPoint Advisors as to a
2  decision as to whether any prepayments on this note
3  would ever be made?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  Can you repeat.
7    Q.  (BY MR. RUKAVINA)  Let's start from scratch.
8        Do you have any memory of any payments being
9  made on this note, Exhibit 13, prior to their scheduled
10  dates of payment?
11    A.  There were payments on -- and to be clear,
12  we're talking about the original 30.7- NexPoint
13  promissory note?  There were payments that I recall
14  happening throughout 2019 on this note.
15    Q.  And we can look at Exhibit 14.
16        MR. MORRIS:  What number?
17        MR. RUKAVINA:  14, 1-4.
18    Q.  (BY MR. RUKAVINA)  And those are only
19  numbered because Ms. Hendrix, they were used for her
20  deposition.
21    A.  Sure.  Just trying to keep these in order, I
22  apologize.  Got it.
23    Q.  Do you recognize Exhibit 14?
24    A.  Generally.  I can't say that I can verify
25  that this is completely accurate.  But it looks

**28**

1  familiar to a loan amortization schedule.
2    Q.  Would it have been maintained by Highland?
3    A.  Yes.
4    Q.  And I'll tell you that no one has yet to
5  authenticate this with a hundred percent precision, so
6  I'm not asking you to ratify these numbers, but let's
7  assume that they are what they are.
8        This does purport to show on the second page
9  a number of transfers in 2019, which goes along with
10  your recent answer.
11        Do you see those, sir?
12    A.  I do.
13    Q.  In particular, 750,000, then 1.3 million,
14  300,000, 2.1 million, 630,000, 1.3 million.
15        You see all those, sir?
16    A.  Yes, I see every one.
17    Q.  Do you have any memory, without going into
18  those transfers of those dates to the dollar, do you
19  have any memory that those transfers were made?
20    A.  Yes.  Again, not a specific recollection of
21  where I was at the time, but yes, I know that these
22  transfers were made.
23    Q.  Do you know why they were made in those
24  amounts and on those dates?
25    A.  No, not without speculating.

David Klos - October 27, 2021

---

**29**

1    Q.  What would be your speculation if you were to
2  speculate?
3    A.  My speculation would be that it would be for
4  liquidity needs at HCMLP, Highland Capital Management,
5  LP, needing liquidity to operate.  Again, that's
6  speculation.  I don't know for a fact that that's true,
7  but that's what I would assume.
8    Q.  Who would have made those decisions in 2019
9  to transfer those funds?
10    MR. MORRIS:  Objection to the form of the
11  question.
12    THE WITNESS:  Yeah, it would have been either
13  Frank or Jim.  I can't say with certainty, but one of
14  the two.  When I say Jim, I should be clear,
15  Mr. Dondero.
16    Q.  (BY MR. RUKAVINA)  Between January and
17  July 2019, do you have any recollection that there was
18  any particular liquidity issue or need at Highland
19  Capital Management?
20    A.  Yeah, Highland was dealing with liquidity
21  problems throughout 2019.  Maybe not every single day
22  of the year, but we were continuously needing to bridge
23  liquidity.
24    Q.  And you joined Highland in 2009.  From that
25  point in time, 2009, through 2019, was there any

---

**30**

1  practice at the enterprise of those businesses to
2  transfer funds between each other on a basis of when
3  one needed it and one had it?
4    A.  Yes, that was a fairly, generally speaking,
5  that was a fairly common practice, of using different
6  entities within the overall structure to bridge
7  liquidity.
8    Q.  Would that have been Mr. Dondero who, in the
9  final analysis, would have made those decisions?
10    A.  Maybe not a hundred percent, but I'd say
11  the -- if not a hundred percent, certainly most.
12    Q.  And who else might have participated,
13  Mr. Waterhouse?
14    A.  Potentially Mr. Waterhouse.  And the reason I
15  hedge on that a little bit is I don't think Frank would
16  have made any of these decisions on his own either.
17  But I may have heard them from Frank via Jim.
18    Q.  So in those same years, were you ever asked
19  by Mr. Dondero or Mr. Waterhouse as to whether funds
20  should be transferred from one entity to another for
21  liquidity purposes?
22    A.  Can you ask that again, please.
23    Q.  Yes.  Trying to understand, were you part of
24  those discussions as to whether these transfers should
25  be made, or did you just learn that a decision to make

---

**31**

1  them had been made and you executed them?
2    A.  Both, depending on the circumstances.
3    Q.  So sometimes you would be brought into a
4  discussion?
5    A.  Yes.
6    Q.  And can you think of any particular example?
7    A.  Of when I was brought into the discussion of
8  whether to transfer?  I can't think of an individual
9  example but we met quite regularly with Jim on cash.
10    So to the extent that either he needed cash
11  on one of his entities, he might let us know that.  Or
12  to the extent that Highland needed cash, we might let
13  him know that and ask for basically his assistance in
14  helping us to meet our own cash needs.
15    Q.  And did he usually find a way to facilitate
16  the cash need either at one of his entities or at
17  Highland?
18    A.  I suppose until October 16 of 2019.
19    Q.  Yes.  Prior to bankruptcy, do you recall any
20  instance where one entity wasn't able to transfer funds
21  to another for liquidity purposes?
22    A.  I can't think of a specific situation.  But
23  I'm sure there were situations where -- you know, cash
24  was always something that was being juggled, so I don't
25  know that necessarily liquidity could be met the same

---

**32**

1  day.
2    But eventually we were able to manage through
3  those situations, you know, oftentimes through some of
4  these loans.
5    Q.  In instances that you may remember when
6  Highland Capital Management needed liquidity, do you
7  know how Mr. Dondero decided from which other entity to
8  transfer the cash?
9    A.  I can't step into his brain and think about
10  his decision-making process, but if I was going to
11  oversimplify it I would speculate that it would be
12  based on who has cash in that moment.
13    Q.  Would he ask you or someone on your team who
14  had cash?
15    A.  At times, depending on which entity we're
16  talking about.  Because my team certainly didn't have
17  responsibility for every single entity in the
18  enterprise, but we did have responsibility for some.
19    Q.  And if your team -- so -- strike that.
20    So over the general -- talking about
21  generally now, over those 10 years when there were
22  these intercompany transfers for liquidity purposes,
23  how were they booked by the debtor, by Highland Capital
24  Management?
25    MR. MORRIS:  Objection to the form of the

---

David Klos - October 27, 2021

**33**

1 question.
2        THE WITNESS:  Help me on the direction.  So
3 this is money that Highland is receiving or money that
4 Highland is sending?
5        Q.  (BY MR. RUKAVINA)  Sending out.
6        A.  Sending out.  So this is -- in the scenario
7 that you're describing, this money that Highland is
8 sending out to meet some other corporate obligor's
9 liquidity needs?
10        Q.  Yes, sir.
11        A.  So those would be booked as a loan.  I
12 would -- I need to hedge a little bit because I'm not
13 a hundred percent certain, but I would say if not
14 exclusively via loans close to exclusively.
15        Q.  And would they -- strike that.
16        Would they usually be papered up with a
17 promissory note?
18        A.  Yes.
19        Q.  Now, why was that the general course during
20 10 years?  Was there a policy and procedure in place,
21 or would Dondero say book it as a loan, or was that
22 just the right thing to do from an accounting
23 perspective?
24        MR. MORRIS:  Objection to the form of the
25 question.

**34**

1        THE WITNESS:  At the end of the day it's at
2 the direction of Jim Dondero, so I can't tell you
3 exactly why he wanted it to be done that way.  But that
4 was certainly the practice of how it was done in those
5 situations.
6        Q.  (BY MR. RUKAVINA)  To your knowledge, did Jim
7 Dondero ever tell you or anyone else that when Highland
8 is transferring funds to one of his affiliated entities
9 that it should always be booked as a loan?
10        A.  So remembering 10 years' worth of
11 conversations, I can't remember a specific instance
12 where he would have said, always book every single
13 transaction I direct you to do as a loan.  However,
14 that was the practice.
15        Q.  Different question.
16        Do you remember that in each instance, and
17 again, that might be unfair over 10 years, but do you
18 remember in each instance when Mr. Dondero said
19 transfer money from Highland to this other entity for
20 liquidity needs that he said book it as a loan?
21        MR. MORRIS:  Objection to the form of the
22 question.
23        THE WITNESS:  I can't recall with any
24 specificity what he may or may not have specifically
25 said so long ago.

**35**

1        Q.  (BY MR. RUKAVINA)  To your knowledge, was
2 there any written policy or procedure in place at
3 Highland Capital Management with respect to how
4 transfers from Highland to an affiliated entity should
5 be booked or treated?
6        A.  No written policy or procedure that I'm aware
7 of.
8        Q.  Is it fair to say that by May 2019, the
9 corporate accounting group had handled so many of these
10 transfers that it believed that if Highland was
11 transferring funds to another affiliated entity, it's
12 probably a loan?
13        MR. MORRIS:  Objection to the form of the
14 question.
15        THE WITNESS:  Yeah, I don't know that I can
16 answer that in terms of the corporate accounting team.
17 That just feels way too broad.
18        It was certainly the practice that when
19 somebody needed liquidity and it was appropriate from an
20 accounting perspective, that's how it would be booked.
21        And there was no reason to doubt that that was
22 the appropriate way to do it, particularly with
23 direction from either Frank or Jim.
24        Q.  (BY MR. RUKAVINA)  Is it your testimony that
25 in each instance that happened, that either Frank or

**36**

1 Jim said, this is a loan, the "this" being the transfer
2 from Highland to an affiliated entity for liquidity
3 purposes?
4        MR. MORRIS:  Objection to the form of the
5 question.
6        THE WITNESS:  I can't recall with that level
7 of specificity if those words came out of Jim's mouth.
8 But with 0 percent doubt in my mind, every single one
9 of those loans was done with the authority of Jim or
10 Frank, or both.
11        Q.  (BY MR. RUKAVINA)  So going back to this
12 Exhibit 14, now I'm going to ask you about these
13 payments coming in.
14        Assuming that these payments were actually
15 made in 2019 --
16        And I think, John, you sent me this morning,
17 or maybe last night, some bank statements?
18        MR. MORRIS:  I actually sent all of the
19 backup for all payments made, I think, under the notes
20 at issue a week or two ago.
21        Q.  (BY MR. RUKAVINA)  How would -- so assuming
22 that these payments in 2019 that NexPoint made didn't
23 technically have to be made at that point in time, how
24 would Highland have booked these payments?
25        A.  So I can't tell the column headers, so you'll

David Klos - October 27, 2021

---

**37**

1  have to excuse me if I flip them.
2      Q.  They'll be on the first page.  Rip the page
3  off if you need to.
4      A.  First one is interest, second one is
5  principal.  On the far right is the actual amount of
6  the payment.  So, for example, March 29, 750,000.
7      And the -- the column that has the negative
8  411,000 is the application of interest and the 338- is
9  the application of principal.
10      Q.  So again, if Highland -- strike that.
11      If NexPoint made a payment that was not
12  technically due at that point in time, it would be
13  recorded as payments on principal and interest?
14      A.  It would be recorded as it's reflected in the
15  schedule.  So there's an application of interest and an
16  application of principal.
17      Q.  So based on your understanding and
18  experience, if that payment wasn't due at that time,
19  would it have been a prepayment by NexPoint?
20      MR. MORRIS:  Objection to the form of the
21  question.
22      THE WITNESS:  Yeah, I'm not sure that it's a
23  prepayment or not.  It's certainly a payment.  It's
24  certainly voluntary.  It's not spelled out under the
25  schedule.  I don't know that it's a per se, capital P,

---

**38**

1  prepayment.  I'm just not certain.
2      Q.  (BY MR. RUKAVINA)  Well, maybe without
3  respect to these specific transfers.
4      Generally, generally, if one of the Dondero
5  affiliates made a payment that wasn't scheduled, how
6  would the debtor have accounted for that payment?
7      A.  It would have recorded the payment as a
8  reduction to either or both outstanding accrued
9  interest or principal.
10      Q.  You wouldn't call those prepayments?
11      A.  I don't know the definition of prepayment.
12  It's a payment.  It's off schedule, but I don't know
13  whether it's a per se prepayment.
14      Q.  Would that be something in your experience
15  that we would look at the promissory note to maybe
16  determine?
17      MR. MORRIS:  Objection to the form of the
18  question.
19      THE WITNESS:  I don't know.
20      Q.  (BY MR. RUKAVINA)  Well, remember, I'm asking
21  you the same question just in different ways.
22      Who decides at the debtor, or how does the
23  debtor decide, if an unscheduled payment is made, how
24  to apply it?
25      MR. MORRIS:  Objection to the form of the

---

**39**

1  question.
2      Q.  (BY MR. RUKAVINA)  And his objection is
3  valid.  And just to give you a little bit of a fine
4  point, does someone look at the promissory note to
5  decide that?  Or is there some other rule or procedure
6  that someone looks at?
7      MR. MORRIS:  Objection to the form of the
8  question.
9      THE WITNESS:  So the person -- I don't know
10  that I can specifically name a person because the role
11  probably changed over time.
12      But either our corporate accountant, or the
13  corporate accountant's boss, which was Kristin Hendrix
14  for years, would have been responsible for recording and
15  tracking those payments.
16      So some combination of the corporate
17  accountant and Kristin would have applied those
18  payments, and that rolls up through my and Frank's
19  review ultimately.
20      Q.  (BY MR. RUKAVINA)  So if I can round off this
21  discussion, I think you told me a few minutes ago that
22  in each instance that Highland was transferring money
23  out to an affiliate.
24      Whether or not you remember Dondero or
25  Waterhouse saying it's a loan, it would have been a

---

**40**

1  loan because that's how it always was and it was always
2  authorized.  Generally correct?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  There were a few "always" and
6  "generallys" in there.  And like I said, when it came
7  to liquidity needs, my recollection is that these would
8  be handled via loans.
9      Q.  (BY MR. RUKAVINA)  And in reverse, if a
10  Dondero entity made a payment prior to a scheduled
11  payment on a note, generally there would be credit
12  against principal and/or interest provided on that
13  note?
14      MR. MORRIS:  Objection to the form of the
15  question.
16      THE WITNESS:  Generally speaking, yes, if the
17  payment was for payment on the note.
18      Q.  (BY MR. RUKAVINA)  Well, that goes back to my
19  question.
20      Do you know how these payments on Exhibit 14
21  in 2019 were determined to be payments on these notes,
22  as opposed to a transfer from NexPoint to Highland for
23  some other reason?
24      A.  What other reason would it be, if I can be so
25  bold.

---

David Klos - October 27, 2021

---

**41**

1    Q.  Can you think of any other reason in 2019?
2    A.  Well, Highland had -- Highland had shared
3  services and intercompany agreements with NexPoint, at
4  this time.
5        But these were not payments that could
6  possibly be confused with those payments.  These are
7  off cycle, they're larger amounts, and there's nothing
8  that they could be other than payments against the
9  loan.
10    Q.  So I asked you before, and I think you said
11  that you were speculating with respect to these
12  payments, that Highland needed money at that time.
13      Do you recall in 2019 any discussions with
14  anyone, Dondero or Waterhouse, to the effect that
15  NexPoint has excess cash so maybe NexPoint should
16  transfer some money to Highland?
17      MR. MORRIS:  Objection.  Asked and answered.
18      THE WITNESS:  Do I still answer?
19    Q.  (BY MR. RUKAVINA)  Yes.
20      MR. MORRIS:  Yes.
21      THE WITNESS:  And sorry, I got lost there.
22    Q.  (BY MR. RUKAVINA)  Yes.  So my predicate was
23  you testified before that you were assuming that these
24  payments were because of a cash need at Highland;
25  right?

---

**42**

1    A.  Correct.
2    Q.  So with that predicate my question is, do you
3  recall discussing with Dondero or Waterhouse or with
4  anyone as to why NexPoint would be transferring money
5  to Highland at that time?
6    A.  Yes, I would have had conversations with
7  Mr. Dondero or Mr. Waterhouse.
8    Q.  And do you remember specifically in 2019 why
9  these transfers were made from NexPoint as opposed to
10  some other Dondero entity?
11    A.  Not with specificity, but certainly NexPoint
12  was generating cash at that time, and had the ability
13  to assist with Highland's liquidity.
14    Q.  So sitting here today, you've told me
15  generally and logically that you have no specific
16  memory why between January 2019 and August 2019, any of
17  these payments on Exhibit 14 were made by NexPoint?
18    A.  I have no specific memory, but I would say
19  with certainty that most or all of this was driven by
20  Highland HCMLP liquidity needs.
21    Q.  And most or all of this would have been
22  Highland in the first instance going to NexPoint and
23  saying, hey, can you send us some cash?
24      MR. MORRIS:  Objection to the form of the
25  question.

---

**43**

1      THE WITNESS:  Yeah, the premise of that,
2  given that Mr. Dondero is in control of both sides,
3  it's a faulty premise.
4    Q.  (BY MR. RUKAVINA)  But you told me not that
5  long ago that in these weekly cash meetings that it
6  would be your team at Highland who would go to
7  Mr. Dondero and say Highland has a liquidity issue.
8        So wouldn't that liquidity issue have
9  originated with the Highland team?
10    A.  Mr. Dondero is the president of Highland.
11  He's the president of NexPoint.  We're employees of
12  Highland.  We're also shared services providers for
13  NexPoint.
14        The waters are very muddy in terms of who is
15  wearing what hat in that conversation.
16    Q.  But Mr. Dondero doesn't know that Highland
17  has a liquidity issue unless someone from the corporate
18  accounting group tells him, does he?
19      MR. MORRIS:  Objection to the form of the
20  question.  I hope that's not the case.
21      THE WITNESS:  He has the ability to know what
22  our cash position is at any given time, at that time.
23    Q.  (BY MR. RUKAVINA)  So why would you have
24  these weekly cash meetings with Mr. Waterhouse and
25  sometimes Mr. Dondero?

---

**44**

1    A.  So these were cash forecasts, looking at
2  outlook.  I can tell you almost without exception,
3  maybe -- with maybe without exception, be speculating,
4  but those forecasts would be showing negative numbers
5  at Highland, virtually nonstop.
6        And so it was important, my opinion, but it
7  was probably important to Frank to make sure that he
8  was getting in front of Jim to make sure that those
9  needs were being addressed timely.
10    Q.  So I've asked that question.  I want to ask
11  you a different question.
12        For any of these payments between
13  January 2019 and August 2019 reflected on Exhibit 14,
14  do you have any personal knowledge as to whether they
15  were intended to be prepayments or not?
16      MR. MORRIS:  Objection to the form of the
17  question.
18      THE WITNESS:  I don't know whether they were
19  intended to be prepayments at that time.
20    Q.  (BY MR. RUKAVINA)  Sitting here today, seeing
21  this document as a CPA and as a sophisticated person,
22  do you read this Exhibit 14 to indicate that those
23  payments were booked as prepayments?
24      MR. MORRIS:  Objection to the form of the
25  question.

---

David Klos - October 27, 2021

**45**

1    THE WITNESS:  Again, the term "prepayments"
2  is the one I'm struggling with.  I can ascertain that
3  there are payments and they're off schedule.  But I
4  don't know that I can ascertain that they're
5  prepayments.
6    Q.  (BY MR. RUKAVINA)  Well, if a borrower makes
7  a payment that's ahead of schedule, how would that
8  generally be accounted for?
9    MR. MORRIS:  Objection to the form of the
10  question.
11    THE WITNESS:  It would be accounted for as a
12  reduction of principal or interest or some combination
13  of the two.
14    Q.  (BY MR. RUKAVINA)  Which would relieve the
15  borrower of having to make that at some point in the
16  future; right?
17    MR. MORRIS:  Objection to the form of the
18  question.
19    THE WITNESS:  No.  The borrower still owes
20  the money.  This is showing 23-point -- pick a date.
21  May 31, 23.034-.  That there's significant obligations
22  that are still outstanding.
23    Q.  (BY MR. RUKAVINA)  So on June 4, 2019 -- I'm
24  sorry, on June 19, 2019, the borrower made a
25  $2.1 million payment.  That's what this shows; correct?

**47**

1  that the maker may pay outstanding accrued interest, or
2  unpaid principal.
3    Q.  (BY MR. RUKAVINA)  But my question is, as I
4  understand accrued interest, it means interest that has
5  already occurred or accrued as of the date, like
6  today's date; right?
7    A.  Uh-huh.
8    MR. MORRIS:  Objection to the form of the
9  question.
10    Q.  (BY MR. RUKAVINA)  Do you agree with that?
11    Do you agree with that?  Accrued interest
12  means interest that has already come due, that has
13  actually happened because interest happens over time.
14    A.  Accrued interest --
15    MR. MORRIS:  Objection to the form of the
16  question.
17    Q.  (BY MR. RUKAVINA)  Why don't you start.  Why
18  don't you define for me accrued interest.
19    A.  Sure.  Accrued interest would be outstanding
20  and unpaid interest that -- sorry, it's hard to define
21  it without using the term.  But it's interest that's
22  accumulated in respect of a principal amount through a
23  given date.
24    Q.  So how do you prepay accrued interest?
25    A.  How do you prepay accrued interest.  Again,

**46**

1    A.  I see that.
2    Q.  You're not saying that the borrower would
3  ever have to make that same $2.1 million payment again,
4  are you?
5    A.  No.  What I'm saying is, based on that 2.1-
6  payment -- and this is reading this cold.
7    But based on that 2.1- payment, 66,000 was
8  applied to interest, which left zero accrued interest
9  outstanding.  2.03- applied to principal, which left
10  24.7- and change still outstanding.
11    Q.  Well, I'm going to ask you about the
12  promissory note then, Exhibit 13, in particular
13  Section 3, where it says prepayment allowed.
14    And the first sentence says, may or -- pardon
15  me, maker may prepay in whole or in part the unpaid
16  principal or accrued interest of this note.
17    Do you see that, sir?
18    A.  Yes, I see that.
19    Q.  In your experience, can someone prepay
20  accrued interest?
21    MR. MORRIS:  Objection to the form of the
22  question.
23    THE WITNESS:  The document reads, maker may
24  prepay in whole or in part the unpaid principal or
25  accrued interest of this note.  So I read that to say

**48**

1  that's a little bit of a mental jumble.
2    Q.  Exactly.
3    A.  Well, what I'm...
4    Q.  To me one pays accrued interest.  But this
5  note says you can prepay accrued interest.  So I'm just
6  seeing whether you as a CPA, CFO and controller for
7  years agrees that one can prepay accrued interest?
8    MR. MORRIS:  Objection to the form of the
9  question.
10    THE WITNESS:  Frankly, I don't know if it's
11  possible.  That's not how I'm seeing it applied here,
12  based on the quick review of Exhibit 14.
13    Q.  (BY MR. RUKAVINA)  Well, the next sentence
14  says, any payments on this note shall be applied first
15  to unpaid accrued interest hereon, and then to unpaid
16  principal hereof.
17    Do you see that, sir?
18    A.  I see that.
19    Q.  Do you have any understanding based either on
20  your personal knowledge or in your expertise as a CPA
21  and a CFO as to what that sentence means?
22    MR. MORRIS:  Objection to the form of the
23  question.
24    THE WITNESS:  The way that I would read that
25  would be that for a payment, for example, pick a date,

David Klos - October 27, 2021

**49**

1  Exhibit 14 again, the $2.1 million payment on or about
2  June 19. I see that a payment was made.
3        And it was -- it appears that there was
4  accrued and unpaid interest at that time of 66,000. And
5  so the first 66,000 was applied to outstanding accrued
6  interest, to bring the balance to zero.
7        And the difference between that 66,000 and the
8  2.1 million was applied to principal.
9    Q.  (BY MR. RUKAVINA) Do you believe, whether
10  from personal knowledge from this note, Exhibit 13, or
11  your experience at Highland or as a CPA, that one can
12  say that interest, accrued interest will be due on a
13  future date, it will accrue by that date, but I'm going
14  to pay it earlier as of that date?
15      MR. MORRIS: Objection to the form of the
16  question.
17      THE WITNESS: If I can rephrase back to you
18  just so I make sure I'm understanding the question.
19  You're saying could someone say, I would like to prepay
20  interest into the future. It hasn't accrued yet, but
21  it will be accrued by end of year.
22        And I would like to be prepaid effectively
23  with respect to that interest, and then have the
24  remainder used to pay down principal.
25        The question is, can someone do that?

**50**

1    Q.  (BY MR. RUKAVINA) Yes.
2      MR. MORRIS: I object to the question.
3      THE WITNESS: I suppose it's possible, but
4  that certainly wasn't the practice if that makes sense.
5    Q.  (BY MR. RUKAVINA) That does make sense. I'm
6  still struggling, and again, I'm not trying to be a
7  smart aleck. I'm still struggling with the first
8  sentence of paragraph 3, that maker may prepay accrued
9  interest.
10        And it sounds like to me like you don't
11  necessarily have a definitive answer as to what that
12  might have meant either.
13      MR. MORRIS: Objection to the form of the
14  question.
15      THE WITNESS: I think the document speaks for
16  itself in that sentence.
17    Q.  (BY MR. RUKAVINA) But have you seen
18  something like this, to your recollection, in other
19  Highland promissory notes?
20    A.  Something like what?
21    Q.  Prepaying accrued interest.
22    A.  Yes, I have seen that.
23    Q.  What's your memory? Where have you seen
24  that?
25    A.  I can't remember a specific note, but I

**51**

1  believe that has been done in a specific circumstance.
2    Q.  So at least at Highland, you would believe
3  that that phrase, prepaying accrued interest, had some
4  established meaning at Highland?
5      MR. MORRIS: Objection to the form of the
6  question.
7      THE WITNESS: No, I don't agree with that.
8    Q.  (BY MR. RUKAVINA) Okay. You understand, of
9  course, that it's Highland's position that with respect
10  to this note, a payment was due on December 31 of 2020
11  that wasn't made; correct?
12    A.  Yes, it's my understanding -- if I can state
13  it back just so I make sure I'm getting it correctly.
14  It's my understanding that there was a payment due on
15  December 31, 2020, that wasn't made timely, yes.
16    Q.  Okay. Do you know why that payment wasn't
17  made timely?
18    A.  By recollection, because Mr. Dondero had
19  directed people not to process payments from Highland
20  affiliates to Highland.
21    Q.  When did you learn of that?
22    A.  Early December 2020.
23    Q.  How did you learn of that?
24    A.  I don't specifically remember the
25  conversation, but I know I had conversations with both

**52**

1  Kristin and Frank. I can't remember if those were
2  individual or collective, but we understood that to be
3  the marching orders.
4    Q.  Did you hear Mr. Dondero say anything like
5  that?
6    A.  I did not.
7    Q.  Did Mr. Waterhouse tell you that Mr. Dondero
8  said something like that to him?
9    A.  Yes.
10    Q.  Okay. Separately, do you remember whether
11  Ms. Hendrix told you that Mr. Waterhouse told her that,
12  or would it have been kind of at the same meeting?
13    A.  I don't remember specifically. It would have
14  been all around the same time.
15    Q.  And to the best of your recollection, what
16  words -- strike that.
17        To the best of your recollection, did
18  Mr. Waterhouse include a reference to promissory notes
19  and the Advisors when he said that Dondero told him not
20  to make payments?
21      MR. MORRIS: Objection to the form of the
22  question.
23      THE WITNESS: I don't remember the specific
24  words that Mr. Waterhouse used. My clear impression
25  was that it was a very global instruction.

David Klos - October 27, 2021

---

**53**

1        And I should clarify also that, you know, at
2  this time, I think as we covered in my background.
3        At this point I had assumed the chief
4  accounting officer role, so I wasn't necessarily in
5  the -- in as much of the chain of command as I had been
6  previously to taking that role, where that sort of thing
7  might have come from Frank, to me, to Kristin.
8        By this time, Frank and Kristin were
9  communicating and I was sometimes in the loop, sometimes
10 not.
11       Q.  (BY MR. RUKAVINA)  Did Mr. Waterhouse tell
12 you why Dondero had told him that?
13       A.  I don't remember with any specificity.
14 However, my perception at the time was that at this
15 time the relationship between Mr. Dondero and Mr. Seery
16 was hopelessly broken, and that this was Jim Dondero,
17 you know, gearing up for a fight in the future.
18       Q.  Prior to December of 2020, had you prepared a
19 report showing potential overpayments that NexPoint and
20 HCMFA had made on account of shared services and
21 payroll reimbursement?
22       MR. MORRIS:  Objection to the form of the
23 question.
24       You can answer.
25       THE WITNESS:  I know the analysis that you're

---

**54**

1  talking about.  I would not characterize it the way
2  that you characterized it.
3        Q.  (BY MR. RUKAVINA)  And we'll talk about this
4  more in November, so I really don't want to go into any
5  detail, unless you feel the need to.
6        But, so you did not prepare that analysis?
7        MR. MORRIS:  Objection to the form of the
8  question.
9        THE WITNESS:  I prepared an analysis that
10 differed from how you described it.
11       Q.  (BY MR. RUKAVINA)  How would you describe it,
12 in a nutshell?
13       A.  I would describe it as I was asked to refresh
14 a spreadsheet using certain assumptions, based on the
15 direction of Frank Waterhouse, and I updated and I sent
16 him an email.
17       Q.  Do you have any understanding that that
18 analysis was then shared with Mr. Dondero by
19 Mr. Waterhouse?
20       A.  I know that now.  I didn't know that at the
21 time.
22       Q.  Do you have any understanding -- strike that.
23       Did you have any understanding that as of
24 early December 2020 the reason why Mr. Dondero said
25 what he said to Mr. Waterhouse was because that

---

**55**

1  analysis, right or wrong, suggested that the Advisors
2  had made large overpayments?
3        MR. MORRIS:  Objection to the form of the
4  question.
5        THE WITNESS:  No, that's incorrect.
6        Q.  (BY MR. RUKAVINA)  Why is that incorrect?
7        A.  Because by recollection, to the best of my
8  recollection, that analysis didn't occur until after
9  Dondero had told Frank no more payments.
10       Q.  Is that the only reason why you might suspect
11 that what I just said was incorrect?
12       MR. MORRIS:  Objection to the form of the
13 question.
14       THE WITNESS:  Yeah, I don't know how to
15 answer that.
16       Q.  (BY MR. RUKAVINA)  I'm going back, when I
17 asked you, did Waterhouse tell you why Dondero gave the
18 direction, you said no.
19       MR. MORRIS:  Objection to the form of the
20 question.
21       THE WITNESS:  Sorry, I'm not sure.  If I
22 could have the question asked again, I'd be happy to
23 answer.
24       Q.  (BY MR. RUKAVINA)  I'll ask it again.
25       Mr. Waterhouse tells you that Mr. Dondero

---

**56**

1  basically said no more payments; right?
2        A.  Yes.
3        Q.  And, but he did not tell you why Mr. Dondero
4  said that?
5        A.  Not that I can recall.
6        Q.  So he might have?
7        A.  He might have.  I don't specifically
8  remember.
9        Q.  Do you recall asking him or anyone else why
10 Dondero would have said that?
11       MR. MORRIS:  Objection.  Asked and answered.
12       THE WITNESS:  I don't recall specifically
13 asking.
14       Q.  (BY MR. RUKAVINA)  Do you recall telling
15 Mr. Seery that Dondero said anything like that?
16       A.  At what point in time?
17       Q.  Prior to December 31, 2020.
18       A.  No, I did not.  I did not say that to
19 Mr. Seery.
20       Q.  In your mind was there any present
21 understanding or concern that NexPoint therefore
22 wouldn't make a scheduled December 31, 2020, payment?
23       A.  Was there any concern that they wouldn't?
24       Q.  Yeah.
25       A.  I would never use the word "concern."  At

---

David Klos - October 27, 2021

---

57

1  that point I wasn't even on the team anymore, so I hate
2  to say it's other people's problem, but I had my hands
3  full with plenty of other things. It wasn't something
4  I was thinking about.
5      Q. Do you remember here today that prior to
6  December 31, 2020, you believed that NexPoint would not
7  make the scheduled payment?
8      MR. MORRIS: Objection to the form of the
9  question.
10     THE WITNESS: I had no idea whether NexPoint
11 was going to make the payment.
12     Q. (BY MR. RUKAVINA) Were you asked prior to
13 December 31, 2020 by Mr. Seery or anyone else as to
14 whether NexPoint was going to make that payment?
15     A. Was I asked by Mr. Seery? Not that I can
16 remember.
17     Q. Prior to December 31, 2020, do you recall any
18 discussion with Mr. Seery about the NexPoint note?
19     MR. MORRIS: I'm sorry, can I have the
20 question again.
21     Q. (BY MR. RUKAVINA) Prior to December 31,
22 2020, do you recall any discussion that you had with
23 Mr. Seery about this NexPoint note?
24     A. Not that I can remember. If there was, it
25 would have been in a cash meeting, but I don't remember

---

58

1  at all.
2      Q. So it might have been some detail as part of
3  a larger discussion, but you don't remember any
4  specific discussion just around this note?
5      A. No.
6      Q. When did you learn or how did you learn that
7  the December 31 payment had not been made?
8      A. I'm not sure, but certainly after
9  December 31.
10     Q. Do you recall if it was before or after
11 January 7?
12     A. I think it was after.
13     Q. The default letter from Highland is in here,
14 if you need to see it. I'm just telling you it's the
15 January 7.
16     Do you recall having any role with respect to
17 drafting the default letter that went out to NexPoint
18 after the failed payment?
19     A. No, none that I can remember.
20     Q. How do you recall learning that the note had
21 been called by Highland?
22     A. I honestly don't remember. I think after the
23 fact. I couldn't tell you how far after the fact.
24     Q. Are you aware that on or about July -- I'm
25 sorry, January 14, 2021 NexPoint made a $1.4 million

---

59

1  and change payment?
2      A. Yeah, I'm aware that that payment happened.
3      Q. When did you become aware of that payment?
4      A. I think after it happened.
5      Q. Can you tell us, was it days, weeks, months
6  later?
7      A. It was that day. And if I can expand, I
8  recall getting an email, seeing a large inflow to
9  Highland, to MLP because I was on an email distribution
10 list that had those payments.
11     And I think I emailed or called Kristin and
12 asked her, is this the NexPoint note, because it was a
13 large amount of money. And she said yes.
14     Q. Did she tell you anything more about that
15 payment, when it had been made, why, who authorized it?
16     A. I had that information of when it had been
17 sent. I had a wire confirm.
18     Q. Only important thing to you is where did that
19 money come from?
20     A. It wasn't important to me. It was more
21 curiosity.
22     Q. Did you have any discussions with anyone on
23 or about that time, January 14, 2021, as to why
24 NexPoint made that payment?
25     A. Not that I can remember.

---

60

1      Q. Did you have any discussion with anybody on
2  or about that time, January 14, 2021, as to how HCMLP
3  should account for that payment?
4      A. No.
5      Q. Did you have any discussion with Mr. Seery at
6  all about whether that payment should or shouldn't
7  reinstate the note?
8      A. No discussion that I can remember.
9      Q. Is it fair to say that any of those
10 considerations would have been at that point in time
11 above your paygrade?
12     MR. MORRIS: Objection to the form of the
13 question.
14     THE WITNESS: Yeah, paygrade, I don't know
15 how to respond to that. Like I said before, I wasn't
16 on the team at that point. I wouldn't have been
17 involved in that determination regardless of my
18 compensation.
19     Q. (BY MR. RUKAVINA) So you know and you
20 remember that in early December 2020 Frank Waterhouse
21 told you that Dondero had directed no more payments by
22 the Advisors. And you know that a payment was made on
23 January 14.
24     And that's pretty much the extent of your
25 knowledge about the missed December 31 payment?

---

David Klos - October 27, 2021

**61**

1      MR. MORRIS: Objection to the form of the
2  question.
3      THE WITNESS: Yeah, it's a very broad
4  question. In general terms, yes.
5      Q. (BY MR. RUKAVINA) Well, I'm not asking what
6  you learned since then.
7      I'm asking that as of, let's say, January 15,
8  2021 that would have been the extent of what you would
9  have known?
10     A. Correct. And if I can just restate and make
11 sure I understand what I'm saying.
12     It would have been my understanding that we
13 had had an instruction -- when I say "we," Kristin and
14 Frank and by default the whole corporate team -- not to
15 make payments from these affiliated entities.
16     To my knowledge, none of those payments had
17 occurred since that point. And then on or about
18 January 14, such a payment was made and I found out
19 about that by seeing a wire confirm.
20     Q. Well, you mentioned a couple times that you,
21 in December 2020, you weren't part of that group
22 anymore. So do you have any understanding as to why
23 Mr. Waterhouse would have told you in particular, you
24 being Mr. Klos, about that instruction from Dondero?
25     A. Sure. I still was participating in cash

**62**

1  meetings, even if it was almost in a nominal role,
2  because of some of my history that I had. So I was
3  still participating in those meetings.
4      I've worked closely with Kristin for a long
5  time, so I may have caught up with her informally. But
6  as far as day-to-day duties, I wasn't part of that team
7  anymore.
8      Q. And is it your, did I understand you
9  correctly, is it your testimony that Mr. Waterhouse
10 informed the whole accounting group there, the
11 corporate accounting group, of Mr. Dondero's
12 instruction?
13     A. I don't know specifically who he told, if he
14 told every single member of the team, but he certainly
15 told Kristin and Kristin was the head of the team.
16     Q. And you don't recall anyone, after you heard
17 about that instruction, raising any concern to the
18 effect that NexPoint is going to default and be in
19 trouble if that payment isn't made?
20     A. I don't remember any discussion to that
21 effect.
22     Q. Do you remember anyone suggesting that they
23 ought to try to dissuade Mr. Dondero from that
24 direction?
25     A. Not that I can remember.

**63**

1      Q. Do you remember any discussion at that
2  approximate point in time for your cash meetings or
3  anything else as to whether NexPoint had made any
4  prepayments on the promissory note?
5      MR. MORRIS: Objection to the form of the
6  question.
7      THE WITNESS: Yeah, it's very hard to -- by
8  the way, I've said yeah a few times. I want to make
9  clear that that's just --
10     Q. (BY MR. RUKAVINA) That's not a yes?
11     A. I apologize for that.
12     Q. Understood. Yeah means, it's not a yes.
13     MR. MORRIS: It's a pause; it's an um.
14     Q. (BY MR. RUKAVINA) Germans call it flavoring
15 particle.
16     A. Sorry, I got lost there. If you can ask
17 again.
18     Q. Yeah. Do you recall in November or
19 December 2020 in your weekly meetings or anything else,
20 any discussion whatsoever concerning whether NexPoint
21 had made any prepayments on its note?
22     A. No discussions of whether or not there had
23 been a prepayment that I can remember, no.
24     Q. To the best of your knowledge sitting here
25 today -- strike that.

**64**

1      For my next question, again we're assuming
2  that Exhibit 14 is what it appears to be.
3      A. Sure, sure.
4      Q. So with that qualification, to the best of
5  your knowledge, other than what's on Exhibit 14, can
6  you think of any other record or source or document
7  that would address whether any unscheduled payments by
8  NexPoint would or wouldn't be prepayments on the note?
9      MR. MORRIS: Objection to the form of the
10 question.
11     THE WITNESS: Again, with the struggle of the
12 prepayment, this is the document that I would expect to
13 explain how the payment was applied.
14     Q. (BY MR. RUKAVINA) But you yourself did not
15 play any role in deciding how the payment would be
16 applied?
17     A. I'd hesitate to say no role, because the team
18 ultimately rolls up to me.
19     Q. You personally?
20     A. Me personally, I wouldn't have prepared these
21 schedules.
22     Q. Or decided, you personally, as Mr. Klos, how
23 any unscheduled payments should be accounted for by
24 Highland?
25     A. Correct, not without some -- some

David Klos - October 27, 2021

---

**65**

1  authoritative direction on how they should be applied.
2      Q.   And that authoritative direction would have
3  come from Mr. Waterhouse or Mr. Dondero?
4      A.   That's what I would expect.
5      Q.   Could it have come from anyone else that you
6  can think of here today?
7      A.   Not that I can think of.
8      Q.   Now we're going to switch gears and I think
9  we're going to stop discussing the NexPoint note, and
10 we're going to focus on the HCMFA two promissory notes.
11     A.   Sure.
12     Q.   So we're going to go back in time to
13 May 2019; okay?
14     A.   Sure.
15     Q.   And is it fair to say by -- that by May 2019
16 there were at least dozens if not hundreds of instances
17 of intercompany loans in the years leading up there
18 from Highland to one of the other entities?
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  From Highland to one of the
22 other entities.  Can you help with other entities.
23     Q.   (BY MR. RUKAVINA)  Advisors, the trusts, any
24 of the Dondero entities?
25         MR. MORRIS:  Objection to the form of the

---

**66**

1  question.
2          THE WITNESS:  Yes, there would have been many
3  loans over the years.
4      Q.   (BY MR. RUKAVINA)  And do I understand that
5  most, if not all, of those loans should have been
6  papered up with a written promissory note?
7          MR. MORRIS:  Objection to the form of the
8  question.
9          THE WITNESS:  Should have been.  To the
10 extent that they were for a promissory note, then yes.
11     Q.   (BY MR. RUKAVINA)  So in the May 2019 time
12 frame, was there a regular pattern or course or
13 procedure in place as to how a promissory note would be
14 physically prepared and presented for approval?
15         MR. MORRIS:  Objection to the form of the
16 question.
17         THE WITNESS:  Yeah, when you say a process,
18 can you please clarify that for me.
19     Q.   (BY MR. RUKAVINA)  Sure.  Let's look at these
20 two promissory notes and maybe that will help frame the
21 question.  And I apologize for not having them right
22 here.
23     A.   It might be --
24         MR. MORRIS:  1 and 2.
25         MR. RUKAVINA:  Yes.

---

**67**

1      Q.   (BY MR. RUKAVINA)  Are you familiar with
2  Exhibits 1 and 2, sir?
3      A.   Yes, I am.
4      Q.   Do you remember them from back -- strike
5  that.
6          Did you have any role, to your knowledge,
7  with the preparation of Exhibits 1 and/or 2?
8      A.   With the preparation of the documents?
9      Q.   Yeah.
10     A.   No.
11     Q.   But you did have some role with these
12 promissory notes?
13     A.   Yes.
14     Q.   And I'm trying to find that email as well.
15 There's an email here from you.  I'll have it in a
16 moment.  That will help frame the question.
17         MR. MORRIS:  Exhibit 3.
18     Q.   (BY MR. RUKAVINA)  Do you recall that email,
19 sir?
20     A.   Not specifically, but it's right in front of
21 me.  I'm certain that I wrote this email.
22     Q.   You have no reason to deny or reject its
23 authenticity?
24     A.   I have no reason to reject it or question it.
25     Q.   Just give me a second.  I don't understand

---

**68**

1  what's going on with my exhibits.  I just don't
2  understand this.
3          (Off the record.)
4      Q.   (BY MR. RUKAVINA)  You have Exhibit 3 in
5  front of you?
6      A.   I do.
7      Q.   And it says, please send 2.4 million from
8  HCMLP to HCMFA.  This is a new interco.
9          Meaning intercompany; right?
10     A.   Correct.
11     Q.   This is a new intercompany loan.
12         Who told you that this was an intercompany
13 loan?
14     A.   Either Frank or Jim.  I would suspect Frank.
15     Q.   Do you have any present memory of him telling
16 you that with respect to this particular loan?
17     A.   I don't have a specific recollection, but
18 with a hundred percent certainty he or Jim would have
19 directed that.
20     Q.   Would they have directed the payment, or
21 would they have directed that it be papered as a loan,
22 or both?
23     A.   Both.
24     Q.   So in each instance -- well, let's take a
25 step back.

---

David Klos - October 27, 2021

**69**

1     So certainly either Jim or Frank directed you
2 to transfer the $2.4 million; correct?
3     A.  Either Jim or Frank would have directed, yes.
4 There's 0 percent chance I would have sent this email
5 if I didn't feel a hundred percent confident that this
6 was authorized in the way that I described in the
7 email.
8     Q.  But can you also say with certainty that
9 either Dondero or Waterhouse also told you that this
10 transfer is an intercompany loan?
11     A.  With a hundred percent certainty, yes.  I
12 can't say that necessarily with respect to Dondero,
13 because I don't remember if I would have talked to him
14 specifically about it.  But, yes, this would have been
15 clear that it's a loan.
16     Q.  You say clear.  Did someone tell you that
17 it's a loan, or are you just, because of the prior
18 10 years of course and conduct, logically deciding that
19 it has to be a loan?
20     MR. MORRIS:  Objection to the form of the
21 question.
22     THE WITNESS:  So this is -- this is not just
23 a situation of past practice.  I would have known with
24 certainty that this was a loan and that's what was
25 authorized.

**70**

1     Q.  (BY MR. RUKAVINA)  How would you have known
2 with certainty that it was a loan?
3     A.  I'll say in part because of past practice,
4 but also because of the nature of what the money was
5 going to be used for, and the background behind it.
6     Q.  So you knew that nature and that background?
7     A.  The nature and background of the 2.4 million,
8 yes.
9     Q.  So you've told me that in part -- I asked you
10 how did you know it was a loan.  You said in part past
11 practices, in part you knew the nature.  Anything else?
12     A.  I'm certain that given that I wrote this
13 email, which Frank is on, that I would have had a
14 conversation with Frank about what this was.
15     Q.  Was Jim Dondero in the corporate accounting
16 email?
17     A.  No, he wasn't.
18     Q.  So what is your understanding as to what this
19 $2.4 million was for?
20     A.  This related to -- well, to separate the
21 transaction, the 2.4- itself relates to a promissory
22 note.  That's what was executed.
23     HCMFA's use of the 2.4 million was to
24 reimburse a fund that it managed called Highland Global
25 Allocation Fund for a NAV error that had occurred

**71**

1 within that fund.
2     Q.  Who made that NAV error?
3     MR. MORRIS:  Objection to the form of the
4 question.
5     THE WITNESS:  Yeah, it's hard to answer that.
6 So the Highland Capital Management Fund Advisors is the
7 advisor to the fund, so they're the responsible party
8 for making the fund whole in the instances of NAV
9 errors.
10     Q.  (BY MR. RUKAVINA)  And did HCMFA contract out
11 with Highland for valuation services?
12     MR. MORRIS:  Objection to the form of the
13 question.
14     THE WITNESS:  I don't specifically remember
15 if they contracted for valuation services, but if you
16 tell me that they did, I'll take that at face value.
17 So yes, HCMFA utilized HCMLP for valuation services.
18     Q.  (BY MR. RUKAVINA)  Do you have any memory of
19 what human being or beings made that NAV error?
20     MR. MORRIS:  Objection to the form of the
21 question.
22     THE WITNESS:  It's -- in respect to people,
23 not particularly.  In respect to parties, Houlihan
24 Lokey was the service provider that performed the
25 valuation that resulted in the NAV error.

**72**

1     And as I described before, the valuation
2 function was housed at HCMLP by HCMLP employees
3 supporting that through, among other people, front
4 office, compliance, other parts of the organization as
5 well.
6     Q.  (BY MR. RUKAVINA)  So it was your
7 understanding that Highland was loaning $2.4 million to
8 HCMFA for HCMFA to compensate that fund?
9     A.  Yes.
10     Q.  Did you have any understanding that Highland
11 might have been, instead of loaning that money,
12 actually paying that money to HCMFA to compensate HCMFA
13 for Highland's valuation error?
14     A.  First, not Highland's valuation error.  But
15 second, no, there's no way that that would have been
16 what that payment was for.
17     Q.  Why can you say that there's no way that that
18 would have been what that payment was for?
19     A.  First, this wasn't the first NAV error that
20 ever occurred.  There had been other NAV errors.  There
21 were other NAV errors with respect to this valuation
22 that pertain to NexPoint Advisors.
23     There was no reimbursement from HCMLP to
24 NexPoint or HCMFA, regardless of any individual being
25 identified as the person.  That had just never occurred

David Klos - October 27, 2021

**73**

1  to my knowledge.
2      Second, the amount was to meet the liquidity
3  need of HCMFA. It wasn't to -- it wasn't to
4  dollar-for-dollar make up for the NAV error. It was
5  that's how much money HCMFA needed.
6      Third, it was definitely Dondero's practice
7  and preference to have expenses at HCMFA for tax
8  purposes. So if this was compensation, he would
9  ultimately not really be benefiting from the deduction
10  so.
11      That would have been a strong preference of
12  his against having it be compensation.
13      So it would have been excruciatingly clear
14  that this was a loan for liquidity for HCMFA to make
15  the fund whole, just like it had in the past NAV
16  errors.
17      Q. How did you know that HCMFA needed
18  $2.4 million for liquidity?
19      A. At that point I was still part of the
20  corporate team, so I had a good sense of how much cash
21  HCMFA would have had at any given moment. And at that
22  given moment it would not have had -- I'd be shocked if
23  it had even 2.4-.
24      Probably would have had probably between
25  a million and 2 million if I had to speculate.

**74**

1      Q. Okay. So you've given the reasons why this
2  was clearly a loan.
3      But you never heard Mr. Dondero say that this
4  was a loan, did you?
5      A. I don't remember. It's possible I did, but I
6  don't specifically remember.
7      Q. Okay. What about the $5 million loan on the
8  day after? What was that $5 million for?
9      A. That was similar but different. So again,
10  HCMFA needed liquidity. This time this was for --
11  related to that same fund.
12      So Highland Global Allocation Fund had
13  converted from an open-end fund, mutual fund, to a
14  closed-end mutual fund.
15      And pursuant to that conversion there was a,
16  I believe it was called a consent fee, for any
17  investors of that fund who consented to the conversion,
18  that they would receive a 3 percent fee payable by the
19  investment advisor.
20      And so at this time the bill came due on that
21  because the conversion had been completed, and the
22  accounting for how much that 3 percent was going to be
23  was complete.
24      HCMFA sure as hell didn't have 5 million
25  bucks. Excuse my language. Highland needed to pay

**75**

1  HCMFA for the liquidity. HCMFA made the payment to the
2  fund. It wasn't dollar for dollar. I think it was
3  like 5,019,000, or some such number.
4      But 5 million was the number that would allow
5  it to make that payment effectively to the investors of
6  Global Allocation Fund.
7      Q. Do you have any understanding as to why
8  Highland, as opposed to some other entity, was
9  transferring $7.4 million?
10      A. Highland as opposed to some other entity?
11      Q. Uh-huh.
12      A. Because Highland had the money.
13      Q. But I think we've established earlier that in
14  the first seven months of 2019, Highland was having
15  constant liquidity issues?
16      A. It was.
17      Q. And that's part of the reason that NexPoint
18  was making unscheduled payments on its note; right?
19      A. That's part of the reason NexPoint was making
20  unscheduled payments on its note, yes.
21      Q. So your recollection is that HCMFA needed
22  $2.4 million for liquidity purposes and about
23  $5 million for the consent fee. And Highland
24  transferred those funds because Highland had the funds?
25      A. Yes. And I should clarify that Highland only

**76**

1  had the funds because Mr. Dondero repaid personal notes
2  to HCMLP on the same days.
3      So he paid 2.4 million on May 2, which
4  Highland turned around and reloaned. And he paid 4.4-
5  on May 3, and Highland sent out 5-, so there's a
6  $600,000 difference. And my recollection is, he paid the
7  other 600,000 via note repayment within a few days.
8      Q. So this would have been part of some broader
9  transaction in Mr. Dondero's mind?
10      A. I would not characterize it that way.
11      Q. You established that HCMFA needed money. You
12  established that Highland temporarily had money because
13  Dondero provided it with money.
14      But you still don't know, sir, as a fact as
15  to whether that transfer was a loan or some other
16  payment from HCMFA -- I'm sorry from HCM, from debtor
17  to HCMFA?
18      MR. MORRIS: Objection to the form of the
19  question. Asked and answered a million times. It's in
20  the documents you're showing him.
21      THE WITNESS: It was a loan.
22      MR. MORRIS: Come on, Davor. With all due
23  respect, it's in the document. It's on the document.
24      Q. (BY MR. RUKAVINA) I'm being courteous and
25  respectful to you and I'd ask the same in return; okay?

David Klos - October 27, 2021

**77**

1    A.   Absolutely.  I apologize if I haven't been.
2    Q.   Mr. Dondero, would you agree, was the only
3  person that had the authority at the debtor to
4  authorize a transfer of 2.4- and then $5 million?
5    A.   At the debtor?
6        MR. MORRIS:  Objection to the form of the
7  question.
8    Q.   (BY MR. RUKAVINA)  Yes, at the debtor.
9    A.   No.
10    Q.   Who else could have transferred 2.4 million
11  or $5 million?
12    A.   Those are two different questions.  But if
13  you're asking who had the authority, certainly Frank
14  did as well.
15    Q.   So Frank had the authority.  Perhaps my
16  question was inartful.
17        Do you believe that Mr. Waterhouse would have
18  decided to transfer $2.4 million or $5 million without
19  Mr. Dondero's approval?
20        MR. MORRIS:  Objection to the form of the
21  question.
22        THE WITNESS:  Generally speaking, no, but I
23  don't know exactly what the form of the approval.  But
24  he certainly wouldn't have done that on his own without
25  discussing with Dondero.

**78**

1    Q.   (BY MR. RUKAVINA)  Do you believe that
2  Mr. Waterhouse had the ability on behalf of the debtor
3  to loan $5 million without Mr. Dondero's approval?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  I think he had the technical
7  authority to.  However, I don't believe in practice
8  that he ever would.
9    Q.   (BY MR. RUKAVINA)  Same question, $2.4
10  million?
11    A.   Same answer.
12    Q.   We've established that you never really had a
13  direct employment or types of a role for NexPoint --
14  I'm sorry, for HCMFA; right?
15    A.   Again --
16    Q.   To the best of your recollection?
17    A.   Best of my recollection I can't remember how
18  the titles transferred over or whatever, but I don't
19  believe I did.
20    Q.   Do you know whether Mr. Waterhouse in 2019
21  had the authority, without Mr. Dondero's approval, to
22  borrow $7.4 million on behalf of HCMFA?
23        MR. MORRIS:  Objection to the form of the
24  question.
25        THE WITNESS:  He had the authority to enter

**79**

1  into the note on behalf of HCMFA, yes.
2    Q.   (BY MR. RUKAVINA)  Was that something that he
3  would have done without Mr. Dondero's approval to your
4  understanding and practice at that time?
5        MR. MORRIS:  Objection to the form of the
6  question.
7        THE WITNESS:  Same answer that I gave before
8  with respect to Highland.
9    Q.   (BY MR. RUKAVINA)  So here's where I'm going
10  with all this.
11        Mr. Dondero's position, and tomorrow his
12  testimony will be, that he caused the $7.4 million to
13  be transferred not as a loan to HCMFA, but to
14  compensate HCMFA for various things including that NAV
15  error.
16        Other than perhaps you think he's lying,
17  would you have any knowledge, hearsay, document,
18  anything, to contradict Mr. Dondero's position?
19        MR. MORRIS:  Objection to the form of the
20  question.
21        THE WITNESS:  Yes.  I would point to the fact
22  that as it pertains to the $5 million note, if we're
23  separating issues, there's no other possibility of what
24  that money could be other than either a loan or equity.
25        It's not compensation.  Highland is under --

**80**

1  HCMLP has absolutely zero obligation in respect to that
2  consent fee.  So when Highland sends $5 million to HCMFA
3  there's nothing else that it can be.  That's Point 1.
4        Point 2, we're right in the middle of an audit
5  at this point.  Jim signs rep letters at this point.
6  He's being provided balance sheets throughout 2019 that
7  indicate the loans that Highland has on its books.
8        Balance sheets are being prepared in respect
9  of annual approvals for 15(c) for retail funds in the
10  fall.  Schedules are being created for bankruptcy after
11  we file in October.
12        Nobody says this is a mistake.  Frank is on
13  all of these emails.  Frank never questions it.
14        There's absolutely no evidence from that point
15  in time to whenever this defense got raised that would
16  indicate that anybody said that these weren't exactly
17  what they say they are.
18    Q.   (BY MR. RUKAVINA)  Are you aware that in
19  February or March 2019 some $5.2 million was paid from
20  insurance that HCMFA had to the fund for the NAV error?
21    A.   The amount sounds unfamiliar, but I'm aware
22  that insurance proceeds were paid from HCMFA to the
23  fund.
24    Q.   And do you think that it's impossible for a
25  sane, rational person to conclude that HCMFA had a

David Klos - October 27, 2021

---

**81**

1 claim against the debtor related to that NAV error?
2     MR. MORRIS: Objection to the form of the
3 question.
4     THE WITNESS: If it did, I don't know how
5 that's not insurance fraud for basically double
6 collecting insurance proceeds and then collecting it
7 again.
8     Q. (BY MR. RUKAVINA) So you believe, sir, that
9 if insurance pays a claim you have no more right to go
10 against a person who caused the fault?
11     MR. MORRIS: Objection to the form of the
12 question.
13     THE WITNESS: We can speak specifically here.
14 This is about a NAV error that an insurance company
15 reimbursed HCMFA for, which it then turned around and
16 paid for the fund.
17     So if it went to collect that same, let's use
18 round numbers, $5 million from Highland that it's
19 already collected from insurance, that sounds
20 inappropriate to me.
21     Q. (BY MR. RUKAVINA) Okay. But you don't know
22 whether that's allowed in Texas law or not, do you?
23     MR. MORRIS: Objection to the form of the
24 question.
25     THE WITNESS: No, I don't know whether it's

---

**82**

1 allowed under Texas law.
2     Q. (BY MR. RUKAVINA) So you don't know that if
3 you're hit by someone on the street and your medical
4 insurance pays your bills, you don't know that he still
5 has to pay you for the same bills?
6     MR. MORRIS: Objection to the form of the
7 question. I hope I don't miss my plane.
8     Q. (BY MR. RUKAVINA) You don't know that under
9 Texas law if someone hits you with their car and causes
10 you medical bills and your medical insurance pays those
11 bills, that you can still sue them for the same
12 damages?
13     MR. MORRIS: Objection to the form of the
14 question.
15     THE WITNESS: I'm not familiar at any level
16 of specificity with Texas law.
17     Q. (BY MR. RUKAVINA) Again, it just sounds
18 wrong to you that you could go after someone after
19 insurance pays, but you don't know legally one way or
20 the other?
21     A. Correct. I'm not a lawyer or expert in Texas
22 law. It feels wrong, yes.
23     Q. Okay. Going back to this email of yours,
24 Exhibit 3, do you recall whether there was a similar
25 email with respect to the $5 million note?

---

**83**

1     A. Yes, I am. I believe Kristin sent that one.
2     Q. Kristin sent that one?
3     A. I believe so.
4     Q. To whom?
5     A. Likely the same distribution group, but
6 that's speculation.
7     Q. Did you see such an email in the last week or
8 two?
9     A. I'm not certain, but probably. I have seen
10 email communication on or around May 3, but I don't
11 know specifically who all was on the email. I'm going
12 off what I would expect to see.
13     MR. MORRIS: If you're really interested,
14 it's right here. It was produced to you with
15 Bates 3763. And if you'd like to question the witness.
16     MR. RUKAVINA: When was it produced?
17     MR. MORRIS: I can't tell you. It's part of
18 the same package.
19     Q. (BY MR. RUKAVINA) So going back to this
20 Exhibit 3, sir, why did you ask Kristin, can you or
21 Hayley please prep a note for execution? Why then?
22     Remember, I was asking about what the course
23 or procedure was at that point in time.
24     A. Yeah, so nomenclature, procedure, process.
25     I would say the informal process for these

---

**84**

1 types of loans, they were frequent in nature, would be
2 for someone on the corporate accounting team to prepare
3 a note and have it executed.
4     Q. Okay. That was the standard course back
5 then?
6     A. Again, I don't know what standard course
7 means. That was fairly typical.
8     Q. Why would you not have asked someone in the
9 Highland legal department to prepare a note?
10     A. Because this was a legally reviewed document
11 as far as the form of the agreement. It's a one-page,
12 two-paragraph form that had been used for a long time.
13     So the only thing that would change with
14 respect to these notes would be the date, the amount,
15 likely the rate. I can't think of anything else
16 offhand that would have changed from note to note.
17     Q. After you asked Ms. Hendrix to prepare this
18 note, did you have any further role with respect to the
19 papering, preparation, or execution of that note?
20     A. Not that I can remember.
21     Q. Would you have had any role in having either
22 or both of the notes actually signed electronically or
23 by ink by Mr. Waterhouse?
24     A. Likely not, no.
25     Q. Do you know who decided to have

David Klos - October 27, 2021

**85**

1  Mr. Waterhouse as opposed to Mr. Dondero sign these two
2  promissory notes?
3      A.  I don't.
4      Q.  On the $5 million note, do you remember if
5  you had any role with respect to its physical papering
6  or execution?
7      A.  Not that I recall.
8      Q.  To the best of your memory, your role would
9  have been done by instructing your team, hey, here is
10 these new loans, go paper it up; is that accurate?
11     A.  On the upfront side.  I suppose my role would
12 have also included on the back end making sure that the
13 actual payment had occurred.  But that would have been
14 doing that realtime, seeing the funds went out, and
15 that, most importantly, that the consent fee had been
16 paid from HCMFA to the transfer agent.
17     Q.  How did you or anyone on your team know -- so
18 obviously, you know it's a $2.4 million loan because
19 that's what Waterhouse or Dondero told you; right?
20         How did you know it was a $2.4 million loan?
21     MR. MORRIS:  Objection.  Asked and answered.
22         THE WITNESS:  I knew that the NAV error was
23 2 million, I think it was 398,000, somewhere in that
24 ballpark.  And that 2.4- had been authorized for that
25 purpose.

**86**

1      Q.  (BY MR. RUKAVINA) Do you know who decided
2  what the interest rate in this note would be, or that
3  it would be a demand note as opposed to a term note?
4      A.  I don't specifically know who made that
5  decision.  However, the common practice for fund
6  advisors was to put -- was for the rate to equal the, I
7  forget if it was the short-term or long-term AFR.
8         And for the note to be demand, that was just
9  the standard -- that was the standard.
10     Q.  And I think I asked this, but just if I
11 didn't.
12         For either or both of these two notes, the
13 2.4- and $5 million note, did you have any role with
14 respect to Mr. Waterhouse signing them?
15     A.  No, not that I can remember.  I don't think I
16 did.
17     Q.  And you don't remember doing anything to get
18 his signatures?
19     A.  Not that I recall.
20     Q.  Nor would that have been something that you
21 would expect that you would have a role with?
22     A.  Certainly not in this instance.  Maybe to the
23 extent that nobody else was around and it was time
24 sensitive, but that wouldn't have been the case with
25 these, I don't believe.

**87**

1      Q.  Did you have any understanding in early May
2  of 2019 as to whether HCMFA was solvent or insolvent?
3      MR. MORRIS:  Objection to the form of the
4  question.
5         THE WITNESS:  Whether HCMFA was solvent or
6  insolvent?  I'm not a solvency expert, so I don't know
7  that I could even attempt to answer that.
8      Q.  (BY MR. RUKAVINA)  Did you have an
9  understanding as far as HCMFA goes on May 2, 2019, that
10 its liabilities exceeded its assets?
11     A.  I don't remember specifically where it stood
12 on assets versus liabilities.
13     Q.  Do you have any memory that by May 2, 2019,
14 the debtor had taken a couple prior demand notes from
15 HCMFA and made them not collectible prior to May 31,
16 2021?
17     A.  I know what you're referring to.  I wouldn't
18 characterize it that way.
19     Q.  How would you characterize it?
20     A.  I recall that there was a financial support
21 acknowledgment, I think it was the name of the
22 acknowledgment.
23         That described -- I can't remember if it
24 described those two notes specifically or just referred
25 to them, that there would not be collection sought on

**88**

1  those until May 31 of 2021.
2      Q.  Do you remember why that document was done?
3      A.  My recollection, and it could have been done
4  for other reasons, but my recollection of it was that
5  it was primarily audit-driven.
6         For the auditors to be comfortable that these
7  notes weren't going to be just called and FA not have
8  the ability to pay them right away.
9      Q.  Because it's true in April or May of 2019
10 HCMFA didn't have the ability to pay those notes;
11 correct?
12     A.  It didn't have enough cash to pay those.
13     Q.  And I think you mentioned before that in
14 May 2019 the auditors at the Highland level were
15 talking about rolling up prior demand notes into term
16 notes so the debtor would at least get some regular
17 cash flow; correct?
18     MR. MORRIS:  Objection to the form of the
19 question.
20         THE WITNESS:  No.
21     Q.  (BY MR. RUKAVINA) So you recall that -- I'm
22 sorry, that was 2017.  I was wrong; right?
23     A.  Correct.
24     Q.  So I guess here is my question, and I'm
25 struggling to understand this.

David Klos - October 27, 2021

**89**

1        So why would Highland be loaning an
2 additional $7.4 million in early May of 2019 to HCMFA
3 when HCMFA already was then unable to repay its debts
4 to Highland?
5        MR. MORRIS: Objection to the form of the
6 question.
7        THE WITNESS: Yeah, I kind of reject the
8 premise of the question, and these are all controlled
9 by Jim. And it's completely within his power at any
10 point in time to make any payment on any of the loans,
11 depending on where priorities sit.
12        So the idea that HCMFA -- that Highland would
13 be doing a credit analysis on HCMFA, determining that it
14 was unable to make that payment and, therefore, this is
15 a bad note, is a completely foreign, preposterous
16 concept at that time.
17        Q. (BY MR. RUKAVINA) And in May of 2019 isn't
18 it also, sir, the case that Mr. Dondero could have,
19 right or wrong, agree or disagree, said, that 7.4- is
20 going to compensate HCMFA for the NAV error as opposed
21 to being a loan?
22        A. No.
23        Q. That's not possible?
24        A. No.
25        Q. And why is that not possible?

**90**

1        A. As we discussed, the 5-, there's absolutely
2 no construct where that can be compensation for an NAV
3 error. It's not a NAV error. It's a consent fee.
4 Highland has absolutely no responsibility for that.
5        Highland also has no responsibility for the
6 2.4-, but if you want to assume that it did, that's
7 completely not the practice. It was Jim's preference
8 to do these via loans, and that's how it was booked.
9        Q. You're saying on the one hand Mr. Dondero can
10 absolutely control that one entity make a loan to
11 another, irrespective of credit worthiness, but he
12 can't decide that a transfer is compensation as opposed
13 to a loan?
14        MR. MORRIS: Objection to the form of the
15 question. Argumentative.
16        THE WITNESS: If he wants to call
17 $7.4 million compensation to himself or to HCMFA, I
18 just don't know how he does that. This is me being an
19 accountant. I don't know how that's possible.
20        If he wants to pay himself a $7.4 million
21 bonus from HCMFA, fine, he has the power to do that. If
22 he wants Highland to inject 7.4 million of equity into
23 HCMFA, he has the power to do that.
24        But sending the 7.4 million and calling it
25 something else, I don't know how he could do that.

**91**

1        Q. (BY MR. RUKAVINA) So it had to have been a
2 loan; correct?
3        MR. MORRIS: Objection to the form of the
4 question.
5        THE WITNESS: In these instances I know it to
6 have been a loan.
7        Q. (BY MR. RUKAVINA) Because of what
8 Mr. Waterhouse told you?
9        MR. MORRIS: Objection to the form of the
10 question. Asked and answered.
11        THE WITNESS: Yeah, it was my understanding
12 that these were loans.
13        Q. (BY MR. RUKAVINA) You know these 7.4- to be
14 loans even though you never heard Mr. Dondero say that
15 to you?
16        A. Yes, although to be fair, I don't know
17 whether I ever heard Mr. Dondero. It's possible he did
18 say it.
19        MR. MORRIS: Objection. Withdrawn.
20        Q. (BY MR. RUKAVINA) You have no memory that on
21 or before May 4, 2019 you heard Mr. Dondero say that
22 the $2.4 million transfer and/or the $5 million
23 transfer to HCMFA were loans?
24        A. I have no specific recollection, but such a
25 conversation is just off the reservation impossible.

**92**

1 That there's no way -- there's no way -- there's no way
2 that it would have been described that way and there's
3 a hundred percent that it's loan.
4        Q. Do you have any memory discussing prior --
5        MR. MORRIS: Objection. Asked and answered.
6 He's answered this a thousand times.
7        Q. (BY MR. RUKAVINA) Do you have any memory on
8 or before May 2, 2019 discussing the $2.4 million
9 transfer with Mr. Dondero at all?
10        A. I do recall, I don't remember the time, but I
11 do remember discussing the NAV error in general terms
12 and the potential magnitude of that. I don't remember
13 specifically when that occurred.
14        Q. At least in your discussion with Mr. Dondero,
15 the $2.4 million loan or note was somehow linked to the
16 NAV error?
17        A. Linked to the NAV error is strong. It
18 related to the NAV error from the standpoint that
19 that's what Highland was loaning HCMFA the money for,
20 because HCMFA couldn't otherwise make the payment
21 itself.
22        Q. You just said Highland was loaning the money
23 for. Are you remembering now Mr. Dondero saying that
24 or are you just extrapolating?
25        A. No, I'm explaining rationally what the

David Klos - October 27, 2021

---

**93**

1  situation was.
2  Q.  Do you remember on or before May 3, 2019
3  discussing the $5 million transfer with Mr. Dondero?
4  A.  Again, in general terms.  I couldn't tell you
5  a time period, but this was something that, between
6  Frank and I, we had put on Jim's radar that this would
7  be a cash need in the future.  I couldn't specify
8  specifically when that happened.
9  Q.  Okay.  You have no present memory of
10  discussing that issue with Mr. Dondero on or before
11  May 3, 2019?  It must have happened but you have no
12  memory?
13  MR. MORRIS:  Objection to the form of the
14  question.
15  THE WITNESS:  We discussed that there would
16  be a consent fee payable from HCMFA.  We would have
17  discussed -- and again, I don't remember where I was,
18  what day it was, the specifics around the conversation.
19  But I know that we had conversations
20  pertaining to cash, because this was a large need for --
21  cash need for HCMFA to satisfy this, and this was an
22  important payment.
23  And neither HCMFA nor Highland had the
24  wherewithal to make that payment.  The only way that
25  those could make the payment was by Jim Dondero repaying

---

**94**

1  loans that he owed to HCMLP.  So we absolutely discussed
2  that with Jim Dondero.
3  Q.  (BY MR. RUKAVINA)  And with respect to
4  everything that we just talked about and your
5  recollection, you still don't remember Mr. Dondero
6  saying to you or Mr. Waterhouse one way or the other
7  that one or both of these transfers were loans?
8  MR. MORRIS:  Objection to the form of the
9  question.  Asked and answered.
10  THE WITNESS:  Yeah, again --
11  Q.  (BY MR. RUKAVINA) Just yes or no.  This is a
12  yes-or-no question.
13  MR. MORRIS:  Let him answer the question.
14  MR. RUKAVINA:  If he'll answer the question
15  I'll stop asking him --
16  MR. MORRIS:  He's allowed --
17  Q.  (BY MR. RUKAVINA)  The answer [verbatim] is,
18  do you remember --
19  A.  I don't remember Jim's exact words two and a
20  half years ago in respect to authorizing these
21  payments.  So to answer your question, no, I don't
22  specifically remember him saying these are loans.
23  But every other fact around this tells me
24  that we did have that conversation and that was the
25  conclusion and that was the direction.

---

**95**

1  Q.  So it's possible that Mr. Dondero told no one
2  that these were loans but because y'all have been doing
3  it this way for 10 years, that everyone, all of you
4  CPAs, understood that it had to be a loan?
5  MR. MORRIS:  Objection to the form of the
6  question.
7  Q.  (BY MR. RUKAVINA)  My question is, is that
8  possible?
9  A.  I really don't think it's possible.  I
10  suppose people say anything is possible.  Again, two
11  and a half years ago, I'm certain that that was the
12  intent at the time and I'm sure it was communicated as
13  such.  I just don't have a specific recollection.
14  MR. RUKAVINA:  Thank you.
15  I'll pass the witness.
16  MR. MORRIS:  Michael, do you have any
17  questions?
18  MR. AIGEN:  I do.  I assume you want me to
19  start now to do my best to be done at 5:00?
20  MR. MORRIS:  Yes, please.
21  EXAMINATION
22  Q.  (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23  name is Michael Aigen with the Stinson law firm.  I
24  represent Mr. Dondero, HCMS, and HCRE.
25  How are you today?

---

**96**

1  A.  I'm very good, thank you.
2  Q.  First topic I wanted to ask you about is the
3  defense raised by some of the defendants related to an
4  oral agreement and condition subsequent.
5  So my question for you generally is, are you
6  aware that some of the defendants in these proceedings
7  have raised a defense that there was a subsequent oral
8  agreement allowing notes to be potentially forgiven if
9  certain events occur?
10  A.  Yeah, I'm generally aware of the defenses
11  sitting here today.
12  Q.  And how are you generally aware of this
13  defense?
14  A.  I don't know with specificity.  Potentially
15  through just document flow on the bankruptcy side,
16  potentially with conversations internally or with
17  counsel.  But I generally understand them to have been
18  raised, the defenses that is.
19  Q.  And I don't want to get into conversations
20  with counsel.  I'm not allowed to do that.
21  Let me ask you, have you had any
22  conversations with anyone other than counsel about this
23  subsequent oral agreement defense?
24  A.  I have had general conversations with
25  Mr. Seery about it.  And other than that, nothing

---

David Klos - October 27, 2021

**97**

1 substantive.
2     Q. And what did you discuss about this with
3 Mr. Seery?
4     A. I've discussed with him, I hate to phrase it
5 this way, the ridiculousness of the defense. Under
6 oath. I've discussed my general understanding of what
7 is being asserted as a defense.
8     Which is that there was some sort of an oral
9 agreement between Jim and his sister at some point in
10 the past pertaining to forgiveness of certain
11 promissory notes that was conditional upon Highland
12 monetizing any of three PE assets for any amount above
13 cost.
14     Q. And is it fair to say that prior to these
15 lawsuits being brought, you weren't aware of any oral
16 agreements related to the promissory notes related to
17 potential forgiveness?
18     A. That's correct. Not that I can remember, and
19 I think I would remember.
20     Q. And other than your conversations with
21 Mr. Seery and counsel, you haven't had any
22 conversations with anyone else about these alleged oral
23 agreements; is that fair to say?
24     A. I'm not sure I understand the question.
25     Q. You told me you may have had questions with

**98**

1 counsel about these oral agreements defense, and you
2 told me about conversations with Mr. Seery, so I'm
3 trying to close that topic.
4     Was there anyone else you had any
5 conversations with about this alleged oral agreement?
6     A. Like I said before, nothing of substance.
7 I've probably mentioned it in passing to other
8 employees, this is what I understand is being asserted
9 in this, but nothing of substance.
10     Q. Do you have any personal knowledge as to
11 whether Mr. Dondero or Ms. Dondero entered into any
12 type of oral agreement prior to the bankruptcy?
13     A. No, not other than what's been pled, or
14 whatever the terminology is.
15     Q. I want to talk a little bit about, you
16 touched on earlier, you gave some testimony about how
17 in -- there were certain term loans that had payments
18 due in December or on or about December 31, 2020.
19     Do you remember talking about that?
20     A. Yeah, generally.
21     Q. And I don't know if you're specifically
22 referring to these loans, but is it also your
23 understanding that HCMS and HCRE also had payments that
24 were due on December 31, 2020?
25     A. Yes.

**99**

1     Q. Is it fair to say that if those payments were
2 to be made, it would have been Ms. Hendrix that would
3 have gone and effectuated those payments?
4     MR. MORRIS: Objection to the form of the
5 question.
6     THE WITNESS: Can you remind me the entities
7 again.
8     Q. (BY MR. AIGEN) Sorry. HCMS and HCRE
9 Partners.
10     A. HCMS, yes. HCRE, I'm not sure, maybe.
11     Q. Why might it have been different?
12     A. I just don't recall who had the, you know,
13 kind of bank access to effectuate that payment. I
14 think Kristin did but I'm not certain.
15     Q. It wouldn't have been you; is that fair to
16 say?
17     A. Correct. It would not have been me.
18     Q. And if Ms. Hendrix testified that the
19 instruction she received in December 2020 about not
20 making payments related only to the Advisors and not to
21 HMS or HCRE, would you have any reason to disagree with
22 her?
23     MR. MORRIS: Objection to the form of the
24 question.
25     THE WITNESS: Yeah, I was struggling with

**100**

1 that question. There was a lot to it. If you don't
2 mind.
3     Q. (BY MR. AIGEN) Okay. I'll repeat it. Maybe
4 that will help.
5     MR. MORRIS: Why don't you ask him about his
6 knowledge, instead of Kristin's. You had her as a
7 witness.
8     I'll continue to object. I don't know why
9 you're asking him about her knowledge.
10     MR. AIGEN: Do you want to keep coaching him?
11     MR. MORRIS: No, I'm trying to coach you.
12     MR. AIGEN: Oh, thanks. That's good.
13 Appreciate if you stop coaching your witness.
14     Q. (BY MR. AIGEN) If Ms. Hendrix testified that
15 the instructions she received in December 2020
16 regarding not making any more payments related only to
17 the Advisors and not to HMS or HCRE, would you have any
18 reason to disagree with her?
19     MR. MORRIS: Objection to the form of the
20 question.
21     THE WITNESS: I have no reason to question
22 Kristin's testimony. I'm sure she gave truthful
23 testimony.
24     Q. (BY MR. AIGEN) Are you aware of not or
25 whether Ms. Hendrix was told by Mr. Waterhouse not to

David Klos - October 27, 2021

**101**

1 make payments from certain entities in December of
2 2020?
3     MR. MORRIS: Objection to the form of the
4 question.
5     THE WITNESS: Yeah, I'm aware, and I think I
6 spoke to that earlier of the instruction that had come
7 down from Dondero through Frank to Kristin, and I was
8 certainly aware of it.
9     And I'm -- and I think I spoke to the fact
10 that, you know, certainly hearing it from a person who,
11 as I said before, wasn't really on the team at that
12 point, it was certainly my understanding that that was a
13 global instruction at the time.
14     Q. (BY MR. AIGEN) And I want to get into what
15 was actually said and what you remember, so let me ask
16 you this.
17     This instruction that came down started from
18 Jim and went to Frank. Is that your understanding?
19     A. That's my understanding.
20     Q. You weren't there during that discussion I
21 assume; is that correct?
22     A. Correct, I was not.
23     Q. And then Frank gave an instruction to
24 Kristin; is that your recollection?
25     MR. MORRIS: Objection to the form of the

**102**

1 question.
2     THE WITNESS: Yeah, it's my understanding
3 that Frank informed Kristin of that instruction.
4     Q. (BY MR. AIGEN) Were you there when Frank
5 provided this instruction to Kristin?
6     A. I don't believe I was.
7     Q. Then can I ask, how did you become aware that
8 Frank had given this instruction to Kristin?
9     A. Through subsequent conversations with Frank
10 and Kristin. As I said before, I don't recall if it
11 was the three of us or me and Frank or me and Kristin.
12 But subsequent conversations.
13     Q. Are we talking about conversations back in
14 2020 or after the bankruptcy?
15     MR. MORRIS: Objection to the form of the
16 question.
17     THE WITNESS: During 2020, December of 2020.
18     Q. (BY MR. AIGEN) Sitting here today, can you
19 say with a hundred percent certainty that the
20 instruction related to all of the entities as opposed
21 to just Advisors?
22     A. So as you pointed out, I was not party to the
23 direction, so I have no way of knowing with any sort of
24 specificity what the direction actually was. I just
25 know how it was conveyed to me and how I understood it.

**103**

1     Q. When you say it was conveyed to you, are you
2 talking about subsequent discussions that you had with
3 Ms. Hendrix and Mr. Waterhouse after they talked with
4 each other?
5     A. Yes.
6     Q. Sitting here today, can you tell me for sure
7 that one of them told you that this instruction related
8 to all of the entities, as opposed to just the
9 Advisors?
10     A. No, I can't say that with certainty, but I
11 think that that was the case. But, again, I can't say
12 with certainty.
13     Q. Would you defer to Mr. Waterhouse and
14 Ms. Hendrix over what the specific instructions were?
15     MR. MORRIS: Objection to the form of the
16 question.
17     THE WITNESS: Like I said, I wasn't part of
18 the conversation, so I would defer to people who
19 received the directions more directly.
20     Q. (BY MR. AIGEN) And you're not aware of
21 anything in writing or anything that reflects these
22 instructions on whether to pay or not to pay certain
23 payments in December of 2020?
24     A. No, I'm not aware of anything in writing.
25     Q. And let's change topics for a second here.

**104**

1     I want to throw out a term. Are you familiar
2 with the term "NAV ratio trigger period" as it was used
3 in --
4     A. In a very, very general sense, yes.
5     Q. And in a general sense what does that term
6 mean to you?
7     A. It's a term I recognize from the limited
8 partnership agreement of HCMLP. It's a defined term in
9 that agreement.
10     Q. To your knowledge, was the NAV ratio trigger
11 period ever reached or triggered prior to the Highland
12 bankruptcy?
13     A. I don't know the definition, so I don't know
14 based on the definition whether it had or hadn't.
15     Q. Sitting here today, though, it's not your
16 belief, based on your experience, that it was
17 triggered; is that fair to say?
18     MR. MORRIS: Objection to the form of the
19 question.
20     THE WITNESS: I don't know the consequence of
21 being in a trigger period, I guess is what -- how I'm
22 trying to answer your question.
23     Q. (BY MR. AIGEN) Have you ever had any
24 conversations with Nancy Dondero?
25     A. Yes.

David Klos - October 27, 2021

**105**

1    Q.  Generally, how many and what was the
2  reasoning?
3    A.  Probably less than five.  I think maybe only
4  one or two that I can really remember.
5    Q.  At a high level what were those conversations
6  about?
7    A.  From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10    Q.  And approximately when were these
11  conversations?
12    A.  I don't know.  Sometime between 2017 and
13  probably 2019.  I couldn't tell you with any
14  specificity.  These were very informal.
15    Q.  Fair to say that you've never had any
16  conversations with Nancy Dondero about any of the loans
17  at issue in this case?
18    A.  No, no, no, I've never had a conversation
19  with her like that.
20    Q.  And fair to say that you've never had any
21  conversations with Nancy Dondero about compensation for
22  Jim or any other officers at Highland?
23    A.  Correct.
24    MR. AIGEN:  Why don't we go off the record
25  for two minutes.  I think I'm either done or about

**106**

1  done.
2    (Off the record.)
3    Q.  (BY MR. AIGEN)  You understand you're still
4  under oath?
5    A.  Yes.
6    Q.  Are you aware of any loans that Highland has
7  made to any employees or officers that were forgiven in
8  all or in part?
9    A.  Yes.
10    Q.  Can you tell me who?
11    A.  I don't know that this will be a complete
12  list, but there were a few employees in the kind of
13  late aughts, maybe 2010, 2011 frame.
14    Q.  Do you know the names?
15    A.  One was Jack Yang.  Another, I'm not sure if
16  it was forgiven or not, that's why I'm hesitating, but
17  it was Tim Lawler.  I think his was forgiven in part or
18  in full, but I'm not a hundred percent certain.
19    Q.  And any other individuals that received loans
20  that were forgiven in part that you're aware of?
21    A.  Not that I recall, but there could be others.
22  Some of this is very, very old.
23    Q.  Changing topics here a little bit, I'm going
24  to combine two entities to try to speed this up.  If
25  you need to separate, that's fine.

**107**

1    Can you just generally explain to me what
2  services Highland Capital Management provided for
3  HCMS and HCRE?
4    A.  For HCMS -- I do need to separate these a
5  little bit.  For HCMS, really full-service accounting,
6  tax, treasury, cash payments.  I said tax.  Valuation.
7  Nothing personnel-wise because they didn't have any
8  employees.
9    That's all I can think of right off the top
10  of my head, but I could be missing some.
11    Q.  And what about HCRE?  How is that different?
12    A.  Similar, except different types of assets.
13  So more real estate, so less heavy.
14    Maybe not necessarily differences in terms of
15  the types of services, but services would have, I'd
16  say, more cash activity, more variety of investments,
17  which triggers different types of activities going on
18  at those entities.
19    But similar in terms of tax operations,
20  making payments.  HCRE didn't have employees, so no
21  payroll.  So these would be the broad areas that I
22  would think about.
23    Q.  And you mentioned making payments.  Would one
24  of those services that Highland provided for these two
25  entities include making loan payments on the term loans

**108**

1  like the term loans at issue in these proceedings?
2    MR. MORRIS:  Objection to the form of the
3  question.
4    THE WITNESS:  I think I mentioned before, I
5  couldn't remember whether or not Kristin was authorized
6  to make payments with respect to HCRE.  I think she
7  probably was, but I don't know that with certainty.
8    But, you know, for services, certainly Kristin
9  and her team would be responsible for making those
10  payments, subject to the proper authorization.
11    Q.  (BY MR. AIGEN)  And I'm sorry if I asked this
12  before.  If it wasn't Kristin for HCRE, do you have an
13  idea who it would have been?
14    A.  If not Kristin, it would have been Melissa
15  Schroth.
16    Q.  And how were those responsibilities split up?
17  What entities was Melissa Schroth responsible for?
18    A.  Generally speaking, Melissa was more
19  responsible for entities that were really, like -- I'm
20  going to use this in the most general sense, like Jim
21  entities, Jim's trusts, Jim personally.
22    And for HCRE it was kind of in the middle.
23  When it started out it kind of was more Jim world and
24  then over time it got more complex.
25    And as entities got more complex over time

David Klos - October 27, 2021

**109**

1 they tend to get transitioned from Melissa to corporate
2 accounting. And when they got really complex over to
3 another group of fund accountants.
4       So this is one that was, at its beginning,
5 Melissa was the, called primary accountant. And at
6 some point in time that transitioned to the corporate
7 accounting team. I can't remember when the cash
8 process kind of cut over.
9     Q. Is there a list somewhere saying Melissa is
10 responsible for these, Kristin for the others, or is it
11 just more of a pattern or matter of practice?
12     A. More of a matter of practice. If you're
13 responsible for an entity, you're responsible. If
14 you're not, then you're not.
15       MR. AIGEN: That's all the questions I have.
16 Thank you for your time.
17       THE WITNESS: Thank you.
18           EXAMINATION
19     Q. (BY MR. MORRIS) Just a few, Mr. Klos. Let's
20 pick up where Mr. Aigen left off.
21       To the best of your knowledge, did HCMS have
22 a shared services agreement with Highland?
23     A. No, it didn't that I'm aware of.
24     Q. But you described certain services that HCMLP
25 provided to HCMS; is that right?

**110**

1     A. Yes.
2     Q. Do you know whether HCMFA ever compensated --
3 do you know whether HCMS ever compensated HCMLP for any
4 of those services that HCMLP provided?
5     A. No, it didn't.
6     Q. You mentioned HCRE. To the best of your
7 knowledge, did HCRE have a shared services agreement
8 with Highland Capital Management, LP?
9     A. No, it didn't.
10     Q. Did HCRE provide the services that --
11 withdrawn.
12       Did HCMLP provide the services to HCRE that
13 you just described?
14     A. Yes.
15     Q. Did HCRE ever compensate HCMLP for any of the
16 services that HCMLP provided?
17     A. No.
18     Q. Okay. Mr. Rukavina asked you some questions
19 about payments that were made on the NexPoint loan in
20 the first half of 2019.
21       Do you remember that?
22     A. Yes, generally.
23     Q. Okay. Notwithstanding those payments, did
24 your group continue to carry on its books and records
25 NexPoint's obligation to make the installment payment

**111**

1 that was due at the end of the year?
2     A. Yes, we continued to track it through our
3 interest schedules and through cash.
4     Q. So in the debtor's books and records is there
5 any evidence that the payments that were made in early
6 2019 were intended to relieve NexPoint's obligation to
7 make the installment payment due at the end of the
8 year?
9       MR. RUKAVINA: Objection. Best evidence.
10       THE WITNESS: No, I don't believe so.
11     Q. (BY MR. MORRIS) Did you have a conversation
12 with anybody at any time in the year 2019 about whether
13 the payments made earlier in the year on behalf of
14 NexPoint would eliminate or suspend its obligation --
15 withdrawn.
16       Did you have any conversation with anybody --
17 I think I screwed up the dates. Going to have to start
18 over.
19       Let me ask better questions.
20       You looked with Mr. Rukavina at certain
21 payments that were made in early 2019 with respect to
22 the NexPoint note.
23       Do I have that right?
24     A. Yes.
25     Q. Notwithstanding those payments, did NexPoint

**112**

1 make the installment payment that was due at the end of
2 2019?
3       MR. RUKAVINA: Objection. Calls for a legal
4 conclusion.
5       THE WITNESS: It did make the payment that
6 was due at the end of 2019.
7     Q. (BY MR. MORRIS) And the payment that it made
8 at the end of 2019, was that the annual installment
9 payment that was called for in the note itself?
10       MR. RUKAVINA: Objection. Legal conclusion.
11       THE WITNESS: Yes, it was a payment pursuant
12 to the note.
13     Q. (BY MR. MORRIS) Did anybody ever tell you at
14 any time prior to the commencement of this lawsuit that
15 any prior payment by or on behalf of NexPoint relieved
16 it of any obligation to pay the installment payment due
17 at the end of 2020?
18     A. No.
19     Q. And did in fact -- is it your understanding
20 that Mr. Dondero specifically authorized Highland to
21 effectuate a payment on NexPoint's behalf in mid
22 January 2021?
23     A. I don't have specific knowledge, but I know
24 that to have occurred.
25     Q. Okay. Did anybody ever tell you in 2021 --

David Klos - October 27, 2021

**113**

1  withdrawn.
2      Did anybody tell you in December 2020 or
3  December -- or January 2021 that NexPoint didn't have
4  to make the installment payment at year end 2020
5  because of some prior prepayment?
6      A.  No.
7      Q.  Can you think of any reason -- withdrawn.
8      Did you ever hear Mr. Dondero -- withdrawn.
9      Did you ever see anything in writing where
10 NexPoint ever contended, prior to February 1, 2021,
11 that it had no obligation to make the payment due at
12 the end of 2020 because of some prepayment issue?
13     A.  No, not that I remember.
14     Q.  Can you think of any reason why Mr. Dondero
15 would have authorized a payment by NexPoint to HCMLP on
16 account of the note in January of 2021 if he actually
17 believed at that time that no obligation was due
18 because of a prior prepayment?
19     MR. RUKAVINA:  Objection.  Speculation, lacks
20 foundation.
21     THE WITNESS:  No.
22     Q.  (BY MR. MORRIS)  Does it make any sense to
23 you as an accountant that you would pay a seven-figure
24 sum of money that you didn't think was due and owing?
25     A.  No, that does not make sense to me.

**114**

1      Q.  Can you get Exhibit 13, please.
2      A.  Got it.
3      Q.  You were asked some questions about
4  paragraph 3.
5      Do you see that?
6      A.  Yes.
7      Q.  Does paragraph 3 mention annual installment
8  payments at all?
9      A.  No, I'm not seeing it.
10     Q.  Does paragraph 3 state in any way that a
11 prepayment as described in that paragraph would relieve
12 the maker of the obligation to make annual installment
13 payments?
14     A.  No.
15     Q.  Can you turn to the next page and look at
16 paragraph 5.
17     Are you familiar with that paragraph at all?
18     A.  No.  I mean, I've seen it before, but this
19 is, as I said before, this is a provision that probably
20 would have been in most, if not all, of these types of
21 notes.
22     Q.  Can you get Exhibit 3, please.  This is your
23 email dated May 2, 2019.
24     Do I have that right?
25     A.  Yes.

**115**

1      Q.  And you sent it to the corporate accounting
2  email group; is that right?
3      A.  I did.
4      Q.  And to the best of your recollection, was
5  Mr. Waterhouse included in that email group?
6      A.  Yes, absolutely.
7      Q.  And did you instruct the corporate accounting
8  team to transfer $2.4 million from HCMLP to HCMFA on
9  May 2, 2019?
10     A.  Yes, specifically Blair, but yes, for the
11 team as well.
12     Q.  The whole team was aware of this?
13     A.  The whole team is on the email, and I'm
14 sending to Blair, who is the AP person, to please set
15 up the payment.
16     Q.  Is it fair to say that you're being
17 completely transparent here by including the entire
18 corporate accounting group on this email?
19     A.  Yes.
20     Q.  And did you tell the entire corporate
21 accounting group that this transaction would be a,
22 quote, new interco loan?
23     A.  Yes, that's what the email says.
24     Q.  Do you have any reason to believe that
25 Mr. Waterhouse didn't get this?

**116**

1      A.  No, he got this.
2      Q.  And did Mr. Waterhouse tell you at any time
3  in the history of the world that this $2.4 million
4  should not have been booked as a loan?
5      A.  No.
6      Q.  Did Mr. Dondero tell you at any moment in the
7  history of the world that this transaction should not
8  have been booked as a loan?
9      A.  No.
10     Q.  You mentioned that there was an audit that
11 followed shortly thereafter?
12     A.  Yes.
13     Q.  Are you familiar with the debtor's audited
14 financial statements for the period ending 2018?
15     A.  Yes, generally.  Not total recall, but yes.
16     Q.  Are you aware that this loan was included as
17 a subsequent event in the debtor's audited financial
18 statements?
19     A.  Yes.
20     MR. RUKAVINA:  Objection.  Best evidence.
21     Q.  (BY MR. MORRIS)  Did Mr. Dondero or
22 Mr. Waterhouse or anybody ever tell you that the debtor
23 should not have included this $2.4 million loan in its
24 audited financial statements?
25     MR. RUKAVINA:  Objection.  Best evidence.

David Klos - October 27, 2021

**117**

1      THE WITNESS:  No.
2      Q.  (BY MR. MORRIS)  Okay.  And the next day
3  there was another loan; right?
4      A.  Yes.
5      Q.  I'm going to show you here a document that's
6  been produced.
7      MR. RUKAVINA:  Would you email it to me and I
8  can print it out for the court reporter.
9      MR. MORRIS:  You want to come over here and
10  look --
11      MR. RUKAVINA:  I know it.  I'm just thinking
12  that we can append it to the record right now.
13      MR. MORRIS:  It's eight pages, so it's part
14  of a whole production.
15      MR. RUKAVINA:  But it's just one email?
16      MR. MORRIS:  Just one email that I'm talking
17  about.  So we're looking at Bates stamp D-CNL003763.
18      And I'll email it to you when we're done here.
19  And you're welcome to come over here if you'd like to
20  see it.
21      Q.  (BY MR. MORRIS)  Mr. Klos, can you take a
22  look at the email that I have on my screen.
23      A.  Yes.
24      Q.  And do you see that it's an email from
25  Kristin Hendrix to the corporate accounting group on

**118**

1  Friday, May 3?
2      A.  Yes.
3      Q.  And were you also included in the corporate
4  accounting email string?
5      A.  Yes.
6      Q.  Can you read the email out loud, please.
7      A.  It says, Blair, please set up a wire from
8  HCMLP to HCMFA for 5 million as a new loan,
9  parentheses, 4.4 million should be coming in from Jim
10  soon.  Hayley, please add this to your loan tracker.  I
11  will paper the loan.
12      Q.  So based on that email, did you understand on
13  May 3 that HCMLP was going to loan $5 million to HCMFA?
14      A.  Yes, HCMFA.
15      Q.  And did you understand that Kristin
16  specifically told the corporate accounting group that
17  she would take responsibility for papering the loan?
18      A.  Yes, that's what she says.
19      Q.  Do you recall whether Mr. Waterhouse ever
20  objected to any aspect of Kristin's email?
21      A.  He didn't.
22      Q.  Do you recall in the history of the world
23  whether Mr. Waterhouse ever told you that this
24  $5 million transaction should not have been booked as a
25  loan?

**119**

1      A.  No.
2      Q.  Did anybody in the history of the world ever
3  raise a question to you as to whether or not Kristin
4  was authorized to paper the loan, as she describes it
5  in this particular email?
6      A.  No.
7      Q.  Do you know if this $5 million loan was also
8  included in the debtor's audited financial statements?
9      MR. RUKAVINA:  Objection.  Best evidence.
10      THE WITNESS:  Yes.  Again, subsequent event.
11      Q.  (BY MR. MORRIS)  Okay.  And did anybody in
12  the history of the world ever tell you that Highland
13  should not have included as a subsequent event in its
14  2018 audited financial statement this $5 million loan?
15      A.  No.
16      MR. RUKAVINA:  Objection.  Best evidence.
17      THE WITNESS:  No.
18      Q.  (BY MR. MORRIS)  Do you know if HCMFA had its
19  financial statements audited?
20      A.  It did.
21      Q.  And are you generally familiar with those
22  financial statements?
23      A.  Yes.
24      Q.  Are you aware that these two loans totaling
25  $7.4 million were included in HCMFA's audited financial

**120**

1  statements as a subsequent event for the period ended
2  December 31, 2018?
3      A.  Yes.
4      MR. RUKAVINA:  Objection.  Best evidence.
5      Q.  (BY MR. MORRIS)  Did anybody in the history
6  of the world ever tell you that HCMFA should not have
7  included as a subsequent event the borrowing of the
8  money reflected in these loans?
9      MR. RUKAVINA:  Objection.  Best evidence.
10      THE WITNESS:  No, no one said that.
11      Q.  (BY MR. MORRIS)  Do you know if HCMFA
12  included these loans as a liability on its balance
13  sheet?
14      A.  It did.
15      MR. RUKAVINA:  Objection.  Move to strike.
16  Best evidence.
17      Q.  (BY MR. MORRIS)  Did anyone in the history of
18  the world ever tell you that HCMFA should not have
19  included these loans as a liability on its balance
20  sheet?
21      MR. RUKAVINA:  Objection.  Best evidence.
22      THE WITNESS:  No.
23      Q.  (BY MR. MORRIS)  Okay.  Do you recall that in
24  October of 2020 HCMFA and NexPoint made a report to the
25  retail board?

David Klos - October 27, 2021

121

1    A.  Yes.
2    Q.  And are you aware that that's part of the
3  annual review process?
4    A.  Yes, it's the 15(c) process.
5    Q.  By the way, as we're talking about these
6  issues, did Mr. Waterhouse have -- was he an officer of
7  HCMFA in 2019 and 2020?
8    A.  Yes.
9    Q.  And what's your understanding as to the
10  office he held?
11    A.  Treasurer, I believe.
12    Q.  And do you know if Mr. Dondero held an
13  officer position with respect to each of the Advisors?
14    A.  He did.
15    Q.  What position did he hold?
16    A.  I don't recall with certainty, but I believe
17  president.
18    Q.  As officers of those two entities, do you
19  have any knowledge as to whether they participated in
20  the communications with the retail board in the fall of
21  2020?
22    A.  I believe Jim and Frank both did.
23    Q.  And do you know whether the retail board
24  asked the Advisors for a report on all obligations due
25  and owing to HCMLP and affiliates?

122

1    A.  They asked for financials, I believe as of
2  6/30 as part of that process.
3    Q.  And are you aware as to whether or not the
4  financials that were provided to the retail board
5  included, among other things, the $7.4 million in notes
6  that were -- that we're talking about here?
7    A.  Yes, those financials would have included
8  those amounts as liabilities to HCMLP.
9    Q.  Did Mr. Dondero or Mr. Waterhouse ever tell
10  you or anybody to your knowledge that the Advisors
11  should not have told the retail boards that they were
12  obligated to pay under those two notes?
13    A.  No.
14    Q.  Let's talk about loan forgiveness for a
15  moment.
16       How long have you been with the company?
17    A.  March of 2009.
18    Q.  At any time since you've been employed by
19  Highland, has Highland ever forgiven a promissory note
20  that it held where the maker was a corporate affiliate?
21    A.  Not that I can recall.
22    Q.  Have you ever heard prior -- has anybody ever
23  told you that before you joined the company, Highland
24  had ever forgiven in whole or in part any note that it
25  held where the maker was a corporate affiliate?

123

1    A.  Not that I'm aware of.
2    Q.  You referred to a couple of loans that were
3  given to individuals earlier.
4       Do you remember that?
5    A.  Yes.
6    Q.  What's the biggest loan that you can recall
7  Highland ever forgiving?
8    A.  The largest one that I can remember was
9  a half-million dollars, 500,000.
10    Q.  So you have no knowledge of any loan ever
11  being forgiven where the principal amount forgiven
12  exceeded $500,000; is that right?
13    A.  Not that I'm aware of.
14    Q.  And when is the last loan that Highland
15  forgave in whole or in part to one of its officers or
16  employees that you can recall?
17    A.  I don't know a specific year, but it would
18  have been in the 2010, 2011 time frame.  Maybe 2012,
19  but I suspect '10 or '11.
20    Q.  So is it fair to say to the best of your
21  recollection and knowledge that Highland did not
22  forgive a single loan made to an officer or employee
23  for at least seven years prior to the petition date?
24    A.  There's none that I can think of.
25    Q.  Let's just turn our attention to

124

1  December 2020.
2       Do you recall that you testified at length
3  about your understanding of the conversations with
4  Mr. Waterhouse and Ms. Hendrix?
5       Do you remember that?
6    A.  Yes.
7    Q.  Okay.  Are you aware of any instruction ever
8  made by Mr. Dondero or Mr. Waterhouse in November or
9  December 2020 in order to make the payments that were
10  due under the three term notes -- withdrawn.
11       There were three term notes that were due --
12  withdrawn.
13       There are three term notes at issue in this
14  case.  Do you understand that?
15    A.  Yeah, that's my understanding.
16    Q.  And one of them was issued by NexBank; is
17  that right?
18    A.  NexPoint Advisors.
19    Q.  Thank you for the clarification.
20       One was by HCRE?
21    A.  Correct.
22    Q.  And one was from HCMS; do I have that right?
23    A.  Yes.
24    Q.  And all three of those notes were executed as
25  of May 31, 2017; right?

David Klos - October 27, 2021

---

**125**

1    A. Yeah, that was the effective date on all
2  three.
3    Q. And they all rolled up previously outstanding
4  notes that were due and payable to Highland.
5       Do I have that right?
6    A. Correct. To the best of my recollection.
7    Q. So we'll refer to those notes as the term
8  notes. Is that okay?
9    A. Sure.
10    Q. Do you have any knowledge that Mr. Dondero or
11  Mr. Waterhouse ever instructed HCMLP to make the
12  installment payments that were due at the end of 2020
13  with respect to any of those term notes?
14    A. No, I don't believe they provided that
15  instruction to make those payments.
16       MR. RUKAVINA: Objection. Move to strike.
17  Lacks foundation.
18       MR. MORRIS: I'm asking him if he ever heard.
19       MR. RUKAVINA: But he answered a different
20  question. He answered a different question.
21    Q. (BY MR. MORRIS) Did you ever see anything in
22  writing where either Mr. Dondero or Mr. Waterhouse
23  directed HCMLP to make the annual installment payments
24  that were due at the end of 2020 with respect to any of
25  the term notes?

---

**126**

1    A. No.
2    Q. Okay. But to the best of your recollection,
3  in the 13-week forecast, those forecasts included the
4  installment payments that were due at the end of the
5  year; is that right?
6    A. They did.
7    Q. Did anybody ever tell you prior to
8  February 1, 2021, that your group had made a mistake by
9  not making the payment -- any of the payments that were
10  due under the term notes at the end of 2020?
11    A. Not that I'm aware of.
12    Q. Did anybody tell you prior to February 1,
13  2021, that the makers of the term notes expected
14  Highland to effectuate the payments that were due at
15  the end of the year without approval by Mr. Waterhouse
16  or Mr. Dondero?
17    A. No.
18    Q. Have you seen any protest in writing prior to
19  the commencement of the litigation by any of the makers
20  of the notes about a failure on the part of HCMLP to
21  perform its duties and make that payment at the end of
22  the year?
23    A. No.
24       MR. MORRIS: I have no further questions.
25       MR. RUKAVINA: I have five minutes.

---

**127**

1       FURTHER EXAMINATION
2    Q. (BY MR. RUKAVINA) Go to Exhibit 16, please,
3  1-6.
4    A. Sure.
5    Q. Sir, this is an email string regarding that
6  Rule 15(c) that you were talking about. I'm just going
7  to ask you about the top email, but you're welcome to
8  read the whole.
9    A. Uh-huh.
10    Q. You're copied on Mr. Waterhouse's email there
11  October 6, 2020; right?
12    A. Yes, I'm on the email.
13    Q. And Mr. Waterhouse writes, the HCMFA note is
14  a demand note. You would have read that; right?
15    A. Yes.
16    Q. Did you ever correct Mr. Waterhouse when he
17  says the HCMFA note, as opposed to notes?
18    A. No, that's not something I would have
19  corrected from Frank.
20    Q. Do you recall right now that you might have,
21  when you read this, realized that he made a mistake?
22    A. It would have been such a de minimus,
23  inconsequential mistake that I don't know that I would
24  have addressed it.
25    Q. What about two sentences over, there was an

---

**128**

1  agreement between HCMLP and HCMFA the earliest they
2  could demand is May 2021.
3       Did you ever write to him and say that too
4  was a mistake?
5    A. I didn't write to him.
6    Q. Did you realize back then when you read it
7  that he had made a mistake?
8    A. I'm not certain.
9    Q. Did you -- and I'm not suggesting that you
10  should have. You're a busy man. But did you attach
11  any significance outside of the ordinary to this email
12  exchange?
13       MR. MORRIS: Objection to the form of the
14  question.
15       THE WITNESS: I struggle with how to answer
16  that. I saw that this note was in response to retail
17  15(c) follow-up on the Advisors.
18       At this point my role was different, where I
19  was dealing with really the retail funds primarily. So
20  the fact that I'm even on this email is somewhat
21  incidental.
22    Q. (BY MR. RUKAVINA) But surely on October 6,
23  2020 you knew that there were four HCMFA demand notes,
24  didn't you?
25    A. I'm sure I would have had access to that

---

David Klos - October 27, 2021

**129**

1  information. I'm not sure that I was keeping track of
2  how many were outstanding at any given point in time.
3      Q. And surely on October 6, 2020 you knew that
4  only two of them couldn't be demanded by May of 2021,
5  didn't you?
6      A. Again, I don't know that I was even really
7  thinking about these notes at that time.
8      Q. Even though you were preparing weekly cash
9  forecasts for Mr. Seery?
10     A. I wasn't preparing a weekly cash forecast for
11 Mr. Seery.
12     Q. Going to Exhibit 13, please. Mr. Morris
13 asked you a couple questions about this.
14     A. I'm sorry, 13?
15     Q. Yes, sir. And again, that paragraph 3 that
16 talks about prepayment.
17        Can you find anything in here, sir, that says
18 that a prepayment does not relieve the maker of any
19 regularly scheduled payment?
20     A. Sorry, that's a lot to comprehend. If you
21 could ask again.
22     Q. Is there any provision that you can see here
23 that's to the effect that a prepayment will not relieve
24 the maker of any regularly scheduled payment?
25     A. I don't see that specific provision. I just

**130**

1  read it for what is on the page.
2      Q. Isn't it, sir, in your experience the case
3  that a promissory note, if it intended not to relieve
4  the borrower of regularly scheduled payments would say
5  that a prepayment does not relieve the borrower of
6  regularly scheduled payments?
7      MR. MORRIS: Objection to the form of the
8  question.
9      THE WITNESS: That's a legal question. I
10 can't -- I don't know the answer.
11     Q. (BY MR. RUKAVINA) Do you remember seeing
12 promissory notes that say something like that?
13     A. Not that I can recall.
14     Q. You'd be surprised if that's what promissory
15 notes say?
16     MR. MORRIS: Objection to the form of the
17 question.
18     THE WITNESS: I don't know.
19     Q. (BY MR. RUKAVINA) And Mr. Morris asked you
20 about this. I'm trying to burn through this so the man
21 can make his plane.
22        Section 2.1 talks about 30 equal annual
23 payments, annual installments.
24        You see that?
25     A. Yes, I see that.

**131**

1      Q. And Mr. Morris asked you whether you see
2  anything in here that says that a prepayment relieves
3  an annual installment.
4      Do you remember that question?
5      MR. MORRIS: Objection. That's not what I
6  asked.
7      THE WITNESS: I don't remember that question.
8      Q. (BY MR. RUKAVINA) Reading Section 2.1 and 3
9  together, what would a prepayment apply to other than
10 an annual installment? Do you have a view on that?
11     MR. MORRIS: Objection to the form of the
12 question.
13     THE WITNESS: Again, I struggle with
14 prepayment. But as I read Section 3, it would be
15 applied first to unpaid accrued interest and then to
16 unpaid principal.
17     Q. (BY MR. RUKAVINA) Have you ever in your
18 personal life prepaid a promissory note before -- have
19 you ever in your personal life prepaid a promissory
20 note prior to its maturity?
21     MR. MORRIS: Objection to the form of the
22 question.
23     THE WITNESS: I don't know.
24     Q. (BY MR. RUKAVINA) Sitting here today, with
25 your CPA, your MBA and you're a CFO of a large entity,

**132**

1  you don't understand what a prepayment means?
2      MR. MORRIS: Objection. Argumentative.
3      I direct you not to answer.
4      You're going to have ask a different question.
5  That's an argumentative question and it's insulting.
6      MR. RUKAVINA: What's the privilege on which
7  you're directing him not to answer?
8      MR. MORRIS: I just said it's argumentative.
9      MR. RUKAVINA: I'm trying to let you get to
10 your flight.
11     MR. MORRIS: Ask a proper question. Don't
12 make this about me.
13     Q. (BY MR. RUKAVINA) You were going to answer
14 my question, sir?
15     MR. MORRIS: No, I'm directing him not to
16 answer.
17     MR. RUKAVINA: Then we'll end this deposition
18 with a motion to compel.
19     MR. MORRIS: Okay. You do that.
20     MR. RUKAVINA: I'm making a motion to compel.
21 We'll call the judge as soon as we land in New York
22 tomorrow.
23     MR. MORRIS: You have to read the whole
24 question. You can ask the question without the
25 verbiage; right?

David Klos - October 27, 2021

---

133

1      MR. RUKAVINA: And I asked you on the basis
2  of what privilege are you instructing your --
3      MR. MORRIS: Argumentative.
4      MR. RUKAVINA: That's not a privilege.
5      MR. MORRIS: Sir, you can rephrase your
6  question and end this right now by not being insulting
7  to my client.
8      Q. (BY MR. RUKAVINA) I was not trying to be
9  insulting, sir.
10      I'm asking you again, you do not, sitting
11 here today, have an understanding of what the word
12 "prepayment" for a promissory note means?
13      MR. MORRIS: Objection to the form of the
14 question.
15      You can answer that one.
16      THE WITNESS: In the context that you're
17 asking the question --
18      Q. (BY MR. RUKAVINA) No, I'm not asking any
19 context. Sitting here today, do you have an
20 understanding of what the word "prepayment" means when
21 it comes to a borrower/lender relationship?
22      MR. MORRIS: Objection to the form of the
23 question.
24      THE WITNESS: Yes, I have a general
25 understanding.

---

134

1      Q. (BY MR. RUKAVINA) What is your
2  understanding?
3      A. That -- you can look at the note.
4      Q. I'm not asking about the note. We got to go
5  step by step.
6      What is your general understanding as to what
7  a prepayment means?
8      MR. MORRIS: Objection to the form of the
9  question.
10      THE WITNESS: It depends on the context and
11 it's going to depend on what the note says about
12 prepayments. So I have a hard time answering that
13 question.
14      Q. (BY MR. RUKAVINA) So you would agree with me
15 that you have to look at the note before you can answer
16 that question?
17      MR. MORRIS: Objection to the form of the
18 question.
19      THE WITNESS: I would want to look at the
20 note before I answer the question, because prepayment
21 is a term that can be used as a defined term or in a
22 casual sense, and those two can sometimes get confused
23 and misconstrued.
24      Q. (BY MR. RUKAVINA) Would you agree with me
25 that in any and all circumstances a prepayment is a

---

135

1  payment made prior to the time that it's due?
2      MR. MORRIS: Objection to the form of the
3  question.
4      THE WITNESS: Yes, in the most general sense
5  a prepayment, the prefix "pre" indicates that it's
6  before some other event. So from that standpoint,
7  prepayment means it was to some extent paid early.
8      MR. RUKAVINA: Thank you.
9      Pass the witness.
10      MR. MORRIS: No further questions.
11      Michael?
12      MR. AIGEN: No questions.
13      THE REPORTER: Mr. Morris, do you want a copy
14 of the transcript?
15      MR. MORRIS: I sure do.
16      THE REPORTER: Mr. Aigen, do you want a copy
17 of the transcript?
18      MR. AIGEN: Yes, we would also like a copy.
19      MR. MORRIS: Yeah, and I'd like that rush.
20      (Whereupon, the deposition adjourned at
21      5:14 P.M.)
22          --oOo--
23      I declare under penalty of perjury that the
24 foregoing is true and correct. Subscribed at
25 _____, Texas, this ____ day  of

---

136

1  _____, 2021.
2
3
4  _____
5  DAVID KLOS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

David Klos - October 27, 2021

**137**

1          CERTIFICATE OF REPORTER
2          I, BRANDON D. COMBS, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause;
7          That said deposition was taken in shorthand by
8    me, a disinterested person, at the time and place
9    therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12         That before completion of the deposition,
13   review of the transcript was not requested.  If
14   requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17         I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22         **DATED:** November 1, 2021
23
24         _____
25         Brandon Combs, Certified Shorthand

**138**

1    State of Texas
     Dickman Davenport, Inc. Cert 312
2    4228 North Central Expressway
     Suite 101, Dallas, TX 75206
3    (214) 855-5100  (800) 445-9548
     Email: info@dickmandavenport.com
4    www.dickmandavenport.com
     My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| A | | | | |
|---|---|---|---|---|
| **ability** 42:12 43:21 78:2 88:8 88:10 | 49:4,5,12,20,21 50:8,21 51:3 131:15 | **agent** 85:16 **ago** 19:6 34:25 36:20 39:21 | 80:21 84:14 97:12 123:11 | 122:10,22 126:7,12 **anymore** 57:1 |
| **able** 31:20 32:2 | **accumulated** 47:22 | 43:5 94:20 95:11 | **amounts** 28:24 41:7 122:8 | 61:22 62:7 **AP** 115:14 |
| **above-styled** 1:21 | **accurate** 27:25 85:10 | **agree** 8:11 47:10 47:11 51:7 77:2 | **analysis** 30:9 53:25 54:6,9,18 55:1,8 89:13 | **apologize** 9:21 27:22 63:11 66:21 77:1 |
| **absolutely** 12:4 16:10 77:1 80:1 80:14 90:1,4,10 94:1 115:6 | **acknowledgment** 87:21,22 **act** 11:5 **activities** 107:17 | 89:19 134:14 134:24 **agreement** 12:23 84:11 96:4,8,23 | **analyst** 5:17,25 **and/or** 40:12 67:7 91:22 **annual** 23:22 | **apparatus** 12:9 **APPEARANC...** 2:1 **appeared** 2:5,12 2:19 |
| **accepting** 19:17 **access** 99:13 128:25 | **activity** 107:16 **actual** 37:5 85:13 **add** 118:10 | 97:9 98:5,12 104:8,9 109:22 110:7 128:1 | 80:9 112:8 114:7,12 121:3 125:23 130:22 | **appears** 49:3 64:2 **append** 117:12 |
| **account** 53:20 60:3 113:16 | **additional** 89:2 **address** 64:7 | **agreements** 41:3 97:16,23 98:1 | 130:23 131:3 131:10 | **appended** 137:16 **application** 37:8 |
| **accountant** 26:5 26:9,15,20 39:12,17 90:19 109:5 113:23 | **addressed** 44:9 127:24 **adjourned** 135:20 | **agrees** 48:7 **ahead** 45:7 **Aigen** 2:18 3:4 95:18,22,23 | **answer** 16:23,25 17:2 20:18,20 21:3,15 22:1 25:5 28:10 | 37:9,15,16 **applied** 39:17 46:8,9 48:11,14 49:5,8 64:13,16 |
| **accountant's** 39:13 | **advisor** 9:24 71:7 74:19 | 99:8 100:3,10 100:12,14,24 | 35:16 41:18 50:11 53:24 | 65:1 131:15 **apply** 38:24 |
| **accountants** 109:3 | **advisor-type** 6:7 **advisors** 1:10 | 101:14 102:4 102:18 103:20 | 55:15,23 71:5 78:11 79:7 87:7 | 131:9 **Appreciate** 100:13 |
| **accounted** 38:6 45:8,11 64:23 | 12:14,15,17 13:3,6 27:1 | 104:23 105:24 106:3 108:11 | 94:13,14,17,21 104:22 128:15 | **appropriate** 35:19,22 |
| **accounting** 4:16 6:5,5,11,11 7:14,17,21 8:23 9:3,5,5,9,15,23 10:12 33:22 35:9,16,20 43:18 53:4 62:10,11 70:15 74:22 84:2 107:5 109:2,7 115:1,7,18,21 117:25 118:4 118:16 | 52:19 55:1 60:22 65:23 71:6 72:22 86:6 99:20 100:17 102:21 103:9 121:13,24 122:10 124:18 128:17 **affect** 16:11,12 16:20 **affiliate** 39:23 122:20,25 **affiliated** 10:21 34:8 35:4,11 36:2 61:15 | 109:15,20 135:12,16,18 **Akard** 1:24 2:4 **aleck** 50:7 **alleged** 97:22 98:5 **Allocation** 70:25 74:12 75:6 **allow** 75:4 **allowed** 46:13 81:22 82:1 94:16 96:20 137:15 **allowing** 96:8 | 130:10 132:3,7 132:13,16 133:15 134:15 134:20 **answered** 21:2 41:17 56:11 76:19 85:21 91:10 92:5,6 94:9 125:19,20 **answering** 134:12 **answers** 9:18 16:10,13 **anybody** 24:13 | **approval** 66:14 77:19,23 78:3 78:21 79:3 126:15 **approvals** 80:9 **approximate** 6:1 63:2 **approximately** 5:9 105:10 **April** 7:13,22 11:16,21 88:9 **areas** 107:21 |
| **accrue** 49:13 **accrued** 38:8 46:8,16,20,25 47:1,4,5,11,14 47:18,19,24,25 48:4,5,7,15 | **affiliates** 38:5 51:20 121:25 **AFR** 86:7 **afternoon** 95:22 | **amortization** 23:16 28:1 **amount** 15:5,15 37:5 47:22 59:13 73:2 | 60:1 80:16 111:12,16 112:13,25 113:2 116:22 119:2,11 120:5 | **argumentative** 90:15 132:2,5,8 133:3 **art** 8:1 9:3 10:12 |

David Klos - October 27, 2021

ascertain 45:2,4
asked 16:18 20:5
  21:2 30:18
  41:10,17 44:10
  54:13 55:17,22
  56:11 57:12,15
  59:12 70:9
  76:19 84:8,17
  85:21 86:10
  91:10 92:5 94:9
  108:11 110:18
  114:3 121:24
  122:1 129:13
  130:19 131:1,6
  133:1
asking 18:11
  20:21 28:6
  38:20 56:9,13
  61:5,7 77:13
  83:22 94:15
  100:9 125:18
  133:10,17,18
  134:4
aspect 118:20
ass 17:18
asserted 97:7
  98:8
asset 15:7
assets 15:3 87:10
  87:12 97:12
  107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
  7:7,10 8:8
assisted 22:23
assume 28:7 29:7
  90:6 95:18
  101:21
assumed 7:14
  53:3
assuming 36:14
  36:21 41:23
  64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
  2:18 137:18
audit 9:25 24:6
  80:4 116:10
audit-driven
  88:5
audited 116:13
  116:17,24
  119:8,14,19,25
auditor 24:3
auditors 24:5
  88:6,14
aughts 106:13
August 42:16
  44:13
authenticate 28:5
authenticity
  67:23
authoritative
  65:1,2
authority 36:9
  77:3,13,15 78:7
  78:21,25
authorization
  108:10
authorize 77:4
authorized 40:2
  59:15 69:6,25
  85:24 108:5
  112:20 113:15
  119:4
authorizing
  94:20
Avenue 2:11,17
aware 35:6 58:24
  59:2,3 80:18,21
  96:6,10,12
  97:15 100:24
  101:5,8 102:7
  103:20,24
  106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

───────────
        B
───────────
back 6:14 15:19
  22:12 23:21,25
  36:11 40:18
  49:17 51:13
  55:16 65:12
  67:4 68:25
  82:23 83:19
  84:4 85:12
  102:13 128:6
back-end 15:19
  15:21
back-ended
  14:25
background 4:13
  53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
  80:6,8 120:12
  120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
  31:19 80:10
  96:15 98:12
  102:14 104:12
base 14:5,7
based 14:11,14
  32:12 37:17
  46:5,7 48:12,19
  54:14 104:14
  104:16 118:12
basically 6:3
  31:13 56:1 81:5
basis 23:22 30:2
  133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
  12:24 25:2 78:2
  78:22 79:1
  111:13 112:15
  112:21
beings 71:19
belief 104:16
believe 6:23
  15:11 16:3 17:3
  17:8 18:2 19:23
  21:13,13 22:20
  23:13,19 24:16
  26:13 49:9 51:1
  51:2 74:16
  77:17 78:1,7,19
  81:8 83:1,3
  86:25 102:6
  111:10 115:24
  121:11,16,22
  122:1 125:14
believed 35:10
  57:6 113:17
beneficiaries
  17:10,15
benefiting 73:9
best 5:25 8:3
  52:15,17 55:7
  63:24 64:4
  78:16,17 85:8
  95:19 109:21
  110:6 111:9
  115:4 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
  123:20 125:6
  126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
  30:15 33:12
  39:3 48:1 98:15
  106:23 107:5
Blair 115:10,14
  118:7
board 120:25
  121:20,23
  122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
  14:19,24 15:14
  18:5 90:21
book 33:21 34:12
  34:20
booked 32:23
  33:11 34:9 35:5
  35:20 36:24
  44:23 90:8
  116:4,8 118:24
books 80:7
  110:24 111:4
borrow 78:22
borrower 45:6,15
  45:19,24 46:2
  130:4,5
borrower/lender
  133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
  5:10
brain 32:9
Brandon 1:22
  137:2,25
break 7:6
bridge 29:22
  30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
  61:3 107:21
broader 76:8
broken 53:16

David Klos - October 27, 2021

brokers 10:17
brought 6:4,14
  31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
  128:10

**C**
call 6:4 11:11,13
  38:10 63:14
  90:16 132:21
called 9:24 58:21
  59:11 70:24
  74:16 88:7
  109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
  6:6 8:4 13:6
  23:22,23 26:19
  26:23 27:1 29:4
  29:19 32:6,23
  35:3 37:25 71:6
  107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
  89:18 103:11
  105:17 124:14
  130:2
cash 9:25 23:21
  23:24 25:23,24
  26:7 31:9,10,12
  31:14,16,23
  32:8,12,14
  41:15,24 42:12
  42:23 43:5,22
  43:24 44:1
  57:25 61:25
  63:2 73:20

88:12,17 93:7
  93:20,21 107:6
  107:16 109:7
  111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
  137:20
caused 79:12
  81:10
causes 82:9
Central 138:2
Cert 138:1
certain 5:17
  11:13 12:21,21
  13:12 23:14
  33:13 38:1
  54:14 67:21
  70:12 83:9
  95:11 96:9
  97:10 98:17
  99:14 101:1
  103:22 106:18
  109:24 111:20
  128:8
certainly 6:18
  9:17 12:3 20:10
  26:4 30:11
  32:16 34:4
  35:18 37:23,24
  42:11 50:4 58:8
  62:14 69:1
  77:13,24 86:22
  101:8,10,12
  108:8
certainty 29:13
  42:19 68:18
  69:8,11,24 70:2
  102:19 103:10
  103:12 108:7
  121:16
CERTIFICATE
  137:1
Certified 137:2
  137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
  8:18 48:6,21
  131:25
chain 53:5
chance 69:4
change 8:8 16:10
  46:10 59:1
  84:13 103:25
changed 6:18
  39:11 84:16
changes 7:1
  137:14
Changing 106:23
characterize 54:1
  76:10 87:18,19
characterized
  54:2
charge 6:15 10:3
chief 7:13,17,21
  8:23,23 9:3
  10:12 13:20,22
  53:3
circumstance
  51:1
circumstances
  31:2 134:25
claim 81:1,9
claimant 15:16
  18:6
clarification
  124:19
clarify 11:3 12:8
  53:1 66:18
  75:25
clear 17:21 26:19
  27:11 29:14
  52:24 63:9
  69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
Cliff 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
  100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
  81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
  37:7
combination
  39:16 45:12
combine 106:24
Combs 1:22
  137:2,25
come 47:12 53:7
  59:19 65:3,5
  76:22 101:6
  117:9,19
comes 133:21
comfortable 88:6
coming 17:20
  36:13 118:9
command 53:5
commencement
  112:14 126:19
comment 17:13
commission
  138:4
common 30:5
  86:5
communicated
  95:12
communicating
  53:9
communication
  83:10
communications

121:20
company 81:14
  122:16,23
compel 132:18,20
compensate 72:8
  72:12 79:14
  89:20 110:15
compensated
  17:16 110:2,3
compensation
  14:3,6,8,19
  15:14 16:4,12
  16:16,21 17:4,8
  17:24 18:5
  60:18 73:8,12
  79:25 90:2,12
  90:17 105:21
complete 15:3
  74:23 106:11
completed 15:22
  15:25 16:2
  74:21
completely 15:24
  27:25 89:9,15
  90:7 115:17
completion
  137:12
complex 108:24
  108:25 109:2
compliance 6:8
  72:4
comprehend
  129:20
computer 137:11
computerized
  1:24
concept 89:16
concern 23:23
  24:1,2,4 56:21
  56:23,25 62:17
concerning 17:7
  63:20
conclude 80:25
concluding 24:6
conclusion 94:25

David Klos - October 27, 2021

112:4,10
condition 96:4
conditional 97:11
conduct 69:18
confer 26:4
confident 69:5
confirm 59:17
  61:19
confused 41:6
  134:22
confusion 11:6
conjunction 24:5
connection 24:12
  26:2
consent 74:16
  75:23 80:2
  85:15 90:3
  93:16
consented 74:17
consequence
  104:20
considerations
  16:1 60:10
constant 75:15
construct 90:2
consultancy 11:9
  11:11
contended
  113:10
context 133:16
  133:19 134:10
contingent 14:11
continue 17:22
  100:8 110:24
continued 111:2
continuously
  6:17 29:22
contract 71:10
contracted 71:15
contradict 79:18
control 43:2
  90:10
controlled 89:8
controller 6:24
  6:25 7:4,4,8,8

7:10,10 8:4,8,9
  8:12,15 9:11
  10:10,12 12:19
  13:10,17 48:6
conversation
  18:22 19:9,19
  43:15 51:25
  70:14 91:25
  93:18 94:24
  103:18 105:18
  111:11,16
conversations
  18:23 19:11
  20:2 34:11 42:6
  51:25 93:19
  96:16,19,22,24
  97:20,22 98:2,5
  102:9,12,13
  104:24 105:5,7
  105:11,16,21
  124:3
conversion 74:15
  74:17,21
converted 74:13
conveyed 102:25
  103:1
coordinated
  22:21
copied 127:10
copy 135:13,16
  135:18
corporate 6:5,15
  9:9,15 25:22
  33:8 35:9,16
  39:12,13,16
  43:17 61:14
  62:11 70:15
  73:20 84:2
  109:1,6 115:1,7
  115:18,20
  117:25 118:3
  118:16 122:20
  122:25
correct 5:22,23
  8:19,21 9:20

16:17 40:2 42:1
  45:25 51:11
  61:10 64:25
  68:10 69:2
  82:21 88:11,17
  88:23 91:2
  97:18 99:17
  101:21,22
  105:23 124:21
  125:6 127:16
  135:24
corrected 127:19
correctly 5:16
  51:13 62:9
cost 97:13
counsel 2:6,13,19
  18:10,20,25
  20:3 21:16
  22:21,25 23:3
  96:17,20,22
  97:21 98:1
  137:17
couple 61:20
  87:14 123:2
  129:13
course 20:3 33:19
  51:9 66:12
  69:18 83:22
  84:4,6
court 1:1 117:8
courteous 76:24
covered 20:14
  53:2
CPA 4:19,22
  44:21 48:6,20
  49:11 131:25
CPAs 95:4
created 80:10
credit 6:8 25:9
  40:11 89:13
  90:11
creditors 15:17
CSR 1:23
curiosity 59:21
current 4:25

cut 109:8
cycle 41:7

**D**

D 1:22 137:2
D-CNL003763
  117:17
Dallas 1:3,25 2:4
  2:18 4:12 5:10
  138:2
damages 82:12
date 4:9 8:6
  24:22 45:20
  47:5,6,23 48:25
  49:13,13,14
  84:14 123:23
  125:1
dated 114:23
  137:22
dates 27:10 28:18
  28:24 111:17
Davenport 138:1
David 1:14,18
  4:1,6 136:5
Davor 2:5 76:22
day 29:21 32:1
  34:1 59:7 74:8
  93:18 117:2
  135:25
day-to-day 9:17
  62:6
days 59:5 76:2,7
de 127:22
dealing 29:20
  128:19
debtor 26:21
  32:23 38:6,22
  38:23 76:16
  77:3,5,8 78:2
  81:1 87:14
  88:16 116:22
debtor's 111:4
  116:13,17
  119:8
debts 89:3

December 24:20
  24:23 51:10,15
  51:22 53:18
  54:24 56:17,22
  57:6,13,17,21
  58:7,9 60:20,25
  61:21 63:19
  98:18,18,24
  99:19 100:15
  101:1 102:17
  103:23 113:2,3
  120:2 124:1,9
decide 38:23 39:5
  90:12
decided 24:9,12
  24:14,15 32:7
  64:22 77:18
  84:25 86:1
decides 38:22
deciding 64:15
  69:18
decision 27:2
  30:25 86:5
decision-making
  32:10
decisions 29:8
  30:9,16
declare 135:23
deduction 73:9
default 58:13,17
  61:14 62:18
defendants 1:11
  1:20 2:6,20
  96:3,6
defense 80:15
  96:3,7,13,23
  97:5,7 98:1
defenses 96:10
  96:18
defer 103:13,18
define 47:18,20
defined 104:8
  134:21
definitely 6:21
  7:12 73:6

David Klos - October 27, 2021

definition 38:11
104:13,14
definitive 50:11
definitively 15:20
degree 4:16
degrees 4:14
Deloitte 5:8,8
demand 23:13
86:3,8 87:14
88:15 127:14
128:2,23
demanded 129:4
deny 67:22
department 9:7
84:9
depend 15:15
17:6,9 134:11
depending 31:2
32:15 89:11
depends 16:5
134:10
deponent 137:14
deposition 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
describe 8:2
54:11,13
described 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
describes 119:4
describing 33:7
detail 54:5 58:2
determination
60:17
determine 38:16
determined
40:21

determining
89:13
Dickman 138:1
differed 54:10
difference 49:7
76:6
differences
107:14
different 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
direct 9:15 20:17
20:19 34:13
78:13 132:3
directed 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
directing 132:7
132:15
direction 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
directions 103:19
directly 103:19
disagree 89:19
99:21 100:18
disciplinary 5:3
disciplined 5:2
discuss 20:4 97:2
discussed 15:8
21:16 90:1
93:15,17 94:1
97:4,6
discussing 42:3
65:9 77:25 92:4
92:8,11 93:3,10
discussion 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
discussions 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
disinterested
137:8
dissimilar 14:21
dissuade 62:23
distinct 10:10
distribution 59:9
83:5
DISTRICT 1:2
dividend 105:8
DIVISION 1:3
document 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
documents 67:8
76:20
doing 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
dollar 28:18 75:2
75:2
dollar-for-dollar
73:4
dollars 18:1
123:9
Dondero 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
Dondero's 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
double 81:5
doubt 35:21 36:8
dozens 65:16
draft 24:16
drafted 22:21
drafting 58:17
DRIP 105:8
driven 42:19
drukavina@m...
2:7
due 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
duly 1:19 4:2
137:4
duties 9:12 62:6
126:21
duty 25:9

**E**
earlier 17:13
49:14 75:13
98:16 101:6
111:13 123:3
earliest 128:1
early 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
educational 4:13
effect 41:14
62:18,21
129:23
effective 125:1
effectively 49:22
75:5
effectuate 99:13
112:21 126:14
effectuated 99:3
eight 117:13
either 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
electronically
84:22
eliminate 111:14

**email** 2:7,14,22
54:16 59:8,9
67:14,15,18,21
69:4,7 70:13,16
82:23,25 83:7
83:10,11
114:23 115:2,5
115:13,18,23
117:7,15,16,18
117:22,24
118:4,6,12,20
119:5 127:5,7
127:10,12
128:11,20
138:3
**emailed** 59:11
**emails** 80:13
**employed** 122:18
**employee** 12:23
26:17,21,24
123:22
**employees** 43:11
72:2 98:8 106:7
106:12 107:8
107:20 123:16
**employment**
78:13
**ended** 120:1
**ensure** 23:20
**enter** 78:25
**entered** 98:11
**enterprise** 30:1
32:18
**entire** 12:9
115:17,20
**entities** 6:7 25:24
26:16 30:6
31:11,16 34:8
61:15 65:18,22
65:22,24 99:6
101:1 102:20
103:8 106:24
107:18,25
108:17,19,21
108:25 121:18

**entitled** 17:23
18:10 20:4
**entity** 12:20 13:8
13:11,13 30:20
31:20 32:7,15
32:17 34:19
35:4,11 36:2
40:10 42:10
75:8,10 90:10
109:13 131:25
**equal** 86:6
130:22
**equity** 79:24
90:22
**error** 70:25 71:2
71:19,25 72:13
72:14,19 73:4
79:15 80:20
81:1,14 85:22
89:20 90:3,3
92:11,16,17,18
**errors** 71:9 72:20
72:21 73:16
**especially** 15:4
**established** 51:4
75:13 76:11,12
78:12
**estate** 107:13
**estimate** 11:22
**et** 6:1 14:20
**event** 116:17
119:10,13
120:1,7 135:6
137:19
**events** 16:20 96:9
**eventually** 32:2
**evidence** 80:14
111:5,9 116:20
116:25 119:9
119:16 120:4,9
120:16,21
**evolved** 6:18,21
**exact** 7:5,11
15:24 20:16
94:19

**exactly** 5:18
14:24 15:23
34:3 48:2 77:23
80:16
**Examination** 3:3
3:4,5,6 4:3
95:21 109:18
127:1
**example** 31:6,9
37:6 48:25
**exceeded** 87:10
123:12
**exception** 16:8
17:1 44:2,3
**excess** 41:15
**exchange** 128:12
**exclude** 18:22
**exclusively** 23:13
33:14,14
**excruciatingly**
73:13
**excuse** 37:1 74:25
**executed** 24:18
31:1 70:22 84:3
124:24
**execution** 22:7,13
22:20 24:23
83:21 84:19
85:6
**executive** 26:14
**exhibit** 22:4 23:8
27:9,15,23
36:12 40:20
42:17 44:13,22
46:12 48:12
49:1,10 64:2,5
67:17 68:4
82:24 83:20
114:1,22 127:2
129:12
**exhibits** 3:10
67:2,7 68:1
**existing** 7:13
23:13
**expand** 59:7

**expect** 17:12
64:12 65:4
83:12 86:21
**expectation** 15:1
**expected** 126:13
**expenses** 73:7
**experience** 5:5
37:18 38:14
46:19 49:11
104:16 130:2
**expert** 82:21 87:6
**expertise** 48:20
**expires** 138:4
**explain** 8:22
64:13 107:1
**explaining** 92:25
**explore** 12:12
**express** 14:19
**Expressway**
138:2
**extended** 7:12
**extending** 14:17
**extent** 31:10,12
60:24 61:8
66:10 86:23
135:7
**extrapolating**
92:24

## F

**FA** 88:7
**face** 71:16
**facile** 15:24
**facilitate** 25:18
31:15
**facility** 6:8
**fact** 29:6 58:23
58:23 76:14
79:21 94:23
101:9 112:19
128:20
**failed** 58:18
**failure** 126:20
**fair** 16:15 35:8
60:9 65:15

91:16 97:14,23
99:1,15 104:17
105:15,20
115:16 123:20
**fairly** 9:22 30:4,5
84:7
**fall** 80:10 121:20
**familiar** 21:23
22:5,6 28:1
67:1 82:15
104:1 114:17
116:13 119:21
**far** 5:1 24:15
37:5 58:23 62:6
84:11 87:9
**fault** 81:10
**faulty** 43:3
**February** 80:19
113:10 126:8
126:12
**fee** 74:16,18
75:23 80:2
85:15 90:3
93:16
**feel** 54:5 69:5
**feels** 35:17 82:22
**fight** 53:17
**file** 80:11
**final** 30:9
**financial** 8:23
13:20,22 87:20
116:14,17,24
119:8,14,19,22
119:25
**financials** 122:1
122:4,7
**find** 26:13 31:15
67:14 129:17
**fine** 21:10 39:3
90:21 106:25
**FINRA** 4:21
**firm** 95:23
**first** 4:2 37:2,4
42:22 46:14
48:14 49:5 50:7

David Klos - October 27, 2021

72:14,19,19
75:14 96:2
110:20 131:15
**five** 105:3 126:25
**flag** 10:4
**flavoring** 63:14
**flight** 132:10
**flip** 37:1
**flipped** 9:20
**Floor** 1:25 2:11
**flow** 23:21,25
26:7 88:17
96:15
**focus** 8:14 65:10
**focused** 6:7
**follow** 16:18
**follow-up** 128:17
**followed** 116:11
**follows** 4:2
**forecast** 126:3
129:10
**forecasting** 6:8
**forecasts** 9:24
44:1,4 126:3
129:9
**foregoing** 135:24
137:4
**foreign** 89:15
**forgave** 123:15
**forget** 86:7
**forgetting** 9:8
**forgive** 123:22
**forgiven** 96:8
106:7,16,17,20
122:19,24
123:11,11
**forgiveness** 97:10
97:17 122:14
**forgiving** 123:7
**form** 6:16 8:25
11:17,24 12:25
14:12 21:24
22:8,15 23:10
25:3,11 27:4
29:10 32:25

33:24 34:21
35:13 36:4
37:20 38:17,25
39:7 40:3,14
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22
49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 57:8
60:12 61:1 63:5
64:9 65:19,25
66:7,15 69:20
71:3,12,20
76:18 77:6,20
77:23 78:4,23
79:5,19 81:2,11
81:23 82:6,13
84:11,12 87:3
88:18 89:5
90:14 91:3,9
93:13 94:8 95:5
99:4,23 100:19
101:3,25
102:15 103:15
104:18 108:2
128:13 130:7
130:16 131:11
131:21 133:13
133:22 134:8
134:17 135:2
**found** 61:18
**foundation**
113:20 125:17
**four** 6:13 128:23
**frame** 4:24 7:11
7:12 8:10,14,24
12:6 20:12 24:8
25:1 66:12,20
67:16 106:13
123:18
**Frank** 8:17 11:1
20:9 29:13

30:15,17 35:23
35:25 36:10
44:7 52:1 53:7
53:8 54:15 55:9
60:20 61:14
68:14,14 69:1,3
70:13,14 77:13
77:15 80:12,13
93:6 101:7,18
101:23 102:3,4
102:8,9,11
121:22 127:19
**Frank's** 39:18
**Frankly** 48:10
**fraud** 81:5
**frequent** 84:1
**Friday** 118:1
**front** 10:17 44:8
67:20 68:5 72:3
**full** 57:3 106:18
**full-service** 107:5
**full-time** 12:3
**function** 72:2
**fund** 1:9 6:11,11
9:5,5 13:6
70:24,25 71:1,6
71:7,8 72:8
73:15 74:11,12
74:13,13,14,17
75:2,6 80:20,23
81:16 86:5
109:3
**funds** 10:21,22
12:13 29:9 30:2
30:19 31:20
34:8 35:11
75:24,24 76:1
80:9 85:14
128:19
**further** 3:6 24:19
84:18 126:24
127:1 135:10
137:17
**future** 17:4 45:16
49:13,20 53:17

93:7

---
### G
**gearing** 53:17
**gears** 65:8
**general** 18:13,15
19:9,10 20:11
20:13 32:20
33:19 61:4
92:11 93:4
96:24 97:6
104:4,5 108:20
133:24 134:6
135:4
**generally** 19:25
27:24 30:4
32:21 38:4,4
40:2,11,16
42:15 45:8
77:22 96:5,10
96:12,17 98:20
105:1 107:1
108:18 110:22
116:15 119:21
**generallys** 40:6
**generating** 42:12
**Germans** 63:14
**getting** 10:4
23:24 44:8
51:13 59:8
**give** 5:21,24 14:4
16:13 39:3
67:25
**given** 15:5 43:2
43:22 47:23
70:12 73:21,22
74:1 102:8
123:3 129:2
**global** 52:25
70:24 74:12
75:6 101:13
**go** 15:19 16:1
20:1 43:6 54:4
65:12 81:9
82:18 85:10

105:24 127:2
134:4
**goes** 28:9 40:18
87:9
**going** 14:2 15:5,6
16:9,12,15,19
17:5 20:19
28:17 32:10
36:11,12 42:22
46:11 49:13
55:16 57:11,14
62:18 65:8,9,10
65:12 68:1 70:5
74:22 79:9
82:23 83:11,19
88:7 89:20
106:23 107:17
108:20 111:17
117:5 118:13
127:6 129:12
132:4,13
134:11
**good** 73:20 95:22
96:1 100:12
**grad** 5:7
**graduate** 4:14,15
**group** 5:19 6:11
6:16 9:9,14,15
9:21 10:7,9,14
10:15,24 11:7
35:9 43:18
61:21 62:10,11
83:5 109:3
110:24 115:2,5
115:18,21
117:25 118:16
126:8
**groups** 6:19,20
**guess** 8:8 88:24
104:21

---
### H
**half** 5:9 94:20
95:11 110:20
**half-million**

David Klos - October 27, 2021

123:9
**hand** 90:9
**handled** 11:9
  26:21 35:9 40:8
**handles** 11:7
**hands** 57:2
**happened** 35:25
  47:13 59:2,4
  93:8,11
**happening** 27:14
**happens** 47:13
**happy** 55:22
**hard** 15:4 18:1
  26:13 47:20
  63:7 71:5
  134:12
**harder** 11:13
**HARDT** 2:3
**HARR** 2:3
**hat** 43:15
**hate** 57:1 97:4
**Hayley** 83:21
  118:10
**HCM** 76:16
**HCMFA** 13:6
  53:20 65:10
  68:8 71:10,17
  72:8,8,12,12,24
  73:3,5,7,14,17
  73:21 74:10,24
  75:1,1,21 76:11
  76:16,17 78:14
  78:22 79:1,13
  79:14 80:2,20
  80:22,25 81:15
  85:16 87:2,5,9
  87:15 88:10
  89:2,3,12,13,20
  90:17,21,23
  91:23 92:19,20
  93:16,21,23
  110:2 115:8
  118:8,13,14
  119:18 120:6
  120:11,18,24

121:7 127:13
  127:17 128:1
  128:23
**HCMFA's** 70:23
  119:25
**HCMLP** 10:21
  29:4 42:20 60:2
  68:8 71:17 72:2
  72:2,23 76:2
  80:1 94:1 104:8
  109:24 110:3,4
  110:12,15,16
  113:15 115:8
  118:8,13
  121:25 122:8
  125:11,23
  126:20 128:1
**HCMS** 2:20
  95:24 98:23
  99:8,10 107:3,4
  107:5 109:21
  109:25 110:3
  124:22
**HCRE** 2:20
  95:24 98:23
  99:8,10,21
  100:17 107:3
  107:11,20
  108:6,12,22
  110:6,7,10,12
  110:15 124:20
**he'll** 94:14
**head** 62:15
  107:10
**headers** 36:25
**hear** 52:4 113:8
**heard** 30:17
  62:16 74:3
  91:14,17,21
  122:22 125:18
**hearing** 101:10
**hearsay** 79:17
**heavy** 107:13
**hedge** 6:11 30:15
  33:12

**held** 6:16 10:20
  121:10,12
  122:20,25
**hell** 74:24
**help** 33:2 65:22
  66:20 67:16
  100:4
**helped** 105:9
**helping** 31:14
**Hendrix** 9:16
  18:16,19,24
  20:3 27:19
  39:13 52:11
  84:17 99:2,18
  100:14,25
  103:3,14
  117:25 124:4
**hereof** 48:16
**hereon** 48:15
**hereto** 137:16
**hesitate** 64:17
**hesitating** 106:16
**hey** 42:23 85:9
**hierarchy** 10:25
**high** 105:5
**Highland** 1:6,9
  5:11,12,14,22
  6:6 7:25 8:4,12
  8:16 10:14,18
  10:20 11:23
  12:6,8,9,23
  13:4,5,14,17,18
  13:21 14:3,22
  15:2,15 16:5,6
  17:5,6 23:2,21
  23:21,22,23
  25:2 26:17,18
  26:19,23,25
  28:2 29:4,18,20
  29:24 31:12,17
  32:6,23 33:3,4
  33:7 34:7,19
  35:3,4,10 36:2
  36:24 37:10
  39:22 40:22

41:2,2,12,16,24
  42:5,20,22 43:6
  43:7,9,10,12,16
  44:5 49:11
  50:19 51:2,4,19
  51:20 58:13,21
  59:9 64:24
  65:18,21 70:24
  71:6,11 72:7,10
  74:12,25 75:8
  75:10,12,14,23
  75:24,25 76:4,5
  76:12 79:8,25
  80:2,7 81:18
  84:9 88:14 89:1
  89:4,12 90:4,5
  90:22 92:19,22
  93:23 97:11
  104:11 105:22
  106:6 107:2,24
  109:22 110:8
  112:20 119:12
  122:19,19,23
  123:7,14,21
  125:4 126:14
**Highland's** 42:13
  51:9 72:13,14
**history** 62:2
  116:3,7 118:22
  119:2,12 120:5
  120:17
**hit** 82:3
**hits** 82:9
**HMS** 99:21
  100:17
**hold** 4:18 121:15
**honestly** 58:22
**hope** 43:20 82:7
**hopelessly** 53:16
**Houlihan** 71:23
**hours** 11:22 12:6
  12:7,10
**housed** 72:2
**human** 71:19
**hundred** 23:14

28:5 30:10,11
  33:13 68:18
  69:5,11 92:3
  102:19 106:18
**hundreds** 65:16

---

## I

**idea** 7:24 57:10
  89:12 108:13
**identified** 72:25
**illiquid** 11:13
**important** 44:6,7
  59:18,20 93:22
**importantly**
  85:15
**impossible** 80:24
  91:25
**impression** 52:24
**in-house** 23:3
**inappropriate**
  81:20
**inartful** 77:16
**incidental** 128:21
**include** 52:18
  107:25
**included** 85:12
  115:5 116:16
  116:23 118:3
  119:8,13,25
  120:7,12,19
  122:5,7 126:3
**including** 79:14
  115:17
**inconsequential**
  127:23
**incorrect** 55:5,6
  55:11
**INDEX** 3:1
**indicate** 44:22
  80:7,16
**indicates** 135:5
**individual** 31:8
  52:2 72:24
**individuals**
  106:19 123:3

David Klos - October 27, 2021

inflow 59:8
info@dickman...
  138:3
informal 83:25
  105:14
informally 62:5
information
  59:16 129:1
informed 62:10
  102:3
inject 90:22
ink 84:23
insinuation 16:9
  17:1
insolvent 87:2,6
installment
  110:25 111:7
  112:1,8,16
  113:4 114:7,12
  125:12,23
  126:4 131:3,10
installments
  14:22 130:23
instance 1:20
  31:20 34:11,16
  34:18 35:25
  39:22 42:22
  68:24 86:22
instances 32:5
  65:16 71:8 91:5
institutional 9:5
instruct 115:7
instructed
  125:11
instructing 85:9
  133:2
instruction 52:25
  61:13,24 62:12
  62:17 99:19
  101:6,13,17,23
  102:3,5,8,20
  103:7 124:7
  125:15
instructions
  100:15 103:14

103:22
insulting 132:5
  133:6,9
insurance 80:20
  80:22 81:5,6,9
  81:14,19 82:4
  82:10,19
intended 44:15
  44:19 111:6
  130:3
intent 95:12
interco 68:8
  115:22
intercompany
  32:22 41:3
  65:17 68:9,11
  68:12 69:10
interest 37:4,8,13
  37:15 38:9
  40:12 45:12
  46:8,8,16,20,25
  47:1,4,4,11,12
  47:13,14,18,19
  47:20,21,24,25
  48:4,5,7,15
  49:4,6,12,12,20
  49:23 50:9,21
  51:3 86:2 111:3
  131:15
interested 83:13
  137:19
internal 22:21,25
internally 96:16
investment 74:19
investments
  107:16
investors 74:17
  75:5
involved 10:7
  25:14,24 60:17
iota 16:13
irrespective
  90:11
issue 29:18 36:20
  43:7,8,17 93:10

105:17 108:1
  113:12 124:13
issued 124:16
issues 75:15
  79:23 121:6

**J**
Jack 106:15
January 29:16
  42:16 44:13
  58:11,15,25
  59:23 60:2,23
  61:7,18 112:22
  113:3,16
Jim 2:20 24:11
  26:4,4 29:13,14
  30:17 31:9 34:2
  34:6 35:23 36:1
  36:9 44:8 53:16
  68:14,18 69:1,3
  70:15 80:5 89:9
  93:25 94:2 97:9
  101:18 105:22
  108:20,21,23
  118:9 121:22
Jim's 26:15,16,20
  26:22,24 36:7
  90:7 93:6 94:19
  108:21
jmorris@pszjl...
  2:14
John 2:12 36:16
joined 5:14 29:24
  122:23
JONES 2:10
judge 132:21
juggled 31:24
July 29:17 58:24
jumble 48:1
June 11:21 45:23
  45:24 49:2

**K**
K-l-o-s 4:7,8
keep 27:21

100:10
keeper 26:15
keeping 129:1
kind 10:25 14:23
  15:25 52:12
  89:7 99:13
  106:12 108:22
  108:23 109:8
Klos 1:14,18 4:1
  4:6 61:24 64:22
  95:22 109:19
  117:21 136:5
knew 70:6,11
  85:22 128:23
  129:3
know 4:19 5:1
  9:22,23 10:19
  11:11 12:7,19
  15:6,13 17:10
  18:7,8,11 19:10
  20:4 23:7,17
  24:1,7,9,12,15
  25:5,7 28:21,23
  29:6 31:11,13
  31:23,25 32:3,7
  35:15 37:25
  38:11,12,19
  39:9 40:20
  43:16,21 44:18
  45:4 48:10
  51:16,25 53:1
  53:17,25 54:20
  54:20 55:14
  60:14,19,22
  62:13 70:10
  73:17 76:14
  77:23 78:20
  81:4,21,25 82:2
  82:4,8,19 83:11
  84:6,25 85:17
  85:18,20 86:1,4
  87:6,17 90:18
  90:19,25 91:5
  91:13,16 93:19
  96:14 98:21

99:12 100:8
  101:10 102:25
  104:13,13,20
  105:12 106:11
  106:14 108:7,8
  110:2,3 112:23
  117:11 119:7
  119:18 120:11
  121:12,23
  123:17 127:23
  129:6 130:10
  130:18 131:23
knowing 102:23
knowledge 7:24
  13:8,10 24:13
  34:6 35:1 44:14
  48:20 49:10
  60:25 61:16
  63:24 64:5 67:6
  73:1 79:17
  98:10 100:6,9
  104:10 109:21
  110:7 112:23
  121:19 122:10
  123:10,21
  125:10
known 61:9
  69:23 70:1
KOPF 2:3
Kristin 9:16
  18:16 39:13,17
  52:1 53:7,8
  59:11 61:13
  62:4,15,15 83:1
  83:2,20 99:14
  101:7,24 102:3
  102:5,8,10,11
  108:5,8,12,14
  109:10 117:25
  118:15 119:3
Kristin's 100:6
  100:22 118:20

**L**
L.P 1:6,10

**lacks** 113:19
125:17
**land** 132:21
**language** 74:25
**large** 55:2 59:8
59:13 93:20
131:25
**larger** 41:7 58:3
**largest** 123:8
**late** 106:13
**launching** 10:3
**Lauren** 23:2
**law** 2:5,12,19
81:22 82:1,9,16
82:22 95:23
**Lawler** 106:17
**Lawn** 2:17
**lawsuit** 112:14
**lawsuits** 97:15
**lawyer** 23:4
82:21
**leading** 65:17
**learn** 30:25 51:21
51:23 58:6,6
**learned** 61:6
**learning** 58:20
**left** 7:14,20 46:8
46:9 109:20
**legal** 18:10,20
84:9 112:3,10
130:9
**legally** 82:19
84:10
**length** 19:24
124:2
**let's** 8:14 12:12
18:22 21:21
24:19 27:7 28:6
61:7 66:19
68:24 81:17
103:25 109:19
122:14 123:25
**letter** 14:15,17
58:13,17
**letters** 80:5

**level** 23:20,24
36:6 82:15
88:14 105:5
**liabilities** 87:10
87:12 122:8
**liability** 120:12
120:19
**liaison** 10:15
11:5
**liberally** 12:8
**license** 4:20,22
107:5
**licenses** 4:18
**life** 131:18,19
**limited** 104:7
**lines** 5:18
**linked** 92:15,17
**liquidity** 29:4,5
29:18,20,23
30:7,21 31:21
31:25 32:6,22
33:9 34:20
35:19 36:2 40:7
42:13,20 43:7,8
43:17 73:2,14
73:18 74:10
75:1,15,22
**list** 59:10 106:12
109:9
**litigation** 15:5
16:6,11 18:1,25
19:21 126:19
**litigations** 17:7
**little** 9:2 12:12
14:2 30:15
33:12 39:3 48:1
98:15 106:23
107:5
**live** 4:11,12
**LLP** 2:17
**loaded** 16:22
**loan** 9:6 28:1
33:11,21 34:9
34:13,20 35:12
36:1 39:25 40:1
41:9 68:11,13

68:16,21 69:10
69:15,17,19,24
70:2,10 73:14
74:2,4,7 76:15
76:21 78:3
79:13,24 85:18
85:20 89:21
90:10,13 91:2,6
92:3,15 95:4
107:25 110:19
115:22 116:4,8
116:16,23
117:3 118:8,10
118:11,13,17
118:25 119:4,7
119:14 122:14
123:6,10,14,22
**loaning** 72:7,11
89:1 92:19,22
**loans** 32:4 33:14
36:9 40:8 65:17
66:3,5 80:7
84:1 85:10
89:10 90:8
91:12,14,23
94:1,7,22 95:2
98:17,22
105:16 106:6
106:19 107:25
108:1 119:24
120:8,12,19
123:2
**logically** 42:15
69:18
**Lokey** 71:24
**long** 15:8 16:5
17:5,9 34:25
43:5 62:4 84:12
122:16
**long-term** 86:7
**look** 15:19 27:15
38:15 39:4
66:19 114:15
117:10,22
134:3,15,19

**looked** 111:20
**looking** 22:3 44:1
117:17
**looks** 27:25 39:6
**loop** 53:9
**lost** 41:21 63:16
**lot** 100:1 129:20
**loud** 118:6
**LP** 6:6 8:5 12:14
12:15,17 13:6
23:22 26:19,24
29:5 110:8
**lying** 79:16

## M

**machine** 1:24
**magnitude** 92:12
**maintained** 28:2
**maker** 46:15,23
47:1 50:8
114:12 122:20
122:25 129:18
129:24
**makers** 126:13
126:19
**making** 71:8
75:18,19 85:12
99:20 100:16
107:20,23,25
108:9 126:9
132:20
**man** 17:23
128:10 130:20
**manage** 32:2
**managed** 10:21
10:21 70:24
**Management** 1:6
1:9 5:12 6:6 8:5
13:6 23:22,24
26:19,23 27:1
29:4,19 32:6,24
35:3 71:6 107:2
110:8
**manager** 7:2,3
**managing** 9:25

25:23
**March** 5:12,14
6:3 13:24 37:6
80:19 122:17
**marching** 52:3
**marked** 3:10
**Master's** 4:16
**material** 15:7
**matter** 109:11,12
**matters** 26:22,24
**maturity** 131:20
**MBA** 4:17
131:25
**mean** 9:18 15:21
24:10 26:9,11
104:6 114:18
**meaning** 51:4
68:9
**means** 47:4,12
48:21 63:12
84:7 132:1
133:12,20
134:7 135:7
**meant** 50:12
**medical** 82:3,10
82:10
**meet** 31:14 33:8
73:2
**meeting** 52:12
57:25
**meetings** 25:24
43:5,24 62:1,3
63:2,19
**Melissa** 26:10,12
108:14,17,18
109:1,5,9
**member** 62:14
**members** 10:17
**memory** 27:8
28:17,19 42:16
42:18 50:23
68:15 71:18
85:8 87:13
91:20 92:4,7
93:9,12

**mental** 48:1
**mention** 10:6
  114:7
**mentioned** 12:13
  61:20 88:13
  98:7 107:23
  108:4 110:6
  116:10
**met** 31:9,25
**Michael** 2:18
  95:16,23
  135:11
**michael.aigen...**
  2:22
**mid** 112:21
**middle** 6:10 80:4
  108:22
**million** 18:1
  21:22 28:13,14
  28:14 45:25
  46:3 49:1,8
  58:25 68:7 69:2
  70:7,19,23 72:7
  73:18,25,25
  74:7,8,24 75:4
  75:9,22,23 76:3
  76:19 77:4,10
  77:11,18,18
  78:3,10,22
  79:12,22 80:2
  80:19 81:18
  82:25 85:4,18
  85:20,23 86:13
  89:2 90:17,20
  90:22,24 91:22
  91:22 92:8,15
  93:3 115:8
  116:3,23 118:8
  118:9,13,24
  119:7,14,25
  122:5
**mind** 36:8 56:20
  76:9 100:2
**mine** 24:1
**minimus** 127:22

**minutes** 39:21
  105:25 126:25
**misconstrued**
  134:23
**missed** 60:25
**missing** 107:10
**mistake** 80:12
  126:8 127:21
  127:23 128:4,7
**MLP** 59:9
**moment** 32:12
  67:16 73:21,22
  116:6 122:15
**monetization**
  15:2
**monetizing** 97:12
**money** 15:17
  33:3,3,7 34:19
  39:22 41:12,16
  42:4 45:20
  59:13,19 70:4
  72:11,12 73:5
  75:12 76:11,12
  76:13 79:24
  92:19,22
  113:24 120:8
**month** 11:22 12:6
**months** 6:13 19:6
  59:5 75:14
**morning** 36:16
**Morris** 2:12 3:5
  8:25 11:17,24
  12:25 14:12
  17:20,25 20:17
  20:21,24 21:2,8
  21:24 22:8,15
  23:10 25:3,11
  27:4,16 29:10
  32:25 33:24
  34:21 35:13
  36:4,18 37:20
  38:17,25 39:7
  40:3,14 41:17
  41:20 42:24
  43:19 44:16,24

  45:9,17 46:21
  47:8,15 48:8,22
  49:15 50:2,13
  51:5 52:21
  53:22 54:7 55:3
  55:12,19 56:11
  57:8,19 60:12
  61:1 63:5,13
  64:9 65:19,25
  66:7,15,24
  67:17 69:20
  71:3,12,20
  76:18,22 77:6
  77:20 78:4,23
  79:5,19 81:2,11
  81:23 82:6,13
  83:13,17 85:21
  87:3 88:18 89:5
  90:14 91:3,9,19
  92:5 93:13 94:8
  94:13,16 95:5
  95:16,20 99:4
  99:23 100:5,11
  100:19 101:3
  101:25 102:15
  103:15 104:18
  108:2 109:19
  111:11 112:7
  112:13 113:22
  116:21 117:2,9
  117:13,16,21
  119:11,18
  120:5,11,17,23
  125:18,21
  126:24 128:13
  129:12 130:7
  130:16,19
  131:1,5,11,21
  132:2,8,11,15
  132:19,23
  133:3,5,13,22
  134:8,17 135:2
  135:10,13,15
  135:19
**motion** 132:18,20

**mouth** 36:7
**Move** 120:15
  125:16
**moved** 6:10
**muddy** 43:14
**MUNSCH** 2:3
**mutual** 74:13,14

**N**

**name** 4:4 26:11
  26:14 39:10
  87:21 95:23
**names** 106:14
**Nancy** 104:24
  105:16,21
**nature** 10:1 70:4
  70:6,7,11 84:1
**NAV** 70:25 71:2
  71:8,19,25
  72:19,20,21
  73:4,15 79:14
  80:20 81:1,14
  85:22 89:20
  90:2,3 92:11,16
  92:17,18 104:2
  104:10
**necessarily** 31:25
  50:11 53:4
  69:12 107:14
**need** 29:18 31:16
  33:12 37:3
  41:24 54:5
  58:14 73:3 93:7
  93:20,21
  106:25 107:4
**needed** 30:3
  31:10,12 32:6
  35:19 41:12
  73:5,17 74:10
  74:25 75:21
  76:11
**needing** 29:5,22
**needs** 29:4 31:14
  33:9 34:20 40:7
  42:20 44:9

**negative** 37:7
  44:4
**negotiation** 22:7
  22:13,18
**neither** 93:23
**never** 18:2 56:25
  72:25 74:3
  78:12 80:13
  91:14 105:15
  105:18,20
**new** 2:11 7:16
  26:11,13 68:8
  68:11 85:10
  115:22 118:8
  132:21
**NexBank** 124:16
**NexPoint** 10:4
  12:13,14,14,17
  12:24 13:3,16
  21:21 26:3 27:1
  27:12 36:22
  37:11,19 40:22
  41:3,15,15 42:4
  42:9,11,17,22
  43:11,13 53:19
  56:21 57:6,10
  57:14,18,23
  58:17,25 59:12
  59:24 62:18
  63:3,20 64:8
  65:9 72:22,24
  75:17,19 78:13
  110:19 111:14
  111:22,25
  112:15 113:3
  113:10,15
  120:24 124:18
**NexPoint's**
  110:25 111:6
  112:21
**night** 36:17
**nomenclature**
  83:24
**nominal** 62:1
**nonstop** 44:5

David Klos - October 27, 2021

**North** 1:24 2:3
138:2
**NORTHERN** 1:2
**note** 21:22,23
22:2,5,7,14,22
23:9,15 24:10
24:18,21,23
25:2,9,17 27:2
27:9,13,14
33:17 38:15
39:4 40:11,13
40:17 46:12,16
46:25 48:5,14
49:10 50:25
51:10 57:18,23
58:4,20 59:12
60:7 63:4,21
64:8 65:9 66:6
66:10,13 70:22
75:18,20 76:7
79:1,22 82:25
83:21 84:3,9,16
84:16,18,19
85:4 86:2,3,3,8
86:13 89:15
92:15 111:22
112:9,12
113:16 122:19
122:24 127:13
127:14,17
128:16 130:3
131:18,20
133:12 134:3,4
134:11,15,20
**notes** 16:7 17:7
19:25 23:13,14
26:3 36:19
40:21 50:19
52:18 65:10
66:20 67:12
76:1 84:14,22
85:2 86:12
87:14,24 88:7
88:10,15,16
96:8 97:11,16

114:21 122:5
122:12 124:10
124:11,13,24
125:4,7,8,13,25
126:10,13,20
127:17 128:23
129:7 130:12
130:15
**Notwithstanding**
110:23 111:25
**November** 54:4
63:18 124:8
137:22
**number** 12:2,10
14:10 22:4
23:19 27:16
28:9 75:3,4
**numbered** 1:21
27:19
**numbers** 14:4,19
28:6 44:4 81:18
**nutshell** 54:12
**NY** 2:11

_____

**O**

**o0o--** 1:4
**Oak** 2:17
**oath** 97:6 106:4
**object** 50:2 100:8
**objected** 118:20
**objection** 8:25
11:17,24 12:25
14:12 20:17
21:2,24 22:8,15
23:10 25:3,11
27:4 29:10
32:25 33:24
34:21 35:13
36:4 37:20
38:17,25 39:2,7
40:3,14 41:17
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22

49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 56:11
57:8 60:12 61:1
63:5 64:9 65:19
65:25 66:7,15
69:20 71:3,12
71:20 76:18
77:6,20 78:4,23
79:5,19 81:2,11
81:23 82:6,13
85:21 87:3
88:18 89:5
90:14 91:3,9,19
92:5 93:13 94:8
95:5 99:4,23
100:19 101:3
101:25 102:15
103:15 104:18
108:2 111:9
112:3,10
113:19 116:20
116:25 119:9
119:16 120:4,9
120:15,21
125:16 128:13
130:7,16 131:5
131:11,21
132:2 133:13
133:22 134:8
134:17 135:2
**obligated** 122:12
**obligation** 25:25
80:1 110:25
111:6,14
112:16 113:11
113:17 114:12
**obligations** 45:21
121:24
**obligor's** 33:8
**obviously** 85:18
**occur** 55:8 96:9
**occurred** 47:5
61:17 70:25

72:20,25 85:13
92:13 112:24
**October** 1:15,21
31:18 80:11
120:24 127:11
128:22 129:3
**offended** 17:22
**offer** 14:15,17
**offhand** 84:16
**office** 5:5,10,10
10:17 72:4
121:10
**officer** 7:14,17,22
8:23,24 9:3
10:13 13:21,22
53:4 121:6,13
123:22
**officer-level** 7:25
13:18
**officers** 105:22
106:7 121:18
123:15
**official** 12:16
13:7
**oftentimes** 32:3
**Oh** 100:12
**okay** 18:14 20:8
51:8,16 52:10
65:13 74:1,7
76:25 81:21
82:23 84:4 93:9
100:3 110:18
110:23 112:25
117:2 119:11
120:23 124:7
125:8 126:2
132:19
**old** 106:22
**one-page** 84:11
**oOo--** 135:22
**open-end** 74:13
**open-ended** 25:6
**operate** 29:5
**operations** 9:6
107:19

**opinion** 44:6
**opposed** 40:22
42:9 75:8,10
85:1 86:3 89:20
90:12 102:20
103:8 127:17
**oral** 96:4,7,23
97:8,15,22 98:1
98:5,12
**order** 27:21
124:9
**orders** 52:3
**ordinary** 128:11
**organization**
72:4
**original** 27:12
**originated** 43:9
**ought** 62:23
**outlook** 44:2
**outside** 11:9
128:11
**outstanding** 38:8
45:22 46:9,10
47:1,19 49:5
125:3 129:2
**overall** 10:10
30:6
**overpayments**
53:19 55:2
**oversaw** 9:17
**overseeing** 9:14
9:14,21
**oversight** 6:20
9:4,8
**oversimplify**
32:11
**owed** 94:1
**owes** 45:19
**owing** 113:24
121:25

_____

**P**

**P** 37:25
**P.M** 1:22,22
135:21

David Klos - October 27, 2021

**PACHULSKI**
2:10
**package** 83:18
**page** 3:2 28:8
37:2,2 114:15
130:1
**pages** 20:16,25
117:13
**paid** 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
**paper** 85:10
118:11 119:4
**papered** 33:16
66:6 68:21
**papering** 84:19
85:5 118:17
**paragraph** 50:8
114:4,7,10,11
114:16,17
129:15
**pardon** 46:14
**parentheses**
118:9
**part** 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:6 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
**participated**
30:12 121:19
**participating**
61:25 62:3
**particle** 63:15
**particular** 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
**particularly**
35:22 71:23
**parties** 71:23
137:18,21
**Partners** 2:21
99:9
**partnership**
104:8
**parts** 72:4
**party** 71:7
102:22
**pass** 95:15 135:9
**passing** 98:7
**pattern** 66:12
109:11
**pause** 7:7,16
63:13
**pay** 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
**payable** 14:23
74:18 93:16
125:4
**paygrade** 60:11
60:14
**paying** 72:12
**payment** 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
**payments** 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
**payroll** 10:1
53:21 107:21
**pays** 48:4 81:9
82:4,10,19
**PC** 2:3
**PE** 97:12
**penalty** 135:23

**people** 51:19
71:22 72:3
95:10 103:18
**people's** 26:1
57:2
**percent** 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
**perception** 53:14
**perform** 126:21
**performed** 71:24
**performing** 9:25
**period** 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
**perjury** 135:23
**person** 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
**personal** 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
**personally** 25:13
25:17 64:19,20
64:22 108:21
**personnel-wise**
107:7
**perspective**
33:23 35:20
**pertain** 72:22
**pertained** 105:8
**pertaining** 93:20
97:10
**pertains** 79:22

**petition** 123:23
**phrase** 51:3 97:4
**physical** 85:5
**physically** 22:23
66:14
**pick** 45:20 48:25
109:20
**piece** 15:20,21
**pin** 8:6
**place** 33:20 35:2
66:13 137:8
**Plaintiff** 1:7 2:13
**plan** 14:22,23,25
17:11
**plane** 82:7
130:21
**platform** 10:20
12:10
**play** 15:6 64:15
**please** 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
**pled** 98:13
**plenty** 57:3
**point** 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
**pointed** 102:22
**points** 7:6 20:14

policy 33:20 35:2
35:6
portion 16:4
21:12
portions 20:8
position 7:25
13:18 43:22
51:9 79:11,18
121:13,15
possibility 79:23
possible 17:17
48:11 50:3 74:5
89:23,25 90:19
91:17 95:1,8,9
95:10
possibly 41:6
potential 53:17
92:12 97:17
potentially 30:14
96:8,14,16
power 89:9 90:21
90:23
practice 30:1,5
34:4,14 35:18
50:4 69:23 70:3
73:6 78:7 79:4
86:5 90:7
109:11,12
practices 70:11
pre 135:5
precision 28:5
predicate 41:22
42:2
preference 73:7
73:11 90:7
prefix 135:5
premise 43:1,3
89:8
prep 83:21
prepaid 49:22
131:18,19
preparation
19:13 21:9 67:7
67:8 84:19
prepare 54:6

84:2,9,17
prepared 26:7
53:18 54:9
64:20 66:14
80:8
preparing 18:9
19:20 129:8,10
prepay 46:15,19
46:24 47:24,25
48:5,7 49:19
50:8
prepaying 50:21
51:3
prepayment
37:19,23 38:1
38:11,13 46:13
63:23 64:12
113:5,12,18
114:11 129:16
129:18,23
130:5 131:2,9
131:14 132:1
133:12,20
134:7,20,25
135:5,7
prepayments
27:2 38:10
44:15,19,23
45:1,5 63:4,21
64:8 134:12
preposterous
89:15
present 18:20,25
56:20 68:15
93:9
presented 66:14
president 43:10
43:11 121:17
pretty 11:15
60:24
previously 53:6
125:3
pricing 10:16,16
primarily 6:7
26:22 88:5

128:19
primary 9:15
109:5
principal 37:5,9
37:13,16 38:9
40:12 45:12
46:9,16,24 47:2
47:22 48:16
49:8,24 123:11
131:16
print 117:8
prior 14:22 19:18
24:19 27:9
31:19 40:10
53:18 56:17
57:5,12,17,21
69:17 87:14,15
88:15 92:4
97:14 98:12
104:11 112:14
112:15 113:5
113:10,18
122:22 123:23
126:7,12,18
131:20 135:1
priorities 89:11
privilege 132:6
133:2,4
probably 4:24
6:12 8:9 9:7
15:11,19 23:19
24:7 35:12
39:11 44:7
73:24,24 83:9
98:7 105:3,13
108:7 114:19
problem 57:2
problems 29:21
procedure 33:20
35:2,6 39:5
66:13 83:23,24
proceedings 5:3
96:6 108:1
proceeds 80:22
81:6

process 17:9
32:10 51:19
66:17 83:24,25
109:8 121:3,4
122:2
processing 10:1
produced 1:18
83:14,16 117:6
production
117:14
professional 4:18
program 105:9
progression 5:24
promissory 16:7
22:14 23:9
24:21 25:2
27:13 33:17
38:15 39:4
46:12 50:19
52:18 63:4
65:10 66:6,10
66:13,20 67:12
70:21 85:2
97:11,16
122:19 130:3
130:12,14
131:18,19
133:12
promoted 6:1
proper 108:10
132:11
protest 126:18
provide 110:10
110:12
provided 13:2,3
13:13 20:15,15
21:6 40:12
76:13 80:6
102:5 107:2,24
109:25 110:4
110:16 122:4
125:14 137:15
provider 11:12
71:24
providers 10:16

43:12
providing 12:24
provision 114:19
129:22,25
public 10:3
purport 28:8
purpose 23:8,12
85:25
purposes 30:21
31:21 32:22
36:3 73:8 75:22
pursuant 12:22
13:14 74:15
112:11
put 6:15 10:2
26:1 86:6 93:6

_____
        Q
_____
qualification
64:4
qualitative 16:1
question 9:1
11:18,25 13:1
14:13 16:8,22
16:25 17:2
20:24 21:25
22:9,16 23:11
24:25 25:4,6,12
27:5 29:11 33:1
33:25 34:15,22
35:14 36:5
37:21 38:18,21
39:1,8 40:4,15
40:19 42:2,25
43:20 44:10,11
44:17,25 45:10
45:18 46:22
47:3,9,16 48:9
48:23 49:16,18
49:25 50:2,14
51:6 52:22
53:23 54:8 55:4
55:13,20,22
57:9,20 60:13
61:2,4 63:6

David Klos - October 27, 2021

64:1,10 65:20
66:1,8,16,21
67:16,24 69:21
71:4,13,21
76:19 77:7,16
77:21 78:5,9,24
79:6,20 81:3,12
81:24 82:7,14
83:15 87:4
88:19,24 89:6,8
90:15 91:4,10
93:14 94:9,12
94:13,14,21
95:6,7 96:5
97:24 99:5,24
100:1,20,21
101:4 102:1,16
103:16 104:19
104:22 108:3
119:3 125:20
125:20 128:14
130:8,9,17
131:4,7,12,22
132:4,5,11,14
132:24,24
133:6,14,17,23
134:9,13,16,18
134:20 135:3
**questions** 19:12
77:12 80:13
95:17 97:25
109:15 110:18
111:19 114:3
126:24 129:13
135:10,12
**quick** 48:12
**quite** 7:9 31:9
**quote** 115:22

_____

**R**

**radar** 93:6
**radars** 26:1
**raise** 24:5,7
119:3
**raised** 24:3 80:15

96:3,7,18
**raising** 62:17
**rate** 84:15 86:2,6
**ratify** 28:6
**ratio** 104:2,10
**rational** 80:25
**rationally** 92:25
**reached** 104:11
**read** 20:8,10,20
20:25 21:11,11
44:22 46:25
48:24 118:6
127:8,14,21
128:6 130:1
131:14 132:23
**reading** 21:5
46:6 131:8
**reads** 46:23
**real** 107:13
**realize** 128:6
**realized** 127:21
**really** 6:12 9:16
10:15 16:8 54:4
73:9 78:12
83:13 95:9
101:11 105:4
107:5 108:19
109:2 128:19
129:6
**realtime** 85:14
**reason** 23:8
30:14 35:21
40:23,24 41:1
54:24 55:10
67:22,24 75:17
75:19 99:21
100:18,21
113:7,14
115:24
**reasoning** 105:2
**reasons** 23:20
74:1 88:4
**recall** 4:23 19:2
21:4,5 22:22
23:6 24:3 27:13

31:19 34:23
36:6 41:13 42:3
56:5,9,12,14
57:17,22 58:10
58:16,20 59:8
62:16 63:18
67:18 82:24
85:7 86:19
87:20 88:21
92:10 99:12
102:10 106:21
116:15 118:19
118:22 120:23
121:16 122:21
123:6,16 124:2
127:20 130:13
**receipt** 26:1
**receive** 74:18
**received** 99:19
100:15 103:19
106:19
**receiving** 22:24
33:3
**recognize** 27:23
104:7
**recollection** 5:25
8:3 28:20 29:17
40:7 50:18
51:18 52:15,17
55:7,8 68:17
75:21 76:6
78:16,17 88:3,4
91:24 94:5
95:13 101:24
105:7 115:4
123:21 125:6
126:2
**record** 4:5 16:14
25:9 64:6 68:3
105:24 106:2
117:12
**recorded** 37:13
37:14 38:7
**recording** 25:15
39:14

**records** 110:24
111:4
**recover** 17:15
**recoveries** 17:10
**recovers** 16:6
**reduced** 137:10
**reduction** 38:8
45:12
**refer** 125:7
**reference** 52:18
**referred** 87:24
123:2
**referring** 87:17
98:22
**reflected** 37:14
44:13 120:8
**reflects** 103:21
**refresh** 54:13
**regarding** 16:7
18:24 100:16
127:5
**regardless** 16:16
16:20 60:17
72:24
**regular** 66:12
88:16
**regularly** 31:9
129:19,24
130:4,6
**reimburse** 70:24
**reimbursed**
81:15
**reimbursement**
53:21 72:25
**reinstate** 60:7
**reinvestment**
105:9
**reiterate** 17:13
**REITs** 10:3
**reject** 67:22,24
89:7
**relate** 19:22
**related** 70:20
74:11 81:1
92:18 96:3

97:16,16 99:20
100:16 102:20
103:7 137:20
**relates** 18:5
70:21
**relating** 19:23
**relationship**
53:15 133:21
**relevant** 5:5
**relieve** 45:14
111:6 114:11
129:18,23
130:3,5
**relieved** 112:15
**relieves** 131:2
**reloaned** 76:4
**remainder** 49:24
**remember** 5:16
7:5 12:1,18
13:9 14:24
15:10 18:6
22:22,24,25
32:5 34:11,16
34:18 38:20
39:24 42:8
50:25 51:24
52:1,10,13,23
53:13 56:8 57:5
57:16,24,25
58:3,19,22
59:25 60:8,20
62:20,22,25
63:1,23 67:4
69:13 71:14
74:5,6 78:17
83:22 84:20
85:4 86:15,17
87:11,23 88:2
92:10,11,12
93:2,17 94:5,18
94:19,22 97:18
97:19 98:19
101:15 105:4
108:5 109:7
110:21 113:13

David Klos - October 27, 2021

123:4,8 124:5
130:11 131:4,7
**remembering**
34:10 92:23
**remind** 99:6
**rep** 80:5
**repaid** 76:1
**repay** 89:3
**repaying** 93:25
**repayment** 76:7
**repeat** 22:10 27:6
100:3
**rephrase** 20:24
22:11 49:17
133:5
**report** 8:15 9:16
10:23 53:19
120:24 121:24
**reported** 1:23
**reporter** 117:8
135:13,16
137:1,3,15
**represent** 19:15
95:24
**representation**
19:17
**represented** 2:4
2:11,18
**requested** 137:13
137:14
**reservation**
91:25
**respect** 19:19
22:17 24:20
25:2,18 35:3
38:3 41:11
47:22 49:23
51:9 58:16
68:16 69:12
71:22,23 72:21
76:23 79:8 80:1
80:8 82:25
84:14,18 85:5
86:14 94:3,20
108:6 111:21

121:13 125:13
125:24
**respectful** 76:25
**respond** 25:7
60:15
**response** 128:16
**responsibilities**
7:15 8:7 9:22
108:16
**responsibility**
32:17,18 90:4,5
118:17
**responsible** 11:4
39:14 71:7
108:9,17,19
109:10,13,13
**restate** 61:10
**resulted** 71:25
**retail** 9:4 80:9
120:25 121:20
121:23 122:4
122:11 128:16
128:19
**return** 76:25
**reverse** 40:9
**review** 39:19
48:12 121:3
137:13
**reviewed** 84:10
**ridiculousness**
97:5
**right** 16:17,21
17:25 18:20
21:23 33:22
37:5 41:25
45:16 47:6 55:1
56:1 66:21
67:20 68:9
75:18 78:14
80:4 81:9 83:14
85:19 88:8,22
89:19 107:9
109:25 111:23
114:24 115:2
117:3,12

123:12 124:17
124:22,25
125:5 126:5
127:11,14,20
132:25 133:6
**Rip** 37:2
**role** 5:15 6:2,12
6:16,18,21 8:22
9:4,11 11:5
12:16 13:7,14
19:13 24:19
25:1,14,17,21
25:22,23 26:25
39:10 53:4,6
58:16 62:1
64:15,17 67:6
67:11 78:13
84:18,21 85:5,8
85:11 86:13,21
128:18
**roll** 23:15
**rolled** 125:3
**rolling** 88:15
**rolls** 39:18 64:18
**roughly** 6:9
**round** 39:20
81:18
**RPR** 1:23
**Rukavina** 2:5 3:3
3:6 4:4 9:10
11:21 12:3 13:5
14:16 17:23
18:4 20:19,23
20:25 21:6 22:3
22:11,19 23:17
25:8,16 27:7,17
27:18 29:16
33:5 34:6 35:1
35:24 36:11,21
38:2,20 39:2,20
40:9,18 41:19
41:22 43:4,23
44:20 45:6,14
45:23 47:3,10
47:17 48:13

49:9 50:1,5,17
51:8 53:11 54:3
54:11 55:6,16
55:24 56:14
57:12,21 60:19
61:5 63:10,14
64:14 65:23
66:4,11,19,25
67:1,18 68:4
70:1 71:10,18
72:6 76:24 77:8
78:1,9 79:2,9
80:18 81:8,21
82:2,8,17 83:16
83:19 86:1 87:8
88:21 89:17
91:1,7,13,20
92:7 94:3,11,14
94:17 95:7,14
110:18 111:9
111:20 112:3
112:10 113:19
116:20,25
117:7,11,15
119:9,16 120:4
120:9,15,21
125:16,19
126:25 127:2
128:22 130:11
130:19 131:8
131:17,24
132:6,9,13,17
132:20 133:1,4
133:8,18 134:1
134:14,24
135:8
**rule** 39:5 127:6
**rush** 135:19

───────
**S**
**sane** 80:25
**satisfy** 93:21
**saw** 128:16
**saying** 39:25
42:23 46:2,5

49:19 61:11
90:9 92:23 94:6
94:22 109:9
**says** 18:2 46:13
46:14 48:5,14
68:7 80:12
115:23 118:7
118:18 127:17
129:17 131:2
134:11
**scenario** 33:6
**schedule** 28:1
37:15,25 38:12
45:3,7
**scheduled** 27:9
38:5 40:10
56:22 57:7
129:19,24
130:4,6
**schedules** 64:21
80:10 111:3
**school** 4:15 5:7
**Schroth** 26:10,12
108:15,17
**Science** 4:16
**scratch** 27:7
**screen** 117:22
**screwed** 111:17
**se** 37:25 38:13
**second** 28:8 37:4
67:25 72:15
73:2 103:25
**Section** 46:13
130:22 131:8
131:14
**securities** 10:20
11:14
**see** 21:18 22:2
28:11,15,16
46:1,17,18
48:17,18 49:2
58:14 83:7,12
113:9 114:5
117:20,24
125:21 129:22

129:25 130:24
130:25 131:1
**seeing** 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
**seen** 50:17,22,23
83:9 114:18
126:18
**Seery** 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
**Seery's** 21:12,19
**semiannual**
14:22
**send** 42:23 68:7
**sending** 33:4,5,6
33:8 90:24
115:14
**sends** 80:2
**senior** 5:17 7:3
**sense** 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
**sensitive** 86:24
**sent** 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
**sentence** 46:14
48:13,21 50:8
50:16
**sentences** 127:25
**separate** 10:25
11:7 70:20
106:25 107:4
**Separately** 52:10
**separating** 79:23
**Series** 4:20

**service** 11:12
71:24
**services** 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
**set** 115:14 118:7
**settlement** 9:6
123:23
**seven** 75:14
123:23
**seven-figure**
113:23
**shape** 6:16
**shared** 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
**sheet** 120:13,20
**sheets** 80:6,8
**shocked** 73:22
**short** 6:12
**short-term** 86:7
**shorthand** 1:24
137:2,7,25
**shortly** 116:11
**show** 28:8 117:5
**showing** 44:4
45:20 53:19
76:20
**shows** 45:25
**side** 85:11 96:15
**sides** 43:2
**sign** 85:1
**signatures** 22:24
86:18
**signed** 84:22
**significance**
128:11
**significant** 12:2

12:10 45:21
**signing** 86:14
**signs** 80:5
**similar** 8:7 13:4
13:16 74:9
82:24 107:12
107:19
**single** 23:15
29:21 32:17
34:12 36:8
62:14 123:22
**sir** 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
**sister** 97:9
**sit** 89:11
**sitting** 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
**situation** 31:22
69:23 93:1
**situations** 31:23
32:3 34:5
**smart** 17:18 50:7
**SMU** 4:15,17
**solvency** 87:6
**solvent** 87:2,5
**somebody** 35:19
**somewhat** 128:20
**soon** 118:10
132:21
**sophisticated**
44:21
**sorry** 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
**sort** 53:6 97:8
102:23
**sought** 87:25
**sounds** 50:10
80:21 81:19
82:17
**source** 64:6
**speak** 81:13
**speaking** 30:4
40:16 77:22
108:18
**speaks** 50:15
**specific** 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
**specifically** 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
**specificity** 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
**specifics** 14:24
93:18
**specify** 93:7
**speculate** 15:4
29:2 32:11
73:25
**speculating**
28:25 41:11
44:3
**speculation** 29:1
29:3,6 83:6
113:19
**speed** 106:24
**spelled** 37:24
**split** 108:16
**spoke** 18:10,19
101:6,9
**spoken** 18:13,15
**spreadsheet**
54:14
**stake** 18:1
**stamp** 117:17
**standard** 84:4,6
86:9,9
**standpoint** 92:18
135:6
**STANG** 2:10
**start** 27:7 47:17
95:19 111:17
**started** 5:7 10:5
101:17 108:23
**starting** 5:6
**state** 1:23 4:4,19
51:12 114:10
138:1
**stated** 137:9
**statement** 26:7
119:14
**statements** 36:17
116:14,18,24
119:8,19,22
120:1
**STATES** 1:1
**step** 32:9 68:25

134:5,5
**Stinson** 2:17
95:23
**stood** 87:11
**Stoops** 7:23
**stop** 21:10 65:9
94:15 100:13
**street** 1:25 2:4
10:17 82:3
**strike** 23:6 32:19
33:15 37:10
52:16 54:22
63:25 67:4
120:15 125:16
**string** 118:4
127:5
**strong** 73:11
92:17
**structure** 14:8
30:6
**struggle** 64:11
128:15 131:13
**struggling** 45:2
50:6,7 88:25
99:25
**subject** 108:10
**Subscribed**
135:24
**subsequent** 96:4
96:7,23 102:9
102:12 103:2
116:17 119:10
119:13 120:1,7
**substance** 19:1
98:6,9
**substantially**
16:2
**substantive** 97:1
**sue** 82:11
**suggested** 55:1
**suggesting** 62:22
128:9
**Suite** 2:4,17
138:2
**sum** 113:24

**summary** 21:7
**supervision**
137:11
**support** 87:20
**supporting** 12:9
72:3
**suppose** 31:18
50:3 85:11
95:10
**sure** 5:7 6:2 19:4
20:1 26:6 27:21
31:23 37:22
44:7,8 47:19
49:18 51:13
55:21 58:8
61:11,25 64:3,3
65:11,14 66:19
74:24 85:12
95:12 97:24
99:10 100:22
103:6 106:15
125:9 127:4
128:25 129:1
135:15
**surely** 128:22
129:3
**surprised** 130:14
**suspect** 55:10
68:14 123:19
**suspend** 111:14
**switch** 65:8
**sworn** 1:19 4:2
137:4

——————
**T**
**take** 12:22 14:5
16:8 18:9 23:12
68:24 71:16
117:21 118:17
**taken** 1:20 87:14
137:7
**takes** 16:5 17:5,9
**talk** 12:14 18:12
21:21 54:3
98:15 122:14

**talked** 19:15,24
69:13 94:4
103:3
**talking** 27:12
32:16,20 54:1
88:15 98:19
102:13 103:2
117:16 121:5
122:6 127:6
**talks** 129:16
130:22
**tax** 73:7 107:6,6
107:19
**team** 6:5,15 10:5
11:3 25:14,22
32:13,16,19
35:16 43:6,9
57:1 60:16
61:14 62:6,14
62:15 64:17
73:20 84:2 85:9
85:17 101:11
108:9 109:7
115:8,11,12,13
**technical** 78:6
**technically** 4:20
36:23 37:12
**teeing** 26:6
**tell** 7:11 14:18
24:22 28:4 34:2
34:7 36:25 44:2
52:7 53:11
55:17 56:3
58:23 59:5,14
69:16 71:16
83:17 93:4
103:6 105:13
106:10 112:13
112:25 113:2
115:20 116:2,6
116:22 119:12
120:6,18 122:9
126:7,12 137:4
**telling** 56:14
58:14 68:15

**tells** 43:18 55:25
94:23
**temporarily**
76:12
**tend** 109:1
**term** 7:16 8:1 9:3
24:10 45:1
47:21 86:3
88:15 98:17
104:1,2,5,7,8
107:25 108:1
124:10,11,13
125:7,13,25
126:10,13
134:21,21
**terminology**
98:14
**terms** 6:19 9:23
10:11 18:13,15
19:23 22:20
26:6 35:16
43:14 61:4
92:11 93:4
107:14,19
**testified** 4:2
41:23 99:18
100:14 124:2
**testify** 16:15,19
**testimony** 35:24
62:9 79:12
98:16 100:22
100:23 137:9
**Texas** 1:2,23,25
4:19 81:22 82:1
82:9,16,21
135:25 138:1
**thank** 95:14 96:1
109:16,17
124:19 135:8
**thanks** 100:12
**Thedford** 23:2
**thereto** 137:21
**thing** 33:22 53:6
59:18 84:13
**things** 10:1 25:25

57:3 79:14
122:5
**think** 6:9 7:2
15:18 16:3
18:18 26:14
30:15 31:6,8,22
32:9 36:16,19
39:21 41:1,10
50:15 53:2
58:12,22 59:4
59:11 64:6 65:6
65:7,8 75:2,13
78:6 79:16
80:24 84:15
85:23 86:10,15
87:21 88:13
95:9 97:19
99:14 101:5,9
103:11 105:3
105:25 106:17
107:9,22 108:4
108:6 111:17
113:7,14,24
123:24
**thinking** 57:4
117:11 129:7
**Third** 2:10 73:6
**third-party**
10:16 11:12
**thousand** 92:6
**threatened** 5:2
**three** 5:9 6:12
97:12 102:11
124:10,11,13
124:24 125:2
**throw** 104:1
**Thursday** 19:14
**Tim** 106:17
**time** 4:24 5:15
6:21,23 7:9,11
7:12,15 8:10,14
8:24 10:2,4
12:6,10 16:14
24:6,8 25:1
28:21 29:25

David Klos - October 27, 2021

36:23 37:12,18
39:11 41:4,12
42:5,12 43:22
43:22 44:19
47:13 49:4
52:14 53:2,8,14
53:15 54:21
56:16 59:23
60:2,10 62:5
63:2 65:12
66:11 74:10,20
79:4 80:15
83:23 84:12
86:23 89:10,16
92:10 93:5
95:12 101:13
108:24,25
109:6,16
111:12 112:14
113:17 116:2
122:18 123:18
129:2,7 134:12
135:1 137:8
**timely** 44:9 51:15
51:17
**times** 7:5 32:15
61:20 63:8
76:19 92:6
**timing** 15:24
**title** 5:15,16 6:22
7:1 10:9,11
12:16 13:7
26:14
**titles** 10:11 78:18
**today** 5:21 14:3
15:12 16:3,13
16:16,19,24
17:3,14 20:5
42:14 44:20
57:5 63:25 65:6
95:25 96:11
102:18 103:6
104:15 131:24
133:11,19
**today's** 47:6

**told** 39:21 42:14
43:4 52:11,11
52:19 53:12
55:9 60:21
61:23 62:13,14
62:15 68:12
69:9 70:9 85:19
91:8 95:1 97:25
98:2 100:25
103:7 118:16
118:23 122:11
122:23
**tomorrow** 79:11
132:22
**top** 107:9 127:7
**topic** 96:2 98:3
**topics** 20:11
103:25 106:23
**total** 116:15
**totaling** 119:24
**touched** 98:16
**track** 111:2 129:1
**tracker** 118:10
**tracking** 39:15
**transaction**
34:13 70:21
76:9 115:21
116:7 118:24
**transcript** 135:14
135:17 137:13
**transfer** 29:9
30:2 31:8,20
32:8 34:19 36:1
40:22 41:16
69:2,10 76:15
77:4,18 85:16
90:12 91:22,23
92:9 93:3 115:8
**transferred**
30:20 75:24
77:10 78:18
79:13
**transferring** 34:8
35:11 39:22
42:4 75:9

**transfers** 28:9,18
28:19,22 30:24
32:22 35:4,10
38:3 42:9 94:7
**transitioned**
109:1,6
**transparent**
115:17
**Treasurer**
121:11
**treasury** 9:6
107:6
**treated** 35:5
**trigger** 104:2,10
104:21
**triggered** 104:11
104:17
**triggers** 14:25
107:17
**trouble** 62:19
**true** 29:6 88:9
135:24
**trust** 15:16 17:10
17:15 18:6
**trusts** 26:16
65:23 108:21
**truth** 137:5,5,5
**truthful** 100:22
**truthfully** 16:16
16:19
**try** 62:23 106:24
**trying** 17:18
27:21 30:23
50:6 67:14 98:3
100:11 104:22
130:20 132:9
133:8
**turn** 114:15
123:25
**turned** 76:4
81:15
**two** 9:7 15:12
29:14 36:20
45:13 65:10
66:20 77:12

83:8 85:1 86:12
87:24 94:19
95:10 105:4,25
106:24 107:24
119:24 121:18
122:12 127:25
129:4 134:22
**two-paragraph**
84:12
**TX** 2:4,18 138:2
**type** 98:12
**types** 13:4 78:13
84:1 107:12,15
107:17 114:20
**typewriting**
137:10
**typical** 84:7

---

**U**

**Uh-huh** 7:18
13:23 47:7
75:11 127:9
**ultimate** 16:12
17:8,10
**ultimately** 11:4
39:19 64:18
73:9
**um** 63:13
**unable** 89:3,14
**undergrad** 4:15
**Undergraduate**
4:14
**understand**
14:14 15:19
17:14 18:19
30:23 47:4 51:8
61:11 62:8 66:4
67:25 68:2
88:25 96:17
97:24 98:8
106:3 118:12
118:15 124:14
132:1
**understanding**
19:11 20:11,13

37:17 48:19
49:18 51:12,14
54:17,22,23
56:21 61:12,22
70:18 72:7,10
75:7 79:4 87:1
87:9 91:11 97:6
98:23 101:12
101:18,19
102:2 112:19
121:9 124:3,15
133:11,20,25
134:2,6
**understood** 52:2
63:12 95:4
102:25
**unfair** 34:17
**unfamiliar** 80:21
**UNITED** 1:1
**unpaid** 46:15,24
47:2,20 48:15
48:15 49:4
131:15,16
**unscheduled**
38:23 64:7,23
75:18,20
**upcoming** 25:25
**updated** 54:15
**upfront** 85:11
**use** 14:19 56:25
70:23 81:17
108:20
**usually** 31:15
33:16
**utilized** 71:17

---

**V**

**valid** 39:3
**valuation** 5:17,19
5:24 6:2,15
9:14 10:7,9,14
10:15,24 11:3,7
11:12 71:11,15
71:17,25 72:1
72:13,14,21

David Klos - October 27, 2021

107:6
valuations 11:4
value 11:14
  71:16
valuing 10:19
variety 107:16
various 25:23
  79:14
vary 17:12
verbatim 94:17
verbiage 132:25
verify 27:24
versus 87:12
videoconference
  1:19 2:6,13,19
videotape 21:18
view 131:10
virtually 44:5
vis-a-vis 15:16
voluntary 37:24
vs 1:8

**W**

want 16:24 44:10
  54:4 63:8 90:6
  95:18 96:19
  98:15 100:10
  101:14 104:1
  117:9 134:19
  135:13,16
wanted 24:17
  34:3 96:2
wants 90:16,20
  90:22
wasn't 23:24
  24:1 31:20
  37:18 38:5 50:4
  51:11,15,16
  53:4 57:1,3
  59:20 60:15
  62:6 70:17
  72:19 73:3,3
  75:2 101:11
  103:17 108:12
  129:10

Waterhouse 8:17
  11:1 13:25 20:9
  30:13,14,19
  39:25 41:14
  42:3,7 43:24
  52:7,11,18,24
  53:11 54:15,19
  54:25 55:17,25
  60:20 61:23
  62:9 65:3 69:9
  77:17 78:2,20
  84:23 85:1,19
  86:14 91:8 94:6
  100:25 103:3
  103:13 115:5
  115:25 116:2
  116:22 118:19
  118:23 121:6
  122:9 124:4,8
  125:11,22
  126:15 127:13
  127:16
Waterhouse's
  21:1,19 127:10
waters 43:14
way 6:16 20:12
  22:22 31:15
  34:3 35:17,22
  48:24 54:1 63:8
  69:6 72:15,17
  76:10 82:19
  87:18 92:1,1,1
  92:2 93:24 94:6
  95:3 97:5
  102:23 114:10
  121:5 137:19
ways 38:21
we'll 20:1 54:3
  125:7 132:17
  132:21
we're 12:8 27:12
  32:15 43:11,12
  64:1 65:8,9,10
  65:12 79:22
  80:4 117:17,18

121:5 122:6
we've 19:24
  75:13 78:12
wearing 43:15
week 36:20 83:7
weekly 25:24
  43:5,24 63:19
  129:8,10
weeks 59:5
welcome 117:19
  127:7
went 4:14 58:17
  81:17 85:14
  101:18
weren't 61:21
  80:16 88:7
  97:15 101:20
whatsoever
  63:20
wherewithal
  93:24
wind 16:5 17:5
winding 15:2,22
wire 59:17 61:19
  118:7
withdrawn 91:19
  110:11 111:15
  113:1,7,8
  124:10,12
within-entitled
  137:6
witness 1:19 9:2
  11:19 12:1 13:2
  14:14 19:12
  21:4 22:1,10,17
  23:12 25:5,13
  27:6 29:12 33:2
  34:1,23 35:15
  36:6 37:22
  38:19 39:9 40:5
  40:16 41:18,21
  43:1,21 44:18
  45:1,11,19
  46:23 48:10,24
  49:17 50:3,15

51:7 52:23
  53:25 54:9 55:5
  55:14,21 56:12
  57:10 60:14
  61:3 63:7 64:11
  65:21 66:2,9,17
  69:22 71:5,14
  71:22 76:21
  77:22 78:6,25
  79:7,21 81:4,13
  81:25 82:15
  83:15 85:22
  87:5 88:20 89:7
  90:16 91:5,11
  93:15 94:10
  95:15 99:6,25
  100:7,13,21
  101:5 102:2,17
  103:17 104:20
  108:4 109:17
  111:10 112:5
  112:11 113:21
  117:1 119:10
  119:17 120:10
  120:22 128:15
  130:9,18 131:7
  131:13,23
  133:16,24
  134:10,19
  135:4,9 137:3
  137:10
word 56:25
  133:11,20
words 10:24 36:7
  52:16,24 94:19
work 5:5 10:19
worked 5:8 11:22
  62:4
working 5:7,11
  12:5
world 108:23
  116:3,7 118:22
  119:2,12 120:6
  120:18
worth 34:10

worthiness 90:11
wouldn't 25:13
  38:10 43:8
  56:22,23 60:16
  64:8,20 77:24
  86:24 87:17
  99:15
write 128:3,5
writes 127:13
writing 103:21
  103:24 113:9
  125:22 126:18
written 35:2,6
  66:6
wrong 55:1 82:18
  82:22 88:22
  89:19
wrote 67:21
  70:12
www.dickman...
  138:4

**X**

**Y**

y'all 95:2
Yang 106:15
yeah 6:23 8:2
  14:21 15:23
  19:17 23:2
  29:12,20 35:15
  37:22 43:1
  55:14 56:24
  59:2 60:14 61:3
  63:7,8,12,18
  66:17 67:9 71:5
  83:24 89:7
  91:11 94:10
  96:10 98:20
  99:25 101:5
  102:2 124:15
  125:1 135:19
year 6:1 9:25
  29:22 49:21
  111:1,8,12,13

David Klos - October 27, 2021

113:4 123:17
126:5,15,22
**years** 5:9 6:17
15:12 24:10,17
30:18 32:21
33:20 34:17
39:14 48:7
65:17 66:3
69:18 94:20
95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

**Z**

**zero** 46:8 49:6
80:1
**ZIEHL** 2:10

**0**

**0** 36:8 69:4
**08** 4:24
**09** 4:24

**1**

**1** 8:11 24:20,23
66:24 67:2,7
80:3 113:10
126:8,12
137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
33:20 34:10,17
69:18 95:3
123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
36:12 40:20
42:17 44:13,22
48:12 49:1
58:25 59:23
60:2,23 61:18
64:2,5
**15** 61:7
**15(c)** 80:9 121:4
127:6 128:17
**16** 8:9 31:18
127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
49:2
**1982** 4:10

**2**

**2** 66:24 67:2,7
73:25 76:3 80:4
85:23 87:9,13
92:8 114:23
115:9
**2.03-** 46:9
**2.1** 28:14 45:25
46:3 49:1,8
130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
70:7,19,23 72:7
73:18 75:22
76:3 77:10,18
78:9 85:18,20
91:22 92:8,15
115:8 116:3,23
**2.4-** 70:21 73:23
77:4 85:24
86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
6:3 29:24,25
122:17
**2010** 6:9 106:13
123:18
**2011** 6:10,21
106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
23:7 24:8,18
88:22 105:12
124:25
**2018** 116:14
119:14 120:2
**2019** 8:11,14 9:10
9:13 10:6 11:10
11:16,21 27:14
28:9 29:8,17,21
29:25 31:18
35:8 36:15,22
40:21 41:1,13
42:8,16,16
44:13,13 45:23
45:24 65:13,15
66:11 75:14
78:20 80:6,19
87:2,9,13 88:9
88:14 89:2,17
91:21 92:8 93:2
93:11 105:13
110:20 111:6
111:12,21
112:2,6,8
114:23 115:9
121:7
**2020** 7:13,22
24:20,24 51:10
51:15,22 53:18
54:24 56:17,22
57:6,13,17,22
60:20 61:21
63:19 98:18,24
99:19 100:15
101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
13:24 58:25
59:23 60:2 61:8
87:16 88:1
112:22,25
113:3,10,16
126:8,13 128:2
129:4 136:1
137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

**3**

**3** 46:13 50:8
67:17 68:4
74:18,22 76:5
82:24 83:10,20
93:2,11 114:4,7
114:10,22
118:1,13
129:15 131:8
131:14
**30** 24:10,17
130:22
**30-year** 23:15
24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

**4**

**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

**5**

**5** 74:7,8,24 75:4
75:23 77:4,11
77:18 78:3
79:22 80:2
81:18 82:25
85:4 86:13
91:22 93:3
114:16 118:8
118:13,24
119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

**6**

**6** 4:10 127:11
128:22 129:3
**6/30** 122:2

**160**

**David Klos - October 27, 2021**

| | | | | |
|---|---|---|---|---|
| **600,000** 76:6,7<br>**630,000** 28:14<br>**66,000** 46:7 49:4<br>   49:5,7 | | | | |
| **7** | | | | |
| **7** 58:11,15<br>**7.4** 75:9 78:22<br>   79:12 89:2<br>   90:17,20,22,24<br>   119:25 122:5<br>**7.4-** 89:19 91:13<br>**75** 18:1<br>**750,000** 28:13<br>   37:6<br>**75201** 2:4<br>**75206** 138:2<br>**75219** 2:18<br>**777** 2:17<br>**780** 2:10 | | | | |
| **8** | | | | |
| **80** 15:25<br>**800** 138:3<br>**855-5100** 138:3 | | | | |
| **9** | | | | |
| **9** 19:5<br>**95** 3:4 | | | | |